UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 13-CIV-80928 – RYSKAMP/HOPKINS

RICHARD COTROMANO, BETHANY
COTROMANO, FRANK DECARLO
PAULETTE DECARLO,  GREGORY
DUNSFORD, JENNIFER DUNSFORD,
JOYCE FEATHERSTON, BILL
FEATHERSTON, ROBERT T. NEWFIELD
and TRACY NEWFIELD, all on behalf of
themselves and all others similarly situated

    Plaintiffs

v s.

UNITED TECHNOLOGIES
CORPORATION, Pratt & Whitney Group,
A Connecticut Corporation, and PALM
BEACH AGGREGATES, LLC, a Florida
Corporation,
    Defendants.

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, RICHARD COTROMANO, BETHANY COTROMANO, FRANK DeCARLO,

PAULETTE DeCARLO, GREGORY DUNSFORD, JENNIFER DUNSFORD, JOYCE

FEATHERSTON, ROBERT T. NEWFIELD and TRACY NEWFIELD, all on behalf of

themselves and all others similarly situated, sue Defendants United Technologies Corporation,

Pratt & Whitney Group, and Palm Beach Aggregates, Inc., a Florida Corporation, for damages as

prayed for specifically below.

## JURISDICTION and VENUE

1. The action was filed in the Circuit Court of the Fifteenth Judicial Circuit of

Florida, in And for Palm Beach County on August 16, 2013.

1

2.      The Defendant Pratt Whitney removed the case; the Plaintiffs moved for Remand.

3.      The Court found that jurisdiction was based upon the allegations of a nuclear incident and the removal provisions of Price-Anderson found at 42 USC 2210(n)(2).

4.      The class members sustained a stigma-wide value loss to property located within the Acreage portion of the L8 basin of western Palm Beach County, Florida as a result of the Defendants' release of contaminants into the L8 basin including heavy metals, technologically enhanced naturally occurring radioactive materials, radioactive by-product material, nuclear source material, and semi-volatile organic hydrocarbons—contaminants which persist in the community to the point of nuisance and damage and which were discovered as the result of investigations into the Acreage Pediatric Brain Tumor Cluster.

5.      RICHARD COTROMANO and BETHANY COTROMANO reside in Palm Beach County, Florida. Together as husband and wife, they owned a residence on 76th Road North in the Acreage, an unincorporated residential community in Palm Beach County. They sold it through a short sale after the Florida Department of Health officially declared their daughter to be a member of a pediatric brain tumor cluster in 2010.

6.      FRANK DeCARLO and PAULETTE DeCARLO reside in Palm Beach County, Florida. Together as husband and wife, they own a residence on 80th Lane North in the Acreage, an unincorporated residential community in Palm Beach County. The Florida Department of Health officially declared their daughter to be a member of a pediatric brain tumor cluster in 2010.

7.      JOYCE and BILL FEATHERSTON reside in Palm Beach County, Florida. Together as husband and wife, they own a residence on 80th Lane North in the Acreage, an unincorporated residential community in Palm Beach County. The Florida Department of Health

officially declared Joseph Michael Baratta, Joyce's deceased son, to be a member of a pediatric brain tumor cluster in 2010. The property is currently subject to a foreclosure action. The Featherstons were unable to enter Deed in Lieu process because of contaminants found in the Department of Environmental Protection investigation.

8.     GREGORY DUNSFORD and JENNIFER DUNSFORD reside in Tennessee. Together as husband and wife, they owned a residence on 85th Street North in the Acreage, an unincorporated residential community in Palm Beach County. They sold it through a short sale after the Florida Department of Health officially declared their son to be a member of a pediatric brain tumor cluster in 2010.

9.     ROBERT T. NEWFIELD and TRACY NEWFIELD reside in Palm Beach County, Florida. Together as husband and wife, they own a residence on Banyan Boulevard in the Acreage, an unincorporated residential community in Palm Beach County. The Florida Department of Health officially declared their daughter to be member of a pediatric brain tumor cluster in 2010.

10.     PRATT & WHITNEY is a division of UNITED TECHNOLOGIES CORPORATION, a Connecticut corporation that possesses, maintains, and runs an engineering facility in northwest Palm Beach County adjacent to the Corbett Wildlife area. (Hereinafter "Pratt Whitney"). The Defendant is United Technologies Corporation.

11.     PALM BEACH AGGREGATES, LLC is a Florida Corporation operating mining and associated interests and owning land in Palm Beach County. (Hereinafter "Aggregates"). Aggregates owned, and then for some time leased, the land that is currently used as an aquifer impoundment by the South Florida Water Management District - the L8 reservoir.

## THE CLASS REPRESENTATIVES

12.     As stated in paragraphs 6-10 above, each of the named Plaintiffs is or has been an Acreage property owner and is a parent or stepparent of a victim of the cancer cluster.

13.     Complaints addressing the injuries to those children have been separately filed. The remedies sought herein are limited to compensation for the diminution in value of property caused as a consequence of the stigma arising from the pollution discovered in the investigations of the cancer cluster designation and do not include claims for physical injuries suffered by any member of the putative class.

14.     The Class sought to be represented is comprised of every current or former Acreage area landowner who owns or owned an Acreage property at any time since August 24, 2009. That definition has not changed since the filing of the action.

15.     The named Plaintiffs are well aware of and are willing and able to accept the responsibility to represent the members of the class.

16.     Each of these representatives has owned property in the Acreage during the time of the public disclosure of the Acreage cancer cluster and has sustained a loss as a consequence of the existence of the cancer cluster.

17.     The pollution on and around their properties, discovered in the investigations of the brain tumor cluster, is a pollution which has affected the property to such an extent that appropriate use of the property has been loss: class members are obliged either to sell the property at diminished value or to remain dwelling at properties because no one will buy them.

## CLASS REPRESENTATION ALLEGATIONS

18.     This action meets the requirements of Federal Rule of Civil Procedure 23.

19.     The Pleading requirements set forth in Rule 23(a) are as follows:

4

i. NUMEROSITY: The members of the class include all past and current property owners of residential lots (including vacant and improved properties) in the Acreage within the time frame of August 2009 to the present. The designated cancer cluster area consists of 850 Census blocks, which is depicted on Exhibit "A" at page 23. There are 15,663 parcels in the Acreage, many of which remain vacant, and all of which have been subject to diminution in value. The total of class members for this area is 27,767. In other words, since August 2009 the 15,663 parcels have been owned by 27,767 persons (including entities). Since August 2009 there have been 4919 transfers of parcels. The population in the Acreage is around 30,000 people or less. More than sixty-six percent of the class members are citizens of Florida.

ii. COMMON Questions of Law or Fact

    a. Does the presence of a contamination of a type associated with an increased risk of brain tumors together with the declaration of a "brain tumor cluster" cause property value loss regardless of whether the contamination caused the increased incidence of brain tumors?

    b. Did the Defendants cause the presence of contaminants in the Acreage that are associated with an increased risk of brain tumor etymology?

    c. Did the environmental contamination caused by the Defendants in fact increase the incidence of brain tumors suffered by Acreage residents?

    d. Did the resulting cancer cluster cause a diminution in property values within the Acreage?

    e. What is the geographic limitation of the contamination?

5

    f.    What is the geographic and temporal limitation of the stigma?

    g.    What is the magnitude of value loss caused by the stigma?

    h.    What damages in addition to the diminution in property values are recoverable such as punitive damages and prejudgment interest?

    i.    Did the Defendants act with reckless disregard?

    j.    Did the releases of Price-Anderson regulated radioactive or source material violate applicable Federal regulations?

    k.    Did the releases of other contaminants violate applicable State regulations?

    l.    To what extent is the alleged nuclear incident indemnified by the United States?

    m.    To what extent do the acts relating to the alleged nuclear incident constitute reckless disregard and warrant punitive damages?

iii.    TYPICALITY OF CLAIMS: the claim of the named Plaintiffs for the recovery of damages caused by a uniform stigma which was in-turn caused by the Defendants' pollutive acts is typical of the claims shared by all persons who have owned property in the Acreage at any time since the public disclosure of the increased incidence of cancer in the Acreage.

iv.    FAIR REPRESENTATIVE: The representative party can fairly and adequately protect and represent the interests of each member of the class. There are, in fact, no better representatives than the families who suffered the primary damages of the cancer cluster, the affliction of a brain tumor. The counsel representing these representatives have prosecuted class actions in the past and have been

investigating the cluster on behalf of the victims since 2009, before the official DOH declaration.

20. The claim is maintainable as a class claim pursuant to Rule 23 (1)(B): the prosecution of separate claims for diminution in value by individual members of the class would as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or substantially impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests. Alternatively, even if separate actions for diminution in value were maintainable, the claim is maintainable as a class claim pursuant to Rule 23 (b)(3): the questions of law or fact common to the claim or defense of the representative party and the claim or defense of each member of the class predominate over any question of law or fact affecting only individual members of the class, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy.

## FACTUAL ALLEGATIONS

### The Brain Tumor Cancer Cluster

21. In 2009, the Department of Health (DOH) declared that the level of pediatric brain tumors diagnosed in the Acreage was significantly escalated for the years 2005-2007.

22. In 2010, the Center for Disease Control (CDC) confirmed the escalation and the 2008 pediatric diagnoses were added to the cluster.

23. "The Acreage" area as designated by that report is a well-water reliant community in the center of the L8 basin, which is influenced by the surface and groundwater at the Pratt Whitney campus from the North and by the L8 reservoir structure built by the Aggregates upon the cessation of its quarry operations in certain rock pits.

7

24.     The report, attached as Exhibit "A", compared the number of cancers diagnosed in the Acreage (the observed incidence) with the population-weighted number of cancers diagnosed in the County and the State (the expected cancer incidence.) The August 2008 report stated that cancer was generally elevated throughout the Acreage and that pediatric brain tumors were significantly elevated to a level of more than three times the expected rate of occurrence.

25.     Charts within the DOH report that the brain cancer incidence among the entire Acreage population as a whole was sharply rising, whereas that same trend was not occurring in the county or the state.

26.     Each of the named representatives is a parent or step-parent of one of the pediatric cases included in the designated cluster.

27.     The cancer cluster designation was based only on pediatric brain tumors. The state stopped looking at diagnoses of brain tumors made in adults in 2007, although it appeared in the report that the entire population of the Acreage was experiencing a steady, sharp increase of cases.

28.     According to self-reported data from the community, the 2008-2010 incidences of brain tumors for the entire Acreage population is above 30. From 1997-2007, the highest number of cases that should be expected in any three year period based on both state and county comparisons is 5.1. Based on the self-reported data the pediatric cancer cluster declared by the State for the years 2004-2008 would be expanded to a **general** brain cancer cluster from 2004-2010.

29.     The fact is that brain cancers are significantly escalated in the Acreage.

30.     The study notes that ionizing radiation is the primary environmental contaminant associated with an increased incidence of brain tumors.

8

31.    Other studies have detected the presence of heavy metals including lead and cadmium in brain tumor tissue.

## Property Value Loss and Loss of Use

32.    When the cancer cluster was declared in 2009, property values in the Acreage declined in direct response to the declaration.

33.    They continued to decline after the Department of Health investigation ceased without finding a cause of the cluster and despite the baseless assertion by the Department of Environmental Protection that that the "Acreage is a safe place to live and no risk factors were found associated to pediatric brain cancer."

34.    At the same time that the Department of Health (DOH) and the Department of Environmental Protection (DEP) announced this failure to find any source of the increased incidence of pediatric brain tumors, the agencies also promised to do the following: "Our epidemiologists will continue to monitor cancer rates in the area for any indication that another increase is occurring. In the meantime, the Department of Health will continue to work with the families whose children have been affected by cancer."

35.    This information remains published on the web at

http://www.pbchd.com/pdfs/newsletters/acreage update/the acreage neighborhood update-11-05-2010.pdf.

36.    Since that statement was released in November 2010, there has been no publication of the numbers of brain tumors diagnosed amongst adults. The agencies have refused to communicate with the families whose children have been affected by cancer or their counsel; in fact, the Department of Health has ignored requests for insight on testing that has

been performed since that time—testing the families requested that the DOH do but refused to do.

37.    The failed state study into the cause has not diminished or nullified the value loss caused by the pollution described herein; but the premature conclusion was clearly based on the desire to mitigate that damage rather than on any sound methodology.

### FAILED STATE STUDY: Incomplete Data

38.    Despite the fact that the "primary environmental contaminant" associated with brain tumors etymology is ionizing radiation, neither Department ever performed any testing of the residential water aquifer for gamma emitting radioactive materials.

39.    The DEP tested the water at the case and control homes only one time including a sampling survey of 59 private wells in August; in that survey it noted an elevated level of gross alpha radiation at several homes—an indication that more specific testing for gamma radionuclides should be done. Radioactive materials can emit either alpha, beta, or gamma radiation. Gamma radiation is the most dangerous.

40.    The fact sheet released described above in paragraph 33-35 incorrectly stated that "After testing the groundwater, soil and gamma radiation levels in the Acreage Study area, the investigation affirmed that the community is safe for residents and visitors." In fact, neither the groundwater nor the surface water was ever tested by any state agency for the presence of gamma emitting radionuclides. The lone gamma radiation spectroscopy done on groundwater within the Acreage has been performed by the various parties in this lawsuit and completely ignored by the state agency.

41.    Neither Department ever performed any testing of any sort on the surface waters that recharge the surficial aquifer in the L8 basin, which charges the Acreage surficial aquifer.

42.     The one-time testing of the water sources at the case homes (referred to in paragraph 39 above) revealed the presence of some heavy metals but neither department ever did any testing to determine where those metals came from so there was no way for them to rule out whether those low levels in fact exceeded regulatory levels at times prior to August 2009 (when the victims would have been exposed) and no way for them to determine if the levels would again increase.

43.     Certain volatile organic compounds including benzopyrene and metals including arsenic were found in levels that exceeded the Department of Environmental Protection's regulated target levels for residential soil clean-up at a number of the soil samples collected at the case homes.

44.     Residents were advised that although these levels exceeded clean-up standards, that neither department could offer guidance as to how to clean-up of the materials because they had not endeavored to find the source.

45.     The Plaintiffs' counsel in fact did test the water for gamma emitting radionuclides and sent them to the DOH as explained below, but the Department of Health Bureau of Radiation Control has no record of assessing either those test results or the soil sampling for gamma products that was performed by the DEP and a contract lab.

### *FAILED STATE STUDY: Failure to Assess Local Polluters*

46.     Both Defendants have conducted operations which various state agencies were aware had released contaminants into the L8 basin, including the types of contaminants found within the state's investigation and the types associated with brain tumors and including the metals found by the DEP in the Acreage water.

47.     The South Florida Water Management District (SFWMD) had noted and curtailed operations of the L8 reservoir, which was constructed by the Palm Beach Aggregates out of the Aggregates' former rock pits due to known concerns about increases in gross alpha radiation.

48.     The increases were caused by the Aggregates' dredging operations.

49.     Pratt Whitney has released and attempted to remediate releases of radioactive materials, heavy metals and volatile organic pollutants at forty-seven (47) sites in its campus.

50.     Financial Statements for United Technologies have stated that the company has identified 710 sites throughout the world for which the Defendant may have had some liability for damages caused by environmental contamination. Of those, it has resolved for the liability for 322; the Palm Beach County Campus is not one of those sites for which Pratt Whitney has resolved liability.

51.     Pratt Whitney has been obligated to institute "corrective measures" at forty-seven known unit-sites on its Palm Beach County campus, which spans over five miles across the top of the L8 Basin in a triangular shape measuring three miles from the heart of the Corbett Wildlife management area to Beeline Highway, three miles down to the South east along beeline highway and then proceeding for over two (2) miles to the point of origin in the Corbett Wildlife Management Area. Its total land mass area includes over 7000 acres.

52.     The Corbett Wildlife Management Area then spans over five (5) miles between the Acreage and the Pratt Whitney campus main canal; the area is a large swamp-based wilderness area that drains to the L8 basin water structures including the Acreage ITID impoundment, the Acreage canals structures, and the L8 reservoir.

53.     In at least one instance the Department of Environmental Protection was aware that Pratt Whitney had neglected several drums of potentially hazardous materials in the Corbett area, which was reported by Corbett Wildlife Management Area to the DEP.

54.     Because of concerns that the community had regarding Pratt Whitney's history of regulated clean-up, the study issued a fact report regarding Pratt Whitney from the Department of Environmental Protection.

55.     The fact sheet noted that Pratt Whitney is six (6) miles away from the Acreage and contains 47 known sites which have been subject to corrective action. It lists the contaminants which continue to be monitored as part of the cleanup process, which include several associated with brain tumors including the heavy metals and semi-volatiles found in the Department of Health's investigation.

56.     The report sheet noted that "While there has been increased interest in the cleanup of contamination at this site in Palm Beach County, DEP does not see any direct relationship between this site and The Acreage which is over five miles away."

57.     That fact sheet fails to note that the investigation and clean-up performed by Pratt Whitney has been the subject of criticism by groups including but not limited to those whose reviews were in fact sought out by the DEP when reviewing Pratt Whitney's proferred risk assessments including The University of Florida's Center for Environmental and Human Toxicology as well as the United States Department of The Interior's Geological Survey (USGS).

58.     The flaws noted by those reviewers and by the Environmental Protection Agency include those aspects of the RCRA investigation that were relied upon in the DEP's summary "all clear" fact sheet release regarding Pratt Whitney's possible relation to the Acreage study.

13

59.     Other than citing to the fact that it has monitored the clean-up of the site performed by Pratt Whitney and noting the distance of the site from the community, there was no other attempt to allay concerns about the site.

60.     The fact sheet fails to note remediation of nuclear materials performed by Pratt Whitney after some years of illegal mixed-media dumping and does not list the radionuclides which were cleaned up in its list of known contaminants.

61.     In fact, the Department of Health was aware that in 1986, certain uranium nuclides were detected in groundwater test wells located in a metal scrap yard where Pratt Whitney illegally disposed of thoriated scrap metal. The concern was that these levels, under forty pcu/L, were far and above the levels for other nearby test wells.

62.     In 1986, this concern was cursorily addressed by the statement that these radionuclides could not be present as a result of the **known** thoriated-nickel scrap dumping because the particular decay products were unassociated with that particular product known to be illegally discarded.

63.     It was determined that the increased uranium in the test wells must be attributed to natural background levels—background levels that somehow escaped the nearby comparable wells referenced in the initial assessment of the concern.

64.     The likelihood that some other materials in addition to the thoriated-scrap metal had been abandoned to the elements and the flooded scrapyard was ignored by the Department of Health's Radiation Bureau in 1986.

65.     The elevated uranium levels in Pratt Whitney test wells was also not re-assessed in 2013 when these families presented the DOH with test results including that uranium was

14

being detected in their wells at small amounts while gamma emitting thorium decay products were being found in the THOUSANDS of picocuries per liter in their residential water supply.

66.     In fact, until Pratt Whitney afforded its license-numbers in the remand briefing in this case, the fact that uranium levels of concern were ever detected at Pratt Whitney and communicated to the Department of Health was not disclosed by the Department of Health.

67.     The failure to address that clean-up within the state's investigation is particularly abhorrent because within the extremely limited amount of testing done by the investigation, the Department of Environmental protection noted an increased presence of gross alpha radiation at certain case homes.

### *FAILED STATE STUDY*: Biased Influence:
### Unwillingness to find an imminent hazard

68.     The Acreage is part of an unincorporated area of Palm Beach County zoned for mixed use including residential dwelling wherein building permits have been issued and the area is reliant upon well water.

69.     As such, the areas roads, drainage and other such structures are maintained by an improvement district referred to as the Indian Trail Improvement District.

70.     Due to the circumstances described above in paragraph 68, if an "imminent health hazard" were to be determined to exist as a result of the community's reliance on well water, the County would be obligated first to subsidize the provision of treated water for the community and to then investigate any potential responsible party in order to provide recovery of such funds.

71.     Although the Palm Beach County Water District had just completed implementing a water main from the south of the Acreage up to a Mecca Farms distribution pump-house site through the Acreage community thoroughfare (Seminole-Pratt Whitney Road),

15

the County would have faced eight hundred millions ($800,000,000.00) in costs if it had to incorporate the community by residential hook-up lines. It had reason to determine that cost in the past.

72.     The Acreage community allowed for the building of that water line, though it remains unusable by most residents because there are no residential lines.

73.     By 2009, Palm Beach County was well aware that the water well field that had been used by Pratt Whitney since 1960 and then abandoned, was not viable because the County abandoned negotiations to purchase the well fields and existing utility structure when numerous environmental site assessments informed the County that the parcel was too tainted and the wells too at risk for contamination from both regulated and unregulated existing hazards.

74.     In fact, by 2006, the County received millions of dollars from the Beeline Community Development District, funded by Pratt Whitney, in order to hook the plant and property up to the Mecca distribution site.

75.     In 2005, the County agreed to provide clean, county treated potable water to the schools and parks in the Acreage.

76.     In 2005, the neighboring Village of Royal Palm Beach also agreed to be hooked up to County water, an agreement through which they abandoned their water wells (which had tapped the same L8 basin aquifer that the Acreage, the Aggregates, Corbett, and Pratt Whitney all once shared.) The County declined the opportunity to purchase that well field.

77.     Essentially, by the 2010 Cancer Cluster designation, the lone communities that would continue to rely on the aquifer within the L8 basin were the Acreage (with individual wells reliant residences) Loxahatchee Groves (with individual wells reliant residences) and

Seminole Water Control District, which treated water from its own well field for use in agricultural settings.

78.     The Seminole water treatment plant included reverse osmosis to remove radionuclides.

## FAILED STATE STUDY: Biased Influence

79.     Michelle Damone and county officials determined to create a community based task force that would communicate on behalf of the Acreage with the State agencies as they investigated the cluster.

80.     From the onset, it appears that Damone was intent upon influencing the government agencies to rescind the cluster designation.

81.     Originally termed the "Governor's Task Force" the board was to include people hand-picked by Damone to speak with the state agencies on behalf of the community. When faced with criticism or question regarding her decision to cherry-pick group members, her response was "I just don't care. This is a serious issue." She formally refused to invite any guest speaker associated with "the Erin Brokavich law firm" because they may have been biased and announced that she would be certain all persons would be vetted and backgrounds disclosed.

82.     Prior to that time, the individual's speaking with the state agencies were the families whose children that had brain tumors and their law firms, including as it happens the law firm associated with Erin Brokavich and this law firm.

83.     Damone's original selection of board members included the following: one parent of a pediatric cluster victim, one former Pratt Whitney engineer, several realtors, a legal assistant of unknown affiliation, and the environmental consulting engineer of an incoming developer.

84.     The former Pratt Whitney Engineer, Andrew Narcus, doggedly pursued Damone to get the group started and requested particularly that she tell the governor's office, with whom she was setting up the task force, that he had a lot of insight on Pratt Whitney.

85.     Pratt Whitney deliberately influenced the premature and inconclusive conclusion of the state investigation through Narcus, who orchestrated and sat on the Acreage Focus Group for months without revealing his work history to the group until it was uncovered by a member of the community who posted Pratt Whitney owned turbine related patents that listed him as inventor.

86.     The Governor's office, through the head of the Department of Health operating under then governor Charlie Christ, insisted that Damone appoint additional families to the board and advised that if the board were to be termed the "governor's task force" the board would be required to go through disclosure, including provisions of Florida's Sunshine laws, which would make all communications of the group members public records and might require election and/or ratification.

87.     Damone, who at that time appears to only have been communicating with Andrew Narcus and County officials about her conversations with Tallahassee, determined to label the group the Acreage Focus Group and circumvented election and disclosure.

88.     She did ask two separate parents to be group members, Tracy Newfield and William "Bill" Featherston.

89.     Before the first meeting, Andrew Narcus and Damone devised a mission statement to set the group on its start; this was done through emails not disclosed with the group. When asked by a board member whether emails would be subject to Sunshine laws, Damone replied "No, that's the beauty of a focus group."

18

90.     Narcus never disclosed his Pratt Whitney background to the group members at large until it was discovered several months after this first meeting by an individual not associated with the Focus Group who notified the group members via internet postings. He only announced himself as a professional engineer who "does root-cause analysis for a living."

91.     By the time the former Pratt Whitney engineer conceded that he was a prior employee of the company, the company and its contamination had been the subject of several meetings, discussions through which the engineer never disclosed his prior employment.

92.     At a presentation by the DEP and the DOH, the subject of Pratt Whitney contaminants was addressed. At that meeting, board members asked what types of fuel were used and why some of the contaminants listed in the fact sheet were not tested for at the residences tested in the DEP's one-time water survey.

93.     Narcus said nothing about his experience and afforded no insight.

94.     At a subsequent meeting in May, Narcus circulated a draft consensus statement stating that the community board was of the opinion that the one round of testing done by the Department of Environmental Protection sufficiently showed that the water was clean and safe, even though continued tests on the soil were still awaiting conclusion.

95.     This particularly contradicted his statements at the first meeting, before he was elected chair, wherein he stated he thought more than one round of testing was required as the community water was subject to seasonal and day-to-day influences.

96.     In response, other members raised concerns about the summary conclusion statement as they had never been included on any draft of the statement.

97.     These other members also stated concerns about the sufficiency of the testing and the lack of DEP disclosure regarding Pratt Whitney and particularly information they had just uncovered about the failed Palm Beach County Water Utilities district deal.

98.     Again, Narcus said nothing about his experience and afforded no insight but agreed that the issue perhaps should be addressed before the summary "all clear" was released.

99.     In subsequent meetings, agency personnel came in to discuss water flow and again, Pratt Whitney's influence on the aquifer was the subject of discourse.

100.     Again, Narcus said nothing.

101.     As Chair of the Focus Group, Narcus received an email from one fellow member, Patricia Curry, the "legal assistant" who at the first meeting stated that she did not believe that an environmental cause existed. It was copied to all members and included a summary of Pratt Whitney concerns at that time as well as a follow up question: "I realize some might find it tiresome to continue discussing P&W and that property's history, but since there are those who are sure, or fairly sure P&W is the source/cause of our "female pediatric brain cancer cluster", and as a class action lawsuit, as well as an individual lawsuit (alleging it caused a different sort of cancer), have been filed with these allegations, it leaves the rest of our community questioning whether there is a direct correlation."

102.     The response from South Florida Water Management did not rule out Pratt Whitney, as was hypothecated by Curry's request. Instead, it left her realizing that it could take Pratt contaminants less than ten years to travel via groundwater alone—she had assumed prior to asking for data that the rumor that Pratt was "100 years away" to be true.

103.    None of her comments shared with Narcus about the SFWMD data or the comments of the Vice Chair were circulated to the group as Narcus noted to Ms. Curry that circulating those comments "would be bad for me."

104.    Although Narcus's employment was apparently known by Curry, Damone and perhaps the vice chair Mike Nichols, it was never in fact disclosed to the group until it was posted by a woman named Kathy Butler.

105.    After his prior employment was disclosed, Andrew Narcus sent out an email stating that he had worked at Pratt in the past and if he would have any concerns about the campus, it would be the western portion of the property.

106.    Later, Narcus resigned because of personal concerns about being the sudden subject of on-line criticisms by non-board member Kathy Butler, the woman who posted his patents.

107.    The Focus Group disbanded when several members resigned because of concerns about the Pratt Whitney's engineer's influence.

108.    The Focus Group originator, Damone, announced to the press that the group disbanded because the group felt the state answered concerns about environmental safety and the fact statement noted in paragraph 40 above was issued by the state agencies.

### *FAILED STATE STUDY*: Ignored Data

109.    In 2013, after learning the identity of a portion of the particular radionuclides that Pratt Whitney had been licensed by the Department of Health to use, the families still living in the Acreage tested their well-drawn water for the presence of those materials as well as water control structures.

110.    In addition to increased levels of decay products of thorium (which could be the result of either the TE-NORM pollution caused by the Aggregates as alleged below or the thorium used by Pratt Whitney as described below), the families detected the presence of non-naturally occurring materials.

111.    These test results were sent to the Department of Health including to the Bureau of Radiation Control, to whom the Plaintiffs had been directed by the Nuclear Regulatory Association upon receipt of the results; and to the Epidemiologists within the DOH who had been conducting the cluster study (the person to whom the Department had previously directed the families to communicate their concerns).

112.    The lone response was a direction from the Department of Health's general counsel requesting that all communications regarding the Acreage issues be sent to Counsels' office only and that the families retain independent experts to interpret the results. In other words, the DOH restricted the families' ability to speak with any DOH person excluding its counsel.

113.    DOH counsel believed that Sharon Watkins, the epidemiologist, in fact was a member of radiation control.

114.    Although the complete test results and subsequent test results have been sent to the Department of Health counsel for forwarding to DOH officials, there has been no internal communication or review of those tests within the Department and no response from the counsel. In fact, DOH Bureau of Radiation Protection and Control has no record of the Plaintiff's results or event any correspondence about its own soil testing.

115.    In other words, while the Department of Health declared the brain tumor cluster, a cluster most primarily associated with exposure to ionizing radiation, it utterly failed to conduct

22

any meaningful study or to assess the two sources who have been subject to consent orders and/or corrective actions related to releases of those materials found in the Acreage that are related to brain tumor etymology.

## RADIATION IN THE ACREAGE GENERALLY

116.    It is generally accepted by nearly all branches of medicine and particularly by epidemiologists, radio-oncologists, health physicists, and neurologists that exposure to ionizing radiation can cause a brain tumor and will significantly increase an individual's risk for developing a brain tumor.

117.    It is generally accepted within the field of neurology that exposure to cadmium, lead, and mercury or any metal capable of passing the blood brain barrier is a neurotoxin capable of causing a brain tumor.

118.    Two types of ionizing radiation, including gamma and/or beta emitting radionuclides, have been detected throughout the Acreage: naturally occurring and non-naturally occurring. Note, "naturally occurring" does not mean naturally present—only that it is neither the use of a nuclear reactor or a particle accelerator required to cause the isotope to be in existence.

119.    Those radionuclides that have been detected in the Acreage at above natural background rates but may be termed naturally *occurring* include Uranium-234, Uranium-235 Uranium-236, and elevated levels of the decay products of Thorium, particularly Lead-214 and Bismuth-214 and Actinium-228. Naturally occurring deposits present in rock containing radium are referred to as Naturally Occurring Radioactive Material (or NORM.) The *presence* of Technologically-Enhanced concentrations of NORM products (or TE-NORMS) in water systems

23

can be associated with the metal processing industry, particularly airplane engine and turbine manufacturing; however, high concentrations of these radionuclides in an environment are more readily associated with mining operations, including the type of shell rock mining conducted by the Aggregates.

120.    In addition to the TE-NORM products identified in 119 above, radionuclides have been detected in the Acreage that are not naturally occurring. These include Cesium-137, Iridium-192, and Cadmium-109. Contamination of Iridium-191 and Cadmium-109 is particularly associated with the metal processing industry generally and with airplane engine and turbine manufacturing and testing of the type conducted by Pratt Whitney at its Palm Beach Facility.

121.    Additional testing has shown that these radioactive metals are not completely absorbed by the sediment filters used by the residences and that some build-up occurs in the pipes of these residences when significant rains increase the presence of radionuclides in the water.

122.    Both these types of radionuclides (TE-NORM and the industrial, non-naturally occurring material) have been detected in the groundwater and in the surface water structures moving water through the canals that recharge the surficial aquifer from which the Acreage residents source their drinking, bathing, and irrigation water.

## SEMI-VOLATILES AND METALS IN THE ACREAGE GENERALLY

123.    The Department of Health's soil study revealed that benzopyrene was elevated at several case homes. The same study and private testing found certain heavy metals including barium, lead, cadmium and arsenic in the water and in the soil at some case homes.

## INVESTIGATION BY CLUSTER FAMILIES

## AND RADIONUCLIDES DETECTED

124.    After heavy rains, the levels of radionuclides found at case homes in 2013 greatly exceed the Maximum Contaminant Level (MCL) for alpha emitters set for drinking water by the Environmental Protection Agency of 15 picocuries per liter (pci/L.) The EPA set that standard because ingestion of alpha radiation over time can cause cancer.

125.    The radionuclides found within the Acreage include gamma and beta emitters, which do not have to be ingested to cause cancer. The MCL for beta was 15 pci/L prior to the EPA recalibrating the level to a maximum for beta activity at 4 millirems per year.

126.    The MCL for radium, an alpha producing NORM product, is 5pcil/L. The level for radium is set lower than for alpha emitters generally because it will degrade into radon, lead-214, and bismuth-214 (beta and low level gamma emitters) within a relatively short period.

127.    The resulting exposure exceeds the dose maximums for the public as set forth by 10 CFR § 20.1301 and explained below regarding Pratt Whitney liability.

128.    Testing in 2013 detected elevated levels of lead-214 in water sourced from the Newfield and DeCarlo well and the homes of other adult cancer victims. It was detected at 1088 ± 123 pci/L at the Newfield home. It was detected at the DeCarlo home at 266±34.7pci/L.

129.    This trend continued in the testing done in the adult victims' wells for Lead-214 and for the other thorium products including Actinium. The trend decreases as the testing proceeds further east, explained by the influence of Palm Beach Aggregates on the M canal and/or the influence of Pratt Whitney on Corbett.

130.    In 2013, Iridium-192 was detected in the Newfield well at 189 ± 22.2 pci/L. It was detected at the DeCarlo home at 41.2±6.49 pci/L. In other words, as the groundwater moved southeast away from Corbett, the concentration of this non-naturally occurring radionuclide decreased at the time of testing.

131.    The referenced contaminants were detected in the soil where Newfield, Featherston and DeCarlo systems back-flush. The half-life of Iridium is 72 days.

132.    The referenced contaminants were found in the water and back-flush soils at the homes of other adult brain tumor victims as well.

133.    The referenced contaminants were detected in the surface water adjacent to the former Cotromano residence 051±.016 pci/L and in the ITID impoundment at 6.115±2.32. In other words as the surface waters move away from Corbett, the surface water concentration of this non-naturally occurring radionuclide decreased at the time of testing.

134.    The only surface water that did not have radionuclides was the water coming east into the Acreage from outside the L8 basin.

135.    Considering that the half-life of Iridium is 72 days, the quantity of Iridium causing the present contamination would of necessity be dramatically higher the longer the span of time between the origination of the contamination and the time of testing when the contamination is detected.

136.    Such an exposure greatly increases the risk of developing a brain tumor and was a material and substantially contributing cause of the brain tumor cluster.

137.    The industrial radionuclide Cadmium-109 was also detected in the Newfield backflush soil.

26

138.    In 2014, Cadmium-109 in particular was found to be lingering in the pvc piping of Newfield and another adult brain tumor victim's water line moving water from the well to the home.

139.    In addition to the ionizing radiation caused by these radioactive contaminants, cadmium, barium, and lead are neurotoxins which can pass the blood-brain barrier and cause brain tumors.

140.    The accumulated exposure to these metals and to naturally occurring and non-naturally occurring radioactive products leached into the environment by these Defendants was a material and substantially contributing cause of the brain tumor cluster.

141.    The synergistic effect of the exposure to these metals and to naturally occurring and non-naturally occurring radioactive products leached into the environment by these Defendants was a material and substantially contributing cause of the brain tumor cluster.

142.    The cancer cluster caused by these Defendants is a material and substantially contributing cause of the damages claimed by Class Representatives including the loss of the use of property.

143.    The pollutive acts and pollution discovered in the course of the investigation into the cause of the brain tumor cluster is a material and substantially contributing cause of the damages claimed by Class Representatives including the loss of the use of property.

## THE ACREAGE EXPOSURE MECHANISMS

144.    The aquifer underneath the Acreage moves at a southeast direction away from the western edge of the Pratt Whitney campus and into the Acreage.

145.    The Aquifer underneath the Acreage is recharged by the M Canal, which has been significantly and periodically influenced by the Aggregates rock pits since at least 2003 and

27

perhaps earlier.

146. In fact, there is little to no distinction between the surface and ground water in the L8 Basin which includes both the Acreage and the Defendants' business operations.

147. The described carcinogenic contaminants are present within the L8 Basin as a result of the operations of Pratt Whitney and the Palm Beach Aggregates and were present in the residential water pipes of the brain tumor victims in the pediatric brain cluster due to the significant flood events or recharge events as follows

    a.    In the month of December 2001, no less than 650 million gallons of water were drawn down from the Indian Trails Improvement Impoundment into the L8 canal for the purposes of filling the Palm Beach Aggregates rock pits;

    b.    Throughout 2003 through 2005, portions of the L8 basin were recharged by discharges from the Palm Beach Aggregates rock pits.

    c.    In the months of August and September 2002, the L8 Basin received an accumulation of over 25 inches of rain.

    d.    In the month of November 2003, the L8 Basin received an accumulation of over 9 inches of rain, an unseasonal deluge for which the surface water canals structures were unprepared, resulting in flooding in the Acreage and significant recharge of the aquifer.

    e.    In the month of September 2004, the L8 Basin received an accumulation of over 20 inches of rain, an unseasonal deluge for which the surface water canals structures were unprepared, resulting in flooding in the Acreage and significant recharge of the aquifer.

    f.    In the month of October 2005, the L8 Basin received an accumulation of over 10

inches of rain, an unseasonal deluge for which the surface water canals structures were unprepared, resulting in flooding in the Acreage and significant recharge of the aquifer.

g.     In the month of May 2007, the L8 Basin received an accumulation of over 10 inches of rain.

h.     In the month of May 2007, portions of the L8 basin were recharged from releases of the L8 reservoir.

## PRATT WHITNEY LIABILITY

148.    Pratt Whitney has used the previously referenced radionuclides, metals including lead, cadmium and barium as well as semivolatiles and oil-based fuels which could cause benzopyrene contamination in its operations at the Pratt Whitney campus, a campus with numerous canals and sheet-swamps that are adjacent to wetlands in the Corbett Wildlife Management Area (Corbett).

149.    Pratt Whitney used either the specific radionuclides or the parent radionuclide of every naturally occurring radionuclide listed in paragraphs 116-119 in its operations at the Pratt Whitney campus.

150.    In the course of its activities, Pratt Whitney has used radioactive by-product materials and source materials at its Palm Beach Count Campus:

a.     The licensed use of Nickel 63, Thallium 204, Radium D&E, Promethium 147, Hydrogen 3, Cadmium 109, Iridium 192, Cesium 137, Strontium 90, Cobalt 56, Manganese 54/Cobalt 58, Krypton 85; Cobalt 60, Lead 210 , Rhodium 106, Cobalt 57, Gadolinium, and Americium241/Strontium90;

b.     The unlicensed use of Nickel      63, Thallium 204, Radium D&E, Promethium

147, Hydrogen 3, Cadmium 109, Iridium 192, Cesium 137, Strontium 90, Cobalt

56, Manganese 54/Cobalt 58, Krypton 80;

c.       Source material including the licensed and unlicensed use of thorium dioxide as

2% of thorium-inclusive nickel alloy;

d.       Source materials including the non-licensed use of thorium-dioxide and other

species of concentrated thorium;

e.       Source materials including the non-licensed use of uranium dioxide and other

species of enriched uranium and depleted uranium.

151.     Some of these materials were provided to Pratt Whitney via the United Stated

Government either by entrustment for a particular project or via the deed and sale of formerly

utilized sites such as the Naval Weapons Reserve Area, also known as the former Air Force Plant

74.

152.     Only some of the licenses for and uses of byproduct and source material by Pratt

Whitney were in furtherance of contracts that Pratt Whitney had with the United States

Department of Energy and/or Department of Defense.

153.     The wetlands in and around Pratt & Whitney drain into the Acreage surface

waters at varying rates each year but particularly in the times of extremely heavy rains such as

have been documented to occur at least once every decade from the time Pratt Whitney began

working with these materials (circa 1958).

154.     Although Pratt Whitney has received or benefited from funding for clean-up of

these and other materials from the United States Army Corp of Engineers and the State of

Florida, Pratt Whitney is liable for all contamination at or emanating from its campus.

155.    Pratt Whitney employees worked with fuels including uranium compounds at the Palm Beach County campus in furtherance of both Pratt Whitney proprietary projects and government contract projects.

156.    Pratt Whitney hosted government or other third party projects which worked with fuels including uranium compounds at the Palm Beach County campus.

157.    Nuclear fuels were stored at the Palm Beach County Campus.

158.    The acts described in paragraph 155-157 above occurred, sometimes without regulatory oversight and thus violated all federal regulations related to such activity.

159.    Pratt Whitney has used some or all of these radionuclides in its operations at test stands located on the western edge of the Pratt Whitney campus, a portion of the campus where the groundwater runs southeast at a velocity and trajectory that would carry and has carried contamination into the Acreage community.

160.    In the 1980's, Pratt Whitney reported a portion of the non-radioactive contamination that had built- up over time on its property to the Department of Environmental Regulation.

161.    The site should have been, and was at various times slated to be, an EPA Superfund site, which would have included "a record of decision" and clean-up plan that was authored by, executed by, and performed by EPA.

162.    A Record of Decision (ROD) is a public document that explains which cleanup alternatives will be used to clean up a Superfund site. The <u>ROD</u> for sites listed on the NPL <u>(NPL Site Listing Process)</u> is created from information generated during an EPA conducted <u>Remedial Investigation/Feasibilty Study (RI/FS).</u>

163.   Instead, Pratt Whitney exercised influence through the state agency, the Department of Environmental Regulation, to avoid the sort of government investigation that should have accompanied the preparation of an agency-authored "Record of Decision."

164.   In order to avoid exposure for the full extent of its clean-up liability and to avoid the disclosure of its use of several hazardous and radioactive products, Pratt Whitney exercised influence on the DER through then DER employee Rick Reis to have the clean-up, and more importantly investigation, performed by Pratt Whitney with limited EPA oversight.

165.   Shortly after securing its ability to maintain control over the site, Pratt Whitney hired Rick Reis away from DER to ensure that the company would have minimal exposure.

166.   Pratt Whitney has buried source and by-product materials in unlined shallow burial pits together with other hazardous materials; many of these burial sites were flooded prior to clean-up and caused contamination of the L8 surface and ground water that accumulated and continues to leach into the Acreage surficial aquifer in times of heavy persistent rains.

167.   Pratt Whitney has burned hazardous materials as well as source and by-product materials in unlined shallow burial pits together with other hazardous materials; many of these burn pits were flooded prior to clean-up and caused contamination of the L8 surface and ground water that accumulated and continues to leach into the Acreage surficial aquifer in times of heavy persistent rains.

168.   Pratt Whitney has repeatedly failed to maintain and dispose of source and by-product material in the manner described by federal regulations.

169.   Pratt Whitney mishandled the source material it was licensed to use and thus, violated regulations regarding limiting public exposure.

170.    For example, Pratt Whitney's disposal of thoriated materials violated its own internal memoranda the regulations governing its possession of such materials, including that since 1964 Pratt Whitney has falsely reported that it was and would have the materials disposed of by a company licensed to handle such waste.

171.    Since the time of its possession of these materials, Pratt Whitney has failed to use and maintain these materials safely and has emitted these materials into the surface and ground waters in Corbett and into the Acreage as part of routine misuse, dumping and neglect.

172.    Some of that dumping occurred as direct consequence of the fact that Pratt Whitney conducted an internal investigation of the safety of the thorium it was using and concluded that it should no longer be used and should instead be buried.

173.    A significant plurality of the engineers that worked on one of the nuclear source material projects and at least one of the medical officers who studied them died of a brain tumor.

174.    Rather than dispose of the material responsibly, Pratt Whitney buried the materials and brought in a corporate counsel to dissuade the state of any concerns.

175.    Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1301-2 because they included unlicensed materials and were used in an unlicensed operation, which is per se violate the entire regulatory regime.

176.    Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1302 because they resulted from the improper storage, use and disposal of such material, as detailed in paragraphs 163-164 and 167.

177.    Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1301 because they resulted in doses that exceeded the dose limits for member of the public as set forth in those regulations, as detailed in paragraphs 163164

33

and 167.

178.   Emissions of licensed materials which occurred prior to December 3, 1991 included violations of the standard set forth at 10 C.F.R. § 20.1301, dose limits for individual members of the public, because the dose received by the brain tumor victims within the cluster described above exceeded those regulations as a result of exposure to these materials.

179. The doses exceeded regulation because they were ingested through the water and were absorbed dermally through direct contact with the water.

180. The doses set forth by 10 CFR § 20.1301 were exceeded as follows:

a)     The dose equivalent to individual members of the public from the licensed operation exceeded 0.1 rem (1 mSv) in a year because the materials, particularly lead 214, cadmium 109 and iridium 192 escape any sediment filters customarily used by the families residing in the Acreage, causing an accumulation of such material in the piping of the residential water supply, causing an ambient dose that exceed .1 rem per year; and

b)     Upon certain flood events as described above, the dose exceeded .002 rem in an hour; and,

c)     Any appreciable dose exceeded the regulations because Pratt Whitney did not have a permit to release the radioactive materials into the public sewer system into its deep injection well, and into the waters of the L8 reservoir.

181. Those emissions which occurred subsequent to 1991 or continued to accrue in measurable dose after December 3, 1991 included violations of both 10 C.F.R. § 20.1301 as well as 20.1302 because Pratt Whitney failed to perform any surveys as required in 20.1301(a) or to measure or reduce the rate as required in 20.13029(b) or (c).

182. Those emissions which occurred subsequent to 1991 also included violations of the "As Low as is Reasonably Achievable" standard set forth in the "Offsite Dose Calculation Manual" published by the Nuclear Regulatory Commission, because the Defendant failed to make any reasonable attempts to keep such doses from occurring for several years while the contaminants were leaching into the L8 surface and ground water.

183. As it relates to hazardous materials and metals only, Pratt Whitney, since the mid 1980's, has been subject to certain requirements pursuant to its RCRA licenses as defined above and has failed to meet its obligations because it delayed clean-up, conducted biased risk assessments, and failed to post notice as required in the library located within the Acreage.

## PALM BEACH AGGREGATES' LIABILITY

184. Palm Beach Aggregates and/or its predecessor in interest, GKK Aggregates, have conducted an aggregate mining business to the west of the Acreage since at least 1993.

185. The aggregate mined by Palm Beach Aggregates is of particular value because it consists of limestone rock, the density of which is sufficient to meet the criteria for road and highway construction.

186. Until 2008, the mining included a dewatering or dredging process through which Palm Beach Aggregates at various times deposited waters including high-concentrations of Technologically Enhanced Naturally Occurring Radioactive Materials (TE-NORM) into adjacent surface waters. These materials are not included within the statutory definition of Source Material or By-Product material as found in Price-Anderson at 42 USC 2014 and are in fact exempted by those definitions.

187. At times prior to 2003, the dewatering violated permits either because the water emitted was in excess of the volume permitted or the water was deposited into non-permitted

recipient water bodies, such as the L8 Canal.

188.    In 2003, Palm Beach Aggregates entered into a Consent Final Judgment with South Florida Water Management District (SFWMD) through which many of the pits Palm Beach Aggregates was in the process of mining or had already mined were condemned to SFWMD for use as a reservoir.

189.    For some time prior to this condemnation, Palm Beach Aggregates had been negotiating with other prospective buyers. The deal struck with SFWMD was for over two hundred million dollars.

190.    The    first    condemnation    was    of    parcels    00404317000001030, 00404320000001040, which included many of the pits Palm Beach Aggregates had already mined. In February and August of 2007, Palm Beach Aggregates conveyed parcels 00404329000005010 and 00404320000001010 to the District as well. These additional conveyances were performed in accordance with the 2003 Consent Judgment.

191.    According to the 2003 Consent Judgment, Palm Beach Aggregates retained a reservation of Occupancy, Possession, and Use, which allowed them continue to excavate or dredge pits. Palm Beach Aggregates also reclaimed pits for reservoir use, or constructed the reservoir. The Consent agreement also required Palm Beach Aggregates to certify the cells for water storage use before turning them over to SFWMD for use as a reservoir.

192.    Pursuant to the Consent Judgment, Palm Beach Aggregates retained control of the pits and specifically provided indemnity for any pollution caused by the pits for some time until the process of handing over the pits was complete, which was not until sometime after May 2009.

193.    Palm Beach Aggregates continued its mining activities at parcels it still owned around the Reservoir including 00404329000005020 and 00404329000003020.

194.    From 2003 until September 2008, the Aggregates continued the dewatering/dredging process through which technologically enhanced NORM (TE-NORM) was increased in the designated reservoir pits.

195.    Before 2003, the recognition that Palm Beach Aggregates operations had caused or may have caused and would continue to cause contamination within the waters of the pits and the adjacent canals within the Acreage was known by Palm Beach Aggregates and its consultants.

196.    The discovery of Palm Beach Aggregates' responsibility for contamination of the Acreage has been hindered by inconsistent and inaccurate reporting to state regulatory agencies by Palm Beach Aggregates.

197.    TE-NORM has from time to time at various times escaped the confinement of the pits and has entered adjacent canals flowing into the Acreage, contaminating both surface and subsurface waters within the Acreage and materially contributing to the increased incident of brain cancers in the Acreage.

**COUNT ONE: Nuclear Incident**
**Diminution in Value via Release of Licensed By-Product or Source Material—**
**PRICE-ANDERSON CLAIM AGAINST DEFENDANT PRATT WHITNEY**

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 12 regarding jurisdiction and citizenship; 13 through 20 regarding Rule 23 Requirements; 21-31 regarding the Brain Tumor Cluster; 32-37 regarding the Decline in the Property Value; 38-116 regarding the Failed State Study; Paragraphs 116-122

regarding the Radiation in the Acreage Generally, 124-143 regarding the investigation by the Families and Particular Radionuclides Found, paragraphs 144-147 regarding exposure mechanisms, paragraphs 148-182 regarding Pratt Whitney liability.

198.   Defendant Pratt Whitney owed a duty of care to the surrounding neighborhoods to exercise caution and to follow the dictates of Price Anderson and all applicable regulations promulgated under that statute including but not limited to 10 CFR § 20.1301 in its use of source and by-product materials.

199.   Defendant Pratt Whitney owed a duty of care to the surrounding neighborhoods to exercise caution and to be licensed to use any source or by-product materials.

200.   Defendant breached those duties as described above by acts including but not limited to the unpermitted use of, burial of, burning of, and dumping of source and by product material.

201.   At times, Defendant Pratt Whitney has realized a portion of the damages caused by its neglect but instead of remediating the problem, it allowed its property to continue such emissions by failing to remediate contamination safely.

202.   Defendant's failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties and eventually into the Acreage community, directly and permanently causing a diminution in value of the Acreage properties.

203.   These breaches caused a significantly increased incidence of brain tumors to occur in the Acreage, which in turn caused a diminution in the value of the Acreage properties.

204.   These breaches, particularly including the acts described in paragraphs 158-174, include reckless, knowing disregard of the safety of the neighboring communities as evidenced

by the fact that in 1964 Pratt Whitney acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and then for decades failed to use any such caution and purposely buried the materials.

205.   The Class Representatives and all others similarly situated as included in the definition of the Class have sustained the damage of that diminution in value.

WHEREFORE, Plaintiffs demand judgment for compensatory damages and punitive damages and further demands trial by jury.

**COUNT TWO**
**<u>Diminution in Value via Negligence—Pratt Whitney</u>**

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 12 regarding jurisdiction and citizenship; 13 through 20 regarding Rule 23 Requirements; 21-31 regarding the Brain Tumor Cluster; 32-37 regarding the Decline in the Property Value; 38 -116 regarding the Failed State Study; Paragraph 123 regarding Semi-volatiles and Metals Generally, paragraphs 144-147 regarding exposure mechanisms, and paragraphs 148, 156-163 and 183 regarding Pratt Whitney liability.

206.   Pratt Whitney owed a duty of care to the surrounding neighborhoods to exercise caution in its use and exploitation of heavy metals and hazardous materials such as semi-volatile compounds.

207.   At times, Pratt Whitney realized a portion of the damages caused by its neglect but instead of remediating the problem, allowed its property and operations to continue such emissions by failing to remediate contamination safely.

208.   Such failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties and eventually into the Acreage community where

cadmium, barium, lead, arsenic, and benzopyrene have been found.

209. These breaches caused a significantly increased incidence of brain tumors to occur in the Acreage, which in turn caused a diminution in the value of the Acreage properties.

210. These breaches caused the surface waters of the L8 basin and the Acreage aquifer to be contaminated, which in turn caused a diminution in the value of the Acreage properties.

211. These breaches, particularly including the acts described in paragraphs 160-165, include reckless, knowing disregard of the safety of the neighboring communities as evidenced by the fact that in 1964 Pratt Whitney acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and then for decades failed to use any such caution and purposely buried the materials.

212. The Class Representatives and all others similarly situated as included in the definition of the Class have sustained the damage of that diminution in value.

WHEREFORE, Plaintiffs demand judgment for compensatory damages, punitive and further demands trial by jury.

## COUNT THREE
### Diminution in Value via Negligence—PALM BEACH AGGREGATES

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 12 regarding jurisdiction and citizenship; 13 through 20 regarding Rule 23 Requirements; 21-31 regarding the Brain Tumor Cluster; 32-37 regarding the Decline in the Property Value; 38 -116 regarding the Failed State Study; Paragraphs 116-119 and 121-123 regarding Radiation in the Acreage Generally; paragraphs 124-129 regarding radium decay products; paragraphs 144-147 regarding exposure mechanisms; and paragraphs 184-197 regarding the Aggregates Liability.

213. Aggregates owed a duty of care to the surrounding neighborhoods to exercise caution in its use and exploitation aggregates rock containing deposits of hazardous naturally occurring amounts of radium decay products.

214. At times, Aggregates realized a portion of the damages caused by its neglect but instead of remediating the problem, it allowed its properties and operations to continue such emissions by failing to remediate contamination safely.

215. These failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties and eventually into the Acreage community.

216. These breaches caused a significantly increased incidence of brain tumors to occur in the Acreage, which in turn caused a diminution in the value of the Acreage properties.

217. These breached caused the surface waters of the L8 basin and the Acreage aquifer to be contaminated, which in turn caused a diminution in the value of the Acreage properties.

218. The Class Representatives and all others similarly situated as included in the definition of the Class have sustained the damage of that diminution in value.

WHEREFORE, Plaintiffs demand judgment for compensatory damages and further demands trial by jury.

## COUNT FOUR
### Diminution in Value via Strict Liability and Chapter 376 DEFENDANTS

Plaintiffs re-allege those facts and matters set forth in all paragraphs 1-197 except 120, and 130-143, paragraphs 149-152.

219. Both Palm Beach Aggregates and Pratt Whitney emitted contaminants into the surface and groundwater in excess of the limits allowed by governing agencies, statutes and, when applicable, their permits. Pursuant to F.S. §376.313, Pratt Whitney and Palm Beach

41

Aggregates are strictly and jointly liable for any and all damages emanating from the effluences as previously described.

220.   They are liable for the contaminants found by the DEP and by the families including benzopyrene, TE-NORM, and various heavy metals including lead, cadmium, and barium.

221.   The emissions caused the Representatives and the entire class the present and on-going diminution in value of their property.

222.   Pursuant to that F.S. §376.313, Plaintiffs may be awarded costs of litigation (including reasonable attorney's and expert fees) if the court determines such an award is in the public interest.

WHEREFORE, Plaintiff demands judgment for damages and an award for attorney fees and costs pursuant to F.S. §376.313 and further demands trial by jury.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of JUNE, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Mara R.P. Hatfield*
Mara Ritchie Poncy Hatfield
Florida Bar No. 37053
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL  33409
Phone:  (561)686-6300
Fax:  (561) 383-9451

## COUNSEL LIST

Gunster Yoakley & Stewart, P.A.
777 S Flagler Drive, Suite 500 E
West Palm Beach, FL  33401
Phone: (561) 655-1980
Fax: (561) 655-5677
Attorneys for United Technologies Corporation Pratt & Whitney Group, a Connecticut
Corporation
eservice@gunster.com;

INCLUDING
Gerard Joseph Curley, Jr
jcurley@gunster.com; sgrayson@gunster.com;
Gregor J. Schwinghammer, Jr.
gschwinghammer@gunster.com;
jhoppel@gunster.com
Fabienne E. Fahnestock
ffahnestock@gunster.com

Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
3344 Peachtree Road, Suite 2400
Atlanta, GA  30326
Phone: (404) 876-2700
Fax: (404) 875-9433
Attorneys for Palm Beach Aggregates

INCLUDING
Stephen James Rapp, Esquire
srapp@wwhgd.com
Thomas D. Allen, Esquire
tallen@wwhgd.com;
bmartin@wwhgd.com