UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80928-CIV-MARRA
(Consolidated Action: Lead Case)

RICHARD COTROMANO, BETHANY COTROMANO, FRANK DECARLO, PAULETTE DECARLO, GREGORY DUNSFORD, JENNIFER DUNSFORD, JOYCE FEATHERSTON, BILL FEATHERSTON, ROBERT T. NEWFIELD and TRACY NEWFIELD, Class Representatives all on behalf of themselves and all others similarly situated,

**9:13-cv-80928 Marra/Hopkins**

     Plaintiffs

vs.

UNITED TECHNOLOGIES CORPORATION, Pratt & Whitney Group, A Connecticut Corporation, and PALM BEACH AGGREGATES, LLC, a Florida Corporation,

     Defendants………………………….

JOSEPH ADINOLFE and KAY SAMSON, Class Representatives, Individually and on behalf of all others similarly situated,

**9:10-cv-80840 Marra/Hopkins**

     Plaintiffs,

vs.

UNITED TECHNOLOGIES, UTC Group, A Connecticut Corporation,

     Defendant……………………………
_____/

**PRATT & WHITNEY'S *DAUBERT* MOTION TO EXCLUDE
THE TESTIMONY OF JOHN KILPATRICK AND INCORPORATED
MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 4

I.      Kilpatrick's Opinions Regarding The Geographic Extent Of the "Acreage" Are
        Irrelevant To Class Certification And Methodologically Unsound ................................5

II.     The Heterogeneity Of The Proposed Class Area Renders Kilpatrick's Mass
        Appraisal Model Unreliable And Inconsistent With Appraisal Standards..........................6

III.    Kilpatrick's Failure To Account For The Cancer Cluster Designation Renders His
        Opinions Regarding Plaintiffs' Alleged Injuries Irrelevant And Unreliable......................8

        A.      Kilpatrick's failure to control for the potential impact of the cancer cluster
                on property values in the "Acreage" renders his analysis unreliable......................9

        B.      Kilpatrick's failure to control for the cancer cluster undermines the
                reliability of his two primary analyses.................................................................11

        C.      Kilpatrick's attempt to scrub his 2016 report of references to the cancer
                cluster demonstrates the unreliability of his opinions...........................................13

IV.     Kilpatrick Offers No Reliable Methodology To Reconcile His Six Valuation
        Analyses.....................................................................................................................15

V.      The Court Should Exclude Kilpatrick's CV Survey Because It Is Not An Accepted
        Appraisal Methodology And Suffers From Errors That Undermine Its Reliability ..........16

VI.     The Court Should Exclude Kilpatrick's Hedonic Regression Because It Is
        Methodologically Flawed And Fails To Account For Data Critical To Its
        Reliability....................................................................................................................18

CONCLUSION.................................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Burke v. Gen. Motors Corp.*,
   218 F. App'x 951 (11th Cir. 2007)................................................................ 15

*Daigle v. Shell Oil Co.*,
   133 F.R.D. 600 (D. Colo. 1990)..................................................................... 6

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)........................................................................... 4, 11, 15

*Davey Compressor Co. v. City of Delray Beach*,
   639 So. 2d 595 (Fla. 1994) ........................................................................... 20

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013) .................................................... 17, 19

*Duffin v. Exelon Corp.*,
   CIV A 06 C 1382, 2007 WL 845336 (N.D. Ill. Mar. 19, 2007) ................... 6

*Exxon Mobil Corp. v. Albright*,
   433 Md. 303 (2013) ......................................................................... 16, 17, 20

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)........................................................................................ 6

*Guinn v. AstraZeneca Pharm. LP*,
   602 F.3d 1245 (11th Cir. 2010)................................................................... 11

*Hartle v. FirstEnergy Generation. Corp.*,
   CIV.A. 08-1019, 2014 WL 1317702 (W.D. Pa. Mar. 31, 2014) ...... 15, 16, 18

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................. 4, 10

*McClain v. Metabolife Intern., Inc.*,
   401 F.3d 1233 (11th Cir. 2005).................................................................. 4, 9

*Palmisano v. Olin Corp.*,
   C-03-01607 RMW, 2005 WL 6777561  (N.D. Cal. July 5, 2005).............. 17

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003)................................................................ 4, 12

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005).......................................................... 4, 12, 15

*Roper v. Kawasaki Heavy Indus. Ltd.*,
   15-13363, 2016 WL 1085489 (11th Cir. Mar. 21, 2016) ........................................... 9

*Sher v. Raytheon Co.*,
   419 F. App'x 887 (11th Cir. 2011) ...................................................................... 5

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ..................................................................... 4, 9

**Rules**

Fed. R. Evid. 702 ................................................................................. 4, 9

## INTRODUCTION

Plaintiffs rely on Dr. John Kilpatrick for two opinions that are fundamental to their claims: (1) the definition of the proposed class area, and (2) the cause and amount of Plaintiffs' alleged property value losses. Dr. Kilpatrick's opinions are the product of unreliable, outcome-driven analyses that deviate from accepted appraisal standards. They should be excluded.

*The Court should exclude Kilpatrick's opinions regarding the proposed class area.* Kilpatrick arbitrarily defined a class area—the "Acreage"—that covers 60 square miles without applying any accepted or objective appraisal methodology. While Kilpatrick claims to define the class area based on an "environmental stigma" related to Pratt & Whitney, he did no analysis to determine the geographic extent of that purported stigma or any common element of Plaintiffs' claims. He outlines an enormous class area that bears no relationship to the cancer cluster investigation, any Acreage neighborhood map, the opinions of the local realtors he interviewed, or any alleged contamination. The class area he defines would contain over 18,000 widely heterogeneous parcels that span ten neighborhoods. The range of differences among these properties renders any common appraisal technique unreliable and prohibits class treatment.

*The Court should exclude Kilpatrick's opinions regarding the existence and valuation of Plaintiffs' alleged injury.* Kilpatrick utilizes six different methodologies to provide what he calls a "mass appraisal" of property value diminution in the proposed class area. Kilpatrick purports to have relied on hedonic regression modeling, survey research, transactional evidence, meta-analysis, literature review, and case studies. He uses these methodologies to assert that the value of the 18,000 parcels in the proposed class area has uniformly diminished between 25% and 40%. This opinion suffers from a series of fatal flaws that merit exclusion.

First, Kilpatrick fails to account for the impact of the cancer cluster investigation on the value of Plaintiffs' properties. Plaintiffs alleged that the designation of their neighborhood as a

1

cancer cluster had an impact on property values, and when Kilpatrick issued his original report in 2011 he expressly based his analysis on the existence of a "cancer cluster." Plaintiffs dropped their contention that Pratt & Whitney caused the Acreage cancer cluster prior to Kilpatrick's 2016 report. Kilpatrick, however, did nothing to modify his analyses to identify the impact (if any) of Pratt & Whitney's alleged contamination separate-and-apart from the cancer cluster. Instead, he relied on the *same data* from the *same sources* to conclude that the *same range* of diminution applied. He supported his opinions, in part, by altering answers he received during informal interviews conducted in 2011 to match Plaintiffs' new theory. Where before he said the "cancer cluster" was the cause of harm, Kilpatrick simply cut-and-pasted a new claim—that the potential for contamination from Pratt & Whitney was to blame. A methodology that allows you simply to change the evidence and your conclusions to fit the Plaintiffs' theory without changing any of the underlying analysis cannot be valid.

Second, Kilpatrick provides no way to tie his different analyses to his final opinion regarding property value diminution in the class area. Despite his assertion that each method could "stand alone," none of Kilpatrick's six analyses support his opinion that property values in the proposed class area have decreased by 25-40%. And Kilpatrick provides no explanation as to how he reconciles the analyses to arrive at the range of harm he advances. Kilpatrick's range is thus the product of an unreliable "black box" analysis that should be excluded.

Third, each of the six analyses performed by Kilpatrick is unreliable in its own right. For example, Kilpatrick purports to rely on a "contingent valuation survey" (CV) that is neither an accepted appraisal technique nor reliably executed under established survey standards. Likewise, he relies on a hedonic regression that is inconsistent with appraisal standards and missing critical data. The remaining analyses each suffer from similar flaws.

## BACKGROUND

*The Cancer Cluster*. In 2009, federal and state authorities investigated a potential cancer cluster in an area of Palm Beach County that is sometimes loosely called the "Acreage." Ex. A at 1, 24. On February 1, 2010, the Florida Department of Health (FDOH) confirmed an elevated rate of pediatric brain cancers in the area over a period of two years. Ex. B. After an extensive investigation, the state determined that there was no environmental cause, that "water quality in The Acreage is generally good," and that "[t]he Acreage is safe." Ex. C, cover letter at 2. Nevertheless, the cancer cluster received widespread media attention, with some speculating (wrongly) that Pratt & Whitney was to blame. *E.g.* Ex. D. The cancer cluster also prompted a lending freeze in parts of the Acreage, cautionary real estate disclosures, and a Federal Housing Administration warning about the cluster. Ex. E at 51:13-52:1, 59:23-60:6; Ex. F ¶¶ 47-48.

*Kilpatrick's 2011 Report*. During the investigation, Plaintiffs sued Pratt & Whitney seeking monetary damages for all proposed class members "who have sustained a diminution of property value as *a result* of public revelation of the so-called *'cancer cluster.'*" Ex. G ¶¶ 10, 27 (emphasis added). To support that claim, Plaintiffs submitted a report from Kilpatrick in April 2011 in which he concluded that "the proposed class area has been impaired *by the cancer cluster designation*." Ex. H at 79 (emphasis added). He opined that the Plaintiffs' properties were worth 25-40% less as a result of the cancer cluster and Pratt & Whitney's alleged contamination. *Id*. at 3, 79.

*Kilpatrick's 2016 Report*. More recently, Plaintiffs abandoned their attempt to prove Pratt & Whitney caused the cancer cluster. Consistent with their new theory, Plaintiffs informed the Court during a hearing in April 2015 that "[o]ur case is tied to environmental contamination . . . but not cancer, itself. . . . We don't have to prove a cancer cluster." Ex. I at 41:16-18, 42:19-20. None of Plaintiffs' experts opine that Pratt & Whitney caused the cancer

cluster. Kilpatrick thus submitted an "update" report in April 2016 that purports to measure the

impact of the alleged threat of contamination by Pratt & Whitney without regard to the cancer

cluster. Ex. J at 5. Kilpatrick relied on the exact same data and analyses from his 2011 report. He

again concluded that Plaintiffs' property values diminished by 25-40%, but this time he

attributed the diminution entirely to Pratt & Whitney, ignoring the cancer cluster. *Id.* at 19.

## ARGUMENT

The Court must act as a "gatekeeper" to ensure that the admission of expert testimony is

consistent with the requirements of the Federal Rules of Evidence. *See Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 589 n.7 (1993); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th

Cir. 2004). The court's gatekeeping function requires an exacting analysis of the reliability,

relevancy, and "intellectual rigor" required by Rule 702. *Frazier*, 387 F.3d at 1260 (quoting

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Because "expert testimony may

be assigned talismanic significance in the eyes of lay jurors," the significance of the court's role

under *Daubert* "cannot be overstated." *Id.* at 1260, 1263. Plaintiffs bear the burden of establishing

the admissibility of Kilpatrick's testimony under Rule 702. *Id.*

The Eleventh Circuit has distilled this exacting analysis into a "rigorous three-part

inquiry." *Id.* at 1260. *First*, the proffered expert must be qualified to offer his opinions. *Id.*

*Second*, the expert's opinions must be based on a sufficiently reliable and discernible

methodology. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005); *Quiet Tech. DC-8,*

*Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003). *Third*, the proffered expert's

testimony must "fit" the facts of the case such that the testimony is helpful to the trier of fact.

*Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260. Importantly, "*any* step that renders the

analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*"

*McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (citation omitted).

4

I.      **Kilpatrick's Opinions Regarding The Geographic Extent Of the "Acreage" Are Irrelevant To Class Certification And Methodologically Unsound**

Plaintiffs rely on Kilpatrick to support their proposed class area. *See* Ex. F at 122 (map of proposed class area). While Plaintiffs and Kilpatrick refer to the proposed class area as the "Acreage," the boundaries of the proposed class area are far more expansive than any area that has elsewhere been called the "Acreage." *See* Ex. K ¶ 4 & Fig. 1 (Jackson Decl.). The proposed class area spans nearly 60 square miles, includes over 18,000 parcels of property, and encompasses ten unique neighborhoods with a diverse range of property types. *Id.* ¶ 7 & Fig 1.

Kilpatrick's opinion regarding the boundaries of the "Acreage" does not fit Plaintiffs' proposed class allegations. The purpose of defining a proposed class area is to identify a group of properties affected by a common injury resulting from a common cause. *See Sher v. Raytheon Co.*, 419 F. App'x 887, 888-89 (11th Cir. 2011) (unpublished) (noting that Plaintiffs' sought to define a class area of contaminated properties to "demonstrate the predominance of common issues under Rule 23(b)(3)"). However, Kilpatrick was not asked to define a class area on that basis. Instead, he was asked simply to "identify the boundaries of The Acreage." Ex. H at 9. Kilpatrick performed no analysis to determine whether the proposed class area actually bears any relation to Plaintiffs' claimed "environmental stigma." Ex. K ¶ 5. Kilpatrick just drew lines on a map. His opinion regarding the geographic boundaries of the "Acreage" tells the Court nothing about whether the class area is bound by a common injury.

In addition to being irrelevant, Kilpatrick's opinion regarding the geographic extent of the "Acreage" is methodologically unsound. Kilpatrick in fact applied no real methodology at all; when asked what he did to determine the area covered by the "Acreage," Kilpatrick could refer only to his observation of the area during a one-day car tour in 2011. Ex. L at 34:21-35:13, 359:9-360:1. He did not rely on any appraisal standard or criteria to guide his assessment.

5

Instead, he offers nothing more than his own unguided *ipse dixit*. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

There is no objective evidence to support the boundaries Kilpatrick advances. Kilpatrick was unable to identify a single government document that reflects the "Acreage" boundaries he sponsors. Ex. L at 359:9-360:1. His proposed "Acreage" area is larger than the area the FDOH defined in its cancer cluster investigation. Ex. H at 23-24; Ex. L at 168:17-169:5. Likewise, none of the local realtors Kilpatrick purportedly interviewed define the "Acreage" the way he does. Ex. H at 9; Ex. K ¶ 6. And most notably, the proposed class area is not tethered to Plaintiffs' claims of environmental contamination, as Kilpatrick admits that he drew his map without regard to any alleged contamination plume. Ex. L at 172:25-173:8.

Kilpatrick's definition of the "Acreage" thus reflects an arbitrary boundary drawn without adherence to any discernible methodology. *Cf. Duffin v. Exelon Corp.*, CIV A 06 C 1382, 2007 WL 845336, at *4 (N.D. Ill. Mar. 19, 2007) ("There is simply no correlation between plaintiffs' evidence concerning the location of contaminated air and groundwater, and the 'arbitrarily drawn lines on a map' constituting plaintiffs' proposed class.") (quoting *Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 603 (D. Colo. 1990) ("[T]he plaintiffs arbitrarily have drawn lines on a map, and declared that certain persons within those geographical boundaries constitute a class.")).

## II.     The Heterogeneity Of The Proposed Class Area Renders Kilpatrick's Mass Appraisal Model Unreliable And Inconsistent With Appraisal Standards

Kilpatrick relies on what he dubs a "mass appraisal" to determine that there has been a diminution in value of properties in the proposed class area and to estimate its extent. The Court should exclude Kilpatrick's mass appraisal technique because the proposed class area cannot be reliably assessed on a mass-basis and Kilpatrick's approach contravenes appraisal standards.

6

The properties in Plaintiffs' proposed class area are too diverse to reliably appraise them through any mass appraisal model. Mass appraisal is a technique sometimes used in appraising discrete, homogenous groups of properties. Ex. K ¶ 7. In order for a mass appraisal to be reliable, the subject properties need to be homogenous in terms of both physical characteristics (*e.g.*, home age, condition, size, etc.) and circumstantial characteristics (*e.g.*, location relative to contamination). *Id*. The characteristics of homes in the proposed class area vary too much to analyze diminution in their value (if any) through a mass appraisal model. *Id*.

The physical characteristics of the 18,000 parcels in the proposed class area vary widely. The homes in the class area were largely constructed in unincorporated areas that are not subject to a common building plan. They range from modest single family residences in relatively poor condition to large (and expensive) equestrian farms. Even within relatively small subareas in the proposed class area there is a diversity of housing types and conditions and even differences in basic amenities—such as the presence of paved roads or access to municipal water. The distinctions between the 10 different neighborhoods in the proposed class areas reinforce the point: neighborhood home prices range from an average of $195,403 in Royal Ascot to an average of $719,009 in White Fences. Ex. K ¶ 8; *see Sher*, 419 Fed. App'x at 889 n.2, 891 (reversing the certification of a class that the Plaintiffs defined to include 1,300 parcels and ten different neighborhoods).

Other essential characteristics of properties within the proposed class area also vary widely. At the most basic level, some properties were part of the cancer cluster investigation, while many others were not. The properties in the investigation area were subject to lending restrictions, real estate disclosures, and FHA warnings that did not impact the balance of the proposed class area. Ex. F ¶¶ 47-48. Likewise, homes at the north end of the proposed class area

are nearly 10 miles closer to the alleged contamination source than homes at the south end. A single model cannot reliably account for all of the unique features that will determine whether a particular property (or subarea of properties) has been diminished in value. Ex. K ¶¶ 7, 8.

Rather than trying to account for these critical differences, Kilpatrick simply ignores them (and assumes them away) in his mass appraisal. He did not consider differences in neighborhoods, access to municipal water, distance from Pratt & Whitney, whether a property was actually contaminated, or location in the cancer cluster investigation area. Ex. L at 293:21-295:15; Ex. D at 125 (Table 3-3). This failure violates the appraisal standard for evaluating the presence of environmental stigma set out in Advisory Opinion 9 (AO-9) from the Appraisal Standards Board. Ex. M. AO-9 governs the appraisal of "contaminated properties, or properties suspected of being contaminated." *Id*. at 1. Among the "relevant property characteristics" that appraisers should consider in analyzing environmental stigma are the type of contaminant at issue, the method of conveyance, and the location of the property relative to the claimed contamination. *Id*. at 4. Kilpatrick's decision to overlook these factors renders his model unreliable and conflicts with the basic standards that govern appraisal practice. Ex. K ¶ 7.

III. **Kilpatrick's Failure To Account For The Cancer Cluster Designation Renders His Opinions Regarding Plaintiffs' Alleged Injuries Irrelevant And Unreliable**

Between Kilpatrick's 2011 and 2016 reports, Plaintiffs' abandoned their attempt to prove Pratt & Whitney was responsible for the cancer cluster designation. This strategic decision by Plaintiffs created a problem for Kilpatrick, who concluded in his 2011 report that "[a]ll methods utilized in my analysis indicate that the proposed class area has been *impaired by the cancer cluster designation*." Ex. H at 79 (emphasis added); Ex. L at 129:13-130:5. Kilpatrick did not do any new analysis to address Plaintiffs' new theory. Instead, he simply changed his conclusion to match their evolving claims; he recast the same analyses he did in 2011 to determine the effect of

the "cancer cluster" but claims in 2016 that he measured only the impact of Pratt & Whitney's alleged contamination. Ex. J at 5, 17; Ex. L at 77:3-18. When asked if the cancer cluster itself impacted Acreage home values, he now says "I don't have an opinion" and proclaims it "not relevant" despite previously opining that the cancer cluster designation impaired property values in the class area. Ex. L at 108:18-109:1, 128:17-129:3.

Kilpatrick's attempt to ignore the potential impact of the cancer cluster designation in his 2016 report renders his opinions unhelpful to the Court and the trier of fact, undermines the reliability of his primary valuation analyses, and reflects rank data manipulation that calls into question the integrity of his analysis as a whole.

> **A.      Kilpatrick's failure to control for the potential impact of the cancer cluster on property values in the "Acreage" renders his analysis unreliable.**

Expert testimony is only reliable when it is grounded in a "rigorous methodology," *Frazier*, 387 F.3d at 1262, and is "based upon sufficient facts or data," *McClain*, 401 F.3d at 1237 (quoting Fed. R. Evid. 702). Expert testimony that fails to account for the material, undisputed facts of the case is insufficiently rigorous, plainly violative of Rule 702, and, therefore, should be excluded as unreliable. *See Roper v. Kawasaki Heavy Indus. Ltd.*, 15-13363, 2016 WL 1085489, at *1 (11th Cir. Mar. 21, 2016) (affirming the exclusion of an expert for failing to consider other causes of an injury and for "fail[ing] to account for data that did not fit [his] hypothesis"), *petition for cert. filed*, Case No. 16-51 (U.S. July 11, 2016).

The cancer cluster is a material fact relevant to assessing both the cause and the extent of Plaintiffs' alleged injury. There is no dispute that a significant portion of the class area was part of a cancer cluster designation in February 2010. Nonetheless, Plaintiffs now seek to recover for alleged property diminution they claim stems solely from Pratt & Whitney's alleged conduct. To properly analyze whether Plaintiffs have suffered an injury and to ascertain its cause, an expert

would have to control for the impact of the cancer cluster designation on property values. Otherwise, the expert cannot separate property diminution (if any) that is due to Pratt & Whitney from any diminution due to the cancer cluster that Pratt & Whitney did not cause.

Rather than account for the cancer cluster designation, Kilpatrick simply tries now to ignore it. Incredibly, he testified that the cancer cluster did "not enter[] into my professional analyses." Ex. L at 79:4-11. Yet Kilpatrick admits that his 2016 report is based on the *same data* and *same analyses* as his 2011 report, in which he concluded that "the proposed class area has been impaired by the cancer cluster designation." Ex. H at 79. Despite relying on the analyses he used in 2011, Kilpatrick admits he did nothing "to control or isolate any property diminution that may be associated with the cancer cluster, but not Pratt & Whitney." Ex. L at 77:24-79:3. He tried to justify his failure to control for the cancer cluster by suggesting that "the cancer cluster condition wasn't really embedded in the findings in the first place." *Id*. Of course, Kilpatrick cannot point to any actual analysis that supports that conclusion, nor can he explain away the numerous references to the cancer cluster in his original analysis. Again, Kilpatrick's opinion is based on excludable *ipse dixit*, which is further contradicted by the conclusions Kilpatrick drew in his 2011 report. *See Kumho Tire Co.,* 526 U.S. at 157 (Courts not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Kilpatrick's failure to consider the impact of the cancer cluster on property values is particularly troubling in light of Plaintiffs' own admissions about its effect. Plaintiffs' allege in their complaint that "property values in the Acreage declined *in direct response*" to the declaration of the area as a cancer cluster. Ex. F ¶ 37 (emphasis added). Plaintiffs also allege that as a result of the cancer cluster, sellers had to issue disclosures and the FHA issued a warning to appraisers. *Id*. ¶¶ 47-48. Numerous individual Plaintiffs have also claimed to have been impacted

10

by the cancer cluster. For example, James Harwood reports that he lost a sale of his property because "the buyer backed out when news of 'Cancer Cluster' broke." Ex. N at 6. Marie Louine wrote that realtors "refused to list [my] property in the Acreage because they can't sell due to the cancer cluster." Ex. O at 6. And Patricia Wyman, a former Acreage-area realtor, testified that the cancer cluster designation impacted her property's value because "[it] wouldn't be as desirable to sell with a label like that." Ex. P at 120:13-20. Remarkably, Kilpatrick admitted that he did not consider, and was not even aware of, what the Plaintiffs themselves had said. Ex. L at 48:8-22.

Kilpatrick acknowledges that he failed to control for the impact of the cancer cluster on property values in the Acreage when analyzing Plaintiffs' claims against Pratt & Whitney. He ignored a material, undisputed fact that Plaintiffs admit had an important impact on the value of their properties. As such, Kilpatrick's offered opinions fail *Daubert's* reliability test. *See Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1254 (11th Cir. 2010) (affirming the exclusion of an expert who "failed to adequately consider possible alternative causes" of an injury).

      **B.**    **Kilpatrick's failure to control for the cancer cluster undermines the reliability of his two primary analyses.**

Kilpatrick's property valuation opinions rest in large part on two analyses he performed in 2011: a CV survey and a hedonic regression model. The structure of both analyses is intertwined with the cancer cluster designation, which led Kilpatrick to opine in 2011 that each analysis demonstrated the impact of the cancer cluster on property values. Ex. H at 63, 71. Despite the fact that he no longer intends to measure the impact of the cancer cluster designation, Kilpatrick continues to rely on the *same* CV survey and the *same* hedonic regression model without adjustment. His failure to control for the influence of the cancer cluster in these analyses makes his continued reliance on them fundamentally unreliable.

11

Kilpatrick uses a CV survey, which is a survey that attempts to measure individuals' willingness-to-pay to live in a given area based on a hypothetical fact card. The fact card is the critical piece of a CV survey because it "frames the scenario" respondents evaluate. Ex. L at 239:17-22. Kilpatrick's fact card not only mentioned the cancer cluster twice, it used the word "cancer" ten times in two paragraphs. Ex. Q at 4. The impact of the cancer cluster is apparent from the fact that 138 of the 496 respondents who indicated they would not move to the "Acreage" in the survey listed cancer or illness as a primary concern. Ex. K ¶ 12. Yet, Kilpatrick continues to rely on the results to support his opinions about the impact of Pratt & Whitney on property values, despite performing no quantitative analysis to control for the fact card's double-digit references to cancer. Ex. L at 253:15-18, 254:17-20. Without undertaking any analysis to address the cancer cluster, Kilpatrick changed his opinion regarding the result of his CV survey in his 2016 report by crudely cutting-and-pasting a new conclusion (that the CV survey showed the effect of Pratt & Whitney's alleged conduct) in place of the old one (that the CV survey showed the effect of the "cancer cluster designation"):

| CV Survey in 2011 | CV Survey in 2016 |
|---|---|
| "If potential buyers demand a discount in order to bid on homes in the area, one can say that the homes' values have been diminished due to the information about **the Pratt & Whitney facility paired with the cancer cluster designation of The Acreage."** [2011 Report at 71] | "If potential buyers demand a discount in order to bid on homes in the area, then I can conclude that the homes' values have been diminished due to the information about **Pratt & Whitney's history of environmental contamination of the groundwater north of The Acreage."** [2016 Update at 14] |

Kilpatrick offers no discernible or testable methodology for controlling, in his CV survey, for the effects of a cancer cluster that he previously declared had a "tremendous impact." *See Rink*, 400 F.3d at 1292; *Quiet Tech.*, 326 F.3d at 1346.

Kilpatrick's analysis is also premised on comparing the results of two hedonic regression models against each other—an "unimpaired" model and an "impaired" model. The "critical date"

dividing his two models is February 1, 2010, which is the same day the FDOH confirmed the cancer cluster designation in the "Acreage." Ex. L at 280:18-21. Despite the obvious influence of using the cancer cluster confirmation date as the "critical" point for his analysis, Kilpatrick continues to rely on his hedonic regression model in his 2016 report. He again just cuts and pastes a new purpose from the model even though the underlying analysis was unchanged:

| Hedonic Regression Models in 2011 | Hedonic Regression Models in 2016 |
|---|---|
| "The purpose of these models was to determine if there was any change to prices based on being within the proposed class area after **the cancer cluster designation**." [2011 Report at 63] | "The purpose of these models was to determine if there was any change to prices based on being within the proposed class area after **Pratt & Whitney's environmental contamination of the groundwater north of The Acreage became generally known**." [2016 Update at 6] |

Kilpatrick's failure to account for the influence of the cancer cluster renders his two primary analyses fundamentally unreliable. Both analyses are structurally dependent on the cancer cluster. Kilpatrick has offered no basis for saying that these analyses measure the impact of Pratt & Whitney on property values without any influence from the cancer cluster designation.

### C. Kilpatrick's attempt to scrub his 2016 report of references to the cancer cluster demonstrates the unreliability of his opinions.

Kilpatrick's complete lack of methodological rigor is nowhere more apparent than in his treatment of informal surveys he claims to have performed. To support his 2011 analysis, Kilpatrick's team interviewed a number of area residents, real estate brokers, and lenders. Ex. H at 65-68. As reported in 2011, those interviews overwhelmingly demonstrated concern about the cancer cluster. *See* "blue" column below. Kilpatrick cut-and-pasted these same interview notes

into his 2016 report,[1] but again crudely changed what he said about the answers he received in

2011 to reflect concerns about Pratt & Whitney (instead of the cancer cluster):

| **Informal Interviews in 2011** | **Informal Interviews in 2016** |
|---|---|
| "Residents said that it was common to see buyers back out of the sales once they discovered the news **about the cancer cluster.**" [2011 Report at 66] | "Residents said that it was common to see buyers back out of sales once they discovered the news **about the history of environmental contamination.**" [2016 Update at 11] |
| "All seven lending institutions were well aware of the **Florida Department of Health's designation of the Acreage as a cancer cluster.**" [2011 Report at 68] | "All seven lending institutions were well aware of the **recent press discussing Pratt & Whitney's environmental contamination of the groundwater north of the Acreage.**" [2016 Update at 12] |
| "Of the 17 [realtors and brokers] with whom my staff and I were able to speak, a majority of respondents noted that they had deals fall through because of the **cancer cluster designation in the Acreage.**" [2011 Report at 65] | "Of the 17 [realtors or brokers] whom my staff were able to interview, a majority of respondents noted that they had deals fall through because of the **revelation of the contamination of the groundwater north of the Acreage by Pratt and Whitney.**" [2016 Update at 12] |
| "[A] number of the [realtors and brokers] indicated that they were actively disclosing **the cancer cluster designation** when conducting their business." [2011 Report at 65] | "[A] number of the [realtors or brokers] indicated that they were actively disclosing **recent press discussing Pratt and Whitney's contamination of the groundwater north of The Acreage** when conducting their business." [2016 Update at 12] |

Kilpatrick then changes the conclusions he draws from the informal surveys as well:

| **Informal Survey Conclusions in 2011** | **Informal Survey Conclusions in 2016** |
|---|---|
| "As the different surveys show, **The Acreage's cancer cluster designation** had a tremendous impact on the general level of activity in the area in many different aspects." [2011 Report at 75] | "As the different surveys show, **news regarding environmental contamination of the groundwater by Pratt & Whitney north of the Acreage** had a tremendous impact on the general level of activity in the area in many different aspects." [2016 Update at 17] |
| "Lending activities decreased because lending institutions viewed **the cancer cluster designation** as a potential liability to their business." [2011 Report at 75] | "Lending activities decreased because lending institutions viewed the **news of environmental contamination** as a potential liability to their business." [2016 Update at 17] |

---

[1] The contrast between Kilpatrick's 2016 report and the informal interview notes is stark. For example, his notes from interviews with the seven lending institutions reveal that *every* lending institution was aware of the cancer cluster, and *none* mentioned Pratt & Whitney. *See* Ex. R.

Kilpatrick's only explanation for changing the informal survey responses is that he understood the phrase "cancer cluster" to be a "mnemonic" device for Pratt & Whitney's alleged contamination. Ex. L at 108:18-109:1. Kilpatrick has absolutely nothing upon which to base that conclusion, given that he admits he did not review the informal survey responses before changing the answers and did not discuss the change with the individuals that actually performed the interviews. *Id.* at 40:17-41:7; 93:6-12. This is the type of outcome-driven analysis, devoid of any methodology, that pervades Kilpatrick's reports and requires his exclusion under *Daubert*. *See Rink*, 400 F.3d at 1293 n.7 (explaining that "a district court may properly consider whether the expert's methodology has been contrived to reach a particular result"); *Burke v. Gen. Motors Corp.*, 218 F. App'x 951, 953 (11th Cir. 2007) (unpublished) (affirming the exclusion of an expert for improper manipulation of relevant data).

## IV. Kilpatrick Offers No Reliable Methodology To Reconcile His Six Valuation Analyses

Kilpatrick's valuation opinions are also fundamentally flawed because he provides no basis for his final opinion in the different methodologies he employed. Kilpatrick concludes that property values in the Acreage have been diminished by 25-40%, but he offers no method for deriving that conclusion from the six analyses set out in his report. His analysis is a black box. *See* Ex. L at 198:2-10 (Kilpatrick admitting he did not "rank order[]" or weight his analyses).

Kilpatrick's lack of transparency on this point warrants exclusion, as there is no way for the jury to evaluate the validity of his opinion on Plaintiffs' injuries. *See Hartle v. FirstEnergy Generation. Corp.*, CIV.A. 08-1019, 2014 WL 1317702, at *2, *10 (W.D. Pa. Mar. 31, 2014) ("If Kilpatrick engaged in an 'implicit weighting process,' it would be the kind of 'haphazard, intuitive inquiry' that district courts must exclude.") (citation omitted). Unlike in *Hartle,* where he rank-ordered his methodologies, Kilpatrick's analysis in this case is the kind of "haphazard,

15

intuitive inquiry that district courts must exclude." *Id.* Kilpatrick's black box methodology is particularly problematic because he claims each "method[] could stand alone," Ex. J at 6, yet *none of his analyses* matches the damages range he puts forward. Ex. K ¶ 13. It is impossible to tell how Kilpatrick got from his six analyses to a range of 25-40% diminution.

Kilpatrick's informal surveys, literature review, and case study analysis underscore the problem. He claims that each analysis independently supports his 25-40% damages range, but he admits that he does not identify a diminution percentage from any of them. Ex. L at 279:7-10; 296:11-15; 324:15-18.[2] As such, Kilpatrick leaves the jury with no way to evaluate his conclusion that these three analyses support his purported damages range. Each should be excluded on this basis alone.

## V.     The Court Should Exclude Kilpatrick's CV Survey Because It Is Not An Accepted Appraisal Methodology And Suffers From Errors That Undermine Its Reliability

Kilpatrick's CV survey should be excluded because it is not an accepted appraisal technique and suffers from fatal flaws that undermine its reliability.

CV surveys are not an accepted appraisal technique for assessing the value of contaminated property. As discussed above, AO-9 guides the appraisal of "contaminated properties, or properties suspected of being contaminated." Ex. M at 1. It provides that the determination of "environmental stigma" (what Kilpatrick purports to do) "must be based on

---

[2] Kilpatrick says his case study analysis supports a damages range of 5-62% but does not draw a specific number from this vast range that provides any meaningful guidance to the jury. Ex. L at 296:11-15. Kilpatrick's case study analysis is also unreliable for numerous reasons, including his reliance on case studies that are based on litigation outcomes or settlements, rather than market data, and factually distinct case studies that are not apples to apples comparisons. Notably, one of Kilpatrick's primary case studies stems from a jury verdict (not actual sales data) in a case in which he served as the expert. Ex. H at 50. That verdict was subsequently overturned in the appellate court based, in part, on the conclusion that admission of Kilpatrick's opinions was clear error. *See Exxon Mobil Corp. v. Albright*, 433 Md. 303, 421 (2013). Kilpatrick's "case study" methodology thus bootstraps off prior opinions, also based on case studies and other methods, that were found unreliable.

market data, rather than unsupported opinion or judgment." *Id.* at 4. CV surveys fail this basic

requirement because they rely on respondents' reactions to hypothetical scenarios in place of

real-world sales. Ex. K ¶ 11. This analysis should be excluded because it is unsupported by

accepted appraisal practices. *See, e.g.*, *Davis v. Carroll*, 937 F. Supp. 2d 390, 395 (S.D.N.Y.

2013) (excluding art appraiser for departing from established standards).

Kilpatrick's CV survey is particularly inappropriate in this case given that there is a

wealth of actual sales data to evaluate, including over 5,200 sales in the proposed class area

alone. It is not necessary to use a hypothetical analysis, like a CV survey, to guess how the

market might react because one can (and should) measure the market reaction directly. Courts

have excluded Kilpatrick's reliance on hypothetical CV surveys in similar circumstances where

actual sales data was available. *See Exxon Mobil*, 433 Md. at 421, 424 (noting that "a real estate

appraisal expert must proffer a reasonable justification for ignoring market data where it is

available" and holding that the state trial court's admission of Kilpatrick's testimony was "clear

error"); *Palmisano v. Olin Corp.*, C-03-01607 RMW, 2005 WL 6777561, at *5 & n.5 (N.D. Cal.

July 5, 2005) (excluding Dr. Kilpatrick's opinion that ignored current prices, remarking that

"[t]he court has serious concerns with the degree of speculation Kilpatrick's theory entails").

The Court should also exclude Kilpatrick's CV survey because it includes numerous

methodological errors that render it fundamentally unreliable. For instance, the fact card—which

forms the basis for the CV survey—contains material errors, including a list of contaminants that

supposedly originated at Pratt & Whitney and "migrated . . . into surrounding areas, including

the Corbett Wildlife Refuge and The Acreage neighborhood." Ex. D at 99. This list included

"cancer-causing agents, oil, sodium cyanide, asbestos, and mercury." *Id.* Plaintiffs have not

alleged that Pratt & Whitney contaminated the Acreage with asbestos or oil, nor have they

offered any evidence that either sodium cyanide or mercury has migrated from Pratt & Whitney to the Acreage. Kilpatrick's fact card is thus squarely at odds with the facts of this case.

Courts have excluded Kilpatrick's reliance on a CV survey in similar circumstances, where the "facts" in the "fact card" do not match the claims being made in the case. In *Hartle*, the Plaintiffs alleged property diminution from a power plant's emissions of "white rain" and "black rain." 2014 WL 1317702, at *1. Kilpatrick's "white rain" fact card erroneously included facts only allegedly associated with "black rain." *Id.* at *6. The court excluded the white rain CV survey, finding that the misstatements in the fact card are "not a mere 'technical flaw'; it is fatal to the reliability of the survey." *Id.* at *5-6. Kilpatrick made the same fundamental mistake here.

Dr. John Hauser, a survey research expert from MIT, has also evaluated Kilpatrick's CV survey against established criteria for conducting surveys of this nature and concluded that it contains numerous "severe flaws" that "render the results . . . unreliable and irrelevant." Ex. S ¶ 6 (Hauser Decl.). Among other flaws, Hauser identified that: (1) Kilpatrick's fact card failed to provide sufficient information for respondents to replicate a home purchase decision and misleadingly includes a picture of Pratt & Whitney, (2) Kilpatrick sampled respondents from the wrong population, and (3) Kilpatrick's survey questions suffer from common biases—such as the starting point bias and the embedding problem—known to make survey results unreliable. *Id.*

Taken as a whole, Kilpatrick's CV survey is not an accepted appraisal methodology and was not reliably applied in this case. The Court should exclude his CV survey and opinions.

**VI.    The Court Should Exclude Kilpatrick's Hedonic Regression Because It Is Methodologically Flawed And Fails To Account For Data Critical To Its Reliability**

Kilpatrick performs a hedonic regression analysis that he claims is capable of measuring the amount of diminution in property value the proposed class area suffered after February 1,

18

2010—the date the cancer cluster was disclosed. His analysis is based on comparing the outcomes of two regression models—an unimpaired model (*i.e.*, modeling sales prices before February 1, 2010) and an impaired model (*i.e.*, modeling sales prices after February 1, 2010). Each model included control areas. As discussed above, Kilpatrick initially attributed the alleged impact reflected in his model to the cancer cluster before changing his opinion (without analysis) to attribute it to Pratt & Whitney. *See* IV.B. *supra*.

In addition to that glaring flaw, Kilpatrick's hedonic regression should also be excluded because it does not account for "relevant property characteristics," such as whether a property was contaminated, that the appraisal industry considers important in evaluating environmental stigma. *See* III *supra* (discussing Kilpatrick's violations of AO-9). Kilpatrick admits that the variables he ignored are important. For example, his model does not control for a property's distance from Pratt & Whitney. Ex. L at 146:20-22; 312:25-313:5. Kilpatrick wrote in his own 2011 report, however, that "proximity (physical closeness) to environmental contamination . . . play[s a] key role[] in determining the nature and degree of the impact of environmental stigma on the market." Ex. H at 29. He also relies on a case study that found diminution declined with distance from a contamination source: diminution dropped from 15% for a property located next to the source to 5% for a property located just over a mile from the source. *Id.* at 49. Nonetheless, Kilpatrick does not include any variable to consider the impact of distance from Pratt & Whitney on property values despite the fact that the homes in the class area range from 5 to 15 miles away from Pratt & Whitney. The absence of a distance variable leaves the model unreliable and at odds with industry practice. *See, e.g.*, *Davis*, 937 F. Supp. 2d at 395.

In addition to missing variables, Kilpatrick's model also ignores sales data critical to its reliability. Kilpatrick created his hedonic regression in April 2011. As such, his impaired model

only includes sales from February 1, 2010 to January 17, 2011. Ex. D at 117. In 2011, Kilpatrick

recognized that low volume of sales in his impaired model was a problem and opined that his

regression "model will benefit from . . . further collection of sales data." Ex. H at 63. Kilpatrick,

however, failed to include *any sales data* from the last 5 years (February 2011 to April 2016) in

his hedonic regression model when he submitted it again as part of his 2016 report. Ex. L at

281:15-282:1. He provided no explanation for his failure to include the intervening sales data

other than that he did not "have the time" in the intervening 5 years to update his analysis. *Id.*

Ignoring 5 years of actual sales data is reason alone to exclude Kilpatrick's hedonic regression.

*See, e.g.*, *Exxon Mobil*, 433 Md. at 421.[3]

Kilpatrick's hedonic regression should be excluded in its entirety because he fails to

consider the full-range of sales data and variables necessary to conduct this analysis reliably.[4]

## CONCLUSION

For the foregoing reasons, Dr. Kilpatrick's opinions should be excluded in their entirety.

---

[3] In both his April 2016 report and his most recent August 2016 supplement Kilpatrick relies on a crude price-per-square foot analysis to compare the proposed class area to his control groups. While this is a deeply flawed analysis in its own right, if taken seriously it demonstrates that the most-recent sales data in the proposed class area shows that home prices have effectively caught up to those in the control area. This undermines Kilpatrick's own assertion that any diminution was permanent. *See Davey Compressor Co. v. City of Delray Beach*, 639 So. 2d 595, 596 (Fla. 1994) (damages ordinarily limited to lesser of cost of restoration or *permanent* loss in value).

[4] Kilpatrick also relies on a meta-analysis, Ex. H at 76, which is not an accepted appraisal technique, Ex. K ¶ 9. Kilpatrick's meta-analysis is untestable and unreliable. He refused to identify the specific observations he extracted from articles in order to create his meta-analysis. As such, despite numerous requests for the information, Pratt & Whitney cannot replicate his analysis. Based on the little information Kilpatrick has made available, however, it is evident that his meta-analysis is based on a series of inapplicable articles. For example, there is not a single article in Kilpatrick's meta-analysis measuring the impact of groundwater contamination on residential property values. Such a flawed analysis is an unreliable basis on which to assess property value diminution. Ex. K ¶ 10.

**REQUEST FOR HEARING**

Pratt & Whitney respectfully requests a hearing on this motion. This motion concerns expert testimony regarding complex economic issues, and is therefore more complex than a typical motion. Pratt & Whitney believes that oral argument will aid this Court in understanding the facts and issues presented in the parties' briefing. Pratt & Whitney estimates that this motion requires 30 minutes of oral argument.

September 6, 2016                          Respectfully submitted,


                                          GUNSTER, YOAKLEY & STEWART, P.A.
                                          777 South Flagler Drive, Suite 500
                                          East West Palm Beach, FL 33401
                                          Telephone: (561) 650-0595
                                          Facsimile: (561) 655-5677
                                          **_Attorneys for Defendant Pratt & Whitney_**

                          By:    /s/Gregor J. Schwinghammer, Jr.
                                 GREGOR J. SCHWINGHAMMER, JR.
                                 Florida Bar No. 090158
                                 gschwinghammer@gunster.com
                                 G. JOSEPH CURLEY, ESQ.
                                 Florida Bar No. 571873
                                 jcurley@gunster.com

Pratt & Whitney's *Daubert* Motion to Exclude the Testimony of John A. Kilpatrick
and Incorporated Memorandum of Law

Index to Exhibits

| | |
|---|---|
| Exhibit A | FDOH Report, August 2009 |
| Exhibit B | FDOH Press Release, February 1, 2010 |
| Exhibit C | FDEP SIS Report, August 10, 2010 |
| Exhibit D | Technical Appendix to Declaration of John Kilpatrick, April 14, 2011 |
| Exhibit E | Deposition of Joseph Adinolfe (excerpts), February 1, 2016 |
| Exhibit F | Plaintiffs' Joint Motion for Leave to Amend and Consolidate Their Class-Action Complaints and Proposed Consolidated Class Action Complaint, *Cotromano, et al. v. United Technologies Corp.*, Consolidated Action: Lead Case, Case No. 13-80928-Marra/Hopkins, DE 229 and 229-1, July 20, 2016 |
| Exhibit G | Class Action Complaint, *Reyes et al., v. United Technologies Corp.*, Case No. 9:10-cv-80228-KLR, DE 1, February 10, 2010 |
| Exhibit H | Declaration of John Kilpatrick, April 14, 2011 |
| Exhibit I | Transcript of Hearing before Hon. Kenneth L. Ryskamp (excerpts), *Adinolfe et al., v. United Technologies Corp.*, Case No. 10-80840-CV-KLR, et al., April 16, 2015 |
| Exhibit J | Declaration of John A. Kilpatrick, March 31, 2016 |
| Exhibit K | Declaration of Thomas O. Jackson, September 5, 2016 |
| Exhibit L | Deposition of John Kilpatrick (excerpts), April 12, 2016 |
| Exhibit M | Advisory Opinion 9 (AO-9), USPAP Advisory Opinions 2012-2013 Edition |
| Exhibit N | Plaintiff's Fact Sheet Related to Third Amended Complaint of James J. Harwood, Jr., December 23, 2015 |
| Exhibit O | Plaintiff's Fact Sheet Related to Third Amended Complaint of Marie Y. Louine, December 23, 2015 |
| Exhibit P | Deposition of Patricia Wyman (excerpts), May 17, 2016 |

Exhibit Q                          Mentions of Cancer in Kilpatrick Fact Card, Exhibit 1 to Expert
                                   Report of John R. Hauser, July 8, 2016

Exhibit R                          Bank Interviews from John Kilpatrick's backup file

Exhibit S                          Declaration of John R. Hauser, September 2, 2016

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 6, 2016, I electronically filed the foregoing

with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being

served on all counsel of record identified on the below Service List in the manner specified,

either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other

authorized manner for those counsel or parties who are not authorized to electronically receive

Notices of Electronic Filing.

/s/ Gregor J. Schwinghammer
GREGOR J. SCHWINGHAMMER, JR.

## SERVICE LIST

**Jack Scarola, Esq.**
**Mara Hatfield, Esq.**
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: 561-686-6300
Facsimile: 561-383-9451
E-mail: jsx@searcylaw.com, mrh@searcylaw.com, dtm@searcylaw.com
*Attorneys for Plaintiffs*

**Bryan Scott Gowdy, Esq.**
Creed & Gowdy, P.A.
865 May Street
Jacksonville, FL 32204
Telephone: 904-350-0075
Facsimile: 350-0086 Email:
bgowdy@appellate-firm.com

**Craig Randall Zobel, Esq.**
Law Offices of Craig R. Zobel, P.A.
Post Office Drawer 32065
Palm Beach Gardens, FL 33420
Telephone: (561) 277-1819
Facsimile: 561- 630-9666
Email: czobel@zobellawfirm.com
*Attorneys for Consolidated Plaintiffs*

**Jeffrey Louis Haberman, Esq.**
**Scott P. Schlesinger, Esq.**
Schlesinger Law Offices, P.A.
1212 SE 3rd Avenue
Fort Lauderdale, FL 33316
Telephone: 954-467-8800
Facsimile: 954-523-4803
Email: JHaberman@schlesingerlaw.com, scott@schlesingerlaw.com