# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

### Case No. 9:13-80928-CIV-MARRA

### CLASS REPRESENTATION

RICHARD COTROMANO, BETHANY COTROMANO, FRANK DECARLO, PAULETTE DECARLO, GREGORY DUNSFORD, JENNIFER DUNSFORD, JOYCE FEATHERSTON, BILL FEATHERSTON, ROBERT T. NEWFIELD, TRACY NEWFIELD, JOSEPH ADINOLFE, and KAY SAMSON, Class Representatives, Individually and on behalf of all others similarly situated,

      Plaintiffs,

vs.

UNITED TECHNOLOGIES, Pratt & Whitney Group, A Connecticut Corporation,

      Defendant.

_____/

## PLAINTIFFS' JOINT MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT UNITED TECHNOLOGIES

SCHLESINGER LAW OFFICES, P.A.

/s/ Scott P. Schlesinger
Scott P. Schlesinger
Florida Bar No.: 444952
scott@schlesingerlawoffices.com
Jeffrey L. Haberman
Florida Bar No.: 98522
jhaberman@schlesingerlaw.com
1212 S.E. 3RD Ave.
Fort Lauderdale, Florida 33316
Telephone: (954) 320-9507
Facsimile (954) 320-9509
*Co-Counsel for Adinolfe Plaintiffs*

CREED & GOWDY, P.A.

/s/ Bryan S. Gowdy
Bryan S. Gowdy

SEARCY DENNEY SCAROLA BARNHART & SHIPLEY, P.A.

/s/ Mara R. P. Hatfield
Mara R. P. Hatfield
Florida Bar No.: 37053
mrh@searcylaw.com and
_hatfieldteam@searcylaw.com
dtm@searcylaw.com
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9539
*Counsel for Cotromano Plaintiffs*

Florida Bar No.:  0176631
bgowdy@appellate-firm.com
filings@appellate-firm.com
865 May Street
Jacksonville, Florida 32204
Telephone: (904) 350-0075
Facsimile: (904) 503-0441
*Co-counsel for Adinolfe Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS............................................................................................................. i

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

    A.    Proposed class, class area, class representatives, and class counsel. ................... 2

    B.    UTC's industrial activities in the vicinity of the Acreage.................................. 3

        1.    UTC's operations in general. ................................................................. 3

        2.    UTC's initial clean-up strategy. ............................................................ 4

        3.    UTC's operations relating to nuclear and radioactive materials........ 6

        4.    Radioactive materials discovered on UTC's site. ............................... 7

    C.    Migration of contaminants from UTC's facility to the Acreage, and UTC's contamination of the class area. ........................................................................ 10

        1.    Water flow and the common aquifer ............................................... 10

        2.    Non-Radioactive CCOCs in the Acreage. ....................................... 11

        3.    Radiation Contamination in the Acreage. ........................................ 12

        4.    Cancer cluster in the Acreage. ......................................................... 13

    D.    Stigma and diminution in value of Acreage properties...................................... 16

MEMORANDUM OF LAW ................................................................................................... 18

    I.    Plaintiffs' claims. ........................................................................................... 19

        A.    Section 376.313, Florida Statutes.................................................... 20

        B.    Nuisance. ......................................................................................... 21

        C.    Negligence and strict liability.......................................................... 22

        D.    Price-Anderson Act. ........................................................................ 22

    II.    Plaintiffs have standing. ................................................................................. 26

III.    The Class is adequately defined and ascertainable. ........................................... 27

IV.    Plaintiffs have satisfied all Rule 23(a) criteria. .................................................. 28

        A.    Rule 23(a)(1) – joinder of the numerous class members is impracticable. ................................................................................. 28

        B.    Rule 23(a)(2) – questions of law and fact are common to the class 28

        C.    Rule 23(a)(3) – the class representatives' claims are typical of the class's claims. ...................................................................... 31

        D.    Rule 23(a)(4) – the class representatives will fairly and adequately protect the class's interests. ........................................... 34

V.    Plaintiffs have satisfied the criteria of Rule 23(b)(3). ....................................... 35

        A.    Questions of law and fact common to all class members predominate over questions affecting only individual members.... 36

        B.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. ........................................ 39

CONCLUSION ................................................................................................... 40

CERTIFICATE OF SERVICE .......................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

# Cases

<u>Adinolfe v. United Techs. Corp.</u>,
   768 F.3d 1161 (11th Cir. 2014) ................................................................. 21, 22, 27, 34

<u>Allapattah Servs.</u>,
   333 F.3d 38 ....................................................................................................... 38

<u>Allen v. Uni-First Corp.</u>,
   558 A.2d 961 (Vt. 1988) ...................................................................................... 34

<u>Amgen Inc. v. Conn. Retirement Plans & Trust Funds</u>,
   133 S. Ct. 1184 (2013) .................................................................................. 19, 20

<u>Appleyard</u>,
   754 F.2d at 958, n.3 ............................................................................................ 32

<u>Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.</u>,
   211 F.R.D. 457 (S.D. Fla. 2002) .................................................................. 31, 32, 35

<u>Bates v. Tenco Servs, Inc.</u>,
   132 F.R.D. 160 (D.S.C. 1990) ..................................................................... 30, 33, 40

<u>Beaulieu v. EQ Indus. Servs., Inc</u>,
   2009 WL 22081 ................................................................................................... 37

<u>Beckman v. Marshall</u>,
   85 So. 2d 552 (Fla. 1956) ................................................................................... 21

<u>Bentley v. Honeywell Intern., Inc.</u>,
   223 F.R.D. 471 (S.D. Ohio 2004) .................................................................. passim

<u>Blair v. Transam Trucking, Inc.</u>,
   2015 WL 5006076 (D. Kan. 2015) ...................................................................... 18

<u>Bolin v. Sears, Roebuck & Co.</u>,
   231 F.3d 970 (5th Cir. 2000) ......................................................................... 19, 20

<u>Brown v. Estate of Stuckey</u>,
   749 So. 2d 490 (Fla. 1999) .................................................................................. 31

<u>Brown v. SCI Funeral Servs. of Fla., Inc.</u>,
   212 F.R.D. 6024 (S. D. Fla. 2003 ................................................................. 29, 35

<u>Busby v. JRHBW Realty, Inc.</u>,
   513 F.3d 1314 (11th Cir. 2008) .................................................................... 19, 35

Bussey v. Macon Cnty. Greyhound Park, Inc.,
    562 F. App'x 782 (11th Cir. 2014) ............................................................................... 27

Cameron v. Tomes,
    990 F.2d 14 (1st Cir. 1993) ........................................................................................... 35

Collins v. Olin Corp.,
    248 F.R.D. 95 (D. Conn. 2008).............................................................................. passim

Cook v. Rockwell Intern. Corp.,
    151 F.R.D. 378 (D. Colo. 1993) ............................................................................ passim

Cook v. Rockwell Intern. Corp.,
    618 F.3d 1127 (10th Cir. 2010) ............................................................................. 25, 26

Cook v. Rockwell Intern. Corp.,
    790 F.3d 1088 (10th Cir. 2015) ............................................................................. 25, 26

Cook v. Rockwell Intern. Corp.,
    273 F.Supp.2d 1175 (D. Col. 2003).............................................................................. 34

Cook v. Rockwell Intern. Corp,
    580 F. Supp. 2d 107115 (D. Colo. 200 .......................................................................... 39

Cooper v. Fed. Reserve Bank of Richmond,
    467 U.S. 867, 104 S. Ct. 2794 (U.S. 1984)................................................................... 35

Cox v. Am. Cast Iron Pipe Co.,
    784 F.2d 1546 (11th Cir. 1986) ............................................................................. 28, 29

Crown Cork & Seal Co., Inc. v. Vroom,
    480 So. 2d 108 (Fla. 2d DCA 1985) ............................................................................. 31

Curd v. Mosaic Fertilizer, LLC,
    39 So. 3d 1216 (Fla. 2010)..................................................................................... passim

Davey Compressor Co. v. City of Delray Beach,
    639 So. 2d 595 (Fla. 1994)............................................................................................ 31

Drossin v. Nat'l Action Fin. Services, Inc.,
    255 F.R.D. 608 (S.D. Fla. 2009).................................................................................... 32

Edmonds,
    233 F.R.D.................................................................................................................... 35

El Paso Nat. Gas Co. v. Neztsosie,
    526 U.S. 473, 119 S. Ct. 1430 (1999)........................................................................... 26

English v. Gen. Elec. Co.,
    496 U.S. 72, 110 S. Ct. 2270 (U.S. 1990) ..................................................................... 25

Fabricant v. Sears Roebuck,
    202 F.R.D. 310 (S.D. Fla. 2001) ................................................................................... 38

Flournoy v. Honeywell Int'l Inc.,
    239 F.R.D. 696 (S.D. Ga. 2006) .............................................................. 30, 33, 37, 40

Great Lakes Dredging & Dock Co. v. Sea Gull Operating Corp.,
    460 So. 2d 510 (Fla. 3d DCA 1984) ............................................................................ 22

In re Katrina Canal Breaches Consol. Litig.,
    2007 WL 32454 ............................................................................................................ 38

In re  MTBE Prods. Liability. Litig.,
    241 F.R.D. 185 (S.D.N.Y. 2007) ..................................................................... 30, 33, 34

In re  MTBE Prods. Liability Litig,
    209 F.R.D. 323 (S.D.N.Y. 2002) ................................................................................. 35

In re Vitamin C Antitrust Litig.,
    279 F.R.D. 90 (E.D.N.Y. 2012) ................................................................................... 35

Jones v. Trawick,
    75 So. 2d 785 (Fla. 1954) ............................................................................................. 21

Josephat v. St. Croix Alumina, LLC,
    2000 WL 1679502 ........................................................................................................ 33

Kennedy v. Tallant,
    710 F.2d 711 (11th Cir. 1983) ..................................................................................... 32

Klay v. Humana, Inc.,
    382 F.3d 1241 (11th Cir. 2004) ................................................................... 37, 38, 39, 40

Kornberg v. Carnival Cruise Lines, Inc.,
    741 F.2d 1332 (11th Cir. 1984) ................................................................................... 32

LeClercq,
    2001 WL 199840 .......................................................................................................... 33

Leszczynski v. Allianz Ins.,
    176 F.R.D. 659 (S.D. Fla. 1997) ..................................................................... 32, 38, 40

Lewis v. Gen. Elec. Co.,
    254 F. Supp. 2d 205 (D. Mass. 2003) .......................................................................... 34

Little v. T-Mobile USA, Inc.,
  691 F.3d 1302 (11th Cir. 2012) ............................................................................. 19

Martin v. Foster Wheeler Energy Corp,
  2007 WL 4437221*7 (M.D. Pa. 200............................................................................. 39

Mejdrech,
  2002 WL 1838141 ............................................................................. 30, 33, 40

MHE Assocs. Ltd. P'ship v. United Musical Instruments, USA, Inc.,
  1995 WL 1051651 (N.D. Ohio 1995) ............................................................................. 34

Mills,
  511 F.3d ............................................................................. 36, 37

Moreno-Espinosa,
  247 F.R.D. ............................................................................. 35, 37

Muniz v. Rexnard Corp.,
  2005 WL 1243428*1 (N.D. Ill. 2005) ............................................................................. 27, 30, 35

O'Connor v. Boeing N. Am., Inc.,
  184 F.R.D. 311 (C.D. Cal. 1998) ............................................................................. passim

O'Keefe,
  214 F.R.D. ............................................................................. 38

Payne v. Goodyear Tire & Rubber Co.,
  216 F.R.D. 21 (D. Mass. 2003) ............................................................................. 32

Peters v. Amoco Oil Co.,
  57 F. Supp. 2d 1268 (M.D. Ala. 1999) ............................................................................. 22

Piazza v. Ebsco Indus., Inc.,
  273 F.3d 1341 (11th Cir. 2001) ............................................................................. 26

Ponca Tribe of Indians of Okla. v. Continental Carbon Co,
  2008 WL 52051 ............................................................................. 39

Prado-Steiman ex rel. Prado v. Bush,
  221 F.3d 1266 (11th Cir. 2000) ............................................................................. 31

Roberts v. Fla. Power & Light Co.,
  146 F.3d 1305 (11th Cir. 1998) ............................................................................. 23

Sher v. Raytheon,
  261 F.R.D. 651 (M.D. Fla. 2009) ............................................................................. 28

Silkwood v. Kerr-McGee Corp.,
   464 U.S. 238, 204 S. Ct. 615 (1984) ............................................................ 25

Singer,
   185 F.R.D. ...................................................................................................... 28

Sterling v. Velsicol Chem. Co.,
   855 F.2d 118897 (6th Cir. 198 ...................................................................... 37

The St. Joe Co. v. Leslie,
   912 So. 2d 21 (Fla. 1st DCA 2005) ......................................................... 34, 37

This That And The Other Gift And Tobacco, Inc. v. Cobb County, Ga.,
   439 F.3d 1275 (11th Cir. 2006) ..................................................................... 27

Turner v. Murphy Oil USA, Inc.,
   234 F.R.D. 597 (E.D. La. 2006) ..................................................................... 33

Turner v. Murphy Oil Co.,
   2006 WL 913 .................................................................................................. 39

Tyson Foods, Inc. v. Bouaphakeo,
   136 S. Ct. 1036 (2016) ................................................................................... 36

Wal-Mart Stores, Inc. v. Dukes,
   564 U.S. 338 (2011) ........................................................................... 28, 29, 31

Williams v. Mohawk Indus., Inc.,
   568 F.3d 1350 (11th Cir. 2009) ..................................................................... 32

## Statutes

28 U.S.C. § 1331 ...................................................................................................... 26

42 U.S.C. § 2210(n)(2) .................................................................................. 22, 25, 26

42 U.S.C. § 2014(q) ............................................................................................ 23, 26

42 U.S.C. § 2210 ...................................................................................................... 23

42 U.S.C. § 2214(hh) ......................................................................................... 23, 26

Fla. Stat. § 373.302 ................................................................................................. 32

Fla. Stat. § 376.308(2) (2009) ................................................................................ 20

Fla. Stat. § 376.313(3) (2004) ................................................................................ 20

Fla. Stat. § 376.302(1)(a) ....................................................................................... 30

Fla. Stat. § 376.313 ................................................................................................. 19, 20

## Rules

Fed. R. Civ. P. 23 ...................................................................................................... passim

Plaintiffs, individually and on behalf of all those similarly situated, have filed claims against Defendant United Technologies, Pratt & Whitney Group (UTC), seeking damages for the diminution in their property values resulting from UTC's contamination of their neighborhood and the underlying aquifer. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law or fact predominate over any individual questions.

## Introduction

UTC has stigmatized a community, the Acreage. It did not do this overnight or with a single act of carelessness.  Instead, UTC stigmatized the Acreage – over the course of nearly half a century – by repeatedly spilling, dumping, burying, and burning contaminants; by mishandling radioactive and nonradioactive waste, and by, worst of all, concealing from the government and the public the true scope of its own misdeeds and contamination. UTC's misconduct has harmed the aquifer shared by UTC and the Acreage residents, who rely on well-water for everyday use. It has created a stigma based on contamination. All of this has resulted in a loss in value of the Acreage's homes and properties.

The members of the Acreage community should be allowed to pool their resources and form a unified class so they can litigate on a level play field against a corporate giant like UTC. This case is well suited for class certification under Fed. R. Civ. P. 23(b)(3), as common issues predominate and a class action is superior to the hundreds, if not thousands, of individual actions that will have to be tried if certification is denied. Each Acreage property owner would rely on same expert witnesses, facts, opinions, and documentary proof to prove his or her individual case.  And so would UTC in defending each individual case. UTC wants to force this Court to try, again and again and again, the same factual disputes and to hear the same battle of the experts, over and over and over. This defies

1

common sense. This Court's sound exercise of discretion counsels that it certify a class so the predominant common issues can be tried and decided once and for all.

Critically, the Eleventh Circuit in a prior appeal has deprived UTC of the all-too-common defense argument used to defeat class certification. Invariably, polluting defendants argue class certification is unworkable because, they say, each individual property owner must prove actual contamination of his individual property. But, here, the Eleventh Circuit has ruled that a property owner can hold a polluter liable if his property loses value as result of merely being in the vicinity of, or being under the future threat of, contamination. Proof of actual contamination of each individual parcel is not required.

In sum, this Court should certify a class of Acreage property owners so they can justly, fairly, and efficiently seek redress for the harm caused by UTC's contamination.

## Factual Background

A.     **Proposed class, class area, class representatives, and class counsel.**

The proposed class area, the Acreage, is a well-defined, homogeneous, semi-rural, predominantly residential neighborhood in Palm Beach County, Florida, that contains 17,409 residential parcels.[1] (D.E. 263-3, at 10-11, ¶ 2.2.) 14,509 of these residential parcels are improved, while 2,900 are vacant. (D.E. 258-6, at 4, Table 1.) The Acreage is bordered on the north by the J.W. Corbett Wildlife Management Area ("Wildlife Area"), which continues north to the south border of UTC's site. (D.E.263-3, at 11, 16-21, 29, Figs. 1-4; 262-5, at 9-13.) The proposed class representatives are two individuals and five married couples who own residential parcels located in the Acreage; they seek to represent all persons who owned residential properties in the Acreage as of August 24, 2009 (or

---

[1] Plaintiffs also propose in the alternative a smaller class, as is discussed infra at 18.

alternatively, as of February 10, 2010). (D.E. 229-1, ¶¶5-13, 51, at 3-5, 12; 255-1. The proposed class counsel consists of seven attorneys from three law firms, all of whom are adequate and committed to serving as class counsel.  (D.E. 255-2.)

**B.     UTC's industrial activities in the vicinity of the Acreage.**

      1.     UTC's operations in general.

Since 1957, UTC has operated testing and manufacturing facilities on its Palm Beach County property. (D.E. 262-8, at 3; 260-2, at 14-15.) These operations have included the design, manufacture, rebuilding, and testing of military, jet, and rocket engines. (D.E. 262-8, at 3; 260-2, at 14-15; 258-1, at 5-7.) For these operations, UTC constructed a system of canals, ponds, above and below ground tanks, pipelines, cooling towers, and test stands. (D.E. 257-12; 262-8, at 4; 262-3, at 2-3; 260-2, at 8-9.) These systems were not lined with an impermeable barrier to prevent contaminants flowing into them from percolating into the groundwater. (D.E. 262-8, at 4.) UTC's operations since 1957 generated significant quantities of toxins, contaminants, carcinogens and other hazardous wastes, collectively called chemical contaminants of concern (CCOCs.)[2] (Id. at 3-4.) The standard of care since at least 1957 required UTC to use methods to prevent human exposure to the CCOCs and to prevent transfers of CCOCs into the environment and the groundwater. (Id. at 7.) Instead of complying with the standard of care, UTC has spilled, sprayed, discharged, dumped,

---

[2]These CCOCs include 1,1 Dichloroethane; 1,2 Dichloroethane; 1,1 Dichloroethylene; Trans–1,2 Dichlororethylene; CIS 1,2 Dichloroethylene; 1,1,1 Trichloroethane, 1,1,2 Trichloroethane;  1,1,2,2 Tetrachlorethane;  Trichloroethylene;  Tetrachloroethylene; Carbon Tetrachloride; Vinyl Chloride; Benzene; Toulene; Methylene Chloride; 2,3,7,8-Tetrachlorodibenzo-P-Dioxin; Ethyl Benzene; Chloroform; Bromodichloromethane; Bromoform; Chloroethane; Chlorobenzene; OCCD; TCDD; 1,2,3,4,6,7,8-HpCDD; Paradichlorobenzene;  Chlorodibromomethane;  1,4  Dichlorobenzene;  Hexavalent Chromium; Trichlorofluromethane, Xylene, Dioxins, Paradichlorotoulene, PCBs, Benzonitrite; 1,4 Dioxane; sodium cyanide; jet fuel; rocket fuel; paints; mercury; heavy metals, pesticide and herbicide residue and their degeneration byproducts.  (D.E. 257-8.)

released, buried, and burned CCOCs on its own property, in the adjacent Wildlife Area, and into ponds, canals, surface water, groundwater, and the common aquifer underlying UTC's property, the Wildlife Area, and the Acreage. (D.E. 262-8, at 9-31; 258-9, at 4-7; 262-3, at 3-6257-17; 257-10; 257-9; 257-8; 257-15; 257-13, 257-12; 257-16.)

UTC's handling of jet fuels exemplify its negligent handling and disposal of materials with CCOCs. UTC did not have consistent procedures on its site for the disposition of jet fuels and used procedures that allowed CCOCs to get into the water table. (D.E. 262-8, at 11.) UTC would burn jet fuel in landfills and pits, allowing fuels to pass into the soil. (Id.; D.E. 260-2, at 12.) UTC's burning formed polychlorinated dibenzo-p-diozins and polychlorinated furans (PCDD/Fs) (D.E. 258-9, at 12). CCOC-filled solvents – used to remove tars and hydrocarbons from jet engines – were disposed of, and handled in, a similarly careless fashion with no regard for the environment. (D.E. 262-8, at 11; 260-2, at 17-19.) From 1960 to 1972, an estimated 48 drums per year of solvents were openly burned in a landfill. (D.E. 262-8, at 11-12.) UTC's long-running, repeated pattern of negligent and reckless handling and disposal of materials with CCOCs is well documented in EPA sources and other sources. (D.E. 262-8, at 9-31; 260-2, at 20.) Indeed, UTC in this litigation has not attempted to defend its historical conduct in how it handled, disposed of, or failed to prevent groundwater and surface water migration of CCOC-filled materials.

   2.   UTC's initial clean-up strategy.

The UTC campus was built to house outdoor test areas, which were adjacent to surface waters. (E.g., D.E. 257-3, at 4, 6, 8.) The overflows occurring at these areas and in the percolation pond was a noted problem in 1981, when UTC was first drafting clean-up plans. (D.E. 261-4, at 3-5; 261-6, at 46; 261-10, at 1.). UTC obtained a preliminary list of

the Superfund sites that the EPA had planned to mandate for a clean-up. UTC's site was ranked 12th in the state and 50th in the nation on that list. (D.E. 261-4, at 19.)  The ranking was based on the amount of hazardous waste in the soil among other factors. It did not consider the amount of buried drums in the soil. (Id.)

UTC's "strategy for dealing with Superfund" centered on a study conducted by UTC's consultant, Dames & Moore, on the groundwater contamination and planned aeration system clean-up. (Id.) On October 9, 1981, UTC forwarded the study to the Florida Department of Environmental Resources (DER). (D.E. 261-4, at 4.) It was received favorably by DER, resulting in the site's removal from the state's priority list. It was viewed as likely that it would have the same effect on the Superfund list. UTC's Environmental Affairs supervisor, James Seelinger, wrote that "it appears our strategy was successful, and that we have scored a major victory." The "submittal beat the official [EPA] Superfund list," which had not yet been promulgated. (D.E. 261-4, at 6.) UTC received word on October 23, 1981 that its site was removed from the EPA Superfund list. (D.E. 261-11, at 49.) The Dames & Moore study was the basis for removing UTC from the Superfund list. (D.E. 261-10, at 5-6.)  UTC also forwarded the study to the county health department in 1982 with similar hopes for influencing a reduction in well-field sampling frequency. (Id.)

Despite entering the first consent agreement with the DER and county health department in 1985 and avoiding the Superfund list (D.E. 261-10, at 4-5; 261-4, at 6), a significant amount of contaminated soil remained on UTC's site until 1993 (D.E. 261-3). UTC still had twenty-two solid waste management units to investigate by that time. (Id.) More than a decade after being delisted, a UTC employee, Rick Reis, was quoted in

newsletters published by UTC that the soil-groundwater relationship in this portion of Florida was complexly interrelated, causing UTC to begin shipping thousands of tons of soil to recycling companies in 1993. (D.E. 261-3.) By 2000, UTC still had over fifty tons of contaminated soil to remove off its site. (D.E. 263-2, at 11-12.) As discussed infra, within two years of submitting the Dames & Moore study to government officials, UTC, through Mr. Seelinger, became aware that there were radioactive materials in the site's landfill. UTC decided to treat this as an unknown. (DE 261-2, at 177; Tr. 149:2-19.)

3.    UTC's operations relating to nuclear and radioactive materials.

The historical activities on UTC's site included the development of nuclear aircraft propulsion. (D.E. 58-1, at 4.) UTC's site was originally purchased to create the Florida Research and Development Center (FRDC). (D.E. 261-1, at 40:13-53:25l; 261-1, at 107-16.) FRDC was opened to test poison fuels. (Id.) Such projects included at least three versions of the FRDC Nuclear Jet-11. (D.E. 263-9.) FRDC's obligations under that program included the operation of a materials laboratory that was to work on thorium-inclusive alloys such as TD-Nickel and TD-Cobalt. (D.E. 263-8, at 12-13; *see also* D.E. 258-1, at 8 (noting that TD-Nickel is a potential source of thorium and thorium is a radioactive metal used to produce aerospace alloys).)

According to Jack Wilson (a UTC engineer asked to look into the safety of the materials lab), five of the twelve engineers who worked with TD Nickel in the structures group died of brain tumors. (D.E. 262-1, at 25:15-26:25, 29:14-22.) Wilson also admitted of being aware that UTC was fabricating materials with 100% thorium in the materials lab, an allegation vigorously questioned by UTC. (D.E. 262-1, at 11:25-14:24; 17:10-22; 48:10-53:8; 110:17-102:11, 116:2-117:21.) In fact, UTC denied any knowledge of the use of

6

thorium powder or any non-sealed source nuclear or radioactive material until March 2016, when it amended an interrogatory answer to include documents referencing the disposal of the following items: Thoriumflouride 99.9%, thorium nitrate, thorium oxide powder, uranium sulfate, strontium 90, and gadolinium 153, and materials contaminated with krypton 85.  (D.E. 257-6.)

      4.     <u>Radioactive materials discovered on UTC's site.</u>

UTC's records indicate that there were at least three sites on the property where the company buried radioactive materials: the scrapyard, the salvage yard, and the landfill, as explained below. Only the scrapyard was subjected to regulatory disclosure and clean-up, as indicated by the correspondence from UTC to the Florida Department of Health and Rehabilitative Services dated November 14, 1986. (D.E. 264-1, at 6-7.)  The mid 1960's burial reported in the letter to the regulators directly conflicted with the Florida Research & Development Safety memorandum UTC had filed with the state in 1964. (D.E 264-1, at 4). According to a state official (Paul Vause), all the representations in the memorandum – such as how to dispose of the material – became obligations because the memorandum was a part of the licensing file.  (D.E. 260-4, at 119:12-20.)

***The scrapyard.*** Wastes containing thorium were land-disposed at UTC's scrapyard. (D.E. 264-1, at 6-7.) Thorium was used at UTC's site as thorium oxide powders. (D.E. 258-1, at 8, 24; 257-5, at 54.) UTC's site and the adjoining Wildlife Area were tested by Plaintiffs' experts for elevated levels of thorium isotopes. (D.E. 258-1, at 8.) This is the only area that has been the subject of radioactive-materials remediation because it is the only site where UTC reported the presence of radioactive material.

*Salvage area.* Plaintiffs discovered a map that discloses an area termed the Salvage Area where the burial of "Radioactive Materials" were plotted. There is no record evidence to explain the map depicting a 1965 radioactive material burial in the salvage yard that Plaintiffs found in the archive. Interestingly, not all three maps of the salvage area indicate the disposal of radioactive materials; in fact, a later version does not indicate the 1964 addition of Radioactive Materials. (Cf. D.E. 263-5; 263-6; 263-7.) No employee has acknowledged ever seeing the map before or burying materials in those locations. Frank Wildes testified that, while he was convinced it includes features which made it appear to be the scrapyard, there were also features that made it appear as it is labeled, a map of the separate scrapyard. (D.E. 263-4, at 65:10-74:19.) There is no record of how it was deduced that the "radioactive materials" buried in numerous places in 1965 included only TD nickel. In fact, Wildes, the person who supplied the information on the TD nickel in the scrapyard and landfill TD nickel, testified that the map did not indicate the areas where he had buried TD nickel. (D.E. 263-4, at 74:19-25.)

*The landfill.* The landfill is adjacent to the scrapyard. James Seelinger, former UTC Environmental Affairs supervisor, acknowledged under oath the burial of radioactive materials at the landfill and that this was treated as an "other material":

> You asked me yesterday what kinds of things were in the landfill. My answer was along the lines of, it was detailed in a detail report. …[B]ut there was also the category of other material that was left intentionally vague. I want to expand a little bit upon that. There was a foreman in the… maintenance grounds area of [UTC] that said that he had put TD nickel in either the pits that may have preceded the landfill or the landfill. There was no print of this material. And [UTC] made the decision that we would cover that with the category of other material.

(D.E. 261-2, at 177:2-19, Tr.149:2-19.)

UTC's decision to treat the materials as an "unknown" or "other" was based on input from UTC's management and legal staff. (D.E. 261-2, at 177-80, Tr. 148:12-152:21.) The "Landfill TD Nickel" file, discovered in UTC's archive, supports Mr. Seelinger's testimony and the proposition that UTC's landfill was a separate, unabated area of buried radioactive materials. (D.E. 261-13; 261-14; 261-15; 261-16; 261-17.) The file has notes from the 1982 investigation. (D.E. 261-15, at 44-51.) One such note states, "Frank Wildes reported burying materials in the landfill trenches," including thoriated nickel. (D.E. 261-15, at 44-45). Another note mentions the presence of material not mentioned in the initial reports to Dames & Moore, UTC's consultant, whose study was used to avoid a Superfund listing. Id. (D.E. 261-13, at 16; 261-10, at 4-5; 261-4 at 6.) In contrast, UTC disclosed the scrapyard materials to the authorities in 1986. (D.E.263-1, at 6-7.)

Years later, the following radioactive materials, at elevated levels, were detected by Plaintiff's experts at UTC's site and the adjacent Wildlife Area: (i) uranium isotopes, with the highest levels being found at a burn pit and solid management waste unit; (ii) $^{210}$Pb, with levels that were ten times background at UTC's site and two to three times background at the Wildlife Area; (iii) $^{137}$Cs, with levels above background on UTC's site and several times above background  times or more above background on the Wildlife Area; and (iv) $^{239}$Pu, with levels five times background in the Wildlife Area. (D.E. 258-1, at 13.) In secondary testing, Plaintiffs found levels of strontium 90 while UTC continued to find levels of Cesium 137, including at places like the truck scales used to weigh soil being removed from the Air Force Plant.  (D.E. 258-3, at 10-11; 258-4, at 5, 11). In all the testing, the presence of thorium and thorium decay products remain pervasive—as they do in the Acreage. (D.E. 58-4, at 6-10.)

**C.      Migration of contaminants from UTC's facility to the Acreage, and UTC's contamination of the class area.**

1.      Water flow and the common aquifer

UTC's property, the Wildlife Area, and the Acreage are underlain by, and share, the same permeable and porous underground aquifer. (D.E. 262-5, at 47.) Specifically, there is a continuity of geologic strata between the UTC site and the Acreage, which include permeable strata composed of sand with course shell fragments and consolidated limestone layers which may be fractured. (D.E. 260-2, at 10, 44; 262-5, at 47.) From a groundwater ridge beneath the UTC property, groundwater generally flows to the south and southeast, directly toward the Acreage. (D.E. 260-2, at 10, 28-29; 262-5, at 48; 262-3, at 9.) In addition, groundwater is drawn from beneath the Wildlife Area and UTC's property to the Acreage as a result of the thousands of wells in the Acreage drawing water. (D.E. 260-2, at 29.) At least one surface canal that drains UTC's property flows through UTC's property in a southerly direction, providing a hydraulic pathway for contaminated surface water to leave the UTC site and flow straight towards the Acreage. (D.E. 262-4, at 1-2; 262-3, at 9.) The surface water in this canal also contributed water to the groundwater in the area, due to the sandy soils in the area. (D.E. 262-4, at 2.) Because the groundwater (and surface water) flows to the south and southeast, the groundwater underlying the Acreage has been contaminated by the CCOCs dumped, spilled, discharged, burned, buried, and released by UTC. (D.E. 260-2, at 38; 260-1, at 294; 262-5, at 49.) These CCOCs continue to migrate beyond the boundaries of UTC's property into the Acreage and contaminate the water below the Acreage. (D.E. 260-2, at 42, 50; 262-3, at 9-10; 262-5, at 8.)

2.      Non-Radioactive CCOCs in the Acreage.

Plaintiffs have drilled test wells and verified the presence of CCOCs in the aquifer beneath the Acreage. Laboratory testing has confirmed that CCOCs present in the water beneath the Acreage include: methylene chloride, chloroform, bromodichloromethane, 1,4 dioxane, dioxins, and furans. (D.E. 262-5, at 39, 46.) UTC used carbon tetrachloride in its operations; that chemical undergoes anaerobic microbial degradation to become chloroform, which undergoes anaerobic microbial degradation to become methylene chloride. (Id. at 39.) UTC reported significant levels of chloroform, methyelene chloride, and bromodichloromethane in its wells. (Id. at 42.) UTC also recorded high concentrations of 1,4-dioxane in its groundwater. (Id. at 43.) The drinking water wells for two Acreage residents, both of whom have or had clear cell renal carcinoma, tested positive for chloroform and methylene chloride. (Id. at 41.) One of those wells also tested positive for bromodichloromethane and levels exceeding Florida's clean-up standard. (Id. at 42.) The FDEP has found 1,4-dioxane under the Corbett and in the Acreage. (Id. at 43-44.) Likewise, dioxins and furans have been found in the groundwater beneath both UTC and the Acreage. (Id. at 45-46.) A state soil study revealed that benzopyrene, arsenic, and TRPH were elevated at several case homes. (D.E. 256-1, at 29, 31.)

These CCOCs that have migrated, and continue to migrate, to the Acreage pose significant health risks to residents.  (D.E. 259-7, at 6.)  Expert agencies have classified many of these CCOCs as known or suspected human carcinogens. (Id. at 8.) PCDD/Fs not only have the potential to initiate cancer, but they are also cancer promoters. In other words, PCDD/Fs contribute to a tumor's development; they can make the cancer cells grow faster and become more numerous. (D.E. 259-7, at 37, 259-4 at 8-9.) Acreage residents are, and will be, exposed to these CCOCs because they rely on well-water for their potable water

11

needs and draw that water from the same aquifer UTC has contaminated. (D.E. 259-7, at 5-6.) A 1981 University of Miami Cancer Study of UTC employees discussed a nine-fold increase in UTC employee cancer rates that was attributable to some of these CCOCs, such as chlorinated hydrocarbons that contaminated the drinking water from the aquifer under the UTC site. (D.E. 260-9, at 9.) The study also found that 35% of all deaths among active UTC workers were attributed to cancer. (Id.) Exposure to a mixture of carcinogens only increases adverse health risks, even if ingested in small amounts over long periods of time. (D.E. 259-7, at 39.)

In short, CCOCs known to exist in the groundwater beneath UTC have been found in multiple locations within the Acreage, and there are no other sites within the vicinity that could explain these findings. (D.E. 262-2, at 49; 260-1, at 193-94.) These CCOCs pose substantial health risks to the Acreage's residents. (D.E. 259-7, at 6.)

        3.        <u>Radiation Contamination in the Acreage.</u>

The physical evidence confirms that more likely than not, contaminants from the industrial activities at UTC's facility have migrated offsite, creating radioisotope and other contaminant exposures to residents of the Acreage. (D.E. 258-1, at 1.) This conclusion was reinforced in the recent supplemental findings, which were made after all test results from the secondary site inspection were received. (D.E. 258-4, at 2.) Of course, exposure to ionizing radiation can cause a brain tumor and significantly increase an individual's risk for developing a brain tumor. (D.E. 259-5, at 3-4.)

Plaintiffs' expert, Dr. Kaltofen has opined, based on his study of the Acreage, about the radioactive contamination of the homes in the Acreage:

> Many . . . homes in the Acreage . . . have drinking water treatment systems. The residuals from these systems include expended filtration materials and soils receiving backflush waters from treatment systems. Despite the use of

these treatment systems, extensive scale deposits form in plumbing and appliances in the Acreage homes. These residuals and scales often have shockingly high levels of radioactive isotopes. Levels of 210Pb and 226Ra repeatedly reach levels of 50 to 100 times soil background levels and higher . . . .The radioactive isotopes, $^{226}$Ra and $^{210}$Pb, which are decay products of $^{230}$Th and $^{238}$U, are found at elevated levels in residuals related to the drinking water systems in Acreage residences. No systematic relationship between the distance between the affected home in the Acreage and [UTC's] facility was noted for these contaminants in home water systems. This suggests that contaminated fill materials, consistent with wastes from [UTC], used in home construction and each home's drinking water wells are a more likely source of contaminants than, for example, windblown materials.

(D.E. 258-1, at 14.)

The presence of these materials is often in tandem with the sort of rare metals used by UTC. One alloy developed at UTC's site was niobium-lithium, which is a very rare material that also has been detected in the Acreage. (D.E. 258-1, at 4.) The highest niobium result was 720 ppb in the backflush area soils belonging to Mr. and Mrs. Newfield, both of whom are proposed class representatives. (Id. at 17.) Typical background levels of niobium are at about 50 ppb (for limestone and limestone sands). (Id. at 11, 32). Data from the UTC site inspection found at UTC's scrapyard niobium levels close to the levels found on the Newfield property. (D.E. 258-4, at 7.)

4.      Cancer cluster in the Acreage.

In August 2009, the Florida Department of Health (DOH) declared that the level of pediatric brain tumors in the Acreage was significantly escalated for the years 2005-2007. (D.E. 256-2, at 14-15, 28, Table 7.) The Acreage is defined by the DOH report, *The Acreage Cancer Review,* using the same area as area 9-2 on the map of the county plan. (Id. at 26-28, 30 and County Unincorporated Map.)  This county-defined area for the Acreage, used by the DOH report, comports with the alternative class area proposed by

13

Plaintiffs (class area #2). (D.E. 255-3, at 3.) Plaintiffs' primary proposed class area (class area #1) includes additional surrounding and adjacent areas. (D.E. 255-3, at 2.)

DOH compared the amount of cancers that occurred in the Acreage to the amount of cancers that occurred in Palm Beach County and Florida. (D.E. 256-2, at 11.) The comparison of these numbers yields the Standardized Incidence Ratio, or a SIR. (Id. at 11-12.) Each time DOH looked at the rate of brain cancer, in the time period 2004-2007, it found an increase. (Id. at 13-15, and tables 6,7,9,10.)

DOH obtained the rate of diagnosis for the Acreage, for the county as a whole, and for the state from data recorded by the Florida Cancer Data Registry, which obtains data from physicians who have until the following end of year to make all reports of brain tumors. (Id. at 7-12.) From that data, it determined that rates of cancer for certain three and four year terms were significantly elevated, most notably in children. (Id. at 13-15.) For the years 2005-2007, pediatric brain cancers were 3.3 times the expected incidence number. (Id. at 14-15, 28, Table 7.) Significantly, the report noted that, if one excluded males, the SIR for pediatric brain cancers increased to 4.7 for the 2004-2007 time frame. (Id. at 29-30, Tables 8&10.)

The August 2009 report was released before the registry could confirm that all of the cancers diagnosed in the year 2008 were reported. It noted, however, that because three cases for the year for 2008 alone were already reported to the registry, the increased incidence of pediatric brain cancer occurred significantly at two separate times, in 2004-2005 and then again in 2008. (Id. at 15.)

The August 2009 report limited its definition of the Acreage to area designated by Palm Beach County. (Id. at 10.) Dr. Watkins – the DOH epidemiologist who primarily

14

authored the DOH report – testified that the Acreage, as defined by the county, had the largest increase in pediatric brain cancer incidence. (Id. at 16.) But, even when the DOH looked at all the combined zipcodes (including the surrounding adjacent areas), rather than the county-defined Acreage alone, it found an increased incidence of pediatric brain cancer, but noted that the SIR would start to decline. (Id. ) In other words, the areas immediately surrounding the county-defined Acreage had the same pattern of increase as the county-defined Acreage, but those surrounding areas were not experiencing as great an increase as the county-defined Acreage.

Because of concerns regarding possible growth in the community that were not accounted for in the original 2009 report (which relied on 2000 Census data), the DOH reassessed the population three different ways and still found a cluster in pediatric brain cancer. (D.E. 257-7.) Within months of the 2009 report, Dr. Watkins, the epidemiologist who wrote the 2009 report, confirmed in an email to Plaintiff Tracy Newfield that the four children diagnosed in 2008 were confirmed by the registry and that the 2008 diagnoses in and of themselves were another increase of the amount expected for a three-year time period. (D.E. 260-7.) The chances of the female pediatric brain cancer rates occurring in this fashion from 2004-2009 by chance alone as opposed to a systematic cause is one in sixteen thousand. (D.E. 264-2, at 131:16-134:9; 259-8, at 14.) In other words, the only probable cause for the cluster is a systematic cause. And the only cause (systemic or non-systemic) is ionizing radiation, according to the epidemiological and neuropatholical literature.   (D.E. 260-5, at 137:7-138:2; D.E. 259-5, at 3-4 citing Cancer Therapy-Associates CNS Neuropathology, A. Perry MD, Acta Nueropathol (2006) 111:197-212.)

The radioactive materials in the Acreage are likely from the UTC campus (D.E. 258-1, at 1), which is a systemic cause.

**D.      Stigma and diminution in value of Acreage properties.**

The Acreage properties have all suffered from a loss of marketability because of the stigma surrounding the cancer cluster designation and the knowledge of UTC's groundwater contamination. (D.E. 263-3 at 17.) Individual property owners, when deposed, confirmed the stigma caused by UTC's contamination and the cancer cluster. (_E.g_. D.E. 255-10, at 79; 255-9, at 93; 255-7, at 20-21, 48-49.) Due to their homogeneity, diminution damages for properties within the Acreage can be determined using a mass appraisal model. (D.E. 263-3 at 10.) Using the standard appraisal method of subtracting the value of the property as impaired from the value of the property unimpaired, Dr. Kilpatrick was able to calculate the diminution in real estate value. (Id. at 17.)

First, the unimpaired values for the properties were calculated using a mass appraisal system known as hedonic modeling. (Id. at 17.) Hedonic pricing models are built using statistically rigorous techniques, and have long been used in the appraisal profession. (Id. at 18.) The hedonic model is a statistically rigorous extension of the sales comparison model. (Id.) Dr. Kilpatrick prepared models for both residential land and improved property in the Acreage. (Id. at 17.) He then selected a control area that has a comparable housing stock and market to the Acreage, and prepared a hedonic model for the control area. (Id. at 19, 24.) By using a control area, Dr. Kilpatrick could determine whether the market recognized and captured a change in value due to contamination and stigma, as compared to other market factors. (Id. at 2.)

Next, Dr. Kilpatrick determined the impaired value of the Acreage property using six valuation models, each of which could stand alone, to determine the range of diminution

in value. (Id. at 21.) Those models are: academic literature review, case studies, hedonic modeling, transaction evidence, survey research, and valuation meta-analysis. (Id.) For example, when compared against the control areas, hedonic modeling suggested that the Acreage properties lost 23.1% of their value. (Id. at 63.) The property value diminution percentages determined by the two meta-analyses were 28% and 30%. (Id. at 76.) Survey evidence suggested the properties lost 40% of their value. (Id. at 76.) And comparable case studies suggested that value losses could range as high as 62%. (Id. at 60.) Using the combined results of these models, Dr. Kilpatrick concluded that the properties in the Acreage diminished in value in the range of 25% to 40%. (Id. at 79.) Thus, class-wide damages range from $818,091,250 to $1,308,946,000. (Id.)

As Dr. Kilpatrick explained, valuing the Acreage properties using mass appraisal has several significant benefits. (Id. at 81.) First, the separate valuation of the individual properties would result in haphazard and inconsistent estimates of damages, whereas class treatment provides a consistent and reliable estimate of damages. (Id.) Second, individual appraisals present severe challenges in ensuring the consistency of data, appraisal methods, and valuation conclusions. (Id.) Third, the significant costs of appropriately valuing the properties can be amortized over all the properties if done in a mass appraisal, and achieves significant economies of scale. (Id. at 81-82.) Fourth, from an appraisal standpoint, mass treatment provides a better and more efficient means of valuation. (Id. at 82.) Fifth, the USPAP requirement for determining impaired values requires specialized knowledge that is beyond the scope of traditional appraisals, but can be achieved in mass treatment. (Id.) Finally, using the control group in a mass appraisal isolates which effects on value are due

to contamination versus larger market trends and reduces "statistical noise" associated with non-arms-length transactions. (Id.)

## **Memorandum of Law**

This case centers on UTC's contamination of the Acreage and the shared aquifer. Plaintiffs, irrespective of whether or not their individual properties have been contaminated, have suffered a diminution in their property values as a result of UTC's contamination. Plaintiffs now move under Fed. R. Civ. P. 23 to certify the following class on the property-damage claims pled in their proposed consolidated class action complaint (Doc. 229-1):[3]

> All persons who, on August 24, 2009, (or, alternatively, on February 1, 2010) owned residential property within the neighborhood in Palm Beach County, Florida, known as The Acreage, as defined on the map attached directly to this motion as Exhibit A (or, alternatively, on the map attached directly to this motion as Exhibit B).[4]

(See also D.E. 255-3 in filed exhibits.) Excluded from the Class are the following: (1) UTC, its agents and employees, and their immediate families; (2) any entity with a controlling interest in, or under the control of, UTC; (3) governmental entities; and (4) judicial officers to whom this case is assigned, and their staff.

---

[3] As of this filing, the Court has not accepted the consolidated class action complaint. If the Court were to reject the consolidated complaint, the same Plaintiffs making this motion jointly request this Court certify a class, as argued herein, based on the identical claims pled in their separate, pre-consolidation operative complaints.

[4] The alternative proposed class definition is smaller, consisting of 15,663 parcels in the Acreage, and comports with the cancer cluster area identified by the Florida Department of Health and with the definition proposed by the Cotromano plaintiffs in their second amended complaint. (DOH Report 10, 23-24; Case 9:13-cv-80928-KAM, Doc. 79, at 5.) Neither Plaintiffs nor the Court are bound by the proposed definition in the complaint, and the Court bears the ultimate responsibility for defining the class. See Blair v. Transam Trucking, Inc., 09-2443-EFM-KGG, 2015 WL 5006076, at *3 (D. Kan. 2015).

To obtain class certification, Plaintiffs must have standing and must satisfy the requirements of Rule 23(a) and one of the three subsections of Rule 23(b). Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1321 (11th Cir. 2008). In addition, Plaintiffs "must establish that the proposed class is 'adequately defined and clearly ascertainable." Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012). Notably, Rule 23 does not permit this Court "to engage in free-ranging merits inquires at the certification stage." Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S. Ct. 1184, 1195 (2013). This Court may consider the merits "only to the extent . . . they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Id. at 1195.

Plaintiffs first outline the causes of action pled in the complaint. Infra Section I, at 19-26. Plaintiffs then discuss standing, infra Section II, at 26-27; explain why the proposed class is adequately defined and clearly ascertainable, infra Section III, at 27; and explain how they have satisfied the requirements of Rule 23(a), infra Section IV, at 28-35; and (b)(3), infra Section V, at 35-40.

**I.      Plaintiffs' claims.**

In ruling on a class certification motion, a court should assess whether certification is appropriate on a claim-by-claim basis. See, e.g., Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 976 (5th Cir. 2000). Plaintiffs have pled the following property-damage claims in their complaint and seek certification on each claim: common-law strict liability; two statutory counts under section 376.313, Florida Statutes; two negligence counts; nuisance; and a count based on the federal Price-Anderson Act (Doc. 229-1, at 26-34; see also supra notes 3 & 4). The common-law strict liability count, one of the statutory counts, one of the negligence counts, and the nuisance count are based on the allegations of non-radioactive contamination of, among other things, the shared aquifer and the Acreage's groundwater,

19

and such contamination that likely will occur in the future. (<u>E.g.</u>, Doc. 229-1, Counts 1-2, 4-6, <u>see also</u> <u>id.</u> ¶¶ 72-73, a 19-20.) The remaining counts are based on the radioactive contamination of the Acreage. (<u>Id.</u>, Counts 3, 7-8.)

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." <u>Amgen Inc.</u>, 133 S. Ct. at 1196. It does require common questions to "predominate over any questions affecting only individual class members." <u>Id</u>. Plaintiffs set out the elements of each claim below and explain why common questions predominate. Plaintiffs' claims will prevail or fail in unison based on resolution of common questions.

A.   <u>Section 376.313, Florida Statutes.</u>

Under section 376.313, Florida Statutes (2009), a plaintiff "'need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.'" <u>Curd v. Mosaic Fertilizer, LLC</u>, 39 So. 3d 1216, 1222 (Fla. 2010) (quoting Fla. Stat. § 376.313(3) (2004)). "*Any* person" may recover "*all* damages resulting from a discharge or other condition of pollution." Fla. Stat. § 376.313(3) (2009) (emphasis added). While section 376.313 imposes very light pleading and proof burdens on Plaintiffs, UTC has limited defenses available to it. The "*only* defenses" to a section 376.313 cause of action "shall be those specified in section 376.308." Fla. Stat. § 376.313(3) (2009) (emphasis added). Outside of certain discharges not applicable in this case, section 376.308 lists only the following defenses: acts of God, war, and government; and acts or omissions of third parties. Fla. Stat. § 376.308(2) (2009). Relying on section 376.308's language, the Supreme Court of Florida in <u>Curd</u> held that the defendant there could not raise the fishermen's lack of property ownership as a defense. 39 So. 3d at 1222. Similarly, as the Eleventh Circuit recognized, <u>Curd</u> means that UTC here cannot raise as a defense a

20

property owner's failure to prove contamination of his or her individual parcel. See Adinolfe v. United Techs. Corp., 768 F.3d 1161, 1178–79 (11th Cir. 2014). Thus, determining liability on Plaintiffs' statutory claims will rise or fall based on the same common question—did a prohibited discharge or pollutive condition occur? Individual characteristics of Plaintiffs' properties will have no bearing on this inquiry.

      B.    Nuisance.

The Supreme Court of Florida has broadly defined nuisance to allow one property owner to restrain another property owner from doing "[a]nything which annoys or disturbs one in the free use, possession, or enjoyment of his property, or which renders its ordinary use or occupation physically uncomfortable." Jones v. Trawick, 75 So. 2d 785, 788 (Fla. 1954). To prevail on a nuisance claim, the plaintiff must show that the conduct of the defendant was "unreasonable." Adinolfe, 768 F.3d at 1174 (citing Beckman v. Marshall, 85 So. 2d 552, 555 (Fla. 1956)). The Eleventh Circuit in this case ruled that actual contamination of a parcel of property is not a requisite for a nuisance claim under Florida law. Id. at 1177 ("It is difficult for us to see how, given the holding and rationale of Jones, actual contamination of a parcel of property is a requisite for a nuisance claim under Florida law."). Contamination of a shared aquifer and groundwater under a neighborhood is a condition that would reasonably annoy and disturb a homeowner in the neighborhood. Thus, Plaintiffs' nuisance claims will rise or fall based on the adjudication of central, common questions — that is, did UTC contaminate the Acreage, its groundwater, and the shared aquifer, and are UTC's discharges of CCOCs likely to contaminate the Acreage, groundwater, and shared aquifer in the future? Individual characteristics of Plaintiffs and their properties will have no bearing on this inquiry.

C.    Negligence and strict liability.

Florida law requires pleading and proof of four elements to sustain a negligence claim:  (1) a duty – an obligation requiring the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) breach of duty – a failure by the defendant to conform to the standard required; (3) causation – a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage. Curd, 39 So. 3d at 1227.  To recover under a strict liability theory, the activity must be ultra hazardous or abnormally dangerous; physical contact or damage is not required. Great Lakes Dredging & Dock Co. v. Sea Gull Operating Corp., 460 So. 2d 510, 512 (Fla. 3d DCA 1984); Peters v. Amoco Oil Co., 57 F. Supp. 2d 1268, 1286 (M.D. Ala. 1999) (applying Great Lakes). The Eleventh Circuit in this case ruled, based on Curd, that plaintiffs "seeking to recover for economic harm caused by pollution or contamination need not own property that is itself polluted or contaminated." Adinolfe, 768 F.3d at 1178–79. Again, Plaintiffs' negligence and strict liability claims will rise or fall based on adjudication of central, common questions — whether UTC contaminated the Acreage, its groundwater, and the shared aquifer, and whether UTC's discharges of CCOCs are likely to contaminate the Acreage, groundwater, and shared aquifer in the future.

D.    Price-Anderson Act.

The federal Price-Anderson Act (PAA) vests this Court with jurisdiction of "any public liability action arising out of or resulting from a nuclear incident . . . without regard to the citizenship of any party or the amount in controversy." 42 U.S.C. § 2210(n)(2).  A "nuclear incident" is "any occurrence . . . causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special

22

nuclear, or byproduct material." 42 U.S.C. § 2014(q). The substantive law is state law, not federal law, except to the extent state law is inconsistent with 42 U.S.C. § 2210. <u>See</u> 42 U.S.C. § 2214(hh) ("A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.")

In cases involving the nuclear power industry, the Supreme Court has emphasized that regulation of nuclear safety is "the exclusive business of the Federal Government," and Section 2214(hh) has been read to preempt state regulations of nuclear safety, whether those regulations be by way of legislation or tort actions. <u>Roberts v. Fla. Power & Light Co.</u>, 146 F.3d 1305, 1308 (11th Cir. 1998) (internal quotations omitted)  Applying that principle in litigation against nuclear power generators, the Eleventh Circuit has held, "federal regulations must provide the sole measure of the defendants' duty in a public liability cause of action." <u>Id.</u> at 1308. In <u>Roberts</u>, the action was a personal injury action, and the regulations at issue were regulations controlling dose to the employee. But neither <u>Roberts</u>' holding nor the regulations cited there have any application in this class action, which seeks only property damages (specifically, diminution in property values).[5]

---

[5] Although UTC was not using radioactive materials within the nuclear power industry (as UTC did not claim to be using the type of materials that must remain within the purview of the Nuclear Regulatory Commission), the Eleventh Circuit's holding in <u>Roberts</u> arguably may require the claimants in related personal injury actions to prove a violation of the federal dose regulations. But even that is not clear. The congressional interest in expanding nuclear power by managing the financial risk perceived by potential entrants into that industry does not apply to other industries.

The PAA stigma claim at issue in this property-damages class action is not a personal injury claim. Instead, the stigma claim is based upon the perception created by the confluence of the following factors:

- UTC's negligent handling of radioactive materials the considerable amount of unknowns created by its ongoing failure to explain what it has and has not used and how it has disposed of those materials;

- UTC's illegal burial of radioactive materials, including thorium, in its landfill and scrapyard;

- the presence of enhanced levels of thorium decay products and other industrial isotopes at UTC, the Acreage case homes (including but not limited to fill materials and soils affected by water treatment backflush), and in the Wildlife Area between the two sites; and

- the presence of a pediatric brain cancer cluster including an incidence that is most readily explained by a dose of 1.5 grays of radiation.

A dose of 1.5 grays to the public clearly exceeds the dose maximums for the public as set forth by 10 C.F.R. § 20.1301 and the additional EPA regulations grafted into §20.1301. However, in this case, those regulations are not the proper measure of the standard of care. Here, the claim is that UTC caused a stigma value loss because it repeatedly violated the regulations regarding the use and disposal of the material it was licensed to own. It has continued to violate those regulations because, since at least 1982, it has been aware that it buried materials, including thorium, in its landfill – materials buried there since the mid-the 1970's and that UTC falsely claimed were "unknown." In 1986, UTC cleaned up similar materials in its scrapyard, but failed to remove or to report the extent of the known materials in its landfill.

Though federal law exclusively regulates nuclear power safety, Congress has left largely intact state tort and statutory actions for incidents of radioactive contamination and, in the development of the PAA scheme through legislative amendment, has expressly

incorporated such state law. See English v. Gen. Elec. Co., 496 U.S. 72, 78–85, 110 S. Ct. 2270, 2275–78 (U.S. 1990). From the PAA's inception, "Congress assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 252, 204 S. Ct. 615, 623-24 (1984). Indeed, federal law preempts only those state laws that "have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." English, 496 U.S. at 85, 110 S. Ct. at 2278; see also Cook v. Rockwell Intern. Corp., 790 F.3d 1088, 1096 (10th Cir. 2015) ("Cook II") ("Congress sought to minimize interference with State law so that the only interference with State law is in the exceedingly remote contingency of a nuclear incident giving rise to damages in excess of the amount of financial responsibility required together with the amount of the governmental indemnity" (internal alteration, ellipses, and quotations omitted).)

Moreover, the 1988 amendments to the Price-Anderson Act that federalized "public liability" claims based on a nuclear incident leave intact state actions for injuries that fall short of a nuclear incident or do not involve radioactive contamination. See generally Cook II, 790 F.3d at 1088. In the Cook litigation, property owners near a nuclear weapons plant filed a class action complaint for the plant's release of plutonium particles, initially alleging both state law and PAA claims. Cook v. Rockwell Intern. Corp., 618 F.3d 1127, 1132–33 (10th Cir. 2010) ("Cook I"). Reversing the judgment on a jury verdict for the class on the federal and state claims, the Cook I panel ruled that the class had failed to prove at trial its assertion of a "nuclear incident."[6] 790 F.3d at 1090; 618 F.3d at 1138-40. On remand, the

---

[6] Insofar as Cook and other decisions could be read to require each plaintiff to prove, for a PAA claim, actual radioactive contamination of his or her individual parcel, Plaintiffs disagree. By its plain text, 42 U.S.C. § 2210(n)(2) merely grants jurisdiction to a federal

Cook class abandoned any claim that a PAA "nuclear incident" occurred, instead seeking judgment exclusively on the state nuisance claim that had prevailed at trial and was not reversed. 790 F.3d at 1091. Colorado nuisance law required the class to prove—not physical damage to each of their properties—but only that the plutonium contamination "exposed them to either 'some increased risk of health problems' or 'a demonstrable risk of future harm.'" Cook, 618 F.3d at 1145. The Cook II panel rejected the defendants' argument that the class's failure to prove a "nuclear incident" allegation dictated preemption of their state law claims. 790 F.3d at 1094–99. The court instead found that act's text, legislative intent, and interpretive precedent required that the class's successful nuisance claim stand—notwithstanding the class's failure to prove a "nuclear incident" under its Price-Anderson Act claim. Id.

## II.      Plaintiffs have standing.

Standing is more appropriately considered in the context of other Rule 23(a) factors, e.g., "typicality." See Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001)

---

court of "any public liability action arising out of or resulting from a nuclear incident." Cf. 28 U.S.C. § 1331 (granting jurisdiction to a federal court of "all civil actions arising under the Constitution, laws, or treaties of the United States"). Further, though 42 U.S.C. § 2014(q) defines a "nuclear incident," it does not establish a PAA claim's elements. To the contrary, under 42 U.S.C. § 2214(hh), state law establishes a PAA claim's elements. For a federal court to have jurisdiction under 42 U.S.C. § 2210(n)(2), it is true that radioactive or other similar material must cause "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property" to someone or some property, but it is not true that each plaintiff must establish one of these losses. Cook II recognizes this distinction. 790 F.3d at 1095 ("[O]nce injuries sufficient to trigger a nuclear incident a nuclear incident finding are proven the Act contemplates recovery . . . for 'any' injuries flowing from that incident, even those that aren't themselves sufficient to trigger a nuclear incident finding.") To hold otherwise would defeat the PAA's purpose of consolidating in one forum, if possible, all claims arising out of a nuclear incident. See El Paso Nat. Gas Co. v. Neztsosie, 526 U.S. 473, 486-87, 119 S. Ct. 1430, 1438 (1999). In any event, the legal issue of how the PAA applies in conjunction with state law is a common issue susceptible to class-wide determination.

("Typicality…encompasses the question of the named plaintiff's standing…"). In any event, the Eleventh Circuit has ruled Plaintiffs have standing. See Adinolfe, 768 F.3d at 1172 (concluding Plaintiffs' allegations established standing). This ruling is the law of this case. See This That And The Other Gift And Tobacco, Inc. v. Cobb County, Ga., 439 F.3d 1275, 1283 (11th Cir. 2006). This ruling is binding precedent that should apply equally to the Cotromano plaintiffs whose claims have been consolidated with the Adinolfe plaintiffs.

### III.     The Class is adequately defined and ascertainable.

A class is adequately defined and ascertainable "if its members can be ascertained by reference to objective criteria." Bussey v. Macon Cnty. Greyhound Park, Inc., 562 F. App'x 782, 787 (11th Cir. 2014). "The analysis of the objective criteria should also be administratively feasible;" that is, "a manageable process that does not require much, if any, individual inquiry." Id.

The class boundaries here are defined by the borders of the cohesive residential enclave known as the Acreage, outlined in Exhibit A, or alternatively, Exhibit B. This objective geographic boundary clearly defines the class area and allows the class members to be identified in an administratively feasible manner. See Collins v. Olin Corp., 248 F.R.D. 95, 101 (D. Conn. 2008) ("Many courts have certified classes defined by geography, as the class here is defined by the contours of the Newhall neighborhood"); O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319, 320 & n.6 (C.D. Cal. 1998) ("[C]ourts have found that a definable class may be established by geographic boundaries"); Muniz v. Rexnard Corp., 2005 WL 1243428*1 (N.D. Ill. 2005) (holding class boundaries adequately defined by streets and the extent of actual and threatened contamination).

27

**IV.     Plaintiffs have satisfied all Rule 23(a) criteria.**

For a class to be certified, (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Plaintiffs have shown these requirements.

A.     <u>Rule 23(a)(1) – joinder of the numerous class members is impracticable.</u>

The Acreage has 17,409 residential properties. The properties' owners are the class members. Rule 23(a)(1)'s requirement – that the class be so numerous that joinder of all members is impracticable – is easily satisfied. It is impracticable to serve and join the many claimants in this action. <u>See</u> <u>Cox v. Am. Cast Iron Pipe Co.</u>, 784 F.2d 1546, 1553 (11th Cir. 1986) (class of greater than 40 members presumptively adequate for numerosity purposes); <u>Singer</u>, 185 F.R.D. at 686-87 ("[E]ven a mere inconvenience in being able to join all of the persons makes class litigation desirable"). These principles have been applied in groundwater contamination cases. <u>E.g.</u>, <u>Sher v. Raytheon</u>, 261 F.R.D. 651, 663 (M.D. Fla. 2009) (holding numerosity satisfied where plaintiffs "identified 1,300 parcels with over 1,000 potential plaintiffs" whose properties were affected by groundwater contamination), <u>reversed on other grounds</u>, <u>Sher v. Raytheon Co.</u>, 2011 WL 814379 (11th Cir. 2011); <u>Bentley v. Honeywell Intern., Inc.</u>, 223 F.R.D. 471, 480 (S.D. Ohio 2004) (showing that the contamination plume underlies "a sizeable portion" of a city of over 10,000 persons, "easily satisfies the numerosity requirement").

B.     <u>Rule 23(a)(2) – questions of law and fact are common to the class</u>

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 349–50 (2011).

The plaintiffs' "claims must depend upon a common contention … that … must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u> at 350. Notably, commonality does not require that all factual and legal questions be common. <u>Cox</u>, 784 F.2d at 1557; <u>Brown v. SCI Funeral Servs. of Fla., Inc.</u>, 212 F.R.D. 602, 604 (S. D. Fla. 2003).

This case contains numerous common issues of law and fact, including:

- Does the presence of a contamination of a type associated with an increased risk of brain tumors together with the declaration of a "brain tumor cluster" cause property value loss regardless of whether the contamination caused the increased incidence of brain tumors?

- Did UTC cause the presence of contaminants in the Acreage that are associated with an increased risk of brain tumor etymology?

- Did the environmental contamination caused by UTC increase the incidence of brain tumors suffered by Acreage residents?

- Did the resulting cancer cluster cause a diminution in property values within the Acreage?

- What is the magnitude of the value loss caused by the stigma?

- What damages in addition to the diminution in property values are recoverable such as punitive damages and prejudgment interest?

- Did UTC act with reckless disregard?

- Did the releases of Price-Anderson regulated radioactive or source material violate applicable Federal regulations?

- Did the releases of other contaminants violate applicable State regulations?

- To what extent is the alleged nuclear incident indemnified by the United States?

- To what extent do the acts relating to the alleged nuclear incident constitute reckless disregard and warrant punitive damages?

- Whether UTC contaminated a common aquifer shared with the Acreage with toxic CCOCs?

- Whether UTC's activities constituted a nuisance.

- Whether UTC was negligent in the manner in which it stored, used, created, or disposed of the CCOCs.

- Whether UTC's manner of use, creation, and discharge of the CCOCs constituted an ultrahazardous activity.

- Whether UTC's activities violated section 376.302(1)(a), Florida Statutes.

- Whether the class members' properties diminished in value as a result of UTC's environmental contamination

Courts have found commonality based on similar factors in contamination cases analogous to this case. See Collins, 248 F.R.D. at 101; In re (MTBE) Products Liab. Litig., 241 F.R.D. 185, 197 (S.D.N.Y. 2007); Flournoy v. Honeywell Int'l Inc., 239 F.R.D. 696 (S.D. Ga. 2006); Muniz, 2005 WL 1243428, at *2; Bentley, 223 F.R.D. at 480–81; Mejdrech, 2002 WL 1838141 at *3; O'Connor, 184 F.R.D. at 331–32; Cook v. Rockwell Intern. Corp., 151 F.R.D. 378, 385 (D. Colo. 1993); Bates v. Tenco Servs, Inc., 132 F.R.D. 160, 163 (D.S.C. 1990).

Plaintiffs' claims will turn on these common legal and factual issues. With respect to liability, Plaintiffs and the class will present common evidence to prove UTC contaminated the Acreage, its groundwater, and the shared aquifer with radioactive and non-radioactive CCOCs, that those contaminants have migrated to the Acreage, and that those contaminants pose serious health risks. The Acreage's property owners have suffered the same injury: a diminution in value of their properties as a result of contamination-

30

related stigma.[7] Plaintiffs' claims thus depend on a common contention—UTC contaminated the shared aquifer—and the determination of this contention's "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, 564 U.S. at 350. Plaintiffs have demonstrated commonality because the class members' claims all arise from the same wrongful acts and evidence of UTC's liability will apply to all class members.

      C.     Rule 23(a)(3) – the class representatives' claims are typical of the class's claims.

The commonality and typicality requirements of Rule 23(a)(2) and (3) overlap: "Both requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of the individual class members to warrant class certification." Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1278–79 (11th Cir. 2000); Ass'n For Disabled Americans, Inc. v. Amoco Oil Co., 211 F.R.D. 457, 463 (S.D. Fla. 2002) ("The commonality and typicality requirements of Rule 23(a) tend to merge."). While "commonality" refers to the characteristics of the class as a whole, "typicality" refers to the individual characteristics of the named plaintiff's claims in relation to the class. Prado-Steiman, 221 F.3d at 1278-79.

Typicality will exist if the claims of the class and the class representative "arise from the same event or pattern or practice and are based on the same legal theory,"

---

[7] Florida courts award diminution in value for property-damages claims based on contamination. See, e.g., Crown Cork & Seal Co., Inc. v. Vroom, 480 So. 2d 108, 111 (Fla. 2d DCA 1985) (upholding verdict for a private landowner because the amount awarded could have been "for the loss in the value of his land" caused by defendant's contamination of well water), abrogated on other grounds by Brown v. Estate of Stuckey, 749 So. 2d 490 (Fla. 1999); see also Davey Compressor Co. v. City of Delray Beach, 639 So. 2d 595, 596 (Fla. 1994) (distinguishing Vroom on grounds unrelated to this case and confirming Vroom accurately stated Florida law).

Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984); or if the defendant "committed the same unlawful acts in the same method against the entire class," Kennedy v. Tallant, 710 F.2d 711, 717 (11th Cir. 1983); or if there are "shared legal issues with divergent factual predicates [or] a common core of salient facts coupled with disparate legal remedies," Assoc. for Disabled Americans, 211 F.R.D. at 463; or if the plaintiffs' claims "arise from the same event or cause or conduct that gave rise to the claims of the class members." Leszczynski v. Allianz Ins., 176 F.R.D. 659, 672 (S.D. Fla. 1997). Typicality is present here under any and all of the foregoing formulations.

Typicality does not require that the facts and legal theories of the class representatives be identical to those of the class members. Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1357 (11th Cir. 2009) (holding typicality will exist "despite substantial factual differences when there is a strong similarity of legal theories"). To destroy typicality, the factual position of the class representative must "markedly differ" from that of the class members, Kornberg, 741 F.2d at 1337, or must be so great as to place the interests of the class in "significant jeopardy."[8] Drossin v. Nat'l Action Fin. Services, Inc., 255 F.R.D. 608, 615–16 (S.D. Fla. 2009).

Courts routinely find typicality in contamination cases like the present one in which the class representatives, in common with all class members, assert the same causes of action – here, nuisance, negligence, violation of Fla. Stat. § 373.302, strict liability, and the Pirce-Anderson Act – for the same form of property damage, as a result of the same acts

---

[8] Any factual differences between the positions of the class representatives and the class members – and plaintiffs contend that there are none here – are, in any event, properly handled by adjusting the composition of the class or adding new class representatives, rather than by denying certification. Appleyard, 754 F.2d at 958, n.3; Kornberg, 741 F.2d at 1337; Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 26 (D. Mass. 2003).

of contamination. <u>See</u> <u>Cook</u>, 151 F.R.D. at 385–86 (holding typicality satisfied where all class members' claims "arise from the same set of circumstances, the release of hazardous …substances from [defendants'] plant…."); <u>In re (MTBE) Products Liab. Litig.</u>, 241 F.R.D. at 198 (holding typicality present where each plaintiff's claim arises out of the same gasoline contamination and relies on the same legal theories); <u>Flournoy</u>, 239 F.R.D. at 699; <u>Bentley</u>, 223 F.R.D. at 484; <u>Turner v. Murphy Oil USA, Inc.</u>, 234 F.R.D. 597, 605 (E.D. La. 2006); <u>Mejdreck</u>, 2002 WL 1838141, at *4; <u>Bates</u>, 132 F.R.D. at 163. <u>See</u> <u>LeClercq</u>, 2001 WL 199840 at *5 ("Here, Plaintiffs, who specifically do not allege personal injury claims, allege that UTC's misuse and mishandling of TCE – the conduct – was the same for all of the putative class members and caused the same damage – contamination of the groundwater, soil and wells. [E]ven though some of the facts underlying each person's claims may vary, they do not create any conflicts between the class members."); <u>Josephat v. St. Croix Alumina, LLC</u>, 2000 WL 1679502*11 (D. V.I. 2000) ("[P]roperty damage claims are appropriate for class certification because they tend to exhibit fewer individualistic characteristics").

The class representatives in this case own properties in the Acreage. The location of their properties within the Acreage,[9] the individual characteristic of their properties,[10] and whether or not their individual properties have or have not been actually contaminated

---

[9] Plaintiffs' appraisal expert can establish through reliable testimony that the class's properties, regardless of their location in the Acreage, have all been adversely impacted by UTC's conduct and contamination. <u>See</u> <u>supra</u> Factual Background, Part D, at 16-18.

[10] UTC's suggestion that the class's claims depend on whether individual members sold, or intended to sell, their properties is meritless. (<u>See, e.g.,</u> Case No. 9:13-cv-80928-KAM, Dkt. 202, at 9-10.) So far in this six-year litigation, UTC has never cited any Florida case holding that an owner's right to recover diminution-in-value damages, under the pled claims, turns on the potential or actual sale of the owner's property.

by the CCOCs will not destroy the typicality of the representatives' claims.[11] In a similar

vein, in <u>O'Connor</u>, 184 F.R.D. at 334, the court rejected the contention that a class

representative's claims were not "typical" because his property did not lie over the

groundwater contamination plume:

> [T]he lack of a Property Representative in the Groundwater Plume does not
> affect the typicality of the Property Representatives' claims. [W]hile... many
> different types of property exist within the [Property Class], all owners of
> property within the [Class] will seek similar remedies from their claims,
> mainly money damages, for any injury caused to the property from
> Defendants' alleged releases of harmful substances. The type of property in
> question is an individual issue that will address the amount of damages
> available to the claimant rather than the nature of the remedy itself.... Thus,
> while the Representative Plaintiffs may not be "identically situated with all
> other class members," because the Plaintiffs share the same injury and
> interest of potentially contaminated property, Plaintiffs' claims are typical
> of those of the members of the [Property Class].

Other courts have reached similar conclusions. <u>In re (MTBE) Products Liab. Litig.</u>, 241

F.R.D. at 189 (certifying a class of homeowners who experienced "interference with the

quiet enjoyment of their property" by the "threatened presence of MTBE"); <u>Cook v.</u>

<u>Rockwell Int'l Corp.</u>, 273 F.Supp.2d 1175, 1202-1203 (D. Col. 2003); <u>Lewis v. Gen. Elec.</u>

<u>Co.</u>, 254 F. Supp. 2d 205, 218 (D. Mass. 2003); <u>Collins</u>, 248 F.R.D. at 100, 104-105

(certifying a "stigma" subclass); <u>MHE Assocs. Ltd. P'ship v. United Musical Instruments,</u>

<u>USA, Inc.</u>, 1995 WL 1051651, at *3-4 (N.D. Ohio 1995); <u>Allen v. Uni-First Corp.</u>, 558

A.2d 961, 963-65 (Vt. 1988).

       D.     <u>Rule 23(a)(4) – the class representatives will fairly and adequately protect</u>
            <u>the class's interests.</u>

---

[11] UTC's argument that stigma damages are not allowed under Florida law is meritless.
(<u>See</u> Case No. 9:13-cv-80928-KAM, Dkt. 202, at 15) (citing <u>The St. Joe Co. v. Leslie</u>, 912
So. 2d 21, 25 (Fla. 1st DCA 2005)). The Eleventh Circuit repudiated <u>The St. Joe</u> opinion
on which UTC has relied for this argument. <u>Adinolfe</u>, 768 F.3d at 1177–79.

The 'adequacy' criterion in Rule 23(a)(4) embraces two inquiries: (1) whether any substantial conflicts exist between the plaintiffs and the class, and (2) whether the plaintiffs and their attorneys will vigorously and competently prosecute the action. Busby, 513 F.3d at 1323; Moreno-Espinosa, 247 F.R.D. at 690; Edmonds, 233 F.R.D. at 642. Generally, "[a]dequacy of representation is presumed unless there is evidence to the contrary." Brown, 212 F.R.D. at 605; Assoc. for Disabled Americans, 211 F.R.D. at 464; Cook, 151 F.R.D. at 386–87. The class representatives' and counsel's declarations support this presumption and demonstrate that they are adequate to represent the class.[12] (D.E. 255-1, 255-2.)

## V.    Plaintiffs have satisfied the criteria of Rule 23(b)(3).

In addition to proving the four elements of Rule 23(a), the party moving for class certification must prove that the action satisfies one of the subdivisions of Rule 23(b). Busby, 513 F.3d at 1321. Plaintiffs seek certification under Rule 23(b)(3),[13] which states:

---

[12] UTC previously has argued that, because Plaintiffs seek certification of only property-damages claims, principles of claim splitting and *res judicata* create an impermissible conflict between the representatives and absent class members who may have personal injury claims. (See Case No. 9:13-cv-80928-KAM, Dkt. 202, at 17-18 (citing In re MTBE Prods. Liability Litig, 209 F.R.D. 323, 339-40 (S.D.N.Y. 2002)). This argument has been correctly rejected by other courts because, among other reasons, simple measures can be taken to preserve the absent class members' personal injury claims. See Cameron v. Tomes, 990 F.2d 14, 17 (1st Cir. 1993) (citing Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 880, 104 S. Ct. 2794, 2801–02 (U.S. 1984) and noting "the Supreme Court confirmed [that] . . . a class action judgment . . . binds the class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action"); In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 115 (E.D.N.Y. 2012) (rejecting reasoning of In re MTBE and holding reservation in judgment could preserve personal injury claims); see also Bentley v. Honeywell Int'l, Inc., 223 F.R.D. 471, 484–85 (S.D.Ohio 2004) (holding, in a property damages class action, "*res judicata* would not apply to bar and/or prejudice any personal injury claims that the class members may have"); Muniz v. Rexnord Corp., Civ. No. 04–2405, 2005 WL 1243428, at *4 (N.D.Ill. Feb. 10, 2005) (same). In addition, the class notice can notify allow any class member with a potential personal injury claim to opt out.

[13] Though Plaintiffs' complaint also alleged certification under subsections (b)(1) and (b)(2) of Rule 23, Plaintiffs now limit their certification request to subsection (b)(3).

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if: …

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually  controlling the prosecution or defense of separate actions;
> >
> > (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D)  the likely difficulties in managing a class action.

A.    <u>Questions of law and fact common to all class members predominate over questions affecting only individual members</u>

The 'predominance' analysis required by Rule 23(b)(3) "reduces to whether the issues in the class action that are subject to generalized proof and thus apply to class as a whole predominate over those issues subject to only individualized proof." <u>Mills</u>, 511 F.3d at 1308 n.2. It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 136 S. Ct. 1036, 1045 (2016). All common questions of law or fact need not predominate over all individual questions. So long as "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." <u>Id.</u>

The predominance requirement allows factual variations in the specific claims of class members as long as those variations will not cause the common issues to break down into an unmanageable variety of individual legal and factual issues. Mills, 511 F.3d at 1309; Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004); Moreno-Espinosa, 247 F.R.D. at 690. For factual variations to be fatal to a Rule 23(b)(3) claim, those variations must generally relate to liability, not damages. Klay, 382 F.3d at 1260 ("It is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification").

The important questions common to all class members, identified supra at 29-30 clearly predominate. The most significant of these common questions is whether UTC contaminated the Acreage, its groundwater, and the shared aquifer with both radioactive and non-radioactive CCOCs. The same evidence—namely, expert testimony—will suffice for each plaintiff to prove this pivotal issue. Indeed, predominance is routinely found in contamination cases because of the obvious class-wide nature of the liability and damages issues arising from the effects of a common source of contamination on a cohesive geographical area. See Sterling v. Velsicol Chem. Co., 855 F.2d 1188, 1197 (6th Cir. 1988) ("In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next"); Beaulieu v. EQ Indus. Servs., Inc., 2009 WL 2208131*20 (E.D. N.C. 2009) ("In a mass tort case such as this, where the same evidence would resolve the question of liability for all class members, common issues of law and fact have been said to predominate"); see also Collins, 248 F.R.D. at 102-104; Flournoy, 239 F.R.D. at 700; O'Connor, 184 F.R.D. at 340; Cook, 151 F.R.D. at 388-89.

Numerous courts have recognized that the presence of individualized damages issues does not preclude a finding that common issues predominate. Klay, 382 F.3d at 1256–60 & nn. 8,9 ("Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification"); Allapattah Servs., 333 F.3d at 1261; Leszczynski, 176 F.R.D. at 675 ("The need for calculations of the individual benefits due to individual claimants is no reason to bar class relief with respect to common legal issues"); Fabricant v. Sears Roebuck, 202 F.R.D. 310, 317 (S.D. Fla. 2001) ("If Plaintiffs are able to establish liability, the Court may either appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a res judicata finding of liability"); O'Keefe, 214 F.R.D. at 292 (holding individual damages issues do not prevent Rule 23(b)(3) certification where common liability issues predominate).

In the present case, however, it will not even be necessary to reach the issue of whether the possible need for individualized damages determinations precludes a finding of predominance. Plaintiffs' appraisal expert has shown that such individualized damages determinations are unnecessary, and he has computed the proportional diminution in value caused by the contamination—applicable to each class member's property—using well-accepted mass appraisal methods. Mass appraisal, sometimes called "hedonic mass appraisal," or "hedonic regression," is well-accepted in the real estate appraisal profession and in the courts. See In re Katrina Canal Breaches Consol. Litig. 2007 WL 3245438*13 (E.D. La. 2007) ("Clearly, mass appraisal is an accepted methodology. …[I]t is a recognized standard under Rule 6 of the Uniform Standards of Professional Appraisal

Practice ("USPAP")…. This approach is used in appraiser's offices all over the country to determine value."); Cook v. Rockwell Intern. Corp., 580 F. Supp. 2d 1071, 1115 (D. Colo. 2006) (noting that regression analysis, also called hedonic price modeling, "is an accepted and reliable method for assessing the effect of a variable on property values"); Martin v. Foster Wheeler Energy Corp., 2007 WL 4437221*7 (M.D. Pa. 2007) (noting court-accepted appraisal methodology used to calculate area-wide diminution in value); Turner v. Murphy Oil Co., 2006 WL 91364*4-5 (E.D. La. 2006) (Court recognized the value of "large-scale real estate valuation models, including mass appraisal models, to [determine] the diminution of value of property that has suffered from environmental contamination"); Ponca Tribe of Indians of Okla. v. Continental Carbon Co., 2008 WL 5205196*1-2 (W.D. Okla. 2008) (noting area-wide hedonic regression analysis used to calculate diminution of value caused by contamination); O'Connor, 184 F.R.D. at 341 ("Plaintiffs' claims that seek diminution in value of their property due to stigma may be proven on a class-wide basis"). Modern mass appraisal methods are more accurate, economical, and expedient. Mr. Kilpatrick's analysis prevents the issue of damages – to the extent damages issues can ever defeat predominance – from defeating predominance in this case.

> B.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

In a 'superiority' analysis, "[the] focus is not on the convenience or burden of a class action suit *per se*, but on the relative advantage of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." Klay, 382 F.3d at 1269, 1273. When commonality and predominance exist, as they clearly do here, a finding of 'superiority' follows almost as a matter of law. Id. at 1273.

In addition to the fact that the liability and damages issues in this case are 'common'

and 'predominant,' all other factors in this case point to the superiority of a class action. The 17,409 property owners obviously constitute too large a class to permit individual motions to intervene in this case. Thousands of separate lawsuits repeatedly seeking the same discovery, asserting the same claims and the same defenses, and using the same evidence – but always with the possibility of inconsistent outcomes – would be wasteful and would overwhelm the docket in this district. A class action offers substantial economies of time, effort, and expense for litigants and the judiciary. The complexity and expense of cases such as this make it unwieldy for individual class members to prosecute on their own individual actions, especially against such a dauntingly large and well-financed corporation as UTC. Klay, 382 F.3d at 1270–71; Leszczynski, 176 F.R.D. at 676.

Where, as here, a defendant's pollution affects a cohesive geographical area and the liability issues are common and predominant, the contamination case law consistently holds that a class action is the superior procedure. Collins, 248 F.R.D. at 105–6; Flournoy, 239 F.R.D. at 700; Bentley, 223 F.R.D. at 488; Mejdreck, 2002 WL 1838141, at *7; O'Connor, 184 F.R.D. at 341–42; Cook, 151 F.R.D. at 389; Bates, 132 F.R.D. at 164.

## CONCLUSION

Plaintiffs have shown that they have standing and that the proposed class action will satisfy the requirements of Rules 23(a) & (b). Accordingly, this Court should:

A.      grant Plaintiffs' motion;

B.      certify the first proposed class as illustrated in Exhibit A; alternatively, certify the second proposed class as illustrated in Exhibit B; or alternatively, certify whatever classes and subclasses under Rules 23(b)(3) and 23(c)(5), and "particular issues" under Rule 23(c)(4), the Court deems proper; and

C.      allow Plaintiffs an evidentiary hearing at which they will adduce any additional facts that may be necessary to support this motion and that will allow this Court to make any necessary credibility determinations or weigh evidence as is appropriate.

Dated: this 20th day of September, 2016.

       Respectfully submitted,

SCHLESINGER LAW OFFICES, P.A.

/s/ Scott P. Schlesinger
Scott P. Schlesinger
Florida Bar No.:  444952
scott@schlesingerlawoffices.com
Jeffrey L. Haberman
Florida Bar No.:  98522
jhaberman@schlesingerlaw.com
1212 S.E. 3RD Ave.
Fort Lauderdale, Florida 33316
Telephone: (954) 320-9507
Facsimile (954) 320-9509
*Co-Counsel for Adinolfe Plaintiffs*

SEARCY DENNEY SCAROLA BARNHART &
SHIPLEY, P.A.
/s/ Mara R. P. Hatfield
Mara R. P. Hatfield
Florida Bar No.: 37053
mrh@searcylaw.com and
_hatfieldteam@searcylaw.com
dtm@searcylaw.com
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9539
*Counsel for Cotromano Plaintiffs*

CREED & GOWDY, P.A.

/s/ Bryan S. Gowdy
Bryan S. Gowdy
Florida Bar No.:  0176631
bgowdy@appellate-firm.com
filings@appellate-firm.com
865 May Street
Jacksonville, Florida 32204
Telephone: (904) 350-0075
Facsimile: (904) 503-0441
*Co-counsel for Adinolfe Plaintiffs*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this 20th day of September, 2016 I served the foregoing on all counsel of record identified on the below stated service list via transmission of the Notices of Electronic Filing generated by CM/ECF.

**Heather Carney Costanzo, Esquire**
Hcostanzo@gunster.com
**Gerard Joseph Curley, Jr., Esquire**
jcurley@gunster.com
**Gregor J. Schwinghammer, Jr., Esquire**
gschwinghammer@gunster.com;
jhoppel@gunster.com
Pdavid@gunster.com
**Fabienne E. Fahnestock, Esquire**
Ffahnestock@gunster.com

**Alexander L. Groden, Esquire**
alex.groden@bartlit-beck.com
**Andrew C. MacNally, Esquire**
andrew.macnally@bartlit-beck.com
**Daniel R. McElroy, Esquire**
daniel.mcelroy@bartlit-beck.com
**Sean W. Gallagher, Esquire**
sean.gallagher@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR &
SCOTT, LLP

Ivanegas@gunster.com
GUNSTER YOAKLEY & STEWART, P.A.
777 S Flagler Drive, Suite 500E
West Palm Beach, FL 33401
Phone: (561)-655-1980/Fax: (561)-655-5677
*Attorneys for United Technologies Corporation, Pratt & Whitney Group*

54 W Hubbard Street, Suite 300
Chicago, IL 60654
Phone: (312)-494-4408/Fax: (312)-494-4440
*Attorneys for United Technologies Corporation, Pratt & Whitney Group*

**Scott P. Schlesinger, Esquire**
scott@schlesingerlawoffices.com
Jeffrey L. Haberman, Esquire
jhaberman@schlesingerlaw.com
SCHLESINGER LAW OFFICES, P.A.
1212 S.E. 3rd Ave.
Fort Lauderdale, FL 33316
Phone: (954) 320-9507/Fax: (954) 320-9509
*Co-Counsel for Adinolfe Plaintiffs*

**Craig R. Zobel, Esquire**
czobel@zobellawfirm.com
CRAIG R. ZOBEL, P.A.
P.O. Drawer 32065
Palm Beach Gardens, FL  33420
Phone: (561) 277-1819/Fax: (561) 630-9666
*Co-Counsel for Adinolfe Plaintiffs*

**Stephen James Rapp, Esquire**
srapp@wwhgd.com
WEINBERG WHEELER HUDGINS GUNN & DIAL
3344 Peachtree Road, Suite 2400
Atlanta, GA 30326
Phone: (404)-876-2700/Fax: (404)-875-9433
*Attorneys for Palm Beach Aggregates*

**Mara R. P. Hatfield, Esquire**
mrh@searcylaw.com and
_hatfieldteam@searcylaw.com
dtm@searcylaw.com
**John Scarola, Esquire**
_scarolateam@searcylaw.com
SEARCY DENNEY SCAROLA BARNHART & SHIPLEY
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300/Fax: (561) 383-9539
*Counsel for Cotromano Plaintiffs*

/s/ *Bryan S. Gowdy*
Attorney