UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80928-CIV-MARRA/HOPKINS
(Consolidated Action: Lead Case)

RICHARD COTROMANO, BETHANY              **9:13-cv-80928 Marra/Hopkins**
COTROMANO, FRANK DECARLO, PAULETTE
DECARLO, GREGORY DUNSFORD, JENNIFER
DUNSFORD, JOYCE FEATHERSTON, BILL
FEATHERSTON, ROBERT T. NEWFIELD and
TRACY NEWFIELD, Class Representatives all on
behalf of themselves and all others similarly situated,
      Plaintiffs
vs.

UNITED TECHNOLOGIES CORPORATION, Pratt
& Whitney Group, A Connecticut Corporation, and
PALM BEACH AGGREGATES, LLC, a Florida
Corporation,
      Defendants……………………………….

JOSEPH ADINOLFE and KAY SAMSON,          **9:10-cv-80840 Marra/Hopkins**
Class Representatives, Individually and on behalf
of all others similarly situated,
      Plaintiffs
vs.

UNITED TECHNOLOGIES, UTC Group, A
Connecticut Corporation,
      Defendant………………………………
_____/

## CONSOLIDATED CLASS ACTION COMPLAINT

      Plaintiffs,[1] Bethany Cotromano, Frank DeCarlo, Paulette DeCarlo, Gregory Dunsford,

Jennifer Dunsford, Joyce Featherston, Robert T. Newfield, Tracy Newfield, Joseph Adinolfe,

and Kay Samson all on behalf of themselves and all others similarly situated, sue Defendants

United Technologies Corporation, Pratt & Whitney Group, and Palm Beach Aggregates, Inc., a

Florida Corporation, for damages as prayed for specifically below.

---

[1] The additional plaintiffs pursuing claims in their individual capacity are listed in Exhibit A. By
order dated July 15, 2016, the Court stayed their claims pending its adjudication of the
anticipated class certification motions. (*Adinolfe v. United Technologies Corporation*, Case No.
10-cv-80840-Civ-Marra, Doc. 370).

**INTRODUCTION** ................................................................................................ 3

**JURISDICTION, VENUE, AND PARTIES**

The Adinolfe Putative Representatives, 10-80840 .................................. 3

The Cotromano Putative Representatives, 13-80928 .............................. 4

The Defendants ........................................................................................ 5

**CONTAMINANTS, CONTAMINANT DISCOVERY, AND INJURY IN GENERAL**

Contamination of the Acreage .................................................................. 5

The Florida Department of Health Declared Acreage Cancer Cluster ....... 7

Stigma and Diminution of Value of Acreage
    Properties Establishing the Commonly-Injured Class ........................... 9

**CLASS ACTION DESIGNATION AND CRITERIA**

Class Definition and Representation .......................................................... 12

Satisfaction of Class Treatment Criteria .................................................... 14

**FOUNDATIONS OF UTC'S LIABILITY FOR THE STIGMA** ........................... 18

**ACREAGE EXPOSURE MECHANISMS COMPOUNDING THE REASONABLE
APPREHENSIONS THAT UNDERLIE THE STIGMA** ................................. 25

**CLAIMS AGAINST UTC FOR STIGMA DAMAGE**

Count I:     Strict Liability – Hazardous Use of Land (10-80840) ............................ 26

Count II:    Strict Liability – Violation of F.S. § 376.313(3) – Stigma from Groundwater
             Plume (10-80840) ................................................................................... 28

Count III:   Strict Liability – Violation of F.S. § 376.313(3) – Stigma from Contamination
             Found in Cancer Cluster Investigation (13-80928) ................................ 29

Count IV:    Negligence – Stigma from Groundwater Plume (10-80840) ................... 29

Count V:     Negligence – Stigma from Contamination Found in Cancer Cluster
             Investigation (13-80928) ........................................................................ 31

Count VI:    Nuisance – Stigma from Groundwater Plume (10-80840) ..................... 32

Count VII:   Nuclear Incident – Stigma via Release of Licensed By-Product or Source
             Material (Price-Anderson Claim) (13-80928) ....................................... 34

**CLAIM AGAINST PALM BEACH AGGREGATES FOR STIGMA DAMAGE**

Count VIII: Negligence – Stigma from Contamination Found in Cancer Cluster
            Investigation (13-80928) ........................................................................ 35

**PRAYER FOR RELIEF AND REQUEST FOR JURY TRIAL ON ALL COUNTS** ......... 38

## INTRODUCTION

1.    These actions were originally filed separately—both sets of putative class representatives seeking to represent a class of landowners in an unincorporated area known as the Acreage for contamination claims. This complaint consolidates the causes of action on behalf of the putative class. With the exception of some jurisdictional history notes, each of the allegations in this consolidated complaint tracks, with explicit cross-references, the allegations of one or both of the last operative putative class action complaints in the two previously-separate actions. The allegations from the Adinolfe Third Amended Complaint are referenced by notation in the form "10-80840, ¶ #," allegations from the Cotromano Second Amended Complaint by "13-80928, ¶ #."

2.    The class members sustained a stigma-wide value loss to property located within the Acreage portion of the L8 basin of western Palm Beach County, Florida as a result of the defendants' release of contaminants into the L8 basin—contaminants which persist in the community to the point of nuisance and damage and which were discovered as the result of investigations into the Acreage Pediatric Brain Tumor Cluster. (13-80928, ¶ 4)

## JURISDICTION, VENUE, AND PARTIES

3.    These cases were originally filed in state court then successfully removed to this Court based on jurisdiction as specified below.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim occurred in Palm Beach County, Florida.

### The Adinolfe Putative Representatives, 10-80840

5.    The Adinolfe Action, 10-80840, was first filed in state court in 2010 and then successfully removed to this Court based on diversity jurisdiction and the removal provision of the Class Action Fairness Act, found at 28 U.S.C. § 1332(d).

6.    JOSEPH ADINOLFE was an owner of real estate at 8955 120th Ave. North, West Palm Beach, Palm Beach County, Florida, on February 1, 2010, which sustained a diminution in real estate value as a result of environmental contamination created by UTC as alleged in the subsequent paragraphs. (10-80840, ¶ 1)

7.    KAY SAMSON was an owner of real estate at 15285 95th Lane North, West Palm Beach, Palm Beach County, Florida, on February 1, 2010, which sustained a diminution in

real estate value as a result of environmental contamination created by UTC as alleged in the subsequent paragraphs. (10-80840, ¶ 335)

### The Cotromano Putative Representatives, 13-80928

8.    The Cotromano Action, 13-80928, was first filed in state court on August 16, 2013, and then removed. In denying the plaintiffs' motion for remand, the Court found jurisdiction because some of the allegations included a nuclear incident claim and the removal provisions of Price-Anderson found at 42 USC 2210(n)(2) applied.

9.    RICHARD COTROMANO and BETHANY COTROMANO reside in Palm Beach County, Florida. Together as husband and wife, they owned a residence on 76th Road North in the Acreage, an unincorporated residential community in Palm Beach County. They sold it through a short sale after the Florida Department of Health officially declared their daughter to be a member of a pediatric brain tumor cluster in 2010. (13-80928, ¶ 5)

10.    FRANK DeCARLO and PAULETTE DeCARLO reside in Palm Beach County, Florida. Together as husband and wife, they own a residence on 80th Lane North in the Acreage, an unincorporated residential community in Palm Beach County. The Florida Department of Health officially declared their daughter to be a member of a pediatric brain tumor cluster in 2010. (13-80928, ¶ 6)

11.    JOYCE and BILL FEATHERSTON reside in Florida. Together as husband and wife, they owned a residence on 80th Lane North in the Acreage, an unincorporated residential community in Palm Beach County. The Florida Department of Health officially declared Joseph Michael Baratta, Joyce's deceased son, to be a member of a pediatric brain tumor cluster in 2010. The property was subject to a foreclosure action. The Featherstons were unable to enter Deed in Lieu process because of contaminants found in the Department of Environmental Protection investigation. (13-80928, ¶ 7)

12.    GREGORY DUNSFORD and JENNIFER DUNSFORD reside in Tennessee. Together as husband and wife, they owned a residence on 85th Street North in the Acreage, an unincorporated residential community in Palm Beach County. They sold it through a short sale after the Florida Department of Health officially declared their son to be a member of a pediatric brain tumor cluster in 2010. (13-80928, ¶ 8)

13.    ROBERT T. NEWFIELD and TRACY NEWFIELD reside in Palm Beach County, Florida. Together as husband and wife, they own a residence on Banyan Boulevard in

the Acreage, an unincorporated residential community in Palm Beach County. The Florida Department of Health officially declared their daughter to be member of a pediatric brain tumor cluster in 2010. (13-80928, ¶ 9)

## The Defendants

14.     Defendant, UNITED TECHNOLOGIES CORPORATION d/b/a PRATT & WHITNEY (hereinafter "UTC") is a Delaware corporation with a principal place of business and address of 1 Financial Plaza, Hartford, Connecticut. At all times material hereto, Defendant owned and operated an industrial facility on property that it owns in northern Palm Beach County, Florida. UTC's property is located close to the northern edge of the Acreage. The area between the southern border of UTC's property and the northern edge of the Acreage consists of undeveloped land known as the J.W. Corbett Wildlife Management Area. (10-80840, ¶ 426)

15.     PALM BEACH AGGREGATES, LLC is a Florida Corporation operating mining and associated interests and owning land in Palm Beach County. (Hereinafter "Aggregates"). Aggregates owned, and then for some time leased, the land that is currently used as an aquifer impoundment by the South Florida Water Management District - the L8 reservoir. (13-80928, ¶ 11)

## CONTAMINANTS, CONTAMINANT DISCOVERY, AND INJURY IN GENERAL
### Contamination of the Acreage

*Semi-Volatiles, Metals, and Non-Radioactive Materials in the Acreage*

16.     Plaintiffs have drilled test wells and verified the presence of toxins, contaminants, carcinogens and other hazardous wastes, hereinafter collectively referred to as Chemicals or Contaminants of Concern or "CCOCs." CCOCs in the aquifer beneath the Acreage Neighborhood. Laboratory testing has confirmed that CCOCs including but not limited to bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene, are present in the water beneath the Acreage. Groundwater contaminated by UTC with all the CCOCs listed in paragraph 70 below, continues to move south through the aquifer underlying the Acreage and will continue to contaminate the shared water of the Acreage Neighborhood which is dependent on groundwater and does not have municipal, city, or community water. Plaintiffs' actions are premised on UTC's contamination of the shared aquifer with all the CCOCs listed. Plaintiffs' actions are neither dependent upon, nor limited to, CCOCs that have

tested positive in the Acreage as of the date of trial. (10-80840, ¶ 433)

17.     The Department of Health's soil study revealed that benzopyrene was elevated at several case homes. The same study and private testing found certain heavy metals including barium, lead, cadmium and arsenic in the water and in the soil at some case homes. (13-80928, ¶ 123).

*Radiation in the Acreage*

18.     It is generally accepted by nearly all branches of medicine and particularly by epidemiologists, radio-oncologists, health physicists, and neurologists that exposure to ionizing radiation can cause a brain tumor and will significantly increase an individual's risk for developing a brain tumor. (13-80928, ¶ 116)

19.     It is generally accepted within the field of neurology that exposure to cadmium, lead, and mercury or any metal capable of passing the blood brain barrier is a neurotoxin capable of causing a brain tumor. (13-80928, ¶ 117)

20.     Two types of ionizing radiation, including gamma and/or beta emitting radionuclides, have been detected throughout the Acreage: naturally occurring and non-naturally occurring. Note, "naturally occurring" does not mean naturally present—only that it is neither the use of a nuclear reactor or a particle accelerator required to cause the isotope to be in existence. (13-80928, ¶ 118)

21.     Those radionuclides that have been detected in the Acreage at above natural background rates but may be termed naturally *occurring* include Uranium-234, Uranium-235 Uranium-236, and elevated levels of the decay products of Thorium, particularly Lead-214 and Bismuth-214 and Actinium-228. Naturally occurring deposits present in rock containing radium are referred to as Naturally Occurring Radioactive Material (or NORM.) The *presence* of Technologically-Enhanced concentrations of NORM products (or TE-NORMS) in water systems can be associated with the metal processing industry, particularly airplane engine and turbine manufacturing. (13-80928, ¶ 119)

22.     In addition to the TE-NORM products identified in paragraph 21 above, radionuclides have been detected in the Acreage that are not naturally occurring. These include Cesium-137, Iridium-192, and Cadmium-109. Contamination of Iridium-191 and Cadmium-109 is particularly associated with the metal processing industry generally and with airplane engine and turbine manufacturing and testing of the type conducted by UTC at its Palm Beach Facility. (13-80928, ¶ 120) Since the filing of the Second Amended Complaint,

Strontium-90, Plutonium-239, Plutonium-238 and Americium-241 have also been located in the Acreage residences. (13-80928, ¶ 120).[2]

23.    Additional testing has shown that these radioactive metals are not completely absorbed by the sediment filters used by the residences and that some build-up occurs in the pipes of these residences when significant rains increase the presence of radionuclides in the water. (13-80928, ¶ 121)

24.    Both these types of radionuclides (TE-NORM and the industrial, non-naturally occurring material) have been detected in the groundwater and in the surface water structures moving water through the canals that recharge the surficial aquifer from which the Acreage residents source their drinking, bathing, and irrigation water. (13-80928, ¶ 122)

**The Florida Department of Health Declared Acreage Cancer Cluster**

25.    In 2009, the Department of Health (DOH) declared that the level of pediatric brain tumors diagnosed in the Acreage was significantly escalated for the years 2005-2007. (13-80928, ¶ 21)

26.    In 2010, the Center for Disease Control (CDC) confirmed the escalation and the 2008 pediatric diagnoses were added to the cluster. (13-80928, ¶ 22)

27.    "The Acreage" area as designated by that report is a well-water reliant community in the center of the L8 basin, which is influenced by the surface and groundwater at the UTC campus from the North. (13-80928, ¶ 23)

28.    The report, attached as Exhibit B, compared the number of cancers diagnosed in the Acreage (the observed incidence) with the population-weighted number of cancers diagnosed in the County and the State (the expected cancer incidence.) The August 2009 report stated that cancer was generally elevated throughout the Acreage and that pediatric brain tumors were significantly elevated to a level of more than three times the expected rate of occurrence. (13-80928, ¶ 24)

---

[2] UTC filed a Response to the Motion for Leave to file this proffered Consolidated Complaint, at which time UTC did not oppose its filing.  In subsequent correspondence, however, UTC addressed this allegation, noting that Plaintiffs' expert has, in response to discovery, opined that he is not aware of any evidence supporting the presence of Iridium 192 or Cadmium 109 in the Acreage.  This testimony is the culmination of several factors that are subject to ongoing discovery. Most significantly, recent Level IV data suggests that the UTC property does not appear to be a source of either Cadmium-109 or Iridium-192—even though UTC's prior reports included a detection of iridium-192.  These recent reports support the theory that the detections of these radionuclides within the Acreage are likely, as alleged in the most recently filed personal injury action, "ghost detections" caused by interference from other radionuclides, see *Kevin R. Tvenstrup vs. United Technologies*, 16-CV-80361 MARRA/HOPKINS.  Discovery into the presence and magnitude of all radionuclides in the Acreage continues.

29.     Charts within the DOH report that the brain cancer incidence among the entire Acreage population as a whole was sharply rising, whereas that same trend was not occurring in the county or the state. (13-80928, ¶ 25)

30.     Each of the named representatives is a parent or step-parent of one of the pediatric cases included in the designated cluster. (13-80928, ¶ 26)

31.     The cancer cluster designation was based only on pediatric brain tumors. The state stopped looking at diagnoses of brain tumors made in adults in 2007, although it appeared in the report that the entire population of the Acreage was experiencing a steady, sharp increase of cases. (13-80928, ¶ 27)

32.     According to self-reported data from the community, the 2008-2010 incidences of brain tumors for the entire Acreage population is above 30. From 1997-2007, the highest number of cases that should be expected in any three-year period based on both state and county comparisons is 5.1. Based on the self-reported data the pediatric cancer cluster declared by the State for the years 2004-2008 would be expanded to a general brain cancer cluster from 2004-2010. (13-80928, ¶ 28)

33.     The fact is that brain cancers are significantly escalated in the Acreage. (13-80928, ¶ 29)

34.     The study notes that ionizing radiation is the primary environmental contaminant associated with an increased incidence of brain tumors. (13-80928, ¶ 30)

35.     Other studies have detected the presence of heavy metals including lead and cadmium in brain tumor tissue. (13-80928, ¶ 31)

36.     The FDOH failed to find the cause of the cluster in part because of flaws in the phase II study's methodology and execution, which included:

    a.   using incomplete data (13-80928, ¶¶ 38–45);

    b.   failing to assess local polluters (13-80928, ¶¶ 46–67);

    c.   bias evidenced by the agency's unwillingness to find an imminent hazard (13-80928, ¶¶ 68–78);

    d.   the improper influence of a county official, former UTC engineer, and others (13-80928, ¶¶ 79–108); and

    e.   ignoring data (13-80928, ¶¶ 109–115).

**Stigma and Diminution of Value of Acreage**
**Properties Establishing the Commonly-Injured Class**

37.     When the cancer cluster was declared in 2009, property values in the Acreage declined in direct response to the declaration. (13-80928, ¶ 32)

38.     They continued to decline after the Department of Health investigation ceased without finding a cause of the cluster and despite the baseless assertion by the Department of Environmental Protection that that the "Acreage is a safe place to live and no risk factors were found associated to pediatric brain cancer." (13-80928, ¶ 33)

39.     At the same time that the Department of Health (DOH) and the Department of Environmental Protection (DEP) announced this failure to find any source of the increased incidence of pediatric brain tumors, the agencies also promised to do the following: "Our epidemiologists will continue to monitor cancer rates in the area for any indication that another increase is occurring. In the meantime, the Department of Health will continue to work with the families whose children have been affected by cancer." (13-80928, ¶ 34)

40.     This information remained published on the web at http://www.pbchd.com/pdfs/newsletters/acreage update/the acreage neighborhood update-11-05-2010.pdf. until 2014. (13-80928, ¶ 35) It was removed by the FDOH later in time.

41.     Since that statement was released in November 2010, there has been no publication of the numbers of brain tumors diagnosed amongst adults. The agencies have refused to communicate with the families whose children have been affected by cancer or their counsel; in fact, the Department of Health has ignored requests for insight on testing that has been performed since that time—testing the families requested that the DOH do but refused to do. (13-80928, ¶ 36)

42.     The failed state study into the cause reached a premature conclusion clearly based on the desire to mitigate the damage to Acreage property values rather than on any sound methodology. However, the state study has not eliminated or reduced the value loss caused by the pollution described herein. (13-80928, ¶ 37)

43.     Beginning as early as July 10, 2009, News Channel 5 (WPTV) in Palm Beach County ran a report stating that "[a]ccording to a 2003 Florida Fish and Wildlife Conservation Commission report, metal drums were found dumped on the Pratt & Whitney side of the property line." The report stated that "[t]he drums were marked hazardous waste and were

spotted by Corbett Wildlife Management workers," and that a plume containing 1,4-dioxane had spread from the drums. (10-80840, ¶ 436)

44.     The media also reported a 1988 inspection conducted by the Florida Department of Health and Rehabilitative Services resulting in a report that "expressed concern about deteriorating drums and their effects on the water supply." The report also "indicate[d] that sources of groundwater, surface water and wind-blown contamination were a concern." (10-80840, ¶ 437)

45.     As the concern regarding elevated numbers of cancer cases continued to escalate, the *Palm Beach Post* ran a series of articles discussing and showing maps of the close proximity of the Acreage to UTC's dumping and spilling of CCOCs and drawing attention to "a long list of toxic leaks and spills on UTC's 7,000 acres dating back to at least 1979 – including one that spread into the neighboring J.W. Corbett Wildlife Management area." On April 11, 2010, the *Palm Beach Post* published an article on its front page titled "Acreage cluster evokes memories of 1980s cancer mystery at Pratt." The article detailed some of the chemical spills a few miles north of the Acreage at UTC which contaminated its groundwater along with a map showing the close proximity to the Acreage of the spills along the southern border of UTC's property. The article also discussed increased cancer death rates of UTC workers attributed to contamination of UTC's groundwater caused by a 1979 spill of TCE from a storage tank into the company's potable groundwater supply. (10-80840, ¶ 438)

46.     Reports also revealed that in the early 1980's the UTC site was placed on the U.S. Environmental Protection Agency's National Priorities List (NPL). Later it was dropped from the NPL at UTC's request for the reason that UTC agreed to attempt some remediation. Unfortunately, UTC's remediation efforts were undertaken after the aquifer had already been heavily contaminated. The remediation efforts did not halt the movement of groundwater contaminated with CCOCs from flowing from beneath UTC property to the Acreage. These remediation efforts did not halt the movement of groundwater contaminated with CCOCs that had escaped from the UTC property and later traveled to and continue to travel to the Acreage. A subsequent 1988 Florida Department of Health report stated that the site remained a "potential public concern because of the risk to human health caused by the possibility of exposure to hazardous substances via CCOCs in groundwater and air." (10-80840, ¶ 439)

47.     On or about February 17, 2010, the Realtors Association of Palm Beach (RAPB), emailed a model disclosure statement and disclaimer to its members that its members should use

to advise potential buyers and renters of the cancer cluster designation at the Acreage. Although the situation in the Acreage was, by then, widely referred to as a "cancer cluster," the RAPB asked its members to:

> Please refer to the situation as the "Acreage Health concern" not as The "Cancer Cluster" which may be perceived as definitive.

The email also stated:

> As Realtors, we are concerned as anyone about the possibility of Specific health concerns in our area. We would also be advocates for government funded studies to determine the cause and to research possible solutions.
>
> In the meantime, however, we do have a duty to disclose the fact that these cases exist and that a potential purchaser or lessee of Property in the area should review for themselves the progress of these studies and findings.

The nation's largest realtor, Coldwell Banker, also prepared a similar disclosure form for its agents' use. (10-80840, ¶ 440)

48.     As the scale and scope of the investigation and public concern continued to escalate, the issue began garnering national attention. The cancer cluster designation and UTC's chemical spills and groundwater contamination received widespread coverage from print and television media. In August 2010 The Federal Housing Administration imposed a warning advising appraisers that the state-declared cancer cluster, which had the effect of calling attention to UTC's history of environmental contamination and proximity to the Acreage, may be harming home values in the central Palm Beach County community. (10-80840, ¶ 441)

49.     As a further direct and proximate result of UTC's contamination of the air, surface water, groundwater, and common aquifer which the Acreage Neighborhood shares, Plaintiffs and the class members have lost the full use and enjoyment of their properties. Plaintiffs and class members depend on groundwater as a source of water for drinking, bathing, cooking and all other domestic uses. Plaintiffs and class members now try to avoid ingestion of and contact with the contaminated groundwater. The CCOCs released and discharged by UTC continue to contaminate the aquifer that is shared with the Acreage Neighborhood and interfere with the use and enjoyment of the Acreage properties. (10-80840, ¶ 442)

50.     UTC's release and discharge of CCOCs into the air, surface water, groundwater, and the common aquifer directly and proximately caused: (i) contamination with CCOCs of the shared aquifer that the Plaintiffs and class members depend upon for their activities of daily living; (ii) the widespread public concerns that it is unsafe and dangerous to one's health to reside in the Acreage due to this contamination; (iii) the diminution of property values within the Acreage, including those properties owned by the Plaintiffs and class members; and (iv) the Plaintiffs and class members to lose the full use and enjoyment of their properties. (10-80840, ¶ 443)

## CLASS ACTION DESIGNATIONS AND CRITERIA
### Class Definition and Representation

51.     The named plaintiffs, as representatives of the putative class, bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following class of persons similarly situated:

> The Class: All persons who, on August 24, 2009 (or, in the alternative, on February 1, 2010), owned residential property within the neighborhood in Palm Beach County, Florida, known as the Acreage, as defined on the map attached hereto as Exhibit B.

Excluded from the Class are the following: (1) defendant, and defendant's agents and employees and their immediate families; (2) any entity with a controlling interest in, or under the control of, defendant; (3) governmental entities; (4) judicial officers to whom this case is assigned, and their staffs; (5) persons other than the Plaintiffs who at the time of the class certification order have sued defendant for their own individual claims arising out of the contamination emanating from UTC's property. (10-80840, ¶ 446, except date of class inception, which is the earlier date from 13-80928, ¶ 14)[3]

52.     Plaintiffs note the recent rulings of the United States Court of Appeals for the Eleventh Circuit made in the case brought by the Adinolfe putative representatives, including that damages for diminution in property value can be recovered by the owners of properties who have sustained economic harm or injury as a result of UTC's environmental contamination. (10-80840, ¶ 447)

---

[3] Plaintiffs reserve the right to request amendment to the class definition after initial certification, should circumstances warrant, as contemplated by Federal Rule of Civil Procedure 23(c) and (d).

53.     All properties—as defined by the Class definition—are harmed by UTC's environmental contamination and that they have common causes of action against UTC. As a result of UTC's environmental contamination the Acreage has been stigmatized as a well water dependent community whose source of groundwater has been severely contaminated with the toxic CCOCs upstream. (10-80840, ¶ 448)

54.     The Eleventh Circuit Court has ruled that owners of properties can recover damages for economic harm to their property values and that the four actions alleged in the Second Amended Complaint do not require physical contamination as an element of those actions. Plaintiffs have repeated the allegations that support those actions herein. Based upon such rulings the Plaintiffs propose a single class as defined above. (10-80840, ¶ 449)

55.     Plaintiffs have previously filed materials with the Court, including laboratory data and expert opinions, demonstrating that UTC has contaminated the common aquifer with CCOCs, that CCOCs are present in the common aquifer beneath the Acreage from which Acreage residents have been drawing water for years, and that CCOCs will continue to travel in the common aquifer from UTC's site to the Acreage. Plaintiffs' ongoing investigation and discovery has and will continue to show different CCOCs contaminating the aquifer beneath the Acreage with CCOCs that UTC contaminated the common aquifer with upstream. (10-80840, ¶ 450)

56.     As stated in paragraphs 9–13 above, some of the named plaintiffs are or have been an Acreage property owner and are a parent or stepparent of a victim of the cancer cluster. (13-80928, ¶ 12)

57.     Complaints addressing the injuries to those children have been separately filed. (None of the Class representatives have claimed personal injuries to their persons.) The remedies sought herein are limited to compensation for the diminution in value of property caused as a consequence of the stigma arising from the pollution discovered in the investigations of the cancer cluster designation and do not include claims for physical injuries suffered by any member of the putative class. (13-80928, ¶ 13)

58.     The named plaintiffs are well aware of and are willing and able to accept the responsibility to represent the members of the class. (13-80928, ¶ 15)

59.     Each of these representatives has owned property in the Acreage during the time of the public disclosure of the Acreage cancer cluster and has sustained a loss as a consequence of the existence of the cancer cluster. (13-80928, ¶ 16)

60.     The pollution on and around their properties, discovered in the investigations of the brain tumor cluster, is a pollution which has affected the property to such an extent that appropriate use of the property has been loss: class members are obliged either to sell the property at diminished value or to remain dwelling at properties because no one will buy them. (13-80928, ¶ 17)

### Satisfaction of Class Treatment Criteria

61.     Class certification is appropriate under Rule 23, meeting the requirements of both 23(a) and 23(b)(3), because (i) members of the proposed class have sustained a common economic injury from a common source which can be adequately ascertained and addressed only through class-wide relief, (ii) the class consists of more than 10,000 property owners, (iii) the specific monetary damages Plaintiffs seek are compensation for the diminution in the value of their properties, assessed by a common method, (iv) all proposed class members, including the named plaintiffs, will be relying on the same underlying legal theories to address the harm caused by contaminants spilled, dumped, burned, buried, discharged or otherwise released at or from UTC's property, and (v) the nature of the relief sought is the same for all the Plaintiffs. (10-80840, ¶ 451)

*Requirements of Rule 23(a)*

62.     <u>Numerosity</u>. The class is sufficiently numerous that joinder of all members is impracticable:

     a.   The class is comprised of at least 10,000 property owners. All property owners within the proposed class area, not already identified in the Amended Complaint, are identifiable through publicly available computerized property records. (10-80840, ¶ 455)

     b.   The members of the class include all past and current property owners of residential lots (including vacant and improved properties) in the Acreage within the time frame of August 2009 to the present. The designated cancer cluster area consists of 850 Census blocks, which is depicted on Exhibit "A" at page 23. There are 15,663 parcels in the Acreage, many of which remain vacant, and all of which have been subject to diminution in value. The total of class members for this area is 27,767. In other words, since August 2009 the 15,663 parcels have been owned by 27,767 persons (including entities). Since

August 2009 there have been 4919 transfers of parcels. The population in the Acreage is around 30,000 people or less. More than sixty-six percent of the class members are citizens of Florida. (13-80928, ¶ 19)

63.    Commonality. The vast majority of the issues of law and fact in this action are common to the class and include:

    a.  Does the presence of a contamination of a type associated with an increased risk of brain tumors together with the declaration of a "brain tumor cluster" cause property value loss regardless of whether the contamination caused the increased incidence of brain tumors?

    b.  Did the Defendants cause the presence of contaminants in the Acreage that are associated with an increased risk of brain tumor etymology?

    c.  Did the environmental contamination caused by the Defendants in fact increase the incidence of brain tumors suffered by Acreage residents?

    d.  Did the resulting cancer cluster cause a diminution in property values within the Acreage?

    e.  What is the geographic limitation of the contamination?

    f.  What is the geographic and temporal limitation of the stigma?

    g.  What is the magnitude of value loss caused by the stigma?

    h.  What damages in addition to the diminution in property values are recoverable such as punitive damages and prejudgment interest?

    i.  Did the Defendants act with reckless disregard?

    j.  Did the releases of Price-Anderson regulated radioactive or source material violate applicable Federal regulations?

    k.  Did the releases of other contaminants violate applicable State regulations?

    l.  To what extent is the alleged nuclear incident indemnified by the United States?

    m.  To what extent do the acts relating to the alleged nuclear incident constitute reckless disregard and warrant punitive damages?

    n.  Whether UTC contaminated a common aquifer shared with the Acreage with toxic CCOCs.

    o.  Whether UTC's activities constituted a nuisance.

      p.   Whether UTC was negligent in the manner in which it stored, used, created, or disposed of the CCOCs.

      q.   Whether UTC's manner of use, creation, and discharge of the CCOCs constituted an ultrahazardous activity.

      r.   Whether UTC's activities violated §376.302(1)(a), Fla. Stat., which prohibits the discharge of pollutants or hazardous substances into or upon Florida's surface waters and groundwaters.

      s.   Whether the class members' properties diminished in value as a result of UTC's environmental contamination.

(a-n: 13-80928, ¶ 19; m-s: 10-80840, ¶ 453)

64.     <u>Typicality</u>. The claims of the Class Representatives are typical of the claims of the class:

      a.   Plaintiffs' factual claims, the legal theories upon which the Plaintiffs' claims are based, and the relief Plaintiffs seek, do not differ from those of the class. Plaintiffs' claims and those of the class arise from the same operative facts and course of conduct engaged in by UTC concerning its use, storage, creation, leakage, spillage and disposal of toxic contaminants resulting in the diminution in value of the Plaintiffs' and class members properties. Plaintiffs and the class will rely on the same evidence to prove the actions against UTC. Every Plaintiff and class member owned real property within the Acreage; the value of every property in the Acreage has been damaged by the contamination emanating from UTC's property; and the amount of damages can be determined on a class-wide basis with a mass appraisal methodology. (10-80840, ¶ 454)

      b.   The claim of the named Plaintiffs for the recovery of damages caused by a uniform stigma which was in-turn caused by the Defendants' pollutive acts is typical of the claims shared by all persons who have owned property in the Acreage at any time since the public disclosure of the increased incidence of cancer in the Acreage. (13-80928, 19)

65.     <u>Fair and Adequate Representation</u>. Class representatives will fairly and adequately protect the interests of the class:

    a.  Plaintiffs are represented by experienced and able counsel who have previously represented persons in class action litigation related to similar issues and will capably and fairly represent the interests of the class members. (10-80840, ¶ 452)

    b.  The representative parties can fairly and adequately protect and represent the interests of each member of the class. There are, in fact, no better representatives than the families who suffered the primary damages of the cancer cluster, the affliction of a brain tumor. The counsel representing these representatives have prosecuted class actions in the past and have been investigating the cluster on behalf of the victims since 2009, before the official DOH declaration. (13-80928, 19)

*Requirements of Rule 23(b)*

66.    Prosecution of separate actions by individual members of the class would create a risk of:

    a.  inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards for the party opposing the class; or

    b.  adjudications concerning individual members of the class which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or substantially impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests.

(10-80840, ¶ 457)

67.    The questions of law and fact that are common to the members of the class predominate over any questions affecting only individual members. (10-80840, ¶ 458)

68.    A class action is a superior method for the fair and efficient adjudication of the issues in dispute. It permits a large number of injured parties, joiner of who is impracticable, to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as such, and no superior alternative exists whereby the relative rights of Plaintiffs, class members, and the defendants can be fairly managed. Class members have no

interest in individually controlling the prosecution of separate actions, and no other litigation is pending by or against any class member concerning this controversy. (10-80840, ¶ 459)

### FOUNDATIONS OF UTC'S LIABILITY FOR THE STIGMA

69.    Beginning in the late 1950s and continuing to the present, Defendant has operated testing and manufacturing facilities on UTC's Palm Beach County property, including but not limited to those known as the Pratt and Whitney Government Engine Business Division, the Pratt & Whitney Aircraft Florida Research and Development Center, and Pratt & Whitney Rocketdyne. Those facilities, collectively referenced as UTC's Operations at the site, have included the design, manufacture, rebuilding, and testing of jet and rocket engines. For these operations UTC constructed a system of canals, ponds, above and below ground tanks, pipelines, cooling towers, and test stands. (10-80840, ¶ 427)

70.    UTC's Operations at the subject property have utilized and generated significant quantities of toxins, contaminants, carcinogens and other hazardous wastes. These toxins, contaminants, carcinogens and other hazardous wastes, hereinafter collectively referred to as Chemicals or Contaminants of Concern or "CCOCs" include but are not limited to 1,1 Dichloroethane; 1,2 Dichloroethane; 1,1 Dichloroethylene; Trans–1,2 Dichlororethylene; CIS 1,2 Dichloroethylene; 1,1,1 Trichloroethane, 1,1,2 Trichloroethane; 1,1,2,2 Tetrachlorethane; Trichloroethylene; Tetrachloroethylene; Carbon Tetrachloride; Vinyl Chloride; Benzene; Toulene; Methylene Chloride; 2,3,7,8-Tetrachlorodibenzo-P-Dioxin; Ethyl Benzene; Chloroform; Bromodichloromethane; Bromoform; Chloroethane; Chlorobenzene; OCCD; TCDD; 1,2,3,4,6,7,8-HpCDD; Paradichlorobenzene; Chlorodibromomethane; 1,4 Dichlorobenzene; Hexavalent Chromium; Trichlorofluromethane, Xylene, Dioxins, Paradichlorotoulene, PCBs, Benzonitrite; 1,4 Dioxane; sodium cyanide; furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, 2-methylnapthalene jet fuel; rocket fuel; paints; mercury; heavy metals, pesticide and herbicide residue and their degeneration byproducts.[i] The CCOCs were stored in barrels and tanks, spilled, sprayed, discharged, dumped, collected in ponds and canals, buried, and burned by UTC on its property and in the Corbett National Wildlife Refuge. (10-80840, ¶ 428)

71.    UTC has caused numerous spills, releases and discharges of the CCOCs into the air, surface water, groundwater, and the common aquifer. UTC has intentionally discharged CCOCs on its property and that of the Corbett National Wildlife Refuge since 1957. As of

November 2008, the Florida Department of Environmental Protection found 24 contaminants in the soil and water on UTC's property including the CCOCs which were confirmed by testing to be present in high concentrations in the soils, surface water, and groundwater in and around UTC's property. Testing performed for and on behalf of UTC has confirmed that the CCOCs were introduced by UTC into the groundwater and are present in high concentrations in the aquifer under its property which flows south and southeasterly from UTC, under the Corbett National wildlife Refuge, and then under The Acreage. (10-80840, ¶ 429)

72.     Operations conducted since 1957 at UTC's property have caused or allowed the CCOCs to be discharged or released into the environment, including into P & W's surface water and groundwater as well as that of the Corbett National Wildlife Refuge. CCOCs were also released into the air, settled, and were deposited on the ground and surface water including canals and ponds. Water contaminated with CCOCs was then used in manufacturing and testing thereby creating additional CCOCs. The CCOCs percolated through the porous and permeable soils and reached the aquifer underlying UTC and the Corbett National Wildlife Refuge. That aquifer is part of a common aquifer that flows in a south and southeasterly direction under The Acreage from where Acreage residents have drawn the water containing the CCOCs for many years. Different CCOCs, depending on their varying chemical attributes, are transported at different rates through the aquifer and arrive at different times beneath The Acreage. Since all of the CCOCs are still present on UTC's property in soils, surface water, or groundwater, all of the CCOCs will continue to travel through the common aquifer and will arrive beneath the Acreage where they will be drawn into water wells that are used by The Acreage residents.  The rates at which the CCOCs migrate from UTC's property and into and under The Acreage vary depending upon the spill or discharge location, the wind, the fluctuating rate of surface water movement, seepage, percolation, pond flooding, canal flooding, and the individual chemical properties of the CCOCs. Consequently, different CCOCs arrive at different times under The Acreage. Since water in the common aquifer is always moving the CCOCs may be present at different times in different locations and in varying quantities and concentrations within the aquifer. As demonstrated by UTC's own testing, a CCOC may be present in a UTC well one day, not appear in the next sample taken a few days or weeks later, and reappear a week or more later. (10-80840, ¶ 430)

73.     UTC's property lies generally north of The Acreage. Hydrologic studies have shown that UTC, the Wildlife Management Area, and The Acreage are underlain by, and share

the same permeable and porous underground aquifer, and that groundwater generally moves from the north to the south into and under The Acreage. In addition, groundwater is drawn from beneath the Corbett National Wildlife Refuge and UTC to the Acreage as a result of the thousands of wells in the Acreage drawing water. At least one surface canal that drains UTC's property flows through and off UTC's property in a southerly direction. Because the groundwater in the contaminated aquifer flows to the south, the groundwater underlying The Acreage has been contaminated by the CCOCs dumped, spilled, discharged, burned, buried, and released by UTC on its property and that of the Corbett National Wildlife Refuge. These CCOCs continue to migrate beyond the boundaries of UTC's property and the Corbett National Wildlife Refuge into the Acreage and contaminate the water below The Acreage Neighborhood where it is drawn for consumption, cooking, bathing and activities of daily living. (10-80840, ¶ 431)

74.     UTC has since the inception of its facility in 1957 failed to take adequate or reasonable measures to prevent the CCOCs from contaminating the common aquifer and warn The Acreage landowners that share and receive groundwater from the aquifer, that the aquifer has been contaminated with CCOCs. (10-80840, ¶ 432)

75.     On May 13, 2009, the Florida Department of Health received an e-mail from a parent in the Acreage stating that she had questions about cancer and asking how she could request a study. Her son, age 6, had been diagnosed with a brain tumor. In June, 2009, initial cancer data collection specific to the Acreage began. On February 1, 2010, as a result of its investigation, the Palm Beach County Health Department designated the Acreage as a cancer cluster elevating even further the public concern and awareness that cancers at the Acreage might be attributable to the pollution and contamination emanating from UTC's property. (10-80840, ¶ 434)

76.     Additional cases of children in the Acreage with brain tumors began to emerge, prompting a multi-agency investigation into the cause of these cancerous tumors. This included limited drinking water testing at the homes of the pediatric brain cancer victims. Many residents in the Acreage began to recognize that the likely source of contamination in the area was the UTC industrial facility to the north as it is the only large industrial complex in the area that handles toxic CCOCs. The cancer concerns in the Acreage prompted widespread interest and awareness of UTC's historic environmental practices, contamination of its groundwater and the groundwater within the Corbett National Wildlife Refuge. (10-80840, ¶ 435)

77.     UTC has used the previously referenced radionuclides, metals including lead, cadmium and barium as well as semivolatiles and oil-based fuels which could cause benzopyrene contamination in its operations at the UTC campus, a campus with numerous canals and sheet-swamps that are adjacent to wetlands in the Corbett Wildlife Management Area (Corbett). (13-80928, ¶ 148)

78.     UTC used either the specific radionuclides or the parent radionuclide of every naturally occurring radionuclide listed in paragraphs 18–21 in its operations at the UTC campus. (13-80928, ¶ 149)

79.     In the course of its activities, UTC has used radioactive by-product materials and source materials at its Palm Beach Count Campus:

    a.  The licensed use of Nickel 63, Thallium 204, Radium D&E, Promethium 147, Hydrogen 3, Cadmium 109, Iridium 192, Cesium 137, Strontium 90, Cobalt 56, Manganese 54/Cobalt 58, Krypton 85; Cobalt 60, Lead 210, Rhodium 106, Cobalt 57, Gadolinium, and Americium241/Strontium90;

    b.  The unlicensed use of Nickel 63, Thallium 204, Radium D&E, Promethium 147, Hydrogen 3, Cadmium 109, Iridium 192, Cesium 137, Strontium 90, Cobalt 56, Manganese 54/Cobalt 58, Krypton 80;

    c.  Source material including the licensed and unlicensed use of thorium dioxide as 2% of thorium-inclusive nickel alloy;

    d.  Source materials including the non-licensed use of thorium-dioxide and other species of concentrated thorium;

    e.  Source materials including the non-licensed use of uranium dioxide and other species of enriched uranium and depleted uranium. (13-80928, ¶ 150)

81.     Some of these materials were provided to UTC via the United Stated Government either by entrustment for a particular project or via the deed and sale of formerly utilized sites such as the Naval Weapons Reserve Area, also known as the former Air Force Plant 74. (13-80928, ¶ 151)

82.     Only some of the licenses for and uses of byproduct and source material by UTC were in furtherance of contracts that UTC had with the United States Department of Energy and/or Department of Defense. (13-80928, ¶ 152)

83.     The wetlands in and around UTC drain into the Acreage surface waters at varying rates each year but particularly in the times of extremely heavy rains such as have been

documented to occur at least once every decade from the time UTC began working with these materials (circa 1958). (13-80928, ¶ 153)

84.     Although UTC has received or benefited from funding for clean-up of these and other materials from the United States Army Corp of Engineers and the State of Florida, UTC is liable for all contamination at or emanating from its campus. (13-80928, ¶ 154)

85.     UTC employees worked with fuels including uranium compounds at the Palm Beach County campus in furtherance of both UTC proprietary projects and government contract projects. (13-80928, ¶ 155)

86.     UTC hosted government or other third party projects which worked with fuels including uranium compounds at the Palm Beach County campus. (13-80928, ¶ 156)

87.     Nuclear fuels were stored at the Palm Beach County Campus. (13-80928, ¶ 157)

88.     The acts described in paragraphs 85–87 above occurred, sometimes without regulatory oversight and thus violated all federal regulations related to such activity. (13-80928, ¶ 158)

89.     UTC has used some or all of these radionuclides in its operations at test stands located on the western edge of the UTC campus, a portion of the campus where the groundwater runs southeast at a velocity and trajectory that would carry and has carried contamination into the Acreage community. (13-80928, ¶ 159)

90.     In the 1980's, UTC reported a portion of the non-radioactive contamination that had built- up over time on its property to the Department of Environmental Regulation. (13-80928, ¶ 160)

91.     The site should have been, and was at various times slated to be, an EPA Superfund site, which would have included "a record of decision" and clean-up plan that was authored by, executed by, and performed by EPA. (13-80928, ¶ 161)

92.     A Record of Decision (ROD) is a public document that explains which cleanup alternatives will be used to clean up a Superfund site. The ROD for sites listed on the NPL (NPL Site Listing Process) is created from information generated during an EPA conducted Remedial Investigation/Feasibilty Study (RI/FS). (13-80928, ¶ 162)

93.     Instead, UTC exercised influence through the state agency, the Department of Environmental Regulation, to avoid the sort of government investigation that should have accompanied the preparation of an agency-authored "Record of Decision." (13-80928, ¶ 163)

94.     In order to avoid exposure for the full extent of its clean-up liability and to avoid the disclosure of its use of several hazardous and radioactive products, UTC exercised influence on the DER through then DER employee Rick Reis to have the clean-up, and more importantly investigation, performed by UTC with limited EPA oversight. (13-80928, ¶ 164)

95.     Shortly after securing its ability to maintain control over the site, UTC hired Rick Reis away from DER to ensure that the company would have minimal exposure. (13-80928, ¶ 165)

96.     UTC has buried source and by-product materials in unlined shallow burial pits together with other hazardous materials; many of these burial sites were flooded prior to clean-up and caused contamination of the L8 surface and ground water that accumulated and continues to leach into the Acreage surficial aquifer in times of heavy persistent rains. (13-80928, ¶ 166)

97.     UTC has burned hazardous materials as well as source and by-product materials in unlined shallow burial pits together with other hazardous materials; many of these burn pits were flooded prior to clean-up and caused contamination of the L8 surface and ground water that accumulated and continues to leach into the Acreage surficial aquifer in times of heavy persistent rains. (13-80928, ¶ 167)

98.     UTC has repeatedly failed to maintain and dispose of source and byproduct material in the manner described by federal regulations. (13-80928, ¶ 168)

99.     UTC mishandled the source material it was licensed to use and thus, violated regulations regarding limiting public exposure. (13-80928, ¶ 169)

100.    For example, UTC's disposal of thoriated materials violated its own internal memoranda the regulations governing its possession of such materials, including that since 1964 UTC has falsely reported that it was and would have the materials disposed of by a company licensed to handle such waste. (13-80928, ¶ 170)

101.    Since the time of its possession of these materials, UTC has failed to use and maintain these materials safely and has emitted these materials into the surface and ground waters in Corbett and into the Acreage as part of routine misuse, dumping and neglect. (13-80928, ¶ 172)

102.    Some of that dumping occurred as direct consequence of the fact that UTC conducted an internal investigation of the safety of the thorium it was using and concluded that it should no longer be used and should instead be buried. (13-80928, ¶ 173)

103.     A significant plurality of the engineers that worked on one of the nuclear source material projects and at least one of the medical officers who studied them died of a brain tumor. (13-80928, ¶ 148)

104.     Rather than dispose of the material responsibly, UTC buried the materials and brought in a corporate counsel to dissuade the state of any concerns. (13-80928, ¶ 174)

105.     Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1301-2 because they included unlicensed materials and were used in an unlicensed operation, which is per se violate the entire regulatory regime. (13-80928, ¶ 175)

106.     Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1302 because they resulted from the improper storage, use and disposal of such material, as detailed in paragraphs 93−94 and 97. (13-80928, ¶ 176)

107.     Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1301 because they resulted in doses that exceeded the dose limits for member of the public as set forth in those regulations, as detailed in paragraphs 93−94 and 97. (13-80928, ¶ 177)

108.     Emissions of licensed materials which occurred prior to December 3, 1991 included violations of the standard set forth at 10 C.F.R. § 20.1301, dose limits for individual members of the public, because the dose received by the brain tumor victims within the cluster described above exceeded those regulations as a result of exposure to these materials. (13-80928, ¶ 178)

109.     The doses exceeded regulation because they were ingested through the water and were absorbed dermally through direct contact with the water. (13-80928, ¶ 179)

110.     The doses set forth by 10 CFR § 20.1301 were exceeded as follows:

    a.   The dose equivalent to individual members of the public from the licensed operation exceeded 0.1 rem (1 mSv) in a year because the materials, particularly lead 214, cadmium 109 and iridium 192 escape any sediment filters customarily used by the families residing in the Acreage, causing an accumulation of such material in the piping of the residential water supply, causing an ambient dose that exceed .1 rem per year; and

    b.   Upon certain flood events as described above, the dose exceeded .002 rem in an hour; and,

      c.  any appreciable dose exceeded the regulations because UTC did not have a permit to release the radioactive materials into the public sewer system into its deep injection well, and into the waters of the L8 reservoir. (13-80928, ¶ 180)

111.    Those emissions which occurred subsequent to 1991 or continued to accrue in measurable dose after December 3, 1991 included violations of both 10 C.F.R. § 20.1301 as well as 20.1302 because UTC failed to perform any surveys as required in 20.1301(a) or to measure or reduce the rate as required in 20.13029(b) or (c). (13-80928, ¶ 181)

112.    Those emissions which occurred subsequent to 1991 also included violations of the "As Low as is Reasonably Achievable" standard set forth in the "Offsite Dose Calculation Manual" published by the Nuclear Regulatory Commission, because the Defendant failed to make any reasonable attempts to keep such doses from occurring for several years while the contaminants were leaching into the L8 surface and ground water. (13-80928, ¶ 182)

113.    As it relates to hazardous materials and metals only, UTC, since the mid 1980's, has been subject to certain requirements pursuant to its RCRA licenses as defined above and has failed to meet its obligations because it delayed clean-up, conducted biased risk assessments, and failed to post notice as required in the library located within the Acreage. (13-80928, ¶ 183)

## ACREAGE EXPOSURE MECHANISMS COMPOUNDING THE REASONABLE APPREHENSIONS THAT UNDERLIE THE STIGMA

114.    The aquifer underneath the Acreage moves at a southeast direction away from the western edge of the UTC campus and into the Acreage. (13-80928, ¶ 144)

115.    In fact, there is little to no distinction between the surface and ground water in the L8 Basin which includes both the Acreage and the Defendants' business operations. (13-80928, ¶ 146)

116.    The described carcinogenic contaminants are present within the L8 Basin as a result of the operations of the defendants and were present in the residential water pipes of the brain tumor victims in the pediatric brain cluster due to the significant flood events or recharge events. (13-80928, ¶ 147)

117.    Concurrent theories explain how the contaminants likely moved from UTC to the Acreage, including transfer

      a.  via surface water flow in flood events from UTC, through Corbett Wildlife Management Area, and into the Acreage surface water, which recharges the ground water surficial aquifer,

      b.   via the deliberate removal of water from Corbett to the L8 reservoir and then
            to the Acreage,

      c.   via a trucking operation that removed the materials from UTC.

(Complaint, DE1, in *Santiago v. UTC*, 14-81385 (Nov. 7, 2014), ¶ 145)

118.    Moreover, UTC (i) mishandled, misused, and improperly stored and disposed of contaminants, (ii) including through burning, burying in the soil without barriers to prevent transfer to surface- or ground-water, and dumping on- and off-site, and (iii) orchestrated the limitation of state and federal regulatory oversight of its clean-up and removal of those contaminants and contaminated soil. (13-80928, ¶¶ 148–174))

## CLAIMS AGAINST UTC FOR STIGMA DAMAGE
### Count I
### Strict Liability – Hazardous Use of Land (10-80840)

Plaintiffs re-allege and incorporate by reference paragraphs 1–118 above, except paragraphs 15, 18–24, 77–89, and 96–112, as if set forth fully herein.

119.    UTC was engaged in the ultrahazardous activity of test firing rocket engines and jet engines on test stands utilizing chemicals in the process that create ultrahazardous CCOCs that pose a serious risk of physical injury and death to those in the vicinity of the testing or who inhale, ingest, or consume the ultrahazardous CCOCs thus created. UTC's aforesaid activities were ultrahazardous and abnormally dangerous. (10-80840, ¶ 461)

120.    The Acreage properties and property owners, including the Plaintiffs and class members, faced a high degree of risk and the substantial likelihood of great harm because the CCOCs and the chemical byproducts created were released into the air, surface water, groundwater, and the common aquifer shared with the well water dependent Acreage Neighborhood. UTC's activities posed a high degree of risk and the substantial likelihood of great harm to Plaintiffs, the Class Members and their properties. (10-80840, ¶ 462)

121.    UTC's aforesaid ultrahazardous activity on its property damaged the Plaintiffs and the Class members property values in that it created CCOCs that pose a high degree of risk of harm not only to its workers, but to the Plaintiffs, Class Members, and their properties. The likelihood that harm would result from this activity was great. The manner and use of the CCOCs in the process of test firing the rocket and jet engines is not common. The use of the CCOCs in the testing process utilized by UTC was outweighed by the dangerous attributes of the CCOCs thus created and was inappropriate, reckless, and unreasonably dangerous. (10-80840, ¶ 463)

122.   Plaintiffs have undertaken to have the groundwater underlying the Acreage Neighborhood which their properties share tested. The test results as reported by the laboratories analyzing the groundwater samples taken from the Acreage Neighborhood show that the groundwater underlying the Acreage Neighborhood has been contaminated with the CCOCs UTC spilled, discharged, burned, created, buried, released to the environment through the air, surface water, groundwater, and which now contaminate the common aquifer.  Groundwater testing has shown numerous CCOCs in the groundwater underlying the Acreage that emanated from UTC. Most if not all of the CCOCs have or will be transported from UTC. Bromodichloromethane, methylene chloride, chloroform, hexavalent chromium, dioxins, furans, dimethyl phthalate, n-propylbenzene, naphthalene, 1-methylnapthalene, and 2-methylnapthalene have all tested positive in the Acreage groundwater and are the result of UTC's aforesaid contamination of the air, surface water, groundwater, and the common aquifer. (10-80840, ¶ 464)

123.   As a direct and proximate result of UTC's ultrahazardous and abnormally dangerous activities, and the public learning of the results of such activities, particularly in February 2010 and the months thereafter, the Plaintiffs and the class members have suffered property damage stigmatization and diminution of the value of their properties. UTC is strictly liable to Plaintiffs and the class members for these damages. (10-80840, ¶ 465)

124.   UTC's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into the Acreage and onto the properties of Plaintiffs and the class was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs, the class members, and their properties. Moreover, UTC intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only on its property but also that of Corbett Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA. The aforesaid dumping and spillage of these CCOCs was a regular pattern and practice of UTC and was done with the knowledge and acquiescence of upper management of UTC and United Technologies Corporation. Plaintiffs and the class members are accordingly entitled to punitive damages. (10-80840, ¶ 466)

**Count II**
**Strict Liability – Violation of F.S. § 376.313(3)**
**– Stigma from Groundwater Plume (10-80840)**

Plaintiffs re-allege and incorporate by reference paragraphs 1–123 above, except paragraphs 15, 18–24, 77–89, and 96–112, as if set forth fully herein.

125.   UTC improperly stored, released, discharged, buried, burned, created, and disposed of CCOCs on its property and at the Corbett National Wildlife Refuge which is underlain by a porous and permeable aquifer, and traversed by surface canals. These CCOCs and their chemical constituents and the aforesaid activities meet the definitions of "contaminant," "hazardous substances," "discharge," and "pollution," in § 376.301, Fla. Stat. (10-80840, ¶ 468)

126.   UTC's activities violated § 376.302(1)(a), Fla. Stat., which prohibits the discharge of pollutants or hazardous substances into or upon Florida's surface waters and groundwaters. (10-80840, ¶ 469)

127.   Violations of § 376.302 are actionable under § 376.313(3), Fla. Stat., which provides, in pertinent part:

> [N]othing contained in ss. 376.30-376.317 prohibits any person from bringing a cause of action in a court of competent jurisdiction for all damages resulting from a discharge or other condition of pollution covered by ss. 376.30-376.317. … [I]n any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.

Under § 376.313(3), UTC is strictly liable to Plaintiffs and the class members for all damages caused to their properties by its violation of § 373.302(1)(a). (10-80840, ¶ 470)

128.   As a direct and proximate result of UTC's violation of § 376.302 and the aforesaid environmental contamination, and the public learning of this, particularly in February 2010 and the months thereafter, Plaintiffs and the class members have been injured in that their properties' values have been diminished. (10-80840, ¶ 471)

129.   UTC's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into the Acreage and onto the properties of Plaintiffs and the class was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs, the class members, and their properties. Moreover, UTC intentionally dumped and with gross negligence spilled the

aforesaid CCOCs not only on its property but also that of Corbett Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA. The aforesaid dumping and spillage of these CCOCs was a regular pattern and practice of UTC and was done with the knowledge and acquiescence of upper management of UTC and United Technologies Corporation. Plaintiffs and the class members are accordingly entitled to punitive damages. (10-80840, ¶ 472)

**Count III**
**Strict Liability – Violation of FS § 376.313(3)**
**– Stigma from Contamination Found in Cancer Cluster Investigation (13-80928)**

Plaintiffs re-allege those facts and matters set forth in paragraphs 1–118 above, except paragraphs 18–24, 77–89, and 96–112.

130.    UTC emitted contaminants into the surface and groundwater in excess of the limits allowed by governing agencies, statutes and, when applicable, their permits. Pursuant to F.S. § 376.313, UTC is strictly and jointly liable for any and all damages emanating from the effluences as previously described. (13-80928, ¶ 219)

131.    It is liable for the contaminants found by the DEP and by the families including benzopyrene, TE-NORM, and various heavy metals including lead, cadmium, and barium. (13-80928, ¶ 220)

132.    The emissions caused the Representatives and the entire class the present and on-going diminution in value of their property. (13-80928, ¶ 221)

133.    Pursuant to that F.S. § 376.313, Plaintiffs may be awarded costs of litigation (including reasonable attorney's and expert fees) if the court determines such an award is in the public interest. (13-80928, ¶ 222)

**Count IV**
**Negligence – Stigma from Groundwater Plume (10-80840)**

Plaintiffs re-allege and incorporate by reference paragraphs 1–123 and 125–127 above, except paragraphs 15, 18–24, 77–89, and 96–112, as if set forth fully herein.

134.    UTC knew or should have known that its creation, storage, release, discharge, and disposal of CCOCs into the air, surface water, and groundwater, including the use of water contaminated with CCOCs on its property as aforesaid, and in the Corbett National Wildlife Refuge which is underlain by a porous and permeable aquifer, and traversed by surface canals, created a zone of risk encompassing the properties and persons in the Acreage for contamination

with toxic CCOCs. For the Acreage shares the contaminated air, the contaminated surface waters, and the common aquifer that UTC contaminated with all of the toxic CCOCs. (10-80840, ¶ 474)

135.    UTC owed a duty to Plaintiffs and the class members to take appropriate precautions and exercise that degree of reasonable or ordinary care in its activities that an ordinary prudent person or business would have exercised under the same or similar circumstances to avoid contamination of the air, surface water, groundwater, and aquifer on its property, the Corbett National Wildlife Refuge, and the Acreage with the CCOCs listed in paragraph 70 above. (10-80840, ¶ 475)

136.    UTC also owed a duty under the Florida Air and Water Pollution Control Act, §403.011, Fla. Stat., et seq., and Florida's Water Quality Assurance Act, §376.30, Fla. Stat., et seq., to avoid contamination of the air, surface water, groundwater, and aquifer on its property, the Corbett, and the Acreage with the CCOCs listed in paragraph 70  above. (10-80840, ¶ 476)

137.    UTC breached the aforesaid duties by negligently: (a) dumping, spilling, burning, burying, releasing, discharging, and disposing of the CCOCs; (b) failing to take appropriate or reasonable precautions in storing, impounding, using, and disposing of the CCOCs; (c) failing to prevent the contamination of groundwater and surface waters by the CCOCs; (d) using water contaminated with CCOCs in its testing and manufacturing process; (e) failing to prevent the escape of the CCOCs from its property, (f) failing to adequately train and supervise its employees in the storage, use, monitoring and disposal of the CCOCs; and (f) failing to clean up or contain contaminated surface and groundwater created by its improper storing, impounding, using, burning, burying, disposing, releasing and discharging of CCOCs on its property. A reasonable and prudent business entity would have taken precautions, testing, and monitoring of its activities involving the CCOCs listed in paragraph 70  above, and would have taken adequate and timely measures to avoid contaminating the air, surface water, and groundwater with them and their byproducts and avoided harming nearby landowners and damaging their property values. A reasonable and prudent person or business entity would have taken steps to identify the extent of any contamination and to find ways to prevent it from spreading and harming others and damaging their properties. UTC had a duty to act in a timely and adequate manner to avoid injury and damage to persons and property in the Corbett and the Acreage, as a reasonably prudent person or business entity would have under the circumstances, but failed to so act to the detriment of the Plaintiffs and Class Members. Belatedly, UTC focused on cleaning up of its

property which was inadequate. UTC failed to adequately test for contamination it was causing on adjacent properties and properties that were down gradient.  UTC failed to warn or adequately warn of its contamination of the aquifer, groundwater, surface water, and air. (10-80840, ¶ 477)

138.   As a direct and proximate result of the aforesaid contamination of the air, surface water, groundwater, and common aquifer, the properties of Plaintiffs, the class members, and the Acreage have been damaged. Knowledge of UTC's contamination of the air, soil, surface water, groundwater on its property, the Corbett, and that this groundwater is shared with the well water dependent Acreage Neighborhood became known to the general public. Plaintiffs and the class members have been injured in that their properties' values have been diminished upon the public learning of the aforesaid negligent acts and resultant surface and groundwater contamination, particularly in February 2010 and the months thereafter. (10-80840, ¶ 478)

139.   UTC's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into the Acreage and onto the properties of Plaintiffs and the class was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs, the class members, and their properties. Moreover, UTC intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only on its property but also that of Corbett Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA. The aforesaid dumping and spillage of these CCOCs was a regular pattern and practice of UTC and was done with the knowledge and acquiescence of upper management of UTC and United Technologies Corporation. Plaintiffs and the class members are accordingly entitled to punitive damages. (10-80840, ¶ 479)

### Count V
### Negligence – Stigma from Contamination
### Found in Cancer Cluster Investigation (13-80928)

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1–118 above, except paragraphs 18–24, 77–89, and 96–112.

140.   UTC owed a duty of care to the surrounding neighborhoods to exercise caution in its use and exploitation of heavy metals and hazardous materials such as semi-volatile compounds. (13-80928, ¶ 206)

141.    At times, UTC realized a portion of the damages caused by its neglect but instead of remediating the problem, allowed its property and operations to continue such emissions by failing to remediate contamination safely. (13-80928, ¶ 207)

142.    Such failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties and eventually into the Acreage community where cadmium, barium, lead, arsenic, and benzopyrene have been found. (13-80928, ¶ 208)

143.    These breaches caused a significantly increased incidence of brain tumors to occur in the Acreage, which in turn caused a diminution in the value of the Acreage properties. (13-80928, ¶ 209)

144.    These breaches caused the surface waters of the L8 basin and the Acreage aquifer to be contaminated, which in turn caused a diminution in the value of the Acreage properties. (13-80928, ¶ 210)

145.    These breaches, particularly including the acts described in paragraphs 90–95, include reckless, knowing disregard of the safety of the neighboring communities as evidenced by the fact that in 1964 UTC acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and then for decades failed to use any such caution and purposely buried the materials. (13-80928, ¶ 211)

146.    The Class Representatives and all others similarly situated as included in the definition of the Class have sustained the damage of that diminution in value. (13-80928, ¶ 212)

**Count VI**
**Nuisance – Stigma from Groundwater Plume (10-80840)**

Plaintiffs re-allege and incorporate by reference paragraphs 1–118, 119–123, 125–127, and 134–137 above, except paragraphs 15, 18–24, 77–89, and 96–112, as if set forth fully herein.

147.    UTC created and maintained a nuisance by improperly creating, storing, impounding, discharging, releasing, reusing, burning, burying, and disposing of CCOCs into the air, surface water and groundwater, not only on its property, but the Corbett National Wildlife Refuge, and the Acreage, all of which are underlain by a porous and permeable aquifer and which is traversed by surface canals. The aforesaid acts of UTC were unreasonable, unwarranted, and unlawful. (10-80840, ¶ 481)

148.    Property owners in the Acreage, share UTC's air and aquifer and receive its surface waters and ground waters. The CCOCs that UTC improperly created, stored, impounded,

discharged, released, reused, burned, buried, and disposed of on its property entered the air, groundwater and surface water on its property and that of the Corbett National Wildlife Refuge and were carried into the air and groundwater of the Acreage Neighborhood which is shared by the properties of Plaintiffs and the class members. The Acreage Neighborhood and the Plaintiffs and class members properties within it were known to be dependent on this groundwater for drinking, cooking, showering, and all activities of daily living as the Acreage Neighborhood does not have municipal, city, or community water. (10-80840, ¶ 482)

149.    UTC's creation and contamination of the environment with CCOCs including the air, surface water, groundwater, and common aquifer beneath it that is shared with the Acreage Neighborhood and Plaintiffs' and class members' properties became known to the Plaintiffs and the general public in February 2010 and the months that followed.  The Acreage Neighborhood and the Plaintiffs and Class Members' properties which share the common aquifer have been materially and substantially harmed.  Plaintiffs and class members' use and enjoyment of their properties have been interfered with and lost. Plaintiffs and class members' loss of use and enjoyment includes: (a) their inability to fully use the wells on their property which were their only sources of potable water; (b) fear and anxiety over illness that could be caused by exposure to CCOCs that originated at the UTC facility; (c) fear and anxiety over the consumption or incidental ingestion of Acreage water; (d) fear and anxiety over bodily contact with Acreage water; (e) having to limit, out of fear and anxiety, their water-related activities; (f) having to purchase and use bottled water and install water purification systems; and (g) being unable to exploit the full economic value of their properties by sale or rental or by using the property as security for a loan. (10-80840, ¶ 483)

150.    As a direct and proximate result of UTC's aforesaid contamination of the air, surface water, groundwater, and the common aquifer shared by the well water dependent Acreage Neighborhood and the Plaintiffs and class members' properties, and the knowledge of UTC's contamination of the air, surface water, groundwater, and aquifer, the Corbett National Wildlife Refuge, and that this groundwater is shared with the Acreage Neighborhood groundwater coming to be known by the general public, particularly in February 2010 and the months that followed, Plaintiffs and the class members have suffered a diminution of the value of their properties. (10-80840, ¶ 484)

151.    UTC's failure to properly store, use, impound and dispose of the aforesaid CCOCs so as to prevent their escape into the Acreage and onto the properties of Plaintiffs and the

class was either intentional or was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights, welfare and safety of Plaintiffs, the class members, and their properties. Moreover, UTC intentionally dumped and with gross negligence spilled the aforesaid CCOCs not only on its property but also that of Corbett Wildlife Refuge in such quantities that it was designated a Superfund site by the USEPA. The aforesaid dumping and spillage of these CCOCs was a regular pattern and practice of UTC and was done with the knowledge and acquiescence of upper management of UTC and United Technologies Corporation. Plaintiffs and the class members are accordingly entitled to punitive damages. (10-80840, ¶ 485)

**Count VII**
**Nuclear Incident – Stigma via Release of**
**Licensed By-Product or Source Material (Price-Anderson Claim) (13-80928)**

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1–118.

152.   Defendant UTC owed a duty of care to the surrounding neighborhoods to exercise caution and to follow the dictates of Price Anderson and all applicable regulations promulgated under that statute including but not limited to 10 CFR § 20.1301 in its use of source and by-product materials. (13-80928, ¶ 198)

153.   Defendant UTC owed a duty of care to the surrounding neighborhoods to exercise caution and to be licensed to use any source or by-product materials. (13-80928, ¶ 199)

154.   Defendant breached those duties as described above by acts including but not limited to the unpermitted use of, burial of, burning of, and dumping of source and by product material. (13-80928, ¶ 200)

155.   At times, Defendant UTC has realized a portion of the damages caused by its neglect but instead of remediating the problem, it allowed its property to continue such emissions by failing to remediate contamination safely. (13-80928, ¶ 201)

156.   Defendant's failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties and eventually into the Acreage community, directly and permanently causing a diminution in value of the Acreage properties. (13-80928, ¶ 202)

157.    These breaches caused a significantly increased incidence of brain tumors to occur in the Acreage, which in turn caused a diminution in the value of the Acreage properties. (13-80928, ¶ 203)

158.    These breaches, particularly including the acts described in paragraphs 158-174, include reckless, knowing disregard of the safety of the neighboring communities as evidenced by the fact that in 1964 UTC acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and then for decades failed to use any such caution and purposely buried the materials. (13-80928, ¶ 204)

159.    The Class Representatives and all others similarly situated as included in the definition of the Class have sustained the damage of that diminution in value. (13-80928, ¶ 205)

**CLAIM AGAINST PALM BEACH AGGREGATES FOR STIGMA DAMAGE**
**Count VIII**
**Negligence – Stigma from Contamination**
**Found in Cancer Cluster Investigation (13-80928)**

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in paragraphs 3–4 regarding jurisdiction and venue; 8–13 regarding the Cotromano plaintiffs; 15 regarding defendant Palm Beach Aggregates; 18–42 regarding radiation in the Acreage, the Florida Department of Health declared cancer cluster, and the resultant stigma and diminution of value of Acreage properties; and 51–68 regarding the class action designations and criteria.

128.    Palm Beach Aggregates and/or its predecessor in interest, GKK Aggregates, have conducted an aggregate mining business to the west of the Acreage since at least 1993. (13-80928, ¶ 184)

129.    The aggregate mined by Palm Beach Aggregates is of particular value because it consists of limestone rock, the density of which is sufficient to meet the criteria for road and highway construction. (13-80928, ¶ 185)

130.    Until 2008, the mining included a dewatering or dredging process through which Palm Beach Aggregates at various times deposited waters including high-concentrations of Technologically Enhanced Naturally Occurring Radioactive Materials (TE-NORM) into adjacent surface waters. These materials are not included within the statutory definition of Source Material or By-Product material as found in Price-Anderson at 42 USC 2014 and are in fact exempted by those definitions. (13-80928, ¶ 186)

131.    At times prior to 2003, the dewatering violated permits either because the water emitted was in excess of the volume permitted or the water was deposited into non-permitted recipient water bodies, such as the L8 Canal. (13-80928, ¶ 187)

132.    In 2003, Palm Beach Aggregates entered into a Consent Final Judgment with South Florida Water Management District (SFWMD) through which many of the pits Palm Beach Aggregates was in the process of mining or had already mined were condemned to SFWMD for use as a reservoir. (13-80928, ¶ 188)

133.    For some time prior to this condemnation, Palm Beach Aggregates had been negotiating with other prospective buyers. The deal struck with SFWMD was for over two hundred million dollars. (13-80928, ¶ 189)

134.    The first condemnation was of parcels 00404317000001030, 00404320000001040, which included many of the pits Palm Beach Aggregates had already mined. In February and August of 2007, Palm Beach Aggregates conveyed parcels 00404329000005010 and 00404320000001010 to the District as well. These additional conveyances were performed in accordance with the 2003 Consent Judgment. (13-80928, ¶ 190)

135.    According to the 2003 Consent Judgment, Palm Beach Aggregates retained a reservation of Occupancy, Possession, and Use, which allowed them continue to excavate or dredge pits. Palm Beach Aggregates also reclaimed pits for reservoir use, or constructed the reservoir. The Consent agreement also required Palm Beach Aggregates to certify the cells for water storage use before turning them over to SFWMD for use as a reservoir. (13-80928, ¶ 191)

136.    Pursuant to the Consent Judgment, Palm Beach Aggregates retained control of the pits and specifically provided indemnity for any pollution caused by the pits for some time until the process of handing over the pits was complete, which was not until sometime after May 2009. (13-80928, ¶ 192 )

137.    Palm Beach Aggregates continued its mining activities at parcels it still owned around the Reservoir including 00404329000005020 and 00404329000003020. (13-80928, ¶ 193)

138.    From 2003 until September 2008, the Aggregates continued the dewatering/dredging process through which technologically enhanced NORM (TE-NORM) was increased in the designated reservoir pits. (13-80928, ¶ 194)

139.    Before 2003, the recognition that Palm Beach Aggregates operations had caused or may have caused and would continue to cause contamination within the waters of the pits

and the adjacent canals within the Acreage was known by Palm Beach Aggregates and its consultants. (13-80928, ¶ 195)

140.     Those radionuclides that have been detected in the Acreage at above natural background rates but may be termed naturally *occurring* include Uranium-234, Uranium-235 Uranium-236, and elevated levels of the decay products of Thorium, particularly Lead-214 and Bismuth-214 and Actinium-228. Naturally occurring deposits present in rock containing radium are referred to as Naturally Occurring Radioactive Material (or NORM.) The *presence* of Technologically-Enhanced concentrations of NORM products (or TE-NORMS) in water systems can be associated with mining operations, including the type of shell rock mining conducted by the Aggregates. (13-80928, ¶ 119)

141.     The discovery of Palm Beach Aggregates' responsibility for contamination of the Acreage has been hindered by inconsistent and inaccurate reporting to state regulatory agencies by Palm Beach Aggregates. (13-80928, ¶ 196)

142.     TE-NORM has from time to time at various times escaped the confinement of the pits and has entered adjacent canals flowing into the Acreage, contaminating both surface and subsurface waters within the Acreage and materially contributing to the increased incident of brain cancers in the Acreage. (13-80928, ¶ 197)

143.     Aggregates owed a duty of care to the surrounding neighborhoods to exercise caution in its use and exploitation aggregates rock containing deposits of hazardous naturally occurring amounts of radium decay products. (13-80928, ¶ 214)

144.     At times, Aggregates realized a portion of the damages caused by its neglect but instead of remediating the problem, it allowed its properties and operations to continue such emissions by failing to remediate contamination safely. (13-80928, ¶ 215)

145.     These failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties and eventually into the Acreage community. (13-80928, ¶ 216)

146.     These breaches caused a significantly increased incidence of brain tumors to occur in the Acreage, which in turn caused a diminution in the value of the Acreage properties. (13-80928, ¶ 217)

147.     These breached caused the surface waters of the L8 basin and the Acreage aquifer to be contaminated, which in turn caused a diminution in the value of the Acreage properties. (13-80928, ¶ 218)

148. The Class Representatives and all others similarly situated as included in the definition of the Class have sustained the damage of that diminution in value. (13-80928, ¶ 219)

WHEREFORE, as to Count VIII, Plaintiffs RICHARD COTROMANO, BETHANY COTROMANO, FRANK DECARLO, PAULETTE DECARLO, GREGORY DUNSFORD, JENNIFER DUNSFORD, JOYCE FEATHERSTON, BILL FEATHERSTON, ROBERT T. NEWFIELD and TRACY NEWFIELD, the Court

a. determine that this claim may be maintained as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (3), that Richard Cotromano, Bethany Cotromano, Frank DeCarlo, Paulette DeCarlo, Gregory Dunsford, Jennifer Dunsford, Joyce Featherston, Bill Featherston, Robert T. Newfield, Tracy Newfield, be designated as Class Representatives, and

b. that the best practicable notice of this action be given to the members of the class and that judgment be entered against Defendant PBA in an amount to be determined for the full compensation of diminished value as prayed for above, prejudgment interest, and, further

c. that the Court expressly reserve the plaintiff's and the Class Members right to maintain any second action for any damages not claimed in this action, whether arising from personal or property injury.

## PRAYER FOR RELIEF AND REQUEST FOR JURY TRIAL ON ALL COUNTS EXCLUDING COUNT VIII

WHEREFORE, Plaintiffs pray that:

A. The Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (3), that Richard Cotromano, Bethany Cotromano, Frank DeCarlo, Paulette DeCarlo, Gregory Dunsford, Jennifer Dunsford, Joyce Featherston, Bill Featherston, Robert T. Newfield, Tracy Newfield, and Joseph Adinolfe and Kay Samson be designated as Class Representatives, and that the best practicable notice of this action be given to the members of the class;

B. The Court enter an Order appointing as co-lead class counsel for the class;

C. The Court enter an Order requiring Defendant to pay all expenses including the cost of class notice;

D. Plaintiffs and the class members recover the compensatory damages determined to have been sustained by each of them respectively including diminution of the value of their real estate and such other and further relief the Court may deem appropriate in the circumstances;

E.      Plaintiffs and the class members recover punitive damages from Defendant based on its aforesaid willful and wanton conduct and its conscious disregard for the rights, welfare and safety of the Plaintiffs, the class members and their properties;

F.      The Court award attorney fees and costs pursuant to F.S. § 376.313;

G.      The Court enter a judgment awarding class counsel their reasonable attorney's fees and reimbursement of all expert fees, costs and expenses;

H.       The Court grant such other and further general and equitable relief as may be deemed just and proper; and,

I.      That judgment be entered against Defendant in an amount to be determined for the full compensation of diminished value as prayed for above, prejudgment interest, and further that the Court expressly reserve the plaintiff's and the Class Members right to maintain any second action for any damages not claimed in this action, whether arising from personal or property injury.

FURTHERMORE, Plaintiffs, for themselves and for the class, hereby demand trial by jury on all issues so triable as a matter of right.

Dated this 14th day of November, 2016                    Respectfully submitted,

                                                         /s/ MARA R.P. HATFIELD
                                                         Mara Ritchie Poncy Hatfield

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of November, 2016, I electronically filed the foregoing Consolidated Class Action Complaint using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Mara R. P. Hatfield
MARA RITCHIE PONCY HATFIELD
Florida Bar No. 37053
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL  33409
Phone:  (561)686-6300
Fax:  (561) 383-9451
Email: mrh@searcylaw.com;
dtm@searcylaw.com;
hatfieldteam@searcylaw.com
Attorneys for *Cotromano and subsequent* Plaintiffs

/s/Jeffrey L. Haberman
JEFFREY L. HABERMAN, ESQ.
JHaberman@schlesingerlaw.com
SCHLESINGER LAW OFFICES, P.A.
1212 S.E. 3rd Avenue
Fort Lauderdale, FL 33316 Telephone: (954) 467-8800 Facsimile: (954) 523-4803
INCLUDING
SCOTT P. SCHLESINGER, ESQ.
scott@schlesingerlaw.com
*Attorneys for Adinolfe & Pinares Plaintiffs*

Law Offices of Craig R. Zobel, P. A.
P.O. Box 32065
Palm Beach Gardens, FL 33420-2065
Telephone: (561) 277-1819
Facsimile: (561) 855-4282
INCLUDING
CRAIG R. ZOBEL, ESQ.
czobel@zobellawfirm.com
*Attorneys for Adinolfe & Pinares Plaintiffs*

**COUNSEL LIST**

Law Offices of Craig Zobel, P.A.
Craig R. Zobel, Esq.
Flordia Bar No: 056080
czobel@reidzobel.com
3801 PGA Blvd., Suite 600
Palm Beach Gardens, FL  33410
Phone:  (561) 277-1819
Facsimile:  (561) 630-9666
Co-counsel for plaintiffs


Stephen James Rapp, Esquire
srapp@wwhgd.com
Weinberg Wheeler Hudgins Gunn & Dial
3344 Peachtree Road, Suite 2400
Atlanta, GA  30326
Phone: (404) 876-2700/Fax: (404) 875-9433
Attorneys for Palm Beach Aggregates

Alexander L. Groden, Esquire
alex.groden@bartlit-beck.com
Andrew C. MacNally, Esquire
Andrew.macnally@bartlit-beck.com
Daniel R. McElroy, Esquire
Daniel.mcelroy@bartlit-beck.com
Sean W. Gallagher, Esquire
sean.gallagher@bartlit-beck.com
Bartlit Beck Herman Palenchar & Scott, LLP
54 W Hubbard Street, Suite 300
Chicago, IL  60654
Phone: (312)-494-4408/Fax: (312)-494-4440
Attorneys for UTC Pratt & Whitney Group, a
Connecticut corporation


Heather Carney Costanzo, Esquire
Hcostanzo@gunster.com
Gerard Joseph Curley, Jr., Esquire
jcurley@gunster.com
Gregor J. Schwinghammer, Jr., Esquire
gschwinghammer@gunster.com;
jhoppel@gunster.com; Pdavid@gunster.com
Fabienne E. Fahnestock, Esquire
Ffahnestock@gunster.com;
Ivanegas@gunster.com
Gunster Yoakley & Stewart, P.A.
777 S Flagler Drive, Suite 500E
West Palm Beach, FL  33401
Phone: (561)-655-1980/Fax: (561)-655-5677
Attorneys for UTC Pratt & Whitney Group, a
Connecticut corporation