1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
2
            Case No. 13-80928-CIV-KAM
3
RICHARD COTROMANO, et al.,      )
4                               )
     PLAINTIFFS,                )
5                               )
     -v-                        )
6                               )
UNITED TECHNOLOGIES             )
7  CORPORATION, PRATT AND       )
WHITNEY GROUP, et al.,          )
8                               )
     DEFENDANTS.                )    West Palm Beach, Florida
9  _____)    January 8, 2018
10

11            VOLUME 1 - PAGES 1 - 291

12   TRANSCRIPT OF MOTION FOR CLASS CERTIFICATION PROCEEDINGS

13         BEFORE THE HONORABLE KENNETH A. MARRA

14              UNITED STATES DISTRICT JUDGE

15

16  Appearances:

17  (On Page 2.)

18
Reporter                    Stephen W. Franklin, RMR, CRR, CPE
19  (561)514-3768               Official Court Reporter
                            701 Clematis Street
20                          West Palm Beach, Florida  33401
                            E-mail:  SFranklinUSDC@aol.com
21

22

23

24

25

```
 1   Appearances:

 2   FOR THE PLAINTIFFS:          Jonathan Gdanski, ESQ., and
                                  Jeffrey L. Haberman, ESQ.,
 3                                Sheldon J. Schlesinger, P.A.
                                  1212 Southeast 3rd Avenue
 4                                Fort Lauderdale, FL 33316
     -and-
 5                                Bryan S. Gowdy, ESQ.
                                  Creed & Gowdy, P.A.
 6                                865 May Street
                                  Jacksonville, FL 32204
 7   -and-
                                  Steven J. Hammer, ESQ.
 8                                440 South Andrews Avenue
                                  Fort Lauderdale, FL 33301
 9   -and-
                                  Jack Scarola, ESQ., and
10                                Mara Ritchie Poncy Hatfield, ESQ.
                                  Searcy, Denney, Scarola, Barnhart
11                                and Shipley, P.A.
                                  2139 Palm Beach Lakes Boulevard
12                                West Palm Beach, FL 33409

13
     FOR THE DEFENDANTS          Sean Gallagher, ESQ., and
14                               Andrew C. MacNally, ESQ., and
                                 Alex Groden, ESQ., and
15                               Daniel R. McElroy, ESQ.
                                 Bartlit, Beck, Herman,
16                               Palenchar & Scott
                                 54 West Hubbard Street
17                               Suite 300
                                 Chicago, IL 60610
18
     -and-
19                               Gregor J. Schwinghammer, Jr., ESQ.
                                 Gunster, Yoakley & Stewart
20                               777 South Flagler Drive
                                 Suite 500-E
21                               West Palm Beach, FL 33401
     -and-
22                               Stephen J. Rapp, ESQ.
                                 Weinberg, Wheeler, Hudgins,
23                               Gunn & Dial
                                 3344 Peachtree Road, Northeast
24                               Suite 2400
                                 Atlanta, GA 30326
25
                                 *  *  *  *  *
```

1          (Call to the order of the Court.)

2          THE COURT:  Good morning, everyone.  Please be

3     seated.

4          We are here in the case of Cotromano versus United

5     Technologies, et al., case number 13-80928-CIV-MARRA.

6          Ordinarily I would ask for the attorneys to state

7     their appearances, but we have so many, what I'm going to do

8     instead is ask you when you are addressing me or a witness if

9     you would state your appearance for the court reporter,

10    because there's so many of you, he's not familiar with

11    everyone.  So if you would, when you're either speaking to me

12    or examining a witness, if you would state your appearance for

13    the reporter's benefit and for mine, as well.

14          All right.  So, good morning.  I know we're a long

15    time in getting ready for this day or this week.  I know

16    you've got a schedule, and I guess I'm a timekeeper, as well,

17    here.  So I'll try and keep track of the time that's being

18    used by everyone.  I prepared for I think the first two days

19    of this session.  I've gone through the affidavits of a

20    number.  Let's see how many of them; one, two, three, four,

21    five, six, seven of the witnesses so far.  Didn't want to get

22    too far ahead of myself.  I forget what people were saying if

23    I read through everything by the end of the week.

24          So I know that you've got some time set aside for

25    opening statements, so I'll let you proceed so we won't waste

1   any more time.

2          MR. GOWDY:  Good morning, Your Honor.  I'm Bryan

3   Gowdy for the plaintiffs.  We have about an hour reserved for

4   opening.  My intention is to spend about 10 to 15 minutes with

5   the Court just going over the applicable law, and then we're

6   going to -- some of my co-counsel will take up the rest of the

7   time with more of a factual overview.

8          I don't think I've appeared at least personally

9   before Your Honor before.  I'm primarily appellate counsel in

10  this case, and I handled the Eleventh Circuit appeal that was

11  decided back in 2014 on this case.

12         And what we're here before Your Honor today is class

13  certification and Daubert.  And I know the Court is obviously

14  familiar with that and I assume has read at least some of the

15  voluminous papers that have been filed, and so I'm not

16  planning to go over every element of class certification or

17  Daubert, but I just wanted to hit a few highlights and answer

18  any questions that the Court may have about the law.

19         I think the most important thing is that for both of

20  these issues the Court is not deciding the merits.  For both,

21  the Court is -- must consider the merits in both doing the

22  class certification analysis and the Daubert analysis, but

23  ultimately the decision on the merits will be to the jury and

24  the finder of fact.

25         And I think the most telling evidence of why class

1   certification is appropriate, Your Honor, is actually the

2   arguments that the defendant has made in its response to our

3   class certification motion.  They spend a good portion of

4   their papers telling you why we lose on the merits.  And

5   they'll have that day in court, Your Honor.  But that doesn't

6   demonstrate individual issues which would defeat the

7   requirements for class certification.

8            And just to give you an example of this, they

9   argue -- and there's many in their papers.  They argue that

10  the Price-Anderson Act preempts all the claims on radioactive

11  materials, on radioactive contamination.  We disagree.  We've

12  argued that a bit in our papers.  Ultimately that's clearly a

13  common issue that will apply to the entire class.  So I would

14  urge the Court in examining the class certification issue, you

15  must examine the elements of each cause of action that has

16  been pled and envision how those will be tried to a jury

17  ultimately.

18           And what you'll see this week is you will see our

19  trial plan.  You will see the witnesses that will come and

20  testify at trial, in addition to all the papers we filed and

21  the affidavits.  We, of course, rely on everything that we

22  filed.  Can't put that all before the Court this week, but

23  you're going to get a good sampling of what that trial's going

24  to look like.

25           And ultimately, Your Honor, you need to decide, when

1   you boil all the requirements for class certification down,

2   you're looking at common injury, common proof, and is the

3   class action superior to other methods.

4           And I think it's very important for the Court to

5   keep in mind, as I said, what is pled and what is not pled.

6           When the first complaint was filed in this lawsuit,

7   Your Honor, there was a trespass claim.  When I got involved

8   in that suit, in this suit, we took that out, and for a good

9   reason.  That is traditionally how defendants have defeated

10  class certification in these cases.  They argue that each

11  individual property owner must prove actual contamination of

12  his or her own property.

13          And there was admittedly some conflict in Florida

14  law on that based on a case called St. Joe versus Leslie.  I

15  actually represented the St. Joe company in that case.  But

16  the Eleventh Circuit clarified for this Court, and it's law of

17  the case, that in the causes of action that are pled in our

18  complaint, there is no requirement that we prove actual

19  contamination on each property.

20          And what we are going to prove, Your Honor, as the

21  common injury, is something that I think anybody who owns a

22  piece of property can understand, and that's stigma.  It's

23  stigma caused by contamination, that results from

24  contamination.

25          And I know you're going to hear from a lot of

 1   experts, but the Court also just needs to use its common sense

 2   and its common experience.  If you live in a neighborhood

 3   where there is a dump or there is some other contamination or

 4   something that -- a cemetery, which is the Jones v. Trawick

 5   case from 1954 from the Florida Supreme Court, something like

 6   that, it stigmatizes the entire neighborhood, the entire

 7   community.  It's not limited to just where the contamination

 8   is, or the dump is, or the gas station is, or the cemetery is.

 9           And I would encourage the Court to read the Jones

10   case, because the Eleventh Circuit relied on it heavily.  And

11   even though that involved a cemetery, they made it very clear

12   that there could be a cause of action even if there were no

13   adverse health effects.  And we do intend to show that this is

14   contamination that is dangerous.

15           But the bottom line for a class certification on

16   property damages is stigma, and that, we will show, can be

17   done by common proof with the experts you'll see this week.

18           I also want to address, Your Honor, essentially the

19   same argument I heard at oral argument in the Eleventh

20   Circuit.  The defense counsel got up in front of the Eleventh

21   Circuit and argued that what I was arguing with respect to not

22   having to prove actual contamination would open the

23   floodgates.  And in rebuttal I argued to the Eleventh Circuit

24   that defense counsel was exactly right; the floodgates were

25   going to be opened, the floodgates were opened.  But it wasn't

 1    the Court that was doing it; it was the Florida legislature

 2    when they wrote Section 376.313.  It was the Florida Supreme

 3    Court when they issued the Kerr (phonetic) decision.  These

 4    statutes and these causes of action under the Florida common

 5    law allow for a property owner to recover damages for stigma

 6    on minimal proof.

 7            376.313, just as an example, is a strict liability

 8    statute.  The -- any damages that result from that

 9    contamination, no matter how innocent it may have resulted

10    from -- and even if the property owner who caused the

11    contamination didn't have anything -- do anything wrong,

12    the -- Pratt & Whitney is liable for that.  Any contamination

13    from their property that results in damages, including stigma

14    damages, they're responsible for.

15            And so really the question, Your Honor, is the

16    floodgates have been opened.  That's what the Eleventh

17    Circuit's decision means, that's what the Kerr decision means

18    from the Florida Supreme Court.  That's what the Florida

19    legislature has done with 376.313.  The question is for you

20    how are you going to manage this litigation.  And we think we

21    can show you this week that the class method is the superior

22    method for managing this litigation; otherwise, you're going

23    to have hundreds, if not thousands of trials you're going to

24    have to deal with.

25            Keep in mind that even though there's only a few

 1   hundred plaintiffs presently before the Court, if class

 2   certification is denied, everybody in the neighborhood is

 3   entitled to come file their own individual actions at that

 4   point, and you're going to see the same experts and the same

 5   evidence time and time again.  And so we believe that this

 6   litigation can be best managed through the class certification

 7   device.

 8           I want to briefly talk about causation and then

 9   briefly about Daubert.

10           The issue here, Your Honor, as I said, under some of

11   these causes of action, Pratt & Whitney is strictly liable for

12   the contamination.  The Aramark case from the Florida Supreme

13   Court makes it clear that even if the property owner who

14   originally had the contamination on their property and it

15   migrated off, did nothing wrong, they're still liable for that

16   migration, whatever damages result from that.  And what the

17   Adinolfe case makes clear here from the Eleventh Circuit is

18   those damages can include stigma damages.

19           And what you're going to hear and you have heard

20   some of is about potential alternative causes for this stigma.

21   And I want to point the Court to two sources of law that

22   really negate that as a problem for class certification.  One

23   is Section 768.81, Subsection 4.  It makes clear that for

24   pollution cases like this, joint and several liability is

25   still the law in Florida.

```
1              We don't have Fabre, which I'm sure the Court is

2    aware of.  Fabre, which you see in almost every other tort

3    action is not applicable in pollution cases.  In pollution

4    cases, we are still under the joint and several liability

5    regime.

6              And why is that important?  Because if Pratt &

7    Whitney caused this stigma in part, they're liable for all of

8    it.  That's all we have to prove; that they caused this stigma

9    in part; that their contamination caused this stigma in part.

10   And if we prove that under the joint and several liability

11   regime, Pratt & Whitney is responsible for all of it.

12             I'd also like to point out the -- which we cited in

13   our papers, the Florida standard jury instruction on

14   concurring cause, which also says to the extent that you have

15   concurring causes and they cannot be reasonably apportioned,

16   the jury is required to award all of the damages.

17             And in this case, Pratt & Whitney has made no

18   effort, and there's no evidence that if we have -- if we can

19   prove the contamination in part caused this stigma, that

20   there's any basis to apportion that.  And that standard

21   instruction is 401.12B.

22             And, finally, Your Honor, I did promise I was going

23   to talk just briefly about Daubert.  I know the Court is very

24   well aware of the standards.  You're looking at whether it's

25   qualified, whether the testimony is reliable, and whether it's
```

```
 1   relevant.  That's -- kinda boils the three requirements down
 2   in a nutshell.
 3              And, again, the role of the Court here is not to
 4   determine who's more believable, which -- which expert witness
 5   is more credible.  That will be decided by the jury.  And we
 6   believe that, you know, our witnesses, their testimony is
 7   admissible and we'll show that this week.  And they'll be
 8   subject to cross-examine, as I'm sure the defense will do this
 9   week and also in front of the jury.
10              So unless the Court has specific questions about
11   any -- anything I've said or anything else, I'm going to let
12   my co-counsel proceed.
13              THE COURT:  The only question I want to ask is on
14   the preemption issue.  Isn't that a legal question as opposed
15   to a determination by a trier of fact?
16              MR. GOWDY:  Yes, but it's a common legal issue, yes.
17              THE COURT:  Okay.
18              MR. GOWDY:  That will apply -- I mean, when you look
19   at class certification, you look at the legal and factual
20   issues and whether they're common to the entire class or their
21   individual.  And you're correct; it is a legal issue.  It
22   would probably be ripe for a summary judgment motion at some
23   point by both sides.  But it's not different from class member
24   to class member.
25              THE COURT:  Okay.  Thank you.
```

1              MR. GOWDY:  Yes, sir.

2              MR. GDANSKI:  Good morning.  May it please the

3      Court, Jonathan Gdanski with the Schlesinger firm.

4              THE COURT:  Good morning.

5              MR. GDANSKI:  Good to see you, Judge.

6              I'm going to try to start without repeating much of

7      what Mr. Gowdy said and putting some of the flesh on the bones

8      of the law and the analysis before the Court, but also

9      hopefully putting the issue that Your Honor has presented

10     before you into perspective as to where we stand and what the

11     greater impact of the case is, how we got here.

12             And so there's a couple of slides we have.  We'll

13     try to walk through them.

14             Just to be clear, a baseline, what is it we need to

15     prove?  What is the baseline proof that's necessary in order

16     to prevail under the Eleventh Circuit's Adinolfe opinion?  It

17     is merely that as a result of Pratt & Whitney's environmental

18     contamination, homes in The Acreage lost value and are

19     stigmatized.  That is the message and the directive that the

20     Eleventh Circuit gave us to prevail in this case.  We are

21     prepared to show Your Honor this week that we meet that in

22     spades.

23             But we should lose sight, the Court shouldn't lose

24     sight, the parties shouldn't lose sight.  The briefing from

25     the defense has lost sight of the core foundational claims

1    that we need to maintain.  Pratt & Whitney is a polluter.

2    Nobody is going to question that.  Pratt & Whitney is a

3    polluter of carcinogens.  Nobody's going to question that.

4    Pratt & Whitney's site in Palm Beach was nearly designated a

5    Top Ten Superfund site and was going to be and was actually

6    one of the most polluted sites in America.  They negotiated

7    politically their way out of that designation in the '80s.

8    But it is a polluter.  They have polluted their own property

9    in this county with cancer-causing chemicals.  They know they

10   did, their experts have testified that they did, their company

11   witnesses have testified that they did, and it's the truth.

12        They had a chance in the 1980s to remediate the

13   issue, right, when confronted with it internally we have from

14   their documents they had the opportunity to properly remediate

15   the issue.  The problem is that it cost them too much, and so

16   they voluntarily chose the cheapest and least useful method to

17   remediate the issue, which caused a flood and flow of

18   contamination to keep going and ultimately, ultimately go

19   further than they had feared.

20        So all of this was reasonably anticipated by Pratt &

21   Whitney.  They had an opportunity to stop it.  They chose not

22   to.  But it's very, very simple and foundational to state that

23   we've done nothing wrong.  They're not maintaining that

24   they've done nothing wrong.  What they're trying to do is use

25   technical defenses at this stage of the case to escape from a

 1    class certification, and we're going to at the end ask Your

 2    Honor to obviously deny that request and certify the class.

 3          The issues are central.  They're Daubert and class

 4    certification.  Your Honor has to look at, look at not every

 5    expert opinion.  Not every expert opinion is subject to

 6    Daubert in this case.  Not every claim is subject to a defense

 7    of not being measurable for class certification.  Some expert

 8    opinions are not even challenged.

 9          And I want to focus Your Honor on two points.  The

10    stigma claim.  That is the core claim that we have in this

11    case.  It's not a claim for personal injury before Your Honor

12    right now.  There's companion cases that are related to that.

13    But in evaluating and measuring the stigma claim, the Eleventh

14    Circuit -- and I'm going to read it to the Court -- in

15    referencing the Jones case said the following:  The

16    plaintiffs -- and this is a passage in the Eleventh Circuit

17    when they get to the heart of the law of the case.  They go

18    through a background.  They even go through why some of the

19    defense arguments are not dispositive, and then they get right

20    to the heart of why the plaintiffs prevail on the Eleventh

21    Circuit issue on the motion to dismiss, and they frame the

22    case going forward, and in doing so they cite to Jones, and

23    they say:  The plaintiffs, in Jones, did not buy their homes

24    with the expectation of living forever in the gloomy shadow of

25    death and with the disquieting interruptions of their normal

1   past times and peaceful pursuits.  We know of no one who would

2   not object to the thought of drinking water that had been

3   drawn from a surface so near the dead, no matter how pure the

4   health authorities have stated it to be.

5          What was Jones about?  Jones was about a community

6   where they wanted to put a cemetery nearby.  No claim of

7   invasion.  No claim of any actual impact on any actual

8   property in the plaintiffs' homes, and they were able to

9   prevail.

10         Pratt & Whitney is the closest -- The Acreage, The

11   Acreage is the closest community to Pratt & Whitney's property

12   in the southern direction.  All there is in between is the

13   Corbett Wildlife.  Every aspect, every clause in this sentence

14   can reasonably be restated to fit perfectly with the facts of

15   this case.  And as the law of this case, it should control the

16   outcome and the prism, the prism through which we view things

17   going forward.

18         I want to try to bring to Your Honor's attention one

19   point that is not really handled in the papers, it's not

20   handled in the Daubert proceedings, and I think it's an

21   important one that Your Honor should have a reflection on

22   going forward, and that is Pratt & Whitney and what they did.

23         So the plaintiffs have an expert, Dr. Jennings,

24   who's a standard of care expert.  Mind you, standard of care

25   is not necessary.  In order to have a claim of nuisance and

1  stigma, you don't need to demonstrate that the bad actor was

2  below the standard of care.  You don't need to show that they

3  were bad.  All you need to show is there is a contamination

4  and an association stigma damage.

5       But we have an expert, Dr. Jennings, who's

6  unchallenged.  So he's not in the papers.  He's not going to

7  come this week.  So they didn't challenge Mr. Jennings,

8  Dr. Jennings.  And despite his -- or in light of his multiple

9  years of experience, he essentially testified to the

10  following:  That Pratt & Whitney improperly, unreasonably

11  handled cancer-causing contaminants on their property.  They

12  don't challenge that.  They don't dispute that.

13       Pratt & Whitney's storing, spilling, spraying,

14  dumping and burning of cancer-causing contaminants fell below

15  the standard of care of a reasonable company.  They have no

16  expert to dispute that.  They've not challenged it.  That's

17  evidence in the record before Your Honor.

18       And so we have now Pratt & Whitney, an industrial

19  site, just to the north of The Acreage, a communal property,

20  where there's an agreement between the parties for purposes of

21  this case that they have polluted the land so close in

22  proximity to The Acreage with cancer-causing chemicals.

23       Pratt & Whitney has no defense to the following

24  propositions.  They have no defense.  They admit that they

25  contaminated their own property with carcinogens, including

```
 1    this one, which will come up throughout the week, 1,4-Dioxin.
 2    They admit that 1,4-Dioxin migrated.  So now I'm moving off of
 3    the Pratt & Whitney.  Dr. Jennings talks about the Pratt &
 4    Whitney property.  This second point has now taken 1,4-Dioxin
 5    and moved it off the Pratt & Whitney property.  Pratt &
 6    Whitney admits that 1,4-Dioxin migrated from their property to
 7    the groundwater in the Corbett, which is just due south,
 8    contaminating the Corbett with carcinogens.
 9           So now we have Pratt & Whitney has carcinogens from
10    their own dumping.  It has migrated into the Corbett.  Pratt &
11    Whitney admits that there have been persistent detections of
12    1,4-Dioxin in the Corbett.  They admit that dioxins and
13    furans, carcinogens, have been found in soil at the Pratt &
14    Whitney property, and they admit that 1,4 dioxins and furans
15    have been found in the groundwater in The Acreage.  None of
16    those will challenged.  None of these are contested.
17           This alone, these concessions alone that they've
18    contaminated their own property, they've contaminated the
19    Corbett, are enough to stigmatize the property just due south
20    in the same manner that a cemetery could stigmatize a property
21    just due east, north, south, or west.
22           Here is a map of the 1,4-Dioxin findings, and Your
23    Honor will see that they're all over the Pratt & Whitney
24    property, and they extend in a southerly direction, which is
25    important, because the acreage is south of the Corbett, which
```

```
 1   is south of Pratt & Whitney's property, and you'll see that

 2   the detections, they go further than they ever expected them

 3   to go.  The furthest southern hits here come from the northern

 4   hits all originating and emanating from the Pratt & Whitney

 5   property.

 6          Ultimately, what Pratt & Whitney's defense is, is

 7   akin to a stiff arm defense, right?  Everything we're

 8   suggesting is wrong.  They contest every single claim that

 9   we're trying to make, despite the fact that the overwhelming

10   evidence and their own testimony from their experts and

11   company witnesses are concessions on many of these critical

12   issues.

13          So broadening out that past view, here you have the

14   full contaminated area.  You have the UTC site at the north,

15   you have the Corbett in the middle and extending into the

16   west, and then you have The Acreage just due south.  All of

17   these areas, the area in the purple, yellow and red have shown

18   contamination.  All of them have shown contamination of the

19   same cancer-causing agents.  There.

20          Is nothing else in the vicinity from an industrial

21   perspective, a corporate perspective that could have

22   reasonably been an alternative cause, not that we need to show

23   one, mind you; that obviously is just the weight of the

24   testimony of the experts.  But our experts have more than to

25   the sufficiency of Daubert established that all of the
```

1    contamination comes from Pratt & Whitney.

2          Why is that so?  Because it flows south.  The

3    groundwater here flows south.  And that's not a mere matter of

4    experts disagreeing on the geology of the underground plains

5    in this area.  It's the fact.  How do we know it's the fact?

6    Because we know already that the contamination for Pratt &

7    Whitney has not flown east, west or north.  It's gone into the

8    Corbett.

9          The fact that they have admitted that 1,4-Dioxin has

10   been contaminated from their property into the Corbett

11   demonstrates that the rational and appropriate and

12   methodologically sufficient basis for suggesting that

13   groundwater flows south.  It has flown south.  It is doing it

14   right now.  And here you see obviously making the point over

15   and over again, the 1,4-Dioxin hits.  The blue and the red

16   acreage are the 1,4-Dioxin hits within The Acreage property.

17         We will bring you Dr. Stephens who will testify.

18   He's eminently qualified.  I don't think -- both sides have

19   experts in their field.  Some have experts from the defense

20   that are not in the fields that are relative to their

21   opinions, but both have classifications and come from

22   institutions and, you know, credentials.

23         Dr. Stephens will testify to you that the

24   groundwater flows south, obviously.  He'll testify to you that

25   the data suggest that the direction of the groundwater is

 1    flowing more southerly than Pratt & Whitney initially thought.

 2          We have their letters from 2015 from Arcadis, which

 3    was a Pratt & Whitney consulting agency, that demonstrates

 4    that they thought it was going to only go a little bit south,

 5    and it's actually gone further than they had ever anticipated.

 6          Dr. Stephens will testify that the contaminants have

 7    already migrated, based on a 2015 letter; that they built

 8    wells into the Corbett, and they had to build additional

 9    wells, right?  So at some point in time Pratt & Whitney is

10    concerned about offsite southerly migration.  They built

11    wells.  They tested those wells.  They saw that those wells

12    were not the bottom line of where it was going and had to

13    build additional wells.  All of this leads to the more than

14    reasonable -- the sides can fight and fuss at a trial over

15    who's right or who's wrong.  But it leads to the more than

16    reasonable conclusion that there's contamination in The

17    Acreage.

18          In The Acreage we've found 1,4-Dioxin, the same

19    exact contaminate that is in Pratt & Whitney, and Pratt &

20    Whitney admits flowed into the Corbett, we found out, since

21    Furans, Methyl Chloride, Chloroform, and Bromodichloromethane,

22    all serious chemicals, all dangerous chemicals, all chemicals

23    that are not supposed to be there, all chemicals that we know

24    were found and originated in the Pratt & Whitney site.

25          They have crossclaims or they have theories that for

1   some of these, for some of these, they are also found in

2   dishwasher detergent or laundry detergent or pool cleaners and

3   solvents.  That's got nothing to do with negating the fact

4   that they could reasonably be from Pratt & Whitney.  That's a

5   classic jury question.  That goes to the credibility and

6   weight, not the sufficiency of the testimony.

7        Dr. Stephens, Dr. Bedient, both are going to come,

8   and even though it's not necessary under the Eleventh Circuit

9   law, will testify, if we bring them both, if we bring just

10  one, that it is certainly two experts' opinions more likely

11  than not to reasonable degrees of certainty that the

12  cancer-causing agents came from Pratt & Whitney into The

13  Acreage.  We've met that burden of proof in spades with

14  experts who are eminently qualified.  They'll discuss

15  everything I'd found (sic), Your Honor, and they're going

16  to -- Dr. Stephens will explain the basis of it.

17       And it's an important basis to the extent there's

18  questions about, well, how could you say it, right?  How could

19  you say it came from there?  They're close by.  We know it

20  came into the Corbett.  The same way that Pratt & Whitney

21  admits, the same method Pratt & Whitney uses to admit that

22  they contaminated the Corbett is the same one that we use to

23  say that they contaminated The Acreage.

24       But Dr. Stephens will explain that the places and

25  depths at which the contaminants are found is evidence of and

 1   demonstrates that it's groundwater contamination, as opposed

 2   to contamination from above into the property, which Pratt &

 3   Whitney suggests is a hypothetical alternative cause.

 4          Dr. Stephens and Dr. Bedient and all of our experts

 5   have used methodologies that are accepted, used, approved,

 6   reproducible and logical.  They make sense.  They've used

 7   material from UTC, from Pratt & Whitney.  United Technologies

 8   is the parent company of Pratt & Whitney.  They've used

 9   drilling reports, logs.  They used the kinds of things you

10   expect them to use.  They use the same things, they use the

11   same pieces of data that the defense experts use.  So Pratt &

12   Whitney can't credibly claim that our experts have used bad

13   data.  They can claim we don't like the way you did your data,

14   but that's not a question of methodology.  That's not a

15   question of sufficient basis.  That's a question of fact for

16   the jury.

17          Dr. Bedient and Dr. Stephens in this particular

18   slide used fundamental hydrogeologic equations.  And what that

19   means in particular for purposes of this is something called

20   Darcy's Law.  Your Honor's probably seen it if you've read

21   through the different testimonies from the different

22   witnesses.

23          And what Darcy's Law does -- I'm not going to spend

24   too much time on it; I'll let the experts complicate it -- but

25   it measures different factors that are necessary.  The

```
 1    critical point when it comes to Darcy's Law and its
 2    application to this hearing is both experts use it.  Both
 3    experts, Dr. Missimer and Dr. Stephens use Darcy's Law.  So
 4    they use the same framework of materials that they rely on.
 5    They use the same equation to reach their opinions.
 6          In a Daubert hearing, when Your Honor's addressing
 7    the sufficiency of their testimony, the reliability, the
 8    methodology, if both experts are using the same method, it
 9    can't credibly be maintained by Pratt & Whitney that
10    Dr. Stephens' method is fundamentally flawed such that it
11    fails.  They just don't like his opinion, his opinion, and
12    they're entitled to do that, and we're entitled to challenge
13    that in front of a jury at some point in the future.
14          And so flowing from the contamination is the stigma.
15    We're going to bring to Your Honor today Dr. Kilpatrick.
16    We've put forth his affidavit.  He's supremely qualified.
17    He's testified.  He's been accepted.  His methods have been
18    accepted.  He's appraised the property on multiple occasions.
19          And what Dr. Kilpatrick has done is put forth
20    several independently sufficient criteria, each of which on
21    their own establishes stigma.
22          But I would echo what Mr. Gowdy said, and that's
23    asking the Court to use just the common sense that the Court
24    has.  The Court's the gatekeeper when it comes to experts and
25    the Daubert analysis.
```

```
 1              But the gatekeeper function doesn't exclude just
 2     does the -- just does what they're saying, the gestalt of what
 3     they're saying make sense, is it sensible, is it credible.
 4     It's credible to claim that The Acreage, the community just
 5     south of a contaminated Corbett, contaminated from Pratt &
 6     Whitney, is stigmatized.
 7              THE COURT:  What about measuring the extent of the
 8     damage accurately?
 9              MR. GDANSKI:  So measuring the damage accurately,
10     there's multiple methodologies to do that, and Dr. Kilpatrick
11     has employed several of them.  One of them is to compare the
12     pricing drop, the price drop, on aggregate per square foot of
13     the homes in The Acreage to the surrounding communities, which
14     he's done.  He's taken two surrounding Palm Beach County
15     communities, Jupiter Farms and Palm Beach, a community just
16     northeast of The Acreage, and compared their relative
17     depreciation over time, and he did so in order to adjust for
18     financial crises that existed at the time.  He's done that.
19              He's gone in and actually interviewed and assessed
20     the willingness of homeowners to buy and sell.  He went in and
21     established that at the time of the stigma, when it became for
22     the first time publicized, banks and lending institutions
23     modified their practices.  And so there's multiple independent
24     vehicles.
25              And when it comes to the class certification --
```

```
 1   well, when it comes to the merits phase of the case,
 2   post-class certification, Dr. Kilpatrick has a model, a model
 3   which I know Pratt & Whitney will not contest, because they
 4   know about it.  There is no question -- I'm reading now from
 5   this slide -- that Dr. Kilpatrick is eminently qualified on
 6   issues of real property evaluations and appraisal standards.
 7   He holds a Ph.d. in real estate finance, is a licensed real
 8   estate appraiser in all 50 states and the District of
 9   Columbia, is a nationally certified appraisal standard
10   instructor, an award-winning scholar in the field, has
11   previously been permitted to testify in court about the same
12   type of work that he has done.
13         Those are not our words.  That is the words of
14   Barlit Beck law firm when they retained Dr. Kilpatrick in a
15   case to prove depreciation of values in homes.  Dr. Kilpatrick
16   was challenged in that case under Daubert.  They defended it
17   and survived.
18         So I have a expert before the Court who has multiple
19   methodologies, one in which when it comes to the individual,
20   which is not yet necessary now, the individual demarcator of
21   drops in homes, he has a foolproof, accepted method that they
22   can't challenge, because they've used it and know about it, to
23   measure all the damages.
24         What he's done, he's had multiple methods. Sales
25   trend analysis, contingent valuations --
```

```
 1              COURT REPORTER:  Sir, please slow down, please.

 2              MR. GDANSKI:  He has multiple methods.  Contingent

 3    sales trend analysis.

 4              And so I'd ask Your Honor to go back actually to the

 5    common sense role, the common sense function that Your Honor

 6    has to employ.  Does it make sense that homeowners are going

 7    to get less money for their property?

 8              THE COURT:  Yeah, but the question is how much?  How

 9    do you measure the actual damage?

10              MR. GDANSKI:  The question of measurement versus

11    individualized measurement are two different things, and I

12    think that's an important framework to break out.  How do we

13    measure the actual damages?  Dr. Kilpatrick has a method to be

14    employed at a later date.  That's what I'm referring to when

15    it comes to that, which was previously used by Barlit Beck,

16    where he can measure through a generally accepted principle,

17    the unimpaired value of homes and then cross-check that

18    against the impaired value of homes.

19              It's not necessary for today.  All we have to know

20    for today is the following:  Will the homes -- are the homes

21    amenable to being measured in group fashion.  So homeowners

22    can always, can always measure the value of their home.

23    Anyone can sell their home on the real estate market.

24              Dr. Kilpatrick is able to do what's called mass

25    appraisal.  So the question before the Court is not is what is
```

```
 1    the exact number of each person's damages today.  It is the
 2    computation of that number, one in which lends itself to mass
 3    computation.  And there are methodologies.  The methodology is
 4    the one that he's prepared to use in the future called GAVM,
 5    which is a mass appraisal method, the mass appraisal method
 6    that Barlit Beck won't challenge, that Pratt & Whitney won't
 7    challenge.
 8            And so we know, we know that after -- to answer your
 9    question this way.  We know that after this class is certified
10    and Your Honor gives a date that says the certification is as
11    of this date, the class consists of homeowners who owned
12    properties from X date until Y date.  There has to be date on
13    the classification order.
14            When there's a date on the order, we have a
15    foolproof method that will not be challenged to determine
16    individualized damage.  It's a comparison of the unencumbered
17    property, unencumbered amount, to the depreciated amount.  And
18    that's one that's generally accepted.
19            But you can also go in and ask homeowners, you can
20    look at sales trend analysis, so the average aggregate sales
21    trend analysis in the Acreage compared to out of The Acreage.
22            For example, before the market crashed, homes in The
23    Acreage were valued at X amount.  Homes outside The Acreage at
24    Jupiter Farms valued at Y amount.  Market crashes, and there's
25    The Acreage stigmatization at or around or near in the
```

 1   vicinity of a couple years same timeframe.

 2          Dr. Kilpatrick has looked at that data already,

 3   adjusted for it to take into account any impact that the

 4   market may have had, and he's able to appreciate within it a

 5   discernible damage model that is from and distinguishable from

 6   the Jupiter Farms neighborhood and related to the

 7   stigmatization.  He's interview the homeowners.  He's went out

 8   to the property and driven every single avenue within The

 9   Acreage property in order to determine that there's a

10   homogeneous -- that there's a context within the class that

11   fits and makes sense.  There's no one in the class that seems

12   out of whack or out of bounds or doesn't make sense.

13          This is the class boundary here, and they're the

14   Adinolfe class.  Your Honor is going to learn about a CV

15   survey this afternoon.  You may have seen some discussion

16   about it in the different papers.  I'm sure you have.  And

17   Dr. Kilpatrick will explain why the CV survey is an accepted

18   methodology, why the information in this survey lends itself

19   to credible responses, and why all of this is done in such a

20   way that supports the notion of a class certification.

21          Dr. Kilpatrick has gone and interviewed informal

22   surveys people within The Acreage property.  And here is a

23   flavor of what they obviously would say.  You know, none of

24   this should be really shocking.  It's not outside the bounds

25   of common sense and it's obvious that people in The Acreage

1    were concerned.  They said they won't live there.  They

2    abandoned homes.  They don't use the water.  Mr. Adinolfe,

3    they don't use -- they put in an expensive water filtration

4    system.  People had to adjust and spend money to make up for

5    the harms caused by Pratt & Whitney.

6           We have Dr. Kilpatrick used transactional evidence.

7    Each of these, mind you, are independently sufficient to

8    support the claim of class certification.  He used valuation

9    evidence and transactional evidence, and he used sales trends

10   that show the acreage is depreciated as compared to the

11   neighboring communities.

12          So at this stage, there's more than sufficient

13   evidence to demonstrate there's a basis to show drops in

14   homeowners' prices above and beyond the norm in the aggregate

15   in The Acreage.

16          At the end we have these fundamental requirements,

17   right?  So we have numerosity.  Well, we have a number of

18   people.  Imagine the problem that would stem and flow from a

19   denial of class certification if each of these individual

20   homeowners had to seek redress on their own.

21          We have typicality, typicality insofar as we have

22   one actor, Pratt & Whitney.  There's not a lot of defendants.

23   It's not like an asbestos case where you have 10 different

24   companies, each of which have, you know, put asbestos in

25   something.  We have one company, Pratt & Whitney.

1          We have adequacy and commonality.  We know that the

2     claims within the homeowners are the same.  The metric and

3     measure with which we're going to determine damages and stigma

4     is the same.

5          We have a predominance of common issues.  They're

6     all common issues.  No one's going to have from the

7     plaintiffs' perspective any material individualized issue.

8     Just because one person used Clorox in their home and one

9     person does not shouldn't be sufficient basis to negate the

10    mechanism that exists to certify a class.  If that was

11    independent sufficient basis, as Pratt & Whitney suggests it

12    is, you'd always nitpick a class certification to death.

13         We have standing and ascertainability.  Can we

14    ascertain the class.  And it's not a question does Pratt &

15    Whitney like the manner in which we've ascertain the class,

16    have we defined a border?  Have we defined a class?  Have we

17    defined a group of homes, a group of people who are

18    stigmatized?  And our evidence supports that certainly

19    sufficiently enough to go forward with a class certification

20    order.

21         And I'd suggest to Your Honor that the presence --

22    that this case presents, you know, a pathway to fix and seek

23    redress for their contamination.  All right.  That's the

24    opportunity we have.  The opportunity they passed up on to

25    sufficiently remediate the problem in the '80s now presents

```
1    itself through the class action mechanism to seek appropriate
2    redress.
3              Thank you.
4              THE COURT:  Thank you.
5              Is that the extent of your opening, or do you have
6    more opening?
7              MS. HATFIELD:  We have just a bit more.
8              THE COURT:  Okay.
9              MS. HATFIELD:  Is it possible to get a time check?
10             THE COURT:  I've got about 41 minutes, approximately
11   you've used so far.
12             MS. HATFIELD:  Thank you.
13             Your Honor, Mara Hatfield on behalf of Cotromano, et
14   al., plaintiffs, and with me is Jack Scarola and Britney Jones
15   and Darren Latham, and our cases have been consolidated, as
16   Your Honor well knows.
17             I'm here to really address the nuclear incident
18   claims and the radiation claims.  And the stigma that we're
19   presenting is a stigma of the fact that at the same time that
20   a pediatric cancer cluster was declared in The Acreage, which
21   is represented on the screen in front of Your Honor with the
22   dots, except for Mr. Wendroff (phonetic), who was diagnosed
23   later, the people in The Acreage became aware of the concern
24   about ionizing radiation, because the Department of Health
25   informed them when the cancer cluster was declared, that
```

1   ionizing radiation is the primary environmental contaminant

2   associated with brain cancer.  And they shortly later began to

3   learn a little bit about the radiation contamination that was

4   existing at Pratt & Whitney.

5           At the top of the slide in front of Your Honor are

6   points A, B and C, which are areas that were cleaned up at the

7   Pratt & Whitney facility over different times.  A is the

8   United Technologies center, former Air Force plant parcel, and

9   C is the scrapyard.  Both areas there was a concern about the

10  presence of low-level radioactive waste, and yet both areas

11  had soil remediation from those sites that went ostensibly to

12  an area called the Magnum Thermal Treatment facility, which is

13  on the bottom of the screen with a little campfire.

14          At this particular thermal treatment facility, what

15  would happen is soil that was supposed to only have a certain

16  amount of jet fuel contamination, for example, would be

17  thermally treated, and the petroleum products would be baked

18  out and sent out through the air stacks, and then the rest of

19  the soil would being could be used for either road

20  construction or sometimes residential construction.

21          The issue today is why would we certify this case.

22  Why not present individual cases?  And the reason why this

23  case should be certified isn't entirely based on judicial

24  economy.  It's not based on legislative economy for the

25  parties.  It's because this case needs a neighborhood

1    solution.  No man is an island.  This is the theme that Judge

2    Hopkins used when he allowed us to test the property of an

3    individual who was saying that we should not be able to test

4    his property, and we had concern about his property because of

5    liens that had been filed on that property by a trucking

6    company that was taking soil from the Pratt & Whitney facility

7    at the same time as the liens were filed.  And he was very

8    proximate to Mr. Wendroff, who has recently deceased and whom

9    the plaintiffs have found an abundance of thorium, which is

10   the radioactive material at Pratt & Whitney in his spine.

11        And you can see on the screen the W dot is where

12   Mr. Wendroff resided during the time of exposure, and the two

13   trucks beneath it are homes, adjacent homes where Tru Trucking

14   had liens filed.

15        And at that hearing Judge Hopkins said, because

16   there was a Fourth Amendment objection to the testing, he

17   said, importantly, you do not have a castle, and nobody comes

18   in.  What's happening on your property, these plaintiffs

19   rightfully think is affecting their children or affecting

20   their neighborhoods and affecting their property values.  If

21   you have a property value concern, that can be addressed

22   within this class.

23        Would that someone had treated Pratt & Whitney that

24   way.  Pratt & Whitney's property was remediated as though it

25   were an island.  It was remediated from the beginning, in

1    1980, after 30 years of lingering contamination, as though it

2    were an island.  It did not take the steps to remove any of

3    the soil for another 16 years.

4            And what's important is that while the Pratt &

5    Whitney site is not an island and the homes where Tru Trucking

6    soil went are not islands, neither are the cancer cluster

7    victims' homes.

8            For example, we know that the soil that was found

9    underneath the DeCarlo home, which is a cancer cluster home,

10   is strikingly similar in radionuclide makeup as homes that

11   we've test -- as sites we've tested at the Pratt & Whitney

12   facility, particularly those test areas, the only area that I

13   did not mention, because we have not had documentary evidence

14   that there was low-level radioactive material there, but we

15   did find radioactive material there when we tested.  Pratt &

16   Whitney has not tested those areas for radioactive materials

17   prior to our litigation.

18           The contamination not only migrates within The

19   Acreage, it migrated into their children.  We have two

20   decedents whose spines show levels of thorium that are

21   hundreds of times background.

22           So, again, why should this case be certified?

23   Because it's about community harm.  You drop something in the

24   water, it ripples out.  You drop something in a community,

25   like there's a pediatric brain cancer cluster and the primary

1   environmental contaminant associated with that is radiation,

2   and then, along those lines, you find out more and more about

3   their reckless remediation of that radiation and their utter

4   disregard in how they handle radioactive materials, you're

5   going to have a stigma in The Acreage.

6          Now, in 2009, when the investigation began, in

7   October 2009, UTC and DEP were talking, because there was a

8   concern.  This was probably caused, a lot of people thought,

9   by Pratt & Whitney.  We know they've had concerns about brain

10  cancer within their industry.  We've had an individual come

11  forward and tell us that five of the 12 engineers who worked

12  with thorium at Pratt & Whitney died of brain tumors.

13         Did The Acreage learn about that at that time?  No.

14  Because in October of 2009, when UTC and DEP were talking, UTC

15  created a lot of demonstrables to talk to the community about

16  their contamination.  None of them mentioned radiation, and

17  the community never got to see those, because the DEP decided,

18  hey, you're six miles away, sure you had nothing to do with

19  it, let's not even bring it up.

20         But what Pratt & Whitney did do was they sent the

21  DEP an e-mail in response to their request outlining

22  everything that they had done about radioactivity.  Why?

23  Because the DOH said that's the primary environmental

24  contaminant concerned.  And after going through this entire

25  litany, which is not entirely representative of the truth,

1   because it doesn't mention the scrapyard where they were

2   testing for radiation before they sent it to Magnum, they

3   conclude that radionuclides in groundwater could not have

4   migrated from Pratt & Whitney to The Acreage, which is over

5   six miles away.

6           Fast-forward four months, and the DEP tells the

7   community we have decided that the Pratt & Whitney site is not

8   really related to The Acreage, because it's over five miles

9   away.  And everything about this fact sheet looks a lot like

10  all the demonstrables that Pratt & Whitney had sent to DEP.,

11  except for one thing; they don't mention radiation.

12          And, again yes, is radiation important?  Because the

13  DOH told us that the primary environmental contaminant

14  associated with the problem going on in The Acreage is

15  ionizing radiation.

16          Pratt & Whitney's going to tell you that it doesn't

17  really matter, because the TD nickel that they buried on-site,

18  the stuff we know they worked with, because it's actually the

19  licensed material that they worked with, as opposed to the

20  nonlicensed material they were disposing of, they're going to

21  tell you it's not that dangerous; it was just two percent

22  thorium oxide within an alloy called TD nickel.

23          The paperwork that they filed with the Department of

24  Health negates that.  The paperwork that they filed with the

25  Department of Health shows that they were very concerned about

1    the particle size that was being used.  It's .2 microns.  A

2    blood cell is 6.  And because they knew the particle size was

3    so small, they promised the Department of Health that they

4    would protect their workers, they would keep it

5    differentiated, and they would importantly dispose of the

6    waste with a licensed broker at all times.  All of these

7    documents were stamped received by the Department of Health in

8    1964.

9          By 1965, Pratt & Whitney decides to bury it anyway,

10   and they buried is in the scrapyard.  This is one of the maps

11   where they showed that they were burying the radioactive

12   material.

13         And what's important with this, Your Honor, is at

14   the bottom of the map it shows that revision A to the

15   scrapyard is the addition of radioactive material.  This will

16   become important later, not right now for purposes of opening,

17   because when Pratt & Whitney goes ahead and gets permission to

18   start disposing of its waste and landfill, until --

19         COURT REPORTER:  I'm sorry, can you repeat that?

20         MS. HATFIELD:  It permitted itself a landfill at the

21   scrapyard.  Prior to that it had been doing all of the open

22   trench burning and then covering it up with fill material so

23   that they would have a new trench to put more of their waste.

24         Finally by 1974 they start working on this landfill,

25   which is this horseshoe thing at the bottom of the map.  Pratt

```
1    & Whitney eventually needs to close that landfill, because it
2    is such a problem.  And when they decide to close the
3    landfill, they don't include in any of their closure plans the
4    fact that there was also a concern that TD nickel was buried
5    here underneath the landfill, and they don't tell the
6    Department of Health that or the DEP when they eventually
7    decide to clean out the scrapyard.
8              So they clean up the scrapyard, never clean up the
9    landfill.  They get off the Superfund site, the preliminary
10   Superfund site, because they had told the DEP nothing about
11   radiation.
12             And yet UTC cleans it up in 1956.  And they're going
13   to tell you that they did a great job in cleaning it up and
14   there was no worries about it.  That is not true.  In 2000,
15   the scrapyard that was cleaned up, there was a concern that
16   there was still radioactive materials there.  And we have all
17   of these e-mails that our experts have looked at to determine
18   did they do a responsible job cleaning up that scrapyard when
19   all that soil got picked up and moved down to Magnum?
20             And these e-mails show that, no, they didn't.  There
21   was radioactive material in the scrapyard.  They had that
22   concern.  They did some testing, which they have just produced
23   last week, of the scrapyard, and the testing is for what even
24   these e-mails will tell you and what our experts will show you
25   is not the proper testing and would not have disclosed the
```

1    presence of any thorium material in the scrapyard soil that

2    was picked up to be taken to a local incinerator.

3            And all of this is important, because at the time

4    the DOH does their testing and does their investigation, one

5    of the things that they get really concerned about is the use

6    of fill material in The Acreage, and they start investigating

7    the local fill providers.  They don't investigate Magnum

8    anymore, because they've been closed since 2001, but they do

9    investigate Sun Recycling.  And at that same time, UTC starts

10   investigating its prior use of those recycling companies and

11   doesn't tell the DEP, hey, your concern about us being only

12   six miles away, that might not be that much of a vitiating

13   card, if, in fact, we use the same soil or recycling companies

14   that you're worried about having a presence in The Acreage.

15           They do use a company called Tru Trucking to take

16   materials to Magnum.  And as I've explained, Tru Trucking was

17   delivering soil in The Acreage sometimes on the same days that

18   they were taking soil to Magnum.

19           And what we've just learned in the second deposition

20   of Mr. Trujillo, which UTC wanted us to take, and we took, and

21   they neglect to mention in their most recent reply regarding

22   Mr. Trujillo, is that Mr. Trujillo was the major provider for

23   the major Acreage builder, Mr. Koosh (phonetic).  All these

24   green men are the properties that Mr. Koosh developed, and all

25   of these trucks in the area where Mr. Trujillo had liens.  And

1    Mr. Trujillo recently testified that the liens represent a

2    small portion of the residential material that he was bringing

3    into The Acreage.

4              And this bears just a brief mention.  There's been a

5    lot of discussion about the fact that one of our experts takes

6    a look at all of the documentary sources, all of the Google

7    Earth imagery and all of the depositions that have taken place

8    in this case regarding the soil remediation, and he has a

9    concern, which we have always had, that Mr. Trujillo first

10   supplied a route to Magnum that simply could not have existed.

11   He said that he took a Beeline entrance onto the turnpike for

12   the busy times at Magnum.  At first he said at all times, and

13   then he recanted and said, well, it didn't open 'til 1999, so

14   I think I took it just for the early stuff.

15             All we're concerned about, Your Honor, is 1999

16   through 2001, when they were taking too many loads to get

17   there in a day if you don't take the route through The

18   Acreage.  That's the important thing.  Mr. Trujillo never

19   describes a route through the acreage.  And, in fact, in his

20   first deposition in the testimony that UTC will tell you that

21   I overlooked, said the only other route was Haverhill, when he

22   recalled that for some of the time he was describing the

23   turnpike was closed, and none of this really matters actually

24   because the exit he was describing was also not open at the

25   time.

```
 1           These white arrows that are on the screen represent
 2  the possible routes from UTC to Magnum, and everybody in The
 3  Acreage knows this.  Most people living in Palm Beach County
 4  at the time of 2003, when the turnpike finally opens on
 5  southern, or in 2006 when it finally opens on Beeline, know
 6  this.  Dump trucks were always going through The Acreage.
 7           So regardless of whether all of these facts wind up
 8  proving individual cancer cases, the stigma is there.  We know
 9  that there were too many cancers in The Acreage, and we know
10  that the primary environmental contaminant is radiation.  We
11  also know there's radiation in The Acreage, and our experts
12  will show how those radiation are present in similarities,
13  both because of what they're present with and the amounts that
14  they're present to the UTC site.
15           We now know that UTC was removing soil and taking it
16  to Magnum, which is just due south.  And everybody there knows
17  what the routes are, even if Mr. Trujillo forgot to explain
18  The Acreage route, which is really interesting, because as
19  we've just learned in the most recent testimony, that third
20  dot on the bottom of the page in The Acreage with the green
21  highlight to the arrow, Mr. Trujillo just explained to us that
22  that's where he lived from 2000 to 2007.  So somehow he
23  neglects to mention that he lived on the route that could have
24  been taken, and he neglects to mention that route, and instead
25  describes two routes, one of which didn't even exist.
```

```
 1              And there are so many more concerns about Magnum and
 2    Tru Trucking, the use of weigh tickets, the fact that no weigh
 3    tickets exist, the fact that Magnum winds up going bankrupt,
 4    because during this heavy time period it was back locked.  It
 5    was so backlogged that the soil was growing vegetation and
 6    bulging out the walls.  It was at many times not able to
 7    accept more soil.  UTC knew that this was a problem before
 8    they decided to use Magnum in 1999, that they were facing
 9    bankruptcy and they used them anyway.
10              And then by the time that Magnum is closed, UTC
11    files a report with the DEP that forgets to mentions the use
12    of the West Palm Beach site every time they talk about soil.
13    Sure they talk about it when they use -- talked about a few
14    towels that they sent for incineration.  But every time they
15    talked about soil, they say it went to a Pompano Beach
16    facility, which is strikingly different from their reports
17    filed to other agencies well before Magnum went bankrupt, well
18    before whatever the financial difficulties were that Pratt &
19    Whitney learned Magnum was facing in May 2001 when it was told
20    by UTC corporate you shouldn't have been using this site in
21    the first place.
22              So if we go back to that slide for a second, when
23    UTC Florida, Don Bilder asked UTC corporate can we find
24    another local incinerator rather than a major services
25    contractor to continue incinerating, because, by the way,
```

```
 1    we're getting most of our money back from the State of Florida
 2    for all of this incineration, the answer from UTC corporate
 3    was no.  Even if you save 40 percent, and they later learned
 4    you could save a hundred percent it's a net loss because of
 5    the potential liabilities and the uncertainties and the issues
 6    that that causes with our major contractors.  In other words,
 7    why do we want that uncertainty?
 8            So who wants that uncertainty?  Well, that's the
 9    uncertainty that The Acreage now faces.  And that is not an
10    individual issue.  The entire acreage -- and this is what our
11    expert, the expert they're so desperately trying to strike,
12    has said from day one.  There is no telling where in The
13    Acreage this is.  We know it's in The Acreage.  And the only
14    way to fix the community problem is to stop pretending like
15    every property is an island and it never gets offsite, and if
16    it does get offsite, we can fix that, in 2006, when it's been
17    lingering since 1958.
18            So in order to address radiation --
19            THE COURT:  By the way, you've used an hour.  You
20    can use as much time as you want, but I'm just letting you
21    know you've used an hour.
22            MS. HATFIELD:  Thank you very much.  And I'm going
23    to be brief here, but Your Honor had some questions about
24    Price-Anderson.  I just want to make sure that I discuss this.
25            Since this case was filed and since the Court had
```

```
 1    the deliberations on jurisdiction, there has been a change at
 2    the way the circuits are looking at Price-Anderson.  And the
 3    same Fifth Circuit that looked at what was called the Cook
 4    case and determined that a nuclear incident has to be XYZ in
 5    order to proceed, they got the case back and they said, but
 6    you know what, if you don't prove a nuclear incident, it just
 7    means your case is not preempted.
 8            What they said -- and this does merit traditional
 9    briefing, because it is a complicated issue, but it's not
10    necessarily entirely legal.  What they said is Price-Anderson
11    is not a go-big-or-go-home statute, because in order to prove
12    a nuclear incident, you have to prove transgression of certain
13    standards of care, which are numbers set forth by the NRC as
14    far as how much radiation can leak at a certain time and cause
15    exposure to the public.
16            And it doesn't matter, because we've already proven
17    that with the case of Cynthia Santiago.  It doesn't matter,
18    because we've already proven that with the amount of
19    contamination that we found in the soil in The Acreage.
20            So we've already proven a nuclear incident.  And if
21    we have a nuclear incident case, it is very clear that those
22    are preempted.  But if we show radiation in The Acreage and
23    Pratt & Whitney wants to argue that that's not the level of a
24    nuclear incident, then they can no longer argue that that
25    claim should be preempted.
```

1          So the radiation contamination is not just the

2    nuclear incident claim, which I believe is number 7 for UTC

3    and number 8 for Palm Beach Aggregates.  It is also claim

4    number 6 -- or, I'm sorry, claim number 5 regarding the cancer

5    cluster contamination in the acreage and the traditional

6    Florida negligence claim.

7          And this is all based on the fact that there is a

8    section in Price-Anderson creating a waiver in judicial

9    procedures that gives us this cause of action now and says

10   that any public liability action arising out of or resulting

11   from a nuclear incident is a Price-Anderson.  That's all the

12   statute says for that.

13         And as Mr. Gowdy said, this doesn't change home to

14   home.  For property value loss, the question whether this is a

15   nuclear incident or not does not change as we go from home to

16   home.

17         In a case that the defendant cited repeatedly -- in

18   some of the papers on Price-Anderson is this case Cotroneo

19   versus Shaw Environmental Infrastructure, and what the Court

20   said there, which is a conservative court on the issue of

21   Price-Anderson and resolving, in knocking all of these claims

22   out because they didn't rise to the level of a nuclear

23   incident, is that when one plaintiff successfully proves a

24   bodily injury that rises to a nuclear incident, a nuclear

25   incident has occurred, and all other claims have survived the

1    nuclear incident issue, because, again, this is particularly

2    important in our case for the fact that Cynthia Santiago, the

3    final pediatric brain cancer cluster victim, has a nuclear

4    incident claim.

5            That fact alone before litigation caused ripples in

6    the community, and it's going to continue to cause them.

7    People should not be trapped in their homes that they cannot

8    get out of because of a property value loss or that they

9    cannot use the water anymore, which is the reason that

10   originally a lot of the people moved to The Acreage, was the

11   ability to have their own potable wellfield that no one is

12   using anymore.

13           Again.  This is Cynthia Santiago at age 13.  You

14   show this to someone, and they're not going to live next door

15   or five houses away or 10 houses away or 15 houses away,

16   especially when they realize that at the 16th house you've got

17   a Tru Trucking hub.

18           Are there limitations on a Price-Anderson claim that

19   would be affected case to case?  No, there are not.  The only

20   limitations on Price-Anderson claims is that you can't bring

21   punitive damages if the liability stems from a government

22   contractor with indemnification after 1988.  UTC has said that

23   there is not that indemnification provision.  And even if

24   there were, the only other limit then would be on damages, and

25   it's a $10 billion cap, and I don't think that that's going to

 1   come into play.

 2          So the last point to note about a Price-Anderson

 3   cause of action is that it is not, in the end, dissimilar from

 4   what the Adinolfe court ruled on nuisance claims in Florida.

 5   You don't have to have damage on every property, which is what

 6   Cook 1 said before Cook 2 said, in fact, it's not even a

 7   go-big-or-go-home statute.

 8          You can have loss of use of property.  And we have

 9   loss of use of property in this case.  We're going to show you

10   through Kilpatrick that not only is the price value effected,

11   but days on market when you compare The Acreage to Jupiter

12   Farms is tremendously affected.  You cannot sell your home

13   when you want to sell your home, and the ability to sell your

14   home is a very important property right in the property

15   bundle.

16          You have a loss of the potable water.  The aquifer

17   underneath The Acreage residence is something that they own

18   and they are not using.

19          So at the end of the day, the question is not why

20   should the case be certified, but how on earth would you

21   remedy this situation without a communal relief.  And I --

22   there is no perfect solution.  Once a problem has occurred,

23   you can't put the genie in the bottle back.

24          And this is the final point that I want to make.  We

25   face in plaintiffs' injury law all the time the question of

1    amount of damage versus fact of damage.  If a person is hurt

2    by someone, the moment they are hurt, their cause of action

3    accrues.  They have suffered the fact of damage.  But that

4    does not mean that a person who is made a quadriplegic by a

5    sleeping truck driver can't also include in their amount of

6    damages the fact that they've now got an infection grown in

7    the year before damage reports are due because of the state of

8    their lungs.  It happens all the time that the amount of

9    damages becomes ascertainable later than the fact of damage.

10           And Dr. Kilpatrick -- and even without

11   Dr. Kilpatrick, all of the plaintiffs who have been deposed by

12   the defendants have said we don't use our water anymore.  And

13   Dr. Kilpatrick has shown that, in fact, these people have

14   already suffered the fact of damage.

15           Are there additional ways we can find out that

16   amount?  Is that amount subject to fluidity?  Yes, it is.  But

17   that does not change the fact that we are here on

18   certification, and certification requires that the claims be

19   ripe, and the claims are ripe when fact of damage occurs.  The

20   day that this stigma happened was the day that these causes of

21   action were ripe, and this stigma is community-wide.  There's

22   simply no other way to address it.

23           Any questions?

24           THE COURT:  No, thank you.

25           MS. HATFIELD:  Thank you.

```
1              MR. GALLAGHER:  Your Honor, if I might just take one
2    moment.  Sean Gallagher.  I don't know if our court reporter
3    needs a break, but I'd be happy to take one or just a moment
4    to put up a board.
5              THE COURT:  Okay.
6              MR. GALLAGHER:  Your Honor, plaintiffs bear the
7    burden on their motion for class certification and on the
8    admissibility of their experts' opinions under Daubert to
9    certify a class, their proposed class.  Plaintiffs have to
10   establish that the requirements of Rule 23 are met through
11   evidentiary proof.  That is the standard under the Comcast
12   decision.  And as the Court in Comcast and other Supreme Court
13   decisions has explained, that standard is rigorous.
14             To satisfy their burden, the plaintiffs have to
15   present admissible evidence showing that they have a common
16   claim that can be established uniformly with class-wide proof,
17   not just that there are some common issues, but that they can
18   proceed as a class with common proof on elements that would be
19   dispositive.
20             Now, we requested a hearing on plaintiffs' class
21   cert. motion because that's what's required under Eleventh
22   Circuit precedent, the Sher versus Ratheon case, where the
23   Eleventh Circuit reversed an order certifying a class in an
24   environmental contamination case, one that happened to involve
25   Dr. Kilpatrick and others of the plaintiffs' experts.
```

 1            And what the Court said in Ratheon is that

 2    plaintiffs are required to prove at the class certification

 3    stage more than just a prima facie case.  Under Ratheon, a

 4    district court, considering whether the plaintiff has met

 5    their burden on class certification, is instructed to evaluate

 6    and weigh the conflicting experts' testimony.  And here

 7    plaintiffs fail in their burden, because the experts they have

 8    proffered offered big gaps in what it is they have to prove to

 9    establish their case on a class-wide basis.  They don't define

10    a coherent class, and they don't offer class-wide proof of

11    elements like causation.

12            The plaintiffs fail also because their expert

13    testimony is inadmissible under Daubert.  And with the

14    exclusion of even one of their experts, they fail to

15    demonstrate that they can prove their case on a class-wide

16    basis.

17            So I'd like, Your Honor, to direct the Court to a

18    map.  This is from docket entry 263-3.  It's part of

19    Dr. Kilpatrick's report.  And I put this up, Your Honor, just

20    to orient the Court to the class area, what it is that

21    plaintiffs propose here.  It sometimes gets lost in the

22    description in the papers when you're looking at a smaller

23    scale or a zoomed-in view.  I think it got lost in the

24    plaintiff's presentations.

25            But what they propose here is an absolutely massive

1    class area.  They're talking about an area that is 60 square

2    miles, 18,000 properties, a population of probably 50,000

3    people.  It's the same size as Palm Beach, West Palm Beach and

4    maybe throw in Riviera Beach, as well.  It's an area the size

5    of Southlake Boulevard on the south, to Northlake Boulevard,

6    from the ocean, past the turnpike.

7              This -- and I apologize, I'll step away from the

8    microphone, but I'll try to speak loudly for your benefit.

9              MR. SCAROLA:  Excuse me, Your Honor.  We're unable

10   to see the demonstrative on the easel.  Does counsel have a

11   smaller copy of that that we can reference?

12             THE COURT:  You can move if you'd like.

13             MR. SCAROLA:  Thank you.  This will work, sir.

14             THE COURT:  Thank you.

15             MR. GALLAGHER:  So to provide a different

16   perspective, Your Honor, on the distances we're talking about,

17   we have blowup version similar to the one the plaintiffs had

18   that show the proposed class areas, the location of the Pratt

19   & Whitney facility and Palm Beach Aggregates.

20             Now, Mr. Gdanski, when he was talking about the

21   Jones case, he stated that the proposed class area is the

22   closest area south of Pratt & Whitney, and he said that

23   there's only the Corbett Wildlife Management Area in between.

24             The Jones case was a case that involved a cemetery

25   that was going to go in right next door to the plaintiffs'

1   property.  Here, the distance from Pratt & Whitney, the

2   shortest distance from Pratt & Whitney to the proposed class

3   area is six miles.  That's like the distance from here, where

4   we are in West Palm Beach, Your Honor, to Palm Beach Gardens.

5          If you're talking about the bottom edge of the

6   proposed class area down here at Southern Boulevard, the

7   distance from Pratt & Whitney is closer to 15 miles.  That's

8   the same as the distance from where we are here in West Palm

9   Beach, up past Mr. Schwinghammer's house, in Jupiter.  And

10  this Corbett Wildlife Management Area, the area in between

11  Mr. Gdanski belittled, that is an area that is in itself 30

12  square miles.

13         The plaintiffs aren't claiming that there's

14  area-wide contamination, and there's no evidence of area-wide

15  contamination.  They put up a map that had -- similar to this

16  that said the contaminated area, but there's no claim here

17  that whatever contamination there is on Pratt & Whitney's

18  property that that has somehow migrated over the entirety of

19  the 30 square miles of the Corbett Wildlife Management Area or

20  the 60 square miles of the proposed class area.  There's no

21  claim of a plume, for example.

22         I have on the screen a version of this that shows

23  the location of the 1,4-Dioxin plume.  That is a thousand feet

24  off of Pratt & Whitney's site.  It is six miles from the edge

25  of that plume to the closest house, roughly six miles to the

1    closest house in the proposed class area.

2         The plaintiffs' groundwater experts aren't claiming

3    that that plume has made its way anywhere near The Acreage.

4    And when it comes to this alternative theory that you heard a

5    little bit about today that I will call the trucking

6    conspiracy theory, there's no basis for that theory, but even

7    the speculation that the plaintiffs have offered doesn't get

8    you area-wide contamination.  There's no claim that soil was

9    taken out of Pratt & Whitney in trucks and dumped all over a

10   60-square-mile area that the plaintiffs have offered as their

11   proposed class.

12        So this is not the claim, Your Honor, that the

13   Eleventh Circuit reviewed.  The plaintiffs rely heavily on the

14   Eleventh Circuit's decision.  But this is not the case that

15   was before the Eleventh Circuit.  The Eleventh Circuit was

16   considering claims that there was a class alleging actual

17   contamination in The Acreage, area-wide contamination all over

18   the place, and a small class of people who were right nearby

19   that contamination in The Acreage or who had inexorable or

20   imminent contamination of their properties.  And what the

21   Eleventh Circuit held only is that on a motion to dismiss, you

22   could proceed with that claim, but that's not the claim that

23   the plaintiffs are alleging here.

24        What the plaintiffs propose as their claim here is

25   that instead of claiming actual contamination or area-wide

1    contamination, that they could proceed on a theory that

2    they're all just in the vicinity of Pratt & Whitney somehow.

3    And as we set forth in our briefs, Your Honor, that theory is

4    both unprecedented and unworkable in practice.  It's

5    unprecedented because there's never been a class certified on

6    a we-are-in-the-vicinity-of claim like this, and certainly not

7    one for a 60-square-mile area with 18,000 properties in it.

8         And it would be unworkable both as a claim, just

9    identifying who would have it, and as a proposed class,

10   because you have to ask the question where does this notion of

11   "being in the vicinity of" began, and, more importantly, where

12   would it stop.

13        The plaintiffs talk about their claim being a claim

14   for stigma, but there's a similar problem there.  Where does

15   that claim start and where would it stop, and who tells you

16   that this -- where that would be?  How do you define a class?

17        Now, it's unclear -- so the plaintiffs have a

18   notion, Your Honor, that there's some contamination up at

19   Pratt & Whitney, and that has some effect down in these

20   proposed class areas, but it's unclear exactly what effect

21   they're claiming.  We've heard different things.  First they

22   argue this we're "in the vicinity of" claim; that they don't

23   have to prove actual contamination.  But there's no indication

24   of what that means.  And I'd submit that it's absurd to

25   suggest that an area 60 square miles with 18,000 properties is

1    in the vicinity of Pratt & Whitney, and there's no way to draw

2    the metes and bounds of that concept.

3         It sometimes appears that the plaintiffs are

4    claiming that somehow traces of chemicals, not area-wide

5    contamination, but just traces might have made their way to

6    The Acreage.  Their groundwater experts will talk about maybe

7    like a superhighway that allowed some trace of chemicals to

8    get to a couple of spots in The Acreage.  And under their

9    trucking theory, they hypothesize that maybe a load of dirt

10   was dumped here or there.  But that doesn't get you any claim

11   on behalf of 18,000 properties in a 60-square-mile area.

12        And sometimes the claim is there's some sort of fear

13   maybe, the threat of potential future contamination.  But that

14   doesn't get you a claim on behalf of 18,000 properties in a

15   60-square-mile area, and that notion doesn't give you any

16   place to draw the line on where the claim might be.

17        The plaintiffs offer, and it's shown here, they

18   propose two different class areas.  And the question, in

19   defining the class area, Your Honor, is can you define a class

20   of people that have a common claim defined by an injury they

21   all share and can prove in common is attributable to Pratt &

22   Whitney.

23        Now, you can draw lines on a map.  You can draw

24   lines around a neighborhood and say people might think this is

25   The Acreage, just like you can draw lines on a map around Palm

 1    Beach Gardens or Wellington or some other community but that's

 2    not the question.  And the question is do these lines that

 3    they've drawn on the map, do they define an affected area?  Is

 4    this an area where people have suffered a common injury that

 5    they can attribute to Pratt & Whitney.  And plaintiffs, in

 6    drawing their proposed class areas, have not done that.

 7         There's one other thing about the plaintiffs' claims

 8    that bears mentioning, and that is this tension in plaintiffs'

 9    submissions, including their class cert. brief, on whether

10    they claim that Pratt & Whitney caused a cancer cluster or

11    not.

12         The Adinolfe plaintiffs, for their part, have

13    historically claimed that Pratt & Whitney has contamination on

14    its property, and that may be in the groundwater around Pratt

15    & Whitney's property, but they have no claim that the stuff

16    they talk about, the 1,4-Dioxin that Mr. Gdanski mentioned in

17    his opening, they have no claim that that is even capable of

18    causing the brain cancers that make up the investigation of a

19    cancer cluster by the Florida Department of Health, and they

20    have no claim that that material is even present in the

21    proposed class area in anything more than trace quantities.

22         The Cotromano plaintiffs, for their part, they do

23    claim actual contamination with radioactive materials, and

24    they do argue that environmental radiation is what caused the

25    brain cancer cases that the Florida Department of Health

```
 1   investigated.
 2           So they've now filed a consolidated complaint, but
 3   this tension remains and the question remains, are they
 4   claiming that Pratt & Whitney caused a cancer cluster or not.
 5   And we'll see this play out in the testimony of the experts,
 6   including the first witness we're going to hear from,
 7   Dr. Kilpatrick.  But it's really important, and here's why.
 8           Whether or not there is, in fact, a cancer cluster,
 9   the Florida Department of Health said there was, and that
10   could have an impact on property values.  And if the
11   plaintiffs aren't claiming that Pratt & Whitney caused that or
12   if it's not shown by them that Pratt & Whitney caused the
13   cancer cluster that the Florida Department of Health declared,
14   then that's something you would have to take into account in
15   determining whether there is a diminution in property values
16   that can be attributed to something Pratt & Whitney did, as
17   opposed to a cancer cluster in an investigation by the Florida
18   Department of Health that we had nothing to do with.
19           So one thing we hope to accomplish in the course of
20   this hearing, Your Honor, is to nail down what exactly it is
21   is the core of the plaintiffs' claim, whether they have a
22   common theory at all, and whether their experts support it.
23           With that, Your Honor, I'd like to just briefly
24   preview the evidence you're going to hear.
25           You will hear evidence on whether there is a cancer
```

1    cluster and on whether there is any environmental cause of

2    brain cancer.  You'll hear from statisticians, and the

3    evidence here, Your Honor, is that there is no valid,

4    statistically valid, finding of a cancer cluster.

5            What the statisticians will say is if you slice the

6    data enough times, you can find an arrangement where there

7    appears to be an excess incidence of cancer cases.  You know,

8    if you look at just a couple of years, and you group all the

9    cancers together and you narrow it down to just pediatric

10   cases and you narrow it down to just women and you look at it

11   just so, you could say there appears to be a few more cases

12   than we might expect.  But that's like flipping a coin a

13   thousand times and then going back through the data and

14   finding, you know, 10 places where it's all heads in a row and

15   saying, aha, you know, this coin must be rigged.

16           What the statisticians will say is this is a

17   well-known problem called the multiple comparisons problem, or

18   more colorfully the Texas sharpshooter problem.  And even

19   their expert will admit it's accepted by every statistician.

20   And what it means is that you can appear to have statistically

21   significant results being reported that do not, in fact,

22   represent real causal effects.  Our expert, Dr. Marais, who

23   you'll hear near the end of the week, will explain what this

24   means is that the finding here by the Florida Department of

25   Health is a false positive.

1          So the next thing you'll hear evidence about with

2    regard to the cancer cluster is the question of causation.  Is

3    there anything that the plaintiffs can point to as a cause of

4    the brain cancers that make up this cancer cluster

5    investigation.  And what's significant here is that plaintiffs

6    offer no expert testimony, none, to support their contention

7    that the cancers that make up the alleged cancer cluster have

8    an environmental cause.  They offer only Dr. Perry, who does

9    not support that contention.  He doesn't have any information

10   at all on the critical question of dose or exposure, and he,

11   in fact, concedes that he doesn't have any opinion on the

12   cause of any of the cancer cases he was asked to look at.

13          So that leaves our expert, Dr. Mitchell, who will

14   explain that the brain cancers in the Florida Department of

15   Health investigation that led to their declaration of a cancer

16   cluster, those cannot be attributed to environmental

17   background levels of radiation or any common cause.

18          The next topic, Your Honor, you'll hear testimony

19   about is the question of I refer to it as the transport

20   question, and that's the question of whether anything that

21   might be that Pratt & Whitney ever could or did get to the

22   proposed class area.  You'll hear from groundwater experts on

23   that, where the plaintiffs' experts ignore the detailed models

24   that show groundwater from Pratt & Whitney doesn't flow to The

25   Acreage, and that it moves at less than 20 feet per year.  And

1    so given those two things, groundwater, not to mention

2    anything that might be in groundwater, never gets to the

3    proposed class area from Pratt & Whitney.

4          What the plaintiffs' experts will offer is a

5    theoretical possibility based on unfounded and speculative

6    assumptions that someday, somehow, through an imagined

7    superhighway, something might get there.

8          We offer Dr. Missimer, who, based on the actual

9    models that are done of groundwater flow, will -- and accepted

10   science will say nothing has ever made its way from Pratt &

11   Whitney to the proposed class area, and nothing ever will.

12         I'll only comment briefly on the alternative

13   trucking conspiracy theory that the plaintiffs have offered.

14   They offer this notion that there is a conspiracy among

15   truckers to -- that were hired to take soil that was being

16   remediated, soil that had jet fuel in it, or something else, a

17   known contaminant, they were hired to take it to a remediation

18   facility, and their theory is that all these truckers

19   conspired instead -- you know, instead of taking it where they

20   were instructed to go, they all just diverted and drove and

21   dumped it in The Acreage, and there's no testimony to support

22   that.  The truckers all deny it.  The documents all belie it.

23         So plaintiffs now -- and the reason, Your Honor, the

24   reason they offer this trucking theory is because it's

25   undisputed that no expert says that any of these radioactive

1   materials they talk about, that any of that has -- can move in

2   groundwater from Pratt & Whitney to the class area.  So

3   groundwater is not a potential explanation, so they have to

4   come up with some other way to suggest that radioactive

5   material from Pratt & Whitney got to this proposed class area.

6           Plaintiffs present the written direct of Mr. Moore.

7   Mr. Moore admitted in his deposition that he had no evidence

8   that there was actually trucking -- this trucking theory going

9   on now.  In a newly minted opinion, he describes the facts

10   that he claims to discern.  We have moved to exclude

11   Mr. Moore, because his direct is -- it's lawyer argument.

12   It's innuendo and speculation, not the proper subject of

13   expert testimony.  But regardless, there's no basis for saying

14   this trucking conspiracy happened.

15           You'll hear also, Your Honor, on the question of

16   contamination, whether there is contamination in the class

17   area, and the evidence there will be that their experts claim

18   there are trace quantities of things like 1,4-Dioxin.  And

19   when I say trace, I mean they point to two or four lab results

20   that are so low, that the lab says this is below the level

21   where we can reliably tell you how much is there; it's just an

22   estimate.  And out of a hundred, that are nondetect -- so the

23   Florida Department of Environmental Protection went in and

24   tested a hundred places, and almost all of them were nothing

25   there, and they point to four that are what are called J

1    results; they're estimates below the detection limit of the

2    test, the quantifiable limit of the test.

3            They have similarly pointed to what are background

4    levels, levels expected to be present of things like

5    radioactive material.  And for some of these things, there's

6    just no potential source at Pratt & Whitney.  For all of them

7    there's no viable transport mechanism.  And what they claim to

8    have found is all explained by either local sources, you know,

9    the artifacts of testing, or just the natural presence of

10   these things in the environment.

11           So, finally, that brings me to the question of

12   whether there is any property value diminution.  The first

13   expert you'll hear from is Dr. Kilpatrick.  On that question

14   he offers an opinion on diminution in the value of property

15   due to environmental effects.  This is not the same thing that

16   he was opining about in the mortgage-backed securities cases

17   or other cases where he's applied his model to say an

18   appraiser appraised this property, and my model says the value

19   is different.

20           So there are in this case, as explained by our

21   experts, in this case what he was doing here to value the

22   supposed diminution in value of property due to environmental

23   effects, there's serious questions with his methodology.

24           Now, plaintiffs hinge much of their argument here on

25   class certification on what they say Dr. Kilpatrick's opinion

```
 1    will be.  Contrary to the way plaintiffs have presented
 2    Dr. Kilpatrick's opinions in their briefing, he does not offer
 3    support for -- to define or sponsor the class area and other
 4    critical things.  But I won't go into any further detail on
 5    that, Your Honor, because Mr. Kilpatrick is sitting here in
 6    court, and I will be hoping to delve into these issues shortly
 7    on cross-examination.
 8              So with that, I thank you for your time, Your Honor,
 9    and would answer any questions.
10              THE COURT:  All right.  No, not at this time.
11              So why don't we -- is that the extent of your
12    defense opening?
13              MR. GALLAGHER:  Yes, Your Honor, that's all we have.
14              THE COURT:  So let's take a 10-minute recess, and
15    then we'll begin with the first witness.
16       (A recess was taken from 10:41 a.m. to 10:56 a.m., after
17    which the following proceedings were had:)
18              THE COURT:  Please be seated, everyone.
19              All right.  We ready for our first witness?
20              MR. SCAROLA:  Yes, sir.
21              THE COURT:  Dr. Kilpatrick.
22              MR. GDANSKI:  Yes, Dr. Kilpatrick is the first
23    witness the plaintiff has.
24              THE COURT:  Sir, will you raise your right hand.
25         John Aaron Kilpatrick, Plaintiffs' witness, sworn.
```

```
 1              THE COURT:  Please be seated, sir.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  If you can try and pull that microphone

 4    towards you there, sir.

 5              THE WITNESS:  Yes, Your Honor.

 6              THE COURT:  And tell us your name and spell your

 7    last name for us, please.

 8              THE WITNESS:  I'm Dr. John Aaron Kilpatrick,

 9    K-i-l-p-a-t-r-i-c-k.

10              THE COURT:  Thank you.

11              All right.  And your affidavit has been submitted,

12    which I've read as your direct testimony, so we're now going

13    to allow cross-examination.

14              THE WITNESS:  Thank you, Your Honor.

15              MR. GALLAGHER:  Thank you, Your Honor, if I may,

16    just for convenience of the Court and the witness, I've got a

17    copy of Dr. Kilpatrick's direct affidavit, his deposition and

18    his expert reports in a binder that I'd like to hand up just

19    so you can follow along.

20              THE COURT:  Yes, that would be helpful.  Thank you.

21                        Cross-examination

22    BY MR. GALLAGHER:

23    Q    Good morning, Doctor.

24    A    Good morning, sir.

25    Q    I have, just to get us oriented, I've prepared a flip
```

1    chart here where I've filled out some basic information about

2    your reports in this case that I want to start by talking

3    about.

4              MR. SCAROLA:  Excuse me, Your Honor.  May we have

5    the Court's permission when necessary to be able to move to

6    view the chart?

7              THE COURT:  Yes.

8              MR. SCAROLA:  Thank you very much, sir.

9              And to assist us in our communication, I would like

10   to take a photograph of it that I'll just distribute among us.

11   Is that acceptable?

12             MR. GALLAGHER:  You might want to wait, because I'm

13   going to add to it.

14             MR. SCAROLA:  I think I'd like to see what it looks

15   like now.

16             THE COURT:  Go ahead, Mr. Scarola.

17             MR. SCAROLA:  Thank you very much, sir.

18             THE COURT:  Mr. Gallagher, go ahead.

19   BY MR. GALLAGHER:

20   Q    So Dr. Kilpatrick, am I right that you were first hired

21   by the Adinolfe group of plaintiffs in 2011 to provide an

22   expert report where you discussed the diminution in property

23   value?

24   A    Well, technically we were hired in 2010, but the report I

25   believe was proffered in 2011.

```
 1   Q    In your report that you proffered in 2011, you used what

 2   the plaintiffs have described to the Court as their first

 3   proposed class area as the area you studied, right?

 4   A    Yes.

 5   Q    And in the report you offered in 2011, you used as the

 6   effective date of your analysis the February 1, 2010, date

 7   that the plaintiffs have offered as one of their proposed

 8   class cutoff dates, right?

 9   A    Yes.

10   Q    And in your 2011 report, you reached the conclusion, the

11   opinion, that there was a 25 to 40 percent diminution in the

12   value of property in that area as of that date?

13   A    That's correct, yes.

14   Q    Now, I've listed here methodologies you describe in that

15   2011 report.  Are these all things that you considered in

16   reaching your opinion that there was a 25 to 40 percent

17   diminution in value as of February 1, 2010?

18   A    That's correct.

19   Q    Now, the method you used to get from these methodologies

20   to this diminution in value opinion, that's essentially a

21   black box, isn't it, sir?

22   A    Well, no.  I would -- certainly wouldn't call it that.

23   We appraisers call it reconciliation.  If you look at any of

24   the appraisal texts or the appraisal standards books, there is

25   a formulation by which appraisers reconcile the available data
```

1    to render an opinion of value, a determination of value.  And

2    there are methodologies which -- which are taught, which I, as

3    an appraisal standards instructor teach, for arriving at these

4    determinations of value.  But it's anything but a black box.

5    Q    There's no formula or spreadsheet you can point us to

6    that would show anybody who was interested how you weighted

7    any of these different methodologies in getting to that 25 to

8    40 percent number, is there?

9    A    I would point you to the chapter on reconciliation in the

10   text The Appraisal of Real Estate, the current edition I

11   believe is the 14th.  I would point you to Uniform Standards

12   of Professional Appraisal Practice, Standard Rule 1, which has

13   an entire section on reconciliation.

14          These point to how the weighting should be done, it

15   points to criteria for that weighting, and it points to

16   methodologies which an appraiser would follow in that

17   weighting, all of which I've adhered to in accordance with

18   good appraisal practice in my work here.

19   Q    I'm not interested in how you should do it, sir.  I'm

20   interested in how you claim actually to have done it in

21   getting from these methodologies to that number there, 25 to

22   40 percent.

23          There's nothing you can point us to that says here's

24   my method, here's how I weighted this one, here's how I

25   weighted this one, here's how I weighted this one, and here's

```
 1   how I get to 25 to 40 percent, is there?
 2   A    Oh, to the contrary.  I'm not just pointing to these
 3   seminal texts and appraisal standards rules as good guidance
 4   on how it ought to be done.  I'm pointing to those as guidance
 5   on how I did do it and as explanation of how it was done.
 6   Q    Well, you've actually changed, sir, in your
 7   characterization to us as to even which of these methodologies
 8   you weighted most heavily, haven't you?
 9   A    What specifically would you be referring to?
10   Q    Well, the first time we asked you at your deposition in
11   April of 2016 how you weighted these things, you told us you
12   don't think you weighted this contingent valuation survey any
13   more than the others.  You said you don't think it's the most
14   important.  You recall that?
15   A    Would you point me to the specific language and the
16   context within which I said that?
17   Q    Your deposition, page 197, line 13 to 25.
18           Question:  The CV --
19           MR. GALLAGHER:  Sorry.  I got unplugged there, Your
20   Honor.
21           Do you have that up on your screen now?
22           THE COURT:  Yes.
23   BY MR. GALLAGHER:
24   Q    "Question:  The CV survey that you performed plays a
25   important role in defining your range of damages; is that
```

1   correct?

2           "Answer:  Yes.

3           "Is the CV survey that you performed the most

4   important analysis in terms of coming up -- coming to your

5   final conclusions about the range of diminution?

6           "Answer:  I don't know if it's the most important.

7   I think that the hedonic model that I ran in 2011 was very

8   important.  I think the CV survey is very important, and the

9   meta-analysis and the case studies are very important."

10          Were you asked those questions, and did you give

11  those answers under oath, sir?

12  A    I did.  And I go on to say that I don't know that I rank

13  ordered them.  I've considered them all in formulating my

14  opinion of value determination.

15  Q    Right.  You said you did not rank order them in whatever

16  methodology it is you claim to have gotten from these methods

17  to this final number.

18  A    At that time, that's correct.

19  Q    And then when we deposed you again in 2010, you told us

20  that you actually weighted the contingent valuation survey a

21  lot more, didn't you?

22  A    Would you point me to that language, sir?

23  Q    Your deposition, page 399, lines 9 through 11.

24          "Question:  And I think you said that you -- you

25  weighted the contingent valuation survey a lot more?

```
 1            "Answer:  Yes."
 2            Were you asked that question, and did you give that
 3     answer under oath?
 4     A    Yes.  And I go on to say I think we give more weight to
 5     that consistent with real estate appraisal methodology.
 6     Q    Right.
 7            And the first time we asked you, you said I didn't
 8     rank order them, they're all important, and then the second
 9     time we asked you what's your methodology, you said case --
10     pardon me, the contingent valuation survey you weighted a lot
11     more.
12     A    Based on my earlier deposition, I had gone back and
13     shall -- I don't want to say reevaluated, but took another
14     look at the data, and in the months that ensued between the
15     two depositions, felt like the CV survey deserved more weight
16     than I was giving it.  Doesn't really change my determination
17     here, but I was giving it more weight on the -- when we had
18     the second deposition.
19     Q    Other than crawling into your brain and trying to figure
20     out what it is you think you did, there's nothing the Court
21     could look at to assess the methodology you claim to have used
22     in getting from these methods here to that number, is there?
23     A    I think I would disagree with that, and I would point you
24     again to the formulation and methodology laid out in appraisal
25     standards, laid out in The Appraisal of Real Estate, as
```

1    published by the appraisal institute, as well as other seminal

2    texts and guidances which are published for appraisals and

3    taught in the appraisal education.

4    Q    There's nothing in your direct examination to the Court

5    where you explain how you got from any of these methods to 25

6    to 40 percent, is there?

7    A    Well, as I testified here in my second deposition, I was

8    putting more weight on the CV survey.  I felt like it was

9    providing, shall we say, somewhat more solid information, not

10   that the others are not mutually supportive.  The others all

11   give indications of the stigma that permeates The Acreage

12   neighborhood.  But by October of 2016, I was weighting the CV

13   survey more heavily than the others.

14   Q    Was that a "yes" or a "no"?

15             MR. GDANSKI:  Objection.

16             THE WITNESS:  It was what it was, counselor.

17             MR. GDANSKI:  At some point, it just gets

18   argumentative.  I know there's no jury.

19             THE COURT:  Sustained.

20   BY MR. GALLAGHER:

21   Q    The CVS survey as you describe it in your direct

22   examination doesn't provide either of these numbers, does it?

23   A    By itself, no.

24   Q    What does provide the 25 percent number?

25   A    It is a combination of the various methodologies.  We

1    certainly have case studies which provide us with that

2    baseline.  Our literature review provides us with that

3    baseline.  The meta-analysis is well over the top of that.  I

4    think that all of these combined with the most weight on the

5    CV survey provide strong support for the 25 to 40 percent

6    opinion.

7    Q    You can't tell us how you got to 25 percent, can you?

8    A    It was a weighting consistent with appraisal practice as

9    outlined in the guidance and standards provided to appraisers.

10   Q    And you don't think that's a black box method?

11        MR. GDANSKI:  Judge, it's argumentative and asked

12   and answered.

13        THE COURT:  Overruled.

14        THE WITNESS:  If that's a black box method, then so

15   is every single appraisal performed in America.  That's

16   consistent with good appraisal standards and certainly the way

17   we teach appraisers to reconcile the data presented to them.

18   BY MR. GALLAGHER:

19   Q    You also teach appraisers, and it's important in

20   appraisal standards to explain how it is you get to your

21   appraised value, isn't it?

22   A    Yes.  And what I've done here is a methodology which is

23   consistent with that teaching.

24   Q    But you never explain how you get to 25 percent or

25   40 percent, do you?

```
 1   A     It's a reconciliation of the data.  We're providing more
 2   weight on the contingent valuation survey, but it is
 3   consistent with appraisal teaching methodology and standards.
 4   Q     What percentage weight did you put on the, say,
 5   contingent valuation survey?
 6   A     I've put more weight on it, but I don't have a
 7   spreadsheet with a percentage weight on each of these.
 8   Consistent with good appraisal practice, I've put more weight
 9   on the CV survey.  But I'm considering all of them as
10   independent support for the fact that there is a 25 to
11   40 percent diminution in value for each of these properties in
12   The Acreage neighborhood.
13   Q     In 2016, the Adinolfe plaintiffs had you prepare a second
14   report that we have identified here where you again used the
15   first proposed class area and an effective date of February 1,
16   2010; is that right?
17   A     That's correct.
18   Q     And you offer the same opinion, 25 to 40 percent, as your
19   bottom line diminution in value, right?
20   A     That's correct.
21   Q     Now, when you provided that March 2016 report, you didn't
22   update any of these methodologies, did you?
23   A     I can't recall if I did or did not.  I don't believe I
24   did.
25   Q     So none of these were updated?
```

1   A    That is to say I don't recall if I did or did not.   I

2   don't believe I did, but I'm not -- I don't believe I did.

3   Q    In fact, sir, you not only didn't update your hedonic

4   regression model, you have abandoned it and do not lie on it

5   for your opinions here?

6   A    I'm not sure that that's a complete characterization.

7   I'm not using the hedonic regression as a measure of

8   diminution in value.  We will come back and use the hedonic

9   regression when we individualize the damages during the

10   damages phase.  We'll use that as a baseline for unimpaired

11   values in each of these properties once that effective date of

12   value is determined by this Court.

13   Q    So you had in mind that your work here is not done and

14   that the deadline for disclosing expert reports that the Court

15   set was not a deadline for offering things like whatever

16   calculation of unimpaired value you might offer here?

17   A    Well, I'm not an attorney; I'm a real estate appraiser.

18   I can tell you that there is stigma in this neighborhood; that

19   stigma is in the range of 25 to 40 percent.  To individualize

20   this -- and we will individualize it for each of these

21   properties -- we'll need to know what the effective date of

22   value is.  As soon as this Court establishes an effective date

23   of value, we will be able to individualize that.

24   Q    To date, you have not run any model that gives you an

25   unimpaired value upon which to base your opinions, have you?

```
 1   A     Not yet.  We're ready to do that as soon as the Court

 2   establishes an effective date of value, and then we can

 3   individualize these at that juncture.

 4   Q     In fact, what you said, sir, is that with respect to the

 5   hedonic regression model, you are not relying on it as a basis

 6   for saying that there's a diminution in value or for measuring

 7   it, right?

 8   A     That's correct.  We recognize the fact that the hedonic

 9   regression was picking up comparables which are both within

10   and without The Acreage, and we weren't able to discern such

11   issues as disclosure.  We were not able to precisely determine

12   the date of value, because that's a determination by the

13   Court.

14          So at this juncture we're not abandoning the hedonic

15   regression.  We certainly will use it as soon as we know what

16   the date of value is, and we'll exclude any comparables from

17   within The Acreage when we determine those unimpaired values.

18   Q     You, in fact, sir, don't consider your hedonic regression

19   model to be a good methodology for assessing diminution in

20   value, do you?

21   A     In the absence of being able to identify things like

22   disclosure and, of course, in the absence of a date

23   established by this Court, it's not useful in making these

24   determinations.

25   Q     In fact, sir, you claim to have replaced your hedonic
```

1    regression model with something called a trend analysis; is

2    that right?

3    A    Yes.  That allows us to do a pricing model which

4    segregates property transactions in The Acreage from property

5    transactions in control areas.  So there we are able to

6    examine what sort of differences in value occur in The Acreage

7    both pre and post the revelation of this contamination

8    problem.

9           So that trend analysis is a more telling way to look

10   at real estate prices, and, in fact, no surprise, it is

11   supportive of the opinions that we were finding from the other

12   methodologies.

13   Q    My question was just did you replace the hedonic

14   regression with the trend analysis.

15   A    Yes, and I was explaining why we did it, how we did it

16   and what the outcome of that was.

17          MR. GALLAGHER:  I'd ask, and, Your Honor, with your

18   indulgence, we are on a clock here, and if I'm going to get

19   explanations that I'm not asking for.  That's going to take a

20   lot of time that I don't think should come out of our

21   allotment.

22   BY MR. GALLAGHER:

23   Q    Sir, jumping ahead to the Cotromano report that you

24   issued in August of 2016, do you recall that in that report

25   you used as the area under study the second proposed class

1    area and the alternative class date of August 24th, 2009?

2    A    I did, yes.

3    Q    And do you recall that at that -- when you were hired by

4    the Cotromano plaintiffs, you were hired also to evaluate

5    whether the claim they were presenting for a so-called nuclear

6    incident, whether that presented or was a basis for saying

7    there was a diminution in value of properties in that proposed

8    area as of that date?

9    A    Well, that I believe mischaracterizes my understanding,

10   at least, of my assignment.  The Cotromano attorneys were

11   proposing or asking me to consider a class area which was a

12   subset of the Adinolfe class area, and I found that anything

13   which I'd determined with respect to Adinolfe would certainly

14   be true with regard to that geographic subset.

15   Q    Now, when you did that, sir, in addition to looking at a

16   different area and a different date, did you understand that

17   the nature of the claim being asserted by the Cotromano

18   plaintiffs was that there was a nuclear incident and

19   contamination with radioactive materials, in contrast to what

20   the Adinolfe plaintiffs had been contending?

21   A    We may have had discussions about that.  That frankly is

22   a legal issue.  I'm a real estate appraiser.  I made a

23   determination that contamination has stigmatized this

24   neighborhood, and I found that contamination remains the same

25   even for this smaller geographic subset.

```
 1   Q    Didn't change your opinion about 25 to 40 percent that

 2   you reached back here in 2011 that the Cotromano plaintiffs

 3   used a different date, a different area and had a different

 4   claim for contamination, did it?

 5   A    Well, as I've already testified, the area is geographic

 6   subsets.  Of course, that would not change.  The date is not a

 7   materially large date.  In other words, these two dates are

 8   about six months apart.  And the claims are legal issues which

 9   are outside the scope of what I'm considering as an appraiser.

10   Q    So in doing your work here, you didn't consider what kind

11   of contamination there was claimed in either of these cases?

12   A    We did not add any additional problems that may be

13   arising from the nuclear claims.  We had already made a

14   determination that the ubiquitous contamination in this area

15   was stigmatizing the area; that is to say, the realization by

16   market participants that this area had a contamination problem

17   was causing a diminution in value.  We did not reevaluate that

18   determination in light of any allegations being made by the

19   Cotromano attorneys.

20   Q    You just said that you assume that there was ubiquitous

21   contamination.  Was that what you assumed in doing your

22   analysis, these methods you used to get to your diminution in

23   value opinion?

24        MR. GDANSKI:  I just have to object.

25   Mischaracterizes testimony.  He didn't say assumes anything.
```

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  I would say ubiquitous considerations

 3    of contamination.  I'm not a physical scientist, and I'm not

 4    here to attempt to offer any opinions about the geographic

 5    extent of the contamination.  When I use the phrase a

 6    ubiquitous contamination problem, I'm referring to the fact

 7    that The Acreage is considered to have a contamination problem

 8    by market participants.

 9    BY MR. GALLAGHER:

10    Q    You didn't update any of your methodologies when you

11    offered your report in the Cotromano case, did you?

12    A    No.

13    Q    Now, I just want to briefly touch on what it is you

14    discuss in your direct examination.  You talk about the trend

15    analysis in some detail in your direct examination, but as I

16    understand it, you're not relying on the trend analysis as a

17    basis for the 25 to 40 percent range you say is the diminution

18    in value, are you?

19    A    I don't know that that fully characterizes my use of the

20    trend analysis.  I think the trend analysis supports the

21    previously determined 25 to 40 percent opinion.  So in that

22    extent, certainly I'm relying on it.  It does not change my

23    calculations.

24              But the trend analysis, even if that was the only

25    thing we would stand on, even if all the others were to go
```

1  away, the trend analysis would certainly provide support in

2  and of itself for that determination.

3  Q    The trend analysis doesn't give you any number that even

4  gets to 25 percent, does it?

5  A    It's supportive of the other determinations.

6  Q    Right.  And you reached that opinion, 25 to 40 percent,

7  before you even had the data that you use in your trend

8  analysis, didn't you?

9  A    That's correct.  But the trend analysis, as I've said,

10  continues to support the determinations that we previously

11  arrived at.

12  Q    Yeah, support in the sense that it doesn't offer a number

13  that even gets you the low end of your range.

14  A    I think it's supportive of that range.

15  Q    The other thing you discuss in your direct examination,

16  at least a little bit, are these informal surveys.  That's the

17  surveys that you claim to have done talking to residents and

18  lenders and brokers and such?

19  A    That's correct.

20  Q    None of those give you a number even, much less the 25 to

21  40 percent range that you offer as your final opinion here, do

22  they?

23  A    That's correct.  What they do is give us an entree into

24  the realization that market participants do consider that The

25  Acreage has a problem with respect to contamination.

```
1   Q    Do they give you a number?

2   A    No, they do not.

3   Q    You discuss the literature review here in your testimony

4   today, but that's not mentioned in your direct examination as

5   a basis for reaching the 25 to 40 percent range, is it?

6   A    No, it's certainly supportive of that, but it's -- we

7   don't quantify the literature review in that context.

8   Q    And in your direct examination, you do not cite, rely

9   upon, explain or describe the case studies or meta-analysis

10  you're providing explanation of how those might get you to

11  your diminution in value number?

12  A    Not in the direct examination.  We had certainly

13  presented that to you in prior reports and in supportive

14  material which have been made available to you.

15  Q    Courts have discussed these two methods in particular,

16  the case study and the meta-analysis, and have held that while

17  you might rely upon them for the general proposition that

18  there can be a diminution in value, they are not admissible as

19  evidence of the actual diminution of the percentage, right?

20           MR. GDANSKI:  I just have to object.  That's an

21  legal question not meant for this witness.

22           THE COURT:  Overruled if he knows in his practice

23  whether that has been excluded by courts, if he knows.

24           THE WITNESS:  Your Honor, I have no basis to answer

25  that question.  I don't know one way or the other.
```

```
 1              THE COURT:  Okay.  Thank you.
 2  BY MR. GALLAGHER:
 3  Q    Well, sir, do you remember the Hartle case, where your
 4  testimony on those topics was excluded?
 5  A    The Hartle case?
 6  Q    The Hartle case.
 7  A    I think you and I might have a difference of opinion
 8  about the word "excluded."
 9          I was allowed to testify at Hartle.  The Court did
10  not find my testimony to support the certification of one of
11  the three classes.  It did find my opinions to be supportive
12  of the certification of the other two classes.
13  Q    Well, with respect to the case study methodology, I have
14  up on the screen the Hartle case at page star 24.  What the
15  Court there said was you can talk about case studies but not
16  as evidence of actual diminution.  That's what the Court said
17  about your case study methodology, right?
18          MR. GDANSKI:  Judge, I just object as improper
19  cross.
20          THE COURT:  Sustained.
21          You can argue to me later that this method is not
22  admissible or shouldn't be used, but I don't think he's the
23  right person to be examining about legal opinions -- I mean
24  legal decisions.
25  BY MR. GALLAGHER:
```

```
1   Q    We've already talked, sir, about how you abandoned your

2   hedonic regression as a basis for coming to any diminution in

3   value, which leaves you really only with the contingent

4   valuation survey as anything you discuss in your direct

5   examination as support for the 25 to 40 percent number, right?

6   A    No, I wouldn't agree with that at all.  And I think I've

7   said repeatedly here that while I'm giving more weight to the

8   contingent valuation survey, these other methodologies are

9   supportive of that.  The trend analysis is supportive of that.

10  The meta-analysis arrives at frankly the high end of the

11  range.

12        So consistent with good appraisal practice, I've

13  reconciled all of this information that's been presented to me

14  in order to develop an appraisal opinion that these properties

15  are each stigmatized in the range of 25 to 40 percent.

16  Q    You understand, sir, that there are two proposed class

17  areas, two different proposed definitions of the class in this

18  case?

19  A    That sounds to me like a legal question.  I was presented

20  with the Cotromano class, which I found to be a geographic

21  subset of the Adinolfe class.  And so I've rendered opinions

22  accordingly.  But any differences among those would probably

23  be a legal question and not an appraisal question.

24  Q    Right.

25        In the Adinolfe case, you were told to assume the
```

1    big area, and in the Cotromano case you were told to assume

2    the smaller yellow area that is divided, but in neither case

3    were you asked to define a priori an effected area.

4    A    I don't know that I would fully agree with that.  As --

5    in the Adinolfe case, as the area was being defined to me, I

6    took it upon myself, and with the assistance of my team, to

7    verify that the extent of the boundaries in Adinolfe

8    constituted a neighborhood defined as The Acreage.  In other

9    words, people thinking about buying a house or selling a house

10   or financing a house within that Adinolfe boundary would

11   consider that they were buying or selling or financing in The

12   Acreage.

13           So I did some confirmatory work.  Admittedly the

14   extent of the boundary was a condition of the appraisal

15   assignment provided to me by my client, but it's not a

16   condition that I blindly accepted.  I did, in fact, do some

17   validation and informed my client of that validation.

18   Q    Right.

19           You were here for opening where I described the

20   difference between drawing lines on a map around something

21   that some people might consider to be a cohesive neighborhood

22   on the one hand, and drawing lines on a map that define an

23   affected area on the other?  Were you here for that?

24   A    I believe I was, yes, sir.

25   Q    And all you did was draw lines that correspond to what

 1   you claim is The Acreage, and you say it's that bigger area in

 2   orange.  You didn't -- you were not asked to say a priori what

 3   area was affected, were you?

 4   A    What do you mean by affected?  Because it's our finding

 5   that any property in the neighborhood called The Acreage is

 6   stigmatized by this contamination problem.  So it may be that

 7   you and I have two different definitions of the word

 8   "affected".  I'm looking at it from the perspective of a real

 9   estate appraiser.

10   Q    Your deposition, page 422, line 14, to 423, line 16.

11           (Video played.)

12           MR. GDANSKI:  I just need a second to get the page.

13           MR. GALLAGHER:  Do you have it?

14           MR. GDANSKI:  One second.

15           422, line?

16           MR. GALLAGHER:  Page 422, line 14, to 423, line 6.

17           MR. GDANSKI:  I would object as improper

18   impeachment, improper use of a deposition.

19           THE COURT:  Overruled.

20           (Video played.)

21   BY MR. GALLAGHER:

22   Q    Sir, you were asked those questions and you gave those

23   answers under oath?

24   A    I did, and that's consistent with the testimony I've just

25   offered, that while I would agree that both Adinolfe and

1    Cotromano geographic boundaries were provided to us as

2    conditions of the appraisal assignment, in Adinolfe we did do

3    some research in the beginning to inform ourselves that those

4    boundaries were indeed an area commonly called The Acreage.

5    Q     What you didn't do was take all of Palm Beach County and

6    do some sort of study and say out of this area I can tell you

7    the proposed class area is the area that's affected?

8    A     And how do you mean affected?  Because I want to make

9    sure we're using that word in the same context.

10   Q     Your deposition, page 421, line 8 to 15.

11   A     Yeah, that's -- I don't have any disagreement with that.

12   We did not do any sort of a priori study, as I've already

13   testified.  This will be the third time.  I'm not trying to be

14   argumentative, but these are the conditions of the assignment

15   that are provided to us by our client.

16          We did, in Adinolfe, confirm on our own that that is

17   an area generally considered to be The Acreage, but I've not

18   attempted to make any determination independent of my clients

19   as to what area is affected.  I'm simply able to offer the

20   testimony that that area, and certainly the subset of that

21   area in Cotromano, is stigmatized by this contamination

22   problem.

23   Q     What you didn't do was take all of Palm Beach County and

24   do a study and say out of this entire area, this where we've

25   drawn the lines is what's affected, did you?

```
 1   A     No, I did not do that, and I'm not testifying that I did
 2   that.
 3   Q     You use in your reports the proposed class dates as the
 4   effective date for your analysis in Cotromano and Adinolfe,
 5   there were two different ones, right?
 6   A     That's correct.
 7   Q     And you use the effective date like an event study, where
 8   the transactions before that date are considered unimpaired,
 9   and properties as of that date going forward are considered
10   impaired, right?
11   A     For purposes of the trend analysis, that's correct.
12   Q     Well, not just for purposes of the trend analysis.
13   That's how you -- that's how you used the effective date for
14   all of your analyses, isn't it?
15   A     Implicitly, yes.  Where we quantify it is in the trend
16   analysis, where we look at pricing models for The Acreage
17   versus a couple of control areas.
18   Q     You were told to assume those two different effective
19   dates for this purpose.  They are not dates that come from any
20   of your analysis or opinions, are they?
21   A     That's correct.
22   Q     You're not going to tell the Court which date to use as
23   the right date on which to measure any diminution in value?
24   A     On the contrary.  I'm waiting for the Court to inform me
25   what that date should be.
```

```
 1   Q     Right.
 2              The Court's going to inform you of that, and you
 3   don't have anything to tell the Court about which date to use,
 4   one of those two or some other?
 5   A     That's correct.  I'm not offering up a date as an
 6   opinion.
 7              I will say that looking at both of those dates,
 8   there is a marked change in the pricing trend in The Acreage
 9   before both of those dates versus after both of those dates.
10   Q     Well, in fact, sir, it doesn't matter to you which date
11   you use.  You can just change the date, and you give the same
12   opinion, right?
13   A     Between those two dates, which is about six months apart,
14   I don't believe that there's a marked change in the level of
15   stigma and the impact on value of the properties in The
16   Acreage neighborhood.
17   Q     Well, let me ask you -- first, I've got a demonstrative
18   that I want to walk through with you to show how the effective
19   date works in your analysis.
20              MR. GALLAGHER:  And, Your Honor, as a housekeeping
21   matter, I failed to do this, but the board that I used in
22   opening we will mark as Pratt & Whitney demonstrative
23   exhibit 1, and the flip chart that I built in the examination
24   earlier we will mark as Pratt & Whitney demonstrative
25   exhibit 2, and this demonstrative we'll mark as Pratt &
```

1   Whitney demonstrative exhibit 3.

2   BY MR. GALLAGHER:

3   Q    So what we have up here, sir, is a representation of a --

4   it's a timeline with the February 1, 2010, effective date,

5   with three transactions listed before that, a purchase on

6   9/21/09 by Plaza, a 10/30/09 purchase by Offner, and a

7   December 10, '09 purchase by Watkins.

8          Do you see that?

9   A    Yes.

10  Q    And so we said before, or you said before, that this

11  February 1, 2010, date works like an event study, where

12  transactions before that date are considered unimpaired, and

13  impaired after.  So we've shown that.  You see that?

14  A    Yes.

15  Q    So as shown here, if you use the February 1, 2010, date,

16  Ms. Plaza, Ms. Offner and Ms. Watkins would have purchased

17  before the event in the period of time where your analysis

18  would assume there was no impairment, right?

19  A    I don't know if I'm making an assumption in that regard.

20  I recognize the fact that it's the Court's authority to

21  establish an effective date.  I've testified that prior to

22  these dates, there does not -- or shall we say from the period

23  of time prior to the dates to the period of time after the

24  dates, there is a noticeable, meaningful and economically

25  material change in pricing.  But I also recognize that the

1   Court can establish a definition of class based on a host of

2   legal issues outside of the scope of my appraisal expertise.

3   Q    Now, if we move the effective date to August 24, 2009, as

4   you did in your Cotromano report, this looks different,

5   because now you're using the August 24, 2009, date as your

6   event for your event study, and transactions or the property

7   after that date is considered impaired, right?

8   A    That's correct.

9   Q    And if you put them both on there together, what you have

10  is for one assumption, these sales in the class area would be

11  during a time your analysis assumes is unimpaired, and if you

12  use the other date, August 24th, they are transactions that

13  occur during the time where your analysis would assume they

14  are impaired, right?

15  A    I don't know that I would go that far.  I think that the

16  Court will establish a date, an effective date, of the class,

17  and we will analyze before and after that effective date.  As

18  I already testified, I'm aware that there are a host of issues

19  the Court will take into account, many of which are outside of

20  the scope of appraisal practice.

21       The demonstrative that you have on the screen here

22  is, from an appraisal perspective, probably nonsensical, but

23  I'm not offering up a date.  And so it has no meaning to me as

24  an appraiser.

25  Q    You say changing the date does not affect your opinion on

```
 1   diminution in value of property at all.
 2   A    On a class-wide basis, no.  I recognize the fact that
 3   there are a host of issues that the Court may take into
 4   account and that establishing one date versus another date may
 5   have some implications that are outside of the scope of my
 6   appraisal practice.  That's why I'm looking to the Court for
 7   its establishment of a date.  I'm not proffering an effective
 8   date here.
 9   Q    Doesn't changing the date from February 1, 2010, to
10   August 24th, 2009, have a -- make a big difference to the
11   people who own the property in this area?
12   A    I -- you know, I don't have any opinion about those three
13   property owners.  My opinions here are with respect to the
14   class-wide stigma which affects the entire neighborhood of The
15   Acreage and to the appropriate methodology for individual
16   calculations of that stigma.  The determination of a specific
17   date is something I would leave up to the Court.
18   Q    Well, under one assumption that you were asked to apply,
19   these three individuals -- well, first, let me ask, changing
20   the date here from February 1 to August 24th, it doesn't
21   change any of the details of these individuals' transactions,
22   when they sold, what they sold for, what kind of disclosures
23   there might have been accompanying their sale, does it?
24   A    I can't testify anything about those three transactions,
25   because I've not done any analysis of those three
```

1   transactions.  That having been said, I'm not offering up any

2   opinions with respect to those transactions.

3   Q    The transactions wouldn't change based on the date, would

4   they?

5   A    I don't have any opinion one way or the other about

6   those.

7   Q    But under one date, those transactions would have these

8   individuals being plaintiffs with a claim, and under the other

9   date, they would be left out of the class, wouldn't they?

10  A    Maybe I can clarify it this way.  I'm looking at

11  properties and not so much plaintiffs.  Now, I recognize the

12  fact that the Court determines an effective date and class

13  members, who are people, oftentimes the Court will define a

14  class as anyone who owned a property as of a given date.

15       My analysis, my appraisal of these properties, has

16  nothing to do with who owned it as of a given date.  So if you

17  are asking me to appraise these three properties as of

18  February 1st, 2010, versus 8/24/09, my appraisal will only be

19  slightly different.  That will be a function of the unimpaired

20  value.

21       But my appraisal has nothing to do with who owned

22  them.  Now, that may have something to do with the -- with who

23  gets an award of damages, but that's outside the scope of

24  appraisal practice.  I have no opinions about the Plazas or

25  the Offners or the Watkins.  I'm issuing opinions regarding

1    the properties which you're telling me now transacted on those

2    dates.

3    Q    You have no opinion whether anybody who would be defined

4    as a member of the class under either definition, you have no

5    opinion about whether any person suffered actual economic

6    loss, do you?

7    A    Well, that's an interesting point.  You know, the people

8    who are property owners certainly suffered economic damages as

9    a result of the stigma.  I'm not questioning the fact that

10   property owners are affected.  And, in fact, I'm offering an

11   opinion that property owners are impacted by this stigma.  I'm

12   simply not personalizing that.  As an appraiser I'm looking at

13   the properties, but I recognize the fact that the

14   identification of those property owners is outside the scope

15   of my appraisal practice.

16          But unquestionably whoever owned those properties,

17   as of whatever date this Court established, suffered an

18   economic damage as a result of the stigma loss.

19   Q    Well, so you would say that if you use August 24th, 2009,

20   these individuals who we've got listed here, or frankly

21   anybody who bought after that date but before the other class

22   date, you'd say none of them suffered any injury, did they?

23   A    At a granular level, I have no opinions about that.  As

24   I'm testifying right now, anybody who owned a parcel of

25   property as of whatever date this Court established, certainly

```
 1   has a stigma loss.  That's unquestionable.

 2   Q    Well, let me --

 3   A    My knowledge --

 4   Q    Let me ask you, if you use August 24th, 2009 --

 5        MR. GDANSKI:  Judge, I just want to give the witness

 6   an opportunity to finish that answer.

 7        THE COURT:  I think he was answering the question

 8   that was asked, so . . .

 9        MR. GALLAGHER:  Exactly.

10   BY MR. GALLAGHER:

11   Q    If you use August 24th, 2009, sir, you would say none of

12   these people suffered an injury, right?

13   A    My analysis hasn't gone that far yet.  I'm simply saying

14   that if you use August 24, 2009, as a date of value, anybody

15   who owned a piece of property as of that date has suffered an

16   economic damage.  And as an appraiser, my focus is on

17   properties, but not on the identification of the people.

18   Q    You can't tell us whether any of the individuals who

19   would make up the class, whether they suffered economic loss

20   on the actual sales of their property, can you?

21   A    No.

22        And, in fact, economic loss is not a function of the

23   sale.  Economic loss may be measured independently of any

24   actual transaction.

25   Q    Well, if someone bought at a discount because the
```

1   property was already impaired or they sold without any

2   discount for impairment that had attached to the property --

3   in other words, the sale price either reflects the impairment

4   in the one case or doesn't reflect it in the other, then they

5   haven't suffered any economic loss, have they?

6   A    Satellite class management issue's is outside the scope

7   of the real estate appraisal.  I recognize the fact that after

8   class is certified and damages are determined and awarded that

9   there's some class management issues, but I've never gotten

10  involved with those.

11  Q    Did the individual identified here as Linda Offner, on

12  the purchase of her property in October of 2009, did she buy

13  at a discount because the property was impaired, or did she

14  buy without any discount for any impairment?

15  A    I have no opinion on that.

16  Q    Can't say that for anybody who bought in this period from

17  August 24, 2009, to February 1, 2010, can you?

18  A    That's correct.  As I've already testified, any actual

19  transaction prices here are not relative or not a function of

20  my opinion.  And to the extent there are any issues like that,

21  it would be outside the scope of my appraisal determination.

22  Q    The point is, sir, you have an opinion that there is a

23  diminution of value in property but no opinion as to who may

24  have suffered economic loss as a result?

25  A    I would say that anybody who owned the property as of

1    whatever date this Court established would have suffered an

2    economic loss as a function of stigma.

3    Q    Well, so even if they bought at a discount that reflected

4    the impairment?

5    A    Again, that sounds like something that would be sorted

6    out at the class management stage.

7    Q    You don't have any opinions on whether there's economic

8    loss like that to the plaintiffs in this case, do you?

9    A    I don't have any opinions that transcend the class

10   management which may occur after the case is adjudicated.

11   Right now my opinions are that the people who own these

12   properties, as of whatever date this Court established,

13   suffered a material and measurable economic loss as a result

14   of the stigma which permeates The Acreage neighborhood.

15   Q    We have this example up of somebody who might have bought

16   between the two proposed class dates, you know, one in one

17   situation they might buy with an impairment, and the other,

18   the same transaction might be considered to be a purchase

19   without any impairment.

20          Another example that you talked about in your

21   deposition was the example of somebody who had a transaction

22   where they actually sold at a 20 percent discount because they

23   disclosed an impairment in contrast to somebody who's never

24   sold and has held on to their property to this day.  Do you

25   recall that hypothetical?

```
 1   A     Yes.
 2   Q     Now, so on the one hand you've got somebody who has an
 3   actual transaction, they put their property on the market,
 4   say, right after one of these effective dates, and they sold
 5   at a 20 percent discount because they disclosed the stigma,
 6   right?  That's one person we're talking about.
 7   A     Yes.
 8   Q     And then you also have people who were part of the class
 9   because they owned on one of these dates, but they've never
10   sold to this day.  That's our other person we got.
11             Both would be members of the class, right?
12   A     Yes.
13   Q     And you can't say whether their damages -- what their
14   damages would be or whether they are the same or all
15   different.
16   A     I would proffer that all of these properties in the
17   neighborhood are affected in the amount of 25 to 40 percent as
18   a result of the stigma.  Now, if we're differentiating between
19   a property owner actually sold versus a property owner who has
20   not sold, that property owner who has not sold has still
21   suffered a loss in value.  Just because that property owner
22   hasn't sold their property doesn't mean that their equity
23   hasn't gone down by an amount of 25 to 40 percent.  They can't
24   borrow against that.  They can't will the house to their kids.
25   They can't use that money in their old age.  They can't get a
```

```
 1   reverse mortgage.  They cannot sell the house and reap that
 2   reward that they may have been saving up for their whole
 3   lives.
 4           So, yeah, these people who didn't sell, who haven't
 5   sold yet, they've suffered a real, material and measurable
 6   economic loss.  They don't have to have a transaction for that
 7   loss to be real.
 8   Q    You don't measure, with your methodology, this economic
 9   loss you're talking about.  And, in fact, you cannot say what
10   these people's damages would be or whether they are all the
11   same or different.  You have no opinion on that?
12   A    Oh, I do have an opinion on that.  I would tell you that
13   each and every one of these properties in The Acreage, whether
14   the person has sold or not, has gone down in value 25 to
15   40 percent.  And when this Court establishes an effective date
16   in its class certification, then we will calculate an
17   individual dollar figure for each and every one of these
18   properties.  We will be able to offer to the Court at that
19   point an unimpaired value, an impaired value and a dollar
20   figure of damages for each and every one of the properties
21   that are part of this class.  We're simply waiting on the
22   Court to establish a date of value in order to be able to
23   offer that at a merits phase.
24   Q    Your deposition, page 547, line 1 through 14.
25           MR. GDANSKI:  547, 1 through 14?
```

```
1    BY MR. GALLAGHER:

2    Q    "Question:  And I would ask a different question.  As an

3    economic matter for these two individuals, one who managed to

4    sell at a 20 percent discount and one that hasn't sold at all,

5    what are their damages?

6           "Answer:  Well, that is a matter for the Court to

7    determine.  I can tell you what the diminution in value of the

8    house is, but in terms of pointing to damages to the

9    individuals, again, that's outside the scope of what I'm

10   testifying to here.

11          "Question:  You can't -- you can't tell us whether

12   the person who sold suffered the same or different damages

13   than the person who was unable to sell?

14          "Answer:  Again, I don't have a -- any basis for

15   making that determination right now."

16          You were asked those questions, and you gave those

17   answers under oath, didn't you?

18   A    I did.  And at the time I was giving those answers, I

19   certainly, as I've already testified here, thought we were

20   talking about that class management issue, which would happen

21   afterwards.

22          I'm not testifying specifically about people here.

23   That's a class management issue.  I am testifying about

24   properties.  And so for each and every property which is in

25   the class, which is owned by somebody who is a class member, I
```

```
 1   will offer an unimpaired value, an impaired value, and a
 2   dollar figure of diminution in value.
 3          Now, how that gets adjudicated among people in the
 4   class management process, which is what I thought we were
 5   talking about in this deposition, is certainly a matter
 6   outside the scope of my appraisal opinion.
 7   Q    You understand, sir, that we're gonna have a class, if
 8   there's one certified, of -- it's going to be a class of
 9   people, not a class of property?
10   A    Well, as a real estate appraiser, I'm testifying about
11   properties.  I understand those people will own properties,
12   and so I will offer up opinions about the value of those
13   properties and how much diminution in value each one of those
14   properties had.  This Court will then translate that
15   diminution in value into a damage number which adheres to each
16   one of these people.
17   Q    Right.  The damages part is gonna have to be an
18   individualized thing done later, because you don't offer any
19   opinion here on damages, do you?
20   A    I don't know that that's quite true.  The damages number
21   is something that we will calculate as soon as this Court --
22   excuse me, the diminution in value number, which would be
23   individualized to each property, is something that we will
24   compute as soon as this Court proffers a date.
25   Q    When it comes to talking about people and not property,
```

```
 1   sir, across the class area, however it's defined, you can't
 2   tell us whether these -- whether people, those who sold or
 3   those who have held on to their properties, whether those
 4   people have suffered the same or different damages, can you?
 5   A    Well, damages is a dollar figure.  We will compute an
 6   individualized damage number or individualized diminution in
 7   value number for each of the properties which are owned by
 8   class members.  How that gets adjudicated into a damage is
 9   outside of the scope of my expertise as an appraiser.  But as
10   soon as the Court gives us a date, we will be able to proffer
11   to the Court an individual property-by-property dollar figure
12   on diminution in value.
13   Q    If the suggestion has been made that you've offered an
14   opinion on class-wide damages defined as economic harm to
15   people and not property, that's just not true, is it?
16   A    Well, I don't know that I would agree with that.  I'm
17   certainly offering up a determination of diminution in value.
18   I know that that's what the Court will take to issue its
19   ruling about damages or what a jury will take into account
20   when offering up its determination of damages.  I'm certainly
21   offering up testimony that I believe will assist the trier of
22   fact in making that determination of damages.  But as a real
23   estate appraiser, I'm proffering an opinion of diminution in
24   value.
25   Q    You're not offering any opinion on damages, are you?
```

```
 1   A    I don't -- don't agree with that.  As I just testified,

 2   I'll be offering up an opinion which I believe will allow the

 3   trier of fact to make a determination of damages, and I'll be

 4   offering up a property-by-property dollar figure to aid the

 5   jury and the trier of fact in that issue.  But as I understand

 6   it, the award of damages is a -- is a trier of fact issue and

 7   a class management issue.  I'll certainly be offering up

 8   testimony to aid the trier of fact on a property-by-property

 9   basis in that regard.

10   Q    You claim to measure property value diminution, not

11   identify what caused it, right?

12   A    Well, it's caused by the stigma which permeates this The

13   Acreage neighborhood, and it's certainly linked to a

14   recognition by market participants that there are

15   environmental issues in this neighborhood.  But I'm not a

16   hydrologist or chemist or physical scientist of any form.  I'm

17   simply saying that because there is an environmental issue in

18   this neighborhood, that's resulted in a neighborhood-wide

19   diminution in value.

20   Q    Right.

21        And you offer no opinion on what might or might not

22   have caused this environmental issue that you have as the

23   basis for your analysis, do you?

24   A    By cause, are you talking with about the physical science

25   issues?
```

```
 1   Q    I'm just talking about what caused this stigma you claim
 2   to have measured.  You have no opinion on what caused it.  In
 3   fact, you weren't even asked to look at that question, were
 4   you?
 5   A    Well, I --
 6            MR. GDANSKI:  I'd just object.
 7            THE COURT:  I'm sorry.
 8            MR. GDANSKI:  I object as compound.
 9            THE COURT:  Rephrase your question.
10            THE WITNESS:  It depends on what you mean by cause.
11            THE COURT:  Wait for another question.
12            THE WITNESS:  I'm sorry.
13   BY MR. GALLAGHER:
14   Q    You were only asked to determine if there is stigma and
15   to measure it, not to isolate or determine the cause of any
16   stigma.
17   A    Are you and I talking about the same meaning of the word
18   "cause"?
19            In --
20   Q    Your --
21   A    In my determination, the environmental concerns in the
22   neighborhood lead to this stigma, but I'm not offering up a
23   physical science opinion.
24   Q    And you're not able to tell us -- well, strike that.
25            Your deposition, page 495, line 24, to 496, line 14.
```

```
 1                    MR. GDANSKI:  One second.

 2                    THE WITNESS:  I'm there.

 3                    (Video played.)

 4     BY MR. GALLAGHER:

 5     Q    You have not determined whether the cause of the stigma

 6     you talk about is the cancer cluster announcement, the impact

 7     of contamination, or something else entirely, have you?

 8     A    That's right.

 9                    And my answer to that question, if you go back to

10     495, line 12, you asked:  "Can you measure how many of that

11     stigma is due to the cancer cluster announcement separate and

12     apart from the impact of any contamination?"

13                    And I testified:  "I've not been asked to parse

14     that."

15                    So with respect to causality, I'm not parsing from

16     among the various environmental issues.  I'm simply saying

17     that because of the environmental issues in The Acreage

18     neighborhood, there is stigma, and I'm measuring that stigma.

19     Q    Your deposition, page 496, line 15 to 19.

20                    (Video played.)

21     A    That's correct; and it goes back to that parsing question

22     that we had on 495.

23     Q    Sir, I'd like to shift gears.

24                    THE COURT:  Mr. Gallagher, is this a good time to

25     take a break if you're shifting gears?
```

```
 1              MR. GALLAGHER:  Perfect time to take a break, Your

 2    Honor.

 3              THE COURT:  Let's take a lunch recess.  Can we get

 4    back in an hour?  Is an hour good enough for everyone?

 5              MR. GALLAGHER:  Works for me, Your Honor.

 6              And --

 7              THE COURT:  Plaintiffs, is that good?

 8              MR. SCAROLA:  Yes, Your Honor.

 9              THE COURT:  All right.

10              MR. GALLAGHER:  And if I may, Your Honor, just -- I

11    don't know, I would ask, since he's under cross-examination,

12    that counsel not confer with the witness.

13              THE COURT:  Don't discuss your testimony with anyone

14    during the break, please.  Okay?

15              THE WITNESS:  Yes, Your Honor.

16              THE COURT:  So we'll see you about 1:05.

17              Thank you.

18         (A recess was taken from 12:06 p.m. to 1:11 p.m., after

19    which the following proceedings were had:)

20              THE COURT:  Please be seated, everyone.

21              All right.  Dr. Kilpatrick, if you'll get back on

22    the stand, please.  You're still under oath.

23              THE WITNESS:  Yes, Your Honor.

24              THE COURT:  And we're ready to continue.

25              Mr. Gallagher, you may proceed.
```

1    BY MR. GALLAGHER:

2    Q    Sir, we talked earlier about some examples of how

3    changing the effective date, how that plays in your analysis.

4    I'd like to briefly talk about how using different class

5    areas, how that interacts with your opinion.

6            So what we have up on the screen, we'll mark this as

7    demonstrative -- Pratt & Whitney demonstrative exhibit

8    number 4.  This is the two proposed class areas with some

9    locations noted in red.  This was something we used at your

10   deposition.

11           Do you recall that?

12   A    Yes.

13   Q    And to highlight, on this map, there's one property in

14   particular down here, number 5, what we labeled number 5, that

15   is meant to represent the property of Linda Offner.

16           Do you see that?

17   A    I do, yes.

18   Q    Now, sir, that property would be in the class area by one

19   definition and excluded from the proposed class area under the

20   second definition, right?

21   A    It appears so.

22   Q    And there are, in fact, 2400 properties in that excluded

23   area, aren't there?

24   A    I don't have that number off -- if you're stipulating

25   that, I don't have my report in front of me to verify that.

```
 1   Q    Setting aside the class area definition that is proposed
 2   and just talking about the properties, did those 2400
 3   properties suffer a diminution in value or not?
 4   A    I believe and I found that any property which is in the
 5   neighborhood labeled as The Acreage, or believed to be The
 6   Acreage, has suffered a diminution in value, but I have no
 7   opinion about the two different legal definitions of class
 8   boundaries.
 9   Q    Well, so are you saying, sir, that if the Court chooses
10   the smaller area that excludes these 2400 properties, that
11   suddenly it's now your opinion that they did not suffer a
12   diminution in value?
13   A    I simply will not be offering the Court a measure of
14   diminution in value for those properties.
15   Q    Well, that's not my question.  I'm not asking, sir, what
16   you would choose to testify about.  I'm asking your opinion.
17   If the Court were to say that we're dealing here with the --
18   we're going to use the small class area, would that suddenly
19   change your opinion about whether these 2400 properties that
20   are in the excluded area, whether they have a diminution in
21   value, or not?
22   A    No.
23   Q    So where the Court tells you to draw the line doesn't
24   change your opinion on whether there's a diminution in value
25   for those properties?
```

```
 1   A    As I've said, any property that is identified as being in

 2   The Acreage appears to be suffering a diminution in value.

 3   Q    Well, did these properties?

 4   A    These properties have suffered a diminution in value by

 5   virtue of being located in The Acreage, yes.

 6   Q    Now, do you recall -- and here now I do want to switch

 7   gears.  Do you recall that when we asked you why you had

 8   removed references to the cancer cluster in your 2016 Adinolfe

 9   report and replaced them with references to groundwater

10   contamination north of The Acreage by Pratt & Whitney, do you

11   recall telling us that you were professionally unaware of the

12   cancer cluster and that you had just used that term in your

13   report as a mnemonic device?

14   A    I believe those were my words, yes.

15   Q    What I'd like to do is go through the history of your

16   positions on the cancer cluster, and first what I'll call up

17   is from your 2011 expert report, which, for the record, is in

18   the record as document entry 263-3.

19        And in particular here, sir, I'm at page 75.

20   A    Yes.

21   Q    And I'd like to call your attention to one part in

22   particular in the conclusions, where you state:  As the

23   different surveys show, The Acreage's cancer cluster

24   designation had a tremendous impact on the general level of

25   activity in the area in many different respects (sic).
```

```
 1              Do you see that?

 2   A    Yes.

 3   Q    So here -- you had many statements like this in your 2011

 4   report, didn't you, where you referenced the cancer cluster

 5   designation?

 6   A    I don't recall if there were many, but I'd certainly use

 7   this language in my report, yes.

 8   Q    And here you are attributing a tremendous impact on

 9   activity in the class area to the cancer cluster, aren't you?

10   A    Yes.

11   Q    Now, at this point in 2011, you were working only for the

12   Adinolfe plaintiffs and not the Cotromano plaintiffs, right?

13   A    That's correct.

14   Q    And you know that the Adinolfe plaintiffs were not

15   offering to prove that there was actual contamination in the

16   proposed class area -- area-wide, much less that Pratt &

17   Whitney was responsible for any cancer cluster?

18              MR. GDANSKI:  Judge, I object.  That's just a legal

19   conclusion.

20              THE COURT:  Overruled if that's what he understood

21   or he didn't.  He either did or didn't understand that to be

22   the case.

23              THE WITNESS:  I did not have an understanding one

24   way or the other about that.

25   BY MR. GALLAGHER:
```

```
 1   Q    So you didn't understand when you were changing all the
 2   references to cancer cluster in your 2016 report for the
 3   Adinolfes, you didn't understand they were alleging in any way
 4   that Pratt & Whitney was responsible for it?
 5            MR. GDANSKI:  It's asked and answered.
 6            THE COURT:  Overruled.
 7            THE WITNESS:  Again, I'm not here as an expert on
 8   liability.  I had -- I testified in my deposition that I had
 9   been using the phrase "cancer cluster" as a mnemonic for the
10   environmental contamination problem that permeated The Acreage
11   neighborhood, and I believe I also testified at my deposition
12   that I found it was not a necessary component to my opinions.
13   BY MR. GALLAGHER:
14   Q    Well, regardless of the reason you did it, sir, you went
15   through, in 2016, when you prepared that first -- pardon me,
16   your second Adinolfe report, you went through and you cut and
17   pasted into your report groundwater contamination north of The
18   Acreage by Pratt & Whitney, or words to that effect,
19   everywhere where you had cancer cluster before.
20            Do you recall that?
21   A    Yes, that's correct.
22   Q    Well, and this what we have on the screen is actually a
23   pretty good example.  Let me show you your March 2016 report,
24   which is docket entry 258-6, and I'll be looking at page 17.
25            And so this is an example of one of those places
```

```
 1   where, in your 2011 report, you said cancer cluster, and now
 2   you've just cut and pasted in "news regarding environmental
 3   contamination of the groundwater by Pratt & Whitney north of
 4   The Acreage;" isn't that right?
 5   A    I hate using phrases like cut and paste, but, yes, I did
 6   relax the use of the phrase "cancer cluster" and substituted
 7   in its place "news regarding environmental contamination of
 8   the groundwater."
 9   Q    You claim you were just relaxing your assumptions?
10   A    I recognize the fact that an actual cancer cluster
11   designation was not a requirement of my opinions.
12   Q    Well, the way your analysis and your methodology work,
13   you could change the opinions you offered, change your
14   conclusions about the effect of the cancer cluster and just
15   cut and paste in environmental contamination of the
16   groundwater by Pratt & Whitney north of The Acreage, right?
17   A    I don't know that I would agree with it that way.  I
18   think, as I've said, the use of the phrase "cancer cluster"
19   was not a necessary predicate for my opinions, and so I
20   relaxed that as a predicate for my opinions.
21   Q    I'll point from here.
22        You made that determination, sir, in 2016, without
23   changing or updating anything at all about the methodologies
24   you claimed to have used in reaching your conclusions --
25   A    Yes.
```

```
1    Q      -- didn't you?

2    A      And that's for a very important reason.

3             As I reviewed the methodologies and findings in my

4    first report, I recognized the fact that the designation --

5    the cancer cluster designation was not a necessary predicate

6    to those opinions.  Therefore, removing the phrase "cancer

7    cluster" from my report had no impact on the opinions I was

8    proffering.

9    Q      So you say that what you did is you went back and you

10   looked at things like your contingent valuation survey, and

11   you determined that the cancer cluster wasn't a predicate for

12   that -- for any decision or opinion you had based on that

13   survey at all?

14   A      Or any of the other methodologies which support my

15   opinion.

16   Q      Well, the way your contingent valuation survey in

17   particular works is that you would present to people in the

18   survey, you present them with what's called a fact card; isn't

19   that right?

20   A      That's part of it, yes.

21   Q      It's not just part of it.  It's actually kind of the most

22   important part of it, isn't it, the fact card?

23   A      I think it is a important part of it.  I won't deny that.

24   Q      The results of your contingent valuation survey reflect

25   the information that's provided to the survey participants in
```

1    the fact card, don't they?

2    A    That's correct.

3    Q    The whole point is to tell people who are in this survey,

4    you know, here's some facts we want you to consider, and then

5    use their answers to questions to come up with your valuation

6    of property, right?

7    A    Yes.

8    Q    And in the fact card that you say you used for your

9    contingent valuation survey, the one where you say you went

10   back and decided that the cancer cluster didn't play any part

11   in your analysis at all, it actually talks about the cancer

12   cluster, doesn't it?

13   A    Would you show me that language?

14   Q    Yes.

15          MR. GALLAGHER:  I'm going to call this up as a

16   demonstrative exhibit, Your Honor.  So we'll mark this as

17   demonstrative exhibit number 4, but it's a version of what is

18   exhibit C to Dr. Kilpatrick's direct testimony, which is

19   docket entry number 363-18.

20   BY MR. GALLAGHER:

21   Q    So here we have your fact card that is described as a

22   description of the present situation, fact card.  And we've

23   formatted it so it fits on one page.

24          Do you see that?

25   A    Yes.

1    Q    And isn't it true, sir, that in the fact card that you

2    presented to the survey participants, the fact card that was

3    central to this technique, you referred to the cancer cluster

4    twice, and you referred to and you used the word "cancer"

5    something like 11 times?

6    A    Yes.

7    Q    And, in fact, you included basically a whole paragraph,

8    out of the five paragraphs in this fact card that you

9    presented in your survey to the participants about the

10   investigation of the cancer cluster?

11   A    And I think it's important to -- as you review that, to

12   point out to the Court that I conclude with the phrase or with

13   the sentence:  "In other words, in the private wells that were

14   sampled, a causal relationship was not established between the

15   contaminants in the well water and the documented pediatric

16   brain cancers."

17          And so based on that, I recognized the fact that

18   that the phrase "cancer cluster" was not a necessary predicate

19   to the opinions that I was proffering.

20   Q    So you say that although the fact card that was the thing

21   that was shown to people in the survey, even though it talks

22   about the cancer cluster and cancer-causing agents, that it's

23   irrelevant to the results?

24   A    I wouldn't use the phrase "irrelevant," but I think I've

25   described it as not a necessary predicate.

```
1   Q    Did you ever use -- did you ever do a survey, sir, where
2   you presented a fact card that didn't highlight for the
3   participants in your survey the cancer cluster?
4   A    In this case?
5   Q    That's what we're here to talk about.
6   A    Well, you said did I ever, so I was curious.  I've done a
7   lot of fact cards and a lot of surveys over the years.
8            In this particular case, no, I have not done a
9   separate fact card that did not have the phrase "cancer
10  cluster" in it.  But if you carefully read that paragraph and
11  the way I conclude it, you can draw the same conclusion that
12  I've drawn, which is that the cancer cluster was not a
13  necessary predicate for the opinions that I proffered in my
14  second report.  I'm not backing away from the fact that
15  there's a cancer cluster conversation going on in The Acreage
16  that the cancer cluster designation has had an impact on the
17  residents in The Acreage, on the property values in The
18  Acreage.  I'm not backing away from any of that.  But it's not
19  a necessary predicate to the opinions that I proffered.
20  Q    Before you went back and took out all the references to
21  cancer cluster in your 2016 Adinolfe opinion, you didn't do a
22  new survey that took out the references to cancer cluster that
23  were presented to the participants in your CVS, did you?
24  A    No; I did not see the need to do that.
25  Q    You changed your conclusion based on the survey that was
```

1    done?

2    A    I don't know that I changed my conclusion.  I just

3    recognized the fact that cancer cluster was not a necessary

4    predicate to the opinions that I was offering in that second

5    report.

6    Q    Sir, you didn't just change your conclusions based on

7    things like the contingent valuation survey.  You actually had

8    to go back and change the facts before you could cut and paste

9    wherever you had cancer cluster in your report, didn't you?

10   A    What are you referring to?

11        MR. GALLAGHER:  We'll mark, Your Honor, the

12   demonstrative that I'm using next as Pratt & Whitney

13   demonstrative 5.

14   BY MR. GALLAGHER:

15   Q    So I have up on the screen a quote from your 2011 report

16   and a quote from your 2016 report.  Do you see that?

17   A    Yes.

18   Q    And just to confirm, Doctor, both of those reports, both

19   the 2011 report and the 2016 report, those were things you

20   signed?

21   A    Yes.

22   Q    And, in fact, you signed them under penalty of perjury,

23   didn't you?

24   A    I did.

25   Q    In 2011, you wrote:  "Residents said that it was common

```
 1   to see buyers back out of sales once they discovered the news

 2   about the cancer cluster."

 3             That's what you said in 2011, right?

 4   A    I did, yes.

 5   Q    2016, same sentence:  Residents said, and you've cut and

 6   pasted, history or about the history of environmental

 7   contamination; isn't that right?

 8   A    Yes, I changed the phrasing, because I recognized the

 9   fact that the phrase "cancer cluster" was no longer a

10   necessary predicate to the opinions I was offering.

11   Q    Well, sir, when you said here "residents said," you were

12   referring to what you claim to have been actual interviews of

13   people, residents in the area, aren't you?

14   A    That's correct.

15   Q    So you're representing here what it is that those people

16   actually said when you supposedly interviewed them?

17   A    And I think it's important to understand that I'm

18   representing what those people actually said, and I recognize

19   the fact that I did not need to represent it with the word

20   "cancer cluster" in order to be a predicate for the opinions

21   I'm producing.

22   Q    Right.  In order for it to support your opinions, you

23   didn't want it to say cancer cluster.

24   A    What I wanted or didn't want is not relevant to my

25   opinions.  What I found is that using the phrase "cancer
```

1   cluster" was not a necessary predicate to my opinions, and it

2   wasn't necessary that I represent the interviews with those

3   residents in that fashion.

4   Q    How about if what you wanted to do was to be faithful,

5   sir, to what the people actually said in these interviews, as

6   opposed to what you need as a predicate for your opinions?

7   A    Well, I certainly wanted to represent what they said in a

8   fair fashion, and I recognize the fact that I did not need to

9   describe or did not need to use the phrase "cancer cluster" in

10  order to provide a predicate to my opinions and in order to

11  represent the interviews that I had had with those people.

12  Q    You didn't think that you needed to use the term "cancer

13  cluster" to be fair to what the people actually said in these

14  interviews?

15  A    That's correct.

16  Q    You thought that you could say "history of environmental

17  contamination" instead and that would be fair to what the

18  people actually said in the interviews?

19  A    That would be a fair representation of what was said in

20  those interviews.

21  Q    Before you made this change, sir, you didn't go back and

22  talk to the people who did these interviews in 2011, did you?

23  A    That's correct.

24  Q    You didn't review any notes or questionnaires that was

25  produced as part of that interview process?

```
 1   A     Well, I certainly went back and reviewed notes, but
 2   that's what caused me to recognize, or at least part of what
 3   led me to recognize that I did not need to use the phrase
 4   "cancer cluster" as a predicate for my opinions.
 5            In short, I didn't make this change without a review
 6   of the work I was doing.
 7   Q    You claim, sir, that you went back and you reviewed some
 8   notes before you made this change?
 9   A     I certainly would have thought I would have.  As I sit
10   here today, I can't imagine that I didn't.
11   Q    Well --
12   A    Have I ever said that I did not?
13   Q    Your deposition, page 83, lines 4 to nine.  Actually,
14   I'll go -- well, four to nine.
15            "Question:  You haven't reviewed the notes of these
16   telephone surveys since your 2011 report, correct?
17            "Answer:  Yes."
18            Are you saying that there were some notes that
19   you -- other notes that you reviewed?
20   A    Which page are we on?
21   Q    Let me just get right to it, Your Honor, with the --
22   Mr. -- Dr. Kilpatrick.
23            What the residents actually said in these interviews
24   that your people conducted, what they actually said was cancer
25   cluster, without any mention at all of anything like history
```

```
 1    of environmental contamination; isn't that right?

 2    A    I think you're quoting from my report, and you're quoting

 3    from your own question on page 83, lines 16 through 18, where

 4    you're quoting from the report.  You're not quoting from my

 5    notes.

 6    Q    Well, you know, sir, we actually have the notes of these

 7    interviews?

 8    A    Yes.

 9    Q    And we actually have the questionnaires from these

10    interviews?

11    A    Yes.

12    Q    And you're saying you went back and looked at them, and

13    they actually said history of environmental contamination and

14    not cancer cluster?

15    A    I think you're misconstruing my testimony from a minute

16    ago.

17            What I said was that the phrase "about the history

18    of environmental contamination" is an equally reasonable way

19    of phrasing or representing the interviews with those members

20    of the public.

21    Q    Well, let's take a look at the notes.

22            MR. GALLAGHER:  We'll mark this, Your Honor, as

23    Pratt & Whitney hearing exhibit number 1.  And with the

24    Court's indulgence, I'll just put it on the screen and give

25    the witness a copy to move things along, and we can provide a
```

1    copy after the examination.

2              THE COURT:  All right.

3              MR. GALLAGHER:  May I approach?

4              THE COURT:  Yes.

5    BY MR. GALLAGHER:

6    Q    Sir, do you recognize this as the spreadsheet with --

7    recording the results of your folks' interviews of residents

8    back in 2011?

9    A    Yes.

10   Q    Here we are on page 1, and let me just say that the

11   residents don't ever in here actually say that -- what you say

12   in your 2016 report, that they were -- there was a history of

13   backing out or there's backing out of transactions because of

14   the history of environmental contamination, do they?

15   A    I haven't read through this in a while, so if you don't

16   mind, I would need to reflect my opinion on that.  I need to

17   read through it to answer that question.

18   Q    Well, let me just say they did say cancer cluster a lot,

19   didn't they?

20   A    I've seen it once in here, but as I said, I think that

21   the phrase "environmental contamination" is a reasonable

22   representation of these quite a few pages of interviews.

23   Q    Well, let me just direct --

24   A    And there are certain -- I'm sorry, go ahead.

25   Q    Let me just direct your attention to the first page,

```
 1   line 5:  Because of the cancer cluster, everyone wants to

 2   leave.

 3            That's one of the things that was said, that the

 4   residents actually said in these interviews, isn't it?

 5   A    Yes.

 6   Q    And right below that:  There are signs up in the

 7   neighborhood about the cancer cluster, and no one can get a

 8   loan to move into the area, another reference to the cancer

 9   cluster and what the people actually said, isn't that?

10   A    Yes.

11   Q    Let's go to the next page:  Can't sell because of cancer

12   cluster stigma.  That's something that one of these people in

13   the interview actually said, isn't it?

14   A    Yes.

15   Q    Another mention of cancer cluster and the cancer cluster

16   was discussed, something actually said in the interviews?

17   A    Yes.

18   Q    On the next page, page 3, lots of references to the

19   cancer cluster here, aren't there?

20   A    Five, yes.

21   Q    And the way your methodology works, you could go back and

22   decide that it would be fair as a predicate to your opinions

23   to characterize this survey as one where the residents didn't

24   say it was common to see buyers back out of sales once they

25   discovered the news about the cancer cluster, but instead to
```

```
 1   cut and paste the history of environmental contamination
 2   everywhere you had said that they said cancer cluster before?
 3   A    I don't deny that my first report had cancer cluster, and
 4   I don't deny that cancer cluster is an important issue.  What
 5   I am saying is that it's not an unfair representation to
 6   categorize all of these interviews with the phrase
 7   "environmental contamination," and it's also not unfair to
 8   recognize the fact that cancer cluster is not a necessary
 9   predicate to my opinions.
10   Q    Do you think it was a fair characterization of what the
11   residents said to eliminate all the references to cancer
12   cluster?
13   A    I did not think it was an unfair representation of the
14   collection of all of these residents' opinions, and I do not
15   think that even though cancer cluster is in these opinions in
16   many places, it was a necessary predicate to the opinions I
17   was proffering in that second report.
18   Q    Now, you mentioned these are resident interviews.  Who
19   are these people, these residents that you claim to have
20   interviewed for this purpose?
21   A    I think I've described them in the report itself.  I
22   don't recall if we have any further identification of them
23   than what we have here.
24   Q    Right.
25            So just so we can get that description from your
```

1    direct, there's a copy in your binder up there.  If you look

2    at page 14 of your direct, in paragraph 69, you refer to your

3    surveys, and you talk about -- you call it an informal survey

4    of residents within The Acreage.  That's how you describe it

5    to the Court in your sworn testimony in your direct, right?

6    A    Yes.

7    Q    What you don't say, sir, is that these people that you

8    characterize as residents for purposes of this analysis where

9    you've -- you relied on an interview of them, you don't say

10   that they're, in fact, plaintiffs who sued Pratt & Whitney, do

11   you?

12   A    No, I don't make that statement.  Quite frankly, I'm not

13   proffering a legal opinion here; I'm doing a real estate

14   appraisal assignment.  And so the fact that they may be

15   plaintiffs who have sued Pratt & Whitney is not relevant to my

16   opinion.

17   Q    Well, this wasn't some kind of random sampling of

18   residents that you did.  This was, in fact, a bunch of folks

19   who are clients of these lawyers over here, aren't they?

20   A    Well, I don't deny that, but the fact that they are

21   clients of those lawyers is not relevant to an appraisal

22   opinion.  I'm interviewing these people about their

23   experiences.

24   Q    Well, so here we have, just on the page we were looking

25   at, Mr. Plaza that we were talking about earlier.  He's one of

1    the plaintiffs, isn't he?

2    A    Excuse me.  I presume so.

3    Q    And if you go back to the first page, if you look at the

4    Myrick and Vogel down there at number 9 and 10, in the far

5    right column, they talk about talking to Mr. Zobel and how

6    they contacted Mr. Zobel, and they've gotten all their

7    information from him.  Do you see that?

8    A    Yes.

9    Q    And do you know that Mr. Zobel is one of the plaintiffs'

10   lawyers who brought this case?

11   A    Yes.

12   Q    In fact, this group of people who you claim to have

13   interviewed and you characterize from your direct examination

14   as residents, includes the lead named plaintiff in the

15   Adinolfe case, doesn't it?

16   A    I have to check, but if you're stipulating that, sure.

17   Q    Well, page 6 -- sorry, I have the wrong thing highlighted

18   there.

19            Page 6, line 53, you see there "Adinolfe"?

20   A    Yes, I do.

21   Q    And, in fact, when folks went to go interview these

22   people, they had them fill out a questionnaire that told these

23   plaintiffs that you were actually gathering information for

24   the lawsuit?

25   A    Wouldn't surprise me.

```
1    Q     You think it's methodologically sound in a survey like
2    this to rely on what the plaintiffs themselves are telling you
3    based on information they got from the lawyers?
4    A     Well, if what we're trying to do is measure the loss of
5    use and enjoyment of their properties, then it's not
6    unreasonable to ask these folks about that loss of use and
7    enjoyment.
8          Note that it's not the only basis for my opinion.
9    Note that it's not even the -- one of the quantifiable bases
10   for my opinion.  Note that it's not even the only type of
11   informal survey that I conducted.  But I think it would be
12   inappropriate not to interview these people and explore the
13   nature of their loss of use and enjoyment with respect to this
14   action that I'm investigating.
15   Q     Before relying on this survey and characterizing it as a
16   survey of residents in your direct testimony to the Court, did
17   you think it would be at least fair to disclose that what you
18   were talking about was not some random sample of people, but
19   the plaintiffs themselves who have an interest in the case and
20   an incentive to behave strategically in their responses?
21   A     Well, there's certainly been no lack of transparency on
22   my part.  We've handed you all of this information and
23   identified precisely who we interviewed.
24         That having been said, as I've just testified, if
25   I'm being asked to investigate and quantify a loss of use and
```

```
 1   enjoyment by a set of plaintiffs, then it would be
 2   inappropriate to not interview that set of plaintiffs and find
 3   out something about the nature of their loss of use and
 4   enjoyment.
 5   Q    The resident, slash, plaintiffs survey that you talked
 6   about was not the only place where you went and cut and pasted
 7   in 2016 something different than the reference to the cancer
 8   cluster you had in your 2011 report, was it?
 9   A    That's correct.
10   Q    Another place where you did that is where you described
11   what you claimed to have learned from lending institutions.
12            Do you see that up on the screen?
13   A    Yes.
14   Q    Now, this is supposedly based on the interviews or
15   interviews or discussions with seven banks, isn't it?
16   A    Yes.
17   Q    And, again, before changing the description in your 2016
18   report from the reference to the designation of The Acreage as
19   a "cancer cluster" to "press discussing Pratt & Whitney's
20   environmental contamination of the groundwater north of The
21   Acreage," you didn't go back and talk to anybody who did those
22   seven interviews or review any of the notes of them, did you?
23   A    I can't recall if I did or didn't.  I know I didn't go
24   back and talk to them again.  I can't recall if I reviewed the
25   notes.  I'd simply recognize the fact that I did not need to
```

1   refer to their knowledge of the environmental contamination as

2   a knowledge of cancer cluster in order to be a predicate for

3   my opinions.

4   Q    Well, in fact, sir, you had to change what it was you

5   said they were claiming to be aware of as a predicate for your

6   opinions.

7   A    I rephrased the representation of those seven interviews.

8   Q    Well, there's a fact at the base of this, isn't there,

9   sir, that -- a fact as to what it is these seven banks

10  actually said when you talked to them in these interviews back

11  in 2011, isn't there?

12  A    I don't disagree with that.  But my representation of

13  those facts -- and they're plural facts -- did not need to

14  reference cancer cluster.  My representation could be

15  sufficient for my opinions if I simply represented it as

16  environmental contamination.

17  Q    Right.

18       So you felt okay representing the fact as the banks

19  said environmental contamination of the groundwater north of

20  The Acreage without regard to whether that's actually the

21  fact.

22  A    I think that's a reasonable representation of the

23  information that I gleaned from these various banks.

24       MR. GALLAGHER:  Your Honor, I'm going to mark as an

25  exhibit Pratt & Whitney exhibit 2.

```
 1                   May I approach?

 2                   THE COURT:  Yes.

 3    BY MR. GALLAGHER:

 4    Q    Again, we actually have your records of the interviews

 5    that show what it is these banks actually said in the

 6    interviews and not what you represent them to have said in

 7    your report, don't we?

 8    A    Well, what we have is the way we recorded those

 9    interviews, and we recorded using cancer cluster as a mnemonic

10    for the environmental issue.  But going back and reflecting on

11    this, we recognized the fact that we did not need to describe

12    the environmental issue as a cancer cluster in our report.

13    Q    The notes that we've marked as -- first of all, here in

14    exhibit 2, those are the notes of the interviews of these

15    seven banks from 2011, aren't they?

16    A    That's correct.

17                   And at the time we were using cancer cluster as a

18    mnemonic for the environmental contamination, and we

19    recognized the fact that we did not need to use that phrasing,

20    "cancer cluster," as a mnemonic for environmental

21    contamination.  I'm not walking away from the notion that

22    there is a cancer cluster.  I'm simply saying that for

23    purposes of my report, I did not need to invoke the phrase

24    "cancer cluster" as a predicate.

25    Q    What the banks actually said when you talked to them was
```

1    that they knew about the cancer cluster designation, with

2    nothing at all about awareness of environmental contamination

3    of the groundwater north of The Acreage, as you now have it in

4    your 2016 report.

5    A    Well, you're making a shortcut there, counselor.  What

6    you're reading from are my own notes about conversations with

7    bankers.  And at the time we were using cancer cluster

8    designation as a mnemonic for these environmental issues, so

9    naturally we recorded it that way in our notes.  But as I look

10   back on it, I recognize the fact that it wasn't necessary for

11   me to invoke the phrase "cancer cluster" as a necessary

12   condition underlying my opinions.

13   Q    So are you saying, sir, that you had these interviews

14   with the banks back in 2011, you're asking them questions, and

15   they said, yeah, we're aware of the recent press discussing

16   Pratt & Whitney's environmental contamination of the

17   groundwater north of The Acreage, but you wrote down "cancer

18   cluster"?

19   A    I'm saying they said they were aware of the issue.  Now,

20   precisely what language may have come out of each one of these

21   banks, precisely what phrasing each bank may have used in

22   response to questions that we asked, as I sit here today I

23   can't recall.  We recorded it, as you see here, because at the

24   time we were using cancer cluster as a shorthand for a whole

25   host of responses regarding knowledge of environmental

```
1    contamination.
2            That having been said, it's not necessary that I use
3    cancer cluster as a predicate for my opinions.
4            THE COURT:  Can I interrupt for just a second and
5    try and get some clarification here?
6            MR. GALLAGHER:  Sure.
7                            Examination
8    BY THE COURT:
9    Q    Doctor, when you were interviewing either the bankers or
10   the residents, you say you're using "cancer cluster" as a
11   mnemonic description, did you use that phrase when you were
12   interviewing people, do you know about the cancer cluster, and
13   how do you think that impacts your value of the property, or
14   when you talk to a banker, are you aware of the cancer cluster
15   in this area, and how does that affect your lending practices
16   or how many mortgages you've been able to, you know, issue in
17   this area?  Did you use that phrase with them?
18   A    Your Honor, we may have.  It's been, as you can see,
19   seven years ago.  We may have used that in some instances, we
20   might not have used it in other instances.
21           Each one of these paragraphs here is a synopsis of a
22   long involved conversation with a banker, just a shorthand.
23   At the time, we at Greenfield were using cancer cluster as a
24   shorthand for whatever environmental issue was revealed in
25   that conversation with a banker.  We may have used cancer
```

1  cluster; we might not have.

2          The only point I'm trying to make with the attorney

3  here is that in reviewing any of this, I didn't believe it was

4  necessary in my second report to use cancer cluster as a

5  shorthand for these issues.

6  Q    Well, I understand your answer, but my concern is what

7  was the output that you got from the question as phrased?  If

8  you phrased the question with cancer cluster, cancer cluster,

9  and you described it as a cancer cluster, in my mind, that

10 would invoke possibly a different response than if you

11 described it as an environmental contamination in the area.

12         And so I'm concerned about the validity or the

13 reliability of the information you're getting back to the

14 question as phrased, not how you interpreted it.  I understand

15 how you interpreted it, and you don't think it makes a

16 difference in your conclusion.  I'm trying to understand how

17 valid your responses are going to be based upon the way you

18 phrase the question.

19 A    And, Your Honor, I did not tape-record any of this, nor

20 did we have a script that we went through in these informal

21 interviews, because they were just informal interviews.  And

22 as you can see from the length of the responses, sometimes the

23 answers meandered all over the place.

24         But as I sit here today, I cannot affirmatively

25 testify that we did or did not use the phrase "cancer

1   cluster."  And I know that at the time, we were using "cancer

2   cluster" as a shorthand for whatever problems we were finding.

3          And so it may very well be that in some of these

4   instances the phrase "cancer cluster" did or did not come up,

5   but that -- my own representation in response to these

6   questions is that I still don't think it's necessary as a

7   predicate to my opinions.

8   Q    Okay.

9   A    I'm not walking away from the fact that cancer cluster is

10  a serious issue.  I just, in the opinions as I expressed them

11  in my second report, I did not feel like it was necessary that

12  I use that phrase, and I didn't feel like it was necessary

13  that I represent the responses of the bankers in that way.

14         THE COURT:  All right.  Thank you.  I just wanted to

15  get clarification about what was asked of the participants and

16  how it was phrased.  So thank you.

17         THE WITNESS:  Yes, Your Honor.

18              Cross-examination (Cont.'d)

19  BY MR. GALLAGHER:

20  Q    And following up on that, sir, you didn't conduct any of

21  these interviews yourself, did you?

22  A    Staff under my direction conducted the interviews, yes.

23  Q    And they didn't have a script?

24  A    That's correct.

25  Q    So you don't know what they asked or what the actual

1    answer was, other than what's written in this document, where

2    it says, knew about the cancer cluster designation, yes, knew

3    about the cancer cluster designation, et cetera, right?

4    A    That's correct.  As I just told the Court, that's a

5    shorthand recording of my staff's synopsis of a conversation

6    they were having with a banker.

7    Q    And the answer, the synopsis you provide, repeatedly

8    begins with, yes, knew about the cancer cluster.  Doesn't that

9    suggest, at least, sir, that the question was, are you aware

10   of the cancer cluster?

11   A    It suggests that my staff was using the phrase "cancer

12   cluster" as a shorthand for whatever environmental issues we

13   were investigating.

14   Q    Well, when they were talking to the banks, were they

15   saying cancer cluster and expecting the banks to know that

16   shorthand, too?

17   A    As I just told the Court, we may or may not have used

18   that phrasing.

19   Q    Now, in addition to the residents that are plaintiffs

20   that you talked to and these banks, you also claim to have

21   conducted and you now rely on in your direct examination to

22   the Court what you characterize as surveys of realtors and

23   brokers who participate in the market, didn't you?

24   A    Yes.

25   Q    And here we have in your 2011 report, references to those

1   interviews where you state that a majority of respondents

2   noted that -- noted that they had deals fall through because

3   of the cancer cluster designation in The Acreage, and they

4   indicated that they were actively disclosing the cancer

5   cluster designation; isn't that right?

6   A    Yes.

7   Q    And that's how you characterized, along with the other

8   statements here, your interviews under penalty of perjury in

9   your 2011 report?

10  A    That's correct.

11  Q    And now you've changed that in your 2016 report and

12  eliminated the references to the cancer cluster designation,

13  and instead you again have pasted in its place, "because of

14  the revelation of the contamination of the groundwater north

15  of The Acreage by Pratt & Whitney," or similar language,

16  right?

17  A    Yes.

18  Q    You don't actually have any notes of these interviews, do

19  you?

20  A    I'm not sure if they do or don't.  If they were not

21  turned over to you, then we must not have had them.

22  Q    Well, I can represent to you, sir, that we've asked for

23  everything that you had, and we've not seen anything that

24  looks like notes of these interviews.  But we do have, in

25  addition to these statements, we have some quotes from these

1   interviews that you included in your 2011 report.  Do you

2   recall that?

3   A    Yes.

4   Q    So here I'll refer to your -- it's, again, docket entry

5   263-3, your 2011 report, and I will be looking at I think it's

6   page 64.

7           So here you have quotes from these interviews with

8   the realtors and the brokers, right?

9   A    Yes.

10  Q    So when you put something in quotes, sir, do you mean to

11  convey that that's what somebody else said, and you are

12  quoting them?

13  A    Yes.

14  Q    So here you are in your 2011 report, having said in

15  quotes that these realtors and brokers referred to the cancer

16  cluster designation.

17          Do you see that?

18  A    The first one is a situation where the broker actually

19  used the phrase "cancer cluster designation."  Next to the

20  bottom one, the broker used the phrase "cancer scare."  In the

21  other two, "cancer cluster designation" is my language as a

22  predicate to a follow-on quote.

23  Q    Now, sir, when you updated your analysis in 2016, this

24  report we're talking about, in other places you cut and pasted

25  in place of cancer cluster designation some of the language,

```
 1   but here you just deleted the references to these quotes,
 2   didn't you?
 3   A     To the ones that have cancer cluster designation in them.
 4   See, only one of them -- in only one of them did the broker
 5   him or herself use the phrase "cancer cluster designation."
 6   And I recognize the fact that in two of them, cancer cluster
 7   designation was my language, and that may or may not have been
 8   language relative to that quote.
 9            So that, in fact, was a very strong indication to me
10   that cancer cluster designation was not something I needed to
11   include in this report.  It may well have been something I was
12   putting in, in fact putting words in their mouth.
13   Q     You actually don't know what they said, do you?
14   A     As I sit here today, I know that they said "long-lasting
15   effect, may never go away."  I'm reading from the last one.
16   But I was referencing cancer cluster designation, and they may
17   very well have been more generally talking about the
18   environmental issues.
19            In the third one from the bottom, "affected values
20   tremendously."  I used cancer cluster designation as a
21   shorthand, but they may have very well have been talking about
22   the overarching environmental issues which we're talking about
23   here today.
24            So at the end of the day, only one of those brokers
25   actually used the phrase "cancer cluster designation."
```

```
 1   Another one used a phrase "cancer scare."  Since I was
 2   recognizing that cancer cluster designation was not a
 3   necessary predicate for my opinion, I recognize that it would
 4   not be appropriate to include those quotes.
 5   Q    You thought it was appropriate to include those quotes in
 6   your 2011 report.
 7   A    At first we were using cancer cluster designation as a
 8   shorthand for these environmental issues, but we recognized by
 9   2016 that that was not necessary.
10   Q    So in addition to these interviews or surveys where you
11   characterize what was said one way in 2011 and you
12   characterize it differently in 2016, you had a comment in your
13   2011 report where you state -- and we have this here on the
14   screen -- "five agents have commented specifically that the
15   cancer cluster designation has affected the marketability or
16   financing of the properties they represented."
17            Do you see that?
18   A    Yes.  And as I've already testified, I believe that the
19   phrase "cancer cluster designation" may very well have been my
20   shorthand, as opposed to something they were actually saying
21   to me.
22   Q    May very well have been, sir, or was?
23   A    Well, may very well have been.
24   Q    In fact, all five of these real estate agents that you
25   are reporting having talked to here, they all did say
```

1   specifically "cancer cluster," didn't they?

2   A    Only one did.  In two of them, I used the phrase "cancer

3   cluster," and then one realtor used "cancer scare" -- or one

4   lender, excuse me.

5   Q    I've got on the screen your -- again, your 2011 report,

6   page 64, and this is where you state:  "Five agents have

7   commented specifically that the cancer cluster designation has

8   affected the marketability or financing of the properties."

9        You see that?

10  A    Yes.

11  Q    And then you have the five examples below, and you

12  highlight where -- or I've highlighted where there's a

13  reference to the cancer cluster.

14       You see that?

15  A    Yes.

16  Q    Including references to the cancer cluster in quotes and

17  a reference to -- like in the third one, for example, that,

18  quote, "no one would finance with the cancer cluster."

19       Do you see that?

20  A    Yes, I see that.

21  Q    None of them mention Pratt & Whitney, do they?

22  A    I don't believe so, no.

23  Q    Your conclusion from this transactional evidence that you

24  cite here in 2011 was that the cancer cluster was the issue,

25  right?

1  A     In 2011, yes.

2  Q     In fact, you elaborate on that to say that there were two

3  overriding themes that emerged from this transactional

4  evidence, both related to the cancer cluster.

5         Do you recall that?

6  A     Show me where I said that.

7  Q     Bear with me.  I just gotta find the page.  It's the next

8  page, page 65 at the top:  "While conducting these calls, two

9  overriding themes emerged.  First, the cancer cluster

10 designation directly caused fear, which in turn caused

11 property values to suffer.  Second, in an already distressed

12 market, the cancer cluster designation provided a reason for

13 people to abandon their properties and mortgages."

14        That's what you said in your 2011 report, yes?

15 A     Yes.

16 Q     And this transactional evidence was, in fact, at that

17 time one of the things you put the most emphasis on, wasn't

18 it?

19 A     At that time, yes.

20 Q     And you said at that time in 2011 that the transactional

21 evidence, this transactional evidence, pointed to the cancer

22 cluster, didn't you?

23 A     At that time, and then later I recognized that there were

24 other issues at play here, that cancer cluster was not a

25 necessary predicate, and that even without the cancer cluster,

1    we had immense support for a neighborhood-wide stigma that was

2    resulting in a 25 to 40 percent diminution in value.

3    Q    Now, unlike with the other examples we have here, you

4    didn't try -- strike that.

5         Unlike the other examples here, you just deleted

6    this reference where you said the five agents commented

7    specifically that the cancer cluster designation has affected

8    marketability, et cetera?

9    A    That's right.  I'm not walking away from the fact that

10   cancer cluster is a severe issue and that there are people --

11   there are agents in the area who are concerned about the

12   cancer cluster.  I'm simply saying that I found that cancer

13   cluster is not a necessary predicate for the diminution in

14   value determination that I found here.

15   Q    The way your methodology and analysis works, sir, you can

16   just change or outright delete the facts that are inconsistent

17   with the opinion you want to offer.

18   A    Well, there's a lot packed into that question, counselor.

19   Number one, nothing's inconsistent here.  And, number two, as

20   I said, I'm not denying that cancer cluster is a significant

21   issue.

22        What I am saying is that my various methodologies

23   show me that this neighborhood-wide diminution in value of 20

24   to 40 percent holds up even without reference to a cancer

25   cluster designation.  So if I remove that language from my

1    report and remove any information from my analysis relative to

2    the cancer cluster designation, I still have more than

3    sufficient support for a 25 to 40 percent neighborhood-wide

4    diminution as a result of the environmental issues.

5    Q    You said if you remove information relevant to the cancer

6    cluster from your analysis, or something to that effect; is

7    that right?

8    A    If I remove that from my analysis and report, because I

9    don't need that, because as we see, the broader issues of

10   environmental concern are resulting in the 25 to 40 percent

11   diminution in value, even without reference to the cancer

12   cluster designation.

13   Q    Sir, you didn't remove cancer cluster from the fact card,

14   that is the central piece of your contingent valuation survey,

15   that is the one thing you cite in your direct to the Court as

16   a basis for your opinions, did you?

17   A    Did not remove it.  But as I've already testified, if you

18   read through the paragraph that discusses cancer, at the end

19   we show respondents that the cancer cluster is not supported

20   by all of the evidence.  So indeed that paragraph opens with a

21   discussion of the cancer cluster, because it is a fact that

22   there's been discussion of a cancer cluster in this

23   neighborhood.  But that paragraph closes with the recognition

24   that that cancer cluster may not be a necessary predicate for

25   our findings.

```
 1   Q    Sir, you actually claimed that the cancer cluster -- you
 2   have claimed that the cancer cluster was irrelevant to your
 3   findings, that it was not really embedded in your contingent
 4   valuation survey at all, or any of your other analyses, and,
 5   in fact, it is something of which you were just professionally
 6   not aware for purposes of your analysis, isn't that what you
 7   said?
 8            MR. GDANSKI:  Judge, I object, it's compound.
 9            THE COURT:  Overruled.
10            THE WITNESS:  I believe that is the phrasing, and I
11   still stand behind that.  I was not professionally aware of
12   it.  That is to say I made no independent professional
13   determination of the cancer cluster.  It's not a necessary
14   predicate to my determinations here.  And, in fact, my
15   determinations of a neighborhood-wide stigma stand on their
16   own without reference to the cancer cluster designation.
17   BY MR. GALLAGHER:
18   Q    Well, since you say you stand behind it, sir, let's take
19   a look at what it is exactly what you said.  Your deposition,
20   page 78, line 17, to 79, line 17.
21   A    Page -- what was that page?
22   Q    Seventy-eight, line 17, to 79, line 17.
23   A    Thank you.
24            (Video played.)
25   Q    And, sir, you stand behind that?
```

```
 1   A    Oh, yeah.  I think that that's totally consistent with

 2   what I testified to here.

 3   Q    If the Court were to find that -- or, strike that.

 4        If the plaintiffs are not claiming or if the Court

 5   were to find that Pratt & Whitney is not responsible for the

 6   cancer cluster -- in other words, if you had to say that's not

 7   on Pratt & Whitney, let's drop it out of my analysis, you have

 8   not differentiated the effect of the cancer cluster from other

 9   things, like fear of contamination, have you?

10   A    Well, there's a lot baked into that question, counselor,

11   and let me try to unpack it, if you will.

12        First, I'm not pointing any liability fingers at

13   Pratt & Whitney.  That's a determination outside the scope of

14   my appraisal opinion.

15        Number two, I have found that there is a

16   neighborhood-wide diminution in value relative to

17   environmental issues.  That's borne out in the sales trend

18   analysis; it's borne out in the CV survey; it's borne out in

19   the meta-analysis.  It's certainly supported by the other

20   factors that we look at.

21        And as a result of that, my determinations are still

22   supported even if this issue of cancer cluster is taken off

23   the table.

24   Q    Do you differentiate the effect of the cancer cluster

25   announcement from fear of contamination?
```

```
 1   A     Hmm.  Well, I think there may be other things at play
 2   here other than just fear of contamination.  I mean, there is
 3   a -- there clearly is a neighborhood-wide diminution in value.
 4   You're pointing to either/or as if to say fear of
 5   contamination or cancer cluster are the only two choices
 6   people have.
 7          Let's face it, there is a diminution in value in The
 8   Acreage neighborhood, and it appears to be related to the
 9   environmental concerns, but I don't know that I've put it in
10   that either/or categorization.
11   Q     You have not parsed what might be due to a cancer cluster
12   being declared in the area and what might be due to any
13   contamination that the plaintiffs allege, have you?
14   A     I believe that's my testimony, yes.
15   Q     And it's, in fact, your testimony that you don't even
16   know if you could differentiate that sort of thing?
17   A     As I stand here today, I don't know that I could.  I
18   think -- I think it's an interesting empirical issue, but I've
19   not attempted it as yet.
20   Q     I'd like to turn to your methodologies, and for this
21   purpose I'll direct your attention to your direct testimony on
22   page 14, and in particular, this table where you have what you
23   call the summary judgment of findings.
24          Do you see that, sir?
25   A     Yes.
```

1   Q     So just to understand or to unpack your overall approach,

2   you claimed to start with some determination of unimpaired

3   value, then make some determination of impaired value, and

4   come up with the difference that you call the diminution in

5   value, right?

6   A     That's correct.

7   Q     But, actually, as a mathematical matter what you've done

8   is not separately appraise an unimpaired value and an impaired

9   value.  What you've done is you've come up with an unimpaired

10  value and then applied to it this percentage, 25 to

11  40 percent, that you offer as your opinion; isn't that right?

12  A     That's correct.  And as the Court establishes a firm

13  effective date for my opinions, then we would proffer

14  individual determinations of unimpaired value and impaired

15  value for each of these 15,769 properties.

16  Q     You haven't attempted to do that yet?

17  A     Not yet, because, as I've said, an important predicate

18  for that will be the Court's determination of an effective

19  date of value.

20  Q     Now, just as an order of magnitude, so the Court

21  understands the bottom line of your claim, what you're saying

22  is that the diminution of value, according to your analysis,

23  is somewhere between $730 million and $1.17 billion?

24  A     Yes, based on these raw numbers here.

25  Q     The unimpaired number here, that's where you say that if

```
 1    the Court certifies a class and gives you the date, you have a

 2    model where you could come up with an unimpaired value, and

 3    even, you would say, an unimpaired value on a

 4    property-by-property basis; is that right?

 5    A    That's correct.

 6    Q    And you refer in your direct to a model that you use in

 7    the mortgage-backed securities cases, don't you?

 8    A    Well, we've used a lot of other cases in addition to

 9    mortgage-backed securities.  Barlit and Beck asked us to use

10    it in mortgage-backed securities cases.  Most recently I used

11    it in a case in federal district court, District of

12    Washington, that was not a mortgage-backed securities case.

13    Q    The mortgage-backed securities cases, that's not

14    something where -- strike that.

15          The use of the model we're talking about here is not

16    something that gives you the diminution in value percentage

17    that is the core of your opinion, is it?

18    A    That's correct.

19    Q    It's something that, in fact, in the mortgage-backed

20    securities cases, those are cases that don't involve any claim

21    of environmental contamination at all.

22    A    That's correct.

23    Q    What you say is that you have a model that you could use

24    for the unimpaired number that you've used in other places,

25    right?
```

1    A    That we've used in other places.  It's been uniformly

2    accepted by the federal courts and defended by your law firm.

3    Q    It's not the model you used in 2010 -- or, pardon me,

4    2011, in your reports in this case, is it?

5    A    It's related to that.  Our work has been evolving over

6    time.  2011 was seven years ago.  I would say that the DNA of

7    the model we currently use, the DNA of the model that we used

8    in the District of Washington a few months ago, used in the

9    District of Massachusetts for you, is related to the DNA of

10   the hedonic regression we were using in 2011.

11   Q    The model you used in 2011, by contrast to the one that

12   has evolved over time in the seven years since then, that

13   model, for purposes of this case, was fundamentally flawed,

14   because you used comparable properties from within the

15   proposed class area to generate the model, didn't you?

16   A    That's right.  That's why we quit using it.  We

17   recognized the fact that we had a data input problem with

18   that.  And so going forward, we will not use data from within

19   the affected area.  And that's another important point.  We

20   need to have the affect~-- the boundaries of the affected area

21   delineated so we can draw comparables from outside of that

22   boundary.

23   Q    The model you used this last year in the case where you

24   talk about where my law firm was involved, may not have been

25   fundamentally flawed, but the one you used here back in 2011

1   you admit was fundamentally flawed, don't you?

2   A    Well, now that you've repeated the question a couple of

3   times, let me make sure that we're on the same page with

4   respect to the phrase "fundamentally flawed."

5         I recognize the fact that we had a data input

6   problem in the 2011 model and therefore don't -- did not rely

7   on it going forward.  I don't know that that means that the

8   model itself was fundamentally flawed, the analytical model,

9   which is, as I say, shares DNA with the model that we used in

10  other cases is a sound analytical model.  The model itself's

11  not fundamentally flawed.

12        But the use of data from inside and outside of The

13  Acreage gave rise to problems interpreting the findings.

14  Q    You're familiar, sir, with the expression "garbage in,

15  garbage out," aren't you?

16  A    Yes.

17  Q    So the model, the theoretical model, may be just fine,

18  but the way you used it here in 2011, you had garbage in and

19  garbage out, didn't you?

20  A    Well, not meaning to agree with a clearly pejorative

21  question, but we recognize the fact that we had data input in

22  the model which would give us problems interpreting the

23  results.  So going forward after 2011, I did not rely on it.

24  Q    Well, just to understand this a little better, put some

25  meat on it, to do this sort of thing reliably, to come up with

1    an unimpaired value for the purposes of a case like this where

2    you're going to apply a diminution in value to it, you would

3    not use in your model, in building your model, properties from

4    the proposed class area itself to determine the unimpaired

5    values, would you?

6    A    That's correct.

7    Q    And you agree that's what you did here?

8    A    That's correct.

9    Q    You agree it's -- in fact, there are a hundred different

10   reasons why it would be a bad idea to do that?

11   A    You're quoting me exactly, yes.

12   Q    If you use transactions from the proposed class area,

13   like you did here, you get bad data and bad results?

14   A    Oh, I said that five minutes ago.

15         MR. GDANSKI:  Judge, I just want to object insofar

16   as he's not using that in this case anymore.

17         THE COURT:  Overruled.

18         MR. GDANSKI:  I object on relevance.

19         THE COURT:  Overruled.

20   BY MR. GALLAGHER:

21   Q    Well, if you're not using it in this case anymore, sir,

22   let me ask, to get to any number on this page that we have up,

23   you need to start with an unimpaired number, don't you?

24   A    Oh, yes.

25   Q    And you don't have any number in this case other than the

```
1    ones you got from that bad model, do you?

2    A     Well, as I pointed out, as we move forward into the

3    damages phase, we'll have a geographic boundary of the

4    approved class, and we'll have an effective date of the

5    approved class.  Given those two, we will be able to proffer

6    property by property unimpaired values of each and every one

7    of these properties using a model which you and your firm are

8    intimately familiar with.

9    Q     Where, in your direct examination to the Court, sir, do

10   you say that the unimpaired number you've provided here is the

11   product of bad data and bad results?

12   A     I don't know that I said that.

13   Q     And where, in your direct examination to the Court, sir,

14   do you say that this is not actually a summary of your

15   findings, because your plan is to throw out the unimpaired

16   number you have here and start all over again sometime down

17   the road with a model that's not flawed?

18   A     Well, there's a lot baked into that, and a lot of it is

19   pejorative.

20            I think we have a good number for illustrative

21   purposes.  It's not precisely correct, and it is not expressed

22   on a property-by-property basis.  I've already testified

23   several times that we're not going to do this somewhere down

24   the road.  We'll be able to do this as soon as the Court

25   designates an approved class boundary, an approved effective
```

```
1    date of the class.  Once we do that, we'll be able to move

2    expeditiously ahead with a property-by-property unimpaired

3    value.  And I think what we have here is illustrative of the

4    magnitude of the number that we should -- we will end up with.

5    Q    You've been working on this case for seven years, and you

6    haven't done it yet, have you?

7    A    That's correct.

8              MR. GALLAGHER:  Your Honor, I'm about to move on to

9    another topic, and I think it would be a good time for a break

10   if we want to take our afternoon recess.

11             THE COURT:  All right.  That sounds reasonable.

12   We'll take another 10-minute recess.

13        (A recess was taken from 2:29 p.m. to 2:45 p.m., after

14   which the following proceedings were had:)

15             THE COURT:  Please be seated, everyone.

16             All right.  Mr. Gallagher, you may continue.

17   BY MR. GALLAGHER:

18   Q    Doctor, I'd like to turn to your -- the trend analysis

19   that you discuss in your direct examination, and this is the

20   analysis that you explain you did to replace a hedonic

21   regression model as a basis for looking at diminution in

22   value.  Is that right?

23   A    Yes.

24   Q    And I think we talked about this earlier, but you don't

25   actually derive your 25 to 40 percent range from the trend
```

1  analysis, but you say it is supportive of that opinion?

2  A    That's correct.

3  Q    What you do when you do a hedonic regression model, if

4  you do it right, is a statistically rigorous technique, isn't

5  it?

6  A    Yes.

7  Q    You know, if you do it right, a hedonic regression can

8  give you -- can be subjected to things like accuracy and

9  dispersion testing, tests of statistical validity, the sorts

10  of things that you acknowledge are required for the admission

11  of scientific evidence in court?

12  A    That's correct.

13  Q    Whatever your hedonic regression that you've -- that

14  you're not relying on was the trend analysis you discuss is

15  not statistically rigorous, is it?

16  A    I think it's rigorous within the bounds of appraisal

17  methodology.  It's certainly the type of analysis that an

18  appraiser would conduct and would rely on for an appraisal

19  determination.  It does not have statistical characterization.

20  And beyond that I can't speak to the rigor of it.

21  Q    Well, let's talk in specific terms about an example of

22  your trend analysis.

23         One thing you've done in your trend analysis is look

24  at the price per square foot of properties in the proposed

25  class area and price per square foot of properties in what you

1    call your control areas; is that right?

2    A    That's correct.

3    Q    And what you're doing is you're looking at the average in

4    both places, all the houses, without regard to their size or

5    location or any other factors like that that might affect

6    their value.

7    A    Well, I don't know that that's exactly true.  By doing

8    price per square foot, we are taking size into account.  And

9    by looking at control area neighborhoods, we are taking

10   location into account and that's why this sort of analysis is

11   recommended in the text, The Appraisal of Real Estate, and why

12   it's taught to real estate appraisers.

13   Q    Well, you're comparing in this trend analysis the one

14   number for the average -- pardon me, for the price per square

15   foot for all properties in The Acreage to one number, price

16   per square foot, for all the properties in your control areas,

17   aren't you?

18   A    In the -- well, I don't have for the control areas

19   plural.  I break out to control areas, but yes.

20   Q    But that is what you're doing?

21   A    Yes.

22   Q    In fact, there is and always has been a difference

23   between the average price per square foot in the proposed

24   class area and these other areas you look at, hasn't there?

25   A    Yeah, and what we're trying to do is see if that

 1    difference changes over time.  In short, does the revelation

 2    of these environmental issues change that relationship between

 3    The Acreage price per square foot and the price per square

 4    foot in other neighborhoods.  It gives a very good measure of

 5    whether something has happened in The Acreage to cause it to

 6    now be less valuable than properties in control areas.

 7    Q    There is some baseline difference between the proposed

 8    class area price per square foot and the control area price

 9    per square foot, and what you claim to have done is look at

10    how that difference might have changed over time, right?

11    A    Yes.

12    Q    Because the raw difference itself doesn't tell you very

13    much.  It's always been there.

14    A    That's correct.  It's a before-and-after-type analysis,

15    consistent with good appraisal practice.

16    Q    Before -- the before part of that is what's the

17    difference before whatever date I'm using, whatever date you

18    are told to use for this event study approach, and the after

19    is after that, right?

20    A    Yes.

21    Q    So one thing you'd want to look at is what was the

22    difference before at some baseline, and then you'd want to

23    look at what was the difference after some relevant event,

24    right?

25    A    Yes.

```
 1  Q    And somehow you'd want to pick a difference before that
 2  wasn't -- and a difference after that wasn't confounded by
 3  other variables like differences in how these areas were
 4  affected by, say, the real estate crisis of '07, '08?
 5  A    That's a great point.
 6         Because we are comparing on a timeframe apples to
 7  apples -- in other words, we're looking at Palm Beach Gardens,
 8  we're looking at Jupiter, we're looking at The Acreage all at
 9  the same time, we're controlling for those confounding
10  factors.  And by doing a before and after, which measures
11  around the announcement time of these environmental issues,
12  we're able to measure very directly, without those confounding
13  factors interfering, just what kind of changes are occurring
14  relative to these prices at that point in time.
15  Q    Sir, you said announcement time of these environmental
16  issues.  The only announcement that was made on August 24th,
17  2009, or February 1, 2010, wasn't about environmental issues;
18  it was about the designation of a cancer cluster, wasn't it?
19  A    And I'm including that as an environmental issue.
20  Q    So now environmental issue is the mnemonic device for
21  cancer cluster?
22  A    I'm simply saying that these are environmental issues
23  which came into the public by way of an announcement at that
24  time.
25  Q    I want to -- I've called up page 11 of your direct
```

1   examination, and this is where you have a figure showing the

2   trend in price per square foot over time.  The blue line is

3   the Cotromano class area.  That's the smaller of them.  And

4   the other lines are what you call the control areas, Jupiter

5   Farms and PBCE; is that right?

6   A    Yes.

7   Q    And so to put -- well, what you say here is that a visual

8   examination of the pricing gap in Figure 1 shows that the

9   relative diminution appears to remain fairly constant.

10          Do you see that?

11  A    Yes.

12  Q    So that's one observation you've made just by eyeballing

13  the data, right?

14  A    That's correct.

15  Q    You could also eyeball this data a different way if what

16  you wanted to do was look at what was the difference before

17  the cancer cluster announcement and what was the difference

18  after.

19  A    Well, we also look at that.

20          What you're referencing is a visual examination of

21  the pricing gap that shows that the relative diminution

22  appears to be constant after the announcement.  But if we

23  measure before and after, if you look at the very narrow gap

24  back in this '04, '06, '07 timeframe, and then we skip forward

25  to '11, '12, '13, '14, we see something's happened here.

1   Q    Right.  Well, one thing that --

2   A    We see that The Acreage prices were very close to the two

3   control areas before this announcement happened, and

4   afterwards The Acreage prices, compared to the two control

5   areas, fell outta bed.

6   Q    What --

7   A    So that tells us that something very significant

8   permeated The Acreage neighborhood relative to these other

9   control areas at about that time.

10  Q    Sir, the gap you're talking about -- well, first of all,

11  the dates you've been talking about are August 2009 and

12  February 2010, and that gap, it widens long before then,

13  doesn't it?

14  A    Yeah, and in financial literature that's called

15  information leakage.  If you -- and I'm going to go back to

16  the financial economics literature right now.  You do a lot of

17  event studies in finance.  If this Court's heard finance

18  cases, it may have had finance professors sitting in this very

19  seat talking about event studies.

20       We have what's known as information leakage in

21  finance, which means that we not only wanna look at before and

22  after the dates in these event studies, but we want a buffer

23  period before and after to account for this thing that, in

24  financial economics, is called information leakage.

25  Q    Well, sir, one very significant thing that happened

 1    around 2007, around the time that gap started to widen, was

 2    the real estate crisis that hit South Florida pretty hard.

 3    A      Yeah, it hit all three of these neighborhoods.  If you

 4    look, you can see that all three of these neighborhoods start

 5    trending down in '06, and we recognize that there was a real

 6    estate crisis.  And as you can see, it hit all three of these.

 7              But for whatever reason, starting in about '08 that

 8    gap starts widening; and when you get up here to '09 and '10,

 9    something else is going on in The Acreage over and above the

10    real estate crisis, which hurt everybody.  And certainly

11    that's the timeframe of these environmental impairment

12    announcements.

13              So this is very powerful support for the notion that

14    even when you take into account the market downturn in real

15    estate, there's something else going on in the neighborhood we

16    call The Acreage.

17    Q      One thing you could do, sir, is you could look at the

18    difference before any of your effective dates that I have

19    represented here with a red oval, and you could look at the

20    difference after and see if there's any difference at all.

21    A      And you're mistaking that buffer zone for the beginning

22    of the event study.  That's why we want a buffer zone in the

23    beginning, to account for any kind of information leakage.

24    Q      Well --

25    A      We find that in studies like this, that announcements

1    don't happen in a vacuum; that there are other things early.

2    Early folks want to get out of Dodge.  They're hearing that

3    something's coming down the pike; there may be a problem.  So

4    it's appropriate to look a little earlier than your first red

5    oval.

6             And you can see that starting in about '07,

7    something very different is happening.  Some other kind of

8    information is entering the marketplace in The Acreage.

9    Q     Yeah.  You think that the cancer cluster might have been

10   entering into the consideration in '07?  Or don't you think,

11   sir, that that's the housing crisis that struck all of South

12   Florida pretty hard?

13   A     Well, it's hitting our control areas, as well.  So it's

14   not just hitting The Acreage; it's also hitting the two

15   control areas.  Everything's trending down there.  But if you

16   look at the early years, '04, '05, '06, going into '07, The

17   Acreage trends very closely.  Every one of these

18   neighborhoods, each of these three neighborhoods, is behaving

19   about the same way relative to the macroeconomic issues.  It's

20   this time period before and after these announcements where we

21   see a gap that opens, and that gap stays open into -- into the

22   present.

23   Q     Well, you say what you see in the data, but what I see in

24   the data is it's exactly the same difference there where I

25   have the red oval before as it is after.  Isn't that another

```
 1   way to look at it, sir?
 2   A    I think you're -- as I've said, you have mistakenly put
 3   that first red oval in the buffer zone.  If you back it up a
 4   year and get to before the buffer zone, which is suggested in
 5   the finance methodological literature, you're going to see
 6   that Jupiter Farms, PCVE and The Acreage all fit very tight
 7   with one another in the price per square foot basis.
 8   Q    Sir, we can fight all day about how to eyeball the data
 9   or look at it, but isn't that precisely why we have statistics
10   and the rigor of statistical analysis, so you don't just
11   eyeball the numbers, you apply rigorous science to them?
12   A    I will tell you that this sort of trend analysis is
13   commonly used by real estate appraisers.  It's recommended in
14   the appraisal literature and utilized by appraisers on a
15   regular basis for formulating determinations of value within a
16   reasonable degree of appraisal certainty.
17   Q    You could, sir, approach this kind of analysis with
18   statistical rigor, like you claim to do when you run a hedonic
19   regression, couldn't you?
20   A    There are a whole lot of possibilities.  There are
21   certainly alternative analyses one could perform, but I think
22   this analysis stands on its own legs, it's illustrative of the
23   issue, and it's certainly well-steeped in accepted appraisal
24   methodology.
25   Q    In your direct examination, page 5, in the bulleted
```

1   paragraph below -- well, midway down the page -- I'll blow it

2   up -- sir, you refer to your trend analysis in your direct

3   examination to the Court as a statistical analysis, don't you?

4   A    Yes.

5   Q    And your trend analysis is not a statistical analysis at

6   all.

7   A    I would -- I would disagree.  It is a statistical

8   analysis.  Once we start measuring means and medians and

9   trends and trends over time, we are performing a statistical

10  analysis.  Now, you may posit that we've not computed a mean

11  and a standard deviation here, but that doesn't mean that this

12  trend analysis is not an acceptable statistical analysis.

13  Q    Your trend analysis does not rely on any statistical

14  analysis, does it?

15  A    Yeah, it does.  I mean, where do you think we get these

16  mean prices from?  In short, just the computation of a mean

17  price per square foot itself is a statistical exercise.

18            I'm not suggesting that this has the same level of

19  statistical rigor as a well-done regression analysis, but it

20  is a statistical analysis.  It is what it is.  And it's

21  certainly taught that way in the appraisal texts and relied

22  upon as a statistical analysis by appraisers.

23  Q    Your deposition, page 541, line 23, to 542, line 4.

24  A    Yes.

25  Q    "Question:  The trend analysis is simpler than hedonic

1  regression?

2          "Answer:  I believe so, yes.

3          "Question:  Takes into account fewer variables?

4          "Answer:  Yes.

5          "Doesn't rely on statistical analysis?

6          "Answer:  Doesn't require it.  That's yes."

7  A    Yes.  That's exactly what I've testified to here.  It

8  doesn't have the same level of statistical rigor as a hedonic

9  regression, but it's still a statistical exercise.

10 Q    You were --

11 A    That's the sort of statistical exercise relied upon by

12 appraisers.

13 Q    You have done nothing to validate the trend analysis

14 using any of the techniques you would use with a rigorous

15 model, have you?

16 A    Well, in a way we have.  You've gotta realize that all

17 we're doing is summarizing the data that's in the marketplace.

18 So it speaks for itself.  The fact that we have summarized a

19 hundred percent of the data that's in the marketplace, we're

20 not doing any sampling, we're not doing any hypothesis

21 testing, I haven't proffered a hypothesis that this is

22 happening.  I'm simply using a statistical presentation of the

23 data in the marketplace.  It is a statistical analysis, but

24 it's a self-validating one, because we're presenting the

25 entire universe of data within the model itself.

1  Q    Your trend analysis doesn't have any validation

2  techniques that you might apply to a regression model, does

3  it?

4  A    Doesn't need them.  In short, a regression model usually

5  works on some kind of sampling.  Here we're not sampling;

6  we're just putting all of the data in the universe out of the

7  bottle and presenting it in a statistical fashion.

8  Q    You did not even test whether the observations you

9  purport to draw from your trend analysis whether any of those

10  are statistically significant, did you?

11  A    Well, what would you define as statistical significance

12  here?  In short, since we're not sampling, we're presenting

13  the entire universe of data, the concept of statistical

14  significance doesn't bear out.

15  Q    There are tests of statistical significance that you

16  could apply to your observations from the trend analysis,

17  aren't there?

18  A    No, because we're presenting the entire universe of data.

19  If we were sampling, that would be a different story, but this

20  isn't a sample.  We're presenting all of the data from these

21  three neighborhoods.  And so the statistical significance that

22  you're referring to would be applicable if we were trying to

23  test to see if the sample was valid.  But this isn't a

24  sampling exercise.  I'm statistically synopsizing all of the

25  data in the marketplace.  Nothing's sampled here.  And

```
 1    therefore a confidence interval, a measure of statistical

 2    significance, none of that applies to this kind of analysis.

 3    Q    The question, sir, is not whether the sampling is

 4    statistically significant.  The question is whether the

 5    results are statistically significant.  There are tests you

 6    could do of statistical significance, aren't there?

 7    A    No, I'm telling you you're wrong.  I mean, here's the

 8    thing.  I'm not sampling.  Because I'm not sampling, you don't

 9    run tests of statistical significance.

10            If this was a sample, then there would be tests like

11    that.  But somebody has misinformed you, counselor.  You don't

12    do a test of statistical significance on a representation of

13    the entire universe of data.  I mean, that's -- that's not --

14    I don't know where you're getting that from.

15    Q    Your deposition, page 542, line 5 to 9, referring to your

16    trend analysis:

17            "Doesn't have any tests versus statistical

18    significance?"  Question.

19            "Answer:  Well, we have not performed any.  There

20    are tests we could do, if you would like, but I have not done

21    any."

22            Did you give -- were you asked that question, sir?

23    A    Yeah --

24    Q    Let me finish, please.

25    A    Sure.
```

1   Q    Were you asked that question, and did you give that

2   answer under oath?

3   A    Yeah, I did.  And when you read it, it's sort of a

4   nonsensical question.  I could see why I was confused, because

5   this word "versus".

6          "Doesn't have any tests versus statistical

7   significance."

8          Well, sure, we've not performed any, because we

9   weren't doing any sampling exercise.  There are some tests,

10  not of statistical significance, that we could do, but they

11  really wouldn't tell us anything.  They wouldn't be very

12  useful in this context.

13  Q    You know, sir, that there are tests of statistical

14  significance, including the difference of differences tests,

15  and others that you could apply to see if these observations

16  you've offered from the trend analysis, whether those are

17  statistically valid.

18  A    Well, that's not a statistical significance test.  Sure,

19  there are some other tests we could do.  But I think the data,

20  since we're not doing the sampling, we're presenting the

21  entire population of data, none of those tests would really

22  tell us anything.  They're useful for hypothesis testing, but

23  we're not testing a hypothesis here.

24          In other words, if I wanted to test the hypothesis

25  that The Acreage is different from Jupiter, well, that's a

1   interesting classroom exercise, but that don't tell us

2   anything here, because the data speaks for itself.  We're

3   statistically representing all of the data from all three of

4   these neighborhoods, and they show a marked difference in the

5   trend line.

6          That's all this exercise does.  It's supportive of

7   the other data.  It definitely shows us that something's going

8   on here, but we're not testing any hypotheses with it.

9   Q    You know that Tom Jackson, our expert, submitted a direct

10  examination where he lays out in his direct testimony the

11  tests of statistical significance that he applied to your

12  trend analysis, don't you?

13  A    Yeah, I've read that.  I don't have his report in front

14  of me, but I think he's -- he's muddying the waters with tests

15  that don't apply in this matter.

16         In short, this data speaks for itself.  We're not

17  trying to test any hypotheses.  If Dr. Jackson wants to engage

18  in some classroom exercises, sobeit, but it really doesn't

19  contribute to the information about these three neighborhoods.

20  Q    So with this trend analysis, sir, you weren't trying to

21  test the hypothesis that there's a 25 to 40 percent diminution

22  in value?

23  A    No.

24  Q    In addition to the other critiques that he offers, you

25  know, that, the overall method is not something he would use,

```
 1    Dr. Jackson does report that there's a high probability that
 2    any of the differences you claim to observe are simply the
 3    product of random chance, doesn't he?
 4    A    Yeah, he said that.  I disagree with him.
 5    Q    I want to turn now to the contingent valuation survey
 6    method, the one we've got an asterisk next to on the chart.
 7    And I think we've established earlier that you -- the way this
 8    method works is you present a fact card with a scenario about
 9    the area you want to test to a group of survey participants;
10    is that fair?
11    A    Yes.
12    Q    And in this case, you claim to have done a web-based
13    survey of a group of people who don't live in the class area.
14    A    That's correct.
15    Q    And the reason you chose to do your survey of people who
16    don't live in the class area is because, unlike with the
17    residents who are plaintiffs you talked to earlier, you wanted
18    to avoid any bias of their results, right?
19    A    That's correct.
20    Q    But by definition, these people that you did your survey
21    on are people who have chosen not to live in the class area,
22    aren't they?
23    A    Well, they've chosen to live somewhere.  Whether they
24    made an objective choice not to live in The Acreage is not a
25    question we ask.
```

```
1   Q     Right.

2         So you didn't -- you didn't pretest these survey

3   participants to see if they had any preexisting biases against

4   living in the class area, did you?

5   A     That's correct.

6   Q     And in your fact card, you actually -- I think you refer

7   specifically to The Acreage.  So you didn't ask people, hey,

8   do you have some preexisting knowledge or bias against this

9   The Acreage neighborhood?

10  A     That's correct.

11  Q     What you did with these people that participated in the

12  survey is you asked them to -- you presented them with a fact

13  card, and then you asked them to imagine that they were buying

14  in the area you had described, right?

15  A     That's correct.

16  Q     You told them that you were asking them to make a

17  hypothetical purchase decision, not a real one?

18  A     That's correct.

19  Q     And with that introduction, that what you were asking

20  them to do was a hypothetical purchase, you asked them some

21  further questions, and you claim to have derived your

22  diminution in value number from their responses.

23  A     That's correct.

24  Q     You asked them questions like this one that I'll show

25  you.  And this is from the technical appendix to your 2011
```

```
 1   report.
 2            MR. GALLAGHER:  And I apologize.  I don't know if
 3   there's a docket entry number for this, but we'll mark it as
 4   the next hearing exhibit, if there's not.
 5   BY MR. GALLAGHER:
 6   Q    So you asked him questions like the following:  Please
 7   imagine again that you are looking for a residence in The
 8   Acreage, and you find one you like that is very similar to
 9   your current residence.  If everything were exactly the same
10   about the residences except for the location, would you be
11   willing to pay X -- and I'll get to this in a second, but you
12   offered them a range of different numbers -- for this
13   residence in The Acreage that is five to seven miles from the
14   Pratt & Whitney plant; and then you recorded their answers; is
15   that right?
16   A    That's correct.
17   Q    One question while we have this up, because it was
18   confusing to me, you said this was a web-based survey?
19   A    Yes.
20   Q    You contracted out to some other firm to do the actual
21   survey?
22   A    Yes.
23   Q    When we asked for it, you were unable to produce to us,
24   or didn't produce to us, the actual screenshots that may have
25   been used in this survey?
```

```
 1   A     I can't recall.

 2   Q     Here in the -- on the -- on this question -- and this is

 3   from your technical appendix from 2011 -- there are some

 4   instructions in red.  Do you see that?

 5   A     Yes.

 6   Q     And one of them is a parenthetical that says -- for the

 7   answer "not sure," it says:  "Do not read; really push for yes

 8   or no."  Do you see that?

 9   A     Yes.

10   Q     Do you know how that was done in a web-based format, as

11   opposed to a phone interview?

12   A     We occasionally do phone interviews to validate the

13   web-based work.  So that parenthetical is in there if, in

14   fact, we are using a phone methodology.

15   Q     Well, did you do that here?

16   A     I can't recall whether we did that or not.

17   Q     Now, sir, today, you have years of actual market data you

18   could look at from 2010 to the present to evaluate whether

19   there's been in the real world, with real buyers and sellers,

20   any impact on the market for properties in the class area,

21   don't you?

22   A     Yes, I suspect that as we go toward the damages phase of

23   this litigation, we will further hone and refine the work

24   we're doing here.  That wouldn't surprise me in the slightest.

25   We'll wanna do further investigation as we move into the
```

1    damages phase.

2    Q    And you know, because you've done this a lot, that you're

3    frequently challenged in cases for ignoring the real world

4    market data and instead relying on hypothetical questions to

5    people in a survey.

6    A    Well, I hesitate to use -- to agree with frequently.

7    There's been a couple of instances where my opinion has been

8    challenged, and since then we've added analyses, such as the

9    trend analysis, to examine actual pricing in the marketplace.

10   Q    Your explanations in other cases for ignoring the market

11   data, the real world sales, and instead looking to a CVS or

12   one of these other methods, has been to say you don't think

13   the market, the real world market out there, is actually aware

14   of whatever condition you're studying, and therefore those

15   prices won't be indicative of anything.

16   A    Well, I don't know that that's a clear synopsis of my

17   testimony.  I have testified in the past that immediately

18   after an announcement or an event that the market takes a

19   period of years to absorb that information and settle back

20   into an equilibrium.

21          House prices are what we call sticky downward.

22   People who find that their house is worth less than they

23   thought it was don't put their house on the market.  They pull

24   it off the market.  So the only people that are on the market

25   are folks that are selling to opportunistic buyers or buyers

```
 1   who are not aware of the problem.  It often takes a period of
 2   quite a few years for a new equillibrium to settle out.
 3            That having been said, there was a court case in
 4   which the Court disagreed with me on that, and who am I to
 5   argue with the Court.  So ever since then, I've -- we have --
 6   we have fleshed out our work with additional analyses of
 7   actual prices, such as the trend analysis which we have here,
 8   which, as it turns out in this case, is highly supportive of
 9   the other methodologies.
10   Q    The only method you talk about in your direct and the
11   only method you rely upon today that looks at actual sales,
12   you know, real world transactions in this class area, is your
13   trend analysis.
14   A    Which is supportive of the findings in the other
15   methodologies.
16   Q    Was this a "yes"?
17   A    Yes.  And I say, yes, and it's supportive of the findings
18   in the other methodologies.
19   Q    And you're not actually claiming here that the market was
20   not aware of the cancer cluster designation or that it was not
21   aware of allegations about contamination of the environment by
22   Pratt & Whitney, are you?
23   A    No, we've not made an investigation one way or the other
24   about that.
25   Q    Now, sir, we talked earlier about this, but you agree
```

```
 1   that the fact card is the critical component of your

 2   contingent valuation survey technique?

 3   A    Well, I kind of like the analyses, but, yes, it is a

 4   critical component.

 5   Q    So let's go back and look again at that fact card.  And,

 6   again, what you do is you present this as an indication to the

 7   people in this survey of the scenario you want them to

 8   consider as they're making this hypothetical purchase

 9   decision, right?

10   A    That's correct.

11   Q    And don't you think, sir, that when you're asking

12   somebody to make a purchase decision or hypothetical purchase

13   decision, that what you are presenting to them is actually

14   representative of the claims in the case?

15   A    Well, they're certainly representative of the facts as we

16   understood them at the time we made this survey.

17   Q    So one thing you'd want to do is give an accurate

18   representation of the area that you call here The Acreage,

19   where you are asking people to decide hey, do I want to, in

20   this hypothetical buy there?

21   A    Yes.

22   Q    And if you were going to, say, include a picture about

23   The Acreage, you would include a picture of The Acreage,

24   wouldn't you?

25   A    Well, sure.  But we presume, because of the screening
```

```
 1    questions, that our respondents already know what a house

 2    looks like, but they probably don't know what Pratt & Whitney

 3    looks like.  So we put a picture of Pratt & Whitney in here so

 4    they understand the nature of the industrial facility that

 5    lies to the north.

 6    Q    Well, you say to the north, but as I mentioned to the

 7    judge in opening, to the north, there are parts of this area

 8    that you were testing where the Pratt & Whitney facility was

 9    15 miles to the north, aren't there?

10    A    From the south end, sure.  From the north end, it's much

11    closer.

12              That having been said, all of this area is deemed

13    The Acreage, and we don't find any evidence to suggest --

14    excuse me.  I'm sorry, Your Honor.  I've got a bad cold today.

15              THE COURT:  No problem.

16              THE WITNESS:  We don't find any information to

17    suggest that there's any differentiation between the southern

18    and northern end of The Acreage.

19              MR. SCAROLA:  May I approach the witness with some

20    water, Your Honor?

21              THE WITNESS:  Actually, I've got one right here.

22              MR. SCAROLA:  Okay.

23              THE WITNESS:  Thank you for the offer.

24              THE COURT:  Do you have water, Doctor?

25              THE WITNESS:  I do, Your Honor.  Thank you for
```

1    asking.

2    BY MR. GALLAGHER:

3    Q    And you have a throat lozenge if you need one?  Because I

4    can share.

5    A    Thanks.  I've got one more here.

6    Q    Did you think, sir, when you were preparing this fact

7    card using your survey, did you think that this industrial

8    facility that you included a picture of, did you think it was

9    actually in the neighborhood?

10   A    No, we didn't believe it was in the neighborhood.  In

11   fact, we state very clearly that it's approximately five miles

12   north of The Acreage neighborhood.

13   Q    I think you said this at your deposition somewhat

14   facetiously, but you'd have to be hundreds of feet tall to see

15   this industrial facility from anywhere in the proposed class

16   area, wouldn't you?

17   A    I think you may have asked me that question somewhat

18   facetiously, and I probably agreed with you.

19   Q    Now, in the fact card, you include a comment that the --

20   all the homes in The Acreage have their own private wells, and

21   you say Pratt & Whitney is located approximately five miles

22   north of The Acreage neighborhood.  You see that?

23   A    Yes.

24   Q    Throughout the fact card you talk about water and the

25   migration of contaminants offsite in water, don't you?

```
 1   A    Yeah.  Well, I don't know that I do it throughout, but I

 2   do mention water in a couple of instances.

 3   Q    Nowhere in your fact card do you inform the people in

 4   this survey that the allegation is that not that contaminants

 5   might be transported in water, but that they've been trucked

 6   in in soil as part of some conspiracy and dumped in The

 7   Acreage?

 8   A    That's correct.

 9   Q    And you -- you tell people in this fact card when it

10   comes to the water that -- that not that there's a theoretical

11   possibility of future contamination or maybe some discrete

12   areas where there's been a trace here or there.  You tell

13   people that the groundwater is contaminated in this well

14   water-dependent community, don't you?

15   A    Well, I don't know that I'd draw that line.  If you get

16   rid of what you've got in front of me here so that I can read

17   the actual second -- or second to the last paragraph of the

18   fact card, I -- let's see here.

19   Q    Well, let me direct you to another part of it.

20        MR. GDANSKI:  Judge, there is a pending question the

21   witness is trying to answer.

22        THE COURT:  He wanted to read another portion of it,

23   so let him finish his answer after reading that.

24   BY MR. GALLAGHER:

25   Q    Go right ahead.
```

1    A     I think my representation to the respondents is

2    summarized in the last couple of sentences of that next to the

3    last paragraph where it says:  "These chemicals and wastes

4    eventually migrated outside of the facility's boundaries into

5    surrounding areas, including the Corbett Wildlife Refuge and

6    The Acreage neighborhood."

7          That sentence I think describes my understanding and

8    the understanding I wanted to convey to these respondents.

9    Q     The first thing you tell them is that you're going to

10   describe a situation that is affecting a community in Florida,

11   don't you?

12   A     Yes.

13   Q     So you don't tell them -- well, strike that.

14         And then you say, in the paragraph above the one you

15   were talking about, you describe a bunch of chemicals and oil,

16   and you say that those things migrated into surrounding areas,

17   including The Acreage, don't you?

18   A     Yes.

19   Q     Weren't you telling the people who were asking this

20   hypothetical question that they were being asked to decide

21   whether they wanted to buy in an area where there was actual

22   contamination?

23   A     I simply said that the chemicals and wastes eventually

24   migrated outside of facility's boundaries and eventually into

25   the wildlife refuge and The Acreage.  I've not elaborated any

```
 1     more than that, nor have I indicated any particular route of

 2     transmission of those migrations.

 3     Q     Right.

 4           In this hypothetical you've posed to the

 5     participants in your survey, you don't tell them to assume

 6     that the only thing that's ever been found in The Acreage are

 7     trace quantities below the level of which a lab can even

 8     characterize a sample, and that most of the testing is

 9     nondetect?

10     A     We've not made that representation.

11     Q     Do you think it's important in presenting a scenario to

12     the people in this survey to provide them with a

13     representation of the scenario that the plaintiffs are

14     actually gonna prove in their case?

15     A     Well, I'm not here to act as an attorney and develop

16     legal strategy for the attorneys.  I have conducted a survey,

17     and if there are a different set of facts, then that -- that

18     may be of interest.  But these are the facts as I understood

19     them at the time of the survey and as I conveyed to the

20     respondents at the time of the survey.

21           But I'm not -- I'm not here to outline legal

22     strategy and determine what may be proveable or not proveable

23     down the road at the liability phase in this litigation.

24     Q     The survey tests the facts that you include in the fact

25     card, not some other set of facts that may be proven at trial,
```

1    right?

2    A    That's correct.

3    Q    And the facts that you presented in your fact card to the

4    survey participants, there you specifically mention oil,

5    sodium cyanide, asbestos and mercury, don't you?

6    A    Yes.

7    Q    These are the only things you mention specifically by

8    name, aren't they?

9    A    Yes.

10   Q    And none of these are what the plaintiffs' claim is

11   about, are they?

12            MR. GDANSKI:  I object, it's outside the scope.

13            THE COURT:  Overruled if he knows.  If he doesn't

14   know, he doesn't know.

15            THE WITNESS:  You know, I don't know.  I'm not privy

16   to that aspect of the case.  All I've said was that spills and

17   leaks at the site caused chemicals, and I did not elaborate

18   any additional chemicals.

19   BY MR. GALLAGHER:

20   Q    Well, were you here in opening where Mr. Gdanski said

21   this is not a case about asbestos?

22   A    I wasn't taking notes.

23            MR. GDANSKI:  I object.  That's not what I said.

24            THE COURT:  Overruled.

25            THE WITNESS:  "And that these chemicals and wastes

```
1    eventually migrated."
2            So while I have listed some chemicals, and I use the
3    word "including" those chemicals, I've not specified which of
4    any chemicals or pollutants or wastes may have migrated onto
5    The Acreage.
6    BY MR. GALLAGHER:
7    Q    You don't, in your fact card testing willingness to pay
8    for a house in the proposed class area, you don't mention any
9    of the alleged contaminants specifically that the plaintiffs
10   rely upon in their case, do you?
11   A    No.
12   Q    Don't you think if what you're being asked to do is to
13   test whether there's a diminution in value in property based
14   on something that the facts of this case would suggest is
15   attributable to Pratt & Whitney, that you should present a
16   fact card that is -- that fits the facts of this case?
17   A    In my experience -- and I've been working on these kinds
18   of cases for a lot of years, and I've done a lot of surveys
19   like this, I don't find and the literature doesn't find that
20   market participants fine tune their opinions based on a
21   chemistry test.
22           So if we've shown that there are a number of
23   commonly identifiable chemicals, like oil and mercury, things
24   that people understand, they're familiar with these, we've not
25   found and the published literature in the appraisal field has
```

```
1    not found that people's opinions would change if they were

2    told there were furans or trichlorethylene or dioxins,

3    chemicals that people might not be familiar with.

4            So we've given them a illustrative list of

5    chemicals.  We've shown that there's chemical contamination,

6    we've asked them to assume that there's some offsite migration

7    of these chemical contaminants, and that this environmental

8    issue is affecting this neighborhood, which lies at its

9    closest .5 miles to the south.

10   Q    In your experience --

11   A    That, in our experience, is a powerful enough basis in

12   which conduct a survey.

13   Q    In your experience, it doesn't really matter what

14   specific chemicals or what specific facts you include, you're

15   going to get results that tell you that they find a diminution

16   in value?

17           MR. GDANSKI:  Object.  It's compound, Judge.  I

18   object.

19           THE COURT:  Overruled.

20           THE WITNESS:  It's not just my experience.  It's

21   also the synopsis of the scholarly literature.

22           And, you know, it's kind of common sense.  I mean,

23   when you think about it from an appraiser's perspective, even

24   if I was a run of the mill MAI appraiser who was appraising

25   one of these houses in The Acreage, I would know that a buyer
```

1  would pay less for a house that was affected by environmental

2  issues than he or she would pay for a house that wasn't

3  affected by environmental issues.  That's kind of common

4  sense.

5         And so when you look at this survey, and you look at

6  the scholarly literature and all of the scholarship that's

7  been done and the impact of environmental contamination of

8  real estate values, there's one clear message that's common

9  throughout that literature; and, that is, that houses which

10 are affected by environmental contamination are systematically

11 worth less than houses that are not infected by environmental

12 contamination.

13 BY MR. GALLAGHER:

14 Q    So I'm sure you've done a lot of these tests, these

15 surveys, right?

16 A    Yes.

17 Q    And you've used a lot of different explanations and

18 descriptions of what goes on, right?

19 A    Yes.

20 Q    And you routinely see that the respondents say that they

21 would -- you know, that they would pay less, and that leads

22 you to a determination of a diminution in value, right?

23 A    Right.

24 Q    And you say it doesn't really matter, because they're not

25 chemists what particular things you put in your fact card,

1   right?

2   A     That's correct.

3   Q     And you say it's common sense that people presented with

4   a scary set of chemicals and a scenario where a neighborhood

5   is described as affected are gonna say I'm less willing to buy

6   there, right?

7   A     Right.

8   Q     But if the question is how much less, on the specific

9   facts of this case, don't you think you should provide a

10  factual scenario that actually fits this case?

11  A     Well, we provided a factual scenario that's not

12  dissimilar to this case.  And our findings in the literature

13  and our findings in the many, many studies we've done in cases

14  like this over the years is that the end result, the final

15  diminution value for a neighborhood like this, does not wiggle

16  around very much based on exactly which chemicals may be at

17  issue here.  If there's a belief on the part of the market

18  participants that there are environmental issues, chemicals

19  borne into this neighborhood which may be hazardous, then

20  those market participants are going to pay less, and it's a

21  fairly consistent amount less for these houses than they would

22  pay for houses in an unpolluted or unaffected or

23  uncontaminated or unstigmatized neighborhood.

24  Q     But if the question, sir, is whether it's on the specific

25  facts of this case a 25 percent or a 27 percent or a 2 percent

1   diminution in value, don't you think it would be important to

2   actually do a survey that was based on the actual facts of

3   this case and the important ones?

4   A    Well, it's not 2 percent.  I mean, that's just being

5   silly.  That's a rounding error.

6          We know that for this kind of situation, and if we

7   look at the literature, it's plain as day, we're going to have

8   a diminution in value that's somewhere in the range that we're

9   finding here.  So that's fairly consistent throughout the

10  published both scholarly and professional literature.

11         These facts as presented in this fact card may not

12  be precisely what ends up being proven to a jury -- and indeed

13  this fact card was developed independent of any discussion of

14  legal strategy with the attorneys.  But that having been said,

15  I would not expect that respondents to the survey would answer

16  remarkably differently if they were told these were dioxins

17  and furans and nucleotides and such than what we've presented

18  to them here.

19  Q    If you've done a bunch of these surveys over the years,

20  and it doesn't really matter what chemicals you put in there,

21  whether they're even the ones the plaintiffs in this case

22  claim, and it's your experience that you get a similar set of

23  results no matter what, why'd you even bother to do a survey

24  in this case?

25  A    It's important every time we tackle a case like this to

1  refresh what we're doing, to refresh it to the local

2  neighborhood, to name the acreage, to conduct a survey of new

3  batch of market participants.  But I do think that it's

4  telling that of all the surveys we've conducted over the

5  years, there's been a fair amount of consistency with respect

6  to the findings over the year.

7  Q    You didn't do a new survey when you took on the Cotromano

8  case where there were whole new factual allegations of a

9  nuclear incident, contamination with radioactive materials and

10  a trucking mechanism instead of groundwater, did you?

11  A    No.

12  Q    Whether you think it matters or not, courts have excluded

13  your contingent valuation survey methodology where your fact

14  card does not match up with the facts of the case, haven't

15  they?

16          MR. GDANSKI:  Judge, I object.  It's improper cross.

17          THE COURT:  Sustained.

18  BY MR. GALLAGHER:

19  Q    Well, you know, sir, that courts have found that it's

20  important for your fact card to actually match up to the facts

21  of the case?

22          MR. GDANSKI:  Same objection.

23          THE COURT:  You can argue that to me later.

24          MR. GALLAGHER:  Bear with me one moment.  I

25  apologize.

```
 1              I'll save that argument, Your Honor.  And with that,
 2    I have no further questions.
 3              THE COURT:  All right.  Thank you.
 4              All right.  Are you going to do the redirect?
 5              MR. GDANSKI:  That's the plan.
 6              THE COURT:  How long do you think it's going to be?
 7    Just roughly.  Is it 15 minutes or an hour and a half?
 8              MR. GDANSKI:  It's longer than 15 minutes.  I don't
 9    know if it will take up the whole day, but what is it now?
10    It's 3:45.  I'd say it would probably take us 'til -- you
11    know, an hour, give or take.
12              THE COURT:  All right.  Why don't we, when you get
13    to a point where you think it makes sense to break, let's take
14    another break before -- because we're going to be going until
15    5:30.
16              MR. GDANSKI:  Then maybe let's -- I don't want to
17    not go -- okay.  We'll do it that way.  That's fine.  We can
18    just jump right in, and we'll take a break in a little bit.
19              THE COURT:  Or if you want to take a break now and
20    we'll go straight to 5:30, it's up to you.
21              MR. GALLAGHER:  If you want us to move our equipment
22    out of your way, we'll be happy to do it.
23              MR. GDANSKI:  That's part of it, but let me spend
24    some time with the witness and we'll take a break and clean up
25    the equipment.  Is that okay with the Court?
```

```
 1              THE COURT:  Sure.

 2              MR. GDANSKI:  Thank you.

 3                    Redirect Examination

 4  BY MR. GDANSKI:

 5  Q    Hi, Dr. Kilpatrick.  How you doing?

 6  A    Doing fine.

 7  Q    Feeling all right?

 8  A    Like I say, I got a head cold.

 9  Q    Okay.  Well, I just want to go over, in the time we have,

10  and hopefully we'll finish it all today, some of the different

11  points that have come up, and I want to try to do it in the

12  same order, as best as we can, that Mr. Gallagher went through

13  and started his examination.  Okay?

14  A    Sure.

15  Q    So let's start at the beginning.

16              One of the subject matters that you had discussed

17  with Mr. Gallagher was the class area for the Adinolfe class

18  and the subclass of the Cotromano class.

19              COURT REPORTER:  Sir, you're going to have to slow

20  it down.  Repeat your question.

21              MR. GDANSKI:  Sure.

22  BY MR. GDANSKI:

23  Q    One of the areas you had discussed was the class areas

24  for the Adinolfe class and the Cotromano class, right?

25  A    That's correct.
```

```
 1   Q    And what does it mean to you and why is it that you've
 2   defined the Cotromano class as a subclass?
 3   A    We mapped it.  We had our geographic information systems
 4   department map the Cotromano class, and we found in all
 5   respects it was a geographic subset of the Adinolfe class.
 6   Q    And does a subclass necessarily contain within it the
 7   entire Adinolfe class?
 8   A    The other way around.  The subclass --
 9   Q    Right.
10   A    The Adinolfe class would contain within it the entire
11   Cotromano class.
12   Q    That's what I meant.  The subclass is necessarily
13   contained within the larger class.
14   A    That's correct.
15   Q    Okay.  And on the discussion of the drawing of the
16   boundaries, you had a conversation about how the -- you know,
17   the term lines on paper or lines on a map or something like
18   that was used.
19        Dr. Kilpatrick, can you explain how is it that you
20   verified these class boundaries are definable and they are
21   measurable and they are a clearly defined group, as opposed to
22   just arbitrary, whimsical lines on a map.
23        MR. GALLAGHER:  Objection; leading, argumentative.
24        THE COURT:  Overruled.
25        THE WITNESS:  Well, we did a couple of things.
```

```
 1            Number one, of course, I've already indicated very
 2   early in the case, I went to The Acreage and spent a good bit
 3   of time driving nearly every road in The Acreage to ascertain
 4   the homogeneity of the market.
 5            Number two, I had our geographic information systems
 6   department map Adinolfe to verify that the boundaries were
 7   discernible, that they were measurable, and that we could
 8   identify properties within those boundaries.  In short, we
 9   were able to identify a hundred percent of the properties
10   using GIS techniques.
11            Number three, we conducted some very early inquiries
12   about this area, The Acreage, and we found that this entire
13   area expressed in the Adinolfe class boundary was an area
14   commonly referred to as The Acreage.  In short, if you were
15   coming in here from California and you wanted to buy a house
16   and you told a realtor I'd like to buy a house in The Acreage,
17   this Adinolfe area would represent the area of properties that
18   that realtor might show you.
19   BY MR. GDANSKI:
20   Q    On that last point, how did you verify that?
21   A    We spoke with some local real estate appraisers, just
22   informal conversations about what do you consider The Acreage
23   to be.  I can't recall if we showed them any maps or not, but
24   they were able to describe to us the boundaries in such
25   fashion that we were able to reliably utilize the Adinolfe
```

1    boundaries as The Acreage.

2    Q    Okay.  And I think you used the term that this is a

3    homogeneous unit.  It's a homogeneous class, right?

4    A    Right.

5    Q    What did you mean by that from a property appraiser's

6    scientific perspective?

7    A    Well, first I'm going to put it in very, very layperson's

8    terms.  Pretty much every house in this area looks a lot

9    pretty much like everybody else's house in this area.  There

10   aren't any Bill Gates mansions in the area.  There aren't any

11   oceanfront properties in the area.

12            There are houses on smaller lots, there are houses

13   on bigger lots.  But you typically -- I didn't see any 10,000

14   square foot houses.  When I drove up and down these roads, I

15   saw 1500 to 3000-square-foot houses that people mow their own

16   lawns.  Some of them were on two-acre lots, some of them were

17   on 15-acre lots.  That's an easily adjustable difference in an

18   appraisal model.  Some people had horses in their backyard;

19   some people had pickup trucks up on concrete blocks.  That

20   does not mean that these properties are not relatively

21   homogeneous with one another and could not be modeled within

22   the same kind of hedonic model.

23   Q    Have you seen communities that are not what you would

24   describe as homogeneous, but, rather, heterogeneous?

25   A    Yes.

```
 1    Q     Is this one of them?

 2    A     No.

 3    Q     And you mentioned that you also used in order to define

 4    the class boundaries some of the Greenfield methodologies, the

 5    mechanisms that Greenfield uses, right?

 6    A     In order to understand the class boundaries, yes.

 7    Q     Okay.  Specifically what?

 8    A     We have what we call a GIS department.  It stands for

 9    geographic information systems.  You might think of it as a

10    mapping department or cartography department.  But they serve

11    us by doing statistical analyses on geographic areas.  They're

12    able to very accurately map this area, these boundaries as

13    provided to us, and demonstrate to us that this area and all

14    the properties within it are ascertainable.

15    Q     And using that term, "ascertainability," does the

16    Adinolfe, so the broader class that contains within it the

17    Cotromano class, does the Adinolfe class boundary consist of a

18    contiguous, discernible, definable and clearly ascertainable

19    tract of properties?

20              MR. GALLAGHER:  I'm going to object, Your Honor.

21    That calls for a legal conclusion to the extent they're

22    suggesting that the witness can say something is or is not

23    ascertainable within the meaning of the legal requirements for

24    a class.

25              THE COURT:  I'll let him speak from a appraiser
```

```
 1   standpoint.  You can give me your appraisal opinion about that
 2   question.
 3             THE WITNESS:  Thank you, Your Honor.
 4             We can certainly ascertain each and every property
 5   within the area.  These are actually easily ascertainable with
 6   public records.  We know that this is a contiguous area, and
 7   it's easily definable.
 8   BY MR. GDANSKI:
 9   Q    And I want to -- maybe we'll take a break after this
10   point and this question, we'll come back to it.
11             Does the definition that we've utilized to define
12   this continuous tract of properties necessarily mean that
13   there are no properties outside of it that are stigmatized?
14   A    No, no, it does not mean that.  There may very well be
15   properties outside which suffer from the same stigma as the
16   ones inside.
17   Q    And am I understanding the conversation you had with
18   Mr. Gallagher and your point in that matter to be the fact
19   that there may be homes outside of The Acreage which may be
20   stigmatized is not the point, so long as you can and have
21   appropriately demonstrated that all of the homes within
22   the class --
23             MR. GALLAGHER:  (Stands.)
24             THE COURT:  I'll sustain the objection that's coming
25   that's a leading question.  So rephrase your question.
```

```
 1              MR. GDANSKI:  Fair enough.
 2   BY MR. GDANSKI:
 3   Q    Have you been able to demonstrate to the satisfaction of
 4   reasonable degrees of property appraiser certainty and
 5   scientific certainty from your perspective that the homes
 6   within the class boundary do, in fact, have levels of
 7   depreciation from stigma from contamination?
 8   A    Yes.
 9              MR. GDANSKI:  I'll come back to it, but we can
10   certainly take a break now.
11              THE COURT:  Let's take another 10-minute recess.
12   Thank you.
13        (A recess was taken from 3:55 p.m. to 4:08 p.m., after
14   which the following proceedings were had:)
15              THE COURT:  Please be seated, everyone.
16              All right.  You may continue your redirect.
17              MR. GDANSKI:  Thank you.  Please the Court.
18   BY MR. GDANSKI:
19   Q    Okay.  Dr. Kilpatrick, in identifying the discernible and
20   contiguous area of the class, were you able to evaluate
21   whether or not the stigma was class-wide?
22   A    Yes.
23   Q    Would you have told us if there were tracts of land,
24   groups of space, developments, specific communities that you
25   were able to identify and say, hey, within this class I don't
```

1    see that this section was stigmatized?  Would you have told us

2    that?

3    A    Yes.

4    Q    Did you see any such evidence of that?

5    A    No.

6    Q    Why is not just the contiguity of space but the

7    uniformity of stigma something that helps you understand the

8    impact that the contamination would have on creating

9    uniformity of stigma?

10   A    Throughout the neighborhood, people identified that they

11   live in The Acreage.  More to the point, people from outside

12   that may want to buy into this neighborhood identify all of it

13   as The Acreage.  The Acreage has come to be identified with

14   this environmental problem.  So that stigma is ubiquitous, and

15   I find no reason to doubt that it's uniform throughout all of

16   the area which is defined as The Acreage.

17   Q    One of the discussions you had was a question posed to

18   you whether or not your analysis is, quote, black box

19   analysis, and you said it is not, but it is a reconciliation,

20   right?

21   A    That's correct.

22   Q    Okay.  What's the difference, and why is your analysis a

23   reconciliation analysis?

24   A    Two appraisers looking at the same set of data would be

25   expected to reconcile the data in nearly the same way.  The --

1    the various approaches or methodologies which are -- have the

2    strongest indication, in this case have the most rigorous

3    underlying analyses, are given the most weight.  And let me

4    give you an example.

5            The IRS requires that an appraiser give the most

6    weight to the comparable with the fewest adjustments.

7            So here, we would give the most weight to the most

8    technically rigorous methodologies.  But in this case, all of

9    these methodologies are internally supportive.  In other

10   words, if I look at the meta-analysis, it gives a fairly high

11   indication of diminution in value, but it's not outside of the

12   reasonable range.

13           If I look at the trend analysis, while we don't rely

14   on it for our calculations, it's a little on the low side.

15   Kind of expect that, because it takes a while for prices to

16   reach equillibrium.

17           If we look at the CV survey, you know, it gives us

18   what it gives us.

19           If I go to the published literature, the scholarly

20   literature on this subject, I'm going to see diminution in

21   value ranges in the 15 to -- excuse me, the 25 to 40 percent

22   range.

23           So each of these methodologies stand on their own

24   legs, but any two or three appraisers looking at this data

25   would be expected to put the most weight on the most

 1   technically rigorous methodologies.

 2   Q    Okay.   So I'm going to try to go through some of these.

 3        One of the things that I heard you say was that your

 4   methodology is consistent with what you called appraisal

 5   standard rule number 1, right?

 6   A    That is correct.

 7   Q    So what are the appraisal standards, and how did you

 8   utilize them?

 9        And we can pull up rule number 1, please.

10   A    Sure.   Just a very brief history.   FIRREA, the Financial

11   Institutions Reform, Recovery and Enforcement Act of 1989,

12   mandated that federally regulated lenders adopt a common set

13   of standards for appraisal and a common set of standards for

14   appraisal licensure.

15        The Appraisal Foundation in Washington was created

16   as a 501(c)(3).   It's provided with Congressional oversight by

17   a group called the Appraisal Subcommittee.   They do several

18   things.   They proffer semiannually -- excuse me, biannually a

19   book called the Uniform Standards of Professional Appraisal

20   Practice.   This has been adopted in all states as the

21   appraisal standards guidance.   They also proffer standards for

22   licensure, and then they license the nationally certified

23   appraisal of standards instructors, of which I'm one.

24        So every state, including Florida, has adopted this

25   book of standards.   Standard number 1 governs the conduct of

1    an individual appraisal.

2    Q    Okay.  So you were just commenting on the standard

3    number 1, right?

4    A    Yes.

5    Q    Does standard number 1 impact and inform the methodology

6    and the approach you take to a case like this?

7    A    Yes.

8    Q    Have you complied with every aspect of standard number 1?

9    A    We believe so, yes.

10   Q    Let's walk through it for us, please, and tell us how you

11   complied.

12   A    Well, standard Rule 1-1 is somewhat overarching.  It says

13   be aware of, understand and correctly employ those recognized

14   methods and techniques that are necessary to produce a

15   credible appraisal.  We certainly believe we've followed that

16   standard to the T.

17          Subparagraph B, not commit a substantial error of

18   omission or commission that significantly affects an

19   appraisal; and

20          C, not render appraisal services in a careless or

21   negligent manner, such as by making a series of errors,

22   although individually might not significantly affect the

23   results, in the aggregate affect the credibility of those

24   results.

25          We believe we've been governed by all three of

```
 1   those.

 2   Q    Okay.

 3   A    And have adhered to them.

 4        If you'll go on to the next page.

 5   Q    You want to go to rule number 2?

 6   A    No, to the second page of rule number 1.  It will be

 7   Standards Rule 1-2.  If you don't have that, there are about

 8   six pages of Standard Rule 1-1, and we've --

 9   Q    Is that it?

10   A    No -- yeah, sure is.

11   Q    Okay.

12   A    We've identified the client and other intended users,

13   identified the intended use of the appraisers opinions and

14   conclusions, identified the type of value, which is, of

15   course, market value.  And if the market value -- ascertain

16   whether the value is to be the most probable price.  In short,

17   we are aiming for a market value, which is the most probable

18   price that would be paid.

19        Now, why is that important?  We're not interested in

20   the highest or lowest price, we've interested in the most

21   probable price that a knowledgeable prudent buyer would pay

22   and that a knowledgeable prudent seller would accept for a

23   transaction in this marketplace.

24        Identify the effective date of the appraiser's

25   opinions and conclusions.
```

```
1              As I've pointed out, we can't run our AVM until this
2    Court proffers an effective date.  So we're going to need that
3    to be able to promulgate our AVM.
4              And identify the characteristics of the property --
5              COURT REPORTER:  Sir, sir.  Slow down, sir.
6              THE WITNESS:  I'm sorry.
7              Identify the characteristics of the property that
8    are relevant to the type and definition of value and intended
9    use of the appraisal.
10             So throughout our reports here, we've endeavored to
11   identify those characteristics which are salient to the
12   opinions I'm proffering.
13   BY MR. GDANSKI:
14   Q    And have you successfully done that, identified the
15   characteristics that are salient to the properties that you're
16   discussing to the satisfaction of the -- which gave you the
17   ability to demarcate the properties and to measure the
18   presence of stigma?
19   A    We believe so, yes.
20   Q    Going back to Rule 1-1 for one second if we can, please.
21   A    Looks like somebody's drawn on my screen here.
22   Q    Mine, too.  I'm not entirely sure where it's coming from.
23   There it is.
24             Going back to Rule 1-1.  So it says:  Be aware of,
25   understand and correctly employ those recognized methods and
```

```
 1    techniques that are necessary to produce a credible appraisal.
 2    A    Yes.
 3    Q    Looking at that and reflecting on the different
 4    methodologies that you've utilized, are each of the
 5    methodologies -- so the informal survey, the literature
 6    review, the case study, the meta-analysis and the CVS -- are
 7    those each independently recognized appropriate methodologies
 8    to do an appraisal like you've done in this case?
 9    A    Yes.  If you go -- and I won't deny trend analysis, as
10    well.  If you -- if you go to the salient professional
11    literature, to the texts, which are published on appraisal
12    valuation, appraisal methodologies, you will find discussions
13    on the conduct of each of these tools and techniques.
14    Q    And you added trend analysis to my question?
15    A    Yes.
16    Q    Okay.  The next question I have for you is this.  Are
17    each of these methods -- the informal survey, the literature
18    review, the case study, the meta-analysis, the CVS and the
19    trend analysis that you've done in this case -- do they each,
20    independent of each other, in a manner that is recognized as
21    appropriate within the context of appraisal standards, do they
22    each independent of each other demonstrate the presence of
23    stigma and depreciated home values to some degree in The
24    Acreage?
25    A    Yes.
```

```
 1                 THE COURT:  Hold on.

 2                 MR. GALLAGHER:  I would object, leading.

 3                 THE COURT:  Overruled.

 4    BY MR. GDANSKI:

 5    Q    What was your answer?

 6    A    Yes.

 7    Q    And do you then -- am I understanding that the process of

 8    reconciliation is then to take all of that and put it

 9    together?

10    A    In order to develop a measurement, that is to say the 25

11    to 40 percent, we then take all of that, put it together and

12    look at those methodologies which are underlying -- have

13    underlying rigorous techniques --

14    Q    Okay.

15    A    -- and give them the most weight.

16                 But in order to simply determine that there is

17    market-wide stigma throughout The Acreage, each of these

18    stands on its own legs.

19    Q    For example, if all you did was sales trend analysis,

20    could you come to court and say, through the use of an

21    appropriate methodology, that The Acreage properties are

22    stigmatized from contamination?

23    A    Certainly appears to be.

24    Q    And could you do the same thing for each and every one of

25    these methodologies independent of each other?
```

1    A     Yes.

2    Q     Okay.  This process where you have independent

3    methodologies in each of these, have you written on each of

4    these or lectured on each of these methodologies and their

5    utility as an appraiser?

6    A     And taught on them and on occasion won awards on them.

7    Q     How is that?  What are you referring to?

8    A     Oh, on contingent valuation, in 2014, the American -- the

9    International Association of Assessing Officers awarded myself

10   and two of my colleagues the best technical paper of the year

11   award on a paper that we published in a journal, in a

12   peer-reviewed journal, on contingent valuation.

13   Q     I want to just -- I'm going a bit out of order, but one

14   of the discussions you had was about the use of the term

15   cancer cluster versus contamination, or something along the

16   lines of contamination.  I forget exactly what it was.  You

17   remember that?

18   A     Yes.

19   Q     Okay.  Does that discussion of the change in the term in

20   the report from cancer cluster to contamination in The

21   Acreage, does that have any impact -- let's assume that

22   Mr. Gallagher's correct and it's meaningful.  Does that have

23   any impact whatsoever at all on sales trend analysis?

24   A     Does not appear to, no.

25   Q     Does it have any impact whatsoever on the literature

1    review which substantiates depreciation in The Acreage?

2    A    No.

3    Q    Does it have any impact whatsoever on the meta-analysis?

4    A    No.

5    Q    Okay.  Did it have any impact whatsoever on the

6    conclusion reached in the report based on the informal survey

7    and the CVS from which those claims came?

8    A    That's been my testimony, yes.

9    Q    And did the fact that you characterized it in one report

10   as a cancer cluster and the next report as a contamination, or

11   evidence of contamination in The Acreage, did that impact the

12   conclusion, the bottom line that there's stigma in The

13   Acreage?

14   A    Would you repeat the question?  I want to make sure I

15   heard it properly.

16   Q    Mr. Scarola's thankfully pointing something out.  I think

17   we talked over each other on the last answer.

18          I'm asking you, you had a long discussion where

19   Mr. Gallagher walked you through several different portions in

20   the report where the term was changed from cancer cluster to

21   something else.  Remember that?

22   A    Yes.

23   Q    Did that change have any impact on the bottom line

24   opinion that you reached that there's diminution in The

25   Acreage?

```
 1   A     No.

 2   Q     Why not?

 3   A     As we've discussed here in the last few minutes, these

 4   various methodologies, which stand on their own legs, show us

 5   that the kind of environmental issues, environmental problems

 6   which are systematic throughout The Acreage, render an

 7   environmental stigma, which is diminishing home values.  And

 8   that is irrespective of whether we use the term "cancer

 9   cluster" or not.

10   Q     Okay.  And I'd like to pull up one of the charts that you

11   had in your report I think you were shown.

12         MR. GDANSKI:  It's K-5, Jonathan, please.  And if we

13   could blow up Figure 1, please.

14   BY MR. GDANSKI:

15   Q     So explain to us what we're looking at here and why it is

16   an independent corroborator and demonstrator of depreciation

17   values and stigma in The Acreage from Pratt & Whitney

18   contamination.

19   A     All right.  Let me -- let me walk through it very slowly.

20   Q     Please.

21   A     Because it was . . . there were a couple of things going

22   on in the cross-examination a minute ago.

23         Number one, there was an economic meltdown in which

24   residential real estate prices fell.  We can see that that

25   peak was during in the 2005-2006 period.  All three
```

1    neighborhoods in question were tracking very close to one

2    another, and all three of them turned downward in the 2006,

3    2007, 2008 period.  That's unquestionably part of the mortgage

4    meltdown that was in all the papers.

5              But now something else is going to.  If you look

6    after 2007, 2007, 2008, 2009, something is causing Cotromano

7    class area to differentiate from the other two control areas.

8    Something's carrying it lower than just the mortgage meltdown.

9    And if we -- if you look at that period of time in the

10   2009-2010 period, when information was being disseminated into

11   the marketplace, we can clearly see before then The Acreage

12   trended very closely to the other two.  After then, The

13   Acreage has a big gap between the other -- it and the other

14   two.  That gap would be explained by whatever information,

15   whatever new information came into the marketplace in that

16   2009-2010 period.  And that we would identify as the

17   information about environmental stigma.

18   Q    Okay.  Is this, what you're discussing, the component of

19   your opinions called trend analysis?

20   A    Yes.

21   Q    Is that the same as meta-analysis, or is that different?

22   A    That's different.

23   Q    Okay.  Is trend analysis listed up here?

24   A    It is in red there at the bottom, trend analysis.

25   Q    All right.

```
 1    A    We added trend analysis after we stopped using the

 2    hedonic regression as a methodology.

 3    Q    Okay.  Have you consistently, since 2016, in your first

 4    report from 2016, going forward until today, utilized trend

 5    analysis as an independent basis to demonstrate stigma in The

 6    Acreage?

 7    A    Yes.

 8    Q    Let's take a look at K5, page 3, please.  And let's blow

 9    up the top chart.

10             This is another chart that you're familiar with?

11    A    Yes.

12    Q    I don't think it was shown on cross, but can you explain

13    the significance of this chart relative to how you can use

14    this to show that the depreciation in The Acreage is not

15    moving at the same speed and the same up and down as the rest

16    of the market?

17    A    Something very interesting happens after there's

18    information about environmental stigma.  Most people hold

19    their properties off the market.  They understand that the

20    values have gone down.  They often can't sell their houses

21    because they're underwater.  But those people who can sell

22    their houses typically want to dump them.  They want to get

23    the house sold, get out of this neighborhood, get their kids

24    to a safer place to live.

25             So as you can see, prior to the 2006, 2007, 2008
```

 1   timeframe, the days on the market trended very well between

 2   the -- among the three neighborhoods.  After 2008, the

 3   Cotromano class area, The Acreage, days on the market trends

 4   materially lower than the other two neighborhoods.

 5           That suggests to us that for a period of time there,

 6   people in The Acreage were dumping their properties.  They

 7   were quick to sell.

 8           There was a study out of Chicago a couple of years

 9   ago, and I unfortunately can't give you the citation of the

10   study, that if you want to maximize the value on your home's

11   sale, you hold it off the market longer; that is to say,

12   you'll have more days on the market.  You will not accept

13   those early offers that are coming in.

14           So the blue trend line here for The Acreage

15   indicates to me that these sellers are taking whatever first

16   offer is coming in the door, compared to Jupiter and PBCE.

17   Q    Is that conclusion you just articulated one you have and

18   hold to a reasonable degree of appraisal certainty?

19   A    Yes.

20   Q    Okay.  And what's the significance -- so why is it

21   significant to the analysis of demonstrating stigma from Pratt

22   & Whitney that they're selling their property at faster rates

23   and keeping it fewer days on the market?

24   A    If you couple that with the lower prices, it's indicative

25   of dumping properties, dumping their homes.

1    Q    Okay.  Did you use the trend analysis, this data, the

2    conglomerate of it, all of the charts and all of the trend

3    analysis, to substantiate the 25 to 40 percent average stigma

4    depreciation in prices?

5    A    Yes, it provides support for that.

6    Q    How so?

7    A    It is consistent with the conclusions that we find in the

8    other methodologies.

9    Q    Let's take a look at K5, page 2, please.

10           And so here's one more chart from your testimony

11   from page 4, paragraph 10 of your direct testimony.  And tell

12   us what we're looking at here, please.

13   A    We're looking at raw comparative sales prices.  Note this

14   is not a price per square foot.  These are just raw

15   comparative sales prices.  And this suggests to us, again,

16   that raw prices trend downward relative to the other two

17   neighborhoods after 2007-2008, and they stay at a gap below

18   Jupiter Farms following these environmental announcements.

19   Q    One of the discussions you had was about the two

20   potential different effective dates within the class.  Do you

21   remember that?

22   A    Yes.

23   Q    Does anything about the effective date that is chosen by

24   the Court or by the attorneys when they plead their case on

25   behalf of their clients impact the specific analysis that you

1   do, or do you do the analysis independent of the date we

2   choose or the Court chooses?

3   A    The impaired analysis --

4   Q    Right.

5   A    -- which we present here, is not affected by small

6   changes in that date.  The unimpaired values, which I will

7   proffer depend on, A, final determination of the class area,

8   and, B, the establishment of an effective date of that class

9   area.

10  Q    Okay.  And the image that was put up of the two different

11  class dates and then the people in between, do you remember

12  that?

13  A    Yes.

14  Q    Okay.  If the class is certified at the earlier date,

15  those people would presumably be class members, right?  Makes

16  sense?

17  A    You know, that's a legal determination --

18  Q    Okay.

19  A    -- outside of the bounds of my expertise.

20  Q    Let's assume the class is certified at the earlier date,

21  and those people who purchased their homes during that

22  interval period are considered class members.

23        Does that change whether or not they actually have

24  diminution of property value?

25  A    No.

```
1    Q     Let's assume the class is certified at the second date.

2    Does that change whether those people actually have diminution

3    in property value?

4    A     No.

5    Q     Does the fact of property value exist as a metric that

6    can currently be measured from either of the two proposed

7    class dates, Adinolfe or Cotromano?

8    A     That's correct.

9    Q     How does that work?  Because you looked at the chart, and

10   it looked like for a second, you know -- explain what you were

11   saying.  Explain your point.

12   A     Well, we're looking at properties, not at who owned that

13   property as of a given time.  So the fact that a property may

14   have changed hands in between September of 2009 and February

15   of 2010 does not change my analysis.  It's certainly not at

16   the impaired state.  It may have a minor impact on the

17   unimpaired value, but not by much.

18   Q     Okay.  Have you, in the -- I want to put in context for

19   the benefit of the Court the difference between proving fact

20   of stigma and class-wide fact of stigma and depreciation

21   versus what the GAVM model can and will do to prove specific

22   levels of stigma on individual properties.  Can you put that

23   into context and explain that?

24   A     Sure.

25              Well, at this juncture, from an appraisal
```

```
 1   perspective, we've certainly found much more than sufficient
 2   evidence to support a conclusion that there is
 3   neighborhood-wide stigma in The Acreage.  The question now is
 4   putting an unimpaired dollar figure and therefore an impaired
 5   dollar figure and a degree -- a dollar figure diminution of
 6   value on each and every one of these 15,000 or so houses, and
 7   we would do that once we had a date and a boundary using the
 8   GAVM.
 9           So I would run my AVM, automated valuation model,
10   for each one of these 15,000 properties.  That would produce
11   an unimpaired value.  I'd be using comparables from outside of
12   The Acreage to ascertain that.  We would then apply the
13   diminution measure.  And as I've indicated, we expect that we
14   would continue to do further analysis, further honing and
15   fine-tuning of this measure of diminution as we get into a
16   damages phase.
17           But we would proffer for each and every one of these
18   houses three numbers for the Court; an unimpaired value
19   produced by the AVM, a degree of impairment produced using
20   this, and then an impaired value, which is the difference
21   between the two.
22   Q   If the -- assume for a second that the question at this
23   stage was demonstrating the class-wide presence of
24   stigmatization and depreciation of homes in The Acreage from
25   contamination at Pratt & Whitney.  Have you done that to the
```

1   satisfaction of ordinary generally accepted real estate

2   appraisal methods?

3   A    Yes, we've concluded within a reasonable degree of

4   appraisal certainty that homes in The Acreage are stigmatized

5   as a result of these environmental factors.

6   Q    Have you adjusted for other potential contributing

7   causes?

8   A    Well, one that came up here in the courtroom today was

9   the mortgage market meltdown, and we've examined through the

10  trend analysis that both The Acreage and comparable

11  neighborhoods suffered from mortgage market meltdown.  But

12  once that was over with, The Acreage further fell relative to

13  the control areas during that period of time when information

14  about environmental hazards were coming into the marketplace.

15  Q    Have you utilized the same mass appraisal methods in the

16  past both in the academic setting, the professional setting

17  and the legal setting in the same manner which you're doing it

18  in this case to compute and demonstrate presence of mass-wide

19  diminution in value?

20  A    Yes.

21  Q    Why is it -- there was a discussion about people versus

22  property, that it doesn't really matter to you who the

23  homeowner is per se, but it's the property that's diminished?

24  What were you -- what was the point you're trying to make?

25  A    I recognize the fact that people are claimants in this

```
 1    class action.  My job is to measure the diminution in value of
 2    the property that those people own, and then to offer up to
 3    the Court a measure of diminution in value which the Court may
 4    adopt as a measure of damages.
 5    Q    One of the components you have on the chart drawn by
 6    defense counsel was meta-analysis.  What is that?
 7    A    It is a statistical examination of a sample of scholarly
 8    and professional studies.  So we go into the journal articles
 9    and the studies which we glean from the professional
10    literature, and we see that there's some common trends that
11    one study might say, well, in the northwestern United States,
12    proximity to a manufacturing facility results in a 30 percent
13    diminution.  Another study might say in the southeastern
14    United States, property to a nuclear plant may result in a
15    40 percent diminution.  A third study might say in the
16    midwest, in an urban area, proximity to a hazardous waste dump
17    results in a 50 percent diminution.
18              So we take all of these findings, and we look at the
19    degree of diminution as a regression-dependent variable, and
20    we analyze based on certain independent variables; the part of
21    the country, the year of the study, the type of noxious
22    instrument which was stigmatizing it.
23              And we're able to compute a statistical measure of
24    diminution in value so that if you now say, well, here we are
25    in Florida, in the southeast, with, you know, contamination,
```

```
 1   chemical contamination in the soil and groundwater in 2011,

 2   what's the diminution in value?  We could plug these factors

 3   into that equation in the meta-analysis, and that will give us

 4   a statistically reliable, valid measure of a diminution in

 5   value.

 6   Q    Did you do that in this case?

 7   A    Yes.

 8        MR. GALLAGHER:  I'm going to object, Your Honor.

 9   This is not only beyond the scope of my cross-examination, it

10   is brand new matter not within the scope of the direct that

11   was submitted being introduced for the first time in redirect.

12        MR. GDANSKI:  It's written on the chart,

13   meta-analysis.

14        THE COURT:  I thought he said he didn't rely on it.

15        MR. GDANSKI:  He said he didn't rely on it for

16   certain portions.  I'm going to get to what he does rely on it

17   for and what it does demonstrate and what he didn't rely on it

18   for.

19        THE COURT:  But is it in his direct?

20        MR. GDANSKI:  I believe so.  Certainly as a

21   reference of what he's done in the case.  I have it right

22   here.

23        At page 5 of 18 of the direct, at paragraph 17,

24   going through his original reports, and to the best of my

25   knowledge, all of his earlier reports were incorporated into
```

```
 1    his testimony.  He mentions his valuation meta-analysis.

 2    That's at docket entry 363-15.

 3               MR. GALLAGHER:  Your Honor, he doesn't provide any

 4    description or explanation or discussion or application of the

 5    meta-analysis in his direct.  That was his testimony in

 6    cross-examination.  To introduce the details of the

 7    meta-analysis --

 8               THE COURT:  I agree, if he didn't -- if it's not

 9    laid out -- I mean, the fact that he just mentions it and he

10    doesn't explain it in his report, then you're going to use it

11    in -- you're going to have him explain it in detail on

12    redirect, when they didn't have an opportunity to

13    cross-examine him on it, I'm going to sustain the objection.

14               MR. GDANSKI:  Not to belabor the point, and I won't

15    if Your Honor tells me not to, but my recollection of the

16    cross is that they examined him on all of the work he did in

17    2011, including the meta-analysis, and there was a discussion

18    about its application to determining specific impairments

19    versus determining presence of stigma.  I think it was covered

20    sufficiently to open the door on redirect, but I would ask the

21    Court to at least indulge it, permit Mr. Gallagher to question

22    the witness if he wants to.

23               It's all over his multiple depositions.  It's all

24    over his multiple reports, which were previously submitted and

25    incorporated into his testimony.
```

1          THE COURT:  Again, I didn't understand that this was

2     going to be -- that the direct testimony by way of affidavit

3     was going to be a way of incorporating everything he did for

4     the last six years, and then they were supposed to figure out

5     where in his reports that he's adopting and incorporating

6     you're going to zero in on.

7          The whole purpose of this was to lay out the basis

8     for his opinion as direct testimony so they can meaningfully

9     cross-examine, not to have to speculate and guess where in all

10    these, you know, hundreds of pages of information you're going

11    to use to come forward and explain in a redirect.  I think

12    it's unfair, so I'm going to sustain the objection.

13          MR. GDANSKI:  Yes, sir.

14    BY MR. GDANSKI:

15    Q    Dr. Kilpatrick, did you also do a literature review?

16    A    Yes.

17    Q    And what is a literature review, and what is its impact

18    on this case and your opinions in this case?

19          MR. GALLAGHER:  Your Honor, I have the same problem

20    here.  He doesn't rely on any literature review in his direct

21    examination, and to introduce it now, for the first time on

22    redirect, would be unfair.

23          THE COURT:  I agree.

24          MR. GDANSKI:  Can I outside the presence of the

25    witness just proffer what it would have been and incorporate

1    his earlier testimony into the record?

2            THE COURT:  You don't have to do it outside of his

3    presence.  There's no jury here.

4            MR. GDANSKI:  Well, then I would just do it right

5    now and go through it with the witness briefly.

6            THE COURT:  Just tell me what it is that you're

7    trying to get across.

8            MR. GDANSKI:  I'm trying to get across that he has,

9    in addition to the methods that they examined him on, multiple

10   methodologies, including a literature review, the

11   meta-analysis, which were sufficient independent bases to

12   reach the conclusion that The Acreage is stigmatized and

13   there's a depreciation from Pratt & Whitney contamination.

14           THE COURT:  He already said that.  He already said

15   all of his methods were independently sufficient to establish

16   the stigma.

17           MR. GDANSKI:  And then I want to go through them.

18           THE COURT:  You know, if you want to use all of your

19   time to, you know, basically start another direct examination,

20   which is what you're doing, you're doing another direct

21   examination which was not presented here --

22           MR. GDANSKI:  I won't spend the time.  I'll just

23   file something.  I'll do it outside.

24           THE COURT:  Well, no, you're not going to file

25   something, because they don't have an opportunity to cross

```
 1   whatever you file.  So this is -- the purpose of this is to
 2   have the testimony presented here so I can evaluate it, not so
 3   you can submit something after the fact.
 4           If it's in his reports, I'll, you know, go through
 5   it.
 6           MR. GDANSKI:  Yes, sir.
 7   BY MR. GDANSKI:
 8   Q    One of the conversations you had was about your opinion
 9   on the cause of the stigma and whether or not you were talking
10   about specific cause of the flow versus the cause of the
11   stigma, and at one point you said it depends on what you're
12   talking about, cause.  Do you remember that conversation?
13   A    Yes.
14   Q    And I want to, just for the benefit of the Court, make
15   sure we're on the same page.  If you have the deposition that
16   was shown to you, and if you could turn to page 494.
17   A    I'm there.
18   Q    Okay.  And I think you were shown page 495, the bottom,
19   and 496, about not looking into the cause, and you
20   explained -- what did you mean by that, that specific aspect
21   of causation?
22   A    I'm not a hydrologist, chemist, physical scientist.  I'm
23   not linking physical science causes to the diminution in value
24   in The Acreage.  As a real estate appraiser, I'm observing
25   that there is a diminution in value in The Acreage, and that
```

```
 1    certainly appears to be explained by the environmental issues

 2    which are at work in The Acreage.

 3    Q    Did you assess, discuss, testify to the linkage between

 4    the depreciation and stigmatization and the contamination, not

 5    from a hydrogeologic perspective, but from a property

 6    appraiser's perspective?

 7    A    This issue of environmental stigma, the contamination

 8    concerns that market participants have is directly linked to

 9    the stigmatization of these properties, and therefore the

10    diminution in value, which I am observing and measuring in The

11    Acreage.

12    Q    And is that opinion one you've given and hold to a

13    reasonable degree of property appraiser and scientific

14    certainty?

15    A    Yes.

16    Q    I'd like to please discuss the fact card, CV survey.

17    Okay?

18    A    Yes.

19    Q    All right.  And so have you utilized CV surveys as part

20    of your academic studies, your teaching responsibilities, and

21    in the litigation realm?

22    A    Yes.

23    Q    Why is it a method that you've talked about, lectured

24    about and used?

25    A    Well, it's a very useful method.  If it -- if we have
```

```
 1   markets which are in disequillibrium, you know, they've been

 2   affected by stigma, they've been affected by something that's

 3   causing people to hold their houses off the market and not to

 4   sell them, or there's some movement in pricing which is

 5   abnormal, then transaction evidence may not tell us the true

 6   story.  And so contingent valuation is a means of getting at

 7   the truth by interviewing, surveying market participants about

 8   how they would react given the facts of this case.

 9           It has been shown to be very useful in a variety of

10   circumstances, not just in environmentally contaminated

11   property, but in measuring natural resource goods.  It's been

12   used in the real estate development arena to come up with

13   pricing models for new subdivisions or new features in houses.

14   It's used in just a variety of contexts where economic

15   decisions are being made.

16   Q    As part of your analysis and your review before your

17   first report, did you review newspaper articles from the local

18   South Florida/Palm Beach community in order to get a sense of

19   how the problem was being described?

20   A    Yes.

21   Q    And how did you use those newspaper articles, Palm Beach

22   Post, for example, to aid you in describing the problem in the

23   CV survey or in discussions with homeowners in a manner

24   consistent with the newspapers?

25   A    They informed the way I constructed the fact card.
```

1    Q      How so?

2    A      Well, the fact card contains information which I believe

3    was being disseminated into this marketplace.  And so what we

4    were doing was surveying market participants on how they would

5    react to the very type of information that was being published

6    and otherwise disseminated about The Acreage.

7    Q      Is there anything at all in your fact card that is an

8    implausibility, an impossibility, something that could never,

9    under any circumstances, occur?

10   A      Not that I'm aware of, no.

11   Q      Why is that important?

12   A      Well, it's important to have a rational basis for the --

13   the survey.  Number one, if there are implausible facts being

14   presented, that that would skew the results of the survey.  It

15   would cause people to question whether the survey was real or

16   fanciful.

17          But, number two, what we want to do is measure

18   people's reaction to an environmental disamenity.  The

19   absolute point specifics of that environmental disamenity are

20   less important than the reality that's there is an

21   environmental disamenity in this marketplace.

22          MR. GDANSKI:  And let's, please, pull up the

23   highlighted fact card, Jonathan.  One second.  One second.

24   Let's just -- yeah.

25          Can we please blow up the second paragraph starting

1   with "there have been."

2   BY MR. GDANSKI:

3   Q    Dr. Kilpatrick, I'd like you to take a minute to read

4   that paragraph closely.   Okay?

5   A    (Perusing exhibit.)

6            All right.   I've read that.

7   Q    Do you see four lines from the bottom where it says

8   "these chemicals and wastes?"

9   A    Yes.

10   Q    And do you see the sentence preceding that which says:

11   "spills and leaks at the site caused chemicals and waste to

12   seep into the soil and groundwater on the Pratt & Whitney

13   property"?

14   A    Yes.

15   Q    And the next sentence where it says:   "These chemicals

16   and wastes eventually migrated outside the facility's

17   boundaries into surrounding areas, including the Corbett and

18   The Acreage neighborhood."   Do you see that?

19   A    Yes.

20   Q    Do you say anywhere in here that specifically oil or

21   sodium cyanide or asbestos or mercury ever migrated into The

22   Acreage?

23   A    No.

24   Q    All right.   What you do reference is the fact on the

25   first line, second sentence:   "These activities involve the

1    cleanup of chemicals and hazardous wastes, including

2    cancer-causing agents, oil, sodium cyanide, asbestos and

3    mercury," right?

4    A    Yes.

5    Q    And in that sentence, are you intending to convey that

6    Pratt & Whitney on their site is using asbestos or sodium

7    cyanide?

8    A    That they are cleaning up cancer-causing agents, oil,

9    sodium cyanide, asbestos and mercury.

10   Q    And I'd like to please go for one moment and switch to a

11   document from a Department of Health, and this is

12   October 1988, Florida Department of Health and Rehabilitative

13   Services, Agency for Toxic Substances and Disease Registry,

14   Examining the Health Assessment of the Pratt & Whitney

15   Facility in Palm Beach.  Okay?

16   A    Yes.

17   Q    Do you see that it demonstrates the presence of stored

18   waste, including waste oil, sodium cyanide, asbestos and

19   mercury?

20   A    Yes.

21   Q    Was there and is there a perfectly good-faith basis and

22   an accurate basis to put in the fact card that Pratt & Whitney

23   was using on their properties waste oil, sodium cyanide,

24   asbestos and mercury?

25   A    Yes.

```
 1                THE COURT:  I'm sorry?

 2                MR. GALLAGHER:  Leading, Your Honor.

 3                THE COURT:  Overruled.

 4   BY MR. GDANSKI:

 5   Q    Now, jumping down to the bottom paragraph of the fact

 6   card.  Several times you've had in the course of the

 7   discussion about cancer cluster versus environmental

 8   contamination, you made a point that one should not look at

 9   the term "cancer cluster" in the fact card and suggest that

10   it's there to boost impact, right?

11   A    Yes.

12   Q    Why not?

13   A    Well, here in this paragraph -- and I pointed this out in

14   cross-exam, my very last sentence is:  "In other words, the

15   private wells that were sampled -- in the private wells that

16   were sampled, a causal relationship was not established

17   between the contaminants in the well water and documented

18   pediatric brain cancers."

19   Q    At the time of the fact card, were you aware of the

20   previous discussion on cancer cluster in the community?

21   A    Yes.

22   Q    And the designation?

23   A    Yes.

24   Q    And were you aware of the Department of Health's ultimate

25   determination on that issue with the data they unfortunately
```

```
 1    only had at that time?

 2    A    Yes.

 3    Q    Okay.  And so why is it you felt it necessary to

 4    contextualize the concept of cancer cluster, but also limit

 5    its impact by explaining the full story on the fact card?

 6    A    Well, it is information which was provided to the

 7    marketplace to the general public, but it is couched with the

 8    fact that as of the time I conducted the survey, that causal

 9    link had not been established.

10    Q    Do you -- let's say you were doing an appraisal for an

11    individual home, a one-off home.  Okay?  Would you talk to the

12    homeowner?

13    A    Yes.

14    Q    If you were doing an appraisal for people on one street,

15    would you talk to the homeowners on that street?

16    A    Yes.

17    Q    If you were doing an appraisal for people in a

18    hundred-square-foot radius, would you talk to those people in

19    that hundred-square-foot radius?

20    A    Yes.

21    Q    Does it make perfect logical sense that one component of

22    your analysis is talking to people in The Acreage?

23    A    Yes.

24         MR. GALLAGHER:  Objection, Your Honor, perfect

25    logical sense.  He's telling him what to say.
```

1          THE COURT:  Rephrase your questions.

2     BY MR. GDANSKI:

3     Q    Why is it methodological sound for you to talk to the

4     people who are claiming they have a diminution in value, when

5     your job is to assess those people's diminution in value?

6     A    Well, as I indicated in cross-examination, to the extent

7     these people are suffering a loss of use and enjoyment of

8     their property, it's important for me to identify what that

9     loss of use and enjoyment is so that I can then go measure it.

10    I'm not asking these people to give me a measure of the

11    valuation of the loss of use and the enjoyment.  On the

12    contrary, I'm simply asking these folks what is it that this

13    issue is doing to you, and now I'll go out and independently

14    measure that.

15    Q    The joint terms or the terms "environmental

16    contamination" and "cancer cluster", which were discussed at

17    length, does environmental contamination include cancer

18    cluster?

19    A    It may.

20    Q    And does it in the context of the way you've reviewed

21    this case and put forth your position in this case?

22    A    It certainly could, yes.

23    Q    And why is that important when it comes to the

24    intersection of the change in the descriptor but not the

25    change in any underlying opinion or result?

```
 1   A    I'm not walking away from the fact that there may be a

 2   cancer cluster here.  I'm using a broader term which I believe

 3   subsumes that.

 4   Q    I'd like you -- so after you had the discussion with

 5   Mr. Gallagher about cancer cluster and whether or not you ever

 6   analyzed for the relative contribution of diminution comparing

 7   cancer cluster to environmental contamination, I'd like to ask

 8   you this question.

 9          Assume that the law in this case is that Pratt &

10   Whitney is jointly and severally liable for all stigma

11   associated with their contamination of The Acreage.  Does it

12   make a difference to you then, in your analysis of the measure

13   of the stigma, whether or not cancer cluster is caused by

14   Pratt & Whitney or not?

15          MR. GALLAGHER:  I'm going to object, Your Honor,

16   because I don't understand the question.

17          THE COURT:  I'm not sure how he can answer that

18   question.  It involves legal concepts.

19          MR. GDANSKI:  Fair enough.  I'll rephrase.

20          THE COURT:  Okay.

21   BY MR. GDANSKI:

22   Q    Does it make a difference to you as a property appraiser

23   in evaluating the measure of diminution of value if a cancer

24   cluster was or was not from Pratt & Whitney?

25   A    No.
```

1    Q    Does it make a difference to you if the cancer cluster

2    was from Pratt & Whitney and the quote/unquote environmental

3    contamination, to the extent Pratt & Whitney's trying to

4    separate the two, was not from Pratt & Whitney?

5    A    It doesn't make any difference to me.

6    Q    When you were discussing the market trend analysis, we

7    had put up some of those charts before; is that right?

8    A    Yes.

9    Q    Okay.  There was a term that was used first by

10   Mr. Gallagher, and then it sort of crept its way into the

11   discussion of "eyeballing the data," right?

12   A    Yes.

13   Q    Did you merely eyeball the data in order to come to a

14   reliable and appropriate conclusion?

15   A    No.  As I've said in my reports, we actually -- I

16   actually looked at the average prices in these neighborhoods

17   and compared them on a dollar-for-dollar basis.  So I'm not

18   just eyeballing the data.  I'm actually performing some

19   calculations based on that data.

20   Q    And in analyzing the data, there was a discussion about

21   whether or not you used real world market information in

22   addition to the CV survey, right?

23   A    Right.

24   Q    Was there a point in time in the past, not in this case,

25   where you had used CV survey data in the absence of

```
1    corroborative real world market data?
2    A    Well, let me first add the caveat that I believe CV
3    surveys are real world market data; they're just not
4    transactional data.
5    Q    Fair enough.
6    A    There have been instances in the past where I have used
7    CV in the absence of transactional data.
8    Q    In this case, did you use CV survey data and real world
9    market transactional data?
10   A    Yes, I did.
11   Q    And how does the combination of the two help inform your
12   opinions and conclusions?
13   A    The transactional data is supportive of the CV findings.
14   Q    In this case, you did not, you did not ignore real world
15   market transactional data in order to come to your
16   conclusions, did you?
17             MR. GALLAGHER:  Objection; leading, Your Honor.
18             THE COURT:  Overruled.
19             THE WITNESS:  That's correct.
20   BY MR. GDANSKI:
21   Q    Just a little bit of wrap-up.
22             Do you have an opinion to a reasonable degree of
23   professional certainty as to whether a stigma associated with
24   environmental contamination caused a diminution in value in
25   the Adinolfe geographic area?
```

```
1   A     I do.

2   Q     Same question with the Cotromano geographic area.

3   A     I do.

4   Q     Did the environmental contamination from Pratt & Whitney

5   and the associated stigma cause damage in both areas by

6   reducing property values?

7              MR. GALLAGHER:  Your Honor, I'm going to object

8   again.  This is, again, leading.  It's just getting --

9              THE COURT:  Overruled.

10             You can answer.

11             THE WITNESS:  The environmental contamination has

12  led to a diminution in property value in The Acreage.

13  BY MR. GDANSKI:

14  Q     During the course of the day, the terms "price" and

15  "value" have been used interchangeably.  From a property

16  appraiser's perspective, is the price at which a property

17  sells equal to the fair market value of the property?

18  A     Not necessarily.

19  Q     Why not?

20  A     There are a lot of other factors which can be at play.  A

21  transaction might not be arm's length; it might be under

22  duress; the property might not be exposed in the marketplace

23  for adequate period of time.

24             Note that in my trend analysis, I look at this

25  decrease in days on the market in The Acreage that's
```

```
 1    suggesting to me that these properties are not being exposed
 2    to achieve optimum market value.
 3              Buyers and sellers both have to be adequately
 4    informed and well-advised.  If they're not adequately
 5    informed, if buyers are coming into The Acreage and not being
 6    provided with full disclosure about the environmental issues,
 7    then they may be overpaying for property.
 8    Q    Can the value change in the absence of a sale?
 9    A    Oh, of course.  If you're holding your property, you
10    lived there for 20 years and you plan to live there until you
11    die, you might want to borrow against it to improve it, you
12    might the want to will it to your kids, you might want to get
13    a reverse mortgage to help you live in your advanced years,
14    you might need to borrow against it to pay medical bills.  All
15    of those things have been negated for these longtime residents
16    as a result of the diminution in value resulting in the
17    environmental contamination.
18    Q    Reflecting on the 25 to 40 percent reduction which you've
19    testified to, is the 25 to 40 percent reduction a reduction in
20    the price of any one particular property?
21    A    No, it's a reduction in the value of each of the
22    properties.
23    Q    Does the 25 to 40 percent range measure the price
24    reductions or value reductions?
25    A    Value reductions.
```

```
 1   Q    And assume that Florida law defines fair market value as
 2   the amount for which a willing buyer will buy and a willing
 3   seller will sell, with both being fully informed as to all
 4   material factors, and with neither buyer nor seller being
 5   under a compulsion to buy or sell.  Okay?
 6   A    Yes.
 7   Q    All right.  If contamination exists but is undisclosed to
 8   either buyer or seller, does that contamination affect price?
 9   A    It does not affect price.  It may affect value, but it
10   does not affect price.
11   Q    When it is disclosed, though, does it then affect price?
12   A    It depends on the extent to which the buyer and seller
13   are reasonably informed, acting in their own best interest,
14   acting without duress, exposing the property on the market for
15   an adequate period of time, a number of other factors that are
16   at play.
17   Q    Okay.  Under that scenario, once the existence of
18   contamination is disclosed, does it affect value of the home?
19   A    Yes.
20   Q    And is that a certain under those circumstances?
21   A    Yes, of course.
22   Q    Okay.  Why?
23   A    Well, as I testified earlier, part of it's kinda common
24   sense.  A contaminated house is worth less than an
25   uncontaminated house.  A damaged piece of property is worth
```

1   less than an undamaged piece of property.  A home in a

2   neighborhood which is subjected to systematic environmental

3   degradation is worth less than a home that's not.

4          And so as soon as that fact of contamination becomes

5   known, properties which are affected by it are worth less than

6   they would have been if they had not been affected by it.

7   Q    You used the term "common sense," right?

8   A    Yes.

9   Q    In addition to all the criteria, parameters, methods, do

10  you ever try to use common sense?  Do you always try to use

11  common sense in assessing whatever it is you're doing

12  professionally, academically, personally, anything?

13  A    Well, we try to teach appraiser that.  When I teach

14  appraisal standards or other courses to appraisers, I do talk

15  about using common sense, and that's an important component of

16  the valuation equation.

17  Q    Does the common sense method and appreciation you have

18  for a community that's due south of The Acreage with wildlife

19  separating it lead you to the conclusion that The Acreage

20  probably is stigmatized from a gross polluter like Pratt &

21  Whitney?

22  A    It's probably stigmatized and property values are

23  probably diminished.

24          MR. GDANSKI:  Those are my questions.  I think

25  Mr. Scarola has a few minutes on some specific -- I guess

1    specific questions he'd like to ask, with the Court's

2    permission.

3              THE COURT:  On redirect?

4              MR. SCAROLA:  Yes, Your Honor.  This is redirect.

5    And it focuses particularly on Cotromano-related issues.

6              THE COURT:  Okay.  Go ahead.

7              MR. SCAROLA:  Thank you very much, sir.

8              MR. GDANSKI:  Thank you very much, Judge.

9              THE COURT:  You're welcome.

10                       Redirect Examination

11   BY MR. SCAROLA:

12   Q    Mr. Kilpatrick, you have repeatedly expressed the opinion

13   that stigmatizing environmental contamination reduced property

14   values in The Acreage?

15   A    That's correct.

16   Q    Does it make any difference to that opinion whether the

17   environmental contamination actually did or did not cause

18   cancer in The Acreage; that is, does it make any difference to

19   the opinion regarding the fact of damage, as opposed to the

20   amount of damage, whether the contamination actually did or

21   did not cause cancer in The Acreage?

22   A    It makes no difference.

23   Q    Based upon the information publicly available to the

24   marketplace, the information that you have said formed the

25   basis for your fact card, is the reference to cancer cluster

```
 1    in any way inconsistent with a history of environmental

 2    contamination?

 3    A     No.

 4    Q     The mnemonic that you used interchangeably for both.

 5    A     It is not inconsistent.

 6    Q     Based upon the information publicly available to the

 7    marketplace, the information upon which the fact card is

 8    based, is the declaration of the cancer cluster within or

 9    outside of that history of environmental contamination?  Is it

10    part of that history or separate from that history?

11    A     I think it's part of that history.

12    Q     Based upon the information publicly available to the

13    marketplace, was the declaration of a cancer cluster a

14    component of the history of environmental contamination, in

15    words that you have used previously, a subset of that history?

16    A     I believe so, yes.

17    Q     Would your opinion of the fact of damage -- and, again,

18    I'm going to distinguish between fact of damage and amount of

19    damage.  Would your opinion of the fact of damage be changed

20    in any respect at all, depending on whether the Adinolfe or

21    Cotromano map were used?

22    A     No.

23    Q     You are aware of the fact that the Cotromano map is

24    coextensive with the cancer cluster defined by governmental

25    entities, correct?
```

```
1   A    Yes.

2   Q    Would your opinion of the fact of damage be changed in

3   any respect whether the February 1, 2010, date, or the

4   August 29, '09 date was used in defining the class?

5   A    No.

6   Q    Would your opinion of the fact of damage be changed in

7   any respect whether all of the contaminants referenced in the

8   fact card migrated off the UTC campus or only some

9   environmental contaminants and even other environmental

10  contaminants other than those specifically identified migrated

11  off the campus?

12  A    That would not change my opinion.

13  Q    Would your opinion be changed in any respect at all with

14  regard to the fact of damage, whether the migration was by

15  groundwater, surface water transport or truck transport?

16  Would that make any difference --

17  A    No.

18  Q    -- to your opinion that, in fact, environmental

19  contamination concerns stigmatized The Acreage?

20  A    No, it would not.

21  Q    Would your opinion with regard to the fact of damage be

22  altered in any respect at all by the degree of proximity to

23  the UTC campus of any individual property that fell within

24  either the Adinolfe map or the Cotromano map?

25  A    No.
```

```
 1   Q    Would your opinion of the fact of damage be changed

 2   depending upon whether the contaminants that migrated off the

 3   UTC campus actually were proven to have caused cancer in The

 4   Acreage?

 5   A    No.

 6   Q    I want to shift focus now from fact of damage to amount

 7   of damage, and I want to go through those same factors again

 8   with regard to the opinion that you have expressed that the

 9   stigma damage is within a range of 25 to 40 percent reduction

10   in property value.

11            Would that opinion change depending upon whether you

12   used the Adinolfe or the Cotromano map?

13   A    No.

14   Q    Would that opinion change depending upon whether you used

15   a 2/1/2010 or an August 29, '09, date?

16   A    No.

17   Q    Would that opinion change whether all of the contaminants

18   referenced in the fact card migrated off the UTC campus or

19   only some of those contaminants?

20   A    No.

21   Q    Would that opinion change depending upon whether the

22   migration was by groundwater, surface water transport or

23   trucking transport?

24   A    No.

25   Q    Would it change depending upon the proximity of an
```

 1    individual parcel to the UTC campus, as long as it fell within

 2    the defined class area?

 3    A     No.

 4    Q     Now, the last one.

 5          Your fact card presents the cancer cluster as being,

 6    at very best, undetermined, if not having been proven to be

 7    unrelated to contamination originating in groundwater,

 8    correct?

 9          THE COURT:  Hold on, Mr. Scarola.

10          MR. GALLAGHER:  Objection; leading.

11          THE COURT:  Sustained.  Rephrase your question.

12          MR. SCAROLA:  Yes, sir.

13    BY MR. SCAROLA:

14    Q     Does your fact card tie any cancer case to any UTC

15    contamination?

16    A     No.

17    Q     I want you to assume that there is indeed proof that UTC

18    contamination did cause cancer within The Acreage.  The

19    uncertainty that is reflected in the fact card is removed.

20    UTC contamination caused cancer.

21          Based upon your background, your experience, your

22    training, the methodologies used to analyze the impact of the

23    stigma, would a confirmation of a causal connection between

24    contamination and cancer in The Acreage have any impact on the

25    numbers that you have described?

```
 1   A     It would probably make the number higher.  Certainly
 2   would not obviate the numbers that I've proffered here.
 3   Q     You testified that the hedonic regression that you did in
 4   2011 was flawed because it used The Acreage area data when it
 5   computed the unimpaired value, correct?
 6   A     That's correct.
 7   Q     Was it only The Acreage homes that were improperly
 8   included in that hedonic regression?
 9   A     That's correct.
10   Q     Only The Acreage homes?
11   A     Only --
12         THE COURT:  We're having trouble hearing you,
13   Doctor.  If you can move that microphone in front of you.
14   Thank you.
15         THE WITNESS:  Yes, Your Honor.
16   BY MR. SCAROLA:
17   Q     And my question was poorly worded, and I apologize for
18   that.
19         Were there homes outside The Acreage that were also
20   included for comparison purposes?
21   A     I believe so, yes.
22   Q     All right.  To the extent that The Acreage homes,
23   impaired homes improperly flawed the hedonic regression when
24   it was initially done, those inclusions would have tended to
25   lower the comparative value, correct?
```

```
 1                    MR. GALLAGHER:  Objection; leading, Your Honor.

 2                    MR. SCAROLA:  It was, and I'll rephrase it.

 3                    THE COURT:  Rephrase it, please.

 4    BY MR. SCAROLA:

 5    Q    What was the result of including stigma-impaired homes in

 6    the hedonic regression improperly?  What was the result of

 7    that flaw?

 8    A    It would have had the impact of lowering the aggregate

 9    values.

10    Q    So to the extent that there was any error made, it was an

11    error that favored the defense or was prejudicial to the

12    defense?

13                    MR. GALLAGHER:  (Stands.)

14                    THE WITNESS:  Would have favored the defense.

15                    THE COURT:  Overruled.

16    BY MR. SCAROLA:

17    Q    You spoke about information leakage, and I want to relate

18    that to the particular circumstances of this case.

19                    You are aware that the Florida Department of Health

20    issued a report in August of 2009 that initially identified a

21    cancer cluster, correct?

22    A    That's correct.

23    Q    I want you to assume that that report tells us that the

24    inquiry that led to the issuance of that August 2009 report

25    arose out of complaints from people in The Acreage community
```

```
 1    about their own perception of an increased incidence of the

 2    occurrence of juvenile cancer within The Acreage.

 3              To what extent, if any, does that relate to the

 4    concept of information leakage that you spoke about earlier?

 5    A    Well, that's exactly why we have information leakage.  In

 6    other words, even though the announcement was of a given date,

 7    the investigation would have been ongoing for a period of many

 8    months prior to that date.  There would have been some leakage

 9    of knowledge and information in the community that there were

10    some problems.  And so there's every reason to believe that --

11              Imagine you're a homeowner in the community, and you

12    hear that there's an investigation going on that may lead to

13    the declaration of a cancer cluster in your neighborhood.  If

14    you can sell your house quickly and get out, you might want to

15    do that, because you might be anticipating that property

16    values are going to get hit by this.

17              So that's why we have a buffer area before -- or

18    buffer time before the event in question, because we want to

19    account for the fact that there is more likely than not

20    information leakage, and more likely than not, market

21    participants taking advantage of that information leakage.

22              MR. SCAROLA:  May I have just one moment, Your

23    Honor?

24              THE COURT:  Yes.

25              MR. SCAROLA:  Thank you, Your Honor.  I have no
```

1    further questions.

2             THE COURT:  All right.

3             MR. GALLAGHER:  Your Honor, if I would, I just have

4    a couple of questions on recross, and I will be very brief.

5             THE COURT:  All right.  Hold on.

6             I'll let you go very, very briefly.  I ordinarily

7    don't allow recross, so just you need to be very quick.

8             MR. GALLAGHER:  Sure.

9                           Recross-examination

10   BY MR. GALLAGHER:

11   Q    Dr. Kilpatrick, am I right that I heard you say your fact

12   card was based on what was in the newspapers and not what's in

13   the plaintiffs' complaint?

14   A    I don't want to suggest that the two don't have the same

15   information in them, and I don't want to suggest that I solely

16   relied on the newspapers, but I would like to suggest to you

17   that the fact card was based on the information which I

18   understood to be publicly available at that time.

19   Q    You talked about the difference between value and market

20   price.  You recall that?

21   A    Yes.

22   Q    And how a -- what you would call a diminution in value

23   may not ever -- may not be reflected in the sale price in the

24   market, right?

25   A    That's correct.

```
1    Q    So if you have somebody in the class who's a member of

2    the class because they owned on the effective date -- say it's

3    February 1, 2010 -- and they sell their property sometime

4    between February 1, 2010, and today, that sale may or may not

5    reflect what -- the sale price may or may not reflect what

6    you're telling the Court is the diminution in value, right?

7    A    That's correct.

8    Q    So that person would be a plaintiff in the case, because

9    they owned on the date set for doing your diminution in value

10   calculation, but they wouldn't actually realize that

11   diminution in value in the real world sale of their property?

12   A    Well, there's the implication in your question that

13   they're selling their home for higher that I would posit their

14   impaired value to be.  They may very well sell it for less.

15   But that having been said, from my perspective as an

16   appraiser, the value issues occur as of the effective date of

17   value.  What may transpire following that is not a portion of

18   my opinion.

19   Q    Right.  But the point I'm trying to get at, sir, is that

20   if that plaintiff, who's a class member because they're an

21   owner as of February 1, 2010, recovers as damages their -- the

22   diminution in value that you've talked about, but they've also

23   sold their property at a price that doesn't reflect that

24   diminution in value, that would be a windfall to them,

25   wouldn't it?
```

```
 1   A    I don't have an opinion one way or the other on that.

 2             MR. GALLAGHER:  Nothing, Your Honor.  That's all.

 3             THE COURT:  Thank you.

 4             May I -- anyone object if I ask a few follow-ups?

 5   Anyone object if I ask a few follow-ups?

 6             MR. SCAROLA:  No, Your Honor.

 7             MR. GALLAGHER:  No, Your Honor.  We welcome it.

 8             MR. SCAROLA:  We welcome.

 9                          Examination

10   BY THE COURT:

11   Q    Doctor, on this issue of aforementioned leakage and a

12   buffer.

13   A    Yes.

14   Q    Did you actually calculate or determine what the buffer

15   period would be for information leakage in your models?

16   A    No, I used an information buffer of a year or two, I

17   can't remember exactly how long it was, since my data was

18   coming to me on yearly averages.  But I don't making any

19   ascertainment of what an appropriate buffer would be.

20   Q    All right.  Because I'm looking at your Figure number 1

21   that was put up earlier.  It's got the square foot sales

22   figures --

23   A    Yes, Your Honor.

24   Q    -- and the flow from the different control areas and the

25   area in question, and it looks to me, if you look at the
```

1   downward trend, you said that, you know, in the -- during the

2   economic crisis, the property in all three areas, you know,

3   started to drop, but I don't know if you have that figure in

4   front of you.

5            MR. GALLAGHER:  Your Honor, if it helps, I've got it

6   up on the screen here if you want to switch it over to me, I

7   think it will be the figure you're talking about.

8            THE COURT:  Yes.

9   BY THE COURT:

10  Q    You see it seems as if the gap between the two control

11  areas and the Cotromano area, the gap seems to be widening

12  somewhere in the middle of 2007, it looks like to me.  Does

13  that seem correct to you, or am I misreading that?

14  A    Well, these are -- these are annual figures, so

15  interpolated in between 2007 and 2008 doesn't necessarily tell

16  you anything.  All of that gap may have opened right at the

17  end of 2008.

18  Q    So you don't know when that gap started?

19  A    That's correct.

20  Q    Okay.  You just drew the lines based upon the numbers you

21  got here.  You got a number here and you just drew a line?

22  A    That's correct, Your Honor.

23  Q    All right.  And then on other -- the other figure I

24  wanted to ask you about was the comparative sales prices.

25  That's Figure 2?  Yes.

 1          It seems like the -- there's a gap in the prices at

 2    the very beginning of this chart, and there's a gap between

 3    all three areas, which the Cotromano is at the lower -- is the

 4    lowest of the three, starting out in 2004, and they're all

 5    going in the same direction, it seems, pretty much.  The

 6    graphs seem to -- you know, they all go up at one point, they

 7    all go down at a different -- the same points, they all seem

 8    to stay fairly consistent at some points, then they all go up

 9    towards the end.

10          How do you account for that if there's this

11    diminution in value that you're saying is so disparate between

12    these different areas?

13    A    Well, there are two things going on, Your Honor.

14          Number one, I believe Figure 1 is probably --

15    because it reduces everything to a dollar per square foot, it

16    accounts for differences in the housing stock among the three

17    areas.  So it gets that variable out, and that's why

18    equation 1 or Figure 1 is really the basis of my testimony.

19          That having been said, if you look at Figure 2 and

20    focus on the area around 2009 and 2010, you can see that

21    Jupiter Farms and Palm Beach CE actually start leveling off

22    there, but The Acreage continues to trend downward.  And that

23    is suggesting to me that whatever's happening in The Acreage

24    around 2009-2010 is continuing to impact prices negatively,

25    whereas the other neighborhoods are leveling off from the

1   mortgage meltdown.

2   Q    And I'm just looking at it with my eyes, and I don't have

3   any way of measuring it.  It doesn't look like a 25 to

4   40 percent difference in those variables there.

5   A    Well, that's why we did not eyeball it.  We -- the 25 to

6   40 percent that I've proffered is not an eyeballing of the

7   charts; it's based on the actual data which I've provided to

8   the defendants.

9   Q    All right.  Thank you.

10  A    Yes.

11  Q    Oh, I'm sorry, I think there was one other question I

12  wanted to ask you.  Hold on.

13         Getting back to the information leakage issue, on

14  the one hand in Figure 1, go back to Figure 1, you say that,

15  well, this information is leaking out, and therefore it's

16  affecting the prices, and that's why you see the downward

17  trend, a much steeper downward trend in the Cotromano area

18  than you do in the other two, but you also said earlier that

19  it takes years for information to be absorbed into the market.

20         So how do you square the information leakage being

21  responsible for this drop and your other statement that it

22  takes years for information to be absorbed into the

23  marketplace?  How did it happen so quickly, and why wasn't

24  that -- suggests that there's some other reasons for this

25  drop?

```
 1   A     Frankly, Your Honor, I was a little surprised myself.  We

 2   normally don't see markets absorbing information this quickly.

 3   In other cases it's taken a couple of years.  But it appears

 4   that here, The Acreage absorbed the information of the

 5   contamination very quickly.

 6   Q     So this is an aberration from normal -- what you see

 7   normally?

 8   A     It is not what I've seen in the past.  I hate using words

 9   like aberration.  This market has absorbed that information

10   quicker than I've seen it in the past.

11   Q     Well, that's -- you're assuming that it's the information

12   that caused the -- caused this drop and not something that --

13   some other factor?

14   A     Well, that certainly seems to be the factor which is at

15   play during this timeframe.  I don't know of any factors which

16   were at play in The Acreage which would have caused this kind

17   of disruption in prices.

18          We have the mortgage meltdown, but that's already

19   explained in the data.  So once we account for that, the one

20   thing that accounts for the widening of the gaps would be this

21   announcement, this contamination problem which is going on in

22   The Acreage.

23          THE COURT:  All right.  Thank you, Doctor.

24          THE WITNESS:  Thank you, Your Honor.

25          MR. SCAROLA:  May I have an opportunity to follow up
```

```
 1   briefly, Your Honor?

 2            THE COURT:  Yes.

 3            MR. SCAROLA:  Thank you very much.

 4                      Redirect Examination

 5   BY MR. SCAROLA:

 6   Q    Mr. Kilpatrick, does the rate at which the market absorbs

 7   and reflects information depend upon the nature of the

 8   information?

 9   A    It may, yes.

10   Q    Does it depend upon the volume of the information being

11   distributed?

12   A    That could be a factor, yes.

13   Q    Does it also depend upon the prominence with which the

14   information is disseminated?

15   A    That could be a factor, yes.

16   Q    And when you looked at the information being disseminated

17   to the marketplace with regard to the environmental

18   contamination in The Acreage, what observations did you make

19   regarding the nature, volume and prominence of the

20   dissemination?

21            MR. GALLAGHER:  I'm going to object, Your Honor.

22   This is actually beyond the scope of anything you asked, and

23   it's also contrary to his testimony that he didn't actually

24   look at the dissemination of information to the marketplace or

25   its effect.
```

```
 1              THE COURT:  Well, you're going to have a chance to

 2    cross on this new information, as well, so I'll let you follow

 3    up.  I'll overrule the objection, and you'll have a chance to

 4    follow up.

 5              THE WITNESS:  As a real estate appraiser and

 6    somebody who's done these kinds of studies in the past, I

 7    would say that this is fairly significant information that

 8    would capture the attention of market participants.

 9    BY MR. SCAROLA:

10    Q    How would you characterize the significance of

11    information that environmental contamination is killing

12    children?

13              MR. GALLAGHER:  Objection, Your Honor.

14              THE COURT:  Sustained.

15              MR. SCAROLA:  I have no further questions, Your

16    Honor.

17              THE COURT:  Okay.

18                        Recross-examination

19    BY MR. GALLAGHER:

20    Q    Doctor, the judge was asking you questions about this

21    Figure 1 and Figure 2 where you're talking about your sales

22    trend analysis.  And just to orient us to when information

23    might have actually gotten into the marketplace here about the

24    cancer cluster investigation, it was May of 2009 that the

25    plaintiffs, Ms. Dunsford, and others went to the Florida
```

1    Department of Health and asked for an investigation of a

2    cancer cluster, isn't it?

3    A    Well, I don't recall the date.  If you're stipulating

4    that, I have no basis to deny it, but I don't as I sit here

5    recall the exact date that they went to Florida with the --

6    with the issue that there were a lot of children in the area

7    developing pediatric cancer.  Now, whether that information

8    was permeating the market prior to their complaint to the

9    State of Florida, I can't testify to that.

10   Q    Right.

11        And the data we have here shows that gap widening,

12   as the Court noted, in 2007.

13   A    Or by the end of 2007.

14   Q    And, now, I think you might have misspoken when you were

15   talking to the judge here about whether this 25 to 40 percent

16   number was even based on these charts.  You said this was

17   based on the actual data provided to the defendants.  You

18   didn't base the 25 to 40 percent number on this trend analysis

19   at all, did you?

20   A    Well, he's talking about some of the percentages that are

21   in my report, or at least that's what I understood, and I told

22   him, I told the Court that the numbers which appear in my

23   report regarding the trend analysis are based on the actual

24   numbers from the trend analysis itself.  I was not taking into

25   account that number.

1          For example, if you look here on the screen, you see

2     that there's a percentage of 41.4 percent.  That's coming from

3     the information contained in the trend analysis itself, which

4     has been provided to you.

5     Q    The trend analysis doesn't give you either of 25 to

6     40 percent, does it?

7     A    No, I'm not linking the trend analysis directly to that

8     calculation.  But, as you know, the trend analysis has its own

9     data, and I've reported that data in my various reports.

10    Q    In fact, the trend analysis, if you were going to look at

11    the market data, gives you numbers that are lower than the

12    25 percent that you list here, doesn't it?

13    A    In some instances, yes.

14    Q    Actually, sir, as you set forth in your direct

15    examination, in all instances, the trend analysis comes out

16    with numbers that are lower than the 25 percent, doesn't it?

17    A    Wouldn't surprise me.  I don't have that number committed

18    to memory right now.

19          MR. GALLAGHER:  Nothing further.

20          THE COURT:  All right.  Thank you.

21          Thank you, Doctor.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  I guess we'll get back together tomorrow

24    at 9:00 and start with another witness.  Is that the plan?

25          MR. SCAROLA:  That is the plan, sir.

 1              MR. RAPP:  Your Honor, can we leave some of this

 2    stuff here?

 3              THE COURT:  You can leave everything.

 4              All right.  We'll see you tomorrow.

 5         (Court in recess at 5:40 p.m.)

 6                         *  *  *  *  *

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        * * * * *

2                        I N D E X

3    Opening Statements

4            By Mr. Gowdy                        4

5            By Mr. Gdanski                       12

6            By Ms. Hatfield                      31

7            By Mr. Gallagher                     49

8    Testimony of John Aaron Kilpatrick

9            Cross by Mr. Gallagher               64

10           Redirect by Mr. Gdanski              188

11           Redirect by Mr. Scarola              235

12           Recross by Mr. Gallagher             243

13           Examination by the Court             245

14           Redirect by Mr. Scarola              250

15           Recross by Mr. Gallagher             251

16                        * * * * *

17

18

19

20

21

22

23

24

25
```

```
 1                        * * * * *

 2                    E X H I B I T S

 3   (None.)

 4                        * * * * *

 5                      CERTIFICATE

 6       I, Stephen W. Franklin, Registered Merit Reporter, and

 7   Certified Realtime Reporter, certify that the foregoing is a

 8   correct transcript from the record of proceedings in the

 9   above-entitled matter.

10       Dated this 8th day of JANUARY, 2018.

11

12       /s/Stephen W. Franklin
         _____
13       Stephen W. Franklin, RMR, CRR

14

15

16

17

18

19

20

21

22

23

24

25
```

**BY MR. GALLAGHER: [35]**
64/21 65/18 68/22 71/19 72/17 76/21 79/8 82/1 82/24 85/20 89/1 94/9 98/25 103/12 104/3 105/25 109/24 110/12 113/19 116/13 121/4 129/2 133/18 143/16 150/19 152/16 170/4 176/1 177/23 180/18 181/5 183/12 186/17 243/9 251/18

**BY MR. GDANSKI: [17]** 188/3 188/21 190/18 193/7 194/1 194/17 200/12 202/3 205/13 217/13 219/6 223/1 225/3 227/1 228/20 230/19 231/12

**BY MR. SCAROLA: [7]** 235/10 239/12 240/15 241/3 241/15 250/4 251/8

**BY THE COURT: [3]** 131/7 245/9 246/8

**COURT REPORTER: [4]** 25/25 37/18 188/18 200/4

**MR. GALLAGHER: [48]** 48/25 49/5 51/14 63/12 64/14 65/11 68/18 76/16 85/12 85/15 88/19 94/8 104/25 105/4 105/9 113/14 116/10 120/21 121/2 128/23 131/5 152/7 170/1 186/23 187/20 189/22 192/19 193/22 202/1 215/7 216/2 217/18 225/1 226/23 228/14 230/16 231/6 239/9 240/25 241/12 243/2 243/7 245/1 245/6 246/4 250/20 251/12 253/18

**MR. GDANSKI: [56]** 12/1 12/4 24/8 26/1 26/9 63/21 71/14 71/16 72/10 78/23 81/19 82/17 85/11 85/13 85/16 94/4 98/24 103/5 103/7 103/25 109/17 110/4 143/7 150/14 150/17 177/19 180/11 180/22 182/16 186/15 186/21 187/4 187/7 187/15 187/22 188/1 188/20 193/25 194/8 194/16 205/11 215/11 215/14 215/19 216/13 217/12 217/23 218/3 218/7 218/16 218/21 219/5 222/21 228/18 234/23 235/7

**MR. GOWDY: [4]** 4/1 11/15 11/17 11/25

**MR. RAPP: [1]** 253/25

**MR. SCAROLA: [22]** 51/8 51/12 63/19 65/3 65/7 65/13 65/16 105/7 175/18 175/21 235/3 235/6 239/11 241/1 242/21 242/24 245/5 245/7 249/24 250/2 251/14 253/24

**MS. HATFIELD: [6]** 31/6 31/8 31/11 37/19 43/21 48/24

**THE COURT: [118]** 3/1 11/12 11/16 11/24 12/3 24/6 26/7 31/3 31/7 31/9 43/18 48/23 49/4 51/11 51/13 63/9 63/13 63/17 63/20 63/23 63/25 64/2 64/5 64/9 64/19 65/6 65/15 65/17 68/21 71/18 72/12 78/25 81/21 81/25 82/19 85/18 94/6 103/6 103/8 103/10 104/23 105/2 105/6 105/8 105/12 105/15 105/19 105/23 109/19 110/5 121/1 121/3 129/1 131/3 133/13 143/8 150/16 150/18 152/10 152/14 175/14 175/23 177/21 180/12 180/23 182/18 186/16 186/22 187/2 187/5 187/11 187/18 187/25 189/23 192/24 193/23 194/10 194/14 201/25 202/2 215/13 215/18 216/7 216/25 217/22 218/1 218/5 218/13 218/17 218/23 224/25 225/2 226/25 228/16 228/19 230/17 231/8 235/2 239/10 240/11 241/2 241/14 242/23 243/1 243/4 245/2 246/7 249/22 250/1 250/25 251/13 251/16 253/19 253/22 254/2

**THE WITNESS: [34]** 64/1 64/4 64/7 64/13 71/15 72/13 79/1 81/23 103/9 103/11 104/1 105/14 105/22 109/22 110/6 133/16 143/9 175/15 175/20 175/22 175/24 180/14 180/24 182/19 189/24 193/2 200/5 230/18 231/10 240/14 241/13 249/23 251/4 253/21

**$**
**$1.17 [1]** 146/23
**$1.17 billion [1]** 146/23
**$10 [1]** 46/25

**$10 billion [1]** 46/25
**$730 [1]** 146/23
**$730 million [1]** 146/23

**,**
**'04 [2]** 157/24 160/16
**'05 [1]** 160/16
**'06 [3]** 157/24 159/5 160/16
**'07 [5]** 156/4 157/24 160/6 160/10 160/16
**'08 [2]** 156/4 159/7
**'09 [4]** 89/7 159/8 237/4 238/15
**'10 [1]** 159/8
**'11 [1]** 157/25
**'12 [1]** 157/25
**'13 [1]** 157/25
**'14 [1]** 157/25
**'80s [2]** 13/7 30/25
**'til [2]** 40/13 187/10

**-**
**-and [5]** 2/4 2/7 2/9 2/18 2/21
**-v [1]** 1/5

**.**
**.2 [1]** 37/1
**.2 microns [1]** 37/1
**.5 [1]** 182/9
**.5 miles [1]** 182/9

**/**
**/s/Stephen [1]** 256/12

**0**
**09 [3]** 89/6 89/6 92/18

**1**
**1,4 [1]** 17/14
**1,4-Dioxin [12]** 17/2 17/4 17/6 17/12 17/22 19/9 19/15 19/16 20/18 52/23 56/16 61/18
**1-1 [2]** 198/12 199/8
**10 [7]** 4/4 29/23 46/15 58/14 89/7 125/4 209/11
**10,000 [1]** 191/13
**10-minute [1]** 63/14 152/12 194/11
**10/30/09 [1]** 89/6
**10:41 [1]** 63/16
**10:56 [1]** 63/16
**11 [3]** 69/23 114/5 156/25
**12 [3]** 35/11 104/10 255/5
**1212 [1]** 2/3
**12:06 [1]** 105/18
**13 [2]** 46/13 68/17
**13-80928-CIV-KAM [1]** 1/2
**14 [7]** 85/10 85/16 98/24 98/25 103/25 124/2 145/22
**14th [1]** 67/11

**15 [8]** 4/4 46/15 86/10 104/19 187/7 187/8 196/21 216/2
**15 miles [2]** 52/7 175/9
**15,000 [2]** 212/6 212/10
**15,769 [1]** 146/15
**15-acre [1]** 191/17
**1500 [1]** 191/15
**16 [3]** 34/3 85/10 120/3
**16th [1]** 46/16
**17 [6]** 110/24 143/20 143/20 143/22 143/22 215/23
**18 [3]** 113/19 120/3 215/23
**18,000 [5]** 51/2 54/7 54/25 55/11 55/14
**188 [1]** 255/10
**19 [1]** 104/19
**1954 [1]** 7/5
**1956 [1]** 38/12
**1958 [1]** 43/17
**1964 [1]** 37/8
**1965 [1]** 37/9
**197 [1]** 68/17
**1974 [1]** 37/24
**1980 [1]** 34/1
**1980s [1]** 13/12
**1988 [2]** 46/22 224/12
**1989 [1]** 197/11
**1999 [3]** 40/13 40/15 42/8
**1:05 [1]** 105/16
**1:11 [1]** 105/18
**1st [1]** 92/18

**2**
**2 percent [2]** 184/25 185/4
**2/1/2010 [1]** 238/15
**20 [2]** 141/23 232/10
**20 feet [1]** 59/25
**20 percent [3]** 96/22 97/5 99/4
**2000 [2]** 38/14 41/22
**2001 [3]** 39/8 40/16 42/19
**2003 [1]** 41/4
**2004 [1]** 247/4
**2005-2006 [1]** 205/25
**2006 [5]** 41/5 43/16 205/25 206/2 207/25
**2007 [10]** 41/22 159/1 206/3 206/6 206/6 207/25 246/12 246/15 252/12 252/13
**2007-2008 [1]** 209/17
**2008 [7]** 206/3 206/6 207/25 208/2 209/17 246/15 246/17
**2009 [21]** 35/6 35/7 35/14 77/1 90/3 90/5 91/10 93/19 94/4 94/11 94/14 95/12 95/17 156/17 158/11 206/6 211/14 241/20 241/24

**247/20 251/24
2009-2010 [3]** 206/10 206/16 247/24
**2010 [25]** 65/24 66/6 66/17 69/19 73/16 89/4 89/11 89/15 91/9 92/18 95/17 148/3 156/17 158/12 171/18 206/10 206/16 211/15 237/3 238/15 244/3 244/4 244/21 247/20 247/24
**2011 [49]** 65/21 65/25 66/1 66/5 66/10 66/15 69/7 78/2 108/17 109/3 109/11 111/1 116/15 116/19 116/25 117/3 118/22 119/16 121/8 127/8 128/11 129/15 130/14 134/25 135/9 136/1 136/5 136/14 138/6 138/11 138/13 139/5 139/24 140/1 140/14 140/20 148/4 148/6 148/10 148/11 148/25 149/6 149/18 149/23 169/25 171/3 215/1 216/17 240/4
**2014 [2]** 4/11 203/8
**2015 [2]** 20/2 20/7
**2016 [24]** 68/11 71/12 73/13 73/21 76/24 108/8 110/2 110/15 110/23 111/22 115/21 116/16 116/19 117/5 117/22 127/7 127/17 130/4 135/11 136/23 138/9 138/12 207/3 207/4
**2018 [2]** 1/9 256/10
**2139 [1]** 2/11
**23 [2]** 49/10 162/23
**235 [1]** 255/11
**24 [6]** 82/14 90/3 90/5 94/14 95/17 103/25
**2400 [5]** 2/24 106/22 107/2 107/10 107/19
**243 [1]** 255/12
**245 [1]** 255/13
**24th [8]** 77/1 90/12 91/10 91/20 93/19 94/4 94/11 156/16
**25 [40]** 66/11 66/16 67/7 67/21 68/1 68/17 71/5 72/5 73/10 73/18 74/19 78/1 79/17 79/21 80/6 80/20 81/5 83/5 83/15 97/17 97/23 98/14 141/2 142/3 142/10 146/10 152/25 167/21 196/21 202/10 209/3 232/18 232/19 232/23 238/9 248/3 248/5 252/15 252/18 253/5
**25 percent [7]** 71/24 72/7 72/24 80/4 184/25 253/12 253/16
**250 [1]** 255/14

(WITNESSNAME) [Index; 251. adjust

**2**

**251** [1] 255/15
**258-6** [1] 110/24
**263-3** [2] 108/18 136/5
**27 percent** [1] 184/25
**29** [2] 237/4 238/15
**291** [1] 1/11
**2:29** [1] 152/13
**2:45** [1] 152/13

**3**

**30** [3] 34/1 52/11 52/19
**30 percent** [1] 214/12
**300** [1] 2/17
**3000-square-foot** [1]
191/15
**30326** [1] 2/24
**31** [1] 255/6
**32204** [1] 2/6
**33301** [1] 2/8
**33316** [1] 2/4
**33401** [2] 1/20 2/21
**33409** [1] 2/12
**3344** [1] 2/23
**363-15** [1] 216/2
**376.313** [3] 8/2 8/7 8/19
**3768** [1] 1/19
**399** [1] 69/23
**3:45** [1] 187/10
**3:55** [1] 194/13
**3rd** [1] 2/3

**4**

**40 percent** [43] 43/3
66/11 66/16 67/8 67/22
68/1 71/6 72/5 72/25
73/11 73/18 74/19 78/1
79/17 79/21 80/6 80/21
81/5 83/5 83/15 97/17
97/23 98/15 141/2
141/24 142/3 142/10
146/11 152/25 167/21
196/21 202/11 209/3
214/15 232/18 232/19
232/23 238/9 248/4
248/6 252/15 252/18
253/6
**401.12B** [1] 10/21
**41** [1] 31/10
**41.4 percent** [1] 253/2
**421** [1] 86/10
**422** [3] 85/10 85/15
85/16
**423** [2] 85/10 85/16
**440** [1] 2/8
**49** [1] 255/7
**494** [1] 219/16
**495** [4] 103/25 104/10
104/22 219/18
**496** [3] 103/25 104/19
219/19
**4:08** [1] 194/13

**5**

**50** [1] 25/8
**50 percent** [1] 214/17

**50,000** [1] 51/2
**500-E** [1] 2/20
**501** [1] 197/16
**514-3768** [1] 1/19
**53** [1] 125/19
**54** [1] 2/16
**541** [1] 162/23
**542** [2] 162/23 165/15
**547** [2] 98/24 98/25
**561** [1] 1/19
**5:30** [2] 187/15 187/20
**5:40** [1] 254/5

**6**

**60** [3] 51/1 52/20 54/25
**60-square-mile** [4]
53/10 54/7 55/11 55/15
**60610** [1] 2/17
**64** [3] 136/6 139/6 255/9
**65** [1] 140/8
**69** [1] 124/2

**7**

**701** [1] 1/19
**75** [1] 108/19
**768.81** [1] 9/23
**777** [1] 2/20
**78** [1] 143/20
**79** [2] 143/20 143/22

**8**

**8/24/09** [1] 92/18
**83** [2] 119/13 120/3
**865** [1] 2/6
**8th** [1] 256/10

**9**

**9/21/09** [1] 89/6
**9:00 and** [1] 253/24

**A**

**a.m** [2] 63/16 63/16
**Aaron** [3] 63/25 64/8
255/8
**abandon** [1] 140/13
**abandoned** [3] 29/2 74/4
83/1
**abandoning** [1] 75/14
**aberration** [2] 249/6
249/9
**ability** [3] 46/11 47/13
200/17
**able** [30] 15/8 26/24
28/4 33/3 42/6 65/5
74/23 75/10 75/11 75/21
76/5 86/19 98/18 98/22
101/10 103/24 131/16
151/5 151/24 152/1
156/12 190/9 190/24
190/25 192/12 194/3
194/20 194/25 200/3
214/23
**abnormal** [1] 221/5
**above** [5] 22/2 29/14
159/9 178/14 256/9
**above-entitled** [1] 256/9
**absence** [5] 75/21 75/22

229/23 231/7 232/8
**absolute** [1] 222/19
**absolutely** [1] 50/25
**absorb** [1] 172/19
**absorbed** [4] 248/19
248/22 249/4 249/9
**absorbing** [1] 249/2
**absorbs** [1] 250/6
**absurd** [1] 54/24
**abundance** [1] 33/9
**academic** [2] 213/16
220/20
**academically** [1] 234/12
**accept** [3] 42/7 199/22
208/12
**acceptable** [2] 65/11
162/12
**accepted** [13] 22/5 23/17
23/18 25/21 26/16 27/18
28/17 58/19 60/9 84/16
148/2 161/23 213/1
**accompanying** [1] 91/23
**accomplish** [1] 57/19
**accordance** [1] 67/17
**according** [1] 146/22
**accordingly** [1] 83/22
**account** [15] 28/3 57/14
90/19 91/4 101/19 154/8
154/10 158/23 159/14
159/23 163/3 242/19
247/10 249/19 252/25
**accounts** [2] 247/16
249/20
**accrues** [1] 48/3
**accuracy** [1] 153/8
**accurate** [2] 174/17
224/22
**accurately** [3] 24/8 24/9
192/12
**achieve** [1] 232/2
**acknowledge** [1] 153/10
**acre** [2] 191/16 191/17
**acreage** [215] 12/18
15/10 15/11 16/19 16/22
17/15 17/25 18/16 19/16
19/16 20/17 20/18 21/13
21/23 24/4 24/13 24/16
27/21 27/21 27/23 27/23
27/25 28/9 28/22 28/25
29/10 29/15 31/20 31/23
34/19 35/5 35/13 36/4
36/8 36/14 39/6 39/14
39/17 39/23 40/3 40/18
40/19 41/3 41/6 41/9
41/11 41/18 41/20 43/9
43/10 43/13 43/13 44/19
44/22 45/5 46/10 47/11
47/17 53/3 53/17 53/19
55/6 55/8 55/25 59/25
60/21 71/11 73/12 75/10
75/17 76/14 76/19 76/7
80/25 84/8 84/12 85/1
85/5 86/4 86/17 87/16
88/8 88/16 91/15 96/14
98/13 102/13 104/17
107/5 107/6 108/2 108/5

108/10 110/10 110/18
111/4 111/16 115/15
115/17 115/18 124/4
127/18 127/21 128/20
130/3 130/17 135/3
135/15 145/8 149/13
154/15 155/3 155/5
156/8 158/2 158/4 158/8
159/9 159/16 160/8
160/14 160/17 161/6
166/25 168/24 169/7
169/9 170/8 170/13
174/18 174/23 174/23
175/13 175/18 176/12
176/20 176/22 177/7
178/6 178/17 178/25
179/6 181/5 182/25
186/2 190/2 190/3
190/12 190/14 190/16
190/22 191/1 193/19
195/11 195/13 195/13
195/16 201/24 202/17
202/21 203/21 204/1
204/11 204/13 204/25
205/6 205/17 206/11
206/13 207/6 207/14
207/3 208/6 208/14
212/3 212/12 212/24
213/4 213/10 213/12
218/12 219/24 219/25
220/2 220/11 222/6
223/18 223/22 226/22
228/11 231/12 231/25
232/5 234/18 234/19
235/14 235/18 235/21
237/19 238/4 239/18
239/24 240/4 240/7
240/10 240/19 240/22
241/25 242/2 247/22
247/23 249/4 249/16
249/22 250/18
**Acreage's** [1] 108/23
**across** [3] 101/1 218/7
218/8
**act** [3] 5/10 179/15
197/11
**acting** [2] 233/13 233/14
**action** [15] 5/15 6/3 6/17
7/12 8/4 9/11 10/3 31/1
45/9 45/10 47/3 48/2
48/21 126/14 214/1
**actions** [1] 9/3
**actively** [1] 135/4
**activities** [1] 223/25
**activity** [2] 108/25 109/9
**actor** [2] 16/1 29/22
**actual** [35] 6/11 6/18
7/22 15/7 15/7 26/9
26/13 53/16 53/25 54/23
56/23 60/8 81/19 82/16
93/5 94/20 94/24 95/18
97/3 109/15 111/10
117/12 133/25 170/20
170/24 171/17 172/9
173/7 173/11 177/17
178/21 185/2 248/7

252/17 252/23
**actually** [75] 5/1 6/15
13/5 20/5 24/19 26/4
36/18 40/23 61/8 67/20
68/6 69/20 96/22 97/19
110/22 112/21 113/11
116/7 117/16 117/18
118/5 118/13 118/18
119/13 119/23 119/24
120/6 120/9 120/13
121/11 122/4 122/9
122/13 122/16 125/23
128/10 128/20 129/4
129/5 129/25 135/18
136/18 137/13 137/25
138/20 143/1 146/7
151/14 152/25 169/6
172/13 173/19 174/13
175/21 176/9 179/14
184/10 185/2 186/20
193/5 210/23 211/2
229/15 229/16 229/18
235/17 235/20 238/3
244/10 245/14 247/21
250/22 250/23 251/23
253/14
**add** [2] 65/13 78/12
230/2
**added** [3] 172/8 201/14
207/1
**addition** [11] 5/20 37/15
77/15 134/19 135/25
138/10 147/8 167/24
218/9 229/22 234/9
**additional** [6] 20/8
20/13 48/15 78/12 173/6
180/18
**address** [4] 7/18 31/17
43/18 48/22
**addressed** [1] 33/21
**addressing** [2] 3/8 23/6
**adequacy** [1] 30/1
**adequate** [2] 231/23
233/15
**adequately** [2] 232/3
232/4
**adhered** [2] 67/17 199/3
**adheres** [1] 100/15
**Adinolfe** [43] 9/17 12/16
28/14 29/2 47/4 56/12
65/21 73/13 77/12 77/13
77/20 83/21 83/25 84/5
84/7 84/10 85/25 86/2
86/16 87/4 108/8 109/12
109/14 110/16 115/21
125/15 125/19 188/17
188/24 189/5 189/7
189/10 190/6 190/13
190/17 190/25 192/16
192/17 211/7 230/25
236/20 237/24 238/12
**Adinolfes** [1] 110/3
**adjacent** [3] 33/13
**adjudicated** [3] 96/10
100/3 101/8
**adjust** [2] 24/17 29/4

**A**

**adjustable [1]** 191/17
**adjusted [2]** 28/3 213/6
**adjustments [1]** 196/6
**admissibility [1]** 49/8
**admissible [4]** 11/7
49/15 81/18 82/22
**admission [1]** 153/10
**admit [7]** 16/24 17/2
17/12 17/14 21/21 58/19
149/1
**admits [4]** 17/6 17/11
20/20 21/21
**admitted [2]** 19/9 61/7
**admittedly [2]** 6/13
84/13
**adopt [2]** 197/12 214/4
**adopted [2]** 197/20
197/24
**adopting [1]** 217/5
**advanced [1]** 232/13
**advantage [1]** 242/21
**adverse [1]** 7/13
**advised [1]** 232/4
**affect [12]** 90/25 131/15
148/20 154/5 198/22
198/23 233/8 233/9
233/9 233/10 233/11
233/18
**affected [29]** 46/19
47/12 56/3 84/23 85/3
85/4 85/8 86/7 86/8
86/19 86/25 93/10 97/17
137/19 138/15 139/8
141/7 148/19 148/20
156/4 183/1 183/3
183/10 184/5 210/5
221/2 221/2 234/5 234/6
**affecting [6]** 33/19
33/19 33/20 178/10
182/8 248/16
**affects [2]** 91/14 198/18
**affidavit [4]** 23/16 64/11
64/17 217/2
**affidavits [2]** 3/19 5/21
**affirmatively [1]** 132/24
**aforementioned [1]**
245/11
**after [45]** 27/8 27/9 34/1
35/24 46/22 63/16 88/9
89/13 89/23 90/7 90/17
93/21 95/7 96/10 97/4
105/18 121/1 149/23
152/13 155/14 155/18
155/19 155/23 156/2
156/10 157/18 157/22
157/23 158/22 158/23
159/20 160/20 160/25
172/18 177/23 193/9
194/13 206/6 206/12
207/1 207/17 208/2
209/17 219/3 228/4
**afternoon [2]** 28/15
152/10
**afterwards [2]** 99/12
158/4

**again [30]** 9/5 11/3
19/15 34/22 36/12 46/1
46/13 69/19 70/24 73/14
96/5 99/9 99/14 110/7
127/17 127/24 129/4
135/13 136/4 139/5
151/16 170/7 174/5
174/6 209/15 217/1
231/8 231/8 236/17
238/7
**against [6]** 26/18 97/24
169/3 169/8 232/11
232/14
**age [2]** 46/13 97/25
**agencies [1]** 42/17
**agency [2]** 20/3 224/13
**agents [10]** 18/19 21/12
114/22 138/14 138/24
139/6 141/6 141/11
224/2 224/8
**aggregate [5]** 24/12
27/20 29/14 198/23
241/8
**Aggregates [2]** 45/3
51/19
**ago [7]** 120/16 131/19
148/6 148/8 150/14
205/22 208/9
**agree [13]** 83/6 84/4
85/25 101/16 102/1
111/17 149/20 150/7
150/9 172/6 173/25
216/8 217/23
**agreed [1]** 176/18
**agreement [1]** 16/20
**aha [1]** 58/15
**ahead [9]** 3/22 37/17
65/16 65/18 76/23
121/24 152/2 177/25
235/6
**aid [3]** 102/4 102/8
221/22
**aiming [1]** 199/17
**air [2]** 32/8 32/18
**akin [1]** 18/7
**al [4]** 1/3 1/7 3/5 31/14
**Alex [1]** 2/14
**allegation [1]** 177/4
**allegations [3]** 78/18
173/21 186/8
**allege [1]** 145/13
**alleged [2]** 59/7 181/9
**alleging [3]** 53/16 53/23
110/3
**allotment [1]** 76/21
**allow [4]** 8/5 64/13
102/2 243/7
**allowed [3]** 33/2 55/7
82/9
**allows [1]** 76/3
**alloy [1]** 36/22
**almost [2]** 10/2 61/24
**alone [3]** 17/17 17/17
46/5
**along [5]** 35/2 64/19
120/25 135/7 203/15

**already [16]** 19/6 20/7
28/2 44/16 44/18 44/20
48/14 78/5 78/13 83/1
86/12 90/18 95/1 95/18
99/19 138/18 140/11
142/17 151/22 175/1
190/1 218/14 218/14
249/18
**also [35]** 7/1 7/18 10/12
10/14 11/9 12/8 21/1
27/19 38/4 40/24 41/11
45/3 48/5 50/12 61/15
72/19 77/4 89/25 97/8
110/11 123/7 134/20
157/15 157/19 160/14
182/21 192/3 197/21
217/15 226/4 240/19
244/22 248/18 250/13
250/23
**altered [1]** 237/22
**alternative [7]** 9/20
18/22 22/3 53/4 60/12
77/1 161/21
**although [2]** 114/20
198/22
**always [8]** 26/22 26/22
30/12 40/9 41/6 154/22
155/13 234/10
**am [10]** 65/20 99/23
123/5 141/22 173/4
193/17 202/7 220/10
243/11 246/13
**amenable [1]** 26/21
**Amendment [1]** 33/16
**America [2]** 13/6 72/15
**American [1]** 203/8
**among [7]** 60/14 65/10
83/22 100/3 104/16
208/2 247/16
**amount [19]** 27/17 27/17
27/23 27/24 32/16 44/18
48/1 48/5 48/8 48/16
48/16 97/17 97/23
184/21 186/5 233/2
235/20 236/18 238/6
**amounts [1]** 41/13
**analyses [8]** 87/14 143/4
161/21 172/8 173/6
174/3 192/11 196/3
**analysis [150]** 4/22 4/22
12/8 23/25 25/25 26/3
27/20 27/21 66/6 69/4
69/9 72/3 76/1 76/9
76/14 78/22 79/15 79/16
79/20 79/20 79/24 80/1
80/3 80/8 80/9 81/9
81/16 83/9 83/10 87/4
87/11 87/12 87/16 87/20
88/19 89/17 90/11 90/13
91/25 92/15 94/13
102/23 106/3 111/12
113/11 124/8 136/23
141/15 142/1 142/6
142/8 143/6 144/7
144/18 144/19 146/22
152/18 152/20 153/1

153/14 153/17 153/22
153/23 154/10 154/13
155/14 161/10 161/12
161/17 161/22 162/2
162/3 162/5 162/5 162/8
162/10 162/12 162/12
162/13 162/14 162/19
162/20 162/22 162/25
163/5 163/13 163/23
164/1 164/9 164/16
165/2 165/16 166/16
167/12 167/20 172/9
173/7 173/13 195/18
195/19 195/22 195/23
196/10 196/13 201/6
201/9 201/14 201/18
201/19 202/19 203/23
204/3 206/19 206/21
206/23 206/24 207/1
207/5 208/21 209/1
209/3 209/25 210/1
210/3 211/15 212/14
213/10 214/6 215/3
215/13 216/1 216/5
216/7 216/17 218/11
221/16 226/22 228/12
229/6 231/24 251/22
252/18 252/23 252/24
253/3 253/5 253/7 253/8
253/10 253/15
**analytical [2]** 149/8
149/10
**analyze [3]** 90/17 214/20
239/22
**analyzed [1]** 228/6
**analyzing [1]** 229/20
**Anderson [11]** 5/10
43/24 44/2 44/10 45/8
45/11 45/18 45/21 46/18
46/20 47/2
**Andrew [1]** 2/14
**Andrews [1]** 2/8
**announcement [13]**
104/6 104/11 144/25
156/11 156/15 156/16
156/23 157/17 157/22
158/3 172/18 242/6
249/21
**announcements [4]**
159/12 159/25 160/20
209/18
**annual [1]** 246/14
**another [26]** 34/3 42/24
70/13 91/4 96/20 103/11
122/8 122/15 127/10
138/1 148/19 152/9
152/12 160/25 161/7
177/19 177/22 187/14
191/21 194/11 206/2
207/10 214/13 218/19
218/20 253/24
**answer [31]** 4/17 27/8
43/2 63/9 69/2 69/6 70/1
70/3 81/24 94/6 99/6
99/14 104/9 119/17
121/17 132/6 134/1

134/7 163/2 163/4 163/6
165/19 166/2 171/7
177/21 177/23 185/15
202/5 204/17 228/17
231/10
**answered [2]** 72/12
110/5
**answering [1]** 94/7
**answers [7]** 69/11 85/23
99/17 99/18 113/5
132/23 170/14
**anticipated [2]** 13/20
20/5
**anticipating [1]** 242/15
**any [161]** 4/1 4/18 8/8
8/12 10/20 11/11 15/7
15/7 28/3 30/7 34/2 38/3
39/1 45/10 48/23 55/10
55/15 58/1 59/9 59/11
59/12 59/17 60/25 61/1
62/12 63/4 63/9 66/23
67/7 68/12 71/5 73/22
74/24 75/16 78/12 78/18
79/4 79/10 80/3 83/2
83/22 85/5 86/11 86/12
86/18 87/19 87/23 91/12
91/21 91/25 92/1 92/5
93/5 93/22 94/18 94/23
95/1 95/5 95/14 95/14
95/18 95/20 96/7 96/9
96/19 99/14 100/18
101/25 102/16 103/15
104/12 107/4 108/1
109/17 110/3 112/12
112/14 113/10 115/18
118/24 119/25 123/22
127/22 132/3 132/19
133/20 135/18 142/1
143/4 144/12 145/12
147/20 150/22 150/25
154/5 159/18 159/20
159/23 162/13 163/14
163/20 163/20 164/1
164/9 165/17 165/19
165/21 166/6 166/8
166/9 167/8 167/17
168/2 168/18 169/3
171/20 175/13 175/16
175/17 178/25 179/1
180/18 181/4 181/8
185/13 190/23 191/10
191/10 191/13 195/4
196/24 203/21 203/23
203/25 204/3 204/5
204/23 216/3 217/20
222/9 227/25 229/5
232/20 235/16 235/18
236/1 236/20 237/3
237/7 237/13 237/16
237/22 237/23 239/14
239/14 239/24 241/10
242/3 245/18 248/3
249/15
**anybody [9]** 6/21 67/6
93/3 93/21 93/24 94/14
95/16 95/25 127/21

**A**

**anymore [6]** 39/8 46/9
46/12 48/12 150/16
150/21
**anyone [5]** 26/23 92/14
105/13 245/4 245/5
**anything [26]** 8/11 8/11
11/11 11/11 56/21 59/3
59/20 60/2 67/4 77/12
78/25 83/4 88/3 91/24
111/23 119/25 135/23
166/11 166/22 167/2
172/15 209/23 222/7
234/12 246/16 250/22
**anyway [2]** 37/9 42/9
**anywhere [3]** 53/3
176/15 223/20
**aol.com [1]** 1/20
**apart [3]** 78/8 88/13
104/12
**apologize [4]** 51/7 170/2
186/25 240/17
**appeal [1]** 4/10
**appear [3]** 58/20 203/24
252/22
**appearance [2]** 3/9 3/12
**appearances [3]** 1/16
2/1 3/7
**appeared [1]** 4/8
**appears [11]** 55/3 58/7
58/11 106/21 108/2
145/8 157/9 157/22
202/23 220/1 249/3
**appellate [1]** 4/9
**appendix [2]** 169/25
171/3
**apples [2]** 156/6 156/7
**applicable [3]** 4/5 10/3
164/22
**application [3]** 23/2
216/4 216/18
**applied [3]** 62/17 146/10
167/11
**applies [1]** 165/2
**apply [10]** 5/13 11/18
91/18 150/2 161/11
164/2 166/14 166/15
167/15 212/12
**apply -- I [1]** 11/18
**apportion [1]** 10/20
**apportioned [1]** 10/15
**appraisal [82]** 25/6 25/9
26/25 27/5 27/5 66/24
66/24 67/3 67/10 67/12
67/18 68/3 70/5 70/24
70/25 71/1 71/3 72/8
72/15 72/16 72/20 73/3
73/8 83/12 83/14 83/23
84/14 86/2 90/2 90/20
90/22 91/6 92/15 92/18
92/21 92/24 93/15 95/7
95/21 100/6 124/14
124/21 144/14 153/16
153/18 154/11 155/15
161/14 161/16 161/23
162/21 181/25 191/18

193/1 197/4 197/7
197/13 197/14 197/15
197/17 197/19 197/21
197/23 198/1 198/15
198/19 198/20 200/9
201/1 201/8 201/11
201/12 201/21 208/18
211/25 213/2 213/4
213/15 226/10 226/14
226/17 234/14
**appraisals [1]** 71/2
**appraise [2]** 92/17 146/8
**appraised [3]** 23/18
62/18 72/21
**appraiser [25]** 25/8
62/18 67/16 74/17 77/22
78/9 85/9 90/24 93/12
94/16 100/10 101/9
101/23 153/18 182/24
192/25 194/4 196/5
203/5 219/24 220/13
228/22 234/13 244/16
251/5
**appraiser's [5]** 182/23
191/5 199/24 220/6
231/16
**appraisers [15]** 66/23
66/25 72/9 72/17 72/19
154/12 161/13 161/14
162/22 163/12 190/21
195/24 196/24 199/13
234/14
**appraising [1]** 182/24
**appreciate [1]** 28/4
**appreciation [1]** 234/17
**approach [7]** 121/3
129/1 146/1 155/18
161/17 175/19 198/6
**approaches [1]** 196/1
**appropriate [12]** 5/1
19/11 31/1 91/15 138/4
138/5 160/4 201/7
201/21 202/21 229/14
245/19
**appropriately [1]**
193/21
**approved [5]** 22/5 151/4
151/5 151/25 151/25
**approximately [3]** 31/10
176/11 176/21
**April [1]** 68/11
**aquifer [1]** 47/16
**Aramark [1]** 9/12
**arbitrary [1]** 189/22
**Arcadis [1]** 20/2
**area [152]** 18/14 18/17
19/5 32/12 34/12 39/25
50/20 51/1 51/1 51/4
51/21 51/22 51/23 52/3
52/6 52/10 52/10 52/11
52/14 52/14 52/16 52/19
52/20 53/1 53/8 53/10
53/17 53/25 54/7 54/25
55/4 55/11 55/15 55/19
56/3 56/4 56/21 59/22
60/3 60/11 61/2 61/5

61/17 61/23 66/3 66/3
66/12 73/15 76/25 77/1
77/8 77/11 77/12 77/16
78/3 78/5 78/14 78/15
78/16 84/1 84/2 84/3
84/5 84/23 85/1 85/3
86/4 86/6 86/7 86/7
86/17 86/19 86/20 86/21
86/24 90/10 91/11 101/1
106/18 106/19 106/23
107/1 107/10 107/18
107/20 108/25 109/9
109/16 109/16 117/13
122/8 131/15 131/17
132/11 141/11 145/12
148/15 148/19 148/20
150/4 150/12 153/25
154/9 154/24 155/8
155/8 157/3 168/9
168/13 168/16 168/21
169/4 169/14 171/20
173/12 174/18 175/7
175/12 176/16 178/21
181/8 188/17 190/12
190/13 190/13 190/17
190/17 191/8 191/9
191/10 191/11 192/12
192/13 193/5 193/6
194/20 195/16 206/7
208/3 210/7 210/9
214/16 230/25 231/2
239/2 240/4 242/17
245/25 246/11 247/20
248/17 252/6
**area-wide [7]** 52/14
52/14 53/8 53/17 53/25
55/4 109/16
**areas [44]** 18/17 32/6
32/9 32/10 34/12 34/16
51/18 54/20 55/18 56/6
76/5 83/17 87/17 106/5
106/8 154/1 154/16
154/18 154/19 154/24
155/6 156/3 157/4 158/3
158/5 158/9 160/13
160/15 177/12 178/5
178/16 188/23 188/23
192/11 206/7 213/13
223/17 231/5 245/24
246/2 246/11 247/3
247/12 247/17
**aren't [18]** 52/13 53/2
57/11 106/23 109/9
117/13 122/19 124/19
129/15 149/15 154/17
164/17 165/6 168/22
175/9 180/8 191/10
191/10
**arena [1]** 221/12
**argue [10]** 5/9 5/9 6/10
44/23 44/24 54/22 56/24
82/21 173/5 186/23
**argued [3]** 5/12 7/21
7/23
**arguing [1]** 7/21
**argument [5]** 7/19 7/19

61/11 62/24 187/1
**argumentative [4]** 71/18
72/11 86/14 189/23
**arguments [2]** 5/2 14/19
**arising [2]** 45/10 78/13
**arm [1]** 18/7
**arm's [1]** 231/21
**arose [2]** 241/25
**around [12]** 27/25 55/24
55/25 56/14 84/20
156/11 159/1 159/1
184/16 189/8 247/20
247/24
**arrangement [1]** 58/6
**arrived [1]** 80/11
**arrives [1]** 83/10
**arriving [1]** 67/3
**arrow [1]** 41/21
**arrows [1]** 41/1
**articles [3]** 214/8 221/17
221/21
**articulated [1]** 208/17
**artifacts [1]** 62/9
**asbestos [10]** 29/23
29/24 180/5 180/21
223/21 224/2 224/6
224/9 224/18 224/24
**ascertain [6]** 30/14
30/15 190/3 193/4
199/15 212/12
**ascertainability [2]**
30/13 192/15
**ascertainable [5]** 48/9
192/14 192/18 192/23
193/5
**ascertainment [1]**
245/19
**aside [2]** 3/24 107/1
**ask [24]** 3/6 3/8 11/13
14/1 26/4 27/19 54/10
76/17 88/17 91/19 94/4
99/2 105/11 126/6
150/22 168/25 169/7
216/20 228/7 235/1
245/4 245/5 246/24
248/12
**asked [40]** 42/23 59/12
68/10 69/10 70/2 70/7
70/9 72/11 84/3 85/2
85/22 91/18 94/8 99/16
103/3 103/14 104/10
104/13 108/7 110/5
126/25 130/22 133/15
133/25 135/22 147/9
165/22 166/1 169/12
169/13 169/20 169/24
170/6 170/23 176/17
178/20 181/12 182/6
250/22 252/1
**asking [17]** 23/23 76/19
77/11 92/17 107/15
107/16 130/14 169/16
169/19 174/11 174/19
176/1 178/19 204/18
227/10 227/12 251/20
**aspect [4]** 15/13 180/16

61/11 62/24 187/1
198/8 219/20
**asserted [1]** 77/17
**assess [3]** 70/21 220/3
227/5
**assessed [1]** 24/19
**assessing [3]** 75/19
203/9 234/11
**Assessment [1]** 224/14
**assignment [5]** 77/10
84/15 86/2 86/14 124/14
**assist [2]** 65/9 101/21
**assistance [1]** 84/6
**associated [6]** 32/2 35/1
36/14 228/11 230/23
231/5
**association [2]** 16/4
203/9
**assume [17]** 4/14 78/20
83/25 84/1 87/18 89/18
90/13 179/5 182/6
203/21 210/20 211/1
212/22 228/9 233/1
239/17 241/23
**assumed [1]** 78/21
**assumes [2]** 78/25 90/11
**assuming [1]** 249/11
**assumption [3]** 89/19
90/10 91/18
**assumptions [2]** 60/6
111/9
**asterisk [1]** 168/6
**Atlanta [1]** 2/24
**attached [1]** 95/2
**attempt [1]** 79/4
**attempted [3]** 86/18
145/19 146/16
**attention [5]** 15/18
108/21 121/25 145/21
251/8
**attorney [3]** 74/17 132/2
179/15
**attorneys [6]** 3/6 77/10
78/19 179/16 185/14
209/24
**attributable [2]** 55/21
181/15
**attribute [1]** 56/5
**attributed [2]** 57/16
59/16
**attributing [1]** 109/8
**August [18]** 76/24 77/1
90/3 90/5 90/12 91/10
91/20 93/19 94/4 94/11
94/14 95/17 156/16
158/11 237/4 238/15
241/20 241/24
**August 2009 [2]** 158/11
241/24
**August 24 [4]** 90/3 90/5
94/14 95/17
**August 24th [8]** 77/1
90/12 91/10 93/20 93/19
94/4 94/11 156/16
**August 29 [2]** 237/4
238/15
**authorities [1]** 15/4

**A**

**authority [1]** 89/20
**automated [1]** 212/9
**available [6]** 66/25
81/14 235/23 236/6
236/12 243/18
**avenue [3]** 2/3 2/8 28/8
**average [6]** 27/20 154/3
154/14 154/23 209/3
229/16
**averages [1]** 245/18
**AVM [4]** 200/1 200/3
212/9 212/19
**avoid [1]** 168/18
**award [5]** 10/16 25/10
92/23 102/6 203/11
**award-winning [1]**
25/10
**awarded [2]** 95/8 203/9
**awards [1]** 203/6
**aware [22]** 10/2 10/24
31/23 90/18 128/5
130/15 130/19 131/14
134/9 143/6 143/11
172/13 173/1 173/20
173/21 198/13 200/24
222/10 225/19 225/24
236/23 241/19
**awareness [1]** 130/2
**away [16]** 35/18 36/5
36/9 39/12 46/15 46/15
46/15 51/7 80/1 115/14
115/18 129/21 133/9
137/15 141/9 228/1

**B**

**back [48]** 4/11 26/4 42/4
42/22 43/1 44/5 47/23
58/13 70/12 74/8 78/2
104/9 104/21 105/4
105/21 112/9 113/10
115/20 116/8 117/1
118/21 119/1 119/7
120/12 121/8 122/21
122/24 125/3 127/21
127/24 128/10 129/10
130/10 130/14 132/13
148/25 157/24 158/15
161/3 172/19 174/5
193/10 194/9 200/20
200/24 248/13 248/14
253/23
**backed [7]** 62/16 147/7
147/9 147/10 147/12
147/13 147/19
**background [5]** 14/18
34/21 59/17 62/3 239/21
**backing [4]** 115/14
115/18 121/13 121/13
**backlogged [1]** 42/5
**backyard [1]** 191/18
**bad [10]** 16/1 16/3 22/12
150/10 150/13 150/13
151/1 151/11 151/11
175/14
**baked [3]** 32/17 144/10

151/18
**bank [1]** 130/21
**banker [4]** 131/14
131/22 131/25 134/6
**bankers [3]** 130/7 131/9
133/13
**bankrupt [2]** 42/3 42/17
**bankruptcy [1]** 42/9
**banks [13]** 24/22 127/15
128/9 128/18 128/23
129/5 129/15 129/25
130/14 130/21 134/14
134/15 134/20
**Barlit [4]** 25/14 26/15
27/6 147/9
**Barnhart [1]** 2/10
**Bartlit [1]** 2/15
**base [3]** 74/25 128/8
252/18
**based [41]** 6/14 20/7
32/23 32/24 45/7 60/5
60/8 70/12 90/1 92/3
112/12 114/17 115/25
116/6 126/3 127/14
132/17 146/24 168/12
170/18 171/10 171/13
181/13 181/20 184/16
185/2 204/6 214/20
229/19 235/23 236/6
236/8 236/12 239/21
243/12 243/17 246/20
248/7 252/16 252/17
252/23
**baseline [7]** 12/14 12/15
72/2 72/3 74/10 155/7
155/22
**bases [2]** 126/9 218/11
**basic [1]** 65/1
**basically [2]** 114/7
218/19
**basis [39]** 10/20 19/12
21/16 21/17 22/15 29/13
30/9 30/11 50/9 50/16
53/6 61/13 75/5 77/6
79/17 81/5 81/24 83/2
91/2 99/14 102/9 102/23
126/8 142/16 147/4
151/22 152/21 161/7
161/15 182/11 207/5
217/7 222/12 224/21
224/22 229/17 235/25
247/18 252/4
**batch [1]** 186/3
**Beach [27]** 1/8 1/20 2/11
2/12 2/21 13/4 24/14
24/15 41/3 42/12 42/15
45/3 51/3 51/3 51/4
51/19 52/4 52/4 52/9
56/1 86/5 86/23 156/7
221/18 221/21 224/15
247/21
**bear [4]** 49/6 140/7
164/14 186/24
**bears [2]** 40/4 56/8
**became [2]** 24/21 31/23
**because [110]** 3/10 7/10

10/6 **291** 19/2 19/6
25/3 25/22 30/8 31/24
32/25 33/4 33/15 34/13
34/23 35/7 35/14 35/17
35/23 36/1 36/8 36/12
36/17 36/18 37/2 37/17
38/1 38/10 39/3 39/8
40/24 41/13 41/18 42/4
42/25 43/4 44/9 44/11
44/16 44/18 45/22 46/1
46/8 48/7 49/21 50/7
50/12 54/5 54/10 60/24
61/11 63/5 65/12 75/12
85/4 86/8 90/5 91/25
94/25 95/13 96/22 97/5
97/9 97/21 100/18
102/17 104/17 117/8
121/13 122/1 122/11
130/23 132/21 135/2
135/13 142/8 142/9
142/21 146/17 148/14
151/15 155/12 156/6
163/24 164/18 165/8
166/4 166/8 167/2
168/16 170/17 172/2
174/25 176/3 183/24
187/14 196/15 205/21
207/21 211/9 218/25
228/16 240/4 242/15
242/18 244/2 244/8
242/20 245/20 247/15
**Beck [5]** 2/15 25/14
26/15 27/6 147/9
**become [1]** 107/5
**becomes [2]** 48/9 234/4
**bed [1]** 158/5
**Bedient [3]** 21/7 22/4
22/17
**Beeline [2]** 40/11 41/5
**before [62]** 1/13 4/9 4/9
4/12 5/22 9/1 12/8 12/10
14/11 16/17 25/18 26/25
27/22 36/2 42/7 42/17
42/18 46/5 47/6 48/7
53/15 80/7 87/8 88/9
89/5 89/10 89/10 89/12
89/17 90/17 93/21
110/19 115/20 116/8
118/21 119/8 123/2
126/15 127/17 155/14
155/16 155/16 155/17
155/22 156/1 156/10
157/16 157/23 158/3
158/12 158/21 158/23
159/18 160/20 160/25
161/4 187/14 206/11
221/16 229/7 242/17
242/18
**before-and-after-type
[1]** 155/14
**began [3]** 32/2 35/6
54/11
**begin [1]** 63/15
**beginning [6]** 33/25 86/3
159/21 159/23 188/15
247/2

**begins [1]** 134/8
**behalf [4]** 31/13 55/11
55/14 209/25
**behave [1]** 126/20
**behaving [1]** 160/18
**behind [3]** 143/11
143/18 143/25
**being [38]** 3/17 14/7
26/21 32/19 37/1 39/11
54/11 54/13 58/21 60/15
75/21 77/17 78/18 84/5
92/8 108/1 108/5 126/25
145/12 178/20 181/12
185/4 185/12 206/10
215/11 221/15 221/19
222/3 222/5 222/13
232/1 232/5 233/3 233/4
239/5 248/20 250/10
250/16
**belabor [1]** 216/14
**belie [1]** 60/22
**belief [1]** 184/17
**believable [1]** 11/4
**believe [35]** 9/5 11/6
45/2 65/25 67/11 73/23
74/2 74/2 77/9 84/24
88/14 101/21 102/2
107/4 108/14 110/11
132/3 138/18 139/22
143/10 145/14 163/2
176/10 198/9 198/15
198/25 200/19 215/20
222/2 228/2 230/2
236/16 240/21 242/10
247/14
**believed [1]** 107/5
**belittled [1]** 52/11
**below [9]** 16/2 16/14
61/20 62/1 122/6 139/11
162/1 179/7 209/17
**beneath [1]** 33/13
**benefit [4]** 3/13 51/8
211/19 219/14
**best [6]** 9/6 188/12
203/10 215/24 233/13
239/6
**better [1]** 149/24
**between [31]** 15/12
16/20 51/23 52/10 70/14
84/20 88/13 96/16 97/18
114/14 146/23 154/3
155/2 155/7 175/17
206/13 208/1 210/11
211/14 211/19 212/21
220/3 225/17 236/18
239/23 243/19 244/4
246/10 246/15 247/2
247/11
**beyond [4]** 29/14 153/20
215/9 250/22
**biannually [1]** 197/18
**bias [2]** 168/18 169/8
**biases [1]** 169/3
**big [6]** 44/11 47/7 50/8
84/1 91/10 206/13
**bigger [2]** 85/1 191/13

**Bilder [1]** 42/23
**Bill [1]** 191/10
**billion [2]** 46/25 146/23
**bills [1]** 232/14
**binder [2]** 64/18 124/1
**bit [10]** 5/12 20/4 31/7
32/3 53/5 80/16 187/18
190/2 203/13 230/21
**black [5]** 66/21 67/4
72/10 72/14 195/18
**blindly [1]** 84/16
**blocks [1]** 191/19
**blood [1]** 37/2
**blow [4]** 162/1 205/13
207/8 222/25
**blowup [1]** 51/17
**blue [3]** 19/15 157/2
208/14
**board [2]** 49/4 88/21
**bodily [1]** 45/24
**boil [1]** 6/1
**boils [1]** 11/1
**bones [1]** 12/7
**book [2]** 197/19 197/25
**books [1]** 66/24
**boost [1]** 225/10
**border [1]** 30/16
**borne [4]** 144/17 144/18
144/18 184/19
**borrow [3]** 97/24 232/11
232/14
**both [35]** 4/19 4/20 4/21
11/23 19/18 19/21 21/7
21/9 23/2 23/2 23/8 32/9
32/10 41/13 54/4 54/8
75/9 76/7 85/25 88/7
88/9 88/9 90/9 97/11
116/18 116/18 140/4
154/4 185/10 213/10
213/16 231/5 232/3
233/3 236/4
**bother [1]** 185/23
**bottle [2]** 47/23 164/7
**bottom [7]** 7/15 20/12
32/13 37/14 37/25 41/20
52/5 73/19 136/20
137/19 146/21 204/12
204/23 206/24 219/18
223/7 225/5
**bought [5]** 93/21 94/25
95/16 96/3 96/15
**Boulevard [2]** 2/11 51/5
51/5 52/6
**boundaries [17]** 84/7
86/1 86/4 107/8 148/20
178/4 178/24 189/16
189/20 190/6 190/8
190/24 191/1 192/4
192/6 192/12 223/17
**boundary [10]** 28/13
84/10 84/14 148/22
151/3 151/25 190/13
192/17 194/6 212/7
**bounds [5]** 28/12 28/24
55/2 153/16 210/19
**box [5]** 66/21 67/4 72/10

**B**

**box... [2]** 72/14 195/18
**brain [13]** 32/2 34/25
35/9 35/12 46/3 56/18
56/25 58/2 59/4 59/14
70/19 114/16 225/18
**brand [1]** 215/10
**break [14]** 26/12 49/3
104/25 105/1 105/14
152/9 154/19 187/13
187/14 187/18 187/19
187/24 193/9 194/10
**brief [5]** 40/4 43/23 56/9
197/10 243/4
**briefing [3]** 12/24 44/9
63/2
**briefly [10]** 9/8 9/9
10/23 57/23 60/12 79/13
106/4 218/5 243/6 250/1
**briefs [1]** 54/3
**bring [7]** 15/18 19/17
21/9 21/9 23/15 35/19
46/20
**bringing [1]** 40/2
**brings [1]** 62/11
**Britney [1]** 31/14
**broadening [1]** 18/13
**broader [3]** 142/9
192/16 228/2
**broker [4]** 37/6 136/18
136/20 137/4
**brokers [5]** 80/18
134/23 136/8 136/15
137/24
**Bromodichloromethane
[1]** 20/21
**brought [1]** 125/10
**Bryan [2]** 2/5 4/2
**buffer [11]** 158/22
159/21 159/22 161/3
161/4 242/17 242/18
245/12 245/14 245/16
245/19
**build [2]** 20/8 20/13
**builder [1]** 39/23
**building [1]** 150/3
**built [3]** 20/7 20/10
88/23
**bulging [1]** 42/6
**bulleted [1]** 161/25
**bunch [3]** 124/18 178/15
185/19
**bundle [1]** 47/15
**burden [5]** 21/13 49/7
49/14 50/5 50/7
**buried [3]** 36/17 37/10
38/4
**burning [2]** 16/14 37/22
**bury [1]** 37/9
**burying [1]** 37/11
**busy [1]** 40/12
**buy [13]** 14/23 24/20
95/12 95/14 96/17
174/20 178/21 184/5
190/15 190/16 195/12
233/2 233/5

**buyer [6]** 182/25 199/21
233/2 233/4 233/8
233/12
**buyers [7]** 117/1 122/24
171/19 172/25 172/25
232/3 232/5
**buying [3]** 84/9 84/11
169/13

**C**

**calculate [3]** 98/16
100/21 245/14
**calculation [3]** 74/16
244/10 253/8
**calculations [4]** 79/23
91/16 196/14 229/19
**California [1]** 190/15
**called [22]** 6/14 22/19
26/24 27/4 32/12 36/22
39/15 44/3 58/17 61/25
76/1 77/5 85/5 86/4
112/18 156/25 158/14
158/24 197/4 197/17
197/19 206/19
**calls [2]** 140/8 192/21
**came [7]** 21/12 21/19
21/20 156/23 204/7
206/15 213/8
**campfire [1]** 32/13
**campus [6]** 237/8 237/11
237/23 238/3 238/18
239/1
**can't [34]** 5/22 22/12
23/9 25/22 46/20 47/23
48/5 72/7 73/23 91/24
94/18 95/16 97/13 97/23
97/24 97/25 97/25 99/11
99/11 101/1 119/10
122/11 127/23 127/24
130/23 153/20 171/1
171/16 190/23 200/1
207/20 208/9 245/17
252/9
**cancer [230]** 13/9 16/11
16/14 16/22 18/19 21/12
31/20 31/25 32/2 34/6
34/9 34/25 35/10 41/8
45/4 46/3 56/10 56/19
56/25 57/4 57/8 57/13
57/17 57/25 58/2 58/4
58/7 59/2 59/4 59/7
59/12 59/15 104/6
104/11 108/8 108/12
108/16 108/23 109/4
109/9 109/17 110/2
110/9 110/19 111/1
111/6 111/10 111/14
111/18 112/5 112/6
112/11 113/10 113/11
114/3 114/4 114/10
114/18 114/22 114/22
115/3 115/9 115/12
115/15 115/16 115/21
115/22 116/3 116/9
117/2 117/9 117/20
117/23 117/25 118/9

118/21 119/4 119/24
120/14 121/18 122/1
122/7 122/8 122/11
122/15 122/15 122/19
122/25 123/2 123/3
123/4 123/8 123/11
123/15 127/7 127/19
128/2 128/14 129/9
129/12 129/17 129/20
129/22 129/24 130/1
130/7 130/11 130/17
130/24 131/3 131/10
131/12 131/14 131/23
131/25 132/4 132/8
132/8 132/9 132/25
133/1 133/4 133/9 134/2
134/3 134/8 134/10
134/11 134/15 135/3
135/4 135/12 136/15
136/19 136/20 136/21
136/25 137/3 137/5
137/6 137/10 137/16
137/20 137/25 138/1
138/2 138/7 138/15
138/19 139/1 139/2
139/3 139/7 139/13
139/16 139/18 139/24
140/4 140/9 140/12
140/21 140/24 140/25
141/7 141/10 141/12
141/12 141/20 141/24
142/2 142/5 142/11
142/13 142/18 142/19
142/21 142/22 142/24
143/1 143/2 143/13
143/16 144/6 144/8
144/22 144/24 145/5
145/11 156/18 156/21
157/17 160/9 173/20
203/15 203/20 204/10
204/20 205/8 224/2
224/8 225/7 225/9
225/20 226/4 227/16
227/17 228/2 228/5
228/7 228/13 228/23
229/1 235/18 235/21
235/25 236/8 236/13
236/24 238/3 239/5
239/14 239/18 239/20
239/24 241/21 242/2
242/13 251/24 252/2
252/7
**cancer-causing [9]** 13/9
16/11 16/14 16/22 18/19
21/12 114/22 224/2
224/8
**cancers [8]** 41/9 56/18
58/9 59/4 59/7 59/14
114/16 225/18
**cannot [8]** 10/15 46/7
46/9 47/12 59/16 98/1
98/9 132/24
**cap [1]** 46/25
**capable [1]** 56/17
**capture [1]** 251/8
**carcinogens [5]** 13/3

16/25 17/8 17/9 17/13
**card [53]** 39/13 112/18
112/22 113/1 113/8
113/21 113/22 114/1
114/2 114/8 114/20
115/2 115/9 142/13
168/8 169/6 169/13
174/1 174/5 176/7
176/19 176/24 177/3
177/9 177/18 179/25
180/3 181/7 181/16
183/25 185/11 185/13
186/14 186/20 220/16
221/25 222/2 222/7
222/23 224/22 225/6
225/9 225/19 226/5
235/25 236/7 237/8
238/18 239/5 239/14
239/19 243/12 243/17
**cards [1]** 115/7
**care [5]** 15/24 15/24
16/2 16/15 44/13
**carefully [1]** 115/10
**careless [1]** 198/20
**carrying [1]** 206/8
**cartography [1]** 192/10
**case [141]** 1/2 3/4 3/5
4/10 4/11 6/14 6/15 6/17
7/5 7/10 9/12 9/17 10/17
12/11 12/20 13/25 14/6
14/11 14/15 14/17 14/22
15/15 15/16 16/21 25/1
25/15 25/16 29/23 30/22
32/21 32/23 32/25 34/22
40/8 43/25 44/4 44/5
44/7 44/17 44/21 45/17
45/18 46/2 46/19 46/19
47/9 47/20 49/22 49/24
50/3 50/9 50/15 51/21
51/24 51/24 53/14 62/20
62/21 65/2 69/9 70/9
72/1 79/11 81/9 81/16
82/3 82/5 82/6 82/13
82/14 82/15 82/17 83/18
83/25 84/1 84/2 84/5
95/4 96/8 96/10 109/22
115/4 115/8 125/10
125/15 126/19 147/11
147/12 148/4 148/13
148/23 150/1 150/16
150/21 150/25 152/5
168/12 173/3 173/8
174/14 179/14 180/16
180/21 181/10 181/14
181/16 184/9 184/10
184/12 184/25 185/3
185/21 185/24 185/25
186/8 186/14 186/21
190/2 196/2 196/8 198/6
201/6 201/8 201/18
201/19 209/24 213/18
215/6 215/21 217/18
217/18 221/8 227/21
227/21 228/9 229/24
230/8 230/14 239/14
241/18 244/8

**cases [29]** 6/10 9/24 10/3
10/4 14/12 31/15 32/22
41/8 56/25 58/7 58/10
58/11 59/12 62/16 62/17
78/11 147/7 147/8
147/10 147/13 147/20
147/20 149/10 158/18
172/3 172/10 181/18
184/13 249/3
**castle [1]** 33/17
**categorization [1]**
145/10
**categorize [1]** 123/6
**causal [5]** 58/22 114/14
225/16 226/8 239/23
**causality [1]** 104/15
**causation [4]** 9/8 50/11
59/2 219/21
**cause [7]** 5/15 7/12
10/14 18/22 22/3 44/14
45/9 46/6 47/3 48/2 58/1
59/3 59/8 59/12 59/17
102/24 103/10 103/15
103/18 104/5 155/5
219/9 219/10 219/10
219/12 219/19 222/15
231/5 235/17 235/21
239/18
**caused [32]** 6/23 8/10
10/7 10/8 10/9 10/19
13/17 29/5 35/8 46/5
56/10 56/24 57/4 57/11
57/12 102/11 102/12
102/22 103/1 103/2
119/2 140/10 140/10
180/17 223/11 228/13
230/24 238/3 239/20
249/12 249/12 249/16
**causes [9]** 6/17 8/4 9/11
9/20 10/15 43/6 48/20
213/7 219/23
**causing [13]** 13/9 16/11
16/14 16/22 18/19 21/12
56/18 78/17 114/22
206/6 221/3 224/2 224/8
**caveat [1]** 230/2
**CE [1]** 247/21
**cell [1]** 37/2
**cemetery [6]** 7/4 7/8
7/11 15/6 17/20 51/24
**center [1]** 32/8
**central [3]** 14/3 114/3
142/14
**cert [2]** 49/21 56/9
**certain [7]** 32/15 44/12
44/14 121/24 214/20
215/16 233/20
**certainly [44]** 21/10
30/18 54/6 66/22 72/1
72/16 75/15 77/13 79/22
80/1 81/6 81/12 86/20
93/8 93/25 99/19 100/5
101/17 101/20 102/7
102/13 109/6 118/7
119/1 119/9 126/21
144/19 153/17 159/10

**C**

**certainly... [15]** 161/21 161/23 162/21 174/15 193/4 194/10 198/15 202/23 211/15 212/1 215/20 220/1 227/22 240/1 249/14

**certainty [8]** 21/11 161/16 194/4 194/5 208/18 213/4 220/14 230/23

**CERTIFICATE [1]** 256/5

**certification [35]** 1/12 4/13 4/16 4/22 5/1 5/3 5/7 5/14 6/1 6/10 7/15 9/2 9/6 9/22 11/19 14/1 14/4 14/7 24/25 25/2 27/10 28/20 29/8 29/19 30/12 30/19 48/18 48/18 49/7 50/2 50/5 62/25 82/10 82/12 98/16

**certified [13]** 25/9 27/9 32/23 34/22 47/20 54/5 95/8 100/8 197/22 210/14 210/20 211/1 256/7

**certifies [1]** 147/1

**certify [5]** 14/2 30/10 32/21 49/9 256/7

**certifying [1]** 49/23

**cetera [2]** 134/3 141/8

**challenge [6]** 16/7 16/12 23/12 25/22 27/6 27/7

**challenged [7]** 14/8 16/16 17/16 25/16 27/15 172/3 172/8

**chance [4]** 13/12 168/3 251/1 251/3

**change [41]** 44/1 45/13 45/15 48/17 70/16 78/1 78/6 79/22 88/8 88/11 88/14 89/25 91/21 92/3 107/19 107/24 111/13 111/13 116/6 116/8 118/21 119/5 119/8 128/4 141/16 155/2 182/1 203/19 204/23 210/23 211/2 211/15 227/24 227/25 232/8 237/12 238/11 238/14 238/17 238/21 238/25

**changed [13]** 68/6 115/25 116/2 117/8 135/11 155/10 204/20 211/14 236/19 237/2 237/6 237/13 238/1

**changes [3]** 155/1 156/13 210/6

**changing [7]** 90/25 91/9 91/19 106/3 110/1 111/23 127/17

**chapter [1]** 67/9

**characteristics [4]** 200/4 200/7 200/11 200/15

**characterization [4]**

**characterize [8]** 122/23 124/8 125/13 134/22 138/11 138/12 179/8 251/10

**characterized [2]** 135/7 204/9

**characterizes [1]** 79/19

**characterizing [1]** 126/15

**chart [12]** 65/1 65/6 88/23 168/6 207/9 207/10 207/13 209/10 211/9 214/5 215/12 247/2

**charts [5]** 205/10 209/2 229/7 248/7 252/16

**cheapest [1]** 13/16

**check [3]** 26/17 31/9 125/16

**chemical [3]** 182/5 182/7 215/1

**chemicals [29]** 13/9 16/22 20/22 20/22 20/22 20/23 55/4 55/7 178/3 178/15 178/23 180/17 180/18 180/25 181/2 181/3 181/4 181/23 182/3 182/5 182/14 184/4 184/16 184/18 185/20 223/8 223/11 223/15 224/1

**chemist [2]** 102/16 219/22

**chemistry [1]** 181/21

**chemists [1]** 183/25

**Chicago [2]** 2/17 208/8

**children [4]** 33/19 34/19 251/12 252/6

**Chloride [1]** 20/21

**Chloroform [1]** 20/21

**choice [1]** 168/24

**choices [1]** 145/5

**choose [2]** 107/16 210/2

**chooses [2]** 107/9 210/2

**chose [3]** 13/16 13/21 168/15

**chosen [3]** 168/21 168/23 209/23

**Circuit [19]** 4/10 6/16 7/10 7/20 7/21 7/23 9/17 12/20 14/14 14/16 14/21 21/8 44/3 49/22 49/23 53/13 53/15 53/15 53/21

**Circuit's [3]** 8/17 12/16 53/14

**circuits [1]** 44/2

**circumstances [4]** 221/10 222/9 233/20 241/18

**citation [1]** 208/9

**cite [4]** 14/22 81/8 139/24 142/15

**cited [2]** 10/12 45/17

**CIV [2]** 1/2 3/5

**claim [75]** 6/7 14/6

**14/10** 14/10 14/11 14/13 15/6 15/7 15/25 18/8 22/12 22/13 24/4 29/8 44/25 45/2 45/3 45/4 45/6 46/4 46/18 49/16 52/16 52/21 53/8 53/12 53/22 53/22 53/24 54/5 54/8 54/13 54/13 54/15 54/22 55/10 55/12 55/14 55/16 55/20 56/10 56/15 56/17 56/20 56/23 57/21 61/17 62/7 67/20 69/16 70/21 75/25 77/5 77/17 78/4 80/17 85/1 92/8 102/10 103/1 111/9 117/12 119/7 123/19 125/12 134/20 146/21 147/20 155/9 161/18 168/2 168/12 169/21 180/10 185/22

**claimants [1]** 213/25

**claimed [7]** 56/13 78/11 111/24 127/11 143/1 143/2 146/2

**claiming [11]** 52/13 53/2 53/25 54/21 55/4 57/4 57/11 128/5 144/4 173/19 227/4

**claims [18]** 5/10 12/25 30/2 31/18 31/18 45/21 45/25 46/20 47/4 48/18 48/19 53/16 56/7 61/10 78/8 78/13 174/14 204/7

**clarification [2]** 131/5 133/15

**clarified [1]** 6/16

**clarify [1]** 92/10

**class [208]** 1/12 4/12 4/16 4/22 4/25 5/3 5/7 5/13 5/14 6/1 6/3 6/10 7/15 8/21 9/1 9/6 9/22 11/19 11/20 11/23 11/24 14/1 14/2 14/3 14/7 24/25 25/2 27/9 27/11 28/10 28/11 28/13 28/14 28/20 29/8 29/19 30/10 30/12 30/14 30/15 30/16 30/19 31/1 33/22 49/7 49/9 49/9 49/16 49/18 49/20 49/23 50/2 50/5 50/9 50/10 50/10 50/15 50/20 51/1 51/18 51/21 52/2 52/6 52/20 53/1 53/11 53/16 53/18 54/5 54/9 54/16 54/20 55/18 55/19 55/19 56/6 56/9 56/21 59/22 60/3 60/11 61/2 61/5 61/16 62/25 63/3 66/3 66/8 73/15 76/25 77/1 77/11 77/12 83/16 83/17 83/20 83/21 86/7 87/3 90/1 90/10 90/16 91/2 91/4 91/9 92/12 92/14 93/4 93/21 94/19 95/6 95/8 95/9 96/6 96/9 96/16 97/8

**97/11** 98/16 98/21 99/20 99/23 99/25 99/25 100/4 100/7 100/8 100/9 101/1 101/8 101/14 102/7 106/4 106/8 106/18 106/19 107/1 107/7 107/18 109/9 109/16 147/1 148/15 150/4 150/12 151/4 151/5 151/25 152/1 153/25 154/24 155/8 157/3 168/13 168/16 168/21 169/4 171/20 173/12 176/15 181/8 188/17 188/17 188/18 188/23 188/24 188/24 189/2 189/4 189/5 189/7 189/10 189/11 189/13 189/20 190/13 191/3 192/4 192/6 192/16 192/17 192/17 192/24 193/22 194/6 194/20 194/21 194/25 206/7 208/3 209/20 210/7 210/8 210/11 210/14 210/15 210/20 210/22 211/1 211/7 211/20 212/23 214/1 237/4 239/2 244/1 244/2 244/20

**class-wide [10]** 49/16 50/9 50/10 50/15 91/2 91/14 101/14 194/21 211/20 212/23

**classes [2]** 82/11 82/12

**classic [1]** 21/5

**classification [1]** 27/13

**classifications [1]** 19/21

**classroom [2]** 167/1 167/18

**clause [1]** 15/13

**clean [4]** 38/7 38/8 38/8 187/24

**cleaned [2]** 32/6 38/15

**cleaners [1]** 21/2

**cleaning [3]** 38/13 38/18 224/8

**cleans [1]** 38/12

**cleanup [1]** 224/1

**clear [8]** 7/11 9/13 9/17 9/23 12/14 44/21 172/16 183/8

**clearly [7]** 5/12 145/3 149/20 176/11 189/21 192/18 206/11

**Clematis [1]** 1/19

**client [4]** 84/15 84/17 86/15 199/12

**clients [4]** 86/18 124/19 124/21 209/25

**clock [1]** 76/18

**Clorox [1]** 30/8

**close [6]** 16/21 21/19 38/1 38/2 158/2 206/1

**closed [3]** 39/8 40/23 42/10

**closely [3]** 160/17 206/12 223/4

**closer [2]** 52/7 175/11

**closes [1]** 142/23

**closest [6]** 15/10 15/11 51/22 52/25 53/1 182/9

**closure [1]** 38/3

**cluster [200]** 31/20 31/25 34/6 34/9 34/25 45/5 46/3 56/10 56/19 57/4 57/8 57/13 57/17 58/1 58/4 59/2 59/4 59/7 59/16 104/6 104/11 108/8 108/12 108/16 108/23 109/4 109/9 109/17 110/2 110/9 110/19 111/1 111/6 111/10 111/11 111/14 111/18 112/5 112/7 112/11 113/10 113/12 114/3 114/10 114/18 114/22 115/3 115/10 115/12 115/15 115/16 115/21 115/22 116/3 116/9 117/2 117/9 117/20 117/23 118/1 118/9 118/13 119/4 119/25 120/14 121/18 122/1 122/7 122/9 122/12 122/15 122/15 122/19 122/25 123/2 123/3 123/4 123/8 123/12 123/15 127/8 127/19 128/2 128/14 129/9 129/12 129/17 129/20 129/22 129/24 130/1 130/7 130/11 130/18 130/24 131/3 131/10 131/12 131/14 131/23 132/1 132/4 132/8 132/8 132/9 133/1 133/2 133/4 133/9 134/2 134/3 134/8 134/10 134/12 134/15 135/3 135/5 135/12 136/16 136/19 136/21 136/25 137/3 137/5 137/6 137/10 137/16 137/20 137/25 138/2 138/7 138/15 138/19 139/1 139/3 139/7 139/13 139/16 139/18 139/24 140/4 140/9 140/12 140/22 140/24 140/25 141/7 141/10 141/12 141/13 141/20 141/25 142/2 142/6 142/12 142/13 142/19 142/21 142/22 142/24 143/1 143/2 143/13 143/16 144/6 144/8 144/22 144/24 145/5 145/11 156/18 156/21 157/17 160/9 173/20 203/15 203/20 204/10 204/20 205/9 225/7 225/9 225/20 226/4

**C**

**cluster... [17]** 227/16
227/18 228/2 228/5
228/7 228/13 228/24
229/1 235/25 236/8
236/13 236/24 239/5
241/21 242/13 251/24
252/2
**co [2]** 4/6 11/12
**co-counsel [2]** 4/6 11/12
**coextensive [1]** 236/24
**coherent [1]** 50/10
**cohesive [1]** 84/21
**coin [2]** 58/12 58/15
**cold [2]** 175/14 188/8
**colleagues [1]** 203/10
**collection [1]** 123/14
**colorfully [1]** 58/18
**Columbia [1]** 25/9
**column [1]** 125/5
**combination [2]** 71/25
230/11
**combined [1]** 72/4
**Comcast [2]** 49/11 49/12
**comes [13]** 19/1 23/1
23/24 24/25 25/1 25/19
26/15 33/17 53/4 100/25
177/10 227/23 253/15
**coming [13]** 69/4 69/4
83/2 160/3 190/15
193/24 200/22 208/13
208/16 213/14 232/5
245/18 253/2
**comment [3]** 60/12
138/12 176/19
**commented [3]** 138/14
139/7 141/6
**commenting [1]** 198/2
**commission [1]** 198/18
**commit [1]** 198/17
**committed [1]** 253/17
**common [39]** 5/13 6/2
6/2 6/21 7/1 7/2 7/17 8/4
11/16 11/20 23/23 26/5
26/5 28/25 30/5 30/6
49/15 49/17 49/18 55/20
55/21 56/4 57/22 59/17
116/25 122/24 182/22
183/3 183/8 184/3
197/12 197/13 214/10
233/23 234/7 234/10
234/11 234/15 234/17
**commonality [1]** 30/1
**commonly [4]** 86/4
161/13 181/23 190/14
**communal [2]** 16/19
47/21
**communication [1]** 65/9
**communities [5]** 24/13
24/15 29/11 191/23
194/24
**community [22]** 7/7
15/5 15/11 24/4 24/15
34/23 34/24 35/15 35/17
36/7 43/14 46/6 48/21
56/1 177/14 178/10

221/18 225/20 234/18
241/25 242/9 242/11
**community-wide [1]**
48/21
**companies [3]** 29/24
39/10 39/13
**companion [1]** 14/12
**company [8]** 6/15 13/10
16/15 18/11 22/8 29/25
33/6 39/15
**comparable [3]** 148/14
196/6 213/10
**comparables [4]** 75/9
75/16 148/21 212/11
**comparative [4]** 209/13
209/15 240/25 246/24
**compare [2]** 24/11 47/11
**compared [6]** 24/16
27/21 29/10 158/4
208/16 229/17
**comparing [3]** 154/13
156/6 228/6
**comparison [2]** 27/16
240/20
**comparisons [1]** 58/17
**complaint [5]** 6/6 6/18
57/2 243/13 252/8
**complete [1]** 74/6
**complicate [1]** 22/4
**complicated [1]** 44/9
**complied [2]** 198/8
198/11
**component [7]** 110/12
174/1 174/4 206/18
226/21 234/15 236/14
**components [1]** 214/5
**compound [3]** 103/8
143/8 182/17
**compulsion [1]** 233/5
**computation [2]** 27/2
27/3 162/16
**compute [4]** 100/24
101/5 213/18 214/23
**computed [2]** 162/10
240/5
**concedes [1]** 59/11
**concept [4]** 55/2 164/13
226/4 242/4
**concepts [1]** 228/18
**concern [12]** 31/23 32/9
33/4 33/21 35/8 38/4
38/15 38/22 39/11 40/9
132/6 142/10
**concerned [8]** 20/10
29/1 35/24 36/25 39/5
40/15 132/12 141/11
**concerns [6]** 35/9 42/1
103/21 145/9 220/8
237/19
**concessions [2]** 17/17
18/11
**conclude [3]** 36/3
114/12 115/11
**concluded [1]** 213/3
**conclusion [16]** 20/16

66/17 90/19 115/11
115/25 116/2 132/16
139/23 192/21 204/6
204/12 208/17 212/2
218/12 229/14 234/19
**conclusions [10]** 69/5
108/22 111/14 111/24
116/6 199/14 199/25
209/7 230/12 230/16
**concrete [1]** 191/19
**concurring [2]** 10/14
10/15
**condition [4]** 84/14
84/16 130/12 172/14
**conditions [2]** 86/2
86/14
**conduct [6]** 133/20
153/18 182/12 186/2
197/25 201/13
**conducted [8]** 119/24
126/11 133/22 134/21
179/16 186/4 190/11
226/8
**conducting [1]** 140/8
**confer [1]** 105/12
**confidence [1]** 165/1
**confirm [2]** 86/16
116/18
**confirmation [1]** 239/23
**confirmatory [1]** 84/13
**conflict [1]** 6/13
**conflicting [1]** 50/6
**confounded [1]** 156/2
**confounding [2]** 156/9
156/12
**confronted [1]** 13/13
**confused [1]** 166/4
**confusing [1]** 170/18
**conglomerate [1]** 209/2
**Congressional [1]**
197/16
**connection [1]** 239/23
**conservative [1]** 45/20
**consider [10]** 4/21 75/18
77/11 78/10 80/24 84/11
84/21 113/4 174/8
190/22
**consideration [1]** 160/10
**considerations [1]** 79/2
**considered [10]** 66/15
69/13 79/7 80/18 87/8
87/9 89/12 90/7 96/18
210/22
**considering [4]** 50/4
53/16 73/9 78/9
**consist [1]** 192/17
**consistency [1]** 186/5
**consistent [16]** 70/5 72/8
72/16 72/23 73/3 73/8
83/12 85/24 144/1
155/15 184/21 185/9
197/4 209/7 221/24
247/8
**consistently [1]** 207/3
**consists [1]** 27/11
**consolidated [2]** 31/15

57/2
**conspiracy [5]** 53/6
60/13 60/14 61/14 177/6
**conspired [1]** 60/19
**constant [2]** 157/9
157/22
**constituted [1]** 84/8
**constructed [1]** 221/25
**construction [2]** 32/20
32/20
**consulting [1]** 20/3
**Cont.'d [1]** 133/18
**contacted [1]** 125/6
**contain [2]** 189/6 189/10
**contained [2]** 189/13
253/3
**contains [2]** 192/16
222/2
**contaminant [1]** 32/1
35/1 35/24 36/13 41/10
60/17
**contaminants [16]** 16/11
16/14 20/6 21/25 114/15
176/25 177/4 181/9
182/7 225/17 237/7
237/9 237/10 238/2
238/17 238/19
**contaminate [1]** 20/19
**contaminated [13]**
16/25 17/18 17/18 18/14
19/10 21/22 21/23 24/5
24/5 52/16 177/13
221/10 233/24
**contaminating [1]** 17/8
**contamination [159]**
5/11 6/11 6/19 6/23 6/24
7/3 7/7 7/14 7/22 8/9
8/11 8/12 9/12 9/14 10/9
10/19 12/18 13/18 16/3
18/18 18/18 19/1 19/6
20/16 22/1 22/2 23/14
30/23 32/3 32/16 34/1
34/18 35/16 44/19 45/1
45/5 49/24 52/14 52/15
52/17 53/8 53/17 53/17
53/19 53/20 53/25 54/1
54/18 54/23 55/5 55/13
56/13 56/23 61/16 61/16
76/7 77/19 77/23 77/24
78/4 78/11 78/14 78/16
78/21 79/3 79/5 79/6
79/7 80/25 85/6 86/21
104/7 104/12 108/10
109/15 110/10 110/17
111/3 111/7 111/15
117/7 118/17 120/1
120/13 120/18 121/14
121/21 123/1 123/7
122/20 128/1 128/16
128/19 129/18 129/21
130/2 130/16 131/1
132/11 135/14 144/9
144/25 145/2 145/5
145/13 147/21 173/21
177/11 178/22 182/5
183/7 183/10 183/12

186/9 194/7 195/8
202/22 203/15 203/16
203/20 204/10 204/11
205/18 212/25 214/25
215/1 218/13 220/4
220/7 225/8 227/16
227/17 228/7 228/11
229/3 230/24 231/4
231/11 232/17 233/7
233/8 233/18 234/4
235/13 235/17 235/20
236/2 236/9 236/14
237/19 239/7 239/15
239/18 239/20 239/24
249/5 249/21 250/18
251/11
**contending [1]** 77/20
**contention [2]** 59/6 59/9
**contest [2]** 18/8 25/3
**contested [1]** 17/16
**context [9]** 28/10 68/16
81/7 86/9 166/12 201/21
211/18 211/23 227/20
**contexts [1]** 221/14
**contextualize [1]** 226/4
**contiguity [1]** 195/6
**contiguous [3]** 192/18
193/6 194/20
**contingent [23]** 25/25
26/2 68/12 69/20 69/25
70/10 73/2 73/5 83/3
83/8 112/10 112/16
112/24 113/9 116/7
142/14 143/3 168/5
174/2 186/13 203/8
203/12 221/6
**continue [6]** 42/25 46/6
105/24 152/16 194/16
212/14
**continues [2]** 80/10
247/22
**continuing [1]** 247/24
**continuous [1]** 193/12
**contracted [1]** 170/20
**contractor [2]** 42/25
46/22
**contractors [1]** 43/6
**contrary [5]** 63/1 68/2
87/24 227/12 250/23
**contrast [3]** 77/19 96/23
148/11
**contribute [1]** 167/19
**contributing [1]** 213/6
**contribution [1]** 228/6
**control [20]** 15/15 76/5
87/17 154/1 154/9
154/16 154/18 154/19
155/6 155/8 157/4 158/3
158/4 158/9 160/13
160/15 206/7 213/13
245/24 246/10
**controlling [1]** 156/9
**convenience [1]** 64/16
**conversation [7]** 115/15
131/22 131/25 134/5
189/16 193/17 219/12

**C**

**conversations [3]** 130/6
190/22 219/8
**convey [3]** 136/11 178/8
224/5
**conveyed [1]** 179/19
**Cook [3]** 44/3 47/6 47/6
**Cook 1 [1]** 47/6
**Cook 2 [1]** 47/6
**copy [5]** 51/11 64/17
120/25 121/1 124/1
**Corbett [20]** 15/13 17/7
17/8 17/10 17/12 17/19
17/25 18/15 19/8 19/10
20/8 20/20 21/20 21/22
24/5 51/23 52/10 52/19
178/5 223/17
**core [4]** 12/25 14/10
57/21 147/17
**corporate [4]** 18/21
42/20 42/23 43/2
**CORPORATION [1]**
1/7
**correct [78]** 11/21 66/13
66/18 69/1 69/18 73/17
73/20 75/8 80/9 80/19
80/23 87/6 87/11 87/21
88/5 90/8 95/18 104/21
109/13 110/21 113/2
117/14 118/15 118/23
119/16 127/9 129/16
133/24 134/4 135/10
146/6 146/12 147/5
147/18 147/22 150/6
150/8 151/21 152/7
153/2 153/12 154/2
155/14 157/14 168/14
168/19 169/5 169/10
169/15 169/18 169/23
170/16 174/10 177/8
180/2 184/2 188/25
189/14 195/21 197/6
203/22 211/8 230/19
235/15 236/25 239/8
240/5 240/6 240/9
240/25 241/21 241/22
243/25 244/7 246/13
246/19 246/22 256/8
**correctly [2]** 198/13
200/25
**correspond [1]** 84/25
**corroborative [1]** 230/1
**corroborator [1]** 205/16
**cost [1]** 13/15
**COTROMANO [38]**
1/3 3/4 31/13 56/22
76/23 77/4 77/10 77/17
78/2 78/19 79/11 83/20
84/1 86/1 86/21 87/4
90/4 109/12 157/3 186/7
188/18 188/24 189/2
189/4 189/11 192/17
206/6 208/3 211/7 231/2
235/5 236/21 236/23
237/24 238/12 246/11
247/3 248/17

**Cotromano-related [1]**
235/5
**Cotroneo [1]** 45/18
**couched [1]** 226/7
**couldn't [1]** 161/19
**counsel [8]** 4/6 4/9 7/20
7/24 11/12 51/10 105/12
214/6
**counselor [5]** 71/16
130/5 141/18 144/10
165/11
**country [1]** 214/21
**county [5]** 13/9 24/14
41/3 86/5 86/23
**couple [15]** 12/12 28/1
55/8 58/8 87/17 149/2
172/7 177/2 178/2
189/25 205/21 208/8
208/24 243/4 249/3
**course [10]** 5/21 57/19
75/22 78/6 190/1 199/15
225/6 231/14 232/9
233/21
**courses [1]** 234/14
**court [128]** 1/1 1/19 3/1
3/9 4/5 4/13 4/18 4/20
4/21 5/5 5/14 5/22 6/4
6/16 7/1 7/5 7/9 8/1 8/3
8/18 9/1 9/13 9/21 10/1
10/23 11/3 11/10 12/3
12/8 12/23 14/14 23/23
23/23 25/11 25/18 26/25
43/25 45/19 45/20 47/4
49/2 49/12 49/12 50/1
50/4 50/17 50/20 63/6
64/16 66/2 70/20 71/4
74/12 74/14 74/22 75/1
75/13 75/23 82/9 82/15
82/16 87/22 87/24 88/3
90/1 90/16 90/19 91/3
91/6 91/17 92/12 92/13
93/17 93/25 96/1 96/12
98/15 98/18 98/22 99/6
100/14 100/21 100/24
101/10 101/11 101/18
107/9 107/13 107/17
107/23 114/12 124/5
126/16 134/4 134/17
134/22 142/15 144/3
144/4 146/12 146/20
147/1 147/11 151/9
151/13 151/24 153/11
162/3 173/3 173/4 173/5
187/25 194/17 200/2
202/20 209/24 210/2
211/19 212/18 214/3
214/3 216/21 219/14
244/6 252/12 252/22
254/5 255/13
**Court's [8]** 23/24 65/5
88/2 89/20 120/24
146/18 158/17 235/1
**courtroom [1]** 213/8
**courts [5]** 81/15 81/23
148/2 186/12 186/19
**covered [1]** 216/19

**cover [1]** 37/22
**CPE [1]** 1/18
**crashed [1]** 27/22
**crashes [1]** 27/24
**crawling [1]** 70/19
**created [2]** 35/15 197/15
**creating [2]** 45/8 195/8
**credentials [1]** 19/22
**credibility [2]** 21/5
198/23
**credible [6]** 11/5 24/3
24/4 28/19 198/15 201/1
**credibly [2]** 22/12 23/9
**Creed [1]** 2/5
**crept [1]** 229/10
**crises [1]** 24/18
**crisis [6]** 156/4 159/2
159/6 159/10 160/11
246/2
**criteria [3]** 23/20 67/15
234/9
**critical [6]** 18/11 23/1
59/10 63/4 174/1 174/4
**critiques [1]** 167/24
**cross [21]** 11/8 26/17
63/7 64/13 64/21 82/19
105/11 133/18 186/16
205/22 207/12 215/9
216/6 216/13 216/16
217/9 218/25 225/14
227/6 251/2 255/9
**cross-check [1]** 26/17
**cross-exam [1]** 225/14
**cross-examination [9]**
63/7 64/13 64/21 105/11
133/18 205/22 215/9
216/6 227/6
**cross-examine [3]** 11/8
216/13 217/9
**crossclaims [1]** 10/25
**CRR [2]** 1/18 256/13
**curious [1]** 115/6
**current [2]** 67/10 170/9
**currently [2]** 148/7
211/6
**cut [9]** 110/16 111/2
111/5 111/15 116/8
117/5 123/1 127/6
136/24
**cutoff [1]** 66/8
**CV [22]** 28/14 28/17
68/18 68/24 69/3 69/8
70/15 71/8 71/12 72/5
73/9 144/18 196/17
220/16 220/19 221/23
229/22 229/25 230/2
230/7 230/8 230/13
**CVS [6]** 71/21 115/23
172/11 201/6 201/18
204/7
**cyanide [7]** 180/5
223/21 224/2 224/7
224/9 224/18 224/23
**Cynthia [3]** 44/17 46/2
46/13

**D**

**damage [34]** 16/4 24/8
24/9 26/9 27/16 28/5
47/5 48/1 48/1 48/3 48/7
48/9 48/14 48/19 93/18
94/16 100/15 101/6
101/8 231/5 235/19
235/20 236/17 236/18
236/19 236/19 237/2
237/6 237/14 237/21
238/1 238/6 238/7 238/9
**damaged [1]** 233/25
**damages [48]** 7/16 8/5
8/8 8/13 8/14 9/16 9/18
9/18 10/16 25/23 26/13
27/1 30/3 46/21 46/24
48/6 48/9 68/25 74/9
74/10 92/23 93/8 95/8
97/13 97/14 98/10 98/20
99/5 99/8 99/12 100/17
100/19 100/20 101/4
101/5 101/14 101/19
101/20 101/22 101/25
102/3 102/6 151/3
171/22 172/1 212/16
214/4 244/21
**dangerous [3]** 7/14
20/22 36/21
**Daniel [1]** 2/15
**Darcy's [4]** 22/20 22/23
23/1 23/3
**Darren [1]** 31/15
**data [71]** 19/25 22/11
22/13 22/13 28/2 58/6
58/13 66/25 70/14 72/17
73/1 80/7 148/17 148/18
149/5 149/12 149/21
150/13 151/11 157/13
157/15 160/23 160/24
161/8 163/17 163/19
163/23 163/25 164/6
164/13 164/18 164/20
164/25 165/13 166/19
166/21 167/2 167/3
167/7 167/16 171/17
172/4 172/11 195/24
195/25 196/24 209/1
225/25 229/11 229/13
229/18 229/19 229/20
229/25 230/1 230/3
230/4 230/7 230/8 230/9
230/13 230/15 240/4
245/17 248/7 249/19
252/11 252/17 253/9
253/9 253/11
**date [105]** 26/14 27/10
27/11 27/12 27/12 27/12
27/14 66/6 66/6 66/12
73/15 74/11 74/21 74/22
74/24 75/2 75/12 75/16
75/22 77/1 77/8 77/16
78/3 78/6 78/7 87/4 87/7
87/8 87/9 87/13 87/22
87/23 87/25 88/3 88/5
88/10 88/11 88/19 89/4
89/11 89/12 89/15 89/21

90/3 90/5 90/7 90/12
90/16 90/16 90/17 90/23
90/25 91/4 91/4 91/7
91/8 91/9 91/17 91/20
92/3 92/7 92/9 92/12
92/14 92/16 93/17 93/21
93/22 93/25 94/14 94/15
96/1 96/12 98/15 98/22
100/24 101/10 106/3
146/13 146/19 147/1
151/4 152/1 155/17
155/17 199/24 200/2
209/23 210/1 210/6
210/8 210/14 210/20
211/1 212/7 237/3 237/4
238/15 242/6 242/8
244/2 244/9 244/16
252/3 252/5
**Dated [1]** 256/10
**dates [22]** 66/8 78/7
87/3 87/19 87/19 88/7
88/9 88/9 88/13 89/22
89/23 89/24 93/2 96/16
97/4 97/9 158/11 158/22
159/18 209/20 210/11
211/7
**Daubert [14]** 4/13 4/17
4/22 9/9 10/23 14/3 14/6
15/20 18/25 23/6 23/25
25/16 49/8 50/13
**days [8]** 3/18 39/17
47/11 208/1 208/3
208/12 208/23 231/25
**dead [1]** 15/3
**deadline [2]** 74/14 74/15
**deal [1]** 8/24
**dealing [1]** 107/17
**deals [1]** 135/2
**death [2]** 14/25 30/12
**DeCarlo [1]** 34/9
**deceased [1]** 33/8
**decedents [1]** 34/20
**December [1]** 89/7
**December 10 [1]** 89/7
**decide [5]** 5/25 38/2
38/7 122/22 174/19
178/20
**decided [6]** 4/11 11/5
35/17 36/7 42/8 113/10
**decides [1]** 37/9
**deciding [1]** 4/20
**decision [11]** 4/23 8/3
8/17 8/17 49/12 53/14
112/12 169/17 174/9
174/12 174/13
**decisions [3]** 49/13
82/24 221/15
**declaration [4]** 59/15
236/8 236/13 242/13
**declared [4]** 31/20 31/25
57/13 145/12
**decrease [1]** 231/25
**deemed [1]** 175/12
**defeat [1]** 5/6
**defeated [1]** 6/9
**defendant [2]** 5/2 45/17

**D**

**defendants [7]** 1/8 2/13 6/9 29/22 48/12 248/8 252/17
**defended [2]** 25/16 148/2
**defense [17]** 7/20 7/24 11/8 12/25 14/6 14/19 16/23 16/24 18/6 18/7 19/19 22/11 63/12 214/6 241/11 241/12 241/14
**defenses [1]** 13/25
**definable [3]** 189/20 192/18 193/7
**define [11]** 50/9 54/16 55/19 56/3 63/3 84/3 84/22 92/13 164/11 192/3 193/11
**defined [14]** 30/16 30/16 30/17 55/20 84/5 84/8 93/3 101/1 101/14 189/2 189/21 195/16 236/24 239/2
**defines [1]** 233/1
**defining [3]** 55/19 68/25 237/4
**definitely [1]** 167/7
**definition [8]** 90/1 93/4 106/19 106/20 107/1 168/20 193/11 200/8
**definitions [3]** 83/17 85/7 107/7
**degradation [1]** 234/3
**degree [10]** 161/16 201/23 208/18 212/5 212/19 213/3 214/19 220/13 230/22 237/22
**degrees [2]** 21/11 194/4
**delete [1]** 141/16
**deleted [2]** 137/1 141/5
**deliberations [1]** 44/1
**delineated [1]** 148/21
**delivering [1]** 39/17
**delve [1]** 63/6
**demarcate [1]** 200/17
**demarcator [1]** 25/20
**demonstrables [2]** 35/15 36/10
**demonstrate [10]** 5/6 16/1 29/13 50/15 192/13 194/3 201/22 207/5 213/18 215/17
**demonstrated [1]** 193/21
**demonstrates [4]** 19/11 20/3 22/1 224/17
**demonstrating [2]** 208/21 212/23
**demonstrative [13]** 51/10 88/17 88/22 88/24 88/25 89/1 90/21 106/7 106/7 113/16 113/17 116/12 116/13
**demonstrative 5 [1]** 116/13
**demonstrator [1]**

**205/16**
**denial [1]** 29/19
**denied [1]** 9/2
**Denney [1]** 2/10
**deny [8]** 14/2 60/22 112/23 123/3 123/4 124/20 201/9 252/4
**denying [1]** 141/20
**DEP [10]** 35/7 35/14 35/17 35/21 36/6 36/10 38/6 38/10 39/11 42/11
**department [24]** 31/24 36/23 36/25 37/3 37/7 38/6 56/19 56/25 57/9 57/13 57/18 58/24 59/14 61/23 189/4 190/6 192/8 192/10 192/10 224/11 224/12 225/24 241/19 252/1
**depend [4]** 210/7 250/7 250/10 250/13
**dependent [2]** 177/14 214/19
**depending [6]** 236/20 238/2 238/11 238/14 238/21 238/25
**depends [3]** 103/10 219/11 233/12
**deposed [2]** 48/11 69/19
**deposition [27]** 39/19 40/20 61/7 64/17 68/10 68/17 69/23 70/12 70/18 71/7 85/10 85/18 86/10 96/21 98/24 100/5 103/25 104/19 106/10 110/8 110/11 119/13 143/19 162/23 165/15 176/13 219/15
**depositions [3]** 40/7 70/15 216/23
**depreciated [3]** 27/17 29/10 201/23
**depreciation [11]** 24/17 25/15 194/7 204/1 205/16 207/14 209/4 211/20 212/24 218/13 220/4
**depths [1]** 21/25
**derive [1]** 152/25
**derived [1]** 169/21
**describe [10]** 66/14 71/21 81/9 118/9 124/4 129/11 178/10 178/15 190/24 191/24
**described [12]** 66/2 84/19 113/21 114/25 123/21 127/10 132/9 132/11 169/14 184/5 221/19 239/25
**describes [4]** 40/19 41/25 61/9 178/7
**describing [3]** 40/22 40/24 221/22
**description [6]** 50/22 113/22 123/25 127/17 131/11 216/4

**descriptions [1]** 183/18
**descriptor [1]** 227/24
**deserved [1]** 70/15
**designated [1]** 13/4
**designates [1]** 151/25
**designation [41]** 13/7 108/24 109/5 111/11 112/4 112/5 115/16 127/18 130/1 130/8 134/2 134/3 135/3 135/5 135/12 136/16 136/19 136/21 136/25 137/3 137/5 137/7 137/10 137/16 137/20 137/25 138/2 138/7 138/15 138/19 139/7 140/10 140/12 141/7 141/25 142/2 142/12 143/16 156/18 173/20 225/22
**desperately [1]** 43/11
**despite [2]** 16/8 18/9
**detail [3]** 63/4 79/15 216/11
**detailed [1]** 59/23
**details [2]** 91/21 216/6
**detection [1]** 62/1
**detections [2]** 17/11 18/2
**detergent [2]** 21/2 21/2
**determination [30]** 11/15 67/1 69/14 70/16 75/12 77/23 78/14 78/18 80/2 86/18 91/16 95/21 99/15 101/17 101/20 101/22 102/3 103/21 111/22 141/14 143/13 144/13 146/2 146/3 146/18 153/19 183/22 210/7 210/17 225/25
**determinations [9]** 67/4 75/24 80/5 80/10 143/14 143/15 144/21 146/14 161/15
**determine [14]** 11/4 27/15 28/9 30/3 38/17 75/11 75/17 99/7 103/14 103/15 150/4 179/22 202/16 245/14
**determined [7]** 44/4 74/12 77/13 79/21 95/8 104/5 112/11
**determines [1]** 92/12
**determining [3]** 57/15 216/18 216/19
**develop [3]** 83/14 179/15 202/10
**developed [2]** 39/24 185/13
**developing [1]** 252/7
**development [1]** 221/12
**developments [1]** 194/24
**deviation [1]** 162/11
**device [3]** 9/7 108/13 156/20
**diagnosed [1]** 31/22

**Dial [1]** 2/23
**didn't [72]** 3/21 8/11 16/7 38/20 40/13 41/25 45/22 69/21 70/7 73/21 74/3 78/1 78/10 78/25 79/10 80/8 85/2 86/5 86/23 98/4 99/17 109/4 109/21 109/21 110/1 110/3 112/1 113/10 115/2 115/21 116/6 116/9 116/23 117/23 117/24 118/12 118/21 118/24 119/5 119/10 121/19 122/23 127/21 127/23 127/23 132/3 133/12 133/20 133/23 134/23 137/2 139/1 140/22 141/4 142/13 148/15 149/19 169/2 169/2 169/7 170/24 176/10 186/7 191/13 215/14 215/15 215/17 216/8 216/12 217/1 250/23 252/18
**die [1]** 232/11
**died [1]** 35/12
**difference [37]** 82/7 84/20 91/10 132/16 146/4 154/22 155/1 155/7 155/10 155/12 155/17 155/22 155/23 156/1 156/2 157/16 157/17 159/18 159/20 159/20 160/24 166/14 167/4 191/17 195/22 211/19 212/20 228/12 228/22 229/1 229/5 235/16 235/18 235/22 237/15 243/19 248/4
**differences [6]** 76/6 83/22 156/3 166/14 168/2 247/16
**different [54]** 11/23 22/21 22/21 22/25 24/11 28/16 29/23 32/7 42/16 52/15 54/21 55/18 62/19 67/7 77/16 77/16 78/3 78/3 78/3 83/17 85/7 87/5 87/18 90/4 92/19 97/15 98/11 99/2 99/12 101/4 106/4 107/7 108/23 108/25 127/7 132/10 150/9 157/15 160/7 164/19 166/25 170/12 179/17 183/17 188/10 201/3 204/19 206/21 206/22 209/20 210/10 245/24 247/7 247/12
**differentiate [3]** 144/24 145/16 206/7
**differentiated [2]** 37/5 144/8
**differentiating [1]** 97/18
**differentiation [1]** 175/17

**differently [2]** 138/12 185/16
**difficulties [1]** 42/18
**diminished [2]** 213/23 234/23
**diminishing [1]** 205/7
**diminution [103]** 57/15 62/12 62/14 62/22 65/22 66/11 66/17 66/20 69/5 73/11 73/19 74/8 75/6 75/19 77/7 78/17 78/22 79/17 81/11 81/18 81/19 82/16 83/2 87/23 91/1 95/23 99/7 100/2 100/13 100/15 100/22 101/6 101/12 101/17 101/23 102/10 102/19 107/3 107/6 107/12 107/14 107/20 107/24 108/2 108/4 141/2 141/13 141/23 142/4 142/11 144/16 145/3 145/7 146/4 146/22 147/16 150/2 152/21 157/9 157/21 167/21 169/22 181/13 182/15 183/22 184/15 185/1 185/8 196/11 196/20 204/24 210/24 211/2 212/5 212/13 212/15 213/19 214/1 214/3 214/13 214/15 214/17 214/19 214/24 215/2 215/4 219/23 219/25 220/10 227/4 227/5 228/6 228/23 230/24 231/12 232/16 243/22 244/6 244/9 244/11 244/22 244/24 247/11
**Dioxin [13]** 17/1 17/2 17/4 17/6 17/12 17/22 19/9 19/15 19/16 20/18 52/23 56/16 61/18
**dioxins [4]** 17/12 17/14 182/1 185/16
**direct [48]** 50/17 61/6 61/11 64/12 64/17 71/4 71/21 79/14 79/15 80/15 81/4 81/8 81/12 83/4 113/18 121/23 121/25 124/1 124/2 124/5 125/13 126/16 134/21 142/15 145/21 145/25 147/6 151/9 151/13 152/19 156/25 161/25 162/2 167/9 167/10 173/10 177/19 209/11 215/10 215/19 215/23 216/5 217/2 217/8 217/20 218/19 218/20 253/14
**direction [5]** 15/12 17/24 19/25 133/22 247/5
**directive [1]** 12/19
**directly [4]** 140/10

**D**

**directly... [3]** 156/12
220/8 253/7
**dirt [1]** 55/9
**disagree [5]** 5/11 70/23
128/12 162/7 168/4
**disagreed [1]** 173/4
**disagreeing [1]** 19/4
**disagreement [1]** 86/11
**disamenity [3]** 222/18
222/19 222/21
**discern [2]** 61/10 75/10
**discernible [4]** 28/5
190/7 192/18 194/19
**disclose [1]** 126/17
**disclosed [5]** 38/25
96/23 97/5 233/11
233/18
**disclosing [2]** 74/14
135/4
**disclosure [3]** 75/11
75/22 232/6
**disclosures [1]** 91/22
**discount [8]** 94/25 95/2
95/13 95/14 96/3 96/22
97/5 99/4
**discovered [2]** 117/1
122/25
**discrete [1]** 177/11
**discuss [11]** 21/14 43/24
79/14 80/15 81/3 83/4
105/13 152/19 153/14
220/3 220/16
**discussed [7]** 65/22
81/15 122/16 188/16
188/23 205/3 227/16
**discusses [1]** 142/18
**discussing [5]** 127/19
130/15 200/16 206/18
229/6
**discussion [16]** 28/15
40/5 142/21 142/22
185/13 189/15 203/19
204/18 213/21 216/4
216/17 225/7 225/20
228/4 229/11 229/20
**discussions [7]** 77/21
127/15 195/17 201/12
203/14 209/19 221/23
**Disease [1]** 224/13
**disequillibrium [1]**
221/1
**dishwasher [1]** 21/2
**dismiss [2]** 14/21 53/21
**disparate [1]** 247/11
**dispersion [1]** 153/9
**dispose [1]** 37/5
**disposing [2]** 36/20
37/18
**dispositive [2]** 14/19
49/19
**dispute [2]** 16/12 16/16
**disquieting [1]** 14/25
**disregard [1]** 35/4
**disruption [1]** 249/17
**disseminated [5]** 206/10

222/3 222/6 250/14
250/16
**dissemination [2]**
250/20 250/24
**dissimilar [2]** 47/3
184/12
**distance [5]** 52/1 52/2
52/3 52/7 52/8
**distances [1]** 51/16
**distinguish [1]** 236/18
**distinguishable [1]** 28/5
**distressed [1]** 140/11
**distribute [1]** 65/10
**distributed [1]** 250/11
**district [9]** 1/1 1/1 1/14
25/8 50/4 147/11 147/11
148/8 148/9
**diverted [1]** 60/20
**divided [1]** 84/2
**DNA [4]** 148/6 148/7
148/9 149/9
**docket [6]** 50/18 110/24
113/19 136/4 170/3
216/2
**Doctor [10]** 64/23
116/18 131/9 152/18
175/24 240/13 245/11
249/23 251/20 253/21
**document [3]** 108/18
134/1 224/11
**documentary [2]** 34/13
40/6
**documented [2]** 114/15
225/17
**documents [3]** 13/14
37/7 60/22
**Dodge [1]** 160/2
**does [81]** 22/23 24/2
24/2 26/6 30/9 30/14
39/4 39/4 43/16 44/8
45/15 48/4 48/17 51/10
54/10 54/14 59/8 63/2
71/22 71/24 79/22 80/4
89/22 90/25 91/23
131/15 153/19 155/1
162/13 162/14 162/15
164/2 167/6 168/1
184/15 186/14 189/1
189/6 191/20 192/15
192/17 193/11 193/14
198/5 203/19 203/21
203/22 203/24 203/25
204/3 209/23 210/23
211/2 211/5 211/9
211/15 215/16 215/17
226/21 227/17 227/20
228/11 228/22 229/1
230/11 232/23 233/8
233/9 233/10 233/11
233/18 234/17 235/16
235/18 239/14 242/3
246/12 250/6 250/10
250/13 253/6
**doesn't [59]** 5/5 24/1
28/12 36/1 36/16 39/11
44/16 44/17 45/13 53/7

55/10 55/14 55/15 59/9
59/11 59/24 70/16 71/22
80/3 80/12 88/10 91/9
91/20 95/4 97/22 107/23
113/12 125/15 134/8
155/12 158/13 162/11
163/5 163/6 163/8 164/1
164/4 164/14 165/17
166/6 167/18 168/3
180/13 180/14 181/19
182/13 183/24 185/20
213/22 216/3 216/10
217/20 229/5 244/23
246/15 248/3 253/5
253/12 253/16
**DOH [3]** 35/23 36/13
39/4
**doing [34]** 4/21 8/1
14/22 19/13 37/21 62/21
78/10 78/21 119/6
124/13 154/3 154/7
154/20 156/10 163/17
163/20 163/20 166/9
166/20 171/24 186/1
188/5 188/6 192/11
213/17 218/20 218/20
222/4 226/10 226/14
226/17 227/13 234/11
244/9
**dollar [12]** 98/17 98/19
100/2 101/5 101/11
102/4 212/4 212/5 212/5
229/17 229/17 247/15
**dollar-for-dollar [1]**
229/17
**Don [1]** 42/23
**don't [163]** 4/8 10/1
16/1 16/2 16/12 16/12
19/18 22/13 23/11 29/2
29/3 36/11 38/3 38/5
39/7 40/17 44/6 46/25
47/5 48/12 49/2 50/9
50/10 54/22 63/11 68/12
68/13 69/6 69/12 70/13
72/10 73/6 73/23 74/1
74/2 74/2 75/18 76/20
79/19 81/7 81/25 82/22
84/4 86/11 88/3 88/14
89/19 90/15 91/12 92/5
96/7 96/9 98/6 98/8
99/14 100/18 100/20
101/16 102/1 102/1
105/11 105/13 106/24
106/25 109/6 111/17
113/1 116/2 121/11
121/15 123/13 123/4
123/22 124/7 124/9
124/12 124/20 128/12
129/7 132/15 133/6
133/25 135/18 135/20
137/13 139/22 142/9
145/9 145/15 145/17
147/7 147/20 149/1
149/6 149/7 150/23
150/25 151/12 152/24
154/7 154/18 160/1

160/1 161/10 162/3
165/8 165/11 165/14
167/1 167/12 167/13
167/15 168/13 168/16
170/2 171/21 172/12
172/16 172/23 174/11
175/2 175/13 175/16
176/25 177/1 177/14
177/15 178/11 178/13
178/17 179/5 180/5
180/15 181/7 181/8
181/12 181/19 184/9
185/1 187/8 187/12
187/16 194/25 196/13
199/7 207/12 218/2
218/25 228/16 243/7
243/14 243/14 243/15
245/1 245/18 246/3
246/18 248/2 249/2
249/15 252/3 252/4
253/17
**done [48]** 7/17 8/19
13/23 13/24 23/19 24/14
24/18 25/12 25/24 28/19
35/22 56/6 60/9 67/14
67/20 68/4 68/5 72/22
74/13 80/17 91/25
100/18 115/6 115/8
116/1 146/7 146/9 152/6
153/23 155/9 162/19
163/13 165/20 168/12
171/10 172/2 181/18
183/7 183/14 184/13
185/19 200/14 201/8
201/19 212/25 215/21
240/24 251/6
**door [4]** 46/14 51/25
208/16 216/20
**dose [1]** 59/10
**dot [2]** 33/11 41/20
**dots [1]** 31/22
**doubt [1]** 195/15
**down [28]** 6/1 11/1 26/1
38/19 52/6 54/19 57/20
58/9 58/10 97/23 98/14
106/14 125/4 130/17
151/16 151/23 159/5
160/3 160/15 162/1
179/23 188/20 191/14
200/5 207/15 207/20
225/5 247/7
**downturn [1]** 159/14
**downward [7]** 172/21
206/2 209/16 246/1
247/22 248/16 248/17
**Dr [1]** 64/8
**Dr. [59]** 15/23 16/5 16/8
17/3 19/17 19/23 20/6
21/7 21/7 21/16 21/24
22/4 22/4 22/17 22/17
23/3 23/3 23/10 23/15
23/19 24/10 25/2 25/5
25/14 25/15 26/13 26/24
28/2 28/17 28/21 29/6
48/10 48/11 48/13 49/25
50/19 57/7 58/22 59/8

59/13 60/8 62/13 62/25
63/2 63/21 63/22 64/17
65/20 105/21 113/18
119/22 167/17 168/1
188/5 189/19 194/19
217/15 223/3 243/11
**Dr. Bedient [3]** 21/7
22/4 22/17
**Dr. Jackson [2]** 167/17
168/1
**Dr. Jennings [4]** 15/23
16/5 16/8 17/3
**Dr. Kilpatrick [30]**
23/15 23/19 24/10 25/2
25/5 25/14 25/15 26/13
26/24 28/2 28/17 28/21
29/6 48/10 48/11 48/13
49/25 57/7 62/13 63/21
63/22 65/20 105/21
119/22 188/5 189/19
194/19 217/15 223/3
243/11
**Dr. Kilpatrick's [5]**
50/19 62/25 63/2 64/17
113/18
**Dr. Marais [1]** 58/22
**Dr. Missimer [2]** 23/3
60/8
**Dr. Mitchell [1]** 59/13
**Dr. Perry [1]** 59/8
**Dr. Stephens [9]** 19/17
19/23 20/6 21/7 21/16
21/24 22/4 22/17 23/3
**Dr. Stephens' [1]** 23/10
**draw [11]** 55/1 55/16
55/23 55/23 55/25 84/25
107/23 115/11 148/21
164/9 177/15
**drawing [4]** 56/6 84/20
84/22 189/15
**drawn [6]** 15/3 56/3
86/25 115/12 200/21
214/5
**drew [2]** 246/20 246/21
**drilling [1]** 22/9
**drinking [1]** 15/2
**Drive [1]** 2/20
**driven [1]** 28/8
**driver [1]** 48/5
**driving [1]** 190/3
**drop [9]** 24/12 24/12
34/23 34/24 144/7 246/3
248/21 248/25 249/12
**drops [2]** 25/21 29/13
**drove [2]** 60/20 191/14
**due [12]** 17/7 17/19
17/21 18/16 41/16 48/7
62/15 62/22 104/11
145/11 145/12 234/18
**dump [5]** 7/3 7/8 41/6
207/22 214/16
**dumped [4]** 53/9 55/10
60/21 177/6
**dumping [5]** 16/14
17/10 208/6 208/25
208/25

**D**

**Dunsford [1]** 251/25
**duress [2]** 231/22
233/14
**during [12]** 33/12 42/4
74/9 90/11 90/13 105/14
205/25 210/21 213/13
231/14 246/1 249/15

**E**

**e-mail [2]** 1/20 35/21
**e-mails [3]** 38/17 38/20
38/24
**each [48]** 5/15 6/10 6/19
23/20 27/1 29/7 29/19
29/24 73/7 73/11 74/11
74/20 83/15 98/13 98/17
98/20 99/24 100/13
100/15 100/23 101/7
130/20 130/21 131/21
146/15 151/6 160/18
193/4 196/23 201/4
201/7 201/13 201/17
201/19 201/20 201/22
201/22 202/17 202/24
202/25 203/3 203/3
203/4 204/17 212/6
212/10 212/17 232/21
**earlier [17]** 70/12 88/24
106/2 124/25 152/24
160/4 168/7 168/17
173/25 210/14 210/20
215/25 218/1 233/23
242/4 245/21 248/18
**early [7]** 40/14 160/1
160/2 160/16 190/2
190/11 208/13
**earth [2]** 40/7 47/20
**easel [1]** 51/10
**easily [3]** 191/17 193/5
193/7
**east [2]** 17/21 19/7
**echo [1]** 23/22
**economic [19]** 93/5 93/8
93/18 94/16 94/19 94/22
94/23 95/5 95/24 96/2
96/7 96/13 98/6 98/8
99/3 101/14 205/23
221/14 246/2
**economically [1]** 89/24
**economics [2]** 158/16
158/24
**economy [2]** 32/24
32/24
**edge [2]** 52/5 52/24
**edition [1]** 67/10
**education [1]** 71/3
**effect [9]** 54/19 54/20
110/18 111/14 137/15
142/6 144/8 144/24
250/25
**effected [2]** 47/10 84/3
**effective [33]** 66/6 73/15
74/11 74/21 74/22 75/2
87/4 87/7 87/13 87/18
88/18 89/4 89/21 90/3

90/16 90/17 91/7 92/12
97/4 98/15 106/3 146/13
146/18 151/4 151/25
159/18 199/24 200/2
209/20 209/23 210/8
244/2 244/16
**effects [4]** 7/13 58/22
62/15 62/23
**effort [1]** 10/18
**eight [1]** 143/22
**either [15]** 3/11 32/19
62/8 71/22 78/11 93/4
95/3 109/21 131/9 145/4
145/10 211/6 233/8
237/24 253/5
**either/or [2]** 145/4
145/10
**elaborate [2]** 140/2
180/17
**elaborated [1]** 178/25
**element [1]** 4/16
**elements [3]** 5/15 49/18
50/11
**Eleventh [21]** 4/10 6/16
7/10 7/19 7/20 7/23 8/16
9/17 12/16 12/20 14/13
14/16 14/20 21/8 49/21
49/23 53/13 53/14 53/15
53/15 53/21
**eliminate [1]** 123/11
**eliminated [1]** 135/12
**else [9]** 11/11 18/20
60/16 104/7 136/11
159/9 159/15 204/21
206/5
**else's [1]** 191/9
**emanating [1]** 18/4
**embedded [1]** 143/3
**emerged [2]** 140/3 140/9
**eminently [1]** 19/18
21/14 25/5
**emphasis [1]** 140/17
**empirical [1]** 145/18
**employ [3]** 26/6 198/13
200/25
**employed [2]** 24/11
26/14
**encourage [1]** 7/9
**end [18]** 3/23 14/1 29/16
47/3 47/19 58/23 80/13
83/10 137/24 142/18
152/4 175/10 175/10
175/18 184/14 246/17
247/9 252/13
**endeavored [1]** 200/10
**ends [1]** 185/12
**Enforcement [1]** 197/11
**engage [1]** 167/17
**engineers [1]** 35/11
**enjoyment [8]** 126/5
126/7 126/13 127/1
127/4 227/7 227/9
227/11
**enough [8]** 17/19 30/19
58/6 105/4 182/11 194/1
228/19 230/5

**ensued [2]** 70/14
**entering [2]** 160/8
160/10
**entire [17]** 5/13 7/6 7/6
11/20 35/24 43/10 67/13
86/24 91/4 163/25
164/13 164/18 165/13
166/21 189/7 189/10
190/12
**entirely [5]** 32/23 35/25
44/10 104/7 200/22
**entirety [1]** 52/18
**entities [1]** 236/25
**entitled [4]** 9/3 23/12
23/12 256/9
**entrance [1]** 40/11
**entree [1]** 80/23
**entry [7]** 50/18 108/18
110/24 113/19 136/4
170/3 216/2
**entry 263-3 [1]** 50/18
**environment [2]** 62/10
173/21
**environmental [107]**
12/17 32/1 35/1 35/23
36/13 41/10 45/19 49/24
56/24 58/1 59/8 59/16
61/23 62/15 62/22
102/15 102/17 102/22
103/21 104/16 104/17
110/10 111/2 111/7
111/15 117/6 118/16
120/1 120/13 120/18
121/14 121/21 123/1
123/7 127/20 128/1
128/16 128/19 129/10
129/12 129/18 129/20
130/2 130/8 130/16
130/25 131/24 132/11
134/12 137/18 137/22
138/8 142/4 142/10
144/17 145/9 147/21
155/2 156/11 156/15
156/17 156/19 156/20
156/22 159/11 182/7
183/1 183/3 183/7
183/10 183/11 184/18
195/14 205/5 205/5
205/7 206/17 207/18
209/18 213/5 213/14
220/1 220/7 222/18
222/19 222/21 225/7
227/15 227/17 228/7
229/2 230/24 231/4
231/11 232/6 232/17
234/2 235/13 235/17
236/1 236/9 236/14
237/9 237/9 237/18
250/17 251/11
**environmentally [1]**
221/10
**envision [1]** 5/16
**equal [1]** 231/17
**equally [1]** 120/18
**equation [4]** 23/5 215/3
234/16 247/18

**equation 1 [1]** 247/18
**equations [1]** 22/18
**equilibrium [1]** 172/20
**equilibrium [2]** 173/2
196/16
**equipment [2]** 187/21
187/25
**equity [1]** 97/22
**error [4]** 185/5 198/17
241/10 241/11
**errors [1]** 198/21
**escape [1]** 13/25
**especially [1]** 46/16
**ESQ [12]** 2/2 2/2 2/5 2/7
2/9 2/10 2/13 2/14 2/14
2/15 2/19 2/22
**essentially [3]** 7/18 16/9
66/20
**establish [7]** 49/10 50/9
89/21 90/1 90/16 98/22
218/15
**established [12]** 18/25
24/21 49/16 75/23 93/17
93/25 96/1 96/12 114/14
168/7 225/16 226/9
**establishes [5]** 23/21
74/22 75/2 98/15 146/12
**establishing [1]** 91/4
**establishment [2]** 91/7
210/8
**estate [30]** 25/7 25/8
26/23 67/10 70/5 70/25
74/17 76/10 77/22 85/9
95/7 100/10 101/23
124/13 138/24 154/11
154/12 156/4 159/2
159/6 159/10 159/15
161/13 183/8 190/21
205/24 213/1 219/24
221/12 251/5
**estimate [1]** 61/22
**estimates [1]** 62/1
**et [6]** 1/3 1/7 3/5 31/13
134/3 141/8
**et cetera [2]** 134/3 141/8
**evaluate [5]** 50/5 77/4
171/18 194/20 219/2
**evaluating [2]** 14/13
228/23
**evaluations [1]** 25/6
**even [50]** 7/11 7/12 8/10
8/25 9/13 14/8 14/18
21/8 35/19 38/23 41/17
41/25 43/3 46/23 47/6
48/10 50/14 53/6 56/17
56/20 58/18 68/7 77/25
79/24 79/25 80/3 80/7
80/13 80/20 96/3 103/3
114/21 123/15 126/9
126/10 140/25 141/24
142/11 144/22 145/15
147/3 159/14 164/8
179/7 182/23 185/21
185/23 237/9 242/6
252/16
**event [13]** 87/7 89/11

89/17 90/6 90/6 155/18
155/23 158/17 158/19
158/22 159/22 172/18
242/18
**eventually [7]** 38/1 38/6
178/4 178/23 178/24
181/1 223/16
**ever [16]** 18/2 20/5
59/21 60/10 60/11 115/1
115/1 115/6 119/12
121/11 173/5 179/6
223/21 228/5 234/10
243/23
**every [31]** 4/16 10/2
14/4 14/5 14/6 15/13
15/13 18/8 28/8 42/12
42/14 43/15 47/5 58/19
72/15 98/13 98/17 98/20
99/24 151/6 160/17
185/25 190/3 191/8
193/4 197/24 198/8
202/24 212/6 212/17
242/10
**everybody [5]** 9/2 41/2
41/16 159/10 191/9
**everyone [9]** 3/2 3/11
3/18 63/18 105/4 105/20
122/1 152/15 194/15
**everything [1]** 3/23
5/21 18/7 21/15 35/22
36/9 135/23 170/9 217/3
247/15 254/3
**Everything's [1]** 160/15
**everywhere [2]** 110/19
123/2
**evidence [34]** 4/25 9/5
10/18 16/17 18/10 21/25
29/6 29/9 29/9 29/13
30/18 34/13 49/15 52/14
57/24 57/25 58/3 59/1
61/7 61/17 81/19 82/16
139/23 140/4 140/16
140/21 140/21 142/20
153/11 175/13 195/4
204/11 212/2 221/5
**evidentiary [1]** 49/11
**evolved [1]** 148/12
**evolving [1]** 148/5
**exact [14]** 20/19 27/1
252/5
**exactly [14]** 7/24 54/20
57/20 94/9 143/19
150/11 154/7 160/24
163/7 170/9 184/16
203/16 242/5 245/17
**exam [1]** 225/14
**examination [45]** 63/7
64/13 64/21 71/4 71/22
79/14 79/15 80/15 81/4
81/8 81/12 83/5 88/23
105/11 121/1 125/13
131/7 133/18 134/21
151/9 151/13 152/19
157/1 157/8 157/20
161/25 162/3 167/10
188/3 188/13 205/22

**E**

**examination... [14]** 214/7 215/9 216/6 217/21 218/19 218/21 227/6 235/10 243/9 245/9 250/4 251/18 253/15 255/13

**examine [6]** 5/15 11/8 76/6 172/9 216/13 217/9

**examined [1]** 213/9 216/16 218/9

**examining [4]** 3/12 5/14 82/23 224/14

**example [17]** 5/8 8/7 27/22 32/16 34/8 52/21 96/15 96/20 96/21 110/23 110/25 139/17 153/21 196/4 202/19 221/22 253/1

**examples [4]** 106/2 139/11 141/3 141/5

**except [3]** 31/22 36/11 170/10

**excess [1]** 58/7

**exclude [3]** 24/1 61/10 75/16

**excluded [7]** 81/23 82/4 82/8 106/19 106/22 107/20 186/12

**excludes [1]** 107/10

**exclusion [1]** 50/14

**excuse [8]** 51/9 65/4 100/22 125/2 139/4 175/14 196/21 197/18

**exercise [7]** 162/17 163/9 163/11 164/24 166/9 167/1 167/6

**exercises [1]** 167/18

**exhibit [13]** 88/23 88/25 89/1 106/7 113/16 113/17 113/18 120/23 128/25 128/25 129/14 170/4 223/5

**exhibit 1 [1]** 88/23

**exhibit 2 [3]** 88/25 128/25 129/14

**exhibit 3 [1]** 89/1

**exist [3]** 41/25 42/3 211/5

**existed [2]** 24/18 40/10

**existence [1]** 233/17

**existing [1]** 32/4

**exists [2]** 30/10 233/7

**exit [1]** 40/24

**expect [5]** 22/10 58/12 185/15 196/15 212/13

**expectation [1]** 14/24

**expected [4]** 18/2 62/4 195/25 196/25

**expecting [1]** 134/15

**expeditiously [1]** 152/2

**expensive [1]** 29/3

**experience [9]** 7/2 16/9 181/17 182/10 182/11 182/13 182/20 185/22 239/21

**experiences [1]** 124/23

**expert [25]** 11/4 14/5 14/5 14/7 15/23 15/24 16/5 16/16 25/18 43/11 43/11 50/12 58/19 58/22 59/6 59/13 60/25 61/13 62/13 64/18 65/22 74/14 108/17 110/7 167/9

**expertise [3]** 90/2 101/9 210/19

**experts [35]** 7/1 7/17 9/4 13/10 18/10 18/24 18/24 19/4 19/19 19/19 21/14 22/4 22/11 22/12 22/24 23/2 23/3 23/8 23/24 38/17 38/24 40/5 41/11 49/25 50/7 50/14 53/2 55/6 57/5 57/22 59/22 59/23 60/4 61/17 61/20

**experts' [3]** 21/10 49/8 50/6

**explain [20]** 21/16 21/24 28/17 41/17 58/23 59/14 71/5 72/20 72/24 87/4 152/20 189/19 205/15 207/12 211/10 211/11 211/23 216/10 216/11 217/11

**explained [9]** 39/16 41/21 49/13 62/8 62/20 206/14 219/20 220/1 249/19

**explaining [2]** 76/15 226/5

**explanation [4]** 61/3 68/5 81/10 216/4

**explanations [3]** 76/19 172/10 183/17

**explore [1]** 126/12

**exposed [2]** 231/22 232/1

**exposing [1]** 233/14

**exposure [3]** 33/12 44/15 59/10

**expressed [5]** 133/10 151/21 190/13 235/12 238/8

**expression [1]** 149/14

**extend [1]** 17/24

**extending [1]** 18/15

**extent [17]** 10/14 21/17 24/7 31/5 63/11 79/5 79/22 84/7 84/14 95/20 192/21 227/6 229/3 233/12 240/22 241/10 242/3

**eyeball [5]** 157/15 161/8 161/11 229/13 248/5

**eyeballing [4]** 157/12 229/11 229/18 248/6

**eyes [1]** 248/2

**F**

**Fabre [2]** 10/1 10/2

**face [2]** 47/25 145/7

**faces [1]** 43/9

**faceably [2]** 176/14 176/18

**facie [1]** 50/3

**facility [14]** 32/7 32/12 32/14 33/6 34/12 42/16 51/19 60/18 175/4 175/8 176/8 176/15 214/12 224/15

**facility's [3]** 178/4 178/24 223/16

**facing [2]** 42/8 42/19

**fact [185]** 4/24 11/15 18/9 19/5 19/5 19/9 21/3 22/15 31/19 36/9 38/4 39/13 40/5 40/19 42/2 42/3 45/7 46/2 46/5 47/6 48/1 48/3 48/6 48/9 48/13 48/14 48/17 48/19 57/8 58/21 59/11 73/10 74/3 75/4 75/8 75/18 75/25 76/10 79/6 84/16 88/10 89/20 91/2 92/12 93/9 93/10 93/13 94/22 95/7 98/9 101/22 102/3 102/5 102/6 102/8 103/3 106/22 111/10 112/4 112/18 112/22 113/1 113/8 113/21 113/22 114/1 114/2 114/7 114/8 114/17 114/20 115/2 115/7 115/9 115/14 116/3 116/22 117/9 117/19 118/8 123/8 124/10 124/14 124/18 124/20 125/12 125/21 127/25 128/4 128/8 128/9 128/18 128/21 129/11 129/19 130/10 133/9 137/6 137/9 137/12 138/24 140/2 140/16 141/9 142/13 142/21 143/5 143/14 145/15 147/19 148/17 145/9 149/21 150/9 154/22 163/18 168/8 169/6 169/12 171/14 174/1 174/5 176/6 176/11 176/19 176/24 177/3 177/9 177/18 179/24 180/3 181/7 181/16 183/25 185/11 185/13 186/13 186/20 193/18 194/6 204/9 211/5 211/13 211/19 211/20 213/25 216/9 219/3 220/16 221/25 222/2 222/7 222/23 223/24 224/22 225/5 225/9 225/19 226/5 226/8 228/1 234/4 235/19 235/25 236/7 236/17 236/18 236/19 236/23 237/2 237/6 237/8 237/14 237/18 237/21 238/1 238/6 238/18 239/5 239/14

**factions [2]** 239/19 242/19 243/11 243/17 253/10

**factor [4]** 249/13 249/14 250/12 250/15

**factors [12]** 22/25 144/20 154/5 156/10 156/13 213/5 215/2 231/20 233/4 233/15 238/7 249/15

**facts [25]** 15/14 41/7 61/9 113/4 116/8 128/13 123/18 141/16 174/15 179/17 179/18 179/24 179/25 180/3 181/14 181/16 182/14 184/9 184/25 185/2 185/11 186/14 186/20 221/8 222/13

**factual [5]** 4/7 11/19 184/10 184/11 186/8

**fail [3]** 50/7 50/12 50/14

**failed [1]** 88/21

**fails [1]** 23/11

**fair [14]** 118/8 118/13 118/17 118/19 122/22 123/10 126/17 168/10 186/5 194/1 228/19 230/5 231/17 233/1

**fairly [6]** 157/9 184/21 185/9 196/10 247/8 251/7

**faith [1]** 224/21

**faithful [1]** 118/4

**fall [1]** 135/2

**false [1]** 58/25

**familiar [7]** 3/10 4/14 149/14 151/8 181/24 182/3 207/10

**fanciful [1]** 222/16

**far [7]** 3/21 3/22 31/11 44/14 90/15 94/13 125/4

**Farms [8]** 24/15 27/24 28/6 47/12 157/5 161/6 209/18 247/21

**fashion [5]** 26/21 118/3 118/8 164/7 190/25

**Fast [1]** 36/6

**Fast-forward [1]** 36/6

**faster [1]** 208/22

**favored [2]** 241/11 241/14

**fear [6]** 55/12 140/10 144/9 144/25 145/2 145/4

**feared [1]** 13/19

**features [1]** 221/13

**February [17]** 66/6 66/17 73/15 89/4 89/11 89/15 91/9 91/20 92/18 95/17 156/17 158/12 211/14 237/3 244/3 244/4 244/21

**February 1 [14]** 66/6 66/17 73/15 89/4 89/11 89/15 91/9 91/20 95/17 156/17 237/3 244/3

**February 1st [1]** 92/18

**February 2010 [1]** 158/12

**federal [2]** 147/11 148/2

**federally [1]** 197/12

**feel [2]** 133/11 133/12

**Feeling [1]** 188/7

**feet [3]** 52/23 59/25 176/14

**fell [6]** 16/14 158/5 205/24 213/12 237/23 239/1

**felt [4]** 70/15 71/8 128/18 226/3

**few [11]** 4/17 8/25 42/13 58/11 121/22 148/8 173/2 205/3 234/25 245/4 245/5

**fewer [2]** 163/3 208/23

**fewest [1]** 196/6

**field [3]** 19/19 25/10 181/25

**fields [1]** 19/20

**Fifth [1]** 44/3

**fight [2]** 20/14 161/8

**figure [26]** 70/19 98/17 98/20 100/2 101/5 101/11 102/4 157/7 157/8 205/13 212/4 212/5 212/5 217/4 245/20 246/3 246/7 246/23 246/25 247/14 247/18 247/19 248/14 248/14 251/21 251/21

**Figure 1 [6]** 157/8 205/13 217/4 247/18 248/14 251/21

**Figure 2 [2]** 246/25 251/21

**figures [2]** 245/22 246/14

**file [4]** 9/3 218/23 218/24 219/11

**filed [12]** 4/15 5/20 5/22 6/6 33/5 33/7 33/14 36/23 36/24 42/17 43/25 57/2

**files [1]** 42/11

**fill [4]** 37/22 39/6 39/7 125/22

**filled [1]** 65/1

**filtration [1]** 29/3

**final [7]** 46/3 47/24 69/5 69/17 80/21 184/14 210/7

**finally [5]** 10/22 37/24 41/4 41/5 42/11

**finance [7]** 25/7 139/18 158/17 158/17 158/18 158/21 161/5

**financial [6]** 24/18 42/18 158/14 158/16 158/24 197/10

**financing [4]** 84/10 84/11 138/16 139/8

**F**

**finder [1]** 4/24
**finding [7]** 58/4 58/14
58/24 76/11 85/4 133/2
185/9
**findings [14]** 17/22
112/3 142/25 143/3
145/23 149/13 151/15
173/14 173/17 184/12
184/13 186/6 214/18
230/13
**fine [5]** 149/17 181/20
187/17 188/6 212/15
**fine-tuning [1]** 212/15
**fingers [1]** 144/12
**finish [4]** 94/6 165/24
177/23 188/10
**firm [7]** 12/3 25/14
146/12 148/2 148/24
151/7 170/20
**FIRREA [1]** 197/10
**first [44]** 3/18 6/6 24/22
40/9 40/12 40/20 42/21
54/21 57/6 62/12 63/15
63/19 63/22 65/20 66/2
68/10 70/7 73/15 88/17
91/19 108/16 110/15
112/4 121/25 123/3
125/3 129/13 136/18
138/7 140/9 144/12
158/10 160/4 161/3
178/9 191/7 207/3
208/15 215/11 217/21
221/17 223/25 229/9
230/2
**fit [2]** 15/14 161/6
**fits [4]** 28/11 113/23
181/16 184/10
**five [15]** 3/21 35/11 36/8
46/15 114/8 122/20
138/14 138/24 139/6
139/11 141/6 150/14
170/13 176/11 176/21
**five miles [3]** 36/8
176/11 176/21
**fix [3]** 30/22 43/14 43/16
**FL [5]** 2/4 2/6 2/8 2/12
2/21
**Flagler [1]** 2/20
**flavor [1]** 28/23
**flaw [1]** 241/7
**flawed [10]** 23/10
148/13 148/25 149/1
149/4 149/8 149/11
151/17 240/4 240/23
**flesh [1]** 12/7
**fleshed [1]** 173/6
**flip [2]** 64/25 88/23
**flipping [1]** 58/12
**flood [1]** 13/17
**floodgates [4]** 7/23 7/24
7/25 8/16
**FLORIDA [37]** 1/1 1/8
1/20 6/13 7/5 8/1 8/2 8/4
8/18 8/18 9/12 9/25
10/13 42/23 43/1 45/6

47/4 56/19 56/25 57/9
57/13 57/17 58/24 59/14
61/23 159/2 160/12
178/10 197/24 214/25
221/18 224/12 233/1
241/19 251/25 252/5
252/9
**Florida/Palm [1]** 221/18
**flow [6]** 13/17 29/18
59/24 60/9 219/10
245/24
**flowed [1]** 20/20
**flowing [2]** 20/1 23/14
**flown [2]** 19/7 19/13
**flows [4]** 19/2 19/3
19/13 19/24
**fluidity [1]** 48/16
**focus [4]** 14/9 94/16
238/6 247/20
**focuses [1]** 235/5
**folks [6]** 124/18 125/21
126/6 160/2 172/25
227/12
**folks' [1]** 121/7
**follow [8]** 64/19 67/16
136/22 245/4 245/5
249/25 251/2 251/4
**follow-on [1]** 136/22
**follow-ups [2]** 245/4
245/5
**followed [1]** 198/15
**following [12]** 14/15
16/10 16/23 26/20 63/17
105/19 133/20 152/14
170/6 194/14 209/18
244/17
**foolproof [2]** 25/21
27/15
**foot [21]** 24/12 153/24
153/25 154/8 154/15
154/16 154/23 155/3
155/4 155/8 155/9 157/2
161/7 162/17 191/14
191/15 209/14 226/18
226/19 245/21 247/15
**Force [1]** 32/8
**foregoing [1]** 256/7
**forever [1]** 14/24
**forget [2]** 3/22 203/16
**forgets [1]** 42/11
**forgot [1]** 41/17
**form [1]** 102/16
**format [1]** 171/10
**formatted [1]** 113/23
**formed [1]** 235/24
**former [1]** 32/8
**formula [1]** 67/5
**formulating [2]** 69/13
161/15
**formulation [2]** 66/25
70/24
**Fort [2]** 2/4 2/8
**forth [6]** 23/16 23/19
44/13 54/3 227/21
253/14
**forward [14]** 14/22

15/17 22/2 30/19 35/11
36/6 87/9 148/18 149/7
149/23 151/2 157/24
207/4 217/11
**found [28]** 17/13 17/15
20/18 20/20 20/24 21/1
21/15 21/25 33/9 34/8
44/19 62/8 77/12 77/24
83/20 107/4 110/12
117/25 141/12 141/14
144/15 179/6 181/25
182/1 186/19 189/4
190/12 212/1
**Foundation [1]** 197/15
**foundational [2]** 12/25
13/22
**four [6]** 3/20 36/6 61/19
61/25 119/14 223/7
**Fourth [1]** 33/16
**frame [1]** 14/21
**framework [2]** 23/4
26/12
**Franklin [4]** 1/18 256/6
256/12 256/13
**frankly [5]** 77/21 83/10
93/20 124/12 249/1
**frequently [2]** 172/3
172/6
**front [10]** 7/20 11/9
23/13 31/21 32/5 106/25
167/13 177/16 240/13
246/4
**fuel [2]** 32/16 60/16
**full [3]** 18/14 226/5
232/6
**fully [3]** 79/19 84/4
233/3
**function [6]** 24/1 26/5
92/19 94/22 95/19 96/2
**fundamental [2]** 22/18
29/16
**fundamentally [7]** 23/10
148/13 148/25 149/1
149/4 149/8 149/11
**furans [5]** 17/13 17/14
20/21 182/2 185/17
**further [15]** 13/19 18/2
20/5 63/4 123/22 169/21
171/23 171/25 187/2
212/14 212/14 213/12
243/1 251/15 253/19
**furthest [1]** 18/3
**fuss [1]** 20/14
**future [4]** 23/13 27/4
55/13 177/11

**G**

**GA [1]** 2/24
**Gallagher [17]** 2/13
49/2 65/18 104/24
105/25 152/16 188/12
188/17 193/18 204/19
216/21 228/5 229/10
255/7 255/9 255/12
255/15
**Gallagher's [1]** 203/22

**gap [19]** 157/8 157/21
157/23 158/10 158/12
159/1 159/8 160/21
160/21 206/13 206/14
209/17 246/10 246/11
246/16 246/18 247/1
247/2 252/11
**gaps [2]** 50/8 249/20
**garbage [4]** 149/14
149/15 149/18 149/19
**Gardens [3]** 52/4 56/1
156/7
**gas [1]** 7/8
**gatekeeper [2]** 23/24
24/1
**Gates [1]** 191/10
**gathering [1]** 125/23
**gave [5]** 12/20 85/22
99/16 149/13 200/16
**GAVM [3]** 27/4 211/21
212/8
**Gdanski [8]** 2/2 12/3
51/20 52/11 56/16
180/20 255/5 255/10
**gears [3]** 104/23 104/25
108/7
**general [3]** 81/17 108/24
226/7
**generally [5]** 26/16
27/18 86/17 137/17
213/1
**generate [1]** 148/15
**genie [1]** 47/23
**geographic [14]** 77/14
77/25 78/5 79/4 83/20
86/1 151/3 189/3 189/5
190/5 192/9 192/11
230/25 231/2
**geology [1]** 19/4
**gestalt [1]** 24/2
**gets [11]** 37/17 43/15
50/21 60/2 71/17 80/4
80/13 92/23 100/3 101/8
247/17
**getting [10]** 3/15 43/1
67/7 67/21 70/22 132/13
165/14 221/6 231/8
248/13
**GIS [2]** 190/10 192/8
**give [28]** 5/8 55/15
69/10 70/2 70/4 71/11
80/3 80/20 80/23 81/1
88/11 94/5 120/24
149/22 153/8 165/22
166/1 174/17 187/11
193/1 196/4 196/5 196/7
202/15 208/9 215/3
227/10 253/5
**given [10]** 60/1 92/14
92/16 151/5 182/4 196/3
211/13 220/12 221/8
242/6
**gives [11]** 27/10 45/9
74/24 101/10 147/1
147/16 155/4 196/10
196/17 196/18 253/11

**giving [4]** 70/16 70/17
83/7 99/18
**glean [1]** 214/9
**gleaned [1]** 128/23
**gloomy [1]** 14/24
**go-big-or-go-home [2]**
44/11 47/7
**goes [4]** 21/5 37/17
104/21 183/18
**going [123]** 3/7 4/5 4/6
5/23 5/23 6/20 6/25 7/25
8/20 8/22 8/23 9/4 9/19
10/22 11/11 12/6 13/2
13/3 13/5 13/18 14/1
14/14 14/22 15/17 15/22
16/6 20/4 20/12 21/7
21/15 22/23 23/15 26/6
28/14 30/3 30/6 35/5
35/24 36/14 36/16 36/20
38/12 41/6 42/3 43/22
46/6 46/14 46/25 47/9
51/25 57/6 57/24 58/13
61/8 64/12 65/13 76/18
76/19 87/9 87/22 88/2
100/8 107/18 113/15
115/15 128/24 129/10
132/17 148/18 149/7
149/23 150/2 151/23
158/15 159/9 159/15
160/16 161/5 167/7
174/22 178/9 182/15
184/20 185/7 187/4
187/6 187/14 187/14
188/19 191/7 192/20
196/20 197/2 200/2
200/20 200/24 203/13
205/21 206/5 207/4
215/8 215/16 215/24
216/10 216/11 216/13
217/2 217/3 217/6
217/10 217/12 218/24
228/15 231/7 236/18
242/12 242/16 247/5
247/13 249/21 250/21
251/1 253/10
**gone [10]** 3/19 19/7 20/5
24/19 28/21 70/12 94/13
97/23 98/14 207/20
**gonna [4]** 100/7 100/17
179/14 184/5
**good [27]** 3/2 3/14 4/2
5/3 5/23 6/8 12/2 12/4
12/5 64/23 64/24 67/18
68/3 72/16 73/8 75/19
83/12 104/24 105/4
105/7 110/23 151/20
152/9 155/4 155/15
190/2 224/21
**good-faith [1]** 224/21
**goods [1]** 221/11
**Google [1]** 40/6
**got [36]** 3/16 3/24 6/7
7/20 12/11 21/3 31/10
35/17 38/19 44/5 46/16
48/6 50/23 61/5 64/16
68/19 71/5 72/7 88/17

**G**

**got... [17]** 93/20 97/2 97/10 126/3 132/7 139/5 151/1 168/6 175/14 175/21 176/5 177/16 188/8 245/21 246/5 246/21 246/21
**gotta [2]** 140/7 163/16
**gotten [1]** 69/16 95/9 125/6 251/23
**governed [1]** 198/25
**government [1]** 46/21
**governmental [1]** 236/24
**governs [1]** 197/25
**Gowdy [7]** 2/5 2/5 4/3 12/7 23/22 45/13 255/4
**granular [1]** 93/23
**graphs [1]** 247/6
**great [2]** 38/13 156/5
**greater [1]** 12/11
**green [2]** 39/24 41/20
**Greenfield [3]** 131/23 192/4 192/5
**Gregor [1]** 2/19
**Groden [1]** 2/14
**gross [1]** 234/20
**groundwater [35]** 17/7 17/15 19/3 19/13 19/24 19/25 22/1 36/3 53/2 55/6 56/14 59/22 59/24 60/1 60/2 60/9 61/2 61/3 108/9 110/17 111/3 111/8 111/16 127/20 128/19 130/3 130/17 135/14 177/13 186/10 215/1 223/12 237/15 238/22 239/7
**group [11]** 1/7 26/21 30/17 30/17 58/8 65/21 125/12 168/9 168/13 189/21 197/17
**groups [1]** 194/24
**growing [1]** 42/5
**grown [1]** 48/6
**guess [4]** 3/16 217/9 234/25 253/23
**guidance [4]** 68/3 68/4 72/9 197/21
**guidances [1]** 71/2
**Gunn [1]** 2/23
**Gunster [1]** 2/19

**H**

**Haberman [1]** 2/2
**half [1]** 187/7
**Hammer [1]** 2/7
**hand [5]** 63/24 64/18 84/22 97/2 248/14
**handed [1]** 126/22
**handle [1]** 35/4
**handled [4]** 4/10 15/19 15/20 16/11
**hands [1]** 211/14
**happen [4]** 32/15 99/20 160/1 248/23

**happened [7]** 48/20 49/24 61/14 155/5 157/25 158/3 158/25
**happening [4]** 33/18 160/7 163/22 247/23
**happens [2]** 48/8 207/17
**happy [2]** 49/3 187/22
**hard [2]** 159/2 160/12
**harm [2]** 34/23 101/14
**harms [1]** 29/5
**Hartle [5]** 82/3 82/5 82/6 82/9 82/14
**hasn't [5]** 94/13 97/22 97/23 99/4 154/24
**hate [2]** 111/5 249/8
**Hatfield [2]** 2/10 31/13 255/6
**haven't [9]** 68/8 95/5 98/4 119/15 121/15 146/16 152/6 163/21 186/14
**Haverhill [1]** 40/21
**having [15]** 7/22 39/14 92/1 126/24 131/2 134/6 136/14 138/25 173/3 175/12 185/14 239/6 240/12 244/15 247/19
**hazardous [3]** 184/19 214/16 224/1
**hazards [1]** 213/14
**he'd [1]** 235/1
**He'll [1]** 19/24
**he's [29]** 3/10 16/6 16/6 19/18 23/16 23/17 23/17 23/18 24/14 24/14 24/18 24/19 25/24 25/24 27/4 28/4 28/7 28/7 62/17 82/22 105/11 124/25 150/16 167/14 167/14 215/21 217/5 226/25 252/20
**head [1]** 188/8
**heads [1]** 58/14
**health [20]** 7/13 15/4 31/24 36/24 36/25 37/3 37/7 38/6 56/19 56/25 57/9 57/13 57/18 58/25 59/15 224/11 224/12 224/14 241/19 252/1
**Health's [1]** 225/24
**hear [13]** 6/25 9/19 57/6 57/24 57/25 58/2 58/23 59/1 59/18 59/22 61/15 62/13 242/12
**heard [8]** 7/19 9/19 53/4 54/21 158/17 197/3 204/15 243/11
**hearing [9]** 23/2 23/6 33/15 49/20 57/20 120/23 160/2 170/4 240/12
**heart [2]** 14/17 14/20
**heavily [4]** 7/10 53/13 68/8 71/13
**heavy [1]** 42/4
**hedonic [25]** 69/7 74/3

74/7 74/24 75/5 75/8 75/14 75/18 75/25 76/13 83/2 148/10 152/20 153/3 153/7 153/13 161/18 162/25 163/8 191/22 207/2 240/3 240/8 240/23 241/6
**held [4]** 53/21 81/16 96/24 101/3
**help [2]** 230/11 232/13
**helpful [1]** 64/20
**helps [2]** 195/7 246/5
**here [189]** 3/4 3/17 4/12 9/10 9/17 11/3 12/11 17/22 18/13 18/13 19/3 19/14 28/13 28/22 31/17 38/5 43/23 48/17 50/6 50/21 50/25 52/1 52/3 52/6 52/8 52/16 53/23 53/24 55/10 55/17 58/3 58/24 59/5 62/21 62/24 63/5 65/1 66/14 67/18 70/17 70/22 71/7 72/22 73/14 74/5 74/13 74/16 76/18 78/2 78/10 79/4 80/21 81/3 83/7 84/19 84/23 89/3 89/15 90/21 91/8 91/13 91/20 93/20 95/11 95/19 99/10 99/19 99/22 100/19 106/14 107/17 108/6 108/19 109/3 109/8 110/7 111/21 113/21 115/5 117/11 117/15 119/10 121/10 121/11 121/20 122/19 123/23 124/13 124/19 124/24 129/13 130/22 130/23 131/5 131/21 132/3 132/24 134/25 135/8 136/4 136/7 136/14 137/1 137/14 137/23 138/13 138/25 139/24 140/24 141/3 141/5 141/14 141/19 143/14 144/2 145/2 145/17 146/24 146/25 147/15 148/25 149/18 150/7 150/13 151/10 151/16 152/3 157/7 157/25 159/8 159/19 162/11 163/7 164/5 164/12 164/25 166/23 167/2 167/8 171/2 171/15 171/24 173/7 173/19 174/18 175/3 175/21 176/5 177/12 177/16 177/18 179/15 179/21 180/20 184/17 185/9 185/18 190/15 196/7 200/10 200/21 205/3 205/15 206/23 208/14 209/12 210/5 213/8 214/24 215/22 217/20 218/3 218/21 219/2 223/20 225/13 228/2 240/2

246/6 246/21 246/21 249/4 251/23 252/4 252/11 252/15 253/1 253/12 254/2
**here's [9]** 57/7 67/23 67/24 67/24 67/25 67/25 113/4 165/7 209/10
**Herman [1]** 2/15
**herself [1]** 137/5
**hesitate [1]** 172/6
**heterogeneous [1]** 191/24
**hey [5]** 35/18 39/11 169/7 174/19 194/25
**Hi [1]** 188/5
**high [3]** 83/10 168/1 196/10
**higher [1]** 240/1 244/13
**highest [1]** 199/20
**highlight [4]** 41/21 106/13 115/2 139/12
**highlighted [3]** 125/17 139/12 222/23
**highlights [1]** 4/17
**highly [1]** 173/8
**hinge [1]** 62/24
**hired [6]** 60/15 60/17 65/20 65/24 77/3 77/4
**historically [1]** 56/13
**history [18]** 108/15 117/6 117/6 118/16 119/25 120/13 120/17 121/12 121/14 123/1 197/10 236/1 236/9 236/10 236/10 236/11 236/14 236/15
**hit [5]** 4/17 159/2 159/3 159/6 242/16
**hits [4]** 18/3 18/4 19/15 19/16
**hitting [3]** 160/13 160/14 160/14
**Hmm [1]** 145/1
**hold [9]** 202/1 207/18 208/11 208/18 220/12 221/3 239/9 243/5 248/12
**holding [1]** 232/9
**holds [2]** 25/7 141/24
**home [22]** 26/22 26/23 30/8 34/9 34/9 44/11 45/13 45/14 45/15 45/16 47/7 47/12 47/13 47/14 201/23 205/7 226/11 226/11 233/18 234/1 234/3 244/13
**home's [1]** 208/10
**homeowner [3]** 213/23 226/12 242/11
**homeowners [10]** 24/20 26/6 26/21 27/11 27/19 28/7 29/20 30/2 221/23 226/15
**homeowners' [1]** 29/14
**homes [34]** 12/18 14/23 15/8 24/13 25/15 25/21

26/17 26/18 26/20 26/20 27/22 27/23 29/2 30/17 33/13 33/13 34/5 34/7 34/10 46/7 176/20 193/19 193/21 194/5 208/25 210/21 212/24 213/4 240/7 240/10 240/19 240/22 240/23 241/5
**homogeneity [1]** 190/4
**homogeneous [5]** 28/10 191/3 191/3 191/21 191/24
**hone [1]** 171/23
**honing [1]** 212/14
**Honor [114]** 4/2 4/9 4/12 5/1 5/5 5/25 6/7 6/20 7/18 8/15 9/10 10/22 12/9 12/21 14/2 14/4 14/9 14/11 15/21 16/17 17/23 21/15 23/15 26/4 26/5 27/10 28/14 30/21 31/13 31/16 31/21 32/5 37/13 40/15 43/23 49/1 49/6 50/17 50/19 51/9 51/16 52/4 53/12 54/3 54/18 55/19 57/20 57/23 58/3 59/18 60/23 61/15 63/5 63/8 63/13 64/5 64/14 64/15 65/4 68/20 76/17 81/24 88/20 105/2 105/5 105/8 105/10 105/15 105/23 113/16 116/11 119/21 120/22 128/24 131/18 132/19 133/17 152/8 175/14 175/20 175/25 187/1 192/20 193/3 215/8 216/3 216/15 217/19 225/22 226/24 228/15 230/17 231/7 235/4 240/15 241/1 242/23 242/25 243/3 245/2 245/6 245/7 245/23 246/5 246/22 247/13 249/1 249/24 250/1 250/21 251/13 251/16 253/22 254/1
**Honor's [3]** 15/18 22/20 23/6
**HONORABLE [1]** 1/13
**hope [1]** 57/19
**hopefully [2]** 12/9 188/10
**hoping [1]** 63/6
**Hopkins [2]** 33/2 33/15
**horses [1]** 191/18
**horseshoe [1]** 37/25
**host [4]** 90/1 90/18 91/3 130/25
**hour [7]** 4/3 43/19 43/21 105/4 105/4 187/7 187/11
**house [25]** 46/16 52/9 52/25 53/1 84/9 84/9 84/10 97/24 98/1 99/8

Case 9:13-cv-80928-KAM   Document 391   Entered on FLSD Docket 01/08/2018   Page 272 of
291
{WITNESSNAME}                                                    Index: house...information

## H

house... [15] 172/21
172/22 172/23 175/1
181/8 183/1 183/2
190/15 190/16 191/8
191/9 207/23 233/24
233/25 242/14
housekeeping [1] 88/20
houses [19] 46/15 46/15
46/15 154/4 182/25
183/9 183/11 184/21
184/22 191/12 191/12
191/14 191/15 207/20
207/22 212/6 212/18
221/3 221/13
housing [2] 160/11
247/16
however [1] 101/1
hub [1] 46/17
Hubbard [1] 2/16
Hudgins [1] 2/22
hundred [9] 9/1 43/4
61/22 61/24 150/9
163/19 190/9 226/18
226/19
hundred-square-foot [2]
226/18 226/19
hundreds [4] 8/23 34/21
176/14 217/10
hurt [3] 48/1 48/2
159/10
hydrogeologic [2] 22/18
220/5
hydrologist [2] 102/16
219/22
hypotheses [2] 167/8
167/17
hypothesis [6] 163/20
163/21 166/22 166/23
166/24 167/21
hypothesize [1] 55/9
hypothetical [10] 22/3
96/25 169/17 169/20
172/4 174/8 174/12
174/20 178/20 179/4

## I

I'd [31] 10/12 21/15
26/4 30/21 49/3 50/17
54/24 57/23 64/18 65/14
76/17 77/13 103/6
104/23 106/4 108/15
108/21 109/6 127/25
145/20 152/18 177/15
187/10 190/16 205/10
212/11 220/16 223/3
224/10 228/4 228/7
I'll [33] 3/17 3/25 22/24
51/7 51/8 60/12 65/10
102/2 102/3 102/7
108/16 110/24 111/21
119/14 120/24 136/4
145/21 162/1 169/24
170/11 187/1 192/25
193/24 194/9 218/22
218/23 219/4 227/13

228/19 241/2 243/6
251/2 251/3
I'm [162] 3/7 3/16 4/2
4/9 4/15 10/1 11/8 11/11
12/6 14/14 17/2 22/23
25/4 26/14 28/16 31/17
37/19 43/20 43/22 45/4
64/8 65/12 67/19 67/19
68/2 68/4 73/9 74/2 74/6
74/7 74/17 74/17 76/18
76/19 77/22 78/9 79/3
79/3 79/6 79/22 83/7
85/8 86/13 86/19 87/1
87/24 88/5 89/19 90/18
90/23 91/6 91/7 92/1
92/10 92/25 93/9 93/10
93/11 93/12 93/24 94/13
99/9 99/22 100/10
101/16 101/20 101/23
102/15 102/16 103/1
103/7 103/12 103/22
104/2 104/15 104/16
104/18 107/15 107/16
108/19 110/7 113/15
115/14 115/18 116/12
117/17 117/21 121/24
124/12 124/13 124/22
126/14 126/25 128/24
129/21 129/22 130/19
132/2 132/12 132/16
133/9 135/20 137/15
141/9 141/12 141/20
144/12 152/8 155/17
156/19 156/22 158/15
162/18 163/22 164/24
165/7 165/8 165/8
175/14 179/15 179/21
179/21 180/15 183/14
184/5 191/7 192/20
196/20 197/2 197/23
200/6 200/12 200/22
203/13 204/18 215/8
215/16 216/13 217/12
218/8 219/17 219/22
219/22 219/24 222/10
225/1 227/10 227/12
228/1 228/2 228/15
228/17 229/17 229/18
231/7 236/18 244/19
245/20 248/2 248/11
250/21 253/7
I've [71] 3/19 4/8 11/11
31/10 39/16 64/12 64/16
64/25 65/1 66/14 67/17
69/13 72/22 73/6 73/8
78/5 80/9 83/6 83/12
83/21 85/24 86/12 86/17
88/17 89/21 91/25 95/9
95/18 99/19 104/13
108/1 111/18 114/24
115/6 115/12 121/20
123/21 126/24 138/18
139/5 139/12 142/17
145/9 145/18 146/17
151/22 156/25 161/2
163/7 167/13 173/5

175/21 176/5
178/25 180/16 181/3
181/17 181/18 190/1
200/1 212/13 223/6
229/15 240/2 246/5
248/6 248/7 249/8
249/10 253/9
idea [1] 150/10
identifiable [1] 181/23
identification [3] 93/14
94/17 123/22
identified [12] 73/14
95/11 108/1 126/23
195/10 195/13 199/12
199/13 199/14 200/14
237/10 241/20
identify [12] 75/21
102/11 190/8 190/9
194/25 195/12 199/24
200/4 200/7 200/11
206/16 227/8
identifying [2] 54/9
194/19
ignore [2] 59/23 230/14
ignoring [2] 172/3
172/10
IL [1] 2/17
illustrative [4] 151/20
152/3 161/22 182/4
image [1] 210/10
imagery [1] 40/7
imagine [5] 29/18
119/10 169/13 170/7
242/11
imagined [1] 60/6
immediately [1] 172/17
immense [1] 141/1
imminent [1] 53/20
impact [31] 12/11 15/7
28/3 57/10 88/15 104/6
104/12 108/24 109/8
112/7 115/16 171/20
183/7 195/8 198/5
203/21 203/23 203/25
204/3 204/5 204/11
204/23 209/25 211/16
217/17 225/10 226/5
239/22 239/24 241/8
247/24
impacted [1] 93/11
impacts [1] 131/13
impaired [19] 26/18
87/10 89/13 90/7 90/14
95/1 95/13 98/19 100/1
146/3 146/8 146/14
210/3 211/16 212/4
212/20 240/23 241/5
244/14
impairment [10] 89/18
95/2 95/3 95/14 96/4
96/17 96/19 96/23
159/11 212/19
impairments [1] 216/18
impeachment [1] 85/18
implausibility [1] 222/8
implausible [1] 222/13

implication [1] 244/12
implications [1] 91/5
Implicitly [1] 87/15
important [45] 4/19 6/4
10/6 15/21 17/25 21/17
26/12 34/4 36/12 37/13
37/16 39/3 40/18 46/2
47/14 57/7 68/14 68/25
69/4 69/6 69/8 69/8 69/9
70/8 72/19 112/2 112/22
112/23 114/11 117/17
123/4 146/17 148/19
179/11 185/1 185/3
185/25 186/20 199/19
222/11 222/12 222/20
227/8 227/23 234/15
importantly [3] 33/17
37/5 54/11
impossibility [1] 222/8
improper [4] 82/18
85/17 85/18 186/16
improperly [4] 16/10
240/7 240/23 241/6
improve [1] 232/11
inadmissible [1] 50/13
inappropriate [2]
126/12 127/2
incentive [1] 126/20
incidence [2] 58/7 242/1
incident [18] 31/17 44/4
44/6 44/12 44/20 44/21
44/24 45/2 45/11 45/15
45/23 45/24 45/25 46/1
46/4 77/6 77/18 186/9
incinerating [1] 42/25
incineration [2] 42/14
43/2
incinerator [2] 39/2
42/24
include [12] 9/18 38/3
48/5 137/11 138/4 138/5
174/22 174/23 176/19
179/24 182/14 227/17
included [5] 114/7 136/1
176/8 240/8 240/20
includes [1] 125/14
including [17] 8/13
16/25 56/9 57/6 139/16
156/19 166/14 178/5
178/17 181/3 197/24
216/17 218/10 223/17
224/1 224/18 241/5
inclusions [1] 240/24
inconsistent [4] 141/16
141/19 236/1 236/5
incorporate [1] 217/25
incorporated [2] 215/25
216/25
incorporating [2] 217/3
217/5
increased [1] 242/1
indeed [4] 86/4 142/20
185/12 239/17
indemnification [2]
46/22 46/23
independent [15] 24/23

30/11 73/10 86/18
143/12 185/13 201/20
201/22 202/25 203/2
205/16 207/5 210/1
214/20 218/11
independently [6] 23/20
29/7 94/23 201/7 218/15
227/13
indicated [5] 135/4
179/1 190/1 212/13
227/6
indicates [1] 208/15
indication [5] 54/23
137/9 174/6 196/2
196/11
indications [1] 71/11
indicative [2] 172/15
208/24
individual [22] 5/6 6/11
9/3 11/21 25/19 25/20
29/19 32/22 33/3 35/10
41/8 43/10 91/15 95/11
98/17 101/11 146/14
198/1 211/22 226/11
237/23 239/1
individualize [5] 74/9
74/19 74/20 74/23 75/3
individualized [7] 26/11
27/16 30/7 100/18
100/23 101/6 101/6
individually [1] 198/22
individuals [6] 91/19
92/8 93/20 94/18 99/3
99/9
individuals' [1] 91/21
indulge [1] 216/21
indulgence [2] 76/18
120/24
industrial [5] 16/18
18/20 175/4 176/7
176/15
industry [1] 35/10
inexorable [1] 53/19
infected [1] 183/11
infection [1] 48/6
inform [6] 86/3 87/24
88/2 177/3 198/5 230/11
informal [10] 28/21
80/16 124/3 126/11
132/20 132/21 190/22
201/5 201/17 204/6
information [72] 28/18
59/9 65/1 71/9 83/13
112/25 125/7 125/23
126/3 126/22 128/23
132/13 142/1 142/5
158/15 158/20 158/24
159/23 160/8 167/19
172/19 175/16 189/3
190/5 192/9 206/10
206/14 206/15 206/17
207/18 213/13 217/10
222/2 222/5 226/6
229/21 235/23 235/24
236/6 236/7 236/12
241/17 242/4 242/5

**I**

**information... [28]** 242/9 242/20 242/21 243/15 243/17 245/15 245/16 248/13 248/15 248/19 248/20 248/22 249/2 249/4 249/9 249/11 250/7 250/8 250/10 250/14 250/16 250/24 251/2 251/7 251/11 251/22 252/7 253/3

**informed [7]** 31/25 84/17 221/25 232/4 232/5 233/3 233/13

**Infrastructure [1]** 45/19

**initially [3]** 20/1 240/24 241/20

**injury [9]** 6/2 6/21 14/11 45/24 47/25 55/20 56/4 93/22 94/12

**innocent [1]** 8/9

**innuendo [1]** 61/12

**input [3]** 148/17 149/5 149/21

**inquiries [1]** 190/11

**inquiry [1]** 241/24

**inside [2]** 149/12 193/16

**insofar [2]** 29/21 150/15

**instances [8]** 131/19 131/20 133/4 172/7 177/2 230/6 253/13 253/15

**instead [11]** 3/8 41/24 53/25 60/19 60/19 118/17 122/25 135/13 172/4 172/11 186/10

**institute [1]** 71/1

**institutions [4]** 19/22 24/22 127/11 197/11

**instructed [2]** 50/5 60/20

**instruction [2]** 10/13 10/21

**instructions [1]** 171/4

**instructor [2]** 25/10 67/3

**instructors [1]** 197/23

**instrument [1]** 214/22

**intend [1]** 7/13

**intended [3]** 199/12 199/13 200/8

**intending [1]** 224/5

**intention [1]** 4/4

**interacts [1]** 106/5

**interchangeably [2]** 231/15 236/4

**interest [3]** 126/19 179/18 233/13

**interested [5]** 67/6 67/19 67/20 199/19 199/20

**interesting [5]** 41/18 93/7 145/18 167/1 207/17

**interfering [1]** 156/13

**internally [2]** 13/13

196/9

**International [1]** 203/9

**interpolated [1]** 246/15

**interpreted [2]** 132/14 132/15

**interpreting [2]** 149/13 149/22

**interrupt [1]** 131/4

**interruptions [1]** 14/25

**intersection [1]** 227/24

**interval [2]** 165/1 210/22

**interview [8]** 28/7 118/25 122/13 124/9 125/21 126/12 127/2 171/11

**interviewed [6]** 24/19 28/21 117/16 123/20 125/13 126/23

**interviewing [4]** 124/22 131/9 131/12 221/7

**interviews [40]** 117/12 118/2 118/5 118/11 118/14 118/18 118/20 118/22 119/23 120/7 120/10 120/19 121/7 121/22 122/4 122/16 123/6 123/18 127/14 127/15 127/22 128/7 128/10 129/4 129/6 129/9 129/14 130/13 132/21 132/21 133/21 133/22 135/1 135/8 135/18 135/24 136/1 136/7 138/10 171/12

**intimately [1]** 151/8

**introduce [2]** 216/6 217/21

**introduced [1]** 215/11

**introduction [1]** 169/19

**invasion [1]** 15/7

**investigate [3]** 39/7 39/9 126/25

**investigated [1]** 57/1

**investigating [4]** 39/6 39/10 126/14 134/13

**investigation [13]** 35/6 39/4 56/18 57/17 59/5 59/15 114/10 171/25 173/23 242/7 242/12 251/24 252/1

**invoke [3]** 129/23 130/11 132/10

**involve [3]** 49/24 147/20 223/25

**involved [6]** 6/7 7/11 51/24 95/10 131/22 148/24

**involves [1]** 228/18

**ionizing [3]** 31/24 32/1 36/15

**irrelevant [3]** 114/23 114/24 143/2

**irrespective [1]** 205/8

**IRS [1]** 196/5

**island [5]** 33/1 33/25

34/2 291/5 143/15

**islands [1]** 34/6

**isn't [27]** 11/14 32/23 66/21 72/21 87/14 111/4 112/18 112/22 114/1 117/7 120/1 122/4 122/9 122/13 125/1 127/15 128/8 128/11 135/5 143/6 146/11 153/4 160/25 161/9 164/20 164/23 252/2

**isolate [1]** 103/15

**issuance [1]** 241/24

**issue [49]** 5/13 5/14 9/10 11/14 11/16 11/21 12/9 13/13 13/15 13/17 14/21 30/7 32/21 43/14 44/9 45/20 46/1 77/22 99/20 99/23 101/18 102/5 102/6 102/7 102/17 102/22 123/4 129/10 129/12 130/19 131/16 131/24 133/10 139/24 141/10 141/21 144/22 145/18 156/19 156/20 161/23 182/8 184/17 220/7 225/25 227/13 245/11 248/13 252/6

**issue's [1]** 95/6

**issued [3]** 8/3 76/24 241/20

**issues [46]** 4/20 5/6 11/20 14/3 18/12 25/6 30/5 30/6 43/5 49/17 63/6 75/11 78/8 90/2 90/18 91/3 95/9 95/20 102/15 102/25 104/16 104/17 130/8 132/5 134/12 137/18 137/22 138/8 140/24 142/4 142/9 144/17 155/2 156/11 156/16 156/17 156/22 160/19 183/2 183/3 184/18 205/5 220/1 232/6 235/5 244/16

**issuing [1]** 92/25

**it's [190]** 6/4 6/16 6/22 7/7 10/24 10/25 11/16 12/13 13/11 13/22 14/11 15/19 15/20 19/5 19/5 19/7 20/5 21/8 21/17 22/1 24/4 26/19 27/16 28/24 28/25 29/23 30/14 32/24 32/25 34/2 36/8 36/18 36/21 37/1 43/4 43/13 43/16 44/9 46/6 46/25 47/6 50/18 51/3 51/4 54/4 54/17 54/20 54/24 55/17 57/7 57/12 58/14 58/19 60/24 61/11 61/12 61/21 67/4 68/13 69/6 72/11 72/19 73/1 75/23 80/5 80/14 81/6 81/6 84/15 85/1 85/4 89/4 89/20 100/8 101/1

102/12 102/13 107/11 110/5 112/21 112/21 113/17 114/11 114/22 115/18 117/17 123/5 123/7 126/1 126/5 126/8 126/9 126/10 131/2 131/18 133/6 136/4 136/5 140/7 143/8 143/13 144/18 144/18 144/19 145/15 145/18 147/19 148/1 148/3 148/5 150/9 151/21 153/16 153/17 154/12 155/13 155/14 160/4 160/13 160/13 160/14 160/19 160/24 161/13 161/22 161/23 162/20 163/9 163/24 166/3 167/6 173/17 175/10 176/11 179/11 180/12 182/17 182/20 182/20 182/22 184/3 184/20 184/24 185/4 185/7 185/22 185/25 186/3 186/16 186/19 187/6 187/8 187/10 187/20 191/3 193/7 195/15 196/11 196/14 197/16 200/22 203/22 205/12 208/24 211/15 213/23 215/12 216/8 216/23 216/23 217/12 219/4 220/25 221/11 221/14 222/12 225/10 227/8 231/8 232/21 233/23 234/22 236/11 244/2 245/21 248/7 248/15 249/3 249/11 250/23

**itself [18]** 27/2 28/18 31/1 37/20 52/11 71/23 80/2 123/21 149/8 150/4 155/12 162/17 163/18 163/25 167/2 167/16 252/24 253/3

**itself's [1]** 149/10

**J**

**Jack [2]** 2/9 31/14

**Jackson [3]** 167/9 167/17 168/1

**Jacksonville [1]** 2/6

**January [2]** 1/9 256/10

**Jeffrey [1]** 2/2

**Jennings [5]** 15/23 16/5 16/7 16/8 17/3

**jet [2]** 32/16 60/16

**job [4]** 38/13 38/18 214/1 227/5

**Joe [2]** 6/14 6/15

**John [3]** 63/25 64/8 255/8

**joint [4]** 9/24 10/4 10/10 227/15

**jointly [1]** 228/10

**Jonathan [4]** 2/2 12/3 205/12 222/23

**Jones [10]** 7/4 7/9 14/15 14/22 14/23 15/5 15/5 31/14 51/21 51/24

**journal [3]** 203/11 203/12 214/8

**Jr [1]** 2/19

**judge [17]** 1/14 12/5 33/11 33/15 72/11 82/18 94/5 109/18 143/8 150/15 175/7 177/20 182/17 186/16 235/8 251/20 252/15

**judgment [2]** 11/22 145/23

**judicial [2]** 32/23 45/8

**jump [1]** 187/18

**jumping [2]** 76/23 225/5

**juncture [3]** 75/3 75/14 211/25

**Jupiter [12]** 24/15 27/24 28/6 47/11 52/9 156/8 157/4 161/6 166/25 208/16 209/18 247/21

**jurisdiction [1]** 44/1

**jury [14]** 4/23 5/16 10/13 10/16 11/5 11/9 21/5 22/16 23/13 71/18 101/19 102/5 185/12 218/3

**just [153]** 4/5 4/17 5/8 7/1 7/7 8/7 10/23 12/14 16/19 17/7 17/19 17/21 18/16 18/23 21/9 23/11 23/23 24/1 24/2 24/4 24/15 30/8 31/7 36/21 38/22 39/19 40/4 40/14 41/16 41/19 41/21 43/20 43/24 44/6 45/1 49/1 49/3 49/17 50/3 50/19 54/2 54/8 55/5 55/25 57/23 58/8 58/9 58/10 58/11 60/20 61/21 62/6 62/9 64/16 64/18 64/25 65/10 68/2 71/17 76/13 78/20 78/24 79/13 81/20 82/18 85/12 85/24 87/12 88/11 94/5 97/21 101/15 102/1 103/1 103/6 105/10 107/2 108/12 109/18 111/2 111/9 111/14 112/21 116/2 116/6 116/18 119/21 120/24 121/10 121/18 121/23 121/25 123/25 124/24 126/24 131/4 131/22 132/21 133/10 133/14 134/4 134/17 137/1 140/7 141/5 141/14 143/5 145/2 146/1 146/20 149/17 149/24 150/15 156/13 157/12 160/14 161/10 162/16 164/6 182/20 185/4 187/7 187/18 188/9 189/22 190/21 195/6 197/10 198/2

**J**

**just... [24]** 203/13 206/8
208/17 209/14 216/9
217/25 218/4 218/6
218/22 219/14 221/10
221/14 222/24 229/18
230/3 230/21 231/8
242/22 243/3 243/7
246/20 246/21 248/2
251/22
**juvenile [1]** 242/2

**K**

**K-5 [1]** 205/12
**K-i-l-p-a-t-r-i-c-k [1]**
64/9
**K5 [2]** 207/8 209/9
**KAM [1]** 1/2
**keep [5]** 3/17 6/5 8/25
13/18 37/4
**keeping [1]** 208/23
**KENNETH [1]** 1/13
**Kerr [2]** 8/3 8/17
**kids [3]** 97/24 207/23
232/12
**killing [1]** 251/11
**Kilpatrick [37]** 23/15
23/19 24/10 25/2 25/5
25/14 25/15 26/13 26/24
28/2 28/17 28/21 29/6
47/10 48/10 48/11 48/13
49/25 57/7 62/13 63/15
63/21 63/22 63/25 64/8
65/20 105/21 119/22
188/5 189/19 194/19
217/15 223/3 235/12
243/11 250/6 255/8
**Kilpatrick's [5]** 50/19
62/25 63/2 64/17 113/18
**kind [18]** 78/10 91/22
112/21 124/17 156/13
159/23 160/7 161/17
164/5 165/2 174/3
182/22 183/3 185/6
191/22 196/15 205/5
249/16
**kinda [2]** 11/1 233/23
**kinds [3]** 22/9 181/17
251/6
**knew [6]** 37/2 42/7
130/1 134/2 134/2 134/8
**knocking [1]** 45/21
**know [122]** 3/14 3/15
3/24 4/13 6/25 10/23
11/6 13/9 15/1 19/5 19/6
19/22 20/23 21/19 25/3
25/4 25/22 26/19 27/8
27/8 27/9 28/23 29/24
30/1 30/22 34/8 35/9
36/18 41/5 41/8 41/9
41/11 41/15 43/13 43/21
44/6 49/2 58/7 58/14
58/15 60/19 62/8 69/6
69/12 71/18 74/21 75/15
79/19 81/25 84/4 89/19
90/15 91/12 93/7 96/16

100/20 101/16 101/18
105/11 109/14 111/17
113/4 116/2 120/6 125/9
127/23 131/12 131/16
133/1 133/25 134/15
137/13 137/14 145/9
145/16 145/17 149/7
151/12 153/7 154/7
165/14 166/13 167/9
167/25 170/2 171/10
172/2 172/16 173/12
175/1 175/2 177/1
177/15 180/14 180/14
180/15 180/15 182/22
182/25 183/21 185/6
186/19 187/9 187/11
189/16 193/6 196/17
210/17 211/10 214/25
217/10 218/18 218/19
219/4 221/1 246/1 246/2
246/3 246/18 247/6
249/15 253/8
**knowledge [7]** 94/3
128/1 128/2 130/25
169/8 215/25 242/9
**knowledgeable [2]**
199/21 199/22
**known [4]** 58/17 60/17
158/20 234/5
**knows [6]** 31/16 41/3
41/16 81/22 81/23
180/13
**Koosh [2]** 39/23 39/24

**L**

**lab [3]** 61/19 61/20
179/7
**labeled [2]** 106/14 107/5
**lack [1]** 126/21
**laid [3]** 70/24 70/25
216/9
**Lakes [1]** 2/11
**land [2]** 16/21 194/23
**landfill [7]** 37/18 37/20
37/24 38/1 38/3 38/5
38/9
**language [11]** 68/15
69/22 109/7 113/13
130/20 135/15 136/21
136/25 137/7 137/8
141/25
**large [1]** 78/7
**larger [1]** 189/13
**last [14]** 38/23 47/2 64/7
137/15 148/23 177/17
178/2 178/3 190/20
204/17 205/3 217/4
225/14 239/4
**lasting [1]** 137/14
**later [10]** 26/14 31/23
32/2 37/16 43/3 48/9
82/21 100/18 140/23
186/23
**Latham [1]** 31/15
**Lauderdale [2]** 2/4 2/8
**laundry [1]** 21/2

law [291]/5 4/18 6/14
6/16 8/5 9/21 9/25 12/8
14/17 15/15 21/9 22/20
22/23 23/1 23/3 25/14
47/25 148/2 148/24
228/9 233/1
**lawns [1]** 191/16
**lawsuit [2]** 6/6 125/24
**lawyer [1]** 61/11
**lawyers [4]** 124/19
124/21 125/10 126/3
**lay [1]** 217/7
**layperson's [1]** 191/7
**lays [1]** 167/10
**lead [4]** 103/22 125/14
234/19 242/12
**leading [8]** 189/23
193/25 202/2 225/2
230/17 231/8 239/10
241/1
**leads [3]** 20/13 20/15
183/21
**leak [1]** 44/14
**leakage [14]** 158/15
158/20 158/24 159/23
241/17 242/4 242/5
242/8 242/20 242/21
245/11 245/15 248/13
248/20
**leaking [1]** 248/15
**leaks [2]** 180/17 223/11
**learn [3]** 28/14 32/3
35/13
**learned [5]** 39/19 41/19
42/19 43/3 127/11
**least [10]** 4/8 4/14 13/16
77/10 80/16 119/2
126/17 134/9 216/21
252/21
**leave [4]** 91/17 122/2
254/1 254/3
**leaves [2]** 59/13 83/3
**lectured [2]** 203/4
220/23
**led [4]** 59/15 119/3
231/12 241/24
**left [1]** 92/9
**legal [24]** 11/14 11/16
11/19 11/21 44/10 77/22
78/8 81/21 82/23 82/24
83/19 83/23 90/2 107/7
109/18 124/13 179/16
179/21 185/14 192/21
192/23 210/17 213/17
228/18
**legislative [1]** 32/24
**legislature [2]** 8/1 8/19
**legs [4]** 161/22 196/24
202/18 205/4
**lender [1]** 139/4
**lenders [2]** 80/18 197/12
**lending [3]** 24/22 127/11
131/15
**lends [2]** 27/2 28/18
**length [3]** 132/22 227/17
231/21

**Leslie [1]** 6/14
**less [19]** 26/7 59/25
80/20 109/16 155/6
172/22 183/1 183/11
183/21 184/5 184/8
184/20 184/21 222/20
233/24 234/1 234/3
234/5 244/14
**let [27]** 3/25 11/11 22/24
88/17 91/19 94/2 94/4
110/23 119/21 121/10
121/18 121/23 121/25
144/11 149/3 150/22
165/24 177/19 177/23
187/23 192/25 196/3
205/19 205/19 230/2
243/6 251/2
**let's [26]** 3/20 35/19
63/14 105/3 120/21
122/11 143/18 144/7
145/7 153/21 174/5
177/18 187/13 187/16
188/15 194/11 198/10
203/21 207/8 207/8
209/9 210/20 211/1
222/22 222/24 226/10
**letter [1]** 20/7
**letters [1]** 20/2
**letting [1]** 43/20
**level [11]** 32/10 34/14
44/23 45/22 61/20 88/14
93/23 108/24 162/18
163/8 179/7
**leveling [2]** 247/21
247/25
**levels [6]** 34/20 59/17
62/4 62/4 194/6 211/22
**liabilities [1]** 43/5
**liability [9]** 8/7 9/24
10/4 10/10 45/10 46/21
110/8 144/12 179/23
**liable [5]** 8/12 9/11 9/15
10/7 228/10
**license [1]** 197/22
**licensed [3]** 25/7 36/19
37/6
**licensure [2]** 197/14
197/22
**lie [1]** 74/4
**liens [5]** 33/5 33/7 33/14
39/25 40/1
**lies [2]** 175/5 182/8
**light [2]** 16/8 78/18
**likely [3]** 21/10 242/19
242/20
**limit [4]** 46/24 62/1 62/2
226/4
**limitations [2]** 46/18
46/20
**limited [1]** 7/7
**Linda [2]** 95/11 106/15
**line [35]** 7/15 20/12
55/16 68/17 73/19 85/10
85/10 85/15 85/16 85/16
86/10 98/24 103/25
103/25 104/10 104/19

107/23 122/1 125/19
143/20 143/20 143/22
143/22 146/21 157/2
162/23 162/23 165/15
167/5 177/15 204/12
204/23 208/14 223/25
225/21
**line 1 [1]** 98/24
**line 12 [1]** 104/10
**line 13 [1]** 68/17
**line 14 [3]** 85/10 85/16
103/25
**line 15 [1]** 104/19
**line 16 [1]** 85/10
**line 17 [4]** 143/20
143/20 143/22 143/22
**line 23 [1]** 162/23
**line 24 [1]** 103/25
**line 4 [1]** 162/23
**line 5 [2]** 122/1 165/15
**line 53 [1]** 125/19
**line 6 [1]** 85/16
**line 8 [1]** 86/10
**lines [19]** 35/2 55/23
55/24 55/25 56/2 69/23
84/20 84/22 84/25 86/25
119/13 120/3 157/4
189/17 189/17 189/22
203/16 223/7 246/20
**lines 16 [1]** 120/3
**lines 4 [1]** 119/13
**lines 9 [1]** 69/23
**lingering [2]** 34/1 43/17
**link [1]** 226/9
**linkage [1]** 220/3
**linked [2]** 102/13 220/8
**linking [2]** 219/23 253/7
**list [2]** 182/4 253/12
**listed [5]** 66/14 89/5
93/20 181/2 206/23
**litany [1]** 35/25
**literature [26]** 72/2 81/3
81/7 158/14 158/16
161/5 161/14 181/19
181/25 182/21 183/6
183/9 184/12 185/7
185/10 196/19 196/20
201/5 201/11 201/17
203/25 214/10 217/15
217/17 217/20 218/10
**litigation [8]** 8/20 8/22
9/6 34/17 46/5 171/23
179/23 220/21
**little [11]** 20/4 32/3
32/13 53/5 80/16 149/24
160/4 187/18 196/14
230/21 249/1
**live [12]** 7/2 29/1 46/14
168/13 168/16 168/21
168/23 168/24 195/11
207/24 232/10 232/13
**lived [3]** 41/22 41/23
232/10
**lives [1]** 98/3
**living [3]** 14/24 41/3
169/4

**L**

load [1] 55/9
loads [1] 40/16
loan [1] 122/8
local [7] 39/2 39/7 42/24
62/8 186/1 190/21
221/17
located [2] 108/5 176/21
location [5] 51/18 52/23
154/5 154/10 170/10
locations [1] 106/9
locked [1] 42/4
logical [3] 22/6 226/21
226/25
logs [1] 22/9
long [9] 3/14 131/22
137/14 158/12 187/6
193/20 204/18 239/11
245/17
long-lasting [1] 137/14
longer [4] 44/24 117/9
187/8 208/11
longtime [1] 232/15
looked [9] 28/2 38/17
44/3 112/10 120/12
211/9 211/10 229/16
250/16
looking [31] 6/2 10/24
44/2 50/22 77/15 85/8
88/7 91/6 92/10 93/12
110/24 124/24 136/5
152/21 154/3 154/9
156/7 156/8 156/8 170/7
172/11 195/24 196/24
201/3 205/15 209/12
209/13 211/12 219/19
245/20 248/2
looks [11] 36/9 65/14
90/4 135/24 173/11
175/2 175/3 191/8
200/21 245/25 246/12
lose [4] 5/4 12/23 12/23
12/24
loss [29] 43/4 45/14 46/8
47/8 47/9 47/16 93/6
93/18 94/1 94/19 94/22
94/23 95/5 95/24 96/2
96/8 96/13 97/21 98/6
98/7 98/9 126/4 126/6
126/13 126/25 127/3
227/7 227/9 227/11
lost [4] 12/18 12/25
50/21 50/23
lot [29] 6/25 29/22 35/8
35/15 36/9 40/5 46/10
69/21 69/25 70/10 76/20
115/7 115/7 121/18
141/18 144/10 147/8
151/18 151/18 158/16
161/20 172/2 181/18
181/18 183/14 183/17
191/8 231/20 252/6
lots [5] 122/18 191/12
191/13 191/16 191/17
loudly [1] 51/8
low [5] 32/10 34/14

61/20 80/13 196/14
low-level [2] 32/10
34/14
lower [7] 206/8 208/4
208/24 240/25 247/3
253/11 253/16
lowering [1] 241/8
lowest [2] 199/20 247/4
lozenge [1] 176/3
lunch [1] 105/3
lungs [1] 48/8

**M**

MacNally [1] 2/14
macroeconomic [1]
160/19
magnitude [2] 146/20
152/4
Magnum [16] 32/12
36/2 38/19 39/7 39/16
39/18 40/10 40/12 41/2
41/16 42/1 42/3 42/8
42/10 42/17 42/19
MAI [1] 182/24
mail [2] 1/20 35/21
mails [3] 38/17 38/20
38/24
maintain [1] 13/1
maintained [1] 23/9
maintaining [1] 13/23
major [4] 39/22 39/23
42/24 43/6
majority [1] 135/1
makes [8] 9/13 9/17 9/23
28/11 132/15 187/13
210/15 235/22
makeup [1] 34/10
making [9] 19/14 75/23
89/19 99/15 101/22
130/5 174/8 198/21
245/18
man [1] 33/1
manage [1] 8/20
managed [2] 9/6 99/3
management [11] 51/23
52/10 52/19 95/6 95/9
96/6 96/10 99/20 99/23
100/4 102/7
managing [1] 8/22
mandated [1] 197/12
manner [6] 17/20 30/15
198/21 201/20 213/17
221/23
mansions [1] 191/10
manufacturing [1]
214/12
map [21] 17/22 37/14
37/25 50/18 52/15 55/23
55/25 56/3 84/20 84/22
106/13 189/4 189/17
189/22 190/6 192/12
236/21 236/23 237/24
237/24 238/12
mapped [1] 189/3
mapping [1] 192/10
maps [2] 37/10 190/23

Mara [2] 32/10 31/13
Marais [1] 58/22
March [2] 73/21 110/23
March 2016 [2] 73/21
110/23
mark [9] 88/22 88/24
88/25 106/6 113/16
116/11 120/22 128/24
170/3
marked [4] 88/8 88/14
129/13 167/4
market [66] 26/23 27/22
27/24 28/4 47/11 78/16
79/8 80/24 97/3 102/14
134/23 140/12 159/14
171/17 171/20 172/4
172/10 172/13 172/13
172/18 172/23 172/24
172/24 173/19 181/20
184/17 184/20 186/3
190/4 199/15 199/15
199/17 202/17 207/16
207/19 208/1 208/3
208/11 208/12 208/23
213/9 213/11 220/8
221/3 221/7 222/4 229/6
229/21 230/1 230/3
230/9 230/15 231/17
231/25 232/2 233/1
233/14 242/20 243/19
243/24 248/19 249/9
250/6 251/8 252/8
253/11
market-wide [1] 202/17
marketability [3]
138/15 139/18 141/8
marketplace [21] 160/8
163/17 163/19 163/23
164/25 172/9 199/23
206/11 206/15 213/14
222/3 222/21 226/7
231/22 235/24 236/7
236/13 248/23 250/17
250/24 251/23
markets [2] 221/1 249/2
MARRA [2] 1/13 3/5
mass [6] 26/24 27/2 27/5
27/5 213/15 213/18
mass-wide [1] 213/18
Massachusetts [1] 148/9
massive [1] 50/25
match [2] 186/14 186/20
material [22] 22/7 30/7
33/10 34/14 34/15 36/19
36/20 37/12 37/15 37/22
38/21 39/1 39/6 40/2
56/20 61/5 62/5 81/14
89/25 96/13 98/5 233/4
materially [2] 78/7
208/4
materials [10] 5/11 23/4
34/16 35/4 38/16 39/16
56/23 61/1 77/19 186/9
mathematical [1] 146/7
matter [21] 8/9 15/3
19/3 36/17 44/16 44/17

88/10 88/21 99/3 99/6
100/5 146/7 167/15
182/13 183/24 185/20
185/23 193/18 213/22
215/10 256/9
matters [3] 40/23
186/12 188/16
maximize [1] 208/10
May 2001 [1] 42/19
maybe [8] 51/4 55/6
55/9 55/13 92/10 177/11
187/16 193/9
McElroy [1] 2/15
me [83] 3/8 3/11 31/14
51/9 62/11 65/4 68/15
69/22 70/10 77/11 82/21
83/13 83/19 84/5 84/15
87/24 88/17 90/23 91/19
92/17 93/1 94/2 94/4
100/22 105/5 106/25
110/15 110/23 113/13
119/2 119/3 119/21
121/10 121/18 121/23
121/25 125/2 125/25
130/11 137/9 138/21
139/4 140/6 140/7
141/23 144/11 148/3
149/3 150/11 150/22
154/14 165/24 167/14
170/18 171/24 173/4
175/14 176/17 177/16
177/19 186/23 186/24
187/23 193/1 196/3
196/21 197/18 205/19
205/19 208/15 216/15
218/6 227/8 227/10
229/5 230/2 232/1
245/18 245/25 246/6
246/12 247/23 253/17
mean [26] 11/18 48/4
61/19 82/23 85/4 86/8
97/22 103/10 136/10
145/2 162/10 162/11
162/5 162/16 162/16
165/7 165/13 182/22
185/4 189/1 191/5
191/20 193/12 193/14
216/9 219/20
meandered [1] 132/23
meaning [4] 90/23
103/17 149/20 192/23
meaningful [2] 89/24
203/22
meaningfully [1] 217/8
means [11] 8/17 8/17
22/19 44/7 54/24 58/20
58/24 149/7 158/21
162/8 221/6
meant [3] 81/21 106/15
189/12
measurable [5] 14/7
96/13 98/5 189/21 190/7
measure [33] 25/23 26/9
26/13 26/16 26/22 30/3
74/7 87/23 98/8 102/10
103/15 104/10 107/13

126/4 155/4 156/12
157/23 165/1 200/17
212/13 212/15 214/1
214/3 214/4 214/23
215/4 222/17 227/9
227/10 227/14 228/12
228/23 232/23
measured [4] 26/21
94/23 103/2 211/6
measurement [3] 26/10
26/11 202/10
measures [2] 22/25
156/10
measuring [9] 14/13
24/7 24/9 75/6 104/18
162/8 220/10 221/11
248/3
meat [1] 149/25
mechanism [4] 30/10
31/1 62/7 186/10
mechanisms [1] 192/5
medians [1] 162/8
medical [1] 232/14
meet [1] 12/21
meltdown [7] 205/23
206/4 206/8 213/9
213/11 248/1 249/18
member [6] 11/23 11/24
93/4 99/25 244/1 244/20
members [6] 92/13
97/11 101/8 120/19
210/15 210/22
memory [1] 253/18
men [1] 39/24
mention [15] 34/13 36/1
36/11 39/21 40/4 41/23
41/24 60/1 119/25
122/15 139/21 177/2
180/4 180/7 181/8
mentioned [6] 35/16
56/16 81/4 123/18 175/6
192/3
mentioning [1] 56/8
mentions [3] 42/11
216/1 216/9
mercury [7] 180/5
181/23 223/21 224/3
224/9 224/19 224/24
mere [1] 19/3
merely [2] 12/17 229/13
merit [2] 44/8 256/6
merits [4] 4/20 4/21 4/23
5/4 25/1 98/23
message [2] 12/19 183/8
met [3] 21/13 49/10 50/4
meta [19] 69/9 72/3 81/9
81/16 83/10 144/19
196/10 201/6 201/18
204/3 206/21 214/6
215/3 215/13 216/1
216/5 216/7 216/17
218/11
meta-analysis [19] 69/9
72/3 81/9 81/16 83/10
144/19 196/10 201/6
201/18 204/3 206/21

## M

**meta-analysis... [8]**
214/6 215/3 215/13
216/1 216/5 216/7
216/17 218/11
**metes [1]** 55/2
**method [24]** 8/21 8/22
13/16 21/21 23/8 23/10
25/21 26/13 27/5 27/5
27/15 66/19 67/24 72/10
72/14 82/21 167/25
168/6 168/8 173/10
173/11 220/23 220/25
234/17
**methodological [2]**
161/5 227/3
**methodologically [2]**
19/12 126/1
**methodologies [42]** 22/5
24/10 25/19 27/3 66/14
66/19 67/2 67/7 67/16
67/21 68/7 71/25 73/22
76/12 79/10 83/8 111/23
112/3 112/14 141/22
145/20 173/9 173/15
173/18 192/4 196/1
196/8 196/9 196/23
197/1 201/4 201/5 201/7
201/12 202/12 202/25
203/3 203/4 205/4 209/8
218/10 239/22
**methodology [28]** 22/14
23/8 27/3 28/18 62/23
69/16 70/5 70/9 70/21
70/24 72/22 73/3 75/19
82/13 82/17 91/15 98/8
111/12 122/21 141/15
153/17 161/24 171/14
186/13 197/4 198/5
202/21 207/2
**methods [18]** 6/3 23/17
25/24 26/2 69/16 70/22
71/5 78/22 81/15 172/12
198/14 200/25 201/17
213/2 213/15 218/9
218/15 234/9
**Methyl [1]** 20/21
**metric [2]** 30/2 211/5
**microns [1]** 37/1
**microphone [3]** 51/8
64/3 240/13
**middle [2]** 18/15 246/12
**midway [1]** 162/1
**midwest [1]** 214/16
**might [48]** 39/12 49/1
55/5 55/16 55/24 58/12
59/21 60/2 60/7 65/12
74/16 81/10 81/17 82/7
84/21 91/23 96/15 96/17
96/18 102/21 102/21
131/20 132/1 145/11
145/12 154/5 155/10
160/9 164/2 177/5 182/3
190/18 192/9 198/22
214/11 214/13 214/15
231/21 231/21 231/22

**211/2 291/9**
**modeled [1]** 191/21
**models [5]** 59/23 60/9
87/16 221/13 245/15
**modified [1]** 24/23
**moment [6]** 48/2 49/2
49/3 186/24 224/10
242/22
**money [4]** 26/7 29/4
43/1 97/25
**months [6]** 36/6 70/14
78/8 88/13 148/8 242/8
**Moore [3]** 61/6 61/7
61/11
**morning [7]** 3/2 3/14 4/2
12/2 12/4 64/23 64/24
**mortgage [15]** 62/16
98/1 147/7 147/9 147/10
147/12 147/13 147/19
206/3 206/8 213/9
213/11 232/13 248/1
249/18
**mortgage-backed [7]**
62/16 147/7 147/9
147/10 147/12 147/13
147/19
**mortgages [2]** 131/16
140/13
**most [28]** 4/19 4/25 13/6
39/21 41/3 41/19 43/1
68/8 68/13 69/3 69/6
72/4 112/21 140/17
147/10 179/8 196/2
196/3 196/5 196/7 196/7
196/25 196/25 199/16
199/17 199/20 202/15
207/18
**motion [7]** 1/12 5/3
11/22 14/21 49/7 49/21
53/21
**mouth [1]** 137/12
**move [12]** 51/12 61/1
65/5 90/3 120/25 122/8
151/2 152/1 152/8
171/25 187/21 240/13
**moved [4]** 17/5 38/19
46/10 61/10
**movement [1]** 221/4
**moves [1]** 59/25
**moving [2]** 17/2 207/15
**mow [1]** 191/15
**Mr [13]** 29/2 39/24
39/25 119/22 255/4
255/5 255/7 255/9
255/10 255/11 255/12
255/14 255/15
**Mr. [47]** 12/7 16/7 23/22
31/22 33/8 33/12 39/20
39/22 39/22 39/23 40/1
40/9 40/18 41/17 41/21
45/13 51/20 52/9 52/11
56/16 61/6 61/7 61/11
63/5 65/16 65/18 104/24
105/25 124/25 125/5
125/6 125/9 152/16
180/20 188/12 188/17

193/18 203/22 204/16
204/19 216/21 228/5
229/10 234/25 235/12
239/9 250/6
**Mr. Gallagher [11]**
65/18 104/24 105/25
152/16 188/12 188/17
193/18 204/19 216/21
228/5 229/10
**Mr. Gallagher's [1]**
203/22
**Mr. Gdanski [4]** 51/20
52/11 56/16 180/20
**Mr. Gowdy [3]** 12/7
39/22 45/13
**Mr. Jennings [1]** 16/7
**Mr. Kilpatrick [3]** 63/5
235/12 250/6
**Mr. Koosh [1]** 39/23
**Mr. Moore [3]** 61/6
61/7 61/11
**Mr. Plaza [1]** 124/25
**Mr. Scarola [3]** 65/16
234/25 239/9
**Mr. Scarola's [1]**
204/16
**Mr. Schwinghammer's
[1]** 52/9
**Mr. Trujillo [8]** 39/20
39/22 39/22 40/1 40/9
40/18 41/17 41/21
**Mr. Wendroff [3]** 31/22
33/8 33/12
**Mr. Zobel [3]** 125/5
125/6 125/9
**Ms [1]** 255/6
**Ms. [4]** 89/16 89/16
89/16 251/25
**Ms. Dunsford [1]**
251/25
**Ms. Offner [1]** 89/16
**Ms. Plaza [1]** 89/16
**Ms. Watkins [1]** 89/16
**much [29]** 12/6 13/15
22/24 26/8 39/12 43/20
43/22 44/14 61/21 62/24
65/8 65/17 80/20 92/11
100/13 109/16 155/13
175/10 184/8 184/16
191/8 191/9 211/17
212/1 235/7 235/8 247/5
248/17 250/3
**muddying [1]** 167/14
**multiple [11]** 16/8 23/18
24/10 24/23 25/18 25/24
26/2 58/17 216/23
216/24 218/9
**must [5]** 4/21 5/15 6/11
58/15 135/21
**mutually [1]** 71/10
**Myrick [1]** 23/25
**myself [4]** 3/22 84/6
203/9 249/1

## N

**nail [1]** 57/20

**name [4]** 64/6 64/7
180/8 186/2
**named [1]** 125/14
**narrow [3]** 58/9 58/10
157/23
**nationally [2]** 25/9
197/22
**natural [2]** 62/9 221/11
**naturally [1]** 130/9
**nature [6]** 77/17 126/13
127/3 175/4 250/7
250/19
**near [4]** 15/3 27/25 53/3
58/23
**nearby [2]** 15/6 53/18
**nearly [3]** 13/4 190/3
195/25
**necessarily [6]** 44/10
189/6 189/12 193/12
231/18 246/15
**necessary [36]** 12/15
15/25 21/18 22/25 25/20
26/19 65/5 110/12
111/19 112/5 114/18
114/25 115/13 115/19
116/3 117/10 118/1
118/2 123/8 123/16
130/10 130/11 131/2
132/4 133/6 133/11
133/12 138/3 138/9
140/25 141/13 142/24
143/13 198/14 201/1
226/3
**need [30]** 5/25 12/14
3/11 16/1 16/2 16/3
18/22 74/21 85/12
115/24 117/19 118/6
118/8 118/9 119/3
121/16 121/16 127/25
128/13 129/11 129/19
129/23 142/9 148/20
150/23 164/4 176/3
200/2 232/14 243/7
**needed [2]** 118/12
137/10
**needs [4]** 7/1 32/25 38/1
49/3
**negate [2]** 9/22 30/9
**negated [1]** 222/15
**negates [1]** 36/24
**negating [1]** 21/3
**negatively [1]** 247/24
**neglect [1]** 39/21
**neglects [2]** 41/23 41/24
**negligence [1]** 45/6
**negligent [1]** 198/21
**negotiated [1]** 13/6
**neighborhood [55]** 7/2
7/6 9/2 28/6 32/25 55/24
71/12 73/12 74/18 77/24
84/8 84/21 85/5 88/16
91/14 96/14 97/17
102/13 102/15 102/18
102/18 103/22 104/18
107/5 110/11 122/7
141/1 141/23 142/3

**N**

**neighborhood... [26]**
142/23 143/15 144/16
145/3 145/8 158/8
159/15 169/9 176/9
176/10 176/12 176/22
178/6 182/8 184/4
184/15 184/19 184/23
186/2 195/10 195/12
207/23 212/3 223/18
234/2 242/13
**neighborhood-wide [8]**
102/18 141/1 141/23
142/3 143/15 144/16
145/3 212/3
**neighborhoods [17]**
33/20 154/9 155/4 159/3
159/4 160/18 160/18
164/21 167/4 167/19
206/1 208/2 208/4
209/17 213/11 229/16
247/25
**neighboring [1]** 29/11
**neither [3]** 34/6 84/2
233/4
**net [1]** 43/4
**never [12]** 35/17 38/8
40/18 43/15 54/5 60/2
72/24 95/9 96/23 97/9
137/15 222/8
**new [11]** 37/23 115/22
173/2 186/2 186/7 186/8
206/15 215/10 221/13
221/13 251/2
**newly [1]** 61/9
**news [4]** 111/2 111/7
117/1 122/25
**newspaper [2]** 221/17
221/21
**newspapers [3]** 221/24
243/12 243/16
**next [16]** 46/14 51/25
59/1 59/18 116/12
122/11 122/18 136/19
140/7 168/6 170/4 178/2
199/4 201/16 204/10
223/15
**nickel [3]** 36/17 36/22
38/4
**nine [2]** 119/13 119/14
**nitpick [1]** 30/12
**no [138]** 1/2 6/18 7/12
8/9 10/17 10/18 15/1
15/3 15/6 15/7 16/15
16/23 16/24 25/4 28/11
30/6 33/1 35/13 38/14
38/20 42/2 43/3 43/12
44/24 46/11 46/19 47/22
48/22 48/24 52/14 52/16
52/20 53/6 53/8 54/23
55/1 56/15 56/17 56/20
58/3 59/6 60/21 60/25
61/7 61/13 62/6 62/7
63/10 66/22 67/5 71/14
71/18 71/23 76/10 79/12
81/2 81/6 81/24 83/6

87/1 89/18 90/23 91/2
92/24 93/3 93/4 93/23
94/21 95/15 95/23 98/11
102/21 103/2 107/6
107/22 112/7 115/8
115/24 117/9 122/7
124/12 126/21 139/18
139/22 143/12 164/18
165/7 167/23 171/8
173/23 175/15 176/10
181/11 185/23 186/11
187/2 192/2 193/13
193/14 193/14 195/5
195/15 199/6 199/10
203/24 204/2 204/4
205/1 210/25 211/4
218/3 218/24 222/10
223/23 228/25 229/15
232/21 235/22 236/3
236/22 237/5 237/17
237/20 237/25 238/5
238/13 238/16 238/20
238/24 239/3 239/16
242/25 245/6 245/7
245/16 251/15 252/4
253/7
**nobody [2]** 13/2 33/17
**Nobody's [1]** 13/3
**nondetect [2]** 61/22
179/9
**none [15]** 17/15 17/16
28/23 35/16 40/23 59/6
73/25 80/20 93/22 94/11
139/21 165/2 166/21
180/10 256/3
**nonlicensed [1]** 36/20
**nonsensical [2]** 90/22
166/4
**norm [1]** 29/14
**normal [2]** 14/25 249/6
**normally [2]** 249/2
249/7
**north [20]** 16/19 17/21
18/14 19/7 108/10
110/17 111/3 111/16
127/20 128/19 130/3
130/17 135/14 175/5
175/6 175/7 175/9
175/10 176/12 176/22
**northeast [2]** 2/23 24/16
**northern [2]** 18/3
175/18
**Northlake [1]** 51/5
**northwestern [1]** 214/11
**note [6]** 47/2 126/8
126/9 126/10 209/13
231/24
**noted [4]** 106/9 135/2
135/2 252/12
**notes [18]** 118/24 119/1
119/8 119/15 119/18
119/19 120/5 120/6
120/21 127/22 127/25
129/13 129/14 130/6
130/9 135/18 135/24
180/22

nothing [20] 9/15 13/23
13/24 18/20 21/3 35/18
38/10 57/18 60/10 60/11
61/24 67/23 70/20 71/4
92/16 92/21 130/2
163/13 245/2 253/19
**nothing's [2]** 141/19
164/25
**noticeable [1]** 89/24
**notion [7]** 28/20 54/10
54/18 55/15 60/14
129/21 159/13
**Nowhere [1]** 177/3
**noxious [1]** 214/21
**NRC [1]** 44/13
**nuclear [20]** 31/17 44/4
44/6 44/12 44/20 44/21
44/24 45/2 45/11 45/15
45/22 45/24 45/24 46/1
46/3 77/5 77/18 78/13
186/9 214/14
**nucleotides [1]** 185/17
**nuisance [2]** 15/25 47/4
**number [73]** 3/5 3/20
27/1 27/2 29/17 45/2
45/3 45/4 45/4 67/8
67/21 69/17 70/22 71/24
80/3 80/12 80/20 81/1
81/11 83/5 100/15
100/20 100/22 101/6
101/7 106/8 106/14
106/14 106/24 113/17
113/19 120/23 125/4
141/19 141/19 144/15
146/25 147/24 150/22
150/23 150/25 151/10
151/16 151/20 152/4
154/14 154/15 169/22
170/3 181/22 190/1
190/5 190/11 197/5
197/22 197/25 198/3
198/5 198/8 199/5 199/6
205/23 222/13 222/17
233/15 240/1 245/20
246/21 247/14 252/16
252/18 252/25 253/17
**number 1 [9]** 120/23
197/5 197/9 197/25
198/3 198/5 198/8 199/6
245/20
**number
13-80928-CIV-MARRA
[1]** 3/5
**number 2 [1]** 199/5
**number 363-18 [1]**
113/19
**number 4 [2]** 106/8
113/17
**number 5 [3]** 45/4
106/14 106/14
**number 6 [1]** 45/4
**number 7 [1]** 45/2
**number 8 [1]** 45/3
**number 9 [1]** 125/4
**numbers [13]** 44/13
71/22 146/24 161/11

170/12 212/18 239/25
240/2 246/20 252/22
252/24 253/11 253/16
**numerosity [1]** 29/17
**nutshell [1]** 11/2

---

**O**

**oath [6]** 69/11 70/3
85/23 99/17 105/22
166/2
**object [24]** 15/2 78/24
81/20 82/18 85/17 103/6
103/8 109/18 143/8
150/15 150/18 180/12
180/23 182/17 182/18
186/16 192/20 202/2
215/8 228/15 231/7
245/4 245/5 250/21
**objection [13]** 33/16
71/15 186/22 189/23
193/24 216/13 217/12
226/24 230/17 239/10
241/1 251/3 251/13
**objective [1]** 168/24
**observation [1]** 157/12
**observations [4]** 164/8
164/16 166/15 250/18
**observe [1]** 168/2
**observing [2]** 219/24
220/10
**obviate [1]** 240/2
**obvious [1]** 28/25
**obviously [6]** 4/13 14/2
18/23 19/14 19/24 28/23
**occasion [1]** 203/6
**occasion won [1]** 203/6
**occasionally [1]** 171/12
**occasions [1]** 23/18
**occur [5]** 76/6 90/13
96/10 222/9 244/16
**occurred [2]** 45/25
47/22
**occurrence [1]** 242/2
**occurring [1]** 156/13
**occurs [1]** 48/19
**ocean [1]** 51/6
**oceanfront [1]** 191/11
**October [5]** 35/7 35/14
71/12 95/12 224/12
**October 1988 [1]** 224/12
**October 2009 [1]** 35/7
**off [18]** 9/15 17/2 17/5
38/9 52/24 106/24
144/22 172/24 207/19
208/11 221/3 226/11
237/8 237/11 238/2
238/18 247/21 247/25
**offer [26]** 50/10 55/17
59/6 59/8 60/4 60/8
60/14 60/24 63/2 73/18
74/16 79/4 80/12 80/21
86/19 98/18 98/23 100/1
100/12 100/18 102/21
141/17 146/11 175/23
208/16 214/2
**offered [12]** 50/8 53/7

53/10 60/13 66/5 66/7
79/11 85/25 101/13
111/13 166/16 170/12
**offering [17]** 74/15 88/5
90/23 92/1 93/10 101/17
101/20 101/21 101/25
102/2 102/4 102/7
103/22 107/13 109/15
116/4 117/10
**offers [3]** 62/14 167/24
208/13
**Officers [1]** 203/9
**Official [1]** 1/19
**Offner [4]** 89/6 89/16
95/11 106/15
**Offners [1]** 92/25
**offsite [5]** 20/10 43/15
43/16 176/25 182/6
**often [2]** 173/1 207/20
**oftentimes [1]** 92/13
**Oh [8]** 68/2 98/12 144/1
150/14 150/24 203/8
232/9 248/11
**oil [8]** 178/15 180/4
181/23 223/20 224/2
224/8 224/18 224/23
**okay [51]** 11/17 11/25
31/8 49/5 82/1 105/14
128/18 133/8 175/22
187/17 187/25 188/9
188/13 189/15 191/2
192/7 194/19 195/22
197/2 198/2 199/2
199/11 201/16 202/14
203/2 203/19 204/5
205/10 206/18 206/23
207/3 208/20 209/1
210/10 210/14 210/18
211/18 219/18 220/17
223/4 224/15 226/3
226/11 228/20 229/9
233/5 233/17 233/22
235/6 246/20 251/17
**old [1]** 97/25
**omission [1]** 198/18
**on-site [1]** 36/17
**once [11]** 47/22 74/11
117/1 121/20 122/24
152/1 162/8 212/7
213/12 233/17 249/19
**one [174]** 3/20 9/22 13/6
15/1 15/18 15/21 17/1
18/23 21/10 21/22 24/11
25/19 27/2 27/4 27/18
28/11 29/22 29/25 30/8
30/8 36/11 37/10 39/4
40/5 41/25 43/12 45/23
46/11 49/1 49/3 49/24
50/14 51/17 54/7 56/7
57/19 66/7 67/24 67/25
67/25 81/25 82/10 84/22
85/14 88/4 90/10 91/4
91/18 92/5 92/7 95/4
96/16 96/16 97/2 97/4
97/6 97/9 98/13 98/17
98/20 99/3 99/4 100/8

## O

one... [111] 100/13
100/16 104/1 106/13
106/18 108/21 109/23
110/25 113/9 113/23
122/3 122/7 122/12
122/23 124/25 125/9
126/9 130/20 131/21
136/18 136/20 137/4
137/4 137/15 137/19
137/24 138/1 138/11
139/2 139/3 139/3
139/17 139/18 140/17
141/19 142/15 148/11
148/25 151/6 153/23
154/13 154/15 155/21
157/12 158/1 158/25
159/17 160/17 161/7
161/21 163/24 168/6
169/17 169/24 170/8
170/17 171/6 172/12
173/23 174/17 175/21
176/3 176/5 178/14
182/25 183/8 186/24
188/16 188/23 190/1
191/21 192/1 195/17
197/3 197/23 200/20
202/24 203/13 204/9
205/10 205/23 206/1
208/17 209/10 209/19
212/6 212/10 212/17
213/8 214/5 214/11
219/8 219/11 220/12
222/13 222/23 222/23
224/10 225/8 226/11
226/14 226/21 232/20
239/4 242/22 245/1
247/6 247/14 248/11
248/14 249/19
one's [1] 30/6
one-off [1] 226/11
ones [6] 87/5 137/3
151/1 185/3 185/21
193/16
ongoing [1] 242/7
only [45] 8/25 11/13
20/4 32/15 34/12 34/18
39/11 40/21 43/13 46/19
46/24 47/10 51/23 53/21
59/8 60/12 74/3 79/24
83/3 92/18 103/14
109/11 126/8 126/10
127/6 132/2 137/4 137/4
137/24 139/2 145/5
156/16 158/21 172/24
173/10 173/11 179/6
180/7 215/9 226/1 237/8
238/19 240/7 240/10
240/11
open [6] 7/22 37/21
40/13 40/24 160/21
216/20
opened [4] 7/25 7/25
8/16 246/16
opening [12] 3/25 4/4
31/5 31/6 37/16 56/17

63/12 84/19 88/22 175/7
180/20 255/3
opens [4] 41/4 41/5
142/20 160/21
opining [1] 62/16
opinion [94] 12/16 14/5
14/5 23/11 23/11 59/11
61/9 62/14 62/25 66/11
66/16 66/20 67/1 69/14
72/6 73/18 78/1 78/23
79/21 80/6 80/21 82/7
83/14 88/6 88/12 90/25
91/12 92/5 93/3 93/5
93/11 95/15 95/20 95/22
95/23 98/11 98/12 100/6
100/19 101/14 101/23
101/25 102/2 102/21
103/2 103/23 106/5
107/7 107/11 107/16
107/19 107/24 112/12
112/15 115/21 121/16
124/13 124/16 124/22
126/8 126/10 138/3
141/17 144/14 146/11
147/17 153/1 172/7
193/1 204/24 217/8
219/8 220/12 227/25
230/22 235/12 235/16
235/19 236/17 236/19
237/2 237/6 237/12
237/13 237/18 237/21
238/1 238/8 238/11
238/14 238/17 238/21
244/18 245/1
opinions [64] 14/8 19/21
21/10 23/5 49/8 63/2
74/5 74/25 76/11 79/4
82/11 82/23 83/21 87/20
91/13 92/2 92/24 92/25
93/23 96/7 96/9 96/11
100/12 110/12 111/11
111/13 111/19 111/20
112/6 112/7 114/19
115/13 115/19 116/4
117/10 117/20 117/22
117/25 118/1 118/6
118/10 119/4 122/22
123/9 123/14 123/15
123/16 128/3 128/6
128/15 130/12 131/3
133/7 133/10 142/16
146/13 181/20 182/1
199/13 199/25 200/12
206/19 217/18 230/12
opportunistic [1] 172/25
opportunity [8] 13/14
13/21 30/24 30/24 94/6
216/12 218/25 249/25
opposed [9] 11/14 22/1
36/19 57/17 118/6
138/20 171/11 189/21
235/19
optimum [1] 232/2
oral [1] 7/19
orange [1] 85/2
order [31] 3/1 12/15

15/25 27/13 27/14
28/9 30/20 43/18 44/5
44/11 49/23 69/15 70/8
83/14 98/22 117/20
117/22 118/10 118/10
128/2 146/20 188/12
192/3 192/6 202/10
202/16 203/13 221/18
229/13 230/15
ordered [1] 69/13
ordinarily [2] 3/6 243/6
ordinary [1] 213/1
orient [2] 50/20 251/22
oriented [1] 64/25
original [1] 215/24
originally [2] 9/14 46/10
originated [1] 20/24
originating [1] 18/4
239/7
ostensibly [1] 32/11
others [8] 49/25 68/13
71/10 71/10 71/13 79/25
166/15 251/25
otherwise [2] 8/22 222/6
ought [1] 68/4
our [54] 5/2 5/12 5/18
6/17 10/13 11/6 18/24
22/4 22/12 25/13 30/18
31/15 34/17 38/17 38/24
40/5 41/11 43/1 43/6
43/10 46/2 48/12 49/2
54/3 58/22 59/13 62/20
63/19 65/9 72/2 76/20
85/4 86/15 86/16 97/10
129/12 130/9 142/25
148/5 152/10 160/13
167/9 173/6 175/1
182/11 184/12 184/13
187/21 189/3 190/5
196/14 200/1 200/3
200/10
ourselves [1] 86/3
outcome [2] 15/16 76/16
outline [1] 179/21
outlined [1] 72/9
outlining [1] 35/21
output [1] 132/7
outright [1] 141/16
outside [32] 27/23 28/24
78/9 90/2 90/19 91/5
92/23 93/14 95/6 95/21
99/9 100/6 101/9 144/13
148/21 149/12 178/4
178/24 180/12 193/13
193/15 193/19 195/11
196/11 210/19 212/11
217/24 218/2 218/23
223/16 236/9 240/19
outta [1] 158/5
oval [4] 159/19 160/5
160/25 161/3
over [36] 4/5 4/16 17/23
19/14 19/15 20/24 24/17
32/7 36/4 36/8 52/18
53/9 53/17 72/3 115/7
124/19 132/23 135/21

148/5 148/12 151/16
155/1 155/10 157/2
159/9 162/9 184/14
185/19 186/4 186/6
188/9 204/17 213/12
216/23 216/24 246/6
overall [2] 146/1 167/25
overarching [2] 137/22
198/12
overlooked [1] 40/21
overpaying [1] 232/7
overriding [2] 140/3
140/9
overrule [1] 251/3
Overruled [18] 72/13
79/1 81/22 85/19 109/20
110/6 143/9 150/17
150/19 180/13 180/24
182/19 189/24 202/3
225/3 230/18 231/9
241/15
oversight [1] 197/16
overview [1] 4/7
overwhelming [1] 18/9
own [29] 6/12 9/3 13/8
16/25 17/10 17/18 18/10
23/21 29/20 46/11 47/17
86/16 91/1 96/11
100/11 120/13 130/6
133/5 143/16 161/22
176/20 191/15 196/23
202/18 205/4 214/2
233/13 242/1 253/8
owned [14] 27/11 92/14
92/16 92/21 93/16 93/24
94/15 95/25 97/9 99/25
101/7 211/12 244/2
244/9
owner [9] 6/11 8/5 8/10
9/13 97/19 97/19 97/20
97/21 244/21
owners [5] 91/13 93/8
93/10 93/11 93/14
owns [1] 6/21
oxide [1] 36/22

## P

P.A [3] 2/3 2/5 2/11
p.m [7] 105/18 105/18
152/13 152/13 194/13
194/13 254/5
packed [1] 141/18
page [53] 1/17 41/20
68/17 69/23 82/14 85/10
85/12 85/16 86/10 98/24
103/25 104/19 108/19
110/24 113/23 119/13
119/20 120/3 121/10
121/25 122/11 122/18
122/18 124/2 124/24
125/3 125/17 125/19
136/6 139/6 140/7 140/8
140/8 143/20 143/21
143/21 145/22 149/3
150/22 156/25 161/25
162/1 162/23 165/15

199/4 199/6 207/8 209/9
209/11 215/23 219/15
219/16 219/18
page 1 [1] 121/10
page 11 [1] 156/25
page 14 [2] 124/2
145/22
page 17 [1] 110/24
page 197 [1] 68/17
page 2 [1] 209/9
page 3 [2] 122/18 207/8
page 399 [1] 69/23
page 4 [1] 209/11
page 421 [1] 86/10
page 422 [2] 85/10
85/16
page 494 [1] 219/16
page 495 [2] 103/25
219/18
page 496 [1] 104/19
page 5 [2] 161/25
215/23
page 541 [1] 162/23
page 542 [1] 165/15
page 547 [1] 98/24
page 6 [2] 125/17
125/19
page 64 [2] 136/6 139/6
page 65 [1] 140/8
page 75 [1] 108/19
page 78 [1] 143/20
page 83 [2] 119/13
120/3
pages [4] 1/11 121/22
199/8 217/10
paid [1] 199/18
Palenchar [1] 2/16
Palm [25] 1/8 1/20 2/11
2/12 2/21 13/4 24/14
24/15 41/3 42/12 45/3
51/3 51/3 51/9 52/4
52/4 52/8 55/25 86/5
86/23 156/7 221/18
221/21 224/15 247/21
paper [3] 189/17 203/10
203/11
papers [12] 4/15 5/4 5/9
5/12 5/20 10/13 15/19
16/6 28/16 45/18 50/22
206/4
paperwork [2] 36/23
36/24
paragraph [16] 114/7
115/10 124/2 142/18
142/20 142/23 162/1
177/17 178/3 178/14
209/11 215/23 222/25
223/4 225/5 225/13
paragraph 10 [1]
209/11
paragraph 17 [1]
215/23
paragraph 69 [1] 124/2
paragraphs [2] 114/8
131/21
parameters [1] 234/9

**P**

parcel [3] 32/8 93/24 239/1
pardon [4] 70/10 110/15 148/3 154/14
parent [1] 22/8
parenthetical [2] 171/6 171/13
parse [1] 104/13
parsed [1] 145/11
parsing [2] 104/15 104/21
participants [23] 78/16 79/8 80/24 102/14 112/25 114/2 114/9 115/3 115/23 133/15 168/9 169/3 179/5 180/4 181/20 184/18 184/20 186/3 220/8 221/7 222/4 242/21 251/8
participate [1] 134/23
participated [1] 169/11
particle [2] 37/1 37/2
particular [14] 22/17 22/19 32/14 81/15 106/14 108/19 108/22 112/17 115/8 145/22 179/1 183/25 232/20 241/18
particularly [3] 34/12 46/1 235/5
parties [3] 12/24 16/20 32/25
parts [1] 175/7
passage [1] 14/16
passed [1] 30/24
past [11] 15/1 18/13 51/6 52/9 172/17 213/16 229/24 230/6 249/8 249/10 251/6
paste [4] 111/5 111/15 116/8 123/1
pasted [6] 110/17 111/2 117/6 127/6 135/13 136/24
pathway [1] 30/22
pay [9] 170/11 181/7 183/1 183/2 183/21 184/20 184/22 199/21 232/14
PBCE [2] 157/5 208/16
PCVE [1] 161/6
peaceful [1] 15/1
Peachtree [1] 2/23
peak [1] 205/25
pediatric [7] 31/20 34/25 46/3 58/9 114/15 225/18 252/7
peer [1] 203/12
peer-reviewed [1] 203/12
pejorative [2] 149/20 151/19
penalty [2] 116/22 135/8
pending [1] 177/20
people [105] 3/22 28/22 28/25 29/4 29/18 30/17 31/23 35/8 41/3 46/7 46/10 48/13 51/3 53/18 55/20 55/24 56/4 84/9 84/21 91/11 92/13 93/7 94/12 94/17 96/11 97/8 98/4 99/22 100/3 100/9 100/11 100/16 100/25 101/2 101/4 101/15 112/17 113/3 114/21 117/13 117/15 117/18 118/5 118/11 118/13 118/18 118/22 119/24 122/9 122/12 123/19 124/7 124/22 125/12 125/22 126/12 126/18 131/12 140/13 141/10 145/6 168/13 168/15 168/20 168/21 169/7 169/11 172/5 172/22 172/24 174/7 174/19 177/3 177/9 177/13 178/19 179/12 181/24 182/3 184/3 191/15 191/18 191/19 195/10 195/11 207/18 207/21 208/6 210/11 210/15 210/21 211/2 213/21 213/25 214/2 221/3 222/15 226/14 226/17 226/18 226/22 227/4 227/7 227/10 241/25
people's [4] 98/10 182/1 222/18 227/5
per [18] 24/12 59/25 153/24 153/25 154/8 154/14 154/16 154/23 155/3 155/3 155/8 155/9 157/2 161/7 162/17 209/14 213/23 247/15
percent [63] 36/21 43/3 43/4 66/11 66/16 67/8 67/22 68/1 71/6 71/24 72/5 72/7 72/24 72/25 73/11 73/18 74/19 78/1 79/17 79/21 80/4 80/6 80/21 81/5 83/5 83/15 96/22 97/5 97/17 97/23 98/15 99/4 141/2 141/24 142/3 142/10 146/11 152/25 163/19 167/21 184/25 184/25 184/25 185/4 190/9 196/21 202/11 209/3 214/12 214/15 214/17 232/18 232/19 232/23 238/9 248/4 248/6 252/15 252/18 253/2 253/6 253/12 253/16
percentage [6] 73/4 73/7 81/19 146/10 147/16 253/2
percentages [1] 252/20
perception [1] 242/1
perfect [4] 47/22 105/1 226/21 226/24
perfected [2] 15/14 224/21
perform [1] 161/21
performed [5] 68/24 69/3 72/15 165/19 166/8
performing [2] 162/9 229/18
period [21] 42/4 89/17 89/22 89/23 95/16 158/23 160/20 172/19 173/1 205/25 206/3 206/9 206/10 206/16 208/5 210/22 213/13 231/23 233/15 242/7 245/15
perjury [2] 116/22 135/8
permeated [2] 110/10 158/8
permeates [3] 71/11 96/14 102/12
permeating [1] 252/8
permission [3] 37/17 65/5 235/2
permit [1] 216/21
permitted [2] 25/11 37/20
Perry [1] 59/8
persistent [1] 17/11
person [12] 30/8 30/9 48/1 48/4 82/23 93/5 97/6 97/10 98/14 99/12 99/13 244/8
person's [1] 27/11
personal [1] 14/11
personalizing [1] 14/20
personally [2] 4/8 234/12
perspective [15] 12/10 18/21 18/21 30/7 51/16 85/8 90/22 182/23 191/6 194/5 212/1 220/5 220/6 231/16 244/15
Perusing [1] 223/5
petroleum [1] 32/17
Ph.d [1] 25/7
phase [8] 25/1 74/10 98/23 151/3 171/22 172/1 179/23 212/16
phone [3] 171/11 171/12 171/14
phonetic [3] 8/3 31/22 39/23
photograph [1] 65/10
phrase [33] 79/5 110/9 111/6 111/18 112/6 114/12 114/18 114/24 115/9 117/9 117/25 118/9 119/3 120/17 121/21 123/6 129/23 130/11 131/11 131/17 132/18 132/25 133/4 133/12 134/11 136/19 136/20 137/5 137/25 138/1 138/19 139/2 149/4
phrased [4] 132/7 132/8 132/14 133/16
phrases [1] 111/5
phrasing [6] 117/8 120/19 129/19 130/21 134/18 143/10
physical [6] 79/3 102/16 102/24 103/23 219/22 219/23
pick [1] 156/1
picked [2] 38/19 39/2
picking [1] 75/9
pickup [1] 191/19
picture [4] 174/22 174/23 175/3 176/8
piece [5] 6/22 94/15 142/14 233/25 234/1
pieces [1] 22/11
pike [1] 160/3
place [11] 40/7 42/21 53/18 55/16 111/7 127/6 127/10 132/23 135/13 136/25 207/24
places [9] 21/24 58/14 61/24 110/25 123/16 136/24 147/24 148/1 154/4
plain [1] 185/7
plains [1] 19/4
plaintiff [6] 45/23 50/4 63/23 125/14 244/8 244/20
plaintiff's [1] 50/24
plaintiffs [73] 1/4 2/2 4/3 9/1 14/16 14/20 14/23 15/23 31/14 33/9 33/18 48/11 49/6 49/9 49/14 50/2 50/7 50/12 50/21 51/17 52/13 53/7 53/10 53/13 53/23 53/24 54/13 54/17 55/3 55/17 56/5 56/12 56/22 57/11 59/3 59/5 60/13 60/23 61/6 62/24 63/1 65/21 66/2 66/7 73/13 77/4 77/18 77/20 78/2 92/8 92/11 96/8 105/7 109/12 109/12 109/14 124/10 124/15 125/1 125/23 126/2 126/19 127/1 127/2 127/5 134/19 144/4 145/13 168/17 179/13 181/9 185/21 251/25
plaintiffs' [16] 15/8 30/7 47/25 49/20 49/25 51/25 53/2 56/7 56/8 57/21 59/23 60/4 63/25 125/9 180/10 243/13
plan [6] 5/19 151/15 187/5 232/10 253/24 253/25
planning [1] 4/16
plans [1] 38/3
plant [3] 32/8 170/14 214/14
play [9] 47/1 57/5 113/10 140/24 145/1 231/20 233/16 249/15 249/16
played [5] 85/11 85/20 104/3 104/20 143/24
plays [2] 68/24 106/3
Plaza [3] 89/6 89/16 124/25
Plazas [1] 92/24
plead [1] 209/24
please [29] 3/2 12/2 26/1 26/1 63/18 64/1 64/7 105/14 105/20 105/22 152/15 165/24 170/6 194/15 194/17 197/9 198/10 200/20 205/12 205/13 205/20 207/8 209/9 209/12 220/16 222/22 222/25 224/10 241/3
pled [4] 5/16 6/5 6/5 6/17
plug [1] 215/2
plume [4] 52/21 52/23 52/25 53/3
plural [2] 128/13 154/19
point [50] 9/4 9/21 10/12 11/23 15/19 17/4 19/14 20/9 23/1 23/13 47/2 47/24 59/3 61/19 67/14 67/25 67/9 67/11 67/14 67/23 68/15 69/22 70/23 71/17 93/7 95/22 98/19 109/11 111/21 113/3 114/12 132/2 148/19 156/5 156/14 187/13 190/20 193/10 193/18 193/20 195/11 211/11 213/24 216/14 219/11 222/19 225/8 229/24 244/19 247/6
pointed [5] 62/3 140/21 151/2 200/1 225/13
pointing [6] 68/2 68/4 99/8 144/12 145/4 204/16
points [7] 14/9 32/6 67/15 67/15 188/11 247/7 247/8
politically [1] 13/7
pollutants [1] 181/4
polluted [3] 13/6 13/8 16/21
polluter [4] 13/1 13/3 13/8 234/20
pollution [3] 9/24 10/3 10/3
Pompano [1] 42/15
Poncy [1] 2/10
pool [1] 21/2
poorly [1] 240/17
population [2] 51/2 166/21
portion [4] 5/3 40/2 177/22 244/17

**P**

**portions** [2] 204/19 215/16

**posed** [2] 179/4 195/17

**posit** [2] 162/10 244/13

**position** [1] 227/21

**positions** [1] 108/16

**positive** [1] 58/25

**possibilities** [1] 161/20

**possibility** [2] 60/5 177/11

**possible** [2] 31/9 41/2

**possibly** [1] 132/10

**post** [3] 25/2 76/7 221/22

**post-class** [1] 25/2

**potable** [2] 46/11 47/16

**potential** [7] 9/20 43/5 55/13 61/3 62/6 209/20 213/6

**powerful** [2] 159/13 182/11

**practice** [13] 54/4 67/12 67/18 72/8 73/8 81/22 83/12 90/20 91/6 92/24 93/15 155/15 197/20

**practices** [2] 24/23 131/15

**PRATT** [147] 1/7 8/12 9/11 10/6 10/11 10/17 12/17 13/1 13/2 13/4 13/20 15/10 15/11 15/22 16/10 16/13 16/18 16/23 17/3 17/3 17/5 17/5 17/9 17/10 17/11 17/23 18/1 18/4 18/6 19/1 19/6 20/1 20/3 20/9 20/19 20/19 20/24 21/4 21/12 21/20 21/21 22/2 22/7 22/8 22/11 23/9 24/5 25/3 27/6 29/5 29/22 29/25 30/11 30/14 32/4 32/7 33/6 33/10 33/23 33/24 34/4 34/11 34/15 35/9 35/12 35/20 36/4 36/7 36/10 36/16 37/9 37/17 37/25 42/18 44/23 51/18 51/22 52/1 52/2 52/7 52/17 52/24 53/9 54/2 54/19 55/1 55/21 56/5 56/10 56/13 56/14 57/4 57/11 57/12 57/16 59/21 59/24 60/3 60/10 61/2 61/5 62/6 88/22 88/24 88/25 106/7 108/10 109/16 110/4 110/18 111/3 111/16 116/12 120/23 124/10 124/15 127/19 128/25 130/16 135/15 139/21 144/5 144/7 144/13 170/14 173/22 175/2 175/3 175/8 176/21 181/15 205/17 208/21 212/25 218/13 223/12 224/6 224/14 224/22 228/9

228/14 228/24 229/2 229/3 229/4 231/4 234/20

**pre** [1] 76/7

**precedent** [1] 49/22

**preceding** [1] 223/10

**precisely** [7] 75/11 126/23 130/20 130/21 151/21 161/9 185/12

**predicate** [30] 111/19 111/20 112/5 112/11 114/18 114/25 115/13 115/19 116/4 117/10 117/20 118/1 118/6 118/10 119/4 122/22 123/9 123/16 128/2 128/5 129/24 131/3 137/7 136/22 138/3 140/25 141/13 142/24 143/14 146/17

**predominance** [1] 30/5

**preempted** [3] 44/7 44/22 44/25

**preemption** [1] 11/14

**preempts** [1] 5/10

**preexisting** [2] 169/3 169/8

**prejudicial** [1] 241/11

**preliminary** [1] 38/9

**prepare** [1] 73/13

**prepared** [5] 3/18 12/21 27/4 64/25 110/15

**preparing** [1] 176/6

**presence** [13] 30/21 32/10 39/1 39/14 62/9 200/18 201/22 212/23 213/18 216/19 217/24 218/3 224/17

**present** [17] 32/22 41/12 41/13 41/14 49/15 56/20 61/6 62/4 112/17 112/18 113/22 160/22 168/8 171/18 174/6 181/15 210/5

**presentation** [1] 163/22

**presentations** [1] 50/24

**presented** [19] 12/9 63/1 72/17 77/6 81/13 83/13 83/19 114/2 114/9 115/2 115/23 169/12 180/3 184/3 185/11 185/17 218/21 219/2 222/14

**presenting** [10] 31/19 77/5 163/24 164/7 164/12 164/18 164/20 166/20 174/13 179/11

**presently** [1] 9/1

**presents** [3] 30/22 30/25 239/5

**press** [2] 127/19 130/15

**presumably** [1] 210/15

**presume** [2] 125/2 174/25

**pretending** [1] 43/14

**pretest** [1] 169/2

**pretty** [6] 110/23 159/2

160/17 191/8 191/9 247/5

**prevail** [4] 12/16 12/20 14/20 15/9

**preview** [1] 57/24

**previous** [1] 225/20

**previously** [6] 25/11 26/15 79/21 80/10 216/24 236/15

**price** [44] 5/10 24/12 43/24 44/2 44/10 45/8 45/11 45/18 45/21 46/18 46/20 47/2 47/10 95/3 153/24 153/25 154/8 154/14 154/15 154/23 155/3 155/3 155/8 155/8 157/2 161/7 162/17 199/16 199/18 199/20 199/21 209/14 231/14 231/16 232/20 232/23 233/8 233/9 233/10 233/11 243/20 243/23 244/5 244/23

**Price-Anderson** [11] 5/10 43/24 44/2 44/10 45/8 45/11 45/18 45/21 46/18 46/20 47/2

**prices** [23] 29/14 76/10 95/19 156/14 158/2 158/4 162/16 172/15 172/21 173/7 196/15 205/24 208/24 209/4 209/13 209/15 209/16 229/16 246/24 247/1 247/24 248/16 249/17

**pricing** [10] 24/12 76/3 87/16 88/8 89/25 157/8 157/21 172/9 221/4 221/13

**prima** [1] 50/3

**primarily** [1] 4/9

**primary** [5] 32/1 34/25 35/23 36/13 41/10

**principle** [1] 26/16

**prior** [9] 34/17 37/21 39/10 81/13 89/21 89/23 207/25 242/8 252/8

**priori** [3] 84/3 85/2 86/12

**prism** [2] 15/16 15/16

**private** [4] 114/13 176/20 225/15 225/15

**privy** [1] 180/15

**probability** [1] 168/1

**probable** [3] 199/16 199/17 199/21

**probably** [14] 11/22 22/20 35/8 51/2 83/22 90/22 175/2 176/18 187/10 234/20 234/22 234/23 240/1 247/14

**problem** [31] 9/22 13/15 29/18 30/25 36/14 38/2 42/7 43/14 47/22 54/14 58/17 58/17 58/18 76/8 78/16 79/6 79/7 80/25

85/6 86/22 110/10 148/17 149/6 160/3 173/1 175/15 195/14 217/19 221/19 221/22 249/21

**problems** [6] 78/12 133/2 149/13 149/22 205/5 242/10

**procedures** [1] 45/9

**proceed** [7] 3/25 11/12 44/5 49/18 53/22 54/1 105/25

**proceedings** [7] 1/12 15/20 63/17 105/19 152/14 194/14 256/8

**process** [4] 100/4 118/25 202/7 203/2

**produce** [5] 170/23 170/24 198/14 201/1 212/10

**produced** [4] 38/22 118/25 212/19 212/19

**producing** [1] 117/21

**product** [2] 151/11 168/3

**products** [1] 32/17

**professional** [9] 67/12 143/12 185/10 197/19 201/10 213/16 214/8 214/9 230/23

**professionally** [4] 108/11 143/5 143/11 234/12

**professors** [1] 158/18

**proffer** [9] 97/16 101/10 146/13 151/5 197/18 197/21 210/7 212/17 217/25

**proffered** [8] 50/8 65/25 66/1 115/13 115/19 163/21 240/2 248/6

**proffering** [7] 91/7 101/23 112/8 114/19 123/17 124/13 200/12

**proffers** [2] 100/24 200/2

**prominence** [2] 250/13 250/19

**promise** [1] 10/22

**promised** [1] 37/3

**promulgate** [1] 200/3

**proof** [10] 6/2 7/17 8/6 12/15 21/13 49/11 49/16 49/18 50/10 239/17

**proper** [2] 38/25 61/12

**properly** [2] 13/14 204/15

**properties** [81] 27/12 39/24 51/2 53/20 54/7 54/25 55/11 55/14 73/11 74/11 74/21 77/7 83/14 87/9 88/15 92/11 92/15 92/17 93/1 93/13 93/16 94/17 96/12 97/16 98/13 98/18 98/20 99/24 100/11 100/11 100/13

100/14 101/3 101/7 106/22 107/2 107/3 107/10 107/14 107/19 107/25 108/3 108/4 126/5 138/16 139/8 140/13 146/15 148/14 150/3 151/7 153/24 153/25 154/15 154/16 155/6 171/20 190/8 190/9 190/17 191/11 191/20 192/14 192/19 193/12 193/13 193/15 200/15 200/17 202/21 207/19 208/6 208/25 211/12 211/22 212/10 220/9 224/23 232/1 232/22 234/5

**property** [164] 6/11 6/12 6/19 6/22 7/16 8/5 8/10 8/13 9/13 9/14 13/8 15/8 15/11 16/11 16/19 16/25 17/4 17/5 17/6 17/14 17/18 17/19 17/20 17/24 18/1 18/5 19/10 19/16 22/2 23/18 25/6 28/22 33/2 33/4 33/4 33/5 33/18 33/20 33/21 33/24 43/15 45/14 46/8 47/5 47/8 47/9 47/14 47/14 52/1 52/18 56/14 56/15 57/10 57/15 62/12 62/14 62/18 62/22 65/22 66/12 76/4 76/4 85/5 90/6 91/1 91/11 91/13 92/14 93/8 93/10 93/11 93/14 93/25 94/15 94/20 95/1 95/2 95/12 95/13 95/23 95/25 96/24 97/3 97/19 97/19 97/20 97/21 97/22 99/24 100/9 100/23 100/25 101/11 101/11 101/15 102/4 102/4 102/8 102/8 102/10 106/13 106/15 106/18 107/4 108/1 113/6 115/17 131/13 140/11 147/4 147/4 151/6 151/6 151/22 151/22 152/2 152/2 181/13 191/5 193/4 194/4 200/4 200/7 208/22 210/24 211/3 211/5 211/13 211/13 213/22 213/23 214/2 214/14 220/5 220/13 221/11 223/13 227/8 228/22 231/6 231/12 231/15 231/16 231/17 231/22 232/7 232/9 232/20 233/14 233/25 234/1 234/22 235/13 237/23 238/10 242/15 244/3 244/11 244/23 246/2

**property-by-property** [6] 101/11 102/4 102/8

**P**

**property-by-property...
[3]** 147/4 151/22 152/2
**propose [4]** 50/21 50/25
53/24 55/18
**proposed [39]** 49/9
51/18 51/21 52/2 52/6
52/20 53/1 53/11 54/9
54/20 56/6 56/21 59/22
60/3 60/11 61/5 66/3
66/7 73/15 76/25 77/7
83/16 83/17 86/7 87/3
96/16 106/8 106/19
107/1 109/16 148/15
150/4 150/12 153/24
154/23 155/7 176/15
181/8 211/6
**proposing [1]** 77/11
**proposition [1]** 81/17
**propositions [1]** 16/24
**protect [1]** 37/4
**Protection [1]** 61/23
**prove [20]** 6/11 6/18
6/20 7/22 10/8 10/10
10/19 12/15 25/15 44/6
44/11 44/12 50/2 50/8
50/15 54/23 55/21
109/15 179/14 211/21
**proveable [2]** 179/22
179/22
**proven [7]** 44/16 44/18
44/20 179/25 185/12
238/3 239/6
**proves [1]** 45/23
**provide [13]** 51/15
65/21 71/22 71/24 72/1
72/5 80/1 118/10 120/25
134/7 179/12 184/9
216/3
**provided [16]** 72/9
73/21 84/15 86/1 86/15
112/25 140/12 151/10
184/11 192/13 197/16
226/6 232/6 248/7
252/17 253/4
**provider [1]** 39/22
**providers [1]** 39/7
**provides [2]** 72/2 209/5
**providing [3]** 71/9 73/1
81/10
**proving [2]** 41/8 211/19
**provision [1]** 46/23
**proximate [1]** 33/8
**proximity [5]** 16/22
214/12 214/16 237/22
238/25
**prudent [2]** 199/21
199/22
**public [6]** 44/15 45/10
120/20 156/23 193/6
226/7
**publicized [1]** 24/22
**publicly [4]** 235/23
236/6 236/12 243/18
**published [8]** 71/1 71/2
181/25 185/10 196/19

201/11 203/11 222/5
**pull [5]** 64/3 172/23
197/9 205/10 222/22
**punitive [1]** 46/21
**purchase [10]** 89/5 89/6
89/7 95/12 96/18 169/17
169/20 174/8 174/12
174/12
**purchased [2]** 89/16
210/21
**pure [1]** 15/3
**purple [1]** 18/17
**purport [1]** 164/9
**purpose [5]** 87/19
123/20 145/21 217/7
219/1
**purposes [12]** 16/20
22/19 37/16 87/11 87/12
124/8 129/23 143/6
148/13 150/1 151/21
240/20
**pursuits [1]** 15/1
**push [1]** 171/7
**put [38]** 5/22 15/6 23/16
23/19 29/3 29/24 37/23
47/23 49/4 50/19 52/15
73/4 73/6 73/8 90/9 97/3
120/24 136/10 140/17
145/9 149/24 157/7
161/2 172/23 175/3
183/25 185/20 191/7
196/25 202/8 202/11
210/10 211/18 211/22
224/22 227/21 229/7
245/21
**putting [7]** 12/7 12/9
71/8 137/12 137/12
164/6 212/4

**Q**

**quadriplegic [1]** 48/4
**qualified [5]** 10/25
19/18 21/14 23/16 25/5
**quantifiable [2]** 62/2
126/9
**quantify [3]** 81/7 87/15
126/25
**quantities [3]** 56/21
61/18 179/7
**question [104]** 8/15 8/19
11/13 11/14 13/2 13/3
21/5 22/14 22/15 22/15
25/4 26/8 26/10 26/25
27/9 30/14 45/14 47/19
47/25 54/10 55/18 56/2
56/2 57/3 59/2 59/10
59/19 59/20 59/20 61/15
62/11 62/13 68/18 68/24
69/24 70/2 76/13 81/21
81/25 83/19 83/23 83/23
94/7 99/2 99/2 99/11
103/3 103/9 103/11
104/9 104/21 107/15
119/15 120/3 121/17
132/7 132/8 132/14
132/18 134/9 141/18

144/20 149/2 149/21
162/25 163/3 165/3
165/4 165/18 165/22
166/1 166/4 168/25
170/17 171/2 176/17
177/20 178/20 184/8
184/24 188/20 193/2
193/10 193/25 193/25
195/17 201/14 201/16
204/14 206/1 212/3
212/22 216/21 222/15
228/18 228/16 228/18
231/2 239/11 240/17
242/18 244/12 245/25
248/11
**questioning [1]** 93/9
**questionnaire [1]**
125/22
**questionnaires [2]**
118/24 120/9
**questions [27]** 4/18
11/10 21/18 43/23 48/23
62/23 63/9 69/10 85/22
99/16 113/5 130/14
130/22 133/6 169/21
169/24 170/6 172/4
175/1 187/2 227/1
234/24 235/1 243/1
243/4 251/15 251/20
**quick [2]** 208/7 243/7
**quicker [1]** 249/10
**quickly [4]** 242/14
248/23 249/2 249/5
**quit [1]** 148/16
**quite [4]** 100/20 121/22
124/12 173/2
**quote [7]** 116/15 116/16
136/22 137/8 139/18
175/1 185/22
**quote/unquote [1]** 229/2
**quotes [8]** 135/25 136/7
136/10 136/15 137/1
138/4 138/5 139/16
**quoting [6]** 120/2 120/2
120/4 120/4 136/12
150/11

**R**

**radiation [21]** 31/18
31/24 32/1 32/3 35/1
35/3 35/16 36/2 36/11
36/12 36/15 38/11 41/10
41/11 41/12 43/18 44/14
44/22 45/1 56/24 59/17
**radioactive [18]** 5/10
5/11 32/10 33/10 34/14
34/15 34/16 35/4 37/11
37/15 38/16 38/21 56/23
60/25 61/4 62/5 77/19
186/9
**radioactivity [1]** 35/22
**radionuclide [1]** 34/10
**radionuclides [1]** 36/3
**radius [2]** 226/18 226/19
**raise [1]** 63/24
**ran [1]** 69/7

**random [3]** 124/17
126/18 168/3
**range [17]** 68/25 69/5
74/19 79/17 80/13 80/14
80/21 81/5 83/11 83/15
152/25 170/12 185/8
196/12 196/22 232/23
238/9
**ranges [1]** 196/21
**rank [3]** 69/12 69/15
70/8
**Rapp [1]** 2/22
**rate [1]** 250/6
**rates [1]** 208/22
**Ratheon [3]** 49/22 50/1
50/3
**rather [2]** 42/24 191/24
**rational [2]** 19/11
222/12
**raw [5]** 146/24 155/12
209/13 209/14 209/16
218/12
**reached [5]** 66/10 78/2
80/6 204/6 204/24
**reaching [3]** 66/16 81/5
111/24
**react [1]** 221/8 222/5
**reaction [1]** 222/18
**read [17]** 3/23 4/14 7/9
14/14 22/20 64/12
115/10 121/15 121/17
142/18 166/3 167/13
171/7 177/16 177/22
223/3 223/6
**reading [4]** 25/4 130/6
137/15 177/23
**ready [4]** 3/15 63/19
75/1 105/24
**real [48]** 25/6 25/7 25/7
26/23 58/22 67/10 70/5
70/25 74/17 76/10 77/22
85/8 95/7 98/5 98/7
100/10 101/22 124/13
138/24 154/11 154/12
156/4 159/2 159/5
159/10 159/14 161/13
169/17 171/19 171/19
172/3 172/11 172/13
173/12 183/8 190/21
205/24 213/1 219/24
221/12 222/15 229/21
230/1 230/3 230/8
230/14 244/11 251/5
**reality [1]** 222/20
**realization [2]** 78/15
80/24
**realize [3]** 46/16 163/16
244/10
**really [23]** 8/15 9/22
15/19 28/24 31/17 36/8
36/17 39/5 40/23 41/18
57/7 70/16 83/3 143/3
166/11 166/21 167/18
171/7 182/13 183/24
185/20 213/22 247/18

**realm [1]** 220/21
**Realtime [1]** 256/7
**realtor [3]** 139/3 190/16
190/18
**realtors [3]** 134/22
136/8 136/15
**reap [1]** 98/1
**reason [12]** 6/9 32/22
46/9 60/23 60/24 110/14
112/2 140/12 159/7
168/15 195/15 242/10
**reasonable [15]** 16/15
20/14 20/16 21/11
120/18 121/21 128/22
152/11 161/16 194/4
196/12 208/18 213/3
220/13 230/22
**reasonably [6]** 10/15
13/20 15/14 18/22 21/4
233/13
**reasons [2]** 150/10
248/24
**rebuttal [1]** 7/23
**recall [24]** 68/14 73/23
74/1 76/24 77/3 96/25
106/11 108/6 108/7
108/11 109/6 110/20
123/22 127/23 127/24
130/23 136/2 140/5
171/1 171/16 190/23
243/20 252/3 252/5
**recalled [1]** 40/22
**recanted [1]** 40/13
**received [1]** 37/7
**recent [3]** 39/21 41/19
130/15
**recently [3]** 33/8 40/1
147/10
**recess [10]** 63/14 63/16
105/3 105/18 152/10
152/12 152/13 194/11
194/13 254/5
**reckless [1]** 35/3
**recognition [2]** 102/14
142/23
**recognize [22]** 75/8
89/20 89/25 91/2 92/11
93/13 95/7 111/10
117/18 118/8 119/2
119/3 121/6 123/8
127/25 130/10 137/6
138/3 149/5 149/21
159/5 213/25
**recognized [13]** 112/4
114/17 116/3 117/8
129/11 129/19 138/8
140/23 148/17 198/13
200/25 201/7 201/20
**recognizing [1]** 138/2
**recollection [1]** 216/15
**recommended [2]**
154/11 161/13
**reconcile [3]** 66/25
72/17 195/25
**reconciled [1]** 83/13
**reconciliation [7]** 66/23

**R**

**reconciliation...** [6] 67/9 67/13 73/1 195/19 195/23 202/8
**record** [6] 16/17 108/17 108/18 132/19 218/11 256/8
**recorded** [5] 129/8 129/9 130/9 130/23 170/14
**recording** [2] 121/7 134/5
**records** [2] 129/4 193/6
**recover** [1] 8/5
**recovers** [1] 244/21
**Recovery** [1] 197/11
**recross** [6] 243/4 243/7 243/9 251/18 255/12 255/15
**Recross-examination** [2] 243/9 251/18
**recycling** [3] 39/9 39/10 39/13
**red** [9] 18/17 19/15 106/9 159/19 160/4 160/25 161/3 171/4 206/24
**redirect** [15] 187/4 188/3 194/16 215/11 216/12 216/20 217/11 217/22 235/3 235/4 235/10 250/4 255/10 255/11 255/14
**redress** [3] 29/20 30/23 31/2
**reduced** [1] 235/13
**reduces** [1] 247/15
**reducing** [1] 231/6
**reduction** [5] 232/18 232/19 232/19 232/21 238/9
**reductions** [3] 232/24 232/24 232/25
**reevaluate** [1] 78/17
**reevaluated** [1] 70/13
**refer** [7] 59/19 124/2 128/1 136/4 147/6 162/2 169/6
**reference** [14] 51/11 122/8 127/7 127/18 128/14 139/13 139/17 141/6 141/24 142/11 143/16 215/21 223/24 235/25
**referenced** [3] 109/4 237/7 238/18
**references** [11] 108/8 108/9 110/2 115/20 115/22 122/18 123/11 134/25 135/12 137/1 139/16
**referencing** [3] 14/15 137/16 157/20
**referred** [4] 114/3 114/4 136/15 190/14
**referring** [8] 26/14 68/9

79/6 116/10 117/12 164/22 165/15 203/7
**refine** [1] 171/23
**reflect** [6] 95/4 112/24 121/16 244/5 244/5 244/23
**reflected** [1] 96/3 239/19 243/23
**reflecting** [3] 129/10 201/3 232/18
**reflection** [1] 15/21
**reflects** [2] 95/3 250/7
**Reform** [1] 197/11
**refresh** [2] 186/1 186/1
**refuge** [2] 178/5 178/25
**regard** [10] 59/2 77/14 89/19 102/9 128/20 154/4 237/14 237/21 238/8 250/17
**regarding** [10] 39/21 40/8 45/4 92/25 111/2 111/7 130/25 235/19 250/19 252/23
**regardless** [3] 41/7 61/13 110/14
**regime** [2] 10/5 10/11
**Registered** [1] 256/6
**Registry** [1] 224/13
**regression** [27] 74/4 74/7 74/9 75/5 75/9 75/15 75/18 76/1 76/14 83/2 148/10 152/21 153/3 153/7 153/13 161/19 162/19 163/1 163/9 164/2 164/4 207/2 214/19 240/3 240/8 240/23 241/6
**regression-dependent** [1] 214/19
**regular** [1] 161/15
**regulated** [1] 197/12
**Rehabilitative** [1] 224/12
**relate** [2] 241/17 242/3
**related** [8] 14/12 28/6 36/8 140/4 145/8 148/5 148/9 235/5
**relationship** [3] 114/14 155/2 225/16
**relative** [15] 19/20 24/16 95/19 137/8 142/1 144/16 156/14 157/9 157/21 158/8 160/19 207/13 209/16 213/12 228/6
**relatively** [1] 191/20
**relax** [1] 111/6
**relaxed** [1] 111/20
**relaxing** [1] 111/9
**relevance** [1] 150/18
**relevant** [7] 11/1 117/24 124/15 124/21 142/5 155/23 200/8
**reliability** [1] 23/7 132/13
**reliable** [3] 10/25 215/4

229/21
**reliably** [3] 61/21 149/25 190/25
**relied** [5] 7/10 124/9 162/21 163/11 243/16
**relief** [1] 47/21
**rely** [20] 5/21 23/4 53/13 81/8 81/17 126/2 134/21 149/6 149/23 153/18 162/13 163/5 173/11 181/10 196/13 215/14 215/15 215/16 215/17 217/20
**relying** [6] 75/5 79/16 79/22 126/15 153/14 172/4
**remain** [1] 157/9
**remains** [3] 57/3 57/3 77/24
**remarkably** [1] 185/16
**remediate** [4] 13/12 13/14 13/17 30/25
**remediated** [3] 33/24 33/25 60/16
**remediation** [4] 32/11 35/3 40/8 60/17
**remedy** [1] 47/21
**remember** [7] 82/3 203/17 204/21 209/21 210/11 219/12 245/17
**remove** [7] 34/2 141/25 142/1 142/5 142/8 142/13 142/17
**removed** [2] 108/8 239/19
**removing** [2] 41/15 112/6
**render** [3] 67/1 198/20 205/6
**rendered** [1] 83/21
**repeat** [3] 37/19 188/20 204/14
**repeated** [1] 149/2
**repeatedly** [4] 45/17 83/7 134/7 235/12
**repeating** [1] 12/6
**rephrase** [7] 103/9 193/25 227/1 228/19 239/11 241/2 241/3
**rephrased** [1] 128/7
**replace** [2] 76/13 152/20
**replaced** [2] 75/25 108/9
**reply** [1] 39/21
**report** [80] 42/11 50/19 65/22 65/24 66/1 66/5 66/10 66/15 73/14 73/21 76/23 76/24 79/11 90/4 106/25 98/9 108/13 108/17 109/4 109/7 110/2 110/16 110/17 110/23 111/1 112/4 112/7 115/14 116/5 116/9 116/15 116/16 116/19 116/19 119/16 120/2 120/4 121/12 123/3 123/17 123/21

127/8 127/18 129/7 129/12 129/23 130/4 132/4 133/11 134/25 135/9 135/11 136/1 136/5 136/14 136/24 137/11 138/6 138/13 139/5 140/14 142/1 142/8 167/13 168/1 170/1 203/20 204/6 204/9 204/10 204/20 205/11 207/4 216/10 221/17 241/20 241/23 241/24 252/21 252/23
**reported** [2] 58/21 253/9
**reporter** [6] 1/18 1/19 3/9 49/2 256/6 256/7
**reporter's** [1] 3/13
**reporting** [1] 138/25
**reports** [18] 22/9 42/16 48/7 64/18 65/2 74/14 81/13 87/3 116/18 148/4 200/10 215/24 215/25 216/24 217/5 219/4 229/15 253/9
**represent** [12] 40/1 41/1 58/22 106/15 117/19 118/2 118/7 118/11 129/6 133/13 135/22 190/17
**representation** [15] 89/3 118/19 121/22 123/5 123/13 128/7 128/12 128/14 128/22 133/5 165/12 174/18 178/1 179/10 179/13
**representative** [3] 35/25 174/14 174/15
**represented** [5] 6/15 31/21 128/15 138/16 159/19
**representing** [5] 117/15 117/18 120/19 128/18 167/3
**reproducible** [1] 22/6
**request** [2] 14/2 35/21
**requested** [1] 49/20
**require** [1] 163/6
**required** [4] 10/16 49/21 50/2 153/10
**requirement** [2] 6/18 111/11
**requirements** [6] 5/7 6/1 11/1 29/16 49/10 192/23
**requires** [2] 48/18 196/5
**research** [1] 86/3
**reserved** [1] 4/3
**resided** [1] 33/12
**residence** [4] 47/17 170/7 170/9 170/13
**residences** [1] 170/10
**resident** [2] 123/18 127/5
**residential** [3] 32/20 40/2 205/24
**residents** [23] 80/17 115/17 116/25 117/5

117/11 117/13 118/3 119/23 121/7 121/11 122/4 122/23 123/1 123/19 124/4 124/8 124/18 125/14 126/16 131/10 134/19 168/17 232/15
**residents'** [1] 123/14
**resolving** [1] 45/21
**resource** [1] 221/11
**respect** [16] 7/21 55/4 77/13 80/25 82/13 91/13 92/2 104/15 126/13 149/4 186/5 236/20 237/3 237/7 237/13 237/22
**respects** [2] 108/25 189/5
**respondents** [8] 135/1 142/19 175/1 178/1 178/8 179/20 183/20 185/15
**response** [5] 5/2 35/21 130/22 132/10 133/5
**responses** [7] 28/19 126/20 130/25 132/17 132/22 133/13 169/22
**responsibilities** [1] 220/20
**responsible** [7] 8/14 10/11 38/18 109/17 110/4 144/5 248/21
**rest** [3] 4/6 32/18 207/15
**restated** [1] 15/14
**result** [17] 8/8 9/16 12/17 93/9 93/18 95/24 96/13 97/18 142/4 144/21 184/14 213/5 214/14 227/25 232/16 241/5 241/6
**resulted** [2] 8/9 102/18
**resulting** [4] 45/10 141/2 142/10 232/16
**results** [20] 6/23 8/13 58/21 61/19 62/1 112/24 114/23 121/7 149/23 150/13 151/11 165/5 168/18 182/15 185/23 198/23 198/24 214/12 214/17 222/14
**retained** [1] 25/14
**revealed** [1] 131/24
**revelation** [3] 76/7 135/14 155/1
**reverse** [2] 98/1 232/13
**reversed** [1] 49/23
**review** [16] 72/2 81/3 81/7 114/11 118/24 119/5 127/22 201/6 201/18 204/1 217/15 217/17 217/20 218/10 221/16 221/17
**reviewed** [9] 53/13 112/3 119/1 119/7 119/15 119/19 127/24 203/12 227/20

**R**

reviewing [1] 132/3
revision [1] 37/14
reward [1] 98/2
RICHARD [1] 1/3
rid [1] 177/16
right [163] 3/14 7/24
13/13 14/12 14/19 18/7
19/14 20/9 20/15 21/18
29/17 30/23 37/16 47/14
51/25 53/18 63/10 63/19
63/24 64/11 65/20 66/3
66/8 69/15 70/6 73/16
73/19 75/7 76/2 80/6
81/19 82/17 82/23 83/5
83/24 84/18 87/5 87/10
87/23 88/1 88/12 89/18
90/7 90/14 93/24 94/12
96/11 97/4 97/6 97/11
99/15 100/17 102/11
102/20 104/8 105/9
105/21 106/20 109/12
111/4 111/16 112/19
113/6 117/3 117/7
117/22 119/21 120/1
121/2 122/6 123/24
124/5 125/5 128/17
133/14 134/3 135/5
135/16 136/8 139/25
141/9 142/7 146/5
146/11 147/4 147/25
148/16 152/11 152/16
152/22 153/4 153/7
154/1 155/10 155/19
155/24 157/5 157/13
158/1 158/16 168/18
169/1 169/14 170/15
174/9 175/21 177/25
179/3 180/1 183/15
183/18 183/22 183/23
184/1 184/6 184/7 187/3
187/4 187/12 187/18
188/7 188/24 189/9
191/3 191/4 192/5
194/16 195/20 197/5
198/3 205/19 206/25
210/4 210/15 215/21
218/4 220/19 223/6
223/24 224/3 225/10
229/7 229/11 229/22
229/23 233/7 234/7
240/22 243/2 243/5
243/11 243/24 244/6
244/19 245/20 246/16
246/23 248/9 249/23
252/10 253/18 253/20
254/4
rightfully [1] 33/19
rigor [5] 153/20 161/10
161/18 162/19 163/8
rigorous [10] 49/13
153/4 153/15 153/16
161/11 163/14 196/2
196/8 197/1 202/13
ripe [4] 11/22 48/19
48/19 48/21
ripples [2] 34/24 46/5
rise [2] 45/22 149/13
rises [1] 45/24
Ritchie [1] 2/10
Riviera [1] 51/4
RMR [2] 1/18 256/13
road [6] 2/23 32/19
151/17 151/24 179/23
190/3
roads [1] 191/14
role [3] 11/3 26/5 68/25
roughly [2] 52/25 187/7
rounding [1] 185/5
route [8] 40/10 40/17
40/19 40/21 41/18 41/23
41/24 179/1
routes [3] 41/2 41/17
41/25
routinely [1] 183/20
row [1] 58/14
rule [11] 49/10 67/12
197/5 197/9 198/12
199/5 199/6 199/7 199/8
200/20 200/24
Rule 1-1 [2] 200/20
200/24
Rule 1-2 [1] 199/7
ruled [1] 47/4
rules [1] 68/3
ruling [1] 101/19
run [6] 74/24 161/18
165/9 182/24 200/1
212/9

**S**

safer [1] 207/24
sale [9] 91/23 94/23 95/3
208/11 232/8 243/23
244/4 244/5 244/11
sales [19] 25/24 26/3
27/20 27/20 29/9 90/10
94/20 117/1 122/24
144/17 172/11 173/11
202/19 203/23 209/13
209/15 245/21 246/24
251/21
salient [3] 200/11
200/15 201/10
same [65] 7/19 9/4 9/4
17/20 18/19 20/18 21/20
21/21 21/22 22/10 22/11
23/4 23/5 23/8 25/11
28/1 30/2 30/4 31/19
33/7 39/9 39/13 39/17
44/3 51/3 52/8 62/15
73/18 77/24 86/9 88/11
96/18 97/14 98/11 99/12
101/4 103/17 115/11
117/5 149/3 156/9
160/19 160/24 162/18
163/8 170/9 186/22
188/12 191/22 193/15
195/24 195/25 202/24
206/21 207/15 207/15
213/15 213/17 217/19
219/21 221/2 238/7
243/14 247/5 247/7
sample [6] 126/18
164/20 164/23 165/10
179/8 214/7
sampled [4] 114/14
164/25 225/15 225/16
sampling [13] 5/23
124/17 163/20 164/5
164/5 164/12 164/19
164/24 165/3 165/8
165/8 166/9 166/20
Santiago [3] 44/17 46/2
46/13
Satellite [1] 95/6
satisfaction [3] 194/3
200/16 213/1
satisfy [1] 49/14
save [3] 43/3 43/4 187/1
saving [1] 98/2
saw [2] 20/11 191/15
say [102] 14/23 21/18
21/19 21/23 28/23 42/15
55/24 58/5 58/11 58/16
60/10 61/19 62/17 62/25
69/12 70/4 70/13 71/9
73/4 74/1 78/15 78/25
79/2 79/17 85/1 85/2
86/6 86/24 88/7 89/22
90/25 93/19 93/22 94/11
95/16 95/25 97/4 97/13
98/9 107/17 112/9 113/8
113/9 114/20 117/23
118/16 121/10 121/11
121/11 121/18 121/18
122/24 124/7 124/9
131/10 138/25 140/2
143/12 143/18 144/6
145/4 146/25 147/3
147/23 148/6 149/9
151/10 151/14 153/1
156/4 157/7 160/23
172/12 173/17 174/22
175/6 176/21 178/14
178/16 183/20 183/24
184/3 184/5 187/10
188/8 192/22 194/25
197/3 202/10 202/20
208/11 214/11 214/13
214/15 214/24 223/20
226/10 226/25 243/11
244/2 248/14 251/7
saying [26] 3/22 24/2
24/3 33/3 58/15 61/13
75/6 77/6 94/13 102/17
104/16 107/9 119/18
120/12 123/5 129/22
130/13 130/19 134/15
138/20 141/12 141/22
146/21 156/22 211/11
247/11
says [17] 10/14 27/10
45/9 45/12 60/25 61/20
62/18 67/23 134/2 171/6
171/7 178/3 198/12
200/24 223/7 223/10
223/15
scale [1] 50/23
scare [3] 136/20 138/1
139/3
Scarola [8] 2/9 2/10
31/14 65/16 234/25
239/9 255/11 255/14
Scarola's [1] 204/16
scary [1] 184/4
scenario [8] 168/8 174/7
179/11 179/13 184/4
184/10 184/11 233/17
schedule [1] 3/16
Schlesinger [2] 2/3 12/3
scholar [1] 25/10
scholarly [5] 182/21
183/6 185/10 196/19
214/7
scholarship [1] 183/6
Schwinghammer [1]
2/19
Schwinghammer's [1]
52/9
science [5] 60/10 102/24
103/23 161/11 219/23
scientific [4] 153/11
191/6 194/5 220/13
scientist [3] 79/3 102/16
219/22
scope [16] 78/9 90/2
90/20 91/5 92/23 93/14
95/6 95/21 99/9 100/6
101/9 144/13 180/12
215/9 215/10 250/22
Scott [1] 2/16
scrapyard [12] 32/9
36/1 37/10 37/15 37/21
38/7 38/8 38/15 38/18
38/21 38/23 39/1
screen [18] 31/21 32/13
33/11 41/1 52/22 68/21
82/14 90/21 106/6
110/22 116/15 120/24
127/12 138/14 139/5
200/21 246/6 253/1
screening [1] 174/25
screenshots [1] 170/24
script [2] 132/20 133/23
se [1] 213/23
Sean [2] 2/13 49/2
Searcy [1] 2/10
seat [1] 158/19
seated [6] 3/3 63/18 64/1
105/20 152/15 194/15
second [32] 17/4 39/19
42/22 70/8 70/18 71/7
73/13 76/25 85/12 85/14
104/1 106/20 110/16
115/14 116/4 123/17
131/4 132/4 133/11
140/11 170/11 177/17
177/17 199/6 200/20
211/1 211/10 212/22
222/23 222/23 222/25
223/25
section [5] 8/2 9/23 45/8
67/13 195/1
Section 768.81 [1] 9/23
securities [7] 62/16
147/7 147/9 147/10
147/12 147/13 147/20
seek [3] 29/20 30/22
31/1
seem [3] 246/13 247/6
247/7
seems [6] 28/11 246/10
246/11 247/1 247/5
249/14
seen [7] 22/20 28/15
121/20 135/23 191/23
249/8 249/10
seep [1] 223/12
segregates [1] 76/4
self [1] 163/24
self-validating [1]
163/24
sell [19] 24/20 26/23
47/12 47/13 47/13 98/1
98/4 99/4 99/13 122/11
207/20 207/21 208/7
221/4 233/3 233/5
242/14 244/3 244/14
seller [5] 199/22 233/3
233/4 233/8 233/12
sellers [3] 171/19 208/15
232/3
selling [5] 84/9 84/11
172/25 208/22 244/13
sells [1] 231/17
semiannually [1] 197/18
seminal [2] 68/3 71/1
sense [25] 7/1 22/6
23/23 24/3 26/5 26/5
26/6 28/11 28/12 28/25
80/12 182/22 183/4
184/3 187/13 210/16
221/18 226/21 226/25
233/24 234/7 234/10
234/11 234/15 234/17
sensible [1] 24/3
sent [5] 32/18 35/20
36/2 36/10 42/14
sentence [9] 15/13
114/13 117/5 178/7
223/10 223/15 223/25
224/5 225/14
sentences [1] 178/2
separate [4] 104/11
115/9 229/4 236/10
separately [1] 146/8
separating [1] 234/19
September [1] 211/14
series [1] 198/21
serious [3] 20/22 62/23
133/10
serve [1] 192/10
services [3] 42/24
198/20 224/13
session [1] 3/19
set [15] 3/24 44/13 54/3
74/15 127/1 127/2
179/17 179/25 184/4

**S**

**set... [6]** 185/22 195/24 197/12 197/13 244/9 253/14

**setting [4]** 107/1 213/16 213/16 213/17

**settle [2]** 172/19 173/2

**seven [11]** 3/21 127/15 127/22 128/7 128/9 129/15 131/19 148/9 148/12 152/5 170/13

**seven miles [1]** 170/13

**Seventy [1]** 143/22

**Seventy-eight [1]** 143/22

**several [9]** 9/24 10/4 10/10 23/20 24/11 151/23 197/17 204/19 225/6

**severally [1]** 228/10

**severe [1]** 141/10

**SFranklinUSDC [1]** 1/20

**shadow [1]** 14/24

**shall [3]** 70/13 71/9 89/22

**share [2]** 55/21 176/4

**shares [1]** 149/9

**sharpshooter [1]** 58/18

**Shaw [1]** 45/19

**sheet [1]** 36/9

**Sheldon [1]** 2/3

**Sher [1]** 49/22

**shift [2]** 104/23 238/6

**shifting [1]** 104/25

**Shipley [1]** 2/11

**shocking [1]** 28/24

**short [9]** 119/5 155/1 162/16 164/4 164/12 167/16 190/8 190/14 199/16

**shortcut [1]** 130/5

**shortest [1]** 52/2

**shorthand [11]** 130/24 131/22 131/24 132/5 133/2 134/5 134/12 134/16 137/21 138/8 138/20

**shortly [2]** 32/2 63/6

**should [18]** 12/23 15/15 15/21 28/24 32/23 33/3 34/22 44/25 46/7 47/20 67/14 67/19 76/20 87/25 152/4 181/15 184/9 225/8

**shouldn't [5]** 12/23 12/24 30/9 42/20 82/22

**show [33]** 7/13 7/16 8/21 11/7 12/21 16/2 16/3 18/22 29/10 29/13 34/20 38/20 38/24 41/12 44/22 46/14 47/9 51/18 59/24 67/6 88/18 108/23 110/23 113/13 129/5 140/6 141/23 142/19 167/4 169/24 190/18

**showed [2]** 37/11 190/23

**showing [2]** 49/15 157/1

**shown [15]** 18/17 18/18 48/13 55/17 57/12 89/13 89/15 114/21 181/22 182/5 205/11 207/12 219/16 219/18 221/9

**shows [7]** 36/25 37/14 52/22 157/8 157/21 167/7 252/11

**sic [2]** 21/15 108/25

**side [1]** 196/14

**sides [3]** 11/23 19/18 20/14

**sight [4]** 12/23 12/24 12/24 12/25

**signed [2]** 116/20 116/22

**significance [17]** 164/11 164/14 164/15 164/21 165/2 165/6 165/9 165/12 165/18 166/7 166/10 166/14 166/18 167/11 207/13 208/20 251/10

**significant [10]** 58/21 59/5 141/20 158/7 158/25 164/10 165/4 165/5 208/21 251/7

**significantly [2]** 198/18 198/22

**signs [1]** 122/6

**silly [1]** 185/5

**similar [7]** 34/10 51/17 52/15 54/14 135/15 170/8 185/22

**similarities [1]** 41/12

**similarly [1]** 62/3

**simple [1]** 13/22

**simpler [1]** 162/25

**simply [19]** 40/10 48/22 86/19 93/12 94/13 98/21 102/17 104/16 107/13 127/25 128/15 129/22 141/12 156/22 163/22 168/2 178/23 202/16 227/12

**since [16]** 20/20 39/8 43/17 43/25 43/25 105/11 119/16 138/1 143/18 148/12 164/12 166/20 172/8 173/5 207/3 245/17

**single [3]** 18/8 28/8 72/15

**sir [99]** 12/1 26/1 51/13 63/20 63/24 64/1 64/4 64/24 65/8 65/17 66/21 67/19 68/6 69/11 69/22 74/3 75/4 75/18 75/25 76/23 77/15 82/3 83/1 83/16 84/24 85/22 88/10 89/3 94/11 95/22 100/7 101/1 104/23 106/2 106/18 107/9 107/15 108/19 110/14 111/22

**114/21 115/1 116/6 117/11 118/5 118/21 119/7 120/6 121/6 124/7 128/4 128/9 130/13 133/20 134/9 135/22 136/10 136/23 138/22 141/15 142/13 143/1 143/18 143/25 145/24 149/14 150/21 151/9 151/13 156/15 158/10 158/25 159/17 160/11 161/1 161/8 161/17 162/2 165/3 165/22 166/13 167/20 171/17 173/25 174/11 176/6 184/24 186/19 188/19 200/5 200/5 200/5 217/13 219/6 235/7 239/12 244/19 253/14 253/25**

**sit [5]** 119/9 130/22 132/24 137/14 252/4

**site [17]** 13/4 13/5 16/19 18/14 20/24 34/5 36/7 36/17 38/9 38/10 41/14 42/12 42/20 52/24 180/17 223/11 224/6

**sites [3]** 13/6 32/11 34/11

**sitting [2]** 63/5 158/18

**situation [6]** 47/21 96/17 113/22 136/18 178/10 185/6

**six [11]** 3/21 35/18 36/5 39/12 52/3 52/24 52/25 78/8 88/13 199/8 217/4

**six miles [6]** 35/18 36/5 39/12 52/3 52/24 52/25

**size [6]** 37/1 37/2 51/3 51/4 154/4 154/8

**skew [1]** 222/14

**skip [1]** 157/24

**slash [1]** 127/5

**sleeping [1]** 48/5

**slice [1]** 58/5

**slide [4]** 22/18 25/5 32/5 42/22

**slides [1]** 12/12

**slightest [1]** 171/24

**slightly [1]** 92/19

**slow [3]** 26/1 188/19 200/5

**slowly [1]** 205/19

**small [5]** 37/3 40/2 53/18 107/18 210/5

**smaller [7]** 50/22 51/11 77/25 84/2 107/10 157/3 191/12

**so-called [1]** 77/5

**sobeit [1]** 167/18

**sodium [7]** 180/5 223/21 224/2 224/6 224/9 225/1 248/11

**soil [26]** 17/13 32/11 32/15 32/19 33/6 34/3 34/6 34/8 38/19 39/1

**39/13 39/17 39/18 40/8 41/15 42/5 42/7 42/12 42/15 44/19 53/8 60/15 60/16 177/6 215/1 223/12

**sold [18]** 91/22 91/22 95/1 96/22 96/24 97/4 97/10 97/19 97/20 97/20 97/22 98/5 98/14 99/4 99/12 101/2 207/23 244/23

**solely [1]** 243/15

**solid [1]** 71/9

**solution [2]** 33/1 47/22

**solvents [1]** 21/3

**somebody [10]** 96/15 96/21 96/23 97/2 99/25 136/11 165/11 174/12 244/1 251/6

**somebody's [1]** 200/21

**someday [1]** 60/6

**somehow [6]** 41/22 52/18 54/2 55/4 60/6 156/1

**someone [4]** 33/23 46/14 48/2 94/25

**something [57]** 6/21 7/4 7/5 22/19 29/25 34/23 34/24 47/17 57/14 57/16 60/7 60/16 76/1 84/20 91/17 92/22 96/5 100/21 100/23 104/7 106/9 114/5 122/12 122/16 127/3 127/7 136/10 137/10 137/11 138/20 142/6 143/5 147/14 147/16 147/19 155/5 158/7 159/9 159/15 160/7 167/25 181/14 189/17 192/22 195/7 203/15 204/16 204/21 206/5 206/6 207/17 218/23 218/25 219/3 221/2 222/8 249/12

**something's [4]** 157/25 160/3 167/7 206/8

**sometime [2]** 151/16 244/3

**sometimes [6]** 32/20 39/17 50/21 55/3 55/12 132/22

**somewhat [4]** 71/9 176/13 176/17 198/12

**somewhere [5]** 146/23 151/23 168/23 185/8 246/12

**soon [8]** 74/22 75/1 75/15 100/21 100/24 101/10 151/24 234/4

**sorry [11]** 37/19 45/4 68/19 103/7 103/12 121/24 125/17 175/14 200/6 225/1 248/11

**sort [11]** 55/12 76/6 86/6 86/12 145/16 149/25 154/10 161/12 163/11

**166/3 229/10

**sorted [1]** 96/5

**sorts [1]** 153/9

**sound [3]** 126/1 149/10 227/3

**sounds [3]** 83/19 96/5 152/11

**source [1]** 62/6

**sources [3]** 9/21 40/6 62/8

**south [24]** 2/8 2/20 17/7 17/19 17/21 17/25 18/1 18/16 19/2 19/3 19/13 19/13 19/24 20/4 24/5 41/16 51/5 51/22 159/2 160/11 175/10 182/9 221/18 234/18

**southeast [2]** 2/3 214/25

**southeastern [1]** 214/13

**southerly [1]** 17/24 20/1 20/10

**southern [6]** 1/1 15/12 18/3 41/5 52/6 175/17

**Southlake [1]** 51/5

**space [3]** 194/24 195/6 195/6

**spades [2]** 12/22 21/13

**speak [3]** 51/8 153/20 192/25

**speaking [3]** 3/11

**speaks [3]** 163/18 167/2 167/16

**specific [16]** 11/10 68/15 91/16 153/21 182/14 182/14 184/8 184/24 194/24 209/25 211/21 216/18 219/10 219/20 234/25 235/1

**specifically [13]** 68/9 99/22 138/14 139/11 139/7 141/7 169/7 180/4 180/7 181/9 192/7 223/20 237/10

**specifics [1]** 222/19

**specified [1]** 181/3

**speculate [1]** 217/9

**speculation [2]** 53/7 61/12

**speculative [1]** 60/5

**speed [1]** 207/15

**spell [1]** 64/6

**spend [6]** 4/4 5/3 22/23 29/4 187/23 218/22

**spent [1]** 190/2

**spilling [1]** 16/13

**spills [2]** 180/16 223/11

**spine [1]** 33/10

**spines [1]** 34/20

**spoke [3]** 190/21 241/17 242/4

**sponsor [1]** 63/3

**spots [1]** 55/8

**spraying [1]** 16/13

**spreadsheet [3]** 67/5 73/7 121/6

**square [31]** 24/12 51/1 52/12 52/19 52/20 53/10

**S**

**square... [25]** 54/7 54/25 55/11 55/15 153/24 153/25 154/8 154/14 154/16 154/23 155/3 155/3 155/8 155/9 157/2 161/7 162/17 191/14 191/15 209/14 226/18 226/19 245/21 247/15 248/20

**St. [2]** 6/14 6/15
**St. Joe [2]** 6/14 6/15
**stacks [1]** 32/18
**staff [2]** 133/22 134/11
**staff's [1]** 134/5
**stage [5]** 13/25 29/12 50/3 96/6 212/23
**stamped [1]** 37/7
**stand [10]** 12/10 79/25 105/22 143/11 143/15 143/18 143/25 145/17 196/23 205/4
**standard [19]** 10/13 10/20 15/24 15/24 16/2 16/15 25/9 49/11 49/13 67/12 162/11 197/5 197/25 198/2 198/5 198/8 198/12 198/16 199/8
**standards [23]** 10/24 25/6 44/13 66/24 67/3 67/11 68/3 70/25 72/9 72/16 72/20 73/3 197/7 197/13 197/13 197/19 197/21 197/21 197/23 197/25 199/7 201/21 234/14
**standing [1]** 30/13
**standpoint [1]** 193/1
**stands [5]** 161/22 192/8 193/23 202/18 241/13
**star [1]** 82/14
**start [15]** 12/6 37/18 37/24 39/6 54/15 65/2 146/2 150/23 151/16 159/4 162/8 188/15 218/19 247/21 253/24
**started [4]** 159/1 188/13 246/3 246/18
**starting [4]** 159/7 160/6 222/25 247/4
**starts [2]** 39/9 159/8
**state [14]** 3/6 3/9 3/12 13/22 43/1 48/7 108/22 135/1 138/13 139/6 176/11 197/24 211/16 252/9
**stated [2]** 15/4 51/21
**statement [2]** 124/12 248/21
**statements [5]** 3/25 109/3 135/8 135/25 255/3
**states [6]** 1/1 1/14 25/8 197/20 214/11 214/14
**station [1]** 7/8

**statistical [38]** 153/9 153/19 161/10 161/18 162/3 162/5 162/7 162/9 162/12 162/13 162/17 162/19 162/20 162/22 163/5 163/8 163/9 163/11 163/22 163/23 164/7 164/11 164/13 164/15 164/21 165/1 165/6 165/9 165/12 165/17 166/6 166/10 166/13 166/18 167/11 192/11 214/7 214/23
**statistically [11]** 58/4 58/20 153/4 153/15 164/10 164/24 165/4 165/5 166/17 167/3 215/4
**statistician [1]** 58/19
**statisticians [3]** 58/2 58/5 58/16
**statistics [1]** 161/9
**statute [4]** 8/8 44/11 45/12 47/7
**statutes [1]** 8/4
**stay [2]** 209/17 247/8
**stays [1]** 160/21
**steeped [1]** 161/23
**steeper [1]** 248/17
**stem [1]** 29/18
**stems [1]** 46/21
**step [1]** 51/7
**Stephen [5]** 1/18 2/22 256/6 256/12 256/13
**Stephens [9]** 19/17 19/23 20/6 21/7 21/16 21/24 22/4 22/17 22/3
**Stephens' [1]** 23/10
**steps [1]** 34/2
**Steven [1]** 2/7
**Stewart [1]** 2/19
**sticky [1]** 172/21
**stiff [1]** 18/7
**stigma [86]** 6/22 6/23 7/16 8/5 8/13 9/18 9/20 10/7 10/8 10/9 10/19 14/10 14/13 16/1 16/4 23/14 23/21 24/21 30/3 31/18 31/19 35/5 41/8 48/20 48/21 54/14 71/11 74/18 74/19 88/15 91/14 91/16 93/9 93/11 93/18 94/1 96/2 96/14 97/5 97/18 102/12 103/1 103/14 103/16 103/22 104/5 104/11 104/18 104/18 122/12 141/1 143/15 193/15 194/7 194/21 195/7 195/9 195/14 200/18 201/23 202/17 204/12 205/7 205/17 206/17 207/5 207/18 208/21 209/3 211/20 211/20 211/22 212/3 216/19 218/16 219/9 219/11 220/7

**221/7** 228/10 228/13 230/23 231/5 238/9 239/23 241/5
**stigma-impaired [1]** 241/5
**stigmatization [5]** 27/25 28/7 212/24 220/4 220/9
**stigmatize [2]** 17/19 17/20
**stigmatized [16]** 12/19 24/6 30/18 77/23 83/15 85/6 86/21 193/13 193/20 195/1 202/22 213/4 218/12 234/20 234/22 237/19
**stigmatizes [1]** 7/6
**stigmatizing [3]** 78/15 214/22 235/13
**still [11]** 9/15 9/25 10/4 38/16 97/20 105/22 133/6 142/2 143/11 144/21 163/9
**stipulating [3]** 106/24 125/16 252/3
**stock [1]** 247/16
**stop [4]** 13/21 43/14 54/12 54/15
**stopped [1]** 207/1
**stored [1]** 224/17
**storing [1]** 16/13
**story [3]** 164/19 221/6 226/5
**straight [1]** 187/20
**strategically [1]** 126/20
**strategy [3]** 179/16 179/22 185/14
**street [5]** 1/19 2/6 2/16 226/14 226/15
**strict [1]** 8/7
**strictly [1]** 9/11
**strike [6]** 43/11 103/24 141/4 144/3 147/14 178/13
**strikingly [2]** 34/10 42/16
**strong [2]** 72/5 137/9
**strongest [1]** 196/2
**struck [1]** 160/11
**studied [1]** 66/3
**studies [13]** 69/9 72/1 81/9 82/15 158/17 158/19 158/22 159/25 184/13 214/8 214/9 220/20 251/6
**study [20]** 76/25 81/16 82/13 82/17 86/6 86/12 86/24 87/7 89/11 90/6 155/18 159/22 201/6 201/18 208/8 208/10 214/11 214/13 214/15 214/21
**studying [1]** 172/14
**stuff [4]** 36/18 40/14 56/15 254/2
**subclass [5]** 188/18 189/2 189/6 189/8

**189/12**
**Subcommittee [1]** 197/17
**subdivisions [1]** 221/13
**subject [7]** 11/8 14/5 14/6 48/16 61/12 188/16 196/20
**subjected [2]** 153/8 234/2
**submissions [1]** 56/9
**submit [2]** 54/24 219/3
**submitted [4]** 64/11 167/9 215/11 216/24
**Subparagraph [1]** 198/17
**Subsection [1]** 9/23
**Subsection 4 [1]** 9/23
**subset [7]** 77/12 77/14 77/25 83/21 86/20 189/5 236/15
**subsets [1]** 78/6
**Substances [1]** 224/13
**substantial [1]** 198/17
**substantiate [1]** 209/3
**substantiates [1]** 204/1
**substituted [1]** 111/6
**subsumes [1]** 228/3
**successfully [2]** 45/23 200/14
**such [11]** 23/10 28/19 38/2 75/10 80/18 172/8 173/7 185/17 190/24 195/4 198/21
**suddenly [2]** 107/11 107/18
**sued [2]** 124/10 124/15
**suffer [4]** 107/3 107/11 140/11 193/15
**suffered [21]** 48/3 48/14 56/4 93/5 93/8 93/17 93/22 94/12 94/15 94/19 95/5 95/24 96/1 96/13 97/21 98/5 99/12 101/4 107/6 108/4 213/11
**suffering [2]** 108/2 227/7
**sufficiency [3]** 18/25 21/6 23/7
**sufficient [12]** 19/12 22/15 23/20 29/7 29/12 30/9 30/11 128/15 142/3 212/1 218/11 218/15
**sufficiently [3]** 30/19 30/25 216/20
**suggest [12]** 19/25 30/21 54/25 61/4 134/9 175/13 175/17 181/14 225/9 243/14 243/15 243/16
**suggested [1]** 161/4
**suggesting [6]** 18/8 19/12 162/18 192/22 232/1 247/23
**suggestion [1]** 101/13
**suggests [6]** 22/3 30/11 134/11 208/5 209/15 248/24

**suit [2]** 6/8 6/8
**Suite [3]** 2/17 2/20 2/24
**summarized [2]** 163/18 178/2
**summarizing [1]** 163/17
**summary [3]** 11/22 145/23 151/14
**Sun [1]** 39/9
**Superfund [3]** 13/5 38/9 38/10
**superhighway [2]** 55/7 60/7
**superior [2]** 6/3 8/21
**supplied [1]** 40/10
**support [20]** 29/8 57/22 59/6 59/9 60/21 63/3 72/5 73/10 80/1 80/10 80/12 82/10 83/5 112/14 117/22 141/1 142/3 159/13 209/5 212/2
**supported [3]** 142/19 144/19 144/22
**supportive [16]** 71/10 76/11 80/5 80/14 81/6 81/13 82/11 83/9 83/9 153/1 167/6 173/8 173/14 173/17 196/9 230/13
**supports [3]** 28/20 30/18 79/20
**supposed [4]** 20/23 32/15 62/22 217/4
**supposedly [2]** 117/16 127/14
**Supreme [5]** 7/5 8/2 8/18 9/12 49/12
**supremely [1]** 23/16
**sure [30]** 10/1 11/8 28/16 35/18 42/13 43/24 74/6 86/9 125/16 131/6 135/20 149/3 165/25 166/8 166/18 171/7 174/25 175/10 183/14 188/1 188/14 188/21 197/10 199/10 200/22 204/14 211/24 219/15 228/17 243/8
**surface [3]** 15/3 237/15 238/22
**surprise [4]** 76/10 125/25 171/24 253/17
**surprised [1]** 249/1
**surrounding [5]** 24/13 24/14 178/5 178/16 223/17
**survey [90]** 28/15 28/17 28/18 68/12 68/24 69/3 69/8 69/20 69/25 70/10 70/15 71/8 71/13 71/21 72/5 73/2 73/5 73/9 83/4 83/8 112/10 112/13 112/16 112/18 112/24 112/25 113/3 113/9 114/2 114/9 114/21 115/1 115/3 115/22 115/25 116/7 122/23

Case 9:13-cv-80928-KAM   Document 391   Entered on FLSD Docket 01/08/2018   Page 286 of
{WITNESSNAME}                                                      Index: survey..there's
291

**S**

survey... [53] 124/3
126/1 126/11 126/15
126/16 127/5 142/14
143/4 144/18 168/5
168/9 168/13 168/15
168/20 169/2 169/12
170/18 170/21 170/25
172/5 174/2 174/7
174/16 176/7 177/4
179/5 179/12 179/16
179/19 179/20 179/24
180/4 182/12 183/5
185/2 185/15 185/23
186/2 186/7 186/13
196/17 201/5 201/17
204/6 220/16 221/23
222/13 222/14 222/15
226/8 229/22 229/25
230/8

surveying [2] 221/7
222/4

surveys [15] 28/22 80/16
80/17 108/23 115/7
119/16 124/3 134/22
138/10 181/18 183/15
185/19 186/4 220/19
230/3

survived [2] 25/17 45/25

suspect [1] 171/22

sustain [3] 193/24
216/13 217/12

Sustained [5] 71/19
82/20 186/17 239/11
251/14

switch [3] 108/6 224/10
246/6

sworn [2] 63/25 124/5

synopsis [5] 131/21
134/5 134/7 172/16
182/21

synopsizing [1] 164/24

system [1] 29/4

systematic [2] 205/6
234/2

systematically [1]
183/10

systems [3] 189/3 190/5
192/9

**T**

table [2] 144/23 145/22

tackle [1] 185/25

take [45] 4/6 28/3 34/2
39/15 39/20 40/17 49/1
49/3 57/14 60/15 60/17
63/14 65/10 76/19 86/5
86/23 90/19 91/3 101/18
101/19 104/25 105/1
105/3 120/21 143/18
152/10 152/12 159/14
187/9 187/10 187/11
187/13 187/18 187/19
187/24 193/9 194/10
194/11 198/6 202/8
202/11 207/8 209/9

214/18 223/3

taken [12] 17/4 24/14
39/2 40/7 41/24 53/9
63/16 105/18 144/22
152/13 194/13 249/3

takes [7] 40/5 163/3
172/18 173/1 196/15
248/19 248/22

taking [11] 33/6 39/18
40/16 41/15 60/19 154/8
154/9 180/22 208/15
242/21 252/24

talk [29] 9/8 10/23 35/15
42/12 42/13 54/13 55/6
56/16 61/1 79/14 82/15
104/6 106/4 115/5
118/22 124/3 125/5
127/21 127/24 131/14
148/24 153/21 173/10
176/24 226/11 226/15
226/18 227/3 234/14

talked [17] 42/13 42/15
83/1 96/20 106/2 127/5
128/10 129/25 134/20
138/25 152/24 168/17
173/25 204/17 220/23
243/19 244/22

talking [37] 35/7 35/14
51/1 51/16 51/20 52/5
65/2 80/17 97/6 98/9
99/20 100/5 100/25
102/24 103/1 103/17
107/2 124/25 125/5
126/18 134/14 136/24
137/17 137/21 137/22
147/15 158/10 158/11
158/19 178/15 219/9
219/12 226/22 246/7
251/21 252/15 252/20

talks [3] 17/3 113/11
114/21

tall [1] 176/14

tape [1] 132/19

tape-record [1] 132/19

taught [5] 67/2 71/3
154/12 162/21 203/6

TD [3] 36/17 36/22 38/4

teach [5] 67/3 72/17
72/19 234/13 234/13

teaching [3] 72/23 73/3
220/20

team [1] 84/6

technical [4] 123/5
169/25 171/3 203/10

technically [3] 65/24
196/8 197/1

technique [3] 114/3
153/4 174/2

techniques [7] 163/14
164/2 190/10 198/14
201/1 201/13 202/13

TECHNOLOGIES [4]
1/6 3/5 22/7 32/8

telephone [1] 119/16

tell [38] 35/11 36/16
36/21 38/5 38/13 38/24

39/1 39/20 61/21 64/6
72/7 74/18 86/6 87/22
88/3 94/18 98/12 99/7
99/11 101/2 103/24
113/3 155/12 161/12
166/11 166/22 167/1
177/9 177/12 178/9
178/13 179/5 182/15
198/10 209/11 218/6
221/5 246/15

telling [12] 4/25 5/4
43/12 76/9 93/1 108/11
126/2 165/7 178/19
186/4 226/25 244/6

tells [6] 36/6 54/15
107/23 158/7 216/15
241/23

Ten [1] 13/5

tended [1] 240/24

tension [2] 56/8 57/3

term [13] 108/12 118/12
189/17 191/2 192/15
203/14 203/19 204/20
205/8 225/9 228/2 229/9
234/7

terms [7] 69/4 99/8
153/21 191/8 227/15
227/15 231/14

test [16] 33/2 33/3 34/11
34/12 62/2 62/2 164/8
164/23 165/12 166/18
166/24 167/17 167/21
168/9 181/13 181/21

tested [5] 20/11 34/11
34/15 34/16 61/24

testified [26] 13/10
13/11 16/9 23/17 40/1
71/7 78/5 86/13 89/21
90/18 95/18 99/19 102/1
104/13 110/8 110/11
126/24 138/18 142/17
144/2 151/22 163/7
172/17 232/19 233/23
240/3

testify [13] 5/20 19/17
19/23 19/24 20/6 21/19
25/11 82/9 91/24 107/16
132/25 220/3 252/9

testifying [6] 87/1 93/24
99/10 99/22 99/23
100/10

testimonies [1] 22/21

testimony [47] 10/25
11/6 18/10 18/24 21/6
23/7 40/20 41/19 50/6
50/13 57/5 59/6 59/18
60/21 61/13 64/12 78/25
81/3 82/4 82/10 85/24
86/20 101/21 102/8
105/13 113/18 120/15
124/5 126/16 145/14
145/15 145/21 167/10
172/17 204/8 209/10
209/11 216/1 216/5
216/25 217/2 217/8
218/1 219/2 247/18

250/2 255/8

testing [15] 33/16 36/2
38/22 38/23 38/25 39/4
62/9 153/9 163/21
166/22 166/23 167/8
175/8 179/8 181/7

tests [17] 153/9 164/15
165/5 165/9 165/10
165/17 165/20 166/6
166/9 166/13 166/14
166/19 166/21 167/11
167/14 179/24 183/14

Texas [1] 58/18

text [2] 67/10 154/11

texts [5] 66/24 68/3 71/2
162/21 201/11

thank [41] 11/25 31/3
31/4 31/12 43/22 48/24
48/25 51/13 51/14 63/8
64/2 64/10 64/14 64/15
64/20 65/8 65/17 82/1
105/17 133/14 133/16
143/23 175/23 175/25
187/3 188/2 193/3
194/12 194/17 235/7
235/8 240/14 242/25
245/3 248/9 249/23
249/24 250/3 253/20
253/22

thankfully [1] 204/16

Thanks [1] 176/5

that after [1] 27/8

that's [224] 3/17 5/12
6/22 8/16 8/17 8/18 10/8
11/1 12/15 16/16 19/3
21/3 21/4 22/14 22/24
22/15 23/22 26/12 26/14
27/18 27/18 30/23 35/23
40/18 41/22 43/8 44/23
45/11 46/25 49/21 52/3
52/7 53/22 56/1 57/14
58/12 59/20 63/13 66/13
66/18 66/20 69/18 72/10
72/14 72/15 73/17 73/20
74/6 75/8 75/12 76/19
80/9 80/16 80/19 80/23
81/4 81/20 82/16 83/13
85/24 86/7 86/11 87/6
87/11 87/13 87/13 87/21
88/5 90/8 91/6 92/23
93/7 94/1 95/18 97/6
97/10 99/9 99/23 100/20
101/15 101/18 102/18
104/8 104/21 107/15
109/13 109/18 109/20
110/21 112/2 112/20
112/25 113/2 115/5
117/3 117/14 118/15
118/23 119/2 122/3
122/12 124/4 127/9
128/20 128/22 129/16
133/24 134/4 134/4
135/7 135/10 136/11
140/14 141/9 144/1
144/6 144/13 144/17
145/14 146/6 146/12

146/25 147/5 147/13
147/18 147/22 148/16
148/16 148/19 150/6
150/7 150/8 151/17
152/7 153/2 153/12
154/2 154/7 154/10
155/14 156/5 157/3
157/12 157/14 158/14
159/11 159/22 160/11
163/6 163/7 163/11
163/17 163/19 165/13
165/13 166/18 166/25
167/6 168/14 168/19
169/5 169/10 169/15
169/18 169/23 170/16
172/16 174/10 177/8
179/6 180/2 180/23
183/3 183/6 183/8 184/2
184/11 185/4 185/5
185/8 185/9 187/5
187/17 187/23 188/25
189/12 189/14 191/17
193/24 193/25 195/21
204/8 206/3 206/22
210/17 211/8 213/23
216/2 221/2 222/20
230/19 231/25 234/3
234/15 234/18 235/15
240/6 240/9 241/22
242/5 242/17 243/25
244/7 245/2 246/19
246/22 246/25 247/17
248/5 248/16 249/11
249/18 252/21 253/2

the class [1] 193/22

theme [1] 33/1

themes [2] 140/3 140/9

themselves [2] 126/2
126/19

theoretical [3] 60/5
149/17 177/10

theories [1] 20/25

theory [11] 53/4 53/6
53/6 54/1 54/3 55/9
57/22 60/13 60/18 60/24
61/8

there's [97] 3/10 5/9
8/25 10/18 10/20 12/12
14/12 16/20 20/16 21/17
24/10 24/23 27/14 27/24
28/9 28/10 28/11 29/12
29/13 29/22 34/25 40/4
41/11 48/21 51/23 52/13
52/14 52/16 52/20 53/6
53/8 54/5 54/14 54/18
54/23 55/1 55/12 56/7
60/21 61/13 62/5 62/7
62/23 67/5 67/23 70/20
71/4 71/18 75/6 88/14
95/9 96/7 100/8 106/13
107/24 115/15 121/13
124/1 126/21 128/8
139/12 141/18 142/22
144/10 151/18 159/15
159/20 167/21 168/1
170/3 170/4 171/19

(WITNESSNAME)                                                                Index: there's.. ..try

# T

**there's... [25]** 172/7
175/17 177/10 177/12
181/13 182/5 182/6
204/12 204/24 207/17
214/10 218/3 218/13
221/4 242/10 242/12
244/12 247/1 247/2
247/10 248/24 253/2
**therefore [7]** 112/6
149/6 165/1 172/14
212/4 220/9 248/15
**thermal [2]** 32/12 32/14
**thermally [1]** 32/17
**they'll [3]** 5/5 11/7 21/14
**they're [44]** 8/14 9/15
10/7 11/20 13/23 13/24
14/3 17/23 21/15 21/19
23/12 24/2 24/3 28/13
30/5 36/20 38/12 41/13
41/14 43/11 46/14 51/1
54/2 54/21 62/1 70/8
124/10 128/13 160/2
166/22 174/8 174/15
181/24 183/24 185/21
192/11 192/21 207/21
208/22 230/3 232/4
244/13 244/20 247/4
**they've [20]** 13/24 16/16
17/17 17/18 22/6 22/8
25/22 35/9 39/8 48/6
56/3 57/2 97/9 98/5
125/6 168/23 177/5
221/1 221/2 244/22
**thing [28]** 4/19 36/11
37/25 40/18 56/7 57/19
59/1 62/15 79/25 80/15
100/18 114/20 125/17
142/15 145/16 149/25
153/23 155/21 158/1
158/23 158/25 159/17
165/8 174/17 178/9
179/6 202/24 249/20
**things [37]** 15/16 22/9
22/10 26/11 39/5 54/21
60/1 61/18 62/4 62/5
62/10 63/4 66/15 68/11
74/15 75/21 112/10
116/7 116/19 120/25
122/3 140/17 144/9
145/1 153/8 153/10
160/1 178/16 180/7
181/23 183/25 189/25
197/3 197/18 205/21
232/15 247/13
**think [104]** 3/18 4/8
4/19 4/25 6/4 6/21 8/20
15/20 19/18 26/12 33/19
40/14 46/25 50/23 55/24
65/14 68/12 68/13 69/7
69/8 69/24 70/4 70/20
70/23 72/4 72/10 76/20
79/20 80/14 82/7 82/22
83/6 90/15 94/7 111/18
112/23 114/11 114/24

117/17 118/12 120/2
120/15 121/20 123/10
123/13 123/15 123/21
126/1 126/11 126/17
128/22 131/13 132/15
133/6 136/5 144/1 145/1
145/18 145/18 151/20
152/3 152/9 152/24
153/16 160/9 160/10
161/2 161/21 162/15
166/19 167/14 168/7
169/6 172/12 174/11
176/6 176/7 176/8
176/13 176/17 178/1
178/7 179/11 181/12
182/23 184/9 185/1
186/3 186/12 187/6
187/13 191/2 192/9
204/16 205/11 207/12
216/19 217/11 219/18
234/24 236/11 246/7
248/11 252/14
**thinking [1]** 84/9
**third [5]** 41/19 86/13
137/19 139/17 214/15
**thorium [5]** 33/9 34/20
35/12 36/22 39/1
**those [115]** 5/16 9/18
17/16 20/11 20/11 25/13
32/11 34/12 34/16 35/2
35/17 39/10 41/12 44/21
59/16 60/1 68/4 69/10
69/11 75/17 80/20 81/10
82/4 83/22 85/22 85/22
86/3 87/18 88/4 88/7
88/9 88/9 88/13 91/12
91/24 91/25 92/2 92/6
92/7 93/1 93/14 93/16
95/10 99/16 99/16 99/18
100/11 100/12 100/13
101/2 101/3 101/3 107/2
107/14 107/25 108/14
110/25 112/6 116/18
116/19 117/15 117/18
118/2 118/11 118/20
120/19 124/21 127/21
128/7 128/13 129/8
129/14 134/25 137/24
138/4 138/5 147/20
151/5 156/9 156/12
164/9 166/16 166/21
172/14 178/16 179/2
181/3 184/20 190/8
198/13 198/23 199/1
200/11 200/25 201/7
202/12 204/7 207/21
208/13 210/15 210/21
211/2 214/2 221/21
226/18 227/5 229/7
232/15 233/20 234/24
237/10 238/7 238/19
240/24 248/4
**though [9]** 7/11 8/25
21/8 33/24 34/1 114/21
123/15 233/11 242/6
**thought [11]** 15/2 20/1

20/4 291/19 99/19 100/4
118/16 119/9 138/5
172/23 215/14
**thousand [2]** 52/23
58/13
**thousands [1]** 8/23
**threat [1]** 55/13
**three [27]** 3/20 11/1
82/11 89/5 91/12 91/19
91/24 91/25 92/17 159/3
159/4 159/6 160/18
164/21 167/3 167/19
190/11 196/24 198/25
205/25 206/2 208/2
212/18 246/2 247/3
247/4 247/16
**throat [1]** 176/3
**through [45]** 3/19 3/23
9/6 12/13 14/18 14/18
15/16 22/21 26/16 31/1
32/18 35/24 40/16 40/17
40/19 41/6 47/10 49/10
58/13 60/6 69/23 88/18
98/24 98/25 108/15
110/15 110/16 120/3
121/15 121/17 132/20
135/2 142/18 188/12
197/2 198/10 202/20
204/19 205/19 213/9
215/24 218/5 218/17
219/4 238/7
**throughout [10]** 17/1
176/24 177/1 183/9
185/9 195/10 195/15
200/10 202/17 205/6
**throw [2]** 51/4 151/15
**tickets [2]** 42/2 42/3
**tie [1]** 239/14
**tight [1]** 161/6
**timeframe [6]** 28/1
156/6 157/24 159/11
208/1 249/15
**timekeeper [1]** 3/16
**timeline [1]** 89/4
**times [13]** 15/1 32/7
34/21 37/6 40/12 40/12
42/6 58/6 58/13 114/5
149/3 151/23 225/6
**today [21]** 4/12 23/15
26/19 26/20 27/1 32/21
53/5 81/4 119/10 130/22
132/24 137/14 137/23
145/17 171/17 173/11
175/14 188/10 207/4
213/8 244/4
**together [5]** 58/9 90/9
202/9 202/11 253/23
**told [20]** 36/13 38/10
42/19 68/11 69/19 83/25
84/1 87/18 125/22 134/4
134/17 155/18 169/16
182/2 185/16 190/16
194/23 195/1 252/21
252/22
**Tom [1]** 167/9
**tomorrow [2]** 253/23

254/4
**too [7]** 3/22 13/15 22/24
40/16 41/9 134/16
200/22
**took [9]** 6/8 39/20 40/11
40/14 70/13 84/6 115/20
115/22 186/7
**tools [1]** 201/13
**top [5]** 13/5 32/5 72/3
140/8 207/9
**topic [2]** 59/18 152/9
**topics [1]** 82/4
**tort [1]** 10/2
**totally [1]** 144/1
**touch [1]** 79/13
**toward [1]** 171/22
**towards [2]** 64/4 247/9
**towels [1]** 42/14
**Toxic [1]** 224/13
**trace [6]** 55/7 56/21
61/18 61/19 177/12
179/7
**traces [2]** 55/4 55/5
**track [1]** 3/17
**tracking [1]** 206/1
**tract [2]** 192/19 193/12
**tracts [1]** 194/23
**traditional [2]** 44/8 45/5
**traditionally [1]** 6/9
**training [1]** 239/22
**transacted [1]** 93/1
**transaction [9]** 94/24
95/19 96/18 96/21 97/3
98/6 199/23 221/5
231/21
**transactional [12]** 29/6
29/9 139/23 140/3
140/16 140/20 140/21
230/4 230/7 230/9
230/13 230/15
**transactions [16]** 76/4
76/5 87/8 89/5 89/12
90/6 90/12 91/21 91/24
92/1 92/2 92/3 92/7
121/13 150/12 173/12
**transcend [1]** 96/9
**transcript [2]** 1/12
256/8
**transgression [1]** 44/12
**translate [1]** 100/14
**transmission [1]** 179/2
**transparency [1]** 126/21
**transpire [1]** 244/17
**transport [6]** 59/19 62/7
237/15 237/15 238/22
238/23
**transported [1]** 177/5
**trapped [1]** 46/7
**Trawick [1]** 7/4
**treated [2]** 32/17 33/23
**treatment [2]** 32/12
32/14
**tremendous [2]** 108/24
109/8
**tremendously [2]** 47/12
137/20

**trench [2]** 37/22 37/23
**trend [79]** 25/25 26/3
27/20 27/21 76/1 76/9
76/14 79/14 79/16 79/20
79/20 79/24 80/1 80/3
80/7 80/9 83/9 87/11
87/12 87/15 88/8 144/17
152/18 152/25 153/14
153/22 153/23 154/13
157/2 161/12 162/2
162/5 162/12 162/13
162/25 163/13 164/1
164/9 164/16 165/16
166/16 167/5 167/12
167/20 172/9 173/7
173/13 196/13 201/9
201/14 201/19 202/19
203/23 206/19 206/23
206/24 207/1 207/4
208/14 209/1 209/2
209/16 213/10 229/6
231/24 246/1 247/22
248/17 248/17 251/22
252/18 252/23 252/24
253/3 253/5 253/7 253/8
253/10 253/15
**trended [2]** 206/12
208/1
**trending [2]** 159/5
160/15
**trends [6]** 29/9 160/17
162/9 162/9 208/3
214/10
**trespass [1]** 6/7
**trial [4]** 5/19 5/20 20/14
179/25
**trial's [1]** 5/23
**trials [1]** 8/23
**trichlorethylene [1]**
182/2
**tried [1]** 5/19
**trier [6]** 11/15 101/21
102/3 102/5 102/6 102/8
**trouble [1]** 240/12
**Tru [6]** 33/13 34/5 39/15
39/16 42/2 46/17
**truck [2]** 48/5 237/15
**trucked [1]** 177/5
**truckers [3]** 60/15 60/18
60/22
**trucking [16]** 33/5 33/13
34/5 39/15 39/16 42/2
46/17 53/5 59/9 60/13
60/24 61/8 61/8 61/14
186/10 238/23
**trucks [5]** 33/13 39/25
41/6 53/9 191/19
**true [7]** 38/14 77/14
100/20 101/15 114/1
154/7 221/5
**Trujillo [9]** 39/20 39/22
39/22 39/25 40/1 40/9
40/18 41/17 41/21
**truth [3]** 13/11 35/25
221/7
**try [14]** 3/17 12/6 12/13

{WITNESSNAME}                                                                    Index: try.. - valued

**T**

**try...** [11] 15/18 51/8 64/3 131/5 141/4 144/11 188/11 197/2 234/10 234/10 234/13
**trying** [18] 13/24 18/9 43/11 70/19 86/13 126/4 132/2 132/16 154/25 164/22 167/17 167/20 177/21 213/24 218/7 218/8 229/3 244/19
**tumors** [1] 35/12
**tune** [1] 181/20
**tuning** [1] 212/15
**turn** [5] 140/10 145/20 152/18 168/5 219/16
**turned** [2] 135/21 206/2
**turnpike** [4] 40/11 40/23 41/4 51/6
**turns** [1] 173/8
**twice** [1] 114/4
**two** [63] 3/18 3/20 9/21 14/9 21/10 24/14 26/11 33/12 34/19 36/21 41/25 55/18 60/1 61/19 70/15 78/7 81/15 82/12 83/16 83/17 85/7 87/5 87/18 88/4 88/13 96/16 99/3 106/8 107/7 136/21 137/6 139/2 140/2 140/8 141/19 144/15 145/5 151/5 158/2 158/4 160/14 190/5 191/16 195/24 196/24 203/10 206/7 206/12 206/14 208/4 209/16 209/19 210/10 211/6 212/21 222/17 229/4 230/11 243/14 245/16 246/10 247/13 248/18
**two percent** [1] 36/21
**two-acre** [1] 191/16
**type** [8] 25/12 126/10 153/17 155/14 199/14 200/8 214/21 222/5
**typicality** [2] 29/21 29/21
**typically** [2] 191/13 207/22
**typically -- I** [1] 191/13

**U**

**ubiquitous** [5] 78/14 78/20 79/2 79/6 195/14
**ultimate** [1] 225/24
**ultimately** [7] 4/23 5/12 5/17 5/25 13/18 13/18 18/6
**unable** [3] 51/9 99/13 170/23
**unaffected** [1] 184/22
**unaware** [1] 108/11
**uncertainties** [1] 43/5
**uncertainty** [4] 43/7 43/8 43/9 239/19
**unchallenged** [1] 16/6

**unclear** [2] 54/17 54/20
**uncontaminated** [2] 184/23 233/25
**undamaged** [1] 234/1
**under** [34] 8/4 9/10 10/4 10/10 12/16 21/8 25/16 49/8 49/11 49/21 50/3 50/13 55/8 69/11 70/3 92/8 93/4 99/17 105/11 105/22 106/19 116/22 133/22 135/8 166/2 222/9 231/21 233/5 233/17 233/20
**underground** [1] 19/4
**underlying** [5] 130/12 196/3 202/12 202/13 227/25
**underneath** [3] 34/9 38/5 47/17
**understand** [25] 6/22 77/16 79/16 83/16 100/7 100/11 102/5 109/21 110/1 110/3 117/17 132/6 132/14 132/16 146/1 149/24 175/4 181/24 192/6 195/7 198/13 200/25 207/19 217/1 228/16
**understanding** [6] 77/9 109/23 178/7 178/8 193/17 202/7
**understands** [1] 146/21
**understood** [5] 109/20 174/16 179/18 243/18 252/21
**underwater** [1] 207/21
**undetermined** [1] 239/6
**undisclosed** [1] 233/7
**undisputed** [1] 60/25
**unencumbered** [2] 27/16 27/17
**unfair** [5] 123/5 123/7 123/13 217/12 217/22
**unfortunately** [2] 208/9 225/25
**unfounded** [1] 60/5
**uniform** [3] 67/11 195/15 197/19
**uniformity** [2] 195/7 195/9
**uniformly** [2] 49/16 148/1
**unimpaired** [32] 26/17 74/10 74/16 74/25 75/17 87/8 89/12 90/11 92/19 98/19 100/1 146/2 146/8 146/9 146/14 146/25 147/2 147/3 147/24 150/1 150/4 150/23 151/6 151/10 151/15 152/2 210/6 211/17 212/4 212/11 212/18 240/5
**unit** [1] 191/3
**UNITED** [8] 1/1 1/6

1/14 2/9 32/7 32/8 214/11 214/14
**universe** [5] 163/25 164/6 164/13 164/18 165/13
**unless** [1] 11/10
**unlike** [3] 141/3 141/5 168/16
**unpack** [2] 144/11 146/1
**unplugged** [1] 68/19
**unpolluted** [1] 184/22
**unprecedented** [2] 54/4 54/5
**unquestionable** [1] 94/1
**unquestionably** [2] 93/16 206/3
**unquote** [1] 229/2
**unreasonable** [1] 126/6
**unreasonably** [1] 16/10
**unrelated** [1] 239/7
**unstigmatized** [1] 184/23
**until** [6] 27/12 37/18 187/14 200/1 207/4 232/10
**unworkable** [2] 54/4 54/8
**update** [3] 73/22 74/3 79/10
**updated** [2] 73/25 136/23
**updating** [1] 111/23
**upon** [23] 74/25 81/9 81/17 84/6 132/17 162/22 163/11 173/11 181/10 235/23 236/6 236/7 236/12 238/22 238/11 238/14 238/21 238/25 239/21 246/20 250/7 250/10 250/13
**ups** [2] 245/4 245/5
**urban** [1] 214/16
**urge** [1] 5/14
**us** [61] 12/20 33/2 35/11 36/13 39/11 39/20 41/21 45/9 64/6 64/7 64/25 65/9 65/10 67/5 67/23 68/7 68/11 69/19 72/1 72/2 72/7 76/3 80/23 86/1 86/15 94/18 99/11 101/2 101/10 103/24 108/11 147/9 149/22 158/7 166/11 166/22 167/1 167/7 170/23 170/24 187/10 187/21 190/24 192/11 192/13 192/13 194/23 195/1 196/17 196/18 198/10 198/10 205/4 205/15 208/5 209/12 209/15 215/3 221/5 241/23 251/22
**used** [86] 3/18 22/5 22/5 22/6 22/8 22/9 22/12 22/18 25/22 26/15 29/6 29/8 29/9 30/8 31/11

32/19 33/2 37/1 42/9 43/19 43/21 66/1 66/5 66/19 70/21 73/14 76/25 78/3 78/22 82/22 87/13 88/21 106/9 108/12 111/24 113/8 114/4 130/21 131/19 131/20 131/25 134/17 136/19 136/20 137/20 137/25 138/1 139/2 139/3 147/8 147/10 147/24 148/1 148/3 148/7 148/8 148/11 148/14 148/23 148/25 149/9 149/18 161/13 170/25 183/17 189/18 191/2 192/3 220/24 221/12 221/14 229/9 229/21 229/25 230/6 231/15 234/7 236/4 236/15 236/21 237/4 238/12 238/14 239/22 240/4 245/16
**useful** [6] 13/16 75/23 166/12 166/22 220/25 221/9
**users** [1] 199/12
**uses** [2] 21/21 192/5
**using** [42] 23/8 42/20 46/12 47/18 74/7 86/9 90/5 106/4 110/9 111/5 116/12 117/25 129/9 129/17 130/7 130/24 131/10 131/23 133/1 134/11 138/7 148/10 148/16 150/16 150/21 151/7 155/17 163/14 163/22 171/14 176/7 190/10 192/15 207/1 212/7 212/11 212/19 224/6 224/23 228/2 234/15 249/8
**usually** [1] 164/4
**UTC** [28] 18/14 22/7 35/7 35/14 35/14 38/12 39/9 39/20 40/20 41/2 41/14 41/15 42/7 42/10 42/20 42/23 42/23 43/2 45/2 46/22 237/8 237/23 238/3 238/18 239/1 239/14 239/17 239/20
**utility** [1] 203/5
**utilize** [2] 190/25 197/8
**utilized** [6] 161/14 193/11 201/4 207/4 213/15 220/19
**utter** [1] 35/3

**V**

**vacuum** [1] 160/1
**valid** [6] 58/3 58/4 132/17 164/23 166/17 215/4
**validate** [2] 163/13 171/12
**validating** [1] 163/24
**validation** [3] 84/17

84/17 164/1
**validity** [2] 132/12 153/9
**valuable** [1] 155/6
**valuation** [28] 29/8 68/12 69/20 69/25 70/10 73/2 73/5 83/4 83/8 112/10 112/16 112/24 113/5 113/9 116/7 142/14 143/4 168/5 174/2 186/13 201/12 203/8 203/12 212/9 216/1 221/6 227/11 234/16
**valuations** [1] 25/25
**value** [167] 12/18 26/17 26/18 26/22 33/21 45/14 46/8 47/10 62/12 62/14 62/18 62/21 62/22 65/23 66/12 66/17 66/20 67/1 67/1 67/4 69/14 72/21 73/11 73/19 74/8 74/12 74/16 74/22 74/23 74/25 75/2 75/6 75/12 75/16 75/20 76/6 77/7 78/17 78/23 79/18 81/11 81/18 83/3 87/23 88/15 91/1 92/20 94/14 95/23 97/21 98/14 98/19 98/19 98/22 99/7 100/1 100/1 100/2 100/12 100/13 100/15 100/22 101/7 101/12 101/17 101/24 102/10 102/19 107/3 107/6 107/12 107/14 107/21 107/24 108/2 108/4 131/13 141/2 141/14 141/21 142/11 144/16 145/3 145/7 146/3 146/3 146/5 146/8 146/9 146/10 146/14 146/15 146/19 146/22 147/12 147/3 147/16 150/1 150/2 152/3 152/22 154/6 161/15 167/22 169/22 181/13 182/16 183/22 184/15 185/1 185/8 196/11 196/21 199/14 199/15 199/15 199/16 199/17 200/8 208/10 210/24 211/3 211/5 211/17 212/6 212/11 212/18 212/20 213/19 214/1 214/3 214/24 215/2 215/5 219/23 219/25 220/10 224/7 227/5 228/23 230/24 231/12 231/15 231/17 232/2 232/8 232/16 232/21 232/24 232/25 233/1 233/9 233/18 238/10 240/25 240/25 243/19 243/22 244/6 244/9 244/11 244/14 244/16 244/17 244/22 244/24 247/11
**valued** [2] 27/23 27/24

{WITNESSNAME}                                    Index: values..where

**V**

**values [22]** 25/15 33/20
57/10 57/15 74/11 75/17
115/17 137/19 140/11
150/5 151/6 183/8
201/23 205/7 205/17
207/20 210/6 231/6
234/22 235/14 241/9
242/16
**variable [2]** 214/19
247/17
**variables [4]** 156/3
163/3 214/20 248/4
**variety [2]** 221/9 221/14
**various [7]** 71/25 104/16
128/23 141/22 196/1
205/4 253/9
**vegetation [1]** 42/5
**vehicles [1]** 24/24
**verified [1]** 189/20
**verify [4]** 84/7 106/25
190/6 190/20
**version [3]** 51/17 52/22
113/17
**versus [20]** 3/4 6/14
26/10 45/19 48/1 49/22
87/17 88/9 91/4 92/18
97/19 165/17 166/5
166/6 203/15 211/21
213/21 216/19 219/10
225/7
**very [66]** 6/4 7/11 10/23
13/22 13/22 33/7 36/25
43/22 44/21 47/14 65/8
65/17 69/7 69/8 69/9
112/2 133/3 137/9
137/17 137/21 138/19
138/22 138/23 155/4
155/12 156/12 157/23
158/2 158/7 158/18
158/25 159/13 160/7
160/17 161/6 166/11
170/8 176/11 184/16
190/1 190/11 191/7
191/7 192/12 193/14
197/10 205/19 206/1
206/12 207/17 208/1
220/25 221/9 222/5
225/14 235/7 235/8
239/6 243/4 243/6 243/6
243/7 244/14 247/2
249/5 250/3
**viable [1]** 62/7
**vicinity [7]** 18/20 28/1
54/2 54/6 54/11 54/22
55/1
**victim [1]** 46/3
**victims' [1]** 34/7
**Video [5]** 85/11 85/20
104/3 104/20 143/24
**view [4]** 15/16 18/13
50/23 65/6
**virtue [1]** 108/5
**visual [2]** 157/7 157/20
**vitiating [1]** 39/12
**Vogel [1]** 125/4

**volume [3]** 1/11 250/10
250/19
**voluminous [1]** 4/15
**voluntarily [1]** 13/16

**W**

**wait [2]** 65/12 103/11
**waiting [2]** 87/24 98/21
**waiver [1]** 45/8
**walk [4]** 12/13 88/18
198/10 205/19
**walked [1]** 204/19
**walking [4]** 129/21
133/9 141/9 228/1
**walls [1]** 42/6
**wanna [2]** 158/21
171/25
**want [69]** 3/21 7/18 9/8
9/21 11/13 14/9 15/18
43/7 43/20 43/24 47/13
47/24 65/2 65/12 70/13
79/13 86/8 88/18 94/5
108/6 113/4 117/23
117/24 141/17 150/15
152/10 155/21 155/22
156/1 156/25 158/22
159/22 160/2 168/5
168/9 174/7 174/17
174/19 187/16 187/19
187/21 188/9 188/11
193/9 195/12 199/5
203/13 204/14 207/22
207/22 208/10 211/18
218/17 218/18 219/14
222/17 232/11 232/12
232/12 238/6 238/7
239/17 241/17 241/23
242/14 242/18 243/14
243/15 246/6
**wanted [16]** 4/17 15/6
39/20 117/24 118/4
118/7 133/14 157/16
166/24 168/17 177/22
178/8 178/21 190/15
246/24 248/12
**wants [5]** 43/8 44/23
122/1 167/17 216/22
**Washington [3]** 147/12
148/8 197/15
**wasn't [13]** 7/25 112/11
118/2 124/17 130/10
140/17 156/2 156/2
156/17 156/18 180/22
183/2 248/23
**waste [10]** 3/25 32/10
37/6 37/18 37/23 214/16
223/11 224/18 224/18
224/23
**wastes [7]** 178/3 178/23
180/25 181/4 223/8
223/16 224/1
**water [19]** 15/2 29/2
29/3 34/24 46/9 47/16
48/12 114/15 175/20
175/24 176/24 176/25
177/2 177/5 177/10

177/17 215/17 237/15
238/22
**water-dependent [1]**
177/14
**waters [1]** 167/14
**Watkins [3]** 89/7 89/16
92/25
**ways [1]** 48/15
**we'll [30]** 11/7 12/12
57/5 63/15 74/10 74/21
75/16 88/25 105/16
106/6 113/16 116/11
120/22 151/3 151/4
151/24 152/1 152/12
170/3 171/25 187/17
187/18 187/20 187/22
187/24 188/10 193/9
193/10 253/23 254/4
**we're [73]** 3/14 4/5 4/12
14/1 18/7 18/9 23/12
23/15 30/3 31/18 40/15
43/1 47/9 51/9 51/16
54/22 57/6 64/12 73/1
75/1 75/14 86/9 97/6
97/18 98/21 100/7
105/24 107/17 107/18
115/5 126/4 130/15
136/24 137/22 147/15
149/3 151/23 154/25
156/7 156/8 156/8 156/9
156/12 163/17 163/19
163/20 163/24 164/5
164/6 164/12 164/12
164/18 164/20 166/20
166/20 166/23 167/2
167/8 167/16 171/24
185/7 185/8 186/1
187/14 199/19 200/2
205/15 209/12 209/13
211/12 214/23 219/15
240/12
**we've [52]** 5/11 13/23
20/18 21/13 23/16 30/15
34/11 34/11 35/10 39/19
41/19 44/16 44/18 44/20
54/21 83/1 86/24 89/13
93/20 113/22 126/22
129/13 135/22 135/23
147/8 148/1 162/10
166/8 168/6 168/7 172/8
172/10 179/10 181/22
181/24 182/4 182/5
182/6 184/13 185/17
186/4 193/11 198/15
198/25 199/8 199/12
199/20 200/10 205/3
212/1 213/3 213/9
**we-are-in-the-vicinity-of
[1]** 54/6
**web [4]** 168/12 170/18
171/10 171/13
**web-based [4]** 168/12
170/18 171/10 171/11
**week [12]** 3/15 3/23 5/18
5/22 7/17 8/21 11/7 11/9
12/21 16/7 38/23 58/23

**week, [1]** 17/1
**week, 1,4-Dioxin [1]**
17/1
**weigh [3]** 42/2 42/2 50/6
**weight [18]** 18/23 21/6
70/4 70/15 70/17 71/8
72/4 73/2 73/4 73/6 73/7
73/8 83/7 196/3 196/6
196/7 196/25 202/15
**weighted [10]** 67/6
67/24 67/25 67/25 68/8
68/11 68/12 69/20 69/25
70/10
**weighting [5]** 67/14
67/15 67/17 71/12 72/8
**Weinberg [1]** 2/22
**welcome [3]** 235/9 245/7
245/8
**well [170]** 3/13 3/16
10/24 21/18 25/1 29/17
31/16 40/13 42/17 42/17
43/8 51/4 58/17 65/24
66/22 68/6 68/10 71/1
71/7 72/3 74/17 77/9
78/5 82/3 82/13 87/12
88/10 88/17 91/18 91/19
93/7 93/19 94/2 94/25
96/3 99/6 100/10 101/5
101/16 102/12 103/5
103/24 107/9 107/15
108/3 110/14 110/22
111/12 112/16 114/15
115/6 117/11 118/7
119/1 119/11 119/14
120/6 120/21 121/18
121/23 124/17 124/20
124/24 125/17 126/4
126/21 128/4 128/8
129/8 130/5 132/6 133/3
134/14 135/22 137/11
137/17 137/21 138/19
138/22 138/23 138/23
141/18 143/18 144/10
145/1 147/8 149/2
149/20 149/24 150/21
151/2 151/18 153/21
154/7 154/13 154/18
157/7 157/19 158/1
158/10 158/25 159/24
160/13 160/13 160/23
161/23 162/1 162/19
163/16 164/11 165/19
166/8 166/18 166/25
168/23 171/15 172/6
172/16 174/3 174/15
174/25 175/6 177/1
177/13 177/15 177/19
178/13 179/15 180/20
184/11 185/4 186/19
188/9 189/25 191/7
193/14 198/12 201/10
208/1 211/12 211/25
213/8 214/11 214/24
218/4 218/24 220/25
222/2 222/12 225/13
225/17 226/6 227/6

230/2 232/4 233/23
234/13 242/5 244/12
244/14 246/14 247/13
248/5 248/15 249/11
249/14 251/1 251/2
252/3 252/20
**well-advised [1]** 232/4
**well-done [1]** 162/19
**well-known [1]** 58/17
**well-steeped [1]** 161/23
**wellfield [1]** 46/11
**Wellington [1]** 56/1
**wells [10]** 20/8 20/9
20/11 20/11 20/11 20/13
114/13 176/20 225/15
225/15
**Wendroff [3]** 31/22 33/8
33/12
**went [22]** 24/20 28/7
32/11 34/6 42/15 42/17
61/23 110/14 110/16
112/9 113/9 115/20
119/1 119/7 120/12
125/21 127/6 132/20
188/12 190/2 251/25
252/5
**weren't [5]** 75/10 103/3
166/9 167/20 178/19
**west [12]** 1/8 1/20 2/12
2/16 2/21 17/21 18/16
19/7 42/12 51/3 52/4
52/8
**whack [1]** 28/12
**what's [16]** 26/24 33/18
34/4 37/13 49/21 59/5
70/9 86/25 112/18 134/1
155/16 158/20 195/22
208/20 215/2 243/12
**whatever [22]** 9/16
42/18 52/17 69/15 74/15
93/17 93/25 96/1 96/12
131/24 133/2 134/12
153/13 155/17 155/17
159/7 172/14 206/14
206/15 208/15 219/1
234/11
**whatever's [1]** 247/23
**whatsoever [4]** 203/23
203/25 204/3 204/5
**Wheeler [1]** 2/22
**where [107]** 7/3 7/7
12/10 15/6 16/20 20/12
26/16 29/23 33/11 33/13
34/5 36/1 37/11 39/25
41/22 43/12 49/22 52/3
52/8 54/10 54/11 54/14
54/15 54/16 55/16 56/4
58/6 58/14 59/23 60/19
61/21 62/17 65/1 65/22
71/5 73/14 82/3 84/19
86/24 87/7 87/15 87/16
89/11 89/17 90/13 96/22
107/23 108/22 109/4
110/19 111/1 113/9
115/1 120/3 122/23
124/8 127/6 127/10

(WITNESSNAME)
Index: where..-you're

**W**

**where... [49]** 127/10
134/1 135/1 136/18
138/10 138/13 139/6
139/12 139/12 140/6
141/6 145/22 146/25
147/2 147/14 148/23
148/24 150/1 151/9
151/13 157/1 160/20
160/24 162/15 165/14
167/10 172/7 174/19
175/8 177/12 178/3
178/21 180/20 184/4
186/8 186/13 187/13
200/22 203/2 204/18
204/20 217/5 217/9
221/14 223/7 223/15
229/25 230/6 251/21
**whereas [1]** 247/25
**wherever [1]** 116/9
**whether [77]** 10/24
10/25 10/25 11/20 41/7
45/14 50/4 56/9 57/8
57/15 57/21 57/22 57/25
58/1 59/20 61/16 62/12
77/5 77/6 81/23 93/3
93/5 94/18 94/19 96/7
97/13 97/14 98/10 98/13
99/11 101/2 101/2 101/3
104/5 107/19 107/20
107/24 128/20 155/5
164/8 164/9 165/3 165/4
166/16 168/23 171/16
171/18 178/21 181/13
184/24 185/21 186/12
194/21 195/18 199/16
205/8 210/23 211/2
219/9 222/15 228/5
228/13 229/21 230/23
235/16 235/20 236/20
237/3 237/7 237/14
238/2 238/11 238/14
238/17 238/21 252/7
252/15
**while [10]** 34/4 81/16
83/7 85/25 121/15 140/8
170/17 181/2 196/13
196/15
**whimsical [1]** 189/22
**white [1]** 41/1
**WHITNEY [133]** 1/7
8/12 9/11 10/7 10/11
10/17 13/1 13/2 13/21
15/10 15/22 16/10 16/18
16/23 17/3 17/4 17/5
17/6 17/9 17/11 17/14
17/23 18/4 19/1 19/7
20/1 20/3 20/9 20/19
20/20 20/24 21/4 21/12
21/20 21/21 22/3 22/7
22/8 22/12 23/9 24/6
25/3 27/6 29/5 29/22
29/25 30/11 30/15 32/4
32/7 33/6 33/10 33/23
34/5 34/11 34/16 35/9
35/12 35/20 36/4 36/7

36/10 37/9 37/17 38/1
42/19 44/23 51/19 51/22
52/1 52/2 52/7 53/9 54/2
54/19 55/1 55/22 56/5
56/10 56/13 57/4 57/11
57/12 57/16 59/21 59/24
60/3 60/11 61/2 61/5
62/6 88/22 88/24 89/1
106/7 108/10 109/17
110/4 110/18 111/3
111/16 116/12 120/23
124/10 124/15 128/25
135/15 139/21 144/5
144/7 144/13 170/14
173/22 175/2 175/3
175/8 176/21 181/15
205/17 208/22 212/25
218/13 223/12 224/6
224/14 224/22 228/10
228/14 228/24 229/2
229/4 231/4 234/21
**Whitney's [14]** 12/17
13/4 15/11 16/13 18/1
18/6 33/24 36/16 52/17
52/24 56/15 127/19
130/16 229/3
**who's [9]** 11/4 15/24
16/5 20/15 20/15 96/23
244/1 244/20 251/6
**whoever [1]** 93/16
**whole [8]** 98/2 113/3
114/7 130/24 161/20
186/8 187/9 217/7
**whom [1]** 33/8
**whose [1]** 34/20
**why [51]** 4/25 5/4 10/6
14/18 14/20 19/2 28/17
28/18 28/19 32/21 32/22
32/22 34/22 35/22 43/7
47/19 57/7 63/11 76/15
91/6 108/7 148/16
150/10 154/10 154/11
159/22 161/9 166/4
187/12 189/1 195/6
195/22 199/19 205/2
205/15 208/20 213/21
220/23 222/11 225/12
226/3 227/3 227/23
231/19 233/22 242/5
242/17 247/17 248/5
248/16 248/23
**why'd [1]** 185/23
**wide [28]** 48/21 49/16
50/9 50/10 50/15 52/14
52/14 53/8 53/17 53/25
55/4 91/2 91/14 101/14
102/18 109/16 141/1
141/23 142/3 143/15
144/16 145/3 194/21
202/17 211/20 212/3
212/23 213/18
**widen [1]** 159/1
**widening [4]** 159/8
246/11 249/20 252/11
**widens [1]** 158/12
**wiggle [1]** 184/15

**wildlife... [2]** 15/13 51/23
52/10 52/19 178/5
178/25 234/18
**willing [4]** 170/11 184/5
233/2 233/2
**willingness [2]** 24/20
181/7
**wind [1]** 41/7
**windfall [1]** 244/24
**winds [1]** 42/3
**winning [1]** 25/10
**within [42]** 19/16 28/4
28/8 28/10 28/22 30/2
33/22 34/18 35/10 36/22
68/16 75/9 75/17 84/10
124/4 148/14 148/18
153/16 161/15 163/25
189/6 189/10 189/13
190/8 191/21 192/14
192/16 192/23 193/5
193/21 194/6 194/25
201/21 209/20 213/3
215/10 236/8 237/23
238/9 239/1 239/18
242/2
**without [18]** 12/6 47/21
47/25 57/10 95/1 95/14
96/19 111/22 119/5
119/25 128/20 140/25
141/24 142/11 143/16
154/4 156/12 233/14
**witness [21]** 3/8 3/12
11/4 57/6 63/15 63/19
63/23 63/25 64/16 81/21
94/5 105/12 120/25
175/19 177/21 187/24
192/22 216/22 217/25
218/5 253/24
**witnesses [6]** 3/21 5/19
11/6 13/11 18/11 22/22
**women [1]** 58/10
**won [1]** 203/6
**won't [10]** 3/25 27/6
27/6 29/1 63/4 112/23
172/15 201/9 216/14
218/22
**worded [1]** 240/17
**words [18]** 25/13 25/13
43/6 78/7 84/9 95/3
108/14 110/18 114/13
137/12 144/6 156/7
166/24 196/10 225/14
236/15 242/6 249/8
**work [15]** 25/12 51/13
67/18 74/13 78/10 84/13
111/12 119/6 148/5
171/13 171/23 173/6
211/9 216/16 220/2
**worked [3]** 35/11 36/18
36/19
**workers [1]** 37/4
**working [4]** 37/24
109/11 152/5 161/17
**works [8]** 88/19 89/11
105/5 112/17 122/21
141/15 164/5 168/8

**world [11]** 171/19 172/3
172/11 172/13 173/12
229/21 230/1 230/3
230/8 230/14 244/11
**worried [1]** 39/14
**worries [1]** 38/14
**worth [6]** 172/22 183/11
233/24 233/25 234/3
234/5
**wouldn't [14]** 66/22
83/6 92/3 92/9 114/24
125/25 166/11 166/11
171/24 174/24 176/16
244/10 244/25 253/17
**wrap [1]** 230/21
**wrap-up [1]** 230/21
**written [4]** 61/6 134/1
203/3 215/12
**wrong [8]** 8/11 9/15
13/23 13/24 18/8 20/15
125/17 165/7
**wrote [3]** 8/2 116/25
130/17

**X**

**XYZ [1]** 44/4

**Y**

**yeah [18]** 26/8 80/12
86/11 98/4 130/15 144/1
154/25 158/14 159/3
160/9 162/15 165/23
166/3 167/13 168/4
177/1 199/10 222/24
**year [8]** 48/7 59/25
148/23 161/4 186/6
203/10 214/21 245/16
**yearly [1]** 245/18
**years [25]** 16/9 28/1
34/1 34/3 58/8 115/7
131/19 148/6 148/12
152/5 160/16 171/17
172/19 173/2 181/18
184/14 185/19 186/5
208/8 217/4 232/10
232/13 248/19 248/22
249/3
**yellow [2]** 18/17 84/2
**yes [205]** 11/16 11/16
12/1 36/12 48/16 63/13
63/20 63/22 64/5 64/20
65/7 66/4 66/9 66/13
68/22 69/2 70/1 70/4
71/14 72/22 76/3 76/15
77/2 84/24 87/15 89/9
89/14 97/1 97/7 97/12
105/8 105/15 105/23
106/12 106/17 108/5
108/14 108/20 109/2
109/7 109/10 110/21
111/5 111/25 112/20
113/7 113/14 113/25
114/6 116/17 116/21
117/4 117/8 119/17
120/8 120/11 121/4
121/9 122/5 122/10
122/14 122/17 122/20

124/6 125/8 125/11
125/20 127/13 127/16
129/2 133/17 133/22
134/2 134/8 134/24
135/6 135/17 136/3
136/9 136/13 138/18
139/10 139/15 139/20
140/1 140/14 140/15
140/19 145/14 145/25
146/24 149/16 150/11
150/24 152/23 153/6
154/19 154/21 155/11
155/20 155/25 157/6
157/11 162/4 162/24
163/2 163/4 163/6 163/7
168/11 170/19 170/22
171/5 171/7 171/9
171/22 173/16 173/17
173/17 174/3 174/21
176/23 178/12 178/18
180/6 180/9 183/16
183/19 191/25 192/6
194/8 194/22 195/3
198/4 198/7 198/9
200/19 201/2 201/9
201/15 201/25 202/6
203/1 203/18 204/8
204/22 206/20 207/7
207/11 208/19 209/5
209/22 210/13 213/3
213/20 215/7 217/13
217/16 219/6 219/13
220/15 220/18 220/22
221/20 223/9 223/14
223/19 224/4 224/16
224/20 224/25 225/11
225/21 225/23 226/2
226/13 226/16 226/20
226/23 227/22 229/8
229/12 230/10 233/6
233/19 233/21 234/8
235/4 236/16 237/1
239/12 240/15 240/21
242/24 243/21 245/13
245/23 246/8 246/25
248/10 250/2 250/9
250/12 250/15 253/13
**yet [10]** 25/20 32/10
38/12 75/1 94/13 98/5
145/19 146/16 146/17
152/6
**Yoakley [1]** 2/19
**you'd [8]** 30/12 51/12
93/22 155/21 155/22
156/1 174/17 176/14
**you'll [14]** 5/18 7/17
18/1 58/2 58/23 59/1
59/18 59/22 61/15 62/13
105/21 199/4 208/12
251/3
**you're [92]** 3/11 5/23
6/2 6/25 8/22 8/23 9/4
9/19 10/24 11/21 35/4
35/18 39/14 50/22 52/5
57/24 79/16 81/10 87/22
90/5 93/1 98/9 101/25

## Y

**you're... [69]** 103/24
104/25 105/22 106/24
117/15 120/2 120/2
120/4 120/4 120/12
120/15 125/16 130/5
130/6 130/14 131/10
132/13 145/4 146/21
149/14 150/2 150/11
150/21 153/14 154/3
154/3 154/13 154/20
157/20 158/10 159/21
161/2 161/5 164/22
165/7 165/14 172/2
172/14 173/19 174/11
178/9 181/12 182/14
188/19 200/15 206/18
207/10 213/17 213/24
216/10 216/11 217/6
217/10 218/6 218/20
218/20 218/24 219/11
232/9 234/11 235/9
242/11 244/6 246/7
247/11 249/11 251/1
251/21 252/3
**you've [44]** 3/16 3/24
22/20 31/11 43/19 43/21
46/16 68/6 97/2 101/13
111/2 117/5 124/9
131/16 135/11 146/7
146/9 146/9 147/24
149/2 151/10 152/5
153/13 153/23 157/12
158/11 163/16 166/16
172/2 177/16 179/4
183/14 183/17 185/19
189/1 201/4 201/8
201/19 220/12 220/23
225/6 227/20 232/18
244/22
**yourself [1]** 133/21

## Z

**zero [1]** 217/6
**Zobel [3]** 125/5 125/6
125/9
**zone [4]** 159/21 159/22
161/3 161/4
**zoomed [1]** 50/23
**zoomed-in [1]** 50/23