1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA
2
      Case No. 13-80928-CIV-KAM
3
RICHARD COTROMANO, et al.,  )
4             )
   PLAINTIFFS,     )
5             )
   -v-        )
6             )
UNITED TECHNOLOGIES    )
7 CORPORATION, PRATT AND   )
WHITNEY GROUP, et al.,   )
8             )
   DEFENDANTS.     ) West Palm Beach, Florida
9             ) January 9, 2018
 _____)

10

11     VOLUME 2 - PAGES 1 - 301

12 TRANSCRIPT OF MOTION FOR CLASS CERTIFICATION PROCEEDINGS

13   BEFORE THE HONORABLE KENNETH A. MARRA

14    UNITED STATES DISTRICT JUDGE

15

16 Appearances:

17 (On Page 2.)

18
Reporter      Stephen W. Franklin, RMR, CRR, CPE
19 (561)514-3768   Official Court Reporter
        701 Clematis Street
20        West Palm Beach, Florida  33401
        E-mail:  SFranklinUSDC@aol.com
21

22

23

24

25

```
 1    Appearances:

 2    FOR THE PLAINTIFFS:          Jonathan Gdanski, ESQ., and
                                   Jeffrey L. Haberman, ESQ.,
 3                                 Sheldon J. Schlesinger, P.A.
                                   1212 Southeast 3rd Avenue
 4                                 Fort Lauderdale, FL 33316
      -and-
 5                                 Bryan S. Gowdy, ESQ.
                                   Creed & Gowdy, P.A.
 6                                 865 May Street
                                   Jacksonville, FL 32204
 7    -and-
                                   Steven J. Hammer, ESQ.
 8                                 440 South Andrews Avenue
                                   Fort Lauderdale, FL 33301
 9    -and-
                                   Jack Scarola, ESQ., and
10                                 Mara Ritchie Poncy Hatfield, ESQ.
                                   Searcy, Denney, Scarola, Barnhart
11                                 and Shipley, P.A.
                                   2139 Palm Beach Lakes Boulevard
12                                 West Palm Beach, FL 33409
      -and-
13                                 Craig R. Zobel, ESQ.
                                   3801 PGA Boulevard, Suite 600
14                                 Palm Beach Gardens, FL  33410

15                                   *  *  *  *  *

16    FOR THE DEFENDANTS           Sean Gallagher, ESQ., and
                                   Andrew C. MacNally, ESQ., and
17                                 Alex Groden, ESQ., and
                                   Daniel R. McElroy, ESQ.
18                                 Bartlit, Beck, Herman,
                                   Palenchar & Scott
19                                 54 West Hubbard Street
                                   Suite 300
20                                 Chicago, IL 60610

21    -and-
                                   Gregor J. Schwinghammer, Jr., ESQ.
22                                 Gunster, Yoakley & Stewart
                                   777 South Flagler Drive
23                                 Suite 500-E
                                   West Palm Beach, FL 33401
24    -and-

25
```

```
 1   Appearances (Cont.'d)

 2   FOR THE DEFENDANTS          Stephen J. Rapp, ESQ.
                                 Weinberg, Wheeler, Hudgins,
 3                               Gunn & Dial
                                 3344 Peachtree Road, Northeast
 4                               Suite 2400
                                 Atlanta, GA 30326
 5
                                    *  *  *  *  *
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Call to the order of the Court.)
 2              THE COURT:  Good morning, everyone.  Please be
 3   seated.
 4              MR. SCAROLA:  Good morning, Your Honor.
 5              THE COURT:  We ready for our next witness?  Is there
 6   anything else we need to talk about before we begin?
 7              MR. SCAROLA:  I don't believe so, sir.  I think
 8   we're ready.
 9              MR. GALLAGHER:  Your Honor, United Technologies,
10   Pratt & Whitney, calls Tom Jackson.
11              THE COURT:  All right.
12              MR. GALLAGHER:  The Court has his direct examination
13   by way of affidavit.
14              THE COURT:  Right over here, sir.
15         Thomas Oliver Jackson, Defendant's witness, sworn.
16              THE COURT:  All right.  Sir, if you would try and
17   get yourself situated and get close to that microphone and
18   speak into it, and tell us your name and spell your last name
19   for us, please.
20              THE WITNESS:  Thomas Oliver Jackson.
21              THE COURT:  Spell your last name.
22              THE WITNESS:  J-a-c-k-s-o-n.
23              THE COURT:  Mr. Scarola.
24              MR. SCAROLA:  Thank you very much, Your Honor.
25                              Cross-Examination
```

```
 1   BY MR. SCAROLA:

 2   Q    Dr. Jackson, my name is Jack Scarola.  You and I have not

 3   had the pleasure of meeting previously, and it is my

 4   responsibility to ask you some questions regarding the role

 5   that you are playing as an expert retained by UTC in this

 6   matter.  Understood?

 7   A    Yes, sir.

 8   Q    I assume that this is a role that you are not unfamiliar

 9   with, correct?

10   A    I have done this before, yes, sir.

11   Q    Will you give us some estimate as to the number of times

12   you have testified as a retained expert regarding matters

13   relating to real estate appraisals?

14   A    I believe in terms of -- is this too loud now?

15             THE COURT:  It's good.

16             THE WITNESS:  Okay.  It seems loud to me.

17             I've provided expert testimony in deposition and

18   trial and hearings total a little over 100 times.  I'm at the

19   end of my career, and this is hopefully one of my last times.

20   BY MR. SCAROLA:

21   Q    Is there a reason why you have that hope currently?

22   A    That this is it?

23   Q    Yes, sir.

24   A    I'm retiring.  I've retired pretty much.

25   Q    Okay.
```

```
 1   A    I've got a couple matters I'm trying to finish up, but
 2   for health and family reasons, I've decided to retire.
 3   Q    All right.  There is nothing regarding the status of your
 4   health that would interfere in any way with your either
 5   understanding the questions that I ask of you or responding
 6   accurately to those questions; is that correct?
 7   A    No, sir, I don't believe so.
 8   Q    Okay.  That is, yes, it is correct, and, no, you don't
 9   believe that there's --
10   A    I don't think --
11             THE COURT:  One at a time, please.
12             THE WITNESS:  My health issues I don't believe will
13   impair my ability to answer your questions.
14   BY MR. SCAROLA:
15   Q    All right.  Thank you, sir.
16             I want to begin by asking you some basic questions
17   that I hope we have agreement on and to be sure that you and I
18   are using terms in the same way.  Understood?
19   A    Yes, sir.
20   Q    All right.  Do you agree that the fact of damage to the
21   value of real estate is a separate issue from measuring the
22   amount of damage?
23   A    If I could just try to understand that; that there is
24   damage -- or there is diminution in value, is different than
25   the amount of diminution?
```

```
1    Q     Yes, sir.

2    A     I guess --

3    Q     Those two things can be dealt with separately?

4    A     Yeah, I suppose that's right.

5    Q     All right.  Thank you.

6          Do you agree that the fact of damage to the value of

7    real estate is measurable by generally accepted methodologies

8    within the area of expertise of appraiser?

9    A     Yes, sir.  Appraisers that specialize in -- there's a lot

10   of specialties in the appraisal profession, but if an

11   appraiser is knowledgeable in the area that's required to

12   measure the diminution in value from a particular source or

13   for a particular property type, then that would be within the

14   purview of that appraiser.

15   Q     All right.  And measurable, that is, you can determine

16   whether real estate has been damaged using generally accepted

17   appraisal methodologies, correct?

18   A     My only -- I'd prefer the word "diminution" or reduction

19   in value, as opposed to damage.

20   Q     Okay.  Well --

21   A     That's my profession's term for it.

22   Q     That's fine, and I have no problem with that, although I

23   will tell you that I may, from time to time, use the word

24   "damage" only because it's a little bit easier than diminution

25   in value.
```

```
 1              Can we agree that when I say damage, we're talking

 2  about the same thing that you say when you say diminution in

 3  value?

 4  A    Well, they are really different.  I mean, damage can

 5  result in a reduction in property value, but the reduction in

 6  property value, which I'll call diminution, is what appraisers

 7  measure.  It's that change in property value.

 8  Q    Okay.  Well, then I will do my best to avoid using the

 9  word "damage."  And as I said, the purpose of these initial

10  questions is to be sure that we're using a vocabulary that

11  allows us to communicate with one another with a common

12  understanding of what it is that's being asked and answered.

13  Okay?

14  A    Yes, sir, I appreciate that.

15  Q    All right.  Thank you.

16              Do you agree that stigma can cause a diminution in

17  value of real estate?

18  A    Well, in the definitions of stigma, environmental stigma,

19  that the appraisal profession uses, stigma is the reduction in

20  value due to environmental contamination.

21  Q    Okay.  So --

22  A    Stigma in appraisal terms is the reduction in value due

23  to contamination.

24  Q    So if we are talking about stigma, you and I have the

25  common understanding that what we are talking about is a
```

1    diminution in value in real estate, correct?

2    A    Due to environmental contamination or the perceptions of

3    risk related to environmental contamination.

4    Q    Well, you do agree that property may be stigmatized in a

5    variety of different ways that are not within the scope of

6    environmental contamination, correct?

7    A    Yes, sir.  I was speaking specifically of environmental

8    stigma is that as defined in Advisory Opinion 9, which I'm

9    sure we'll talk about sometime today.

10   Q    All right, sir.  And in general terms, you agree that

11   stigmatized property is property that buyers or tenants may

12   shun for reasons that are unrelated to the physical condition

13   of the particular property itself, correct?

14   A    I'm sorry, could you just say that one more time?

15   Q    Yes, sir.

16          A stigmatized property, in general terms, is

17   property that a buyer or a tenant may shun for reasons that

18   are not directly related to the condition of the property

19   itself?  And maybe it's helpful if I give you some examples.

20   A    No, I'm just thinking about your question here for a

21   second.

22   Q    Sure.  I appreciate that.  Take your time.

23   A    Sometimes it helps.

24          If a buyer is concerned about a environmental issue,

25   a condition, contamination, buyer's concerned about

1    contamination -- I'm trying to be responsive -- your question

2    is if the property itself is not contaminated, would the buyer

3    be -- would there be a concern or could there be a concern

4    that might lead to a stigma?  Is that the question?

5    Q    Well, what I am trying to do is to first deal with stigma

6    in a more general sense before we begin to focus on stigma

7    arising out of environmental concerns.

8          So if we're talking about stigma, which is a

9    recognized term within the real estate appraisal industry,

10   stigma is -- stigma to property is generally recognized within

11   the real estate industry to be a property that buyers or

12   tenants may shun for reasons that are unrelated to the

13   physical condition of the particular property, correct?

14   A    I mean, it's possible -- and, again, my definition of

15   stigma is what's in Advisory Opinion 9.  It's possible that

16   the market's perception of increased environmental risk due to

17   contamination, which is the way it's defined in AO9, it's

18   possible that that is related to something other than the

19   property's physical condition.  Are you asking if the property

20   has no contamination, could it be related to something else?

21   Q    Well, that's not my question.

22   A    Oh.

23   Q    But it's obviously the question that you would prefer to

24   answer, so why don't you answer that one, and then we'll get

25   to mine.

```
 1   A     Well, I just thought that was your question.

 2              MR. GALLAGHER:  Your Honor, I object to that.

 3              THE COURT:  Sustained.  Just . . .

 4   BY MR. SCAROLA:

 5   Q     You can go ahead and answer your question, sir.

 6   A     It's -- if it's -- you're asking -- well, my

 7   interpretation of your question -- I'm sorry if I'm not

 8   getting it -- is that the property could be impacted by

 9   environmental contamination that doesn't change the physical

10   condition of the property, and my answer to that, and always

11   my answer to that kinda question would be it's an empirical

12   question.  You would have to study that with appropriate data

13   and methods, techniques.  I mean, you could say anything is

14   possible, but that would be a question, an imperial question,

15   that you would go out -- an appraiser would go out and measure

16   with appropriate data and analyze more properly.

17   Q     Well, let me pose my question in the context of specific

18   examples, and maybe that will get us to where I think we need

19   to go.

20              You do agree that a house in which a murder or

21   suicide has occurred is recognized in the real estate industry

22   as a stigmatized property; do you not?

23   A     I -- you know, if somebody asked me that, I wouldn't have

24   a general answer.  There's no general answers to any of these

25   questions.
```

1   Q    Okay.

2   A    It's always specific to the property, specific to the

3   issue that's alleged to have impacted the property.  There's

4   no -- you know, the appraisal institute and the appraisal

5   profession doesn't have a single answer for all these things.

6   Q    Okay.

7   A    So what we do instead is have a framework for looking at

8   them and evaluating them.

9   Q    So the answer to my question is you don't know, fair?

10  A    Well, that's not exactly what you asked me.  You asked me

11  if the appraisal profession recognizes crime scene stigma or

12  stigma from a house where somebody, you know, had a crime.

13       And my answer to that is it's not environmental

14  stigma, I guess, but it would always have to be studied.  So

15  there may or may not be.

16  Q    Okay.  Stigma may arise as a consequence of a murder or

17  suicide having occurred on a particular property, correct?

18  A    May or may not, that's right.

19  Q    And a house that has been used as a brothel or a drug den

20  you agree is recognized within the real estate profession as a

21  stigmatized property, correct?

22  A    I -- same answer.  It's -- there's no -- there's no,

23  like, official recognition of any of these things within the

24  appraisal profession.  We're going a little far afield of my

25  area of expertise.  But what I've been talking about is

1   environmental stigma, which is related to environmental

2   contamination.

3   Q    And environmental stigma is specifically defined by

4   Advisory Opinion 9 as an adverse effect on property value

5   produced by the market's perception of increased environmental

6   risk due to contamination, correct?

7   A    That's it.  There's also -- it ties it to the definition

8   of environmental risk, which is a little bit -- there's an

9   additional part of that.

10  Q    Well, there is a reference that says, see environmental

11  risk in the definition, correct?

12  A    Yes, sir.

13  Q    Okay.  But environmental stigma is defined as I have just

14  read as, quote, an adverse effect on property value produced

15  by the market's perception of increased environmental risk due

16  to contamination, correct?

17  A    That's correct.  You read that properly.

18  Q    So when we are talking about stigma, we are talking about

19  what the market perceives to exist, independent of whether, in

20  fact, it does exist, fair?

21  A    It would be the market's -- excuse me.  It would be the

22  market's perception of risk associated with contamination that

23  may produce a reduction in the property value that's referred

24  to in the definition as environmental stigma.

25  Q    Yes, sir.  But my question to you is, what we are focused

```
1   on~-- and when I say "we," I mean what appraisers are focused
2   on -- is the perception of that environmental risk, which may
3   or may not coincide with the reality of environmental risk.
4   Fair enough?
5   A    No, that's not exactly right.
6           The appraisal profession is focused on measuring the
7   effect of those perceptions by analyzing market data, like
8   sales data and transactional data.  It's the appraisal
9   profession's focus solely on this idea that the value of
10  property may be impacted or may not be impacted.  That's our
11  focus.
12  Q    Yes, sir.  And the focus is on perception rather than
13  attempting to measure what the scientific level of risk is,
14  correct?
15  A    If your question's going to the scientific measurement of
16  contamination, then the appraisal profession and appraisers
17  are not trained in that area.  We don't do chemical testing
18  and things like that.  Instead, we have to rely upon others.
19  We have to rely upon -- and there's also things related to
20  that in AO9.  We have to rely upon the state agencies that
21  establish thresholds, so many parts per million, things like
22  that we don't do that.
23  Q    Yes, sir.
24  A    We don't get the data that says there's an exceedance.
25  Somebody has to tell us that.
```

```
 1   Q     So can we then agree that the answer to my question is,
 2   yes, appraisers focus on the market's perception of risk and
 3   not the scientific reality of whether that risk, in fact,
 4   exists, correct?
 5   A     Well, there's three things here I think we're talking
 6   about.  We're talking about the physical condition, the
 7   contamination, the presence or absence of contamination.
 8              Then there's the market's perception of that, which,
 9   you know, as you suggest, may not be 100 percent accurate.
10              And then the appraiser comes in at the third step,
11   which is measuring how that perception may impact the market.
12              So we're really over here in step three.  We're not
13   measuring perception; we're measuring the impact of that on
14   the value of property.  And the way we do that is we look at
15   sales; we look at transactions.
16              So we're over here in three.  We're not measuring
17   perception; we're measuring its impact.  That's all we can do.
18   Q     Yes, sir.  But what you are measuring is the impact of
19   the market's perception of environmental contamination, as
20   opposed to the environmental contamination itself, correct?
21   A     Right.  That's step one of my three-step analogy.  We're
22   over in step three, which is saying, okay, are there
23   differences in price that can be attributed to this.
24   Q     Do you agree that a common environmental stigma may
25   attach to multiple properties, and even to entire communities?
```

```
 1   A    I don't know that I have a general answer to that

 2   question.  You'd have to -- I would have to evaluate it.  I'm

 3   not going to generally say yes or no.  I don't know.  Depends.

 4   These issues are specific to properties and regions and issues

 5   that you would have to evaluate.

 6   Q    Okay.  Well, perhaps you didn't understand my question.

 7   A    Okay.

 8   Q    So let me try again.

 9        Do you agree that a common environmental stigma may

10   attach to multiple properties, and even entire communities?

11   A    A common environmental stigma.  There could be a stigma

12   effect that could be present in more than one property, or

13   there could be -- you know, there could be a measurable effect

14   over more than one property.  I would agree to that.

15   Q    Okay.  So let's go to the second part of my question.

16   And it was a compound question for which I apologize.

17        So you have agreed that a common stigma may attach

18   to multiple properties?

19        That's what you just told us, right?

20   A    More than one property could be impacted, potentially

21   impacted, or the value of more than one property could be

22   impacted.  I would agree with that.

23   Q    By a common stigma, a common environmental stigma.

24   A    Well, excuse me.  The stigma is the impact.  It could

25   be -- there could be more than one property impacted by a
```

1    common source of contamination.

2    Q    All right, sir.

3    A    And it could be stigmatized.  But the stigma is on the

4    end.  It's the effect.  It's not the source; it's the effect.

5    Q    Well, let my see if I can phrase the question this way:

6    Do you agree that the market's perception of increased

7    environmental risk due to contamination may attach to multiple

8    properties?

9    A    Perception . . . I'm just -- I'm sorry, the stigma

10   doesn't attach to anything.  The stigma is an effect.  Can

11   more than one property be affected by a common source of

12   contamination?  That's possible.  You would have to go measure

13   it, but it's possible.  That's -- that's --

14   Q    And, in fact, it is possible that the environmental

15   stigma can adversely affect an entire community, correct?

16   A    I don't mean to mince words, but when you say community,

17   are you talking about a town?  Are you talking about a

18   neighborhood?  These are all empirical questions.  And I've

19   certainly read a lot in my field and written a lot and done a

20   lot of these, you know, studies.  And if you want -- are you

21   asking me about my personal experience in this, or are you

22   just saying is it possible to happen, or . . .

23   Q    I'm trying to determine whether we have a common basis

24   upon which to discuss your testimony in this matter, and one

25   of the common bases I'm exploring is whether there is

1   agreement between us that an adverse effect on property value

2   produced by the market's perception of increased environmental

3   risk due to contamination may extend beyond just multiple

4   properties to an entire community?

5   A    It may or may not.  It -- you know, it would have to be

6   investigated and measured and tested with, you know, sales

7   data, and analyzed property, and . . .

8   Q    So the answer to my question, then, is, yes, it may.  You

9   don't know whether it has or not until you've investigated it,

10  but you recognize that the nature of environmental stigma is

11  such that it may adversely affect property values produced by

12  the market's perception of increased environmental risk due to

13  contamination in an area as large as an entire community,

14  correct?  It may.

15  A    Well, it goes -- is anything possible?  It's possible.

16  It may or may not.

17  Q    All right.  Thank you, sir.  You agree that it's

18  possible.

19  A    It's possible.

20  Q    Okay.  And, in fact, it might even extend to an entire

21  city, such as Flint, Michigan, right?

22  A    It may or may not.  I haven't studied Flint, Michigan.

23  Q    Okay.  But you do agree that environmental stigma, an

24  adverse effect on property value produced by the market's

25  perception of increased environmental risk due to

1    contamination could extent to an entire city, such as Flint,

2    Michigan, if it is demonstrated that the water supply in the

3    entire city is under threat of mercury contamination.  Fair?

4    A    That it's possible?

5    Q    Yes, sir.  That's all I'm asking you right now.

6    A    It's possible.  It would have to be appropriately

7    studied, but it's possible.

8         I can give you examples of, you know, situations

9    where I've studied groundwater plumes, well sources that have

10   been contaminated, that we had to -- you know, we studied

11   those.  We studied them by evaluating the sales of properties

12   that had the contamination compared to properties that did

13   not.

14        In my experience, I've been doing this a long time,

15   you know, properties that are contaminated can suffer a

16   diminution in value if they're actually contaminated.

17   Q    Well, it is not your position, is it, that there must be

18   actual contamination in order for there to be an adverse

19   effect on property value produced by the market's perception

20   of increased environmental risk due to contamination?

21   A    That's been my experience in this -- in the studies that

22   I have done to date.

23   Q    Well --

24   A    It's -- let me finish my answer, please.

25   Q    Yes, sir.  I'm sorry, but you're not being responsive to

1    my question, because my question didn't ask you about your

2    personal experience.

3           THE COURT:  Rephrase your question.  Ask the

4    question again, please.

5           MR. SCAROLA:  Thank you.

6    BY MR. SCAROLA:

7    Q    Do you agree that an environmental stigma, that is, an

8    adverse effect on property value produced by the market's

9    perception of increased environmental risk due to

10   contamination can extend to an entire city?

11   A    And you're asking me if it's possible --

12   Q    That's all I'm asking at this point.

13   A    -- not that I've found that or anybody's found that here?

14   It's possible.

15   Q    Okay.  Thank you, sir.

16          And do you also agree that it is measurable by

17   generally accepted appraisal methodologies; that is, whether

18   the possibility is a reality is measurable by generally

19   accepted appraisal methodologies?

20   A    Yes, sir, I would agree with that.  We have the tools and

21   techniques that could be used to measure the impact of

22   contamination on property values in one property or many

23   properties.

24   Q    Well, not only are you able to measure the risk of

25   contamination -- excuse me.  Not only are you able to value or

```
 1   measure the effect on property value produced by contamination

 2   on a particular piece of property, you're able -- and by "you"

 3   I mean appraisers -- are able, using generally accepted

 4   appraisal technologies, to measure the risk of contamination,

 5   even when there is no actual contamination on property value,

 6   correct?

 7   A    Well, that's what we've been talking about is measuring

 8   this what we call the stigma, environmental stigma, which

 9   is -- could be produced by perceptions of risk.

10   Q    Okay.  Thank you, sir.

11   A    And the way we would do that is looking at, you know, the

12   market data, and we'll sure talk about that later.

13           Now, if I just could go back to one of my previous

14   answers on your idea of the community, measuring it on a

15   community, and I think that that's one of the issues in this

16   case is whether you could measure it commonly across a very

17   broad area, and that's a different question.

18   Q    And one that I'm sure we're going to get to, but we're

19   not there quite yet.

20   A    Okay.

21   Q    Okay?

22           Can we agree that in a case about whether the

23   property in a given geographic area has been stigmatized by

24   concerns about environmental pollution, there are common

25   questions that need to be answered in order to measure whether
```

1    an adverse effect has occurred?

2    A    I -- so you're -- I'm sorry, I'm having a hard time

3    following the question.

4          So are there common questions -- I think that's what

5    you said, common questions?

6    Q    Yes, sir.

7    A    Like what?

8    Q    Well, for example, if what we are talking about is the

9    market's perception of increased environmental risk due to

10   contamination, one of the things that you need to determine

11   is, is there a market perception of increased environmental

12   risk due to contamination, correct?

13   A    Whether an appraiser should determine the market's

14   perception or whether they should evaluate the perception of

15   the market?  Is that what you're asking me?

16   Q    If we define environmental stigma as an adverse effect on

17   property value produced by the market's perception of

18   increased environmental risk due to contamination, one of the

19   common questions that needs to be asked is, is there a market

20   perception of increased environmental risk due to

21   contamination, right?

22   A    And you're asking me as an appraiser is my profession

23   equipped to evaluate the market's perception, and my -- I

24   think that's what you're asking me -- and my profession is

25   equipped to evaluate the adverse effect on property value, the

1   reduction in property value.  We're not necessarily trained to

2   evaluate perception, perception research, surveys, going out

3   and look -- that's -- that is, you know, not something we're

4   trained to do.  We're trained to evaluate the impact on market

5   value, the change in market value.

6              There's a second step, I suppose if you found there

7   was a reduction in market value, then what is the cause of

8   that reduction of market value.  And there we would look to

9   the -- you know, we would look to the information in the

10  market and say, well, you know, we found something in this

11  area; we found property values in this area had gone down.

12  Why did they go down?  And then we would look for different

13  causes.  It could be a lot -- there could be a lot of things

14  that impact market value.

15  Q    Yes, sir.

16             And before you can determine whether this is

17  environmental stigma, you need to determine whether the cause

18  is, or whether a cause is, the market's perception of

19  increased environmental risk due to contamination, right?

20  A    Before we could make a -- if -- if somebody said, well --

21  or I went out and valuated properties and said, well, these

22  properties have gone down in value, I've compared the prices,

23  and they've reduced in -- they've been reduced in value beyond

24  what they should have sold for, okay, why?  Why did I find the

25  properties went down in value?  Then I would look at causation

```
 1   factors.  It could be something else.  It's possible.

 2   Q    Yes, sir.

 3   A    It could be other things in the market.

 4   Q    I didn't mean to interrupt you, and I was about to.

 5   A    I thought we were actually agreeing here.

 6   Q    So far we are.  Yeah, so far we are.

 7   A    So the market is the source, or the physical

 8   contamination, or whatever it is, could be the cause of this

 9   measured reduction in value.  Is that what you're asking me?

10   But the appraiser would be the one measuring the effect, the

11   reduction in value.  That would be our -- within our purview.

12   Q    Well, what I am really trying to ask you, sir, is

13   whether, if what you are attempting to determine is if there

14   is environmental stigma causing an adverse effect on property

15   value, eventually you need to get to the question of whether

16   there is a market perception of increased environmental risk

17   due to contamination, right?

18   A    The cause.  You would make assumptions about the cause.

19          So can I give you a hypothetical?  It may help me to

20   explain or understand your question.

21   Q    If you're having difficulty understanding my question, I

22   apologize for that.  I'm trying to use the exact words that

23   appear in Advisory Opinion Number 9, which you have told us

24   you are familiar with, in order to avoid any problem in our

25   communication.
```

```
 1    A      Right.

 2    Q      Okay?

 3    A      And I think we're doing pretty well.

 4            So the appraiser finds diminish in value in an area.

 5    All right.  So say there's a -- and I know this is a

 6    hypothetical.  Say there's a groundwater plume in this area,

 7    in this -- there's a block of houses, and they have a

 8    groundwater plume underneath them.  And you found that all the

 9    properties over this groundwater plume that had sold, had sold

10    for lower prices than they would have compared to properties

11    that are not over the groundwater plume.  Then that would

12    be -- an appraiser would -- you know, it would be logical to

13    conclude that the reason for that, the cause of that is the

14    groundwater plume.

15            Now, appraisers would also want to look at other

16    things, but that would be an appropriate thing to do.  Does

17    that . . .

18    Q    Well, one of the things you would want to do, based upon

19    the hypothetical that you have just given us, is to make a

20    determination about whether the market even knows about this

21    groundwater plume, right?

22    A    That would be a good idea.

23    Q    Yes.  Because what we are trying to investigate from an

24    appraisal perspective is whether there has been an adverse

25    effect on property value produced by the market's perception
```

1    of increased environmental risk due to contamination.  So we

2    need to know what the market knew or believed, correct?

3    A    Yes.

4         So, for example, if I could stick with my little

5    hypothetical, I might go talk to the buyers and sellers.  I

6    might look at the sales disclosure forms.  I might ask them

7    did you know that your house was over a plume?  Did that

8    impact your price that you paid for it?  Things like that.

9    Q    So you'd do a survey of actual buyers and sellers?

10   A    Well, I would talk to the buyers and sellers of those

11   properties.

12   Q    Yes.

13   A    So if there's 10 properties that have sold at a lower

14   price, than I, you know, think they should have otherwise, I

15   would want to find out more information, and one of the

16   sources of that information is the buyers and sellers of those

17   properties.

18   Q    Okay.

19   A    And you also, as you know, have sales disclosure forms in

20   Florida where you might find information that would have been

21   provided.

22   Q    So one of the generally accepted methodologies utilized

23   by appraisers in making determinations about the existence of

24   environmental stigma is the conduct of surveys, correct?

25   A    Well, interviewing -- survey to me has a scientific

```
 1   connotation.

 2   Q    I'm only using the word you used, sir.

 3   A    Yeah.  Well, did I use survey?

 4   Q    Yes.

 5   A    I did?

 6         Okay.  Well, I do distinguish between surveys and

 7   going out and talking to buyers and sellers.  Survey is where

 8   you do a sample in a population.  I've done surveys, and

 9   they're very helpful.  But what I was talking about would be

10   more akin to what I refer to as market interviews.

11   Q    Okay.

12   A    And I actually have an article called "Surveys, Market

13   Interviews and Environmental Stigma" that explains all this.

14   Q    So one of the generally accepted methodologies by which

15   appraisers investigate the existence of environmental stigma,

16   as defined in Advisory Opinion 9, is interviews of buyers and

17   sellers, correct?

18   A    I know you think I'm mincing words here, but the stigma

19   is the impact on property value.  The market interviews would

20   help to establish the cause of that diminution in value.  It's

21   not the measurement of the diminution in value; it's getting

22   more information in context about what caused the diminution

23   in value.

24   Q    So we get right back to where we started when we first

25   began, and, that is, there's a distinction between determining
```

1   the fact of damage and measuring the amount of damage, and

2   right now we're talking about determining the fact of damage.

3   Fair?

4   A    No, it's the way I just explained it.  That's my

5   understanding of it.  You measure the diminution -- you first

6   test to see if there is any diminution.  And then if you find

7   the diminution, then the question of causality comes into

8   play, what caused that diminution.

9   Q    Was the --

10  A    And then you might do market interviews to -- or

11  interview the buyers and sellers to determine if -- to make a

12  determination or an analysis of what may have caused it.

13  Q    And you are making a determination of what may have

14  caused it in order to determine whether this diminution in

15  value, the adverse effect on the value of property, was caused

16  by the market's perception of increased environmental risk due

17  to contamination, correct?

18  A    That -- I agree with that.

19  Q    All right, sir.  And so I think we're now in agreement

20  that one of the tools, one of the methodologies generally

21  recognized by appraisers for investigating the existence of

22  environmental stigma is interviews with buyers and sellers.

23  Fair?

24  A    No, I don't agree with that.

25              I know it sounds like --

1  Q    You've really lost me at this point.  So tell me why you

2  disagree.

3  A    Let me start again.

4         The stigma is measured with transactional data, with

5  sales data.  That's the stigma effect.  That's not measured

6  with interviews.  Interviews and surveys are not techniques

7  that appraisers use to measure diminution in value.  It's just

8  not.  It's nontransactional data.  There's specific

9  prohibitions in our standards for not using that as an

10 appropriate measure for property value diminution.  It's a

11 clear bright-line thing.  I've got one of the documents here

12 in front of me.

13        But the market interviews, talking to buyers and

14 sellers, is useful to understand when you found diminution

15 value what may have caused it.  But it's not a technique to

16 measure it.  That's the point.

17 Q    So let me back up once again and focus your attention on

18 the issue of the fact of damage, as opposed to the amount of

19 damage.  And I've reverted into using the word that you don't

20 like, and I'll rephrase the question, recognizing that I just

21 did that.

22 A    Thank you.

23 Q    We are talking about the amount of -- I'm sorry.  We're

24 talking about the existence of a diminution in value due to

25 environmental stigma, as opposed to the amount of the

1    diminution in value due to environmental stigma.  Do you

2    understand what I want you to focus on?

3    A    I'm trying.

4         So if the -- if the property is stigmatized, it has

5    had a reduction in value, you're saying that's a different

6    question than the amount of the -- the amount of the

7    diminution.  So if it's -- if it's greater than zero, that's

8    whether or not it has been affected.  But that's a separate

9    question from is it 10 percent less or 20 percent less.  Is

10   that what you're -- is that --

11   Q    I think that that's probably a fair rephrase of my

12   question.

13   A    I just have to be real simple.

14   Q    But I don't know that yet.

15   A    I have to do this simply, because I -- you know, I --

16   anyway, does that -- are we okay with that explanation?

17   Q    Well, do you agree with that concept, the concept that

18   you just, yourself, phrased?  Does that make sense to you?

19   A    I don't know.  I mean, if you found diminution in value,

20   you know, if you found that it was greater than zero, then you

21   would have to find that it was something.  I mean, say you

22   found it was five percent.  Five percent is greater than zero,

23   but you've already found what percent it is.  I'm not sure

24   that -- I've never -- never seen the question addressed that

25   way.

1          Could you have any diminution, as opposed to could

2   you have a specific amount of diminution?  I mean, once you've

3   determined that there is diminution, you usually determine

4   that there's some amount.

5   Q    Well, don't interviews serve a useful purpose for

6   appraisers in determining whether there has been an adverse

7   effect on property value produced by the market's perception

8   of increased environmental risk due to contamination without

9   necessarily measuring how much that effect is?

10  A    The interviews provide information as to the cause of the

11  effect that's been found by looking at the market data that I

12  talked about.  That's the -- that's the way it should work.

13  Q    Okay.  And surveys serve the same purpose, correct?

14  A    Surveys could serve that same purpose.

15  Q    All right, sir.  Now, we're at the point where we are

16  conducting the investigation of the cause of an adverse effect

17  on property value.  We've done what appraisers do and made a

18  determination that property value, either with respect to one

19  property or multiple properties or a larger geographic area,

20  have been adversely affected.  Now, we want to determine why.

21          Okay?  You know where we are?

22  A    Yes.

23  Q    Okay.

24  A    I was going with your analogy where it was getting

25  bigger, and I was going to throw in some other issues, but I

1    understand.

2    Q    All right.  So if we are looking at is why was there an

3    adverse effect on property value, we want to determine whether

4    that adverse effect is environmental stigma, right?

5    A    If that's the -- well, the stigma is the effect.  I know

6    this seems strange, but it is.  That's the effect.  What we

7    want to do is determine -- or what we would then need to infer

8    is what caused that reduction in value referred to as

9    environmental stigma, and that's what I think you're asking me

10   about.

11   Q    Adverse effects on property value may occur as a

12   consequence of a variety of different causes?

13   A    Right.

14   Q    Fair?

15   A    Right.

16   Q    One of those --

17   A    In this case we could have the recession or a lot of

18   other things that could happen that cause property values to

19   go down.

20   Q    One of those potential causes of an adverse effect on

21   property value, one of the things that can produce an adverse

22   effect on property value, according to Advisory Opinion

23   Number 9 is the market's perception of increased environmental

24   risk due to contamination, right?

25   A    Right.  Then the effect would be called stigma.

```
 1   Q     Yes, sir.

 2               Not only --

 3   A     Environmental stigma.

 4   Q     -- would it be called stigma, it would be called

 5   environmental stigma.

 6   A     Environmental stigma, right.

 7   Q     Okay.  So we're at the point --

 8   A     That's the point of that definition.

 9               THE COURT:  Hold it.

10               THE WITNESS:  I'm sorry.

11               THE COURT:  Only one person can talk at a time,

12   please.  So finish the question, give your answer.  Wait for

13   him to ask the next question, please.

14               THE WITNESS:  Yes, sir, Your Honor.  I'm sorry.

15               THE COURT:  So where are we on this -- what was your

16   question?

17   BY MR. SCAROLA:

18   Q     You have told us that a determination has been made that

19   there has been an adverse effect on property value.  Now we

20   want to determine was it produced by the market's perception

21   of increased environmental risk due to contamination.

22   Correct?

23   A     Yes, sir.

24   Q     You have acknowledged that one of the accepted

25   methodologies utilized by appraisers in making that
```

1    determination is interviews, correct?

2    A    Market interviews, appropriately done, carefully

3    constructed, market interviews could be one of the ways

4    appraisers get at the cause of the measured diminution.

5    Q    And another tool generally accepted within the profession

6    of appraisers is the conduct of surveys, correct?

7    A    Surveys can be used for that.  Appraisers are not trained

8    to be survey researchers.  Surveys are done in a very specific

9    way.  I've done surveys.  I did them for my dissertation.  It

10   was very, very structured.  It had to be done -- I had a grant

11   from the National Science Foundation, and I had all these

12   reviewers looking at it.  It had to be done with careful

13   sampling, careful statistical inference.

14        We don't, as a profession, train our members to do

15   that.  Some appraisers may know how to do that; some may not.

16   But it's not as part of our body of knowledge that we train

17   appraisers to do surveys.

18        But it could be used for that purpose.  I think that

19   was your question.

20   Q    Yes, sir.

21   A    But it's not within the appraisal profession.  Most

22   appraisers don't know how to do surveys.

23   Q    Well, my question was not who does the survey or how the

24   survey is done.  My question, which I think you've now

25   answered is, yes, surveys are a methodology generally

1    recognized within the appraisal profession as a means by which

2    to determine the existence of environmental stigma, correct?

3    A    Properly constructed surveys, properly administered,

4    managed and analyzed surveys, could be used to establish the

5    causality of environmental stigma that has been measured by

6    appraisers.

7    Q    One of the things that you would want to know, assuming

8    the information is available, regarding the market's

9    perception of increased environmental risk due to

10   contamination, is what does the market perceive about the

11   origin of the contaminants, correct?

12   A    You mean about the source of the contamination?

13   Q    I think that "source" is a good synonym for "origin" in

14   that context, yes.

15   A    Yeah, we use "source" in these -- in our lexicon.  So is

16   the source of the contamination important?  Yes, I would think

17   that would be important.

18   Q    Okay.  And another common question is how likely is it

19   that the contaminants have or will migrate into the vicinity

20   that that is being measured for potential adverse effect on

21   property value, correct?

22   A    The migration pattern of contamination -- and I -- is not

23   something that appraisers are trained to evaluate.

24   Q    I'm sorry, and I don't mean to interrupt you, but that

25   suggests to me that you don't understand the question that I

1    asked.

2    A    Oh, I'm sorry.

3    Q    My question is not whether appraisers are trained to

4    evaluate whether contaminants have or will migrate into the

5    neighborhood.  And I phrased my question in this way so to tie

6    it into Advisory Opinion Number 9 about the market's

7    perception.

8             What you would want to know is what does the market

9    perceive to be the likelihood that contaminants have or will

10   migrate into the vicinity that you are investigating for

11   environmental stigma, right?

12   A    In the studies that I've done, we would look to

13   information about -- again, back to my plume analogy -- about

14   the plume itself, not that we would know -- we would have the

15   scientific expertise to evaluate that, but we would take what

16   the state agencies have said, particularly because they're

17   public -- you know, public source of information, about where

18   the plume has gone, and also as you suggest, where it might

19   go.  That's important information.

20            Then that, if we found diminution, that might be

21   used to say the diminution is caused by this migrating plume,

22   or plume that may have migrated into a neighborhood.  And that

23   information -- if it was secret information, it wouldn't make

24   any difference, I guess.  If it was information that was in

25   the market, then the market -- we found, for example, if there

1  were documents suggesting -- or that documented reports from

2  the state agencies that were publicly available, then that

3  would be important consideration.  It wouldn't measure the

4  diminution, but it would be important consideration in

5  understanding a diminution that has been appropriately

6  measured.

7  Q    It could help you to understand the fact of diminution

8  and whether that fact of diminution was attributable to a

9  market perception of a risk of environmental contamination,

10  correct?

11  A    I think I'm in agreement with your question, yes, sir.

12  Q    Okay.  Thank you.

13          Because our focus continues to remain on what the

14  market's perception is, right?

15  A    Well, my focus and my profession's focus is on the

16  measurement of the diminution.  Then the concern or the issue,

17  if you measure diminution, is what caused it.

18  Q    And that's where we are now.

19  A    Right.

20  Q    We're talking about the cause.

21  A    Right.

22  Q    We've gotten past you're measuring the fact that there

23  was a diminution in value.  Now we're making a determination

24  as to whether that diminution in value was as a consequence of

25  environmental stigma.

```
 1   A     Well, again, the stigma is the diminution, but we would
 2   be want -- an appraiser would want, once they measured in the
 3   neighborhood for a property that there has been diminution,
 4   they would want to know a cause.  If it was this contaminant
 5   plume or was it the general market conditions or was it a
 6   highway, you know, what would be the cause of this.
 7   Q     More accurately, what they want to know is what the
 8   market perceives to be the cause, correct?
 9   A     They would want to know the market's perception by
10   looking at the things I've already mentioned, talking to
11   buyers and sellers in that market.  Why did you pay X number
12   of dollars for this property?  Did this contaminant plume
13   under the property make a difference in your purchase.
14   Q     Okay.
15   A     That would be good information to know.
16   Q     Another common question in making the determination
17   regarding the existence of an environmental stigma is what is
18   the market's perception of how widespread the contamination
19   is, correct?
20   A     Your focus there is on the word "widespread," how far
21   it's gone?
22   Q     No, my focus was on every word that I just spoke.
23   A     Well, that's the one word you added, I think.
24         So the market's perception of how widespread the
25   contamination is?
```

1  Q    Yes, sir.

2  A    In this idea of causality.  Yeah, that would be

3  important.

4  Q    Okay.  And another common question that you would need to

5  examine in connection with this analysis that we're now

6  discussing is what does the market perceive to be the

7  quantities of contaminants involved, right?

8  A    Well, I think the key there is not the quantities

9  insomuch as it -- it sounds the same thing, but the

10  concentrations and the regulatory thresholds for whatever the

11  constituent is.

12        In other words, the state agency establishes a

13  certain concentration that is believed to be harmful, and the

14  appraiser can't do that.  And, really, the market can't do

15  that either.  The scientists have to do that.  So that is

16  important to know.

17  Q    Well, what we are looking at here is regardless of

18  whether an individual consumer is capable of appreciating what

19  a risk actually is.  What we are investigating is, what the

20  common question is what is the market's perception of the

21  risk.  Does the market perceive that this is entirely trivial

22  and really doesn't make a difference, or does the market

23  perceive that there is a risk of death associated with this

24  contamination.  That would be important to know, wouldn't it?

25        MR. GALLAGHER:  I'm going to object, Your Honor, to

```
 1    the emphasis on death and the tone of that question.

 2              THE COURT:  Overruled.

 3              You can answer.

 4              THE WITNESS:  The markets -- I don't know how many

 5    more ways I can explain this.

 6              You found diminution in value in a certain area.

 7    You're trying to figure out what caused that diminution.  The

 8    market's perception of contamination would be an important

 9    consideration in making a determination about causality.

10              And I didn't understand the common part, but the

11    market's perception would be important to figure out if what

12    you're measuring is due to that or due to something else.

13    BY MR. SCAROLA:

14    Q    All right, sir.

15              And another common question that you would want to

16    investigate is what is the market's perception of how easy or

17    difficult it would be to remediate the contamination perceived

18    by the market to exist, correct?

19    A    The buyers and sellers of properties that we or somebody

20    may have found to be diminished would want to know,

21    particularly with regard to their property, but probably also

22    regarding the source property, what -- you know, first of all,

23    there would have to be something to remediate.  But assuming

24    there was, there would be, I would think, interest to know

25    when the remediation was going to occur, what was going to be
```

```
 1   done.  That would be -- would be important.
 2           I'll also just ask you, when you say common
 3   question, you keep saying common question, what -- is that --
 4   there's some meaning to that that I'm not picking up on?
 5   Q    Well, I'm not sure that there's --
 6   A    What is common?
 7   Q    -- a meaning you're not picking up on.  What we're
 8   talking about is making a determination as to whether the
 9   value of property has been adversely affected by the market's
10   perception of increased environmental risk due to
11   contamination.
12   A    Right.
13   Q    Right?
14   A    I'm with you on that.
15   Q    Okay.  So if we're looking at multiple properties, then a
16   common question with regard to each of those properties would
17   be each of those questions we've been discussing, right?
18   Because one property may be affected and another property may
19   not be.
20   A    I would -- I would agree with that.  If you had multiple
21   properties in an area, some of them might be affected and some
22   of them might not.
23   Q    And so --
24   A    Really, your focus would be on the ones that were
25   affected, that had diminished value, and you would try and
```

1   determine what was causing their diminished value.

2           And you could find in a neighborhood, you might find

3   properties in the neighborhood that were -- that had

4   diminished value and properties that did not.  And then of the

5   properties that had diminished value, you would make -- you

6   would want to know or make some kind of analysis of what

7   caused the diminished value.  You might find diminished value

8   on one side of the neighborhood due to something that's

9   different on the other side of the neighborhood, you know.

10          I could give you an example, but you see what I'm

11  saying.

12  Q    Yes, sir, I do see what you're saying.

13  A    Okay.

14  Q    So let's move on to the next point, then, if we could.

15          Can we agree that price does not necessarily equal

16  fair market value?

17  A    Yes, price and value can differ.  Price is what's

18  actually paid, and there has to be certain conditions for that

19  price to equal value.

20  Q    Yes, sir.  So let's focus on that, if we could.

21          Can we agree that fair market value is the price at

22  which a willing buyer will buy and at which a willing seller

23  will sell when, one, the parties are unrelated, that is, it is

24  an arm's length transaction; two, each party is fully informed

25  as to all material relevant factors; and, three, neither is

```
1    under any compulsion to either buy or sell?

2            Is that a fair definition of fair market value?

3    A    Except for the part about fully informed.

4            The definition of market value is established by

5    law.  There's several definitions, and they have those

6    elements in there; that the properties are not acting under

7    duress.  It's what's -- it's arm's length.  That they're not

8    necessarily fully informed, but I would say typically

9    informed.  And this comes up in the environmental area. How

10   informed does a buyer have to be?  You know, a buyer is

11   typically not a certified engineer.  There's a lot of

12   knowledge of these things beyond what the typical market would

13   know.  But typically informed, that's really where I like to

14   focus that.

15           But other than that, I think your definition

16   captures most of the elements of fair market value.

17   Q    Is there some source upon which you rely to define that

18   element of fair market value as not being fully informed as to

19   all relevant facts impacting upon value and rather typically

20   informed as to all relevant facts?

21   A    Yes, sir.

22   Q    Something we could look at?

23   A    Yeah, there's an advisory opinion that addresses that

24   point, but I --

25   Q    And which one is it?
```

```
 1   A     I don't remember.

 2   Q     And it uses the word "typically"?

 3   A     It discusses the issue of typicality -- typicalness, or

 4   whatever.  The issue really is does a buyer have to know

 5   everything about this -- particularly with contamination,

 6   could a buyer know everything about the contamination?  Could

 7   they know everything that an engineer who has studied this

 8   issue, hypothetical issue, knows.

 9         And the buyer doesn't necessarily have to do that.

10   I mean, the buyer may be an engineer, may not be an engineer.

11   They would have to have information that was readily -- you

12   know, was normally available in the market.

13         We rely on the market.  The market is our litmus

14   test for what's happening with values.  And, you know, we make

15   the assumption that it's a typical buyer and seller, typically

16   informed, and, you know, the proposed class area would be

17   somebody who's knowledgeable about what's going on there.

18         But do they have to go out and have rigorous

19   scientific background and testing?  I don't think so.  It's

20   just typical knowledge.

21   Q     How do we measure --

22         I'm sorry.  I began to ask the question before you

23   had finished.

24         How do we measure what typically informed is?

25   A     That's when we were calling them market interviews
```

1    earlier.  We would talk to the buyers and sellers and see what

2    they knew.  That would be one way of doing it.

3    Q    And what are we measuring what they knew against in order

4    to make the determination as to whether they are typically

5    informed?

6    A    We would measure it, you know, going back to my analogy,

7    we found the property sold for less.  Why did it sell for

8    less?  The buyer would say because it's over a contaminant

9    plume.  Now, the buyer may not know the exact details of that

10   plume, the particulate levels, its migration pattern and all

11   this other stuff.  But they would say that, in their mind, was

12   a reason that they paid less for it.  That would be a typical

13   sort -- what kind of typical knowledge we would look at.

14   Q    Would we look at public sources of information and make

15   the determination as to whether this particular buyer was

16   informed, as the community in general has been informed, with

17   respect to these environmental concerns?  Do we measure

18   typicality in that way?

19   A    Let me answer your question.

20         The source of information could be public records,

21   could be newspaper articles, could be news broadcasts, media.

22   Then the question is, you know, does that impact the market.

23   But that would be a source of information; are you aware that

24   there is this information, things like that.

25   Q    So one of the tools that is typically used by appraisers

1   in making these determinations relevant to environmental

2   stigma is a review of public sources of information, correct?

3   A    Yeah, it would be advisable for an appraiser to become

4   aware of sources of information about the environmental

5   contamination.  I would look more to the public agencies and

6   what they say.  Sometimes the newspaper articles, you know,

7   they have various sources of information.  But the public

8   agencies, right or wrong, they're a third party that provides

9   information.  That would be a good source of information.

10  Q    And when you say right or wrong, governmental entities

11  may sometimes mislead the general public through conclusions

12  that are either incomplete or incorrect, correct?

13  A    Well, I don't think I want to accuse government agencies

14  of misleading people, but what I was really saying is that the

15  government agencies are a source, a third-party source of

16  information about environmental issues.  They're the ones that

17  are responsible for establishing the regulatory thresholds and

18  making determinations about the contamination, and that would

19  be a good source of -- perhaps the best source of that

20  information.

21  Q    Didn't you just say government agencies, right or wrong?

22  Did I mishear you say those things?

23  A    No, you didn't mishear me.

24  Q    Okay.

25  A    But you inferred that I think that they're deliberately

1    misleading people.

2    Q    No, sir.  No.  And I did not mean to suggest that.

3    A    Okay.

4    Q    I don't think my question suggested that in any way.

5          You do agree that governmental agencies may

6    influence, in the words of Advisory Opinion Number 9, the

7    market's perception of increased environmental risk due to

8    contamination, and that influence may or may not be accurate,

9    correct?

10   A    I don't think I have an opinion as to whether government

11   agencies are accurate.  I assume that that information from a

12   government agency is reliable, and that's what's gonna be

13   followed.

14         If the government agency later determines -- and I

15   have seen this happen, where they change their mind or they

16   have a different -- they change the standard, or something

17   else happens.  That doesn't necessarily mean they're

18   misleading; that just means they've changed their mind.

19         But they're the ones that I would recommend for

20   appraisers and the market to focus on.

21   Q    Did you do that in this case?  Did you focus on the

22   information available in the marketplace with regard to

23   environmental risks associated with The Acreage?

24   A    Did I evaluate the government agencies' information?

25   Q    Yes, sir.

```
 1   A     Well, I'm aware of the Department of Health's -- the DOH
 2   statements and reports.  We put them in our documents.  I
 3   didn't evaluate them.  I am aware of them, that, you know, the
 4   cancer cluster that you guys talked about yesterday at length,
 5   I'm aware of that.
 6   Q     You were in the courtroom throughout the testimony that
 7   was given yesterday by Dr. Kilpatrick, correct?
 8   A     Yes, sir.
 9   Q     Okay.
10   A     Could -- are we getting close to a point where we could
11   take a short break?
12   Q     I am sure that His Honor will honor a request from you to
13   take a break if you would like to do that.
14   A     Just a short break.  I like to break periodically.  I got
15   this health issue with my blood clotting.
16              THE COURT:  That's fine.  We'll take -- 10 minutes
17   good?
18              THE WITNESS:  Fine.
19              THE COURT:  Let's take a 10-minute recess.
20              THE WITNESS:  Appreciate the accommodation.
21              THE COURT:  Thank you.
22              Let me know if you need other breaks.  Okay?
23        (A recess was taken from 10:14 a.m. to 10:29 a.m., after
24   which the following proceedings were had:)
25              THE COURT:  All right.  Please be seated, everyone.
```

```
 1                THE WITNESS:  Thank you, Your Honor.

 2                THE COURT:  Mr. Scarola, you may proceed.

 3                MR. SCAROLA:  Thank you very much, sir.

 4                THE COURT:  You all right, sir?  Dr. Jackson, you

 5      all right?

 6                THE WITNESS:  I'm fine, thanks.

 7                About every hour.  I have these blood clotting

 8      issues, and they tell me if I get up and walk around, it helps

 9      to prevent that.

10                THE COURT:  Whenever you need a break, let me know.

11                THE WITNESS:  I appreciate that.  Thank you.

12                MR. SCAROLA:  I've noted the time is about 10:30,

13      and so we'll make sure that together we remind ourselves that

14      11:30 you need to get up again.

15                THE WITNESS:  Fair enough.  I appreciate that.

16                MR. SCAROLA:  You're welcome, sir.

17      BY MR. SCAROLA:

18      Q    Do you accept the proposition that it may sometimes take

19      years for the market to learn of, absorb and accurately

20      reflected in market transactions information relevant to

21      value?

22      A    I remember yesterday listening to Dr. Kilpatrick talk

23      about that, the leakage, information leakage question, and

24      that's not been my experience nor experience I think that's

25      been reported in various literature.
```

```
 1            The issue of contamination is one of knowledge and
 2   uncertainty.  That knowledge and uncertainty and the effect of
 3   that on property values is a rather immediate effect, because
 4   you know less, you have greater uncertainty.  That's not
 5   something -- the market reacts fairly quickly as opposed to
 6   this buildup in reaction, which I think is what Dr. Kilpatrick
 7   was trying to say.  I haven't seen that.
 8            The market, you know, once it has more knowledge
 9   about contamination, where it is, what is necessary, generally
10   the risk and uncertainty goes down with greater knowledge.  So
11   it's sort of the opposite.  The effect is kind of the
12   opposite.
13   Q    You do recognize, then, that the available information
14   impacting on the market's perception of increased
15   environmental risk due to contaminants can change over time?
16   A    Yes.  And as I just said, it would generally increase so
17   that you knew more about it over time.
18            Risk and uncertainty are greatest when, in the --
19   yeah, there's a cycle called the -- you know, the risk cycle
20   that I've written quite a bit about.  In the initial phases,
21   when the information is not as fully developed, there's more
22   uncertainty, more risk.  As more information becomes available
23   after whatever it is has been studied, then the risk and
24   uncertainty goes down.  So the effects are higher initially
25   and lower later on is what I wrote my dissertation on.
```

```
1    Q    With, Doctor, I certainly understand your statement that

2    uncertainty decrease as information increases, but could you

3    explain to us how it is that you are able to say categorically

4    that risk decreases as information increases?

5    A    Certainly.

6         Risk and uncertainty are correlated.  They're

7    related to each other.  The more information, the more

8    certainty and the less risk.  The market perceives the

9    greatest risk with the least amount of knowledge.

10        So in the beginning, if something is discovered,

11   contamination is discovered, at that point in time, usually,

12   there is less information available about it, other than maybe

13   its existence, and there's more uncertainty in the market.  So

14   the market would have a greater reaction at that point than

15   they would after more information is available, the issue has

16   been studied, there's greater certainty, for example, where

17   the contamination is, what is gonna be required to remediate

18   and that sort of thing.

19        So the market reaction, this risk effect that we've

20   within talking about, which is the stigma effect, goes down

21   over time.  It doesn't go up, it goes down.

22        And I've done -- I've analyzed hundreds of sales.

23   I've done surveys of lenders and investors.  And this is also

24   borne out in the empirical literature that's been published.

25   The effect is sooner rather than later.  And, in fact, what
```

1    happens is this effect becomes a temporary effect.  It's

2    greater knowledge and information about the environmental

3    condition in the area becomes known -- excuse me, becomes

4    known.

5    Q    So it is your testimony that if new information is

6    developed that resolves uncertainty in the direction of

7    confirming greater danger than was even suspected initially,

8    that the risk perception decreases?

9    A    My opinion -- and this is based on a lot of careful

10   study, and it's also shared, can be found in the literature

11   that I've reviewed, and it's available, peer-reviewed

12   literature, is that as this information comes about -- think

13   about it in terms of a plume.  Okay.  We found contamination.

14   We haven't defined the plume yet.  We don't know where it is;

15   we don't know how far it's gone.  There's a lot of

16   uncertainty.

17            In that situation, the market uncertainty translates

18   into greater risk and could translate into property value

19   diminution.

20            As the information becomes available and they're

21   studied -- you know, usually there's studies that go on, and

22   the state agencies go and do studies and more carefully define

23   and delineate the plume and the contamination, there's more

24   knowledge.  Increased knowledge reduces risk.

25   Q    But what if the increased knowledge is there really is a

1    plume, it really carries dangerous contaminants, the

2    contaminants are cancer-causing agents, the cancer-causing

3    agents are, in fact, affecting the health and safety of

4    children within The Acreage, if that's the new information, is

5    it your assertion that that new information decreases the

6    public perception of risk?

7    A    The information -- and I think other people are going to

8    talk about this besides me.  In the Department of Health where

9    they found the cancer cluster --

10   Q    I'm sorry to interrupt you, sir, but right now, at least

11   for these purposes -- because you are not the scientific

12   expert that's going to address what the facts are.  My

13   question to you has to do with a hypothetical.

14            Are you telling us, because you have made the

15   general statement that the more information is available, the

16   lower the perception of public risk is, and my question to

17   you, based upon the hypothetical that you gave us, is if the

18   new information is, yes, there really is a plume, yes, the

19   plume is transporting cancer-causing agents into The Acreage,

20   yes, it is a widespread transport of large quantities of

21   cancer-causing agents, yes, those cancer-causing agents are,

22   in fact, affecting the health and lives of children in The

23   Acreage, are you telling us that that risk, the public

24   perception of risk, then goes down because we have more

25   information now?

```
 1   A     Now, you're saying this is a hypothetical?

 2   Q     Yes, sir.  Yes, you gave me the hypothetical.  I'm

 3   working with your hypothetical.

 4   A     But you also threw in The Acreage and the cancer and

 5   everything.

 6         In general -- I'm giving you an in general and also

 7   based on my research and other research -- over time, risk and

 8   uncertainty are reduced because the properties in the market

 9   and everything have greater knowledge so they can know with

10   more certainty.

11         Now, if the information comes about that, okay, the

12   contaminant plume is -- we knew there was a plume, and now we

13   know exactly where it is, and we knew there was

14   concentrations, but we weren't certain how much they were, now

15   we know exactly what they are and it's in a confined area or

16   it's in an area where there's -- you know, that there's a

17   definable, delineated area, that information would be -- could

18   be translated into -- you know, into market value impacts, if

19   there is a market that's perceiving this particular risk, it's

20   possible.

21         But my point is that if there's this -- and this can

22   occur --

23         MR. SCAROLA:  Excuse me, Your Honor.  I'm sorry to

24   interrupt, but could you please direct the witness to answer

25   my question?
```

55

```
1          THE COURT:  I think he's trying to.
2          MR. SCAROLA:  Okay, sir.
3          THE WITNESS:  I really am.
4          MR. SCAROLA:  I missed it, but I defer to you.
5          THE COURT:  Go ahead.
6          THE WITNESS:  So I'm talking about this
7   risk-in-information period, where you don't know where things
8   are, now you find out where it is, you find out the
9   concentrations, you find out what the hazards are, more
10  clearly defined plumes and concentrations and standards, maybe
11  find out what it takes to remediate, that reduces risk.
12          Now, if there's a property that's sitting right on
13  top of the plume that's going to have to be remediated and
14  demolished, then for that particular property, yes, that would
15  be -- it would be more certain, but it would be a more certain
16  adverse impact.
17          But over time, you're talking in a general area, the
18  greater knowledge of the contamination and its extent and
19  where it is reduces risk, and that's why you see these
20  effects, where there are effects, of course, you see these
21  effects as temporary.  They taper off over time.
22  BY MR. SCAROLA:
23  Q    Do you remember the question I had asked you?
24  A    You're talking about -- yeah, you're talking about
25  information that came about, they found more information about
```

1    the contamination.

2    Q    What information, sir?

3    A    I don't -- well, why don't you repeat the question.  I'll

4    give it another go.

5    Q    Thank you.  I appreciate that.

6           I want you to assume that at one point in time, the

7    public perception is that there is a potential risk of

8    contamination in a given area and that potentially it may be

9    related to an increase in cancer within that area.  I want you

10   to assume that new information develops, and that new

11   information is this isn't just a potential, a potential that

12   has been rejected by government agencies, but this is a

13   reality that contaminants are, in fact, entering this area,

14   and they are, in fact, causing cancer, and the contaminants

15   are found in tissue samples of children with cancer of the

16   exact type caused by those contaminants.  I want you to assume

17   those are the facts.

18          Are you telling us that when that new information is

19   developed, the public perception of risk goes down?  Is that

20   your testimony?

21   A    Well, let me just make sure I'm following your

22   hypothetical.

23          So the initial information that there was a

24   potential for cancer in the area, you know, they didn't know

25   for sure, there was a potential for cancer in the area, and

1   then later on they have some studies, or whatever, that

2   determine that there is cancer in the area, that it's a

3   certainty, is that generally the direction you're asking me?

4   Q    Well, you're missing a few important elements, sir, and,

5   that is, that the cancer is actually caused by contaminants.

6   A    Okay.  I'll use that, too, then.

7            So there is cancer, and it's caused by the

8   contaminants.  And that's certain now.  There's no question

9   about that.

10  Q    Yes, sir.

11  A    And this is --

12  Q    Despite the fact that initially the Government said we

13  can't draw any conclusions about any connection, now the

14  connection's been made, the uncertainty has been resolved, and

15  it's been resolved in favor of the determination that cancer

16  is being caused by contaminants in this area.

17  A    And when you say the -- I know we're talking about a

18  hypothetical here.

19  Q    Yes, sir, we are.

20  A    So when you say this area, and so there's a more clearly

21  defined area, there's like a boundary of the area, there's

22  certain, and the cancer is being caused by contamination, is

23  that --

24  Q    No, that's not part of my hypothetical.

25  A    When you said this area, I'm just trying to figure out

```
 1   what this area means.
 2   Q    Yes, sir, the area of concern to the general public.
 3   A    So there isn't -- there's a more clearly defined area
 4   where contamination has caused cancer.
 5   Q    Yes, sir.
 6   A    Whereas initially there was just this general notion that
 7   there's a potential, a potential for cancer.
 8   Q    In this same area.
 9   A    And now we know it is.
10   Q    Now we know it's there.  Now we know it's being caused by
11   contaminants.
12        Are you telling us that this new, really bad
13   information decreases the risk and therefore decreases the
14   adverse effect on value?  Is that your testimony?
15   A    Well, what it might do is have -- produce a more severe
16   effect in the area in the second set of information you
17   describe, where you know, or the agency now knows that the
18   cancer is there, and it's caused by contamination, as opposed
19   to a broader area, where it's unknown, and it might have been
20   unknown when they initially said it's the potential, that
21   might happen.  I could see that.
22        But in general, the description of the risk cycle
23   that I was going through is pretty clear.  You know, a lack of
24   knowledge is generally, for the market, something that causes
25   uncertainty in risk and reduces property values.
```

1          More knowledge usually causes property values to go

2    down, but if the more knowledge is greater certainty with

3    respect to your property is impacted, then for that particular

4    property, then it would probably increase the diminution.

5    Q    Do you agree that information relevant to value that is

6    concealed from the market cannot be accurately reflected in

7    market transactions?

8    A    You mean that the market doesn't know about?

9    Q    Yes, sir.  When I say concealed, I mean the market

10   doesn't know about the information.

11   A    Concealed makes it sound like it's -- you're deliberately

12   withholding it.  But if the market doesn't know, the market

13   doesn't know.

14   Q    Whether it is intentionally concealed or whether the

15   market doesn't know simply because the market hasn't been

16   informed.

17   A    Like I said, if the market doesn't know, it doesn't know.

18   Q    Okay.  And if it doesn't know, then that information

19   cannot be accurately reflected in market transactions,

20   correct?

21   A    If it doesn't know, yes, sir.

22   Q    Okay.  Have you conducted an information review to

23   determine what information regarding the impact of

24   environmental contaminants in The Acreage became available and

25   when it became available?

```
1    A     No, sir, that wasn't part of my assignment.

2    Q     So when you spoke generally about information leakage,

3    you were not talking about the particular circumstances of

4    this case, because you don't know what information became

5    available and when it became available, correct?

6    A     I don't like that term, "leakage."

7    Q     I thought that that was a term that you used.

8    A     No, I've never -- I heard that term for the first time

9    yesterday.

10          The cycle, the risk cycle that I was talking about,

11   I was talking in a general way, you know, that I've found in

12   my studies and that have been found in other studies, that

13   over time, with greater knowledge, you know, the focus of the

14   remedial effort becomes more apparent, and that tends to

15   reduce risk in the market.  That was what I was talking about.

16   Q     Okay.  So if we accept your proposition, the more

17   uncertainty there is, assuming your proposition to be true,

18   the more uncertainty there is, the greater the environmental

19   stigma is?

20   A     Potentially the greater, because there's less knowledge.

21   And then over time, these environmental events usually result

22   in studies and remediation and greater knowledge than less

23   knowledge, and that's just -- that's the way the market works.

24   Q     So is there any ramp-up, or does it just overnight

25   suddenly become an environmental stigma whose adverse effect
```

1    has matured instantly?

2    A    When there are impacts on environmental property

3    associated with this term "environmental stigma," it is

4    generally more -- greater immediately after the announcement

5    or knowledge of the contamination.

6    Q    Well, which one is it?  Is it greater immediately after

7    the, quote, announcement, unquote --

8    A    Discovery.

9    Q    -- or immediately after the, quote, knowledge, unquote?

10   A    Immediately after the discovery of contamination.

11   Q    By whom?

12   A    Discovery by whom?

13   Q    Yeah.

14        Isn't it discovery by the marketplace?

15   A    Yeah, I -- let me answer your question.

16        You said by whom.

17   Q    Yes, sir, I did.

18   A    Usually there's some environmental specialists.  There's

19   environmental -- there's a whole profession of people that do

20   environmental assessments, and they go out and they find

21   contamination.  A lot of times it occurs when there's a

22   transaction, a pending transaction, and there will be an

23   assessment done, and then there will be a discovery on

24   contamination.

25        Now, that discovery is the not same -- at that point

```
 1   in time, the discovery of contamination is simply that.
 2   There's contamination there.  We don't know the extent and the
 3   nature of it.  We don't know how far it's spread.  We don't
 4   know what's going to be involved in remediation.  So that's
 5   the uncertainty that I was talking about.
 6           It might be done by a state agency; it might be done
 7   by an environmental professional, assessment professional; it
 8   might be done by an engineer.  But that's what I'm talking
 9   about, the discovery of -- you just found contamination.
10   Okay.  That's the period that, you know, it -- obviously the
11   market would have to know about it.  The market would be the
12   buyers and sellers in that area, or maybe of that particular
13   property.  They would -- they would be -- this would be
14   reported to them in some way.
15           Or, you know, in this case you've got your trigger
16   dates when the DOH issued these reports.  There would have to
17   be some dissemination of that information.  If they kept it
18   secret, you know, we wouldn't know about it.
19           But that's what I'm talking about.
20   Q    So the answer to my question, which was discovery by
21   whom, is discovery by the market, correct?
22   A    Well, discovery by the qualified environmental
23   professional that has found this, and then the information
24   being provided to the market.  If they found it and they kept
25   it secret, it wouldn't be knowledge in the market.
```

```
 1   Q     Okay.

 2   A     If that's what you're asking.

 3   Q     So what we need to look at when we are making the

 4   determination as to whether an adverse effect on property

 5   value was produced by the market's perception of increased

 6   environmental risk due to contamination is when the market

 7   perception of increased environmental risk due to

 8   contamination arose, correct?

 9   A     Well, at what point in time?  Depends on, you know, the

10   point in time at which you're evaluating the property.

11   Q     Doesn't that equal when?  Isn't point in time the same

12   thing as when?

13   A     I'm just trying to piece your question together so I can

14   make sure I'm answering what you're asking me.

15         So the market's perception of this increased risk

16   would be as of a point in time.  And as I tried to explain it,

17   it could change over time, and usually does.  But that would

18   be -- that would be a potential cause of the measured

19   diminution in value.  And my point was about the change over

20   time.  That's what I guess we're talking about.

21   Q     No, what I was talking about is whether you need to

22   determine when the market's perception of increased

23   environmental risk due to contamination arose, and I think I

24   understood your answer to that question to be, yes, you do

25   need to determine when it arose.
```

```
 1    A     Yes.  And you would have to have -- and in this case we

 2    have these -- we've been calling them trigger dates.  It'd be

 3    a date that you evaluate the properties in the before

 4    condition and the after condition.  So you'd have a -- that

 5    would be the key date in doing the study of the effects on

 6    property values.  So you have to have that date.

 7    Q     When did the market's perception of increased

 8    environmental risk due to contamination in The Acreage arise?

 9    A     I have not made a determ --

10         MR. GALLAGHER:  I'm going to object that that's a

11    loaded question.  It's in the nature of saying when did you

12    stop beating your wife.  It assumes that there was a market

13    perception and asks him to assume that fact.  It's a loaded

14    question.

15         THE COURT:  I think he's well able to not answer the

16    question if it's loaded, and so I'll let him decide how to

17    answer it.

18         THE WITNESS:  I've been dodging loaded questions for

19    quite a while.

20         So in doing a study of this type of impacts of

21    contamination on property values, you would generally have a

22    date, and there would be -- you know, we've talked -- you

23    know, you guys talked yesterday about these two potential

24    trigger dates.  It's sort of an event date.  You know, what

25    event are you studying the impact of?  And I haven't made a
```

```
 1   determination as to what is the proper trigger date or event

 2   date that -- for this particular matter.

 3              Dr. Kilpatrick has, you know, proffered two dates,

 4   and I was a little confused about his support for either one

 5   of those dates.  But there's at least two dates floating

 6   around here.

 7              But I haven't made any determination.  But usually

 8   there is a date.  Okay.  You're studying this announcement or

 9   this, you know, whatever information you're studying the

10   effect of, and you need to have that -- you need to know that.

11   BY MR. SCAROLA:

12   Q    So you told us that you have not conducted an information

13   review to determine what information regarding the impact of

14   environmental contaminants in The Acreage became available,

15   you have told us that you have not conducted any determination

16   of when the information became available, and you have not

17   determined an event date.  True?

18   A    My -- those -- the things you just asked me about in your

19   question were not part of my assignment.  My assignment was

20   focused on what Dr. Kilpatrick did.  And my only comment about

21   the dates was that it didn't seem to make any difference to

22   him, and he changed it and said it didn't make any difference,

23   and I found that a little hard to -- you know, I -- kind of

24   hard to believe that it didn't make any difference, because

25   you have to have a date.  That's where you're -- you have to
```

```
 1   delineate when your sales in the before condition and the
 2   after condition occurred as of a date.
 3              And I haven't -- nobody asked me to determine the
 4   date, but --
 5   Q    So the answer --
 6   A    But the question -- but the answer is that I haven't
 7   determined a date.  I don't know that he's determined a date.
 8   My only comment on his -- the changing date, he said, doesn't
 9   make any difference.  But you would have sales before and
10   after -- you have to have sales before and after some date in
11   order to, you know, do this kind of analysis.
12   Q    The answer to my question is "yes," correct?  You have
13   not done any of those things I just described.
14   A    No; I just described what it was that I did.
15   Q    Okay.
16   A    Nobody asked me to independently determine the
17   appropriate trigger date.
18   Q    And you can't tell us that either of the trigger dates,
19   since you haven't made the determination, that were utilized
20   by Dr. Kilpatrick are wrong, correct?  Since you didn't do the
21   work, you don't have an opinion about that.
22   A    Well, I did a lot of work relative to those dates, but I
23   didn't determine those dates.  I did determine --
24   Q    No, sir.  I don't mean -- I don't mean to interrupt you.
25   Okay?
```

```
 1   A     Well, you did just interrupt me.

 2   Q     And there are a lot of things I'm sure that you could

 3   comment on about the question, and I'll let you do that, I

 4   promise you.  But I would like you to begin with an answer to

 5   the question first.

 6              And the question is:  You cannot tell us that either

 7   of the dates utilized by Dr. Kilpatrick is wrong, because you

 8   did not make a determination with regard to a trigger date,

 9   right?

10   A     No, I have no opinion about one of the dates being

11   correct or incorrect.  My opinion is just that you have to

12   have a date, and it makes a difference.

13   Q     You have not considered any evidence that information

14   regarding Pratt & Whitney's contaminants was concealed from

15   the market by the conduct of Pratt & Whitney, correct?

16   A     I have no opinion about that.

17   Q     You have not considered any evidence that information

18   regarding Pratt & Whitney's contaminants was concealed from

19   the market by the failure of government entities to thoroughly

20   investigate The Acreage cancer cluster, correct?

21   A     I have no opinion about that.

22   Q     You have not considered any evidence of the existence of

23   a court order prohibiting any comment about issues in this

24   litigation and the extent to which that had an impact on what

25   was available to the market, correct?
```

```
 1   A     Same answer.
 2   Q     And the answer is you have not considered those -- that
 3   evidence --
 4   A     Well, I haven't --
 5   Q     -- if it exists?
 6   A     I have no opinion about that.
 7   Q     Okay.  Have you considered that cancer-causing
 8   contaminants originating on the Pratt & Whitney campus have
 9   been found on autopsy in the tissue of The Acreage children
10   who died of the exact kind of cancer scientifically linked to
11   those contaminants?
12   A     I have no opinion about that.
13   Q     And that's because you haven't considered it, correct?
14   A     Considered it in terms of what?
15   Q     Considered it in formulating any opinion or conclusion
16   that you have expressed in your testimony to the Court.
17   A     Well, in my express testimony in my affidavit, I focused
18   solely on Dr. Kilpatrick's methodologies and appropriateness
19   and rigor, and I haven't made any independent analysis of any
20   of the information that you've just described.
21   Q     Have you ever seen any published reports relating to
22   cancer-causing contaminants originating on the Pratt & Whitney
23   campus being found on autopsy in the tissue of The Acreage
24   children who died of the exact kind of cancer scientifically
25   linked to those contaminants?
```

```
1    A    I don't recall seeing any of those reports or seeing

2    reports that you describe.

3    Q    Do you agree that until the market is informed of that

4    evidence, the evidence that I have just described in the

5    preceding questions that you have told us you did not

6    consider, that that evidence can have no impact on market

7    transactions?

8    A    Could you repeat the question?  I'm sorry.

9    Q    Yes, sir.

10         You have identified in response to a series of

11   questions that I just asked you that you have not considered

12   evidence with regard to various aspects of environmental

13   contamination in The Acreage.  And my question to you is do

14   you agree that until the market is informed of that evidence,

15   it can have no impact on market transactions?

16   A    I would agree if there's information such as you

17   described, which, again, I have no knowledge of one way or the

18   other, if that information is not available to the public,

19   then it wouldn't have an impact, but I can also say the

20   contrary, too.  There's been no -- I'm aware of no studies of

21   that information having an impact.  I just don't have an

22   opinion about it.

23   Q    What you do have an opinion about is that as long as

24   there is a market concern about the risk of such things, then

25   the adverse effect on property value produced by that
```

1   uncertainty in the marketplace has an even greater impact, an

2   even greater negative impact on value, right?

3   A    No, that's not what I'm saying.

4        I haven't evaluated the impact on value.  I've

5   evaluated Dr. Kilpatrick's analysis of the impact on value.

6   And you know -- and my opinions about that are stated in my

7   direct affidavit testimony; that I don't think he's discovered

8   any impacts either, or he's not reliably discovered anything.

9        But I haven't done that.  I'm not -- that's not my

10  purpose here.

11  Q    But I thought you told us as a general matter that

12  uncertainty is even of greater adverse impact than certainty

13  with regard to that negative information.  Isn't that what you

14  told us?

15  A    I talked about that quite a bit, but --

16  Q    Yes, sir.

17  A    But --

18  Q    And is that what you said?  Did I understand that

19  correctly?

20  A    Let me answer your question here, and the court

21  reporter's going to get upset with us again.

22       My testimony is that's what generally happens in the

23  market with greater knowledge and certainty that property

24  impacts go down.  But you have to measure the property value

25  impacts, first.  You have to find some impact.  You have to

```
 1   find diminution in value, and then we're looking for causes of
 2   the diminution in value.  That's different, slightly different
 3   focus there.
 4           I haven't measured the values of properties, the
 5   diminution in values of properties in this area.  I have
 6   reviewed Dr. Kilpatrick's measurements of those values and his
 7   opinions.  You know, we haven't even talked about that yet,
 8   but that's what I've done.  I haven't gone out and measured
 9   those.
10           Risk and uncertainty can lead to diminished property
11   values or they may not lead to diminished property values.
12   There's a -- there's kind of a sequence that you have to
13   follow.  You have to find diminished property values, and then
14   in terms of causality you look at these other factors that
15   I've been mentioning.  That's the best I can explain it.
16   Q    So are you here to tell us that there has been no adverse
17   effect on property value in The Acreage produced by the
18   market's perception of increased environmental risk due to
19   contamination?  Is that an opinion that you have formed and
20   which you are presenting to the Court as your opinion; no
21   damage?
22   A    Okay.  Is your question finished?
23           I haven't made an independent determination of
24   property value diminution in this matter.  My role has been to
25   review Dr. Kilpatrick's opinions and methodologies and his
```

1    analysis of property value diminution.  I've conducted a

2    review of his work.  I haven't come up with an independent

3    impact analysis.

4    Q    Okay.  So you are not here to express the opinion that

5    there is no adverse effect on property value in The Acreage

6    produced by the market's perception of increased environmental

7    risk due to contamination.  You're not here to tell us no

8    damage, correct, or no adverse effect?

9    A    My turn?

10         I have no -- I have not conducted the requisite

11   studies that I would do to determine if there have or have not

12   been any impacts on the -- or property value diminution in

13   your proposed class area.

14   Q    Okay.

15   A    My sole role is as a reviewer of what Dr. Kilpatrick has

16   done, and I have found his methodologies to be unreliable.

17   Q    And since you haven't even reached the threshold question

18   of whether there is any adverse effect on property value

19   produced by the market's perception of increased environmental

20   risk due to contamination, you are also not here to present

21   any opinion as to what, if there has been an adverse effect,

22   that adverse effect has been, that is, quantifying the damage?

23   Not your role?

24   A    Well, I was following you there the first part.

25         I haven't done an analysis of -- an independent

1   analysis of property value diminution in the proposed class

2   area.  I've only addressed what Dr. Kilpatrick's done.  I've

3   also addressed the issue of whether or not this area's

4   suitable for common class-wide analysis of such diminution.

5   That was my initial task.

6           And typically what I've done -- I've done a few of

7   these -- where I've -- looking at the class area, can you do

8   this on a class-wide basis, is there enough commonality and

9   homogeneity to do this, and I've done that.

10          And then usually it's a second phase of merits.  And

11  I know in the Sher-Ratheon case where I was an expert that's

12  what we did.  We had the class cert. phase and the merits

13  phase.

14          But at any rate, I haven't done it; nobody's asked

15  me to do it.  All I've done is comment on his methods and

16  techniques, and I've also opined that the proposed -- the two

17  proposed class areas, neither of which are suitable for common

18  treatment in terms of estimating a same -- similar or common

19  damage across this -- these large areas.

20          That's my role.  That's the best I can explain it.

21  Q    So the foundation of your relevant opinions in this

22  matter is that there is not enough commonality and homogeneity

23  within either of the defined class areas to permit the

24  application of generally accepted appraisal methodologies in

25  determining whether there has been any adverse effect on

1    property within those areas, correct?

2    A     I'm thinking about each of your words, because it's

3    important.

4              Yeah, my opinion -- I think that's correct.  My

5    opinion is that there are sufficient -- there is sufficient

6    diversity among the properties and markets and areas.  The

7    properties are not homogeneous.  It's not all one common

8    market.  Impacts on value could not be assessed.  There's no

9    way to reliably assess impacts on value across this broad

10   spectrum of properties in a reliable way.  You can do it, but

11   it's not going to be reliable.

12             The 25 to 40 percent, which is a pretty big range in

13   and of itself, but that, it would be inappropriate, even if

14   that was the range, to apply it commonly across the whole

15   area.

16   Q    Okay.  Well, I want to stay focused, if we could, on

17   these issues separately, and I want to focus on the issue as

18   to whether there is sufficient commonality and homogeneity in

19   order to determine if there has been any adverse effect on

20   property value within the defined areas on the two separate

21   maps you're familiar with, correct?  You're familiar with

22   those maps?

23   A    The two proposed class areas?

24   Q    Yes, sir.

25   A    Yes, sir.

```
 1   Q    Whether there is sufficient commonality and homogeneity
 2   within those areas to determine whether there has been any
 3   adverse effect on property values within those areas produced
 4   by the market's perception of increased environmental risk due
 5   to contamination.
 6          Do you understand what the focus is?
 7   A    Is that a question?
 8   Q    Yes, sir.  Do you understand what the focus is?  The fact
 9   of damage, not the amount of damage.
10   A    Let me try to answer your question.  Just let me make a
11   go of it here.
12          My opinion is that the diversity among the
13   properties in the proposed class area would preclude a
14   reliable analysis of a common area-wide property value
15   diminution determination; that there's sufficient diverse
16   tease among the properties and submarkets in this 18-,
17   15-thousand property area, that you could not reliably come up
18   with a single, common, across-the-board estimate of
19   diminution.  You couldn't do that together.  That's my opinion
20   about what you're just asking me.
21   Q    Now do you remember the question that I asked?
22   A    I was not -- that wasn't the --
23   Q    No, sir.
24   A    Okay.  What --
25   Q    I asked you -- I have asked you to consider separately
```

1    the issue of fact of damage and amount of damage.  I

2    understood that what you have just told us is that there is

3    insufficient homogeneity and commonality within either of the

4    two proposed class areas to be able to come up with an opinion

5    through mass appraisal of the amount of damage.  That's what

6    you just said, right?

7    A    Yes, that's what I said.

8    Q    Okay.  But that's not my question.

9         My question is whether you are here to express an

10   opinion as to whether it can be determined that there has or

11   has not been an adverse effect on property values produced by

12   the market's perception of increased environmental risk due to

13   contamination within either of those two proposed class areas.

14        We're focused now on the fact of damage, not the

15   amount of damage.

16   A    And this fact of damage would be whether or not there's

17   been damages on a class-wide basis, as opposed to how much the

18   damages are?

19   Q    Yes, sir.  Whether there has been, in the words of

20   Advisory Opinion Number 9, an environmental stigma that

21   attached to The Acreage, as defined in either map.

22   A    Well, as you know, I have disagreements about what you're

23   calling The Acreage, but if we just call it the proposed class

24   area, whether or not there has been any damages as opposed to

25   the amount of damage.

```
1              My review of Dr. Kilpatrick's analyses of this topic

2    or this issue is what I -- is what I'm concluding that he

3    hasn't determined it.  I have not made an independent

4    determination as to whether there are or are not damages.

5              In addition, the next point that I've already made

6    is that I have made a determination that there's no reliable

7    method for determining it on a class-wide basis.  That's not

8    your question, I understand.  But I haven't made a

9    determination whether there are or are not damages anywhere in

10   your proposed class area.  That wasn't my assignment.

11   Q    Bottom line -- please correct me if I'm wrong -- is you

12   cannot tell us based upon the work you have done that there

13   has been no proposed class-wide adverse effect on value due to

14   the market's perception of increased environmental risk due to

15   contamination within either of the class areas, correct?

16   Weren't asked to do it, didn't do it, can't express any

17   opinion about it.

18   A    Well, I can express an opinion that there is no way to do

19   it, but I can't express an opinion as to whether there's been

20   any impacts in the proposed class area.

21   Q    And is it your testimony that there is no way, in

22   accordance with generally accepted appraisal methodologies, to

23   even make the determination as to whether there has been any

24   adverse impact on Acreage property values produced by the

25   market's perception of increased environmental risk due to
```

 1   contamination?

 2   A     Are you asking me specifically if there's a way to

 3   determine it on a class-wide basis in all the properties in

 4   the class?

 5   Q     I'm asking you whether there's any way to do it.

 6   A     To do it on a class-wide basis.  That's an important

 7   distinction.

 8   Q     I'm asking you whether there's any way to determine

 9   whether there has been an adverse impact at some level

10   produced by the market's perception of increased environmental

11   risk due to contamination.

12   A     Um, when you say at some level, is that level are you

13   talking about an individual property versus a group of

14   properties, or are you talking --

15   Q     I'm talking about the fact of damage as opposed to the

16   amount of damage.

17             THE COURT:  He wants to know whether you're talking

18   about the entire area or specific piece of property.

19             MR. SCAROLA:  I'm talking about whether you can make

20   a determination based upon generally accepted appraisal

21   methodologies as to whether the entire area has sustained an

22   adverse impact produced by the market's perception of

23   increased environmental risk due to contamination.

24             THE COURT:  Okay.  The entire area.

25             THE WITNESS:  The entire area.  Okay.  That's what I

```
 1   was getting at.

 2           And I don't believe you can do that.

 3   BY MR. SCAROLA:

 4   Q    Okay.

 5   A    That's my opinion, and I've stated my opinion in that

 6   regard.

 7   Q    Now, doesn't the answer to that question depend upon

 8   whether the market perceives this to be an identifiable area?

 9   A    It has more to do with the properties in the area and

10   their characteristics, and --

11   Q    Sir, I'm sorry.

12   A    Would you please let me finish my question -- I mean my

13   answer?

14   Q    I would like you to -- as I said, if you could answer my

15   question first, I promise you the opportunity to say anything

16   at all that you want to, anything.  But let's try to focus on

17   my question first.

18           Doesn't --

19           MR. GALLAGHER:  Your Honor, he was answering the

20   question.

21           THE COURT:  Please ask the question again.

22   BY MR. SCAROLA:

23   Q    Doesn't a determination as to whether there has been

24   area-wide damage depend upon the market's perception of

25   whether area-wide there has been increased environmental risk
```

```
 1   due to contamination?  Yes, no, I don't know, and then any
 2   explanation you want.
 3   A    Well, I'm thinking about your question, sir.  Just give
 4   me a chance before you ask additional questions.
 5            The market's perception can lead to impacts on
 6   value.  I've -- I don't disagree with that.  The question is
 7   whether or not this vast proposed class area is sufficiently
 8   homogeneous and similar that it could be evaluated in that
 9   way.  You could evaluate a single property.  You could go
10   property by property.
11            But the properties in this area have, in my opinion,
12   sufficient diversity that that would be -- a common class-wide
13   analysis would be improper and would be not reliable.
14   Q    Since environmental stigma is defined as an adverse
15   effect on property value produced by the market's perception
16   of increased environmental risk due to contamination, isn't
17   it, by definition, true that if the market perceives this to
18   be a common and homogeneous area, impacted by an increased
19   environmental risk due to contamination, that the fact of
20   damage can be measured based upon that market perception?
21   A    No, no, I don't think so.
22   Q    Okay.
23   A    For the reasons that I've previously stated, the
24   diversity and breadth, and the markets are different in these
25   different areas, different -- even residential markets differ,
```

```
 1    different buyers and sellers.  The effect on the market
 2    would -- if there was an effect, would be different.
 3    Q    Whether there is enough commonality and homogeneity
 4    within either of the proposed class areas is a factual
 5    determination, is it not?
 6    A    Yes, and that's why we went out and inventoried all the
 7    properties and looked at them and consulted with local real
 8    estate people and did the research that's described in my
 9    reports.
10    Q    So you conducted an investigation of the facts, and you
11    concluded that there was insufficient commonality and
12    homogeneity, and Dr. Kilpatrick conducted an investigation of
13    the facts and made the determination that there was sufficient
14    commonality and homogeneity, correct?  You arrived at
15    different factual conclusions.
16    A    I arrived at the conclusion that I did, and he obviously
17    arrived at a different conclusion.  But my conclusion is based
18    on the research that I did --
19    Q    Yes, sir.
20    A    -- in looking at the same area.
21    Q    And you could present all of the factual findings that
22    you made with regard to commonality and homogeneity, and
23    Dr. Kilpatrick could produce all of the factual findings that
24    he made regarding commonality and homogeneity, and some finder
25    of fact would need to decide whose facts are right and whose
```

```
 1   facts are wrong, right?  That's the way the court system

 2   works.

 3            MR. GALLAGHER:  I'm going to object, Your Honor,

 4   that he's not an expert on how the court system works.

 5            THE COURT:  Sustained.

 6            MR. GDANSKI:  I'll remove the tail.

 7            THE WITNESS:  Well, I've probably seen too much of

 8   that.

 9            But Dr. Kilpatrick has evaluated these on a common

10   class-wide basis, and I believe his evaluation is unreliable

11   for the reasons that is stated in my reports and in my

12   affidavit.  And then -- that there's -- the base reason is

13   that there's too much -- there's too much diversity.  He tried

14   to do this regression model, and it failed because of the

15   diversity and aggregation area.  You just can't lump all these

16   properties together for any sort of appraisal-based analysis.

17   There's no methodology or technique in my profession that you

18   can do that, and it would be misleading and improper to do

19   that.  That's my opinion.

20   BY MR. SCAROLA:

21   Q    You have told us that information that has not yet

22   reached the market cannot have an impact on market value,

23   correct?

24   A    If information is unknown to the market, right, it

25   wouldn't have -- it couldn't have an effect.
```

```
 1   Q    Do you agree that information is not necessarily made
 2   known to the market in its entirety all at the same time?
 3             Do you need me to explain that?  You look puzzled.
 4   A    I certainly have an opportunity to think here.
 5   Q    Yes, sir.  And I --
 6   A    It improves my answers.
 7             My experience of doing studies on impacts on value
 8   and thinking about even, you know, just very simple examples,
 9   the market being the buyers and sellers of a home, say.  The
10   buyers of a home don't collect all their information at one
11   point in time.  They have to go through their due diligence,
12   finding out things, asking around.  It's a process.  You know,
13   I've bought and sold a couple of homes, and, you know, there's
14   a process that we went through.  You don't get it all at once,
15   you're right.
16   Q    And some market participants can have more knowledge than
17   other market participants, correct?
18   A    Well, that's why I was kinda getting back to that
19   typically informed market participant.
20   Q    Yes, sir.
21             And some market participants can have more accurate
22   information than other market participants, correct?
23   A    I suppose so.
24   Q    So information with a potential impact on value can be
25   disseminated to different market participants in different
```

1    ways at different times, correct?

2    A    Generally, yes, sir.

3    Q    And if what we are doing is gathering all of the data

4    regarding every transaction that has taken place in a relevant

5    market over a relevant period of time, some of those

6    transactions will reflect prices that have been influenced by

7    information that did not influence other transactions,

8    correct?

9    A    Yes.  You would always have information -- when you're

10   talking about a market -- I mean, it kinda depends on what

11   you're doing, but I assume we're talking about the proposed

12   class area.  There's always gonna be information that differs

13   depending on where you are in the class area.  Are you in a

14   good school district?  Are you near a highway?  Is there

15   something about this neighborhood or that neighborhood, crime

16   statistics.  There's a lot of information that will vary

17   depending on your location.  That will always differ.

18           And that's why it's very important to look -- to

19   look at these properties in a disaggregated way.  You look at

20   the properties individually to determine impacts on value and

21   individual values.  It's -- that's the way the real estate

22   market works.  It varies by location.

23   Q    And if what we are doing is charting out all of the

24   transactions that have taken place over a given period of time

25   in different market areas, we can reasonably assume that some

1    of those transactions are impacted by information that was not

2    yet typical and known to the market in general.  Fair?

3    A    I would answer that the same way I just answered your

4    previous question is that given the breadth of this market or

5    the proposed class area, there's gonna be information that

6    would be of relevance and importance in one area that may not

7    be of relevance and importance in another area.  That's why

8    it's so hard to come up with these gross generalizations,

9    especially after not considering all these differences about

10   impacts on value.

11             There's -- you know, one neighborhood is going to

12   have a different set of influences than another neighborhood,

13   for example.

14   Q    Are you familiar with this graph?

15   A    Yes, sir.

16   Q    And what do you understand it to depict?

17   A    This is Dr. Kilpatrick's sales trends analysis based on

18   the sales per square foot over time in the Cotromano class

19   area and in his two control areas.

20   Q    Is it your understanding that this graph is the product

21   of a sampling of transactions, or does it capture the universe

22   of transactions that are depicted on the graph?

23   A    I believe that Dr. Kilpatrick has represented that this

24   captures the universe.  I don't know if it does or not.

25   Q    So you're not in a position to contradict his sworn

```
 1    testimony.  You don't know, correct?

 2    A    I don't know if it -- this includes all the sales in the

 3    Cotromano class area or not.

 4    Q    Does it make any difference to you?

 5    A    Well, if it's represented to be all the sales, it would

 6    make a difference.

 7    Q    And it would make all -- it would make a difference

 8    because the reliability of the information depicted on this

 9    graph is greater if we don't need to take into consideration

10    the statistical validity of any sampling, correct?

11    A    I didn't understand that question.

12    Q    If we don't need to take into consideration the

13    statistical validity of any sampling, because there was no

14    sampling, this captures the universe of transactions in its

15    entirety, then the chart is not subject to any concern about

16    validity, right?

17    A    Well, there's a lot of concerns about validity.  I have a

18    lot of concerns about validity, statistical validity.  But

19    your issue was sampling.  If it contains every sale that

20    occurred in this period of time, you could think about it this

21    way.  Every property doesn't sell every year.  Some subset of

22    properties sell each year in each area.  That subset of

23    properties that sold in, say, 2011, is a sample of properties

24    in 2011 that -- the sales occurring in each of these areas.

25            That -- well, yes, so there is sampling.
```

1           Statistical validity, or, really, it's statistical

2    reliability, is a more complex question.  We talked -- or you

3    guys talked yesterday a little bit about this whole idea of

4    statistical significance, and I think it got off key, because

5    it's not based on sampling, it's based on differences,

6    statistical significant differences.  That's what really the

7    focus was, and that got lost in the conversation.

8           But there is sampling that occurs.  Every year

9    there's a sample of sales.  Every house doesn't sell every

10   year.  Some houses sell, some don't.  Some are on the market,

11   some aren't.

12   Q    So this is a chart that reflects price, not value, right?

13   A    Yeah, that's unrelated to the sampling thing.  But, yes,

14   it reflects sales price per square foot.  That's what it's

15   purported to represent.

16   Q    Okay.  Have you conducted any investigation whatsoever to

17   explain the widening gap between the sales price on a

18   per-square-foot basis between the Cotromano class area on the

19   one hand and the Jupiter Farms and Palm Beach Country Estates

20   area on the other hand?

21   A    Yes, sir.

22   Q    No.

23   A    Yes.

24   Q    Oh, you have?

25   A    Yes.

```
 1   Q    Okay.  What is the reason for that widening gap?

 2   A    Well, first of all, we're talking -- my investigation and

 3   what's in my report deals with what we would call it the after

 4   period, the period after the trigger date.  I know we have two

 5   trigger dates, but if you look at the after period after the

 6   2010 trigger date, we've looked at the actual change and

 7   looked at the percentage change in the three areas in sales

 8   price per square foot, and we found that in the Cotromano

 9   class area, the sales price per square foot is actually

10   increasing at a greater rate than it is at the Jupiter Farms

11   or Palm Beach country gardens class areas.

12            I've also developed opinions about the reliability

13   of only looking at the size of the house.  That's an

14   inappropriate and professionally unacceptable way of valuing

15   homes, but we would like --

16            MR. SCAROLA:  Excuse me, Your Honor, again, I'm

17   sorry to interrupt, but this has nothing to do with the

18   question that I asked.

19            THE COURT:  The question was?

20            MR. SCAROLA:  Was:  Has he determined the reason for

21   the widening gap between the sales on a per-square-footage

22   basis that occurred in the Jupiter Farms and the Palm Beach

23   Country Estate area on the one hand, and the Cotromano class

24   area on the other.

25            MR. GALLAGHER:  Actually, Your Honor, the question
```

```
 1   he was answering was the next question, which is what is the
 2   reason, and he was explaining.
 3           MR. SCAROLA:  Yeah, what is the reason?  He said
 4   yes, so now I wanna know why does that gap widen.  I haven't
 5   heard any of that yet.
 6           THE COURT:  Okay.
 7           THE WITNESS:  So the widening gap, just so we're --
 8   and this is the problem with these kind of things.  It's kind
 9   of -- it's real fuzzy.  It subject to -- I think
10   Dr. Kilpatrick called it the visual interpretation method or
11   the eyeball method.  It's a very imprecise method.  It's
12   certainly not an acceptable appraisal technique, but it's a
13   very imprecise methodology.
14           Yesterday we talked about the gap being the same
15   in -- actually make it -- one area as it is in the other area.
16           MR. SCAROLA:  Excuse me, Your Honor.  I'm sorry to
17   interrupt again, but could I ask that the witness be directed
18   first to answer my question why does that gap widen, and then,
19   as I told him, he can say anything else at all that he wants
20   to.  But I'd like an answer to my question first, please.
21           THE WITNESS:  All right.  Are you -- tell me the
22   widening of the gap.  And you're talking about the widening,
23   it starts here, it's narrower, and here it's further apart?
24   Is that -- can you guys see this?
25   BY MR. SCAROLA:
```

```
 1   Q    I'm talking about the widening of the gap that begins

 2   in -- sometime in 2007-2008 and continues through 2016.

 3   A    Okay.  Well, the gap doesn't widen out here.  But I can

 4   tell you in this early period you see this big drop starting

 5   around '06 and '07, there was the financial mortgage meltdown

 6   crisis that the state of Florida, as well as most other areas

 7   in the country, experienced real estate recession.

 8   Q    Do you have any reason to believe that that real estate

 9   recession --

10              THE COURT:  Well, hold on.  Hold on.

11              Were you finished?

12              THE WITNESS:  No.

13              MR. SCAROLA:  I still don't -- I don't hear an

14   answer to my question first, Your Honor.

15              THE COURT:  He said it was the real estate

16   recession.  That's what he was saying.  I don't know -- and he

17   wasn't finished.

18              MR. SCAROLA:  Okay, sir.  I'm sorry.  I didn't know

19   how the real estate recession was impacting Jupiter Farms any

20   differently than Cotromano, and I'm trying to find out about

21   the difference.

22              THE COURT:  He's -- let him finish his answer.

23              MR. SCAROLA:  Yes.  My apologies.

24              THE WITNESS:  Thank you.  It helps if I can finish'

25   otherwise, I'll get confused.
```

1          Okay.  So we did investigate the extent of

2   foreclosure sales in the three areas, foreclosure sales being

3   a distressed sale.  Generally foreclosure sales are not

4   considered arm's length transactions, and I've talked about

5   that in my affidavit.  You know, appraisers would not want to

6   use foreclosure sales.  They're not arm's length.  We have a

7   entire guideline about that.  Dr. Kilpatrick has ignored that

8   very important thing.

9          But there were more foreclosure sales in the

10  Cotromano area than there were in the other two areas.

11  Therefore, the market effect of this recession or the real

12  estate recession, had a more pronounced effect in Cotromano

13  than it did in the other two.

14          Now, if you look after -- and that all occurred

15  before the trigger dates.  So the trigger dates and the

16  information about the trigger dates couldn't have been the

17  cause of the recession -- or the foreclosures, because it

18  occurred before that.

19          So then if you look at after that period, the

20  distance between the lines is relatively the same.  In fact,

21  we find the Cotromano area, the prices are increasing more

22  rapidly there.

23          So there was a pre-trigger date effect in Cotromano

24  that differed from the other two areas, because they -- one of

25  the possible reasons of that is because of this recession and

1    that there were more foreclosures there.

2           Foreclosures are generally considered non-arm's

3    length transactions.  Palm Beach County considers them

4    nonqualified sales.  They don't use them.  There was a lot of

5    foreclosure activity in these areas as there was in other

6    areas of the state, Orlando, Tampa, other places I've studied.

7    And that all occurred before the trigger date.

8           And then, as I said before, after that trigger date

9    the prices increase~-- the price per square foot increases

10   more rapidly in Cotromano than it does in the other two areas,

11   but it sort of tracks along the same general trend.

12   BY MR. SCAROLA:

13   Q    Have you finished, sir?

14   A    No, I'm not finished quite yet, I'm sorry.

15          There are many other possible explanations.  This is

16   an oversimplified analysis, considering only the size of the

17   house.  There's -- each year when we do this sampling, if you

18   want to call it a sampling of sales, there could be larger

19   houses or smaller -- I mean larger lots and smaller lots.

20          I talked a lot about the conditions of the property.

21   There could be properties of poor condition that sell in one

22   area proportionally greater than the properties in poor

23   condition in another area.

24          I don't know that that was true, but that's

25   something appraisers should investigate.  I've got a

 1   discussion in here of condition.  In Dr. Kilpatrick's now

 2   defunct regression model condition wasn't an important factor

 3   in predicting the value of the properties.  Independent of

 4   whether he included class area sales or not, it's an important

 5   factor.  You know, maintenance and upkeep of homes is an

 6   important factor.

 7           So there could be a lot of other explanations in

 8   here.  And this oversimplified visual, eyeball analysis just

 9   doesn't reflect that; and, therefore, it was my conclusion

10   that this is not a reliable -- reliable analysis.

11           Okay.  I'm finished now.

12   BY MR. SCAROLA:

13   Q    You talked about --

14           MR. GALLAGHER:  Your Honor, if I could just ask,

15   we've gone a little over an hour.

16           MR. SCAROLA:  And I'm almost finished with this

17   line.

18           MR. GALLAGHER:  Thank you.

19           THE COURT:  Okay.

20   BY MR. SCAROLA:

21   Q    You talked about one possible reason, could be more

22   foreclosures.  Another possible reason could be difference in

23   property condition.

24           You didn't mention that one possible reason is

25   environmental stigma.  Is that another possible reason?

```
1    A    My turn?

2              The environmental stigma that you -- that your

3    expert has opined about is based on this trigger date

4    somewhere in here.  The decline or the relative -- you know,

5    the separation of the lines occurs before that.  That's -- we

6    got back into this area -- you know, the issue of market

7    knowledge; so if the market didn't know about it, how does it

8    impact the market.

9              Well, this is the point in time at which the market

10   is alleged to have known about it, and so the impact would be

11   after that point in time, if there was an impact.  And it's

12   not showing up in this data.  These are almost parallel lines

13   in here.  It just -- you know, based on this.

14             Now, there's a lot of problems with this analysis,

15   because it excludes all these other factors.  And the one I've

16   been pointing to is the foreclosure sales.  No investigation

17   has been made of that.  It's been ignored when -- it's been an

18   important influence in this market.  But there's a lot of

19   other factors that can account for these line differences.

20             But the effect that you guys are talking about is an

21   after condition effect.  And just eyeballing this -- I'm not

22   saying the eyeball method is acceptable.  I don't know of any

23   appraisal textbooks that talk about that.  Doesn't occur.

24   Q    So while you have spoken about possible reasons for the

25   divergence between those lines, you have not conducted an
```

1    investigation that enables you to express an opinion to a

2    reasonable degree of certainty within your area of expertise

3    as to why the lines diverged, correct?

4    A    Why they diverged prior to 2010?

5              And I told you about the -- we have done an

6    investigation of the foreclosure sales.  I've got a table in

7    my book of the foreclosure sales.  And we've also looked at

8    them different -- we looked at the percentage of foreclosure

9    sales in Cotromano relative to Jupiter Farms and PCB, and it

10   was a much higher percentage.  It was something like, let's

11   see, in '08 and '09 it was around 30 percent of the sales in

12   Cotromano were foreclosures, and in the other areas it was

13   more like 8, 10 percent.  So it's much higher.  Palm Beach

14   Country Gardens it was 8 and a half percent, and the other,

15   Jupiter Farms it was 17 percent.

16             So there's greater numbers of foreclosure sales in

17   the before period in Cotromano.  And I think that would

18   account for the fact that this line goes down or rapidly prior

19   to 2010.

20             But my more general point is there's been, besides

21   me, there's been no determination -- no investigation of this.

22   That's an important -- you know, foreclosures are an important

23   factor.  They sell -- foreclosure sales are at lower prices

24   than a regular arm's length transactions.

25             And then there's just this whole thing about the

1    square footage.  Square footage is important, but there could

2    be -- you know, the mix of sales each year could easily have

3    included houses in poor condition, houses with larger lots,

4    smaller lots, and none of that's been investigated.

5           So I'm not really putting any -- I would not put

6    very much weight on this analysis.

7    Q    And you are not here to tell us to a reasonable degree of

8    certainty within your area of expertise why the gap widened.

9    You have identified possibilities.  You haven't identified a

10   reason, correct?

11   A    Well, the foreclosures are a big reason.  My research on

12   foreclosures elsewhere in Florida has shown that foreclosures

13   sell -- foreclosure sales have lower prices than

14   nonforeclosure sales, and that's something that's been borne

15   out in studies, not just my studies but other studies.

16          So if there's more foreclosures in The Acreage, then

17   the prices would go down more rapidly.  That seems logical to

18   me.

19   Q    And logic, common sense is a generally recognized tool

20   for appraisers to use in reconciling the results of various

21   appraising methodologies, correct?

22   A    We're talking about the -- excuse me.  Are we talking

23   about the reconciliation process now?

24   Q    We're about to, but I just want to get an answer to that

25   question, and then we're past the time when I told you we'd

```
 1   take a break, so --

 2   A    Well, I have a lot to say about reconciliation, so if

 3   we're going to move to that topic, maybe we should take a

 4   break.

 5   Q    Well, the only question I have is whether common sense is

 6   part of the reconciliation process, sir.

 7   A    Well, I hope common sense is part of the entire appraisal

 8   process.

 9        MR. SCAROLA:  Thank you.  And we can take a break

10   now, Your Honor.

11        THE COURT:  Well, we can take a break now, but I

12   have an appointment at noon, and so we're going to be losing

13   15 minutes.

14        MR. SCAROLA:  I'm prepared to go forward.  If the

15   witness is and he can hang in there for a few more minutes,

16   I'll go to whenever Your Honor tells me to stop.

17        THE COURT:  Can you go 15 minutes before we take a

18   break, Doctor, or is that going to be an issue for you?

19        THE WITNESS:  No, I'll persevere.

20        THE COURT:  Well, I don't want to jeopardize your

21   health in any way.

22        THE WITNESS:  Yeah, it would be nice to have a break

23   right now, but . . .

24        THE COURT:  How much of a break would you need?

25        THE WITNESS:  Could we have, like, a three- or
```

```
 1    four-minute break?  I'll stretch my legs and go to the
 2    bathroom.
 3             THE COURT:  Why don't we do that.
 4             MR. GALLAGHER:  And I suggest, Your Honor, we all
 5    stay here and let him go stretch his legs and use the restroom
 6    and we'll get right back at it.
 7             THE WITNESS:  I know this sounds -- it's somewhat
 8    embarrassing.
 9             THE COURT:  It's not an issue.  I just have an
10    appointment at 12:00, and I want to use as much time as we
11    can, and I don't want to jeopardize your health in any way.
12             THE WITNESS:  I sometime listen to the doctors,
13    but . . .
14             THE COURT:  No, I don't -- I want you to do what the
15    doctors suggest, so . . .
16             Everyone can just relax until the doctor gets back.
17         (Pause in proceedings.)
18             THE WITNESS:  Thank you.
19             THE COURT:  You're welcome.
20             Are you ready to go?
21             THE WITNESS:  Yes.
22             THE COURT:  Okay.  All right.  Mr. Scarola, we're
23    going to go for about another 10 minutes.
24             MR. SCAROLA:  You tell me when, sir.
25             THE COURT:  Thank you.
```

1          MR. SCAROLA:  I'll break as soon as Your Honor gives

2   me the word.

3          THE COURT:  You may proceed.  Go ahead.

4          MR. SCAROLA:  Thank you very much.

5   BY MR. SCAROLA:

6   Q    Doctor, are you familiar with who Garrett Dunsford is?

7   A    No, sir.

8   Q    Did you read any of the testimony relating to Garrett

9   Dunsford's diagnosis in January 2008?

10  A    I don't know who he is, I'm sorry.

11  Q    Did you read the testimony of any of the parents of any

12  of the pediatric cancer victims?

13  A    No, sir, not that I recall.

14  Q    Are you aware that there was a pediatric cancer diagnosis

15  in January of 2008 which led very quickly to dissemination

16  within The Acreage about a concern that the rate of cancer in

17  The Acreage was linked to environmental contaminants?

18  A    I'm not aware of that.

19  Q    Are you aware that there was a network in existence

20  within The Acreage which, in February of 2008, began the

21  spread of information regarding a concern about the increased

22  rate of pediatric cancer tied to environmental concerns?

23          MR. GALLAGHER:  Your Honor, I'm going to object;

24  that this assumes facts not in evidence.

25          THE COURT:  You can ask him to make assumptions,

```
 1   make -- assume those to be --
 2           MR. SCAROLA:  Well, first I want to know whether
 3   he's aware of it at all, and then I'll ask him to assume it if
 4   he's not.
 5           THE COURT:  Well, you are stating it as a matter of
 6   fact.  I don't know if it's a matter of fact.  You can ask him
 7   if.
 8   BY MR. SCAROLA:
 9   Q    Okay.  I want you to assume that one of the children in
10   The Acreage was diagnosed in January of 2008, and that the
11   parents of that child began communicating with family members
12   of other child cancer victims in January of 2008 and began to
13   conduct research about environmental contamination that led to
14   the sharing of information in February of 2008 among Acreage
15   community members about a relationship between Pratt & Whitney
16   environmental contamination and the incidence of cancer in The
17   Acreage.  Can you assume that for us?
18   A    You're not asking me if I know of; you're just saying to
19   assume that's correct?
20   Q    Well, I think you've indicated to us that you're not
21   aware of those facts, so I'm asking you to assume them.
22   A    Okay.
23   Q    Assuming those facts to be true, can we agree that that
24   kind of information begun to spread within The Acreage
25   marketplace, can produce an environmental stigma?
```

```
 1   A    You're asking me in the absence of all other information

 2   about the market, any other factors at play, if that

 3   information in and of itself could reduce property values?  Is

 4   that what you're asking me?

 5   Q    Well, I phrased it in terms of producing an environmental

 6   stigma, and we have defined environmental stigma as having an

 7   adverse effect on property values.  So I can accept that

 8   modification of my question if you're more comfortable

 9   understanding it in that way.

10   A    I am.  I'm more comfortable understanding when you say

11   environmental stigma, we're talking about the reduction in

12   property values.

13             So you're asking me if that information, in and of

14   itself, would be sufficient to cause or produce an adverse

15   effect on property values, and I don't think I can answer that

16   question.  I don't know.  Property values are influenced by a

17   variety of things.  That's why you have to look at actual

18   sales transactions.  There's a whole cluster of influences on

19   value that occur.  What you're describing may be one of those

20   influences, maybe not.  But you have to look at it together,

21   and you have to look at what's actually happened in the

22   marketplace.

23   Q    Which --

24   A    So I can't really answer your question.

25   Q    Which you haven't done in order to determine whether
```

1    there is any relationship between what we see on Figure 1 and

2    environmental stigma.  Haven't done that, because you weren't

3    asked to do it, right?

4    A    I mean, I think we covered this point.  I'm trying to see

5    if it's different now.  But I haven't independently evaluated

6    the impacts on property values.  All I've done is take a look

7    at what Kilpatrick did, and, you know, offer some potential

8    alternative explanations and deficiencies to say that what

9    he's done is reliable to prove environmental stigma in the

10   proposed class area, and then I've added to that by saying

11   that there's a whole bunch of factors that influence property

12   values.  That's why you have to look at sales prices,

13   transactional data.

14   Q    Do you accept the concept that there are viable generally

15   accepted methods within the appraisal profession for

16   conducting the mass appraisal of multiple properties under any

17   circumstances?

18   A    Mass appraisal is a misused technique.  It is defined,

19   clearly defined, in USPAP.  USPAP are our standards.  And

20   there are techniques for doing mass appraisals.

21   Q    So is that a "yes" in response to my question?

22   A    Are there techniques for doing mass appraisals?  Yes,

23   there are.

24   Q    And do you accept the concept that environmental stigma

25   may decrease the value of multiple properties at the same

1    time?

2    A     It's possible.

3    Q     Do you accept the concept that whether multiple

4    properties have suffered a diminution in value due to a common

5    environmental stigma is something that can be determined by

6    applying generally accepted appraising methodologies?

7    A     There is a lot of conditions that must be met in order to

8    evaluate the impacts of contamination on multiple properties.

9    Q     And if those conditions are met, you accept that multiple

10   properties -- excuse me.  You accept that whether multiple

11   properties have suffered a diminution in value due to a common

12   stigma is something that can be determined by applying

13   generally accepted appraising methodologies, correct?

14   A     Yeah, well, we haven't talked about the conditions, but

15   if the conditions I have in mind are met, then properties --

16   there's more than one property that can be evaluated for

17   impacts on value.

18   Q     And --

19   A     Now, that's different than estimating their unimpaired

20   value and a lot of things, but there has to be certain

21   conditions that are met, and I've done that in other matters.

22   Q     And what are those conditions, where you can conduct a

23   mass appraisal to determine whether multiple properties have

24   suffered a diminution in value due to a common stigma?

25   A     I'm going to need to talk about your question just a

```
 1   little bit.
 2          Mass appraisal is estimating the value of multiple
 3   properties.  That's what the assessor does.  There's a variety
 4   of methods for doing that.
 5          Estimating the impact on value is a slightly
 6   different question.  So you have this unimpaired value, then
 7   you estimate the impact on value.
 8          The impact on value can be estimated for small
 9   groups of properties that are relatively homogeneous, that
10   have, you know, similar -- that the market's similar, the
11   properties are similar.  They can be evaluated.  There's a
12   reasonable similarity in the market characteristics,
13   influences and that sort of thing.  That can be done.
14   Q    So we're back to commonality and homogeneity being the
15   conditions that need to be met in order to make the
16   determination about whether multiple properties have suffered
17   a diminution in value due to a common stigma, correct?
18   A    For the type of -- excuse me.  For the type of analysis
19   that I was thinking of, those conditions, and then they all
20   have to have the same environmental condition, too.  If you're
21   evaluating impacts on value from a single source of
22   environmental contamination on properties that function in the
23   same general way, they're similar types of properties, then
24   they can be evaluated, say, using the regression models.
25          But once you start, you know, adding to that group
```

```
 1    and the properties become more diverse, these models break
 2    down.  They start having huge errors, and they become
 3    unreliable.
 4            And I know Dr. Kilpatrick has abandoned his
 5    regression models, but that was one of the problems I thought.
 6    But you could do it on a very small basis.
 7            The issue then become, okay, you're evaluating this
 8    small group of properties, is there some sort of common
 9    environmental condition that they all have, and that would,
10    you know, be what you would have to evaluate.  But there would
11    be a way of doing that on a very narrow basis.
12    Q    Okay.  So --
13    A    And not suitable for the class-wide issues in the
14    proposed class area.
15    Q    So there are factual issues as to whether the property is
16    sufficiently homogeneous, whether the properties share
17    sufficient common characteristics, whether the properties
18    share a common source of contaminants, whether the properties
19    share the risk of exposure to the common nature of the
20    contaminants, and all of those other things regarding
21    contamination that we discussed earlier as needing to review
22    from a factual basis, correct?
23    A    Yeah, I'm just trying to think of what a -- we discussed
24    so much today.
25            There would have to be similarities in their
```

```
 1   environmental condition or the contamination condition, but

 2   yet the properties themselves would have to have enough

 3   similarity.

 4           You know, the best example I could get is like a

 5   tract homes, you know, where they all have been built around

 6   the same time, and they're very similar.  They could be

 7   evaluated together.  That would be appropriate.

 8           It starts to break down when you get larger than

 9   that, because the properties become more diverse, like we have

10   here in The Acreage.  The Acreage is a very diverse area.

11           So it's not -- not that it can't be done on any

12   scale.  There's possibilities on a very smaller scale, but

13   not -- that has not been done in this matter, nor has it been

14   proposed in this matter.

15           MR. SCAROLA:  I note the time, sir.

16           THE COURT:  All right.  Why don't we take our lunch

17   break.  All right?

18           Doctor, don't discuss your testimony during the

19   break.  If we can be back around 1:10.  All right?

20           MR. SCAROLA:  Yes, sir, thank you.

21           THE COURT:  Thank you.

22       (A recess was taken from 12:02 p.m. to 1:13 p.m., after

23   which the following proceedings were had:)

24           THE COURT:  Welcome back, everyone.  Please be

25   seated.
```

```
1              All right.  We ready, Mr. Scarola?

2              MR. SCAROLA:  I am, Your Honor.  Thank you.

3              THE COURT:  Doctor, you ready?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Okay.  Mr. Scarola, you may proceed.

6              MR. SCAROLA:  Thank you.

7  BY MR. SCAROLA:

8  Q    Doctor, we have again in front of us the Figure 1 chart

9  on sale price per square foot in three different geographic

10 areas that we spoke about earlier, correct?

11 A    Yes, sir, I think that's where we left off.

12 Q    And the one possibility that you said existed was that

13 the divergence between sale prices per square foot in the

14 Cotromano class area, as compared to the Jupiter Farms and

15 Palm Beach Country Estates areas, may have been as a result of

16 what you noted to be a disparity in foreclosures and short

17 sales, right?

18 A    Right.  That's correct.

19 Q    Indeed, you would reasonably expect that in an area

20 environmentally stigmatized, there would be likely an increase

21 in foreclosures and short sales, wouldn't you?

22 A    I'm not aware of any information or studies that would

23 support that contention.  Plus --

24 Q    Let's take about -- I'm sorry.

25 A    Plus, the increased incidents of short sales and
```

1    foreclosures occurred in the period prior to your -- what's

2    called your trigger dates.  So the information that the

3    trigger dates are based on would not have been disseminated in

4    the market to have caused that kind of an effect.  But I've

5    not seen that kind of an effect anyway.

6    Q    You just drew two green lines on this chart, right?

7    A    Yes.

8    Q    Now three.

9    A    Three.

10   Q    They keep appearing magically.

11   A    Well, I don't know.  Sometimes I do.

12   Q    Is that the period during which there were increased

13   foreclosures and short sales which possibly could have

14   explained a disparity in the prices?

15   A    We looked at 2008 here, and then I extended out a little

16   further to go to July of 2009.  So the numbers that I talked

17   about before we went -- broke for lunch were for those

18   periods.  But the peak is before that.  The market appears to

19   have peaked and then started dropping around '06.

20   Q    I apologize for my confusion, but we were talking about

21   the discrepancy in the price per square foot between the

22   Cotromano class area on the one hand and the Jupiter Farms and

23   Palm Beach Country Estates price per square foot on the other

24   hand, and you had told us before lunch that while you couldn't

25   testify that that disparity was a result of an increase in

```
 1   foreclosures and short sales, you said it was a possibility,

 2   correct?

 3   A    Yeah, the change that -- I hate to keep touching this,

 4   because . . . but the change prior to where you see the gap

 5   start to widen in here would be very likely, I would think, or

 6   some high possibility that if there are more foreclosure sales

 7   in those areas and they're indeed included in Dr. Kilpatrick's

 8   database -- and I talked about the problems associated with

 9   that -- that would have -- that would very likely have caused

10   a reduction overall in sales price in The Acreage compared to

11   the other areas.

12   Q    Well, did you conduct any study as to why the incidence

13   of foreclosures and short sales exceeded on a percentage basis

14   the foreclosures and short sales in the Cotromano class area,

15   as opposed to the Jupiter Farms and Palm Beach Country Estates

16   areas?  You didn't do that investigation, did you?

17   A    Are you asking me why they occurred?

18   Q    Yes, sir.

19   A    Why the foreclosures occurred?

20   Q    Why?

21   A    I don't know.  It could be -- I mean, typically

22   foreclosures occur because people are, you know, behind on

23   their mortgages and the value of the homes are plummeting,

24   and . . .

25   Q    Sir, do you remember the question?  I asked you whether
```

1    you conducted an investigation as to why.  Did you do that?

2    A    My investigation was limited to identifying the fact that

3    they did occur more frequently.  It didn't really address the

4    why question.  I can only say from my experience why these

5    things occur, but . . .

6    Q    All right, sir.  And one reason why there could be an

7    increase in foreclosure and short sales is because people are

8    no longer willing to make the financial sacrifices necessary

9    to save their property if their property has become

10   environmentally stigmatized, right?

11   A    I have no knowledge, nor has any information been

12   presented to me that would support that conclusion.

13   Q    Well, let me ask you this, sir.  Doesn't it make common

14   sense to you that people might be more inclined to allow their

15   homes to go into foreclosure if what is being foreclosed upon

16   is someplace where their children might contract cancer

17   because of environmental pollution?  Doesn't that make common

18   sense?

19   A    I have no information to suggest that.  I've never seen

20   that in studying this, studying contamination impacts

21   elsewhere.

22        Foreclosures are the product of in this case the

23   market.  The general market overall was going through a very

24   difficult time.  I've seen this in Orlando; I've seen it in

25   St. Petersburg.  The properties that were financed, there's

 1   many explanations, but they're not related to environmental

 2   contamination.

 3   Q    Do you remember what my question was?

 4   A    Yeah, if I had studied this.

 5   Q    No, sir.

 6   A    What was your question, then?

 7   Q    My question was does it make common sense to you that

 8   someone would be less inclined to make the financial

 9   sacrifices necessary to save his or her home from foreclosure

10   if the home was a home in which his or her children were

11   exposed to a risk of cancer as a result of environmental

12   contamination?  Does that make common sense?

13   A    I have no opinion about that.

14   Q    Okay.  Thank you, sir.

15        There was a chart that has been utilized earlier

16   that you may not have been able to read -- it's not this

17   one -- from your position in the back of the courtroom

18   yesterday, but it was a chart that was labeled "Cancer Cluster

19   Altered Facts."

20        MR. SCAROLA:  Is it possible to bring that up?

21        MR. GALLAGHER:  We gave you a copy.

22        MR. SCAROLA:  Yes, I know.  Can you bring it up on

23   the screen?

24        MR. GALLAGHER:  Sure.

25        MR. SCAROLA:  Thank you.  I appreciate that.

```
 1              Thank you.

 2   BY MR. SCAROLA:

 3   Q    Have you had a chance to look at this previously, sir?

 4   A    I'm not sure that I recall.  I'm aware of the issue,

 5   though.

 6   Q    All right.  The issue is that there was a substitution of

 7   terminology between the 2011 report of Dr. Kilpatrick and the

 8   2016 report of Dr. Kilpatrick, correct?

 9   A    Correct.

10   Q    In the 2011 report, the references to concerns

11   influencing property value were described as concerns about

12   the cancer cluster, correct?

13   A    Yeah, Dr. Kilpatrick's 2011 report concludes that based

14   on his research back then, I guess, that these perceptions

15   were related to cancer cluster.

16   Q    Yes, sir.

17              And in 2016, those same perceptions are described as

18   relating to the history of environmental contamination,

19   correct?

20   A    The history of contamination, and then the second -- the

21   second one there, it's environmental contamination of the

22   groundwater north of The Acreage.

23              So his interpretation of his own research had

24   changed, but the research hadn't changed.  I mean, he hadn't

25   done any new surveys.  It was the same survey.  That's what I
```

1    understand.

2    Q    Well, sir, my question to you is what was referred to in

3    2011 as the influence of cancer cluster is referred to in 2016

4    as the influence of the history of environmental

5    contamination, correct?

6    A    Yes; but the research hadn't changed.  That's what I

7    don't understand.

8    Q    Yes, sir.  And that's fine, and I'm sure you're going to

9    have plenty of time to talk about whatever you want to talk

10   about when it's time for redirect, but let's please try to

11   focus on my questions, because that will enable me to turn you

12   over to your counsel, and he can ask you whatever he would

13   like to do.  Fair enough?

14   A    Yes; but I'm trying to answer your questions the best I

15   can.

16   Q    Yes, sir, and I would appreciate if you tried just a

17   little bit harder so that we can focus on my questions.

18        MR. GALLAGHER:  Your Honor, I object to the colloquy

19   and the introduction to that.  He is answering the questions,

20   and that's just unfair.

21        THE COURT:  Let's just move on.

22   BY MR. SCAROLA:

23   Q    The language relating to environmental contamination is

24   exactly the way advisory opinion number 9 defines

25   environmental stigma, right?

```
 1   A     No, no, it's not.

 2   Q     Perception of increased environmental risk due to

 3   contamination.

 4   A     Right, and the --

 5   Q     Right?

 6   A     Right.

 7         Well, let me answer your question.

 8   Q     That is my question.

 9   A     Yes, and the answer is "no."

10   Q     Does Advisory Opinion Number 9 speak in terms of

11   perception of increased environmental risk due to

12   contamination?

13   A     Right.  But the way you asked it was that environmental

14   stigma.  The contamination can produce environmental stigma,

15   but the contamination is not environmental stigma itself.

16   Q     Yes, sir.  I'm sorry if you misunderstood my question in

17   that fashion, but let me ask you the next question.

18         My next question is did you see anything to suggest

19   that the market's perception producing an adverse effect on

20   property values distinguished in any way between cancer

21   cluster and history of environmental contamination?

22   A     You're asking me if I -- if my research or what I've seen

23   in the market would distinguish between the two?

24   Q     More accurately, sir, did anything that you did suggest

25   to you that the market's perception distinguished between
```

```
 1   cancer cluster and the history of environmental contamination?
 2           That's not something you even looked at, is it?
 3   A    Well, just let me address your question.
 4           The purpose of this altered facts was that
 5   Dr. Kilpatrick had done that, not me.  I don't . . . he's the
 6   one who said cancer cluster was the same thing.  I didn't say
 7   it.  I didn't do any research on it.  It's -- it -- the cancer
 8   cluster was something specific that came out of the Department
 9   of Health.  Environmental contamination is ground -- to the
10   groundwater north, I mean, that -- cancer cluster was
11   associated with the proposed class area.  The contamination
12   north was north.  They're two different things.
13   Q    Do you remember my question, sir?
14   A    You were asking me what my opinion was about the
15   difference and weren't they all the same.
16   Q    No, sir.  No, I did not ask you that, so let me try my
17   question again.
18           Did you do anything to determine whether the
19   market's perception producing an adverse effect on property
20   values within The Acreage distinguished between the cancer
21   cluster and the history of environmental contamination?
22   A    All right.  Well, let me just say I didn't do any
23   research on the market's perception in the proposed class
24   area.
25   Q    Thank you, sir.
```

```
 1   A    I was only reviewing or commenting on what Dr. Kilpatrick

 2   had done and reported in his two different or three different

 3   reports.

 4   Q    Okay.  You have told us previously that interviews,

 5   surveys and common sense are generally accepted methodologies

 6   used among appraisers in assessing property values, correct?

 7   A    No, not correct.

 8        Can I explain?

 9   Q    I have told you, sir, that when you give a direct answer

10   to my question, I'll give you any opportunity to add anything

11   else you'd like, and that was a direct answer.  Thank you.

12   A    But I'm not finished.

13        My statement was that those were not valuation

14   methods.  They could not be used to value property or estimate

15   diminution in value of properties.  I did not say they were

16   not useful.  Certainly common sense is useful.  But my

17   statement was that they were not valuation methods.

18        And it's not just me saying this.  This is in guide

19   note 6.  It's really clear.  You cannot use nontransactional

20   data to estimate property value diminution.  And surveys are

21   not transactions.

22   Q    Do you agree that interviews, surveys and common sense

23   are generally accepted tools used among appraisers in

24   assessing property values?

25   A    It depends on what you mean by tool.  They're not methods
```

1   or techniques to estimate diminution in value.  They may be

2   methods -- surveys and interviews may be methods to collect

3   information in an area about the market, but they're not

4   valuation techniques.  There's no way -- there's no -- I mean,

5   I was a member of the Appraisal Standards Board.  I wrote a

6   lot of these guide notes.  They're not -- they're not

7   valuation methods; they're nontransactional techniques.  It's

8   not that they're useless, but they're not valuation methods.

9   Q    I'm sorry, you said they're useful, but they're not

10  valuation methods?

11  A    Yes.

12  Q    Okay.  So --

13  A    They could be useful.

14  Q    -- interviews, surveys and common sense are generally

15  accepted useful means by which to collect information among

16  property appraisers in assessing property values.  Did I get

17  that right this time?

18  A    Generally accepted ways of collecting information that,

19  again, if properly structured and appropriately done

20  carefully, that can be replicated, generally -- they would be

21  generally accepted for purposes of developing an understanding

22  of the market or the issues in a market, but that's as far as

23  it goes.  It doesn't go over into estimating value or

24  estimating diminution in value.

25  Q    They could be useful means of collecting information

1    about what the market's perception is of increased

2    environmental risk due to contamination, correct?

3    A     Yeah, I know we talked a lot about this morning.  There's

4    different tasks.  One task is estimating diminution in value,

5    you know, through the methods that we have in our profession,

6    using sales.  The other method would be -- I mean, the other

7    part of that process would be the causality part, and these

8    are, you know, talking to people in the market, doing surveys

9    or market interviews would be useful in that part of the

10   process.

11          I don't think I can explain it any better than I did

12   this morning.

13   Q     And this morning you said that surveys can be used to

14   help determine what's driving the market's perception of risk,

15   correct?

16   A     Surveys could be used to -- state this precisely -- or

17   market interviews could be used to understand the market's

18   perception of risk.

19   Q     Well, how about --

20   A     Or better understand.

21   Q     How about telling me whether you are altering the

22   testimony that you gave earlier today that surveys can be used

23   to help determine what's driving the market's perception of

24   risk.

25          Is that your testimony this afternoon, or is it not

```
 1   your testimony this afternoon?

 2   A    About the driving risk part?  I don't -- I'm not getting

 3   what you're asking.

 4   Q    To help determine what's driving the market's perception

 5   of risk.

 6            MR. GALLAGHER:  Your Honor, if this is meant to be

 7   an impeachment, can we have the actual question and answer?

 8            THE COURT:  I thought he just read what he believes

 9   was the answer.  I don't know what the question was.  You

10   can --

11            MR. SCAROLA:  Nor do I remember, Your Honor.

12            THE COURT:  Okay.  Is that -- assuming that was what

13   you said this morning, are you sticking by that or are you --

14            THE WITNESS:  Yeah, I stick by what I said earlier.

15            THE COURT:  Thank you.

16            MR. SCAROLA:  Good.  Thank you very much.

17   BY MR. SCAROLA:

18   Q    Are case studies a generally accepted methodology used

19   among appraisers in assessing property values?

20   A    Properly constructed and developed case studies based on

21   transactional data that's appropriately analyzed are generally

22   accepted methods.

23   Q    Is a meta-analysis a generally accepted methodology used

24   among appraisers in assessing property values?

25   A    No, absolutely not.
```

1   Q     Is meta-analysis a useful method of collecting

2   information about what's driving the market's perception of

3   risk?

4   A     No, I don't think so.

5   Q     Is it of any use as generally accepted among appraisers?

6   A     I've never, other than Dr. Kilpatrick and maybe one or

7   two others, I've never seen an appraiser even use

8   meta-analysis for any purpose.

9   Q     Are you familiar with what has been described in earlier

10  testimony as contingent valuation surveys?

11  A     Yes, sir.

12  Q     And can you tell us whether contingent valuation surveys

13  are a generally accepted appraisal methodology for conducting

14  an assessment of whether and how specific circumstances impact

15  the value in property?

16  A     Contingent valuation, first of all, is not an appropriate

17  valuation method, and that's pretty clear.  It's not a

18  transactional-based method.  There's kind of a bright line

19  about that.

20        Surveys in and of themselves can be useful tools, as

21  I've said, to gain a better understanding of the market.  So a

22  properly structured and implemented survey could be useful in

23  that regard, but not as a valuation method.  They're not

24  generally accepted within the appraisal profession.  We've had

25  a series of articles about contingent evaluation in the

```
 1    appraisal journal, and they sort of concluded by saying that
 2    they're not reliable for that purpose.
 3    Q    Do you remember the question that I asked you, sir?
 4    A    Yeah, I think I answered it.
 5    Q    Okay.  Well, let me try again.
 6          Are contingent valuation surveys recognized in
 7    peer-reviewed literature as a generally accepted methodology
 8    for conducting an assessment of whether and how specific
 9    circumstances impact the value of property?
10    A    I'm not aware of any peer-reviewed literature in the
11    appraisal profession that has done that.  The preponderance of
12    the articles that I'm aware of talk about the problems with
13    contingent valuation.  There were a couple of early articles
14    that talked about contingent valuation as a valuation method,
15    but those have been supplanted by articles against contingent
16    valuation, pointing out its shortcomings for real estate
17    appraisers.
18    Q    So there is --
19    A    In addition, in addition, contingent valuation has never
20    made its way into our body of knowledge.  It's not accepted in
21    my profession.
22    Q    You are aware because you were in the courtroom yesterday
23    that Dr. Kilpatrick has, in fact, been recognized within the
24    appraisal industry for the quality of his work in the area of
25    contingent valuation, correct?
```

```
1    A    I'm not aware of that.  I'm aware that he said that, but

2    I'm not aware of what it was, if it was contingent valuation

3    or what.  I don't know about that.

4    Q    Have you ever read his articles on contingent valuation?

5    A    I'm not aware that he's written any.

6    Q    How would you go about making the determination of

7    whether an adverse effect on property value was produced by

8    the market's perception of increased environmental risk due to

9    contamination?

10   A    How would I go about estimating the impacts on value?

11   Q    No, sir.  Let me try my question again.

12         How would you go about making a determination as to

13   whether there has been an adverse effect on property value

14   produced by the market's perception of increased environmental

15   risk due to contamination?

16   A    Well, I have written on appropriate methodologies that

17   appraisers can used.  I've also developed the Appraisal

18   Institute's national course on how to do this that is approved

19   through the Appraisal Institute and offered to our members.

20   I've taught that course, and we've laid out methodologies.

21         We've talked about how we would use sales data in a

22   sales comparison approach.  We've talked about the use of

23   regression analysis.  We've talked about case studies.  Those

24   are the types of methods that I would use.

25         We talked about -- and I also have talked about
```

1    market interviews, but not as a valuation method, to use them

2    in the way that I've previously described.

3    Q    So, I'm sorry, but I missed it in that answer.  How would

4    you go about doing that in this case?  What would you do?

5    A    Estimating diminution in value in the Cotromano case?

6    Q    No, sir.  No.

7         Making a determination as to whether there has been

8    any adverse effect on property value produced by the market's

9    perception of increased environmental risk due to

10   contamination.  I understand you haven't done it, but how

11   would you do it?  Or can it just not be done?

12   A    Okay.  Well, let me run with that, then.

13        First of all, nobody's asked me to do it, but,

14   secondly, my -- we've already talked about this in great

15   detail, but my opinion is that it couldn't be done on a common

16   class-wide basis.

17        If somebody were to ask me to evaluate property

18   value diminution, I would look at sales data.  I would use one

19   of the techniques that I previously described.  I would look

20   at compared sales.  Sales comparison is a generally accepted

21   way of looking at things.  You look at sales in the area that

22   are alleged to be impacted and compare those to otherwise

23   similar properties not in that area and see if they sold at

24   different prices.  You have to adjust for differences, other

25   differences in the properties.

```
 1              If there was enough sales in a relatively
 2    homogeneous area, I would do what I described before the lunch
 3    break, perhaps construct a statistical analysis of that, and I
 4    would look at those sorts of things.  Paired sales,
 5    statistical analysis of sales, with appropriate controls for
 6    differences in properties.  That's what I -- that's the
 7    approach that I would take and have taken in other matters.
 8    Q    I didn't hear anything in that response about measuring
 9    the market's perception of increased environmental risk due to
10    contamination.  Was it there and I just missed it?
11    A    You said the impact -- I interpreted your question as the
12    impact on property values, and that's how I would measure it.
13    If I was going to go to that second step, which we talked
14    about earlier today, and say, okay, is there -- I found some
15    evidence that properties in this area are selling for lower
16    prices than otherwise similar properties not in the area, then
17    I would go to that second step, which is I've referred to it
18    as causality, but interpreting what those results mean.
19              And in that step I perhaps would do market
20    interviews, I would talk to buyers and sellers, I may talk to
21    lenders, to try to get a better understanding of what was
22    going on in that area in order to properly interpret the
23    diminution that I found there.
24    Q    So you would do informal surveys.
25              Would you do literature reviews, authoritative
```

```
 1   literature reviews?

 2   A     In order to interpret my results in a particular area?

 3   If I found articles that were exactly on point, you know, that

 4   had the same issues and the same type of area, I might look at

 5   those.

 6   Q     Okay.  And you would do case studies, right?

 7   A     Again, properly constructed and analyzed.

 8   Q     Yes, sir.

 9         And you wouldn't do a contingent valuation survey?

10   A     No, I would not do that.

11   Q     Because you wouldn't think that asking a wide range of

12   people how specific facts would or would not influence their

13   purchase decision would provide any useful information to you;

14   is that correct?

15   A     Well, that's not the purpose of these contingent

16   valuation surveys.  They're trying to value goods and

17   properties using these surveys.  That's why it's called

18   contingent valuation surveys.  I testified that surveys in and

19   of themselves can be useful information, but not the way

20   that -- not a contingent valuation survey.

21         And going back to my point, I would look at, you

22   know, these informal surveys.  I just wouldn't -- I wouldn't

23   do them the way Dr. Kilpatrick did.  I would do them in a

24   structured way, and I've got an article about that.  And they

25   would provide me with -- they could provide me with
```

```
 1    information that would be useful in interpreting my results or
 2    providing context to the results that I found that showed,
 3    using the accepted methods for valuation, that showed there
 4    was some diminution.
 5    Q    Have you reviewed Dr. Kilpatrick's fact card?
 6    A    Not in any detail.
 7    Q    So you can't tell us whether there is any aspect of that
 8    fact card that is in any way either inaccurate or misleading,
 9    correct?  That's not what you're here to do?
10    A    I just -- I have not been asked to render an opinion
11    about that.
12              MR. SCAROLA:  If I might have just a moment, Your
13    Honor?
14              THE COURT:  Yes.
15              MR. SCAROLA:  I have the team's permission to sit
16    down and shut up, sir.
17              THE COURT:  All right.  Thank you.
18              Any redirect?
19              MR. GALLAGHER:  Yes, Your Honor.
20                        Redirect Examination
21    BY MR. GALLAGHER:
22    Q    Good afternoon.
23    A    Good afternoon.
24    Q    You were just asked some questions about whether -- about
25    these methodologies up here, informal surveys, literature
```

```
 1   review, et cetera, and I believe the gist of the questions was
 2   would you do any of those things at the second step you talked
 3   about today to determine the cause of any diminution in value
 4   that you might have seen in the market.
 5   A    Yeah, I was doing my best to distinguish between methods
 6   that could be used to determine diminution in value and just
 7   contextual methods that could be used to interpret what
 8   somebody had found using the valuation methods.
 9   Q    And what does Dr. Kilpatrick purport to have done with
10   these methods, like the informal survey, the case study and
11   the meta-analysis, was he using those on the second question,
12   or did he purport to use those methodologies to arrive at the
13   diminution in value in the first place?
14            THE COURT:  Hold on one second.
15            MR. SCAROLA:  Objection; leading.
16            THE COURT:  Sustained.
17            MR. SCAROLA:  Thank you.
18            THE COURT:  Rephrase your question.
19   BY MR. GALLAGHER:
20   Q    How did Dr. Kilpatrick purport to use those methods?
21   A    He used -- he used the six methods, in his own words, I
22   think, as independent valuation methods, independently valuing
23   or estimating the value and the diminution in value of
24   properties in the proposed class area.  That's a different
25   purpose than what I was discussing.
```

1   Q     And is the way he's used them proper under the standards

2   of your profession?

3   A     No, sir.

4   Q     Do you have a copy of your direct affidavit up there that

5   has the -- the attachments to it?  All of them?

6   A     No, I don't have the attachments.

7          MR. GALLAGHER:  Your Honor, if I could approach?  I

8   want to ask him a question about one of those.

9          THE COURT:  Yes.

10         MR. GALLAGHER:  And I have a copy for the Court if

11   you would like one.

12         THE COURT:  Yes, I would appreciate it.  Thank you.

13   BY MR. GALLAGHER:

14   Q     So, Mr. Jackson, you were asked some questions very early

15   on today about whether the definition of market value required

16   a fully informed buyer and seller, and I think you mentioned

17   that there was a standard or a guideline that you thought of

18   that might address that question?

19   A     I believe there's a -- there's an advisory opinion, and I

20   just don't recall it, that talks about what I was referring to

21   as the typically informed buyer and seller, as opposed to the

22   fully or perfectly informed, and I was trying to distinguish

23   between the two.

24   Q     If you would, sir, turn to tab 12, the attachments to

25   your direct examination.

```
 1    A     Yes, sir.

 2    Q     And this is guide note 11 about comparable selection in a

 3    declining market.  And then on the second page there it talks

 4    about characteristics of, quote, market value.  Do you see

 5    that?

 6    A     At the top of the second page, or . . .

 7    Q     Yeah, right here (indicating).

 8    A     Oh, yes, sir, I see that.

 9    Q     Okay.  And if you go down that page, there's a reference

10    that says the dictionary goes on to cite the definition of

11    market value used by agencies that regulate federally-insured,

12    et cetera, et cetera.  You see that?

13    A     Yes, sir.

14    Q     And you see further down the second bullet point?

15          Well, the first bullet point is buyer and seller are

16    typically motivated, and then the second one is both parties

17    are well-informed or well-advised.  Do you see that?

18    A     I do.

19    Q     Is this the guidance you were thinking of?

20    A     No, there's another discussion of it, but I see what

21    you're saying.

22          THE COURT:  I'm sorry.

23          Mr. Scarola?

24          MR. SCAROLA:  I was deciding whether I was going to

25    object to leading and improper bolstering, but so far I like
```

1    the answer, sir.

2              THE COURT:  Okay.  Thank you.

3    BY MR. GALLAGHER:

4    Q    So is there another one that addresses this question?

5    A    There is, and I'm sorry that it doesn't come to mind.

6    Q    Does this guidance note address the question that

7    Mr. Scarola was asking you, whether a buyer -- for the

8    definition of market value, a buyer and seller have to be

9    fully informed?

10   A    Well, it addresses it from the standpoint that they are

11   well-informed, and that's what the bullet point you just read

12   says, or well-advised, acting in what they consider to be

13   their best interests.  And what I was trying to do before was

14   distinguish, like, perfectly informed or, you know, the buyer

15   that knows everything about every molecule of contamination.

16   That's not necessary.

17             The market's imperfect.  There's no question that

18   the real estate market is imperfect, but it is what it is, and

19   that's what we base our conclusions on is what the market's

20   done.

21   Q    I have up the Figure 1 that we've heard so much about,

22   the square foot trend, sales trends analysis.  Do you see

23   that?

24   A    Yes, sir.

25   Q    You were asked some questions whether you conducted any

```
 1   study to determine -- well, first let me ask you do you have

 2   an opinion about whether looking at a trend analysis like this

 3   is an appropriate way to arrive at an opinion about a

 4   diminution in value of property -- actually, I'll just stop

 5   there, a diminution in value of property?

 6   A    No, this is too simplistic and doesn't include the many

 7   features of properties that influence their value besides

 8   square footage and time to be useful for that purpose.  And

 9   I've never seen anyone try to value property based on a trend

10   line analysis.  It excludes -- there's a range of things that

11   appraisers typically look at when appraising a property, and

12   they're not included in this analysis.  It's just not complete

13   subject to each -- visual interpretation is not something we

14   teach.  It's just crazy.

15           You know, each of us have looked at it, and we've

16   had different opinions about it.

17           MR. SCAROLA:  Excuse me, Your Honor.  Pardon me.

18           I'm going to object to what other people's opinions

19   may be.

20           THE COURT:  Sustained.

21           THE WITNESS:  Fine.

22           Anyway, no, no, it's not.  It's not a generally

23   accepted method for valuing property.

24   BY MR. GALLAGHER:

25   Q    There's been a lot of discussion about the difference
```

1    between the lines from 2005 or 2007, out to further, 2015 and

2    later.  Do -- does Dr. Kilpatrick's analysis give you enough

3    information to determine whether that difference is

4    statistically significant?

5    A    I have enough information from his numbers that we

6    gleaned from this to look at the year-by-year change from --

7    and we did it from 2010 to 2016, and that's in my affidavit,

8    to see if that change is statistically significant.  We called

9    it a difference of difference test.

10           So, in other words, if the difference~-- the

11   difference from one year to the next is significantly -- is

12   statistically significant, to try to add a little precision to

13   this.  But, again, it kinda falls short because it excludes so

14   many things.  But even with that, we didn't find that there

15   was any significant difference.

16   Q    And you were asked some question, sir, about whether you

17   conducted any study to ascertain in a reliable way why there

18   is a widening of the gap between these lines or a narrowing of

19   the gap between these lines at various points on the chart.

20           Do you recall that?

21   A    Right.  And we discussed the housing crisis and the

22   possible differential impact of that between the areas, and I

23   talked about the percentage of short sales or foreclosure

24   sales, distress sales.  And then I also pointed out that that

25   was a very important factor for all appraisers to consider.

1   And the fact that they're all mixed up in this, without any

2   attempt to sort that out, further undermines this type of

3   analysis.

4   Q    You've identified lots of possible explanations for that?

5   A    There are many different factors that have not been

6   included in this analysis that would need to be evaluated by

7   an appraiser in order to derive any conclusions regarding

8   diminution in value.

9   Q    Does Dr. Kilpatrick describe any study that he did to

10  reliably ascertain the cause of any widening in these lines,

11  the difference?

12       MR. SCAROLA:  Your Honor, I'm going to object to

13  this witness commenting upon what his belief is about what

14  Dr. Kilpatrick did.  Dr. Kilpatrick has been here for

15  cross-examination, he's been cross-examined.  It is not

16  appropriate to have this witness commenting upon

17  Dr. Kilpatrick based upon his perceptions of what

18  Dr. Kilpatrick did.

19       THE COURT:  He can tell me what he -- what his

20  opinion is of what he -- what he presented in his report.

21       MR. GALLAGHER:  Yeah, let me lay the foundation.

22  BY MR. GALLAGHER:

23  Q    Have you reviewed Dr. Kilpatrick's expert reports in this

24  case?

25  A    Yes, sir.

```
1    Q    Have you report -- have you reviewed the files that he

2    produced with the backup materials to what he claims to have

3    done in his expert reports?

4    A    Yes, sir.

5    Q    Have you looked at his models that he produced?

6    A    Yes, sir.

7    Q    Have you read his direct testimony in this case?

8    A    Most of it.

9    Q    And were you present in the courtroom while I

10   cross-examined him yesterday?

11   A    Yes, sir.

12   Q    Does he anywhere provide a reliable -- does he

13   anywhere -- does he anywhere do, explain or demonstrate that

14   he did any study that would allow an appraiser to reliably

15   state what the difference is -- why there is a difference or a

16   divergence in these lines?

17   A    No.  My --

18             MR. SCAROLA:  Objection.

19             THE COURT:  Hold on.

20             MR. SCAROLA:  Objection, compound, sir.

21             THE COURT:  Overruled.

22             THE WITNESS:  In my opinion, Dr. Kilpatrick does not

23   have a sufficient basis in this chart or anything else that

24   he's done to conclude the diminution in value in the proposed

25   class area.
```

```
 1   BY MR. GALLAGHER:

 2   Q    There was one question you were asked right before the

 3   lunch break where I -- I heard your answer, and I think you

 4   might have misspoken, and so I had our court reporter mark it

 5   so that he could read it to you and I could seek

 6   clarification.

 7              So if the Court reporter could read back that

 8   question for me, please, I would appreciate it.

 9        (The court reporter read back the requested portion of

10   the transcript.)

11              MR. GALLAGHER:  And the answer, please, yeah.

12        (The court reporter read back the requested portion of

13   the transcript.)

14   BY MR. GALLAGHER:

15   Q    There was a phrase from there, Mr. Jackson, where, as it

16   was read back, you are transcribed as saying that you looked

17   at -- you examined that Dr. -- that what Dr. Kilpatrick has

18   done is reliable.  Did you mean to say in your testimony that

19   you think --

20              MR. SCAROLA:  Objection; leading.

21              THE COURT:  Overruled.

22              THE WITNESS:  Well, I don't think what

23   Dr. Kilpatrick has done is reliable, if that's the question.

24   I maybe got confused and said it was, but I don't -- knowing

25   my general opinion is pretty clear, I think, that these
```

```
 1   methods and techniques and what he has done is not a reliable

 2   basis for estimating diminution in value in the proposed class

 3   area or in any area.

 4          MR. GALLAGHER:  No further questions, Your Honor.

 5          THE COURT:  All right.  Thank you.

 6          Did you have any recross, Mr. Scarola?

 7          MR. SCAROLA:  I do not, Your Honor.  Thank you.

 8          THE COURT:  Thank you, Doctor.

 9          THE WITNESS:  Thank you.

10          THE COURT:  All right.  This is not scientific.  I

11   don't know if my means are reliable or not of calculating the

12   time that's been used, but according to my calculations, based

13   upon what the defense -- I mean, the plaintiffs wanted to use

14   for this section of the hearing relating to, as I understood

15   it, three witnesses, Kilpatrick, Jackson and Hauser, the

16   plaintiffs wanted four hours of time for that portion of the

17   case, and you've already exceeded that.  I don't care how much

18   time you use in any particular portion, but I want you to be

19   aware of that.  If we're going to split the time, you're past

20   your four hours for this portion of the case.

21          MR. SCAROLA:  Your Honor, just so that we have

22   accurate records in that regard, where are we?  How far past

23   four hours?

24          THE COURT:  Okay.  Well, again, I'm not -- I can't

25   claim to be a hundred percent accurate, but I have you used an
```

```
 1    hour and eight minutes during opening, when you had only

 2    wanted an hour.

 3              MR. SCAROLA:  I've already docked Ms. Hatfield's pay

 4    for that, Your Honor.

 5              THE COURT:  And then I have, if I'm counting

 6    correctly, I have four hours and -- essentially four and a

 7    half hours.

 8              MR. SCAROLA:  Thank you.

 9              Now, I owe her money.

10              THE COURT:  Okay.  I think.

11              Let me just add it up again.

12              MR. SCAROLA:  Well, that ballpark figure is fine,

13    Your Honor.

14              THE COURT:  Yeah, approximately four and a half

15    hours.

16              MR. SCAROLA:  Thank you, sir.

17              MR. HAMMER:  Judge, Steven Hammer for the record.

18    I'll be doing the cross on the next witness.

19              That's Hauser, correct?

20              And I've tried to shorten my time because of -- I'm

21    aware of the time.

22              THE COURT:  You can use your time however you want.

23    I just want you to be aware of that.

24              MR. GRODEN:  Your Honor, Alex Groden for United

25    Technologies.  UTC calls John Hauser.
```

```
 1                 THE COURT:  All right.  Sir, would you raise your
 2    right hand, please.
 3                 John R. Hauser, Defendants' witness, sworn.
 4                 THE COURT:  Sir, if you could pull that microphone
 5    toward you.  The chair doesn't really move very well, so if
 6    you can just pull that microphone towards you.
 7                 Tell us your name and spell your last name, please.
 8                 THE WITNESS:  My name is John R. Hauser,
 9    H-a-u-s-e-r.
10                 THE COURT:  Thank you, sir.  You may proceed.
11                 MR. HAMMER:  Thank you, Judge.
12                             Cross-Examination
13    BY MR. HAMMER:
14    Q    Good afternoon, sir.
15    A    Good afternoon.
16    Q    My name is Steven Hammer, from the Schlesinger law
17    offices, and I don't think we've met before.
18                 COURT REPORTER:  Slow it down, please.
19                 MR. HAMMER:  I'm going to try to do that.
20                 THE COURT:  And get a little closer to the
21    microphone, too, also.
22                 MR. HAMMER:  I'll do that too, Judge.
23    BY MR. HAMMER:
24    Q    We have not met before, correct?
25    A    What?
```

```
 1    Q    We have not met before?

 2    A    No, we haven't met.

 3    Q    I'm going to ask you some questions about the report you

 4    did in this case --

 5    A    Okay.

 6    Q    -- and the affidavit you made.

 7         I want to ask you a few questions, though,

 8    preliminary.

 9         You're presently a chaired professor at MIT; is that

10    correct?

11    A    Yes, that's correct.

12    Q    Okay.  And you teach marketing management at the

13    university?

14    A    Well, that's one of the courses I teach.

15         THE COURT:  Mr. Hammer, you're going to need to pull

16    that microphone closer to you, because we're having trouble

17    hearing you.

18         MR. HAMMER:  Yes, sir.

19    BY MR. HAMMER:

20    Q    You've been doing expert witness work since around the

21    '80s?

22    A    Yes, that's correct.

23    Q    In your work through the expert witness work, you're

24    affiliated with a group called The Analysis Group; is that

25    correct?
```

1   A    Yes, they consider me an affiliated expert.

2   Q    Now, in your expert work, you've testified in matters

3   regarding the assessment of consumer preferences as it relates

4   to a variety of durables and nondurables regarding services

5   and products, correct?

6   A    Yes, I do other things, as well, but that certainly is

7   many of the things I do.

8   Q    Okay.  And when we use the term durable and nondurable,

9   it means long-lasting as opposed to short-term use; is that

10  accurate?

11  A    Well, yes.  I mean, certainly housing stock would be a

12  durable good.

13  Q    Now, you've never testified as an expert in assessing

14  consumer preferences specifically with regard to real estate;

15  isn't that true, sir?

16  A    No, I have not testified specifically with regard to real

17  estate.

18  Q    And you've never testified or provided testimony with

19  regard to willingness to pay -- specifically for the

20  willingness to pay regarding real estate, correct, sir?

21  A    No, I've testified about willingness to pay for many

22  goods.  The same techniques apply to real estate, but I have

23  not applied -- testified specifically to real estate.

24  Q    Okay.  So my answer -- the answer to my question is, no,

25  you have not testified with regard to real estate, correct?

```
 1   A    That's correct.  I've testified about willingness to pay

 2   for many goods.

 3   Q    I understand.

 4          Your experience is really in designing surveys,

 5   correct, sir?

 6   A    I have other experience, as well.  I'm a marketing

 7   scientist.  I'm a survey researcher.  I do a number of things,

 8   including product development, and that would include, say,

 9   for example, designing dormitories.

10   Q    As far as your expertise, that is in designing surveys,

11   correct, sir?

12   A    I have expertise in designing surveys, but I also have

13   expertise in other areas, as well.  Many of those would go

14   under the heading of marketing science, and there are

15   certainly a lot of sub areas of marketing science.  In fact,

16   I've edited a journal that's known as *Marketing Science*, and

17   many people consider me one of the founders of the field.

18   Q    With regard to the surveys you've done, it relates to the

19   goods, the durable goods, the nondurable goods, specifically

20   with regard to products, goods and services, as opposed to

21   real estate, correct, sir?

22   A    Well, I've actually done real estate surveys, as well,

23   but I've done a lot of products, a lot of surveys.

24   Q    I understand.

25   A    I've done many surveys.
```

```
 1   Q     But I'm talking about real estate.  You have not done

 2   specific surveys with regard to real estate and the value of

 3   real estate, correct, sir?

 4   A     Actually, I recently completed a dormitory -- a study

 5   where a developer, in this case it happened to be the

 6   university I work for, was developing an area known as the

 7   Volpe Center that the U.S. Department of Transportation had

 8   exited, and the City of Cambridge asked them to make

 9   multi-million-dollar decisions with respect to dormitories.

10   And I was involved in determining the preferences of students

11   for various aspects of dormitories and, in fact, their

12   willingness to pay.  I don't know if you define that as real

13   estate, but certainly there were real estate decisions being

14   made.

15   Q     And those real estate decisions that were being made were

16   based on choices that students may have as to where they want

17   to live on campus, correct?

18   A     Where they want to live and also the -- a number of

19   features at dormitories; for example, the size of the room,

20   how much they would pay, whether or not you have house tutors,

21   whether or not you have gyms on-site or barbecues outside,

22   just a number of different attributes.

23   Q     You did not design a survey in this case, nor were you

24   asked to, correct, sir?

25   A     No, I was not asked to design a survey.  I was asked to
```

1    evaluate Dr. Kilpatrick's survey.

2    Q    I understand, but my question is you were not asked to do

3    a survey, you did not do a survey, nor were you asked to in

4    this case, correct, sir?

5    A    I did not need to do a survey.  In some cases I would

6    need to pretest a survey.  In this particular case the survey

7    was so bad it was easy to evaluate.

8    Q    Sir, I'm trying to ask you very pointed questions.  Okay?

9    If you think you need to explain, feel free to do so, but can

10   you please answer my question first?

11   A    Okay, I'll do that.  I'll endeavor to do that.

12   Q    Thank you.  I appreciate that.

13              Sir, you are not a real estate appraiser, correct?

14   A    No, I am not a real estate appraiser.

15   Q    You don't have a license to appraise real estate,

16   correct, sir?

17   A    No, I do not have a license to appraise real estate.  I'm

18   really here to comment upon the surveys that were done in this

19   case.

20   Q    I understand, sir.  Bear with me.  I'm going to ask you

21   some questions.  I just ask you to answer the questions.

22   Okay?

23              You've not appraised real estate on a mass scale

24   before; isn't that true, sir?

25   A    No, I have not been asked to appraise real estate on a

```
 1   mass scale.

 2   Q    You don't teach courses in real estate, correct?

 3   A    No.  I mean, I teach how to elicit consumer preferences

 4   for real estate, but, no, I do not teach courses, as you say,

 5   on real estate appraisal.  I think that was your question.

 6   Q    Right.

 7        So the answer is no, right?

 8   A    I did not --

 9   Q    I'll move on, sir.

10        You teach others how to measure preferences.  That's

11   what you basically do in your courses, correct?

12   A    I do many things in my courses, but that's certainly one

13   of the things that I teach students, both Ph.d. students and

14   MBAs, how to elicit preferences, preference solicitation

15   questions.

16   Q    You don't teach others how to market real estate or sell

17   real estate, correct?  That's fair to say?

18   A    Well, I teach the four P's of marketing, and the four P's

19   of marketing could certainly be applied to real estate.

20   Q    How about specifically to real estate?  You don't, do

21   you, sir?

22   A    I don't -- I think my teaching is not specific to any one

23   particular product.  My teaching is really about methods and

24   techniques.

25   Q    You've never written any publications regarding the
```

```
 1    appraisal of real estate, correct?

 2    A    No, I think we've already established that I'm not an

 3    appraiser.

 4    Q    You don't perform contingent valuation studies, do you,

 5    sir?

 6    A    That's not true.

 7    Q    So do you use contingent valuation surveys?

 8    A    Contingent valuation surveys are -- they go under many

 9    names.  They go under hypothetical preference, they go under

10    choice-based questions, they go under stated preference, and I

11    do all of those.  In fact, there are many forms of contingent

12    value.  Dr. Kilpatrick used one of them.

13            But I certainly have talked to my colleagues and

14    advised my colleagues about contingent valuation surveys.

15    It's basically one method of preference solicitation.  And it

16    really is a form of something known as conjoint analysis.  In

17    fact, I was -- a colleague sent me a book over lunch --

18    Q    Sir, it's going --

19            MR. HAMMER:  Judge, I would move to strike.  It's

20    beyond my question.

21            THE COURT:  What's the question again?

22            MR. HAMMER:  That he does not perform contingent

23    valuation surveys.  I asked nothing about a colleague sending

24    him a book.

25            THE COURT:  Do you conduct contingent valuation
```

```
 1   surveys?

 2           THE WITNESS:  I certainly conduct preference

 3   solicitation surveys, and the methods and the techniques of

 4   contingent valuation are part of those.  I think we are

 5   talking about words, and there are many names for contingent

 6   valuation surveys.

 7   BY MR. HAMMER:

 8   Q    You did not do any kind of what you termed as a conjoint

 9   analysis specifically for this case, correct, sir?

10   A    Well, a contingent value survey is a conjoint study, but

11   I have not done it specifically for this case.

12   Q    Nor were you asked to do so, correct?

13   A    No, I was not asked to do a survey for this case.  I was

14   asked to evaluate a survey, actually multiple surveys, in this

15   case.

16   Q    Dr. Kilpatrick performed a contingent valuation analysis

17   in this case which you take exception with, correct?  Is that

18   fair to say?

19   A    Yes, Dr. Kilpatrick performed a contingent value survey

20   that I believe is fundamentally flawed.

21   Q    And we're going to talk about that, okay, in greater

22   detail.

23           Now, as far as the survey itself, you know that he

24   contracted with a third party called the Wilkins Research

25   Services, correct?
```

```
 1   A     Yes, that's what he said in his expert report.

 2   Q     And you took a look at that, and they conducted an online

 3   survey, correct?

 4   A     They claim to have conducted an online survey.  The

 5   actual survey they gave looks more like a telephone survey.

 6   But I heard Dr. Kilpatrick testify yesterday, and he said that

 7   that was just a -- it might have been a preliminary form.

 8   Q     Sir --

 9   A     But he did say that he did conduct an online survey.

10   Q     Okay.

11   A     I'm sorry, that he contracted to have an online survey

12   conducted.

13   Q     That was my question.  Very simple.  Thank you.

14         As far as the survey itself, you took no exception

15   to hiring Wilkins Research Services, a third party service, to

16   do the survey, right?

17   A     No, it would be common to hire an implementer for a

18   survey.

19   Q     In fact, in the past when you've conducted your own

20   surveys, you've hired third party services, correct?

21   A     Yes, I'd design the surveys and very often will contract

22   to interviewers or to panel companies, to other people who are

23   actually going to do the actual interviews, or basically

24   invite people to the online survey.

25   Q     So that's a "yes" to my question?
```

```
 1   A      I thought I just said, yes, I do do those things.

 2   Q      A contingent valuation survey is one way to measure

 3   willingness to pay, correct, sir?

 4   A      A well done contingent value survey, if you can get rid

 5   of all the biases, which is not easy, is one way in which one

 6   can measure willingness to pay.

 7   Q      And, in fact, are you familiar with the NOAA?

 8   A      The NOA -- National Oceanic and Atmospheric

 9   Administration.  Yes, I'm familiar with them.

10   Q      And, in fact, they recommend using willingness to pay,

11   correct?

12   A      Well, you're talking about the NOAA report that was

13   written by Dr. Arrow, Dr. Solow and others, two Nobel

14   Laureates.  They recommend that if you're going to make a

15   choice between willingness to pay and willingness to sell,

16   they would prefer to use a willingness to pay method.

17          However, I would point out that the methods they're

18   talking about are actually not the methods that Dr. Kilpatrick

19   uses.  They're asking about a direct solicitation question,

20   whereas Dr. Kilpatrick uses an evolution of that known as a

21   choice-based question.

22   Q      I didn't ask you what Dr. Kilpatrick used.  I'm just

23   asking you in general right now.  Okay.  Please focus on my

24   question, if you will.

25   A      Okay.
```

1   Q     Thank you.

2           Contingent valuation surveys, if done properly, is a

3   valuable way to measure willingness to pay, correct?

4   A     Yes.  If you can do it carefully and get rid of biases,

5   then contingent value surveys are one means to measure

6   willingness to pay.

7   Q     Dr. Kilpatrick, in his analysis, acknowledged that the

8   use of mean willingness to pay gives a CV survey results that

9   predict slightly higher losses than other methods, correct,

10  sir?

11  A     Just repeat that.  You had a lot of things in there.  I

12  heard the word "mean," and so could you please repeat that?

13  Q     Well, let me back up.  One of your criticisms of

14  Dr. Kilpatrick's use of the CV survey was that he had an

15  exaggerated diminution estimate, correct?

16  A     Well, if you correct his arithmetic, it's a very

17  substantial diminution estimate.

18  Q     And so you think that there's an error in his math, in

19  his arithmetic, correct, sir?

20  A     Oh, absolutely.  And I explained it in my direct

21  testimony.  I could gladly explain it to you.

22  Q     We'll get into that.

23           In your -- in looking at Dr. Kilpatrick's analysis,

24  though, he did adjust his diminution amounts by 10.46 percent,

25  didn't he, sir, to adjust for that variance?

1   A    No, that doesn't adjust for the error in the math.

2   That's a totally different adjustment.

3   Q    One of your criticisms is that Dr. -- and we're talking

4   about the math, going back to your math problem.  One of the

5   criticisms is that Dr. Kilpatrick utilized the wrong equation

6   from the Hanemann paper, correct, sir?

7              THE COURT:  Hold it.  What was it; the Hanemann?

8              MR. HAMMER:  Hanemann.  It's H-a-n-e-m-a-n.

9              THE WITNESS:  I think there are two N's.

10             MR. HAMMER:  Actually, there are two N's, two N's at

11   the end.

12   BY MR. HAMMER:

13   Q    Thank you.

14   A    And we're talking about the 1989 paper.

15   Q    And in that criticism, you say that he should have used

16   equation 10 as opposed to 11, which he used, correct?

17   A    I'm sorry, I don't remember the numbers of the equation.

18   I can actually tell you what the equations are.  But

19   Dr. Kilpatrick chose, and it was actually his choice to

20   estimate a particular model.  And given that that's the model

21   he estimated, Hanemann says that there is a particular formula

22   you should use, and he actually cautions against using the

23   formula that Dr. Kilpatrick claims to use.

24             Now, I'd like to point out that Dr. Kilpatrick

25   didn't use that formula per se; he actually left out some of

1    the variables, as well.

2    Q    And so you believe, in your analysis of Dr. Kilpatrick's

3    work, he used the wrong equation, you would have used a

4    different equation; is that correct?

5    A    Given the model he chose to estimate, it is

6    straightforward mathematics to determine, and Hanemann

7    provides that, what form you should use for the mean of the

8    willingness to pay, and Dr. Kilpatrick used the wrong formula.

9    Q    Now, in Dr. Kilpatrick's survey, in the questionnaires,

10   he asks respondents to react to bids expressed in specific

11   dollar amounts, isn't that true, sir, and not percentages?

12   A    Yes, he asks specific dollar amounts, that's correct.

13   Q    And, in fact, if we looked at the first question, one of

14   the questions he asks is what do you think is the current

15   value of your residence, correct?  That asks for a dollar

16   amount, as opposed to a percentage amount, correct, sir?

17   A    Yes, that's one of the questions he asks.  That's his

18   baseline.

19   Q    One of the faults that you found with Mr. Kilpatrick's

20   use of the equation from Hanemann was that in reading the

21   questionnaire, he was asking questions about percentages

22   instead of dollar amounts; isn't that true, sir?

23   A    No.  Actually, his questions, he -- if you actually put

24   the question up, but we could look at it, no, he asks it in

25   dollar amounts, but he takes that first question you gave me,

1    and then he computes a percentage of that, and then that gives

2    a dollar amount, and that's the choice-based question that he

3    provides to respondents.

4    Q    The study that was conducted by Dr. Kilpatrick, that was

5    a blind study, correct, sir?

6    A    Well, there are demand artifacts in the study, but it

7    was -- and as a result, the respondents were not blind to the

8    purpose of the study or the hypotheses because of demand

9    artifacts, and we actually see that in the qualitative data,

10   so it's not a perfectly blind study.

11   Q    Well --

12   A    But it is true that he did make some attempts, except for

13   the demand artifacts, to make it at least single blind.

14   Q    Well, in the study, the respondents were not told who the

15   study's sponsors were, correct?

16   A    Right.  But if we look very carefully, they can guess the

17   purpose of the study and the hypotheses.

18   Q    Well, sir --

19   A    Which is a demand artifact, and it's a little bit

20   different from blind.  But he did attempt a blind study, I'll

21   give you that.

22   Q    And the respondents were not informed of the core reason

23   for the study directly, right?  You're saying it's an

24   artifact, but they were not advised of what the reason was for

25   the study or who was performing the study; isn't that true,

1   sir?

2   A   No, no.  They could easily infer it, but, no, they were

3   not advised directly.

4   Q   Sir, there's a big difference between being told

5   something and inferring something, isn't it?

6   A   Yes.  In a survey, a researcher would look at what

7   is inferred --

8           MR. HAMMER:  Please, Judge, I don't mean to cut him

9   off, but he's not answering my questions.

10          THE COURT:  Well, that seems to require an

11  explanation to me.  You said you can allow him to explain

12  after he answers the question.  So he answered it and is

13  giving an explanation.

14  BY MR. HAMMER:

15  Q   In the survey, the respondents were asked to value a

16  residence in The Acreage that was exactly the same as their

17  current residence except for the location; isn't that true,

18  sir?

19  A   Those are the words he used, yes, correct.

20  Q   And so --

21  A   I don't have it in front of me, but those certainly sound

22  like the words that he used.

23  Q   And in doing that, since the respondents were asked to

24  imagine a residence in The Acreage that was exactly the same

25  as their current residence except for location, this meant

1    that the respondents were asked to include all the good things

2    about their home that they liked, correct?  It was the same

3    exact home other than the location; isn't that true, sir?

4    A    Except for the fact that there's many questions that come

5    before that, and the fact card itself is biased.  So he really

6    violates the -- you've mentioned NOAA report.  He really

7    violates the recommendations in the NOAA report.  And he also

8    violates the recommendations from Dr. Shari Diamond, which he

9    holds up as something with which to evaluate his own survey.

10            MR. HAMMER:  Judge, I would like to move to strike

11   as nonresponsive.

12            THE COURT:  Overruled.

13   BY MR. HAMMER:

14   Q    Sir, my question is, sir, if I ask you to imagine your

15   exact residence, would you be able to do that?  Is that a

16   difficult thing for a person to do?

17   A    I could imagine my own residence, of course.

18   Q    Okay.  And is it unreasonable for a person, in

19   administering a survey, to ask a respondent to imagine their

20   exact residence as it exists?

21   A    If they do it in an unbiased form and we have to look at

22   the whole survey, but that particular question you're getting

23   to is not a biased question.  The rest of the survey, in fact,

24   there are strong order effects, there are strong induction

25   effects, there are anchoring effects.  There are a lot of

```
 1    problems in the survey before we get to that.

 2           One thing you know with surveys is the prior

 3    questions influence the later questions.  It's a standard

 4    procedure that we've established -- that has been established

 5    in surveys.

 6    Q    When you imagine or a respondent imagines their exact

 7    residence, they take and consider all the good things about

 8    that residence, right?  All the things they like about that

 9    residence; isn't that true, sir?

10    A    Yes, but it's a little bit more complicated.  And because

11    they're doing it in the context of a survey, there are many

12    things that are top of mind.  And basically his fact card, as

13    well as his prior questions, put other things in top of mind.

14           And we know that respondents react, and there's a

15    theory of short-term memory and how many items they can hold

16    in short-term memory, and many of these biases are pushing

17    those things out.  So it's really a survey issue.

18           That question alone, that question alone is not

19    biased, but the rest of the survey, because of the order

20    effects, biases the responses.

21    Q    You talk about the fact card, and I want to talk about

22    that real quick.  Okay?  The fact card that you're referring

23    to -- it should be popping up on your screen there.

24    A    Here, okay.

25           THE COURT:  Do you see it, Doctor?
```

1          THE WITNESS:  Yes, thank you.

2    BY MR. HAMMER:

3    Q    If we need to, we can blow it up paragraph by paragraph

4    so it's a little bit easier to read.  And so why don't we go

5    to the top there, if you could.

6          So this is the fact card that was used in this case,

7    correct, sir?

8    A    Yes, this appears to be the fact card; that's correct.

9    Q    All right.  And it describes~-- the beginning paragraphs

10   talk about The Acreage community, correct, sir?

11   A    Yes, they do.

12   Q    Okay.  And it describes The Acreage community, correct?

13   A    It provides some description of The Acreage community,

14   that's correct.

15   Q    And it talks about the fact that it's located

16   approximately five miles north of The Acreage -- that Pratt &

17   Whitney is located approximately five miles north of The

18   Acreage property, correct?

19   A    Yes, you're reading what it says; that's correct.

20   Q    Let's go down to the next section.

21         Now -- and before we do that, you are -- one of your

22   criticisms is that there was a picture of the Pratt & Whitney

23   facility and there was not a picture of the homes in The

24   Acreage.  That was one of your criticisms, correct, sir?

25   A    Yes, that was one of my criticisms, and I could explain

```
 1   it if you would like.

 2   Q    Well, before you explain it, is it fair to say that a

 3   person who is asked to imagine their exact home in -- being

 4   placed in The Acreage would know what their home looks like?

 5   Is that a fair statement?

 6   A    But recall that this is within context, and there are a

 7   lot of other things going on here.  And it's just -- if you

 8   look at this fact card, it's just a -- it's just not a

 9   two-sided presentation.

10   Q    Sir, that's not my question.

11        My question is if a person is asked to assume or

12   imagine that they're just picking up their home and placing it

13   into The Acreage, would they need to have a picture of

14   their -- of a home to understand what they're asked to

15   imagine?

16   A    Well, they would certainly know what their home looks

17   like.

18   Q    Exactly.

19   A    But The Acreage, it's in a context, and actually there

20   are many areas of The Acreage.  You know, is that that area

21   that's horse farms?  Is it that area that's front loaders in

22   the front yard?  You know, what is the context.  And if I

23   understand real estate, neighborhood matters.

24   Q    I'm glad you asked that.

25        Did you drive around The Acreage?
```

```
 1    A    Actually, I did.

 2    Q    When?

 3    A    I was down here so I thought I should go see it.

 4    Q    When?

 5    A    Sunday.

 6    Q    Well, but prior to giving your opinions in this case, you

 7    had never been to The Acreage, isn't that true, sir?

 8    A    No, but I've certainly seen pictures.  I've certainly

 9    read Dr. Jackson's survey.  I've certainly talked to people

10    about the heterogeneity of The Acreage, but I did want to see

11    it for myself.

12    Q    I understand that, sir.

13         At the time of your deposition, you had not driven

14    through The Acreage; isn't that true, sir?

15    A    Oh, that's correct.  I had not driven through The Acreage

16    at that point.

17    Q    Now, the next paragraph talks about what was going on at

18    Pratt & Whitney, correct?  It's up in front of you now.

19    A    Yes, this is now a descriptions of what's going on at

20    Pratt & Whitney.  I think we've gone through whether or not

21    this is accurate, but that's in my direct testimony.

22    Q    Okay.  And we're going to go through this a little bit.

23    Okay, sir?

24         So in going through this, let's take a look at the

25    first sentence.  Okay?  Well, first of all, is there anything
```

1  in this paragraph that is not accurate, based upon your

2  research?

3  A    Did you say is not accurate?

4  Q    Yes.

5  A    Okay.  I just didn't hear you.

6       I really -- you know, I've heard the claims in this

7  case, and I can't say whether or not this is accurate.  I can

8  say it's biased.  I've seen a lot of information that shows

9  other things, as well.

10      But I cannot say whether or not there was, for

11 example, asbestos or sodium cyanide, both of which are very

12 loaded words, but I just don't know.

13 Q    Okay.  So you don't know if --

14 A    I'm not a hydrologist or chemist, and I don't know what

15 was in there.

16 Q    Understood.

17      You did not do any independent research to determine

18 whether or not the fact card that you're here to tell -- to

19 basically explain whether or not it's a valid fact card, you

20 didn't do any independent research to determine whether or not

21 the facts in the fact card are true facts, did you?

22 A    I've been informed, and then that's what I said in my

23 report.

24 Q    Sir --

25 A    I did not -- I'm not a hydrologist.  I'm not a chemist.

 1   And whether or not these were the particular contaminants, I

 2   don't know.  But when we look at that fact card, it's a loaded

 3   fact card.

 4   Q    Fine, sir.

 5   A    And they're not giving the positives.  It's not -- I

 6   mean, if we look at the literature in contingent value, we

 7   look at the agent article, we look at the NOAA report --

 8           MR. HAMMER:  Judge, I have to cut him off.  It's not

 9   responsive.

10           THE COURT:  What's the question again?

11   BY MR. HAMMER:

12   Q    My question is did you do any independent research to

13   determine whether or not the facts in this paragraph of the

14   fact card are accurate?  Yes or no?

15           THE COURT:  Yes or no?

16           THE WITNESS:  I've not done any independent research

17   to verify whether these particular statements are accurate.

18   BY MR. HAMMER:

19   Q    And so if all of these statements are accurate, then the

20   fact card, at least as regard to this paragraph, is accurate;

21   isn't it true, sir?

22   A    There's a difference between -- yes, it's accurate.

23   There's a difference between accurate and biased.

24   Q    Well, if you're providing the facts to an individual to

25   get how they feel about a certain set of facts, it's important

1    to provide them with accurate facts; isn't that true, sir?

2    A    Okay.  Now are you talking about for contingent

3    valuation?

4    Q    If you're providing a fact card -- a fact card is called

5    a fact card because it contains facts, correct, sir?

6    A    A fact card contains facts.

7         If we're talking about contingent valuation, it's

8    important to provide context, because the answers respondent

9    give are very sensitive to the context, and it's very

10   important to provide a two-sided complete description of what

11   the decision that the consumers actually made.  And that's

12   strongly in the literature.  It's in the contingent value

13   literature, and it's in the preference solicitation literature

14   in general, and I can give some cites if you'd like.

15   Q    Let's go to the next paragraph, please.

16        Now, before we start going through this paragraph, I

17   think one of your criticisms were that the word "cancer"

18   and/or "cancer cluster" was used 10 times in this fact card,

19   correct?

20   A    Yes, it is -- that's a fact.  It's used 10 times in the

21   fact card.

22   Q    Okay.  And, in fact, it's a fact that The Acreage

23   neighborhood was declared a cancer cluster by the Florida

24   Department of Health; isn't that true, sir?

25   A    I believe that I've been informed that that's correct.

```
1    Q     Okay.  And in a fact card -- does a -- does an individual
2    necessarily know what a cancer cluster is?
3    A     A -- are you talking about a lay individual?
4    Q     Yes.
5    A     A lay individual, no, would not know what a cancer
6    cluster is.
7    Q     So in a fact card it would be a wise thing to explain
8    what a cancer cluster is, correct?
9    A     It certainly would be -- in a fact card it would be
10   important to explain all the aspects of the decision the
11   person is being made, and --
12   Q     Sir.
13   A     -- and the person should know, of course, what cancer
14   clusters are.
15   Q     And in order to explain a cancer cluster, you'd have to
16   use the word "cancer cluster" and the word "cancer," correct?
17   A     I'm not at all saying you can't use the cancer; it's just
18   that it's so overwhelming.
19   Q     Well, I understand that, and that's your position that it
20   was used 10 times in this fact card, but let me get to the
21   fact card itself.
22         In the paragraph it describes what a cancer cluster
23   is, and it describes a cancer cluster as an area with a high
24   number of cases of the same type of cancer than what is
25   expected by chance for an area within a certain period of
```

1    time, right?  You see that?

2    A    I see that, yes, correct.

3    Q    Okay.  And so in explaining what a cancer cluster is, in

4    that one sentence they had to use it two times, correct?

5    A    Yes, they used it twice.

6    Q    Okay.  And in speaking about the fact it was declared a

7    cancer cluster and the reason why it was declared a cancer

8    cluster, it was used twice in that same sentence, saying that

9    the area was declared a cancer cluster as a result of the high

10   rates of pediatric brain cancer, correct?

11   A    Yes, Dr. Kilpatrick chose to explain at great length what

12   a cancer cluster is.

13   Q    Well, in order for an individual to make a decision about

14   whether or not they would want to live in an area with a

15   cancer cluster, they would need to know with precision what a

16   cancer cluster is; isn't that fair, sir?

17   A    Well, you've said in order for a consumer, or, I'm sorry,

18   a resident to make a decision -- not a resident, someone

19   making a decision about living there, they would have to know

20   a number of things.  And the issue is not so much with

21   describing the information here, it's just that you don't

22   describe other things, and it's very biased.

23   Q    All right.  And we'll get to the other things in a

24   minute, but I'm talking about your concern, and it was a major

25   concern of yours in your report, that he used -- that it was

 1    biased because of the use of "cancer" 10 times in this short

 2    fact card.  That was one of your major criticisms; isn't that

 3    true, sir?

 4    A    It remains a major criticism, and the consumers fed it

 5    back to him.

 6    Q    And that's why --

 7    A    If you look at what consumers say, they say --

 8    Q    I haven't asked a question.

 9    A    -- cancer cluster, cancer cluster, cancer cluster.

10    Q    I promise we'll get to that.  I promise we'll get to that.

11         THE COURT:  Please, Doctor, just try and answer his

12    questions without going into a lengthy, you know, explanation

13    of your position.  You know, it's in the affidavit.  I know

14    what it is.

15         THE WITNESS:  Okay.

16    BY MR. HAMMER:

17    Q    It then goes on to say that some local residents

18    suspected that local cancer cases were due to contamination

19    from the Pratt & Whitney facility, and it talks about a letter

20    that The Acreage citizens received from the Center for Disease

21    Control, correct?

22    A    Yes, that's what it says.

23    Q    And it goes on to say that -- it basically explains that

24    there was an investigation done and that the cancer cluster,

25    based upon what the state agencies initiated as far as a

 1   report, it was established between -- there was no causal

 2   relationship was established between the contaminants in the

 3   well water and the documented pediatric brain cancers,

 4   correct, sir?  That was the final words in that fact card,

 5   correct?

 6   A    Yes, that's what it says.

 7   Q    Okay.  And so you said earlier that there's a --

 8   something called recency of your memory?  In other words, when

 9   you're reading a fact pattern, you know, the last thing you

10   recall is the -- the last thing you read is the greatest thing

11   you recall, correct?

12   A    I didn't mention the word "recency."  It's the

13   entire~thing priming.

14           COURT REPORTER:  I'm sorry, sir.

15           THE WITNESS:  I'm sorry.  The entire fact card and

16   the entire survey is priming.  It's not necessarily just

17   recency.  There's a primacy effect, as well.

18   BY MR. HAMMER:

19   Q    And, so, in sum, as the final summation of this fact

20   card, this fact card was telling the people even though there

21   was a cancer cluster and even though it was investigated, and

22   even though it may have been from Pratt & Whitney, it was

23   determined that there was not a causal relationship between

24   the contaminants in the well and the documented pediatric

25   brain cancers; isn't that true, sir?

1    A    Yes, it -- actually choose the word "limited testing,"

2    and I understand there was much more extensive testing.  But,

3    yes, this refers to at the end it basically gives that

4    statement.

5    Q    And so if anything, instead of increasing the concerns

6    that residents may have of the cancer cluster, it lessens the

7    concerns by saying that the state agencies determined there

8    was no causal relationship; isn't that true, sir?

9    A    That I don't think is true.  Or that -- my expert opinion

10   is that that's not true.

11   Q    Well, it's certainly a more positive statement than

12   saying that -- than not including the fact that the State

13   found that there was no causal relationship?

14   A    Yes.  I mean, there's no question it's better to include

15   that than not include that.

16   Q    So it's certainly better to include the truth than to

17   not, isn't that true, in a fact card?

18   A    It's certainly -- yeah, the truth is -- it's important to

19   have the truth in there, and I think we -- it's important to

20   have the whole truth in there.

21   Q    And one of the critiques you had was that Dr. Kilpatrick

22   presented only negative and very limited information in this

23   fact card, correct, sir?

24   A    Yes, that's correct.

25   Q    Okay.  And when we look at this fact card, it looks like

1    it provides a lot of information about the cancer cluster and

2    the results of the cancer cluster and the results of the

3    investigation, doesn't it, sir?

4    A     It provides a lot of information.  There's a lot that it

5    doesn't provide.

6    Q     And you say it only -- it provided only negative

7    information, right?  Isn't that what you critiqued?  That's

8    one of your opinions, correct?

9    A     Are you reading from my report "only negative

10   information"?

11   Q     Yes.

12   A     Well, the general feeling of this is it's a pretty

13   negative statement, but I'll admit that there is at least a

14   little bit of positive information here.  Certainly not a

15   completely positive statement, but there's a little bit of

16   positive.

17   Q     And, sir, you reviewed the responses to the survey.  You

18   reviewed the survey cards themselves, right, the responses?

19   A     Yes, I reviewed many of the responses.

20   Q     And would it be reasonable that people would seek to

21   avoid being exposed to carcinogens in a neighborhood?

22   A     You mean in general?

23   Q     Yes.

24   A     Yes, people of course would -- if there were carcinogens,

25   that's not reasonable.

```
 1  Q    And one of the things, one of your criticisms were that

 2  he used terms such as --

 3           MR. HAMMER:  And, if you could go up to the

 4  paragraph right above this.

 5  BY MR. HAMMER:

 6  Q    That he used terms such as "cancer-causing agents, oil,

 7  sodium cyanide, asbestos and mercury," correct, sir?

 8  A    Yes.  And I've been informed that some of these are not

 9  at issue in this case.

10  Q    Well, not at issue -- well, some may not be at issue in

11  this case.  You're aware, though, that there were governmental

12  reports finding that there were cleanup activities of

13  chemicals and hazardous wastes, including cancer-causing

14  agents, oil, sodium cyanide, asbestos and mercury at the Pratt

15  & Whitney site.  You're aware of the governmental reports that

16  state that, aren't you, sir?

17  A    I'm quite willing to accept that.  That sounds

18  reasonable.

19  Q    And, in fact, I think it's attached, the 1988 FDOH

20  report.

21           MR. HAMMER:  Do you have that?

22           And, Judge, I believe this is an exhibit.  I'm not

23  sure what number it is.  Do we know?

24           MR. GALLAGHER:  I don't believe it's an exhibit.

25           MR. GRODEN:  No.
```

```
 1              MR. HAMMER:  Well, if it's not, we would mark it,

 2    because we have used it.

 3              And this is the 1988 report regarding the Pratt &

 4    Whitney facility.

 5    BY MR. HAMMER:

 6    Q    And, sir, just so that --

 7              THE COURT:  What are you marking it as if it's going

 8    to be --

 9              MR. HAMMER:  As an exhibit for purposes of this

10    hearing, Judge.

11              THE COURT:  What number?

12              MR. HAMMER:  That, I don't know what number we are

13    at.  I apologize.

14              MR. SCAROLA:  One.

15              MR. HAMMER:  Maybe 1.  I'll take it.

16              THE COURT:  One.

17              MR. HAMMER:  Thank you, Judge.

18              THE COURT:  Thank you.

19    BY MR. HAMMER:

20    Q    And in that, sir, you see that it references the waste

21    oil, the sodium cyanide, the asbestos and the mercury,

22    correct?  I think those are highlighted there for you.

23    A    Yes.  I mean, we can all read this.  Those are

24    highlighted.  It says in the past they were there, and that's

25    correct.
```

```
 1   Q     And it lists a lot of other things in this report, but
 2   those aren't listed in the fact card, right?
 3   A     Yes, it lists a lot of other things.
 4   Q     Now, I think you also took exception that -- with the
 5   wording of the fact card.
 6              MR. HAMMER:  And if we can go back to the fact card.
 7   BY MR. HAMMER:
 8   Q     And that same paragraph right below the picture, where
 9   you indicate that I think you were concerned about the fact
10   that it says that chemicals and wastes eventually migrated
11   outside of the facility's boundaries and into surrounding
12   areas, including the Corbett Wildlife Refuge and The Acreage
13   neighborhood.  Was that a concern of yours?
14   A     These are all strongly negatively balanced statements
15   that are going to influence the consumer.
16   Q     Well --
17   A     And, yes, these are a concern of mine.
18   Q     And if those statements are true, then putting them in a
19   fact card to determine whether or not an individual is willing
20   to live in that neighborhood -- in other words, pick up their
21   house, their beautiful house that they love, and move it into
22   The Acreage neighborhood, it's important that they know what
23   they're moving into, isn't it?
24   A     I totally agree it's important that they know all the
25   aspects and that they be given an unbiased description, and we
```

```
 1    know that it's important to be unbiased if we're going to get

 2    an accurate answer.

 3    Q    Now, with regard to consumer preferences with regard to

 4    health risks, would you agree --

 5              MR. HAMMER:  You can take that down.  Thank you.

 6    BY MR. HAMMER:

 7    Q    Would you agree that consumer preferences with regard to

 8    health risks are relatively stable?

 9    A    Hmm.  I don't know that for sure.  They can evolve over

10    time.

11    Q    And consumer preferences with regard to health risk,

12    trade off change relatively slowly?

13    A    Again, that's an empirical question that one can study,

14    and certainly you can test that, but I don't know for sure.

15    Q    Well, you've --

16              MR. HAMMER:  Do we have the deposition from -- the

17    2009 depo?  Do we have that?

18              I'm sorry, Judge.  Can I have a minute?

19              THE COURT:  Yes.

20              MR. HAMMER:  I'll move on.

21              THE COURT:  Okay.

22    BY MR. HAMMER:

23    Q    Sir, we talked about the fact that you went through the

24    survey response cards, correct?

25    A    Well, I went through the data that we had been given,
```

1    yes.

2    Q    And --

3    A    Which I believe was in a spreadsheet.

4    Q    Okay.  And in those -- in that data, many of them talk

5    about fear of using their well water because of environmental

6    contamination; isn't that true?

7    A    Yes, that's true.

8    Q    Now, in this case, you've not done any direct market

9    research yourself, correct?

10   A    Not in this case, no, I have not.

11   Q    In this case, you've not interviewed a single Acreage

12   resident?

13   A    No, I have not done any surveys of my own.

14   Q    You've not interviewed a single real estate broker in the

15   area with --

16   A    No, I --

17   Q    -- regard to The Acreage?

18   A    Sorry, I should let you finish.  I'm sorry.

19         No, I have not interviewed any real estate agents in

20   The Acreage.

21   Q    And you have not interviewed a single mortgage lender

22   with regard to their position about lending in The Acreage

23   community, correct?

24   A    No, I have not interviewed any mortgage lenders about

25   their lending in The Acreage.

```
 1                 MR. HAMMER:  Thank you, Judge.  I have nothing
 2   further.
 3                 THE COURT:  Thank you.
 4                 How long do you think you'll be on redirect?
 5                 MR. GRODEN:  Less than 10 minutes, Your Honor.
 6                 THE COURT:  All right.  Let's finish up.
 7                           Redirect Examination
 8   BY MR. GRODEN:
 9   Q    Good afternoon, Dr. Hauser.
10   A    Good afternoon.
11   Q    I'll be asking you a few follow-up questions on behalf of
12   UTC.
13                 Let's start with your qualifications, which the
14   plaintiffs have challenged.
15                 First, are you familiar with the survey tools that
16   Dr. Kilpatrick has used in this case, a CV survey and what he
17   calls informal surveys?
18   A    Yes.  These -- I've done preference solicitation for
19   close to 45 years, and the methods he's using are preference
20   solicitation surveys.  I learned these in grad -- I learned
21   the methods and the criteria in graduate school.  I've taught
22   these for roughly 45 years at both Northwestern and at MIT.  I
23   use these in my own professional survey, helping firms make
24   decisions.  And I've certainly testified about them.
25   Q    Well, let's look at Dr. Kilpatrick's direct testimony.
```

```
 1    This is docket entry 363-15.

 2             Dr. Hauser, I've pulled up page 7 of

 3    Dr. Kilpatrick's direct testimony, and do you see in

 4    paragraph 47 it says:  "All work was conducted in conformance

 5    with the guidance provided by the Reference Manual on

 6    Scientific Evidence"?

 7             Footnote 7 then cites Diamond, Shari S, 2011.  Title

 8    is "Reference Guide on Survey Research," and it looks to be

 9    published by the Federal Judicial Center.

10             Do you see that?

11    A    Yes, I do.

12    Q    Dr. Hauser, who is Shari Diamond?

13    A    Well, Dr. Shari Diamond is a professor at the

14    Northwestern law school, and she's written, as indicated here,

15    about survey standards, particularly as to be used in the

16    federal districts.

17    Q    Are you familiar with Diamond survey standards?

18    A    I'm definitely familiar with them.  Again, the basic

19    methods that she goes over are standard survey methods.  I

20    teach these.  I learned them in graduate school.  I use them

21    in my own professional surveys.

22    Q    Are Diamond standards limited to surveys of any

23    particular market or industry?

24             MR. HAMMER:  Objection; leading.

25             THE COURT:  Overruled.
```

```
1              THE WITNESS:  No, of course not.  They're standard
2     survey methods that are used for any survey that would be
3     conducted for evidence, and they're actually quite general.
4     They apply to any survey that might be used by a corporation
5     to make decisions, as well.
6     BY MR. GRODEN:
7     Q    Are Diamond standards limited to surveys related to any
8     particular product or good?
9     A    No, not at all.  They apply to wide range of products,
10    everything from consumer goods to automobiles to real estate.
11    They really apply quite generally.
12    Q    Let's take a look at what the plaintiffs argued about
13    your qualifications.  I'm pulling up their Daubert motion,
14    which is docket entry 237.
15              And here in this paragraph, plaintiffs argue:  Dr.
16    Hauser is not qualified to opine on either, one, CV surveys
17    or, two, the standards applicable to any survey performed for
18    mass real estate valuation purposes.
19              MR. HAMMER:  And, Judge, I would object as beyond
20    the scope.
21              THE COURT:  Overruled.
22    BY MR. GRODEN:
23    Q    Let's start with the first point, Dr. Hauser, which I'll
24    highlight.
25              Are you familiar with this criticism the plaintiffs
```

1   have lodged:  Dr. Hauser is not qualified to opine on CV

2   surveys?

3   A     Yes, I'm familiar with the criticism.

4   Q     What is your response?

5   A     My response is contingent value surveys are surveys.

6   They're a form of preference solicitation.  And to really

7   demystify CV surveys, the original surveys in the NOAA report

8   ask people how much they're willing to pay straight out.

9   They've evolved.  They now ask choice questions.  They give a

10  dollar amount and a contingent change, one attribute being

11  changed, and the respondent basically says yes or no, and

12  there might be a don't know, as well.

13          The literature's really evolved beyond this, because

14  CV surveys have a number of biases.  One of the things we do

15  today is instead of asking a single question, we ask multiple

16  questions, and that allows us to deal with heterogeneity in

17  consumers, and instead of asking a single attribute, we ask

18  multiple attributes, and that allows us not to have focalism

19  and to allow consumers to make trade-offs in a realistic

20  sense.

21          Now, going to multiple questions and multiple

22  attributes is called conjoint analysis.  But as you can see, a

23  CV is just one question, one attribute conjoint analysis.

24          In fact, as I sort of indicated earlier, a recent

25  book came out on conjoint analysis, and it talks about CV

```
 1   surveys --
 2              MR. HAMMER:  Objection, bolstering.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  It basically talks at length about
 5   them, and it goes over many of the biases that are inherent in
 6   CV surveys.
 7   BY MR. GRODEN:
 8   Q    Dr. Hauser, let's now discuss the second point, which
 9   argues that you're not qualified to opine on standards
10   applicable to any survey performed for mass real estate
11   valuation purposes.
12              Are you familiar with this criticism?
13   A    I'm familiar with that criticism, as well.
14   Q    What is your response, sir?
15   A    I feel I'm qualified to comment upon the actual
16   implementation of a survey, whether the survey is done for
17   real estate or whether the survey is done for other purposes.
18   I would apply that both by training, my experience, Dr. Shari
19   Diamond's criteria, as well as many of the criteria that
20   really apply in general for survey research.
21   Q    Is there anything unique to real estate that would render
22   you unable to comment on a survey relating to real estate
23   presences?
24   A    No, not at all.
25   Q    Dr. Hauser, let's now talk about your opinions.  And
```

1   without repeating everything in your direct, and especially

2   because I promised the Court that we'd stick under 10 minutes,

3   is Dr. Kilpatrick's CV a reliable survey?

4   A    No, it is not.  It's fatally flawed.

5   Q    And why is that, sir?

6   A    Well, begin with the fact card.  And the fact card for a

7   number of reasons detailed in my direct testimony, is really

8   biased.  The literature, both in CV and in preference

9   solicitation, including the NOAA report, indicate that the way

10  you present the information is -- responses are very sensitive

11  to this, and it's important to provide a two-sided set of

12  information, information that will be understood by the

13  respondents so they can make tradeoffs as they would in a real

14  world.

15          In addition, we have the problem that Dr. Kilpatrick

16  literally goes with the wrong sample.  He chooses a sample,

17  and if you look at where the zip codes come, it's mostly

18  coastal Florida.  And although there are some close to The

19  Acreage and there are some interior, if you think of someone,

20  say, in Juno or along the coast, and you literally ask them

21  would you move to The Acreage, independent of any problems

22  there with wastewater or whatever, they would say, no, I don't

23  want to move away from the coast, I don't want to move inland.

24  And, in fact, you see that in his survey responses; that

25  people are saying I would just not consider The Acreage.

```
 1              Now, there are ways to get around that, but he
 2    certainly can't do that after the fact, because he has a
 3    sample that's not -- basically of people who have chosen not
 4    to live in The Acreage by the very sample.
 5              So if we look at that, and then together we can go
 6    through and actually correct his arithmetic, and if we correct
 7    his arithmetic, we literally get a 200-plus diminution.  What
 8    that would mean is if I have a $200,000 house, you would have
 9    to give me the house for free and give me $200,000 in order to
10    get me to live there.  And on the face of it, that's just not
11    realistic.
12              And that's not just his arithmetic.  If you look at
13    his actual numbers, in one case he's telling people they can
14    get the house for 15 percent of what the fair market value is,
15    and only 10 percent say they would.  That's just a very, very
16    high number.  And likely because of all the biases or because
17    of all the sample problems, either one of those would cause
18    that effect.
19    Q    Does any --
20    A    So those are the essence.  There are other things that I
21    detail in my report.
22    Q    Does anything that you discussed on cross-examination or
23    that Dr. Kilpatrick said in his testimony cause you to change
24    your opinion on the CV survey?
25    A    No, not at all.
```

```
 1   Q    Let's now briefly turn to Dr. Kilpatrick's informal
 2   surveys.
 3             Again, without repeating everything in your direct,
 4   are Dr. Kilpatrick's informal surveys reliable?
 5   A    No, they're just not done to scientific standards.  To
 6   begin with, the respondents, which I heard yesterday are
 7   either all or mostly named plaintiffs, they're not blind.  The
 8   interviewers aren't blind.  And when we do a survey, as I was
 9   asked earlier, we like to get it as blind as possible on both
10   sides.
11             So these people were clearly litigation aware, and
12   if you read the transcript, they're made to be litigation
13   aware.  They're literally told that this -- their lawyers have
14   asked them -- asked their survey researchers to talk about
15   them.
16             And then when the data are coded, normally you would
17   have blind coders go through these data, put them in
18   categories and summarize those categories.
19             So it's just not done to scientific standards.
20   Q    Does anything that you discussed on cross-examination or
21   that Dr. Kilpatrick said in his testimony cause you to change
22   your opinions on the informal surveys?
23   A    No, not at all.
24             MR. GRODEN:  Thank you, Dr. Hauser.  Nothing
25   further.
```

```
 1                    THE COURT:  Thank you.

 2                    Any recross?

 3                    MR. HAMMER:  I've got -- if the Court doesn't mind,

 4      I've got -- can Mr. Scarola have some questions, follow-up?

 5                    THE COURT:  We're going to, you know, be

 6      piggybacking here?

 7                    MR. SCAROLA:  No, sir, we're going to be

 8      representing the separate interests of our clients.

 9                    MR. GALLAGHER:  Your Honor, there are no separate

10      interests of the clients here.  They have a merged complaint.

11      There's one party over there with one set of lawyers

12      representing a putative class.

13                    MR. SCAROLA:  Your Honor, had requested permission

14      to do that previously.  Opposing counsel agreed.  If they're

15      objecting and Your Honor sustains that objection, I'll just

16      feed my questions.

17                    THE COURT:  I mean, how long is this going to be?

18                    MR. SCAROLA:  Two minutes.

19                    THE COURT:  Go ahead, Mr. Scarola.

20                    MR. SCAROLA:  Thank you very much.

21                    MR. GALLAGHER:  And to be clear, Your Honor, because

22      he represented that we agreed, I did not agree.  I was asked

23      if yesterday Mr. Scarola could ask questions because they had

24      a separate interest in the nuclear theory, that they never

25      then asked any questions about.  But I was never asked if I
```

```
1    would agree throughout the hearing for them to have two sets

2    of lawyers get up and tag team.

3              THE COURT:  Let's go, Mr. Scarola.  Let's wrap it up

4    quickly.

5              MR. SCAROLA:  Thank you, Judge.  I will be quick.

6                        Recross-examination

7    BY MR. SCAROLA:

8    Q    Sir, you said that the results of the survey, had the

9    math been properly interpreted, would result in a finding that

10   it would be necessary to pay someone to live in The Acreage,

11   right?

12   A    It's not my survey, but that's what the -- if you analyze

13   the survey correctly, using the model that Dr. Kilpatrick put

14   forth and did the math correctly, that's what it implies.

15   Q    Yes, sir.

16             And you also said that that would be an -- a totally

17   unreasonable conclusion, right?

18   A    I think it would be unreasonable and could be explained

19   entirely by the sample.

20   Q    Yes, sir.

21             It could also be explained by the fact that a family

22   with children, who believed that their children would be

23   exposed by environmental contamination to a high risk of

24   contracting cancer would need to be paid a very substantial

25   sum of money before they would subject their children to that
```

```
 1  risk.  That would be another alternative examination, wouldn't

 2  it?

 3            MR. GRODEN:  Your Honor, I object to the question.

 4            THE COURT:  Overruled.

 5            You can answer.

 6            THE WITNESS:  That might be, but I don't -- I think

 7  given the fact that he asked people in the -- outside of The

 8  Acreage, he had a biased fact card, it's much more likely to

 9  be due to a sample issue, much more likely to be the biases,

10  and furthermore we see a lot of purchases in The Acreage.

11  People are actually making a decision.

12            So I think it would be a stretch to imagine that the

13  average person in his survey would have a 200 percent

14  diminution.

15  BY MR. SCAROLA:

16  Q    Are you aware of the fact, sir, that there were numerous

17  families in The Acreage who chose to abandon the investment in

18  their homes rather than continue to pay to live in The

19  Acreage?  Is that information that has made -- that has been

20  made available to you?

21  A    I understand that there's been many foreclosures, and

22  I -- basically I heard Dr. Jackson testify to that earlier.

23  I -- and I don't doubt that maybe a few people might believe

24  that.  But we're talking about the average person, and we're

25  talking about whether it should be a diminution of value.  And
```

```
 1   Dr. Kilpatrick's survey has so many problems, he just has not

 2   shown any evidence that can be used reliably.

 3   Q    And you conducted no investigation to determine whether

 4   the average person living in The Acreage would rather abandon

 5   their homes than subject their children to an increased risk

 6   of cancer, correct?  That's not something you've done?

 7   A    I have not done any independent survey myself, but I'd be

 8   glad to address the average issue, although it is direct -- in

 9   my direct testimony.

10            MR. SCAROLA:  Thank you, sir.  I have nothing

11   further, Your Honor.

12            THE COURT:  Thank you, Doctor.

13            MR. SCAROLA:  Appreciate the Court's allowing me to

14   do that.

15            THE COURT:  Thank you, Doctor.

16            THE WITNESS:  Thank you.

17            THE COURT:  All right.  Let's take a 10-minute

18   recess before we go to the next witness.

19       (A recess was taken from 3:09 p.m. to 3:23 p.m., after

20   which the following proceedings were had:)

21            THE COURT:  Please be seated, everyone.

22            Okay.  We are ready to go with Mr. Stephens; is that

23   correct?  Or Dr. Stephens?

24            MR. HABERMAN:  Yes, Your Honor.  Plaintiffs call

25   Dr. Stephens Your Honor.
```

```
 1              MR. MACNALLY:  Andrew MacNally on behalf of United
 2   Technologies.
 3              THE COURT:  Sir, would you raise your right hand.
 4          Daniel Bruce Stephens, Plaintiff's witness, sworn.
 5              THE COURT:  Your name, sir.  Spell your last name
 6   for us.
 7              THE WITNESS:  Daniel Bruce Stephens,
 8   S-t-e-p-h-e-n-s.
 9              THE COURT:  Thank you, sir.
10              You may proceed.
11                          Cross-Examination
12   BY MR. MACNALLY:
13   Q    Good afternoon, Dr. Stephens.  My name is Andrew
14   MacNally, and I'm here today on behalf of United Technologies
15   to ask you a few questions.  Okay?
16   A    Yes.
17   Q    For your convenience, sir, I've set a copy of your
18   report, your deposition, as well as your written direct
19   testimony right there for your reference this afternoon.
20   Okay?
21   A    Yes.
22   Q    I think you might need to pull the microphone a little
23   closer to you.
24              You are a hydrogeologist, sir?
25   A    Yes.
```

```
 1   Q     You offer opinions in this case regarding the movement of

 2   groundwater in the area that stretches from Pratt & Whitney,

 3   through the Corbett, south to the proposed class area,

 4   correct?

 5   A     Yes.

 6   Q     One of your opinions is that at the maximum rate of

 7   contaminant migration in the area, it is sufficient for some

 8   contaminants to actually reach the proposed class area,

 9   correct?

10   A     Yes.

11   Q     And you now claim that some contaminants have, in fact,

12   reached the proposed class area?

13   A     Yes, more likely than not, yes.

14   Q     You have not proffered any contaminant plume in

15   connection with your direct testimony here today, correct?

16   A     I don't understand your question.

17   Q     There is no contaminant plume that you've identified

18   anywhere stretching from Pratt & Whitney, through the Corbett,

19   down into the proposed class area anywhere in your written

20   direct testimony, is there?

21   A     I believe there is.

22   Q     Please point us to the figure that you believe identifies

23   a contamination plume that you have characterized in this case

24   in your written direct testimony.

25   A     How would you define plume?
```

```
 1   Q     I define a plume in the way -- how would you define a
 2   plume, Dr. Stephens?
 3   A     I would define a plume as a collection of data points
 4   that go from the source to a receptor downstream or down
 5   gradient, and --
 6   Q     And show us, then, any figure in your written direct, any
 7   of your tables, any of your figures, any of your paragraphs
 8   that give us a map of the proposed class area with a series of
 9   test results that you believe stretch from the source site,
10   all the way down continuously through to the proposed class
11   area.
12   A     There's a figure in my expert report that shows the
13   concentration of 1,4-Dioxane at the Pratt & Whitney site.  It
14   also shows the concentration of 1,4-Dioxane off the Pratt &
15   Whitney site, and it shows concentrations at The Acreage.
16   Q     This is the figure you're talking about, isn't it?
17   A     Yes, sir.
18   Q     This is docket entry 366-3, which is also Figure 5 --
19   excuse me, I believe it's 5-3 to your written direct, correct?
20   A     Yes.
21   Q     And what you show here is you have two magenta detections
22   that you claim are 1,4-Dioxane up here near the Pratt &
23   Whitney site.  Do you see that?
24   A     Yes.
25   Q     And then you show two J results -- we'll get to what a J
```

1    result means later -- that are over six and a half miles south

2    down in the proposed class area, correct?

3    A    Yes, there's actually four detections in the class area.

4    Q    And those are also J results, the other two, correct?

5    A    Yes.

6    Q    I'm working off your map, correct?

7    A    Yes.

8    Q    And you have a big giant blue arrow that traces an area

9    that you would agree spans at least 5.75 miles, correct?

10   A    Well, the shortest distance between the Pratt & Whitney

11   site and The Acreage is about 5.1 miles.

12   Q    Could you turn, please, sir, to your expert written

13   direct affidavit at paragraph 40.  Blow it up here on the

14   screen.

15         Did you write in your expert written direct that:

16   The UTC plant site is located at 17900 Highway 710, paren, the

17   Beeline Highway, end paren, approximately 5.75 miles north of

18   The Acreage?

19   A    Yes, it's approximately.  There are other distances to

20   the northern edge, but the closest one would be about

21   5.1 miles.

22   Q    Did you give that testimony that I'm showing here on your

23   screen in your expert written direct?

24   A    About 5.1 miles, or what?

25   Q    Is there anywhere in your expert written direct where you

```
 1   characterize the difference -- distance between Pratt &
 2   Whitney and the proposed class area as 5.1 miles?
 3   A    It may be -- I don't recall if that's actually in the
 4   report or not.  I know I measured it at one point after I saw
 5   Dr. Missimer come up with a number.  I believe he used
 6   something similar, and so I checked it, and I think it was
 7   5.1 miles approximately.
 8   Q    Well, there's no dispute between us, Dr. Stephens, that
 9   in paragraph 40 of your expert written direct, you do, in
10   fact, say that Pratt & Whitney is located about 5.75 miles
11   north of the proposed class area, correct?
12   A    Approximately 5.7 miles north.
13   Q    Taking us back to Figure 5.3 to your big blue arrow, do
14   you see that?
15   A    Yes.
16   Q    You do not have a single detection of 1,4-Dioxane
17   anywhere in the proposed Corbett area south of the wells at
18   Pratt & Whitney's property, all the way down to the
19   northernmost detection that you show on this map, correct?
20   A    Did you say from the offsite Corbett wells?
21   Q    South of Pratt & Whitney's Corbett wells, to the
22   northernmost detection that you show, over six and a half
23   miles away, you don't have a single detection of 1,4-Dioxane,
24   do you?
25   A    In the area where the blue arrow is, that's correct.
```

```
 1   Q    And you certainly don't have a string of detections of
 2   1,4-Dioxane, sir, that you have identified anywhere that
 3   stretches the 14 miles down to the southern boundary of the
 4   proposed class area, correct?
 5   A    Well, I don't know where the other two samples were taken
 6   by the Florida Department of Environmental Protection, so I
 7   only have these two points on The Acreage.
 8   Q    So what you have is four detections of 1,4-Dioxane in an
 9   area that's approximately 60 square miles, correct?
10   A    I don't recall the square miles of The Acreage.
11   Q    Well, you wouldn't argue that the proposed class area is
12   about 60 square miles, right?
13   A    I would say approximately that's right.
14   Q    Now, before I turn to some of your opinions here, I want
15   to talk to you a little bit more about the actual class area
16   itself, and I'm going to turn to another one of your figures,
17   Figure 4-6.  Do you see this?
18   A    Yes.
19   Q    And I just want to orient everybody.  We've got the UTC
20   site up here in sort of yellow, this triangle, correct?
21   A    Yes.
22   Q    And then you've got the Corbett area to the south?
23   A    Yes.
24   Q    And you understand that the red outline is the
25   plaintiffs' primary proposed class area?
```

```
 1   A    That's my understanding, yes.

 2   Q    Now, I want to focus you on the red boundary of the

 3   proposed class area for a moment.

 4        The metes and bounds of the proposed class area on

 5   this map was not dictated by your analysis of ground port

 6   transwater, correct?  I garbled the end of that.  Let me try

 7   it again.

 8        The metes and bounds of the proposed class area on

 9   these maps was not dictated by your analysis of groundwater

10   transport, correct?

11   A    That's correct.

12   Q    For instance, you haven't drawn a map of contamination

13   hits that you say covers this whole area of 60 square miles,

14   right?

15   A    Can you repeat that?

16   Q    Are you familiar with the concept of a plume map, sir?

17        MR. HABERMAN:  Objection, Your Honor.  The witness

18   asked for the question to be repeated.

19        THE COURT:  Are you abandoning your other question?

20        MR. MACNALLY:  I think this question may be more

21   productive for us.

22   BY MR. MACNALLY:

23   Q    Are you familiar with the concept of a plume map, where

24   you draw perceived concentrations of contaminants and you try

25   and determine or decipher where those contaminants rest?
```

```
 1    A     Yes.

 2    Q     Have you drawn a plume map that you claim approximates

 3    the boundaries of the proposed class area anywhere in your

 4    expert written direct?

 5    A     No.

 6    Q     Instead, the metes and bounds of the proposed class area

 7    were an assumption that was given to you as part of your

 8    analysis in this case, correct?

 9    A     I'm not sure I recall exactly where it came from, but I

10    didn't draw it on my own.

11    Q     Something that you were asked to assume for the purposes

12    of your analysis?

13    A     I believe that's fair to say.

14    Q     And you do not think that the whole proposed class area

15    has contamination in it, do you?

16    A     Well, we know it's a few locations, and it's not present

17    at other locations, but that's the basic data that's

18    available.

19    Q     Based on the study that you have done in this case, you

20    doubt that the whole area, the whole proposed class area, is

21    impacted by contamination, correct?

22    A     I missed a word or two in there.  Can you repeat that for

23    me, please?

24          MR. HABERMAN:  Objection, Your Honor, overbroad and

25    calls for a legal conclusion.
```

```
 1              THE COURT:  Overruled.

 2   BY MR. MACNALLY:

 3   Q    Based on the study that you have done in this case, you

 4   doubt that the whole proposed class area is impacted by

 5   contamination.

 6   A    I'd say we don't know where the contamination is

 7   everywhere.  We know it's at some locations, or it was at some

 8   locations when it was sampled.  We don't know exactly where it

 9   is right now, but that's about what data exists and what you

10   could say about the extent of contamination based on

11   observations.

12   Q    Please turn --

13   A    Contamination -- let me clarify, perhaps, too, that

14   contamination we're speaking about here so far has been the

15   1,4-Dioxane.  There are other contaminants that were of

16   interest to me, as well, and that was the dioxins and furans.

17   Q    Could you please turn to page 249 of your deposition in

18   this case, line 16 through 20:

19          "Question:  Do you have an opinion as to whether the

20   entire area that's been delineated "The Acreage" has

21   contamination in it?

22          "Answer:  I doubt that the whole area is impacted."

23          Were you asked that question, and did you give that

24   testimony under oath?

25   A    Yes, I did.
```

1   Q    Turning back to the proposed class area, I want to talk a

2   little bit about groundwater movement within the class area

3   itself.

4           If you want to look at the question whether people

5   in the class area all face the same risk of contamination, you

6   need to look at how groundwater moves around the proposed

7   class area itself, right?

8   A    That's a factor, yes.

9   Q    Such a study would require you to take into account

10  various considerations, like the subsurface geology and the

11  presence of canals in the proposed class area?

12  A    That would be a consideration, yes.

13  Q    And what I've highlighted here with these three red

14  arrows, trying to call attention there to something called the

15  M Canal; do you see that?

16  A    Yes.

17  Q    And you're familiar with the M Canal as a significant

18  canal that cuts through the proposed class area?

19  A    It does cross the area, yes.

20  Q    And the M Canal, like most canals, probably has some

21  interaction with the groundwater in The Acreage, correct?

22  A    Probably some.  It would depend on the hydraulic

23  conductivity of the sediments that line the bottom of the

24  canal, and it would depend on what the water level was inside

25  the canal relative to the water level outside the canal.  If

```
 1   the two are the same, there's really no interaction.

 2   Q    If the question is about the potential for migration of

 3   contaminants in the groundwater from the top of the proposed

 4   class area to the bottom of the proposed class area, you would

 5   have to consider how these canals like the M Canal interact

 6   with groundwater flow in the proposed class area, correct?

 7   A    That's a consideration, yes.

 8   Q    You now testify that evidence indicates the contaminants

 9   at the UTC site have migrated from Pratt & Whitney to the

10   proposed class area, correct?

11   A    Yes.

12   Q    And, specifically, you reference 1,4-Dioxane and dioxins

13   and furans, correct?

14   A    Yes.

15   Q    Your written direct, sir, is the fifth time that you've

16   offered opinions in this case, correct?

17   A    I don't recall how many times there were.  It was two

18   depositions.

19   Q    So you've written two reports, correct?

20   A    Yes.

21   Q    One in April 2016 and one in August 2016, correct?

22   A    Yes, the rebuttal report -- main report, rebuttal report

23   and affidavit.

24   Q    And you've given two depositions, correct?

25   A    Yes.
```

```
1    Q    One to Mr. McElroy here, right?

2    A    I believe so, yes.

3    Q    And one to Mr. Gallagher there?

4    A    Yes.

5    Q    So this is the fifth time that you've offered opinions in

6    this case, right?

7    A    Yes.

8    Q    Your opinion that contaminants have, in fact, reached the

9    proposed class area from Pratt & Whitney is brand new in your

10   expert written direct?

11   A    I don't think so.  I don't think that's true.

12   Q    You previously testified that you were not offering the

13   opinion that contaminants from Pratt & Whitney had, in fact,

14   reached the proposed class area, correct?

15   A    I think that was in the second deposition, perhaps, and

16   my recollection there is that the conversation had to do with

17   my interpretation of the question as being to a reasonable

18   degree of scientific certainty, which was debated over a few

19   pages of that deposition.

20        But in reading through that section, I think you'd

21   find that I said that the evidence indicates that I felt the

22   Pratt & Whitney site -- or the Pratt & Whitney site had

23   impacted The Acreage.

24   Q    Please turn to your deposition, page 344, lines 17

25   through 23:
```

```
 1              "Question:  So you are not -- it is not your opinion

 2    in this case -- you are not submitting the opinion that

 3    contaminants from Pratt & Whitney have reached The Acreage as

 4    you sit here today; is that correct?

 5              "Answer:  That's correct."

 6              Were you asked that question, and did you give that

 7    testimony under oath?

 8    A    I did, but can I look at the -- can you take that off and

 9    can I look at the other pages?

10    Q    You've got your expert deposition, but why don't we turn,

11    sir -- in fact, you recall being asked --

12              MR. HABERMAN:  Objection, Your Honor.  Can we give

13    the witness a chance to look at his testimony?

14              THE COURT:  Yes, take your time to look at it,

15    Doctor.

16              THE WITNESS:  (Perusing deposition.)

17              There's a couple of examples of what I was saying on

18    page 346, lines 20 on, where I say:  "Basically all the

19    factors that I have looked at indicate that that's a

20    possibility, and that possibility is consistent with the

21    opinion that they should be concerned about whether the

22    chemicals had already -- that the chemicals that are already

23    there are from Pratt & Whitney."

24    BY MR. MACNALLY:

25    Q    Well --
```

```
 1   A    Later on, on page 348 -- there's another location I want
 2   to find.
 3            "So it's your opinion that it's possible -- strike
 4   that.
 5            "Is it your opinion it is possible that contaminants
 6   have already reached The Acreage from Pratt & Whitney?
 7            "Answer:  Yes."
 8            Page 345, lines 1 through 5.
 9   Q    Well, we asked you, sir, if you had a opinion to a
10   reasonable degree of scientific certainty about that
11   possibility of whether contaminants had reached The Acreage
12   from Pratt & Whitney and you testified that you were not even
13   asked to give an opinion on whether contaminants had reached
14   The Acreage from Pratt & Whitney to a reasonable degree of
15   scientific certainty, correct?
16   A    That's true.
17   Q    Why don't we take a look, sir, at that testimony at
18   page 347 of your deposition, where you were asked the
19   question:  "So the answer to my question is, no, you cannot
20   say to a reasonable degree of certainty that contaminants have
21   reached The Acreage from Pratt & Whitney as you sit here
22   today?
23            "Answer:  Like I said, I was not asked to give the
24   opinion to a reasonable degree of scientific certainty."
25            You were asked that question; you gave that
```

```
 1   testimony under oath, correct?
 2   A    Yes, sir.
 3           The language, if you read through the whole
 4   deposition, that I was quibbling with was this interpretation
 5   about reasonable degree of scientific certainty, which I was
 6   not comfortable with that particular language.
 7           Now, if it means more likely than not or the
 8   preponderance of the evidence would indicate to a reasonable
 9   scientist that these sets of facts and analyses would indicate
10   that the contaminants at the Pratt & Whitney came from --
11   moved to The Acreage, then I think that's what I concluded.
12   Q    Well, sir, do you remember that when we asked you if you
13   had an opinion to a reasonable degree of scientific certainty,
14   your lawyers actually objected that that opinion was outside
15   the scope of your opinions?
16           MR. HABERMAN:  Objection, Your Honor.
17           One, the witness is being badgered, two, completely
18   mischaracterizing the testimony so far in this case.
19           THE COURT:  Well, he can say, no, that's not what
20   happened, or, yes, it is what happened, he does remember it.
21   So -- and I've got the transcript here, so I can read it
22   myself and figure out what he said, so I don't know why we're
23   going to spend a lot of time going over what his deposition
24   said if I can read it myself.
25   BY MR. MACNALLY:
```

```
 1    Q     Well, you talk now, Doctor, about a probability of more

 2    likely than not the contaminants reached The Acreage, right?

 3    A     Yes, in the affidavit and elsewhere.

 4    Q     But you did not offer an opinion regarding the

 5    probability that contaminants have reached The Acreage from

 6    Pratt & Whitney in either of your expert reports, correct?

 7    A     Well, if probability means maybe more than 50 percent

 8    chance, then I'd say more likely than not that's a

 9    probabilistic answer.

10    Q     Please turn to page --

11    A     As far as a number, a statistic, a 95 percent confidence

12    limit or something like that, I have not done that.

13    Q     Please turn to page 348 of your deposition.

14          "Question:  Did you disclose an opinion either in

15    response to Dr. Missimer or in your original report regarding

16    the probability that contaminants have reached The Acreage

17    from Pratt & Whitney?

18          "Answer:  No."

19          Were you asked that question, and did you give that

20    testimony under oath?

21    A     Yes, and it was in the context and my understanding was

22    in a statistical or quantitative sense of probability, one in,

23    you know, chance in 50, a chance in 20 or something like that.

24    Q     Is it more likely than not, a probability, Dr. Stephens?

25    A     Yes.
```

```
 1    Q    And when you were asked if you have disclosed an opinion

 2    regarding the probability that contaminants have reached The

 3    Acreage from Pratt & Whitney, your answer was "no," correct?

 4    A    I think probably at the time I was doing the deposition I

 5    was thinking about a probabilistic or a statistical analysis,

 6    and that could be done here, I suppose, but that's what I had

 7    in my mind, I think, when I answered the question.  I don't

 8    believe that we were debating more likely than not as an

 9    interpretation at this point.

10    Q    When asked in your deposition whether you had an opinion

11    about the probability that contaminants had reached The

12    Acreage from Pratt & Whitney, your answer was "no," correct?

13              MR. HABERMAN:  Objection; asked and answered.

14              THE COURT:  Sustained.

15    BY MR. MACNALLY:

16    Q    You now discuss the dioxins and furans in 1,4-Dioxane

17    have reached well over six miles down into the proposed class

18    area, but I want to ask about some other contaminants first.

19              I'm going to turn your attention to a demonstrative

20    that was shown yesterday, which is Pratt & Whitney

21    demonstrative exhibit number 4, and this is a fact card that

22    has been relied on by plaintiffs' expert, Dr. John Kilpatrick,

23    in the context of his opinions in this case.  And I want to

24    call to your attention, Dr. Stephens, a specific portion of

25    this fact card that discusses oil, sodium cyanide, asbestos
```

```
 1   and mercury.  Do you see that?

 2   A    Yes.

 3            MR. HABERMAN:  Objection, Your Honor.  I object.

 4   There's no predicate for these -- for this question, the lines

 5   of questions that are going to follow.  It hasn't been in

 6   his -- any of his opinions in the cross-examination so far and

 7   in the direct affidavit submitted to the Court.

 8            THE COURT:  What does this have to do with his

 9   testimony?

10            MR. MACNALLY:  My question is going to be is he

11   offering the opinion that oil, sodium cyanide, asbestos and

12   mercury have reached the proposed class area from Pratt &

13   Whitney.

14            THE COURT:  I mean, is that part of his opinion?

15            MR. MACNALLY:  It is not, Your Honor, and that's

16   what I'm trying to elicit onto the record.

17            THE COURT:  So you want to make sure that he doesn't

18   have that opinion?

19            MR. MACNALLY:  I would like to confirm that for Your

20   Honor, given that there's been some question about it in this

21   case.

22            THE COURT:  All right.  Go ahead.

23   BY MR. MACNALLY:

24   Q    You do not offer the opinion, Dr. Stephens, that any of

25   these substances -- oil, sodium cyanide, asbestos or mercury
```

```
 1   -- are present in the proposed class area from Pratt &

 2   Whitney?

 3   A    I don't have an --

 4           MR. HABERMAN:  Objection, misstates the fact card,

 5   Your Honor.

 6           THE COURT:  Overruled.

 7           THE WITNESS:  I have not offered an opinion on oil,

 8   sodium cyanide, asbestos and mercury migration.

 9           MR. HABERMAN:  Your Honor, may I have permission to

10   take a picture of the defendant's demonstrative?

11           THE COURT:  Yes.

12           MR. MACNALLY:  And for the record, Your Honor, we

13   have marked this board, which is entitled Darcy Calculation

14   Pratt & Whitney exhibit -- Pratt & Whitney demonstrative

15   exhibit number 6.

16   BY MR. MACNALLY:

17   Q    One of the central analyses that you provide in your

18   expert written direct, Dr. Stephens, is the possibility that

19   contaminants have reached Pratt & Whitney from The Acreage

20   (sic) through the process of advective flow, correct?

21   A    Yes.

22   Q    And one of the analyses that you perform, and the primary

23   analysis that you perform is a Darcy calculation to describe

24   what we talked about earlier was the maximum rates of

25   contaminant migration in the area, correct?
```

```
 1   A     That's correct.

 2   Q     And what I've done here is created a board for us that

 3   has the basic Darcy calculation up so we have a frame of

 4   reference.   Okay?

 5   A     Yes.

 6   Q     And the Darcy calculation involves multiplying hydraulic

 7   conductivity by hydraulic gradient, divided by effective

 8   porosity, correct?

 9   A     Yes.

10   Q     And the result of that gives you average groundwater

11   velocity based on the assumed inputs that you used into the

12   calculation?

13   A     It just gives you the velocity depending on what the

14   values are that you put in, whether they're averages or not.

15   It just gives you a velocity based on the numbers that you put

16   in.

17   Q     To get an accurate prediction of how fast groundwater's

18   moving in the area, you'll want to use inputs that are

19   consistent with the available field of data regarding the

20   aquifer that you're studying, correct?

21   A     Yes, sir.

22   Q     If the inputs you select for hydraulic conductivity,

23   hydraulic gradient and effective porosity are not a fair

24   representation of the conditions in the area that you're

25   studying, your Darcy calculation will not provide a fair
```

```
 1   representation of groundwater flow.

 2          THE COURT:  Is that a question or a statement?

 3   BY MR. MACNALLY:

 4   Q    Correct?

 5   A    Can you repeat that, please?

 6   Q    If the inputs you select for hydraulic conductivity,

 7   hydraulic gradient and effective porosity are not a fair

 8   representation of the area you are studying, your Darcy

 9   calculation will not provide a fair representation of

10   groundwater flow, correct?

11   A    That's generally true, yes.

12   Q    So let's turn to your affidavit quickly, and specifically

13   to paragraph 69, where you discuss the inputs that you used

14   for your Darcy calculation in this case.  For your

15   convenience, I put it up on the screen.

16          And paragraph 69 lays out the inputs you've used for

17   your Darcy calculation, correct?

18   A    Yes, sir.

19   Q    And you've assumed a hydraulic conductivity of 2000 feet

20   per day, correct?

21   A    Yes.

22   Q    A gradient of .0002, correct?

23   A    Yes.

24   Q    And an effective porosity of .05, correct?

25   A    Yes.
```

```
 1   Q     And your resulting groundwater velocity that you

 2   concluded from that calculation was 2920 feet per year,

 3   correct?

 4   A     Yes.

 5   Q     And you claim that this number represents the outer

 6   bounds calculation of groundwater flow in this area?

 7   A     Yes.

 8   Q     So when you referred to a maximum rate of contaminant

 9   migration, this was the calculation you were referring to?

10   A     From the advective transport mechanism.

11   Q     So let's start by talking about some of these inputs, and

12   let's start with hydraulic conductivity.  Hydraulic

13   conductivity is the ease with which water flows through an

14   aquifer, right?

15   A     Yes, sir.

16   Q     Holding everything else constant, if you have a higher

17   hydraulic conductivity, you're going to get a higher

18   groundwater velocity at the end of the equation, correct?

19   A     Correct.

20   Q     And when you ran your Darcy calculations for this purpose

21   in your written direct, you used a single input for hydraulic

22   conductivity, correct?

23   A     I did the calculation a number of times with different

24   hydraulic conductivities.  I think the reports would show

25   that.
```

1   Q    I'm talking about the hydraulic conduct -- I'm talking

2   about the Darcy calculation reflected in paragraph 69 of your

3   expert written direct.  You use a single input for hydraulic

4   conductivity in the Darcy calculation in paragraph 69 of your

5   expert written direct, right?

6   A    Yes.

7   Q    And you have data from a number of wells on Pratt &

8   Whitney's property that give you inputs like hydraulic

9   conductivity, right?

10  A    Yes.

11  Q    2,143 feet per day is the absolute maximum hydraulic

12  conductivity of all the tests that you consider for hydraulic

13  conductivity on Pratt & Whitney's property, correct?

14  A    That's the maximum that came out of the aquifer testing

15  at Pratt & Whitney.  It likely in itself is an average, but

16  that's the number, the highest number that came out of the

17  field testing.

18  Q    And you don't have any other testing that you're pointing

19  to from Pratt & Whitney that has a higher hydraulic

20  conductivity than 2,143 feet per day, correct?

21  A    That's correct.

22  Q    So your calculation assumes for this purpose here in

23  paragraph 69 of your expert written direct that the hydraulic

24  conductivity of 2000 feet per day extends the entire way from

25  Pratt & Whitney, through the Corbett, down through the

1    proposed class area, correct?

2    A    That's correct.

3         Now, keep in mind that this calculation is a --

4    called a bounding and scoping calculation.  And the purpose of

5    this bounding and scoping calculation is to more or less

6    shortcut and get to the quick of the issue that you're

7    concerned about.  And if we calculate using the parameters

8    that would give the fastest velocity, and the particles or the

9    rate of travel is too slow to have reached The Acreage, then

10   we wouldn't be talking.  I wouldn't be talking here.

11   Q    And if you use un --

12   A    It's kind of giving me a method to say that, well, if I

13   use the fastest path, particles or contaminants could reach

14   The Acreage.  But it doesn't say that's the only one.  But if

15   that existed, the contaminants certainly could reach The

16   Acreage.  If it didn't reach The Acreage, then I think all the

17   other calculations would be unnecessary.

18   Q    You used the word "path" in your last answer, right?

19   A    I think I did.  I don't recall.

20   Q    You have not identified a path and characterized it

21   through testing data that stretches from Pratt & Whitney, down

22   through the Corbett, down through the proposed class area that

23   is characterized by an average hydraulic conductivity of

24   2000 feet per day, have you?

25   A    Well, on the southwest part of the Pratt & Whitney site

1    there are these values between 1000 and 2000 feet per day in a

2    zone near the manufacturing area.  And then in the model that

3    was developed by the South Florida Water Management District

4    at the very northeast corner of The Acreage, the hydraulic

5    conductivity there also is greater than 1000 feet per day.

6    The two formations where those occur are basically the same.

7    Q    Do you have a single, even one single hydraulic

8    conductivity reading that you can point to between Pratt &

9    Whitney's wells in the Corbett and five and a half, 5.1 miles

10   down to the northern point of The Acreage showing hydraulic

11   conductivity of 2000 feet per day?

12   A    No, but this is, keep in mind, a scoping calculation.

13   It's designed to show the fastest path.  And if this path is,

14   even using this data, the time is too long, then no other

15   calculations are necessary.  We can use a slower -- a lower

16   hydraulic conductivity and other values for hydraulic gradient

17   and effective porosity, and the velocity is sufficient to

18   reach The Acreage in 50 years or so.

19   Q    Dr. Stephens, again, you use the word "path."  You don't

20   have any hydraulic conductivity readings that characterize a

21   path of high hydraulic conductivity that stretch between the

22   southern border of Pratt & Whitney's property and the northern

23   border of the proposed class area, do you?

24   A    From the geology we do.  I mean, there is the same

25   stratigraphic formation, the same depositional processes led

```
 1    to that more likely than not.  We have some boring logs that
 2    describe the geology that's similar.
 3            On the Corbett Wildlife area and the area between
 4    where you're talking about, I don't have any values of the
 5    thousand or 2000 feet per day, but we do see values that high
 6    in the model layer in the northeast part of The Acreage and in
 7    the southeast part of the Pratt & Whitney sites.
 8    Q   Dr. Stephens, I didn't ask you, respectfully, about
 9    geology.  I asked you if you had any testing data that you
10    could point to anywhere between the southern boundary of Pratt
11    & Whitney's property and the northern boundary of the proposed
12    class area that characterizes a path of high hydraulic
13    conductivity -- so hydraulic conductivity testing -- of
14    2000 feet per day?
15            MR. HABERMAN:  Asked and answered, Your Honor.
16            THE COURT:  Overruled.
17            THE WITNESS:  Geology does tell you the path.
18    That's why we're hydrogeologists.  We look at the geologic
19    structures and we look at boring logs.  It's not just the
20    hydraulic conductivity measurement that tells you the path.
21    Many times that's not sufficient.  You need to look at a lot
22    more detail in a borehole than just doing an aquifer pumping
23    test.  That may not be sufficient to find the thin
24    transmissive zones that are present in stratified aquifers
25    like this.
```

```
 1   BY MR. MACNALLY:

 2   Q    I'm asking you a very simple question, Dr. Stephens.  Do

 3   you have any tested -- can you point to one single hydraulic

 4   conductivity test anywhere in your expert written direct that

 5   characterizes even one well in the Corbett from Pratt &

 6   Whitney's property down to the proposed class area that is

 7   2000 feet of hydraulic conductivity per day?

 8             MR. HABERMAN:  Asked and answered, Your Honor.

 9             THE COURT:  He hasn't answered the question of

10   whether he has any data.  He's got an opinion about how it

11   flows, but he's asking him if he has data.

12             THE WITNESS:  As far as if a data point is a pumping

13   test value in terms of feet per day, I don't have one there

14   that is comparable to 2000 feet per day.

15   BY MR. MACNALLY:

16   Q    And, in fact, Dr. Stephens, nowhere in your expert

17   written direct do you identify any hydraulic conductivity

18   value from anywhere in the Corbett between Pratt & Whitney's

19   property and the proposed class area, correct?

20   A    I believe that's true, except that in the -- there's a

21   figure in the appendix that shows the hydraulic conductivity

22   distribution from the model, the same model that Dr. Missimer

23   used.

24   Q    You agree that the geologic properties of the aquifer in

25   question are heterogeneous, if you look at the entire area
```

1   that you studied?

2   A    Yes, sir.

3   Q    And in a heterogeneous aquifer, hydraulic conductivity

4   does not necessarily remain constant over distance, correct?

5   A    Not necessarily, that's correct.  There's correlations.

6   There's connectedness.  Heterogeneity doesn't mean randomness.

7   Heterogeneity means spatially variable.  But within that

8   spatially variable heterogeneous system, pore spaces can be

9   and often are continuous and stratified.

10  Q    In fact, the rate and direction of groundwater flow and

11  movement of contaminants in groundwater will be affected in

12  changes by subsurface geology, correct?

13  A    You sometimes can see that, yes.

14  Q    And subsurface geology can change as you move sort of

15  east and west in an aquifer, correct?

16  A    It can.

17  Q    And it can move sort of as you go north and south in the

18  aquifer, right?

19  A    It can.

20  Q    And you can see it as you move sort of up and down in the

21  aquifer, if you will, to greater depths and shallower depths,

22  right?

23  A    Yes, vertically hydraulic conductivity can change.

24  Q    And the hydraulic conductivity tests that you evaluated

25  on Pratt & Whitney's property ranged from .14 feet per day up

1    to 2143 feet per day, correct?

2    A    I don't remember the lower end, but that's, but that

3    sounds about right.

4    Q    Do you have any reason to disagree?

5    A    I don't.  I could check the report, but I don't have any

6    reason to disagree off the top of my head.

7    Q    Nevertheless, despite that range, you have used an

8    average hydraulic conductivity in your Darcy calculation here

9    in paragraph 69 of 2000 feet per day, correct?

10   A    That was one.  I've used others as low as I believe 374.

11   I've used, I think, 500.  I've used a thousand.  There are a

12   whole range of numbers one can use, including the ones that

13   Dr. Missimer used, by the way.

14   Q    And not one of those --

15              MR. HABERMAN:  Your Honor, he hasn't finished his

16   answer.

17              THE COURT:  Let him finish.

18              Go ahead, Doctor.

19              THE WITNESS:  I've forgotten what I was going to say

20   now.

21   BY MR. MACNALLY:

22   Q    And not one of those other calculations of 374 feet per

23   day or 500 feet per day, not one of those calculations is

24   disclosed in your expert written direct, is it?

25   A    Sure it is.

```
 1              Oh, the expert written direct?  Well, in some of the
 2   testimony -- I know it's in my expert report, probably is in
 3   the supplemental report somewhere, but I'm pretty sure that
 4   I've had other -- and I can do some right now, too, if you
 5   like.  But there's a whole range of numbers.
 6              I chose -- understand, I chose the 2000 just as the
 7   maximum.  And if contaminants wouldn't get to The Acreage if
 8   the permeability was as high as 2000, then there would be a
 9   very unlikely chance that any contaminants in The Acreage
10   would have come from the Pratt & Whitney site.
11   Q    Well, you said you also did a calculation with 374 feet,
12   right?
13   A    Yes.
14   Q    And you do understand that 374 feet of hydraulic
15   conductivity per day is faster than over 90 percent of the
16   hydraulic conductivity test samples that you looked at at
17   Pratt & Whitney's property?
18   A    You know, that's the state of our science is that
19   hydraulic conductivity varies a lot.  It varies over easily
20   three or four orders of magnitude by factors of a thousand or
21   10,000 easily in almost any site you look at.  The question is
22   connectedness.  And what people find --
23              MR. MACNALLY:  Your Honor, respectfully.
24              THE COURT:  He's answering your question.
25   BY MR. MACNALLY:
```

```
 1    Q     Continue.

 2    A     What researchers find is that when you use these average

 3    hydraulic conductivities, such as you're suggesting, they

 4    under-predict the farthest and fastest path contaminants can

 5    take.

 6          It's very clear in our literature for probably

 7    20-some years that we're having a weak ability to predict

 8    these far-afield fingers or pathways that are at the far end

 9    of a contaminants plume.  The average just isn't good enough.

10    If it were, then we wouldn't be doing so much research on

11    heterogeneity in porous and fractured media.

12    Q     I didn't ask you any question about average.  I asked you

13    whether you were aware that 374 feet of hydraulic conductivity

14    per day is faster, is a higher hydraulic conductivity than

15    90 percent of the data that you looked at from Pratt &

16    Whitney's property.

17          MR. HABERMAN:  Asked and answered, Your Honor.

18          THE COURT:  No, he didn't answer that specific

19    question.

20          THE WITNESS:  I wouldn't argue it.  It sounds about

21    right.  But that's part of what I expect.

22    BY MR. MACNALLY:

23    Q     And you and I don't disagree that if you use the average

24    hydraulic conductivity of the tests that you looked at at

25    Pratt & Whitney's property in your Darcy calculation, it would
```

```
 1   take over 500 years for groundwater to make it from Pratt &
 2   Whitney to The Acreage, right?
 3   A    When you're talking about averages, that's an average.
 4   But we're not interested in the averages here.  This is
 5   looking at the far edge of a contaminant plume where there's
 6   low concentrations.  That's what we're trying to predict.  You
 7   cannot predict that easily with average numbers.
 8   Q    If you use the average hydraulic conductivity of the
 9   hydraulic conductivity test that you evaluated at Pratt &
10   Whitney's property, contaminants would take over 500 years to
11   get from Pratt & Whitney's property to The Acreage, correct?
12   A    Which average are you using?
13   Q    Twenty feet per day of hydraulic conductivity.
14   A    Twenty feet per day?  That's very, very low.  I mean,
15   there's many areas where it's much greater than that, so I
16   don't know why you'd use 20 feet per day as an average.
17   Q    Well, do you know what the geometric mean, Dr. Stephens,
18   is, of the hydraulic conductivities that you evaluated at
19   Pratt & Whitney's property?
20   A    In that range.
21   Q    So if you used the range of the geometric mean, which is
22   actually 16 feet per day, you would agree with me that at
23   16 feet per day of hydraulic conductivity, even taking all of
24   your other assumptions from paragraph 69, groundwater would
25   not make it from Pratt & Whitney to The Acreage for several
```

1    hundred years, correct?

2    A    Well, we're talking about particles of contamination, and

3    that's different.  We're not talking about average rates of

4    groundwater velocity, and that's a fundamentally different

5    issue.  We're looking at not the average distance a

6    contaminant plume will travel.

7    Q    Dr. Stephens, if you use the geometric mean of 16 feet

8    per day of hydraulic conductivity, using all of your other

9    inputs from paragraph 69 in your Darcy calculation, do you

10   agree that it would take several hundred years for groundwater

11   to make it from Pratt & Whitney down to the proposed class

12   area?

13   A    Some particles would move faster than that, some would

14   move slower than that.  On average, if that's what you were

15   interested in finding, the average, and actually the geometric

16   mean is not quite the right number, it's a little bit greater

17   than the geometric mean actually that one would use, but you

18   would -- yeah, it's going to take a long time, and that's

19   fundamentally what's the, you know, difference of opinion here

20   with the experts is how long will that take and what the

21   fundamental values one should input into the Darcy's equation.

22   Q    By a long time, Dr. Stephens, you mean hundreds of years,

23   right?

24   A    Well, we're already 50 years or 60 years into the time

25   since Pratt & Whitney started, so maybe another 40 years of --

```
 1    would get you to a hundred, hundred years of travel.  So it
 2    might take a hundred -- it might take hundreds of years to get
 3    there with those numbers.
 4              I just don't think those are the right numbers to
 5    figure out when the particles -- the low concentrations are
 6    what we're trying to figure out, where are those.  They don't
 7    move like the average.  They're flares out in front of the
 8    contaminant plume.
 9    Q    So let's switch gears and talk about another piece of
10    your Darcy calculation.  You also talk about hydraulic
11    gradient, right?
12    A    Yes.
13    Q    And you use an input of .0002, correct?
14    A    That's one of the numbers, yes.
15    Q    And the input -- and that's the input in paragraph 69,
16    correct?
17    A    Yes.
18    Q    And that's the only Darcy calculation that you disclose
19    as part of your expert written direct, correct?
20    A    In the affidavit I believe, yeah, I think that's the only
21    one.
22    Q    And in your report, you indicated that the average
23    regional gradient for this area is about .00015, right?
24    A    I'm not sure if I said that that's what it was.  It could
25    be as much as -- I think we have, you know, values that are
```

1   over 0002.  There's some a little lower, some higher.

2   Q     Turning my attention quickly to your affidavit -- to your

3   April 2016 report.  You talk about the average gradient, do

4   you see that, for the area?  And you refer to it as .00015.

5   Do you see that?

6   A     Yes.

7   Q     And when you use a hydraulic gradient like .0002, that's

8   higher, holding everything else in your Darcy calculation

9   constant, you get a faster groundwater velocity, correct?

10  A     Yeah, a little bit.

11  Q     And you also use an effective porosity as part of your

12  Darcy calculation, correct?

13  A     Yes, I've used effective porosity of -- in the Darcy

14  calculation.

15  Q     And effective porosity is a measurement of how mobile

16  water can be in the aquifer for transport, right?

17  A     It's a measure of the fraction of the aquifer through

18  which the contaminants move.

19  Q     And as with hydraulic conductivity that we talked about

20  earlier, and I think you did the same with hydraulic gradient,

21  you also assume a constant effective porosity in the

22  calculation that you perform in paragraph 69 of your expert

23  written direct, correct?

24  A     Yes, for the scoping calculations, yes.

25  Q     And you use .05 for the effective porosity, correct?

```
1    A    Which calculation?

2    Q    In paragraph 69 of your expert direct.

3    A    Yes.

4    Q    And effective porosity is inversely related to

5    groundwater velocity, correct?

6    A    Yes.

7    Q    So as you decrease the effective porosity, groundwater

8    velocity goes higher, correct?

9    A    Yes, that's true.

10   Q    And you say in your April 2016 report that the average

11   effective porosity for flow is .2 in this area, correct?

12   A    For flow; but effective porosity for flow is different

13   than effective porosity for transport.  It's smaller.  It's

14   clearly much smaller.  There's -- you know, use .05, you can

15   use .01.  There's a variety of studies done that would support

16   even lower effective porosities than .05.

17   Q    Dr. Stephens, you've testified that the inputs for your

18   Darcy calculation came directly from United Technologies,

19   correct?

20   A    I'm sorry, for which parameter?

21   Q    You've testified that the parameters, the data you're

22   using for your Darcy calculation, came directly from United

23   Technologies?

24   A    The hydraulic conductivity did.  The hydraulic gradient

25   came from offsite data, and some -- tempered by some on-site
```

```
 1    hydraulic gradient measurements.

 2              And the effective porosity, one of the calculations

 3    for effective porosity was from a test done at the Pratt &

 4    Whitney site where the effective porosity averaged 7 percent

 5    but had a -- had been as low as 3 percent.

 6    Q    So what I put up here, Dr. Stephens, is Figure 3-1 from

 7    your expert written direct.  Do you see that?

 8    A    Yes.

 9    Q    And orient the Court here, we've got kind of a close-up

10    of the Pratt & Whitney property, right?

11    A    Yes.

12    Q    And then you've identified on here several of the

13    operational areas of the facility, correct?

14    A    Yes.

15    Q    There is no test location that you can identify anywhere

16    on Pratt & Whitney's property where the gradient hydraulic

17    conductivity and effective porosity actually match the outer

18    bound calculation that you performed in your expert written

19    direct for the Darcy calculation, right?

20    A    I don't know whether that's true or not.

21    Q    You cannot, as you sit here, identify even one spot

22    anywhere on Pratt & Whitney's property where the effective

23    porosity, the hydraulic gradient and the hydraulic

24    conductivities that you rely on for your Darcy calculation are

25    present in one spot, can you?
```

```
 1   A    I think the hydraulic gradient data are greater.  I can

 2   show you many places where the hydraulic gradient is much

 3   greater than the value, by maybe 10 times, than what was

 4   assumed in the calculations that we just looked at.  And we

 5   only have one measurement of effective porosity at the site,

 6   so really have to -- you don't have any choice.  There is just

 7   one number that Pratt & Whitney, through its consultants,

 8   analyzed.

 9        As for hydraulic conductivity, the high values occur

10   over on the east side around where there's the manufacturing

11   building.  But I -- I didn't try to pair up the numbers.  I

12   assumed like along that line AA prime, but I assume that the

13   hydraulic gradient was from measurements south of the

14   manufacturing area and the landfill.

15        We have quite a bit of data to support a gradient of

16   .0002, and that is in an area that is not far from some of

17   these high hydraulic conductivity values that were mentioned

18   in the area around the manufacturing building.

19   Q    You have three inputs, Dr. Stephens, to your hydraulic --

20   to your Darcy calculation, hydraulic conductivity, hydraulic

21   gradient and effective porosity.  Is there any one point at

22   Pratt & Whitney's property where you can verify through

23   testing data that the three assumptions from paragraph 69 of

24   your expert written direct are all present?

25   A    From the scoping calculation, I'm not sure I've -- I
```

1    haven't tried to do that.  That wasn't in my opinion report.

2    Q    Is the answer --

3    A    But there's a lot of places where we could do it for

4    other -- other values, I think.

5    Q    I'm not --

6            MR. HABERMAN:  Your Honor, he hasn't finished his

7    answer.

8            THE COURT:  Sustained.  Let him finish.

9            THE WITNESS:  We have hydraulic conductivity

10   measurements at a number of locations, mostly on the east

11   side.  We have hydraulic gradient data pretty much all over

12   the site.  And where we look all over this site for hydraulic

13   gradient data, generally they're greater than that .00015

14   value, not inconsistent with .0002 or greater.

15           But we only have one effective porosity measurement,

16   so I only have one place to really look, so it's really

17   difficult to completely answer your question.

18   BY MR. MACNALLY:

19   Q    Well, you make an assumption in this case that the

20   hydraulic gradient of .0002, the effective porosity of .05 and

21   the hydraulic conductivity of 2000 feet per day reflect an

22   outer bound Darcy calculation for an area that stretches from

23   Pratt & Whitney's property, all the way down to the proposed

24   class area, and you can't identify even one place where you

25   verify through testing data that all of your assumptions line

```
1    up in one spot, can you?
2    A    Well, I didn't try to do that.  I didn't look to do that.
3    But because we only have one value of effective porosity, and
4    it's over on the west side, and the high conductivities and
5    most of the data are on the east side, I can't really pair
6    them up.
7    Q    And you didn't come onto Pratt & Whitney's site and do
8    any testing of your own, correct?
9    A    I did not.
10   Q    So what you do, then, Dr. Stephens, is you take a
11   hydraulic conductivity from over here at the manufacturing
12   building, right?  You use a hydraulic conductivity from over
13   here in the manufacturing building, right?
14   A    Yes.
15   Q    And you say that's on the east side of the property,
16   right?
17   A    Yes.
18   Q    And then you use an effective porosity, or you support it
19   with data from some tracer tests that were taken in test area
20   D, right?
21   A    Yes.
22   Q    And test area D, to orient the Court, is over roughly
23   four miles west of the manufacturing building, correct?
24   A    It's west, yes.
25   Q    So let's look quickly at your expert direct again, and I
```

```
 1    want to turn to paragraph 65.  And you discuss in paragraph 65

 2    the tracer tests from test area D, right?

 3    A    Yes.

 4    Q    And you talk about the fact that there's a range of 3 to

 5    11 percent of effective porosity based on these tracer tests,

 6    correct?

 7    A    Yes.

 8    Q    And you say the average is about 7 percent, right?

 9    A    Yes.

10    Q    And if we turn to the next page, you actually talk about

11    those tracer tests again in paragraph 68, correct?

12    A    Yes.

13    Q    And you talk about the idea that the tracer tests

14    provided a one- to two-foot-thick layer of more permeable

15    coarse shells at 48 to 50 feet below surface.  Do you see

16    that?

17    A    Yes.

18            MR. MACNALLY:  Your Honor, may I approach the

19    witness?

20            THE COURT:  Yes.

21            MR. MACNALLY:  This is already in the record.

22            THE COURT:  Thank you.

23    BY MR. MACNALLY:

24    Q    What I've handed you is already in the record at docket

25    372-9, and I'll pull it up here.  This is a copy of the 2009
```

1    tracer test summary from test area D.  Do you see that?

2    A    Yes.

3    Q    And if we turn to page 4 of it, you can see I've

4    highlighted there where it talks about the mobile porosity,

5    the effective porosity of 7.13 percent, right?

6    A    Yes.

7    Q    And then if we look back over to page 2, we see it

8    discusses the one and a half-foot -- one and a half to

9    two-foot layer of course shells that you discuss in

10   paragraph 68, right?

11   A    Yes.

12   Q    This report, though, Dr. Stephens, discusses more than

13   just effective porosity in shell layers.  It also discusses

14   groundwater flow direction and groundwater velocity, doesn't

15   it?

16   A    Yes.

17   Q    And if we turn to page 5, it talks about a groundwater

18   velocity in the area of up to .13 feet per day.  Do you see

19   that?

20   A    Yes.

21   Q    And at .13 feet per day, that's about 47 feet per year;

22   is that fair?

23   A    It's about right.

24   Q    And at 47 feet per year of groundwater velocity, it would

25   take over 600 years for water to get from Pratt & Whitney,

1    down to the northernmost border of The Acreage, correct?

2    A    If that was the hydraulic conductivity everywhere,

3    that -- that would be about right on average.

4    Q    That's not hydraulic conductivity, Dr. Stephens.  That's

5    hydraulic velocity, correct?

6    A    I'm sorry, you're right.  That is the velocity, not the

7    hydraulic conductivity.  But you're assuming it's a constant

8    hydraulic conductivity and a layer all along the way.  I'm

9    assuming --

10   Q    Isn't that the same assumption, Doctor?

11         MR. HABERMAN:  Objection, Your Honor.  He's cutting

12   him off again.

13         THE COURT:  Go ahead, Doctor.

14         THE WITNESS:  As you talked about earlier,

15   heterogeneity, this is a very localized test.  We don't know

16   what the hydraulic conductivity is in other areas surrounding

17   that one point.

18         So it is a low value, but there are lots of low

19   values, depending on where exactly you do these tests.

20   BY MR. MACNALLY:

21   Q    And there's a lot more low values on Pratt & Whitney's

22   property than there are high values; is that true?

23   A    That's true everywhere you look for hydraulic

24   conductivity.  In my experience as a researcher on hydraulic

25   conductivity, especially in materials which are fractured and

1   have solution cavities or other heterogeneities.

2          When you do a test, the first tests you do, more

3   likely than not will have lower hydraulic conductivity.  To

4   find the higher hydraulic conductivities takes a lot of

5   sampling, because those are the preferential pathways.  Those

6   are the ones you're looking for.  They're thin.  They're

7   narrow.  But those are the ones that conduct the contamination

8   that confound our ability to predict contaminant transport

9   using average properties.

10  Q    And you didn't conduct even one single hydraulic

11  conductivity test anywhere in the Corbett to try and

12  characterize the path that you assume as part of your Darcy

13  calculation, correct?

14  A    I didn't do hydraulic conductivity tests on the Corbett,

15  but I did look at paths.  Paths are determined by geology, and

16  they're determined by the hydraulic gradient, which, the

17  hydraulic gradient, keep in mind, is a vector.  It's a

18  direction, and it points towards The Acreage.

19  Q    And they also talk about groundwater flow in the area and

20  the direction of groundwater flow in this tracer test,

21  correct?

22  A    I don't recall.

23  Q    Well, look down at the sentence that's right below the

24  groundwater velocity.  They say:  The direction of natural

25  groundwater flow appears to be west-southwest of the injection

1  well WETADIW1.  Do you see that?

2  A    Which paragraph is it?

3  Q    Looking at page 5.  It's right there on the screen.  I

4  can blow it up to make it bigger, if you'd like, make it a

5  little easier to read.

6  A    That's what it says.  It appears to be west-southwest.

7  Q    And there's nowhere in your expert written direct where

8  you inform the Court that the tracer test that you relied on

9  for your effective porosity analysis on Pratt & Whitney's

10  property found that the groundwater velocity associated with

11  that effective porosity was only 47 feet per year and was

12  trending in a west-southwest direction, correct?

13  A    I did not mention that in my report.  I certainly cited

14  the entire document here, but the direction of groundwater

15  flow, I'm not -- I don't recall exactly at this site what else

16  was going on, but the directions for groundwater flow vary

17  locally, and this is a very localized test.  I have other

18  evidence that would indicate that at different depths, the

19  gradient is not to the west.

20  Q    And what you did instead is you took the effective

21  porosity reading from Pratt & Whitney's property, from test

22  area D, without telling the Court that that effective porosity

23  was based on~-- was associated with 47 feet per day of

24  groundwater flow, and you plugged into a Darcy calculation

25  using other inputs from four miles away and came up with your

1  calculation of 2920 feet per day of groundwater -- a year of

2  groundwater velocity, right?

3  A    Well, basically I'm using all the data that's available,

4  and it came from the site.  Both of the numbers came from the

5  site.

6  Q    They came from four miles apart.

7         MR. HABERMAN:  Again, Your Honor, he didn't finish

8  his answer.

9         THE COURT:  Let him finish his answer.

10         THE WITNESS:  It's all the data that I had.  And it

11  was from the Pratt & Whitney site.  I didn't estimate; I used

12  those numbers.  And there's corroborating data, experimental

13  data, and literature that would support the kinds of effective

14  porosities that came out of this field test.  It's not from

15  this alone.

16         In fact, I use .05, which is supported by geology,

17  it's supported by experiments elsewhere.  It's supported by

18  even work Dr. Missimer did elsewhere.

19  BY MR. MACNALLY:

20  Q    Dr. Stephens, my question to you was you used data points

21  that were from four miles apart, correct?

22  A    Yes, that's all that was available to me.

23  Q    And you didn't come onto Pratt & Whitney's site and

24  conduct any testing of your own, correct?

25  A    No, I relied on the data that Pratt & Whitney and its

1    consultants had collected over the years.

2    Q    Now, I want to turn back to something we talked about at

3    the very beginning, which is where you talked about

4    1,4-Dioxane.  Do you remember looking at Figure 5-3, which

5    I've put back up?

6    A    I'm sorry, what's the question?

7    Q    Do you remember talking about this earlier?

8    A    Yes, sir.

9    Q    Both of the results that you show here on Figure 5-3 are

10   what we call J or I results, they're estimate detections,

11   correct?

12   A    They're detections, yes.

13   Q    They're detections that are so low they cannot actually

14   be quantified by the lab accurately, so they have to be

15   estimated, correct?

16   A    The lab detected them, but they couldn't quantify them.

17   Q    And the other two 1,4-Dioxane results that you referenced

18   earlier, those were also I results, correct?

19   A    They were estimates, yes.

20   Q    So you cannot identify a single detection of 1,4-Dioxane

21   that was high enough for a lab to accurately measure it

22   anywhere in the 60 square miles of the proposed class area,

23   correct?

24   A    Yeah, the lab accurately measured it.  They were not

25   confident and comfortable in quantifying it, but they were

1    confident it was there.

2    Q    You cannot identify a single test result anywhere in the

3    60 square miles of the proposed class area where the level of

4    1,4-Dioxane was sufficient for the lab to quantify it,

5    correct?

6    A    Well, if by quantify you mean not estimate, then they

7    have not -- the values are estimates.  They're detections.

8    But that's the whole -- you know, that's the whole point about

9    this analysis and what fits the -- what fits the data.

10   Q    The couple of detections that you list here are not the

11   only tests that were taken for 1,4-Dioxane, correct?

12   A    There are four of them.

13   Q    Well, the four detections that we've been talking about

14   aren't the only four tests that were taken for 1,4-Dioxane in

15   the proposed class area, right?

16   A    Yes, those are the -- there's four of them.

17   Q    Do you understand that --

18   A    Two we know the locations of and two we don't.

19   Q    You understand that there are more than four tests for

20   1,4-Dioxane that have been taken in the proposed class area,

21   correct?

22   A    Yes.

23   Q    As a matter of fact, there's been many more than four

24   tests, correct?

25   A    Yes, sir.

```
1    Q    And all of the other tests are nondetects, right?

2    A    I believe that's correct.

3    Q    I'm going to show you what I'll mark as Pratt & Whitney

4    demonstrative exhibit 7, a map that we have put together that

5    shows the detections of 1,4-Dioxane in the proposed class area

6    from the FDEP 2009 testing, as well as the plaintiffs' in

7    2012.

8              Now, as you noted, there's 2010 testing that we

9    don't have the addresses for.  What we show here are the

10   detections in -- or the estimated results you rely on are

11   there in yellow.  Do you see that?

12   A    Yes.

13   Q    And all of the nondetections are identified there in

14   blue.  Do you see that?

15   A    Yes.

16   Q    And in addition to this testing, you've already said that

17   the FDEP found two estimated results in 2010, correct?

18   A    Yes.

19   Q    And they found 34 more nondetections in 2010, correct?

20   A    I don't remember the number, but that sounds like about

21   right.

22   Q    So the vast majority of the FDEP testing identified no

23   detection of 1,4-Dioxane when tested in The Acreage, correct?

24   A    Yes, that's correct.  That's part of the conundrum here

25   with how that hydrogeology fits that story, and I've done my
```

1   best as a scientist to kind of reconcile this data with

2   scientific literature, with measurements and calculations.

3   Q    And every single test taken by the plaintiffs in this

4   case for 1,4-Dioxane was a nondetect, correct?

5   A    I don't recall the plaintiffs' data with respect to

6   1,4-Dioxane.

7   Q    So your theory, Dr. Stephens, is that somehow 1,4-Dioxane

8   broke away from Pratt & Whitney, got on some hydraulic

9   conductivity superhighway, went all the way down, missed all

10  of these nondetect wells and show up with only estimated

11  results at these two points that are miles apart in the

12  proposed class area, correct?

13  A    Well, there's four points, and as far as pathways are

14  concerned, super pathways, almost certainly the 2143 feet per

15  day hydraulic conductivity reflects one of two things:  One, a

16  fracture zone; or, two, a solution cavity.  It's not the

17  typical permeability you find for sand.

18          And my experience, having done research on hydraulic

19  conductivity for many years as a professor in the field, and

20  I'm seeing that the literature describe sinkholes that lie

21  between the Pratt & Whitney site and The Acreage, and I'm

22  seeing literature that describes joints in the cemented zones

23  of the Anastasia formation that also would be what you're

24  calling superhighways.  So I think that is the evidence

25  perhaps for fast pathways, if you will, between the Pratt &

```
 1    Whitney site and The Acreage.

 2    Q     And you don't have a single detection of 1,4-Dioxane

 3    between the northernmost point in The Acreage and the Pratt &

 4    Whitney wells in the Corbett, and you don't have a single

 5    hydraulic conductivity in the Corbett between Pratt &

 6    Whitney's property and the proposed class area, correct?

 7    A     That's correct.  That's part of the opinion, that, you

 8    know, if I were living in The Acreage, I'd be concerned,

 9    because there is no monitoring in the area of the Corbett to

10    protect the residents there and evaluate the oncoming

11    contamination.

12    Q     And you didn't take a single test for 1,4-Dioxane

13    anywhere in the Corbett, did you?

14    A     I did not sample in the Corbett.

15    Q     And you didn't put a single monitoring well anywhere in

16    the Corbett, did you?

17    A     I did not; others did.

18    Q     Now, there are some limitations on Darcy flow in terms of

19    what it tells us, and one of the limitations is that Darcy

20    flow doesn't necessarily tell us the direction that the

21    groundwater is going to move, correct?

22    A     I'm not sure I follow what you mean.

23    Q     Well, Darcy flow, your Darcy calculation, that gives us a

24    groundwater velocity, right?

25    A     Yes.
```

```
 1   Q    But the Darcy calculation itself doesn't tell us what
 2   direction the groundwater is going to move, correct?
 3   A    Sure, it does.
 4   Q    That calculation gives you a direction?
 5   A    Yes.
 6   Q    By itself?
 7   A    Yes.
 8   Q    How?
 9   A    Because the hydraulic gradient is a function of the
10   direction.  It's a product of the magnitude, of the slope of
11   the water table, for example, times its direction.  It
12   includes the direction of that slope.
13   Q    And a water table could slant to the east, right?
14   A    Yes.
15   Q    And it could slant to the west?
16   A    Yes.
17   Q    And it could slant to the north?
18   A    It could.
19   Q    It could slant to the south?
20   A    Yes.
21   Q    You assume that there's a straight-line path between
22   Pratt & Whitney and the proposed class area as part of your
23   Darcy calculation.  That's a predicate of the Darcy
24   calculation, correct?
25   A    Not necessarily.  We can calculate the velocity in any
```

1   direction we want.  We can calculate it vertically, to the

2   east, to the south.  Pick a direction.  It's just a function

3   of the slope you take.  It's just like a topographic map.  If

4   you want to walk side slope.  You use the side slope, and the

5   gradient would be about zero.

6   Q    I'm talking about the actual calculation you performed in

7   your expert written direct in paragraph 69.  You assume a

8   straight-line path between Pratt & Whitney and the proposed

9   class area for the purposes of that calculation, correct?

10  A    Of course.  I mean, it's designed to be a scoping

11  calculation of the fastest path.  So if we take the shortest

12  distance and contaminants don't get there in 50-some years,

13  then we don't need to do many more calculations.

14  Q    And groundwater doesn't flow in a straight line, does it?

15  A    It will wiggle and waggle a little bit, but by and large

16  it's -- the gradient data that I've looked at indicate that

17  for the most part the flow direction is to the

18  south-southeast.

19  Q    Well, another limitation on Darcy is that it doesn't tell

20  us how fast contaminants themselves necessarily move.  It

21  tells us how fast groundwater moves, correct?

22  A    It depends what number you use for effective porosity,

23  and then it also only accounts for the advective component

24  generally.  But to calculate concentrations when you're

25  talking about transport, you'd need to look at the

1    hydrodynamic dispersion.

2    Q     Well, some contaminants move well in groundwater, right?

3    A     Well, what do you mean?

4    Q     Well, 1,4-Dioxane is a chemical that's known to move

5    relatively easily in groundwater, correct?

6    A     Yes.

7    Q     And other contaminants have properties that make them

8    move more slowly in groundwater, correct?

9    A     That's true.

10   Q     And there's no input into the Darcy calculation that you

11   performed in paragraph 69 that varies the calculation to

12   account for the properties of specific chemicals, correct?

13   A     Well, it's implicit here that there's a part of this

14   equation when you're talking about transport-absorbing

15   components or chemicals that there's a retardation factor, and

16   in this case the retardation factor was assumed to be 1.

17   Q     And you don't have a variety of retardation factors that

18   you have calculated in your expert written direct to discuss

19   and describe different chemicals on Pratt & Whitney's

20   property, correct?

21   A     I think it's in my expert report, though.

22   Q     Is it your expert written direct?

23   A     I believe it's in the expert written direct, but it's in

24   my expert report.

25   Q     Now, one of the chemicals that doesn't tend to move

 1   particularly well in groundwater are dioxins and furans,

 2   correct?

 3   A     Well, that depends on the situation.

 4   Q     Well, you agree that dioxins and furans are relatively

 5   immobile in groundwater, right?

 6   A     Not always.  Sometimes.

 7         In fact, some cases I think I cited in my expert

 8   report that they move faster than the groundwater.

 9   Q     Turning to your deposition at page 223, at lines 7

10   through 10.

11         "Question:  Generally speaking, dioxins and furans

12   are immobile in tran -- in groundwater?

13         "Answer:  Generally, they're -- they're very

14   relatively immobile."

15         Do you see that?

16   A     Yes, sir.

17   Q     You testified, and generally you would not expect dioxins

18   and furans to move very far at all in groundwater, correct?

19   A     Again, it depends.  I mean, I've cited a lot of

20   literature which indicate that, surprisingly, they did move.

21   I mean, the expectation is that they're highly absorbing

22   chemicals, but the findings from laboratory and field

23   observations is that they move a lot farther than one would

24   have expected.

25   Q     And the movement that you talk about in your expert

1  written direct is something called colloidal transport,

2  correct?

3  A    Yes, sir.

4  Q    And colloidal transport is the idea that dioxins and

5  furans sort of connect with small particles called colloids

6  and move along with the groundwater flow along with the

7  colloids; is that fair?

8  A    Yes.

9  Q    You have not identified anywhere in your expert written

10  direct a single piece of literature that demonstrates and

11  discusses colloidal transport taking place anywhere in the

12  state of Florida, correct?

13  A    I don't know that I had studies from Florida.  I had

14  studies from somewhere else up on the east coast, I think.  It

15  might have been some work Phil Gschwend did when he was with

16  MIT.  I don't recall exactly where that was, but it's in my

17  expert report.

18  Q    In fact, you didn't even look at the question whether

19  there was any literature or source that confirmed colloidal

20  transport of dioxins and furans in the state of Florida,

21  correct?

22  A    I don't believe I have any, that I came across any.  I

23  just was looking at the primary literature that's in the, you

24  know, main journals.

25  Q    You did not even look at the question whether there was

```
1    literature or a source that confirmed colloidal transport of

2    dioxins and furans in the state of Florida, did you?

3    A    I didn't even look?  I sure -- you know, if I had found a

4    site -- a study that said here's a study of colloidal

5    transport in the Anastasia formation of Florida, I would have

6    found it.  I looked all over for colloidal transport.

7    Q    Please turn to your deposition --

8             MR. HABERMAN:  Object.  He should finish.

9             THE COURT:  Did you finish your answer, Doctor?

10            THE WITNESS:  More or less.

11   BY MR. MACNALLY:

12   Q    So what you said, sir, is that you looked for it now, but

13   you did not find any discussing colloidal transport actually

14   taking place in the state of Florida, correct?

15   A    Yes, I continued to look at colloidal transport even

16   after my deposition, and I don't recall having found one, a

17   study in Florida.  I found other studies, but not one in

18   Florida.

19            I mean, the question is a scientific one.  It's

20   nothing to do with the geography of Florida.  I mean, the

21   colloids don't care what county they're in, what state they're

22   in.  It's a function of the porous media, the fractured media,

23   whether there's solution cavities and all that.  That's the

24   issue, and what kinds of chemicals we're dealing with.

25   Q    Another limit on Darcy analysis --
```

```
 1              MR. HABERMAN:  Your Honor, again, he's cutting him

 2    off again.

 3              THE COURT:  Did you finish?

 4    BY MR. MACNALLY:

 5    Q    I'm sorry, I understood you were done.

 6    A    I'm done.

 7    Q    I apologize, Dr. Stephens.  That was not my intention.

 8              One thing you need to take into account when you're

 9    considering how fast groundwater's going to flow from Pratt &

10    Whitney's site down anywhere offsite is where on Pratt &

11    Whitney's site you're starting from in terms of a contaminant

12    or the groundwater, correct?

13    A    Can you repeat that, please?

14    Q    To assess the potential for a contaminant to migrate

15    offsite at Pratt & Whitney, you have to consider where you

16    start from the Pratt & Whitney property, correct?

17    A    Yes.  If you're looking for a specific pathway, you need

18    to know the location, the time and the conditions that existed

19    at the time and that location at the Pratt & Whitney site,

20    when the release occurred.

21    Q    It's a different analysis, Dr. Stephens, if the source of

22    contamination is on the eastern part of Pratt & Whitney's

23    property, as compared to the western part of Pratt & Whitney's

24    property, correct?

25    A    I think the analysis is the same.  It's just a different
```

1    distance and different direction.

2    Q    Well, you have differences, such as the fact that the

3    subsurface geology varies between the eastern and the western

4    portions of Pratt & Whitney's property, correct?

5    A    There's some geological differences, yes.

6    Q    One of the contaminants that you were just discussing is

7    dioxins and furans, right?

8    A    Yes.

9    Q    And I'm going to pull up a table from your -- I'm going

10   to pull up a table here, which is Table 5.1 from your work,

11   and do you see there you have a list of maximum contaminants

12   found at various locations on Pratt & Whitney's property.  Do

13   you see that?

14   A    Yes.

15   Q    And the only area you identified as having dioxins and

16   furans on it was test area C, correct?

17   A    That's the only area where we had data that is in the

18   database that Pratt & Whitney made available to us which

19   showed dioxins and furans.

20   Q    Well, you do understand that Pratt & Whitney provided you

21   with the database of hundreds of thousands of test results

22   from all over the property, correct?

23   A    It's an extensive database, but we don't believe it's

24   complete.

25   Q    And you understand that there were over 650 water tests

```
 1   for dioxins and furans alone, correct?

 2   A    I believe -- I don't know the number, how many there

 3   were.  It's not a very large number, given the years and the

 4   size of this 16-square-mile site.

 5   Q    And despite taking test results all over the property,

 6   the only place that had identified dioxins and furans was test

 7   area C, correct?

 8   A    I believe that that's what the data from the groundwater

 9   database indicated, yes.

10   Q    And area C is unlikely to be a source of dioxins and

11   furans in either Pratt & Whitney's Corbett wells or in the

12   class area, correct?

13   A    Probably not in the Corbett wells, but there's no offsite

14   monitoring of that area, or any area west of the landfill in

15   the southeast part of the Pratt & Whitney site.  So I don't

16   have any measurements south of this location.

17   Q    You just said there's no offsite monitoring wells

18   anywhere west of the landfill at Pratt & Whitney's site, but

19   you acknowledge, sir, that Pratt & Whitney has on-site

20   monitoring wells west of the landfill, correct?

21   A    Yes, there are.

22   Q    In fact, Pratt & Whitney has hundreds of monitoring wells

23   all along the border of its property in areas of known

24   contamination, doesn't it?

25   A    Well, it depends what contamination you're talking about.
```

1    When they sample, they don't always sample for dioxins and

2    furans.  That's not a very common analysis that has been done.

3    And, in fact, in many of the locations where you'd expect to

4    find it, there isn't much monitoring.

5    Q    You haven't offered an opinion anywhere in your expert

6    written direct about the sufficiency of Pratt & Whitney's

7    on-site monitoring wells anywhere on its property?

8    A    I don't believe I wrote that in the affidavit.  It's more

9    of an offsite evaluation that I was concerned about.

10   Q    Well, you agree that placing monitoring wells in areas of

11   known -- down gradient of areas of known contamination is a

12   standard practice for monitoring the movement of contaminants

13   in groundwater, correct?

14   A    Yes.

15   Q    The reason why area C isn't particularly likely to reach

16   the Corbett wells or The Acreage, for that matter, is that

17   groundwater originating from area C flows west and southwest

18   due to a groundwater divide in the area south of Pratt &

19   Whitney's property, correct?

20   A    Well, I think the groundwater flow direction, I have to

21   look closely at area C, but generally as you get deeper, the

22   groundwater flow direction appears to be more to the

23   south-southeast.

24   Q    Turning your attention to page 195 of your deposition, at

25   lines 2 through 7.

```
 1              "Question:  And that's because you know the

 2    groundwater originating from around area C doesn't flow east,

 3    it flows more west?

 4              "Answer:  Area C, it flows west and southwest.  It's

 5    kind of -- there's a groundwater divide in the area."

 6              Were you asked that question, and did you give that

 7    answer under oath?

 8    A    Yes, I did.  It was based on the regional data that we

 9    had.  And my answer to you here is based in part on subsequent

10    testimony that I read from the Arcadis Consultants, who

11    collect the data in this area, and they indicated that the

12    groundwater flow direction in -- at depth is to the

13    south-southeast.  Plus, I might also look at the map I hadn't

14    seen at this time, the composite water level map that

15    Dr. Missimer created, which I believe is his figure exhibit 1.

16    Q    Well, you created a map showing --

17              MR. HABERMAN:  Objection, Your Honor.

18              THE COURT:  I'm sorry.

19              MR. HABERMAN:  Objection, Your Honor.  I don't think

20    the witness was finished.

21              THE COURT:  I thought he finished.

22              Did you finish?  I thought you finished.  If you

23    didn't finish, finish your answer.

24              THE WITNESS:  I'm done.

25              THE COURT:  Okay.
```

1    BY MR. MACNALLY:

2    Q    Well, you created your own particle tracking map that

3    maps groundwater flow in this case, correct?

4    A    Yes, we ran a particle tracking simulator.

5    Q    Okay.  So let's walk the Court through this quickly.

6         The sort of purple triangle up there is the familiar

7    triangular shape of Pratt & Whitney's property, right?

8    A    Yes, sir.

9    Q    And the red outline that's sort of partially there is the

10   top portion of the proposed class area, correct?

11   A    Yes.

12   Q    And the black dot that you have on Pratt & Whitney's

13   property, that's the landfill, correct?

14   A    Yes.

15   Q    And these lines that run simulate how, according to the

16   model, groundwater would flow from that point on Pratt &

17   Whitney's property, south through the Corbett and onwards,

18   correct?

19   A    Yes, it's a model simulation using regional data.  And

20   you can see on this figure there's two red dots at the very

21   top, it says PB-689, and then it says PB-831 in the lower left

22   part of this map.  Those were the water level data closest to

23   the Pratt & Whitney site that the model was calibrated to, the

24   regional model.  So there's really not any of the 200 or so

25   water level measurements inside the Pratt & Whitney area that

1    were used to make this model and predict flow directions.

2    Q     And this model is based on a model that was created by

3    the South Florida Water Management District, correct?

4    A     Yes, it was created for water management purposes.  It

5    was not created for purposes of particle tracking within a

6    local area.  This model covers pretty much all of Palm Beach

7    County.

8    Q     And then it was updated with data by yourself, correct?

9    You added some assumptions into the model?

10   A     We added a layer of high hydraulic conductivity, that's

11   correct.

12   Q     And then you attach this model not only to your expert

13   report, but you also attach it also to your expert written

14   direct, correct?

15   A     I believe that's correct.

16   Q     And if groundwater flows according to this model,

17   groundwater to the east of Pratt & Whitney's property, on the

18   eastern part, such as around the landfill, actually flows

19   east, out towards the ocean, correct?

20   A     Now, that's what the model says.  That's not what the

21   data show.  But it's putting -- you know, using the model for

22   purposes of hypothesis testing, as I described, to show what

23   the directions of groundwater flow basically are from the

24   Pratt & Whitney site to The Acreage, not for the purpose of

25   specifically tracking where contaminants from a location went.

1   It's not that detailed.  It can't do that.  It's a regional

2   model.

3   Q    And if groundwater flows according to your model that

4   you've included in your expert written direct, groundwater on

5   the western third of Pratt & Whitney's property flows out to

6   the west towards Lake Okeechobee, correct?

7   A    Groundwater flows to the southwest in this particular

8   simulation at this particular time.

9        Now, the model doesn't really start until I believe

10  1986.  So all the first, you know, '52 -- or '58 through 1986,

11  all that hydrologic information about features, important

12  hydrologic features at the site is not part of what represents

13  these particle tracks.

14  Q    And you haven't treated any other particle tracking model

15  in this case that you've disclosed as part of your expert

16  written direct, correct?

17  A    No, I think you -- the purpose -- you have used this

18  simulation for a different purpose than I have.  My purpose

19  was to show that given all the three dimensional behavior in a

20  three-layered model, that particles could still reach The

21  Acreage, consistent with the Darcy's law calculation.

22        You, as the defendants, have used it to

23  back-calculate to where contaminants would have originated

24  from, but that's not the purpose of this model.  If one were

25  to do that, if you asked me that question about where the

1   particle -- where contaminants from a particular location on

2   the site would have come from, I would not have used this

3   model.

4   Q    But you don't have a different model that you did use to

5   show a path of groundwater transport from Pratt & Whitney to

6   The Acreage.  What you produced is what you have here in

7   exhibit K that's up on the screen, correct?

8   A    No, we have the hydraulic gradient information from maps,

9   that's maps at the Pratt & Whitney site.  We have hydraulic

10  head gradient data from the Mecca Farms area.  And we actually

11  do use the same regional data and triangulate that.  And all

12  show that -- pretty much the same thing, that the flow is to

13  the south-southeast.

14  Q    Well, what your map shows is that if a contaminant or

15  water starts in the center of Pratt & Whitney's property, it

16  may be able to flow south, but if it's over by the landfill,

17  according to your model, that contaminant or that groundwater

18  is flowing out east towards the ocean, correct?

19  A    It flows towards a -- in this simulation, it appears to

20  flow towards a canal.

21  Q    Another factor in determining how far contaminants are

22  able to migrate in water is how much contaminant you start

23  with at the source, right?

24  A    Yes.

25  Q    Generally speaking, contaminants, as they travel through

```
 1   groundwater, spread out a little bit?

 2   A    Generally, yes.

 3   Q    And so a useful piece of information in knowing how far a

 4   contaminant is likely to migrate is to know how much you have

 5   at the source, correct?

 6   A    It's not necessary for particle tracking, but it's -- if

 7   you're trying to do contaminant transport, meaning to predict

 8   concentrations at a point in space and time, then, yes, you

 9   need to know the concentration at the source.

10   Q    Is it also important to know the concentrations at the

11   source if you're trying to figure out if it's possible for

12   contaminants to move through groundwater over the course of an

13   area that's 30 square miles?

14   A    I don't think so.

15            MR. MACNALLY:  We'll pass the witness.

16            THE COURT:  Thank you.

17            We'll take a five-minute break before we do the

18   redirect.  All right?  Take five minutes.

19            MR. HABERMAN:  Okay, Your Honor.

20       (A recess was taken from 5:03 p.m. to 5:12 p.m., after

21   which the following proceedings were had:)

22            THE COURT:  Please be seated, everyone.

23            All right.  Redirect.

24                         Redirect Examination

25   BY MR. HABERMAN:
```

1    Q    Good afternoon, Dr. Stephens.

2    A    Good afternoon.

3    Q    You how doing?

4    A    Great.

5    Q    Okay.  You recall you were asked a question on cross

6    about whether more likely than not you thought the

7    contaminants of 1,4-Dioxane and dioxin and furans from Pratt &

8    Whitney were in The Acreage.  Do you recall that line of

9    questioning?

10   A    Yes.

11   Q    Okay.  Can you turn to your first deposition, page 294?

12   A    Okay.

13   Q    On page 294, line 6 you were asked:  "And particularly

14   with respect to 1,4-Dioxane and dioxins and furans, you've

15   seen evidence of those contaminants in The Acreage itself,

16   right?"

17        And you answered on line 14:  "Those chemicals are

18   found in The Acreage."

19        Do you see that?

20   A    Yes.

21   Q    And you were asked:  "And what is your opinion with

22   respect to the source of those contaminants."

23        What was your answer on line 19?

24   A    "More likely than not, they were derived from the Pratt &

25   Whitney facility."

1   Q    And what is the date of this deposition?

2   A    May 17th, 2016.

3   Q    So this was an opinion that you had as of May 17th, 2016,

4   correct?

5   A    Yes, sir.

6   Q    You were asked questions earlier about whether or not you

7   drew a plume map.  Do you recall those questions?

8   A    Yes.

9   Q    Under your analysis, you determined that everyone in The

10  Acreage has reason to fear groundwater contamination from

11  Pratt & Whitney, right?

12  A    Yes, I'd be concerned if I were a resident there.

13  Q    What is the basis for that opinion?

14  A    Well, I think it's based on a lot of the factors that I

15  looked at.  One is the sources and the types of chemicals that

16  were found at the Pratt & Whitney site, the age of the site,

17  the continuity of geology between the site -- excuse me, the

18  Pratt & Whitney site and The Acreage.  It's based on

19  calculations, it's based on data from the field, it's based on

20  scientific literature, and it's just based on the available

21  information to me.

22  Q    Do you need to have drawn a plume map in order to reach

23  that opinion?

24  A    No, the information of the data looked to me to be

25  scattered throughout the area.

```
 1    Q    But even with the scattered data throughout the area,

 2    that's sufficient enough to reach the opinion that residents

 3    in The Acreage have reason to be fearful of the contaminants

 4    in groundwater from Pratt & Whitney?

 5              MR. MACNALLY:  Objection; leading.

 6              THE COURT:  Sustained.  Rephrase your question.

 7    BY MR. HABERMAN:

 8    Q    Even with the detects -- with the information, the

 9    scattered information that you have, you were able to reach

10    your opinion, right?

11              MR. MACNALLY:  Objection; leading.

12              THE COURT:  Overruled.

13              Go ahead.  Answer the question.

14              THE WITNESS:  Yes.

15    BY MR. HABERMAN:

16    Q    You were asked questions about Darcy's Law; do you

17    recall?

18    A    Yes.

19    Q    Can you explain for the Court what Darcy's Law is?

20    A    Darcy's Law is basically a relationship between the

21    permeability of a porous media and the amount of water which

22    can flow through that under a given force, and the force is

23    called the hydraulic gradient.  The ease with which the water

24    flows through it is the hydraulic conductivity.  And then the

25    experimental measurement is really the flow rate.
```

```
 1                   That's what Darcy's Law traditionally was all about
 2      when it was first used in France in 1851 or something like
 3      that.  But this equation has come to be used in the sense of
 4      calculating a velocity as the flow rate, the volumetric flow
 5      rate, per unit cross-sectional area of an aquifer.
 6      Q     You're a hydrogeologist, right?
 7      A     Yes.
 8      Q     What is a hydrogeologist?
 9      A     A hydrogeologist studies the subsurface movement of water
10      in the geologic media.
11      Q     Hydrogeologists use Darcy's Law in their every day work,
12      right?
13      A     Yes.
14      Q     And you used Darcy's Law in this case, right?
15      A     Yes.
16      Q     Did you see evidence that Thomas Missimer, the
17      defendant's expert, used Darcy's Law in this case?
18      A     Yes.
19      Q     Okay.  Is Darcy's Law a well-recognized methodology to
20      compute groundwater transport?
21      A     Yes, in this form, when you consider the effective
22      porosity.  That is the part of the pore space that transmits
23      contaminants through -- effective porosity for transport as I
24      call it.
25      Q     When you want to know what groundwater velocity is over a
```

1    period of space, you use Darcy's Law, right?

2    A    Yes.

3    Q    You were asked questions about hydraulic conductivity.

4    Do you recall that line of questioning?

5    A    Yes, sir.

6    Q    Define for the Court please what is hydraulic

7    conductivity?

8    A    That's the ease with which water flows through porous or

9    fractured media.

10   Q    And how does hydraulic conductivity figure into Darcy's

11   Law?

12   A    It's in this evaluation, hydraulic conductivity is

13   proportional to the rate of flow.

14   Q    So generally speaking, when there are higher levels of

15   hydraulic conductivity, you would expect, other things being

16   constant, a higher velocity, right?

17   A    Yes.

18   Q    And you examined areas of hydraulic conductivity at

19   UTC's -- at Pratt & Whitney's site, right?

20   A    Yes.

21   Q    Where else did you examine areas of hydraulic

22   conductivity?

23   A    Well, we looked at hydraulic conductivity at, you know,

24   locations where tests had been done throughout the county and

25   other reports by the U.S. Geological Survey, for example.  We

```
 1   looked at other literature from which the models were

 2   constructed, the regional models, those developed for South

 3   Florida Water Management District, for example.

 4   Q    So this demonstrative here has the what you refer to in

 5   your report as -- I mean, to use a demonstrative that you

 6   actually use in your report --

 7              MR. HABERMAN:  Can you pull up S1, please?

 8   BY MR. HABERMAN:

 9   Q    Dr. Stephens, you have before you what you refer to as

10   the project area; is that right?

11   A    Yes.

12   Q    And in this area, have you looked at data to determine

13   various levels of hydraulic conductivity in the project area?

14   A    Yes.

15   Q    And can you point out for the Court the areas that you

16   were referring to earlier?

17   A    Well, the areas pretty much that have data are in the --

18   this doesn't work with my finger on here, does it?

19              THE COURT:  It should.

20              THE WITNESS:  It should?  Okay.

21              The areas particularly at the Pratt & Whitney site

22   in this location.  And then throughout the county, most of the

23   data are in this general area.  There's some others scattered

24   around, but most of the lie on the east side of The Acreage

25   and the east side of the Pratt & Whitney site.  The data I'm
```

```
 1   talking about are the hydraulic conductivity data from aquifer

 2   pumping tests and slug tests.

 3              MR. HABERMAN:  Can you pull up S6?

 4   BY MR. HABERMAN:

 5   Q    Dr. Stephens, tell the Court, please, what we're looking

 6   at here.

 7   A    This is a map that shows the hydraulic conductivity

 8   values.  They're very small numbers, but the key up here says

 9   horizontal permeability sandstone layer and so on, but I've

10   shown with these contours that this is the zone where

11   hydraulic conductivity is about a thousand or more feet per

12   day, as much as with 1.2143 feet per day.

13   Q    And are there other areas in that overall project area

14   that we looked at that have hydraulic conductivities of over a

15   thousand feet per day?

16   A    For the most part, the other values of very high

17   hydraulic conductivity hundreds of feet or thousands of feet

18   per day lie just to the east-southeast of this area and are

19   found near the northeast part of -- just off the east side of

20   The Acreage.

21   Q    So just off in the north and the northeast part just off

22   of The Acreage you found hydraulic conductivity also of over a

23   thousand feet per day?

24   A    They're very high.  I don't remember the exact number,

25   but I know in the model that was used by the South Florida
```

```
 1   Water Management District, they had over 1000 feet per day

 2   hydraulic conductivity in their model in the northeast corner

 3   of The Acreage.  But if you look at the data, the hydraulic

 4   conductivity is even greater, of the same formation is even

 5   greater in other locations to the east between these

 6   properties and the ocean.

 7            MR. HABERMAN:  Please blow up S7.

 8   BY MR. HABERMAN:

 9   Q    Dr. Stephens, you have before you what we call S7.  Can

10   you tell the Court what this document is?

11   A    This is a -- it's called a hydraulic profiling tool test

12   results.  And if you look at the blue line here, it's east to

13   west.  The east here kinda goes to that point and west goes to

14   this point.  So it's kind of a blowup.

15            But what is done with this tool is to insert it

16   vertically down through the formation, and the location of

17   this is adjacent to a pond.  This black feature here is a

18   pond, and then there's a landfill, a former landfill is shown

19   in this light tone over here.

20            So the westernmost extent of this line and the

21   eastern extent cover from about the middle of this former

22   landfill, across the pond, and extends over a distance of,

23   let's see, 88 -- that's about a thousand -- a thousand feet or

24   so.

25            And what this tool basically does is it's a
```

 1    geophysical tool that's designed to see the very fine scale

 2    permeability or hydraulic conductivity variations in the

 3    vertical direction.  And so down here in the lower right,

 4    these are numbers that come out of that tool, this particular

 5    hydraulic profiling tool.  The maximum that the tool can see

 6    that it reports is 150 feet per day, that I've been able to

 7    see, anyway.  So values, it's just sort of the end of the

 8    scale.  Conductivities or hydraulic conductivities, could be

 9    greater than that.

10         But the point of this is all not so much the values,

11    although they range over, you know, factor of a hundred or so

12    in terms of the range of permeabilities, but what you can

13    see -- and here's a fairly good example -- the formation we're

14    talking about, for the most part a lot of the transport is

15    occurring we believe in this so-called Ft. Thompson and

16    Anastasia formation, mostly the latter.

17         And you can see that within the formation that is

18    called the Ft. Thompson/Anastasia formation is there are thin

19    zones that have much higher permeability than other locations.

20    So greater than 150 would be in these thin red zones here, and

21    then there's correlation of some of these thin red zones --

22    you can draw a line right across here -- and that's more or

23    less what one does with geology to show that there's

24    continuity and very fine features.

25         And, in fact, the reason they did this testing was

```
 1   to find the reason why contaminants seem to have moved
 2   offsite, and they didn't expect it.
 3   Q    Okay.  You mentioned the Ft. Thompson and Anastasia
 4   formation.  Just so we all know, what is -- what are those
 5   formations, and what is the relevance of that here?
 6   A    Well, the Anastasia formation is basically a beach-type
 7   deposit.  It consists of a lot of shells, broken shells broken
 8   by the waves.  It's called a beach-type of deposit.  So it's
 9   mostly sandy.  In places, though, there's extensive cements
10   that have developed on the shell and sand materials, and then
11   there's layers of limestone, as well.  So it's a mix of what's
12   called coquina, or cemented seashells, and sand, basically,
13   and some limestone.
14   Q    And is the Ft. Thompson/Anastasia formation the relevant
15   formation that underlays Pratt & Whitney's property, the
16   Corbett and The Acreage?
17   A    It's one of them.  I mean, the Caloosahatchee is another
18   formation where you can see there's contamination down in it
19   surprisingly, where it can't expected.
20         It does seem to have some thin zones again, higher
21   red zones of higher hydraulic conductivity.
22   Q    Does this demonstrate what you had described early on
23   cross-examination as thin transmissive units?
24   A    Yes, it's -- when you try to say, well, what is the
25   average hydraulic conductivity in this formation, say, well,
```

1    we have to look at each individual strata and compute that

2    hydraulic conductivity and weight it on its thickness, or we

3    could try to just model or simulate or do a calculation within

4    just one thin layer itself, assuming that thin layer had

5    continuity over an extensive distance.

6            So that's the sort of two ways of going about

7    looking at predicting travel is, one, you take all these

8    values and average them up, and you mix them together and pull

9    out some average, or you recognize it has this lateral

10   continuity, natural geologic structure consistent with what

11   one might expect in this type of geologic environment,

12   depositional environment, and recognize that continuity and

13   use it to predict transport.

14   Q    Turn to --

15   A    It's not a random.  In other words, this picture does not

16   show randomness, that there's just a, you know, blue dot here,

17   a red dot there, a yellow one.  It's just not a random

18   mixture.  There's continuity in structure.

19   Q    And these zones of high transmissivity are continuous, in

20   your opinion, based on the research that you've done, from the

21   Pratt & Whitney site through The Acreage?

22           MR. MACNALLY:  Objection; leading.

23           THE COURT:  Sustained.

24   BY MR. HABERMAN:

25   Q    What is your opinion with respect to whether -- that it

1   is continuity of strata between Pratt & Whitney and The

2   Acreage?

3   A    We're -- I've looked at the geologic logs and the types

4   of descriptions of the sediments at the Pratt & Whitney site.

5   I've looked at the geologic descriptions at other borings on

6   the Corbett.  I've looked at some of the geologic logs of

7   borings in the Seminole Improvement District.  And it looks to

8   me like there's a lot of similarities in the fact that they do

9   encounter cemented zones, they encounter sandstones,

10  limestones, shell hash, all those same kinds of descriptors

11  you can find in The Acreage as you can at the Pratt & Whitney

12  site.

13  Q    Do you know whether Pratt & Whitney -- whether Pratt &

14  Whitney's consultant, environmental consultant, has confirmed

15  that there are small transmissive units at the UTC site?

16  A    Yes, they have.

17           MR. HABERMAN:  Please pull up S19, please.

18  BY MR. HABERMAN:

19  Q    Do you know what this letter, or part of this letter,

20  comes from?

21  A    Yes, it's an offsite investigation, I believe, at the

22  Caloosahatchee formation.

23  Q    And what is the conclusion of this -- first of all, do

24  you know who authored this document?

25  A    I believe it's Arcadis.

```
 1   Q     And what is Arcadis?

 2   A     It's the consultants for Pratt & Whitney.

 3   Q     So the consultants for Pratt & Whitney wrote to Pratt &

 4   Whitney on May 8th, 2015, what?

 5   A     That the 1,4-Dioxane is moving in small transmissive

 6   units in the upper Caloosahatchee formation.

 7   Q     You were asked questions about whether or not hydraulic

 8   conductivities of the values of over 2000 feet per day were

 9   found in the Corbett.  Do you recall that?

10   A     Can you repeat that, please?

11   Q     You were asked if there were measures of hydraulic

12   conductivity in the Corbett of over 2000 feet per day.  Do you

13   recall that?

14   A     Yes.

15             MR. HABERMAN:  Let's put up S2.

16   BY MR. HABERMAN:

17   Q     Doctor, how many monitoring wells or clusters of

18   monitoring wells are there in the Corbett?

19   A     Five.

20   Q     And all of those monitoring wells appear where?

21   A     South of the landfill and the manufacturing building.

22   Q     In your opinion, is that adequate?  Is that what a

23   responsible company would do to assess offsite migration?

24             MR. MACNALLY:  Objection; leading.

25             THE COURT:  Sustained.
```

```
 1   BY MR. HABERMAN:

 2   Q    Doctor, what is your opinion -- do you have an opinion

 3   with regards to whether or not it is adequate to only have

 4   five clusters of Corbett wells in The Acreage -- I mean,

 5   excuse me, in the Corbett?

 6            MR. MACNALLY:  Your Honor, I didn't ask him anything

 7   about his opinions of offsite monitoring wells at all.  He

 8   brought it up.  I didn't respond to it.  So this is outside

 9   the scope.

10            THE COURT:  Go ahead and answer the question.  You

11   can answer it.

12            THE WITNESS:  I don't believe that this is a

13   sufficient number of wells for a variety of reasons, and I

14   would have looked in other locations than these.  Including

15   these, but others, as well.

16   BY MR. HABERMAN:

17   Q    Okay.  And if there were other locations, they might show

18   hydraulic conductivity values of over a thousand feet per day

19   in the Corbett, too, right?

20            MR. MACNALLY:  Objection; leading.

21            THE COURT:  Sustained.

22            I mean, who knows what they would have shown?  They

23   might; they might not.

24            MR. HABERMAN:  You know, Your Honor, I'm going to be

25   moving to a different subject, and so I think it might be good
```

```
 1   to stop for the day.

 2          THE COURT:  Well, you want to bring this doctor back

 3   tomorrow?  Can't we finish him up?  This is redirect.  I mean,

 4   how much more do you have?

 5          MR. HABERMAN:  I have a little bit more.  I would

 6   say a half an hour at least.

 7          THE COURT:  All right.  Well, then if that's the

 8   case, then we'll have to come back tomorrow.  I hate to have

 9   to bring the doctor back tomorrow, but . . .

10          MR. MACNALLY:  Your Honor, we would just ask for an

11   instruction that they not communicate with the witness.

12          THE COURT:  Well, they cannot discuss his testimony.

13          MR. MACNALLY:  Fair enough.

14          THE COURT:  They can communicate with him, but don't

15   discuss his testimony.

16          All right.  We'll get back tomorrow at 9:00 o'clock.

17   I'm sorry, Doctor, to have to bring you back.

18          Besides -- we have the other hydrologists scheduled

19   I guess for tomorrow.  Does anybody have hard copies of the

20   affidavits of Moore and Kaltofen and Frazier that I might

21   have?  It's easier for me to review them in hard copy than

22   have to review them on a computer.  If you have them.  If you

23   don't have them, that's fine.

24          MS. HATFIELD:  I do.  It will just take me a moment

25   to get it out of my box.
```

1              THE COURT:  I would appreciate it.  You can step

2    down, Doctor.

3              We can go off the record.  If you can just give me

4    those hard copies, I'd appreciate it.

5         (Court in recess at 5:39 p.m.)

6                        *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              * * * * *

 2                             I N D E X

 3    Testimony of Thomas Oliver Jackson

 4            Cross by Mr. Scarola                    4

 5            Redirect by Mr. Gallagher            126

 6    Testimony of John R. Hauser

 7            Cross by Mr. Hammer                  138

 8            Redirect by Mr. Groden              173

 9            Recross by Mr. Scarola              182

10    Testimony of Daniel Bruce Stephens

11            Cross by Mr. MacNally

12            Redirect by Mr. Haberman

13                              * * * * *

14                         E X H I B I T S

15    (None.)

16                              * * * * *

17                           CERTIFICATE

18        I, Stephen W. Franklin, Registered Merit Reporter, and

19    Certified Realtime Reporter, certify that the foregoing is a

20    correct transcript from the record of proceedings in the

21    above-entitled matter.

22        Dated this 9th day of JANUARY, 2018.

23

24        /s/Stephen W. Franklin
          _____
25        Stephen W. Franklin, RMR, CRR
```

**BY MR.
GALLAGHER: [8]**
126/20 127/18 128/12
130/2 131/23 133/21
134/25 135/13
**BY MR. GRODEN: [4]**
173/7 175/5 175/21
177/6
**BY MR. HABERMAN:
[11]** 251/24 254/6
254/14 257/7 258/3
259/7 262/23 263/17
264/15 264/25 265/15
**BY MR. HAMMER:
[18]** 138/12 138/22
139/18 146/6 150/11
153/13 154/12 156/11
160/10 160/17 164/15
165/17 168/4 169/4
169/18 170/6 171/5
171/21
**BY MR. MACNALLY:
[21]** 185/11 191/21
193/1 197/23 199/24
201/14 202/22 203/15
205/2 210/25 211/14
213/20 214/24 215/21
223/17 225/22 227/19
230/18 241/10 242/3
246/25
**BY MR. SCAROLA:
[25]** 4/25 5/19 6/13 11/3
20/5 33/16 40/12 49/16
55/21 65/10 79/2 79/21
82/19 89/24 92/11 93/11
93/19 99/4 100/7 107/6
112/1 113/21 119/16
182/6 183/14
**COURT REPORTER:
[2]** 138/17 165/13
**MR. GALLAGHER:
[25]** 4/8 4/11 11/1 39/24
64/9 79/18 82/2 88/24
93/13 93/17 98/3 99/22
111/20 111/23 113/17
119/5 126/18 128/6
128/9 133/20 135/10
136/3 168/23 181/8
181/20
**MR. GDANSKI: [1]**
82/5
**MR. GRODEN: [5]**
137/23 168/24 173/4
180/23 183/2
**MR. HABERMAN:
[28]** 184/23 191/16
192/23 197/11 199/15
201/12 202/2 203/3
203/8 210/14 211/7
213/14 215/16 223/5
227/10 230/6 241/7
241/25 246/16 246/18
251/18 257/6 258/2
259/6 263/16 264/14
265/23 266/4

**MR. HAMMER: [28]**
137/16 138/10 138/18
138/21 139/17 145/18
145/21 150/7 150/9
153/7 154/9 160/7 168/2
168/20 168/25 169/8
169/11 169/14 169/16
170/5 171/4 171/15
171/19 172/25 174/23
175/18 177/1 181/2
**MR. MACNALLY:
[18]** 184/25 191/19
202/9 202/14 202/18
203/11 214/22 225/17
225/20 251/14 254/4
254/10 262/21 264/23
265/5 265/19 266/9
266/12
**MR. SCAROLA: [58]**
4/3 4/6 4/23 20/4 49/2
49/11 49/15 54/22 55/1
55/3 78/18 88/15 88/19
89/2 89/15 90/12 90/17
90/22 93/15 97/8 97/13
98/23 98/25 99/3 100/1
106/14 106/19 107/1
107/5 111/19 111/21
111/24 119/10 119/15
126/11 126/14 127/14
127/16 129/23 131/16
133/11 134/17 134/19
135/19 136/6 136/20
137/2 137/7 137/11
137/15 169/13 181/6
181/12 181/17 181/19
182/4 184/9 184/12
**MS. HATFIELD: [1]**
266/23
**THE COURT: [158]**
4/1 4/4 4/10 4/13 4/15
4/20 4/22 5/14 6/10 11/2
20/2 33/8 33/10 33/14
40/1 48/15 48/18 48/20
48/24 49/1 49/3 49/9
54/25 55/4 64/14 78/16
78/23 79/20 82/4 88/18
89/5 90/9 90/14 90/21
93/18 97/10 97/16 97/19
97/23 98/2 98/8 98/13
98/18 98/21 98/24 99/2
99/24 100/4 106/15
106/20 106/23 107/2
107/4 113/20 119/7
119/11 119/14 126/13
126/16 127/13 127/15
127/17 128/8 128/11
129/21 130/1 131/19
133/18 134/18 134/20
135/20 136/4 136/7
136/9 136/23 137/4
137/9 137/13 137/21
137/25 138/3 138/9
138/19 139/14 145/20
145/24 150/6 153/9
154/11 155/24 160/9
160/14 164/10 169/6

169/9 169/15 169/17
171/11 171/20 173/2
173/5 174/24 175/20
177/2 180/25 181/4
181/16 181/18 182/2
183/3 184/11 184/14
184/16 184/20 185/2
185/4 185/8 191/18
192/25 197/13 199/18
201/13 202/7 202/13
202/16 202/21 203/5
203/10 205/1 210/15
211/8 213/16 214/23
215/17 223/7 225/19
225/21 227/12 230/8
241/8 242/2 246/17
246/20 246/24 251/15
251/21 254/5 254/11
257/18 262/22 264/24
265/9 265/20 266/1
266/6 266/11 266/13
266/25
**THE WITNESS: [61]**
4/19 4/21 5/15 6/11 33/9
33/13 40/3 48/17 48/19
48/25 49/5 49/10 49/14
55/2 55/5 64/17 78/24
82/6 89/6 89/20 90/11
90/23 97/18 97/21 97/24
98/6 98/11 98/17 98/20
107/3 119/13 131/20
134/21 135/21 136/8
138/7 146/1 150/8
155/25 160/15 164/14
165/14 174/25 177/3
183/5 184/15 185/6
197/15 203/6 210/16
211/11 213/18 215/19
223/8 227/13 230/9
241/9 246/23 254/13
257/19 265/11

**$**

**$200,000 [2]** 179/8
179/9

**'**

**'06 [2]** 90/5 108/19
**'07 [1]** 90/5
**'08 [1]** 95/11
**'09 [1]** 95/11
**'52 [1]** 249/10
**'58 [1]** 249/10
**'80s [1]** 139/21

**-**

**-and [6]** 2/4 2/7 2/9 2/12
2/21 2/24
**-v [1]** 1/5

**.**

**.00015 [3]** 218/23 219/4
223/13
**.0002 [6]** 205/22 218/13
219/7 222/16 223/14
223/20
**.01 [1]** 220/15

**.05 [6]** 205/24 219/25
220/14 220/16 223/20
230/16
**.13 [2]** 226/18 226/21
**.13 feet [2]** 226/18
226/21
**.14 [1]** 212/25
**.14 feet [1]** 212/25
**.2 [1]** 220/11

**/**

**/s/Stephen [1]** 268/24

**0**

**0002 [1]** 219/1

**1**

**1,4-Dioxane [28]** 187/13
187/14 187/22 189/16
189/23 190/2 190/8
193/15 195/12 201/16
231/4 231/17 231/20
232/4 232/11 232/14
232/20 233/5 233/23
234/4 234/6 234/7 235/2
235/12 238/4 252/7
252/14 264/5
**1.2143 feet [1]** 258/12
**10 [12]** 26/13 48/16
98/23 150/16 161/18
161/20 162/20 164/1
173/5 178/2 222/3
239/10
**10 percent [3]** 30/9
95/13 179/15
**10,000 [1]** 214/21
**10-minute [2]** 48/19
184/17
**10.46 percent [1]** 149/24
**100 [1]** 5/18
**100 percent [1]** 15/9
**1000 [1]** 209/1
**1000 feet [2]** 209/5
259/1
**10:14 [1]** 48/23
**10:29 [1]** 48/23
**10:30 [1]** 49/12
**11 [2]** 129/2 150/16
**11 percent [1]** 225/5
**11:30 [1]** 49/14
**12 [1]** 128/24
**1212 [1]** 2/3
**126 [1]** 268/5
**12:00 [1]** 98/10
**12:02 [1]** 106/22
**13-80928-CIV-KAM [1]**
1/2
**138 [1]** 268/7
**14 [1]** 252/17
**14 miles [1]** 190/3
**15 [3]** 97/13 97/17 174/1
**15 percent [1]** 179/14
**15-thousand [1]** 75/17
**150 [1]** 260/20
**150 feet [1]** 260/6
**16 [1]** 193/18
**16 feet [3]** 216/22

216/23 217/7
**16-square-mile [1]**
244/4
**17 [1]** 196/24
**17 percent [1]** 95/15
**173 [1]** 268/8
**17900 [1]** 188/16
**17th [2]** 253/2 253/3
**18 [1]** 75/16
**182 [1]** 268/9
**1851 [1]** 255/2
**19 [1]** 252/23
**195 [1]** 245/24
**1986 [2]** 249/10 249/10
**1988 [2]** 168/19 169/3
**1989 [1]** 150/14
**1:10 [1]** 106/19
**1:13 [1]** 106/22

**2**

**2,143 feet [2]** 207/11
207/20
**20 [3]** 193/18 197/18
200/23
**20 feet [1]** 216/16
**20 percent [1]** 30/9
**20-some [1]** 215/7
**200 [1]** 247/24
**200 percent [1]** 183/13
**200-plus [1]** 179/7
**2000 [2]** 214/6 214/8
**2000 feet [13]** 205/19
207/24 208/24 209/1
209/11 210/5 210/14
211/7 211/14 213/9
223/21 264/8 264/12
**2005 [1]** 132/1
**2007 [1]** 132/1
**2007-2008 [1]** 90/2
**2008 [8]** 90/2 99/9 99/15
99/20 100/10 100/12
100/14 108/15
**2009 [4]** 108/16 171/17
225/25 233/6
**2010 [7]** 88/6 95/4 95/19
132/7 233/8 233/17
233/19
**2011 [7]** 86/23 86/24
112/7 112/10 112/13
113/3 174/7
**2012 [1]** 233/7
**2015 [2]** 132/1 264/4
**2016 [11]** 90/2 112/8
112/17 113/3 132/7
195/21 195/21 219/3
220/10 253/2 253/3
**2018 [2]** 1/9 268/22
**2139 [1]** 2/11
**2143 feet [2]** 213/1
234/14
**223 [1]** 239/9
**23 [1]** 196/25
**237 [1]** 175/14
**2400 [1]** 3/4
**249 [1]** 193/17
**25 [1]** 74/12

**2**

**2920 feet [2]** 206/2 230/1
**294 [2]** 252/11 252/13

**3**

**3 percent [1]** 221/5
**30 [1]** 251/13
**30 percent [1]** 95/11
**300 [1]** 2/19
**301 [1]** 1/11
**30326 [1]** 3/4
**32204 [1]** 2/6
**33301 [1]** 2/8
**33316 [1]** 2/4
**33401 [2]** 1/20 2/23
**33409 [1]** 2/12
**33410 [1]** 2/14
**3344 [1]** 3/3
**34 [1]** 233/19
**344 [1]** 196/24
**345 [1]** 198/8
**346 [1]** 197/18
**347 [1]** 198/18
**348 [2]** 198/1 200/13
**363-15 [1]** 174/1
**366-3 [1]** 187/18
**372-9 [1]** 225/25
**374 [1]** 213/10
**374 feet [4]** 213/22 214/11 214/14 215/13
**3768 [1]** 1/19
**3801 [1]** 2/13
**3:09 [1]** 184/19
**3:23 [1]** 184/19
**3rd [1]** 2/3

**4**

**40 [3]** 188/13 189/9 217/25
**40 percent [1]** 74/12
**440 [1]** 2/8
**45 [2]** 173/19 173/22
**47 [1]** 174/4
**47 feet [4]** 226/21 226/24 229/11 229/23
**48 [1]** 225/15

**5**

**5.1 [1]** 243/10
**5.1 miles [6]** 188/11 188/21 188/24 189/2 189/7 209/9
**5.3 [1]** 189/13
**5.7 miles [1]** 189/12
**5.75 miles [3]** 188/9 188/17 189/10
**50 [3]** 200/23 209/18 217/24
**50 feet [1]** 225/15
**50 percent [2]** 200/7
**50-some [1]** 237/12
**500 [3]** 213/11 216/1 216/10
**500 feet [1]** 213/23
**500-E [1]** 2/23

**514-3768 [1]** 1/19
**54 [1]** 2/19
**561 [1]** 1/19
**5:03 [1]** 251/20
**5:12 [1]** 251/20
**5:39 [1]** 267/5

**6**

**60 [6]** 190/9 190/12 191/13 217/24 231/22 232/3
**600 [2]** 2/13 226/25
**60610 [1]** 2/20
**65 [2]** 225/1 225/1
**650 [1]** 243/25
**68 [2]** 225/11 226/10
**689 [1]** 247/21
**69 [14]** 205/13 205/16 207/2 207/4 207/23 213/9 216/24 217/9 218/15 219/22 220/2 222/23 237/7 238/11

**7**

**7 percent [2]** 221/4 225/8
**7.13 percent [1]** 226/5
**701 [1]** 1/19
**710 [1]** 188/16
**777 [1]** 2/22

**8**

**831 [1]** 247/21
**865 [1]** 2/6
**88 [1]** 259/23
**8th [1]** 264/4

**9**

**90 percent [2]** 214/15 215/15
**95 percent [1]** 200/11
**9:00 o'clock [1]** 266/16
**9th [1]** 268/22

**A**

**a.m [2]** 48/23 48/23
**AA [1]** 222/12
**abandon [2]** 183/17 184/4
**abandoned [1]** 105/4
**abandoning [1]** 191/19
**ability [3]** 6/13 215/7 228/8
**able [13]** 20/24 20/25 21/2 21/3 51/3 64/15 76/4 111/16 154/15 250/16 250/22 254/9 260/6
**above [2]** 168/4 268/21
**above-entitled [1]** 268/21
**absence [2]** 15/7 101/1
**absolute [1]** 207/11
**absolutely [2]** 119/25 149/20
**absorb [1]** 49/19
**absorbing [2]** 238/14

**239/23** **301**
**accept [9]** 49/18 60/16 101/7 102/14 102/24 103/3 103/9 103/10 168/17
**acceptable [2]** 89/12 94/22
**accepted [31]** 7/7 7/16 20/17 20/19 21/3 26/22 27/14 33/24 34/5 73/24 77/22 78/20 102/15 103/6 103/13 116/5 116/23 117/15 117/18 117/21 119/18 119/22 119/23 120/5 120/13 120/24 121/7 121/20 123/20 126/3 131/23
**accommodation [1]** 48/20
**accordance [1]** 77/22
**according [6]** 32/22 136/12 247/15 248/16 249/3 250/17
**account [5]** 94/19 95/18 194/9 238/12 242/8
**accounts [1]** 237/23
**accurate [20]** 15/9 47/8 47/11 83/21 136/22 136/25 140/10 158/21 159/1 159/3 159/7 160/14 160/17 160/19 160/20 160/22 160/23 161/1 171/2 204/17
**accurately [9]** 6/6 38/7 49/19 59/6 59/19 114/24 231/14 231/21 231/24
**accuse [1]** 46/13
**acknowledge [1]** 244/19
**acknowledged [2]** 33/24 149/7
**Acreage [125]** 47/23 53/4 53/19 53/23 54/4 59/24 64/8 65/14 67/20 68/9 68/23 69/13 71/17 72/5 76/21 76/23 77/24 96/16 99/16 99/17 99/20 100/10 100/14 100/17 100/24 106/10 106/10 109/10 112/22 115/20 153/16 153/24 156/10 156/12 156/13 156/16 156/18 156/24 157/4 157/13 157/19 157/20 157/25 158/7 158/10 158/14 158/15 161/22 164/20 170/12 170/22 172/11 172/17 172/20 172/22 172/25 178/19 178/21 178/25 179/4 182/10 183/8 183/10 183/17 183/19 184/4 187/15 188/11 188/18 190/7 190/10 193/20 194/21 196/23 197/3 198/6 198/11 198/14 198/21 199/11 200/2

**200/5 200/16 201/3**
**201/12 203/19 208/9 208/14 208/16 208/16 209/4 209/10 209/18 210/6 214/7 214/9 216/2 216/11 216/25 227/1 228/18 233/23 234/21 235/1 235/3 235/8 245/16 248/24 249/21 250/6 252/8 252/15 252/18 253/10 253/18 254/3 257/24 258/20 258/22 259/3 261/16 262/21 263/2 263/11 265/4
**across [8]** 21/16 73/19 74/9 74/14 75/18 240/22 259/22 260/22
**across-the-board [1]** 75/18
**acting [2]** 43/6 130/12
**activities [1]** 168/12
**activity [1]** 92/5
**actual [12]** 19/18 21/5 26/9 88/6 101/17 119/7 147/5 147/23 177/15 179/13 190/15 237/16
**actually [45]** 19/16 24/5 27/12 39/19 42/18 57/5 88/9 88/25 89/15 101/21 131/4 141/22 142/4 146/14 147/23 148/18 150/10 150/18 150/19 150/22 150/25 151/23 151/23 152/9 157/19 158/1 161/11 166/1 175/3 179/6 183/11 186/8 188/3 189/3 199/14 216/22 217/15 217/17 221/17 225/10 231/13 241/13 248/18 250/10 257/6
**add [3]** 116/10 132/12 137/11
**added [4]** 38/23 102/10 248/9 248/10
**adding [1]** 104/25
**addition [5]** 77/5 121/19 121/19 178/15 233/16
**additional [2]** 13/9 80/4
**address [6]** 53/12 110/3 115/3 128/18 130/6 184/8
**addressed [3]** 30/24 73/2 73/3
**addresses [4]** 43/23 130/4 130/10 233/9
**adequate [2]** 264/22 265/3
**adjacent [1]** 259/17
**adjust [4]** 123/24 149/24 149/25 150/1
**adjustment [1]** 150/2
**administered [1]** 35/3
**administering [1]** 154/19

**Administration [1]** 148/9
**admit [1]** 167/13
**advective [3]** 203/20 206/10 237/23
**adverse [49]** 13/4 13/14 18/1 18/24 19/18 20/8 22/1 22/16 22/25 24/14 25/24 28/15 31/6 31/16 32/3 32/4 32/1 32/20 32/21 33/19 35/20 55/16 58/14 60/25 63/4 69/25 70/12 71/16 72/5 72/8 72/18 72/21 72/22 73/25 74/19 75/3 76/11 77/13 77/24 78/9 78/22 80/14 101/7 101/14 114/19 115/19 122/7 122/13 123/8
**adversely [4]** 17/15 18/11 31/20 41/9
**advisable [1]** 46/3
**advised [5]** 129/17 130/12 145/14 152/24 153/3
**advisory [13]** 9/8 10/15 13/4 24/23 27/16 32/22 36/6 43/23 47/6 76/20 113/24 114/10 128/19
**affect [2]** 17/15 18/11
**affected [8]** 17/11 30/8 31/20 41/9 41/18 41/21 41/25 212/11
**affecting [2]** 53/3 53/22
**affidavit [17]** 4/13 68/17 70/7 82/12 91/5 128/4 132/7 139/6 164/13 188/13 195/23 200/3 202/7 205/12 218/20 219/2 245/8
**affidavits [1]** 266/20
**affiliated [2]** 139/24 140/1
**afield [2]** 12/24 215/8
**after [28]** 48/23 50/23 51/15 61/4 61/6 61/9 61/10 64/4 66/2 66/10 66/10 85/9 88/3 88/4 88/5 88/5 91/14 91/19 92/8 94/11 94/21 106/22 153/12 179/2 184/19 189/4 241/16 251/20
**afternoon [12]** 118/25 119/1 126/22 126/23 138/14 138/15 173/9 173/10 185/13 185/19 252/1 252/2
**again [37]** 10/14 16/8 20/4 29/3 29/17 36/13 38/1 49/14 69/17 70/21 79/21 88/16 89/17 107/8 115/17 117/19 121/5 122/11 125/7 132/13 136/24 137/11 145/21 160/10 171/13 174/18 180/3 191/7 209/19

**A**

again... [8] 224/25
225/11 227/12 230/7
239/19 242/1 242/2
261/20
against [3] 45/3 121/15
150/22
age [1] 253/16
agencies [15] 14/20
36/16 37/2 46/5 46/8
46/13 46/15 46/21 47/5
47/11 52/22 56/12
129/11 164/25 166/7
agencies' [1] 47/24
agency [5] 39/12 47/12
47/14 58/17 62/6
agent [1] 160/7
agents [8] 53/2 53/3
53/19 53/21 53/21 168/6
168/14 172/19
aggregation [1] 82/15
agree [45] 6/20 7/6 8/1
8/16 9/4 9/10 11/20
12/20 15/1 15/24 16/9
16/14 16/22 17/6 18/17
18/23 20/7 20/16 20/20
21/22 28/18 28/24 30/17
41/20 42/15 42/21 47/5
59/5 69/3 69/14 69/16
83/1 100/23 116/22
170/24 171/4 171/7
181/22 182/1 188/9
211/24 216/22 217/10
239/4 245/10
agreed [3] 16/17 181/14
181/22
agreeing [1] 24/5
agreement [4] 6/17 18/1
28/19 37/11
ahead [9] 11/5 55/5 99/3
181/19 202/22 213/18
227/13 254/13 265/10
akin [1] 27/10
al [2] 1/3 1/7
Alex [2] 2/17 137/24
alleged [3] 12/3 94/10
123/22
allow [4] 110/14 134/14
153/11 176/19
allowing [1] 184/13
allows [3] 8/11 176/16
176/18
almost [4] 93/16 94/12
214/21 234/14
alone [4] 155/18 155/18
230/15 244/1
along [7] 92/11 178/20
222/12 227/8 240/6
240/6 244/23
already [14] 30/23 38/10
77/5 123/14 136/17
137/3 145/2 197/22
197/22 198/6 217/24
225/21 225/24 233/16
also [46] 13/7 14/19
20/16 25/15 26/19 36/18

40/21 41/2 51/23 52/10
54/4 54/6 69/19 72/20
73/3 73/16 88/12 95/7
122/17 122/25 132/24
138/21 141/12 142/18
154/7 170/4 182/16
182/21 187/14 187/18
188/4 209/5 214/11
218/10 219/11 219/21
226/13 228/19 231/18
234/23 237/23 246/13
248/13 248/13 251/10
258/22
altered [2] 111/19 115/4
altering [1] 118/21
alternative [2] 102/8
183/1
although [4] 7/22
178/18 184/8 260/11
always [8] 11/10 12/2
12/14 84/9 84/12 84/17
239/6 245/1
am [8] 10/5 24/12 48/3
48/12 55/3 101/10 107/2
143/14
among [10] 74/6 75/12
75/16 100/14 116/6
116/23 117/15 119/19
119/24 120/5
amount [22] 6/22 6/25
28/1 29/18 29/23 29/25
30/6 30/6 31/2 31/4 51/9
75/9 76/1 76/5 76/15
76/25 78/16 151/16
151/16 152/2 176/10
254/21
amounts [5] 149/24
151/11 151/12 151/22
151/25
analogy [4] 15/21 31/24
36/13 45/6
analyses [4] 77/1 199/9
203/17 203/22
analysis [58] 28/12 39/5
42/6 66/11 68/19 70/5
72/1 72/3 72/25 73/1
73/4 75/14 80/13 82/16
85/17 92/16 93/8 93/10
94/14 96/6 104/18
119/23 120/1 120/8
122/23 124/3 124/5
127/11 130/22 131/2
131/10 131/12 132/2
133/3 133/6 139/24
145/16 146/9 146/16
149/7 149/23 151/2
176/22 176/23 176/25
191/5 191/9 192/8
192/12 201/5 203/23
229/9 232/9 241/25
242/21 242/25 245/2
253/9
analyze [2] 11/16 182/12
analyzed [6] 18/7 35/4
51/22 119/21 125/7
222/8

analyzing [1] 14/7
Anastasia [7] 234/23
241/5 260/16 260/18
261/3 261/6 261/14
anchoring [1] 154/25
and/or [1] 161/18
Andrew [3] 2/16 185/1
185/13
Andrews [1] 2/8
announcement [3] 61/4
61/7 65/8
another [25] 8/11 34/5
35/18 38/16 39/4 40/15
41/18 56/4 85/7 85/12
92/23 93/22 93/25 98/23
129/20 130/4 183/1
190/16 198/1 217/25
218/9 237/19 241/25
250/21 261/17
answer [89] 6/13 10/24
10/24 11/5 11/10 11/11
11/24 12/5 12/9 12/13
12/22 15/1 16/1 18/8
19/24 33/12 40/3 45/19
54/24 61/15 62/20 63/24
64/15 64/17 66/5 66/6
66/12 67/4 68/1 68/2
70/20 75/10 79/7 79/13
79/14 85/3 89/18 89/20
90/14 90/22 96/24
101/15 101/24 113/14
114/7 114/9 116/9
116/11 119/7 119/9
123/3 130/1 135/3
135/11 140/24 140/24
143/10 143/21 144/7
164/11 171/2 183/5
193/22 197/5 198/7
198/19 198/23 200/9
200/18 201/3 201/12
208/18 213/16 215/18
223/2 223/7 223/17
230/8 230/9 239/13
241/9 246/4 246/7 246/9
246/23 252/23 254/13
265/10 265/11
answered [13] 8/12
21/25 34/25 85/3 121/4
153/12 201/7 201/13
210/15 211/8 211/9
215/17 252/17
answering [6] 63/14
79/19 89/1 113/19 153/9
214/24
answers [5] 11/24 21/14
83/6 153/12 161/8
any [150] 6/4 11/24
12/23 24/24 28/6 31/1
36/24 43/1 47/4 57/13
57/13 60/24 65/7 65/15
65/21 65/22 65/24 66/9
66/13 67/13 67/17 67/22
67/23 68/15 68/19 68/19
68/21 69/1 70/8 72/12
72/18 72/21 73/14 73/25
74/19 75/2 76/24 77/16

77/20 77/23 78/5 78/8
80/1 82/16 86/4 86/10
86/13 86/15 87/16 89/5
90/8 90/19 94/22 96/5
97/21 98/11 99/8 99/11
99/11 101/2 102/1
102/16 106/11 107/22
109/12 110/11 112/25
114/20 115/7 115/22
116/10 118/11 120/5
120/8 121/10 122/5
123/8 125/13 126/6
126/7 126/8 126/18
127/2 127/3 130/25
132/15 132/17 133/1
133/7 133/9 133/10
134/14 136/3 136/6
136/18 144/22 144/25
146/8 159/17 159/20
160/12 160/16 172/8
172/13 172/19 172/24
174/22 175/2 175/4
175/7 175/17 177/10
178/21 179/19 181/2
181/25 184/2 184/7
186/14 187/6 187/6
187/7 187/7 202/6
202/24 207/18 209/20
210/4 210/9 211/3
211/10 211/17 213/4
213/5 214/9 214/21
215/12 222/6 222/21
224/8 230/24 236/25
240/19 240/22 240/22
241/13 244/14 244/16
247/24 249/14
anybody [1] 266/19
anybody's [1] 20/13
anyone [1] 131/9
anything [20] 4/6 11/13
17/10 18/15 70/8 79/15
79/16 89/19 114/18
114/24 115/18 116/10
124/8 134/23 158/25
166/5 177/21 179/22
180/20 265/6
anyway [4] 30/16 108/5
131/22 260/7
anywhere [26] 77/9
134/12 134/13 134/13
186/18 186/19 188/25
189/17 190/2 192/3
210/10 211/4 211/18
221/15 221/22 228/11
231/22 232/2 235/13
235/15 240/9 240/11
242/10 244/18 245/5
245/7
AO9 [2] 10/17 14/20
aol.com [1] 1/20
apart [4] 89/23 230/6
230/21 234/11
apologies [1] 90/23
apologize [5] 16/16
24/22 108/20 169/13
242/7

apparent [1] 60/14
appear [2] 24/23 264/20
Appearances [3] 1/16
2/1 3/1
appearing [1] 108/10
appears [6] 108/18
156/8 228/25 229/6
245/22 250/19
appendix [1] 211/21
applicable [2] 175/17
177/10
application [1] 73/24
applied [2] 140/23
144/19
apply [7] 74/14 140/22
175/4 175/9 175/11
177/18 177/20
applying [2] 103/6
103/12
appointment [2] 97/12
98/10
appraisal [41] 7/10 7/17
8/19 8/22 10/9 12/4 12/4
12/11 12/24 14/6 14/8
14/16 20/17 20/19 21/4
25/24 34/21 35/1 73/24
76/5 77/22 78/20 82/16
89/12 94/23 97/7 102/15
102/16 102/18 103/23
104/2 117/5 120/13
120/24 121/1 121/11
121/24 122/17 122/19
144/5 145/1
appraisal-based [1]
82/16
appraisals [3] 5/13
102/20 102/22
appraise [3] 143/15
143/17 143/25
appraised [1] 143/23
appraiser [19] 7/8 7/11
7/14 11/15 15/10 22/13
22/22 24/10 25/4 25/12
38/2 39/14 46/3 120/7
137/7 134/14 143/13
143/14 145/3
appraisers [38] 7/9 8/6
14/1 14/16 15/2 21/3
25/15 26/23 27/15 28/21
29/7 31/6 31/17 33/25
34/4 34/6 34/7 34/15
34/17 34/22 35/6 35/23
36/3 45/25 47/20 91/5
92/25 96/20 116/6
116/23 117/16 119/19
119/24 120/5 121/17
122/17 131/11 132/25
appraising [4] 96/21
103/6 103/13 131/11
appreciate [14] 8/14
9/22 48/20 49/11 49/15
56/5 111/25 113/16
128/12 135/8 143/12
184/13 267/1 267/4
appreciating [1] 39/18
approach [4] 122/22

{WITNESSNAME}                                                                    Index: approach .. back

**A**

**approach... [3]** 124/7
128/7 225/18
**appropriate [11]** 11/12
11/16 25/16 29/10 66/17
106/7 120/16 122/16
124/5 131/3 133/16
**appropriately [5]** 19/6
34/2 37/5 117/19 119/21
**appropriateness [1]**
68/18
**approved [1]** 122/18
**approximately [9]**
137/14 156/16 156/17
188/17 188/19 189/7
189/12 190/9 190/13
**approximates [1]** 192/2
**April [3]** 195/21 219/3
220/10
**April 2016 [3]** 195/21
219/3 220/10
**aquifer [13]** 204/20
206/14 207/14 210/22
211/24 212/3 212/15
212/18 212/21 219/16
219/17 255/5 258/1
**aquifers [1]** 210/24
**Arcadis [3]** 246/10
263/25 264/1
**area [237]** 7/8 7/11
12/25 14/17 18/13 21/17
21/23 23/11 23/11 25/4
25/6 31/19 40/6 41/21
43/9 44/16 52/3 54/15
54/16 54/17 55/17 56/8
56/9 56/13 56/24 56/25
57/2 57/16 57/20 57/21
57/21 57/25 58/1 58/2
58/3 58/8 58/16 58/19
62/12 71/5 72/13 73/2
73/7 74/15 75/13 75/14
75/17 76/24 77/10 77/20
78/18 78/21 78/24 78/25
79/8 79/9 79/24 79/25
80/7 80/11 80/18 81/20
82/15 84/12 84/13 85/5
85/6 85/7 85/19 86/3
86/22 87/18 87/20 88/9
88/23 88/24 89/15 89/15
91/10 91/21 92/22 92/23
93/4 94/6 95/2 96/8
102/10 105/14 106/10
107/14 107/19 108/22
109/14 115/11 115/24
117/3 121/24 123/21
123/23 124/2 124/15
124/16 124/22 125/2
125/4 127/24 134/25
136/3 136/3 142/6
157/20 157/21 162/23
162/25 163/9 163/14
172/15 186/2 186/3
186/7 186/8 186/12
186/19 187/8 187/11
188/2 188/3 188/8 189/2
189/11 189/17 189/25

190/4 190/9 190/11
190/15 190/22 190/25
191/3 191/4 191/8
191/13 192/3 192/6
192/14 192/20 192/20
193/4 193/20 193/22
194/1 194/2 194/5 194/7
194/11 194/18 194/19
195/4 195/4 195/6
195/10 196/9 196/14
201/18 202/12 203/1
203/25 204/18 204/24
205/8 206/6 208/1
208/22 209/2 209/23
210/3 210/3 210/12
211/6 211/19 211/25
217/12 218/23 219/4
220/11 222/14 222/16
222/18 223/22 223/24
224/19 224/22 225/2
226/1 226/18 228/19
229/22 231/22 232/3
232/15 232/20 233/5
234/12 235/6 235/9
236/22 237/9 243/15
243/16 243/17 244/7
244/10 244/12 244/14
244/14 245/15 245/17
245/18 245/21 246/2
246/4 246/5 246/11
247/10 247/25 248/6
250/10 251/13 253/25
254/1 255/5 257/10
257/12 257/13 257/23
258/13 258/18
**area -- you [1]** 94/6
**area's [1]** 73/3
**area-wide [3]** 75/14
79/24 79/25
**areas [49]** 73/17 73/19
73/23 74/1 74/6 74/20
74/23 75/2 75/3 76/4
76/13 77/15 80/25 81/4
84/25 85/19 86/24 88/7
88/11 90/6 91/2 91/10
91/24 92/5 92/6 92/10
95/12 107/10 107/15
109/7 109/11 109/16
132/22 141/13 141/15
157/20 170/12 216/15
221/13 227/16 244/23
245/10 245/11 256/18
256/21 257/15 257/17
257/21 258/13
**aren't [5]** 87/11 168/16
170/2 180/8 232/14
**argue [3]** 175/15 190/11
215/20
**argued [1]** 175/12
**argues [1]** 177/9
**arise [2]** 12/16 64/8
**arising [1]** 10/7
**arithmetic [5]** 149/16
149/19 179/6 179/7
179/12
**arm's [6]** 42/24 43/7

91/4 91/4 92/2 95/24
**arose [3]** 63/8 63/23
63/25
**around [17]** 49/8 65/6
83/12 90/5 95/11 106/5
106/19 108/19 139/20
157/25 179/11 194/6
222/10 222/18 246/2
248/18 257/24
**arrive [2]** 127/12 131/3
**arrived [3]** 81/14 81/16
81/17
**arrow [4]** 148/13 188/8
189/13 189/25
**arrows [1]** 194/14
**article [3]** 27/12 125/24
160/7
**articles [8]** 45/21 46/6
120/25 121/12 121/13
121/15 122/4 125/3
**artifact [2]** 152/19
152/24
**artifacts [3]** 152/6 152/9
152/13
**asbestos [8]** 159/11
168/7 168/14 169/21
201/25 202/11 202/25
203/8
**ascertain [2]** 132/17
133/10
**ask [43]** 5/4 6/5 20/1
20/3 24/12 26/6 33/13
41/2 44/22 79/21 80/4
89/17 93/14 99/25 100/3
100/6 110/13 113/12
114/17 115/16 123/17
128/8 131/1 139/3 139/7
143/8 143/20 143/21
148/22 154/14 154/19
176/8 176/9 176/15
176/17 178/20 181/23
185/15 201/18 210/8
215/12 265/6 266/10
**asked [84]** 8/12 11/23
12/10 12/10 22/19 36/1
55/23 65/18 66/3 66/16
69/11 73/14 75/21 75/25
75/25 77/16 88/18 102/3
109/25 114/13 121/3
123/13 126/10 126/24
128/14 130/25 132/16
135/2 142/8 142/24
142/25 142/25 143/2
143/3 143/25 145/23
146/12 146/13 146/14
153/15 153/23 154/1
157/3 157/11 157/14
157/24 164/8 180/9
180/14 180/14 181/22
181/25 181/25 183/7
191/18 192/11 193/23
197/6 197/11 198/9
198/13 198/18 198/23
198/25 199/12 200/19
201/1 201/10 201/13
210/9 210/15 211/8

215/12 215/17 246/6
249/25 252/5 252/13
252/21 253/6 254/16
256/3 264/7 264/11
**asking [39]** 6/16 10/19
11/6 17/21 19/5 20/11
20/12 22/15 22/22 22/24
24/9 32/9 57/3 63/2
63/14 75/20 78/2 78/5
78/8 83/12 100/18
100/21 101/1 101/4
101/13 109/17 114/22
115/14 119/3 125/11
130/7 148/19 148/23
151/21 173/11 176/15
176/17 211/2 211/11
**asks [7]** 64/13 151/10
151/12 151/14 151/15
151/17 151/24
**aspect [1]** 126/7
**aspects [4]** 69/12 142/11
162/10 170/25
**assertion [1]** 53/5
**assess [3]** 74/9 242/14
264/23
**assessed [1]** 74/8
**assessing [6]** 116/6
116/24 117/16 119/19
119/24 140/13
**assessment [5]** 61/23
62/7 120/14 121/8 140/3
**assessments [1]** 61/20
**assessor [1]** 104/3
**assignment [4]** 60/1
65/19 65/19 77/10
**associated [8]** 13/22
39/23 47/23 61/3 109/8
115/11 229/10 229/23
**assume [21]** 5/8 47/11
56/6 56/10 56/16 64/13
84/11 84/25 100/1 100/3
100/9 100/17 100/19
100/21 157/11 192/11
219/21 222/12 228/12
236/21 237/7
**assumed [5]** 204/11
205/19 222/4 222/12
238/16
**assumes [3]** 64/12 99/24
207/22
**assuming [8]** 35/7 40/23
60/17 100/23 119/12
227/7 227/9 262/4
**assumption [4]** 44/15
192/7 223/19 227/10
**assumptions [6]** 24/18
99/25 216/24 222/23
223/25 248/9
**Atlanta [1]** 3/4
**Atmospheric [1]** 148/8
**attach [7]** 15/25 16/10
16/17 17/7 17/10 248/12
248/13
**attached [2]** 76/21
168/19
**attachments [3]** 128/5

128/6 128/24
**attempt [2]** 133/2
152/20
**attempting [2]** 14/13
24/13
**attempts [1]** 152/12
**attention [6]** 29/17
194/14 201/19 201/24
219/2 245/24
**attributable [1]** 37/8
**attribute [3]** 176/10
176/17 176/23
**attributed [1]** 15/23
**attributes [3]** 142/22
176/18 176/22
**August [1]** 195/21
**August 2016 [1]** 195/21
**authored [1]** 263/24
**authoritative [1]** 124/25
**automobiles [1]** 175/10
**autopsy [2]** 68/9 68/23
**available [26]** 35/8 37/2
44/12 47/22 50/13 50/22
51/12 51/15 52/11 52/20
53/15 59/24 59/25 60/5
60/5 65/14 65/16 67/25
69/18 183/20 192/18
204/19 230/3 230/22
243/18 253/20
**Avenue [2]** 2/3 2/8
**average [31]** 183/13
183/24 184/4 184/8
204/10 207/15 208/23
213/8 215/2 215/9
215/12 215/23 216/3
216/7 216/8 216/12
216/16 217/3 217/5
217/14 217/15 218/7
218/22 219/3 220/10
225/8 227/3 228/9
261/25 262/8 262/9
**averaged [1]** 221/4
**averages [3]** 204/14
216/3 216/4
**avoid [3]** 8/8 24/24
167/21
**aware [29]** 45/23 46/4
48/1 48/3 48/5 69/20
99/14 99/18 99/19 100/3
100/21 107/22 112/4
121/10 121/12 121/22
122/1 122/1 122/2 122/5
136/19 137/21 137/23
168/11 168/15 180/11
180/13 183/16 215/13
**away [4]** 178/23 189/23
229/25 234/8

**B**

**back [34]** 21/13 27/24
29/17 36/13 45/6 83/18
94/6 98/6 98/16 104/14
106/19 106/24 111/17
112/14 125/21 135/7
135/9 135/12 135/16
149/13 150/4 164/5

**B**

**back... [12]** 170/6
189/13 194/1 226/7
231/2 231/5 249/23
266/2 266/8 266/9
266/16 266/17
**back-calculate [1]**
249/23
**background [1]** 44/19
**backup [1]** 134/2
**bad [2]** 58/12 143/7
**badgered [1]** 199/17
**balanced [1]** 170/14
**ballpark [1]** 137/12
**barbecues [1]** 142/21
**Barnhart [1]** 2/10
**Bartlit [1]** 2/18
**base [2]** 82/12 130/19
**based [43]** 25/18 52/9
53/17 54/7 77/12 78/20
80/20 81/17 82/16 85/17
87/5 87/5 94/3 94/13
108/3 112/13 119/20
120/18 131/9 133/17
136/12 142/16 145/10
148/21 152/2 159/1
164/25 192/19 193/3
193/10 204/11 204/15
225/5 229/23 246/8
246/9 248/2 253/14
253/18 253/19 253/19
253/20 262/20
**baseline [1]** 151/18
**bases [1]** 17/25
**basic [4]** 6/16 174/18
192/17 204/3
**basically [19]** 144/11
145/15 147/23 155/12
159/19 164/23 166/3
176/11 177/4 179/3
183/22 197/18 209/6
230/3 248/23 254/20
259/25 261/6 261/12
**basis [17]** 17/23 73/8
76/17 77/7 78/3 78/6
82/10 87/18 88/22 105/6
105/11 105/22 109/13
123/16 134/23 136/2
253/13
**bathroom [1]** 98/2
**be 1 [1]** 238/16
**beach [17]** 1/8 1/20 2/11
2/12 2/14 2/23 87/19
88/11 88/22 92/3 95/13
107/15 108/23 109/15
248/6 261/6 261/8
**beach-type [2]** 261/6
261/8
**Bear [1]** 143/20
**beating [1]** 64/12
**beautiful [1]** 170/21
**became [6]** 59/24 59/25
60/4 60/5 65/14 65/16
**because [60]** 7/24 20/1
25/23 30/15 36/16 37/13
41/18 45/8 50/3 53/11

53/14 53/24 54/8 59/15
60/4 60/20 65/24 67/7
68/13 74/2 82/14 86/8
86/13 87/4 91/17 91/24
91/25 94/15 102/2 106/9
109/4 109/22 110/7
110/17 113/11 121/22
125/11 132/13 137/20
139/16 152/8 155/10
155/19 161/5 161/8
164/1 169/2 172/5
176/13 178/2 179/2
179/16 179/16 181/21
181/23 224/3 228/5
235/9 236/9 246/1
**Beck [1]** 2/18
**become [7]** 46/3 60/25
105/1 105/2 105/7 106/9
110/9
**becomes [6]** 50/22 52/1
52/3 52/3 52/20 60/14
**Beeline [1]** 188/17
**before [40]** 1/13 4/6
5/10 10/6 23/16 23/20
44/22 64/3 66/1 66/9
66/10 80/4 91/15 91/18
92/7 92/8 94/5 95/17
97/17 108/17 108/18
108/24 124/2 130/13
135/2 138/17 138/24
139/1 143/24 154/5
155/1 156/21 157/2
161/16 182/25 184/18
190/14 251/17 257/9
259/9
**began [5]** 27/25 44/22
99/20 100/11 100/12
**begin [6]** 4/6 6/16 10/6
67/4 178/6 180/6
**beginning [3]** 51/10
156/9 231/3
**begins [1]** 90/1
**begun [1]** 100/24
**behalf [3]** 173/11 185/1
185/14
**behavior [1]** 249/19
**behind [1]** 109/22
**being [26]** 8/12 19/25
35/20 43/18 57/16 57/22
58/10 62/24 67/10 68/23
83/9 89/14 91/2 104/14
110/15 142/13 142/15
153/4 157/3 162/11
167/21 176/10 196/17
197/11 199/17 256/15
**belief [1]** 133/13
**believe [44]** 4/7 5/14 6/7
6/9 6/12 65/24 79/2
82/10 85/23 90/8 127/1
128/19 146/20 151/2
161/25 168/22 168/24
172/3 183/23 186/21
186/22 187/9 187/19
189/5 192/13 196/2
201/8 211/20 213/10
218/20 233/2 238/23

240/20 243/23 244/2
244/8 245/8 246/15
248/15 249/9 260/15
263/21 263/25 265/12
**believed [3]** 26/2 39/13
182/22
**believes [1]** 119/8
**below [3]** 170/8 225/15
228/23
**besides [4]** 53/8 95/20
131/7 266/18
**best [9]** 8/8 46/19 71/15
73/20 106/4 113/14
127/5 130/13 234/1
**better [6]** 118/11 118/20
120/21 124/21 166/14
166/16
**between [50]** 18/1 27/6
27/25 87/17 87/18 88/21
91/20 94/25 100/15
102/1 107/13 108/21
112/7 114/20 114/23
114/25 115/20 127/5
128/23 132/1 132/18
132/19 132/22 148/15
153/4 160/22 160/23
165/1 165/2 165/23
188/10 189/1 189/8
209/1 209/8 209/21
210/3 210/10 211/18
234/21 234/25 235/3
235/5 236/21 237/8
243/3 253/17 254/20
255/9 263/1
**beyond [6]** 18/3 23/23
43/12 145/20 175/19
176/13
**biased [9]** 154/5 154/23
155/19 159/8 160/23
163/22 164/1 178/8
183/8
**biases [8]** 148/5 149/4
155/16 155/20 176/14
177/5 179/16 183/9
**bids [1]** 151/10
**big [6]** 74/12 90/4 96/11
153/4 188/8 189/13
**bigger [2]** 31/25 229/4
**bit [21]** 7/24 13/8 50/20
70/15 87/3 104/1 113/17
152/19 155/10 156/4
158/22 167/14 167/15
190/15 194/2 217/16
219/10 222/15 237/15
251/1 266/5
**black [2]** 247/12 259/17
**blind [10]** 152/5 152/7
152/10 152/13 152/20
152/20 180/7 180/8
180/9 180/17
**block [1]** 25/7
**blood [2]** 48/15 49/7
**blow [4]** 156/3 188/13
229/4 259/7
**blowup [1]** 259/14
**blue [6]** 188/8 189/13

189/25 233/14 259/12
262/16
**board [4]** 75/18 117/5
203/13 204/2
**body [2]** 34/16 121/20
**bolstering [2]** 129/25
177/2
**book [4]** 95/7 145/17
145/24 176/25
**border [4]** 209/22
209/23 227/1 244/23
**borehole [1]** 210/22
**boring [2]** 210/1 210/19
**borings [2]** 263/5 263/7
**both [9]** 129/16 144/13
159/11 173/22 177/18
178/8 180/9 230/4 231/9
**bottom [3]** 77/11 194/23
195/4
**bought [1]** 83/13
**Boulevard [2]** 2/11 2/13
**bound [2]** 221/18 223/22
**boundaries [2]** 170/11
192/3
**boundary [5]** 57/21
190/3 191/2 210/10
210/11
**bounding [2]** 208/4
208/5
**bounds [4]** 191/4 191/8
192/6 206/6
**box [1]** 266/25
**brain [3]** 163/10 165/3
165/25
**brand [1]** 196/9
**breadth [2]** 80/24 85/4
**break [21]** 48/11 48/13
48/14 48/14 49/10 97/1
97/4 97/9 97/11 97/18
97/22 97/24 98/1 99/1
105/1 106/8 106/17
106/19 124/3 135/3
251/17
**breaks [1]** 48/22
**briefly [1]** 180/1
**bright [2]** 29/11 120/18
**bright-line [1]** 29/11
**bring [5]** 11/20 111/22
266/2 266/9 266/17
**broad [2]** 21/17 74/9
**broadcasts [1]** 45/21
**broader [1]** 58/19
**broke [2]** 108/17 234/8
**broken [2]** 261/7 261/7
**broker [1]** 172/14
**brothel [1]** 12/19
**brought [1]** 265/8
**Bruce [3]** 185/4 185/7
268/10
**Bryan [1]** 2/5
**building [6]** 222/11
222/18 224/12 224/13
224/23 264/21
**buildup [1]** 50/6
**built [1]** 106/5

**bullet [3]** 129/14 129/15
130/11
**bunch [1]** 102/11
**buy [2]** 42/22 43/1
**buyer [20]** 9/17 9/24
10/2 42/22 43/10 43/10
44/4 44/6 44/9 44/10
44/15 45/8 45/9 45/15
128/16 128/21 129/15
130/7 130/8 130/14
**buyer's [1]** 9/25
**buyers [19]** 9/11 10/11
26/5 26/9 26/10 26/16
27/7 27/16 28/11 28/22
29/13 38/11 40/19 45/1
62/12 81/1 83/9 83/10
124/20

**C**

**calculate [5]** 208/7
236/25 237/1 237/24
249/23
**calculated [1]** 238/18
**calculating [2]** 136/11
255/4
**calculation [54]** 203/13
203/23 204/3 204/6
204/12 204/25 205/9
205/14 205/17 206/2
206/6 206/9 206/21
207/2 207/4 207/22
208/3 208/4 208/5
209/12 213/8 214/11
215/25 217/9 218/10
218/18 219/8 219/12
219/14 219/22 220/1
220/18 220/22 221/18
221/19 221/24 222/20
222/25 223/22 228/13
229/24 230/1 235/23
236/1 236/4 236/23
236/24 237/6 237/9
237/11 238/10 238/11
249/21 262/3
**calculations [12]** 136/12
206/20 208/17 209/15
213/22 213/23 219/24
221/2 222/4 234/2
237/13 253/19
**calibrated [1]** 247/23
**called [24]** 27/12 32/25
33/4 33/4 50/19 89/10
108/2 125/17 132/8
139/24 146/24 161/4
165/8 176/22 194/14
208/4 240/1 240/5
254/23 259/11 260/15
260/18 261/8 261/12
**calling [4]** 44/25 64/2
76/23 234/24
**calls [4]** 4/10 137/25
173/17 192/25
**Caloosahatchee [3]**
261/17 263/22 264/6
**Cambridge [1]** 142/8
**came [16]** 55/25 115/8

# C

**came... [14]** 176/25 192/9 199/10 207/14 207/16 220/18 220/22 220/25 229/25 230/4 230/4 230/6 230/14 240/22

**campus [3]** 68/8 68/23 142/17

**can't [19]** 39/14 39/14 57/13 66/18 77/16 77/19 82/15 101/24 106/11 126/7 136/24 159/7 162/17 179/2 223/24 224/5 249/1 261/19 266/3

**canal [9]** 194/15 194/17 194/18 194/20 194/24 194/25 194/25 195/5 250/20

**canals [3]** 194/11 194/20 195/5

**cancer [80]** 48/4 53/2 53/2 53/9 53/19 53/21 53/21 54/4 56/9 56/14 56/15 56/24 56/25 57/2 57/5 57/7 57/15 57/22 58/4 58/7 58/18 67/20 68/7 68/10 68/22 68/24 99/12 99/14 99/16 99/22 100/12 100/16 110/16 111/1 111/18 112/12 112/15 113/3 114/20 115/1 115/6 115/7 115/10 115/20 161/17 161/18 161/23 162/2 162/5 162/8 162/13 162/15 162/16 162/16 162/17 162/22 162/23 162/24 163/3 163/7 163/7 163/9 163/10 163/12 163/15 163/16 164/1 164/9 164/9 164/9 164/18 164/24 165/21 166/6 167/1 167/2 168/6 168/13 182/24 184/6

**cancer-causing [9]** 53/2 53/2 53/19 53/21 53/21 68/7 68/22 168/6 168/13

**cancers [2]** 165/3 165/25

**cannot [14]** 59/6 59/19 67/6 77/12 82/22 116/19 159/10 198/19 216/7 221/21 231/13 231/20 232/2 266/12

**capable [1]** 39/18

**capture [1]** 85/21

**captures [3]** 43/16 85/24 86/14

**carcinogens [2]** 167/21 167/24

**card [45]** 126/5 126/8 154/5 155/12 155/21 155/22 156/6 156/8 157/8 159/18 159/19 159/21 160/2 160/3

**160/14 160/20 161/4 161/4 161/5 161/6 161/18 161/21 162/1 162/7 162/9 162/20 162/21 164/2 165/4 165/15 165/20 165/20 166/17 166/23 166/25 170/2 170/5 170/6 170/19 178/6 178/6 183/8 201/21 201/25 203/4

**cards [2]** 167/18 171/24

**care [2]** 136/17 241/21

**career [1]** 5/19

**careful [3]** 34/12 34/13 52/9

**carefully [5]** 34/2 52/22 117/20 149/4 152/16

**carries [1]** 53/1

**case [63]** 1/2 21/16 21/22 32/17 47/21 60/4 62/15 64/1 73/11 110/22 119/18 119/20 122/23 123/4 123/5 125/6 127/10 133/24 134/7 136/17 136/20 139/4 142/5 142/23 143/4 143/6 143/19 146/9 146/11 146/13 146/15 146/17 156/6 158/6 159/7 168/9 168/11 172/8 172/10 172/11 173/16 179/13 186/1 186/23 192/8 192/19 193/3 193/18 195/16 196/6 197/2 199/18 201/23 202/21 205/14 223/19 234/4 238/16 247/3 249/15 255/14 255/17 266/8

**cases [4]** 143/5 162/24 164/18 239/7

**categorically [1]** 51/3

**categories [2]** 180/18 180/18

**causal [4]** 165/1 165/23 166/8 166/13

**causality [7]** 28/7 35/5 39/2 40/9 71/14 118/7 124/18

**causation [1]** 123/5

**cause [25]** 8/16 23/7 23/17 23/18 24/8 24/18 24/18 25/13 27/20 31/10 31/16 32/18 34/4 37/20 38/4 38/6 38/8 63/18 91/17 101/14 127/3 133/10 179/17 179/23 180/21

**caused [21]** 27/22 28/8 28/12 28/14 28/15 29/15 32/8 36/21 37/17 40/7 42/7 56/16 57/5 57/7 57/16 57/22 58/4 58/10 58/18 108/4 109/9

**causes [6]** 23/13 32/12

**32/23 32/24 59/1 71/1

**causing [12]** 24/14 42/1 53/2 53/2 53/19 53/21 53/21 56/14 68/7 68/22 168/6 168/13

**cautions [1]** 150/22

**cavities [2]** 228/1 241/23

**cavity [1]** 234/16

**cemented [3]** 234/22 261/12 263/9

**cements [1]** 261/9

**center [4]** 142/7 164/20 174/9 250/15

**central [1]** 203/17

**cert [1]** 73/12

**certain [11]** 39/13 40/6 42/18 54/14 55/15 55/15 57/8 57/22 103/20 160/25 162/25

**certainly [31]** 17/19 51/1 51/5 83/4 89/12 116/16 140/6 140/11 141/15 142/13 144/12 144/19 145/13 146/2 153/21 157/16 158/8 158/8 158/9 162/9 166/11 166/16 166/18 167/14 171/14 173/24 179/2 190/1 208/15 229/13 234/14

**certainty [16]** 51/8 51/16 54/10 57/3 59/2 70/12 70/23 95/2 96/8 196/18 198/10 198/15 198/20 198/24 199/5 199/13

**CERTIFICATE [1]** 268/17

**CERTIFICATION [1]** 1/12

**certified [2]** 43/11 268/19

**certify [1]** 268/19

**cetera [3]** 127/1 129/12 129/12

**chair [1]** 138/5

**chaired [1]** 139/9

**challenged [1]** 173/14

**chance [8]** 80/4 112/3 162/25 197/13 200/8 200/23 200/23 214/9

**change [20]** 8/7 11/9 23/5 47/15 47/16 50/15 63/17 63/19 88/6 88/7 109/3 109/4 132/6 132/8 171/12 176/10 179/23 180/21 212/14 212/23

**changed [6]** 47/18 65/22 112/24 112/24 113/6 176/11

**changes [1]** 212/12

**changing [1]** 66/8

**characteristics [4]** 79/10 104/12 105/17 129/4

**characterize [3]** 189/1 209/20 228/12

**characterized [3]** 186/23 208/20 208/23

**characterizes [2]** 210/12 211/5

**chart [8]** 86/15 87/12 107/8 108/6 111/15 111/18 132/19 134/23

**charting [1]** 84/23

**check [1]** 213/5

**checked [1]** 189/6

**chemical [2]** 14/17 238/4

**chemicals [12]** 168/13 170/10 197/22 197/22 238/12 238/15 238/19 238/25 239/22 241/24 252/17 252/25

**chemist [2]** 159/14 159/25

**Chicago [1]** 2/20

**child [2]** 100/11 100/12

**children [12]** 53/4 53/22 56/15 68/9 68/24 100/9 110/16 111/10 182/22 182/22 182/25 184/5

**choice [7]** 145/10 148/15 148/21 150/19 152/2 176/9 222/6

**choice-based [3]** 145/10 148/21 152/2

**choices [1]** 142/16

**choose [1]** 166/1

**chooses [1]** 178/16

**chose [6]** 150/19 151/5 163/11 183/17 214/6 214/6

**chosen [1]** 179/3

**circumstances [4]** 60/3 102/17 120/14 121/9

**cite [1]** 129/10

**cited [3]** 229/13 239/7 239/19

**cites [2]** 161/14 174/7

**citizens [1]** 164/20

**city [5]** 18/21 19/1 19/3 20/10 142/8

**CIV [1]** 1/2

**claim [6]** 136/25 147/4 186/11 187/22 192/2 206/5

**claims [3]** 134/2 150/23 159/6

**clarification [1]** 135/6

**clarify [1]** 193/13

**class [107]** 1/12 44/16 72/13 73/1 73/4 73/7 73/8 73/12 73/17 73/23 74/23 75/13 76/4 76/13 76/17 76/23 77/7 77/10 77/13 77/15 77/20 78/3 78/4 78/6 80/7 80/12 81/4 82/10 84/12 84/13 85/5 85/18 86/3 87/18 88/9 88/11 88/23 93/4 102/10 105/13 105/14 107/14 108/22 109/14

**115/11 115/23 123/16 127/24 134/25 136/2 181/12 186/3 186/8 186/12 186/19 187/8 187/10 188/2 188/3 189/2 189/11 190/4 190/11 190/15 190/25 191/3 191/4 191/8 192/3 193/4 194/1 194/2 194/5 194/7 194/11 194/18 195/4 195/4 195/6 195/10 196/9 196/14 201/17 202/12 203/1 208/1 208/22 209/23 210/12 211/6 211/19 217/11 223/24 231/22 232/3 232/15 232/20 233/5 234/12 235/6 236/22 237/9 244/12 247/10

**class-wide [11]** 73/4 73/8 76/17 77/7 77/13 78/3 78/6 80/12 82/10 105/13 123/16

**cleanup [1]** 168/12

**clear [7]** 29/11 58/23 116/19 120/17 135/25 181/21 215/6

**clearly [6]** 55/10 57/20 58/3 102/19 180/11 220/14

**Clematis [1]** 1/19

**clients [2]** 181/8 181/10

**close [5]** 4/17 48/10 173/19 178/18 221/9

**close-up [1]** 221/9

**closely [1]** 245/21

**closer [3]** 138/20 139/16 185/23

**closest [2]** 188/20 247/22

**clotting [2]** 48/15 49/7

**cluster [38]** 48/4 53/9 67/20 101/18 111/18 112/12 112/15 113/3 114/21 115/1 115/6 115/8 115/10 115/21 161/18 161/23 162/2 162/6 162/8 162/15 162/16 162/22 162/23 163/3 163/7 163/8 163/9 163/12 163/15 163/16 164/9 164/9 164/9 164/24 165/21 166/6 167/1 167/2

**clusters [3]** 162/14 264/17 265/4

**coarse [1]** 225/15

**coast [3]** 178/20 178/23 240/14

**coastal [1]** 178/18

**coded [1]** 180/16

**coders [1]** 180/17

**codes [1]** 178/17

**coincide [1]** 14/3

# C

**colleague [2]** 145/17 145/23
**colleagues [2]** 145/13 145/14
**collect [4]** 83/10 117/2 117/15 246/11
**collected [1]** 231/1
**collecting [3]** 117/18 117/25 120/1
**collection [1]** 187/3
**colloidal [9]** 240/1 240/4 240/11 240/19 241/1 241/4 241/6 241/13 241/15
**colloids [3]** 240/5 240/7 241/21
**colloquy [1]** 113/18
**comes [6]** 15/10 28/7 43/9 52/12 54/11 263/20
**comfortable [4]** 101/8 101/10 199/6 231/25
**comment [8]** 65/20 66/8 67/3 67/23 73/15 143/18 177/15 177/22
**commenting [3]** 116/1 133/13 133/16
**common [57]** 8/11 8/25 15/24 16/9 16/11 16/17 16/23 16/23 17/1 17/11 17/23 17/25 21/24 22/4 22/5 22/19 35/18 38/16 39/4 39/20 40/10 40/15 41/2 41/3 41/6 41/16 73/4 73/17 73/18 74/7 75/14 75/18 80/12 80/18 82/9 96/19 97/5 97/7 103/4 103/11 103/24 104/17 105/8 105/17 105/18 105/19 110/13 110/17 111/7 111/12 116/5 116/16 116/22 117/14 123/15 147/17 245/2
**commonality [11]** 73/8 73/22 74/18 75/1 76/3 81/3 81/11 81/14 81/22 81/24 104/14
**commonly [2]** 21/16 74/14
**communicate [3]** 8/11 266/11 266/14
**communicating [1]** 100/11
**communication [1]** 24/25
**communities [2]** 15/25 16/10
**community [12]** 17/15 17/16 18/4 18/13 21/14 21/15 45/16 100/15 156/10 156/12 156/13 172/23
**companies [1]** 147/22
**company [1]** 264/23
**comparable [2]** 129/2 211/14
**compare [1]** 123/22
**compared [7]** 19/12 23/22 25/10 107/14 109/10 123/20 242/23
**comparison [2]** 122/22 123/20
**complaint [1]** 181/10
**complete [3]** 131/12 161/10 243/24
**completed [1]** 142/4
**completely [3]** 167/15 199/17 223/17
**complex [1]** 87/2
**complicated [1]** 155/10
**component [1]** 237/23
**components [1]** 238/15
**composite [1]** 246/14
**compound [2]** 16/16 134/20
**compulsion [1]** 43/1
**compute [2]** 255/20 262/1
**computer [1]** 266/22
**computes [1]** 152/1
**concealed [6]** 59/6 59/9 59/11 59/14 67/14 67/18
**concentration [4]** 39/13 187/13 187/14 251/9
**concentrations [11]** 39/10 54/14 55/9 55/10 187/15 191/24 216/6 218/5 237/24 251/8 251/10
**concept [7]** 30/17 30/17 102/14 102/24 103/3 191/16 191/23
**concern [12]** 10/3 10/3 37/16 58/2 69/24 86/15 99/16 99/21 163/24 163/25 170/13 170/17
**concerned [9]** 9/24 9/25 170/9 197/21 208/7 234/14 235/8 245/9 253/12
**concerns [10]** 10/7 21/24 45/17 86/17 86/18 99/22 112/10 112/11 166/5 166/7
**conclude [2]** 25/13 134/24
**concluded [4]** 81/11 121/1 199/11 206/2
**concludes [1]** 112/13
**concluding [1]** 77/2
**conclusion [9]** 68/15 81/16 81/17 81/17 93/9 110/12 182/17 192/25 263/23
**conclusions [5]** 46/11 57/13 81/15 130/19 133/7
**condition [23]** 9/12 9/18 9/25 10/13 10/19 11/10 15/6 52/3 64/4 64/4 66/1 66/2 92/21 92/23 93/1 93/2 93/3 94/21 96/3 104/20 105/9 106/1 106/1
**conditions [13]** 38/5 42/18 92/20 103/7 103/9 103/14 103/15 103/21 103/22 104/15 104/19 204/24 242/18
**conduct [13]** 26/24 34/6 67/15 100/13 103/22 109/12 145/25 146/2 147/9 207/1 228/7 228/10 230/24
**conducted [20]** 59/22 65/12 65/15 72/1 72/10 81/10 81/12 87/16 94/25 110/1 130/25 132/17 147/2 147/4 147/12 147/19 152/4 174/4 175/4 184/3
**conducting [4]** 31/16 102/16 120/13 121/18
**conductivities [10]** 206/24 215/3 216/18 221/24 224/4 228/4 258/14 260/8 260/8 264/8
**conductivity [92]** 194/23 204/7 204/22 205/6 205/19 206/12 206/13 206/17 206/22 207/4 207/9 207/12 207/13 207/20 207/24 208/23 209/5 209/8 209/11 209/16 209/20 209/21 210/13 210/13 210/20 211/4 211/7 211/17 211/21 212/3 212/23 212/24 213/8 214/15 214/16 214/19 215/13 215/14 215/24 216/8 216/9 216/13 216/23 217/8 219/19 220/24 221/17 222/9 222/17 222/20 223/9 223/21 224/11 224/12 227/2 227/4 227/7 227/8 227/16 227/24 227/25 228/3 228/11 228/14 234/9 234/15 234/19 235/5 248/10 254/24 256/4 256/7 256/10 256/12 256/23 257/13 258/1 258/7 258/11 258/17 258/22 259/2 259/4 260/2 261/21 261/25 262/2 264/12 265/18
**confidence [1]** 200/11
**confident [2]** 231/25 232/1
**confined [1]** 54/15
**confirm [1]** 202/19
**confirmed [3]** 240/19 241/1 263/14
**confirming [1]** 52/7
**conformance [1]** 174/4
**confound [1]** 228/8
**confused [3]** 65/4 90/25 135/24
**confusion [1]** 108/20
**conjoint [6]** 145/16 146/8 146/10 176/22 176/23 176/25
**connect [1]** 240/5
**connectedness [2]** 212/6 214/22
**connection [3]** 39/5 57/13 186/15
**connection's [1]** 57/14
**connotation [1]** 27/1
**consequence [3]** 12/16 32/12 37/24
**consider [12]** 69/6 75/25 130/12 132/25 140/1 141/17 155/7 178/25 195/5 207/12 242/15 255/21
**consideration [7]** 37/3 37/4 40/9 86/9 86/12 194/12 195/7
**considerations [1]** 194/10
**considered [11]** 67/13 67/17 67/22 68/2 68/7 68/13 68/14 68/15 69/11 91/4 92/2
**considering [3]** 85/9 92/16 242/9
**considers [1]** 92/3
**consistent [4]** 197/20 204/19 249/21 262/10
**consists [1]** 261/7
**constant [6]** 206/16 212/4 219/9 219/21 227/7 256/16
**constituent [1]** 39/11
**construct [1]** 124/3
**constructed [5]** 34/3 35/3 119/20 125/7 257/2
**consultant [2]** 263/14 263/14
**consultants [5]** 222/7 231/1 246/10 264/2 264/3
**consulted [1]** 81/7
**consumer [10]** 39/18 140/3 140/14 144/3 163/17 170/15 171/3 171/7 171/11 175/10
**consumers [5]** 161/11 164/4 164/7 176/17 176/19
**Cont.'d [1]** 3/1
**contains [3]** 86/19 161/5 161/6
**contaminant [20]** 38/4 38/12 45/8 54/12 186/7 186/14 186/17 203/25 206/8 216/5 217/6 218/8 228/8 242/11 242/14
**contaminants [79]** 35/11 35/19 36/4 36/9 39/7 50/15 53/1 53/2 56/13 56/14 56/16 57/5 57/8 57/16 58/11 59/24 65/14 67/14 67/18 68/8 68/11 68/22 68/25 99/17 105/18 105/20 160/1 165/2 165/24 186/8 186/11 191/24 191/25 193/15 195/3 195/8 198/5 198/11 198/13 198/20 199/10 200/2 200/5 200/16 201/2 201/11 201/18 203/19 208/13 208/15 212/11 214/7 214/9 215/4 215/9 216/10 219/18 237/12 237/20 238/2 238/7 243/6 243/11 245/12 248/25 249/23 250/1 250/21 250/25 251/12 252/7 252/15 252/22 254/3 255/23 261/1
**contaminated [4]** 10/2 19/10 19/15 19/16
**contamination [152]** 8/20 8/23 9/2 9/3 9/6 9/25 10/1 10/17 10/20 11/9 13/2 13/6 13/16 13/22 14/16 15/7 15/7 15/19 15/20 17/1 17/7 17/12 18/3 18/13 19/1 19/3 19/12 19/18 19/20 20/10 20/22 20/25 21/1 21/4 21/5 22/10 22/12 22/18 22/21 23/19 24/8 24/17 26/1 28/17 31/8 32/24 33/21 35/10 35/12 35/16 35/22 37/9 38/18 38/25 39/24 40/8 40/17 41/11 44/5 44/6 46/5 46/18 47/8 50/1 50/9 51/11 51/17 52/13 52/23 55/18 56/1 56/8 57/22 58/4 58/18 61/5 61/10 61/21 61/24 62/1 62/2 62/9 63/6 63/8 63/23 64/8 64/21 69/13 71/19 72/7 72/20 75/5 76/13 77/15 78/1 78/11 78/23 80/1 80/16 80/19 100/13 100/16 103/8 104/22 105/21 106/1 110/20 111/2 111/12 112/18 112/20 112/21 113/5 113/23 114/3 114/12 114/14 114/15 114/21 115/1 115/9 115/11 115/21 118/2 122/9 122/15 123/10 124/10 130/15 164/18 172/6 182/23 186/23 191/12

**C**

**contamination... [18]**
192/15 192/21 193/5
193/6 193/10 193/13
193/14 193/21 194/5
217/2 228/7 235/11
242/22 244/24 244/25
245/11 253/10 261/18
**contention [1]** 107/23
**context [12]** 11/17 27/22
35/14 126/2 155/11
157/6 157/19 157/22
161/8 161/9 200/21
201/23
**contextual [1]** 127/7
**contingent [38]** 120/10
120/12 120/16 120/25
121/6 121/13 121/14
121/15 121/19 121/25
122/2 122/4 125/9
125/15 125/18 125/20
145/4 145/7 145/8
145/11 145/14 145/22
145/25 146/4 146/5
146/10 146/16 146/19
148/2 148/4 149/2 149/5
160/6 161/2 161/7
161/12 176/5 176/10
**continue [2]** 183/18
215/1
**continued [1]** 241/15
**continues [2]** 37/13 90/2
**continuity [7]** 253/17
260/24 262/5 262/10
262/12 262/18 263/1
**continuous [2]** 212/9
262/19
**continuously [1]** 187/10
**contours [1]** 258/10
**contract [2]** 110/16
147/21
**contracted [2]** 146/24
147/11
**contracting [1]** 182/24
**contradict [1]** 85/25
**contrary [1]** 69/20
**control [2]** 85/19 164/21
**controls [1]** 124/5
**conundrum [1]** 233/24
**convenience [2]** 185/17
205/15
**conversation [2]** 87/7
196/16
**copies [2]** 266/19 267/4
**copy [6]** 111/21 128/4
128/10 185/17 225/25
266/21
**coquina [1]** 261/12
**Corbett [33]** 170/12
186/3 186/18 189/17
189/20 189/21 190/22
207/25 208/22 209/9
210/3 211/5 211/18
228/11 228/14 235/4
235/5 235/9 235/13
235/14 235/16 244/11

244/13 245/16 247/17
261/16 263/6 264/9
264/12 264/18 265/4
265/5 265/19
**core [1]** 152/22
**corner [2]** 209/4 259/2
**corporation [2]** 1/7
175/4
**correct [316]**
**correctly [4]** 70/19
137/6 182/13 182/14
**correlated [1]** 51/6
**correlation [1]** 260/21
**correlations [1]** 212/5
**corroborating [1]**
230/12
**COTROMANO [19]**
1/3 85/18 86/3 87/18
88/8 88/23 90/20 91/10
91/12 91/21 91/23 92/10
95/9 95/12 95/17 107/14
108/22 109/14 123/5
**couldn't [6]** 75/19 82/25
91/16 108/24 123/15
231/16
**counsel [2]** 113/12
181/14
**counting [1]** 137/5
**country [8]** 87/19 88/11
88/23 90/7 95/14 107/15
108/23 109/15
**county [5]** 92/3 241/21
248/7 256/24 257/22
**couple [5]** 6/1 83/13
121/13 197/17 232/10
**course [10]** 55/20
122/18 122/20 154/17
162/13 167/24 175/1
226/9 237/10 251/12
**courses [5]** 139/14 144/2
144/4 144/11 144/12
**court [29]** 1/1 1/19 4/1
4/12 67/23 68/16 70/20
71/20 82/1 82/4 128/10
135/4 135/7 135/9
135/12 178/2 181/3
202/7 221/9 224/22
229/8 229/22 247/5
254/19 256/6 257/15
258/5 259/10 267/5
**Court's [1]** 184/13
**courtroom [4]** 48/6
111/17 121/22 134/9
**cover [1]** 259/21
**covered [1]** 102/4
**covers [2]** 191/13 248/6
**CPE [1]** 1/18
**Craig [1]** 2/13
**crazy [1]** 131/14
**created [7]** 204/2 246/15
246/16 247/2 248/2
248/4 248/5
**Creed [1]** 2/1
**crime [3]** 12/11 12/12
84/15
**crisis [2]** 90/6 132/21

**criter...[1]** 173/21
177/19 177/19
**criticism [6]** 150/15
164/4 175/25 176/3
177/12 177/13
**criticisms [9]** 149/13
150/3 150/5 156/22
156/24 156/25 161/17
164/2 168/1
**critiqued [1]** 167/7
**critiques [1]** 166/21
**cross [17]** 4/25 133/15
133/15 134/10 137/18
138/12 179/22 180/20
185/11 194/19 202/6
252/5 255/5 261/23
268/4 268/7 268/11
**cross-examination [8]**
4/25 133/15 138/12
179/22 180/20 185/11
202/6 261/23
**cross-examined [2]**
133/15 134/10
**cross-sectional [1]** 255/5
**CRR [2]** 1/18 268/25
**current [3]** 151/14
153/17 153/25
**currently [1]** 5/21
**cut [2]** 153/8 160/8
**cuts [1]** 194/18
**cutting [2]** 227/11 242/1
**CV [13]** 149/8 149/14
173/16 175/16 176/1
176/7 176/14 176/23
176/25 177/6 178/3
178/8 179/24
**cyanide [8]** 159/11
168/7 168/14 169/21
201/25 202/11 202/25
203/8
**cycle [5]** 50/19 50/19
58/22 60/10 60/10

**D**

**damage [31]** 6/20 6/22
6/24 7/6 7/19 7/24 8/1
8/4 8/9 28/1 28/1 28/2
29/18 29/19 71/21 72/8
72/22 73/19 75/9 75/9
76/1 76/1 76/5 76/14
76/15 76/16 76/25 78/15
78/16 79/24 80/20
**damaged [1]** 7/16
**damages [5]** 76/17 76/18
76/24 77/4 77/9
**danger [1]** 52/7
**dangerous [1]** 53/1
**Daniel [4]** 2/17 185/4
185/7 268/10
**Darcy [37]** 203/13
203/23 204/3 204/6
204/25 205/8 205/14
205/17 206/20 207/2
207/4 213/8 215/25
217/9 218/10 218/18
219/8 219/12 219/13

220/18 220/22 221/19
221/24 222/20 223/22
228/12 229/24 235/18
235/19 235/23 235/23
236/1 236/23 236/23
237/19 238/10 241/25
**Darcy's [12]** 217/21
249/21 254/16 254/19
254/20 255/1 255/11
255/14 255/17 255/19
256/1 256/10
**data [75]** 11/12 11/16
14/7 14/8 14/8 14/24
18/7 21/12 29/4 29/5
29/8 31/11 84/3 94/12
102/13 116/20 119/21
122/21 123/18 152/9
171/25 172/4 180/16
180/17 187/3 192/17
193/9 204/19 207/7
208/21 209/14 210/9
211/10 211/11 211/12
215/15 220/21 220/25
222/1 222/15 222/23
223/11 223/13 223/25
224/5 224/19 230/3
230/10 230/12 230/13
230/20 230/25 232/9
234/1 234/5 237/16
243/17 244/8 246/8
246/11 247/19 247/22
248/8 248/21 250/10
250/11 253/19 253/24
254/1 257/12 257/17
257/23 257/25 258/1
259/3
**database [5]** 109/8
243/18 243/21 243/23
244/9
**date [27]** 19/22 64/3
64/5 64/6 64/22 64/24
65/1 65/2 65/8 65/17
65/25 66/2 66/4 66/7
66/7 66/8 66/10 66/17
67/8 67/12 88/4 88/6
91/23 92/7 92/8 94/3
253/1
**Dated [1]** 268/22
**dates [18]** 62/16 64/2
64/24 65/3 65/5 65/5
65/21 66/18 66/22 66/23
67/7 67/10 88/5 91/15
91/15 91/16 108/2 108/3
**Daubert [1]** 175/13
**deal [2]** 10/5 176/16
**dealing [1]** 241/24
**deals [1]** 88/3
**dealt [1]** 7/3
**death [2]** 39/23 40/1
**debated [1]** 196/18
**debating [1]** 201/8
**decide [2]** 64/10 81/25
**decided [1]** 6/2
**deciding [1]** 129/24
**decipher [1]** 191/25
**decision [7]** 125/13

161/11 162/10 163/13
163/18 163/19 183/11
**decisions [5]** 142/9
142/13 142/15 173/24
175/5
**declared [1]** 161/23
163/6 163/7 163/9
**decline [1]** 94/4
**declining [1]** 129/3
**decrease [3]** 51/2 102/25
220/7
**decreases [5]** 51/4 52/8
53/5 58/13 58/13
**deeper [1]** 245/21
**defendant's [3]** 4/15
203/10 255/17
**defendants [4]** 1/8 2/16
3/2 249/22
**Defendants' [1]** 138/3
**defense [1]** 136/13
**defer [1]** 55/4
**deficiencies [1]** 102/8
**definable [1]** 54/17
**define [9]** 22/16 43/17
52/22 142/12 186/25
187/1 187/1 187/3 256/6
**defined [16]** 9/8 10/17
13/3 13/13 27/16 52/14
55/10 57/21 58/3 73/23
74/20 76/21 80/14 101/6
102/18 102/19
**defines [1]** 113/24
**definitely [1]** 174/18
**definition [12]** 10/14
13/7 13/11 13/24 33/8
43/2 43/4 43/15 80/17
128/15 129/10 130/8
**definitions [2]** 8/18 43/5
**defunct [1]** 93/2
**degree [9]** 95/2 96/7
196/18 198/10 198/14
198/20 198/24 199/5
199/13
**deliberately [2]** 46/25
59/11
**delineate [2]** 52/23 66/1
**delineated [2]** 54/17
193/20
**demand [2]** 152/6 152/8
152/13 152/19
**demolished [1]** 55/14
**demonstrate [2]** 134/13
261/22
**demonstrated [1]** 19/2
**demonstrates [1]** 240/10
**demonstrative [7]**
201/19 201/21 203/10
203/14 233/4 257/4
257/5
**demystify [1]** 176/7
**den [1]** 12/19
**Denney [1]** 2/10
**Department [6]** 48/1
53/8 115/8 142/7 161/24
190/6
**depend [4]** 79/7 79/24

**D**

**depend... [2]** 194/22 194/24
**depending [4]** 84/13 84/17 204/13 227/19
**depends [8]** 16/3 63/9 84/10 116/25 237/22 239/3 239/19 244/25
**depict [1]** 85/16
**depicted [2]** 85/22 86/8
**depo [1]** 171/17
**deposit [2]** 261/7 261/8
**deposition [22]** 5/17 158/13 171/16 185/18 193/17 196/15 196/19 196/24 197/10 197/16 198/18 199/4 199/23 200/13 201/4 201/10 239/9 241/7 241/16 245/24 252/11 253/1
**depositional [2]** 209/25 262/12
**depositions [2]** 195/18 195/24
**depth [1]** 246/12
**depths [3]** 212/21 212/21 229/18
**derive [1]** 133/7
**derived [1]** 252/24
**describe [8]** 58/17 69/2 133/9 163/22 203/23 210/2 234/20 238/19
**described [14]** 66/13 66/14 68/20 69/4 69/17 81/8 112/11 112/17 120/9 123/2 123/19 124/2 248/22 261/22
**describes [5]** 156/9 156/12 162/22 162/23 234/22
**describing [2]** 101/19 163/21
**description [4]** 58/22 156/13 161/10 170/25
**descriptions [3]** 158/19 263/4 263/5
**descriptors [1]** 263/10
**design [3]** 142/23 142/25 147/21
**designed [3]** 209/13 237/10 260/1
**designing [4]** 141/4 141/9 141/10 141/12
**despite [3]** 57/12 213/7 244/5
**detail [5]** 123/15 126/6 146/22 179/21 210/22
**detailed [2]** 178/7 249/1
**details [1]** 45/9
**detected [1]** 231/16
**detection [7]** 189/16 189/19 189/22 189/23 231/20 233/23 235/2
**detections [12]** 187/21 188/3 190/1 190/8 231/10 231/12 231/13

232/7 232/10 232/13 233/5 233/10
**detects [1]** 254/8
**determ [1]** 64/9
**determination [34]** 25/20 28/12 28/13 31/18 33/18 34/1 37/23 38/16 40/9 41/8 45/4 45/15 57/15 63/4 65/1 65/7 65/15 66/19 67/8 71/23 75/15 77/4 77/6 77/9 77/23 78/20 79/23 81/5 81/13 95/21 104/16 122/6 122/12 123/7
**determinations [3]** 26/23 46/1 46/18
**determine [49]** 7/15 17/23 22/10 22/13 23/16 23/17 24/13 28/11 28/14 31/3 31/20 32/3 32/7 33/20 35/2 42/1 57/2 59/23 63/22 63/25 65/13 66/3 66/16 66/23 66/23 72/11 74/19 75/2 78/3 78/8 84/20 101/25 103/23 115/18 118/14 118/23 119/4 127/3 127/6 131/1 132/3 151/6 159/17 159/20 160/13 170/19 184/3 191/25 257/12
**determined [14]** 31/3 65/17 66/7 66/7 76/10 77/3 88/20 103/5 103/12 165/23 166/7 228/15 228/16 253/9
**determines [1]** 47/14
**determining [7]** 27/25 28/2 31/6 73/25 77/7 142/10 250/21
**developed [9]** 50/21 52/6 56/19 88/12 119/20 122/17 209/3 257/2 261/10
**developer [1]** 142/5
**developing [2]** 117/21 142/6
**development [1]** 141/8
**develops [1]** 56/10
**diagnosed [1]** 100/10
**diagnosis [2]** 99/9 99/14
**Dial [1]** 3/3
**Diamond [7]** 154/8 174/7 174/12 174/13 174/17 174/22 175/7
**Diamond's [1]** 177/19
**dictated [2]** 191/5 191/9
**dictionary [1]** 129/10
**didn't [53]** 16/6 20/1 24/4 40/10 46/21 46/23 48/3 56/24 65/21 65/22 65/24 66/20 66/23 77/16 86/11 90/18 93/24 94/7 109/16 110/3 115/6 115/7 115/22 124/8 132/14 148/22 149/25

150/20 159/5 159/20 165/12 192/10 208/16 210/8 215/12 215/18 222/11 224/2 224/2 224/7 228/10 228/14 230/7 230/11 230/23 235/12 235/15 240/18 241/3 246/23 261/2 265/6 265/8
**died [2]** 68/10 68/24
**differ [3]** 42/17 80/25 84/17
**differed [1]** 91/24
**difference [29]** 36/24 38/13 39/22 65/21 65/22 65/24 66/9 67/12 86/4 86/6 86/7 90/21 93/22 115/15 131/25 132/3 132/9 132/9 132/10 132/11 132/15 133/11 134/15 134/15 153/4 160/22 160/23 189/1 217/19
**differences [10]** 15/23 85/9 87/5 87/6 94/19 123/24 123/25 124/6 243/2 243/5
**different [52]** 6/24 8/4 9/5 21/17 23/12 30/5 32/12 42/9 47/16 71/2 71/2 80/24 80/25 80/25 81/1 81/2 81/15 81/17 83/25 83/25 84/1 84/25 85/12 95/8 102/5 103/19 104/6 107/9 115/12 116/2 116/2 118/4 123/24 127/24 131/16 133/5 142/22 150/2 151/4 152/20 206/23 217/3 217/4 220/12 229/18 238/19 242/21 242/25 243/1 249/18 250/4 265/25
**differential [1]** 132/22
**differently [1]** 90/20
**differs [1]** 84/12
**difficult [4]** 40/17 110/24 154/16 223/17
**difficulty [1]** 24/21
**diligence [1]** 83/11
**dimensional [1]** 249/19
**diminish [1]** 25/4
**diminished [10]** 40/20 41/25 42/1 42/4 42/5 42/7 42/7 71/10 71/11 71/13
**diminution [84]** 6/24 6/25 7/12 7/18 7/24 8/2 8/6 8/16 9/1 19/16 27/20 27/21 27/22 28/5 28/6 28/7 28/8 28/14 29/7 29/10 29/14 29/24 30/1 30/7 30/19 31/1 31/2 31/3 34/4 36/20 36/21 37/4 37/5 37/7 37/8 37/16 37/17 37/23 37/24

38/1 38/3 40/6 40/7 52/19 59/4 63/19 71/1 71/2 71/5 71/24 72/1 72/12 73/1 73/4 75/15 75/19 103/4 103/11 103/24 104/17 116/15 116/20 117/1 117/24 118/4 123/5 123/18 124/23 124/4 127/3 127/6 127/13 127/23 131/4 131/5 133/8 134/24 136/2 149/15 149/17 149/24 179/7 183/14 183/25
**Dioxane [28]** 187/13 187/14 187/22 189/16 189/23 190/2 190/8 193/15 195/12 201/16 231/4 231/17 231/20 232/4 232/11 232/14 232/20 233/5 233/23 234/4 234/6 234/7 235/2 235/12 238/4 252/7 252/14 264/5
**dioxin [1]** 252/7
**dioxins [18]** 193/16 195/12 201/16 239/1 239/4 239/11 239/17 240/4 240/20 241/2 243/7 243/15 243/19 244/1 244/6 244/10 245/1 252/14
**direct [61]** 4/12 54/24 70/7 116/9 116/11 128/4 128/25 134/7 148/19 149/20 158/21 172/8 173/25 174/3 178/1 178/7 180/3 184/8 184/9 185/18 186/15 186/20 186/24 187/6 187/19 188/13 188/15 188/23 188/25 189/9 192/4 195/15 196/10 202/7 203/18 206/21 207/3 207/5 207/23 211/4 211/17 213/24 214/1 218/19 219/23 220/2 221/7 221/19 222/24 224/25 229/7 237/7 238/18 238/22 238/23 240/1 240/10 245/6 248/14 249/4 249/16
**directed [1]** 89/17
**direction [23]** 52/6 57/3 212/10 226/14 228/18 228/20 228/24 229/12 229/14 235/20 236/2 236/4 236/10 236/11 236/12 237/1 237/2 237/17 243/1 245/20 245/22 246/12 260/3
**directions [3]** 229/16 248/1 248/23
**directly [5]** 9/18 152/23 153/3 220/18 220/22
**disaggregated [1]** 84/19

**disagree [5]** 29/2 80/6 213/4 213/6 215/23
**disagreements [1]** 76/22
**disclose [2]** 200/14 218/18
**disclosed [3]** 201/1 213/24 249/15
**disclosure [2]** 26/6 26/19
**discovered [4]** 51/10 51/11 70/7 70/8
**discovery [11]** 61/8 61/10 61/12 61/14 61/23 61/25 62/1 62/9 62/20 62/21 62/22
**discrepancy [1]** 108/21
**discuss [10]** 17/24 106/18 177/8 201/16 205/13 225/1 225/9 238/18 266/12 266/15
**discussed [5]** 105/21 105/23 132/21 179/22 180/20
**discusses [6]** 44/3 201/25 226/8 226/12 226/13 240/11
**discussing [5]** 39/6 41/17 127/25 241/13 243/6
**discussion [3]** 93/1 129/20 131/25
**Disease [1]** 164/20
**disparity [3]** 107/16 108/14 108/25
**dispersion [1]** 238/1
**dispute [1]** 189/8
**disseminated [2]** 83/25 108/3
**dissemination [2]** 62/17 99/15
**dissertation [2]** 34/9 50/25
**distance [9]** 91/20 188/10 189/1 212/4 217/5 237/12 243/1 259/22 262/5
**distances [1]** 188/19
**distinction [2]** 27/25 78/7
**distinguish [5]** 27/6 114/23 127/5 128/22 130/14
**distinguished [3]** 114/20 114/25 115/20
**distress [1]** 132/24
**distressed [1]** 91/3
**distribution [1]** 211/22
**district [9]** 1/1 1/1 1/14 84/14 209/3 248/3 257/3 259/1 263/7
**districts [1]** 174/16
**diverged [2]** 95/3 95/4
**divergence [3]** 94/25 107/13 134/16
**diverse [4]** 75/15 105/1 106/9 106/10

**D**

**diversity [6]** 74/6 75/12
80/12 80/24 82/13 82/15
**divide [2]** 245/18 246/5
**divided [1]** 204/7
**docked [1]** 137/3
**docket [4]** 174/1 175/14
187/18 225/24
**doctor [24]** 51/1 97/18
98/16 99/6 106/18 107/3
107/8 136/8 155/25
164/11 184/12 184/15
197/15 200/1 213/18
227/10 227/13 241/9
264/17 265/2 266/2
266/9 266/17 267/2
**doctors [2]** 98/12 98/15
**document [3]** 229/14
259/10 263/24
**documented [3]** 37/1
165/3 165/24
**documents [3]** 29/11
37/1 48/2
**dodging [1]** 64/18
**does [56]** 13/20 25/16
30/16 30/18 34/23 35/10
36/8 39/6 39/21 39/22
42/15 43/10 44/4 45/22
60/24 63/17 85/21 85/24
86/4 89/4 89/18 92/10
94/7 104/3 111/7 111/12
114/10 127/9 130/6
132/2 133/9 134/12
134/12 134/13 134/22
145/22 162/1 162/1
179/19 179/22 180/20
194/19 199/20 202/8
210/17 212/4 236/3
237/14 256/10 257/18
259/25 260/23 261/20
261/22 262/15 266/19
**doesn't [49]** 11/9 12/5
17/10 39/22 44/9 47/17
51/21 59/8 59/12 59/12
59/13 59/15 59/17 59/17
59/18 59/21 63/11 66/8
79/7 79/18 79/23 86/21
87/9 90/3 93/9 94/23
110/13 110/17 117/23
130/5 131/6 138/5 150/1
167/3 167/5 181/3
202/17 208/14 212/6
226/14 235/20 236/1
237/14 237/19 238/25
244/24 246/2 249/9
257/18
**DOH [2]** 48/1 62/16
**doing [24]** 19/14 25/3
45/2 64/5 64/20 83/7
84/3 84/11 84/23 102/20
102/22 104/4 105/11
118/8 123/4 127/5
137/18 139/20 153/23
155/11 201/4 210/22
215/10 252/3
**dollar [8]** 142/9 151/11

151/12 151/15 151/22
151/25 152/2 176/10
**dollars [1]** 38/12
**don't [175]** 4/7 6/7 6/8
6/10 6/12 10/24 12/9
14/17 14/22 14/24 16/1
16/3 17/16 18/9 28/24
29/19 30/14 30/19 31/5
34/14 34/22 35/24 35/25
40/4 44/1 44/19 46/13
47/4 47/10 52/14 52/15
55/7 56/3 56/3 60/4 60/6
62/2 62/3 62/3 66/7
66/21 66/24 66/24 69/1
69/21 70/7 79/2 80/1
80/6 80/21 83/10 83/14
85/24 86/1 86/2 86/9
86/12 87/10 90/13 90/13
90/16 92/4 92/24 94/22
97/20 98/3 98/11 98/14
99/10 100/6 101/15
101/16 106/16 106/18
108/11 109/21 113/7
115/5 118/11 119/2
119/9 120/4 122/3 128/6
128/20 135/22 135/24
136/11 136/17 138/17
142/12 143/15 144/2
144/16 144/20 144/22
145/4 150/17 153/8
153/21 156/4 159/12
159/13 159/14 160/2
163/21 166/9 168/24
169/12 171/9 171/14
176/12 178/22 178/23
183/6 183/23 186/16
189/3 189/23 190/1
190/5 190/10 193/6
193/8 195/17 196/11
196/11 197/10 198/17
199/22 201/7 203/3
207/18 208/19 209/19
210/4 211/13 213/2
213/5 213/5 215/23
216/16 218/4 218/6
221/20 222/6 227/15
228/22 229/15 232/18
233/9 233/20 234/5
235/2 235/4 237/12
237/13 238/17 240/13
240/16 240/22 241/16
241/21 243/23 244/2
244/15 245/1 245/8
246/19 250/4 251/14
258/24 265/12 266/14
266/23
**don't -- I [1]** 90/13
**done [91]** 5/10 17/19
19/22 27/8 31/17 34/2
34/8 34/9 34/10 34/12
34/24 36/12 41/1 51/22
51/23 61/23 62/6 62/6
62/8 66/13 70/9 71/8
72/16 72/25 73/2 73/6
73/6 73/9 73/14 73/15
77/12 95/5 101/25 102/2

102/9 103/21
104/13 106/11 106/13
112/25 115/5 116/2
117/19 121/11 123/10
123/11 123/15 127/9
130/20 134/3 134/24
135/18 135/23 136/1
141/18 141/22 141/23
141/25 142/1 143/18
146/11 148/4 149/2
160/16 164/24 172/8
172/13 173/18 177/16
177/17 180/5 180/19
184/6 184/7 192/19
193/3 200/12 201/6
204/2 220/15 221/3
233/25 234/18 242/5
242/6 245/2 246/24
256/24 259/15 262/20
**dormitories [4]** 141/9
142/9 142/11 142/19
**dormitory [1]** 142/4
**dot [3]** 247/12 262/16
262/17
**dots [1]** 247/20
**doubt [4]** 183/23 192/20
193/4 193/22
**down [48]** 23/11 23/12
23/22 23/25 32/19 50/10
50/24 51/20 51/21 53/24
56/19 59/2 70/24 95/18
96/17 105/2 106/8
126/16 129/9 129/14
138/18 156/20 158/3
171/5 186/19 187/4
187/10 188/2 189/18
190/3 201/17 207/25
208/21 208/22 209/10
211/6 212/20 217/11
223/23 227/1 228/23
234/9 242/10 245/11
259/16 260/3 261/18
267/2
**downstream [1]** 187/4
**Dr [10]** 135/17 150/3
174/12 175/15 175/23
176/1 177/8 177/25
180/24 230/20
**Dr. [124]** 5/2 48/7 49/4
49/22 50/6 65/3 65/20
66/20 67/7 68/10 75/6
71/6 71/25 72/15 73/2
77/1 81/12 81/23 82/9
85/17 85/23 89/10 91/7
93/1 105/4 109/7 112/7
112/8 112/13 115/5
116/1 120/6 121/23
125/23 126/7 127/20
132/2 133/9 133/14
133/14 133/17 135/23
135/15 135/22 143/1
149/14 149/23 151/2
151/9 173/25 174/3
178/3 180/1 180/4 184/1
189/5 200/15 211/22
213/13 230/18 246/15

150/5 150/19 150/23
150/24 151/2 151/8
151/9 152/4 154/8 158/9
163/11 166/21 173/9
173/16 173/25 174/2
174/3 174/13 177/18
178/3 178/15 179/23
180/1 180/4 180/21
182/13 183/22 184/1
184/23 184/25 185/13
187/2 189/5 189/8
200/15 200/24 201/22
201/24 202/24 203/18
209/19 210/8 211/2
211/16 211/22 213/13
216/17 217/7 217/22
220/17 221/6 222/19
224/10 226/12 227/4
230/18 234/7 242/7
242/15 246/15 252/1
257/9 258/5 259/9
**Dr. Arrow [1]** 148/13
**Dr. Hauser [2]** 173/9
174/2
**Dr. Jackson [3]** 5/2 49/4
183/22
**Dr. Jackson's [1]** 158/9
**Dr. John [1]** 201/22
**Dr. Kilpatrick [53]** 48/7
49/22 50/6 65/3 65/20
66/20 67/7 72/15 81/12
81/23 82/9 85/23 89/10
91/7 105/4 112/7 112/8
115/5 116/1 120/6
121/23 125/23 127/9
127/20 133/9 133/14
133/14 133/17 133/18
134/22 135/17 135/23
145/12 146/16 146/19
147/6 148/18 148/20
148/22 149/7 150/5
150/19 150/23 150/24
151/8 152/4 163/11
166/21 173/16 178/15
179/23 180/21 182/13
**Dr. Kilpatrick's [24]**
68/10 70/5 71/6 71/25
73/2 77/1 85/17 93/1
109/7 112/13 126/5
132/2 133/23 143/1
149/14 149/23 151/2
151/9 173/25 174/3
178/3 180/1 180/4 184/1
**Dr. Missimer [6]** 189/5
200/15 211/22 213/13
230/18 246/15
**Dr. Shari [3]** 154/8
174/13 177/18
**Dr. Solow [1]** 148/13
**Dr. Stephens [29]**
184/23 184/25 185/13
187/2 189/8 200/24
201/24 202/24 203/18
209/19 210/8 211/2
211/16 216/17 217/7
217/22 220/17 221/6

222/19 224/10 226/12
227/4 234/7 242/7
242/21 252/1 257/9
258/5 259/9
**draw [4]** 57/13 191/24
192/10 260/22
**drawn [3]** 191/12 192/2
253/22
**drew [2]** 108/6 253/7
**drive [2]** 2/22 157/25
**driven [2]** 158/13
158/15
**driving [5]** 118/14
118/23 119/2 119/4
120/2
**drop [1]** 90/4
**dropping [1]** 108/19
**drug [1]** 12/19
**due [64]** 8/20 8/22 9/2
10/16 13/6 13/15 17/7
18/3 18/12 18/25 19/20
20/9 22/9 22/12 22/18
22/20 23/19 24/17 26/1
28/16 29/24 30/1 31/8
32/24 33/21 35/9 40/12
40/12 41/10 42/8 47/7
50/15 63/6 63/7 63/23
64/8 71/18 72/7 72/20
75/4 76/12 77/13 77/14
77/25 78/11 78/23 80/1
80/16 80/19 83/11 103/4
103/11 103/24 104/17
114/2 114/11 118/2
122/8 122/15 123/9
124/9 164/18 183/9
245/18
**Dunsford [1]** 99/6
**Dunsford's [1]** 99/9
**durable [3]** 140/8
140/12 141/19
**durables [1]** 140/4
**duress [1]** 43/7
**during [3]** 106/18
112/10 137/1

**E**

**E-mail [1]** 1/20
**each [13]** 41/16 41/17
42/24 51/7 74/2 86/22
86/22 86/24 92/17 96/2
131/13 131/15 262/11
**earlier [19]** 45/1 105/21
107/10 111/15 118/22
119/14 120/9 124/14
165/7 176/24 180/9
183/22 203/24 219/20
227/14 231/7 231/18
253/6 257/16
**early [4]** 90/4 121/13
128/14 261/22
**ease [3]** 206/13 254/23
256/8
**easier [4]** 7/24 156/4
229/5 266/21
**easily [6]** 96/2 153/2
214/19 214/21 216/7

# E

**easily... [1]** 238/5
**east [19]** 212/15 222/10 223/10 224/5 224/15 236/13 237/2 240/14 246/2 248/17 248/19 250/18 257/24 257/25 258/18 258/19 259/5 259/12 259/13
**east-southeast [1]** 258/18
**eastern [4]** 242/22 243/3 248/18 259/21
**easy [3]** 40/16 143/7 148/5
**edge [2]** 188/20 216/5
**edited [1]** 141/16
**effect [79]** 13/4 13/14 14/7 16/12 16/13 17/4 17/4 17/10 18/1 18/24 19/19 20/8 21/1 22/1 22/16 22/25 24/10 24/14 25/25 28/15 29/5 31/7 31/9 31/11 31/16 32/3 32/4 32/5 32/6 32/20 32/22 32/25 33/19 35/20 50/2 50/3 50/11 51/19 51/20 51/25 52/1 52/1 58/14 58/16 60/25 63/4 65/10 69/25 71/17 72/5 72/8 72/18 72/21 72/22 73/25 74/19 75/3 76/11 77/13 80/15 81/1 81/2 82/25 91/11 91/12 91/23 94/20 94/21 101/7 101/15 108/4 108/5 114/19 115/19 122/7 122/13 123/8 165/17 179/18
**effective [38]** 204/7 204/23 205/7 205/24 209/17 219/11 219/13 219/15 219/21 219/25 220/4 220/7 220/11 220/12 220/13 220/16 221/2 221/3 221/4 221/17 221/22 222/5 222/21 223/15 223/20 224/3 224/18 225/5 226/5 226/13 229/9 229/11 229/20 229/22 230/13 237/22 255/21 255/23
**effects [10]** 32/11 50/24 55/20 55/20 55/21 64/5 154/24 154/25 154/25 155/20
**effort [1]** 60/14
**eight [1]** 137/1
**either [22]** 6/4 31/18 39/15 43/1 46/12 65/4 66/18 67/6 70/8 73/23 76/3 76/13 76/21 77/15 81/4 126/8 175/16 179/17 180/7 200/6 200/14 244/11

**element [1]** 43/18
**elements [3]** 43/6 43/16 57/4
**elicit [3]** 144/3 144/14 202/16
**else [13]** 4/6 10/20 24/1 40/12 47/17 89/19 116/11 134/23 206/16 219/8 229/15 240/14 256/21
**elsewhere [5]** 96/12 110/21 200/3 230/17 230/18
**embarrassing [1]** 99/8
**emphasis [1]** 40/1
**empirical [4]** 11/11 17/18 51/24 171/13
**enable [1]** 113/11
**enables [1]** 95/1
**encounter [2]** 263/9 263/9
**end [10]** 5/19 17/4 150/11 166/3 188/17 191/6 206/18 213/2 215/8 260/7
**endeavor [1]** 143/11
**engineer [5]** 43/11 44/7 44/10 44/10 62/8
**enough [14]** 14/4 49/15 73/8 73/22 81/3 106/2 113/13 124/1 132/2 132/5 215/9 231/21 254/2 266/13
**entering [1]** 56/13
**entire [22]** 15/25 16/10 17/15 18/4 18/13 18/20 19/1 19/3 20/10 78/18 78/21 78/24 78/25 91/7 97/7 165/13 165/15 165/16 193/20 207/24 211/25 229/14
**entirely [2]** 39/21 182/19
**entirety [2]** 83/2 86/15
**entities [2]** 46/10 67/19
**entitled [2]** 203/13 268/21
**entry [3]** 174/1 175/14 187/18
**environment [2]** 262/11 262/12
**environmental [157]** 8/18 8/20 9/2 9/3 9/6 9/7 9/24 10/7 10/16 11/9 12/13 13/1 13/1 13/3 13/5 13/8 13/10 13/13 13/15 13/24 14/2 14/3 15/19 15/20 15/24 16/9 16/11 16/23 17/7 17/14 18/2 18/10 18/12 18/23 18/25 19/20 20/7 20/9 21/8 21/24 22/9 22/11 22/16 22/18 22/20 23/17 23/19 24/14 24/16 26/1 26/24 27/13 27/15 28/16 28/22 29/25 30/1 31/8

32/4 30/1 32/23 33/3 33/5 33/6 33/21 35/2 35/5 35/9 36/11 37/9 37/25 38/17 41/10 43/9 45/17 46/1 46/4 46/16 47/7 47/23 50/15 52/2 59/24 60/18 60/21 60/25 61/2 61/3 61/18 61/19 61/20 62/7 62/22 63/6 63/7 63/23 64/8 65/14 69/12 71/18 72/6 72/19 75/4 76/12 76/20 77/14 77/25 78/10 78/23 79/25 80/14 80/16 80/19 93/25 94/2 99/17 99/22 100/13 100/16 100/25 101/5 101/6 101/11 102/2 102/9 102/24 103/5 104/20 104/22 105/9 106/1 110/17 111/1 111/11 112/18 112/21 113/4 113/23 113/25 114/2 114/11 114/13 115/1 115/9 115/21 118/2 122/8 122/14 123/9 124/9 172/5 182/23 190/6 263/14
**environmentally [2]** 107/20 110/10
**equal [3]** 42/15 42/19 63/11
**equation [10]** 150/5 150/16 150/17 151/3 151/4 151/20 206/18 217/21 238/14 255/3
**equations [1]** 150/18
**equipped [2]** 22/23 22/25
**error [2]** 149/18 150/1
**errors [1]** 105/2
**especially [3]** 85/9 178/1 227/25
**ESQ [13]** 2/2 2/2 2/5 2/7 2/9 2/10 2/13 2/16 2/16 2/17 2/17 2/21 3/2
**essence [1]** 179/20
**essentially [1]** 137/6
**establish [3]** 14/21 27/20 35/4
**established [5]** 43/4 145/2 155/4 155/4 165/1 165/2
**establishes [1]** 39/12
**establishing [1]** 46/17
**estate [57]** 5/13 6/21 7/7 7/16 8/17 9/1 10/9 10/11 11/21 12/20 81/8 84/21 88/23 90/7 90/8 90/15 90/19 91/12 121/16 130/18 140/14 140/17 140/20 140/22 140/23 140/25 141/21 141/22 142/1 142/2 142/3 142/13 142/13 142/15 143/13 143/14 143/15

143/17 143/23 143/25 144/2 144/4 144/5 144/16 144/17 144/19 144/20 145/1 157/23 172/14 172/19 175/10 175/18 177/10 177/17 177/21 177/22
**Estates [4]** 87/19 107/15 108/23 109/15
**estimate [13]** 5/11 75/18 104/7 116/14 116/20 117/1 149/15 149/17 150/20 151/5 230/11 231/10 232/6
**estimated [6]** 104/8 150/21 231/15 233/10 233/17 234/10
**estimates [2]** 231/19 232/7
**estimating [11]** 73/18 103/19 104/2 104/5 117/23 117/24 118/4 122/10 123/5 127/23 136/2
**et [5]** 1/3 1/7 127/1 129/12 129/12
**et cetera [3]** 127/1 129/12 129/12
**evaluate [22]** 16/2 16/5 22/14 22/23 22/25 23/2 23/4 35/23 36/4 36/15 47/24 48/3 64/3 80/9 103/8 105/10 123/17 143/1 143/7 146/14 154/9 235/10
**evaluated [13]** 70/4 70/5 80/8 82/9 102/5 103/16 104/11 104/24 106/7 133/6 212/24 216/9 216/18
**evaluating [5]** 12/8 19/11 63/10 104/21 105/7
**evaluation [4]** 82/10 120/25 245/9 256/12
**even [39]** 15/25 16/10 18/20 21/5 25/20 52/7 70/1 70/2 70/12 71/7 72/17 74/13 77/23 80/25 83/8 115/2 120/7 132/14 165/20 165/21 165/22 198/12 209/7 209/14 211/5 216/23 220/16 221/21 223/24 228/10 230/18 240/18 240/25 243/1 241/15 254/1 254/8 259/4 259/4
**event [4]** 64/24 64/25 65/1 65/17
**events [1]** 60/21
**eventually [2]** 24/15 170/10
**ever [2]** 68/21 122/4
**every [12]** 38/22 49/7 84/4 86/19 86/21 86/21 87/8 87/9 87/9 130/15

234/3 255/11
**everybody [1]** 190/19
**everyone [7]** 4/2 48/25 98/16 106/24 184/21 251/22 253/9
**everything [11]** 44/5 44/6 44/7 54/5 54/9 130/15 175/10 178/1 180/3 206/16 219/8
**everywhere [3]** 193/7 227/2 227/23
**evidence [21]** 67/13 67/17 67/22 68/3 69/4 69/4 69/6 69/12 69/14 99/24 124/15 174/6 175/3 184/2 195/8 196/21 199/8 229/18 234/24 252/15 255/16
**evolution [1]** 148/20
**evolve [1]** 171/9
**evolved [2]** 176/9 176/13
**exact [11]** 24/22 45/9 56/16 68/10 68/24 154/3 154/15 154/20 155/6 157/3 258/24
**exactly [14]** 12/10 14/5 54/13 54/15 113/24 125/3 153/16 153/24 157/18 192/9 193/8 227/19 229/15 240/16
**exaggerated [1]** 149/15
**examination [15]** 4/12 4/25 126/20 128/25 133/15 138/12 173/7 179/22 180/20 182/6 183/1 185/11 202/6 251/24 261/23
**examine [2]** 39/5 256/21
**examined [4]** 133/15 134/10 135/17 256/18
**example [14]** 22/8 26/4 36/25 42/10 51/16 85/13 106/4 141/9 142/19 159/11 236/11 256/25 257/3 260/13
**examples [5]** 9/19 11/18 19/8 83/8 197/17
**exceedance [1]** 14/24
**exceeded [2]** 109/13 136/17
**except [6]** 43/3 152/12 153/17 153/25 154/4 211/20
**exception [3]** 146/17 147/14 170/4
**excludes [3]** 94/15 131/10 132/13
**excuse [14]** 13/21 16/24 20/25 52/3 54/23 88/16 89/16 96/22 103/10 104/18 131/17 187/19 253/17 265/5
**exhibit [9]** 168/22 168/24 169/9 201/21 203/14 203/15 233/4 246/15 250/7

**E**

**exhibit 1 [1]** 246/15
**exhibit 7 [1]** 233/4
**exist [3]** 13/19 13/20
40/18
**existed [3]** 107/12
208/15 242/18
**existence [9]** 26/23
27/15 28/21 29/24 35/2
38/17 51/13 67/22 99/19
**exists [4]** 15/4 68/5
154/20 193/9
**exited [1]** 142/8
**expect [7]** 107/19 215/21
239/17 245/3 256/15
261/2 262/11
**expectation [1]** 239/21
**expected [3]** 162/25
239/24 261/19
**experience [13]** 17/21
19/14 19/21 20/2 49/24
49/24 83/7 110/4 141/4
141/6 177/18 227/24
234/18
**experienced [1]** 90/7
**experimental [2]** 230/12
254/25
**experiments [1]** 230/17
**expert [60]** 5/5 5/12
5/17 53/12 73/11 82/4
94/3 133/23 134/3
139/20 139/23 140/1
140/2 140/13 147/1
166/9 187/12 188/12
188/15 188/23 188/25
189/9 192/4 196/10
197/10 200/6 201/22
203/18 207/3 207/5
207/23 211/4 211/16
213/24 214/1 214/2
218/19 219/22 220/2
221/7 221/18 222/24
224/25 229/7 237/7
238/18 238/21 238/22
238/23 238/24 239/7
239/25 240/9 240/17
245/5 248/12 248/13
249/4 249/15 255/17
**expertise [8]** 7/8 12/25
36/15 95/2 96/8 141/10
141/12 141/13
**experts [1]** 217/20
**explain [22]** 24/20 40/5
51/3 63/16 71/15 73/20
83/3 87/17 116/8 118/11
134/13 143/9 149/21
153/11 156/25 157/2
159/19 162/7 162/10
162/15 163/11 254/19
**explained [5]** 28/4
108/14 149/20 182/18
182/21
**explaining [2]** 89/2
163/3
**explains [2]** 27/13
164/23

**explanation [5]** 30/16
80/2 153/11 153/13
164/12
**explanations [5]** 92/15
93/7 102/8 111/1 133/4
**exploring [1]** 17/25
**exposed [3]** 111/11
167/21 182/23
**exposure [1]** 105/19
**express [7]** 68/17 72/4
76/9 77/16 77/18 77/19
95/1
**expressed [2]** 68/16
151/10
**extend [3]** 18/3 18/20
20/10
**extended [1]** 108/15
**extends [2]** 207/24
259/22
**extensive [4]** 166/2
243/23 261/9 262/5
**extent [8]** 19/1 55/18
62/2 67/24 91/1 193/10
259/20 259/21
**eyeball [3]** 89/11 93/8
94/22
**eyeballing [1]** 94/21

**F**

**face [2]** 179/10 194/5
**facility [5]** 156/23
164/19 169/4 221/13
252/25
**facility's [1]** 170/11
**fact [121]** 6/20 7/6 13/20
15/3 17/14 18/20 28/1
28/2 29/18 37/7 37/8
37/22 51/25 53/3 53/22
56/13 56/14 57/12 64/13
75/8 76/1 76/14 76/16
78/15 80/19 81/25 91/20
95/18 100/6 100/6 110/2
121/23 126/5 126/8
133/1 141/15 142/11
145/11 145/17 147/19
148/7 148/10 151/13
154/4 154/5 154/23
155/12 155/21 155/22
156/6 156/8 156/15
157/8 159/18 159/19
159/21 160/2 160/3
160/14 160/20 161/4
161/4 161/5 161/6
161/18 161/20 161/21
161/22 161/22 162/1
162/7 162/9 162/20
162/21 163/6 164/2
165/4 165/9 165/15
165/19 165/20 166/12
166/17 166/23 166/25
168/19 170/2 170/5
170/6 170/9 170/19
171/23 176/24 178/6
178/6 178/24 179/2
182/21 183/7 183/8
183/16 186/11 189/10

196/8 196/13 197/11
201/21 201/25 203/4
211/16 212/10 225/4
230/16 232/23 239/7
240/18 243/2 244/22
245/3 260/25 263/8
**factor [10]** 93/2 93/5
93/6 95/23 132/25 194/8
238/15 238/16 250/21
260/11
**factors [12]** 24/1 42/25
71/14 94/15 94/19 101/2
102/11 133/5 197/19
214/20 238/17 253/14
**facts [23]** 43/19 43/20
53/12 56/17 81/10 81/13
81/25 82/1 99/24 100/21
100/23 111/19 115/4
125/12 159/21 159/21
160/13 160/24 160/25
161/1 161/5 161/6 199/9
**factual [6]** 81/4 81/15
81/21 81/23 105/15
105/22
**failed [1]** 82/14
**failure [1]** 67/19
**fair [31]** 12/9 13/20 14/4
19/3 28/3 28/23 30/11
32/14 42/16 42/21 43/2
43/2 43/16 43/18 49/15
85/2 113/13 144/17
146/18 157/2 157/5
163/16 179/14 192/13
204/23 204/25 205/7
205/9 226/22 240/7
266/13
**fairly [2]** 50/5 260/13
**falls [1]** 132/13
**familiar [19]** 24/24
74/21 74/21 85/14 99/6
120/9 148/7 148/9
173/15 174/17 174/18
175/25 176/3 177/12
186/23 191/16 191/23
194/17 247/6
**families [1]** 183/17
**family [3]** 6/2 100/11
182/21
**far [26]** 12/24 24/6 24/6
38/20 52/15 62/3 117/22
129/25 136/22 141/10
146/23 147/14 164/25
193/14 199/18 200/11
202/6 211/12 215/8
215/8 216/5 222/16
234/13 239/18 250/21
251/3
**far-afield [1]** 215/8
**farms [11]** 87/19 88/10
88/22 90/19 95/9 95/15
107/14 108/22 109/15
157/21 250/10
**farther [1]** 239/23
**farthest [1]** 215/4
**fashion [1]** 114/17
**fast [5]** 204/17 234/25

237/20 237/21 242/9
**faster [5]** 214/15 215/14
217/13 219/9 239/8
**fastest [5]** 208/8 208/13
209/13 215/4 237/11
**fatally [1]** 178/4
**faults [1]** 151/19
**favor [1]** 57/15
**FDEP [3]** 233/6 233/17
233/22
**FDOH [1]** 168/19
**fear [2]** 172/5 253/10
**fearful [1]** 254/3
**feature [1]** 259/17
**features [5]** 131/7
142/19 249/11 249/12
260/24
**February [2]** 99/20
100/14
**fed [1]** 164/4
**federal [2]** 174/9 174/16
**federally [1]** 129/11
**federally-insured [1]**
129/11
**feed [1]** 181/16
**feel [3]** 143/9 160/25
177/15
**feeling [1]** 167/12
**feet [50]** 205/19 206/2
207/11 207/20 207/24
208/24 209/1 209/5
209/11 210/5 210/14
211/7 211/13 211/14
212/25 213/1 213/9
213/22 213/23 214/11
214/14 215/13 216/13
216/14 216/16 216/22
216/23 217/7 223/21
225/15 226/18 226/21
226/21 226/24 229/11
229/23 230/1 234/14
258/11 258/12 258/15
258/17 258/17 258/23
259/1 259/23 260/6
264/8 264/12 265/18
**felt [1]** 196/21
**few [9]** 57/4 73/6 97/15
139/7 173/11 183/23
185/15 192/16 196/18
**field [8]** 17/19 141/17
204/19 207/17 230/14
234/19 239/22 253/19
**fifth [2]** 115/19 196/5
**figure [25]** 40/7 40/11
57/25 102/1 107/8
130/21 137/12 186/22
187/6 187/12 187/16
187/18 189/13 190/17
199/22 211/21 218/5
218/6 221/6 231/4 231/9
246/15 247/20 251/11
256/10
**Figure 1 [3]** 102/1 107/8
130/21
**Figure 3-1 [1]** 221/6
**Figure 4-6 [1]** 190/17

**Figure 5 [1]** 187/18
**Figure 5-3 [2]** 231/4
231/9
**Figure 5.3 [1]** 189/13
**figures [2]** 187/7 190/16
**files [1]** 134/1
**final [2]** 165/4 165/19
**financed [1]** 110/25
**financial [3]** 90/5 110/8
111/8
**finder [1]** 81/24
**finding [4]** 83/12 168/12
182/9 217/15
**findings [3]** 81/21 81/23
239/22
**finds [1]** 25/4
**fine [11]** 7/22 48/16
48/18 49/6 113/8 131/21
137/12 160/4 260/1
260/24 266/23
**finger [1]** 257/18
**fingers [1]** 215/3
**finish [18]** 6/1 19/24
33/12 79/12 90/22
172/18 173/6 213/17
223/8 230/7 230/9 241/8
241/9 242/3 246/22
246/23 246/23 266/3
**finish' [1]** 90/24
**finished [14]** 44/23
71/22 90/11 90/17 92/13
92/14 93/11 93/16
116/12 213/15 223/6
246/20 246/21 246/22
**firms [1]** 173/23
**first [33]** 10/5 27/24
28/5 40/22 60/8 67/5
70/25 72/24 79/15 79/17
88/2 89/18 89/20 90/14
100/2 120/16 123/13
127/13 129/15 131/1
143/10 151/13 151/25
158/25 158/25 173/15
175/23 201/18 228/2
249/10 252/11 255/2
255/23
**fits [3]** 232/9 232/9
233/25
**five [9]** 30/22 30/22
156/16 156/17 209/9
251/17 251/18 264/19
265/4
**five miles [2]** 156/16
156/17
**five percent [2]** 30/22
30/22
**five-minute [1]** 251/17
**FL [6]** 2/4 2/6 2/8 2/12
2/14 2/23
**Flagler [1]** 2/22
**flares [1]** 31/16
**flawed [2]** 146/20 178/4
**Flint [3]** 18/21 18/22
19/1
**floating [1]** 65/5
**FLORIDA [22]** 1/1 1/8

**F**

**FLORIDA... [20]** 1/20 26/20 90/6 96/12 161/23 178/18 190/6 209/3 240/12 240/13 240/20 241/2 241/5 241/14 241/17 241/18 241/20 248/3 257/3 258/25

**flow [39]** 195/6 203/20 205/1 205/10 206/6 212/10 220/11 220/12 220/12 226/14 228/19 228/20 228/25 229/15 229/16 229/24 235/18 235/20 235/23 237/14 237/17 240/6 242/9 245/20 245/22 246/2 246/12 247/3 247/16 248/1 248/23 250/12 250/16 250/20 254/22 254/25 255/4 255/4 256/13

**flowing [1]** 250/18

**flows [13]** 206/13 211/11 245/17 246/3 246/4 248/16 248/18 249/3 249/5 249/7 250/19 254/24 256/8

**focalism [1]** 176/18

**focus [28]** 10/6 14/9 14/11 14/12 15/2 29/17 30/2 37/13 37/15 37/15 38/20 38/22 41/24 42/20 43/14 47/20 47/21 60/13 71/3 74/17 75/6 75/8 79/16 87/7 113/11 113/17 148/23 191/2

**focused [7]** 13/25 14/1 14/6 65/20 68/17 74/16 76/14

**follow [5]** 71/13 173/11 181/4 202/5 235/22

**follow-up [2]** 173/11 181/4

**followed [1]** 47/13

**following [7]** 22/3 48/24 56/21 72/24 106/23 184/20 251/21

**foot [14]** 85/18 87/14 87/18 88/8 88/9 92/9 107/9 107/13 108/21 108/23 130/22 225/14 226/8 226/9

**footage [4]** 88/21 96/1 96/1 131/8

**Footnote [1]** 174/7

**Footnote 7 [1]** 174/7

**force [2]** 254/22 254/22

**foreclosed [1]** 110/15

**foreclosure [18]** 91/2 91/2 91/3 91/6 91/9 92/5 94/16 95/6 95/7 95/8 95/16 95/23 96/13 109/6 110/7 110/15 111/9 132/23

**foreclosures [21]** 91/17

92/1 92/2 93/22 95/12 95/22 96/11 96/12 96/12 96/16 107/16 107/21 108/1 108/13 109/1 109/13 109/14 109/19 109/22 110/22 183/21

**foregoing [1]** 268/19

**forgotten [1]** 213/19

**form [6]** 145/16 147/7 151/7 154/21 176/6 255/21

**formation [17]** 209/25 234/23 241/5 259/4 259/16 260/13 260/16 260/17 260/18 261/4 261/6 261/14 261/15 261/18 261/25 263/22 264/6

**formations [2]** 209/6 261/5

**formed [1]** 71/19

**former [2]** 259/18 259/21

**forms [3]** 26/6 26/19 145/11

**formula [4]** 150/21 150/23 150/25 151/8

**formulating [1]** 68/15

**Fort [2]** 2/4 2/8

**forth [1]** 182/14

**forward [1]** 97/14

**found [52]** 20/13 20/13 23/6 23/10 23/11 25/8 29/14 30/19 30/20 30/22 30/23 31/11 36/20 36/25 40/6 40/20 45/7 52/10 52/13 53/9 55/25 56/15 60/11 60/12 62/9 62/23 62/24 65/23 68/9 68/23 72/16 88/8 124/14 124/23 125/3 126/2 127/8 151/19 166/13 229/10 233/17 233/19 241/3 241/6 241/16 241/17 243/12 252/18 253/16 258/19 258/22 264/9

**foundation [3]** 34/11 73/21 133/21

**founders [1]** 141/17

**four [23]** 98/1 136/16 136/20 136/23 137/6 137/6 137/14 144/18 144/18 188/3 190/8 214/20 224/23 229/25 230/6 230/21 232/12 232/13 232/14 232/23 234/13 234/13 234/13 **four miles [4]** 224/23 229/25 230/6 230/21

**four-minute [1]** 98/1

**fraction [1]** 219/17

**fracture [1]** 234/16

**fractured [4]** 215/11 227/25 241/22 256/9

**frame [1]** 204/3

**framework [1]** 12/7

**France [1]** 255/2

**Franklin [4]** 1/18 268/18 268/24 268/25

**Frazier [1]** 266/20

**free [2]** 143/9 179/9

**frequently [1]** 110/3

**front [7]** 29/12 107/8 153/21 157/21 157/22 158/18 218/7

**Ft [4]** 260/15 260/18 261/3 261/14

**fully [8]** 42/24 43/3 43/8 43/18 50/21 128/16 128/22 130/9

**function [4]** 104/22 236/9 237/2 241/22

**fundamental [1]** 217/21

**fundamentally [3]** 146/20 217/4 217/19

**furans [19]** 193/16 195/13 201/16 239/1 239/4 239/11 239/18 240/5 240/20 241/2 243/7 243/16 243/19 244/1 244/6 244/11 245/2 252/7 252/14

**further [9]** 89/23 108/16 129/14 132/1 133/2 136/4 173/2 180/25 184/11

**furthermore [1]** 183/10

**fuzzy [1]** 89/9

**G**

**GA [1]** 3/4

**gain [1]** 120/21

**Gallagher [3]** 2/16 196/3 268/5

**gap [14]** 87/17 88/1 88/21 89/4 89/19 89/14 89/18 89/22 90/1 90/3 96/8 109/4 132/18 132/19

**garbled [1]** 191/6

**gardens [3]** 2/14 88/11 95/14

**Garrett [2]** 99/6 99/8

**gathering [1]** 84/3

**gave [7]** 53/17 54/2 111/21 118/22 147/5 151/25 198/25

**Gdanski [1]** 2/2

**gears [1]** 218/9

**general [31]** 9/10 9/16 10/6 11/24 11/24 16/1 38/5 45/16 46/11 53/15 54/6 54/6 55/17 58/2 58/6 58/22 60/11 70/11 85/2 92/11 95/20 104/23 110/23 135/25 148/23 161/14 167/12 167/22 175/3 177/20 257/23

**generalizations [1]** 85/8

**generally [56]** 7/7 7/16 10/10 16/3 20/17 20/18

21/3 26/22 27/14 28/20 34/5 34/25 50/9 50/16 57/3 58/24 60/2 61/4 64/21 70/22 73/24 77/22 78/20 84/2 91/3 92/2 96/19 102/14 103/6 103/13 116/5 116/23 117/14 117/18 117/20 117/21 119/18 119/21 119/23 120/15 120/13 120/24 121/7 123/20 131/22 175/11 205/11 223/13 237/24 239/11 239/13 239/17 245/21 250/25 251/2 256/14

**geographic [3]** 21/23 31/19 107/9

**geography [1]** 241/20

**geologic [8]** 210/18 211/24 255/10 262/10 262/11 263/3 263/5 263/6

**geological [2]** 243/5 256/25

**geology [12]** 194/10 209/24 210/2 210/9 210/17 212/12 212/14 228/15 230/16 243/3 253/17 260/23

**geometric [5]** 216/17 216/21 217/7 217/15 217/17

**geophysical [1]** 260/1

**gets [1]** 98/16

**getting [8]** 11/8 27/21 31/24 48/10 79/1 83/18 119/2 154/22

**giant [1]** 188/8

**gist [1]** 127/1

**give [29]** 5/11 9/19 19/8 24/19 33/12 42/10 56/4 80/3 116/9 116/10 132/2 152/21 161/9 161/14 176/9 179/9 179/9 187/8 188/22 193/23 197/6 197/12 198/13 198/23 200/19 207/8 208/8 246/6 267/3

**given [17]** 21/23 25/19 48/7 56/8 84/24 85/4 150/20 151/5 170/25 171/25 183/7 192/7 195/24 202/20 244/3 249/19 254/22

**gives [9]** 99/1 149/8 152/1 166/3 204/10 204/13 204/15 235/23 236/4

**giving [5]** 54/6 153/13 158/6 160/5 208/12

**glad [2]** 157/24 184/8

**gladly [1]** 149/21

**gleaned [1]** 132/6

**goes [18]** 18/15 50/10 50/24 51/20 51/21 53/24 56/19 95/18 117/23

129/10 164/17 164/23 174/19 177/5 178/16 220/8 259/13 259/13

**going [79]** 12/24 14/15 16/3 21/18 23/2 27/7 31/24 31/25 39/25 40/25 40/25 44/17 45/6 53/7 53/12 55/13 58/23 62/4 64/10 70/21 74/11 82/3 85/11 97/3 97/12 97/18 98/23 99/23 103/25 110/23 113/8 124/13 124/22 125/21 129/24 131/18 133/12 136/19 138/19 139/3 139/15 143/20 145/18 146/21 147/23 148/14 150/4 157/7 158/17 158/19 158/22 158/24 161/16 164/12 169/7 170/15 171/1 176/21 181/5 181/7 181/17 190/16 199/23 199/23 201/19 202/5 202/10 206/17 213/19 217/18 229/16 233/3 235/21 236/2 242/9 243/9 243/9 262/6 265/24

**gone [8]** 23/11 23/22 36/18 38/21 52/15 71/8 93/15 158/20

**gonna [4]** 47/12 51/17 84/12 85/5

**good [27]** 4/2 4/4 5/15 25/22 35/13 38/15 46/9 46/19 48/17 84/14 119/16 126/22 126/23 138/14 138/15 140/12 154/1 155/7 173/9 173/10 175/8 185/13 215/9 252/1 252/2 260/13 265/25

**goods [8]** 125/16 140/22 141/2 141/19 141/19 141/19 141/20 175/10

**got [20]** 6/1 29/11 48/14 62/15 87/4 87/7 92/25 94/6 95/6 125/24 135/24 181/3 181/4 190/19 190/22 197/10 199/21 211/10 221/9 234/8

**gotten [1]** 37/22

**government [10]** 46/13 46/15 46/21 47/10 47/12 47/14 47/24 56/12 57/12 67/19

**governmental [4]** 46/10 47/5 168/11 168/15

**Gowdy [2]** 2/5 2/5

**grad [1]** 173/20

**gradient [33]** 187/5 204/7 204/23 205/7 205/22 209/16 218/11 218/23 219/3 219/7 219/20 220/24 221/1 221/16 221/23 222/1

**G**

**gradient... [17]** 222/2
222/13 222/15 222/21
223/11 223/13 223/20
228/16 228/17 229/19
236/9 237/5 237/16
245/11 250/8 250/10
254/23
**graduate [2]** 173/21
174/20
**grant [1]** 34/10
**graph [4]** 85/14 85/20
85/22 86/9
**great [3]** 123/14 163/11
252/4
**greater [40]** 30/7 30/20
30/22 50/4 50/10 51/14
51/16 52/2 52/7 52/18
54/9 55/18 59/2 60/13
60/18 60/20 60/22 61/4
61/6 70/1 70/2 70/12
70/23 86/9 88/10 92/22
95/16 146/21 209/5
212/21 216/15 217/16
222/1 222/3 223/13
223/14 259/4 259/5
260/9 260/20
**greatest [3]** 50/18 51/9
165/10
**green [1]** 108/6
**Gregor [1]** 2/21
**Groden [3]** 2/17 137/24
268/8
**gross [1]** 85/8
**ground [2]** 115/9 191/5
**ground port [1]** 191/5
**groundwater [85]** 19/9
25/6 25/8 25/9 25/11
25/14 25/21 112/22
115/10 186/2 191/9
194/2 194/6 194/21
195/3 195/6 204/10
205/1 205/10 206/1
206/6 206/18 212/10
212/11 216/1 216/24
217/4 217/10 219/9
220/5 220/7 226/14
226/14 226/17 226/24
228/19 228/20 228/24
228/25 229/10 229/14
229/16 229/24 230/1
230/2 235/21 235/24
236/2 237/14 237/21
238/2 238/5 238/8 239/1
239/5 239/8 239/12
239/18 240/6 242/12
244/8 245/13 245/17
245/18 245/20 245/22
246/2 246/5 246/12
247/3 247/16 248/16
248/17 248/23 249/3
249/4 249/7 250/5
250/17 251/1 251/12
253/10 254/4 255/20
255/25
**groundwater's [2]**
204/17 242/9
**group [6]** 1/7 78/13
104/25 105/8 139/24
139/24
**groups [1]** 104/9
**Gschwend [1]** 240/15
**guess [7]** 7/2 12/14
36/24 63/20 112/14
152/16 266/19
**guidance [3]** 129/19
130/6 174/5
**guide [4]** 116/18 117/6
129/2 174/8
**guideline [2]** 91/7
128/17
**Gunn [1]** 3/3
**Gunster [1]** 2/22
**guys [5]** 48/4 64/23 87/3
89/24 94/20
**gyms [1]** 142/21

**H**

**H-a-n-e-m-a-n [1]** 150/8
**H-a-u-s-e-r [1]** 138/9
**Haberman [2]** 2/2
268/12
**hadn't [4]** 112/24
112/24 113/6 246/13
**half [9]** 95/14 137/7
137/14 188/1 189/22
209/9 226/8 226/8 266/6
**half-foot [1]** 226/8
**Hammer [5]** 2/7 137/17
138/16 139/15 268/7
**hand [7]** 87/19 87/20
88/23 108/22 108/24
138/2 185/3
**handed [1]** 225/24
**Hanemann [6]** 150/6
150/7 150/8 150/21
151/6 151/20
**hang [1]** 97/15
**happen [4]** 17/22 32/18
47/15 58/21
**happened [4]** 101/21
142/5 199/20 199/20
**happening [1]** 44/14
**happens [3]** 47/17 52/1
70/22
**hard [7]** 22/2 65/23
65/24 85/8 266/19
266/21 267/4
**harder [1]** 113/17
**harmful [1]** 39/13
**hash [1]** 263/10
**hasn't [6]** 59/15 77/3
202/5 211/9 213/15
223/6
**hate [2]** 109/3 266/8
**Hatfield [1]** 2/10
**Hatfield's [1]** 137/3
**Hauser [15]** 136/15
137/19 137/25 138/3
138/8 173/9 174/2
174/12 175/16 175/23
176/1 177/8 177/25

**180/23 300/6**
**haven't [35]** 18/22 50/7
52/14 64/25 65/7 66/3
66/6 66/19 68/4 68/13
68/19 70/4 70/9 71/4
71/7 71/8 71/23 72/2
72/17 72/25 73/14 77/8
89/4 96/9 101/25 102/2
102/5 103/14 123/10
139/2 164/8 191/12
223/1 245/5 249/14
**having [11]** 12/17 22/2
24/21 69/21 101/6 105/2
139/16 215/7 234/18
241/16 243/15
**hazardous [1]** 168/13
**hazards [1]** 55/9
**he's [23]** 55/1 64/15 66/7
70/7 70/8 82/4 90/22
100/3 100/4 102/9 115/5
122/5 128/1 133/15
134/24 153/9 173/19
179/13 211/10 211/11
214/24 227/11 242/1
**head [2]** 213/6 250/10
**heading [1]** 141/14
**health [14]** 6/2 6/4 6/12
48/15 53/3 53/8 53/22
97/21 98/11 115/9
161/24 171/4 171/8
171/11
**Health's [1]** 48/1
**hear [3]** 90/13 124/8
159/5
**heard [9]** 60/8 89/5
130/21 135/3 147/6
149/12 159/6 180/6
183/22
**hearing [4]** 136/14
139/17 169/10 182/1
**hearings [1]** 5/18
**help [6]** 24/19 27/20
37/7 118/14 118/23
119/4
**helpful [2]** 9/19 27/9
**helping [1]** 112/13
**helps [3]** 9/23 49/8
90/24
**here [98]** 4/14 9/20 15/5
15/12 15/16 20/13 24/5
27/18 29/11 39/17 57/18
65/6 70/10 70/20 71/16
72/4 72/7 72/20 75/11
76/9 83/4 89/23 89/23
90/3 93/1 93/8 94/4
94/13 96/7 98/5 106/10
108/15 109/5 126/9
126/25 129/7 133/14
143/18 155/24 157/7
158/3 159/18 163/21
167/14 174/14 175/15
181/6 181/10 185/14
185/16 187/21 187/22
188/13 188/22 190/14
190/20 193/14 194/13
196/1 197/4 198/21

**199/21 201/6 204/2**
207/22 208/10 213/8
216/4 217/19 221/6
221/9 221/12 221/21
224/11 224/13 225/25
229/14 231/9 232/10
233/9 233/24 238/13
243/10 246/9 250/6
257/4 257/18 258/6
258/8 259/12 259/13
259/17 259/19 260/3
260/20 260/22 261/5
262/16
**here's [2]** 241/4 260/13
**Herman [2]** 2/18
**heterogeneities [1]**
228/1
**heterogeneity [6]**
158/10 176/16 212/6
212/7 215/11 227/15
**heterogeneous [3]**
211/25 212/3 212/8
**high [18]** 109/6 162/23
163/9 179/16 182/23
209/21 210/5 210/12
214/8 222/9 222/17
224/4 227/22 231/21
248/10 258/16 258/24
262/19
**higher [17]** 50/24 95/10
95/13 149/9 206/16
206/17 207/19 215/14
219/1 219/8 220/8 228/4
256/14 256/16 260/19
261/20 261/21
**highest [1]** 207/16
**highlight [1]** 175/24
**highlighted [4]** 169/22
169/24 194/13 226/4
**highly [1]** 239/21
**highway [4]** 38/6 84/14
188/16 188/17
**hire [1]** 147/17
**hired [1]** 147/20
**hiring [1]** 147/15
**history [6]** 112/18
112/20 113/4 114/21
115/1 115/21
**hits [1]** 191/13
**Hmm [1]** 171/9
**hold [7]** 33/9 90/10
90/10 127/14 134/19
150/7 155/15
**holding [2]** 206/16 219/8
**holds [1]** 154/9
**home [12]** 83/9 83/10
111/9 111/10 111/10
154/2 154/3 157/3 157/4
157/12 157/14 157/16
**homes [9]** 83/13 88/15
93/5 106/5 109/23
110/15 156/23 183/18
184/5
**homogeneity [11]** 73/9
73/22 74/18 75/1 76/3
81/3 81/12 81/14 81/22

**81/24 104/14**
**homogeneous [6]** 74/7
80/8 80/18 104/9 105/16
124/2
**honor [72]** 4/4 4/9 4/24
11/2 33/14 39/25 48/12
48/12 49/1 54/23 79/19
82/3 88/16 88/25 89/16
90/14 93/14 97/10 97/16
98/4 99/1 99/23 107/2
113/18 119/6 119/11
126/13 126/19 128/7
131/17 133/12 136/4
136/7 136/21 137/4
137/13 137/24 173/5
181/9 181/13 181/15
181/21 183/3 184/11
184/24 184/25 191/17
192/24 197/12 199/16
202/3 202/15 202/20
203/5 203/9 203/12
210/15 211/8 213/15
214/23 215/17 223/6
225/18 227/11 230/7
242/1 246/17 246/19
251/19 265/6 265/24
266/10
**HONORABLE [1]** 1/13
**hope [3]** 5/21 6/17 97/7
**hopefully [2]** 5/19
**horizontal [1]** 258/9
**horse [1]** 157/21
**hour [5]** 49/7 93/15
137/1 137/2 266/6
**hours [6]** 136/16 136/20
136/23 137/6 137/7
137/15
**house [13]** 11/20 12/12
12/19 26/7 87/9 88/13
92/17 142/20 170/21
170/21 179/8 179/9
179/14
**houses [5]** 25/7 87/10
92/19 96/3 96/3
**housing [2]** 132/21
140/11
**however [2]** 137/22
148/17
**Hubbard [1]** 2/19
**Hudgins [1]** 3/2
**huge [1]** 105/2
**hundred [7]** 136/25
217/1 217/10 218/1
218/1 218/2 260/11
**hundreds [6]** 51/22
217/22 218/2 243/21
244/22 258/17
**hydraulic [128]** 194/22
204/6 204/7 204/22
204/23 205/6 205/7
205/19 206/12 206/12
206/17 206/21 206/24
207/1 207/3 207/8
207/11 207/12 207/19
207/23 208/23 209/4
209/7 209/10 209/16

Case 9:13-cv-80928-KAM   Document 393   Entered on FLSD Docket 01/09/2018   Page 283 of
301
(WITNESSNAME)                                                      Index: hydraulic.. information

## H

**hydraulic... [103]**
209/16 209/20 209/21
210/12 210/13 210/20
211/3 211/7 211/17
211/21 212/3 212/23
212/24 213/8 214/14
214/16 214/19 215/3
215/13 215/14 215/24
216/8 216/9 216/13
216/18 216/23 217/8
218/10 219/7 219/19
219/20 220/24 220/24
221/1 221/16 221/23
221/23 222/1 222/2
222/9 222/13 222/17
222/19 222/20 222/20
223/9 223/11 223/12
223/20 223/21 224/11
224/12 227/2 227/4
227/5 227/7 227/8
227/16 227/23 227/24
228/3 228/4 228/10
228/14 228/16 228/17
234/8 234/15 234/18
235/5 236/9 248/10
250/8 250/9 254/23
254/24 256/3 256/6
256/10 256/12 256/15
256/18 256/21 256/23
257/13 258/1 258/7
258/11 258/14 258/17
258/22 259/2 259/3
259/11 260/2 260/5
260/8 261/21 261/25
262/2 264/7 264/11
265/18

**hydrodynamic [1]** 238/1
**hydrogeologist [4]**
185/24 255/6 255/8
255/9
**hydrogeologists [2]**
210/18 255/11
**hydrogeology [1]**
233/25
**hydrologic [2]** 249/11
249/12
**hydrologist [2]** 159/14
159/25
**hydrologists [1]** 266/18
**hypotheses [2]** 152/8
152/17
**hypothesis [1]** 248/22
**hypothetical [14]** 24/19
25/6 25/19 26/5 44/8
53/13 53/17 54/1 54/2
54/3 56/22 57/18 57/24
145/9

## I

**I'd [10]** 7/18 89/20
147/21 150/24 184/7
193/6 200/8 235/8
253/12 267/4
**I'll [30]** 8/6 29/20 41/2
56/3 57/6 64/16 67/3

82/6 90/25 97/16 97/19
98/1 99/1 100/3 116/10
131/4 137/18 138/22
143/11 143/11 144/9
152/20 167/13 169/15
171/20 173/11 175/23
181/15 225/25 233/3
**I'm [176]** 5/18 5/24 6/1
9/8 9/14 9/20 10/1 11/7
11/7 16/2 17/9 17/9
17/23 17/25 19/5 19/25
20/12 21/18 22/2 22/2
24/22 27/2 27/18 29/23
30/3 30/23 33/10 33/14
35/24 36/2 37/11 39/25
41/4 41/5 41/14 42/10
44/22 48/1 48/5 49/6
53/10 54/2 54/6 54/23
55/6 56/21 57/25 62/8
62/19 63/13 63/14 64/10
67/2 69/8 69/20 70/3
70/9 74/2 77/2 77/11
78/5 78/8 78/15 78/19
79/11 80/3 82/3 88/16
89/16 90/1 90/18 90/20
92/14 92/14 93/11 93/16
94/21 96/5 97/14 99/10
99/18 99/23 100/21
101/10 102/4 103/25
105/23 107/22 107/24
112/4 112/4 113/8
113/14 114/16 116/12
117/9 119/2 121/10
121/12 122/1 122/1
122/2 122/5 123/3
129/22 130/5 131/18
133/12 136/24 137/5
137/20 138/19 139/3
141/6 141/7 142/1 143/8
143/17 143/20 145/2
147/11 148/9 148/22
150/17 157/24 159/14
159/25 159/25 162/17
163/17 163/24 165/14
165/15 168/17 168/22
171/18 172/18 174/18
175/13 176/3 177/13
177/15 185/14 188/6
188/22 190/16 192/9
201/19 202/16 207/1
207/1 211/2 214/3
218/24 220/20 222/25
223/5 227/6 227/8
229/15 230/3 231/6
233/3 234/20 234/21
235/22 237/6 242/5
242/6 243/9 243/9
246/18 246/24 257/25
265/24 266/17
**I've [112]** 5/17 5/24 6/1
6/2 12/25 17/18 19/9
19/14 20/13 23/22 27/8
29/11 29/19 30/24 34/9
36/12 38/10 49/12 50/20
51/22 51/22 51/23 52/11
60/8 60/11 64/18 70/4

71/8 7105 72/1 73/2
73/2 73/6 73/6 73/7 73/9
73/15 73/16 77/5 79/5
80/6 80/23 82/7 83/13
88/12 91/4 92/6 92/25
94/15 95/6 102/6 102/10
103/21 108/4 110/19
110/24 110/24 114/22
120/6 120/7 120/21
122/17 122/20 123/2
124/17 125/24 131/9
137/3 137/20 140/21
141/1 141/16 141/22
141/23 141/25 158/8
158/8 158/9 159/6 159/8
159/22 160/16 161/25
168/8 173/18 173/21
173/24 174/2 181/3
181/4 185/17 194/13
199/21 204/2 213/10
213/11 213/11 213/19
214/4 219/13 222/25
225/24 226/3 231/5
233/25 237/16 239/19
258/9 260/6 263/3 263/5
263/6
**idea [7]** 14/9 21/14
25/22 39/2 87/3 225/13
240/4
**identifiable [1]** 79/8
**identified [13]** 69/10
96/9 96/9 133/4 186/17
190/2 208/20 221/12
233/13 233/22 240/9
243/15 244/6
**identifies [1]** 186/22
**identify [6]** 211/17
221/15 221/21 223/24
231/20 232/2
**identifying [1]** 110/2
**ignored [2]** 91/7 94/17
**IL [1]** 2/20
**imagine [9]** 153/24
154/14 154/17 154/19
155/6 157/3 157/12
157/15 183/12
**imagines [1]** 155/6
**immediate [1]** 50/3
**immediately [4]** 61/4
61/6 61/9 61/10
**immobile [3]** 239/5
239/12 239/14
**impact [43]** 15/11 15/13
15/17 15/18 16/24 20/21
23/4 23/14 26/8 27/19
45/22 55/16 59/23 64/25
65/13 67/24 69/6 69/15
69/19 69/21 70/1 70/2
70/4 70/5 70/12 70/25
72/3 77/24 78/9 78/22
92/3 82/24 94/8 94/10
94/11 104/5 104/7 104/8
120/14 121/9 124/11
124/12 132/22
**impacted [16]** 11/8 12/3
14/10 14/10 16/20 16/21

16/22 16/25 59/3 80/18
85/1 123/22 192/21
193/4 193/22 196/23
**impacting [3]** 43/19
50/14 90/19
**impacts [20]** 54/18 61/2
64/20 70/8 70/24 70/25
72/12 74/8 74/9 77/20
80/5 83/7 84/20 85/10
102/6 103/8 103/17
104/21 110/20 122/10
**impair [1]** 6/13
**impeachment [1]** 119/7
**imperfect [2]** 130/17
130/18
**imperial [1]** 11/14
**implementation [1]**
177/16
**implemented [1]** 120/22
**implementer [1]** 147/17
**implicit [1]** 238/13
**implies [1]** 182/14
**importance [2]** 85/6
85/7
**important [36]** 35/16
35/17 36/19 37/3 37/4
39/3 39/16 39/24 40/8
40/11 41/1 57/4 74/3
78/6 84/18 91/8 93/2
93/4 93/6 94/18 95/22
95/22 96/1 132/25
160/25 161/8 161/10
162/10 166/18 166/19
170/22 170/24 171/1
178/11 249/11 251/10
**imprecise [2]** 89/11
89/13
**improper [3]** 80/13
82/18 129/25
**Improvement [1]** 263/7
**improves [1]** 83/6
**inaccurate [1]** 126/8
**inappropriate [2]** 74/13
88/14
**incidence [2]** 100/16
109/12
**incidents [1]** 107/25
**inclined [2]** 110/14
111/8
**include [6]** 131/6 141/8
154/1 166/14 166/15
166/16
**included [6]** 93/4 96/3
109/7 131/12 133/6
249/4
**includes [2]** 86/2 236/12
**including [7]** 141/8
166/12 168/13 170/12
178/9 213/12 265/14
**incomplete [1]** 46/12
**inconsistent [1]** 223/14
**incorrect [2]** 46/12
67/11
**increase [7]** 50/16 56/9
59/4 92/9 107/20 108/25
110/7

**increased [54]** 10/16
13/5 13/15 17/16 18/2
18/12 18/25 19/20 20/9
22/9 22/11 22/18 22/20
23/19 24/16 26/1 28/16
31/8 32/23 33/21 35/9
41/10 47/7 50/14 52/24
52/25 63/5 63/7 63/15
63/22 64/7 71/18 72/6
72/19 75/4 76/12 77/14
77/25 78/10 78/23 79/25
80/16 80/18 99/21
107/25 108/12 114/2
114/11 118/1 122/8
122/14 123/9 124/9
184/5
**increases [3]** 51/2 51/4
92/9
**increasing [3]** 88/10
91/21 166/5
**indeed [2]** 107/19 109/7
**independent [14]** 13/19
68/19 71/23 72/2 72/25
77/3 93/3 127/22 159/17
159/20 160/12 160/16
178/21 184/7
**independently [3]** 66/16
102/5 127/22
**indicate [8]** 170/9 178/9
197/19 199/8 199/9
229/18 237/16 239/20
**indicated [6]** 100/20
174/14 176/24 218/22
244/9 246/11
**indicates [2]** 195/8
196/21
**indicating [1]** 129/7
**individual [10]** 39/18
78/13 84/21 160/24
162/1 162/3 162/5
163/13 170/19 262/1
**individually [1]** 84/20
**induction [1]** 154/24
**industry [5]** 10/9 10/11
11/21 121/24 174/23
**infer [2]** 32/7 153/2
**inference [1]** 34/13
**inferred [2]** 46/25 153/7
**inferring [1]** 153/5
**influence [11]** 47/6 47/8
84/7 94/18 102/11 113/3
113/4 125/12 131/7
155/3 170/15
**influenced [2]** 84/6
101/16
**influences [4]** 85/12
101/18 101/20 104/13
**influencing [1]** 112/11
**inform [1]** 229/8
**informal [8]** 124/24
125/22 126/25 127/10
173/17 180/1 180/4
180/22
**information [134]** 23/9
26/15 26/16 26/20 27/22
31/10 35/8 36/13 36/17

## I

**information... [125]**
36/19 36/23 36/23 36/24
38/15 44/11 45/14 45/20
45/23 45/24 46/2 46/4
46/7 46/9 46/9 46/16
46/20 47/11 47/22 47/24
49/20 49/23 50/13 50/21
50/22 51/2 51/4 51/7
51/12 51/15 52/2 52/5
52/12 52/20 53/4 53/5
53/7 53/15 53/18 53/25
54/11 54/17 55/7 55/25
55/25 56/2 56/10 56/11
56/18 56/23 58/13 58/16
59/5 59/10 59/18 59/22
59/23 60/2 60/4 62/17
62/23 65/9 65/12 65/13
65/16 67/13 67/17 68/20
69/16 69/18 69/21 70/13
82/21 82/24 83/1 83/10
83/22 83/24 84/7 84/9
84/12 84/16 85/1 85/5
86/8 91/16 99/21 100/14
100/24 101/1 101/3
101/13 107/22 108/2
110/11 110/19 117/3
117/15 117/18 117/25
120/2 125/13 125/19
126/1 132/3 132/5 159/8
163/21 166/22 167/1
167/4 167/7 167/10
167/14 178/10 178/12
178/12 183/19 249/11
250/8 251/3 253/21
253/24 254/8 254/9

**informed [28]** 42/24
43/3 43/8 43/9 43/10
43/13 43/18 43/20 44/16
44/24 45/5 45/16 45/16
59/16 69/3 69/14 83/19
128/16 128/21 128/22
129/17 130/9 130/11
130/14 152/22 159/22
161/25 168/8

**inherent [1]** 177/5
**initial [4]** 8/9 50/20
56/23 73/5
**initially [5]** 50/24 52/7
57/12 58/6 58/20
**initiated [1]** 164/25
**injection [1]** 228/25
**inland [1]** 178/23
**input [7]** 206/21 207/3
217/21 218/13 218/15
218/15 238/10
**inputs [12]** 204/11
204/18 204/22 205/6
205/13 205/16 206/11
207/8 217/9 220/17
222/19 229/25
**insert [1]** 259/15
**inside [2]** 194/24 247/25
**insomuch [1]** 39/9
**instance [1]** 191/12
**instantly [1]** 61/1

**instead [8]** 12/7 14/18
151/22 166/5 176/15
176/17 192/6 229/20
**institute [1]** 12/4 122/19
**Institute's [1]** 122/18
**instruction [1]** 266/11
**insufficient [2]** 76/3
81/11
**insured [1]** 129/11
**intention [1]** 242/7
**intentionally [1]** 59/14
**interact [1]** 195/5
**interaction [2]** 194/21
195/1
**interest [3]** 40/24 181/24
193/16
**interested [2]** 216/4
217/15
**interests [3]** 130/13
181/8 181/10
**interfere [1]** 6/4
**interior [1]** 178/19
**interpret [3]** 124/22
125/2 127/7
**interpretation [7]** 11/7
89/10 112/23 131/13
196/17 199/4 201/9
**interpreted [2]** 124/11
182/9
**interpreting [2]** 124/18
126/1
**interrupt [8]** 24/4 35/24
53/10 54/24 66/24 67/1
88/17 89/17
**interview [1]** 28/11
**interviewed [5]** 172/11
172/14 172/19 172/21
172/24
**interviewers [2]** 147/22
180/8
**interviewing [1]** 26/25
**interviews [24]** 27/10
27/13 27/16 27/19 28/10
28/22 29/6 29/6 29/13
31/5 31/10 34/1 34/2
34/3 44/25 116/4 116/22
117/2 117/14 118/9
118/17 123/1 124/20
147/23
**introduction [1]** 113/19
**inventoried [1]** 81/6
**inversely [1]** 220/4
**investigate [6]** 25/23
27/15 40/16 67/20 91/1
92/25
**investigated [4]** 18/6
18/9 96/4 165/21
**investigating [3]** 28/21
36/10 39/19
**investigation [16]** 31/16
81/10 81/12 87/8 88/2
94/16 95/1 95/6 95/21
109/16 110/1 110/2
164/24 167/3 184/3
263/21
**investment [1]** 183/17

**invest[11]** 51/23
**invite [1]** 147/24
**involved [3]** 39/7 62/4
142/10
**involves [1]** 204/6
**is inferred [1]** 153/7
**isn't [33]** 56/11 58/3
61/14 63/11 70/13 80/16
140/15 143/24 151/11
151/22 152/25 153/5
153/17 154/3 155/9
158/7 158/14 160/21
161/1 161/24 163/16
164/2 165/25 166/8
166/17 167/7 170/23
172/6 187/16 215/9
227/10 245/4 245/15
**issue [33]** 6/21 9/24 12/3
29/18 37/16 44/3 44/4
44/8 44/8 48/15 50/1
51/15 73/3 74/17 76/1
77/2 86/19 94/6 97/18
98/9 105/7 112/4 112/6
155/17 163/20 168/9
168/10 168/10 183/9
184/8 208/6 217/5
**issued [1]** 62/16
**issues [13]** 6/12 16/4
16/4 21/15 31/25 46/16
49/8 67/23 74/17 105/13
105/15 117/22 125/4
**It'd [1]** 64/2
**it's [252]** 5/15 7/24 8/7
9/19 10/14 10/15 10/17
10/17 10/23 11/6 11/6
11/11 12/2 12/13 12/22
14/8 17/4 17/4 17/4
17/13 18/15 18/17 18/19
19/4 19/6 19/7 19/24
20/11 20/14 24/1 27/20
27/21 28/4 29/7 29/8
29/10 29/15 30/7 30/7
34/16 34/21 38/21 43/7
43/7 44/15 44/19 45/8
50/11 52/1 52/10 52/11
52/15 54/15 54/16 54/19
57/2 57/7 57/15 58/10
58/10 58/18 58/19 58/20
59/11 62/3 64/11 64/13
64/16 64/24 73/10 74/2
74/7 74/11 83/12 84/18
84/21 85/8 86/5 87/1
87/5 87/5 87/14 89/8
89/9 89/11 89/11 89/12
89/23 89/23 93/4 94/11
94/17 94/17 95/13 98/7
98/9 100/6 102/5 103/2
106/11 111/16 112/21
113/10 114/1 115/7
116/18 116/19 117/7
120/17 121/20 125/17
131/21 134/11 131/22
131/22 145/15 145/18
145/19 149/16 150/8
152/10 152/19 152/23

**invest[11]** continued
155/5 155/10 155/17
156/4 156/15 157/7
157/8 157/8 157/19
158/18 159/8 159/19
160/2 160/5 160/8
160/22 160/25 161/7
161/9 161/12 161/13
161/20 161/22 162/17
162/18 163/21 163/22
164/13 165/12 165/16
166/11 166/14 166/16
166/18 166/18 166/19
167/12 168/19 168/24
169/1 169/7 170/22
170/24 171/1 178/4
178/11 178/17 180/19
182/12 183/8 187/19
188/19 192/16 192/16
193/7 198/3 198/3
208/12 209/13 210/19
214/2 215/6 216/15
217/16 217/18 219/17
220/13 220/13 223/16
224/4 224/24 226/23
227/7 228/17 229/3
230/10 230/14 230/17
230/17 234/16 236/10
237/2 237/3 237/10
237/16 238/13 238/21
238/23 238/23 240/16
241/19 241/22 242/21
242/25 243/23 243/23
244/3 245/8 246/4
247/19 248/21 249/1
249/1 250/16 251/6
251/6 251/11 253/14
253/18 253/19 253/19
253/20 256/12 259/11
259/12 259/14 259/25
260/7 261/8 261/8
261/11 261/17 261/24
262/15 262/17 263/21
263/25 264/2 266/21
**it's 5-3 [1]** 187/19
**items [1]** 155/15
**itself [21]** 9/13 9/19 10/2
15/20 36/14 74/13 101/3
101/14 114/15 146/23
147/14 154/5 162/21
190/16 194/3 194/7
207/15 236/1 236/6
252/15 262/4

## J

**J-a-c-k-s-o-n [1]** 4/22
**Jack [2]** 2/9 5/2
**Jackson [10]** 4/10 4/15
4/20 5/2 49/4 128/14
135/15 136/15 183/22
268/3
**Jackson's [1]** 158/9
**Jacksonville [1]** 2/6
**January [6]** 1/9 99/9
99/15 100/10 100/12
268/22
**January 2008 [1]** 99/9

**Jeffrey [1]** 2/2
**jeopardize [2]** 97/20
98/11
**John [5]** 137/25 138/3
138/8 201/22 268/6
**joints [1]** 234/22
**Jonathan [1]** 2/2
**journal [2]** 121/1 141/16
**journals [1]** 240/24
**Jr [1]** 2/21
**JUDGE [15]** 1/14
137/17 138/11 138/22
145/19 153/8 154/10
160/8 168/22 169/10
169/17 171/18 173/1
175/19 182/5
**Judicial [1]** 174/9
**July [1]** 108/16
**Juno [1]** 178/20
**Jupiter [9]** 87/19 88/10
88/22 90/19 95/9 95/15
107/14 108/22 109/15
**just [144]** 6/23 9/14 9/20
11/1 11/3 13/13 16/19
17/9 17/22 18/3 21/13
25/19 28/4 29/7 29/20
30/13 30/18 38/22 41/2
44/20 46/21 47/18 48/14
50/16 56/11 56/21 57/25
58/6 60/23 60/24 62/9
63/13 65/18 66/13 66/14
67/1 67/11 68/20 69/4
69/11 69/21 75/10 75/20
76/2 76/6 76/23 80/3
82/15 83/8 85/3 89/7
93/8 93/14 94/13 94/21
95/25 96/15 96/24 98/9
98/16 100/18 103/25
105/23 108/6 113/16
113/20 113/21 115/3
115/22 116/18 119/8
123/11 124/10 125/22
126/10 126/12 126/24
127/6 128/20 130/11
131/4 131/12 131/14
136/21 137/11 137/23
138/6 142/22 143/21
147/7 148/1 148/22
149/11 157/7 157/8
157/8 157/12 159/5
159/12 162/17 163/21
164/11 165/16 169/6
176/23 178/25 179/10
179/12 179/15 180/5
180/19 181/15 184/1
190/19 204/13 204/15
210/19 210/22 214/6
215/9 218/4 222/4 222/6
226/13 237/2 237/3
240/23 242/25 243/6
244/17 253/20 258/18
258/19 258/21 258/21
260/7 261/4 262/3 262/4
262/16 262/17 266/10
266/24 267/3

# K

**KAM [1]** 1/2
**keep [6]** 41/3 108/10
109/3 208/3 209/12
228/17
**KENNETH [1]** 1/13
**kept [2]** 62/17 62/24
**key [4]** 39/8 64/5 87/4
258/8
**Kilpatrick [56]** 48/7
49/22 50/6 65/3 65/20
66/20 67/7 72/15 81/12
81/23 82/9 85/23 89/10
91/7 102/7 105/4 112/7
112/8 115/5 116/1 120/6
121/23 125/23 127/9
127/20 133/9 133/14
133/14 133/17 133/18
134/22 135/17 135/23
136/15 145/12 146/16
146/19 147/6 148/18
148/20 148/22 149/7
150/5 150/19 150/23
150/24 151/8 152/4
163/11 166/21 173/16
178/15 179/23 180/21
182/13 201/22
**Kilpatrick's [25]** 68/18
70/5 71/6 71/25 73/2
77/1 85/17 93/1 109/7
112/13 126/5 132/2
133/23 143/1 149/14
149/23 151/2 151/9
151/19 173/25 174/3
178/3 180/1 180/4 184/1
**kind [20]** 42/6 45/13
50/11 65/23 66/11 68/10
68/24 71/12 89/8 89/8
100/24 108/4 108/5
120/18 146/8 208/12
221/9 234/1 246/5
259/14
**kinda [5]** 11/11 83/18
84/10 132/13 259/13
**kinds [3]** 230/13 241/24
263/10
**knew [6]** 26/2 45/2 45/3
50/17 54/12 54/13
**know [243]** 11/23 12/4
12/9 12/12 15/9 16/1
16/3 16/13 17/20 18/5
18/6 18/9 19/8 19/10
19/15 21/11 23/3 23/9
23/10 25/5 25/12 26/2
26/7 26/14 26/19 27/18
28/25 30/14 30/15 30/19
30/20 31/21 32/5 34/15
34/22 35/7 36/8 36/14
36/17 38/4 38/6 38/7
38/9 38/15 39/16 39/24
40/4 40/20 40/22 40/24
42/6 42/9 43/10 43/13
44/4 44/6 44/7 44/12
44/14 44/16 45/6 45/9
45/22 46/6 48/3 48/22
49/10 50/4 50/8 50/19
52/14 52/15 52/21 54/9
54/13 54/15 54/16 54/18
55/7 56/24 56/24 57/17
58/9 58/10 58/10 58/17
58/23 59/8 59/10 59/12
59/13 59/15 59/17 59/17
59/18 59/21 60/4 60/11
60/13 62/2 62/3 62/4
62/10 62/11 62/15 62/18
62/18 63/9 64/22 64/23
64/24 65/3 65/9 65/10
65/23 66/7 66/11 70/6
71/7 73/11 76/22 78/17
80/1 83/8 83/12 83/13
85/11 85/24 86/1 86/2
88/4 89/4 90/16 90/18
91/5 92/24 93/5 94/4
94/6 94/7 94/13 94/22
95/22 96/2 98/7 99/10
100/2 100/6 100/18
101/16 102/7 104/10
104/25 105/4 105/10
106/4 106/5 108/11
109/21 109/22 111/22
118/3 118/5 118/8 119/9
122/3 125/3 125/22
130/14 131/15 136/11
142/12 146/23 155/2
155/14 157/4 157/16
157/20 157/22 159/6
159/12 159/13 159/14
160/2 162/2 162/5
162/13 163/15 163/19
164/12 164/13 164/13
165/9 168/23 169/12
170/22 170/24 171/1
171/9 171/14 176/12
181/5 189/4 190/5
192/16 193/6 193/7
193/8 199/22 200/23
214/2 214/18 216/16
216/17 217/19 218/25
220/14 221/20 227/15
232/8 232/18 235/8
240/13 240/24 241/3
242/18 244/2 246/1
248/21 249/10 251/4
251/9 251/10 255/25
256/23 258/25 260/11
261/4 262/16 263/13
263/19 263/24 265/24
**knowing [2]** 135/24
251/3
**knowledge [31]** 34/16
43/12 44/20 45/13 50/1
50/2 50/8 50/10 51/9
52/2 52/24 52/24 52/25
54/9 55/18 58/24 59/1
59/2 60/13 60/20 60/22
60/23 61/5 61/9 62/25
69/17 70/23 83/16 94/7
110/11 121/20
**knowledgeable [2]** 7/11
44/17
**known [13]** 52/3 52/4
83/2 85/2 94/10 141/16
142/21 143/16 148/20
238/4 244/23 245/11
245/11
**knows [5]** 25/20 44/8
58/17 130/15 265/22

# L

**lab [5]** 231/14 231/16
231/21 231/24 232/4
**labeled [1]** 111/18
**laboratory [1]** 239/22
**lack [1]** 58/23
**laid [1]** 122/20
**Lake [1]** 249/6
**Lakes [1]** 2/11
**landfill [11]** 222/14
244/14 244/18 244/20
247/13 248/18 250/16
259/18 259/18 259/22
264/21
**language [3]** 113/23
199/3 199/6
**large [5]** 18/13 53/20
73/19 237/15 244/3
**larger [5]** 31/19 92/18
92/19 96/3 106/8
**last [8]** 4/18 4/21 5/19
138/7 165/9 165/10
185/5 208/18
**lasting [1]** 140/9
**later [9]** 21/12 47/14
50/25 51/25 57/1 132/2
155/3 188/1 198/1
**lateral [1]** 262/9
**latter [1]** 260/16
**Lauderdale [2]** 2/4 2/8
**Laureates [1]** 148/14
**law [14]** 43/5 138/16
174/14 249/21 254/16
254/19 254/20 255/1
255/11 255/14 255/17
255/19 256/1 256/11
**lawyers [4]** 180/13
181/11 182/2 199/14
**lay [3]** 133/21 162/3
162/5
**layer [8]** 210/6 225/14
226/9 227/8 248/10
258/9 262/4 262/4
**layered [1]** 249/20
**layers [2]** 226/13 261/11
**lays [1]** 205/16
**lead [4]** 10/14 71/10
71/11 80/5
**leading [9]** 127/15
129/25 135/20 174/24
254/5 254/11 262/22
264/24 265/20
**leakage [4]** 49/23 49/23
60/2 60/6
**learn [1]** 49/19
**learned [3]** 173/20
173/20 174/20
**least [8]** 51/9 53/10 65/5
152/13 160/20 167/13
188/9 266/6
**led [3]** 99/15 100/13
209/25
**left [3]** 107/11 150/25
247/21
**legal [1]** 192/25
**legs [2]** 98/1 98/5
**lender [1]** 172/21
**lenders [3]** 51/23 124/21
172/24
**lending [2]** 172/22
172/25
**length [9]** 42/24 43/7
48/4 91/4 91/6 92/3
95/24 163/11 177/4
**lengthy [1]** 164/12
**less [15]** 30/9 30/9 45/7
45/8 45/12 50/4 51/8
51/12 60/20 60/22 111/8
173/5 208/5 241/10
260/23
**lessens [1]** 166/6
**let [39]** 11/17 16/8 17/5
19/24 29/3 29/17 45/19
48/22 49/10 56/21 61/15
64/16 67/3 70/20 75/10
75/10 79/12 90/22 98/5
110/13 114/7 114/17
115/3 115/16 115/22
121/5 122/11 123/12
131/1 133/21 137/11
149/13 162/20 172/18
191/6 193/13 213/17
223/8 230/9
**let's [31]** 16/15 42/14
42/20 48/19 79/16 95/10
107/24 113/10 113/21
156/20 158/24 161/15
173/6 173/13 173/25
175/12 175/23 177/8
177/25 180/1 182/3
182/3 184/17 205/22
206/11 206/12 218/9
224/25 247/5 259/23
264/15
**letter [3]** 164/19 263/19
263/19
**level [10]** 14/13 78/9
78/12 78/12 194/24
194/25 232/3 246/14
247/22 247/25
**level are [1]** 78/12
**levels [3]** 45/10 256/14
257/13
**lexicon [1]** 35/15
**license [2]** 143/15
143/17
**lie [3]** 234/20 257/24
258/18
**light [1]** 259/19
**liked [1]** 154/2
**likelihood [1]** 36/9
**likely [20]** 35/18 107/20
109/5 109/9 179/16
183/8 183/9 186/13
199/7 200/2 200/8
200/24 201/8 207/15
**210/1 228/3 245/15
251/4 252/6 252/24
**limestone [2]** 261/11
261/13
**limestones [1]** 263/10
**limit [2]** 200/12 241/25
**limitation [1]** 237/19
**limitations [2]** 235/18
235/19
**limited [5]** 110/2 166/1
166/22 174/22 175/7
**line [22]** 29/11 77/11
93/17 94/19 95/18
120/18 131/10 193/18
194/23 222/12 223/25
236/21 237/8 237/14
252/8 252/13 252/17
252/23 256/4 259/12
259/20 260/22
**line 14 [1]** 252/17
**line 16 [1]** 193/18
**line 19 [1]** 252/23
**line 6 [1]** 252/13
**lines [18]** 91/20 94/5
94/12 94/25 95/3 108/6
132/1 132/18 132/19
133/10 134/16 196/24
197/18 198/8 202/4
239/9 245/25 247/15
**lines 1 [1]** 198/8
**lines 17 [1]** 196/24
**lines 20 [1]** 197/18
**lines 7 [1]** 239/9
**linked [3]** 68/10 68/25
99/17
**list [2]** 232/10 243/11
**listed [1]** 170/2
**listen [1]** 98/12
**listening [1]** 49/22
**lists [2]** 170/1 170/3
**literally [4]** 178/16
178/20 179/7 180/13
**literature [26]** 49/25
51/24 52/10 52/12 121/7
121/10 124/25 125/1
126/25 160/6 161/12
161/13 161/13 178/8
215/6 230/13 234/2
234/20 234/22 239/20
240/10 240/19 240/23
241/1 253/20 257/5
**literature's [1]** 176/13
**litigation [3]** 67/24
180/11 180/12
**litmus [1]** 44/13
**little [30]** 5/18 7/24
12/24 13/8 26/4 65/4
65/23 87/3 93/15 104/1
108/15 113/17 132/12
138/20 152/19 155/10
156/4 158/22 167/14
167/15 185/22 190/15
194/2 217/16 219/11
219/10 229/5 237/15
251/1 266/5
**live [8]** 142/17 142/18

**L**

**live... [6]** 163/14 170/20 179/4 179/10 182/10 183/18
**lives [1]** 53/22
**living [3]** 163/19 184/4 235/8
**loaded [6]** 64/11 64/13 64/16 64/18 159/12 160/2
**loaders [1]** 157/21
**local [4]** 81/7 164/17 164/18 248/6
**localized [2]** 227/15 229/17
**locally [1]** 229/17
**located [4]** 156/15 156/17 188/16 189/10
**location [14]** 84/17 84/22 153/17 153/25 154/3 198/1 221/15 242/18 242/19 244/16 248/25 250/1 257/22 259/16
**locations [13]** 192/16 192/17 193/7 193/8 223/10 232/18 243/12 245/3 256/24 259/5 260/19 265/14 265/17
**lodged [1]** 176/1
**logic [1]** 96/19
**logical [2]** 25/12 96/17
**logs [4]** 210/1 210/19 263/3 263/6
**long [9]** 19/14 69/23 140/9 173/4 181/17 209/14 217/18 217/20 217/22
**long-lasting [1]** 140/9
**longer [1]** 110/8
**looked [29]** 81/7 88/6 88/7 95/7 95/8 108/15 115/2 131/15 134/5 135/16 151/13 197/19 214/16 215/15 215/24 222/4 237/16 241/6 241/12 253/15 253/24 256/23 257/1 257/12 258/14 263/3 263/5 263/6 265/14
**looking [24]** 12/7 21/11 31/11 32/2 34/12 38/10 39/17 41/15 71/1 73/7 81/20 88/13 123/21 131/2 149/23 216/5 217/5 228/6 229/3 231/4 240/23 242/17 258/5 262/7
**looks [6]** 147/5 157/4 157/16 166/25 174/8 263/7
**losing [1]** 97/12
**losses [1]** 149/9
**lost [2]** 29/1 87/7
**lot [52]** 7/9 17/19 17/19 17/20 23/13 23/13 32/17

43/11 52/9 52/15 61/21 66/22 67/2 84/16 86/17 86/18 92/4 92/20 93/7 94/14 94/18 97/2 103/7 103/20 117/6 118/3 131/25 141/15 141/23 141/23 149/11 154/25 157/7 159/8 167/1 167/4 167/4 170/1 170/3 183/10 199/23 210/21 214/19 223/3 227/21 228/4 239/19 239/23 253/14 260/14 261/7 263/8
**lots [6]** 92/19 92/19 96/3 96/4 133/4 227/18
**loud [2]** 5/14 5/16
**love [1]** 170/21
**low [9]** 213/10 216/6 216/14 218/5 221/5 227/18 227/18 227/21 231/13
**lower [14]** 25/10 26/13 50/25 53/16 95/23 96/13 124/15 209/15 213/2 219/1 220/16 228/3 247/21 260/3
**lump [1]** 82/15
**lunch [6]** 106/16 108/17 108/24 124/2 135/3 145/17

**M**

**MacNally [4]** 2/16 185/1 185/14 268/11
**magenta [1]** 187/21
**magically [1]** 108/10
**magnitude [2]** 214/20 236/10
**mail [1]** 1/20
**main [2]** 195/22 240/24
**maintenance [1]** 93/5
**major [3]** 163/24 164/2 164/4
**majority [1]** 233/22
**makes [2]** 59/11 67/12
**making [15]** 26/23 28/13 33/25 37/23 38/16 40/9 41/8 46/1 46/18 63/3 122/6 122/12 123/7 163/19 183/11
**managed [1]** 35/4
**management [6]** 139/12 209/3 248/3 248/4 257/3 259/1
**Manual [1]** 174/5
**manufacturing [8]** 209/2 222/10 222/14 222/18 224/11 224/13 224/23 264/21
**map [20]** 76/21 187/8 188/6 189/19 191/5 191/12 191/16 191/23 192/2 233/4 237/3 246/13 246/14 246/16 247/2 247/22 250/14

253/21 255/22 258/7
**maps [6]** 74/21 74/22 191/9 247/3 250/8 250/9
**Mara [1]** 2/10
**mark [3]** 135/4 169/1 233/3
**marked [1]** 203/13
**market [149]** 13/19 14/7 15/11 21/12 22/11 22/15 22/19 23/4 23/8 23/7 23/8 23/10 23/14 24/3 24/7 24/16 25/20 26/2 27/10 27/12 27/19 28/10 29/13 31/11 34/2 34/3 35/10 36/8 36/25 36/25 37/9 38/5 38/8 38/11 39/6 39/14 39/21 39/22 40/18 42/16 42/21 43/2 43/4 43/12 43/16 43/18 44/12 44/13 44/13 44/25 45/22 47/20 49/19 49/20 50/5 50/8 51/8 51/13 51/14 51/19 52/17 54/8 54/18 54/19 58/24 59/6 59/7 59/8 59/9 59/12 59/12 59/15 59/15 59/17 59/19 60/15 60/23 62/11 62/11 62/21 62/24 62/25 63/6 64/12 67/15 67/19 67/25 69/3 69/6 69/14 69/15 69/24 70/23 74/8 79/8 80/17 80/20 81/1 82/22 82/22 82/24 83/2 83/9 83/16 83/17 83/19 83/21 83/22 83/25 84/5 84/10 84/22 84/25 85/2 85/4 87/10 91/11 94/6 94/7 94/8 94/9 94/18 101/2 104/12 108/4 108/18 110/23 110/23 114/23 117/3 117/22 117/22 118/8 118/9 118/17 120/21 123/1 124/19 127/14 128/15 129/3 129/4 129/11 130/8 130/18 144/16 172/8 174/23 179/14
**market's [70]** 10/16 13/5 13/15 13/21 13/22 15/2 15/8 15/19 17/6 18/2 18/12 18/24 19/19 20/8 22/9 22/13 22/17 22/23 23/18 25/25 28/16 31/7 32/23 33/20 35/8 36/6 37/14 38/9 38/18 38/24 39/20 40/8 40/11 40/16 41/9 47/7 50/14 63/5 63/15 63/22 64/7 71/18 72/6 72/19 75/4 76/12 77/14 77/25 78/10 78/22 79/24 80/5 80/15 104/10 114/19 114/25 115/19 115/23 118/1 118/14 118/17 118/23 119/4 120/2 122/8 122/14 123/8 124/9

130/17 130/19
**marketing [7]** 139/12 141/6 141/14 141/15 141/16 144/18 144/19
**marketplace [5]** 47/22 61/14 70/1 100/25 101/22
**markets [4]** 40/4 74/6 80/24 80/25
**marking [1]** 169/7
**MARRA [1]** 1/13
**mass [11]** 76/5 102/16 102/18 102/20 102/22 103/23 104/2 143/23 144/1 175/18 177/10
**match [1]** 221/17
**material [1]** 42/25
**materials [3]** 134/2 227/25 261/10
**math [6]** 149/18 150/1 150/4 150/4 182/9 182/14
**mathematics [1]** 151/6
**matter [13]** 5/6 17/24 65/2 70/11 71/24 73/22 100/5 100/6 106/13 106/14 232/23 245/16 268/21
**matters [6]** 5/12 6/1 103/21 124/7 140/2 157/23
**matured [1]** 61/1
**maximum [8]** 186/6 203/24 206/8 207/11 207/14 214/7 243/11 260/5
**May 17th [2]** 253/2 253/3
**May 8th [1]** 264/4
**maybe [14]** 9/19 11/18 51/12 55/10 62/12 97/3 101/20 120/6 135/24 169/15 183/23 200/7 217/25 222/3
**Maybe 1 [1]** 169/15
**MBAs [1]** 144/14
**McElroy [2]** 2/17 196/1
**me [125]** 5/16 11/17 11/23 12/10 12/10 13/21 16/8 16/24 17/21 19/24 20/11 20/25 22/15 22/22 22/24 24/9 24/19 26/25 29/21 29/1 29/3 29/12 29/17 32/9 35/25 45/19 46/23 48/22 49/8 49/10 52/3 53/8 54/2 54/23 56/21 57/3 61/15 63/14 65/18 66/3 66/16 67/1 70/20 73/15 75/10 75/10 75/20 77/11 78/2 79/12 80/4 83/3 88/16 89/16 89/21 95/21 96/18 96/22 97/16 98/24 99/2 100/18 101/1 101/4 101/13 103/10 104/18 109/17 110/12 110/13 113/11

114/7 114/17 114/22 115/3 115/5 115/14 115/16 115/22 116/18 118/21 121/5 122/11 123/12 123/13 123/17 125/25 125/25 131/1 131/17 131/17 133/19 133/21 135/8 137/11 140/1 141/17 143/20 145/17 149/13 151/25 153/11 153/21 162/20 179/9 179/9 179/10 184/13 187/19 191/6 192/23 193/13 193/16 208/12 216/22 230/22 249/25 253/17 253/21 253/24 263/8 265/5 266/21 266/24 267/3
**mean [67]** 8/4 10/14 11/13 14/1 17/16 21/3 24/4 30/19 30/21 31/2 35/12 35/24 44/10 47/2 47/17 59/8 59/9 66/24 66/24 79/12 84/10 92/19 102/4 109/21 112/24 115/10 116/25 117/4 118/6 124/18 135/18 136/13 140/11 144/3 149/8 149/12 151/7 153/8 160/6 166/14 167/22 169/23 179/8 181/17 202/14 209/24 212/6 216/14 216/17 216/21 217/17 217/22 232/6 235/22 237/10 238/3 239/19 239/21 241/19 241/20 257/5 261/17 265/4 265/22 266/3
**mean -- I [1]** 66/24
**meaning [3]** 41/4 41/7 251/7
**means [12]** 35/1 47/18 58/1 117/15 117/25 136/11 140/9 149/5 188/1 199/7 200/7 212/7
**meant [2]** 119/6 153/25
**measurable [5]** 7/7 7/15 16/13 20/16 20/18
**measure [30]** 7/12 8/7 11/15 14/13 17/12 20/21 20/24 21/1 21/4 21/16 21/25 28/5 29/7 29/10 29/16 37/3 37/17 44/21 44/24 45/6 45/17 70/24 124/12 144/10 148/2 148/6 149/3 149/5 219/17 231/21
**measured [15]** 18/6 24/9 29/4 29/5 34/4 35/5 35/20 37/6 38/2 63/18 71/4 71/8 80/20 189/4 231/24
**measurement [8]** 14/15 27/21 37/16 210/20 219/15 222/5 223/15

## M

**measurement... [1]**
254/25

**measurements [7]** 71/6
221/1 222/13 223/10
234/2 244/16 247/25

**measures [1]** 264/11

**measuring [17]** 6/21
14/6 15/11 15/13 15/13
15/16 15/17 15/18 21/7
21/14 24/10 28/1 31/9
37/22 40/12 45/3 124/8

**Mecca [1]** 250/10

**mechanism [1]** 206/10

**media [7]** 45/21 215/11
241/22 241/22 254/21
255/10 256/9

**meeting [1]** 5/3

**meltdown [1]** 90/5

**member [1]** 117/5

**members [4]** 34/14
100/11 100/15 122/19

**memory [3]** 155/15
155/16 165/8

**mention [3]** 93/24
165/12 229/13

**mentioned [5]** 38/10
128/16 154/6 222/17
261/3

**mentioning [1]** 71/15

**mercury [8]** 19/3 168/7
168/14 169/21 202/1
202/12 202/25 203/8

**merged [1]** 181/10

**Merit [1]** 268/18

**merits [2]** 73/10 73/12

**met [9]** 103/7 103/9
103/15 103/21 104/15
138/17 138/24 139/1
139/2

**meta [4]** 119/23 120/1
120/8 127/11

**meta-analysis [4]**
119/23 120/1 120/8
127/11

**metes [3]** 191/4 191/8
192/6

**method [16]** 77/7 89/10
89/11 89/11 94/22 118/6
120/1 120/17 120/18
120/23 121/14 123/1
131/23 145/15 148/16
208/12

**methodologies [22]** 7/7
7/17 20/17 20/19 26/22
27/14 28/20 33/25 68/18
71/25 72/16 73/24 77/22
78/21 96/21 103/6
103/13 116/5 122/16
122/20 126/25 127/12

**methodology [8]** 34/25
82/17 89/13 119/18
119/23 120/13 121/7
255/19

**methods [34]** 11/13
73/15 102/15 104/4

116/14 116/17 116/25
117/2 117/2 117/7 117/8
117/10 118/5 119/22
122/24 126/3 127/5
127/7 127/8 127/10
127/20 127/21 127/22
136/1 144/23 146/3
148/17 148/18 149/9
173/19 173/21 174/19
174/19 175/2

**Michigan [3]** 18/21
18/22 19/2

**microphone [6]** 4/17
138/4 138/6 138/21
139/16 185/22

**middle [1]** 259/21

**might [42]** 10/4 18/20
26/5 26/6 26/6 26/20
28/10 36/18 36/20 41/21
41/22 42/2 42/7 58/15
58/19 58/21 62/6 62/6
62/8 110/14 110/16
125/4 126/12 127/4
128/18 135/4 147/7
175/4 176/12 183/6
183/23 185/22 218/2
218/2 240/15 246/13
262/11 265/17 265/23
265/23 265/25 266/20

**migrate [6]** 35/19 36/4
36/10 242/14 250/22
251/4

**migrated [3]** 36/22
170/10 195/9

**migrating [1]** 36/21

**migration [8]** 35/22
45/10 186/7 195/2 203/8
203/25 206/9 264/23

**mile [1]** 244/4

**miles [28]** 156/16 156/17
188/1 188/9 188/11
188/17 188/21 188/24
189/2 189/7 189/10
189/12 189/23 190/3
190/9 190/10 190/12
191/13 201/17 209/9
224/23 229/25 230/6
230/21 231/22 232/3
234/11 251/13

**million [2]** 14/21 142/9

**mince [1]** 17/16

**mincing [1]** 27/18

**mind [12]** 45/11 47/15
47/18 103/15 130/5
155/12 155/13 181/3
201/7 208/3 209/12
228/17

**mine [2]** 10/25 170/17

**minute [6]** 48/19 98/1
163/24 171/18 184/17
251/17

**minutes [10]** 48/16
97/13 97/15 97/17 98/23
137/1 173/5 178/2
181/18 251/18

**mischaracterizing [1]**

199/3, 301

**mishear [2]** 46/22 46/23

**mislead [1]** 46/11

**misleading [5]** 46/14
47/1 47/18 82/18 126/8

**missed [5]** 55/4 123/3
124/10 192/22 234/9

**Missimer [7]** 189/5
200/15 211/22 213/13
230/18 246/15 255/16

**missing [1]** 57/4

**misspoken [1]** 135/4

**misstates [1]** 203/4

**misunderstood [1]**
114/16

**misused [1]** 102/18

**MIT [3]** 139/9 173/22
240/16

**mix [3]** 96/2 261/11
262/8

**mixed [1]** 133/1

**mixture [1]** 262/18

**mobile [2]** 219/15 226/4

**model [35]** 82/14 93/2
150/20 150/20 151/5
182/13 209/2 210/6
211/22 211/22 247/16
247/19 247/23 247/24
248/1 248/2 248/2 248/6
248/9 248/12 248/16
248/20 248/21 249/2
249/3 249/9 249/14
249/20 249/24 250/3
250/4 250/17 258/25
259/2 262/3

**models [6]** 104/24 105/1
105/5 134/5 257/1 257/2

**modification [1]** 101/8

**molecule [1]** 130/15

**moment [3]** 126/12
191/3 266/24

**money [2]** 137/9 182/25

**monitoring [14]** 235/9
235/15 244/14 244/17
244/20 244/22 245/4
245/7 245/10 245/12
264/17 264/18 264/20
265/7

**Moore [1]** 266/20

**morning [6]** 4/2 4/4
118/3 118/12 118/13
119/13

**mortgage [3]** 90/5
172/21 172/24

**mortgages [1]** 109/23

**most [11]** 34/21 43/16
90/6 134/8 194/20 224/5
237/17 257/22 257/24
258/16 260/14

**mostly [5]** 178/17 180/7
223/10 260/16 261/9

**motion [2]** 1/12 175/13

**motivated [1]** 174/18

**move [32]** 42/14 97/3
113/21 138/5 144/9
145/19 154/10 170/21

171/20 178/21 178/23
178/23 212/14 212/17
212/20 217/13 217/14
218/7 219/18 235/21
236/2 237/20 238/2
238/4 238/8 238/25
239/8 239/18 239/20
239/23 240/6 251/12

**moved [2]** 199/11 261/1

**movement [6]** 186/1
194/2 212/11 239/25
245/12 255/9

**moves [2]** 194/6 237/21

**moving [4]** 170/23
204/18 264/5 265/25

**Mr [7]** 268/4 268/5
268/7 268/8 268/9
268/11 268/12

**Mr. [19]** 4/23 49/2 98/22
107/1 107/5 128/14
129/23 130/7 135/15
136/6 139/15 151/19
181/4 181/19 181/23
182/3 184/22 196/1
196/3

**Mr. Gallagher [1]** 196/3

**Mr. Hammer [1]** 139/15

**Mr. Jackson [2]** 128/14
151/19

**Mr. Kilpatrick's [1]**
151/19

**Mr. McElroy [1]** 196/1

**Mr. Scarola [12]** 4/23
49/2 98/22 107/1 107/5
129/23 130/7 136/6
181/4 181/19 181/23
182/3

**Mr. Stephens [1]** 184/22

**Ms. [1]** 137/3

**Ms. Hatfield's [1]** 137/3

**much [42]** 4/24 5/24
31/9 49/3 54/14 76/17
82/7 82/13 82/13 95/10
95/13 96/6 97/24 98/10
99/4 105/24 119/16
130/21 136/17 142/20
163/20 166/2 176/8
181/20 183/8 183/9
215/10 216/15 218/25
220/14 222/2 223/11
245/4 248/6 250/12
250/22 251/4 257/17
258/12 260/10 260/19
266/4

**multi [1]** 142/9

**multi-million-dollar [1]**
142/9

**multiple [22]** 15/25
16/10 16/18 17/7 18/3
31/19 41/15 41/20
102/16 102/25 103/3
103/8 103/9 103/10
103/23 104/2 104/16
146/14 176/15 176/18
176/21 176/21

**multiplying [1]** 204/6

171/21 178/21 178/23
178/23 212/21 212/17
212/20 217/13 217/14
218/7 219/18 235/21
236/2 237/20 238/2
238/4 238/8 238/25
239/8 239/18 239/20
239/23 240/6 251/12

## N

**N's [3]** 150/9 150/10
150/10

**name [11]** 4/18 4/18
4/21 5/2 138/7 138/7
138/8 138/16 185/5
185/5 185/13

**named [1]** 180/7

**names [2]** 145/9 146/5

**narrow [2]** 105/11 228/7

**narrower [1]** 89/23

**narrowing [1]** 132/18

**national [3]** 34/11
122/18 148/8

**natural [2]** 228/24
262/10

**nature [4]** 18/10 62/3
64/11 105/19

**near [4]** 84/14 187/22
209/2 258/19

**necessarily [14]** 23/1
31/9 42/15 43/8 44/9
47/17 83/1 162/2 165/16
212/4 212/25 235/20
236/25 237/20

**necessary [7]** 50/9 110/8
111/9 130/16 182/10
209/15 251/6

**need [42]** 4/6 11/18
21/25 22/10 23/17 24/15
26/2 32/7 39/4 48/22
49/10 49/14 63/3 63/21
63/25 65/10 65/10 81/25
83/3 86/9 86/12 97/24
103/25 104/15 133/6
139/15 143/5 143/6
143/9 156/3 157/13
163/15 182/24 185/22
194/6 210/21 237/13
237/25 242/8 242/17
251/9 253/22

**needing [1]** 105/21

**needs [1]** 22/19

**negative [4]** 70/2 70/13
166/22 167/6 167/9
167/13

**negatively [1]** 170/14

**neighborhood [18]**
17/18 36/5 36/22 38/3
42/2 42/3 42/8 42/9
84/15 84/15 85/11 85/12
157/23 161/23 167/21
170/13 170/20 170/22

**neither [2]** 42/25 73/17

**network [1]** 99/19

**never [14]** 30/24 30/24
60/8 110/19 120/6 120/7
121/19 131/9 140/13
140/18 144/25 158/7
181/24 181/25

**Nevertheless [1]** 213/7

**N**

**new [10]** 52/5 53/4 53/5 53/18 56/10 56/10 56/18 58/12 112/25 196/9
**news [1]** 45/21
**newspaper [2]** 45/21 46/6
**next [14]** 4/5 33/13 42/14 77/5 89/1 114/17 114/18 132/11 137/18 156/20 158/17 161/15 184/18 225/10
**nice [1]** 97/22
**no [163]** 1/2 6/7 6/8 7/22 9/20 10/20 11/24 12/4 12/22 12/22 14/5 16/3 21/5 28/4 28/24 38/22 46/23 47/2 47/2 57/8 57/24 60/1 60/8 63/21 66/14 66/24 67/10 67/10 67/16 67/21 68/6 68/12 69/6 69/15 69/17 69/20 69/20 70/3 71/16 71/20 72/5 72/7 72/8 72/10 74/8 75/23 77/6 77/13 77/18 77/21 80/1 80/21 80/21 82/17 86/13 87/22 90/12 92/14 94/16 95/21 95/21 97/19 98/14 99/7 99/13 110/8 110/11 110/19 111/5 111/13 114/1 114/1 114/9 115/16 115/16 116/7 117/4 117/4 119/25 120/4 122/11 123/6 123/6 125/10 128/3 128/6 129/20 130/17 131/6 131/22 131/22 134/17 136/4 139/2 140/16 140/21 140/24 142/25 143/14 143/17 143/25 144/3 144/4 144/7 145/2 146/13 147/14 147/17 150/1 151/23 151/24 153/2 153/2 153/2 158/8 160/14 160/15 162/5 165/1 166/8 166/13 166/14 168/25 172/10 172/13 172/16 172/19 172/24 175/1 175/9 176/11 177/24 178/4 178/22 179/25 180/5 180/23 181/7 181/9 184/3 186/17 189/8 192/5 195/1 198/19 199/19 200/18 201/3 201/12 202/4 209/12 209/14 215/18 221/15 230/25 233/22 235/9 238/10 244/13 244/17 249/17 250/8 253/24
**NOA [1]** 148/8
**NOAA [7]** 148/7 148/12 154/6 154/7 160/7 176/7 178/9

**Nobel [1]** 148/13
**nobody [2]** 66/3 66/16
**nobody's [2]** 73/14 123/13
**non [1]** 92/2
**non-arm's [1]** 92/2
**nondetect [2]** 234/4 234/10
**nondetections [2]** 233/13 233/19
**nondetects [1]** 233/1
**nondurable [2]** 140/8 141/19
**nondurables [1]** 140/4
**none [2]** 96/14 268/15
**nonforeclosure [1]** 96/14
**nonqualified [1]** 92/4
**nonresponsive [1]** 154/11
**nontransactional [3]** 29/8 116/19 117/7
**noon [1]** 97/12
**normally [2]** 44/12 180/16
**north [12]** 112/22 115/10 115/12 115/12 156/16 156/17 188/17 189/11 189/12 212/17 236/17 258/21
**northeast [6]** 3/3 209/4 210/6 258/19 258/21 259/2
**northern [4]** 188/20 209/10 209/22 210/11
**northernmost [4]** 189/19 189/22 227/1 235/3
**Northwestern [2]** 173/22 174/14
**note [4]** 106/15 116/19 129/2 130/6
**note 6 [1]** 116/19
**noted [3]** 49/12 107/16 233/8
**notes [1]** 117/6
**nothing [7]** 6/3 88/17 145/23 173/1 180/24 184/10 241/20
**notion [1]** 58/6
**nowhere [1]** 211/16 229/7
**nuclear [1]** 181/24
**number [38]** 5/11 24/23 32/23 36/6 38/11 47/6 76/20 113/24 114/10 141/7 142/18 142/22 162/24 163/20 168/23 169/11 169/12 176/14 178/7 179/16 189/5 200/11 201/21 203/15 206/5 206/23 207/7 207/16 207/16 217/16 222/7 223/10 233/20 237/22 244/2 244/3 258/24 265/13

**number21 [1]** 201/21
**number 6 [1]** 203/15
**number 9 [7]** 24/23 32/23 36/6 47/6 76/20 113/24 114/10
**numbers [17]** 95/16 108/16 132/5 150/17 179/13 204/15 213/12 214/5 216/7 218/3 218/4 218/14 222/11 230/4 230/12 258/8 260/4
**numerous [1]** 183/16

**O**

**o'clock [1]** 266/16
**oath [5]** 193/24 197/7 199/1 200/20 246/7
**object [13]** 11/2 39/25 64/10 82/3 99/23 113/18 129/25 131/18 133/12 175/19 183/3 202/3 241/8
**objected [1]** 199/14
**objecting [1]** 181/15
**objection [22]** 127/15 134/18 134/20 135/20 177/12 177/18 181/15 191/17 192/24 197/12 199/16 201/13 202/3 203/4 227/11 246/17 246/19 254/5 254/11 262/22 264/24 265/20
**observations [2]** 193/11 239/23
**obviously [3]** 10/23 62/10 81/16
**occur [10]** 32/11 40/25 54/22 94/23 101/19 109/22 110/3 110/5 209/6 222/9
**occurred [13]** 11/21 12/17 22/1 66/2 86/20 88/22 91/14 91/18 92/7 108/1 109/17 109/19 242/20
**occurring [2]** 86/24 260/15
**occurs [3]** 61/21 87/8 94/5
**ocean [3]** 248/19 250/18 259/6
**Oceanic [1]** 148/8
**off [16]** 55/21 87/4 107/11 153/9 160/8 171/12 187/14 188/6 197/8 213/6 227/12 242/2 258/19 258/21 251/21 267/3
**offer [4]** 102/7 186/1 200/4 202/24
**offered [5]** 122/19 195/16 196/5 203/7 245/5
**offering [2]** 196/12 202/11
**offices [1]** 138/17

**official [2]** 1/19 12/23
**offs [1]** 176/19
**offsite [11]** 189/20 220/25 242/10 242/15 244/13 244/17 245/9 261/2 263/21 264/23 265/7
**often [2]** 147/21 212/9
**Oh [7]** 10/22 36/2 87/24 129/8 149/20 158/15 214/1
**oil [7]** 168/6 168/14 169/21 201/25 202/11 202/25 203/7
**okay [134]** 5/16 5/25 6/8 7/20 8/8 8/13 8/21 12/1 12/6 12/16 13/13 15/22 16/6 16/7 16/15 18/20 18/23 20/15 21/10 21/20 21/21 23/24 25/2 26/18 27/6 27/11 30/16 31/13 31/21 31/23 33/7 35/18 37/12 38/14 39/4 41/15 42/13 46/24 47/3 48/9 48/22 52/13 54/11 55/2 57/6 59/18 59/22 60/16 62/10 63/1 65/8 66/15 66/25 68/7 71/22 72/4 72/14 74/16 75/24 76/8 78/24 78/25 79/4 80/22 87/16 88/1 89/6 90/3 90/18 91/1 93/11 93/19 98/22 100/9 100/22 105/7 105/12 107/5 111/14 116/4 117/12 119/12 121/5 123/12 124/14 125/6 129/9 130/2 136/24 137/10 139/5 139/12 140/8 140/24 143/8 143/11 143/22 146/21 147/10 148/23 148/25 154/18 155/22 155/24 156/12 158/22 158/23 158/25 159/5 159/13 161/2 161/22 162/1 163/3 163/6 164/15 165/7 166/25 171/21 172/4 184/22 185/15 185/20 204/4 246/25 247/5 251/19 252/5 252/11 252/12 255/19 257/20 261/3 265/17
**Okeechobee [1]** 249/6
**Oliver [3]** 4/15 4/20 268/3
**on-site [4]** 142/21 220/25 244/19 245/7
**once [6]** 29/17 31/2 38/2 50/8 83/14 104/25
**oncoming [1]** 235/10
**one [179]** 5/19 6/11 8/11 9/14 10/24 15/21 16/12 16/14 16/20 16/21 16/25 17/11 17/24 20/22 21/13 21/15 21/18 22/10 22/18

24/10 25/18 26/15 26/22 27/14 28/20 28/20 29/11 31/18 32/16 32/20 32/21 33/11 33/24 34/3 35/7 38/23 41/18 42/8 42/23 43/25 45/2 45/25 50/1 56/6 61/6 65/4 67/10 69/17 74/7 83/10 85/6 85/11 87/19 88/23 89/15 91/24 92/21 93/21 93/24 94/15 100/9 101/19 103/16 105/5 107/12 108/22 110/6 111/17 112/21 115/6 118/4 120/6 123/18 127/14 128/8 128/11 129/16 130/4 132/11 135/2 139/14 141/17 144/12 144/22 145/12 145/15 148/2 148/5 148/5 149/5 149/13 150/3 150/4 151/13 151/17 151/19 155/2 156/21 156/24 156/25 161/17 163/4 164/2 166/21 167/8 168/1 168/1 169/14 169/16 171/13 175/16 176/10 176/14 176/23 176/23 179/13 179/17 181/1 181/11 186/6 188/20 189/4 190/16 195/21 195/21 196/1 196/3 199/17 200/22 203/17 203/22 208/14 209/7 211/3 211/5 211/13 213/10 213/12 213/14 213/22 213/23 217/17 217/21 218/14 218/21 221/2 221/21 221/25 222/5 222/7 222/21 223/15 223/16 223/24 224/1 224/3 225/14 226/8 226/8 227/17 228/10 234/15 234/15 235/19 238/25 239/23 241/16 241/17 241/19 242/8 243/6 249/24 253/15 260/23 261/17 262/4 262/7 262/11 262/17
**ones [6]** 41/24 46/16 47/19 213/12 228/6 228/7
**online [5]** 147/2 147/4 147/9 147/11 147/24
**only [39]** 7/18 7/24 20/24 20/25 27/2 33/2 33/11 65/20 66/8 73/2 88/13 92/16 97/5 110/4 116/1 137/1 166/22 167/6 167/6 167/9 179/15 190/7 208/14 218/18 218/20 222/5 223/15 223/16 224/3 229/11 232/11 232/14 234/10 237/23 243/15

**O**

**only... [4]** 243/17 244/6
248/12 265/3
**onwards [1]** 247/17
**opening [1]** 137/1
**operational [1]** 221/13
**opine [3]** 175/16 176/1
177/9
**opined [2]** 73/16 94/3
**opinion [92]** 9/8 10/15
13/4 24/23 27/16 32/22
36/6 43/23 47/6 47/10
52/9 66/21 67/10 67/11
67/16 67/21 68/6 68/12
68/15 69/22 69/23 71/19
71/20 72/4 72/21 74/4
74/5 75/12 75/19 76/4
76/10 76/20 77/17 77/18
77/19 79/5 79/5 80/11
82/19 95/1 111/13
113/24 114/10 115/14
123/15 126/10 128/19
131/2 131/3 133/20
134/22 135/25 166/9
179/24 193/19 196/8
196/13 197/1 197/2
197/21 198/3 198/5
198/9 198/13 198/24
199/13 199/14 200/4
200/14 201/1 201/10
202/11 202/14 202/18
202/24 203/7 211/10
217/19 223/1 235/7
245/5 252/21 253/3
253/13 253/23 254/2
254/10 262/20 262/25
264/22 265/2 265/2
**Opinion 9 [2]** 10/15
13/4
**opinions [20]** 70/6 71/7
71/25 73/21 88/12
131/16 131/18 158/6
167/8 177/25 180/22
186/1 186/6 190/14
195/16 196/5 199/15
201/23 202/6 265/7
**opportunity [3]** 79/15
83/4 116/10
**opposed [16]** 7/19 15/20
29/18 29/25 31/1 50/5
58/18 76/17 76/24 78/15
109/15 128/21 140/9
141/20 150/16 151/16
**Opposing [1]** 181/14
**opposite [2]** 50/11 50/12
**order [22]** 4/1 19/18
21/25 24/24 28/14 45/3
66/11 67/23 74/19
101/25 103/7 104/15
124/22 125/2 133/7
154/24 155/19 162/15
163/13 163/17 179/9
253/22
**orders [1]** 214/20
**orient [3]** 190/19 221/9
224/22
**origin [2]** 35/11 35/13
**original [2]** 176/7
200/15
**originated [1]** 249/23
**originating [4]** 68/8
68/22 245/17 246/2
**Orlando [2]** 92/6 110/24
**others [9]** 14/18 120/7
144/10 144/16 148/13
213/10 235/17 257/23
265/15
**otherwise [4]** 26/14
90/25 123/22 124/16
**our [23]** 4/5 14/10 24/11
24/11 24/24 29/9 34/14
34/16 35/15 37/13 44/13
48/2 102/19 106/16
118/5 121/20 122/19
130/19 135/4 181/8
214/18 215/6 228/8
**ourselves [1]** 49/13
**outer [3]** 206/5 221/17
223/22
**outline [2]** 190/24 247/9
**outside [6]** 142/21
170/11 183/7 194/25
199/14 265/8
**over [69]** 4/14 5/18
15/12 15/16 15/22 16/14
25/9 25/11 26/7 45/8
50/15 50/17 51/21 54/7
55/17 55/21 60/13 60/21
63/17 63/19 84/5 84/24
85/18 93/15 113/12
117/23 145/17 171/9
174/19 177/5 181/11
188/1 189/22 196/18
199/23 201/17 212/4
214/15 214/19 216/1
216/10 219/1 222/10
223/11 223/12 224/4
224/11 224/12 224/22
226/7 226/25 231/1
241/6 243/22 243/25
244/5 250/16 251/12
255/25 258/14 258/22
259/1 259/19 259/22
260/11 262/5 264/8
264/12 265/18
**overall [3]** 109/10
110/23 258/13
**overbroad [1]** 192/24
**overnight [1]** 60/24
**Overruled [12]** 40/2
134/21 135/21 154/12
174/25 175/21 177/3
183/4 193/1 203/6
210/16 254/12
**oversimplified [2]** 92/16
93/8
**overwhelming [1]**
162/18
**owe [1]** 137/9
**own [12]** 112/23 127/21
147/19 154/9 154/17
172/13 173/23 174/21

**192/**901**/14 230/24
247/2

**P**

**P's [2]** 144/18 144/18
**P.A [3]** 2/3 2/5 2/11
**p.m [7]** 106/22 106/22
184/19 184/19 251/20
251/20 267/5
**page [22]** 1/17 129/3
129/6 129/9 174/2
193/17 196/24 197/18
198/1 198/8 198/18
200/10 200/13 225/10
226/3 226/7 226/17
229/3 239/9 245/24
252/11 252/13
**page 195 [1]** 245/24
**page 2 [1]** 226/7
**page 223 [1]** 239/9
**page 249 [1]** 193/17
**page 294 [2]** 252/11
252/13
**page 344 [1]** 196/24
**Page 345 [1]** 198/8
**page 346 [1]** 197/18
**page 347 [1]** 198/18
**page 348 [2]** 198/1
200/13
**page 4 [1]** 226/3
**page 5 [2]** 226/17 229/3
**page 7 [1]** 174/2
**pages [3]** 1/11 196/19
197/9
**paid [4]** 26/8 42/18
45/12 182/24
**pair [2]** 222/11 224/5
**Paired [1]** 124/4
**Palenchar [1]** 2/18
**Palm [15]** 1/8 1/20 2/11
2/12 2/14 2/23 87/19
88/11 88/22 92/3 95/13
107/15 108/23 109/15
248/6
**panel [1]** 147/22
**paper [2]** 150/6 150/14
**paragraph [34]** 156/3
156/3 158/17 159/1
160/13 160/20 161/15
161/16 162/22 168/4
170/8 174/4 175/15
188/13 189/9 205/13
205/16 207/2 207/4
207/23 213/9 216/24
217/9 218/15 219/22
220/2 222/23 225/1
225/1 225/11 226/10
229/2 237/7 238/11
**paragraph 40 [2]**
188/13 189/9
**paragraph 47 [1]** 174/4
**paragraph 65 [2]** 225/1
225/1
**paragraph 68 [2]**
225/11 226/10
**paragraph 69 [14]**

205/13 205/16 207/2
207/4 207/23 213/9
216/24 217/9 218/15
219/22 220/2 222/23
237/7 238/11
**paragraphs [2]** 156/9
187/7
**parallel [1]** 94/12
**parameter [1]** 220/20
**parameters [2]** 208/7
220/21
**Pardon [1]** 131/17
**paren [2]** 188/16 188/17
**parents [2]** 99/11 100/11
**partially [1]** 247/9
**participant [1]** 83/19
**participants [5]** 83/16
83/17 83/21 83/22 83/25
**particle [7]** 247/2 247/4
248/5 249/13 249/14
250/1 251/6
**particles [7]** 208/8
208/13 217/2 217/13
218/5 240/5 249/20
**particular [29]** 7/12
7/13 9/13 10/13 12/17
21/2 45/15 54/19 55/14
59/3 60/3 62/12 65/2
125/2 136/18 143/6
144/23 150/20 150/21
154/22 160/1 160/17
174/23 175/8 199/6
249/7 249/8 250/1 260/4
**particularly [8]** 36/16
40/21 44/5 174/15 239/1
245/15 252/13 257/21
**particulate [1]** 45/10
**parties [2]** 42/23 129/16
**parts [1]** 14/21
**party [7]** 42/24 46/8
46/15 146/24 147/15
147/20 181/11
**pass [1]** 251/15
**past [6]** 37/22 96/25
136/19 136/22 147/19
169/24
**path [16]** 208/13 208/18
208/20 209/13 209/13
209/19 209/21 210/12
210/17 210/20 215/4
228/12 236/21 237/8
237/11 250/5
**paths [2]** 228/15 228/15
**pathway [1]** 242/17
**pathways [5]** 215/8
228/5 234/13 234/14
234/25
**pattern [1]** 35/22 45/10
165/9
**Pause [1]** 98/17
**pay [20]** 38/11 137/3
140/19 140/20 140/21
141/1 142/12 142/20
148/3 148/6 148/10
148/15 148/16 149/3
149/6 149/8 151/8 176/8

182/10 183/18
**PB [2]** 247/21 247/21
**PB-689 [1]** 247/21
**PB-831 [1]** 247/21
**PCB [1]** 95/9
**Peachtree [1]** 3/3
**peak [1]** 108/18
**peaked [1]** 108/19
**pediatric [6]** 99/12
99/14 99/22 163/10
165/3 165/24
**peer [3]** 52/11 121/7
121/10
**peer-reviewed [3]** 52/11
121/7 121/10
**pending [1]** 61/22
**people [27]** 46/14 47/1
53/7 61/19 81/8 109/22
110/7 110/14 118/8
125/12 141/17 147/22
147/24 158/9 165/20
167/20 167/24 176/8
178/25 179/3 179/13
180/11 183/7 183/11
183/23 194/4 214/22
**people's [1]** 131/18
**per [60]** 14/21 85/18
87/14 87/18 88/8 88/9
88/21 92/9 107/9 107/13
108/21 108/23 150/25
205/20 206/2 207/11
207/20 207/24 208/24
209/1 209/5 209/11
210/5 210/14 211/7
211/13 211/14 212/25
213/1 213/9 213/22
213/23 214/15 215/14
216/13 216/14 216/16
216/22 216/23 217/8
223/21 226/18 226/21
226/21 226/24 229/11
229/23 230/1 234/14
255/5 258/11 258/12
258/15 258/18 258/23
259/1 260/6 264/8
264/12 265/18
**per-square-foot [1]**
87/18
**per-square-footage [1]**
88/21
**perceive [5]** 35/10 36/9
39/6 39/21 39/23
**perceived [2]** 40/17
191/24
**perceives [5]** 13/19 38/8
51/8 79/8 80/17
**perceiving [1]** 54/19
**percent [25]** 15/9 30/9
30/9 30/22 30/22 30/23
74/12 95/11 95/13 95/14
95/15 136/25 149/24
179/14 179/15 183/13
200/7 200/11 214/15
215/15 221/4 221/5
225/5 225/8 226/5
**percentage [7]** 88/7 95/8

**P**

**percentage... [5]** 95/10 109/13 132/23 151/16 152/1

**percentages [2]** 151/11 151/21

**perception [90]** 10/16 13/5 13/15 13/22 14/2 14/12 15/2 15/8 15/11 15/13 15/17 15/19 17/6 17/9 18/2 18/12 18/25 19/19 20/9 22/9 22/11 22/14 22/14 22/17 22/20 22/23 23/2 23/2 23/18 24/16 25/25 28/16 31/7 32/23 33/20 35/9 36/7 37/9 37/14 38/9 38/18 38/24 39/20 40/8 40/11 40/16 41/10 47/7 50/14 52/8 53/6 53/16 53/24 56/7 56/19 63/5 63/7 63/15 63/22 64/7 64/13 71/18 72/6 72/19 75/4 76/12 77/14 77/25 78/10 78/22 79/24 80/5 80/15 80/20 114/2 114/11 114/19 114/25 115/19 115/23 118/1 118/14 118/18 118/23 119/4 120/2 122/8 122/14 123/9 124/9

**perceptions [6]** 9/2 14/7 21/9 112/14 112/17 133/17

**perfectly [3]** 128/22 130/14 152/10

**perform [5]** 145/4 145/22 203/22 203/23 219/22

**performed [7]** 146/16 146/19 175/17 177/10 221/18 237/6 238/11

**performing [1]** 152/25

**perhaps [7]** 16/6 46/19 124/3 124/19 193/13 196/15 234/25

**period [15]** 55/7 62/10 84/5 84/24 86/20 88/4 88/4 88/5 90/4 91/19 95/17 108/1 108/12 162/25 256/1

**periodically [1]** 48/14

**periods [1]** 108/18

**permeabilities [1]** 260/12

**permeability [6]** 214/8 234/17 254/21 258/9 260/2 260/19

**permeable [1]** 225/14

**permission [3]** 126/15 181/13 203/9

**permit [1]** 73/23

**persevere [1]** 97/19

**person [30]** 33/11 154/16 154/18 157/3 157/11 162/11 162/13

**personal [2]** 17/21 20/2

**perspective [1]** 25/24

**Perusing [1]** 197/16

**Petersburg [1]** 110/25

**PGA [1]** 2/13

**Ph.d [1]** 144/13

**phase [3]** 73/10 73/12 73/13

**phases [1]** 50/20

**Phil [1]** 240/15

**phrase [2]** 17/5 135/15

**phrased [3]** 30/18 36/5 101/5

**physical [6]** 9/12 10/13 10/19 11/9 15/6 24/7

**pick [2]** 170/20 237/2

**picking [3]** 41/4 41/7 157/12

**picture [6]** 156/22 156/23 157/13 170/8 203/10 262/15

**pictures [1]** 158/8

**piece [6]** 21/2 63/13 78/18 218/9 240/10 251/3

**piggybacking [1]** 181/6

**place [8]** 84/4 84/24 127/13 223/16 223/24 240/11 241/14 244/6

**placed [1]** 157/4

**places [4]** 92/6 222/2 223/3 261/9

**placing [2]** 157/12 245/10

**Plaintiff's [1]** 185/4

**plaintiffs [11]** 1/4 2/2 136/13 136/16 173/14 175/12 175/15 175/25 180/7 184/24 234/3

**plaintiffs' [4]** 190/25 201/22 233/6 234/5

**plant [1]** 188/16

**play [2]** 28/8 101/2

**playing [1]** 5/5

**please [46]** 4/2 4/19 6/11 19/24 20/4 33/12 33/13 48/25 54/24 77/11 79/12 79/21 89/20 106/24 113/10 135/8 135/11 138/2 138/7 138/18 143/10 148/23 149/12 153/8 161/15 164/11 184/21 186/22 188/12 192/23 193/12 193/17 196/24 200/10 200/13 205/5 241/7 242/13 251/22 256/6 257/7 258/5 259/7 263/17 263/17 264/10

**pleasure [1]** 5/3

**plenty [1]** 113/9

**plugged [1]** 229/24

**plume [41]** 25/6 25/8 25/9 25/11 25/14 25/21 26/7 36/13 36/14 36/18

**plumes [2]** 19/9 55/10

**plummeting [1]** 109/23

**plus [4]** 107/23 107/25 179/7 246/13

**point [53]** 20/12 29/1 29/16 31/15 33/7 33/8 42/14 43/24 48/10 51/11 51/14 54/21 56/6 61/25 63/9 63/10 63/11 63/16 63/19 77/5 83/11 94/9 94/11 95/20 102/4 125/3 125/21 129/14 129/15 130/11 148/17 150/24 158/16 175/23 177/8 186/22 189/4 201/9 209/8 209/10 210/10 211/3 211/12 222/21 227/17 232/8 235/3 247/16 251/8 257/15 259/13 259/14 260/10

**pointed [2]** 132/24 143/8

**pointing [3]** 94/16 121/16 207/18

**points [7]** 132/19 187/3 190/7 228/18 230/20 234/11 234/13

**pollution [2]** 21/24 110/17

**Poncy [1]** 2/10

**pond [3]** 259/17 259/18 259/22

**poor [3]** 92/21 92/22 96/3

**popping [1]** 155/23

**population [1]** 27/8

**pore [2]** 212/8 255/22

**porosities [2]** 220/16 230/14

**porosity [37]** 204/8 204/23 205/7 205/24 209/17 219/11 219/13 219/15 219/21 219/25 220/4 220/7 220/11 220/12 220/13 221/2 221/23 221/4 221/17 221/23 222/5 222/21 224/18 225/5 226/4 226/5 226/13 229/9 229/11 229/21 229/22 237/22 255/22 255/23

**porous [4]** 215/11 241/22 254/21 256/8

**port [1]** 191/5

**portion [7]** 135/9 135/12 136/16 136/18 136/20 201/24 247/10

**portions [1]** 243/4

**pose [1]** 11/17

**position [16]** 19/17 85/25 111/17 162/19 164/13 172/22

**positive [4]** 166/11 167/14 167/15 167/16

**positives [1]** 160/5

**possibilities [2]** 96/9 106/12

**possibility [8]** 20/18 107/12 109/1 109/6 197/20 197/20 198/11 203/18

**possible [34]** 10/14 10/15 10/18 11/14 17/12 17/13 17/14 17/22 18/15 18/15 18/18 18/19 19/4 19/16 19/7 20/11 20/14 24/1 54/20 91/25 92/15 93/21 93/22 93/24 93/25 94/24 103/2 111/20 132/22 133/4 180/9 198/3 198/5 251/11

**possibly [1]** 108/13

**potential [16]** 32/20 35/20 56/7 56/11 56/11 56/24 56/25 58/7 58/7 58/20 63/18 64/23 83/24 102/7 195/2 242/14

**potentially [3]** 16/20 56/8 60/20

**practice [1]** 245/12

**PRATT [145]** 1/7 4/10 67/14 67/15 67/18 68/8 68/22 100/15 156/16 156/22 158/18 158/20 164/19 165/22 168/14 169/3 186/2 186/18 187/13 187/14 187/22 188/10 189/1 189/19 189/18 189/21 195/9 196/9 196/13 196/22 196/22 197/3 197/23 198/6 198/12 198/14 198/21 199/10 200/6 200/17 201/3 201/12 201/20 202/12 203/1 203/14 203/14 203/19 207/7 207/13 207/15 207/19 207/25 208/21 208/25 209/8 209/22 210/7 210/10 211/5 211/18 212/25 214/10 214/17 215/15 215/25 216/1 216/9 216/11 216/19 216/25 217/11 217/25 221/3 221/10 221/16 221/22 222/7 222/22 223/23 224/7 226/25 227/21 229/9 229/21 230/11 230/23 230/25 233/3 234/8 234/21 234/25 235/3 235/5 236/22 237/8 238/19 242/9 242/10

**pre [1]** 91/23

**pre-trigger [1]** 91/23

**preceding [1]** 69/5

**precisely [1]** 118/16

**precision [2]** 132/12 163/15

**preclude [1]** 75/13

**predicate [2]** 202/4 236/23

**predict [9]** 149/9 215/4 215/7 216/6 216/7 228/8 248/1 251/7 262/13

**predicting [2]** 93/3 262/7

**prediction [1]** 204/17

**prefer [3]** 7/18 10/23 148/16

**preference [10]** 144/14 145/9 145/10 145/15 146/2 161/13 173/18 173/19 176/6 178/8

**preferences [9]** 140/3 140/14 142/10 144/3 144/10 144/14 171/3 171/7 171/11

**preferential [1]** 228/5

**preliminary [2]** 139/8 147/7

**prepared [1]** 97/14

**preponderance [2]** 121/11 199/8

**presence [2]** 15/7 194/11

**presences [1]** 177/23

**present [10]** 16/12 72/20 81/21 134/9 178/10 192/16 203/1 210/24 221/25 222/24

**presentation [1]** 157/9

**presented [3]** 110/12 133/20 166/22

**presenting [1]** 71/20

**presently [1]** 139/9

**pretest [1]** 143/6

**pretty [12]** 5/24 25/3 58/23 74/12 120/17 135/25 167/12 214/3 223/11 248/6 250/12 257/17

**prevent [1]** 49/9

**previous [2]** 21/13 85/4

**242/15 242/16 242/19 242/22 242/23 243/4 243/12 243/18 243/20 244/11 244/15 244/18 244/19 244/22 245/6 245/18 247/7 247/12 247/16 247/23 247/25 248/17 248/24 249/5 250/5 250/9 250/15 252/7 252/24 253/11 253/16 253/18 254/4 256/19 257/21 257/25 261/15 262/21 263/11 263/4 263/11 263/13 263/13 264/2 264/3 264/3**

Case 9:13-cv-80928-KAM   Document 393   Entered on FLSD Docket 01/09/2018   Page 291 of
(WITNESSNAME)                                                                Index: previously..question
301

**P**

**previously [8]** 5/3 80/23
112/3 116/4 123/2
123/19 181/14 196/12

**price [18]** 15/23 26/8
26/14 42/15 42/17 42/17
42/19 42/21 87/12 87/14
87/17 88/8 88/9 92/9
107/9 108/21 108/23
109/10

**prices [13]** 23/22 25/10
84/6 91/21 92/9 95/23
96/13 96/17 102/12
107/13 108/14 123/24
124/16

**primacy [1]** 165/17

**primary [3]** 190/25
203/22 240/23

**prime [1]** 222/12

**priming [2]** 165/13
165/16

**prior [7]** 95/4 95/18
108/1 109/4 155/2
155/13 158/6

**probabilistic [2]** 200/9
201/5

**probability [8]** 200/1
200/5 200/7 200/16
200/22 200/24 201/2
201/11

**probably [10]** 30/11
40/21 59/4 82/7 194/20
194/22 201/4 214/2
215/6 244/13

**problem [5]** 7/22 24/24
89/8 150/4 178/15

**problems [8]** 94/14
105/5 109/8 121/12
155/1 178/21 179/17
184/1

**procedure [1]** 155/4

**proceed [5]** 49/2 99/3
107/5 138/10 185/10

**proceedings [7]** 1/12
48/24 98/17 106/23
184/20 251/21 268/20

**process [8]** 83/12 83/14
96/23 97/6 97/8 118/7
118/10 203/20

**processes [1]** 209/25

**produce [7]** 13/23 32/21
58/15 81/23 100/25
101/14 114/14

**produced [30]** 13/5
13/14 18/2 18/11 18/24
19/19 20/8 21/1 21/9
22/17 25/25 31/7 33/20
63/5 69/25 71/17 72/6
72/19 75/3 76/11 77/24
78/10 78/22 80/15 122/7
122/14 123/8 134/2
134/5 250/6

**producing [3]** 101/5
114/19 115/19

**product [6]** 85/20
110/22 141/8 144/23
175/8 236/10

**productive [1]** 191/21

**products [4]** 140/5
141/20 141/23 175/9

**profession [22]** 7/10
8/19 12/5 12/11 12/20
12/24 14/6 14/16 22/22
22/24 34/5 34/14 34/21
35/1 61/19 82/17 102/15
118/5 120/24 121/11
121/21 128/2

**profession's [3]** 7/21
14/9 37/15

**professional [5]** 62/7
62/7 62/23 173/23
174/21

**professionally [1]** 88/14

**professor [3]** 139/9
174/13 234/19

**proffered [2]** 65/3
186/14

**profiling [2]** 259/11
260/5

**prohibiting [1]** 67/23

**prohibitions [1]** 29/9

**project [3]** 257/10
257/13 258/13

**promise [4]** 67/4 79/15
164/10 164/10

**promised [1]** 178/2

**pronounced [1]** 91/12

**proper [2]** 65/1 128/1

**properly [11]** 11/16
13/17 35/3 35/3 117/19
119/20 120/22 124/22
125/7 149/2 182/9

**properties [86]** 15/25
16/4 16/10 16/18 17/8
18/4 19/11 19/12 19/15
20/23 23/21 23/22 23/25
25/9 25/10 26/11 26/13
26/17 31/19 40/19 41/15
41/16 41/21 42/3 42/4
42/5 43/6 54/8 64/3 71/4
71/5 74/6 74/7 74/10
75/13 75/16 78/3 78/14
79/9 80/11 81/7 82/16
84/19 84/20 86/22 86/23
86/23 92/21 92/22 93/3
102/16 102/25 103/4
103/8 103/10 103/11
103/15 103/23 104/3
104/9 104/11 104/16
104/22 104/23 105/1
105/8 105/16 105/17
105/18 106/2 106/9
110/25 116/15 123/23
123/25 124/6 124/15
124/16 125/17 127/24
131/7 211/24 228/9
238/7 238/12 259/6

**property [196]** 7/13 8/5
8/6 8/7 9/4 9/11 9/11
9/13 9/16 9/17 9/18 10/2
10/10 10/11 10/13 10/19
11/8 11/10 11/22 12/2
12/3 12/17 12/21 13/4
13/14 13/23 14/10 15/14
16/12 16/14 16/20 16/21
16/25 17/11 18/1 18/7
18/11 18/24 19/19 20/8
20/22 20/22 21/1 21/2
21/5 21/23 22/7 22/25
23/1 23/11 24/14 25/25
27/19 28/15 29/10 30/4
31/7 31/17 31/18 31/19
32/3 32/11 32/18 32/21
32/22 33/19 35/21 38/3
38/12 38/13 40/21 40/22
41/9 41/18 41/18 45/7
50/3 52/18 55/12 55/14
58/25 59/1 59/3 59/4
61/2 62/13 63/4 63/10
64/6 64/21 69/25 70/23
70/24 71/10 71/11 71/13
71/17 71/24 72/1 72/5
72/12 72/18 73/1 74/1
74/20 75/3 75/14 75/17
76/11 77/24 78/13 78/18
80/9 80/10 80/10 80/15
86/21 92/20 93/23 101/3
101/7 101/12 101/15
101/16 102/6 102/11
103/16 105/15 110/9
110/9 112/11 114/20
115/19 116/6 116/14
116/20 116/24 117/16
117/16 119/19 119/24
120/15 121/9 122/7
122/13 123/8 123/17
124/12 131/4 131/5
131/9 131/11 131/23
156/18 189/18 207/8
207/13 209/22 210/11
211/6 211/19 212/25
214/17 215/16 215/25
216/10 216/11 216/19
221/10 221/16 221/22
222/22 223/23 224/15
227/22 229/10 229/21
235/6 238/20 242/16
242/23 242/24 243/4
243/12 243/22 244/5
244/23 245/7 245/19
247/7 247/13 247/17
248/17 249/5 250/15
261/15

**property's [1]** 10/19

**proportional [1]** 256/13

**proportionally [1]** 92/22

**proposed [77]** 44/16
72/13 73/1 73/16 73/17
74/23 75/13 76/4 76/13
76/23 77/10 77/13 77/20
80/7 81/4 84/11 85/5
102/10 105/14 106/14
115/11 115/23 127/24
134/24 136/2 186/3
186/8 186/12 186/19
187/8 187/10 188/2
189/2 189/11 189/17
190/4 190/11 190/25
191/3 191/4 191/8 192/3
192/6 192/14 192/20
193/4 194/1 194/6
194/11 194/18 195/3
195/4 195/6 195/10
196/9 196/14 201/17
202/12 203/1 208/1
208/22 209/23 210/11
211/6 211/19 217/11
223/23 231/22 232/3
232/15 232/20 233/5
234/12 235/6 236/22
237/8 247/10

**proposition [3]** 49/18
60/16 60/17

**protect [1]** 235/10

**Protection [1]** 190/6

**prove [1]** 102/9

**provide [13]** 31/10
125/13 125/25 125/25
134/12 161/1 161/8
161/10 167/5 178/11
203/17 204/25 205/9

**provided [8]** 5/17 26/21
62/24 140/18 167/6
174/5 225/14 243/20

**provides [6]** 46/8 151/7
152/3 156/13 167/1
167/4

**providing [3]** 126/2
160/24 161/4

**public [15]** 36/17 36/17
45/14 45/20 46/2 46/5
46/7 46/11 53/6 53/16
53/23 56/7 56/19 58/2
69/18

**publications [1]** 144/25

**publicly [1]** 37/2

**published [3]** 51/24
68/21 174/9

**pull [11]** 138/4 138/6
139/15 185/22 225/25
243/9 243/10 257/7
258/3 262/8 263/17

**pulled [1]** 174/2

**pulling [1]** 175/13

**pumping [3]** 210/22
211/12 258/2

**purchase [2]** 38/13
125/13

**purchases [1]** 183/10

**purple [1]** 247/6

**purport [3]** 127/9
127/12 127/20

**purported [1]** 87/15

**purpose [22]** 8/9 31/5
31/13 31/14 34/18 70/10
115/4 120/8 121/2
125/15 127/25 131/8
152/8 152/17 206/20
207/22 208/4 248/24
249/17 249/18 249/18
249/24

**purposes [11]** 53/11
117/21 169/9 175/18
177/11 177/17 192/11
191/3 191/4 191/8 192/3
192/6 192/14 192/20
193/4 194/1 194/6
194/11 194/18 195/3
195/4 195/6 195/10
196/9 196/14 201/17
202/12 203/1 208/1
208/22 209/23 210/11
211/6 211/19 217/11
223/23 231/22 232/3
232/15 232/20 233/5
234/12 235/6 236/22
237/8 247/10

**purview [2]** 7/14 24/11

**pushing [1]** 155/16

**put [14]** 48/2 96/5
151/23 155/13 180/17
182/13 204/14 204/15
205/15 221/6 231/5
233/4 235/15 264/15

**putative [1]** 181/12

**putting [3]** 96/5 170/18
248/21

**puzzled [1]** 83/3

**Q**

**qualifications [2]**
173/13 175/13

**qualified [5]** 62/22
175/16 176/1 177/9
177/15

**qualitative [1]** 152/9

**quality [1]** 121/24

**quantified [1]** 231/14

**quantify [3]** 231/16
232/4 232/6

**quantifying [2]** 72/22
231/25

**quantitative [1]** 200/22

**quantities [3]** 39/7 39/8
53/20

**question [221]** 9/20 10/1
10/4 10/21 10/23 11/1
11/5 11/7 11/11 11/12
11/14 11/14 11/17 12/9
13/25 15/1 16/2 16/6
16/15 16/16 17/5 18/8
20/1 20/1 20/3 20/4
21/17 22/3 24/15 24/20
24/21 28/7 29/20 30/6
30/9 30/12 30/24 33/12
33/13 33/16 34/19 34/23
34/24 35/18 35/25 36/3
36/5 37/11 38/16 39/4
39/20 40/1 40/15 41/3
41/3 41/16 44/22 45/19
45/22 47/4 49/23 53/13
53/16 54/25 55/23 56/3
57/8 61/15 62/20 63/13
63/24 64/11 64/14 64/16
65/19 66/6 66/12 67/3
67/5 67/6 69/8 69/13
70/20 71/22 72/17 75/7
75/10 75/21 76/8 76/9
77/8 79/7 79/12 79/15
79/17 79/20 79/21 80/3
80/6 85/4 86/11 87/2
88/18 88/19 88/25 89/1
89/18 89/20 90/14 96/25
97/5 101/8 101/16
101/24 102/21 103/25
104/6 109/25 110/4
111/3 111/6 111/7 113/2
114/7 114/8 114/16
114/17 114/18 115/3
115/13 115/17 116/10
119/7 119/9 121/3

Case 9:13-cv-80928-KAM   Document 393   Entered on FLSD Docket 01/09/2018   Page 292 of
301
(WITNESSNAME)                                                    Index: question..reliability

**Q**

**question... [86]** 122/11
124/11 127/11 127/18
128/8 128/18 130/4
130/6 130/17 132/16
135/2 135/8 135/23
140/24 143/2 143/10
144/5 145/20 145/21
147/13 147/25 148/19
148/21 148/24 151/13
151/24 151/25 152/2
153/12 154/14 154/22
154/23 155/18 155/18
157/10 157/11 160/10
160/12 164/8 166/14
171/13 176/15 176/23
183/3 186/16 191/18
191/19 191/20 193/19
193/23 194/4 195/2
196/17 197/1 197/6
198/19 198/19 198/25
200/14 200/19 201/7
202/4 202/10 202/20
205/2 211/2 211/9
211/25 214/21 214/24
215/12 215/19 223/17
230/20 231/6 239/11
240/18 240/25 241/19
246/1 246/6 249/25
252/5 254/6 254/13
265/10
**question's [1]** 14/15
**questioning [2]** 252/9
256/4
**questionnaire [1]**
151/21
**questionnaires [1]** 151/9
**questions [58]** 5/4 6/5
6/6 6/13 6/16 8/10 11/25
17/18 21/25 22/4 22/5
22/19 41/17 64/18 69/5
69/11 80/4 113/11
113/14 113/17 113/19
126/24 127/1 128/14
130/25 136/4 139/3
139/7 143/8 143/21
143/21 144/15 145/10
151/14 151/17 151/21
151/23 153/9 154/4
155/3 155/3 155/13
164/12 173/11 176/9
176/16 176/21 181/4
181/16 181/23 181/25
185/15 202/5 253/6
253/7 254/16 256/3
264/7
**quibbling [1]** 199/4
**quick [3]** 155/22 182/5
208/6
**quickly [7]** 50/5 99/15
182/4 205/12 219/2
224/25 247/5
**quite [10]** 21/19 50/20
64/19 70/15 92/14
168/17 175/3 175/11
217/16 222/15

**quote [4]** 13/14 61/7
61/9 129/4

**R**

**raise [2]** 138/1 185/3
**ramp [1]** 60/24
**ramp-up [1]** 60/24
**ran [2]** 206/20 247/4
**random [2]** 262/15
262/17
**randomness [2]** 212/6
262/16
**range [13]** 74/12 74/14
125/11 131/10 175/9
213/7 213/12 214/5
216/20 216/21 225/4
260/11 260/12
**ranged [1]** 212/25
**rapidly [4]** 91/22 92/10
95/18 96/17
**Rapp [1]** 3/2
**rate [12]** 73/14 88/10
99/16 99/22 186/6 206/8
208/9 212/10 254/25
255/4 255/5 256/13
**rates [3]** 163/10 203/24
217/3
**Ratheon [1]** 73/11
**rather [6]** 14/12 43/19
50/3 51/25 183/18 184/4
**reach [10]** 186/8 208/13
208/15 208/16 209/18
245/15 249/20 253/22
254/2 254/9
**reached [19]** 72/17
82/22 186/12 196/8
196/14 197/3 198/6
198/11 198/13 198/21
200/2 200/5 200/16
201/2 201/11 201/17
202/12 203/19 208/9
**react [2]** 151/10 155/14
**reaction [3]** 50/6 51/14
51/19
**reacts [1]** 50/5
**read [25]** 13/14 13/17
17/19 99/8 99/11 111/16
119/8 122/4 130/11
134/7 135/5 135/7 135/9
135/12 135/16 156/4
158/9 165/10 169/23
180/12 199/3 199/21
199/24 229/5 246/10
**readily [1]** 44/11
**reading [7]** 151/20
156/19 165/9 167/9
196/20 209/8 229/21
**readings [1]** 209/20
**ready [6]** 4/5 4/8 98/20
107/1 107/3 184/22
**real [60]** 5/13 6/21 7/7
7/16 8/17 9/1 10/9 10/11
11/21 12/20 30/13 81/7
84/21 89/9 90/7 90/8
90/15 90/19 91/11
121/16 130/18 140/14

140/17 140/20 140/22
140/23 140/25 141/21
141/22 142/1 142/2
142/3 142/12 142/13
142/15 143/13 143/14
143/15 143/17 143/23
143/25 144/2 144/4
144/5 144/16 144/17
144/19 144/20 145/1
155/22 157/23 172/14
172/19 175/10 175/18
177/10 177/17 177/21
177/22 178/13
**realistic [2]** 176/19
179/11
**reality [4]** 14/3 15/3
20/18 56/13
**really [43]** 8/4 15/12
24/12 29/1 39/14 39/22
41/24 43/13 44/4 46/14
52/25 53/1 53/18 55/3
58/12 87/1 87/6 96/5
101/24 110/3 116/19
138/5 141/4 143/18
144/23 145/16 154/5
154/6 155/17 159/6
175/11 176/6 176/13
177/20 178/7 195/1
222/6 223/16 223/16
224/5 247/24 249/9
254/25
**really -- you [1]** 159/6
**Realtime [1]** 268/19
**reason [26]** 5/21 25/13
45/12 82/12 88/1 88/20
89/2 89/3 90/8 93/21
93/22 93/24 93/25 96/10
96/11 110/6 152/22
152/24 163/7 213/4
213/6 245/15 253/10
254/3 260/25 261/1
**reasonable [14]** 95/2
96/7 104/12 167/20
167/25 168/18 196/17
198/10 198/14 198/20
198/24 199/5 199/8
199/13
**reasonably [2]** 84/25
107/19
**reasons [10]** 6/2 9/12
9/17 10/12 80/23 82/11
91/25 94/24 178/7
265/13
**rebuttal [2]** 195/22
195/22
**recall [26]** 69/1 99/13
112/4 128/20 132/20
157/6 165/10 165/11
189/3 190/10 192/9
195/17 197/11 208/19
228/22 229/15 238/25
240/16 241/16 252/5
252/8 253/7 254/17
256/4 264/9 264/13
**received [1]** 164/20
**recency [3]** 165/8

165/12 165/17
**recent [1]** 176/24
**recently [1]** 142/4
**receptor [1]** 187/4
**recess [7]** 48/19 48/23
106/22 184/18 184/19
251/20 267/5
**recession [9]** 32/17 90/7
90/9 90/16 90/19 91/11
91/12 91/17 91/25
**recognition [1]** 12/23
**recognize [4]** 18/10
50/13 262/9 262/12
**recognized [10]** 10/9
10/10 11/21 12/20 28/21
35/1 96/19 121/6 121/23
255/19
**recognizes [1]** 12/11
**recognizing [1]** 29/20
**recollection [1]** 196/16
**recommend [3]** 47/19
148/10 148/14
**recommendations [2]**
154/7 154/8
**reconcile [1]** 234/1
**reconciliation [3]** 96/23
97/2 97/6
**reconciling [1]** 96/20
**record [7]** 137/17
202/16 203/12 225/21
225/24 267/3 268/20
**records [2]** 45/20 136/22
**recross [4]** 136/6 181/2
182/6 268/9
**Recross-examination [1]**
182/6
**red [9]** 190/24 191/2
194/13 247/9 247/20
260/20 260/21 261/21
262/17
**redirect [2]** 113/10
126/18 126/20 173/4
173/7 251/18 251/23
251/24 266/3 268/5
268/8 268/12
**reduce [2]** 60/15 101/3
**reduced [3]** 23/23 23/23
54/8
**reduces [4]** 52/24 55/11
55/19 58/25
**reduction [15]** 7/18 8/5
8/5 8/19 8/22 13/23 23/1
23/7 23/8 24/9 24/11
30/5 32/8 101/11 109/10
**refer [4]** 27/10 219/4
257/4 257/9
**reference [7]** 13/10
129/9 174/5 174/8
185/19 195/12 204/4
**referenced [1]** 231/17
**references [2]** 112/10
169/20
**referred [6]** 13/23 32/8
113/2 113/3 124/17
206/8
**referring [4]** 128/20

165/12 165/17
**refers [1]** 166/3
**reflect [3]** 84/6 93/9
223/21
**reflected [4]** 49/20 59/6
59/19 207/2
**reflects [3]** 87/12 87/14
234/15
**Refuge [1]** 170/12
**regard [24]** 40/21 41/16
47/22 67/8 69/12 70/13
79/6 81/22 120/23
136/22 140/14 140/16
140/19 140/25 141/18
141/20 142/2 160/20
171/3 171/3 171/7
171/11 172/17 172/22
**regarding [25]** 5/4 5/12
6/3 35/8 38/17 40/22
59/23 65/13 67/14 67/18
81/24 84/4 99/21 105/20
133/7 140/3 140/4
140/20 144/25 169/3
186/1 200/4 200/15
201/2 204/19
**regardless [1]** 39/17
**regards [1]** 265/3
**regional [7]** 218/23
246/8 247/19 247/24
249/1 250/11 257/2
**regions [1]** 16/4
**Registered [1]** 268/18
**regression [5]** 82/14
93/2 104/24 105/5
122/23
**regular [1]** 95/24
**regulate [1]** 129/11
**regulatory [2]** 39/10
46/17
**rejected [1]** 56/12
**related [12]** 9/3 9/18
10/18 10/20 13/1 14/19
51/7 56/9 111/1 112/15
175/7 220/4
**relates [2]** 140/3 141/18
**relating [7]** 5/13 68/21
99/8 112/18 113/23
136/14 177/22
**relationship [7]** 100/15
102/1 165/2 165/23
166/8 166/13 254/20
**relative [4]** 66/22 94/4
95/9 194/25
**relatively [8]** 91/20
104/9 124/1 171/8
171/12 238/5 239/4
239/14
**relax [1]** 98/16
**release [1]** 242/20
**relevance [3]** 85/6 85/7
261/5
**relevant [10]** 42/25
43/19 43/20 46/1 49/20
59/5 73/21 84/4 84/5
261/14
**reliability [3]** 86/8 87/2

**R**

**reliability... [1]** 88/12
**reliable [18]** 47/12 74/10
74/11 75/14 77/6 80/13
93/10 93/10 102/9 121/2
132/17 134/12 135/18
135/23 136/1 136/11
178/3 180/4
**reliably [6]** 70/8 74/9
75/17 133/10 134/14
184/2
**relied [3]** 201/22 229/8
230/25
**rely [7]** 14/18 14/19
14/20 43/17 44/13
221/24 233/10
**remain [2]** 37/13 212/4
**remains [1]** 164/4
**remedial [1]** 60/14
**remediate [4]** 40/17
40/23 51/17 55/11
**remediated [1]** 55/13
**remediation [3]** 40/25
60/22 62/4
**remember [17]** 44/1
49/22 55/23 75/21
109/25 111/3 115/13
119/11 121/3 150/17
199/12 199/20 213/2
231/4 231/7 233/20
258/24
**remind [1]** 49/13
**remove [1]** 82/6
**render [2]** 126/10
177/21
**repeat [9]** 56/3 69/8
149/11 149/12 191/15
192/22 205/5 242/13
264/10
**repeated [1]** 191/18
**repeating [2]** 178/1
180/3
**rephrase [5]** 20/3 29/20
30/11 127/18 254/6
**replicated [1]** 117/20
**report [46]** 88/3 112/7
112/8 112/10 112/13
133/20 134/1 139/3
147/1 148/12 154/6
154/7 159/23 160/7
163/25 165/1 167/9
168/20 169/3 170/1
176/7 178/9 179/21
185/18 187/12 189/4
195/22 195/22 195/22
200/15 213/5 214/2
214/3 218/22 219/3
220/10 223/1 226/12
229/13 238/21 238/24
239/8 240/17 248/13
257/5 257/6
**reported [3]** 49/25 62/14
116/2
**reporter [8]** 1/18 1/19
135/4 135/7 135/9
135/12 268/18 268/19

**reporter's [1]** 70/21
**reports [18]** 37/1 48/2
62/16 68/21 69/1 69/2
81/9 82/11 116/3 133/23
134/3 168/12 168/15
195/19 200/6 206/24
256/25 260/6
**represent [1]** 87/15
**representation [4]**
204/24 205/1 205/8
205/9
**represented [3]** 85/23
86/5 181/22
**representing [2]** 181/8
181/12
**represents [2]** 206/5
249/12
**request [1]** 48/12
**requested [3]** 135/9
135/12 181/13
**require [2]** 153/10 194/9
**required [3]** 7/11 51/17
128/15
**requisite [1]** 72/10
**research [27]** 23/2 54/7
54/7 81/8 81/18 96/11
100/13 112/14 112/23
112/24 113/6 114/22
115/7 115/23 146/24
147/15 159/2 159/17
159/20 160/12 160/16
172/9 174/8 177/20
215/10 234/18 262/20
**researcher [3]** 141/7
153/6 227/24
**researchers [3]** 34/8
180/14 215/2
**residence [11]** 151/15
153/16 153/17 153/24
153/25 154/15 154/17
154/20 155/7 155/8
155/9
**resident [4]** 163/18
163/18 172/12 253/12
**residential [1]** 80/25
**residents [4]** 164/17
166/6 235/10 254/2
**resolved [2]** 57/14 57/15
**resolves [1]** 52/6
**respect [8]** 31/18 45/17
59/3 142/9 234/5 252/14
252/22 262/25
**respectfully [2]** 210/8
214/23
**respond [1]** 265/8
**respondent [4]** 154/19
155/6 161/8 176/11
**respondents [11]** 151/10
152/3 152/7 152/14
152/22 153/15 153/23
154/1 155/14 178/13
180/6
**responding [1]** 6/5
**response [8]** 69/10
102/21 124/8 171/24
176/4 176/5 177/14

**responses [6]** 155/20
167/17 167/18 167/19
178/10 178/24
**responsibility [1]** 5/4
**responsible [2]** 46/17
264/23
**responsive [3]** 10/1
19/25 160/9
**rest [3]** 154/23 155/19
191/25
**restroom [1]** 98/5
**result [11]** 8/5 60/21
107/15 108/25 111/11
152/7 163/9 182/9 188/1
204/10 232/2
**resulting [1]** 206/1
**results [22]** 96/20
124/18 125/2 126/1
126/2 149/8 167/2 167/2
182/8 187/9 187/25
188/4 231/9 231/10
231/17 231/18 233/10
233/17 234/11 243/21
244/5 259/12
**retained [2]** 5/5 5/12
**retardation [3]** 238/15
238/16 238/17
**retire [1]** 6/2
**retired [1]** 5/24
**retiring [1]** 5/24
**reverted [1]** 29/19
**review [10]** 46/2 59/22
65/13 71/25 72/2 77/1
105/21 127/1 266/21
266/22
**reviewed [11]** 52/11
52/11 71/6 121/7 121/10
126/5 133/23 134/1
167/17 167/18 167/19
**reviewer [1]** 72/15
**reviewers [1]** 34/12
**reviewing [1]** 116/1
**reviews [2]** 124/25 125/1
**RICHARD [1]** 1/3
**rid [2]** 148/4 149/4
**right [183]** 4/11 4/14
4/16 6/3 6/15 6/20 7/4
7/5 7/15 8/15 9/10 12/18
14/5 15/21 16/19 17/2
18/17 18/21 19/5 22/21
23/19 24/17 25/1 25/5
25/21 27/24 28/2 28/19
31/15 32/2 32/4 32/13
32/15 32/24 32/25 33/6
36/11 37/14 37/19 37/21
39/7 40/14 41/12 41/13
41/17 46/8 46/10 46/21
48/25 49/4 49/5 53/10
55/12 67/9 70/2 76/6
81/25 82/1 82/24 83/15
86/16 87/12 89/21 97/23
98/6 98/22 102/3 106/16
106/17 106/19 107/1
107/17 107/18 108/6
110/6 110/10 112/6

113/25 114/4 114/5
114/6 114/13 115/22
117/17 125/6 126/17
129/7 132/21 135/2
136/5 136/10 138/1
138/2 144/6 144/7
147/16 148/23 152/16
152/23 155/8 156/9
163/1 163/23 167/7
167/18 168/4 170/2
170/8 173/6 182/11
182/17 184/17 185/3
185/19 190/12 190/13
191/14 193/9 194/7
196/1 196/6 200/2
202/22 206/14 207/5
207/9 208/18 212/18
212/22 213/3 214/4
214/12 215/21 216/2
217/16 217/23 218/4
218/11 218/23 219/16
221/10 221/19 224/12
224/13 224/16 224/20
225/2 225/8 226/5
226/10 226/23 227/3
227/6 228/23 229/3
230/2 232/15 233/1
233/21 235/24 236/13
238/2 239/5 243/7 247/7
250/23 251/18 251/23
252/16 253/11 254/10
255/6 255/12 255/14
256/1 256/16 256/19
257/10 260/3 260/22
265/19 266/7 266/16
**rigor [1]** 68/19
**rigorous [1]** 44/18
**risk [108]** 9/3 10/16 13/6
13/8 13/11 13/15 13/22
14/2 14/3 14/13 15/2
15/3 17/7 18/3 18/12
18/25 19/20 20/9 20/24
21/4 21/9 22/9 22/12
22/18 22/20 23/19 24/16
26/1 28/16 31/8 32/24
33/21 35/9 37/9 39/19
39/21 39/23 41/10 47/7
50/10 50/15 50/18 50/19
50/22 50/23 51/4 51/6
51/8 51/9 51/19 52/8
52/18 52/24 53/6 53/16
53/23 53/24 54/7 54/19
55/7 55/11 55/19 56/7
56/19 58/13 58/22 58/25
60/10 60/15 63/6 63/7
63/15 63/23 64/8 69/24
71/10 71/18 72/7 72/20
75/4 76/12 77/14 77/25
78/11 78/23 79/25 80/16
80/19 105/19 111/11
114/2 114/11 118/2
118/4 118/18 118/24
119/2 119/5 120/3 122/8
122/15 123/9 124/9
171/11 182/23 183/1
184/5 194/5

**risk-in-information [1]**
55/7
**risks [3]** 47/23 171/4
171/8
**Ritchie [2]** 2/10
**RMR [2]** 1/18 268/25
**Road [1]** 3/3
**role [6]** 5/4 5/8 71/24
72/15 72/23 73/20
**room [1]** 142/19
**roughly [2]** 173/22
224/22
**run [2]** 123/12 247/15

**S**

**S-t-e-p-h-e-n-s [1]** 185/8
**S1 [1]** 257/7
**S19 [1]** 263/17
**S2 [1]** 264/15
**S6 [1]** 258/3
**S7 [2]** 259/7 259/9
**sacrifices [2]** 110/8
111/9
**safety [1]** 53/3
**sale [4]** 86/19 91/3 107/9
107/13
**sales [66]** 14/8 15/15
18/6 19/11 26/6 26/19
29/5 51/22 66/1 66/9
66/10 85/17 85/18 86/2
86/5 86/24 87/9 87/14
87/17 88/7 88/9 88/21
91/2 91/2 91/3 91/6 91/9
92/4 92/18 93/4 94/16
95/6 95/7 95/9 95/11
95/16 95/23 96/2 96/13
96/14 101/18 102/12
107/17 107/21 107/25
108/13 109/1 109/6
109/10 109/13 109/14
110/7 118/6 122/21
122/22 123/18 123/20
123/20 123/21 124/1
124/4 124/5 130/22
132/23 132/24 132/24
**same [47]** 6/18 8/2 12/22
31/13 31/14 39/9 58/8
61/25 63/11 68/1 73/18
81/20 83/2 85/3 89/14
91/20 92/11 102/25
104/20 104/23 106/6
112/17 112/25 115/6
115/15 125/4 125/4
140/22 153/16 153/24
154/2 162/24 163/8
170/8 194/5 195/1 209/6
209/24 209/25 211/22
219/20 227/10 242/25
250/11 250/12 259/4
263/10
**sample [13]** 27/8 86/23
87/9 178/16 178/16
179/3 179/4 179/17
182/19 183/9 235/14
245/1 245/1
**sampled [1]** 193/8

## S

**samples [3]** 56/15 190/5 214/16
**sampling [13]** 34/13 85/21 86/10 86/13 86/14 86/19 86/25 87/5 87/8 87/13 92/17 92/18 228/5
**sand [3]** 234/17 261/10 261/12
**sandstone [1]** 258/9
**sandstones [1]** 263/9
**sandy [1]** 261/9
**save [2]** 110/9 111/9
**saw [1]** 189/4
**say [82]** 8/1 8/2 8/2 9/14 11/13 14/1 16/3 17/16 23/10 25/5 25/6 30/21 36/21 41/2 43/8 45/8 45/11 46/6 46/10 46/21 46/22 50/7 51/3 57/17 57/20 59/9 69/19 78/12 79/15 83/9 86/23 89/19 97/2 101/10 102/8 104/24 110/4 115/6 115/22 116/15 124/14 135/18 141/8 144/4 144/17 146/18 147/9 150/15 157/2 159/3 159/7 159/8 159/10 164/7 164/7 164/17 164/23 167/6 178/20 178/22 179/15 189/10 189/20 190/13 191/13 192/13 193/6 193/10 197/18 198/20 199/19 200/8 208/12 208/14 213/19 220/10 224/15 225/8 228/24 261/24 261/25 266/6
**saying [25]** 15/22 17/22 30/5 41/3 42/11 42/12 46/14 54/1 64/11 70/3 90/16 94/22 100/18 102/10 116/18 121/1 129/21 135/16 152/23 162/17 163/8 166/7 166/12 178/25 197/17
**says [17]** 13/10 14/24 129/10 130/12 150/21 156/19 164/22 165/6 169/24 170/10 174/4 176/11 229/6 247/21 247/21 248/20 258/8
**scale [6]** 106/12 106/12 143/23 144/1 260/1 260/8
**Scarola [17]** 2/9 2/10 4/23 5/2 49/2 98/22 107/1 107/5 129/23 130/7 136/6 181/4 181/19 181/23 182/3 268/4 268/9
**scattered [4]** 253/25 254/1 254/9 257/23
**scene [1]** 12/11
**scheduled [1]** 266/18

**Schlesinger [2]** 2/3 138/16
**school [4]** 84/14 173/21 174/14 174/20
**Schwinghammer [1]** 2/21
**science [5]** 34/11 141/14 141/15 141/16 214/18
**scientific [20]** 14/13 14/15 15/3 26/25 36/15 44/19 53/11 136/10 174/6 180/5 180/19 196/18 198/10 198/15 198/24 199/5 199/13 234/2 241/19 253/20
**scientifically [2]** 68/10 68/24
**scientist [3]** 141/7 199/9 234/1
**scientists [1]** 39/15
**scope [4]** 9/5 175/20 199/15 265/9
**scoping [6]** 208/4 208/5 209/12 219/24 222/25 237/10
**Scott [1]** 2/18
**screen [7]** 111/23 155/23 188/14 188/23 205/15 229/3 250/7
**se [1]** 150/25
**Sean [1]** 2/16
**Searcy [1]** 2/10
**seashells [1]** 261/12
**seated [5]** 4/3 48/25 106/25 184/21 251/22
**second [18]** 9/21 16/15 23/6 58/16 73/10 112/20 112/21 124/13 124/17 127/2 127/11 127/14 129/3 129/6 129/14 129/16 177/8 196/15
**secondly [1]** 123/14
**secret [3]** 36/23 62/18 62/25
**section [3]** 136/14 156/20 196/20
**sectional [1]** 255/5
**sediments [2]** 194/23 263/4
**seeing [4]** 69/1 69/1 234/20 234/22
**seek [2]** 135/5 167/20
**seem [3]** 65/21 261/1 261/20
**seems [4]** 5/16 32/6 96/17 153/10
**seen [17]** 30/24 47/15 50/7 68/21 82/7 108/5 110/19 110/24 110/24 114/22 120/7 127/4 131/9 158/8 159/8 246/14 252/15
**select [2]** 204/22 205/6
**selection [1]** 129/2
**sell [12]** 42/23 43/1 45/7 86/21 86/22 87/9 87/10

92/2 92/3 96/13 144/16 148/15
**seller [6]** 42/22 44/15 128/16 128/21 129/15 130/8
**sellers [16]** 26/5 26/9 26/10 26/16 27/7 27/17 28/11 28/22 29/14 38/11 40/19 45/1 62/12 81/1 83/9 124/20
**selling [1]** 124/15
**Seminole [1]** 263/7
**sending [1]** 145/23
**sense [16]** 10/6 30/18 96/19 97/5 97/7 110/14 110/18 111/7 111/12 116/5 116/16 116/22 117/14 176/20 200/22 255/3
**sensitive [2]** 161/9 178/10
**sent [1]** 145/17
**sentence [4]** 158/25 163/4 163/8 228/23
**separate [6]** 6/21 30/8 74/20 181/8 181/9 181/24
**separately [7]** 7/3 74/17 75/25
**separation [1]** 94/5
**sequence [1]** 71/12
**series [3]** 69/10 120/25 187/8
**serve [3]** 31/5 31/13 31/14
**service [1]** 147/15
**services [5]** 140/4 141/20 146/25 147/15 147/20
**set [6]** 58/16 85/12 160/25 178/11 181/11 185/17
**sets [2]** 182/1 199/9
**several [4]** 43/5 216/25 217/10 221/12
**severe [1]** 58/15
**SFranklinUSDC [1]** 1/20
**shallower [1]** 212/21
**shape [1]** 247/7
**share [3]** 105/16 105/18 105/19
**shared [1]** 52/10
**Shari [5]** 154/8 174/7 174/12 174/13 177/18
**sharing [1]** 100/14
**she's [1]** 174/14
**Sheldon [1]** 2/3
**shell [3]** 226/13 261/10 263/10
**shells [4]** 225/15 226/9 261/7 261/7
**Sher [1]** 73/11
**Sher-Ratheon [1]** 73/11
**Shipley [1]** 2/11
**short [16]** 48/11 48/14

107/16 107/21 107/25 108/13 109/1 109/13 109/14 110/7 132/13 132/23 140/9 155/15 155/16 164/1
**short-term [3]** 140/9 155/15 155/16
**shortcomings [1]** 121/16
**shortcut [1]** 208/6
**shorten [1]** 137/20
**shortest [2]** 188/10 237/11
**should [20]** 22/13 22/14 23/24 26/14 31/12 92/25 97/3 150/15 150/22 151/7 155/23 158/3 162/13 172/18 183/25 197/21 217/21 241/8 257/19 257/20
**show [20]** 187/6 187/21 187/25 189/19 189/22 206/24 209/13 222/2 231/9 233/3 233/9 234/10 248/21 248/22 249/19 250/5 250/12 260/23 262/16 265/17
**showed [3]** 126/2 126/3 243/19
**showing [4]** 94/12 188/22 209/10 246/16
**shown [6]** 96/12 184/2 201/20 258/10 259/18 265/22
**shows [8]** 159/8 187/12 187/14 187/15 211/21 233/5 250/14 258/7
**shun [3]** 9/12 9/17 10/12
**shut [1]** 126/16
**sic [1]** 203/20
**side [12]** 42/8 42/9 222/10 223/11 224/4 224/5 224/15 237/4 237/4 257/24 257/25 258/19
**sided [3]** 157/9 161/10 178/11
**sides [1]** 180/10
**significance [1]** 87/4
**significant [6]** 87/6 132/4 132/8 132/12 132/15 194/17
**significantly [1]** 132/11
**similar [11]** 73/18 80/8 104/10 104/10 104/11 104/23 106/6 123/23 124/16 189/6 210/2
**similarities [2]** 105/25 263/8
**similarity [2]** 104/12 106/3
**simple [4]** 30/13 83/8 147/13 211/2
**simplistic [1]** 131/6
**simply [3]** 30/15 59/15 62/1
**simulate [2]** 247/15

262/3
**simulation [4]** 247/19 249/8 249/18 250/19
**simulator [1]** 247/4
**since [7]** 66/19 66/20 72/17 80/14 139/20 153/23 217/25
**single [26]** 12/5 75/18 80/9 104/21 152/13 172/11 172/14 172/21 176/15 176/17 189/16 189/23 206/21 207/3 209/7 209/7 211/3 222/10 231/20 232/2 234/3 235/2 235/4 235/12 235/15 240/10
**sinkholes [1]** 234/20
**sir [233]** 4/7 4/14 4/16 5/7 5/10 5/23 6/7 6/15 6/19 7/1 7/9 8/14 9/7 9/10 9/15 11/5 13/12 13/25 14/12 14/23 15/18 17/2 18/17 19/5 19/25 20/15 20/20 21/10 22/6 23/15 24/2 24/12 27/2 28/19 31/15 33/1 33/14 33/23 34/20 37/11 39/1 40/14 42/12 42/20 43/21 47/2 47/25 48/8 49/3 49/4 49/16 53/10 54/2 55/2 56/2 57/4 57/10 57/19 58/2 58/5 59/9 59/21 60/1 61/17 66/24 69/9 70/16 74/24 74/25 75/8 75/23 76/19 79/11 80/3 81/19 83/5 83/20 84/2 85/15 87/21 90/18 92/13 97/6 98/24 99/7 99/13 106/15 106/20 107/4 107/11 109/18 109/25 110/6 110/13 111/5 111/14 112/3 112/16 113/2 113/8 113/16 114/16 114/24 115/13 115/16 116/25 116/9 120/11 121/3 122/11 123/6 125/8 126/16 128/3 128/24 129/1 129/8 129/13 130/1 130/24 132/16 133/25 134/4 134/6 134/11 134/20 137/16 138/1 138/4 138/10 138/14 139/18 140/15 140/20 141/5 141/11 141/21 142/3 142/24 143/4 143/8 143/13 143/16 143/20 143/24 144/9 144/21 145/5 145/18 146/9 147/8 148/3 149/10 149/19 149/25 150/6 151/11 151/16 151/22 152/5 152/18 153/1 153/4 153/18 154/3 154/14 154/14 155/9 156/7

**S**

**sir... [64]** 156/10 156/24
157/10 158/7 158/12
158/14 158/23 159/24
160/4 160/21 161/1
161/5 161/24 162/12
163/16 164/3 165/4
165/14 165/25 166/8
166/23 167/3 167/17
168/7 168/16 169/6
169/20 171/23 177/14
178/5 181/7 182/8
182/15 182/20 183/16
184/10 185/3 185/5
185/9 185/17 185/24
187/17 188/12 190/2
191/16 195/15 197/11
198/9 198/17 199/2
199/12 204/21 205/18
206/15 212/2 231/8
232/25 239/16 240/3
241/12 244/19 247/8
253/5 256/5

**sit [4]** 126/15 197/4
198/21 221/21

**site [53]** 142/21 168/15
187/9 187/13 187/15
187/23 188/11 188/16
190/20 195/9 196/22
196/22 208/25 214/10
214/21 220/25 221/4
222/5 223/12 223/12
224/7 229/15 230/4
230/5 230/11 230/23
234/21 235/1 241/4
242/10 242/11 242/19
244/4 244/15 244/18
244/19 245/7 247/23
248/24 249/12 250/2
250/9 253/16 253/16
253/17 253/18 256/19
257/21 257/25 262/21
263/4 263/12 263/15

**sites [1]** 210/7

**sitting [1]** 55/12

**situated [1]** 4/17

**situation [2]** 52/17 239/3

**situations [1]** 19/8

**six [4]** 127/21 188/1
189/22 201/17

**six miles [1]** 201/17

**size [4]** 88/13 92/16
142/19 244/4

**slant [4]** 236/13 236/15
236/17 236/19

**slightly [3]** 71/2 104/5
149/9

**slope [5]** 236/10 236/12
237/3 237/4 237/4

**slow [2]** 138/18 208/9

**slower [2]** 209/15
217/14

**slowly [2]** 171/12 238/8

**slug [1]** 258/2

**small [7]** 104/8 105/6
105/8 240/5 258/8

**smaller [6]** 92/19 92/19
96/4 106/12 220/13
220/14

**so-called [1]** 260/15

**sodium [8]** 159/11 168/7
168/14 169/21 201/25
202/11 202/25 203/8

**sold [8]** 23/24 25/9 25/9
26/13 45/7 83/13 86/23
123/23

**sole [1]** 72/15

**solely [2]** 14/9 68/18

**solicitation [9]** 144/14
145/15 146/3 148/19
161/13 173/18 173/20
176/6 178/9

**Solow [1]** 148/13

**solution [3]** 228/1
234/16 241/23

**somebody [8]** 11/23
12/12 14/25 23/20 40/19
44/17 123/17 127/8

**somehow [1]** 234/7

**someone [4]** 111/8
163/18 178/19 182/10

**someplace [1]** 110/16

**something [38]** 10/18
10/20 23/3 23/10 24/1
30/21 35/23 40/12 40/23
42/8 43/22 47/16 50/5
51/10 58/24 84/15 92/25
95/10 96/14 103/5
103/12 115/2 115/8
131/13 145/16 153/5
153/5 154/9 165/8 184/6
189/6 192/11 194/14
200/12 200/23 231/2
240/1 255/2

**sometime [3]** 9/9 90/2
98/12

**sometimes [7]** 9/23 46/6
46/11 49/18 108/11
212/13 239/6

**somewhat [1]** 98/7

**somewhere [3]** 94/4
214/3 240/14

**soon [1]** 99/1

**sooner [1]** 51/25

**sorry [40]** 9/14 11/7
17/9 19/25 22/2 29/23
33/10 33/14 35/24 36/2
44/22 53/10 54/23 69/8
79/11 88/17 89/16 90/18
92/14 99/10 107/24
114/16 117/9 123/3
129/22 130/5 147/11
150/17 163/17 165/14
165/15 171/18 172/18
172/18 220/20 227/6
231/6 242/5 246/18
266/17

**sort [20]** 45/13 50/11
51/18 64/24 82/16 92/11
104/13 105/8 121/1
133/2 176/24 190/20

212/3 217/2 212/20
240/5 247/6 247/9 260/7
262/6

**sorts [1]** 124/4

**sound [2]** 59/11 153/21

**sounds [7]** 28/25 39/9
98/7 168/17 213/3
215/20 233/20

**source [32]** 7/12 17/1
17/4 17/11 24/7 35/12
35/13 35/15 35/16 36/17
40/22 43/17 45/20 45/23
46/9 46/15 46/15 46/19
46/19 104/21 105/18
187/4 187/9 240/19
241/1 242/21 244/10
250/23 251/5 251/9
251/11 252/22

**sources [7]** 19/9 26/16
45/14 46/2 46/4 46/7
253/15

**south [24]** 2/8 2/22
186/3 188/1 189/17
189/21 190/22 209/3
212/17 222/13 236/19
237/2 237/18 244/16
245/18 245/23 246/13
247/17 248/3 250/13
250/16 257/2 258/25
264/21

**south-southeast [4]**
237/18 245/23 246/13
250/13

**southeast [8]** 2/3 210/7
237/18 244/15 245/23
246/13 250/13 258/18

**southern [4]** 1/1 190/3
209/22 210/10

**southwest [7]** 208/25
228/25 229/6 229/12
245/17 246/4 247/17

**space [3]** 251/8 255/22
256/1

**spaces [1]** 212/8

**spans [1]** 188/9

**spatially [2]** 212/7 212/8

**speak [2]** 4/18 114/10

**speaking [6]** 9/7 163/6
193/14 239/11 250/25
256/14

**specialists [1]** 61/18

**specialize [1]** 7/9

**specialties [1]** 7/10

**specific [20]** 11/17 12/2
12/2 16/4 29/8 31/2 34/8
78/18 115/8 120/14
121/8 125/12 142/2
144/22 151/10 151/12
201/24 215/18 238/12
242/17

**specifically [14]** 9/7
13/3 78/2 140/14 140/16
140/19 140/23 141/19
144/20 146/9 146/11
195/12 205/12 248/25

**spectrum [1]** 74/10

**spell [4]** 4/18 4/21 138/7
185/5

**spend [1]** 199/23

**split [1]** 136/19

**spoke [3]** 38/22 60/2
107/10

**spoken [1]** 94/24

**sponsors [1]** 152/15

**spot [3]** 221/21 221/25
224/1

**spread [4]** 62/3 99/21
100/24 251/1

**spreadsheet [1]** 172/3

**square [23]** 85/18 87/14
87/18 88/8 88/9 88/21
92/9 96/1 96/1 107/9
107/13 108/21 108/23
130/22 131/8 190/9
190/10 190/12 191/13
231/22 232/3 244/4
251/13

**St [1]** 110/25

**stable [1]** 171/8

**standard [6]** 47/16
128/17 155/3 174/19
175/1 245/12

**standards [13]** 29/9
55/10 102/19 117/5
128/1 174/15 174/17
174/22 175/7 175/17
177/9 180/5 180/19

**standpoint [1]** 130/10

**start [12]** 29/3 104/25
105/2 109/5 161/16
173/13 175/23 206/11
206/12 242/16 249/9
250/22

**started [3]** 27/24 108/19
217/25

**starting [2]** 90/4 242/11

**starts [3]** 89/23 106/8
250/15

**state [20]** 14/20 36/16
37/2 39/12 52/22 62/6
90/6 92/6 118/16 134/15
164/25 166/7 166/12
168/16 214/18 240/12
240/20 241/2 241/14
241/21

**stated [5]** 70/6 79/5
80/23 82/11 145/10

**statement [10]** 51/1
53/15 116/13 116/17
157/5 166/4 166/11
167/13 167/15 205/2

**statements [5]** 48/2
160/17 160/19 170/14
170/18

**STATES [2]** 1/1 1/14

**stating [1]** 100/5

**statistic [1]** 200/11

**statistical [12]** 34/13
86/10 86/13 86/18 87/1
87/1 87/4 87/6 124/3
124/5 200/22 201/5

**statistically [3]** 132/4

132/8 132/12

**statistics [1]** 84/16

**status [1]** 6/3

**stay [2]** 74/16 98/5

**step [11]** 15/10 15/12
15/21 15/21 15/22 23/6
124/13 124/17 124/19
127/2 267/1

**Stephen [5]** 1/18 3/2
268/18 268/24 268/25

**Stephens [34]** 184/22
184/23 184/25 185/4
185/7 185/13 187/2
189/8 200/24 201/24
202/24 203/18 209/19
210/8 211/2 211/16
216/17 217/7 217/22
220/17 221/6 222/19
224/10 226/12 227/4
230/20 234/7 242/7
242/21 252/1 257/9
258/5 259/9 268/10

**Steven [3]** 2/7 137/17
138/16

**Stewart [1]** 2/22

**stick [3]** 26/4 119/14
178/2

**sticking [1]** 119/13

**stigma [90]** 8/16 8/18
8/18 8/19 8/22 8/24 9/8
10/4 10/5 10/6 10/8
10/10 10/10 10/15 12/11
12/12 12/14 12/16 13/1
13/3 13/13 13/18 13/24
15/24 16/9 16/11 16/11
16/17 16/23 16/23 16/24
17/3 17/9 17/10 17/15
18/10 18/23 20/7 21/8
21/8 22/16 23/17 24/14
26/24 27/13 27/15 27/18
28/22 29/4 29/5 29/25
30/1 32/4 32/5 32/9
32/25 33/3 33/4 33/5
33/6 35/2 35/5 36/11
37/25 38/1 38/17 46/2
51/20 60/19 60/25 61/3
76/20 80/14 93/25 94/2
100/25 101/6 101/6
101/11 102/2 102/9
102/24 103/5 103/12
103/24 104/17 113/25
114/14 114/14 114/15

**stigmatized [10]** 9/4
9/11 9/16 11/22 12/21
17/3 21/23 30/4 107/20
110/10

**still [2]** 90/13 249/20

**stock [1]** 140/11

**stop [4]** 64/12 97/16
131/4 266/1

**story [1]** 233/25

**straight [4]** 176/8
236/21 237/8 237/14

**straight-line [2]** 236/21
237/8

**straightforward [1]**

**S**

**straightforward... [1]** 151/6

**strange [1]** 32/6

**strata [2]** 262/1 263/1

**stratified [2]** 210/24 212/9

**stratigraphic [1]** 209/25

**Street [3]** 1/19 2/6 2/19 183/12 187/9 209/21

**stretch [5]** 98/1 98/5

**stretches [4]** 186/2 190/3 208/21 223/22

**stretching [1]** 186/18

**strike [3]** 145/19 154/10 198/3

**string [1]** 190/1

**strong [2]** 154/24 154/24

**strongly [2]** 161/12 170/14

**structure [2]** 262/10 262/18

**structured [4]** 34/10 117/19 120/22 125/24

**structures [1]** 117/19

**students [4]** 142/10 142/16 144/13 144/13

**studied [13]** 12/14 18/22 19/7 19/9 19/10 19/11 44/7 50/23 51/16 52/21 92/6 111/4 212/1

**studies [26]** 17/20 19/21 36/12 52/21 52/22 57/1 60/12 60/12 60/22 69/20 72/11 83/7 96/15 96/15 96/15 107/22 119/18 119/20 122/23 125/6 145/4 220/15 240/13 240/14 241/17 255/9

**study [30]** 11/12 52/10 64/5 64/20 109/12 127/10 131/1 132/17 133/9 134/14 142/4 146/10 152/4 152/5 152/6 152/8 152/10 152/14 152/17 152/20 152/23 152/25 152/25 171/13 192/19 193/3 194/9 241/4 241/4 241/17

**study's [1]** 152/15

**studying [8]** 64/25 65/8 65/9 110/20 110/20 204/20 204/25 205/8

**stuff [1]** 45/11

**sub [1]** 141/15

**subject [6]** 86/15 89/9 131/13 182/25 184/5 265/25

**submarkets [1]** 75/16

**submitted [1]** 202/7

**submitting [1]** 197/2

**subsequent [1]** 246/9

**subset [2]** 86/21 86/22

**substances [1]** 202/25

**substantial [2]** 149/17

182/24

**substitution [1]** 112/6

**subsurface [5]** 194/10 212/12 212/14 243/3 255/9

**such [12]** 18/11 18/21 19/1 69/16 69/24 73/4 168/2 168/6 194/9 215/3 243/2 248/18

**suddenly [1]** 60/25

**suffer [1]** 19/15

**suffered [4]** 103/4 103/11 103/24 104/16

**sufficiency [1]** 245/6

**sufficient [17]** 74/5 74/5 74/18 75/1 75/15 80/12 81/13 101/14 105/17 134/23 186/7 209/17 210/21 210/23 232/4 254/2 265/13

**sufficiently [2]** 80/7 105/16

**suggest [8]** 15/9 36/18 47/2 98/4 98/15 110/19 114/18 114/24

**suggested [1]** 47/4

**suggesting [2]** 37/1 215/3

**suggests [1]** 35/25

**suicide [2]** 11/21 12/17

**suitable [3]** 73/4 73/17 105/13

**Suite [4]** 2/13 2/19 2/23 3/4

**sum [2]** 165/19 182/25

**summarize [1]** 180/18

**summary [1]** 226/1

**summation [1]** 165/19

**Sunday [1]** 158/5

**super [1]** 234/14

**superhighway [1]** 234/9

**superhighways [1]** 234/24

**supplanted [1]** 121/15

**supplemental [1]** 214/3

**supply [1]** 19/2

**support [7]** 65/4 107/23 110/12 220/15 222/15 224/18 230/13

**supported [3]** 230/16 230/17 230/17

**suppose [4]** 7/4 23/6 83/23 201/6

**sure [29]** 6/17 8/10 9/9 9/22 21/12 21/18 30/23 41/5 48/12 49/13 56/21 56/25 63/14 67/2 111/24 112/4 113/8 168/23 171/9 171/14 192/9 202/17 213/25 214/3 218/24 222/25 235/22 236/3 241/3

**surface [1]** 225/15

**surprisingly [2]** 239/20 261/19

**surrounding [2]** 170/11

227/16

301

**survey [85]** 26/9 26/25 27/3 27/7 34/8 34/23 34/24 112/25 120/22 125/9 125/20 127/10 141/7 142/23 142/25 143/1 143/3 143/3 143/5 143/6 143/6 146/10 146/13 146/14 146/19 146/23 147/3 147/4 147/5 147/5 147/9 147/11 147/14 147/16 147/18 147/24 148/2 148/4 149/8 149/14 151/9 153/6 153/15 154/9 154/19 154/22 154/23 155/1 155/11 155/17 155/19 158/9 165/16 167/17 167/18 171/24 173/15 173/16 173/23 174/8 174/15 174/17 174/19 175/2 175/2 175/4 175/17 177/10 177/16 177/16 177/17 177/20 177/22 178/3 178/24 179/24 180/8 180/14 182/8 182/12 182/13 183/13 184/1 184/7 256/25

**surveys [80]** 23/2 26/24 27/6 27/8 27/12 29/6 31/13 31/14 34/6 34/7 34/8 34/9 34/17 34/22 34/25 35/3 35/4 51/23 112/25 116/5 116/20 116/22 117/2 117/14 118/8 118/13 118/16 118/22 120/10 120/12 120/20 121/6 124/24 125/16 125/17 125/18 125/18 125/22 126/25 141/4 141/10 141/12 141/18 141/22 141/23 141/25 142/2 143/18 145/7 145/8 145/14 145/23 146/1 146/3 146/6 146/14 147/20 147/21 149/2 149/5 155/2 155/5 172/13 173/17 173/20 174/21 175/6 176/2 176/5 176/5 176/7 176/7 176/14 177/1 177/6 180/2 180/4 180/22

**suspected [2]** 52/7 164/18

**sustained [11]** 11/3 78/21 82/5 127/16 131/20 201/14 223/8 254/6 262/23 264/25 265/21

**sustains [1]** 181/15

**switch [1]** 218/9

**sworn [4]** 4/15 85/25 138/3 185/4

**synonym [1]** 35/13

**system [3]** 82/1 82/4 212/8

**T**

**tab [1]** 128/24

**tab 12 [1]** 128/24

**table [6]** 95/6 236/11 236/13 243/9 243/10 243/10

**Table 5.1 [1]** 243/10

**tables [1]** 187/7

**tag [1]** 182/2

**tail [1]** 82/6

**take [48]** 9/22 36/15 48/11 48/13 48/16 48/19 49/18 86/9 86/12 97/1 97/3 97/9 97/11 97/17 102/6 106/16 107/24 124/7 146/17 155/7 158/24 169/15 171/5 175/12 184/17 194/9 197/8 197/14 198/17 203/10 215/5 216/1 216/10 217/10 217/18 217/20 218/2 218/2 224/10 226/25 235/12 237/3 237/11 242/8 251/17 251/18 262/7 266/24

**taken [13]** 48/23 84/4 84/24 106/22 124/7 184/19 190/5 224/19 232/11 232/14 232/20 234/3 251/20

**takes [3]** 55/11 151/25 228/4

**taking [5]** 189/13 216/23 240/11 241/14 244/5

**talk [34]** 4/6 9/9 21/12 26/5 26/10 33/11 45/1 49/22 53/8 94/23 103/25 113/9 113/9 121/12 124/20 124/20 146/21 155/21 155/21 156/10 172/4 177/25 180/14 190/15 194/1 200/1 218/9 218/10 219/3 225/4 225/10 225/13 228/19 239/25

**talked [35]** 31/12 48/4 64/22 64/23 70/15 71/7 87/2 87/3 89/14 91/4 92/20 93/13 93/21 103/14 108/16 109/8 118/3 121/14 122/21 122/22 122/23 122/25 122/25 123/14 124/13 127/2 132/23 145/13 158/9 171/23 203/24 219/19 227/14 231/2 231/3

**talking [83]** 8/1 8/24 8/25 10/8 12/5 13/18 13/18 15/5 15/6 17/17 17/17 21/7 22/8 27/7

27/9 28/2 29/13 29/23 29/24 37/20 38/10 41/8 51/20 55/6 55/17 55/24 55/24 57/17 60/3 60/10 60/11 60/15 62/5 62/8 62/19 63/20 63/21 78/13 78/14 78/15 78/17 78/19 84/10 84/11 88/2 89/22 90/1 94/20 96/22 96/22 101/11 108/20 118/8 142/1 146/5 148/12 148/18 150/3 150/14 161/2 161/7 162/3 163/24 183/24 183/25 187/16 206/11 207/1 207/1 208/10 208/10 210/4 216/3 217/2 217/3 231/7 232/13 237/6 237/25 238/14 244/25 258/1 260/14

**talks [9]** 128/20 129/3 156/15 158/17 164/19 176/25 177/4 226/4 226/17

**Tampa [1]** 92/6

**taper [1]** 55/21

**task [2]** 73/5 118/4

**tasks [1]** 118/4

**taught [2]** 122/20 173/21

**teach [11]** 131/14 139/12 139/14 144/2 144/3 144/4 144/10 144/13 144/16 144/18 174/20

**teaching [2]** 144/22 144/23

**team [1]** 182/2

**team's [1]** 126/15

**tease [1]** 75/16

**technique [4]** 29/15 82/17 89/12 102/18

**techniques [14]** 11/13 20/21 29/6 73/16 102/20 102/22 117/1 117/4 117/7 123/19 136/1 140/22 144/24 146/3

**technologies [8]** 1/6 4/9 21/4 137/25 185/2 185/14 220/18 220/23

**telephone [1]** 147/5

**tell [26]** 4/18 7/23 14/25 29/1 49/6 66/18 67/6 71/16 72/7 77/12 89/21 90/4 96/7 98/24 120/12 126/7 133/19 138/7 150/18 159/18 210/17 235/20 236/1 237/19 258/5 259/10

**telling [8]** 53/14 53/23 56/18 58/12 118/21 165/20 179/13 229/22

**tells [4]** 97/16 210/20 235/19 237/21

**tempered [1]** 220/25

**temporary [2]** 52/1

Case 9:13-cv-80928-KAM   Document 393   Entered on FLSD Docket 01/09/2018   Page 297 of
301
(WITNESSNAME)                                              Index: temporary..throughout

**T**

**temporary...** [1] 55/21
**tenant** [1] 9/17
**tenants** [2] 9/11 10/12
**tend** [1] 238/25
**tends** [1] 60/14
**term** [10] 7/21 10/9 60/6
60/7 60/8 61/3 140/8
140/9 155/15 155/16
**termed** [1] 146/8
**terminology** [1] 112/7
**terms** [17] 5/14 6/18
8/22 9/10 9/16 52/13
68/14 71/14 73/18 101/5
114/10 168/2 168/6
211/13 235/18 242/11
260/12
**test** [33] 28/6 44/14
132/9 171/14 187/9
210/23 211/4 211/13
214/16 216/9 221/3
221/15 224/19 224/22
225/2 226/1 226/1
227/15 228/2 228/11
228/20 229/8 229/17
229/21 230/14 232/2
234/3 235/12 243/16
243/21 244/5 244/6
259/11
**tested** [3] 18/6 211/3
233/23
**testified** [16] 5/12
125/18 140/2 140/13
140/16 140/18 140/21
140/23 140/25 141/1
173/24 196/12 198/12
220/17 220/21 239/17
**testify** [4] 108/25 147/6
183/22 195/8
**testimony** [50] 5/17
17/24 48/6 52/5 56/20
58/14 68/16 68/17 70/7
70/22 77/21 86/1 99/8
99/11 106/18 118/22
118/25 119/1 120/10
134/7 135/18 140/18
149/21 158/21 173/25
174/3 178/7 179/23
180/21 184/9 185/19
186/15 186/20 186/24
188/22 193/24 197/7
197/13 198/17 199/1
199/18 200/20 202/9
214/2 246/10 266/12
266/15 268/3 268/6
268/10
**testing** [20] 14/17 44/19
166/1 166/2 207/14
207/17 207/18 208/21
210/9 210/13 222/23
223/25 224/8 230/24
233/6 233/8 233/16
233/22 248/22 260/25
**tests** [20] 207/12 212/24
215/24 224/19 225/2
225/5 225/11 225/13

227/19 228/2 228/14
232/11 232/14 232/19
232/24 233/1 243/25
256/24 258/2 258/2
**textbooks** [1] 94/23
**thank** [65] 4/24 6/15 7/5
8/15 18/17 20/5 20/15
21/10 29/22 37/12 48/21
49/1 49/3 49/11 56/5
90/24 93/18 97/9 98/18
98/25 99/4 106/20
106/21 107/2 107/6
111/14 111/25 112/1
115/25 116/11 119/15
119/16 126/17 127/17
128/12 130/2 136/5
136/7 136/8 136/9 137/8
137/16 138/10 138/11
143/12 147/13 149/1
150/13 156/1 169/17
169/18 171/5 173/1
173/3 180/24 181/1
181/20 182/5 184/10
184/12 184/15 184/16
185/9 225/22 251/16
**thanks** [1] 49/6
**that's** [284]
**themselves** [5] 106/2
120/20 125/19 167/18
237/20
**theory** [3] 155/15
181/24 234/7
**there's** [159] 6/9 7/9
11/24 12/3 12/22 12/22
13/7 13/8 14/19 14/24
15/5 15/8 23/6 25/5 25/6
25/7 26/13 27/25 29/8
31/4 41/4 41/5 43/5
43/11 43/23 50/19 50/21
51/13 51/16 52/15 52/21
52/23 54/16 54/16 54/21
55/12 57/8 57/20 57/21
57/21 58/3 58/7 60/20
61/18 61/18 61/19 61/21
62/2 65/5 69/16 69/20
71/12 71/12 74/8 75/15
76/16 77/6 77/19 78/2
78/5 78/8 82/12 82/13
82/13 82/17 83/13 84/12
84/16 85/5 85/11 86/17
87/9 92/17 94/14 94/18
95/16 95/20 95/21 95/25
96/16 101/18 102/11
103/16 104/3 104/11
106/12 110/25 117/4
117/4 118/3 120/18
128/19 128/19 129/9
129/20 130/17 131/10
131/25 149/18 153/4
154/4 155/14 160/22
160/23 165/7 165/17
166/14 167/4 167/15
181/11 183/21 187/12
188/3 189/8 195/1
197/17 198/1 202/4
202/20 211/20 212/5

212/6 215/5 216/5
216/15 219/1 220/14
220/15 222/10 223/3
225/4 227/21 229/7
230/12 232/16 232/23
233/8 234/13 236/21
238/10 238/13 238/15
241/23 243/5 244/13
244/17 246/5 247/20
247/24 257/23 259/18
260/21 260/23 261/9
261/11 261/18 262/16
262/18 263/8
**therefore** [3] 58/13
91/11 93/9
**they're** [64] 19/16 27/9
36/16 43/7 46/8 46/16
46/25 47/17 47/19 51/6
52/20 91/6 104/23 106/6
109/7 111/1 115/12
116/25 117/3 117/6
117/6 117/7 117/8 117/8
117/9 117/9 120/23
121/2 125/16 131/12
133/1 148/17 148/19
155/11 157/12 157/14
160/5 170/23 175/1
175/3 176/6 176/8 180/5
180/7 180/12 180/13
181/14 204/14 218/7
223/13 228/6 228/6
228/16 231/10 231/12
231/13 232/7 239/13
239/13 239/21 241/21
241/21 258/8 258/24
**they've** [4] 23/23 23/23
47/18 176/9
**thick** [1] 225/14
**thickness** [1] 262/2
**thin** [9] 210/23 228/6
260/18 260/20 260/21
261/20 261/23 262/4
262/4
**thing** [20] 8/2 25/16
29/11 39/9 51/18 63/12
87/13 91/8 95/25 104/13
115/6 154/16 155/2
162/7 165/9 165/10
165/10 165/13 242/8
250/12
**things** [62] 7/3 12/5
12/23 14/18 14/19 14/21
15/5 22/10 23/13 24/3
25/16 25/18 26/8 32/18
32/21 35/7 38/10 43/12
45/24 46/22 55/7 65/18
66/13 67/2 69/24 83/12
89/8 101/17 103/20
105/20 110/5 115/12
123/21 124/4 127/2
131/10 132/14 140/6
140/7 141/7 144/12
144/13 148/1 149/11
154/1 155/7 155/8
155/12 155/13 155/17
157/7 159/9 163/20

163/22 163/23 168/1
170/1 170/3 176/14
179/20 234/15 256/15
**think** [113] 4/7 6/10
11/18 15/5 21/15 22/4
22/24 25/3 26/14 27/18
28/19 30/11 32/9 34/18
34/24 35/13 35/16 37/11
38/23 39/8 40/24 43/15
44/19 46/13 46/25 47/4
47/10 49/24 50/6 52/12
53/7 55/1 63/23 64/15
70/7 74/4 80/21 83/4
86/20 87/4 89/9 95/17
100/20 101/15 102/4
105/23 107/11 109/5
118/11 120/4 121/4
125/11 127/22 128/16
135/3 135/19 135/22
135/25 137/10 138/17
143/9 144/5 144/22
145/2 146/4 149/18
150/9 151/14 158/20
161/17 166/9 166/19
168/19 169/22 170/4
170/9 173/4 178/19
182/18 183/6 183/12
185/22 189/6 191/20
192/14 196/11 196/11
196/15 196/20 199/11
201/4 201/7 206/24
208/16 208/19 213/11
218/4 218/20 218/25
219/20 222/1 223/4
234/24 238/21 239/7
240/14 242/25 245/20
246/19 249/17 251/14
253/14 265/25
**thinking** [7] 9/20 74/2
80/3 83/8 104/19 129/19
201/5
**third** [7] 15/10 46/8
46/15 146/24 147/15
147/20 249/5
**third-party** [1] 46/15
**Thomas** [4] 4/15 4/20
255/16 268/3
**Thompson** [4] 260/15
260/18 261/3 261/14
**Thompson/Anastasia** [2]
260/18 261/14
**thoroughly** [1] 67/19
**those** [99] 6/6 7/3 14/7
19/11 26/10 26/16 32/16
32/20 41/16 41/17 43/5
46/22 53/21 56/16 56/17
65/5 65/18 66/13 66/22
66/23 68/2 68/11 68/25
69/1 71/6 71/9 74/1
74/22 75/2 75/3 76/13
84/5 85/1 94/25 100/1
100/21 100/23 101/19
103/9 103/22 104/19
105/20 108/17 109/7
112/17 116/13 121/15
122/23 123/22 124/4

124/18 125/5 127/2
127/11 127/12 127/20
128/8 141/13 142/15
145/11 146/4 148/1
153/19 153/21 155/17
169/22 169/23 170/2
170/18 172/4 179/17
179/20 180/18 188/4
191/25 209/6 213/14
213/22 213/23 218/3
218/4 218/6 225/11
228/5 228/5 228/7
230/12 231/18 232/16
247/22 252/15 252/17
252/22 253/7 257/2
261/4 263/10 264/20
267/4
**though** [10] 112/5 139/7
149/24 165/20 165/21
165/22 168/11 226/12
238/21 261/9
**thought** [12] 11/1 24/5
60/7 70/11 105/5 119/8
128/17 148/1 158/3
246/21 246/22 252/6
**thousand** [10] 75/17
210/5 213/11 214/20
258/11 258/15 258/23
259/23 259/23 265/15
**thousands** [2] 243/21
258/17
**threat** [1] 19/3
**three** [20] 15/5 15/12
15/16 15/21 15/22 42/25
88/7 91/2 97/25 107/9
108/8 108/9 116/2
136/15 194/13 214/20
222/19 222/23 249/19
249/20
**three-layered** [1] 249/20
**three-step** [1] 15/21
**threshold** [1] 72/17
**thresholds** [3] 14/21
39/10 46/17
**threw** [1] 54/4
**through** [53] 46/11
58/23 76/5 83/11 83/14
90/2 110/23 118/5
122/19 139/23 158/14
158/15 158/20 158/22
158/24 161/16 171/23
171/25 179/6 180/17
186/3 186/18 187/10
193/18 194/18 196/20
196/25 198/8 199/3
203/20 206/13 207/25
207/25 208/21 208/22
208/22 219/17 222/7
222/22 223/25 239/10
245/25 247/5 247/17
249/10 250/25 251/12
254/22 254/24 255/23
256/8 259/16 262/21
**through 7** [1] 245/25
**throughout** [6] 48/6
182/1 253/25 254/1

**T**

**throughout...** [2] 256/24 257/22

**throw** [1] 31/25

**tie** [1] 36/5

**tied** [1] 99/22

**ties** [1] 13/7

**times** [15] 5/11 5/18 5/19 61/21 84/1 161/18 161/20 162/20 163/4 164/1 195/17 206/23 210/21 222/3 236/11

**tissue** [3] 56/15 68/9 68/23

**Title** [1] 174/7

**today** [11] 9/9 105/24 118/22 124/14 127/3 128/15 176/15 185/14 186/15 197/4 198/22

**together** [9] 49/13 63/13 75/19 82/16 101/20 106/7 179/5 233/4 262/8

**told** [19] 16/19 24/23 33/18 65/12 65/15 69/5 70/11 70/14 76/2 82/21 89/19 95/5 96/25 108/24 116/4 116/9 152/14 153/4 180/13

**Tom** [1] 4/10

**tomorrow** [5] 266/3 266/8 266/9 266/16 266/19

**tone** [2] 40/1 259/19

**too** [15] 5/14 57/6 69/20 82/7 82/13 82/13 104/20 131/6 138/21 138/22 193/13 208/9 209/14 214/4 265/19

**took** [4] 147/2 147/14 170/4 229/20

**tool** [10] 34/5 96/19 116/25 259/11 259/15 259/25 260/1 260/4 260/5 260/5

**tools** [6] 20/20 28/20 45/25 116/23 120/20 173/15

**top** [9] 55/13 129/6 155/12 155/13 156/5 195/3 213/6 247/10 247/21

**topic** [2] 77/1 97/3

**topographic** [1] 237/3

**total** [1] 5/18

**totally** [3] 150/2 170/24 182/16

**touching** [1] 109/3

**toward** [1] 138/5

**towards** [7] 138/6 228/18 248/19 249/6 250/18 250/19 250/20

**town** [1] 17/17

**tracer** [8] 224/19 225/2 225/5 225/11 225/13 226/1 228/20 229/8

**traces** [1] 188/8

**tracking** [6] 247/2 247/4 248/5 248/25 249/14 251/6

**tracks** [2] 92/11 249/13

**tract** [1] 106/5

**trade** [2] 171/12 176/19

**trade-offs** [1] 176/19

**tradeoffs** [1] 178/13

**traditionally** [1] 255/1

**train** [2] 34/14 34/16

**trained** [7] 14/17 23/1 23/4 23/4 34/7 35/23 36/3

**training** [1] 177/18

**tran** [1] 239/12

**transaction** [4] 42/24 61/22 61/22 84/4

**transactional** [5] 14/8 29/4 102/13 119/21 120/18

**transactional-based** [1] 120/18

**transactions** [18] 15/15 49/20 59/7 59/19 69/7 69/15 84/6 84/7 84/24 85/1 85/21 85/22 86/14 91/4 92/3 95/24 101/18 116/21

**transcribed** [1] 135/16

**transcript** [6] 1/12 135/10 135/13 180/12 199/21 268/20

**translate** [1] 52/18

**translated** [1] 54/18

**translates** [1] 52/17

**transmissive** [4] 210/24 261/23 263/15 264/5

**transmissivity** [1] 262/19

**transmits** [1] 255/22

**transport** [23] 53/20 191/10 206/10 219/16 220/13 228/8 237/25 238/14 240/1 240/4 240/11 240/20 241/1 241/5 241/6 241/13 241/15 250/5 251/7 255/20 255/23 260/14 262/13

**transport-absorbing** [1] 238/14

**Transportation** [1] 142/7

**transporting** [1] 53/19

**transwater** [1] 191/6

**travel** [5] 208/9 217/6 218/1 250/25 262/7

**treated** [1] 249/14

**treatment** [1] 73/18

**trend** [4] 92/11 130/22 131/2 131/9

**trending** [1] 229/12

**trends** [2] 85/17 130/22

**trial** [1] 5/18

**triangle** [2] 190/20 247/6

**triangulat** [1] 247/7

**triangulate** [1] 250/11

**tried** [5] 63/16 82/13 113/16 137/20 223/1

**trigger** [19] 62/15 64/2 64/24 65/1 66/17 66/18 67/8 88/4 88/5 88/6 91/15 91/15 91/16 91/23 92/7 92/8 94/3 108/2 108/3

**trivial** [1] 39/21

**trouble** [1] 139/16

**true** [39] 60/17 65/17 80/17 92/24 100/23 140/15 143/24 145/6 151/11 151/22 152/12 152/25 153/17 154/3 155/9 158/7 158/14 159/21 160/21 161/1 161/24 164/3 165/25 166/8 166/9 166/10 166/17 170/18 172/6 172/7 196/11 198/16 205/11 211/20 220/9 221/20 227/22 227/23 238/9

**truth** [4] 166/16 166/18 166/19 166/20

**try** [22] 41/16 6/23 16/8 41/25 75/10 79/16 113/10 115/16 121/5 122/11 124/21 131/9 132/12 138/19 164/11 191/6 191/24 222/11 224/2 228/11 261/24 262/3

**trying** [27] 6/1 10/1 10/5 17/23 24/12 24/22 25/23 30/3 40/7 50/7 55/1 57/25 63/13 90/20 102/4 105/23 113/14 125/16 128/22 130/13 143/8 194/14 202/16 216/6 218/6 251/7 251/11

**turn** [24] 72/9 94/1 113/11 128/24 180/1 188/12 190/14 190/16 193/12 193/17 196/24 197/10 200/10 200/13 201/19 205/12 225/1 220/10 226/3 226/17 231/2 241/7 252/11 262/14

**Turning** [4] 194/1 219/2 239/9 245/24

**tutors** [1] 142/20

**Twenty** [1] 216/13 216/14

**Twenty feet** [2] 216/13 216/14

**twice** [2] 163/5 163/8

**two** [56] 7/3 42/24 64/23 65/3 65/5 73/16 74/20 74/23 76/4 76/13 85/19 88/4 91/10 91/13 91/24 92/10 108/6 114/23

**2001:** [1] 247/7

**2:** 115/12 116/2 120/7 128/23 148/13 150/9 150/10 150/10 157/9 161/10 163/4 175/17 178/11 181/18 182/1 187/21 187/25 188/4 190/5 190/7 192/22 195/1 195/17 195/19 195/24 199/17 209/6 225/14 226/9 231/17 232/18 232/18 233/17 234/11 234/15 234/16 247/20 262/6

**two-foot** [1] 226/9

**two-foot-thick** [1] 225/14

**two-sided** [3] 157/9 161/10 178/11

**type** [11] 7/13 56/16 64/20 104/18 104/18 125/4 133/2 162/24 261/6 261/8 262/11

**types** [4] 104/23 122/24 253/15 263/3

**typical** [7] 43/12 44/15 44/20 45/12 45/13 85/2 234/17

**typicality** [2] 44/3 45/18

**typically** [15] 43/8 43/11 43/13 43/19 44/2 44/15 44/24 45/4 45/25 73/6 83/19 109/21 128/21 129/16 131/11

**typicalness** [1] 44/3

**U**

**U.S** [2] 142/7 256/25

**Um** [1] 78/12

**un** [1] 208/11

**unable** [1] 177/22

**unacceptable** [1] 88/14

**unbiased** [3] 154/21 170/25 171/1

**uncertainty** [22] 50/2 50/22 50/4 50/10 50/18 50/22 50/24 51/2 51/6 51/13 52/6 52/16 52/17 54/8 57/14 58/25 60/17 60/18 62/5 70/1 70/12 71/10

**under** [20] 19/3 38/13 43/1 43/6 102/16 128/1 141/14 145/8 145/9 145/9 145/10 178/2 193/24 197/7 199/1 200/20 215/4 246/7 253/9 254/22

**under-predict** [1] 215/4

**underlays** [1] 261/15

**undermines** [1] 133/2

**underneath** [1] 25/8

**understand** [39] 6/23 16/6 24/20 29/14 30/2 32/1 35/25 37/7 40/10 51/1 70/18 75/6 75/8 77/8 85/16 86/11 113/1

**113/7 118/17 118/20 123/10 141/3 141/24 143/2 143/20 157/14 157/23 158/12 162/19 166/2 183/21 186/16 190/24 214/6 214/14 232/17 232/19 243/20 243/25**

**understanding** [14] 6/5 8/12 8/25 24/21 28/5 37/5 85/20 101/9 101/10 117/21 120/21 124/21 191/1 200/21

**understood** [8] 5/6 6/18 63/24 76/2 136/14 159/16 178/12 242/5

**unfair** [1] 113/20

**unfamiliar** [1] 5/8

**unimpaired** [2] 103/19 104/6

**unique** [1] 177/21

**unit** [1] 255/5

**UNITED** [9] 1/1 1/6 1/14 4/9 137/24 185/1 185/14 220/18 220/22

**units** [3] 261/23 263/15 264/6

**universe** [3] 85/21 85/24 86/14

**university** [2] 139/13 142/6

**unknown** [3] 58/19 58/20 82/24

**unlikely** [2] 214/9 244/10

**unnecessary** [1] 208/17

**unquote** [2] 61/7 61/9

**unreasonable** [3] 154/18 182/17 182/18

**unrelated** [4] 9/12 10/12 42/23 87/13

**unreliable** [3] 72/16 82/10 105/3

**until** [5] 18/9 69/3 69/14 98/16 249/9

**updated** [1] 248/8

**upkeep** [1] 93/5

**upon** [22] 14/18 14/19 14/20 17/24 25/18 43/17 43/19 53/17 77/12 78/20 79/7 79/24 80/20 110/15 133/13 133/16 133/17 136/13 143/18 159/1 164/25 177/15

**upper** [1] 264/6

**upset** [1] 70/21

**us** [57] 4/18 4/19 5/11 8/11 11/18 14/25 16/19 18/1 24/23 25/19 33/18 51/3 53/14 53/17 53/23 56/18 58/12 65/12 65/15 66/18 67/6 69/5 70/11 70/14 70/21 71/16 72/7 76/2 77/12 82/21 96/7 100/17 100/20 107/8 108/24 116/4 120/12

(WITNESSNAME)

**U**

**us... [20]** 126/7 131/15 138/7 176/16 176/18 185/6 186/22 187/6 187/8 189/8 189/13 191/21 204/2 235/19 235/20 235/23 236/1 237/20 237/21 243/18
**used [76]** 12/19 20/21 27/2 34/7 34/18 35/4 36/21 45/25 60/7 116/6 116/14 116/23 118/13 118/16 118/17 118/22 119/18 119/23 122/17 127/6 127/7 127/21 127/21 128/1 129/11 136/12 136/25 145/12 148/22 150/15 150/16 151/3 151/3 151/8 153/19 153/22 156/6 161/18 161/20 162/20 163/5 163/8 163/25 168/2 168/6 169/2 173/16 174/15 175/2 175/4 184/2 189/5 204/11 205/13 205/16 206/21 208/18 211/23 213/7 213/10 213/11 213/11 213/13 216/21 219/13 230/11 230/20 248/1 249/17 249/22 250/2 255/2 255/3 255/14 255/17 258/25
**useful [17]** 29/14 31/5 116/16 116/16 117/9 117/13 117/15 117/25 118/9 120/1 120/20 120/22 125/13 125/19 126/1 131/8 251/3
**useless [1]** 117/8
**uses [4]** 8/19 44/2 148/19 148/20
**using [29]** 6/18 7/16 8/8 8/10 21/3 27/2 29/9 29/19 104/24 118/6 125/17 126/3 127/8 127/11 148/10 150/22 172/5 173/19 182/13 208/7 209/14 216/12 217/8 220/22 228/9 229/25 230/3 247/19 248/21
**USPAP [2]** 102/19 102/19
**usually [9]** 31/3 51/11 52/21 59/1 60/21 61/18 63/17 65/7 73/10
**UTC [7]** 5/5 137/25 173/12 188/16 190/19 195/9 263/15
**UTC's [1]** 256/19
**utilized [6]** 26/22 33/25 66/19 67/7 111/15 150/5

**V**

**valid [1]** 159/19

**validity [7]** 86/10 86/13 86/16 86/17 86/18 86/18 87/1
**valuable [1]** 149/3
**valuated [1]** 23/21
**valuation [43]** 116/13 116/17 117/4 117/7 117/8 117/10 120/10 120/12 120/16 120/17 120/23 121/6 121/13 121/14 121/14 121/16 121/19 121/25 122/2 122/4 123/1 125/9 125/16 125/18 125/20 126/3 127/8 127/22 145/4 145/7 145/8 145/14 145/23 145/25 146/4 146/6 146/16 148/2 149/2 161/3 161/7 175/18 177/11
**value [188]** 6/21 6/24 7/6 7/12 7/19 7/25 8/3 8/5 8/6 8/7 8/17 8/20 8/22 9/1 13/4 13/14 13/23 14/9 15/14 16/21 18/1 18/24 19/16 19/19 20/8 20/25 21/1 21/5 22/17 22/25 23/1 23/5 23/5 23/7 23/8 23/14 23/22 23/23 23/25 24/9 24/11 24/15 25/4 25/25 27/19 27/20 27/21 27/23 28/15 28/15 29/7 29/10 29/15 29/24 30/1 30/5 30/19 31/7 31/17 31/18 32/3 32/8 32/11 32/21 32/22 33/19 35/21 37/23 37/24 40/6 41/9 41/25 42/1 42/4 42/5 42/7 42/7 42/16 42/17 42/19 42/21 43/2 43/4 43/16 43/18 43/19 49/21 52/18 54/18 58/14 59/5 63/5 63/19 69/25 70/2 70/4 70/5 70/24 71/1 71/2 71/17 71/24 72/1 72/5 72/12 72/18 73/1 74/8 74/9 74/20 75/14 77/13 80/6 80/15 82/22 83/7 83/24 84/20 85/10 87/12 93/3 101/19 102/25 103/4 103/11 103/17 103/20 103/24 104/2 104/5 104/6 104/7 104/8 104/17 104/21 109/23 112/11 116/14 116/15 116/20 117/1 117/23 117/24 118/4 120/15 121/9 122/7 122/10 122/13 123/5 123/8 123/18 125/16 127/3 127/6 127/13 127/23 127/23 128/15 129/14 129/11 130/8 131/4 131/5 131/7 131/9 133/8 134/24 136/2 142/2

145/2 146/10 146/19 148/4 149/5 151/15 153/15 166/6 161/12 176/5 179/14 183/25 211/13 211/18 222/3 223/14 224/3 227/18
**values [56]** 18/11 20/22 23/11 32/18 44/14 50/3 71/4 71/5 71/6 71/11 71/11 71/13 75/3 76/11 77/24 84/21 101/3 101/7 101/12 101/15 101/16 102/6 102/12 114/20 115/20 116/16 116/24 117/16 119/19 119/24 124/12 204/14 209/1 209/16 210/4 210/5 217/21 218/25 222/9 222/17 223/4 227/19 227/21 227/22 232/7 258/8 258/16 260/7 260/10 262/8 264/8 265/18
**valuing [3]** 88/14 127/22 131/23
**variable [2]** 212/7 212/8
**variables [1]** 151/1
**variance [1]** 149/25
**variations [1]** 260/2
**varies [5]** 84/22 214/19 214/19 238/11 243/3
**variety [8]** 9/5 32/12 101/17 104/3 140/4 220/15 238/17 265/13
**various [9]** 46/7 49/25 69/12 96/20 132/19 142/11 194/10 243/12 257/13
**vary [2]** 84/16 229/16
**vast [2]** 80/7 233/22
**vector [1]** 228/17
**velocity [24]** 204/11 204/13 204/15 206/1 206/18 208/8 209/17 217/4 219/9 220/5 220/8 226/14 226/18 226/24 227/5 227/6 228/24 229/10 230/2 235/24 236/25 255/4 255/25 256/16
**verify [3]** 160/17 222/22 223/25
**versus [1]** 78/13
**vertical [1]** 260/3
**vertically [3]** 212/23 237/1 259/16
**very [62]** 4/24 21/16 27/9 34/8 34/10 34/10 49/3 83/8 84/18 89/11 89/13 91/8 96/6 99/4 99/15 105/6 105/11 106/6 106/10 106/12 109/5 109/9 110/23 119/16 128/14 132/25 138/5 143/8 147/13

147/21 149/16 152/16 159/11 161/9 161/9 163/22 166/22 178/10 179/4 179/15 179/15 181/20 182/24 209/4 211/2 214/9 215/6 216/14 216/14 227/15 229/17 231/3 239/13 239/18 244/3 245/2 247/20 258/8 258/16 258/24 260/1 260/24
**viable [1]** 102/14
**vicinity [2]** 35/19 36/10
**victims [2]** 99/12 100/12
**violates [3]** 154/6 154/7 154/8
**visual [3]** 89/10 93/8 131/13
**vocabulary [1]** 8/10
**Volpe [1]** 142/7
**VOLUME [1]** 1/11
**volumetric [1]** 255/4

**W**

**waggle [1]** 237/15
**Wait [1]** 33/12
**walk [3]** 49/8 237/4 247/5
**wanna [1]** 89/4
**want [66]** 6/16 17/20 25/15 25/18 26/15 30/2 31/20 32/3 32/7 33/20 35/7 36/8 38/2 38/2 38/4 38/7 38/9 40/15 40/20 42/6 46/13 56/6 56/9 56/16 74/16 74/17 79/16 80/2 91/5 92/18 96/24 97/20 98/10 98/11 98/14 100/2 100/9 113/9 128/8 136/18 137/22 137/23 139/7 142/16 142/18 155/21 158/10 163/14 178/23 178/23 190/14 190/19 191/2 194/1 194/4 198/1 201/18 201/23 202/17 204/18 225/1 231/2 237/1 237/4 255/25 266/2
**wanted [3]** 136/13 136/16 137/2
**wants [2]** 78/17 89/19
**wasn't [6]** 60/1 75/22 77/10 90/17 93/2 223/1
**waste [1]** 169/20
**wastes [2]** 168/13 170/10
**wastewater [1]** 178/22
**water [25]** 19/2 165/3 172/5 194/24 194/25 206/13 209/3 219/16 226/25 236/11 236/13 243/25 246/14 247/22 247/25 248/3 248/4 250/15 250/22 254/21 254/23 255/9 256/8 257/3 259/1

**waves [1]** 261/8
**ways [7]** 9/5 34/3 45/9 84/1 117/18 179/1 262/6
**we measure [1]** 44/21
**we'd [2]** 56/25 178/2
**we'll [15]** 9/9 10/24 21/12 48/16 49/13 98/6 149/22 163/23 164/10 164/10 187/25 251/15 251/17 266/8 266/16
**we're [72]** 4/8 8/1 8/10 10/8 12/24 15/5 15/6 15/12 15/12 15/13 15/16 15/16 15/17 15/21 21/18 21/18 23/1 23/3 23/4 25/3 28/2 28/19 29/23 31/15 33/7 37/20 37/23 39/5 41/7 41/15 57/17 63/20 71/1 76/14 84/11 88/2 89/7 96/22 96/24 96/25 97/3 97/12 98/22 101/11 104/14 136/19 139/16 146/21 150/3 150/14 158/22 161/17 171/1 181/5 181/7 183/24 183/24 193/14 199/22 210/18 215/7 216/4 216/6 217/2 217/3 217/5 217/24 218/6 241/24 258/5 260/13 263/3
**we've [25]** 21/7 31/17 37/22 41/17 51/19 64/2 64/22 88/6 93/15 95/7 120/24 122/20 122/21 122/22 122/23 123/14 130/21 131/15 138/17 145/2 155/4 158/20 190/19 221/9 232/13
**weak [1]** 215/7
**weight [2]** 96/6 262/2
**Weinberg [1]** 3/2
**welcome [3]** 49/16 98/19 106/24
**well [216]** 7/20 8/4 8/8 8/18 9/4 10/5 10/21 11/1 11/6 11/17 12/10 13/10 15/5 16/6 16/24 17/5 18/15 19/9 19/17 19/23 20/24 21/7 22/8 23/10 23/20 23/21 24/12 25/3 25/18 26/10 26/25 27/3 27/6 30/17 31/5 32/5 34/23 37/15 38/1 38/23 39/8 39/17 41/5 46/13 48/1 56/3 56/21 57/4 58/15 61/6 62/22 63/9 64/15 66/22 67/1 68/4 68/17 72/24 74/16 76/22 77/18 80/3 82/7 83/18 86/5 86/17 86/25 88/2 90/3 90/6 90/10 94/9 96/11 97/2 97/5 97/7 97/11 97/20 100/2 100/5 100/20 101/5 103/14 108/11 109/12 110/13

{WITNESSNAME}                                                                    Index: well..written

**W**

**well... [130]** 113/2 114/7
115/3 115/22 118/19
121/5 122/16 123/12
125/15 129/15 129/17
129/17 130/10 130/11
130/12 131/1 135/22
136/24 137/12 138/5
139/14 140/6 140/11
141/6 141/13 141/22
141/22 144/18 146/10
148/4 148/12 149/13
149/16 151/1 152/6
152/11 152/14 152/18
153/10 155/13 157/2
157/16 158/6 158/25
159/9 160/24 162/19
163/13 163/17 165/3
165/17 165/24 166/11
167/12 168/10 168/10
169/1 170/16 171/15
171/25 172/5 173/25
174/13 175/5 176/12
177/13 177/19 178/6
185/18 188/10 189/8
190/5 190/11 192/16
193/16 197/25 198/9
199/12 199/19 200/1
200/7 201/17 208/12
208/25 211/5 214/1
214/11 216/17 217/2
217/24 223/19 224/2
228/23 229/1 230/3
232/6 232/13 233/6
234/13 235/15 235/23
237/19 238/2 238/2
238/3 238/4 238/13
239/1 239/3 239/4 243/2
243/20 244/25 245/10
245/20 246/16 247/2
250/14 253/14 255/19
256/23 257/17 261/6
261/11 261/24 261/25
265/15 266/2 266/7
266/12
**well-advised [2]** 129/17
130/12
**well-informed [2]**
129/17 130/11
**well-recognized [1]**
255/19
**wells [21]** 189/17 189/20
189/21 207/7 209/9
234/10 235/4 244/11
244/13 244/17 244/20
244/22 245/7 245/10
245/16 264/17 264/18
264/20 265/4 265/7
265/13
**went [9]** 23/21 23/25
81/6 83/14 108/17
171/23 171/25 234/9
248/25
**weren't [4]** 54/14 77/16
102/2 115/15
**west [23]** 1/8 1/20 2/12

2/19 2/23 212/15 224/4
224/23 224/24 228/25
229/6 229/12 229/19
236/15 244/14 244/18
244/20 245/17 246/3
246/4 249/6 259/13
259/13
**west-southwest [3]**
228/25 229/6 229/12
**western [3]** 242/23
243/3 249/5
**westernmost [1]** 259/20
**WETADIW1 [1]** 229/1
**what's [20]** 10/15 42/17
43/7 44/14 44/17 47/12
62/4 88/3 101/21 108/1
118/14 118/23 119/4
120/2 145/21 158/19
160/10 217/19 231/6
261/11
**whatever [9]** 24/8 39/10
44/4 50/23 57/1 65/9
113/9 113/12 178/22
**whatsoever [1]** 87/16
**Wheeler [1]** 3/2
**whenever [2]** 49/10
97/16
**where [92]** 11/18 12/12
19/9 26/20 27/7 27/24
31/15 31/21 31/24 33/15
36/17 36/18 37/18 43/13
47/15 48/10 50/9 51/16
52/14 53/8 54/13 54/16
55/7 55/7 55/8 55/19
55/20 58/4 58/17 58/19
65/25 73/7 73/11 84/13
103/22 106/5 107/11
109/4 110/16 135/3
135/15 136/22 142/5
142/16 142/18 170/8
178/17 188/25 189/25
190/5 191/23 191/25
192/9 193/6 193/8
197/18 198/18 205/13
209/6 210/4 216/5
216/15 218/6 221/4
221/16 221/22 222/2
222/10 222/22 223/3
223/12 223/24 226/4
227/19 229/7 231/3
232/3 240/16 242/10
242/15 243/17 245/3
248/25 249/23 249/25
250/1 256/21 256/24
258/10 261/18 261/19
264/20
**whereas [2]** 58/6 148/20
**whether [129]** 7/16
13/19 15/3 17/23 17/25
18/9 20/17 21/16 21/22
21/25 22/13 22/14 23/16
23/17 23/18 24/13 24/15
25/20 25/24 28/14 30/8
31/6 32/3 36/3 36/4 37/8
37/24 39/18 41/8 45/4
45/15 47/10 59/14 59/14

63/4 63/21 72/18 73/3
73/25 74/18 75/1 75/2
76/9 76/10 76/16 76/19
76/24 77/4 77/9 77/19
78/5 78/8 78/9 78/9
78/17 78/19 78/21 79/8
79/23 79/25 80/7 81/3
93/4 97/5 100/2 101/25
103/3 103/10 103/23
104/16 105/15 105/16
105/17 105/18 109/25
115/18 118/21 120/12
120/14 121/8 122/7
122/13 123/7 126/7
126/24 128/15 129/24
130/7 130/25 131/2
132/3 132/16 142/20
142/21 158/20 159/7
159/10 159/18 159/19
159/20 160/1 160/13
160/17 163/14 170/19
177/16 177/17 183/25
184/3 193/19 194/4
197/21 198/11 198/13
201/10 204/14 211/10
215/13 221/20 240/18
240/25 241/23 252/6
253/6 262/25 263/13
263/13 264/7 265/3
**while [4]** 64/19 94/24
108/24 134/9
**WHITNEY [97]** 1/7
4/10 67/15 68/8 68/22
100/15 156/17 156/22
158/18 158/20 164/19
165/22 168/15 169/4
186/2 186/18 187/13
187/15 187/23 188/10
189/2 189/10 195/9
196/9 196/13 196/22
196/22 197/3 197/23
198/6 198/12 198/14
198/21 199/10 200/6
200/17 201/3 201/12
201/20 202/13 203/2
203/14 203/14 203/19
207/15 207/19 207/25
208/21 208/25 210/7
214/10 216/2 216/25
217/11 217/25 221/4
221/10 222/7 226/25
230/11 230/25 233/3
234/8 234/21 235/1
235/4 236/22 237/8
242/15 242/16 242/19
243/18 243/20 244/15
244/19 244/22 247/23
247/25 248/24 250/5
250/9 252/8 252/25
253/11 253/16 253/18
254/4 257/21 257/25
262/21 263/1 263/4
263/11 263/13 264/2
264/3 264/4
**Whitney's [48]** 67/14
67/18 189/18 189/21

207/8 207/13 209/9
209/22 210/11 211/6
211/18 212/25 214/17
215/16 215/25 216/10
216/11 216/19 221/16
221/22 222/22 223/23
224/7 227/21 229/9
229/21 230/23 235/6
238/19 242/10 242/11
242/22 242/23 243/4
243/12 244/11 244/18
245/6 245/19 247/7
247/12 247/17 248/17
249/5 250/15 256/19
261/15 263/14
**who's [1]** 44/17
**whole [19]** 61/19 74/14
87/3 95/25 101/18
102/11 154/22 166/20
191/13 192/14 192/20
192/20 193/4 193/22
199/3 213/12 214/5
232/8 232/8
**whom [4]** 61/11 61/12
61/16 62/21
**whose [3]** 60/25 81/25
81/25
**why [47]** 5/21 10/24
23/12 23/24 23/24 29/1
31/20 32/2 38/11 45/7
55/19 56/3 81/6 83/18
84/18 85/7 89/4 89/18
95/3 95/4 96/8 98/3
101/17 102/12 106/16
109/12 109/17 109/19
109/20 110/1 110/4
110/4 110/6 125/17
132/17 134/15 156/4
163/7 164/6 178/5
197/10 198/17 199/22
210/18 216/16 245/15
261/1
**wide [16]** 73/4 73/8
75/14 76/17 77/7 77/13
78/3 78/6 79/24 79/25
80/12 82/10 105/13
123/16 125/11 175/9
**widen [4]** 89/4 89/18
90/3 109/5
**widened [1]** 96/8
**widening [9]** 87/17 88/1
88/21 89/7 89/22 89/22
90/1 132/18 133/10
**widespread [4]** 38/18
38/20 38/24 53/20
**wife [1]** 64/12
**wiggle [1]** 237/15
**Wildlife [2]** 170/12
210/3
**Wilkins [2]** 146/24
147/15
**willing [6]** 42/22 42/22
110/8 168/17 170/19
176/8
**willingness [15]** 140/19
140/20 140/21 141/1

142/12 148/3 148/6
148/10 148/15 148/15
148/16 149/3 149/6
149/8 151/8
**wise [1]** 162/7
**withholding [1]** 59/12
**within [39]** 7/8 7/13 9/5
10/9 10/10 12/20 12/23
24/11 34/5 34/21 35/1
51/20 53/4 56/9 73/23
74/1 74/20 75/2 75/3
76/3 76/13 77/15 81/4
95/2 96/8 99/16 99/20
100/24 102/15 115/20
120/24 121/23 157/6
162/25 194/2 212/7
248/5 260/17 262/3
**without [6]** 31/8 133/1
164/12 178/1 180/3
229/22
**witness [20]** 4/5 4/15
54/24 89/17 97/15
133/13 133/16 137/18
138/3 139/20 139/23
184/18 185/4 191/17
197/13 199/17 225/19
246/20 251/15 266/11
**witnesses [1]** 136/15
**wording [1]** 170/5
**words [17]** 17/16 24/22
27/18 39/12 47/6 74/2
76/19 127/21 132/10
146/5 153/19 153/22
159/12 165/4 165/8
170/20 262/15
**work [18]** 31/12 66/21
66/22 72/2 77/12 121/24
139/20 139/23 139/23
140/2 142/6 151/3 174/4
230/18 240/15 243/10
255/11 257/18
**working [2]** 54/3 188/6
**works [4]** 60/23 82/2
82/4 84/22
**world [1]** 178/14
**wouldn't [20]** 11/23
36/23 37/3 39/24 62/18
62/25 69/19 82/25
107/21 125/9 125/11
125/22 125/22 183/1
190/11 208/10 208/10
214/7 215/10 215/20
**wrap [1]** 182/3
**written [46]** 17/19 50/20
122/5 122/16 144/25
148/13 174/14 185/18
186/19 186/24 187/6
187/19 188/12 188/15
188/23 188/25 189/9
192/4 195/15 195/19
196/10 203/18 206/21
207/3 207/5 207/21
211/4 211/17 213/24
214/1 218/19 219/23
221/7 221/18 222/24
229/7 237/7 238/18

{DATE}

**W**

**written... [8]** 238/22
238/23 240/1 240/9
245/6 248/13 249/4
249/16
**wrong [11]** 46/8 46/10
46/21 66/20 67/7 77/11
82/1 150/5 151/3 151/8
178/16
**wrote [4]** 50/25 117/5
245/8 264/3

**Y**

**yard [1]** 157/22
**yeah [33]** 7/4 24/6 27/3
35/15 39/2 43/23 46/3
50/19 55/24 61/13 61/15
74/4 87/13 89/3 97/22
103/14 105/23 109/3
111/4 112/13 118/3
119/14 121/4 127/5
129/7 133/21 135/11
137/14 166/18 217/18
218/20 219/10 231/24
**year [14]** 86/21 86/22
87/8 87/10 92/17 96/2
132/6 132/6 132/11
206/2 226/21 226/24
229/11 230/1
**year-by-year [1]** 132/6
**years [20]** 49/19 173/19
173/22 209/18 215/7
216/1 216/10 217/1
217/10 217/22 217/24
217/24 217/25 218/1
218/2 226/25 231/1
234/19 237/12 244/3
**yellow [3]** 190/20
233/11 262/17
**yes [322]**
**yesterday [14]** 48/4 48/7
49/22 60/9 64/23 87/3
89/14 111/18 121/22
134/10 147/6 180/6
181/23 201/20
**yet [9]** 21/19 30/14
52/14 71/7 82/21 85/2
89/5 92/14 106/2
**Yoakley [1]** 2/22
**you'd [11]** 16/2 26/9
64/4 116/11 161/14
162/15 196/20 216/16
229/4 237/25 245/3
**you'll [2]** 173/4 204/18
**you're [100]** 11/6 19/25
20/11 21/2 22/2 22/15
22/22 22/24 24/9 24/21
30/5 30/10 32/9 37/22
40/7 40/12 41/7 42/12
49/16 54/1 55/17 55/24
55/24 57/3 57/4 59/11
63/2 63/10 63/14 65/8
65/9 65/25 72/7 74/21
74/21 75/20 76/22 78/17
83/15 84/9 84/11 85/25
89/22 98/19 100/18

100/18 100/20 101/1
101/4 101/8 101/13
101/19 104/20 105/7
113/8 114/22 119/3
126/9 129/21 136/19
139/9 139/15 139/23
148/12 148/14 152/23
154/22 155/22 156/19
159/18 160/24 161/4
165/9 168/11 168/15
177/9 187/16 194/17
204/20 204/24 206/17
207/18 208/6 210/4
215/3 216/3 220/21
227/6 227/7 228/6
234/23 237/24 238/14
242/8 242/11 242/17
244/25 251/7 251/11
255/6
**you've [43]** 18/9 29/1
30/23 31/2 34/24 62/15
68/20 100/20 133/4
136/17 139/20 140/2
140/13 140/18 141/18
143/23 144/25 147/19
147/20 154/6 163/17
171/15 172/8 172/11
172/14 184/6 186/17
190/22 195/15 195/19
195/24 196/5 197/10
205/16 205/19 220/17
220/21 221/12 233/16
249/4 249/15 252/14
262/20
**yours [2]** 163/25 170/13
**yourself [4]** 4/17 30/18
172/9 248/8

**Z**

**zero [4]** 30/7 30/20
30/22 237/5
**zip [1]** 178/17
**Zobel [1]** 2/13
**zone [3]** 209/2 234/16
258/10
**zones [9]** 210/24 234/22
260/19 260/20 260/21
261/20 261/21 262/19
263/9