```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                  Case No. 13-80928-CIV-KAM
 3
   RICHARD COTROMANO, et al.,    )
 4                               )
        PLAINTIFFS,              )
 5                               )
        -v-                      )
 6                               )
   UNITED TECHNOLOGIES           )
 7   CORPORATION, PRATT AND      )
   WHITNEY GROUP, et al.,        )
 8                               )
        DEFENDANTS.              )    West Palm Beach, Florida
 9                               )    January 12, 2018
   _____)
10

11               VOLUME 5 - PAGES 1 - 130

12    TRANSCRIPT OF MOTION FOR CLASS CERTIFICATION PROCEEDINGS

13           BEFORE THE HONORABLE KENNETH A. MARRA

14                UNITED STATES DISTRICT JUDGE

15

16   Appearances:

17   (On Page 2.)

18
   Reporter              Stephen W. Franklin, RMR, CRR, CPE
19   (561)514-3768        Official Court Reporter
                          701 Clematis Street
20                        West Palm Beach, Florida  33401
                          E-mail:  SFranklinUSDC@aol.com
21

22

23

24

25
```

```
1   Appearances:

2   FOR THE PLAINTIFFS:          Jonathan Gdanski, ESQ., and
                                 Jeffrey L. Haberman, ESQ.,
3                                Sheldon J. Schlesinger, P.A.
                                 1212 Southeast 3rd Avenue
4                                Fort Lauderdale, FL 33316
    -and-
5                                Bryan S. Gowdy, ESQ.
                                 Creed & Gowdy, P.A.
6                                865 May Street
                                 Jacksonville, FL 32204
7   -and-
                                 Steven J. Hammer, ESQ.
8                                440 South Andrews Avenue
                                 Fort Lauderdale, FL 33301
9   -and-
                                 Jack Scarola, ESQ., and
10                               Mara Ritchie Poncy Hatfield, ESQ.
                                 Searcy, Denney, Scarola, Barnhart
11                               and Shipley, P.A.
                                 2139 Palm Beach Lakes Boulevard
12                               West Palm Beach, FL 33409
    -and-
13                               Craig R. Zobel, ESQ.
                                 3801 PGA Boulevard, Suite 600
14                               Palm Beach Gardens, FL  33410

15                                   *  *  *  *  *

16

17

18

19

20

21

22

23

24

25
```

```
 1   Appearances (Cont.'d)

 2   FOR THE DEFENDANTS        Sean Gallagher, ESQ., and
                               Andrew C. MacNally, ESQ., and
 3                             Alex Groden, ESQ., and
                               Daniel R. McElroy, ESQ.
 4                             Bartlit, Beck, Herman,
                               Palenchar & Scott
 5                             54 West Hubbard Street
                               Suite 300
 6                             Chicago, IL 60610

 7   -and-
                               Gregor J. Schwinghammer, Jr., ESQ.
 8                             Gunster, Yoakley & Stewart
                               777 South Flagler Drive
 9                             Suite 500-E
                               West Palm Beach, FL 33401
10   -and-

11                             Stephen J. Rapp, ESQ.
                               Weinberg, Wheeler, Hudgins,
12                             Gunn & Dial
                               3344 Peachtree Road, Northeast
13                             Suite 2400
                               Atlanta, GA 30326

14                                 * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to the order of the Court.)

 2              THE COURT:  Good afternoon, everyone.  Please be

 3    seated.

 4              Okay.  I guess we're ready to proceed with the last

 5    two witnesses; is that right?

 6              MS. HATFIELD:  Yes, Your Honor.  The plaintiff calls

 7    Richard Smith.

 8              THE COURT:  Okay.  Hold on.  Before you do that, I

 9    just want to give you -- make a suggestion, and it's up to you

10    how to deal with it, with the time remaining.

11              I felt pretty comfortable with reading all the other

12    affidavits that we've heard from, but this stuff is -- this is

13    not easy.  So if you want, and it's up to you, if you want to

14    use some of your time that you were planning to use for

15    cross-examination, to actually have these witnesses maybe give

16    me a little bit more on direct, help me understand these

17    concepts a little better, I think it would be helpful to me,

18    but I'll leave it to you whether you want to do that or not

19    with the time you've got.

20              I think you have like an hour and a half each

21    approximately set aside for this.  And I know it's probably

22    coming as a surprise, and you might not be prepared to do

23    that.  I understand that.  But I'm just telling you, as I

24    said, I didn't have real problems with the other subject

25    matters, but this is really kinda tough for me to digest.
```

1    MR. SCAROLA:  It is easy for many of us in the

2    courtroom to identify with the concern that Your Honor has.

3    And while we certainly didn't prepare in that way, it's hard

4    for me to imagine that at least our witness isn't ready to

5    give Your Honor a general overview of what he did and how he

6    did it and to respond to any questions that the Court may have

7    before there is any cross-examination.

8         It certainly makes sense from our perspective that

9    Your Honor get the best possible understanding of the subject

10   matter before we proceed to cross-examine, but we'll be guided

11   by the Court.  It sounds like that's what your preference is,

12   and we're happy to abide by that preference.

13        MR. MACNALLY:  Sure.

14        THE COURT:  Okay.  So, again, I don't know if you

15   want to take a few minutes to think about how you want to go

16   about it.  I'm willing to stay past 5:00 tonight.  I don't

17   know about my court reporter.  Again, I know this is coming in

18   somewhat of a surprise to you in terms of your preparation,

19   and you might not be prepared to jump right into this.  And

20   I'm willing to give you a few minutes if you'd like to take it

21   to think about how you want to proceed.

22        MR. SCAROLA:  Because Ms. Hatfield had planned on

23   doing the cross-examination and hadn't planned a direct, would

24   Your Honor have any problem with my doing the direct exam and

25   Ms. Hatfield doing the redirect?  I said cross, but I meant

1   redirect.

2          THE COURT:  I don't have any problem with that if

3   you feel more capable of getting the information that you want

4   out.

5          MR. SCAROLA:  I feel more capable of responding

6   spontaneously than imposing that pressure on Ms. Hatfield.

7          THE COURT:  What is the defense's position on going

8   forward?  Again, it's up to you.  You can say, no, we don't

9   want to do it that way, or you can put your witness on and

10  just subject him to cross-examine.  That's up to you.

11         MR. GALLAGHER:  I have all the confidence in the

12  world that when it comes times for Laurentius Marais,

13  Dr. Marais, to get to the stand and testify about on direct

14  examination that both Mr. MacNally and the Court can ask him

15  his opinions, and you'll understand them.  So I'm perfectly

16  happy with this approach, Your Honor.

17         THE COURT:  So do you want to --

18         MR. MACNALLY:  Your Honor, if I could just do one

19  housekeeping matter before we call Dr. Smith.  I just want to

20  mark into the record Pratt & Whitney demonstrative exhibits,

21  three of them, that we neglected to add in over the last

22  couple days that were used in cross-examination.

23         The first is demonstrative exhibit number 10, which

24  is a chart, a flip chart, handwritten chart that we used with

25  Dr. Kaltofen during his cross-examination.  And we'll give you

 1   copies of these at the end.

 2          Demonstrative exhibit number 11 will be a

 3   demonstrative that we used with Dr. Kilpatrick that is the two

 4   lines where we had the circles placed into his sales

 5   comparison lines.

 6          And the final one is demonstrative exhibit number 12

 7   will be the trihalomethane detection demonstrative that we

 8   used with Dr. Bedient during his examination.

 9          THE COURT:  All right.  Thank you.

10          MR. SCAROLA:  Your Honor, I've apparently made about

11   my fifth or sixth mistake of the day.  Ms. Hatfield is more

12   than prepared to conduct the direct examination, so she will

13   do that.

14          But while we're talking about procedural issues, it

15   might be of some help to both sides if we got some guidance

16   from Your Honor with regard to what the Court's preference is

17   as to how we are going to deal with, assuming we had any time

18   at all, the issue of closing argument.  And I have some

19   suggestions to the Court.

20          I will tell you, first of all, that if there is any

21   time left, we are fully prepared to go into closing argument.

22          THE COURT:  I don't think there's going to be enough

23   time to have a meaningful oral closing argument today.  I

24   mean, that's --

25          MR. SCAROLA:  So one of my suggestions was that Your

1   Honor complete whatever review you intend to do of those

2   matters that weren't expressly covered in the presentation

3   through testimony this week, and then if you find that it

4   would be helpful, call us back to present closing argument at

5   that point and be prepared to answer any questions that the

6   Court may have.

7          Alternatively, we would be happy to submit findings

8   of fact and conclusions of law in writing if that's the

9   procedure that Your Honor thinks would be helpful.  And we

10  also suggest that Your Honor may find it of some assistance,

11  since part of what needs to be done is to identify common

12  issues and those that may be disparate, to have us submit

13  proposed jury instructions that would provide some guidance in

14  assisting the Court in that regard.  And that's a procedure

15  that the Eleventh Circuit's Vega case has suggested may be

16  appropriate.

17         So I present those alternatives to Your Honor, and

18  obviously Your Honor may have some different thoughts about

19  how to proceed, but we're prepared to go in any of those

20  directions.

21         THE COURT:  Mr. Gallagher?

22         MR. GALLAGHER:  Your Honor, if I may, Mr. Gowdy last

23  night filed a brief suggesting the Court is committing some

24  kind of error in how you've conducted this hearing.  I don't

25  know if you've seen it yet.

```
 1              THE COURT:  I saw it was filed, but I haven't

 2   reviewed it.

 3              MR. GALLAGHER:  We couldn't disagree more.  I don't

 4   think there's any confusion about or ever was confusion about

 5   what we're doing here.  We understood that what we're doing

 6   here is as a supplement to the brief they filed and our

 7   response, and this massive record that we've filed with the

 8   Court, our purpose here was to highlight for you the things we

 9   thought were important on the question of class certification.

10              And the parties have had that opportunity to

11   highlight for you what it is we think you should take into

12   consideration as you're addressing the questions raised by

13   their motion, where they carry the burden of establishing a

14   class certification is appropriate here.

15              So on the question of whether we should have

16   summation today, I defer to the Court.  If you -- if there's

17   time and you want it, I'm ready.  If you want to --

18              THE COURT:  There's not going to be time.

19              MR. GALLAGHER:  And if you don't want us darkening

20   your door for a while, I understand that, as well.

21              And I also agree that if the Court, after reflecting

22   on what's been presented here and on the briefs and this

23   massive record, if there's something you want us back in here

24   arguing to you, we're at your disposal, and if not, not.

25              THE COURT:  Okay.  Well, I can just tell you from a
```

```
 1   practical standpoint I'm going to be very busy over the next
 2   few months with other things.  I've got a criminal trial
 3   starting on Tuesday, I've got right after that another civil
 4   trial with one of Mr. Schwinghammer's partners.  After that,
 5   I've got a month or more trial with Mr. Scarola in another
 6   case.
 7                MR. GALLAGHER:  I'm sorry to hear that, Your Honor.
 8                THE COURT:  So it's going to be a while before I'm
 9   going to be able to actually devote the time that this
10   requires for me to sort through.  It might be helpful by the
11   time I finish with all those things if I had some proposed
12   briefing or, you know, some closing briefs.  That might be
13   helpful to me to -- and then I can decide whether I want to
14   bring you in for some oral presentations after I've maybe had
15   some written closing briefs by the parties.
16                I think that would probably make most sense for me
17   to -- again, I'm going to be very busy in the next couple of
18   months, and that will give you enough time to maybe put
19   something together so that when I have some -- the time to
20   direct myself to this matter, I'll have a complete package of
21   information.
22                MR. SCAROLA:  We will consult with Mr. Gallagher and
23   his co-counsel regarding an appropriate schedule to comply
24   with that request, Your Honor, and subject to the Court's
25   approval, we'll certainly work on that.
```

```
 1              I do want to comment, however, because Your Honor
 2    has not yet read Mr. Gowdy's submission, that the suggestion
 3    that we have alleged that Your Honor has committed error is
 4    not accurate.  I think you'll see that when you take a look at
 5    the submission.
 6              THE COURT:  Not yet, not yet.
 7              MR. SCAROLA:  Not yet, not yet.
 8              THE COURT:  I can still save myself.
 9              MR. SCAROLA:  We are recognizing the potential for
10    error to have been committed, which is why -- or to be
11    committed, which is why we've addressed it in the brief
12    written submission that we've made.
13              But those are things we don't have to argue about
14    today.
15              THE COURT:  What are your thoughts on a closing
16    brief of some kind?
17              MR. GALLAGHER:  I think that the proposal, Your
18    Honor, that we have posttrial briefing is probably a good one.
19    I don't want to, you know, actually file a response to what
20    Mr. Gowdy filed, so I'll just tell you my response right now.
21              My understanding of it, maybe a little different, is
22    that he suggested that I told the Court or that I told you you
23    should adopt a procedure here that would be error, and I think
24    that's a mistake, and I think that's clear from our exchange
25    earlier this week.
```

```
 1              But the -- on the posttrial briefs, I think it's a

 2    good idea.  I think we should follow the standard kinda format

 3    for that, where the plaintiffs, since they bear the burden on

 4    class certification, file a brief laying out for the Court

 5    what they think is important for your consideration after this

 6    hearing and after the evidence and the entire record that they

 7    want to rely upon, and that we then be given an appropriate

 8    amount of time, I would say a relatively long period of time,

 9    because there's an amount to be digested here, to respond, and

10    then they have a reply.

11              So on that, I think we should work out a proposal on

12    a schedule.  We outta talk about it amongst ourselves and come

13    to you with a schedule hopefully that we can jointly propose

14    for a posttrial -- a set of posttrial submissions.

15              MR. SCAROLA:  I agree.

16              THE COURT:  All right.

17              MR. SCAROLA:  I don't foresee a problem in coming to

18    an agreement with regard to either the procedure or the

19    timing, Your Honor.

20              THE COURT:  I'm sure you'll be able to work that

21    out.

22              MR. GALLAGHER:  Thank you, Your Honor.

23              MR. SCAROLA:  Thank you.

24              THE COURT:  Sir, if you could just give me one

25    second to get my computer up and running.  All right?  I
```

1    apologize.  You can have a seat.  Make yourself comfortable.

2           All right.  Sir, would you raise your right hand,

3    please.

4           Richard L. Smith, Plaintiffs' witness, sworn.

5           THE COURT:  Sir, if you can try and get a little

6    closer to that microphone.

7           THE WITNESS:  Okay.

8           THE COURT:  Pull the whole thing towards you, and

9    tell us your name, sir, and spell your last name, please.

10          THE WITNESS:  My name is Richard L. Smith,

11   S-m-i-t-h.

12          THE COURT:  Thank you.

13          Ms. Hatfield.

14                    Direct Examination

15   BY MS. HATFIELD:

16   Q    Good afternoon, Dr. Smith.

17   A    Good afternoon.

18   Q    You've been hired to write a number of reports for the

19   plaintiffs in this and in what's considered to be a

20   consolidated injury case, correct?

21   A    Correct.

22   Q    And if you could just briefly describe for the Court what

23   it is that you were asked to do by the time of this affidavit.

24   A    Yeah, okay.  So I was asked to prepare a report where we

25   looked -- we were focusing specifically on female pediatric

1    brain cancer cases in The Acreage in the years spanning 2004

2    to 2009, and by combining various sources, have computed both

3    the observed number of brain cancer incidences, which is

4    seven, and also compute an expected number on the assumption

5    that the cancer incidences in The Acreage are the same as

6    those in the rest of Florida.

7          And based on that, we computed a standardized

8    incidence ratio, which is essentially the ratio of the

9    observed number to the expected number, and based on that,

10   make various probability calculations, essentially trying to

11   ask questions -- answer questions of the nature what's the

12   probability that this kind of number of brain cancer cases

13   could have occurred by chance and to quote the one number

14   that's sort of central to the testimony based on the numbers

15   that are in the table, the probability is 0.00004, or I think

16   in a little bit more plain English, a 1 in 25,000 chance.

17         And the report goes on to consider other ways of

18   looking at and interpreting that number, but that's the main

19   part of the testimony that I'm responsible for.

20         And I will also add the comment that I've -- I've

21   also looked at some of the earlier reports produced by the

22   Florida Department of Health, some of which are also

23   comparisons of standardize incidence rates for cancer counts,

24   and we also reviewed the case control study that was produced

25   by the Florida Department of Health, and in my affidavit I

```
 1   also made some criticisms of that study.

 2   Q    Okay.  So that is an excellent overview, thank you, of

 3   all the work that you've done up until now and where we are

 4   now.

 5          What I'd like to do for the Court is dial it back to

 6   the actual original Department of Health cancer cluster

 7   designation.

 8   A    Okay.

 9   Q    By the time that you started working for plaintiffs, had

10   the Department of Health declared a cancer cluster?

11   A    I'm sorry, could you repeat the question?

12   Q    By the time that you started working for the plaintiffs,

13   did the Department of Health declare a significant increased

14   incidence of pediatric cancer in The Acreage?

15   A    Yes.

16          MS. HATFIELD:  If we could bring up The Acreage

17   cancer review of August 2009.

18          THE WITNESS:  Yes.

19          MS. HATFIELD:  We're going to bring it up on the

20   screen.

21          THE WITNESS:  Okay.

22          MS. HATFIELD:  And if we could flip to the SIR table

23   on page 28 of that report.

24          THE WITNESS:  Okay.

25   BY MS. HATFIELD:
```

```
 1   Q     And if we focus in particularly on Table 7.

 2   A     Okay.

 3   Q     Do you recall that the Department of Health -- do you

 4   recall these SIR tables from The Acreage cancer review?

 5   A     Yes, I do.

 6   Q     And do you agree that the -- or disagree with the SIR of

 7   3.3 for the 2005 through 2007 time period of brain and other

 8   CNS cancers in the pediatric population of The Acreage?

 9   A     Yes, I agree with that.

10   Q     And I know that you've just provided the Court with a

11   definition of what an SIR is, but if you could, within the

12   context of this chart, just redefine for the Court or explain

13   to the Court exactly what that SIR means for the population of

14   The Acreage.

15   A     So the observed number of cases is four.  That simply

16   corresponds to children who lived in The Acreage who satisfied

17   the conditions here.  The expected number of 1.2, that arose

18   from, in the first place, knowing the population of The

19   Acreage and specifically the population in these pediatric

20   classes, and multiplying by a number that corresponds to the

21   probability that a particular individual gets brain or other

22   CNS cancer.

23          So that comes to 1.2 is the expected number of cases

24   if the overall rate was the same as that for the whole state

25   of Florida.  And essentially it's the one number divided by
```

1    the other, taking account of the fact that these are both

2    rounded off.  So four divided by 1.2 comes to 3.3.  So that's

3    the quantity that we call the standardized incident ratio.

4    Q    And Dr. Smith, I notice that that's the -- the SIR is

5    based on comparing The Acreage to Florida, and we have two

6    columns here in fact.  We have comparing The Acreage to Palm

7    Beach County.

8    A    Yep.

9    Q    And we have comparing The Acreage to Florida.

10   A    Yes, okay, I apologize.  That's correct.  What you said

11   is correct.

12           So the first number there, 3.3, is compared with

13   Palm Beach County, and the second number, 3.9, is compared

14   with the whole of Florida.  That's my understanding of the way

15   the table is calculated.

16   Q    And based -- did you review the numbers that the

17   Department of Health used in their calculations?

18   A    To obtain the 1.2 and the 1.0, you mean, the -- you mean

19   in referring to the expected numbers in these cases?  Is that

20   what you're referring to?

21   Q    Well, did you agree that the Department of Health -- did

22   you agree with their determination that there was a SIR that

23   showed an increase of cases in The Acreage as compared to both

24   Palm Beach County and Florida?

25   A    Yes.  I mean, I reviewed -- I didn't go back to their

```
1    report and check the original numbers on which they based the

2    report, but I read the report and the way they described the

3    methodology, and the methodology seemed correct to me, and so

4    I believe these numbers, both the expected number of cases and

5    the SIR, are correct.

6    Q    And if we compare this chart to the chart that's at

7    paragraph 10 on page 7 of 10 of your affidavit --

8    A    Yes.

9    Q    363-9.

10   A    Yes, let me just check that.  Yes, Table 1 on page 7.

11   Yes, I've got it here.

12        Okay.

13   Q    Your chart includes diagnoses of the time period '05 to

14   '07.

15   A    Correct.

16   Q    And you'll recall that the chart that we were looking at

17   from Department of Health was '05 to '07.

18   A    Right.

19   Q    This chart is for female pediatrics alone, and then you

20   also have a number for '04 to '09.

21        Can you explain for the Court what your SIR and your

22   expected number mean on your chart?

23   A    Okay.  So let me talk about the expected number first and

24   then the SIR.

25        So the expected number is obtained by taking
```

1    population estimates for The Acreage, and the numbers being

2    used here are -- even for the '05-'07 numbers, the numbers are

3    a bit different, because they take into account population

4    growth in The Acreage over that period of time, and my

5    recollection is the original 2009 report didn't take that into

6    account.

7         And the expected -- so the expected numbers are

8    based on~-- on counts that were made, estimates of the female

9    pediatric population in The Acreage overreach of the years --

10   in fact, they did it from '04 through to '07.  And using

11   cancer rates that were related to the state of Florida, and

12   these cancer rates were actually calculated from the original

13   2009FDOH report, because in the FDOH report they were relating

14   the numbers in The Acreage to the numbers in the whole of

15   Florida and computing cancer rates for the whole of Florida.

16        And so it's basically the expected number there is

17   the -- is the population as it's been estimated for The

18   Acreage in those years multiplied by the overall rate for --

19   for Florida to get that number, 0.45.  And so the SIR in this

20   case is 3 divided by 0.45, which comes to 6.73.

21        And then the second row of the table corresponds to

22   extending the calculation so that the FDOH2009 report stopped

23   in 2007.  And as it turned out, there were a number of

24   additional cases in '08 and '09.  And specifically if we look

25   at the female pediatric cases, there were three in 2008 and

 1   one in 2009.  So that takes the total up to seven over the

 2   six-year period.

 3          And calculating the expected variable, so takes into

 4   account the additional -- I think I stated that slightly

 5   wrongly, because the second row here also includes one case in

 6   2004, and I think it was two female cases in '08 and one in

 7   '09.  So that's where we get the number 7 from.

 8          And then the expected value corresponds to taking

 9   the population for all of those six years, instead of just the

10   three years that the previous line there.  So for the '04 to

11   '09 calculation, the observed number is seven, the expected

12   number is .89, and that corresponds to an SIR of 7.88.

13   Q    So in laymen's terms, is the incidence of female

14   pediatric brain cancer within The Acreage elevated during the

15   time period from 2004 through 2009?

16   A    Yes.

17   Q    By a factor of what?

18   A    By a factor of 7.8.

19   Q    What is the P-value?

20   A    So the P-value corresponds to calculating the probability

21   that -- let's assume that that expected count is correct, that

22   the expected number is .89, and that these are purely random

23   occurrences.  So -- and it's even possible that with an

24   expected count of .89, it's still possible that you would

25   observe seven cases without any sort of elevation of risk

```
 1   factor or anything like that.
 2           So what the P-value does is to try to calculate --
 3   it's not exactly the probability that it's equal to seven, but
 4   it's the probability that it's seven or more cases.  So the
 5   P-value corresponds to a calculation that we observe seven or
 6   more cases on the assumption that the expected value is 0.89.
 7           And to get that number, there's a -- there's a
 8   formula called the Poisson distribution --
 9           COURT REPORTER:  I'm sorry, called the what?
10           THE WITNESS:  It's called the Poisson distribution,
11   P-o-i-s-s-o-n.
12           And essentially I used tables of the Poisson
13   distribution to compute that P-value, which is the
14   number 0.00004; which can also be written as 1 in 25,000.
15           So I think a layman's interpretation would be if
16   there were no factors causing an elevation of brain cancer,
17   the probability that we would have observed that number of
18   counts or more was 1 in 25,000.
19   Q    If we look to your affidavit at paragraph F on page 6,
20   which bleeds over to 7 --
21   A    Okay.
22   Q    -- does paragraph F describe generally the process that
23   you used in order to come up with that recalculation?
24   A    Correct, yes.
25   Q    And it provides the -- strike that.
```

```
 1          Can you explain for the Court where it is that you

 2   got the numbers that create the incidence for your table; that

 3   is, where did you get the seven cases?

 4   A     Where did I get the seven cases?

 5          Okay.  There are -- it's actually by combining a

 6   number of different sources.  You can go back to the original

 7   2009 report, and that has -- I think that had a table for 2005

 8   to 2007.  I think that was -- that was your first table you

 9   showed me, Ms. Hatfield.  So that was one piece of

10   information.

11          We -- there was an exchange of e-mails with

12   Dr. Sharon Watkins, the chief epidemiologist for the state of

13   Florida, and in particular an e-mail that she sent on August

14   the 11th, 2010, detailed several of the cases that have been

15   reported in 2008 and 2009.

16          So the first source of information was the 2009

17   report.  The second source of information was Dr. Watkins'

18   e-mail in 2010.

19          We also have a -- there are a number of D positions,

20   but in particular a D position from Tracy Newfield lists a

21   number of the cases that Ms. Newfield was aware of.

22          We also have a pathologist's report from Dr. Perry.

23          And, finally, there was a compilation of data from

24   the -- sorry, I've forgotten the acronym, but the other

25   Florida cancer count that Dr. David Banks put together.  And
```

1  this also lists a total of seven female pediatric cases during

2  the years in question.

3          And I've looked at all of these references.  So we

4  have the 2009 report, we have Dr. Watkins' e-mail, we have the

5  D position of Tracy Newfield, we have the pathologist report

6  of Dr. Perry, and we have the spreadsheets compiled by

7  Dr. David Banks.

8  Q    And which of those sources also describe the sex of the

9  individuals who were diagnosed?

10 A    Certainly Tracy Newfield's does.  The 2009 report broke

11 it up into male and female.  If I recall correctly,

12 Dr. Watkins' e-mail from 2010.  I think -- I don't think she

13 was explicit in all cases where they were male and female.

14 Dr. Perry's report I believe doesn't cover all of these cases,

15 but the cases it does cover, it's clear which are male and

16 female.

17 Q    And if we take a look at Tracy Newfield's affidavit.  I

18 just want to clear up one thing, and then we'll move into it.

19 A    Okay.

20 Q    You notice this is called the Affidavit of Tracy

21 Newfield.  Is this the document that you reviewed?

22 A    Yes.

23 Q    You didn't review a deposition of Tracy Newfield?

24 A    I did review it, yes.

25 Q    Well, an affidavit is a written document, and a

1    deposition is a transcript of a document.

2    A    Okay.

3    Q    Is this the only -- what you refer to as a deposition of

4    Tracy Newfield?

5    A    Oh, I understand your question.

6         Yeah, I'm referring to this document, yes.  I

7    haven't viewed the video, if that's what you mean, no.

8    Q    If we take a look at paragraph 22 of the affidavit,

9    Ms. Newfield says that she's personally aware of the following

10   DOH cases on the DOH map, exhibit A -- and we can get to that

11   -- were 2008 diagnoses.

12   A    Correct.

13   Q    Christina DeCarlo, Garrett Dunsford, Hannah Samarippa,

14   Rodenia Peart?

15   A    Yes.

16   Q    And this includes three 2008 brain cancer diagnoses, yet

17   you testified earlier that you had counted two for 2008 within

18   the seven that are in your chart.  Why only two and not three?

19   A    Because Hannah Samarippa according to -- actually, I'm

20   not certain whether this was actually in Ms. Newfield's

21   testimony, but my understanding was that was at least

22   initially classified as a benign tumor.  And it may not be

23   clear whether that was a correct diagnosis.  But the number

24   that I quoted in my affidavit that listed seven female cases,

25   these were malignant cases, and they did not include Hannah

1    Samarippa.

2    Q    And so to be clear, you said that there may have been an

3    error in her diagnosis.  Do you mean in her diagnosis or in

4    the classification of her diagnosis?

5    A    I guess I'm referring to the classification of her

6    diagnosis, yes.

7    Q    If, in fact, Hannah Samarippa were a malignant case, that

8    would make your incidence number eight?

9    A    Correct.

10   Q    And it would not change the expected number?

11   A    It would not change the expected number, that's correct.

12   Q    Tracy Newfield's affidavit refers to what was exhibit A

13   to her affidavit, which is a -- what she refers to as a map.

14   And we have a better version of that map that's been attached

15   to depositions.

16         MS. HATFIELD:  If we could pull up that site map.

17   BY MS. HATFIELD:

18   Q    Are you familiar with this document?

19   A    I've certainly seen it before, yes.

20   Q    And if we look at the legend on the map, it says that

21   it's the sample location map for The Acreage FDEP site

22   section, and then further in the legend it describes that the

23   blue homes are DOH case homes.

24   A    Okay.

25   Q    And we saw in Ms. Newfield's affidavit that she provided

 1  case home numbers for these 2008 diagnoses.

 2  A     Yes.

 3  Q     Were you aware -- strike that.

 4        You've mentioned earlier that the 2009 Acreage

 5  cancer cluster review only went up to 2007, and yet we're

 6  looking at the site map from the investigation that they did

 7  that included 2008 numbers.

 8        Do you know why the 2008 incidence numbers were not

 9  incorporated into the Department of Health's chart and the

10  table that we were first looking at?

11        MR. MACNALLY:  Your Honor, foundation from the

12  witness.

13        THE COURT:  I'm sorry?

14        MR. MACNALLY:  Foundation, the witness to speak on

15  why the FDOH did or did not --

16        THE COURT:  Well, I don't know if he knows.  If he

17  does know, and if it's information he would ordinarily rely

18  upon in rendering his opinion, I guess he --

19        THE WITNESS:  I don't know that.  I don't know that.

20  BY MS. HATFIELD:

21  Q     Why did you include the 2008 numbers?

22  A     Why did I include the 2008 numbers?  Because the concern

23  about elevated cancer rates in The Acreage continued beyond

24  2007, and in particular, these new cases had been reported; I

25  mean, in particular, in the 2010 e-mail of Dr. Watkins they

1    were reported.  So, you know, they're clearly connected with

2    the case that we're talking about here.  They are elevated

3    cancer cases in The Acreage over this period of time.  So it

4    seemed to me entirely appropriate to include them in my

5    report.

6    Q    And this map talks about cases and controls.  Have you

7    heard -- do you know what a case control study is?

8    A    Yes.

9    Q    Can you explain to the Court what a case control study

10   is?

11   A    Yes.

12         So a case control study is used when -- it's

13   essentially -- it's a method of trying to establish the cause

14   of some elevated disease rate or something.  Maybe I can give

15   you an example.  A very famous classical example is one of the

16   very earliest studies linking smoking and cancer was a case

17   control study.  And what they did, they took a number of

18   people who had lung cancer, and they took a matched group of

19   people who did not have lung cancer, and they looked at the

20   percentages who were smokers among both the cancer cases and

21   the noncancer cases.

22         And, in fact, because this was a British study

23   conducted in the 1950s, in both groups the smoking rates were

24   actually quite high, but the point of the study was that the

25   smoking rates were clearly higher in the group that had cancer

```
 1   than the group that didn't.

 2            So, you know, that in broad terms is what a case

 3   control study is.

 4            For an example such as we're talking about here, it

 5   would mean taking homes that had been -- had been sites of

 6   cancer cases and taking comparable homes that were not sites

 7   of cancer cases and doing some sort of comparison in terms of

 8   environmental contaminants, or whatever, between the two sets.

 9   Q    Did you review some of the case control study documents

10   that the Department of Health did?

11   A    Yes, I referred already to a 2009 report of FDOH.  There

12   was a second report of FDOH, which -- I think it came out

13   later, in 2009, but it might have been 2010, I can't remember.

14   But there was a second report that essentially contained the

15   case control study that was also done by FDOH, and I did

16   review that.

17   Q    In your affidavit, you discuss the fact that you reviewed

18   some of Dr. Marais' prior reports.

19   A    Correct.

20   Q    And do you recall what Dr. Marais' criticisms were in

21   those prior reports that are discussed in your affidavit?

22   A    Yes, there were a number of them.

23            So one criticism was concerning the -- the -- well,

24   the -- there are different ways to express it, but the

25   multiple comparisons aspect of the -- of the -- of, you know,
```

1    the comparison of observed and expected cancer counts.

2              So the issue, roughly speaking, is that, you know,

3    what I presented to you was -- it was, you know, for one

4    particular group we had seven cancer cases over a specified

5    period of years, and they were restricted to female pediatric

6    brain cancer cases.  And there are a number of other

7    statistical tests we could have done or in some cases did do.

8    There was an earlier report of mine where I -- I didn't make

9    that specific calculation but made some other calculations

10   that were similar in nature.

11             And there's the question that if every time you do

12   that sort of a test you use the standard .05 significance

13   level, which is what statisticians and medical people

14   traditionally use for this sort of test, if you -- if you did

15   a large number of tests where every time there was a .05

16   significance level, you would most likely come up with some

17   false positive cases on the basis that even if there were no

18   effect at all, one test in 20 would be expected to be

19   statistically significant.

20             So in response to that criticism, I made some other

21   calculations.  And there are various ways of dealing with

22   this, and I actually discuss two of them in my affidavit.

23   But, you know, the first one and the simpler one to describe

24   is known as the Bonferroni correction, which I should perhaps

25   state is something very widely used in statistics and widely

1    discussed in the literature of these sort of issues.  And it's

2    a simple method where you just say -- well, you the take the

3    P-value for one test and you simply multiply by the number of

4    corresponding tests.

5            And, you know, if we take that description at its

6    literal number -- I quoted you a P-value of .00 -- well,

7    .00004, or 1 in 25,000.  If we multiplied that by the number

8    of tests that we've considered, then we would get -- you know,

9    there could be a hundred tests, but that would still be 1 in

10   250, which is well below the standard .05 rate that people use

11   for determining statistical significance.

12           So what I argued in my affidavit was to acknowledge

13   that this is an issue which you need to correct for in some

14   way, but the theory doesn't really give a specific number for

15   this Bonferroni correction.

16           And, you know, in an earlier report by Dr. Marais,

17   he had come up with the number 460, which was based on

18   comparing the population of The Acreage with the population

19   with the whole of Florida.  Now, I've actually got a couple of

20   comments about that.

21           In the first place, there's no real reason to take

22   the state of Florida as the comparison sample.  Another issue

23   is that his comparison was based on total population and not

24   specifically of population such as female 0 to 19, which is

25   the group we're talking about here.

1          But, you know, nevertheless, I was willing to say as

2     just for illustration what would happen if we applied that

3     Bonferroni correction factor, and we still come up with a

4     number of less than .02.

5          So it still seems to me that even if you take

6     account of the Bonferroni correction factor, that we're still

7     looking at a highly statistically significant result here.

8     Q     And just to be clear, you had said you do have to account

9     for that issue.  You mean the issue of a multiple comparisons

10    problem?

11    A     Yes.

12    Q     And multiple comparisons problem, what does that mean?

13    A     Well, it means that with a given set of data, there are

14    multiple tests we might choose to do.  And in some way when

15    you're -- you know, the P-value is just a reference to one

16    single test.  So, you know, when I say P-value of 1 and

17    25,000, just based on that one single test, that's the right

18    P-value.  But if you take this test combined with a whole

19    bunch of other tests, and you say, well, what's the

20    probability that one of these tests produced a significant

21    result, then the P-value would be greater than 1 in 25,000.

22         And the simplest -- it's a very conservative method

23    of doing it, but the simplest way to do it is multiply that 1

24    in 25,000 by the Bonferroni correction factor.

25    Q     And if we go back to your chart on page 7 of the

```
1    affidavit, paragraph 10 --

2    A     Yeah.

3    Q     -- after accounting for the Bonferroni Correction and

4    looking at the data from the many different areas that you can

5    look at it, do you have an opinion within a reasonable degree

6    of medical -- or scientific certainty, sorry, that the

7    incidence of female pediatric malignant brain tumors within

8    The Acreage is elevated for the time period of 2004 to 2009?

9    A     Yes.  Even taking account of the multiple comparisons

10   issue and the Bonferroni correction, it is my opinion that

11   this represents strong evidence that the cancer rates are

12   indeed elevated in The Acreage over that period of time.

13   Q     Does it speak at all as to whether there is something

14   systematic causing that or whether that could be random?

15   A     Well, it's -- I mean, in essence, the fact that it's

16   random is -- is the hypothesis that we're rejecting.  So it's

17   not random.  There is something systematic causing this.

18           The calculation I've given you does not of itself

19   imply any particular source of why it would be elevated.  It

20   simply implies that there is something happening that the --

21   that mean the rates of brain cancer within The Acreage are

22   different from those in the state of Florida.

23   Q     Is it fair to take the P-value and convert it to a error

24   rate -- for example, the original DOH study had an error rate

25   of a 95 percent confidence interval.
```

```
 1              What is the confidence interval that's associated
 2   with the P-value that you have for the 7.88 SIR?
 3   A    So the calculation here, the table here gives the
 4   confidence intervals at various percentages; 95 percent,
 5   99 percent, 99.9 percent and 99.99 percent.  And, you know, I
 6   want to clarify.  Most of the time this table -- this sort of
 7   table appears in the medical literature, for instance.  People
 8   look at the 95 percent and maybe also the 99 percent if they
 9   want an extra -- if they want to feel extra confident that
10   they've got the right answer.  Well, both the 95 and the
11   99 percent confidence, the -- what it's basically saying is
12   what range of incidence of SIRs are consistent with the data
13   at that level of confidence.
14              So, for instance, if we look at the 99 percent, it
15   says that an SIR between 2.29 and 19.3 would be consistent
16   with the data.  So that corresponds to saying, well,
17   whatever -- you know, whatever the cause -- like I said, this
18   is not making any assumption about the cause of such elevated
19   rates.  But whatever the cause, the actual elevation, the
20   fraction by which it's increased the SIR is between 2.29 and
21   19.3.  That's based on the 99 percent confidence interval.
22   Q    And --
23   A    If you --
24   Q    Sorry.
25   A    If you go across two columns and look at the
```

```
 1   99.99 percent confidence interval, you still get 1.04, which
 2   is still bigger than 1.  So even at the 99.99 percent
 3   confidence level, the data are inconsistent with an SIR of 1,
 4   which would correspond to no effect.
 5             MS. HATFIELD:  Thank you, Dr. Smith.  I don't have
 6   any further questions.
 7             THE WITNESS:  Thank you.
 8             MS. HATFIELD:  But I reserve the right to redirect.
 9             THE COURT:  Okay.  Thank you.
10             THE WITNESS:  Thank you.
11                          Cross-Examination
12   BY MR. MACNALLY:
13   Q    Good afternoon, Dr. Smith.
14   A    Good afternoon.
15   Q    My name is Andrew MacNally, and I'm here today on behalf
16   of United Technologies to ask you a few questions about your
17   opinions.  Okay?
18   A    You're most welcome.
19   Q    First of all, before we get going, I put a binder up
20   there for you that has your reports --
21   A    Yes.
22   Q    -- as well as your written direct and the attachments.
23   Okay?
24   A    Okay.
25             MR. MACNALLY:  And, Your Honor, you should have a
```

1    copy, as well, I believe.

2            THE COURT:  Yes, thank you.

3    BY MR. MACNALLY:

4    Q    You are a biostatistician, right, Dr. Smith?

5    A    I'm a statistician and a biostatistician, yes.

6    Q    And you're here to offer opinions today about an analysis

7    that the FDOH performed regarding a potential cancer --

8    pediatric cancer cluster in The Acreage, right?

9    A    That is correct.

10   Q    The FDOH issued an initial statistical analysis in 2009,

11   and it was updated again in 2010; is that right?

12   A    Correct.

13   Q    You agree that you cannot simply rely on the face of the

14   FDOH's cancer cluster analysis as a reliable indication of a

15   truly statistically significant finding of a cancer cluster?

16   A    I'm sorry, would you repeat the question?

17   Q    Sure.

18           Do you agree that you cannot simply rely on the face

19   of the FDOH's cancer cluster analysis as they presented it as

20   a reliable indication of a truly statistically significant

21   finding of a cancer cluster?

22   A    No.  I mean, I think the -- I've broadly stated that I

23   agreed with the report based on the data at the time.  The

24   data has been updated since then to take account of more

25   recent cases.  But in my initial report on this case I did

 1   state that I broadly agreed with the initial FDOH report.

 2   Q    Well, you agree that the Florida Department of Health's

 3   cancer cluster analysis suffers from certain statistical

 4   problems that lead to the increased likelihood that it will

 5   report apparently statistically significant findings that are,

 6   in fact, false positives, correct?

 7   A    No, I'm not sure what you're referring to there.

 8   Q    Well, you agree that the Florida Department of Health's

 9   analysis suffers from the multiple comparisons problem,

10   correct?

11   A    I agree that I've already acknowledged that there is an

12   issue with multiple comparisons in this kind of study, and

13   that includes the analysis originally done by the FDOH.

14   Q    And another name for multiple comparisons in this context

15   is selection bias?

16   A    In most -- yes, it's more or less the same thing, yes.

17   Q    And a little more colloquial term for it is the Texas

18   sharpshooter problem, right?

19   A    Well, that wasn't a term I had heard before coming into

20   this case, but I have heard it referred to as that, as well.

21   Q    Relying on the Florida Department of Health's cancer

22   cluster analysis, without any consideration of the multiple

23   comparisons problem, would create the potential of reporting

24   apparently statistically significant results that do not

25   represent real causal effects, correct?

```
1   A     I agree with that, yes.
2   Q     So you cannot rely on the face of the FDOH's cancer
3   cluster assessment without first taking into account the
4   multiple comparisons problem as a reliable indication of a
5   cancer cluster finding?
6   A     So we can take the data were contained in that report,
7   and we can make various further calculations that account for
8   multiple comparisons.  So I'm not going to say that the report
9   wasn't valid at all, but, I mean, you want to take account of
10  multiple comparisons in how you interpret the results.
11  Q     And you need to take into account multiple comparisons
12  problems in order to know whether you really have a
13  statistically valid finding, right?
14  A     Clearly you need to do that in some way.
15  Q     And you provide three possible ways, or maybe all three
16  together.  I think you talked about two, but not the third.
17          So the first is you provide a recalculation where
18  you add some additional data; is that right?
19  A     Well, that's -- that's a different issue from the
20  multiple comparisons problem.  I view that more as updating
21  the report.  So I didn't do that in response to the multiple
22  comparisons issue.
23  Q     Well, you did provide a cancer cluster recalculation,
24  right?
25  A     Yes.
```

```
 1   Q    And then you applied something called, and you talked

 2   about this with Ms. Hatfield, the Bonferroni correction.

 3   A    Yes.

 4   Q    And then you also provided the Court with a Bayesian

 5   argument?

 6   A    Yes.

 7   Q    And we will address all three of those.

 8        So why don't we start, though, at the beginning

 9   talking about the 2009 cancer cluster report, and I'll just

10   call this up.  I'm sure you're familiar with the 2009 report,

11   which I put on your -- it's not on your screen.

12   A    It's not on the screen right now.

13   Q    It's not on the screen.  I apologize.  That's my fault.

14   A    Okay.  That looks like it.

15   Q    One important factor in evaluating the cancer cluster

16   analysis is how you define the geographic area that you're

17   going to look at for increased incidence, correct?

18   A    Yes.

19   Q    Do you recognize on page 33, Map 1 from the Florida

20   Department of Health, as the area that they studied for the

21   cancer cluster assessment in this case?

22   A    I recall seeing that map, yes.

23   Q    And for your reference, this is a map we've also created,

24   and you can see the orange -- the sort of yellow outline

25   areas --
```

```
 1   A      Okay.

 2   Q      -- match up with the Florida Department of Health's area,

 3   in case you need a reference.  Okay?

 4   A      Okay.

 5   Q      Now, I want to turn your attention to page 18 of the

 6   report, where they talk about the manner in which they went to

 7   define the proposed area.  And specifically I want to focus

 8   you on the paragraph on page 18 where the Florida Department

 9   of Health writes:  "Limiting the study area to the census

10   block areas that comprise The Acreage may have been an

11   artificial boundary for this concern.  An analysis of the

12   larger zip code area and the zip code area minus The Acreage

13   residents indicated that the majority of any excess was

14   related to The Acreage area.  However, there is no biological

15   reason why any excess would be limited within these artificial

16   boundaries, particularly as no environmental issues have

17   surfaced at this time."

18          Do you see that?

19   A      Yes.

20   Q      The Florida Department of Health determined the

21   boundaries of The Acreage cancer cluster study around a group

22   of known cancer events, right?

23   A      Right.

24   Q      And the Florida Department of Health acknowledged that

25   the boundaries it selected were, in some respects, artificial?
```

```
1   A    Well, I acknowledge what it says in the paragraph you're
2   highlighting.  I mean, naturally I had no involvement with the
3   FDOH study, so I have no knowledge of why they did it in the
4   way they described.  But I acknowledge the points you're
5   making about what was described there.
6   Q    You don't know why the Florida Department of Health drew
7   the lines the way they did instead of shifting them over in
8   some way, right?
9   A    Correct.
10  Q    So you have no reason to dispute the Florida Department
11  of Health's conclusion that the way they drew the proposed
12  boundaries for the cancer cluster study area were artificial
13  or had no biological reason behind them, correct?
14  A    Well, I'm just reading what -- what you have pointed out
15  to me, and I acknowledge that's what they say.
16  Q    And I want to call your attention to the highlighted
17  sentence of the same exact paragraph where it reads:  "The
18  analysis of the larger zip coded area and the zip code area
19  minus The Acreage residents indicated that the majority of any
20  excess was related to The Acreage area."
21          Do you see that?
22  A    Yes.
23  Q    One of the issues highlighted in this passage from the
24  FDOH is that they initially look at a somewhat larger area
25  before shrinking the boundaries of the proposed study area,
```

1    right?

2    A    That seems to be the case, yes.

3    Q    The FDA (sic) focused its study around a group of

4    cancers, which introduces a problem known as selection bias,

5    correct?

6    A    There is certainly a risk of that, yes.

7    Q    And here selection bias in the way the FDOH defined the

8    cancer cluster creates a predetermined expectation that the

9    number of observed cancers in the study area will be higher

10   than expected, even if there is no causal effect, right?

11   A    Yes.

12   Q    Put simply, selection bias increases the risk that we're

13   going to see a false positive?

14   A    I'll agree with that, yes.

15   Q    And you do not dispute that the Florida Department of

16   Health definition of The Acreage cancer cluster study area

17   creates that selection bias problem?

18   A    I would have preferred that they had done the study, you

19   know, in some completely -- you know, as I understand, The

20   Acreage itself is a well-defined region.  You can go online

21   and look up the census count for The Acreage, for instance.

22   It would seem to be a well -- maybe it's the region you've

23   highlighted on the map.

24        I agree that the way that they did it does create

25   the possibility of selection bias.

```
 1    Q    And we talked earlier about selection bias and a term
 2    called the Texas sharpshooter.  So I want to return to that
 3    for a second.
 4    A    Okay.
 5    Q    So the Texas sharpshooter phenomenon is a story about a
 6    guy that goes out to the barn, right?  And he's got a pistol,
 7    and he fires a bunch of bullet holes into the barn, and then
 8    he goes up after the fact, and he paints a target around the
 9    bullet holes and finds a significant cluster, right?
10    A    That's the way it's been explained to me, yes.
11    Q    If you paint the target after the holes are in the barn,
12    it's a lot easier to hit the target, isn't it?
13    A    Uh-huh.
14              THE COURT:  Is that a "yes"?  Was that a "yes"?
15              THE WITNESS:  I'm sorry?  Yes.
16              THE COURT:  Thank you.
17    BY MR. MACNALLY:
18    Q    Now, you discussed the multiple comparisons problem on
19    direct, so I want to follow up with that.
20              Frequently statistical analyses are accompanied by
21    something called a probability value, right?
22    A    Yes.
23    Q    Which is also shorthanded as P-value?
24    A    Correct.
25    Q    The P-value is a measure of the likelihood that a
```

1  statistical analysis the result of it is due to chance,

2  correct?

3  A    Yes.

4  Q    So a P-value of .05 would mean there's a 5 percent

5  chance, or 1 in 20 chance, that the result you get is due to

6  chance, as opposed to a statistically valid finding?

7  A    I need to make a small correction of that, because there

8  is a common misconception about P-values, and, you know, this

9  comes up every time I teach a course in statistics.  But the

10  P-value is the probability -- it's assuming it's saying if

11  there is no effective -- if you're just observing background

12  rate, in this case background rates of cancer, what is the

13  probability that we observe this number of cases, given that

14  there was no effect at all.

15        Now, the way you asked the question is open to the

16  interpretation, you're trying to turn that around, that says

17  the probability that there is no effect given the number of

18  cases, and it's not actually that.  It's the probability that

19  you observe this or a greater number of cases, given that

20  there is no effect that would elevate the rate of cancer.

21  Q    So to keep it simple, what falls into the 5 percent are

22  false positives.

23  A    Yes.

24  Q    Things that appear to be statistically significant but

25  are, in fact, due to random chance, is that fair?

```
1   A     Yes.

2   Q     The idea behind the multiple comparisons problem is that

3   when you conduct a system or a multitude of statistical tests,

4   you increase the chances that you will see a false positive

5   among at least one of them?

6   A     Yes.

7   Q     So even though each test has a P-value of .05, or perhaps

8   something lower, the chances that at least one of the tests

9   will produce a false positive is potentially greater or much

10  greater than .05, right?

11  A     Correct.

12  Q     And you agree that the Florida Department of Health's

13  assessment of a cancer cluster in The Acreage is subject to

14  the multiple comparisons problem?

15  A     Yes.

16  Q     As are --

17  A     Potentially subject, yes.

18  Q     As are your recalculations.

19  A     The recalculations I made are also subject to the same

20  issue, yes.

21  Q     So we already talked about geography as one element of

22  comparison, but there are some other elements of comparison,

23  and I'd like to just talk about them quickly.

24  A     Okay.

25  Q     So let's go back to the Florida Department of Health's
```

1   report, and let's look at Tables 4 and 5 to provide us some
2   illustrative examples.
3   A    Okay.
4   Q    So one dimension that you talked about on direct with
5   Ms. Hatfield was that the Florida Department of Health created
6   one set of comparisons for The Acreage versus Palm Beach
7   County, right?
8   A    Correct.
9   Q    And then a second set of comparisons for The Acreage
10  versus the state of Florida.
11  A    Correct.
12  Q    And another set of comparisons that was going on here was
13  to look at gender.  They looked at men and women separately in
14  some analyses, correct?
15  A    Yes.
16  Q    They also broke things down in terms of age.  There are
17  analyses with everyone grouped together, there are analyses
18  that are adult and analyses that are pediatric?
19  A    Yep.
20  Q    And they also broke things down in terms of different
21  time periods, right?
22  A    Yes.
23  Q    So if you look at Table number 4, the analysis is from
24  2000 through 2007 as one big time period.
25  A    Right.

```
1    Q     But if you look at Table number 5, the analysis is from

2    1996 through 2007, and it's broken down into finer three-year

3    blocks, right?

4    A     Yeah.

5    Q     And they also broke down different disease definitions,

6    right?

7    A     Well, they're looking at cancer, brain and CNS and brain

8    cancer, yes.

9    Q     So let's break that down a little bit.  So all cancers

10   are a large grouping of cancer, both brain and everything else

11   in the body.

12   A     Yeah.

13   Q     And then brain cancers are, in some instances, were

14   defined as malignant brain cancers, right?

15   A     Yes.

16   Q     And other instances, later years it was defined as

17   malignant, borderline or benign brain tumors.

18   A     Yeah.

19   Q     And then yet in other instances they took the brain

20   tumors and they added central nervous system tumors to that

21   population.

22   A     Well, I don't think there were actually many that --

23   there isn't actually much of a difference between if you look

24   at the brain and CNS versus just the brain, but they did make

25   that distinction, yes.
```

1  Q    In all of these different examples, geography, disease

2  definition, patient age, patient gender and time periods are

3  dimensions of comparisons that went into the Florida

4  Department of Health's cancer cluster analysis.

5  A    Yes.

6  Q    And they're also dimensions of comparison that have gone

7  into your recalculations.

8  A    Yes.

9  Q    So before we move forward to talk about your

10 recalculation, I want to talk a little bit about the notion of

11 grouping brain cancers together.  Okay?

12 A    Okay.

13 Q    You understood when reviewing the Florida Department of

14 Health's analysis that it had grouped together different types

15 of brain tumors into a common category for their analysis,

16 right?

17 A    Yes.

18 Q    And we can look quickly, staying with the Florida

19 Department of Health's report, at Table 8.  Do you see that?

20 A    I've got it, yes.

21 Q    And there's a large table that lists different types of

22 brain tumors; do you see that?

23 A    Yeah.  Yes.

24 Q    And we already talked about also there are different ways

25 that the Florida Department of Health grouped these tumors,

```
1    whether it was malignant, malignant borderline and benign, and

2    then brain cancers with CNS cancers, right?

3    A    Yes.

4    Q    You are not an oncologist, correct?

5    A    I am not.

6    Q    And you do not have any special expertise in neural

7    oncology?

8    A    No.

9    Q    You are not an expert in brain tumor formation or

10   causation?

11   A    No.

12   Q    In fact, you do not even have any personal experience in

13   identifying cancer clusters?

14   A    I'm not a medical doctor or anything like that, no.

15   Q    But even from a statistics perspective, you have not had

16   background in identifying cancer clusters?

17   A    Correct.

18   Q    Including brain cancer clusters.

19   A    Correct.

20   Q    This is the very first time you've been asked to evaluate

21   a cancer cluster?

22   A    Well, that's not strictly correct, but, yes, it's true

23   that I've not had a lot of prior experience evaluating cancer

24   clusters.

25   Q    You would agree that you do not have the expertise to
```

1    determine whether it makes medical or biological sense to

2    group these difference cancers together?

3    A     Correct.

4    Q     And if we turn to page 15 of the FDOH report, I'll call

5    out a portion here for you.

6    A     Okay.

7    Q     The FDOH writes:  "Brain cancers are a diverse group of

8    tumors with numerous tumor types.  Different types of cancers

9    have different risk factors.  In other words, it is unlikely

10   different types of brain cancers share the same cause."

11           Do you see that?

12   A     Yes.

13   Q     And if we turn over to page 17, the Florida Department of

14   Health continued, stating:  "Brain cancers are a group of

15   diseases with many specific types diagnosed in The Acreage.

16   Lumping of these different types for analysis purposes may not

17   make sense from a medical/biological perspective, and it is

18   likely that the risk factors for one type are not the same as

19   the risk factors for another."

20           Do you see that?

21   A     Well, I certainly see it, but I don't agree with it.

22   Q     Well, the FDOH recognized the fact that it lumped

23   different types of cancers together is a limitation on the

24   utility of its analysis, right?

25   A     They acknowledge that, yes.

```
 1   Q    And you agree that it is, in fact, a limitation on the

 2   utility of the FDOH's analysis?

 3   A    Well, I just indicated that I disagreed with the sentence

 4   you just highlighted.

 5   Q    Turning to your deposition quickly.

 6   A    Objection.

 7   Q    Starting on page 92.

 8        "Question:  If you look at page 15 under the heading

 9   type of brain cancers" --

10   A    Okay.

11   Q    "Answer:  Yes.  Yes.

12        "Question:  Do you see where they say, quote,

13   different types of cancers have different risk factors.  In

14   other words, it is unlikely different type of brain cancers

15   share the same causes.  Do you see that?

16        "Answer:  Yes."

17   A    I see it, yes.

18   Q    "Question:  Do you understand that the Florida Department

19   of Health here was identifying a limitation on the utility of

20   its analysis?

21        "Answer:  I understood that, yes.

22        "Question:  And then if you look --

23        "Answer:  And I think that's appropriate."

24   A    Okay.

25   Q    Were you asked those questions, and did you give that
```

1    testimony under oath?

2    A    Yes, I did.

3    Q    Regardless of the conclusions of your statistical

4    analysis, you do not have the medical or biological expertise

5    to determine whether there is any plausible common cause to

6    the tumors that you have identified in your analysis here

7    today?

8    A    I have not stated that there was a common cause.  What I

9    have stated is that the evidence is inconsistent with

10   background rates of cancer.  I'm not making any assumption or

11   presumption about what the causes of these elevated cancer

12   rates might be.

13   Q    The statistical analyses you performed cannot -- can show

14   a statistically significant excess of cancer, but not

15   causation.

16   A    That's exactly what I stated from the beginning, yes.

17   Q    So let's talk about your recalculations.  And I want to

18   go back to the chart that you looked at with Ms. Hatfield

19   field.

20          Do you remember looking at Table 1 from your expert

21   written direct?

22   A    Yes.

23   Q    And I want to focus your attention on the one that you

24   focused most of your attention on, which is the 2004 to 20009

25   recalculation.

1    A    Okay.

2    Q    Do you see that?

3    A    Yes.

4    Q    This recalculation involves adding data to the FDOH's

5    analysis from 2004, 2008 and 2009, correct?

6    A    Correct.

7    Q    This --

8    A    Just a clarification.  The FDOH had a table that covered

9    the years 2005 to 2007, so I'm -- and then there were

10   additional data that, you know, the source of which we've

11   described that covered the cases in 2004, 2008, 2009, and it

12   was the sum of those that produced the seven cases covering

13   that six-year period.

14   Q    And I just want to make sure that everybody's on the same

15   page.  When you talked about the 1 in 25,000 number, you were

16   talking about this recalculation from 2004 to 2009, correct?

17   A    Yes.

18   Q    Not an analysis that's in the FDOH's original report.

19   A    That is correct.

20   Q    This analysis of a cancer cluster for malignant pediatric

21   female brain tumors from 2004 to 2009 is a brand new analysis

22   issued for your first time in your expert written direct.

23   A    Yes, that is correct.  There was another report that I

24   submitted in December 2016, but this is an update of that

25   report.

```
 1   Q    Well, you actually issued a report in August of 2016,
 2   right?
 3   A    Yes.
 4   Q    And you had recalculations in that report?
 5   A    Yes.
 6   Q    But they are different than this 2004 to 2009
 7   recalculation, right?
 8   A    Yes.
 9   Q    And you had a second report that you mentioned, the
10   December 2016 report?
11   A    Yes.
12   Q    And there, you did another set of recalculations, but
13   that set of recalculations was different from your first
14   report, correct?
15   A    Yes.
16   Q    And, again, that recalculation did not include this 2004
17   to 2009 analysis, right?
18   A    I forget exactly what went into those tables, but it
19   didn't correspond exactly to the table you're displaying here.
20   Q    So now for the first time in your third testimony, in
21   your expert written direct, you provided a brand new
22   calculation, right?
23   A    Yes.
24   Q    And I have never had the opportunity to cross-examine you
25   on that calculation in a deposition, right?
```

1    A     Okay.  Yes, that's correct.

2    Q     Or my partner, Mr. Gallagher, who you can't see, but he

3    took your deposition?

4    A     Yes, I remember that, yes.

5    Q     He's hiding behind a board so he can play on his phone.

6    A     I can see him behind the screen, yes.

7    Q     Now, the multiple comparisons problem we talked about

8    earlier applies to your recalculations.

9    A     Yes.

10   Q     And each recalculation presents similar problems or

11   similar challenges, let's call them, to the FDOH analysis in

12   terms of comparisons along gender lines, age, geography, time

13   periods and cancer groups.

14   A     Well, I'm acknowledging that there are -- yes, I

15   acknowledge that there are comparisons in each of these

16   studies, but the selection of time intervals and disease types

17   is motivated by the fact that we -- you know, this whole case

18   arose because there was an observed increase of cancers

19   that -- that it has been suggested are connected with -- with

20   environmental pollution from Pratt & Whitney.

21          So the -- you know, the time periods cor -- the time

22   period, the nature of the disease, corresponds to what we

23   understand may be, you know, the time period that would

24   correspond to the time of the contamination and brain tumors,

25   because that is the kind of effect that we're aware of.

1          So, you know, these things weren't chosen totally

2    arbitrarily.  They corresponded to the set of circumstances

3    that have led to this whole case.

4    Q    There is nowhere in your expert written direct where you

5    describe the basis for this 2004 to 2009 time period as being

6    related to a time period of contamination from Pratt &

7    Whitney, is there?

8    A    Well, I didn't report that, not in the written report,

9    but I can explain that.

10   Q    I'm asking you a different question.

11   A    Okay.

12   Q    I'm asking you is there any place in your written direct

13   where you correlate or suggest that the 2004 to 2009 time

14   period was selected because it correlates to some perceived

15   contamination from Pratt & Whitney?  Is that a statement that

16   you make in your written direct?

17   A    You're correct that I did not make that statement in my

18   written direct, yes.

19   Q    And you estimate that you have conducted upwards of 80

20   statistical tests on The Acreage alone.

21   A    Well, that's a rough guess, but, I mean, that's -- that's

22   an upper bound.  It's -- and I certainly haven't done hundreds

23   and hundreds of tests.

24          But, for instance, in the December 2016 report,

25   there's a table there that includes 20 tests.  Now, I should

```
 1   point out these aren't necessarily tests of 20 different

 2   things.  Sometimes I will quote a test with male and female

 3   combined, and then break it up into separate tests for the

 4   males and for the females, and those are all categories.  It's

 5   not as though I was doing three completely independent tests.

 6            But the question Mr. MacNally asked me is

 7   essentially maybe I have done 80 tests over the whole course

 8   of the study, and I would say that that seems to be reasonable

 9   that I've quoted you 20 tests in that one particular table,

10   and there's another two here, and the first report I forget

11   how many separate tests there were there.

12            So, yes, I acknowledge that I've done more than just

13   one test to come up with these results.

14   BY MR. MACNALLY:

15   Q    Upwards of 80?

16   A    I would say up to 80.

17   Q    We'll settle on up to 80.  Okay?

18   A    Okay.

19   Q    Now, before the 2004 to 2009 cancer cluster analysis that

20   you show here, you'd issued earlier analyses, and I want to

21   turn your attention now to the first page of your

22   December 2016 report.  Do you see this?

23   A    Yes.

24   Q    And you understand that you've attached this report as a

25   exhibit to your written direct?
```

```
 1    A    Correct.

 2    Q    And you indicate that you had reconfirmed the analyses in

 3    your earlier reports as part of your preparation for your

 4    written direct.

 5    A    Yes.

 6    Q    And I want to turn your attention to look at the analysis

 7    that you performed.  This is the Table 1 of calculations that

 8    you were just talking about, the 20 statistical tests.

 9    A    Right.

10    Q    And I particularly want to call out the adult brain

11    cancer lines for 2008 to 2011 and 2004 to 2011.  Do you see

12    those?

13    A    I do.

14    Q    One of the opinions offered in this report was that there

15    was the existence of an adult brain cancer cluster in both

16    2008 to 2011, and 2004 to 2011, correct?

17    A    Correct.

18    Q    Dr. Smith, do you stand behind your opinion that you

19    calculated a valid statistically significant adult brain

20    cancer cluster for 2008 to 2011 and 2004 to 2011?

21    A    Yes.

22    Q    Your analysis of an adult brain cancer cluster reflected

23    here in this chart is the product of a basic math error, isn't

24    it?

25    A    Not that I'm aware of.
```

```
 1    Q     So let's start with the basics.

 2               You purport to calculate a brain cancer cluster,

 3    right?

 4    A     Correct.

 5    Q     And that's different than brain, slash, CNS cancer,

 6    right?

 7    A     Yes, potentially different, yes.

 8    Q     So when you want to talk about brain cancer, you have

 9    brain in the line, right?

10    A     Yes.

11    Q     And then you had B/CNS when you meant to include the

12    central nervous system cancers, right?

13    A     Okay.

14    Q     And what you say is that there are 23 observed adult

15    brain cancers from 2008 to 2011.

16    A     Yes, that's what it says.

17    Q     And so we can look at page 3 of your report, and we can

18    pull out -- and you rely on an e-mail from Dr. Sharon Watkins

19    to come to that conclusion, right?

20    A     Yes.

21    Q     And do you see down in the second highlighted portions it

22    reads:  "The second e-mail also noted that the number of adult

23    brain cancer cases in 2008, 2009, 2010 and 2011 were

24    respectively five, four, seven, and seven, for a total of 23."

25    A     Okay.
```

```
1    Q    So let's look at the actual e-mail from Dr. Sharon

2    Watkins.  Do you recognize this is the Watkins e-mail that you

3    were relying on?

4    A    I'm going to answer that and say no, because I don't

5    immediately recognize this.

6    Q    All right.  Well, let me see if I can refresh your

7    recollection.

8              Do you recall this phrase, which is verbatim almost

9    from your report that we just reviewed?

10   A    I don't actually recall that, but I do note that the

11   number of cases corresponds to what you just quoted to me,

12   yes.

13   Q    Well, let's look at what Dr. Watkins says in the next

14   paragraph.

15   A    Okay.

16   Q    She says:  "By type, we noted seven malignant brain

17   cancers, zero malignant CNS cancers, zero borderline or benign

18   brain tumors, and 16 borderline or benign central nervous

19   system tumors in this four-year period."

20             Do you see that?

21   A    Yes.

22   Q    What you counted as 23 brain tumors in your December 2016

23   report is actually seven brain tumors and 16 CNS tumors, isn't

24   it?

25   A    Let me take a look.
```

1          Okay.  So she's making the distinction between brain

2     cancers and CNS.  Okay.  I agree.

3     Q    So instead of counting 23 brain cancers for 2008 to 2011,

4     like you did, if we turn back -- instead of counting 23 brain

5     cancers for 2008 to 2011, like you do here in Table 1 of your

6     December 2016 report, it should really be seven, shouldn't it?

7     A    Well, I -- I -- it's possible there was a mislabeling of

8     the count there.  Maybe it should have been brain, slash, CNS.

9     I don't remember -- it's some time over a year since I

10    prepared that, so I can't remember exactly what I was

11    comparing with what when I prepared that table.

12    Q    Well, it look to me like what you were comparing was

13    brain and CNS to the expected count of brain.

14    A    I don't know that.  That's certainly a point that is

15    valid to check.  I understand that some of the -- some of the

16    cases reported by Dr. Watkins, that it's not clear whether her

17    classifications were accurate; that some people suggested they

18    were malignant brain cancers even though they weren't

19    initially reported as such.

20          But in response to your point, I mean, if you're

21    comparing an observed and expected count of clusters of

22    cancers, you should be comparing like with like, I would

23    acknowledge that point.

24    Q    And what you did is you relied on Dr. Watkins' e-mail,

25    which you read to have 23 brain cancers, even though

1  Dr. Watkins' e-mail shows there's even seven?

2  A    It looks as though this chart should have said brain,

3  slash, CNS, but I don't recall how the expected total was

4  counted in this case.

5  Q    So if you have seven observed brain cancers and 8.72

6  expected brain cancers, which is how you represent what's in

7  your table, you would agree with me that seven is not

8  significantly elevated over 8.7?

9  A    That's correct, yes.  If the number 7 is correct and the

10 number 8.72 is correct, and if they do indeed correspond to

11 like with like, then that would not be considered an elevated

12 rate of brain cancer.

13 Q    And you would also have to reduce the 38 brain cancers

14 that you report in the bottom line of the 2004 to 2011 adult

15 brain cancer cluster, right?

16 A    I don't recall where the number 38 came from.  But if it

17 was taking 23 plus the number that had been recorded to

18 2004-'07, then the same point would arise.

19 Q    As you sit here today, you cannot confirm that the

20 analysis that you've done here is reliable, can you?

21 A    You're raising certain points that are legitimate

22 questions to check.  I would be happy to check them.

23 Q    Well, you told the Court, sir, that you did check them,

24 didn't you?

25 A    Well, at the time I was -- at the time I submitted this

1    report, I was -- I was satisfied to the, you know, the extent

2    of my own abilities that what I was reporting to you was

3    correct information.

4    Q    Did you go back and check the Watkins data and actually

5    confirm that the analyses that you were putting forward to the

6    Court as an exhibit to your written direct were correct when

7    you told the Court that you had reconfirmed the opinions

8    expressed in your prior two reports?

9    A    This is -- what you're quoting here is from the affidavit

10   I submitted with -- for today's hearing you're referring to

11   here.

12            I reviewed the previous reports, and based on

13   information known to me, I have no reason to revise those

14   reports.  The -- you know, I've confirmed that the previous

15   reports that I've wrote are accurate to the best of my

16   knowledge.  That's as much as I can tell you.

17   Q    I asked you a slightly different question.  I asked you

18   if you went back to look at the Dr. Watkins e-mail that you

19   were relying on for your adult brain cancer count and

20   reconfirm that you'd done the math right before you

21   reconfirmed to this Court that your December 2016 analysis of

22   an adult brain cancer cluster was accurate.

23   A    I have not been back to all the documents that I cited in

24   my December 2016 report.  I stand by that.  If there's an

25   error somewhere, I'd be happy to look again at the

1    calculations.  But the -- to the best of my knowledge, that is

2    what I've -- that is the report I made at the time, and I

3    stand by that report.

4    Q    In light of the math error in your last report, you now

5    have a new recalculation in the written direct that I haven't

6    had a chance to cross-examine about, so I've got some

7    questions.

8    A    Okay.

9    Q    Can you see this okay?  It will be big when I open it up.

10   A    Yes, I think I can see that clearly enough, yes.

11   Q    So I want to focus back on that same 2004 to 2009 time

12   period.

13   A    Okay.

14   Q    And I want to talk about the data.

15            So you said that you added cancers for 2009 and

16   2008, correct?

17   A    Yes.

18   Q    And you did that from Sharon Watkins' e-mails, right?

19   A    And other sources.

20   Q    Interestingly, the e-mail that you rely on in order to

21   come to the three additional cancers, one of the e-mails that

22   you rely on is the same one I just showed you that has the

23   adult brain cancers in it, isn't it?

24   A    I actually thought that was a different e-mail; but if I

25   misstated that, I apologize.  I thought it was referring to a

```
 1   different e-mail.

 2   Q    So what I've done here is I've put up 2008 through 2011.

 3   Do you see that?

 4   A    Correct.

 5   Q    And I put two malignant brain cancers in 2008.

 6   A    Uh-huh.

 7   Q    And that's correct?

 8   A    Uh-huh.

 9        THE COURT:  Is that a "yes"?

10        THE WITNESS:  Yes, yes.  I apologize, yes.

11   BY MR. MACNALLY:

12   Q    And one malignant brain cancer in 2009.  That's another

13   assumption of your analysis?

14   A    It's a piece of firm information, yes.

15   Q    And Dr. Watkins' e-mails also had data for 2010 and 2011,

16   and there were zero malignant pediatric female brain cancers

17   in those years?

18   A    Yes.

19   Q    So what you did is you drew a line, and you included the

20   data from 2008 and 2009, right?

21   A    Yes.

22   Q    And you excluded the data for 2010 and 2011, right?

23   A    The data I considered was up to 2009, yes.

24   Q    Well, the data you reviewed was up to 2011.  The data you

25   put into your analysis ignored 2010 and 2011, right?
```

```
 1   A    Yes.

 2   Q    And you did that because by ignoring 2009 and 2000' --

 3   2010 to 2011, you were able to get a lower P-value for your

 4   recalculation.

 5   A    But there's more to it than that, because there are other

 6   reasons for going up to 2009.  For instance, the contamination

 7   that has been suggested relates to the period up to 2001, and

 8   there are e-mails reporting latent periods in pediatric brain

 9   cancer as of the order of one to eight years.  So you could

10   take the eight years after 2001, you would go up to 2009.

11   Q    You don't offer any opinions in your written direct or in

12   any of your expert reports about the latency periods and that

13   being the reason to have an analysis that stops at 2009,

14   correct?

15   A    I didn't offer that as a specific reason, but I'm citing

16   it now; that that's -- that has been reported, that there's a

17   latency period of up to eight years.

18   Q    Well, you submitted an expert written direct testimony,

19   correct?

20   A    Yes.

21   Q    Did you understand that it was your obligation under that

22   analysis to tell us and the Court the basis of your opinions?

23   A    Yes.

24   Q    And you don't mention anything in there about why you

25   stopped at 2009, do you?
```

```
1    A    Yes, correct.

2    Q    And you also had some data from 2002 to 2004 that you

3    looked at.

4    A    Yes.

5    Q    And that's not from one source, it's actually from I

6    think you called it logically deduced from sort of a

7    compilation of FDOH tables and a few other things.

8    A    I can't remember exactly how the numbers for 2002, 2003,

9    2004 were calculated.  But what you -- I have no reason to

10   dispute what you've put up on the screen.

11   Q    So what I put up here is that you had data from 2002 to

12   2004, right?

13   A    Yeah.

14   Q    And for 2002, there were no malignant pediatric brain --

15   female brain cancers, correct?

16   A    As far as I know.

17   Q    And same thing in 2003, correct?

18   A    As far as I know.

19   Q    And there was one in 2004, correct?

20   A    Yes.

21   Q    So, again, what you did is you drew a line, and you took

22   the data from 2004, right?

23   A    Yes.

24   Q    And you excluded the data from 2002 and 2003, correct?

25   A    Yes.
```

1    Q    And you did that, in part, because excluding 2002 and

2    2003 helped you obtain a lower P-value, correct?

3    A    Well, it's also because there was no report of excess

4    cancer 'til about 2004.  So it's still trying to focus on the

5    time period for which we believe there may have been a

6    problem.

7    Q    Your analysis here, Doctor, is the embodiment of the

8    Texas sharpshooter problem, isn't it?

9    A    I've acknowledged that there is an issue with multiple

10   comparisons, and I've addressed that issue in my report.

11   Q    Well, it's beyond an issue.  You looked at the data, you

12   isolated a time period, narrowed it down, excluded years with

13   no analysis, and then tested that for statistical

14   significance, correct?

15   A    Yes.

16   Q    And in doing that, you've introduced selection bias into

17   your analysis, correct?

18   A    I've acknowledged there is an issue with selection bias,

19   yes.

20   Q    And when you have an issue with selection bias, you

21   increase the chance that you're going to report what appears

22   to be statistically significant, but is, in fact, a false

23   positive, right?

24   A    You do increase the chance that you would do that, yes.

25   Q    And let's talk about how you try to address this problem.

```
1              The first one that you talked about, and the only
2    one that you talked about with Ms. Hatfield, was something
3    called the Bonferroni correction, right?
4    A    Uh-huh.
5    Q    Am I pronouncing that correctly?
6    A    Yes, yes.  Bonferroni.
7    Q    Dr. Marais made fun of me because I called it Bonfareenee
8    (phonetic) the first week I was here.
9              So the Bonferroni correction.  Let's just go back to
10   first principles on how this works.
11             So you have a statistically result of P .05,
12   correct?
13   A    Uh-huh.
14   Q    And let's say you performed 10 tests, and one of the
15   tests had that P-value of .05.
16   A    Yeah.
17   Q    So what you would do is you would multiply 10 by .05 to
18   see if that one test remains statistically significant.
19   A    Yes.
20   Q    Is that a simple explanation?
21   A    It's a simple explanation.  It doesn't give you an
22   accurate answer -- it doesn't give you the precise answer for
23   what the probability would be, but it gives you an upper bound
24   on that.  It's a number that's bigger than what the true value
25   would be if you calculated it precisely.
```

```
1  Q    So when you apply a Bonferroni correction of 10 to a

2  statistically significant result of P .05 --

3  A    Yeah.

4  Q    -- you would wind up with a resulting probability of .5?

5  A    Correct.

6  Q    And that's not statistically significant, correct?

7  A    Correct, correct.

8  Q    So you use a Bonferroni correction of 460 in your direct,

9  correct?

10  A    I've used -- yes, I've -- yes, we -- I mean, as an

11  illustration.  A part of what I'm saying here is there is no

12  formula that will tell you exactly what the precise correction

13  factor is at any particular instance.  But as an illustration,

14  and because the number of 460 had arisen in an earlier report

15  by Dr. Marais, I used that also for comparison.

16  Q    So we'll get to whether 460 is the right number, but I

17  just want to talk about what you do with it.

18  A    Okay.

19  Q    So you apply it to your 2004 to 2009 cancer cluster

20  analysis, correct?

21  A    Yes.

22  Q    And you say it's still statistically significant?

23  A    Yes.

24  Q    But you don't tell the Court what happens if you apply it

25  to the other cancer cluster analysis, the one the FDOH did,
```

1    from 2005 to 2007.

2    A    That is correct; I didn't report that.

3    Q    And what is the result -- we have it up here on the

4    screen -- if you apply a Bonferroni correction of 460 to a

5    P-value of .011?

6    A    Well, you'd get a number bigger than one, so that would

7    not count as statistically significant.

8    Q    So you don't even need the calculator?

9    A    Right.

10            Thank you for offering it.

11   Q    If you need it later, we have it.

12   A    I may need it.

13   Q    So you didn't tell the Court that of the two cancer

14   cluster significant findings that you identify in your written

15   direct, only one of them survives the Bonferroni example that

16   you offer, correct?

17   A    But this is -- the issue we're discussing here is what is

18   the chance that one of these tests -- this is what the

19   Bonferroni test is trying to account for; that if you do a

20   bunch of statistical tests, what's the probability that one of

21   them turns out to be significant.  It doesn't concern itself

22   with what happened to all the other tests that you did that

23   are not statistically significant.

24   Q    Well, we're in a slightly different universe here.  We're

25   in the courtroom.

```
1    A       Okay.

2    Q       And you provided a written direct testimony, correct?

3    A       Yeah.

4    Q       Is there anyplace in your written direct testimony where

5    you inform us or the Court that your 2005 to 2007 cancer

6    cluster analysis does not survive if you apply a Bonferroni

7    correction of 460?

8    A       No, I did not say that.

9    Q       Now, you don't actually offer the opinion that 460 is the

10   proper Bonferroni correction, right?

11   A       Correct.

12   Q       And so we all know where 460 comes from.  It's if we took

13   all the people in Florida and we lined them up in a line, and

14   we broke them up into roughly equal segments about the size of

15   The Acreage, we would get 460, right?

16   A       Yes.

17   Q       And that's where the analysis -- that's where the

18   number 460 --

19   A       That's where the number came from.  Yes, I agree with

20   that.

21   Q       And you mentioned earlier on direct with Ms. Hatfield,

22   you attributed that to Dr. Marais, correct?

23   A       I -- yes, I did.

24   Q       But you acknowledge that Dr. Marais has actually opined

25   that 460 is not the correct Bonferroni correction?
```

1    A     In his more recent report he has said that, yes.

2    Q     Well, we can quibble about whether or not Dr. Marais ever

3    said that 460 was the proper Bonferroni correction, but we can

4    certainly agree that he doesn't contend that today, right?

5    A     Agreed.

6    Q     In fact, he says that the Bonferroni correction would

7    have to be much higher to account for the magnitude of

8    comparisons in this case.

9    A     That's what he says?

10   Q     And you don't actually disagree anywhere in your written

11   direct with Dr. Marais.  What you say is just that you could

12   continue the argument with Dr. Marais forever.

13   A     Well, I think it's clear from the wording that I don't

14   agree with that.  I mean, I think what you've -- the sentence

15   after you've immediately highlighted is -- is evidence that

16   I'm disagreeing with that.

17   Q     Well, you don't offer the proper Bonferroni correction in

18   your opinion, right?

19   A     Well, I've argued that there isn't a single unique way of

20   calculating.

21         For instance, you asked me a few minutes ago whether

22   I would agree that I had done up to 80 tests.  So based on

23   that, I would say that a Bonferroni correction factor of 80

24   would be reasonable.

25   Q     Well, that's not what you say in your written direct, is

1    it?  In your written direct, what you say is that you start in

2    paragraph 15 by noting that you have done 60 to 80 tests,

3    which would imply a Bonferroni correction somewhere between 60

4    and 80.  You see that?

5    A    Yeah.

6    Q    But then you say in the next paragraph:  "Then one should

7    take into account other tests that might have been conducted

8    but were not."

9             Do you see that?

10   A    Yes.

11   Q    And that's in your written testimony, correct?

12   A    I agree with that, and that is an argument why you might

13   want to consider a Bonferroni factor of greater than 80.

14   Q    You could have performed the 60 to 80 tests that you did

15   just in the proposed class area in any of the other 460

16   groupings of people in Florida, right?

17   A    I've not done anything remotely like that.  I haven't

18   looked at data from other parts of Florida.  My involvement in

19   this case is entirely based on the reported cases in The

20   Acreage.

21   Q    I'm not asking if you did it.  I'm asking could you.  You

22   could have performed the same 4 -- in all 460 populations, you

23   could perform the same 60 to 80 tests that you did in this

24   case, right?

25   A    I could.

```
1   Q    And if we took that as the baseline, 460 times 80 is

2   38,000?

3   A    Yeah.

4   Q    And --

5   A    Whatever.  I don't know, but that -- yes, if you say

6   that.  Yeah, we don't . . . that sounds reasonable, yes.  It's

7   a number of about 40,000, yeah.

8   Q    It's a good thing you don't need it, because I don't

9   think the calculator works.  That's Mr. Gallagher's fault, for

10  the record.

11          At 38,000 as a Bonferroni correction, we can agree

12  that your 2004 to 2009 cancer cluster analysis would not be

13  statistically significant, correct?

14  A    I would agree if that was the correct Bonferroni

15  correction factor, then it would not be statistically

16  significant.

17  Q    And there's nowhere in your written direct where you give

18  us the correct Bonferroni correction?

19  A    But I've already said in this oral testimony that I don't

20  believe that there is any single number that represents the

21  right Bonferroni correction factor.

22  Q    I just want to circle back.

23          So this 2005 to 2007 analysis, that was the baseline

24  analysis from the Florida Department of Health, correct?

25  A    I -- yes, yes.  I understand what you're saying.  Yeah.
```

1 Q So the Florida Department of Health's interpretation of a

2 malignant pediatric female brain cancer cluster is no longer

3 valid if you correct for the multiple comparisons problem

4 using the Bonferroni correction that you used in your report,

5 correct?

6 A If you -- if you take the P-values -- well, they didn't

7 actually quote P-values.  But if you take the SIR values that

8 are quoted in the 2009 report and apply a Bonferroni

9 correction factor of 460, then based on those numbers, the

10 results you get would not be statistically significant.

11 Q You had to perform a recalculation to even find a cancer

12 cluster that could withstand the multiple comparisons problem

13 in your opinion, notwithstanding whether we or Dr. Marais

14 agree.

15 A I acknowledge that, yes.

16 Q Now we come to the Bayesian part of the discussion.

17 A Okay.

18 Q So I'm going to take down this board, and I'm going to

19 put up the Bayesian formula.

20   Do you see that?

21 A Yeah.

22 Q And this is the Bayesian formula that you use in your

23 expert written direct, correct?

24 A Yes.

25 Q So let's start slow.

1          The Bayesian -- the point of your Bayesian analysis

2    is to figure out the probability that a site is contaminated

3    if you observe the presence of a cancer cluster.

4    A    Do you mind if I just refer to my own appendix here?

5    Because I may state some of the formulas wrongly if I don't

6    look at it.  Is that okay with you?

7    Q    Please.

8    A    I'm referring to what was submitted to the Court as

9    attachment 4, which is the mathematical details of the

10   Bayesian calculation.

11          MR. MACNALLY:  And I'm going to mark this

12   demonstrative as Pratt & Whitney demonstrative exhibit 13 for

13   the record.

14   BY MR. MACNALLY:

15   Q    So the point of the Bayesian argument is to figure out

16   the probability that a site is contaminated with a

17   cancer-causing agent if you have -- if you observe a cancer

18   cluster.

19   A    Yes.

20   Q    So starting with the formula -- and let's start with this

21   black part, this $P(A|B)$.

22   A    Right.

23   Q    That's a mathematical way of saying the probability of A,

24   given B.

25   A    Correct.

```
1   Q    And here A equals the presence of a cancer-causing agent.

2   A    Yes.

3   Q    And B equals a cancer cluster is observed.

4   A    Yes.

5   Q    Now, before we turn to the rest of the inputs into the

6   formula, I just want to stay with this phrase "a

7   cancer-causing agent is present" for the moment.

8            When you say a cancer-causing agent is present, you

9   are not referring to any specific cancer-causing agent, right?

10  A    That is correct.

11  Q    You testify in your written direct that the statistical

12  basis of your Bayesian calculation does not require the

13  identification of a specific contaminating factor.

14  A    That is correct.

15  Q    A cancer-causing agent under your analysis could

16  literally be anything associated with brain cancer.

17  A    Yes.

18  Q    It could be an environmental contaminant, correct?

19  A    Yes.

20  Q    The cancer-causing agent also might be an environmental

21  contaminant that no one's ever identified.

22  A    It's possible.

23  Q    And it's also possible that the cancer-causing agent

24  won't be an environmental contaminant at all?

25  A    It is possible.
```

```
1    Q    It might be something other than an environmental
2    contaminant that is common to the area and has some connection
3    with cancer, correct?
4    A    Yes.
5    Q    For instance, it could be something about the way people
6    live their lives in the area that has nothing to do with the
7    environment, correct?
8    A    That is possible.
9    Q    So even if we accepted your Bayesian argument, it does
10   not tell us what the cancer-causing agent is, correct?
11   A    I've acknowledged that, yes.
12   Q    So we can't go out and test to see if there actually is
13   the presence of a cancer-causing agent if your Bayesian
14   formula tells us there should be one, right?
15   A    That would be a different kind of process to actually go
16   out and find the cancer-causing agent, yes.
17   Q    And it doesn't tell us whether the unidentified
18   cancer-causing agent is connected to the environment, right?
19   A    Correct.
20   Q    And it certainly doesn't tell us whether the unidentified
21   cancer-causing agent has anything to do with Pratt & Whitney.
22   A    That is correct.
23   Q    So let's talk about some inputs.
24   A    Okay.
25   Q    I want to talk about two of them with you today, Q and R.
```

```
1    A     Okay.

2    Q     So let's start with Q.  Q is here in green, and this

3    represents what we call the prior probability.

4    A     Yeah.

5    Q     Is that right?

6          And the prior probability is the probability that a

7    unidentified cancer-causing agent is present at a site.

8    A     Yes.

9    Q     Sort of as a background.

10   A     Yes.

11   Q     And R is the second one I want to talk about, and that's

12   located here and here in red, right?

13   A     Yes, I agree.

14   Q     And R is the probability that you will observe a cancer

15   cluster if there is a cancer-causing agent present on the

16   site.

17   A     Yes.

18   Q     So it's sort of the reverse of the probability that we're

19   looking for, right?

20   A     Yes, because it's P of B, given A, and we're trying to

21   calculate P of A, given B.  And the connection between those

22   two is what is known as Bayes' formula.

23   Q     Now, your Bayesian argument is driven by the assumptions

24   that you use for Q and R, correct?

25   A     Yes.
```

1   Q    And if you use different numbers, materially different

2   numbers, you'll wind up with a materially different result,

3   correct?

4   A    I gave a number of examples of that in my testimony, yes

5   -- in my affidavit.

6   Q    And the Q and R and the assumptions and inputs that you

7   use for them are nothing more than pure assumptions on your

8   part, correct?

9   A    Yes.  They are assumptions that are intended to represent

10  a range of reasonable numbers that correspond to what we might

11  be seeing here.

12  Q    Well, the assumptions that you use for Q and R are not

13  based on test data, correct?

14  A    Yes.

15  Q    They're not based on supporting literature, correct?

16  A    Well, to some extent they're based on supporting

17  literature.  I did cite some supporting literature on the

18  value of Q.

19  Q    Well, R's certainly not based on any literature, correct?

20  A    Correct.

21  Q    So at the end of the day, Q and R and the assumptions

22  that underlie them are really just based on your subjective

23  judgment, correct?

24  A    Well, I'm acknowledging there is some subjective judgment

25  that goes into this calculation, yes.

```
 1   Q    So let's start with the prior probability.
 2             And what you say is that it refers to the
 3   probability that a site is contaminated with an unidentified
 4   cancer-causing agent, correct?
 5   A    Yes.
 6   Q    And you set the prior probability of your analysis at .1,
 7   correct?
 8   A    I think it was --
 9   Q    I'm sorry, 1 percent.
10   A    One percent, .01, yes.
11   Q    And what that means in English is that it corresponds to
12   the assumption that 1 percent of all communities in Florida
13   are contaminated in some way that could lead to the -- an
14   excess of brain cancers; do you see that?
15   A    Yes.
16   Q    And that's the interpretation of your 1-percent
17   assumption --
18   A    That's the interpretation I gave you, yes.
19   Q    And you acknowledge, Dr. Smith, that if your prior
20   probability is much lower, your Bayesian argument falls apart?
21   A    Well, the calculation would still be valid, but it
22   wouldn't give you a result -- I mean, it would lead to a much
23   smaller value of P of A, given B, and in that case, the result
24   would not be of so much interest.  I mean, the calculation
25   itself is still valid, but --
```

```
1    Q    Well, the result wouldn't be of interest to Ms. Hatfield
2    if it resulted in a much lower probability that you would find
3    contamination --
4    A    I agree.
5    Q    -- in the presence of a cancer cluster, right?
6    A    I agree.
7    Q    But that result may be very relevant to Pratt & Whitney
8    or to the Court, wouldn't it?
9    A    It could be.
10   Q    So if you have a lower prior probability, say one in a
11   million versus 1 percent, you would agree that your Bayesian
12   formula would indicate that the presence of a cancer cluster,
13   a brain cancer cluster, doesn't really tell you much of
14   anything about whether the environment is contaminated?
15   A    In that case that would be true, yes.
16   Q    And what you said is that you were relying on an article
17   about polycyclic aromatic hydrocarbons, right?
18   A    I always forget that description myself, yes, but that's
19   correct.
20   Q    Can we agree to call them PAHs from now on?
21   A    Yes.
22   Q    And here is that discussion from your written direct.
23        So you set your prior probability based on an
24   article from Dr. Christopher Teaf, correct?
25   A    Yes.
```

```
 1   Q     And Dr. Teaf writes about the prevalence of PAHs in the
 2   environment, right?
 3   A     Yeah.
 4   Q     And based on the prevalence of PAHs at low levels, you
 5   argue that you are justified using a prior probability
 6   of 1 percent, correct?
 7   A     That's what I argued, yes.
 8   Q     You do not cite anything to support your prior
 9   probability other than Dr. Teaf's article?
10   A     That's the one citation that I found that -- I mean,
11   acknowledge that I'm not an expert in these contamination
12   issues, I did find the article by Dr. Teaf.  And although
13   there's nothing in the article that specifically justifies
14   the 1 percent, he was clearly trying to argue that the -- and
15   I actually -- you know, the word "ubiquity" is within the
16   section that you highlighted, and I believe that's a quotation
17   directly from Dr. Teaf.
18         So clearly Dr. Teaf is saying in that article that
19   PAHs are quite widespread through the state of Florida.
20   Q     So I asked a little bit shorter question, which was you
21   don't cite any other literature besides the article from
22   Dr. Teaf, right?
23   A     Correct.
24   Q     And that's actually true -- that's actually true --
25   that's actually true not only in your expert written direct,
```

1   but that's true in all of your prior reports, correct?

2   A    That's correct.

3   Q    Now, you have no personal basis to associate any level of

4   PAHs with cancer, right?

5   A    I'm not a toxicologist.  I'm aware that PAHs are

6   associated with a variety of adverse health outcomes, and I'm

7   also aware that PAHs have been implicated in The Acreage.

8   Beyond that, I don't have specific information.

9   Q    You think that there are PAHs that have been implicated

10  in The Acreage?

11  A    I was under the impression that some of the studies did

12  concern PAHs.

13  Q    You're not a toxicologist?

14  A    Correct.

15  Q    And you're not an oncologist, correct?

16  A    Correct.

17  Q    And you have no specific expertise in analyzing whether

18  PAHs, like benzopyrene, are harmful to human health?

19  A    I've not -- I've not myself conducted studies of that

20  nature, correct.

21  Q    And you can't point to any expert testimony in this case,

22  can you, that links PAHs in any way, shape or form with brain

23  cancer.

24  A    Correct.

25  Q    And Dr. Teaf's article says nothing about brain cancer,

1    right?

2    A    That is correct.  I agree with that.

3    Q    And, in fact, you're aware that Dr. Teaf has testified in

4    this very hearing that PAHs have nothing to do with brain

5    cancer?

6    A    I am aware of that.

7    Q    So let's look quickly at what Dr. Teaf had to say.

8         Have you read Dr. Teaf's affidavit in this case?

9    A    Yes, I have.

10   Q    And you understand -- so what Dr. Teaf writes in

11   paragraph 19 of his affidavit is:  "One cannot conclude from

12   my article, as Dr. Smith does, that it is appropriate to use

13   a 1 percent background probability that The Acreage has the

14   presence of an agent that causes brain cancer, because the

15   article has nothing to do with brain cancer."

16        Do you see that?

17   A    I see that.

18   Q    And Dr. Teaf also discusses that:  "Neither BaP, which is

19   an acronym for benzopyrene" --

20   A    Right.

21   Q    -- "nor any of the other PAHs are known to cause brain

22   cancer."

23        Do you see that?

24   A    I see that.

25   Q    And you have no basis to dispute Dr. Teaf's commentary on

1    whether PAHs are associated with brain cancer.

2    A    No, I don't dispute Dr. Teaf's testimony in those areas

3    at all.

4    Q    So the only article that you are relying on is Dr. Teaf's

5    article, and Dr. Teaf's article says there's no association

6    between the contaminant that you based the prior probability

7    on and brain cancer, correct?

8    A    Correct.

9    Q    So there's no basis for you to suggest that this article

10   has any relevance to whether there is the existence of an

11   unknown, unidentified cancer-causing agent as a background

12   rate in Florida.

13   A    Unless it was associated with P -- you know, certain

14   other contaminants might be associated with PAHs, but that's

15   the connection with PAHs.

16   Q    And you don't have any evidence that PAHs are associated

17   with some other contaminant that is present at the same times

18   and the same amounts and levels as PAHs, correct?

19   A    Correct.

20             I mean, I've acknowledged all the way through this

21   that the prior probability is not an exact calculation.  It's

22   meant to reflect the fact that we know there are soil and

23   groundwater contaminants in Florida, and I think it's probably

24   fairly conservative to say that the probability that The

25   Acreage is contaminated by something is of the order of

```
1    1 percent.

2    Q    And that's based on absolutely nothing, correct?

3    A    It's based on my limited understanding -- and I emphasize

4    this it is limited about the toxicology factors and evidence

5    that I've seen in Dr. Teaf's report and other things that I

6    didn't cite, because they were found on the Web, and they

7    weren't documents that appeared in journals that imply that

8    there are fairly widespread concerns about different types of

9    contaminants in Florida.

10   Q    You do understand, sir --

11   A    Yes.

12   Q    -- that your 1 percent prior probability is an agent

13   associated with brain cancer, correct?

14   A    To be relevant to this calculation, we would be talking

15   about -- because the -- the A event -- sorry, the B -- yeah,

16   the B event that we're referring to conditioned on the outcome

17   is referring to the brain cancer.  So this is all about

18   probability of brain cancer; it's not probability about

19   anything else.

20   Q    And you don't have a single piece of literature that

21   discusses and describes the prevalence of any brain

22   cancer-causing contaminant in the environment in the state of

23   Florida, do you?

24   A    No.

25   Q    As a matter of fact, you don't have a single piece of
```

1   literature discussing the prevalence in the environment of any

2   brain cancer-causing agent anywhere in the world that you

3   cite, correct?

4   A    Correct.

5   Q    So your prior probability of 1 percent is just made up,

6   isn't it?

7   A    Well, I pretty much acknowledge that, that -- and that's

8   why I compare it with other numbers of below 1 percent, that

9   this is meant to represent a scenario of possible

10  probabilities that could arise.

11  Q    And if the possible probability of the presence of a

12  contaminating factor that could cause brain cancer is actually

13  1 in 10,000, then your Bayesian formula would not be

14  sufficient to overcome the multiple comparisons problem

15  inherent in the FDOH analysis.

16  A    I agree with that statement, yes.

17  Q    And certainly not if it was one in a million, correct?

18  A    Correct.

19  Q    And you have nothing you can point to that tells you

20  whether the right number is 1 percent, 1 in 10,000, 1 in a

21  million or 1 in a billion, right?

22  A    Correct.

23  Q    So let's turn to the red part of the formula.

24       MR. MACNALLY:  Actually, Your Honor, it may be a

25  moment for a break.

```
 1              THE COURT:  Okay.  And I just want to let you know,
 2    I was operating on the assumption we had about an hour and a
 3    half each that you wanted to use however you wanted, and
 4    you've used close to that already on cross-examining him, so I
 5    don't know how much you're going to have left to --
 6              MR. MACNALLY:  I'll be very brief, Your Honor, when
 7    I come back.
 8              THE COURT:  Well, and also for purposes of redirect
 9    or direct on your own witness.
10              MR. MACNALLY:  Right.
11              THE COURT:  And Ms. Hatfield, you've used 35 minutes
12    so far today.
13              So, again, to the extent you want to redirect him
14    and save time for cross-examining their witness, take all that
15    into account.  I'm just letting everybody know.
16              MR. GALLAGHER:  Thank you, Your Honor.
17              MS. HATFIELD:  Thank you, Your Honor.
18              THE COURT:  Ten minutes.
19        (A recess was taken from 4:09 p.m. to 4:24 p.m., after
20    which the following proceedings were had:)
21              THE COURT:  Welcome back, everyone.  Please be
22    seated.
23              All right.  You may proceed.
24    BY MR. MACNALLY:
25    Q    I want to return, Dr. Smith, to something we were talking
```

1    about earlier.

2    A    Yes, Mr. MacNally.  Would it be -- may I go back and

3    correct one of the answers I gave you a few minutes ago?  Is

4    that -- may I do that?

5    Q    Well, I think you'll have an opportunity on redirect if

6    there's something you wanted to clarify.

7    A    Okay.

8    Q    Is what you want to clarify something that you've

9    discussed with your counsel?

10   A    No, no.  I haven't discussed this with counsel.

11   Q    Okay.  Sure.  Go ahead, then.

12   A    You asked me whether I was aware of any literature that

13   implied a common prevalence of substances that case brain

14   cancer, that cause brain cancer, and you referred to the

15   testimony of Dr. Teaf.  And I did read that testimony myself,

16   and not just the bit that was directly addressing my own

17   comments.

18           He did refer to other substances, such as

19   1,4-Dioxanes and dioxins and furans, I don't know whether

20   that's the correct pronunciations.  My understanding is that

21   those substances are associated with brain cancer.  I'm not

22   sure of that point, but that was my understanding that -- his

23   context.  He stated that these substances are common in the

24   environment of Florida from a variety of nonspecific sources.

25           That's the correct -- that's the clarification I

1    wanted to make.

2    Q    Dr. Smith, are you aware that there are two medical

3    experts that have testified in this case?

4    A    I'm aware of that, yes.

5    Q    And do you understand that both medical experts agree

6    that dioxins and furans and 1,4-Dioxane and all of the other

7    substances that you just mentioned do not have an association

8    with brain cancer?

9    A    If that is the opinion of the medical experts, I have no

10   reason to dispute it.

11   Q    And you have no basis to suggest that any of those

12   substances do have an association with brain cancer, correct?

13            THE COURT:  I'm sorry, hold on.

14            Ms. Hatfield?

15            MS. HATFIELD:  Your Honor, can we just ask that the

16   chart be pushed back.  I can't see you if I sit in my seat.

17            THE COURT:  I don't know why you'd want to.

18            MS. HATFIELD:  Just a little bit.

19            THE COURT:  It might be a benefit.

20            MS. HATFIELD:  Thank you.

21            THE WITNESS:  That's perfectly fine, Mr. MacNally.

22   I acknowledge that.

23   BY MR. MACNALLY:

24   Q    So I want to go back to your December 2016, report.

25   A    Okay.

```
1   Q     And I want to talk again about the math error.
2            Sir, if it were true that there were -- and correct
3   that there were a brain cancer cluster identified in The
4   Acreage by you that is statistically significant, that finding
5   of an adult brain cancer cluster, never before disclosed, at
6   an extremely low P-value, would be a very significant finding,
7   wouldn't it?
8   A     It could be, yes.
9   Q     The kind of thing you might want to tell the Court about.
10  A     Yes.
11  Q     In fact, Mr. Scarola did just that in a hearing on
12  February 2nd of 2017.  He put up your chart in this court.
13  A     Yeah.
14  Q     And he said:  "Recently, plaintiffs' expert confirmed
15  brain cancer rates among the overall The Acreage population,
16  children and adults, substantially exceeded the expected rate
17  of occurrence in the area."
18            THE COURT:  Hold on a second.
19            Ms. Hatfield, yes?
20            MS. HATFIELD:  I just -- this is beyond the scope of
21  his direct affidavit.
22            THE COURT:  Well, what's the point?
23            MS. HATFIELD:  My objection or the question?
24            THE COURT:  No, I'm asking of the question.  If he
25  really believed that there was this cluster there, that he
```

```
 1   should run to the health department and let them know about

 2   it?

 3              MR. MACNALLY:  Or maybe he would have included it in

 4   his written direct.

 5              THE COURT:  Okay.  All right.

 6   BY MR. MACNALLY:

 7   Q    Dr. Smith --

 8              THE COURT:  Basically it's an argumentative

 9   question, so why don't you move on to something else.

10   BY MR. MACNALLY:

11   Q    Dr. Smith, you didn't include an adult brain cancer

12   analysis in your written direct, correct?

13   A    For this hearing, no.

14   Q    And you did not include an adult brain cancer in your

15   written direct, because you knew before you submitted your

16   testimony today that this analysis was the product of a basic

17   math error of miscounting cancers?

18   A    I did not know that.

19              MR. MACNALLY:  No further questions.

20              THE COURT:  All right.  Thank you.

21              Any redirect?

22              MS. HATFIELD:  Yes, Your Honor.

23                        Redirect Examination

24   BY MS. HATFIELD:

25   Q    Hello again, Dr. Smith.
```

```
1   A     Hello.

2   Q     I'm going to take this a little out of turn because of

3   where we just left off with your cross and the adult cancer

4   cluster incidence that was the subject of your December 2016

5   report.

6           MS. HATFIELD:  If we could pull up the

7   December 23rd, 2016, report, which is attached to the direct

8   affidavit.  It was at 363-11 is the number.

9   BY MS. HATFIELD:

10  Q     If we look at the bottom paragraph.

11  A     Okay.  Yes.

12  Q     I believe this came up in your cross from Mr. MacNally as

13  the sources for the later incidence numbers featured in your

14  December 2016 report, including not only the pediatrics, which

15  is the only subject in the direct affidavit, but the adult

16  cancer cluster incidence in your 2016 report, is it not?

17          Is this the part you were reviewing with

18  Mr. MacNally as the source of the increased incidence?

19  A     Yes.

20          MS. HATFIELD:  If we could blow up that bottom

21  paragraph.

22  BY MS. HATFIELD:

23  Q     It discusses e-mails from Dr. Sharon Watkins to Acreage

24  residents dated March 24th and August 11th, 2010, and it

25  discusses a letter to Alina Alonso, September 2014.
```

```
 1              And anywhere in your response or your report of
 2   December 2016, or at any time, do you recall reviewing the
 3   e-mail of 2014 that Mr. MacNally was referencing?
 4   A    No, I do not recall referring to that.
 5   Q    So if we take --
 6   A    I do not recall even seeing it, yeah.
 7   Q    If we take a look at what is the affidavit of Tracy
 8   Newfield again, which was brought up earlier, and we flip to
 9   what is page 10 of that affidavit, we have an e-mail of
10   April 8th, 2010, we have the e-mail of August 14th, 2010.
11   A    Right.
12   Q    And then we have the -- a letter of September 26, 2014,
13   which falls on page 18 of the affidavit.
14   A    Okay.
15   Q    If we flip down to the bottom paragraph, we could --
16   regarding adult brain cancer cases in The Acreage community
17   for the period 2008, 2009, 2010 and 2011, we noted five, four,
18   seven and seven cases respectively.
19   A    Okay.
20              MR. MACNALLY:  Your . . .
21   BY MS. HATFIELD:
22   Q    Is this the source of the 23 brain cancers that are noted
23   as the incidence number in the chart of your December 2016
24   report that was last displayed by Mr. MacNally?
25   A    I believe so.
```

```
 1   Q    Do you recall why it was the adult brain cancer incidence
 2   finding was not included in your direct affidavit, although
 3   the pediatric cancer cluster was?
 4   A    We -- we -- so the affidavit I was presented to this
 5   Court was intended as a summary; it wasn't meant to include
 6   everything that had occurred in the previous reports, and a
 7   decision was taken to focus on the pediatric cases.
 8   Q    Do you have any idea as to why it was that the e-mail
 9   from Dr. Watkins that was depicted by the defendant said that
10   some of these cases were, in fact, nonbrain cancer, and the
11   letter from Dr. Alonso says that they are all brain cancer?
12            MR. MACNALLY:  Objection to form.  That
13   mischaracterizes the document, and it's argumentative.
14            THE COURT:  Overruled, if you can answer it.
15            THE WITNESS:  I -- I merely noted that those were
16   the number of cancer cases reported.  I was aware there was
17   some disagreement about how those cases should be classified.
18   BY MS. HATFIELD:
19   Q    Is that one of the reasons that it's not in your direct
20   affidavit?
21   A    No, because the -- because as I -- as I said earlier, the
22   affidavit is -- the decision was taken to focus on pediatric
23   cases.
24            MS. HATFIELD:  Okay.  We can take that down now.
25   BY MS. HATFIELD:
```

```
 1   Q    I would like to go to The Acreage cancer review document

 2   and talk a little bit about the discussion that you had with

 3   Mr. MacNally about the possibility of selection bias.

 4            Do you recall that portion of your testimony?

 5   A    Yes.  Yeah.

 6   Q    And he had mentioned that at page 10 of the document

 7   there was a discussion about the fact that drawing the

 8   boundaries of the study around The Acreage area zip codes was

 9   an artificial boundary.  Do you recall that?

10   A    I recall that discussion, yes.

11   Q    And you admitted that that could be a selection bias.

12   A    It could be a selection bias, yes.

13   Q    What would you do in order to correct for that selection

14   bias as far as drawing new geographic boundaries would be

15   concerned?

16   A    What I would do would be to say let's work with something

17   that is a completely well-established geographic boundary,

18   such as, for example, The Acreage itself.  I mean, in my

19   understanding, there's no ambiguity about what area we're

20   talking about when we say The Acreage.  So that might have

21   been the way I would have done that myself.

22   Q    And do you recall that on page 16 of the Department of

23   Health's Acreage cancer investigation that there was a section

24   labeled "Additional Analysis" that Dr. Watkins did regarding

25   determining the boundaries of the study?
```

```
 1    A     No, I don't recall that.

 2    Q     Well, if I can -- you did review The Acreage cancer

 3    review?

 4    A     I did review it, yes.

 5    Q     If we could go to page 16 of The Acreage cancer review,

 6    and if we look in the additional analysis, it says:  "In order

 7    to further explore these rates in a larger geographic area,

 8    the above analyses were conducted using data from the three

 9    zip codes that include and surround The Acreage, as well as

10    these three zip codes minus the actual Acreage.  The analysis

11    combining zip codes also showed an increase in the rate of

12    cancers for the period 1999 to the current and an increase in

13    the rate of brain cancers for 2005 to 2007 only.  A similar

14    pattern held with increased rates of cancers among adults, but

15    no increased rate of brain cancer among adults.  For the

16    combined zip codes an increased rate of pediatric cancers and

17    pediatric brain cancers was identified primarily in the period

18    2005-2007?"

19    A     Yes.

20    Q     She goes on to say, Dr. Watkins, in the middle of the

21    next paragraph:  "These analyses indicated the same patterns

22    as The Acreage and zip code analysis, all cancer elevated,

23    brain cancer elevated in children for the period 2005-2007.

24    The SIRs were reduced, however, indicating that a larger

25    portion of the total zip codes increase was due to increase
```

1    rates in The Acreage area."

2          Can you explain for the Court what it is that

3    Dr. Watkins is doing here by doing this additional analysis

4    and going outside The Acreage?

5    A    Okay.  Let me just take a minute to read the section

6    you've highlighted a little more carefully.

7          (Perusing document.)

8          So this -- I mean, I interpret this as meaning that

9    she was -- well, obviously she was making comparisons, she was

10    looking at The Acreage itself, she was looking at The Acreage

11    plus these three additional zip codes, as well as the three

12    additional zip codes minus The Acreage.

13          And if I'm reading this correctly, what she's

14    basically saying is that -- is that all of these exhibited

15    increased cancer rates, and therefore it's not a Texas

16    sharpshooter effect; that she's finding these effects overall.

17          But the last section here, the section that you've

18    specifically highlighted, you know, there are still variations

19    in the SIRs over these different portions of the region.  So

20    what her larger -- what her last sentence is saying is that --

21    is that there's an increased -- is that the rate of increase

22    is higher within The Acreage than it is outside The Acreage.

23    I think that's what she's saying.

24          And, you know, my overall interpretation of that is

25    that it's not a Texas sharpshooter effect; that there's an

1   overall increase over The Acreage and the surrounding region.

2   Q    So does this resolve, at least in part, the sharpshooter

3   phenomenon described by Mr. Marais?

4   A    Yes, I believe it does.

5   Q    Dr. Marais?

6   A    I believe it does.

7   Q    And one of the other issues in the multiple comparisons

8   problems discussed by Mr. MacNally with you was the fact that

9   there were repeated and different ways of looking at The

10  Acreage cancer cluster.  Do you recall that?

11  A    Yes, I recall that.

12  Q    Do you recall whether more often than not when looking at

13  brain cancer from the very many different points whether the

14  increase -- whether there was an increased incidence every

15  time brain cancer was looked at?

16  A    Well, the -- the table that was quoted from my

17  December 16 report that had the 20 -- 20 statistical

18  calculations, several of those indicated an elevated rate of

19  brain and/or CNS cancer.  So the -- it's not as if, you know,

20  we did a huge bunch of analyses and only one of them was

21  statistically significant and the rest showed absolutely

22  nothing.  These elevations occurred frequently during the

23  analyses that are performed.

24  Q    And the multiple comparisons problem is a problem when

25  you do repeat analysis and you keep getting increased

```
 1    incidences, or when you only get increased incidences in one

 2    of those situations?

 3    A    So the direct -- the direct discussion of multiple

 4    comparisons refers to the fact that suppose you do a bunch of

 5    tests, and only one of them produces a statistically

 6    significant result.

 7    Q    And in this instance, did more than one of the ways of

 8    looking at brain cancer produce a statistically significant

 9    result?

10    A    Yes.

11    Q    And is that true for the DOH study, as well as yours?

12    A    Yes, certainly, yes.

13    Q    One of the issues that was raised by Mr. MacNally as

14    being a multiple comparisons issue was the fact that

15    Dr. Watkins compared the pediatric brain cancer cluster of '04

16    through '07 to Palm Beach County and then again to Florida, as

17    though multiplying -- doing multiple comparisons was a

18    problem.

19         MS. HATFIELD:  If we could bring up that chart that

20    was in The Acreage cancer review, the SIR chart on page 28

21    that we looked at in the very beginning of your testimony.

22         THE WITNESS:  Yeah.  Could you blow that up a bit?

23    BY MS. HATFIELD:

24    Q    Thank you.

25    A    Thank you.
```

1   Q    When we look at the SIR for Palm Beach County compared to

2   The Acreage, it's an SIR of 3.3, correct?

3   A    Yes.

4   Q    And when we look at it for Florida, it's 3.9, correct?

5   A    Yes.

6   Q    So is this a true multiple comparisons problem?

7   A    I wouldn't characterize that as a multiple comparisons

8   problem at all.  It's not like you're saying one of them is

9   statistically significant and the other one isn't.  I mean,

10  you can compare -- because this is a comparison of the

11  background rates; it's not a comparison of where we're

12  observing the cases.

13          You could argue that the right comparison is Palm

14  Beach County, or you could argue more broadly that the

15  comparison is the whole state of Florida.  And as this table

16  confirms, you do get different answers in those two cases,

17  though, again, both of them are statistically -- both of them

18  lead to statistically significant results.

19  Q    I'm not sure what the defendant had marked this table as,

20  but it's the FDOH tables with the 2002, zero; 2003, zero; and

21  the 2004, one; and the cross testimony with Mr. MacNally, the

22  implication was that you chose to stop at 2004 rather than

23  going to 2002 because there was not an incidence in 2002.

24          Do you recall that?

25  A    I recall him saying that, yes.

```
 1  Q    If we --

 2            MR. MACNALLY:  It's demonstrative exhibit 14 for the

 3  record.

 4            MS. HATFIELD:  Thank you.

 5            MR. MACNALLY:  UTC demonstrative exhibit 14.

 6            MS. HATFIELD:  Thank you.

 7  BY MS. HATFIELD:

 8  Q    If we take a look at the chart again that's up on the

 9  screen, there is an incidence number in 1996 through 1998,

10  correct?

11  A    Yes.

12  Q    And for 1999 through 2001?

13  A    Yes.

14  Q    And then for 2002 through 2004?

15  A    Yes.

16  Q    Is -- your answer to Mr. MacNally's question was that you

17  had been asked to focus on the problem that was at issue in

18  The Acreage cancer review, do you recall whether The Acreage

19  cancer review identified that problem as beginning in 2004?

20  A    I recall there was discussion of that issue.  I don't

21  recall exactly what they said, but I do recall there was some

22  discussion that essentially they may -- I don't remember

23  whether it was 2004 or some other later effect.  But I do

24  recall that they went back to 1996 for the purpose of

25  comparison, because one of the things they were trying to show
```

1   was that there had been a sharp increase over that period

2   between -- if you take the whole time period, 1996 to 2007,

3   one of the points they were making with this table was that in

4   both parts of the table, the all cancers part and the brain

5   cancer part was clearly showing an increase in the incidence

6   towards the end of that period.  And I don't recall the exact

7   words they used to describe it, but I do recall they had that

8   discussion.

9   Q    And, finally, the last area that was subject in your

10  cross today was the issue regarding your decision to look at

11  the number of areas that could possibly be affected by

12  benzopyrene and PAHs as a basis for one of your calculations.

13          Do you recall that line?

14  A    Yes.

15  Q    And one of the things that you were asked to do in this

16  case was to compare the -- or to critique the case control

17  study --

18  A    Yes.

19  Q    -- by the Department of Health.

20  A    Yes.

21          MS. HATFIELD:  If we could take a look at the -- and

22  I'm going to throw my technology assistant into a loop,

23  because I did not tell you this earlier.  Can we go to Marais

24  exhibit number 8?  Actually, before we do that, could we go to

25  the Marais exhibit number 5?

```
 1    BY MS. HATFIELD:

 2    Q    Do you recall reviewing this letter from the DEP in

 3    August 2010 regarding the case control study and the

 4    conclusions thereof?

 5              THE COURT:  I'm sorry, hold on.

 6              MR. MACNALLY:  Your Honor, I object on scope.  I

 7    didn't address the case control at all in my

 8    cross-examination.  She addressed it with the witness already

 9    on direct examination.  So I would object on scope.

10              THE COURT:  Overruled.

11              You can answer.

12              THE WITNESS:  Okay.  So your question was do I

13    recall this letter.  I recall seeing that letter.  I don't

14    immediately recall the precise contents.

15              MS. HATFIELD:  If we could blow up the bottom

16    paragraph.

17    BY MS. HATFIELD:

18    Q    I want to call your attention to the sentence beginning:

19    "Although contaminants were detected above these levels in

20    some area" -- and they're referring to the soil cleanup target

21    levels -- "the investigation found no evidence of substantial

22    spills, dumping or area-wide contamination."

23              Do you recall that the Department of Health and the

24    DEP did find some evidence of contamination above SCTLs at

25    some of the case homes?
```

```
 1    A      So there was -- now, I apologize, I'm not sure exactly
 2    what report you're referring to here.  There was the case
 3    control study that was submitted by FDOH that we've already
 4    talked about.  But there was a separate set of reports, and I
 5    apologize, I can't remember the name of the report, but there
 6    was another set of reports that included benzopyrene and I
 7    believe some of the radionuclides that did document evidence
 8    of increased cases in a number of The Acreage homes.  That's
 9    my recollection.
10    Q      And if we now flip to what was marked as Marais exhibit
11    number 8.  Do you recall that one of the issues was related to
12    whether -- do you recall that one of the contaminants found
13    above the SCTL was benzopyrene?
14    A      Yes, I do recall that.
15            MR. MACNALLY:  Your Honor, this is -- again this is
16    way beyond the scope.
17            THE COURT:  I mean, what difference does it make?
18    He can't opine on whether or not they have any adverse health
19    effects, so what difference does it make if they're there or
20    not?
21            MS. HATFIELD:  Well, Your Honor, the implication was
22    that he should not have been looking at benzopyrene at all,
23    and what he was doing is looking at the material that the FDOH
24    looked at, which, if that's not related to brain cancer, I
25    don't know why they would be looking at it in the brain cancer
```

1    investigation.

2            THE COURT:  Well, I don't know either, but are you

3    saying it is related to brain cancer?

4            MS. HATFIELD:  I'm saying that it is related to the

5    scope of the work that Mr. Smith was asked to do.  He was

6    asked to critique The Acreage DOH study, and he looked at the

7    materials that they found to be in excess.

8            THE COURT:  But what difference does it make if it's

9    a material that doesn't affect brain cancer?

10           MS. HATFIELD:  They raised the question that he may

11   be unreliable because he was talking about benzopyrene.  And

12   I'm just pointing to the evidence that says that the

13   benzopyrene was looked at because the Department of Health

14   found the benzopyrene.

15           THE COURT:  Go ahead.  If you want to answer the

16   question, if you can answer the question, go ahead.

17           THE WITNESS:  You'll have to remind me, what was the

18   question?  I'm sorry.

19   BY MS. HATFIELD:

20   Q    Do you recall that benzopyrene was one of the materials

21   that the Department of Health noted was elevated at the case

22   homes?

23   A    Yes, I do recall that.

24   Q    Why did you look at benzopyrene?

25   A    Because my -- my understanding was that it was a toxic

```
 1   substance that could possibly be implicated in brain cancer.
 2   Q    Does anything that came up during your cross-examination
 3   or any of the testimony that you provided during your
 4   cross-examination change your opinion that the incidence
 5   increase of pediatric brain cancer from 2004 through 2009 is 1
 6   in 25,000 chance of being random?
 7   A    That is completely correct.  I see no reason to modify
 8   that calculation.
 9             MS. HATFIELD:  I have no further questions.  Thank
10   you.
11             THE COURT:  Thank you.
12             MR. MACNALLY:  Your Honor, if I may be permitted
13   shortly, I want to clarify an issue that was raised with the
14   witness.
15             THE COURT:  Okay.  But you're basically out of time
16   for your own witness.  You understand?
17             MR. MACNALLY:  I will cede my time to direct
18   Dr. Marais.  I think Dr. Marais --
19             THE COURT:  And redirect.
20             MR. MACNALLY:  And redirect Dr. Marais.
21             THE COURT:  All right.
22             MR. MACNALLY:  I think Dr. Marais is capable of
23   answering any questions from any of us.
24             THE COURT:  That's fine.  I just want you to be
25   aware that you're going to be out of time.
```

```
 1              So go ahead.

 2                     Recross-examination

 3    BY MR. MACNALLY:

 4    Q    All right.  I want to start with you, Dr. Smith, at a

 5    letter that you looked at with plaintiff's counsel.

 6              Do you recall looking at this letter with

 7    Ms. Hatfield a few minutes ago?

 8    A    Yes.

 9    Q    I'm going to call out the section that Ms. Hatfield was

10    referring to.

11    A    Okay.

12    Q    And you said -- this is the material that you relied on

13    in coming to the numbers that you used in your December 2016

14    report, correct?

15    A    Yes.

16    Q    And you testified, as well, that you have never seen the

17    April 11, 2014, e-mail from Dr. Sharon Watkins that I showed

18    you on your cross-examination, correct?

19    A    I'm sorry, could you repeat the question?

20    Q    Well, you testified with Ms. Hatfield --

21    A    Yes.

22    Q    -- that you'd never seen the April 11th, 2014, e-mail

23    from Dr. Watkins that I showed you on your cross-examination,

24    right?

25              THE COURT:  I'm sorry, hold on.
```

```
 1              MS. HATFIELD:  Objection; mischaracterizes.  He said

 2    that he did not recall the e-mail and that he looked at

 3    several, not that he had never seen it.

 4              THE COURT:  Okay.  I don't remember which it is, but

 5    go ahead, ask your question.

 6              I mean, if you saw it -- if you saw it, that's fine,

 7    you can tell us you did see it.

 8              THE WITNESS:  I do not recall.

 9    BY MR. MACNALLY:

10    Q    Okay.  Well, first of all, the document that you did rely

11    on or you say you relied on, right, Ms. Hatfield focused on

12    this top paragraph here where you drew some numbers.

13    A    Right.

14    Q    Nothing here talks about whether these are brain or brain

15    and CNS cancers until you get down to the second bullet,

16    right?

17    A    Yeah.

18    Q    And there, it talks about the fact that it's dealing with

19    rates of brain and CNS cancers, doesn't it?

20    A    Yes.

21    Q    And the fact of the matter is --

22              MS. HATFIELD:  Your Honor --

23              THE COURT:  I'm sorry, what's the objection?

24              MS. HATFIELD:  He's mischaracterizing the paragraph

25    that he's even citing to.  It does at the beginning say only
```

```
 1   brain cancer, and then the second bullet is about the American
 2   Community Survey.
 3              THE COURT:  Well, the witness is perfectly capable
 4   of reading that and coming to the same conclusion if that's
 5   his -- his interpretation of the letter.
 6   BY MR. MACNALLY:
 7   Q    So let's talk, Dr. Smith, then, about this April 11,
 8   2014, e-mail.
 9   A    Okay.
10   Q    Respectfully, Dr. Smith, you rely on that April 2014th
11   (sic) e-mail for a lot of your opinions, don't you?
12   A    Okay.  I'm not recalling it now, but -- but I acknowledge
13   that I wrote that, yes.
14   Q    And, in fact, you didn't rely on the letter that
15   Ms. Hatfield showed you when you came up with the numbers for
16   your chart in your December 2016 report, right?
17   A    To be honest, I don't now remember exactly where -- what
18   sources I put together to come up with that table.
19   Q    So when you suggested on redirect -- and maybe I was
20   mistaken.  When you suggested that that was what you were
21   relying on, the FDOH letter she was showing you, what you
22   meant to say is you don't recall what you relied on, right?
23   A    Correct.
24   Q    But there is a way we can check to figure out what you
25   relied on, and that's to go back to your report and actually
```

```
 1    look at what you said that you relied on when you came up with

 2    that -- the number, right?

 3    A    Okay.

 4    Q    So let's blow it up.

 5         And what you relied on when you came to your

 6    December 2016 report --

 7    A    Yeah.

 8    Q    -- is Dr. Sharon Watkins' April 11, 2014, e-mail, isn't

 9    it?

10    A    Okay.

11         MR. MACNALLY:  Your Honor, no further questions.

12         THE WITNESS:  I acknowledge that -- okay.

13         THE COURT:  All right.  Thank you, Doctor.

14         THE WITNESS:  All right.  Thank you very much.

15         THE COURT:  All right.  Are we ready for Dr. Marais?

16         MR. MACNALLY:  Your Honor, United Technologies calls

17    Dr. Laurentius Marais to the stand.

18         THE COURT:  Sir, if you would raise your right hand,

19    please.

20      M. Laurentius Marais, Defendant's  witness, sworn.

21         THE COURT:  Please be seated, sir.

22         All right.  If you could pull that microphone

23    towards you, sir.  Tell us your name, and spell both your

24    first and last names for us, please.

25         THE WITNESS:  My name is Laurentius Marais,
```

```
 1    L-a-u-r-e-n-t-i-u-s, last name is M-a-r-a-i-s.  Actually,

 2    Laurentius is my middle name.  To clarify, there is a

 3    different first name with the initial M, for Mike.

 4              THE COURT:  Thank you, sir.

 5              And if you could try and get a little closer to that

 6    microphone.  Just slightly closer.  Thank you.

 7              Ms. Hatfield?

 8                        Cross-Examination

 9    BY MS. HATFIELD:

10    Q    Dr. Marais, do you agree that the Florida Department of

11    Health found a significantly increased incidence of pediatric

12    brain cancer?

13    A    I agree that some of their findings indicated statistical

14    significance by the measures that they reported.

15              MS. HATFIELD:  I don't have any further questions.

16              THE COURT:  All right.  I guess that's it.

17              MR. MACNALLY:  I ceded all my time.

18              THE COURT:  I'm sorry, Doctor, to bring you here for

19    that little bit.  Thank you, sir.  You can step down, sir.

20              MR. GALLAGHER:  You did great.

21              THE COURT:  All right.  I really -- again, I think

22    we outlined how we're going to go forward from here.  The

23    parties are going to come up with a schedule of submitting

24    closing memoranda; and once I've had an opportunity to review

25    the materials and -- I'll either issue a ruling or ask you to
```

```
 1    come in for additional argument.  My guess is I'll probably
 2    ask you to come in, but I -- I guess I'll reserve the right to
 3    not have to do that if I -- if I conclude it's not necessary.
 4            Is there anything else we should discuss today?
 5            MR. SCAROLA:  Your Honor, the only other matter is
 6    that we would all be remiss if we did not thank the Court for
 7    your generosity with your time and the attention that you have
 8    paid to these matters.  And we may not agree on anything else,
 9    but we absolutely certainly agree on that.
10            THE COURT:  All right.  Thank you.  Appreciate that.
11            MR. GALLAGHER:  And, Your Honor, the only thing I
12    would add is I would like to thank our court reporter for
13    doing a fantastic job under difficult circumstances with a lot
14    of people who talk fast and a lot of big words.
15            We have, for the Court's benefit, copies of the
16    materials that we marked as either demonstrative exhibits or
17    hearing exhibits.  This is for Pratt & Whitney-UTC that we
18    would like to make available to the Court.  We have binders.
19    We understand that we would also need to file them with a
20    notice of filing so that they are part of the record of the
21    proceedings, Your Honor.  If I may approach.
22            THE COURT:  Sure.
23            All right.  Anything else?
24            MS. HATFIELD:  Just we were advised to file all of
25    the demonstrative exhibits.  We don't have all of ours in
```

1  printed form.  Would the Court like us to send courtesy copies

2  of printed materials?

3          THE COURT:  I guess, you know, so I can have a

4  complete copy of everything, yes, why don't you do that.  All

5  right?

6          MS. HATFIELD:  Thank you for your time, Your Honor.

7          THE COURT:  Thank you.  Have a nice weekend.  Thanks

8  for all -- it was very enlightening and well-presented.  So

9  thank you all.

10          MR. SCAROLA:  Thank you, sir.

11      (Proceedings concluded.)

12                       * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    * * * * *

 2                   I N D E X

 3   Testimony of Richard L. Smith

 4            Direct by Ms. Hatfield          13

 5            Cross by Mr. MacNally           34

 6            Redirect by Ms. Hatfield        93

 7            Recross by Mr. MacNally        109

 8   Testimony of M. Laurentius Marais

 9            Cross by Ms. Hatfield          113

10                    * * * * *

11                 E X H I B I T S

12   (None.)

13                    * * * * *

14                  CERTIFICATE

15       I, Stephen W. Franklin, Registered Merit Reporter, and

16   Certified Realtime Reporter, certify that the foregoing is a

17   correct transcript from the record of proceedings in the

18   above-entitled matter.

19       Dated this 12th day of JANUARY, 2018.

20

21       /s/Stephen W. Franklin
         _____
22       Stephen W. Franklin, RMR, CRR

23

24

25
```

**BY MR. MACNALLY:**
**[13]**  34/11 35/2 42/16
56/13 64/10 76/13 89/23
91/22 93/5 93/9 109/2
110/8 111/5
**BY MS. HATFIELD:**
**[16]**  13/14 15/24 25/16
26/19 93/23 94/8 94/21
95/20 96/17 96/24
101/22 103/6 104/25
105/16 107/18 113/8
**COURT REPORTER:**
**[1]**  21/8
**MR. GALLAGHER:**
**[10]**  6/10 8/21 9/2 9/18
10/6 11/16 12/21 89/15
113/19 114/10
**MR. MACNALLY:**
**[24]**  5/12 6/17 26/10
26/13 34/24 76/10 88/23
89/5 89/9 93/2 93/18
95/19 96/11 103/1 103/4
105/5 106/14 108/11
108/16 108/19 108/21
112/10 112/15 113/16
**MR. SCAROLA: [13]**
4/25 5/21 6/4 7/9 7/24
10/21 11/6 11/8 12/14
12/16 12/22 114/4 115/9
**MS. HATFIELD: [32]**
4/5 15/15 15/18 15/21
25/15 34/4 34/7 89/16
91/14 91/17 91/19 92/19
92/22 93/21 94/5 94/19
96/23 101/18 103/3
103/5 104/20 105/14
106/20 107/3 107/9
108/8 109/25 110/21
110/23 113/14 114/23
115/5
**THE COURT: [71]**  4/1
4/7 5/13 6/1 6/6 6/16 7/8
7/21 8/20 8/25 9/17 9/24
10/7 11/5 11/7 11/14
12/15 12/19 12/23 13/4
13/7 13/11 13/12 26/15
34/8 35/1 42/13 42/15
64/8 88/25 89/7 89/10
89/17 89/20 91/12 91/16
91/18 92/17 92/21 92/23
93/4 93/7 93/19 96/13
105/4 105/9 106/16
107/1 107/7 107/14
108/10 108/14 108/18
108/20 108/23 109/24
110/3 110/22 111/2
112/12 112/14 112/17
112/20 113/3 113/15
113/17 113/20 114/9
114/21 115/2 115/6
**THE WITNESS: [20]**
13/6 13/9 15/17 15/20
15/23 21/9 26/18 34/6
34/9 42/14 64/9 91/20
96/14 101/21 105/11

**'**
**'04 [4]**  18/20 19/10
20/10 101/15
**'05 [3]**  18/13 18/17 19/2
**'05-'07 [1]**  19/2
**'07 [6]**  18/14 18/17 19/2
19/10 61/18 101/16
**'08 [2]**  19/24 20/6
**'09 [4]**  18/20 19/24 20/7
20/11
**'til [1]**  67/4

**-**
**-and [6]**  2/4 2/7 2/9 2/12
3/7 3/10
**-v [1]**  1/5

**.**
**.00 [1]**  30/6
**.00004 [1]**  30/7
**.01 [1]**  81/10
**.011 [1]**  70/5
**.02 [1]**  31/4
**.05 [10]**  29/12 29/15
30/10 43/4 44/7 44/10
68/11 68/15 68/17 69/2
**.1 [1]**  81/6
**.5 [1]**  69/4
**.89 [3]**  20/12 20/22
20/24

**/**
**/s/Stephen [1]**  116/21

**0**
**0.00004 [2]**  14/15 21/14
**0.45 [2]**  19/19 19/20
**0.89 [1]**  21/6

**1**
**1 percent [3]**  81/9 82/11
87/1
**1,4-Dioxane [1]**  91/6
**1,4-Dioxanes [1]**  90/19
**1.0 [1]**  17/18
**1.04 [1]**  34/1
**1.2 [4]**  16/17 16/23 17/2
17/18
**10 [9]**  6/23 18/7 18/7
32/1 68/14 68/17 69/1
95/9 97/6
**10,000 [1]**  88/13
**10,000, 1 [1]**  88/20
**109 [1]**  116/7
**11 [5]**  7/2 94/8 109/17
111/7 112/8
**113 [1]**  116/9
**11th [3]**  22/14 94/24
109/22
**12 [2]**  1/9 7/6
**1212 [1]**  2/3
**12th [1]**  116/19
**13 [2]**  76/12 116/4
**13-80928-CIV-KAM [1]**

**1/2**  130
**130 [1]**  1/11
**14 [2]**  103/2 103/5
**14th [1]**  95/10
**15 [3]**  49/9 50/8 73/2
**16 [5]**  59/18 59/23 97/22
98/5 100/17
**17 [1]**  49/13
**18 [3]**  39/5 39/8 95/13
**19 [2]**  30/24 85/11
**19.3 [2]**  33/15 33/21
**1950s [1]**  27/23
**1996 [4]**  46/2 103/9
103/24 104/2
**1998 [1]**  103/9
**1999 [2]**  98/12 103/12

**2**
**2.29 [2]**  33/15 33/20
**20 [8]**  29/18 43/5 55/25
56/1 56/9 57/8 100/17
100/17
**2000 [1]**  45/24
**2000' [1]**  65/2
**20009 [1]**  51/24
**2001 [3]**  65/7 65/10
103/12
**2002 [10]**  66/2 66/8
66/11 66/14 66/24 67/1
102/20 102/23 102/23
103/14
**2003 [5]**  66/8 66/17
66/24 67/2 102/20
**2004 [33]**  14/1 20/6
20/15 32/8 51/24 52/5
52/11 52/16 52/21 53/6
53/16 55/5 55/13 56/9
57/11 57/16 57/20 61/14
63/11 66/2 66/9 66/12
66/19 66/22 67/4 69/19
74/12 102/21 102/22
103/14 103/19 103/23
108/5
**2004-'07 [1]**  61/18
**2005 [7]**  16/7 22/7 52/9
70/1 71/5 74/23 98/13
**2005-2007 [2]**  98/18
98/23
**2007 [15]**  16/7 19/23
22/8 26/5 26/24 45/24
46/2 52/9 70/1 71/5
74/23 98/13 98/18 98/23
104/2
**2008 [24]**  19/25 22/15
24/11 24/16 24/17 26/1
26/7 26/8 26/21 26/22
52/5 52/11 57/11 57/16
57/20 60/15 63/16 64/2 64/5
60/5 63/16 64/2 64/5
64/20 95/17
**2009 [42]**  14/2 15/17
19/5 20/1 20/15 22/7
22/15 22/16 23/4 23/10
26/4 28/11 28/13 32/8
35/10 38/9 38/10 52/5
52/11 52/16 52/21 53/6

53/17 55/5 55/13 56/19
58/23 63/11 63/15 64/12
64/20 64/23 65/2 65/6
65/10 65/13 65/25 69/19
74/12 75/8 95/17 108/5
**2009FDOH [1]**  19/13
**2010 [16]**  22/14 22/18
23/12 26/25 28/13 35/11
58/23 64/15 64/22 64/25
65/3 94/24 95/10 95/10
95/17 105/3
**2011 [18]**  57/11 57/11
57/16 57/16 57/20 57/20
58/15 58/23 60/3 60/5
61/14 64/2 64/15 64/22
64/24 64/25 65/3 95/17
**2014 [7]**  94/25 95/3
95/12 109/17 109/22
111/8 112/8
**2014th [1]**  111/10
**2016 [19]**  52/24 53/1
53/10 55/24 56/22 59/22
60/6 62/21 62/24 91/24
94/4 94/7 94/14 94/16
95/2 95/23 109/13
111/16 112/6
**2017 [1]**  92/12
**2018 [2]**  1/9 116/19
**2139 [1]**  2/11
**22 [1]**  24/8
**23 [8]**  58/14 58/24 59/22
60/3 60/4 60/25 61/17
95/22
**23rd [1]**  94/7
**2400 [1]**  3/13
**24th [1]**  94/24
**25,000 [9]**  14/16 21/14
21/18 30/7 31/17 31/21
31/24 52/15 108/6
**250 [1]**  30/10
**26 [1]**  95/12
**28 [2]**  15/23 101/20
**2nd [1]**  92/12

**3**
**3.3 [4]**  16/7 17/2 17/12
102/2
**3.9 [2]**  17/13 102/4
**300 [1]**  3/5
**30326 [1]**  3/13
**32204 [1]**  2/6
**33 [1]**  38/19
**33301 [1]**  2/8
**33316 [1]**  2/4
**33401 [2]**  1/20 3/9
**33409 [1]**  2/12
**33410 [1]**  2/14
**3344 [1]**  3/12
**34 [1]**  116/5
**35 [1]**  89/11
**363-11 [1]**  94/8
**363-9 [1]**  18/9
**3768 [1]**  1/19
**38 [2]**  61/13 61/16
**38,000 [2]**  74/2 74/11
**3801 [1]**  2/13

**3rd [1]**  2/3

**4**
**40,000 [1]**  74/7
**440 [1]**  2/8
**460 [16]**  30/17 69/8
69/14 69/16 70/4 71/7
71/9 71/12 71/15 71/18
71/25 72/3 73/15 73/22
74/1 75/9
**4:09 [1]**  89/19
**4:24 [1]**  89/19

**5**
**5 percent [2]**  43/4 43/21
**500-E [1]**  3/9
**514-3768 [1]**  1/19
**54 [1]**  3/5
**561 [1]**  1/19
**5:00 [1]**  5/16

**6**
**6.73 [1]**  19/20
**60 [4]**  73/2 73/3 73/14
73/23
**600 [1]**  2/13
**60610 [1]**  3/6

**7**
**7.8 [1]**  20/18
**7.88 [2]**  20/12 33/2
**701 [1]**  1/19
**777 [1]**  3/8

**8**
**8.7 [1]**  61/8
**8.72 [2]**  61/5 61/10
**80 [13]**  55/19 56/7 56/15
56/16 56/17 72/22 72/23
73/2 73/4 73/13 73/14
73/23 74/1
**865 [1]**  2/6
**8th [1]**  95/10

**9**
**92 [1]**  50/7
**93 [1]**  116/6
**95 [1]**  33/10
**95 percent [3]**  32/25
33/4 33/8
**99 percent [5]**  33/5 33/8
33/11 33/14 33/21
**99.9 percent [1]**  33/5
**99.99 percent [5]**  33/5
34/1 34/2

**A**
**a 1 percent [1]**  85/13
**abide [1]**  5/12
**abilities [1]**  62/2
**able [3]**  10/9 12/20 65/3
**above [5]**  98/8 105/19
105/24 106/13 116/18
**above-entitled [1]**
116/18
**absolutely [3]**  87/2
100/21 114/9

**A**

**accepted [1]** 78/9
**accompanied [1]** 42/20
**according [1]** 24/19
**account [16]** 17/1 19/3 19/6 20/4 31/6 31/8 32/9 35/24 37/3 37/7 37/9 37/11 70/19 72/7 73/7 89/15
**accounting [1]** 32/3
**accurate [5]** 11/4 60/17 62/15 62/22 68/22
**acknowledge [16]** 30/12 40/1 40/4 40/15 49/25 54/15 56/12 60/23 71/24 75/15 81/19 83/11 88/7 91/22 111/12 112/12
**acknowledged [6]** 36/11 39/24 67/9 67/18 78/11 86/20
**acknowledging [2]** 54/14 80/24
**Acreage [77]** 14/1 14/5 15/14 15/16 16/4 16/8 16/14 16/16 16/19 17/5 17/6 17/9 17/23 19/1 19/4 19/9 19/14 19/18 20/14 25/21 26/4 26/23 27/3 30/18 32/8 32/12 32/21 35/8 39/10 39/12 39/14 39/21 40/19 40/20 41/16 41/20 41/21 44/13 45/6 45/9 49/15 55/20 85/13 86/25 92/4 92/15 94/23 95/16 97/1 97/8 97/18 97/20 97/23 98/2 98/5 98/9 98/10 98/22 99/1 99/4 99/10 99/10 99/12 99/22 99/22 100/1 100/10 101/20 102/2 103/18 103/18 106/8 107/6
**acronym [2]** 22/24 85/19
**across [1]** 33/25
**actual [4]** 15/6 33/19 59/1 98/10
**actually [34]** 4/15 10/9 11/19 19/12 22/5 24/19 24/20 27/24 29/22 30/19 43/18 46/22 46/23 53/1 59/10 59/23 62/4 63/24 66/5 71/9 71/24 72/10 75/7 78/12 78/15 83/15 83/24 83/24 83/25 88/12 88/24 104/24 111/25 113/1
**add [4]** 6/21 14/20 37/18 114/12
**added [2]** 46/20 63/15
**adding [1]** 52/4
**additional [11]** 19/24 20/4 37/18 52/10 63/21 97/24 98/6 99/3 99/11 99/12 114/1

**address [3]** 38/7 67/25 105/7
**addressed [3]** 11/11 67/10 105/8
**addressing [2]** 9/12 90/16
**admitted [1]** 97/11
**adopt [1]** 11/23
**adult [18]** 45/18 57/10 57/15 57/19 57/22 58/14 58/22 61/14 62/19 62/22 63/23 92/5 93/11 93/14 94/3 94/15 95/16 96/1
**adults [3]** 92/16 98/14 98/15
**adverse [2]** 84/6 106/18
**advised [1]** 114/24
**affect [1]** 107/9
**affected [1]** 104/11
**affidavit [31]** 13/13 14/25 18/7 21/19 23/17 23/20 23/25 24/8 24/24 25/12 25/13 25/25 28/17 28/21 29/22 30/12 32/1 62/9 80/5 85/8 85/11 92/21 94/8 94/15 95/7 95/9 95/13 96/2 96/4 96/20 96/22
**affidavits [1]** 4/12
**after [12]** 9/21 10/3 10/4 10/14 12/5 12/6 32/3 42/8 42/11 65/10 72/15 89/19
**afternoon [5]** 4/2 13/16 13/17 34/13 34/14
**again [17]** 5/14 5/17 6/8 10/17 35/11 53/16 62/25 66/21 89/13 92/1 93/25 95/8 101/16 102/17 103/8 106/15 113/21
**age [3]** 45/16 47/2 54/12
**agent [20]** 76/17 77/1 77/7 77/8 77/9 77/15 77/20 77/23 78/10 78/13 78/16 78/18 78/21 79/7 79/15 81/4 85/14 86/11 87/12 88/2
**ago [3]** 72/21 90/3 109/7
**agree [40]** 9/21 12/15 16/6 16/9 17/21 17/22 35/13 35/18 36/2 36/8 36/11 37/1 41/14 41/24 44/12 48/25 49/21 50/1 60/2 61/7 71/19 72/4 72/14 72/22 73/12 74/11 74/14 75/14 79/13 82/4 82/6 82/11 82/20 85/2 88/16 91/5 113/10 113/13 114/8 114/9
**agreed [3]** 35/23 36/1 72/5
**agreement [1]** 12/18
**ahead [5]** 90/11 107/15 107/16 109/1 110/5
**al [2]** 1/3 1/7
**Alex [1]** 3/3

**Alina [30]** 04/25
**alleged [1]** 11/3
**almost [1]** 59/8
**alone [2]** 18/19 55/20
**along [1]** 54/12
**Alonso [2]** 94/25 96/11
**already [8]** 28/11 36/11 44/21 47/24 74/19 89/4 105/8 106/3
**also [39]** 8/10 9/21 14/4 14/20 14/21 14/22 14/24 15/1 18/20 20/5 21/14 22/19 22/22 23/1 23/8 28/15 33/8 38/4 38/23 42/23 44/19 45/16 45/20 46/5 47/6 47/24 58/22 61/13 64/15 66/2 67/3 69/15 77/20 77/23 84/7 85/18 89/8 98/11 114/19
**Alternatively [1]** 8/7
**alternatives [1]** 8/17
**although [3]** 83/12 96/2 105/19
**always [1]** 82/18
**am [3]** 48/5 68/5 85/6
**ambiguity [1]** 97/19
**American [1]** 111/1
**among [5]** 27/20 44/5 92/15 98/14 98/18
**amongst [1]** 12/12
**amount [2]** 12/8 12/9
**amounts [1]** 86/18
**analyses [13]** 42/20 45/14 45/17 45/17 45/18 51/13 56/20 57/2 62/5 98/8 98/21 100/20 100/23
**analysis [60]** 35/6 35/10 35/14 35/19 36/3 36/9 36/13 36/22 38/16 39/11 40/18 43/1 45/23 46/1 47/4 47/14 47/15 49/16 49/24 50/2 50/20 51/4 51/6 52/5 52/18 52/20 52/21 53/17 54/11 56/19 57/6 57/22 61/20 62/21 64/13 64/25 65/13 65/22 67/7 67/13 67/17 69/20 69/25 71/6 71/17 74/12 74/23 74/24 76/1 77/15 81/6 88/15 93/12 93/16 97/24 98/6 98/10 98/22 99/3 100/25
**analyzing [1]** 84/17
**and 5 [1]** 45/1
**and/or [1]** 100/19
**Andrew [2]** 3/2 34/15
**Andrews [1]** 2/8
**another [11]** 10/3 10/5 30/22 36/14 45/12 49/19 52/23 53/12 56/10 64/12 106/6
**answer [15]** 8/5 14/11 33/10 50/11 50/16 50/21 50/23 59/4 68/22 68/22 96/14 103/16 105/11

107/15 107/16
**answering [1]** 108/23
**answers [2]** 90/3 102/16
**any [48]** 5/6 5/7 5/24 6/2 7/17 7/20 8/5 8/19 9/4 20/25 32/19 33/18 34/6 36/22 39/13 39/15 40/19 48/6 48/12 51/5 51/10 55/12 65/11 65/12 69/13 73/15 74/20 77/9 80/19 83/21 84/3 84/21 84/22 85/21 86/10 86/16 87/21 88/1 90/12 91/1 93/21 95/2 96/8 106/18 108/3 108/23 108/23 113/15
**anyplace [1]** 71/4
**anything [13]** 21/1 48/14 65/24 73/17 77/16 78/21 82/14 83/8 87/19 108/2 114/4 114/8 114/23
**anywhere [3]** 72/10 88/2 95/1
**aol.com [1]** 1/20
**apart [1]** 81/20
**apologize [7]** 13/1 17/10 38/13 63/25 64/10 106/1 106/5
**apparently [3]** 7/10 36/5 36/24
**appear [1]** 43/24
**Appearances [3]** 1/16 2/1 3/1
**appeared [1]** 87/7
**appears [2]** 33/7 67/21
**appendix [1]** 76/4
**applied [2]** 31/2 38/1
**applies [1]** 54/8
**apply [6]** 69/1 69/19 69/24 70/4 71/6 75/8
**Appreciate [1]** 114/10
**approach [2]** 6/16 114/21
**appropriate [7]** 8/16 9/14 10/23 12/7 27/4 50/23 85/12
**approval [1]** 10/25
**approximately [1]** 4/21
**April [6]** 95/10 109/17 109/22 111/7 111/10 112/8
**April 11 [3]** 109/17 111/7 112/8
**April 11th [1]** 109/22
**April 2014th [1]** 111/10
**April 8th [1]** 95/10
**arbitrarily [1]** 55/2
**area [27]** 38/16 38/20 39/2 39/7 39/9 39/12 39/12 39/14 40/12 40/18 40/18 40/20 40/24 40/25 41/9 41/16 73/15 78/2 78/6 92/17 97/8 97/19 98/7 99/1 104/9 105/20 105/22
**area-wide [1]** 105/22

**areas [5]** 32/4 38/25 39/10 86/2 104/11
**aren't [1]** 56/1
**argue [5]** 11/13 83/5 83/14 102/13 102/14
**argued [3]** 30/12 72/19 83/7
**arguing [1]** 9/24
**argument [12]** 7/18 7/21 7/23 8/4 38/5 72/12 73/12 76/15 78/9 79/23 81/20 114/1
**argumentative [2]** 93/8 96/13
**arise [2]** 61/18 88/10
**arisen [1]** 69/14
**aromatic [1]** 82/17
**arose [2]** 16/17 54/18
**around [5]** 39/21 41/3 42/8 43/16 97/8
**article [14]** 82/16 82/24 83/9 83/12 83/13 83/18 83/21 84/25 85/12 85/15 86/4 86/5 86/5 86/9
**artificial [5]** 39/11 39/15 39/25 40/12 97/9
**aside [1]** 4/21
**ask [7]** 6/14 14/11 34/16 91/15 110/5 113/25 114/2
**asked [15]** 13/23 13/24 43/15 48/20 50/25 56/6 62/17 62/17 72/21 83/20 90/12 103/17 104/15 107/5 107/6
**asking [5]** 55/10 55/12 73/21 73/21 92/24
**aspect [1]** 28/25
**assessment [3]** 37/3 38/21 44/13
**assistance [1]** 8/10
**assistant [1]** 104/22
**assisting [1]** 8/14
**associate [1]** 84/3
**associated [9]** 33/1 77/16 84/6 86/1 86/13 86/14 86/16 87/13 90/21
**association [3]** 86/5 91/7 91/12
**assume [1]** 20/21
**assuming [2]** 7/17 43/10
**assumption [8]** 14/4 21/6 33/18 51/10 64/13 81/12 81/17 89/2
**assumptions [6]** 79/23 80/6 80/7 80/9 80/12 80/21
**Atlanta [1]** 3/13
**attached [3]** 25/14 56/24 94/7
**attachment [1]** 76/9
**attachment 4 [1]** 76/9
**attachments [1]** 34/22
**attention [8]** 39/5 40/16 51/23 51/24 56/21 57/6 105/18 114/7

(WITNESSNAME) Index: attributed..circle

**A**

**attributed [1]** 71/22
**August [6]** 15/17 22/13
53/1 94/24 95/10 105/3
**August 11th [1]** 94/24
**August 14th [1]** 95/10
**August 2009 [1]** 15/17
**August 2010 [1]** 105/3
**available [1]** 114/18
**Avenue [2]** 2/3 2/8
**aware [14]** 22/21 24/9
26/3 54/25 57/25 84/5
84/7 85/3 85/6 90/12
91/2 91/4 96/16 108/25

**B**

**B/CNS [1]** 58/11
**back [22]** 8/4 9/23 15/5
17/25 22/6 31/25 44/25
51/18 60/4 62/4 62/18
62/23 63/11 68/9 74/22
89/7 89/21 90/2 91/16
91/24 103/24 111/25
**background [8]** 43/11
43/12 48/16 51/10 79/9
85/13 86/11 102/11
**Banks [2]** 22/25 23/7
**BaP [1]** 85/18
**barn [3]** 42/6 42/7 42/11
**Barnhart [1]** 2/10
**Bartlit [1]** 3/4
**based [26]** 14/7 14/9
14/14 17/5 17/16 18/1
19/8 30/17 30/23 31/17
33/21 35/23 62/12 72/22
73/19 75/9 80/13 80/15
80/16 80/19 80/22 82/23
83/4 86/6 87/2 87/3
**baseline [2]** 74/1 74/23
**basic [2]** 57/23 93/16
**basically [5]** 19/16 33/11
93/8 99/14 108/25
**basics [1]** 58/1
**basis [9]** 29/17 55/5
65/22 77/12 84/3 85/25
86/9 91/11 104/12
**Bayes' [1]** 79/22
**Bayesian [15]** 38/4
75/16 75/19 75/22 76/1
76/1 76/10 76/15 77/12
78/9 78/13 79/23 81/20
82/11 88/13
**Beach [13]** 1/8 1/20 2/11
2/12 2/14 3/9 17/7 17/13
17/24 45/6 101/16 102/1
102/14
**bear [1]** 12/3
**because [37]** 5/22 11/1
12/9 19/3 19/13 20/5
24/19 26/22 27/22 43/7
54/18 54/25 55/14 59/4
65/2 65/5 67/1 67/3 68/7
69/14 74/8 76/5 79/20
85/14 87/6 87/15 93/15
94/2 96/21 96/21 102/10
102/23 103/25 104/23

**Beck [1]** 3/4
**Bedient [1]** 7/8
**before [17]** 1/13 4/8 5/7
5/10 6/19 10/8 25/19
34/19 36/19 40/25 47/9
56/19 62/20 77/5 92/5
93/15 104/24
**beginning [6]** 38/8 51/16
101/21 103/19 105/18
110/25
**behalf [1]** 34/15
**behind [5]** 40/13 44/2
54/5 54/6 57/18
**being [5]** 19/1 55/5
65/13 101/14 108/6
**believe [11]** 18/4 23/14
35/1 67/5 74/20 83/16
94/12 95/25 100/4 100/6
106/7
**believed [1]** 92/25
**below [2]** 30/10 88/8
**below 1 percent [1]** 88/8
**benefit [2]** 91/19 114/15
**benign [5]** 24/22 46/17
48/1 59/17 59/18
**benzopyrene [11]** 84/18
85/19 104/12 106/6
106/13 106/22 107/11
107/13 107/14 107/20
107/24
**besides [1]** 83/21
**best [3]** 5/9 62/15 63/1
**better [2]** 4/17 25/14
**between [7]** 28/8 33/15
33/20 46/23 60/1 73/3
79/21 86/6 104/2
**beyond [5]** 26/23 67/11
84/8 92/20 106/16
**bias [14]** 36/15 41/4
41/7 41/12 41/17 41/25
42/1 67/16 67/18 67/20
97/3 97/11 97/12 97/14
**big [3]** 45/24 63/9
114/14
**bigger [3]** 34/2 68/24
70/6
**billion [1]** 88/21
**binder [1]** 34/19
**binders [1]** 114/18
**biological [5]** 39/14
40/13 49/1 49/17 51/4
**biostatistician [2]** 35/4
35/5
**bit [11]** 4/16 14/16 19/3
46/9 47/10 83/20 90/16
91/18 97/2 101/22
113/19
**black [1]** 76/21
**bleeds [1]** 21/20
**block [1]** 39/10
**blocks [1]** 46/3
**blow [4]** 94/20 101/22
105/15 112/4
**blue [1]** 25/23
**board [2]** 54/5 75/18

**body [136]** 66/11
**Bonfareenee [1]** 68/7
**Bonferroni [31]** 29/24
30/15 31/3 31/6 31/24
32/3 32/10 38/2 68/3
68/6 68/9 69/1 69/8 70/4
70/15 70/19 71/6 71/10
71/25 72/3 72/6 72/17
72/23 73/3 73/13 74/11
74/14 74/18 74/21 75/4
75/8
**borderline [4]** 46/17
48/1 59/17 59/18
**both [16]** 6/14 7/15 14/2
17/1 17/23 18/4 27/20
27/23 33/10 46/10 57/15
91/5 102/17 102/17
104/4 112/23
**bottom [5]** 61/14 94/10
94/20 95/15 105/15
**Boulevard [2]** 2/11 2/13
**bound [5]** 55/22 68/23
**boundaries [8]** 39/16
39/21 39/25 40/12 40/25
97/8 97/14 97/25
**boundary [3]** 39/11 97/9
97/17
**brain [123]**
**brand [2]** 52/21 53/21
**break [3]** 46/9 56/3
88/25
**brief [6]** 8/23 9/6 11/11
11/16 12/4 89/6
**briefing [2]** 10/12 11/18
**briefly [1]** 13/22
**briefs [4]** 9/22 10/12
10/15 12/1
**bring [5]** 10/14 15/16
15/19 101/19 113/18
**British [1]** 27/22
**broad [1]** 28/2
**broadly [3]** 35/22 36/1
102/14
**broke [5]** 23/10 45/16
45/20 46/5 71/14
**broken [1]** 46/2
**brought [1]** 95/8
**Bryan [1]** 2/5
**bullet [4]** 42/7 42/9
110/15 111/1
**bunch [5]** 31/19 42/7
70/20 100/20 101/4
**burden [2]** 9/13 12/3
**busy [2]** 10/1 10/17

**C**

**calculate [3]** 21/2 58/2
79/21
**calculated [5]** 17/15
19/12 57/19 66/9 68/25
**calculating [3]** 20/3
20/20 72/20
**calculation [16]** 19/22
20/11 21/5 29/9 32/18
33/3 53/22 53/25 76/10
77/12 80/25 81/21 81/24

**86/21 87/14 108/8**
**calculations [9]** 14/10
17/17 29/9 29/21 37/7
57/7 63/1 100/18 104/12
**calculator [2]** 70/8 74/9
**called [10]** 21/8 21/9
21/10 23/20 38/1 42/22
42/21 66/6 68/3 68/7
**calls [2]** 4/6 112/16
**came [3]** 28/12 61/16
71/19 94/12 108/2
111/15 112/1 112/5
**can't [9]** 28/13 54/2
60/10 66/8 78/12 84/21
91/16 106/5 106/18
**cancer [177]**
**cancer-causing [19]**
76/17 77/1 77/7 77/8
77/9 77/15 77/20 77/23
78/10 78/13 78/16 78/18
78/21 79/7 79/15 81/4
86/11 87/22 88/2
**cancers [49]** 16/8 41/4
41/9 46/9 46/13 46/14
47/11 48/2 48/2 49/2
49/7 49/8 49/10 49/14
49/23 50/9 50/13 50/14
54/18 58/12 58/15 59/17
59/17 60/2 60/3 60/5
60/18 60/22 60/25 61/5
61/6 61/13 63/15 63/21
63/23 64/5 64/16 66/15
81/14 93/17 95/22 98/12
98/13 98/14 98/16 98/17
104/4 110/15 110/19
**cannot [6]** 35/13 35/18
37/2 51/13 61/19 85/11
**capable [4]** 6/3 6/5
108/22 111/3
**carefully [1]** 99/6
**carry [1]** 9/13
**case [43]** 1/2 8/15 10/6
13/20 14/24 19/20 20/5
25/7 25/23 26/1 27/2
27/7 27/9 27/12 27/16
28/2 28/9 28/15 35/25
36/20 38/21 39/3 41/2
43/12 54/17 55/3 61/4
72/8 73/19 73/24 81/23
82/15 84/21 85/8 90/13
91/3 104/16 104/16
105/3 105/7 105/25
106/2 107/21
**cases [55]** 14/1 14/12
16/15 16/23 17/19 17/23
18/4 19/24 19/25 20/6
20/25 21/4 21/6 22/3
22/4 22/14 22/21 23/1
23/13 23/14 23/15 24/10
24/24 24/25 26/24 27/3
27/6 27/20 27/23 28/5
28/7 29/4 29/6 29/7
29/17 35/25 43/13 43/18
43/19 52/11 52/12 58/23
59/11 60/16 73/19 95/16
95/18 96/7 96/10 96/16

**96/17 96/23 102/12
102/16 106/8**
**categories [1]** 56/4
**category [1]** 47/15
**causal [2]** 36/25 41/10
**causation [2]** 48/10
51/15
**cause [10]** 27/13 33/17
33/18 33/19 49/10 51/5
51/8 85/21 88/12 90/14
**causes [3]** 50/15 51/11
85/14
**causing [22]** 21/16 32/14
32/17 76/17 77/1 77/7
77/8 77/9 77/15 77/20
77/23 78/10 78/13 78/16
78/18 78/21 79/7 79/15
81/4 86/11 87/22 88/2
**cede [1]** 108/17
**ceded [1]** 113/17
**census [2]** 33/9 41/21
**central [4]** 14/14 46/20
58/12 59/18
**certain [4]** 24/20 36/3
61/21 86/13
**certainly [15]** 5/3 5/8
10/25 23/10 25/19 41/6
49/21 55/22 60/14 72/4
78/20 80/19 88/17
101/12 114/9
**certainty [1]** 32/6
**CERTIFICATE [1]**
116/14
**certification [4]** 1/12 9/9
9/14 12/4
**Certified [1]** 116/16
**certify [1]** 116/16
**challenges [1]** 54/11
**chance [12]** 14/13 14/16
43/1 43/5 43/5 43/6
43/25 63/6 67/21 67/24
70/18 108/6
**chances [2]** 44/4 44/8
**change [3]** 25/10 25/11
108/4
**characterize [1]** 102/7
**chart [23]** 6/24 6/24
6/24 16/12 18/6 18/6
18/13 18/16 18/19 18/22
24/18 26/9 31/25 51/18
57/23 61/2 91/16 92/12
95/23 101/19 101/20
103/8 111/16
**check [8]** 18/1 18/10
60/15 61/22 61/22 61/23
62/4 111/24
**Chicago [1]** 3/6
**chief [1]** 22/12
**children [3]** 16/16 92/16
98/23
**choose [1]** 31/14
**chose [1]** 102/22
**chosen [1]** 55/1
**Christina [1]** 24/13
**Christopher [1]** 82/24
**circle [1]** 74/22

**C**

**circles [1]** 7/4
**Circuit's [1]** 8/15
**circumstances [2]** 55/2
114/13
**citation [1]** 83/10
**cite [5]** 80/17 83/8 83/21
87/6 88/3
**cited [1]** 62/23
**citing [2]** 65/15 110/25
**CIV [1]** 1/2
**civil [1]** 10/3
**clarification [2]** 52/8
90/25
**clarify [5]** 33/6 90/6
90/8 108/13 113/2
**class [5]** 1/12 9/9 9/14
12/4 73/15
**classes [1]** 16/20
**classical [1]** 27/15
**classification [2]** 25/4
25/5
**classifications [1]** 60/17
**classified [2]** 24/22
96/17
**cleanup [1]** 105/20
**clear [8]** 11/24 23/15
23/18 24/23 25/2 31/8
60/16 72/13
**clearly [7]** 27/1 27/25
37/14 63/10 83/14 83/18
104/5
**Clematis [1]** 1/19
**close [1]** 89/4
**closer [3]** 13/6 113/5
113/6
**closing [8]** 7/18 7/21
7/23 8/4 10/12 10/15
11/15 113/24
**cluster [54]** 15/6 15/10
26/5 35/8 35/14 35/15
35/19 35/21 36/3 36/22
37/3 37/5 37/23 38/9
38/15 38/21 39/21 40/12
41/8 41/16 42/9 44/13
47/4 48/21 52/20 56/19
57/15 57/20 57/22 58/2
61/15 62/22 69/19 69/25
70/14 71/6 74/12 75/2
75/12 76/3 76/18 77/3
79/15 82/5 82/12 82/13
92/3 92/5 92/25 94/4
94/16 96/3 100/10
101/15
**clusters [5]** 48/13 48/16
48/18 48/24 60/21
**CNS [16]** 16/8 16/22
46/7 46/24 48/2 58/5
58/11 59/17 59/23 60/2
60/8 60/13 61/3 100/19
110/15 110/19
**co [1]** 10/23
**co-counsel [1]** 10/23
**code [4]** 39/12 39/12
40/18 98/22
**coded [1]** 40/18

**codes [8]** 97/8 98/9
98/10 98/11 98/16 98/25
99/11 99/12
**colloquial [1]** 36/17
**columns [2]** 17/6 33/25
**combined [3]** 31/18 56/3
98/16
**combining [3]** 14/2 22/5
98/11
**comes [6]** 6/12 16/23
17/2 19/20 43/9 71/12
**comfortable [2]** 4/11
13/1
**coming [6]** 4/22 5/17
12/17 36/19 109/13
111/4
**comment [2]** 11/1 14/20
**commentary [1]** 85/25
**comments [2]** 30/20
90/17
**committed [3]** 11/3
11/10 11/11
**committing [1]** 8/23
**common [8]** 8/11 43/8
47/15 51/5 51/8 78/2
90/13 90/23
**communities [1]** 81/12
**community [2]** 95/16
111/2
**comparable [1]** 28/6
**compare [4]** 18/6 88/8
102/10 104/16
**compared [5]** 17/12
17/13 17/23 101/15
102/1
**comparing [8]** 17/5 17/6
17/9 30/18 60/11 60/12
60/21 60/22
**comparison [14]** 7/5
28/7 29/1 30/22 30/23
44/22 44/22 47/6 69/15
102/10 102/11 102/13
102/15 103/25
**comparisons [38]** 14/23
28/25 31/9 31/12 32/9
36/9 36/12 36/14 36/23
37/4 37/8 37/10 37/11
37/20 37/22 42/18 44/2
44/14 45/6 45/9 45/12
47/3 54/7 54/12 54/15
67/10 72/8 75/3 75/12
88/14 99/9 100/7 100/24
101/4 101/14 101/17
102/6 102/7
**compilation [2]** 22/23
66/7
**compiled [1]** 23/6
**complete [3]** 8/1 10/20
115/4
**completely [4]** 41/19
56/5 97/17 108/7
**comply [1]** 10/23
**comprise [1]** 39/10
**compute [2]** 14/4 21/13
**computed [2]** 14/2 14/7
**computer [1]** 12/25

**compiled [1]** 19/15
**concepts [1]** 4/17
**concern [5]** 5/2 26/22
39/11 70/21 84/12
**concerned [1]** 97/15
**concerning [1]** 28/23
**concerns [1]** 87/8
**conclude [2]** 85/11
114/3
**concluded [1]** 115/11
**conclusion [3]** 40/11
58/19 111/4
**conclusions [3]** 8/8 51/3
105/4
**conditioned [1]** 87/16
**conditions [1]** 16/17
**conduct [2]** 7/12 44/3
**conducted [6]** 8/24
27/23 55/19 73/7 84/19
98/8
**confidence [9]** 6/11
32/25 33/1 33/4 33/11
33/13 33/21 34/1 34/3
**confident [1]** 33/9
**confirm [2]** 61/19 62/5
**confirmed [2]** 62/14
92/14
**confirms [1]** 102/16
**confusion [2]** 9/4 9/4
**connected [2]** 27/1
54/19 78/18
**connection [3]** 78/2
79/21 86/15
**conservative [2]** 31/22
86/24
**consider [2]** 14/17 73/13
**consideration [2]** 9/12
12/5 36/22
**considered [4]** 13/19
30/8 61/11 64/23
**consistent [2]** 33/12
33/15
**consolidated [1]** 13/20
**consult [1]** 10/22
**Cont.'d [1]** 3/1
**contained [2]** 28/14 37/6
**contaminant [7]** 77/18
77/21 77/24 78/2 86/6
86/17 87/22
**contaminants [6]** 28/8
86/14 86/23 87/9 105/19
106/12
**contaminated [6]** 76/2
76/16 81/3 81/13 82/14
86/25
**contaminating [2]** 77/13
88/12
**contamination [8]** 54/24
55/6 55/15 65/6 82/3
83/11 105/22 105/24
**contend [1]** 72/4
**contents [1]** 105/14
**context [3]** 16/12 36/14
90/23
**continue [1]** 72/12
**continued [2]** 26/23

49/14
**control [12]** 14/24 27/7
27/9 27/12 27/17 28/3
28/9 28/15 104/16 105/3
105/7 106/3
**controls [1]** 27/6
**convert [1]** 32/23
**copies [3]** 7/1 114/15
115/1
**copy [2]** 35/1 115/4
**cor [1]** 54/21
**CORPORATION [1]**
1/7
**correct [143]**
**correction [29]** 29/24
30/15 31/3 31/6 31/24
32/3 32/10 38/2 43/7
68/3 68/9 69/1 69/8
69/12 70/4 71/7 71/10
71/25 72/3 72/6 72/17
72/23 73/3 74/11 74/15
74/18 74/21 75/4 75/9
**correctly [3]** 23/11 68/5
99/13
**correlate [1]** 55/13
**correlates [1]** 55/14
**correspond [5]** 34/4
53/19 54/24 61/10 80/10
**corresponded [1]** 55/2
**corresponding [1]** 30/4
**corresponds [1]** 16/16
16/20 19/21 20/8 20/12
20/20 21/5 33/16 54/22
59/11 81/11
**COTROMANO [1]** 1/3
**couldn't [1]** 9/3
**counsel [4]** 10/23 90/9
90/10 109/5
**count [9]** 20/21 20/24
22/25 41/21 60/8 60/13
60/21 62/19 70/7
**counted [3]** 24/17 59/22
61/4
**counting [2]** 60/3 60/4
**counts [4]** 14/23 19/8
21/18 29/11
**County [7]** 17/7 17/13
17/24 45/7 101/16 102/1
102/14
**couple [3]** 6/22 10/17
30/19
**course [2]** 43/9 56/7
**court [43]** 1/1 1/19 4/1
5/6 5/11 5/17 6/14 7/19
8/6 8/14 8/23 9/8 9/16
9/21 11/22 12/4 13/22
15/5 16/10 16/12 16/13
18/21 22/1 27/9 38/4
61/23 62/6 62/7 62/21
65/22 69/24 70/13 71/5
76/8 82/8 92/9 92/12
96/5 99/2 114/6 114/12
114/18 115/1
**Court's [3]** 7/16 10/24
114/15
**courtesy [1]** 115/1

**courtroom [2]** 5/2 70/25
**cover [2]** 23/14 23/15
**covered [3]** 8/2 52/8
52/11
**covering [1]** 52/12
**CPE [1]** 1/18
**Craig [1]** 2/13
**create [3]** 22/2 36/23
41/24
**created [2]** 38/23 45/5
**creates [2]** 41/8 41/17
**Creed [1]** 2/5
**criminal [1]** 10/2
**criticism [2]** 28/23 29/20
**criticisms [2]** 15/1 28/20
**critique [2]** 104/16
107/6
**cross [25]** 4/15 5/7 5/10
5/23 5/25 6/10 6/22 6/25
34/11 53/24 63/6 89/4
89/14 94/3 94/12 102/21
104/10 105/8 108/2
108/4 109/18 109/23
113/8 116/5 116/9
**cross-examination [12]**
4/15 5/7 5/23 6/22 6/25
34/11 105/8 108/2 108/4
109/18 109/23 113/8
**cross-examine [4]** 5/10
6/10 53/24 63/6
**cross-examining [2]**
89/4 89/14
**CRR [2]** 1/18 116/22
**current [1]** 98/12

**D**

**Daniel [1]** 3/3
**darkening [1]** 9/19
**data [28]** 22/23 31/13
32/4 33/12 33/16 34/3
35/23 35/24 37/6 37/18
52/4 52/10 62/4 63/14
64/15 64/20 64/22 64/23
64/24 64/24 66/2 66/11
66/22 66/24 67/11 73/18
80/13 98/8
**dated [2]** 94/24 116/19
**David [2]** 22/25 23/7
**days [1]** 6/22
**deal [4]** 4/10 7/17
**dealing [2]** 29/21 110/18
**DeCarlo [2]** 24/13
**December [18]** 52/24
53/10 55/24 56/22 59/22
60/6 62/21 62/24 91/24
94/4 94/7 94/14 95/2
95/23 100/17 109/13
111/16 112/6
**December 16 [1]** 100/17
**December 2016 [16]**
52/24 53/10 55/24 56/22
59/22 60/6 62/21 62/24
91/24 94/4 94/14 95/2
95/23 109/13 111/16
112/6
**December 23rd [1]** 94/7

**D**

decide [1] 10/13
decision [3] 96/7 96/22
104/10
declare [1] 15/13
declared [1] 15/10
deduced [1] 66/6
defendant [2] 96/9
102/19
Defendant's [1] 112/20
DEFENDANTS [1] 1/8
3/2
defense's [1] 6/7
defer [1] 9/16
define [2] 38/16 39/7
defined [4] 41/7 41/20
46/14 46/16
definition [3] 16/11
41/16 47/2
definitions [1] 46/5
degree [1] 32/5
demonstrative [12] 6/20
6/23 7/2 7/3 7/6 7/7
76/12 76/12 103/2 103/5
114/16 114/25
Denney [1] 2/10
DEP [2] 105/2 105/24
department [40] 14/22
14/25 15/6 15/10 15/13
16/3 17/17 17/21 18/17
26/9 28/10 36/2 36/8
36/21 38/20 39/4 39/8
39/20 39/24 40/6 40/10
41/15 44/12 44/25 45/5
47/4 47/13 47/19 47/25
49/13 50/18 74/24 75/1
93/1 97/22 104/19
105/23 107/13 107/21
113/10
depicted [1] 96/9
deposition [6] 23/23
24/1 24/3 50/5 53/25
54/3
depositions [1] 25/15
describe [6] 13/22 21/22
23/8 29/23 55/5 104/7
described [5] 18/2 40/4
40/5 52/11 100/3
describes [2] 25/22
87/21
description [2] 30/5
82/18
designation [1] 15/7
detailed [1] 22/14
details [1] 76/9
detected [1] 105/19
detection [1] 7/7
determination [1] 17/22
determine [2] 49/1 51/5
determined [1] 39/20
determining [2] 30/11
97/25
devote [1] 10/9
diagnosed [2] 23/9
49/15
diagnoses [4] 18/13

24/11 24/16 26/1
diagnosis [5] 24/23 25/3
25/3 25/4 25/6
dial [2] 3/12 15/5
didn't [19] 4/24 5/3
17/25 19/5 23/23 28/1
29/8 37/21 53/19 55/8
61/24 65/15 70/2 70/13
75/6 87/6 93/11 105/7
111/14
difference [5] 46/23
49/2 106/17 106/19
107/8
different [42] 8/18
11/21 19/3 22/6 28/24
32/4 32/22 37/19 45/20
46/5 47/1 47/14 47/21
47/24 49/8 49/9 49/10
49/16 49/23 50/13 50/13
50/14 53/6 53/13 55/10
56/1 58/5 58/7 62/17
63/24 64/1 70/24 78/15
80/1 80/1 80/2 87/8
99/19 100/9 100/13
102/16 113/3
difficult [1] 114/13
digest [1] 4/25
digested [1] 12/9
dimension [1] 45/4
dimensions [2] 47/3 47/6
Dioxan [1] 91/6
Dioxanes [1] 90/19
dioxins [2] 90/19 91/6
direct [50] 4/16 5/23
5/24 6/13 7/12 10/20
13/14 34/22 42/19 45/4
51/21 52/22 53/21 55/4
55/12 55/16 55/18 56/25
57/4 62/6 63/5 65/11
65/18 69/8 70/15 71/2
71/4 71/21 72/11 72/25
73/1 74/17 75/23 77/11
82/22 83/25 89/9 92/21
93/4 93/12 93/15 94/7
94/15 96/2 96/19 101/3
101/3 105/9 108/17
116/4
directions [1] 8/20
directly [2] 83/17 90/16
disagree [3] 9/3 16/6
72/10
disagreed [1] 50/3
disagreeing [1] 72/16
disagreement [1] 96/17
disclosed [1] 92/5
discuss [3] 28/17 29/22
114/4
discussed [6] 28/21 30/1
42/18 90/9 90/10 100/8
discusses [4] 85/18
87/21 94/23 94/25
discussing [2] 70/17
88/1
discussion [9] 75/16
82/22 97/2 97/7 97/10
101/3 103/20 103/22

104/4
disease [5] 27/14 46/5
47/1 54/16 54/22
diseases [1] 49/15
disparate [1] 8/12
displayed [1] 95/24
displaying [1] 53/19
disposal [1] 9/24
dispute [6] 40/10 41/15
66/10 85/25 86/2 91/10
distinction [2] 46/25
60/1
distribution [3] 21/8
21/10 21/13
DISTRICT [3] 1/1 1/1
1/14
diverse [1] 49/7
divided [3] 16/25 17/2
19/20
doctor [4] 48/14 67/7
112/13 113/18
document [11] 23/21
23/25 24/1 24/6 25/18
96/13 97/1 97/6 99/7
106/7 110/10
documents [3] 28/9
62/23 87/7
does [21] 21/2 21/22
23/10 23/15 26/17 31/12
32/13 32/18 41/24 71/6
77/12 78/9 85/12 100/2
100/4 100/6 106/17
106/19 107/8 108/2
110/19
doesn't [11] 23/14 30/14
68/21 68/22 70/21 72/4
78/17 78/20 82/13 107/9
110/19
DOH [6] 24/10 24/10
25/23 32/24 101/11
107/6
doing [14] 5/23 5/24
5/25 9/5 9/5 28/7 31/23
56/5 67/16 99/3 99/3
101/17 106/23 114/13
don't [64] 5/14 5/16 6/2
6/8 7/22 8/24 9/3 9/19
11/13 11/19 12/17 23/12
26/16 26/19 26/19 34/5
38/8 40/6 46/22 49/21
59/4 59/10 60/9 60/14
61/3 61/16 65/11 65/24
69/24 70/8 71/9 72/10
72/13 72/17 74/5 74/6
74/8 74/8 74/19 76/5
83/21 84/8 86/2 86/16
87/20 87/25 89/5 90/19
91/17 93/9 98/1 103/20
103/22 104/6 105/13
106/25 107/2 110/4
111/11 111/17 111/22
113/15 114/25 115/4
done [16] 8/11 15/5
28/15 29/7 36/13 41/18
55/22 56/7 56/12 61/20
62/20 64/2 72/22 73/2

73/17 97/21
door [1] 9/20
down [20] 45/16 45/20
46/2 46/5 46/9 58/21
67/12 75/18 95/15 96/24
110/15 113/19
Dr [2] 6/13 100/5
Dr. [85] 6/19 6/25 7/3
7/8 13/16 17/4 22/12
22/17 22/22 22/25 23/4
23/6 23/7 23/12 23/14
26/25 28/18 28/20 30/16
34/5 34/13 35/4 57/18
58/18 59/1 59/13 60/16
60/24 61/1 62/18 64/15
68/7 69/15 71/22 71/24
72/2 72/11 72/12 72/14
72/2 72/11 72/12 75/13
81/19 82/24 83/1 83/9
83/12 83/17 83/18 83/22
84/25 85/3 85/7 85/8
85/10 85/12 85/18 85/25
86/2 86/4 86/5 87/5
89/25 90/15 91/2 93/7
93/11 93/25 94/23 96/9
96/11 97/24 98/20 99/3
101/15 108/18 108/18
108/20 108/22 109/4
109/17 109/23 111/7
111/10 112/8 112/15
112/17 113/10
Dr. Alonso [1] 96/11
Dr. Bedient [1] 7/8
Dr. Christopher [1]
82/24
Dr. David [2] 22/25 23/7
Dr. Kaltofen [1] 6/25
Dr. Kilpatrick [1] 7/3
Dr. Laurentius [1]
112/17
Dr. Marais [15] 30/16
68/7 69/15 71/22 71/24
72/2 72/11 72/12 75/13
108/18 108/18 108/20
108/22 112/15 113/10
Dr. Marais' [2] 28/18
28/20
Dr. Perry [2] 22/22 23/6
Dr. Perry's [1] 23/14
Dr. Sharon [6] 22/12
58/18 59/1 94/23 109/17
112/8
Dr. Smith [17] 6/19
13/16 17/4 34/5 34/13
35/4 57/18 81/19 85/12
89/25 91/2 93/7 93/11
93/25 109/4 111/7
111/10
Dr. Teaf [10] 83/1 83/12
83/17 83/18 83/22 85/3
85/7 85/10 85/18 90/15
Dr. Teaf's [8] 83/9
84/25 85/8 85/25 86/2
86/4 86/5 87/5
Dr. Watkins [10] 26/25
59/13 60/16 62/18 96/9
97/24 98/20 99/3 101/15

109/23
Dr. Watkins' [6] 22/17
23/4 23/12 60/24 61/1
64/15
drawing [2] 97/7 97/14
drew [5] 40/6 40/11
64/19 66/21 110/12
Drive [1] 3/8
driven [1] 79/23
due [4] 43/1 43/5 43/25
98/25
dumping [1] 105/22
Dunsford [1] 24/13
during [7] 6/25 7/8
20/14 23/1 100/22 108/2
108/3

**E**

e-mail [26]  1/20 22/13
22/18 23/4 23/12 26/25
58/18 58/22 59/1 59/2
60/24 61/1 62/18 63/20
63/24 64/1 95/3 95/9
95/10 96/8 109/17
109/22 110/2 111/8
111/11 112/8
e-mails [6]  22/11 63/18
63/21 64/15 65/8 94/23
each [5]  4/20 44/7 54/10
54/15 89/3
earlier [16]  11/25 14/21
24/17 26/4 29/8 30/16
42/1 54/8 56/20 57/3
69/14 71/21 90/1 95/8
96/21 104/23
earliest [1]  27/16
easier [1]  42/12
easy [2]  4/13 5/1
effect [10]  29/18 34/4
41/10 43/14 43/17 43/20
54/25 99/16 99/25
103/23
effective [1]  43/11
effects [3]  36/25 99/16
106/19
eight [4]  25/8 65/9 65/10
65/17
either [4]  12/18 107/2
113/25 114/10
element [1]  44/21
elements [1]  44/22
elevate [1]  43/20
elevated [15]  20/14
26/23 27/2 27/14 32/8
32/12 32/19 33/18 51/11
61/8 61/11 98/22 98/23
100/18 107/21
elevation [3]  20/25
21/16 33/19
elevations [1]  100/22
Eleventh [1]  8/15
else [6]  46/10 87/19 93/9
114/4 114/8 114/23
embodiment [1]  67/7
emphasize [1]  87/3
end [3]  7/1 80/21 104/6

{WITNESSNAME} Index: English..going

**E**

**English [2]** 14/16 81/11
**enlightening [1]** 115/8
**enough [3]** 7/22 10/18
63/10
**entire [1]** 12/6
**entirely [2]** 27/4 73/19
**entitled [1]** 116/18
**environment [7]** 78/7
78/18 82/14 83/2 87/22
88/1 90/24
**environmental [7]** 28/8
39/16 54/20 77/18 77/20
77/24 78/1
**epidemiologist [1]** 22/12
**equal [2]** 21/3 71/14
**equals [2]** 77/1 77/3
**error [12]** 8/24 11/3
11/10 11/23 25/3 32/23
32/24 57/23 62/25 63/4
92/1 93/17
**ESQ [13]** 2/2 2/2 2/5 2/7
2/9 2/10 2/13 3/2 3/2 3/3
3/3 3/7 3/11
**essence [1]** 32/15
**essentially [8]** 14/8
14/10 16/25 21/12 27/13
28/14 56/7 103/22
**establish [1]** 27/13
**established [1]** 97/17
**establishing [1]** 9/13
**estimate [1]** 55/19
**estimated [1]** 19/17
**estimates [2]** 19/1 19/8
**et [2]** 1/3 1/7
**evaluate [1]** 48/20
**evaluating [2]** 38/15
48/23
**even [18]** 19/2 20/23
29/17 31/5 32/9 34/2
41/10 44/7 48/12 48/15
60/18 60/25 61/1 70/8
75/11 78/9 95/6 110/25
**event [2]** 87/15 87/16
**events [1]** 39/22
**ever [3]** 9/4 72/2 77/21
**every [4]** 29/11 29/15
43/9 100/14
**everybody [1]** 89/15
**everybody's [1]** 52/14
**everyone [3]** 4/2 45/17
89/21
**everything [3]** 46/10
96/6 115/4
**evidence [10]** 12/6 32/11
51/9 72/15 86/16 87/4
105/21 105/24 106/7
107/12
**exact [3]** 40/17 86/21
104/6
**exactly [11]** 16/13 21/3
51/16 53/18 53/19 60/10
66/8 69/12 103/21 106/1
111/17
**exam [1]** 5/24
**examination [19]** 4/15

5/7 5/23 6/14 6/22 6/25
7/8 7/12 13/14 34/11
93/23 105/8 105/9 108/2
108/4 109/2 109/18
109/23 113/8
**examine [4]** 5/10 6/10
53/24 63/6
**examining [2]** 89/4
89/14
**example [6]** 27/15 27/15
28/4 32/24 70/15 97/18
**examples [3]** 45/2 47/1
80/4
**exceeded [1]** 92/16
**excellent [1]** 15/2
**excess [7]** 39/13 39/15
40/20 51/14 67/3 81/14
107/7
**exchange [2]** 11/24
22/11
**excluded [3]** 64/22
66/24 67/12
**excluding [1]** 67/1
**exhibit [13]** 6/23 7/2 7/6
24/10 25/12 56/25 62/6
76/12 103/2 103/5
104/24 104/25 106/10
**exhibit 13 [1]** 76/12
**exhibit 14 [2]** 103/2
103/5
**exhibited [1]** 99/14
**exhibits [4]** 6/20 114/16
114/17 114/25
**existence [2]** 57/15
86/10
**expectation [1]** 41/8
**expected [29]** 14/4 14/9
16/17 16/23 17/19 18/4
18/22 18/23 18/25 19/7
19/7 19/16 20/3 20/8
20/11 20/21 20/22 20/24
21/6 25/10 25/11 29/1
29/18 41/10 60/13 60/21
61/3 61/6 92/16
**experience [2]** 48/12
48/23
**expert [12]** 48/9 51/20
52/22 53/21 55/4 65/12
65/18 75/23 83/11 83/25
84/21 92/14
**expertise [4]** 48/6 48/25
51/4 84/17
**experts [3]** 91/3 91/5
91/9
**explain [6]** 16/12 18/21
22/1 27/9 55/9 99/2
**explained [1]** 42/10
**explanation [2]** 68/20
68/21
**explicit [1]** 23/13
**explore [1]** 98/7
**express [1]** 28/24
**expressed [1]** 62/8
**expressly [1]** 8/2
**extending [1]** 19/22
**extent [3]** 62/1 80/16

89/13 130
**extra [2]** 33/9 33/9
**extremely [1]** 92/6

**F**

**face [3]** 35/13 35/18
37/2
**fact [29]** 8/8 17/1 17/6
19/10 25/7 27/22 28/17
32/15 36/6 42/8 43/25
48/12 49/22 50/1 54/17
67/22 72/6 85/3 86/22
87/25 92/11 96/10 97/7
100/8 101/4 101/14
110/18 110/21 111/3
**factor [15]** 20/17 20/18
21/1 31/3 31/6 31/24
38/15 69/13 72/23 73/13
74/15 74/21 75/9 77/13
88/12
**factors [6]** 21/16 49/9
49/18 49/19 50/13 87/4
**fair [2]** 32/23 43/25
**fairly [2]** 86/24 87/8
**falls [3]** 43/21 81/20
95/13
**false [7]** 29/17 36/6
41/13 43/22 44/4 44/9
67/22
**familiar [2]** 25/18 38/10
**famous [1]** 27/15
**fantastic [1]** 114/13
**far [4]** 66/16 66/18
89/12 97/14
**fast [1]** 114/14
**fault [2]** 38/13 74/9
**FDA [1]** 41/3
**FDEP [1]** 25/21
**FDOH [24]** 19/13 26/15
28/11 28/12 28/15 35/7
35/10 36/1 36/13 40/3
40/24 41/7 49/4 49/7
49/22 52/8 54/11 66/7
69/25 88/15 102/20
106/3 106/23 111/21
**FDOH's [6]** 35/14 35/19
37/2 50/2 52/4 52/18
**FDOH2009 [1]** 19/22
**featured [1]** 94/13
**February [1]** 92/12
**February 2nd [1]** 92/12
**feel [3]** 6/3 6/5 33/9
**felt [1]** 4/11
**female [19]** 13/25 18/19
19/8 19/25 20/6 20/13
23/1 23/11 23/13 23/16
24/24 29/5 30/24 32/7
52/21 56/2 64/16 66/15
75/2
**females [1]** 56/4
**few [8]** 5/15 5/20 10/2
34/16 66/7 72/21 90/3
109/7
**field [1]** 51/19
**fifth [1]** 7/11
**figure [3]** 76/2 76/15

111/24
**file [4]** 11/19 12/4
114/19 114/24
**filed [5]** 8/23 9/1 9/6 9/7
11/20
**filing [1]** 114/20
**final [1]** 7/6
**finally [2]** 22/23 104/9
**finding [9]** 35/15 35/21
37/5 37/13 43/6 92/4
92/6 96/2 99/16
**findings [4]** 8/7 36/5
70/14 113/13
**finds [1]** 42/9
**fine [3]** 91/21 108/24
110/6
**finer [1]** 46/2
**finish [1]** 10/11
**fires [1]** 42/7
**firm [1]** 64/14
**first [25]** 6/23 7/20
16/18 17/12 18/23 22/8
22/16 26/10 29/23 30/21
34/19 37/3 37/17 48/20
52/22 53/13 53/20 56/10
56/21 68/1 68/8 68/10
110/10 112/24 113/3
**five [2]** 58/24 95/17
**FL [6]** 2/4 2/6 2/8 2/12
2/14 3/9
**Flagler [1]** 3/8
**flip [5]** 6/24 15/22 95/8
95/15 106/10
**FLORIDA [57]** 1/1 1/8
1/20 14/6 14/22 14/25
16/25 17/5 17/9 17/14
17/24 19/11 19/15 19/15
19/19 22/13 22/25 30/19
30/22 32/22 36/24 40/10
41/15 44/12 44/25 45/5
45/10 47/3 47/13 47/18
47/25 49/13 50/18 71/13
73/16 73/18 74/24 75/1
81/12 83/19 86/12 86/23
87/9 87/23 90/24 101/16
102/4 102/15 113/10
**focus [8]** 16/1 39/7
51/23 63/11 67/4 96/7
96/22 103/17
**focused [2]** 41/3 51/24
110/11
**focusing [1]** 13/25
**follow [2]** 12/2 42/19
**following [2]** 24/9 89/20
**foregoing [1]** 116/16
**foresee [1]** 12/17
**forever [1]** 72/12
**forget [3]** 53/18 56/10
82/18
**forgotten [1]** 22/24
**form [3]** 84/22 96/12
115/1
**format [1]** 12/2
**formation [1]** 48/9

**formula [11]** 21/8 69/12
75/19 75/22 76/20 77/6
78/14 79/22 82/12 88/13
88/23
**formulas [1]** 76/5
**Fort [2]** 2/4 2/8
**forward [4]** 6/8 47/9
62/5 113/22
**found [7]** 83/10 87/6
105/21 106/12 107/7
107/14 113/11
**foundation [2]** 26/11
26/14
**four [5]** 16/15 17/2
58/24 59/19 95/17
**four-year [1]** 59/19
**fraction [1]** 33/20
**Franklin [1]** 1/18
116/15 116/21 116/22
**frequently [2]** 42/20
100/22
**fully [1]** 7/21
**fun [1]** 68/7
**furans [2]** 90/19 91/6
**further [8]** 25/22 34/6
37/7 93/19 98/7 108/9
112/11 113/15

**G**

**GA [1]** 3/13
**Gallagher [4]** 3/2 8/21
10/22 54/2
**Gallagher's [1]** 74/9
**Gardens [1]** 2/14
**Garrett [1]** 24/13
**gave [3]** 80/4 81/18 90/3
**Gdanski [1]** 2/2
**gender [3]** 45/13 47/2
54/12
**general [1]** 5/5
**generally [1]** 21/22
**generosity [1]** 114/7
**geographic [4]** 38/16
97/14 97/17 98/7
**geography [3]** 44/21
47/1 54/12
**gets [1]** 16/21
**getting [2]** 6/3 100/25
**give [14]** 4/9 4/15 5/5
5/20 6/25 10/18 12/24
27/14 30/14 50/25 68/21
68/22 74/17 81/22
**given [10]** 12/7 31/13
32/18 43/13 43/17 43/19
76/24 79/20 79/21 81/23
**gives [2]** 33/3 68/23
**goes [5]** 14/17 42/6 42/8
80/25 98/20
**going [29]** 6/7 7/17 7/22
9/18 10/1 10/8 10/9
10/17 15/19 34/19 37/8
38/17 41/13 45/12 59/4
65/6 67/21 71/18 75/18
76/11 89/5 94/2 99/4
102/23 104/22 108/25
109/9 113/22 113/23

(WITNESSNAME)                                    [Index.gone...it's

**G**

**gone [1]** 47/6
**good [8]** 4/2 11/18 12/2
13/16 13/17 34/13 34/14
74/8
**got [12]** 4/19 7/15 10/2
10/3 10/5 18/11 22/2
30/19 33/10 42/6 47/20
63/6
**Gowdy [4]** 2/5 2/8 8/22
11/20
**Gowdy's [1]** 11/2
**great [1]** 113/20
**greater [5]** 31/21 43/19
44/9 44/10 73/13
**green [1]** 79/2
**Gregor [1]** 3/7
**Groden [1]** 3/3
**groundwater [1]** 86/23
**group [11]** 1/7 27/18
27/25 28/1 29/4 30/25
39/21 41/3 49/2 49/7
49/14
**grouped [3]** 45/17 47/14
47/25
**grouping [2]** 46/10
47/11
**groupings [1]** 73/16
**groups [2]** 27/23 54/13
**growth [1]** 19/4
**guess [8]** 4/4 25/5 26/18
55/21 113/16 114/1
114/2 115/3
**guidance [2]** 7/15 8/13
**guided [1]** 5/10
**Gunn [1]** 3/12
**Gunster [1]** 3/8
**guy [1]** 42/6

**H**

**Haberman [1]** 2/2
**hadn't [1]** 5/23
**half [2]** 4/20 89/3
**Hammer [1]** 2/7
**hand [2]** 13/2 112/18
**handwritten [1]** 6/24
**Hannah [4]** 24/13 24/19
24/25 25/7
**happen [1]** 31/2
**happened [1]** 70/22
**happening [1]** 32/20
**happens [1]** 69/24
**happy [5]** 5/12 6/16 8/7
61/22 62/25
**hard [1]** 5/3
**harmful [1]** 84/18
**Hatfield [25]** 2/10 5/22
5/25 6/6 7/11 13/13 22/9
38/2 45/5 51/18 68/2
71/21 82/1 89/11 91/14
92/19 109/7 109/9
109/20 110/11 111/15
113/7 116/4 116/6 116/9
**haven't [6]** 9/1 24/7
55/22 63/5 73/17 90/10
**he's [4]** 42/6 54/5 110/24

110/25
**heading [1]** 50/8
**health [30]** 14/22 14/25
15/6 15/10 15/13 16/3
17/17 17/21 18/17 28/10
38/20 39/9 39/20 39/24
40/6 41/16 45/5 47/25
49/14 50/19 74/24 84/6
84/18 93/1 104/19
105/23 106/18 107/13
107/21 113/11
**Health's [13]** 26/9 36/2
36/8 36/21 39/2 40/11
44/12 44/25 47/4 47/14
47/19 75/1 97/23
**hear [1]** 10/7
**heard [4]** 4/12 27/7
36/19 36/20
**hearing [7]** 8/24 12/6
62/10 85/4 92/13 93/13
114/17
**held [1]** 98/14
**Hello [2]** 93/25 94/1
**help [2]** 4/16 7/15
**helped [1]** 67/2
**helpful [5]** 4/17 8/4 8/9
10/10 10/13
**here [57]** 9/5 9/6 9/8
9/14 9/22 9/23 11/23
12/9 16/17 17/6 18/11
19/2 20/5 27/2 28/4
30/25 31/7 33/3 33/3
34/15 35/6 41/7 45/12
49/5 50/19 51/6 53/19
56/10 56/20 57/23 60/5
61/19 61/20 62/9 62/11
64/2 66/11 67/7 68/8
69/11 70/3 70/17 70/24
76/4 77/1 79/2 79/12
79/12 80/11 82/22 99/3
99/17 106/2 110/12
110/14 113/18 113/22
**Herman [1]** 3/4
**hiding [1]** 54/5
**high [1]** 27/24
**higher [4]** 27/25 41/9
72/7 99/22
**highlight [2]** 9/8 9/11
**highlighted [9]** 40/16
40/23 41/23 50/4 58/21
72/15 83/16 99/6 99/18
**highlighting [1]** 40/2
**highly [1]** 31/7
**hired [1]** 13/18
**hit [1]** 42/12
**hold [5]** 4/8 91/13 92/18
105/5 109/25
**holes [3]** 42/7 42/9 42/11
**home [1]** 26/1
**homes [7]** 25/23 25/23
28/5 28/6 105/25 106/8
107/22
**honest [1]** 111/17
**Honor [41]** 4/6 5/2 5/5
5/9 5/24 6/16 6/18 7/10
7/16 8/1 8/9 8/10 8/17

8/18 8/30 10/7 10/24
11/1 11/3 11/18 12/19
12/22 26/11 34/25 88/24
89/6 89/16 89/17 91/15
93/22 105/6 106/15
106/21 108/12 110/22
112/11 112/16 114/5
114/11 114/21 115/6
**HONORABLE [1]** 1/13
**hopefully [1]** 12/13
**hour [2]** 4/20 89/2
**housekeeping [1]** 6/19
**however [4]** 11/1 39/14
89/3 98/24
**Hubbard [1]** 3/5
**Hudgins [1]** 3/11
**huge [1]** 100/20
**huh [5]** 42/13 64/6 64/8
68/4 68/13
**human [1]** 84/18
**hundred [1]** 30/9
**hundreds [2]** 55/22
55/23
**hydrocarbons [1]** 82/17
**hypothesis [1]** 32/16

**I**

**I put [1]** 38/11
**I'd [3]** 15/5 44/23 62/25
**I'll [10]** 4/18 10/20
11/20 38/9 41/14 49/4
89/6 113/25 114/1 114/2
**I'm [68]** 4/23 5/16 5/20
6/15 9/17 10/1 10/7 10/8
10/17 12/20 14/19 15/11
21/9 24/6 24/19 25/5
26/13 34/15 35/5 35/16
36/7 37/8 38/10 40/14
42/15 48/14 51/10 52/9
54/14 55/10 55/12 57/25
59/4 65/15 69/11 72/16
73/21 73/21 75/18 75/18
76/8 76/11 80/24 81/9
83/11 84/5 84/5 84/6
89/15 90/21 91/4 91/13
92/24 94/2 99/13 102/19
104/22 105/5 106/1
107/4 107/12 107/18
109/9 109/19 109/25
110/23 111/12 113/18
**I've [39]** 7/10 10/2 10/3
10/5 10/14 14/20 14/20
18/11 22/24 23/3 25/19
30/19 32/18 35/22 36/11
47/20 48/23 56/9 56/12
62/14 62/15 63/2 63/6
64/2 64/7 67/9 67/10
67/18 69/10 69/10 72/19
73/17 74/19 78/11 84/19
84/19 86/20 87/5 113/24
**idea [3]** 12/2 44/2 96/8
**identification [1]** 77/13
**identified [5]** 51/6 77/21
92/3 98/17 103/19
**identify [3]** 5/2 8/11
70/14

**identifying [3]** 48/13
48/16 50/19
**ignored [1]** 64/25
**ignoring [1]** 65/2
**IL [1]** 3/6
**illustration [3]** 31/2
69/11 69/13
**illustrative [1]** 45/2
**imagine [1]** 5/4
**immediately [3]** 59/5
72/15 105/14
**implicated [3]** 84/7 84/9
108/1
**implication [2]** 102/22
106/21
**implied [1]** 90/13
**implies [1]** 32/20
**imply [3]** 32/19 73/3
87/7
**important [3]** 9/9 12/5
38/15
**imposing [1]** 6/6
**impression [1]** 84/11
**incidence [22]** 14/8
14/23 15/14 20/13 22/2
25/8 26/8 32/7 33/12
38/17 94/4 94/13 94/16
94/18 95/23 96/1 100/14
102/23 103/9 104/5
108/4 113/11
**incidences [4]** 14/3 14/5
101/1 101/1
**incident [1]** 17/3
**include [10]** 24/25 26/21
26/22 27/4 53/16 58/11
93/11 93/14 96/5 98/9
**included [5]** 26/7 64/19
93/3 96/2 106/6
**includes [5]** 18/13 20/5
24/16 36/13 55/25
**including [2]** 48/18
94/14
**inconsistent [2]** 34/3
51/9
**incorporated [1]** 26/9
**increase [15]** 17/23 44/4
54/18 67/21 67/24 98/11
98/12 98/25 98/25 99/21
100/1 100/14 104/1
104/5 108/5
**increased [15]** 15/13
33/20 36/4 38/17 94/18
98/14 98/15 98/16 99/15
99/21 100/14 100/25
101/1 106/8 113/11
**increases [1]** 41/12
**indeed [2]** 32/12 61/10
**independent [1]** 56/5
**indicate [2]** 57/2 82/12
**indicated [6]** 39/13
40/19 50/3 98/21 100/18
113/13
**indicating [1]** 98/24
**indication [3]** 35/14
35/20 37/4
**individual [1]** 16/21

**individuals [1]** 23/9
**inform [1]** 71/5
**information [10]** 6/3
10/21 22/10 22/16 22/17
26/17 62/3 62/13 64/14
84/8
**inherent [1]** 88/15
**initial [4]** 35/10 35/25
36/1 113/3
**initially [3]** 24/22 40/24
60/19
**injury [1]** 13/20
**inputs [3]** 77/5 78/23
80/6
**instance [9]** 33/7 33/14
41/21 55/24 65/6 69/13
72/21 78/5 101/7
**instances [3]** 46/13
46/16 46/19
**instead [4]** 20/9 40/7
60/3 60/4
**instructions [1]** 8/13
**intend [1]** 8/1
**intended [2]** 80/9 96/5
**interest [2]** 81/24 82/1
**Interestingly [1]** 63/20
**interpret [2]** 37/10 99/8
**interpretation [7]** 21/15
43/16 75/1 81/16 81/18
99/24 111/5
**interpreting [1]** 14/18
**interval [4]** 32/25 33/1
33/21 34/1
**intervals [2]** 33/4 54/16
**introduced [1]** 67/16
**introduces [1]** 41/4
**investigation [4]** 26/6
97/23 105/21 107/1
**involvement [2]** 40/2
73/18
**involves [1]** 52/4
**is 1 percent, 1 [1]** 88/20
**isn't [11]** 5/4 42/12
46/23 57/23 59/23 63/23
67/8 72/19 88/6 102/9
112/8
**isolated [1]** 67/12
**issue [23]** 7/18 29/2
30/13 30/22 31/9 31/9
32/10 36/12 37/19 37/22
44/20 67/9 67/10 67/11
67/18 67/20 70/17
101/14 103/17 103/20
104/10 108/13 113/25
**issued [4]** 35/10 52/22
53/1 56/20
**issues [9]** 7/14 8/12 30/1
39/16 40/23 83/12 100/7
101/13 106/11
**it's [83]** 4/9 4/13 4/21
5/3 6/8 10/8 12/1 16/25
19/16 19/17 20/23 20/24
21/3 21/3 21/4 21/4
21/10 22/5 23/15 25/21
26/17 27/12 27/13 30/1
31/22 32/15 32/15 32/16

## I

**it's... [55]** 33/11 33/20
36/16 38/11 38/12 38/13
41/22 42/10 42/12 43/10
43/10 43/18 43/18 46/2
48/22 55/22 56/4 60/7
60/9 60/16 64/14 66/5
67/3 67/4 67/11 68/21
68/24 69/22 71/12 72/13
74/6 74/8 77/22 77/23
79/18 79/20 86/21 86/23
87/3 87/18 93/8 96/13
96/19 99/15 99/25
100/19 102/2 102/4
102/8 102/11 102/20
103/2 107/8 110/18
114/3
**itself [6]** 32/18 41/20
70/21 81/25 97/18 99/10

## J

**Jack [1]** 2/9
**Jacksonville [1]** 2/6
**January [2]** 1/9 116/19
**Jeffrey [1]** 2/2
**job [1]** 114/13
**jointly [1]** 12/13
**Jonathan [1]** 2/2
**journals [1]** 87/7
**Jr [1]** 3/7
**JUDGE [1]** 1/14
**judgment [2]** 80/23
80/24
**jump [1]** 5/19
**jury [1]** 8/13
**just [56]** 4/9 4/23 6/10
6/18 6/19 9/25 11/20
12/24 13/22 16/10 16/12
18/10 20/9 23/18 30/2
31/2 31/8 31/15 31/17
38/9 40/14 43/11 44/23
46/24 50/3 50/14 52/8
52/14 56/12 57/8 59/9
59/11 63/22 68/9 69/17
72/11 73/15 74/22 76/4
77/6 80/22 88/5 89/1
89/15 90/16 91/7 91/15
91/18 92/11 92/20 94/3
99/5 107/12 108/24
113/6 114/24
**justified [1]** 83/5
**justifies [1]** 83/13

## K

**Kaltofen [1]** 6/25
**KAM [1]** 1/2
**keep [2]** 43/21 100/25
**KENNETH [1]** 1/13
**Kilpatrick [1]** 7/3
**kind [7]** 8/24 11/16
14/12 36/12 54/25 78/15
92/9
**kinda [2]** 4/25 12/2
**knew [1]** 93/15
**know [61]** 4/21 5/14
5/17 5/17 8/25 10/12

11/19 16/10 26/8 26/16
26/17 26/19 26/19 27/1
27/7 28/2 28/25 29/2
29/3 29/23 30/5 30/8
30/16 31/1 31/15 31/16
33/5 33/17 37/12 40/6
41/19 41/19 43/8 52/10
54/17 54/21 54/23 55/1
60/14 62/1 62/14 66/16
66/18 71/12 74/5 83/15
86/13 86/22 89/1 89/5
89/15 90/19 91/17 93/1
93/18 99/18 99/24
100/19 106/25 107/2
115/3
**knowing [1]** 16/18
**knowledge [3]** 40/3
62/16 63/1
**known [6]** 29/24 39/22
41/4 62/13 79/22 85/21
**knows [1]** 26/16

## L

**L-a-u-r-e-n-t-i-u-s [1]**
113/1
**labeled [1]** 97/24
**Lakes [1]** 2/11
**large [3]** 29/15 46/10
47/21
**larger [6]** 39/12 40/18
40/24 98/7 98/24 99/20
**last [11]** 4/4 6/21 8/22
13/9 63/4 95/24 99/17
99/20 104/9 112/24
113/1
**latency [2]** 65/12 65/17
**latent [1]** 65/8
**later [5]** 28/13 46/16
70/11 94/13 103/23
**Lauderdale [2]** 2/4 2/8
**Laurentius [6]** 6/12
112/17 112/20 112/25
113/2 116/8
**law [1]** 8/8
**laying [1]** 12/4
**layman's [1]** 21/15
**laymen's [1]** 20/13
**lead [4]** 36/4 81/13
81/22 102/18
**least [5]** 5/4 24/21 44/5
44/8 100/2
**leave [1]** 4/18
**led [1]** 55/3
**left [3]** 7/21 89/5 94/3
**legend [2]** 25/20 25/22
**legitimate [1]** 61/21
**less [2]** 31/4 36/16
**let [7]** 18/10 18/23 59/6
59/25 89/1 93/1 99/5
**let's [22]** 20/21 44/25
45/1 46/9 51/17 54/11
58/1 59/1 59/13 67/25
68/9 68/14 75/25 76/20
78/23 79/2 81/1 85/7
88/23 97/16 111/7 112/4
**letter [11]** 94/25 95/12

96/1 100/2 105/13
105/13 109/5 109/6
111/5 111/14 111/21
**letting [1]** 89/15
**level [5]** 29/13 29/16
33/13 34/3 84/3
**levels [4]** 83/4 86/18
105/19 105/21
**light [1]** 63/4
**likelihood [2]** 36/4 42/25
**likely [2]** 29/16 49/18
**limitation [3]** 49/23 50/1
50/19
**limited [3]** 39/15 87/3
87/4
**Limiting [1]** 39/9
**line [7]** 20/10 58/9 61/14
64/19 66/21 71/13
104/13
**lined [1]** 71/13
**lines [5]** 7/4 7/5 40/7
54/12 57/11
**linking [1]** 27/16
**links [1]** 84/22
**listed [1]** 24/24
**lists [3]** 22/20 23/1 47/21
**literal [1]** 30/6
**literally [1]** 77/16
**literature [10]** 30/1 33/7
80/15 80/17 80/17 80/19
83/21 87/20 88/1 90/12
**little [15]** 4/16 4/17
11/21 13/5 14/16 36/17
46/9 47/10 83/20 91/18
94/2 97/2 99/6 113/5
**live [1]** 78/6
**lived [1]** 16/16
**lives [1]** 78/6
**located [1]** 79/12
**location [1]** 25/21
**logically [1]** 66/6
**long [1]** 12/8
**longer [1]** 75/2
**looked [16]** 13/25 14/21
23/3 27/19 45/13 51/18
66/3 67/11 73/18 100/15
101/21 106/24 107/6
107/13 109/5 110/2
**looking [18]** 14/18 18/16
26/6 26/10 31/7 32/4
46/7 51/20 79/19 99/10
99/10 100/9 100/12
101/8 106/22 106/23
106/25 109/6
**looks [2]** 38/14 61/2
**loop [1]** 104/22
**lot [5]** 42/12 48/23
111/11 114/13 114/14
**low [2]** 83/4 92/6
**lower [6]** 44/8 65/3 67/2
81/20 82/2 82/10
**lumped [1]** 49/22
**Lumping [1]** 49/16
**lung [2]** 27/18 27/19

## M

**M-a-r-a-i-s [1]** 113/1
**MacNally [16]** 3/2 6/14
34/15 56/6 90/2 91/21
94/12 94/18 95/3 95/24
97/3 100/8 101/13
102/21 116/5 116/7
**MacNally's [1]** 103/16
**magnitude [1]** 72/7
**mail [26]** 1/20 22/13
22/18 23/4 23/12 26/25
58/18 58/22 59/1 59/2
60/24 61/1 62/18 63/20
63/24 64/1 95/3 95/9
95/10 96/8 109/17
109/22 110/2 111/8
111/11 112/8
**mails [6]** 22/11 63/18
63/21 64/15 65/8 94/23
**main [1]** 14/18
**majority [2]** 39/13 40/19
**makes [2]** 5/8 49/1
**making [6]** 33/18 40/5
51/10 60/1 99/9 104/3
**male [2]** 23/11 23/13
23/15 56/2
**males [1]** 56/4
**malignant [16]** 24/25
25/7 32/7 46/14 46/17
48/1 48/1 52/20 59/16
59/17 60/18 64/5 64/12
64/16 66/14 75/2
**manner [1]** 39/6
**map [12]** 24/10 25/13
25/14 25/16 25/20 25/21
26/6 27/6 38/19 38/22
38/23 41/23
**Map 1 [1]** 38/19
**Mara [1]** 2/10
**Marais [26]** 6/12 6/13
30/16 68/7 69/15 71/22
71/24 72/2 72/11 72/12
75/13 100/3 100/5
104/23 104/25 106/10
108/18 108/18 108/20
108/22 112/15 112/17
112/20 112/25 113/10
116/8
**Marais' [2]** 28/18 28/20
**March [1]** 94/24
**mark [2]** 6/20 76/11
**marked [3]** 102/19
106/10 114/16
**MARRA [1]** 1/13
**massive [2]** 9/7 9/23
**match [1]** 39/2
**matched [1]** 27/18
**material [3]** 106/23
107/9 109/12
**materially [2]** 80/1 80/2
**materials [5]** 107/7
107/20 113/25 114/16
115/2
**math [5]** 57/23 62/20
63/4 92/1 93/17
**mathematical [2]** 76/9

76/23
**matter [7]** 5/10 6/19
10/20 87/25 110/21
114/5 116/18
**matters [3]** 4/25 8/2
114/8
**maybe [12]** 4/15 10/14
10/18 11/21 27/14 33/8
37/15 41/22 56/7 60/8
93/3 111/19
**McElroy [1]** 3/3
**me [29]** 4/16 4/16 4/17
4/25 5/4 10/10 10/13
10/16 12/24 18/3 18/10
18/23 22/9 27/4 31/5
40/15 42/10 54/6 59/6
59/11 59/25 60/12 61/7
62/13 68/7 72/21 90/12
99/5 107/17
**mean [30]** 7/24 17/18
17/18 17/25 18/22 24/7
25/3 26/25 28/5 31/9
31/12 32/15 32/21 35/22
37/9 40/2 43/4 55/21
60/20 69/10 72/14 81/22
81/24 83/10 86/20 97/18
99/8 102/9 106/17 110/6
**meaning [1]** 99/8
**meaningful [1]** 7/23
**means [3]** 16/13 31/13
81/11
**meant [6]** 5/25 58/11
86/22 88/9 96/5 111/22
**measure [1]** 42/25
**measures [1]** 113/14
**medical [26]** 29/13 32/6
33/7 48/14 49/1 49/17
51/4 91/2 91/5 91/9
**medical/biological [1]**
49/17
**memoranda [1]** 113/24
**men [1]** 45/13
**mention [1]** 65/24
**mentioned [5]** 26/4 53/9
71/21 91/7 97/6
**merely [1]** 96/15
**Merit [1]** 116/15
**method [3]** 27/13 30/2
31/22
**methodology [2]** 18/3
18/3
**microphone [3]** 13/6
112/22 113/6
**middle [2]** 98/20 113/2
**might [17]** 4/22 5/19
7/15 10/10 10/12 28/13
31/14 51/12 73/7 73/12
77/20 78/1 80/10 86/14
91/19 92/9 97/20
**Mike [1]** 113/3
**million [3]** 82/11 88/17
88/21
**mind [1]** 76/4
**mine [1]** 29/8
**minus [4]** 39/12 40/19
98/10 99/12

## M

**minute [1]** 99/5
**minutes [7]** 5/15 5/20 72/21 89/11 89/18 90/3 109/7
**mischaracterizes [2]** 96/13 110/1
**mischaracterizing [1]** 110/24
**misconception [1]** 43/8
**miscounting [1]** 93/17
**mislabeling [1]** 60/7
**misstated [1]** 63/25
**mistake [2]** 7/11 11/24
**mistaken [1]** 111/20
**modify [1]** 108/7
**moment [2]** 77/7 88/25
**month [1]** 10/5
**months [2]** 10/2 10/18
**most [6]** 10/16 29/16 33/6 34/18 36/16 51/24
**motion [2]** 1/12 9/13
**motivated [1]** 54/17
**move [3]** 23/18 47/9 93/9
**Mr [2]** 116/5 116/7
**Mr. [25]** 6/14 8/21 8/22 10/4 10/5 10/22 11/2 11/20 54/2 56/6 74/9 90/2 91/21 92/11 94/12 94/18 95/3 95/24 97/3 100/3 100/8 101/13 102/21 103/16 107/5
**Mr. Gallagher [3]** 8/21 10/22 54/2
**Mr. Gallagher's [1]** 74/9
**Mr. Gowdy [2]** 8/22 11/20
**Mr. Gowdy's [1]** 11/2
**Mr. MacNally [12]** 6/14 56/6 90/2 91/21 94/12 94/18 95/3 95/24 97/3 100/8 101/13 102/21
**Mr. MacNally's [1]** 103/16
**Mr. Marais [1]** 100/3
**Mr. Scarola [2]** 10/5 92/11
**Mr. Schwinghammer's [1]** 10/4
**Mr. Smith [1]** 107/5
**Ms [3]** 116/4 116/6 116/9
**Ms. [25]** 5/22 5/25 6/6 7/11 13/13 22/9 22/21 24/9 24/20 25/25 38/2 45/5 51/18 68/2 71/21 82/1 89/11 91/14 92/19 109/7 109/9 109/20 110/11 111/15 113/7
**Ms. Hatfield [21]** 5/22 5/25 6/6 7/11 13/13 22/9 38/2 45/5 51/18 68/2 71/21 82/1 89/11 91/14 92/19 109/7 109/9

109/20 110/11 111/15 113/7
**Ms. Newfield [2]** 22/21 24/9
**Ms. Newfield's [2]** 24/20 25/25
**much [12]** 44/9 46/23 62/16 72/7 81/20 81/22 81/24 82/2 82/13 88/7 89/5 112/14
**multiple [30]** 28/25 31/9 31/12 31/14 32/9 36/9 36/12 36/14 36/22 37/4 37/8 37/10 37/11 37/20 37/21 42/18 44/2 44/14 54/7 67/9 75/3 75/12 88/14 100/7 100/24 101/3 101/14 101/17 102/6 102/7
**multiplied [2]** 19/18 30/7
**multiply [3]** 30/3 31/23 68/17
**multiplying [2]** 16/20 101/17
**multitude [1]** 44/3
**myself [6]** 10/20 11/8 82/18 84/19 90/15 97/21

## N

**name [11]** 13/9 13/9 13/10 34/15 36/14 106/5 112/23 112/25 113/1 113/2 113/3
**names [1]** 112/24
**narrowed [1]** 67/12
**naturally [1]** 40/2
**nature [4]** 14/11 29/10 54/22 84/20
**necessarily [1]** 56/1
**necessary [1]** 114/3
**need [10]** 30/13 37/11 37/14 39/3 43/7 70/8 70/11 70/12 74/8 114/19
**needs [1]** 8/11
**neglected [1]** 6/21
**Neither [1]** 85/18
**nervous [3]** 46/20 58/12 59/18
**neural [1]** 48/6
**never [5]** 53/24 92/5 109/16 109/22 110/3
**nevertheless [1]** 31/1
**new [5]** 26/24 52/21 53/21 63/5 97/14
**Newfield [8]** 22/20 22/21 23/5 23/21 23/23 24/4 24/9 95/8
**Newfield's [5]** 23/10 23/17 24/20 25/12 25/25
**next [5]** 10/1 10/17 59/13 73/6 98/21
**nice [1]** 115/7
**night [1]** 8/23
**no [56]** 1/2 6/8 21/16 24/7 29/17 30/21 34/4

35/2 37/20 39/14 39/16 40/2 40/3 40/10 40/13 41/10 43/11 43/14 43/17 43/20 48/8 48/11 48/14 59/4 62/13 66/9 66/14 67/3 67/13 69/11 71/8 75/2 77/21 84/3 84/17 85/25 86/2 86/5 86/9 87/24 90/10 90/10 91/9 91/11 92/14 93/13 93/19 95/4 96/21 97/19 98/1 98/15 105/21 108/7 108/9 112/11
**nonbrain [1]** 96/10
**noncancer [1]** 27/21
**None [1]** 116/12
**nonspecific [1]** 90/14
**Northeast [1]** 3/12
**note [1]** 59/10
**noted [6]** 58/22 59/16 95/17 95/22 96/15 107/21
**nothing [10]** 78/6 80/7 83/13 84/25 85/4 85/15 87/2 88/19 100/22 110/14
**notice [3]** 17/4 23/20 114/20
**noting [1]** 73/2
**notion [1]** 47/10
**notwithstanding [1]** 75/13
**nowhere [2]** 55/4 74/17
**number [83]** 6/23 7/2 7/6 13/18 14/3 14/4 14/9 14/9 14/12 14/13 14/18 16/15 16/17 16/20 16/23 16/25 17/12 17/13 18/4 18/20 18/22 18/23 18/25 19/16 19/19 19/23 20/7 20/11 20/12 20/22 21/7 21/14 21/17 22/6 22/19 22/21 24/23 25/8 25/10 25/11 27/17 28/22 29/6 29/15 30/3 30/6 30/7 30/14 30/17 31/4 41/9 43/13 43/17 43/19 45/23 46/1 52/15 58/22 59/11 61/9 61/10 61/16 61/17 68/24 69/14 69/16 70/6 71/18 71/19 74/7 74/20 80/4 88/20 94/8 95/23 96/16 103/9 104/11 104/24 104/25 106/8 106/11 112/2
**number 0.00004 [1]** 21/14
**number 10 [1]** 6/23
**number 11 [1]** 7/2
**number 12 [1]** 7/6
**number 38 [1]** 61/16
**number 4 [1]** 45/23
**number 460 [2]** 30/17 71/18
**number 5 [2]** 46/1 104/25

**number 7 [2]** 20/7 61/9
**number 8 [2]** 104/24 106/11
**number 8.72 [1]** 61/10
**number eight [1]** 25/8
**number first [1]** 18/23
**numbers [27]** 14/14 17/16 17/19 18/1 18/4 19/1 19/2 19/2 19/7 26/7 26/8 26/21 26/22 66/8 75/9 80/1 80/2 80/10 88/8 94/13 109/13 110/12 111/15
**numerous [1]** 49/8

## O

**oath [1]** 51/1
**object [2]** 105/6 105/9
**objection [5]** 50/6 92/23 96/12 110/1 110/23
**obligation [1]** 65/21
**observe [7]** 20/25 21/5 43/13 43/19 76/3 76/17 79/14
**observed [12]** 14/3 14/9 16/15 20/11 21/17 29/1 41/9 54/18 58/14 60/21 61/5 77/3
**observing [2]** 43/11 102/12
**obtain [2]** 17/18 67/2
**obtained [1]** 18/25
**obviously [2]** 8/18 99/9
**occurred [3]** 14/13 96/6 100/22
**occurrence [1]** 92/17
**occurrences [1]** 20/23
**of 1 percent [2]** 83/6 88/5
**off [2]** 17/2 94/3
**offer [6]** 35/6 65/11 65/15 70/16 71/9 72/17
**offered [1]** 57/14
**offering [1]** 70/10
**Official [1]** 1/19
**often [1]** 100/12
**Oh [1]** 24/5
**okay [74]** 4/4 4/8 5/14 9/25 13/7 13/24 15/2 15/8 15/21 15/24 16/2 17/10 18/12 18/23 21/21 22/5 23/19 24/2 25/24 34/9 34/17 34/23 34/24 38/14 39/1 39/3 39/4 42/4 44/24 45/3 47/11 47/12 49/6 50/10 50/24 52/1 54/1 55/11 56/17 56/18 58/13 58/25 59/15 60/1 60/2 63/8 63/9 63/13 69/18 71/1 75/17 76/6 78/24 79/1 89/1 90/7 90/11 91/25 93/5 94/11 95/14 95/19 96/24 99/5 105/12 108/15 109/11 110/4 110/10

111/9 111/12 112/3 112/10 112/12
**once [1]** 113/24
**oncologist [2]** 48/4 84/15
**oncology [1]** 48/7
**one [77]** 6/18 7/6 7/25 10/4 11/18 12/24 14/13 16/25 20/1 20/5 20/6 22/9 23/18 27/15 28/23 29/23 29/18 29/23 29/23 30/3 31/15 31/17 31/20 38/15 40/23 44/5 44/8 44/21 45/4 45/6 45/24 49/18 51/23 56/9 56/13 57/14 63/21 63/22 64/12 65/9 66/5 66/19 68/1 68/2 68/14 68/18 69/25 70/6 70/15 70/18 70/20 73/6 78/14 79/11 81/10 82/10 83/10 85/11 88/17 90/3 96/19 100/7 100/20 101/1 101/5 101/7 101/13 102/8 102/9 102/21 103/25 104/3 104/12 104/15 106/11 106/12 107/20
**One percent [1]** 81/10
**one's [1]** 77/21
**online [1]** 41/20
**only [16]** 24/3 24/18 26/5 68/1 70/15 83/25 86/4 94/14 94/15 98/13 100/20 101/1 101/5 110/25 114/5 114/11
**open [2]** 43/15 63/9
**operating [1]** 89/2
**opine [1]** 106/18
**opined [1]** 71/9
**opinion [9]** 26/18 32/5 32/10 57/18 71/9 72/18 75/13 91/9 108/4
**opinions [8]** 6/15 34/17 35/6 57/14 62/7 65/11 65/22 111/11
**opportunity [4]** 9/10 53/24 90/5 113/24
**opposed [2]** 43/6
**or 1 [1]** 88/21
**oral [3]** 7/23 10/14 74/19
**orange [1]** 38/24
**order [8]** 4/1 21/23 37/12 63/20 65/9 86/25 97/13 98/6
**ordinarily [1]** 26/17
**original [7]** 15/6 18/1 19/5 19/12 22/6 32/24 52/18
**originally [1]** 36/13
**our [6]** 5/4 5/8 9/6 9/8 11/24 114/12
**ours [1]** 114/25
**ourselves [1]** 12/12
**outcome [1]** 87/16
**outcomes [1]** 84/6

(WITNESSNAME)                                                                 Index: outline..question

# O

**outline** [1] 38/24
**outlined** [1] 113/22
**outside** [2] 99/4 99/22
**outta** [1] 12/12
**over** [16] 6/21 10/1 19/4 20/1 21/20 27/3 29/4 32/12 40/7 49/13 56/7 60/9 61/8 99/19 100/1 104/1
**overall** [6] 16/24 19/18 92/15 99/16 99/24 100/1
**overcome** [1] 88/14
**overreach** [1] 19/9
**Overruled** [2] 96/14 105/10
**overview** [2] 5/5 15/2
**own** [5] 62/2 76/4 89/9 90/16 108/16

# P

**P-o-i-s-s-o-n** [1] 21/11
**P-value** [23] 20/19 20/20 21/2 21/5 21/13 30/3 30/6 31/15 31/16 31/18 31/21 32/23 33/2 42/23 42/25 43/4 43/10 44/7 65/3 67/2 68/15 70/5 92/6
**P-values** [3] 43/8 75/6 75/7
**P.A** [3] 2/3 2/5 2/11
**p.m** [2] 89/19 89/19
**package** [1] 10/20
**page** [22] 1/17 15/23 18/7 18/10 21/19 31/25 38/19 39/5 39/8 49/4 49/13 50/7 50/8 52/15 56/21 58/17 95/9 95/13 97/6 97/22 98/5 101/20
**page 10** [2] 95/9 97/6
**page 15** [2] 49/4 50/8
**page 16** [2] 97/22 98/5
**page 17** [1] 49/13
**page 18** [3] 39/5 39/8 95/13
**page 28** [2] 15/23 101/20
**page 3** [1] 58/17
**page 33** [1] 38/19
**page 6** [1] 21/19
**page 7** [3] 18/7 18/10 31/25
**page 92** [1] 50/7
**PAGES** [1] 1/11
**PAHs** [19] 82/20 83/1 83/4 83/19 84/4 84/5 84/7 84/9 84/12 84/18 84/22 85/4 85/21 86/1 86/14 86/15 86/16 86/18 104/12
**paid** [1] 114/8
**paint** [1] 42/11
**paints** [1] 42/8
**Palenchar** [1] 3/4
**Palm** [13] 1/8 1/20 2/11

2/12 2/14 3/9 17/6 17/13 17/24 45/6 101/16 102/1 102/13
**paragraph** [19] 18/7 21/19 21/22 24/8 32/1 39/8 40/1 40/17 59/14 73/2 73/6 85/11 94/10 94/21 95/15 98/21 105/16 110/12 110/24
**paragraph 10** [2] 18/7 32/1
**paragraph 19** [1] 85/11
**paragraph 22** [1] 24/8
**particular** [9] 16/21 22/13 22/20 26/24 26/25 29/4 32/19 56/9 69/13
**particularly** [3] 16/1 39/16 57/10
**parties** [3] 9/10 10/15 113/23
**partner** [1] 54/2
**partners** [1] 10/4
**parts** [2] 73/18 104/4
**passage** [1] 40/23
**past** [1] 5/16
**pathologist** [1] 23/5
**pathologist's** [1] 22/22
**patient** [2] 47/2 47/2
**pattern** [1] 98/14
**patterns** [1] 98/21
**Peachtree** [1] 3/12
**Peart** [1] 24/14
**pediatric** [25] 13/25 15/14 16/8 16/19 19/9 19/25 20/14 23/1 29/5 32/7 35/8 45/18 52/20 64/16 65/8 66/14 75/2 96/3 96/7 96/22 98/16 98/17 101/15 108/5 113/11
**pediatrics** [2] 18/19 94/14
**people** [10] 27/18 27/19 29/13 30/10 33/7 60/17 71/13 73/16 78/5 114/14
**perceived** [1] 55/14
**percent** [26] 32/25 33/4 33/5 33/5 33/5 33/8 33/8 33/11 33/14 33/21 34/1 34/2 43/4 43/21 81/9 81/10 81/12 81/16 82/11 83/6 83/14 85/13 87/1 87/12 88/5 88/8
**percent, [1]** 88/20
**percentages** [2] 27/20 33/4
**perfectly** [3] 6/15 91/21 111/3
**perform** [2] 73/23 75/11
**performed** [7] 35/7 51/13 57/7 68/14 73/14 73/22 100/23
**perhaps** [2] 29/24 44/7
**period** [30] 12/8 16/7 18/13 19/4 20/2 20/15 27/3 29/5 32/8 32/12

45/24 53/3 54/22 54/23 55/5 55/6 55/14 59/19 63/12 65/7 65/17 67/5 67/12 95/17 98/12 98/17 98/23 104/1 104/2 104/6
**periods** [6] 45/21 47/2 54/13 54/21 65/8 65/12
**permitted** [1] 108/12
**Perry** [2] 22/22 23/6
**Perry's** [1] 23/14
**personal** [2] 48/12 84/3
**personally** [1] 24/9
**perspective** [3] 5/8 48/15 49/17
**Perusing** [1] 99/7
**PGA** [1] 2/13
**phenomenon** [2] 42/5 100/3
**phone** [1] 54/5
**phonetic** [1] 68/8
**phrase** [2] 59/8 77/6
**piece** [4] 22/9 64/14 87/20 87/25
**pistol** [1] 42/6
**place** [3] 16/18 30/21 55/12
**placed** [1] 7/4
**plain** [1] 14/16
**plaintiff** [1] 4/6
**plaintiff's** [1] 109/5
**plaintiffs** [6] 1/4 2/2 12/3 13/19 15/9 15/12
**plaintiffs'** [2] 13/4 92/14
**planned** [2] 5/22 5/23
**planning** [1] 4/14
**plausible** [1] 51/5
**play** [1] 54/5
**please** [8] 4/2 13/3 13/9 76/7 89/21 112/19 112/21 112/24
**plus** [2] 61/17 99/11
**point** [13] 8/5 27/24 56/1 60/14 60/20 60/23 61/18 76/1 76/15 84/21 88/19 90/22 92/22
**pointed** [1] 40/14
**pointing** [1] 107/12
**points** [4] 40/4 61/21 100/13 104/3
**Poisson** [2] 21/8 21/10 21/12
**pollution** [1] 54/20
**polycyclic** [1] 82/17
**Poncy** [1] 2/10
**population** [15] 16/8 16/13 16/18 16/19 19/1 19/3 19/9 19/17 20/9 30/18 30/18 30/23 30/24 46/21 92/15
**populations** [1] 73/22
**portion** [3] 49/5 97/4 98/25
**portions** [2] 58/23 99/19
**position** [3] 6/7 22/20 23/5
**positions** [1] 22/19

**positive** [5] 29/17 41/13 44/4 44/9 67/23
**positives** [2] 36/6 43/22
**possibility** [2] 41/25 97/3
**possible** [11] 5/9 20/23 20/24 37/15 60/7 77/22 77/23 77/25 78/8 88/9 88/11
**possibly** [2] 104/11 108/1
**posttrial** [4] 11/18 12/1 12/14 12/14
**potential** [3] 11/9 35/7 36/23
**potentially** [3] 44/9 44/17 58/7
**practical** [1] 10/1
**PRATT** [9] 1/7 6/20 54/20 55/6 55/15 76/12 78/21 82/7 114/17
**precise** [3] 68/22 69/12 105/14
**precisely** [1] 68/25
**predetermined** [1] 41/8
**preference** [3] 5/11 5/12 7/16
**preferred** [1] 41/18
**preparation** [2] 5/18 57/3
**prepare** [2] 5/3 13/24
**prepared** [8] 4/22 5/19 7/12 7/21 8/5 8/19 60/10 60/11
**presence** [7] 76/3 77/1 78/13 82/5 82/12 85/14 88/11
**present** [7] 8/4 8/17 77/7 77/8 79/7 79/15 86/17
**presentation** [1] 8/2
**presentations** [1] 10/14
**presented** [5] 9/22 29/3 35/19 96/4 115/8
**presents** [1] 54/10
**pressure** [1] 6/6
**presumption** [1] 51/11
**pretty** [2] 4/11 88/7
**prevalence** [5] 83/1 83/4 87/21 88/1 90/13
**previous** [4] 20/10 62/12 62/14 96/6
**primarily** [1] 98/17
**principles** [1] 68/10
**printed** [2] 115/1 115/2
**prior** [18] 28/18 28/21 48/23 62/8 79/3 79/6 81/1 81/6 81/19 82/10 82/23 83/5 83/8 84/1 86/6 86/21 87/12 88/5
**probabilities** [1] 88/10
**probability** [43] 14/10 14/12 14/15 16/21 20/20 21/3 21/4 21/17 31/20 42/21 43/10 43/13 43/17 43/18 68/23 69/4 70/20 76/2 76/16 76/23 79/3

79/6 79/6 79/14 79/18 81/1 81/3 81/6 81/20 82/2 82/10 82/23 83/5 83/9 85/13 86/6 86/21 86/24 87/12 87/18 87/18 88/5 88/11
**probably** [5] 4/21 10/16 11/18 86/23 114/1
**problem** [29] 5/24 6/2 12/17 31/10 31/12 36/9 36/18 36/23 37/4 37/20 41/4 41/17 42/18 44/2 44/14 54/7 67/6 67/8 67/25 75/3 75/12 88/14 100/24 100/24 101/18 102/6 102/8 103/17 103/19
**problems** [5] 4/24 36/4 37/12 54/10 100/8
**procedural** [1] 7/14
**procedure** [4] 8/9 8/14 11/23 12/18
**proceed** [5] 4/4 5/10 5/21 8/19 89/23
**proceedings** [5] 1/12 89/20 114/21 115/11 116/17
**process** [2] 21/22 78/15
**produce** [2] 44/9 101/8
**produced** [4] 14/21 14/24 31/20 52/12
**produces** [1] 101/5
**product** [2] 57/23 93/16
**pronouncing** [1] 68/5
**pronunciations** [1] 90/20
**proper** [3] 71/10 72/3 72/17
**proposal** [2] 11/17 12/11
**propose** [1] 12/13
**proposed** [6] 8/13 10/11 39/7 40/11 40/25 73/15 115/3
**provide** [5] 8/13 37/15 37/17 37/23 45/1
**provided** [6] 16/10 25/25 38/4 53/21 71/2 108/3
**provides** [1] 21/25
**pull** [5] 13/8 25/16 58/18 94/6 112/22
**pure** [1] 80/7
**purely** [1] 20/22
**purport** [1] 58/2
**purpose** [2] 8/9 103/24
**purposes** [2] 49/16 89/8
**pushed** [1] 114/6
**put** [14] 6/9 10/18 22/25 34/19 38/11 41/12 64/2 64/5 64/25 66/10 66/11 75/19 92/12 111/18
**putting** [1] 62/5

# Q

**quantity** [1] 17/3
**question** [27] 9/9 9/15 15/11 23/2 24/5 29/11

**Q**

**question... [21]** 35/16
43/15 50/8 50/12 50/18
50/22 55/10 56/6 62/17
83/20 92/23 92/24 93/9
103/16 105/12 107/10
107/16 107/16 107/18
109/19 110/5

**questions [15]** 5/6 8/5
9/12 14/11 14/11 34/6
34/16 50/25 61/22 63/7
93/19 108/9 108/23
112/11 113/15

**quibble [1]** 72/2

**quickly [4]** 44/23 47/18
50/5 85/7

**quite [2]** 27/24 83/19

**quotation [1]** 83/16

**quote [4]** 14/13 50/12
56/2 75/7

**quoted [6]** 24/24 30/6
56/9 59/11 75/8 100/16

**quoting [1]** 62/9

**R**

**R's [1]** 80/19

**radionuclides [1]** 106/7

**raise [2]** 13/2 112/18

**raised [4]** 9/12 101/13
107/10 108/13

**raising [1]** 61/21

**random [6]** 20/22 32/14
32/16 32/17 43/25 108/6

**range [2]** 33/12 80/10

**Rapp [1]** 3/11

**rate [17]** 16/24 19/18
27/14 30/10 32/24 32/24
43/12 43/20 61/12 86/12
92/16 98/11 98/13 98/15
98/16 99/21 100/18

**rates [20]** 14/23 19/11
19/12 19/15 26/23 27/23
27/25 32/11 32/21 33/19
43/12 51/10 51/12 92/15
98/7 98/14 99/1 99/15
102/11 110/19

**rather [1]** 102/22

**ratio [3]** 14/8 14/8 17/3

**read [6]** 11/2 18/12 60/25
85/8 90/15 99/5

**reading [4]** 4/11 40/14
99/13 111/4

**reads [2]** 40/17 58/22

**ready [4]** 4/4 5/4 9/17
112/15

**real [3]** 4/24 30/21 36/25

**really [8]** 4/25 30/14
37/12 60/6 80/22 82/13
92/25 113/21

**Realtime [1]** 116/16

**reason [10]** 30/21 39/15
40/10 40/13 62/13 65/13
65/15 66/9 91/10 108/7

**reasonable [5]** 32/5 56/8
72/24 74/6 80/10

**reasons [2]** 65/6 96/19

**recalculation [13]** 21/23
37/17 37/23 47/10 51/25
52/4 52/16 53/7 53/16
54/10 63/5 65/4 75/11

**recalculations [8]** 44/18
44/19 47/7 51/17 53/4
53/12 53/13 54/8

**recall [46]** 16/3 16/4
18/16 23/11 28/20 38/22
59/8 59/10 61/3 61/16
95/2 95/4 95/6 96/1 97/4
97/9 97/10 97/22 98/1
100/10 100/11 100/12
102/24 102/25 103/18
103/20 103/21 103/21
103/24 104/6 104/7
104/13 105/2 105/13
105/13 105/14 105/23
106/11 106/12 106/14
107/20 107/23 109/6
110/2 110/8 111/22

**recalling [1]** 111/12

**recent [2]** 35/25 72/1

**Recently [1]** 92/14

**recess [1]** 89/19

**recognize [3]** 38/19 59/2
59/5

**recognized [1]** 49/22

**recognizing [1]** 11/9

**recollection [3]** 19/5
59/7 106/9

**reconfirm [1]** 62/20

**reconfirmed [3]** 57/2
62/7 62/21

**record [9]** 6/20 9/7 9/23
12/6 74/10 76/13 103/3
114/20 116/17

**recorded [1]** 61/17

**Recross [2]** 109/2 116/7

**Recross-examination [1]**
109/2

**red [2]** 79/12 88/23

**redefine [1]** 16/12

**redirect [12]** 5/25 6/1
34/8 89/8 89/13 90/5
93/21 93/23 108/19
108/20 111/19 116/6

**reduce [1]** 61/13

**reduced [1]** 98/24

**refer [3]** 24/3 76/4 90/18

**reference [3]** 31/15
38/23 39/3

**references [1]** 23/3

**referencing [1]** 95/3

**referred [3]** 28/11 36/20
90/14

**referring [15]** 17/19
17/20 24/6 25/5 36/7
62/10 63/25 76/8 77/9
87/16 87/17 95/4 105/20
106/2 109/10

**refers [4]** 25/12 25/13
81/2 101/4

**reflect [1]** 86/22

**reflected [1]** 57/22

**reflecting [1]** 9/21

**refresh [1]** 59/6

**regard [3]** 7/16 8/14
12/18

**regarding [6]** 10/23 35/7
95/16 97/24 104/10
105/3

**Regardless [1]** 51/3

**region [4]** 41/20 41/22
99/19 100/1

**Registered [1]** 116/15

**rejecting [1]** 32/16

**related [8]** 19/11 39/14
40/20 55/6 106/11
106/24 107/3 107/4

**relates [1]** 65/7

**relating [1]** 19/13

**relatively [1]** 12/8

**relevance [1]** 86/10

**relevant [2]** 82/7 87/14

**reliable [4]** 35/14 35/20
37/4 61/20

**relied [7]** 60/24 109/12
110/11 111/22 111/25
112/1 112/5

**rely [11]** 12/7 26/17
35/13 35/18 37/2 58/18
63/20 63/22 110/10
111/10 111/14

**relying [6]** 36/21 59/3
62/19 82/16 86/4 111/21

**remaining [1]** 4/10

**remains [1]** 68/18

**remember [10]** 28/13
51/20 54/4 60/9 60/10
66/8 103/22 106/5 110/4
111/17

**remind [1]** 107/17

**remiss [1]** 114/6

**remotely [1]** 73/17

**rendering [1]** 26/18

**repeat [4]** 15/11 35/16
100/25 109/19

**repeated [1]** 100/9

**reply [1]** 12/10

**report [84]** 13/24 14/17
15/23 18/1 18/2 18/2
19/5 19/13 19/13 19/22
22/7 22/17 22/22 23/4
23/5 23/10 23/14 27/5
28/11 28/12 28/14 29/8
30/16 35/23 35/25 36/1
36/5 37/6 37/8 37/21
38/9 38/10 39/6 45/1
47/19 49/4 52/18 52/23
52/25 53/1 53/4 53/9
53/10 53/14 55/8 55/8
55/24 56/10 56/22 56/24
57/14 58/17 59/9 59/23
60/6 61/14 62/1 62/24
63/2 63/3 63/4 67/3
67/10 67/21 69/14 70/2
72/1 75/4 75/8 87/5
91/24 94/5 94/7 94/14
94/16 95/1 95/24 100/17
106/2 106/5 109/14
111/16 111/25 112/6

**reported [9]** 22/15 26/24
27/1 60/16 60/19 65/16
73/19 96/16 113/14

**reporter [6]** 1/18 1/19
5/17 114/12 116/15
116/16

**reporting [3]** 36/23 62/2
65/8

**reports [15]** 13/18 14/21
28/18 28/21 34/20 57/3
62/8 62/12 62/14 62/15
65/12 84/1 96/6 106/4
106/6

**represent [4]** 36/25 61/6
80/9 88/9

**represents [3]** 32/11
74/20 79/3

**request [1]** 10/24

**require [1]** 77/12

**requires [1]** 10/10

**reserve [2]** 34/8 114/2

**residents [3]** 39/13
40/19 94/24

**resolve [1]** 100/2

**Respectfully [1]** 111/10

**respectively [2]** 58/24
95/18

**respects [3]** 39/25

**respond [2]** 5/6 12/9

**responding [1]** 6/5

**response [7]** 9/7 11/19
11/20 29/20 37/21 60/20
95/1

**responsible [1]** 14/19

**rest [3]** 14/6 77/5 100/21

**restricted [1]** 29/5

**result [14]** 31/7 31/21
43/1 43/5 68/11 69/2
70/3 80/2 81/22 81/23
82/1 82/7 101/6 101/9

**resulted [1]** 82/2

**resulting [1]** 69/4

**results [5]** 36/24 37/10
56/13 75/10 102/18

**return [2]** 42/2 89/25

**reverse [1]** 79/18

**review [18]** 8/1 15/17
16/4 17/16 23/23 23/24
26/5 28/9 28/16 97/1
98/2 98/3 98/4 98/5
101/20 103/18 103/19
113/24

**reviewed [8]** 9/2 14/24
17/25 23/21 28/17 59/9
62/12 64/24

**reviewing [4]** 47/13
94/17 95/2 105/2

**revise [1]** 62/13

**RICHARD [5]** 1/3 4/7
13/4 13/10 116/3

**right [112]** 4/5 5/19 7/9
10/3 11/20 12/16 12/25
13/2 13/2 18/18 31/17
33/10 34/8 35/4 35/8
35/11 36/18 37/13 37/18
37/24 38/12 39/22 39/23

40/8 41/1 41/10 42/6
42/9 42/21 44/10 45/7
45/21 45/23 46/3 46/6
46/14 47/16 48/2 49/24
53/2 53/7 53/17 53/22
53/25 57/9 58/3 58/6
58/9 58/12 58/19 59/6
61/15 62/20 63/18 64/20
64/22 64/25 66/12 66/22
67/23 68/3 69/16 70/9
71/10 71/15 72/4 72/18
73/16 73/24 74/21 76/22
77/9 78/14 78/18 79/5
79/12 79/19 82/5 82/17
83/2 83/22 84/4 85/1
85/20 88/20 88/21 89/10
89/23 93/5 93/20 95/11
102/13 108/21 109/4
109/24 110/11 110/13
110/16 111/16 111/22
112/2 112/13 112/14
112/15 112/18 112/22
113/16 113/21 114/2
114/10 114/23 115/5

**risk [7]** 20/25 41/6 41/12
49/9 49/18 49/19 50/13

**Ritchie [1]** 2/10

**RMR [2]** 1/18 116/22

**Road [1]** 3/12

**Rodenia [1]** 24/14

**rough [1]** 55/21

**roughly [2]** 29/2 71/14

**rounded [1]** 17/2

**row [2]** 19/21 20/5

**ruling [1]** 113/25

**run [1]** 93/1

**running [1]** 12/25

**S**

**S-m-i-t-h [1]** 13/11

**sales [1]** 7/4

**Samarippa [4]** 24/13
24/19 25/1 25/7

**same [19]** 14/5 16/24
36/16 40/17 44/19 49/10
49/18 50/15 52/14 61/18
63/11 63/22 66/17 73/22
73/23 86/17 86/18 98/21
111/4

**same 4 [1]** 73/22

**sample [2]** 25/21 30/22

**satisfied [2]** 16/16 62/1

**save [2]** 11/8 89/14

**saw [4]** 9/1 25/25 110/6
110/6

**say [33]** 6/8 12/8 30/2
31/1 31/16 31/19 37/8
40/15 50/12 56/8 56/16
58/14 59/4 68/14 69/22
71/8 72/11 72/23 72/25
73/1 73/6 74/5 77/8 81/2
82/10 85/7 86/24 97/16
97/20 98/20 110/11
110/25 111/22

**saying [14]** 33/11 33/16
43/10 69/11 74/25 76/23

**S**

**saying... [8]** 83/18 99/14 99/20 99/23 102/8 102/25 107/3 107/4
**says [15]** 24/9 25/20 33/15 40/1 43/16 58/16 59/13 59/16 72/6 72/9 84/25 86/5 96/11 98/6 107/12
**Scarola [4]** 2/9 2/10 10/5 92/11
**scenario [1]** 88/9
**schedule [4]** 10/23 12/12 12/13 113/23
**Schlesinger [1]** 3/7
**Schwinghammer [1]** 3/7
**Schwinghammer's [1]** 10/4
**scientific [1]** 32/6
**scope [5]** 92/20 105/6 105/9 106/16 107/5
**Scott [1]** 3/4
**screen [8]** 15/20 38/11 38/12 38/13 54/6 66/10 70/4 103/9
**SCTL [1]** 106/13
**SCTLs [1]** 105/24
**Sean [1]** 3/2
**Searcy [1]** 2/10
**seat [2]** 13/1 91/16
**seated [3]** 4/3 89/22 112/21
**second [16]** 12/25 17/13 19/21 20/5 22/17 28/12 28/14 42/3 45/9 53/9 58/21 58/22 79/11 92/18 110/15 111/1
**section [7]** 25/22 83/16 97/23 99/5 99/17 99/17 109/9
**seeing [4]** 38/22 80/11 95/6 105/13
**seem [1]** 41/22
**seemed [2]** 18/3 27/4
**seems [3]** 31/5 41/2 56/8
**seen [6]** 8/25 25/19 87/5 109/16 109/22 110/3
**segments [1]** 71/14
**selected [2]** 39/25 55/14
**selection [15]** 36/15 41/4 41/7 41/12 41/17 41/25 42/1 54/16 67/16 67/18 67/20 97/3 97/11 97/12 97/13
**send [1]** 115/1
**sense [4]** 5/8 10/16 49/1 49/17
**sent [1]** 22/13
**sentence [5]** 40/17 50/3 72/14 99/20 105/18
**separate [3]** 56/3 56/11 106/4
**separately [1]** 45/13
**September [2]** 94/25 95/12
**September 2014 [1]**
94/25
**September 26 [1]** 95/12
**set [13]** 4/21 12/14 31/13 45/6 45/9 45/12 53/12 53/13 55/2 81/6 82/23 106/4 106/6
**sets [1]** 28/8
**settle [1]** 56/17
**seven [24]** 14/4 20/1 20/11 20/25 21/3 21/4 21/5 22/3 22/4 23/1 24/18 24/24 29/4 52/12 58/24 58/24 59/16 59/23 60/6 61/1 61/5 61/7 95/18 95/18
**several [3]** 22/14 100/18 110/3
**sex [1]** 23/8
**SFranklinUSDC [1]**
1/20
**shape [1]** 84/22
**share [2]** 49/10 50/15
**Sharon [7]** 22/12 58/18 59/1 63/18 94/23 109/17 112/8
**sharp [1]** 104/1
**sharpshooter [7]** 36/18 42/2 42/5 67/8 99/16 99/25 100/2
**she's [5]** 24/9 60/1 99/13 99/16 99/23
**Sheldon [1]** 2/3
**shifting [1]** 40/7
**Shipley [1]** 2/11
**shorter [1]** 83/20
**shorthanded [1]** 42/23
**shortly [1]** 108/13
**should [18]** 9/11 9/15 11/23 12/2 12/11 29/24 34/25 55/25 60/6 60/8 60/22 61/2 73/6 78/14 93/1 96/17 106/22 114/4
**shouldn't [1]** 60/6
**show [3]** 51/13 56/20 103/25
**showed [8]** 17/23 22/9 63/22 98/11 100/21 109/17 109/23 111/15
**showing [2]** 104/5 111/21
**shows [1]** 61/1
**shrinking [1]** 40/25
**sic [2]** 41/3 111/11
**sides [1]** 7/15
**significance [5]** 29/12 29/16 30/11 67/14 113/14
**significant [31]** 15/13 29/19 31/7 31/20 35/15 35/20 36/5 36/24 42/9 43/24 51/14 57/19 67/22 68/18 69/2 69/6 69/22 70/7 70/14 70/21 70/23 74/13 74/16 75/10 92/4 92/6 100/21 101/6 101/8 102/9 102/18
**significantly [2]** 61/8 113/11
**similar [4]** 29/10 54/10 54/11 98/13
**simple [4]** 30/2 43/21 68/20 68/21
**simpler [1]** 29/23
**simplest [2]** 31/22 31/23
**simply [6]** 16/15 30/3 32/20 35/13 35/18 41/12 60/9
**since [4]** 8/11 12/3 35/24 60/9
**single [6]** 31/16 31/17 72/19 74/20 87/20 87/25
**sir [34]** 12/24 13/2 13/5 13/9 15/22 16/4 16/6 16/11 16/13 17/4 17/22 18/5 18/21 18/24 19/19 20/12 33/2 33/15 33/20 34/3 61/23 75/7 87/10 92/2 101/20 102/1 102/2 112/18 112/21 112/23 113/4 113/19 113/19 115/10
**SIRs [3]** 33/12 98/24 99/19
**sit [2]** 61/19 91/16
**site [8]** 25/16 25/21 26/6 76/2 76/16 79/7 79/16 81/3
**sites [2]** 28/5 28/6
**situations [1]** 101/2
**six [3]** 20/2 20/9 52/13
**six-year [2]** 20/2 52/13
**sixth [1]** 7/11
**size [1]** 71/14
**slash [3]** 58/5 60/8 61/3
**slightly [4]** 20/4 62/17 70/24 113/6
**slow [1]** 75/25
**small [1]** 43/7
**smaller [1]** 81/23
**Smith [22]** 4/7 6/19 13/4 13/10 13/16 17/4 34/5 34/13 35/4 57/18 81/19 85/12 89/25 91/2 93/7 93/11 93/25 107/5 109/4 111/7 111/10 116/3
**smokers [1]** 27/20
**smoking [3]** 27/16 27/23 27/25
**soil [2]** 86/22 105/20
**something [19]** 9/23 10/19 27/14 29/25 32/13 32/17 32/20 38/1 42/21 44/8 68/2 78/1 78/5 86/25 89/25 90/6 90/8 93/9 97/16
**Sometimes [1]** 56/2
**somewhat [2]** 5/18 40/24
**somewhere [2]** 62/25 73/3
**sorry [18]** 10/7 15/11 21/9 22/24 26/13 32/6 33/24 35/16 42/15 81/9
**87/15 91/13 105/5 107/18 109/19 109/25 110/23 113/18
**sort [12]** 10/10 14/14 20/25 28/7 29/12 29/14 30/1 33/6 38/24 66/6 79/9 79/18
**sounds [2]** 5/11 74/6
**source [7]** 22/16 22/17 32/19 52/10 66/5 94/18 95/22
**sources [7]** 14/2 22/6 23/8 63/19 90/24 94/13 111/18
**South [2]** 2/8 3/8
**Southeast [1]** 2/3
**SOUTHERN [1]** 1/1
**spanning [1]** 14/1
**speak [2]** 26/14 32/13
**speaking [1]** 29/2
**special [4]** 48/6
**specific [8]** 29/9 30/14 49/15 65/15 77/9 77/13 84/8 84/17
**specifically [7]** 13/25 16/19 19/24 30/24 39/7 83/13 99/18
**specified [1]** 29/4
**spell [2]** 13/9 112/23
**spills [1]** 105/22
**spontaneously [1]** 6/6
**spreadsheets [1]** 23/6
**stand [5]** 6/13 57/18 62/24 63/3 112/17
**standard [3]** 12/2 29/12 30/10
**standardize [1]** 14/23
**standardized [2]** 14/7 17/3
**standpoint [1]** 10/1
**start [8]** 38/8 58/1 73/1 75/25 76/20 79/2 81/1 109/4
**started [2]** 15/9 15/12
**starting [3]** 10/3 50/7 76/20
**state [12]** 16/24 19/11 22/12 29/25 30/22 32/22 36/1 45/10 76/5 83/19 87/22 102/15
**stated [6]** 20/4 35/22 51/8 51/9 51/16 90/23
**statement [3]** 55/15 55/17 88/16
**STATES [2]** 1/1 1/14
**stating [1]** 49/14
**statistical [16]** 29/7 30/11 35/10 36/3 42/20 43/1 44/3 51/3 51/13 55/20 57/8 67/13 70/20 77/11 100/17 113/13
**statistically [29]** 29/19 31/7 35/15 35/20 36/5 36/24 37/13 43/6 43/24 51/14 57/19 67/22 68/11 68/18 69/2 69/6 69/22
**70/7 70/23 74/13 74/15 75/10 92/4 100/21 101/5 101/8 102/9 102/17 102/18
**statistician [1]** 35/5
**statisticians [1]** 29/13
**statistics [3]** 29/25 43/9 48/15
**stay [2]** 5/16 77/6
**staying [1]** 47/18
**step [1]** 113/19
**Stephen [5]** 1/18 3/11 116/15 116/21 116/22
**Steven [1]** 2/7
**Stewart [1]** 3/8
**still [13]** 11/8 20/24 30/9 31/3 31/5 31/6 34/1 34/2 67/4 69/22 81/21 81/25 99/18
**stop [1]** 102/22
**stopped [2]** 19/22 65/25
**stops [1]** 65/13
**story [1]** 42/5
**Street [3]** 1/19 2/6 3/5
**strictly [1]** 48/22
**strike [2]** 21/25 26/3
**strong [1]** 32/11
**studied [1]** 38/20
**studies [4]** 27/16 54/16 84/11 84/19
**study [30]** 14/24 15/1 27/7 27/19 27/12 27/17 27/22 27/24 28/3 28/9 28/15 32/24 36/12 39/9 39/21 40/3 40/12 40/25 41/3 41/9 41/16 41/18 56/8 97/8 97/25 101/11 104/17 105/3 106/3 107/6
**stuff [1]** 4/12
**subject [10]** 4/24 5/9 6/10 10/24 44/13 44/17 44/19 94/4 94/15 104/9
**subjective [2]** 80/22 80/24
**submission [3]** 11/2 11/5 11/12
**submissions [1]** 12/14
**submit [2]** 8/7 8/12
**submitted [7]** 52/24 61/25 62/10 65/18 76/8 93/15 106/3
**submitting [1]** 113/23
**substance [1]** 108/1
**substances [6]** 90/13 90/18 90/21 90/23 91/7 91/12
**substantial [1]** 105/21
**substantially [1]** 92/16
**such [6]** 28/4 30/24 33/18 60/19 90/18 97/18
**suffers [2]** 36/3 36/9
**sufficient [1]** 88/14
**suggest [4]** 8/10 55/13 86/9 91/11
**suggested [7]** 8/15 11/22

(WITNESSNAME) Index: suggested..universe

## S

**suggested... [5]** 54/19 60/17 65/7 111/19 111/20
**suggesting [1]** 8/23
**suggestion [2]** 4/9 11/2
**suggestions [2]** 7/19 7/25
**Suite [4]** 2/13 3/5 3/9 3/13
**sum [1]** 52/12
**summary [1]** 96/5
**summation [1]** 9/16
**supplement [1]** 9/6
**support [1]** 83/8
**supporting [3]** 80/15 80/16 80/17
**suppose [1]** 101/4
**sure [11]** 5/13 12/20 35/17 36/7 38/10 52/14 90/11 90/22 102/19 106/1 114/22
**surfaced [1]** 39/17
**surprise [2]** 4/22 5/18
**surround [1]** 98/9
**surrounding [1]** 100/1
**Survey [1]** 111/2
**survive [1]** 71/6
**survives [1]** 70/15
**sworn [2]** 13/4 112/20
**system [4]** 44/3 46/20 58/12 59/19
**systematic [2]** 32/14 32/17

## T

**table [32]** 14/15 15/22 16/1 17/15 18/10 19/21 22/2 22/7 22/8 26/10 33/3 33/6 33/7 45/23 46/1 47/19 47/21 51/20 52/8 53/19 55/25 56/9 57/7 60/5 60/11 61/7 100/16 102/15 102/19 104/3 104/4 111/18
**Table 1 [3]** 51/20 57/7 60/5
**Table 8 [1]** 47/19
**tables [6]** 16/4 21/12 45/1 53/18 66/7 102/20
**Tables 4 [1]** 45/1
**take [33]** 5/15 5/20 9/11 11/4 19/3 19/5 23/17 24/8 30/2 30/5 30/21 31/5 31/18 32/23 35/24 37/6 37/9 37/11 59/25 65/10 73/7 75/6 75/7 75/18 89/14 94/2 95/5 95/7 96/24 99/5 103/8 104/2 104/21
**taken [3]** 89/19 96/7 96/22
**takes [2]** 20/1 20/3
**taking [8]** 17/1 18/25 20/8 28/5 28/6 32/9 37/3 61/17

**talk [18]** 12/12 18/23 39/6 44/23 47/9 47/10 51/17 58/8 63/14 67/25 69/17 78/23 78/25 79/11 92/1 97/2 111/7 114/14
**talked [11]** 37/16 38/1 42/1 44/21 45/4 47/24 52/15 54/7 68/1 68/2 106/4
**talking [11]** 7/14 27/2 28/4 30/25 38/9 52/16 57/8 87/14 89/25 97/20 107/11
**talks [3]** 27/6 110/14 110/18
**target [4]** 42/8 42/11 42/12 105/20
**teach [1]** 43/9
**Teaf [11]** 82/24 83/1 83/12 83/17 83/18 83/22 85/3 85/7 85/10 85/18 90/15
**Teaf's [8]** 83/9 84/25 85/8 85/25 86/2 86/4 86/5 87/5
**TECHNOLOGIES [3]** 1/6 34/16 112/16
**technology [1]** 104/22
**tell [17]** 7/20 9/25 11/20 13/9 62/16 65/22 69/12 69/24 70/13 78/10 78/17 78/20 82/13 92/9 104/23 110/7 112/23
**telling [1]** 4/23
**tells [2]** 78/14 88/19
**Ten [1]** 89/18
**term [3]** 36/17 36/19 42/1
**terms [7]** 5/18 20/13 28/2 28/7 45/16 45/20 54/12
**test [14]** 29/12 29/14 29/18 30/3 31/16 31/17 31/18 44/7 56/2 56/13 68/18 70/19 78/12 80/13
**tested [1]** 67/13
**testified [5]** 24/17 85/3 91/3 109/16 109/20
**testify [2]** 6/13 77/11
**testimony [23]** 8/3 14/14 14/19 24/21 51/1 53/20 65/18 71/2 71/4 73/11 74/19 80/4 84/21 86/2 90/15 90/15 93/16 97/4 101/21 102/21 108/3 116/3 116/8
**tests [31]** 29/7 29/15 30/4 30/8 30/9 31/14 31/19 31/20 44/3 44/8 55/20 55/23 55/25 56/1 56/3 56/5 56/7 56/9 56/11 57/8 68/14 68/15 70/18 70/20 70/22 72/22 73/2 73/7 73/14 73/23 101/5
**Texas [6]** 36/17 42/2

42/5 42/6 99/15 99/25
**thank [34]** 7/9 12/22 12/23 13/12 15/2 34/5 34/7 34/9 34/10 35/2 42/16 70/10 89/16 89/17 91/20 93/20 101/24 101/25 103/4 103/6 108/9 108/11 112/13 112/14 113/6 113/19 114/6 114/10 114/12 115/6 115/9 115/10
**Thanks [1]** 115/7
**that 1 percent [1]** 81/12
**that there [1]** 54/14
**that's [81]** 5/11 6/10 7/24 8/8 8/14 11/24 11/24 14/14 14/18 17/2 17/4 17/10 17/14 18/6 20/7 24/7 25/11 25/14 31/17 33/1 33/21 37/19 37/19 38/13 40/15 42/10 48/22 50/23 51/16 52/18 54/1 55/21 55/21 55/21 58/5 58/16 60/14 61/9 62/16 64/7 64/12 65/16 66/5 68/24 69/6 71/17 71/17 71/19 72/9 72/25 73/11 74/9 75/23 79/11 81/16 81/18 82/18 83/7 83/10 83/16 83/24 83/24 83/25 84/1 84/2 86/14 87/2 88/7 90/20 90/25 90/25 91/21 99/23 103/8 106/8 106/24 108/24 110/6 111/4 111/25 113/16
**the 1 percent [1]** 83/14
**the 11th [1]** 22/14
**theory [1]** 30/14
**there's [26]** 7/22 9/16 9/18 9/23 12/9 21/7 21/7 29/11 30/21 43/4 47/21 55/25 56/16 74/17 62/24 65/5 65/16 74/17 83/13 86/5 86/9 90/6 97/19 99/21 99/25
**therefore [1]** 99/15
**thereof [1]** 105/4
**they're [7]** 27/1 46/7 47/6 80/15 80/16 105/20 106/19
**they've [1]** 33/10
**thing [7]** 13/8 23/18 36/16 66/17 74/8 92/9 114/11
**things [13]** 9/8 10/2 10/11 11/13 43/24 45/16 45/20 55/1 56/2 66/7 87/5 103/25 104/15
**think [42]** 4/17 4/20 5/15 5/21 7/22 9/4 9/11 10/16 11/4 11/17 11/23 11/24 12/1 12/2 12/5 12/11 14/15 20/4 20/6 21/15 22/7 22/8 23/12

23/12 28/12 35/22 37/16 46/22 50/23 63/10 66/6 72/13 72/14 74/9 81/8 84/9 86/23 90/5 99/23 108/18 108/22 113/21
**thinks [1]** 8/9
**third [2]** 37/16 53/20
**those [30]** 8/1 8/12 8/17 8/19 10/11 11/13 14/6 19/18 20/9 23/8 28/21 32/22 38/7 50/25 52/12 53/18 56/4 57/12 62/13 64/17 75/9 79/21 86/2 90/21 91/11 96/15 96/17 100/18 101/2 102/16
**though [8]** 38/8 44/7 56/5 60/18 60/25 61/2 101/17 102/17
**thought [3]** 9/9 63/24 63/25
**thoughts [2]** 8/18 11/15
**three [15]** 6/21 19/25 20/10 24/16 24/18 37/15 37/15 38/7 46/2 56/5 63/21 98/8 98/10 99/11 99/11
**three-year [1]** 46/2
**through [15]** 8/3 10/10 16/7 19/10 20/15 45/24 46/2 64/2 83/19 86/20 101/16 103/9 103/12 103/14 108/5
**throw [1]** 104/22
**times [3]** 6/12 74/1 86/17
**timing [1]** 12/19
**today [13]** 7/23 9/16 11/14 34/15 35/6 51/7 61/19 72/4 78/25 89/12 93/16 104/10 114/4
**today's [1]** 62/10
**together [9]** 10/19 22/25 37/16 45/17 47/11 47/14 49/2 49/23 111/18
**told [4]** 11/22 11/22 61/23 62/7
**tonight [1]** 5/16
**took [7]** 27/17 27/18 46/19 54/3 66/21 71/12 74/1
**top [1]** 110/12
**total [6]** 20/1 23/1 30/23 58/24 61/3 98/25
**totally [1]** 55/1
**tough [1]** 4/25
**towards [3]** 13/8 104/6 112/23
**toxic [1]** 107/25
**toxicologist [2]** 84/5 84/13
**toxicology [1]** 87/4
**Tracy [9]** 22/20 23/5 23/10 23/17 23/20 23/23 24/4 25/12 95/7
**traditionally [1]** 29/14
**transcript [3]** 1/12 24/1

116/17
**trial [3]** 10/2 10/4 10/5
**trihalomethane [1]** 7/7
**true [10]** 48/22 68/24 82/15 83/24 83/24 83/25 84/1 92/2 101/11 102/6
**truly [2]** 35/15 35/20
**try [4]** 13/5 21/2 67/25 113/5
**trying [8]** 14/10 27/13 43/16 67/4 70/19 79/20 83/14 103/25
**Tuesday [1]** 10/3
**tumor [3]** 24/22 48/9 49/8
**tumors [16]** 32/7 46/17 46/20 46/20 47/15 47/22 47/25 49/8 51/6 52/21 54/24 59/18 59/19 59/22 59/23 59/23
**turn [10]** 39/5 43/16 49/4 49/13 56/21 57/6 60/4 77/5 88/23 94/2
**turned [1]** 19/23
**Turning [1]** 50/5
**turns [1]** 70/21
**two [18]** 4/5 7/3 17/5 20/6 24/17 24/18 28/8 29/22 33/25 37/16 56/10 62/8 64/5 70/13 78/25 79/22 91/2 102/16
**type [4]** 49/18 50/9 50/14 59/16
**types [11]** 47/14 47/21 49/8 49/8 49/10 49/15 49/16 49/23 50/13 54/16 87/8

## U

**ubiquity [1]** 83/15
**Uh [5]** 42/13 64/6 64/8 68/4 68/13
**Uh-huh [5]** 42/13 64/6 64/8 68/4 68/13
**under [6]** 50/8 51/1 65/21 77/15 84/11 114/13
**underlie [1]** 80/22
**understand [17]** 4/16 4/23 6/15 9/20 24/5 41/19 50/18 54/23 56/24 60/15 65/21 74/25 85/10 87/10 91/5 108/16 114/19
**understanding [9]** 5/9 11/21 17/14 24/21 87/3 90/20 90/22 97/19 107/25
**understood [3]** 9/5 47/13 50/21
**unidentified [5]** 78/17 78/20 79/7 81/3 86/11
**unique [1]** 72/19
**UNITED [5]** 1/1 1/6 1/14 34/16 112/16
**universe [1]** 70/24

**U**

**unknown** [1] 86/11
**Unless** [1] 86/13
**unlikely** [2] 49/9 50/14
**unreliable** [1] 107/11
**until** [2] 15/3 110/15
**update** [1] 52/24
**updated** [2] 35/11 35/24
**updating** [1] 37/20
**upon** [2] 12/7 26/18
**upper** [2] 55/22 68/23
**upwards** [2] 55/19 56/15
**us** [19] 5/1 8/4 8/12 9/19
9/23 13/9 45/1 65/22
71/5 74/18 78/10 78/14
78/17 78/20 108/23
110/7 112/23 112/24
115/1
**used** [17] 6/22 6/24 7/3
7/8 17/17 19/2 21/12
21/23 27/12 29/25 69/10
69/15 75/4 89/4 89/11
104/7 109/13
**using** [4] 19/10 75/4
83/5 98/8
**UTC** [2] 103/5 114/17
**utility** [3] 49/24 50/2
50/19

**V**

**valid** [8] 37/9 37/13 43/6
57/19 60/15 75/3 81/21
81/25
**value** [29] 20/8 20/19
20/20 21/2 21/5 21/6
21/13 30/3 30/6 31/15
31/16 31/18 31/21 32/23
33/2 42/21 42/23 42/25
43/4 43/10 44/7 65/3
67/2 68/15 68/24 70/5
80/18 81/23 92/6
**values** [4] 43/8 75/6 75/7
75/7
**variable** [1] 20/3
**variations** [1] 99/18
**variety** [2] 84/6 90/24
**various** [5] 14/2 14/10
29/21 33/4 37/7
**Vega** [1] 8/15
**verbatim** [1] 59/8
**version** [1] 25/14
**versus** [4] 45/6 45/10
46/24 82/11
**very** [15] 10/1 10/17
27/15 27/16 29/25 31/22
48/20 82/7 85/4 89/6
92/6 100/13 101/21
112/14 115/8
**video** [1] 24/7
**view** [1] 37/20
**viewed** [1] 24/7
**VOLUME** [1] 1/11

**W**

**want** [58] 4/9 4/13 4/13
4/18 5/15 5/15 5/21 6/3

**well-defined** [1] 41/20
**well-established** [1]
97/17
**well-presented** [1] 115/8
**went** [6] 26/5 39/6 47/3
53/18 62/18 103/24
**weren't** [4] 8/2 55/1
60/18 87/7
**West** [5] 1/8 1/20 2/12
3/5 3/9
**what's** [9] 9/22 13/19
14/11 31/19 61/6 70/20
92/22 110/23
**whatever** [6] 8/1 28/8
33/17 33/17 33/19 74/5
**Wheeler** [1] 3/11
**where** [31] 7/4 9/13 12/3
13/24 15/3 20/7 22/1
22/3 22/4 23/13 29/8
29/15 30/2 37/17 39/6
39/8 40/17 50/12 55/4
55/13 61/16 71/4 71/12
71/17 71/17 71/19 74/17
94/3 102/11 110/12
111/17
**whether** [33] 4/18 9/15
10/13 24/20 24/23 32/13
32/14 37/12 48/1 49/1
51/5 60/16 69/16 72/2
72/21 75/13 78/17 78/20
82/14 84/17 86/1 86/10
88/20 90/12 90/19
100/12 100/13 100/14
103/18 103/23 106/12
106/18 110/14
**while** [4] 5/3 7/14 9/20
10/8
**WHITNEY** [9] 1/7 6/20
54/20 55/7 55/15 76/12
78/21 82/7 114/17
**Whitney-UTC** [1]
114/17
**whole** [12] 13/8 16/24
17/14 19/14 19/15 30/19
31/18 54/17 55/3 56/7
102/15 104/2
**why** [22] 11/10 11/11
24/18 26/8 26/15 26/21
26/22 32/19 38/8 39/15
40/3 40/6 65/24 73/12
88/8 91/17 93/9 96/1
96/8 106/25 107/24
115/4
**wide** [1] 105/22
**widely** [2] 29/25 29/25
**widespread** [2] 83/19
87/8
**willing** [3] 5/16 5/20
31/1
**wind** [2] 69/4 80/2
**within** [9] 16/11 20/14
24/17 32/5 32/7 32/21
39/15 83/15 99/22
**without** [3] 20/25 36/22
37/3

6/9 6/17 6/19 9/17 9/17
9/19 9/23 10/13 11/1
11/19 12/7 23/18 33/6
33/9 33/9 37/9 39/5 39/7
40/16 42/2 42/19 47/10
51/17 51/23 52/14 56/20
57/6 57/10 58/8 63/11
63/14 69/17 73/13 74/22
77/6 78/25 79/11 89/1
89/13 89/25 90/8 91/17
91/24 92/1 92/9 105/18
107/15 108/13 108/24
109/4
**wanted** [4] 89/3 89/3
90/6 91/1
**wasn't** [3] 36/19 37/9
96/5
**Watkins** [17] 22/12
26/25 58/18 59/2 59/2
59/13 60/16 62/4 62/18
94/23 96/9 97/24 98/20
99/3 101/15 109/17
109/23
**Watkins'** [8] 22/17 23/4
23/12 60/24 61/1 63/18
64/15 112/8
**ways** [7] 14/17 28/24
29/21 37/15 47/24 100/9
101/7
**we'll** [6] 5/10 6/25 10/25
23/18 56/17 69/16
**we're** [25] 4/4 5/12 7/14
8/19 9/5 9/5 9/24 15/19
26/5 27/2 28/4 30/25
31/6 32/16 41/12 54/25
70/17 70/24 70/24 79/18
79/20 87/16 97/19
102/11 113/22
**we've** [8] 4/12 9/7 11/11
11/12 30/8 38/23 52/10
106/3
**Web** [1] 87/6
**week** [3] 8/3 11/25 68/8
**weekend** [1] 115/7
**Weinberg** [1] 3/11
**welcome** [2] 34/18 89/21
**well** [78] 9/20 9/25
17/21 23/25 26/16 28/23
30/2 30/6 30/10 31/13
31/19 32/15 33/10 33/16
34/22 35/1 36/2 36/8
36/19 36/20 37/19 37/23
40/1 40/14 41/20 41/22
46/7 46/22 48/22 49/21
49/22 50/3 53/1 54/14
55/8 55/21 59/6 59/13
60/7 60/12 61/23 61/25
64/24 65/18 67/3 67/11
70/6 70/24 72/2 72/13
72/17 72/19 72/25 75/6
80/12 80/16 80/19 80/24
81/21 82/1 88/7 89/8
90/5 92/22 97/17 98/2
98/9 99/9 99/11 100/16
101/11 106/21 107/2
109/16 109/20 110/10

111/1 136/8

**withstand** [1] 75/12
**witness** [12] 5/4 6/9 13/4
26/12 26/14 89/9 89/14
105/8 108/14 108/16
111/3 112/20
**witnesses** [2] 4/5 4/15
45/13
**women** [1] 45/13
**won't** [1] 77/24
**wording** [1] 72/13
**words** [4] 49/9 50/14
104/7 114/14
**work** [6] 10/25 12/11
12/20 15/3 97/16 107/5
**working** [2] 15/9 15/12
**works** [2] 68/10 74/9
**world** [2] 6/12 88/2
**wouldn't** [5] 81/22 82/1
82/8 92/7 102/7
**writes** [4] 39/9 49/7 83/1
85/10
**writing** [1] 8/8
**written** [34] 10/15 11/12
21/14 23/25 34/22 51/21
52/23 53/21 54/5 55/8
55/12 55/16 55/18 56/25
57/4 62/6 63/5 65/11
65/18 70/14 71/2 71/4
72/10 72/25 73/1 73/11
74/17 75/23 77/11 82/22
83/25 93/4 93/12 93/15
**wrongly** [2] 20/5 76/5
**wrote** [2] 62/15 111/13

**Y**

**yeah** [26] 13/24 24/6
32/2 46/4 46/12 46/18
47/23 66/13 68/16 69/3
71/3 73/5 74/3 74/6 74/7
74/25 75/21 79/4 83/3
87/15 92/13 95/6 97/5
101/22 110/17 112/7
**year** [5] 20/2 46/2 52/13
59/19 60/9
**years** [14] 14/1 19/9
19/18 20/9 20/10 23/2
29/5 46/16 52/9 64/17
65/9 65/10 65/17 67/12
**yellow** [1] 38/24
**Yep** [2] 17/8 45/19
**yes** [210]
**yet** [9] 8/25 11/2 11/6
11/6 11/7 11/7 24/16
26/5 46/19
**Yoakley** [1] 3/8
**you'd** [6] 5/20 56/20
62/20 70/6 91/17 109/22
**you'll** [7] 6/15 11/4
12/20 18/16 80/2 90/5
107/17
**you're** [28] 9/12 17/20
31/15 34/18 35/6 36/7
38/10 38/16 40/1 40/4
43/11 43/16 53/19 55/17
60/20 61/21 62/9 62/10
67/21 74/25 84/13 84/15
85/3 89/5 102/8 106/2

108/15 108/25
**you've** [20] 4/19 8/24
8/25 13/15 13/16 16/10
26/4 41/22 48/20 56/24
61/20 66/10 67/16 72/14
72/15 89/4 89/11 90/8
99/6 99/17
**your 1 percent** [1] 87/12
**your 1-percent** [1]
81/16
**yours** [1] 101/11
**yourself** [1] 13/1

**Z**

**zero** [5] 59/17 59/17
64/16 102/20 102/20
**zip** [13] 39/12 39/12
40/18 40/18 97/8 98/9
98/10 98/11 98/16 98/22
98/25 99/11 99/12
**Zobel** [1] 2/13