UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO.:  9:13-cv-80928 MARRA**
**(Consolidated Action: Lead Case)**

RICHARD COTROMANO, et al.,
        Plaintiffs,

vs.

UNITED TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, a Connecticut corporation,
and PALM BEACH AGGREGATES, LLC, a
Florida corporation,
        Defendants.                              **CASE NO.: 9:13-cv-80928 MARRA**
_____/

**COTROMANO ET AL PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO**
**LIABILITY AND AGAINST CERTAIN AFFIRMATIVE DEFENSES**

**CONTENTS**

AUTHORITIES  …………………………………………………………. iv

INTRODUCTION…. ………………………………………………………… 1

ARGUMENT …………………………………………………………………… 2

I.    Unrebutted Expert Testimony May Ground Summary Judgment on Matters Calling for
      Expertise, Such as the Standard of Care for Environmental Remediation and
      Epidemiological Inference  …………………………………………………….. 3

II.   Unrebutted Expert Testimony Establishes that UTC Breached the Standard of Care
      Applicable to Its Remediation Practices    ………………………………………….. 4

III.  Unrebutted Expert Testimony Also Establishes a "Discharge or Other Condition of
      Pollution" for which UTC Is Strictly Liable under Florida Statutes § 376.313(3)  ……….. 4

IV.   No Reasonable Jury Could Fail to Find a "Reasonably Close Causal Connection"
      Between UTC's Breach of the Standard of Care, or Its § 376.313(3)-Covered Pollution,
      and the Pediatric Brain Cancer Cluster in the Acreage  …………………………………… 5

      A.  Dr. Dominici's unrebutted opinion identifies UTC as the cause of the Acreage
          cancer cluster by inference from undisputed cancer-incidence data coupled with
          unrebutted expert opinion on contamination, exposure, and disease process ……….. 6

      B.  Unrebutted expert testimony and facts ground Dr. Dominici's inference, first, that
          UTC caused the Acreage to be contaminated with radioactive carcinogens ……….. 6

          1.  Unrebutted expert testimony establishes that thorium 230 found in the
              Acreage matches that found at UTC's site    ………………………………... 7

          2.  Nothing supports an inference that the Th-230 found in the Acreage that
              matches the Th-230 found at UTC's site came from anywhere but UTC     ... 8

          3.  Undisputed facts establish how UTC enabled its radioactively-
              contaminated soil to reach the Acreage, which an unrebutted expert
              confirms occurred ………………………………………………………… 8

      C.  Unrebutted expert testimony contributes to Dr. Dominici's inference that UTC's
          contamination of the Acreage, in turn, caused the cancer cluster…………………… 8

V.    UTC Has Not Disputed Plaintiffs' Evidence that the Cancer Cluster Caused Them
      "Some Actual Harm"—a Diminution of the Value of Their Homes in the Acreage  …... 10

      A.  Testimony by the owner may establish the fact of loss of home value   …………... 10

ii

B. Plaintiffs' testimony that their home values were diminished by the cancer -cluster stigma is uncontradicted and supported by unrebutted local-real-estate-professional opinion ……………………………………………………… 13

C. Alternatively, Dr. Kilpatrick's particular conclusion that the cancer cluster diminished the value of Acreage homes is not rebutted ……………………….. 13

VI. To Prove Amount of Damages, Plaintiffs Need to Provide Only a Reasonable Yardstick ……………………………………………………………… 14

VII. UTC's Affirmative Defenses to Liability Are Inapplicable or Unsupported ………... 15

A. Affirmative Defense 1 fails because the referenced dose limit, 10 C.F.R. § 20.1301, applies only to a "licensed operation" while UTC had neither an operative license for thorium in 2000 nor licenses for Th-230, Sr-90, or Cs-137 in the forms found on its property and in the Acreage ……………………………………………… 15

B. UTC's affirmative defenses based on the Price Anderson Act (PAA) are not applicable ………………………………………………………………... 16

1. Defenses 3, 28, 29, 30, and 44 do not apply because property value loss is not a "nuclear incident" and the PAA does not preempt state-law tort claims regarding radioactive materials that it does not govern ………... 16

2. Defense 25 regarding the inapplicability of punitive damages for claim indemnified by the federal government fails because UTC is not indemnified under the PAA ……………………………………………… 17

C. The statute of limitations defense fails as this action was filed within four years of the cancer cluster designation and for several independent reasons ………... 17

1. The pendency of the predecessor putative action claiming the damages alleged by these plaintiffs, filed within any arguably-applicable limitations period, also rendered these claims timely ……………………… 18

2. Plaintiffs' claims are further rendered timely by operation of the FRCD, by the equitable implications of UTC's concealment, by chapter 376, and by the continuing nature of the injury …………………………………… 18

D. UTC's asserted defenses to liability under Florida Statutes § 376.313(3) are not supported ……………………………………………………………... 19

E. UTC's other affirmative defenses lack evidentiary support or do not articulate a defense to the Cotromano Plaintiffs' claims ……………………………… 20

CONCLUSION ........................................................................................... 20

# AUTHORITIES

## Cases

*Adinolfe v. UTC*, 768 F.3d 1161 (11th Cir. 2014) ............................................................ 2

*Aguilar v. Ocwen Loan Servicing, LLC*, 2018 U.S. LEXIS 26288 (N.D. Tex. Feb. 20, 2018).... 18

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)................................................. 18

*Anderson v. Am. Family Ins. Co.*, 350 F.Supp.3d 1295 (M.D. Ga. 2018) ................................... 11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 5

*Aramark Uniform and Career Apparel, Inc. v. Easton*, 894 So. 2d 20 (Fla. 2004)........................ 2

*Armstead v. Allstate Prop. & Cas. Ins. Co*, 2016 U.S. Dist. LEXIS 31272 (Mar. 11, 2016)....... 12

*Aruanno v. Martin County Sheriff*, 343 Fed. Appx. 535 (11th Cir. 2009)................................... 19

*Calde v. GEICO Gen. Ins. Co.*, 838 F.3d 1113 (11th Cir. 2016)................................................ 3, 6

*California Financial, LLC v. Perdido Land Dev. Co.*, 303 F. Supp. 3d 1306 (M.D. Fla. 2017) . 19

*Chmura v. Monaco Coach Corp.*, 2006 U.S. Dist. LEXIS 11217 (M.D. Fla. Mar. 20, 2006)..... 12

*Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127 (10th Cir. 2010) (*"Cook I"*) ............................ 16, 17

*Crown v. Parker*, 462 U.S. 345 (1983) ................................................................. 18

Fla. Dep't of Envtl. Prot. v. Fleet Credit Corp., 691 So. 512 (Fla.4th DCA 1997)................. 19

*Gadsden Indus. Park, LLC v. United States*, 111 F. Supp. 3d 1218 (N.D. Ala. 2015)................ 12

*Henderson v. Demars*, 2013 LEXIS Dist. 38574 (S.D. Fla. Mar. 20, 2013) ............................... 15

*In re Chiquita Brands Int'l Inc.*, 2019 U.S. Dist. LEXIS 153856 (S.D. Fla. Sept. 5, 2019) .......... 2

*In re Trasylol Prods. Liab. Litig. – MDL-1928*, 709 F.Supp.2d 1321 (S.D. Fla. 2010) ................ 4

*Ins. Co. of the West v. Island Dream Homes, Inc.*, 679 F.3d 1295 (11th Cir. 2012) ...................... 3

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292 (11th Cir. 2011)....................... 2

*Lieupo v. Simon's Trucking, Inc.*, 2019 Fla. LEXIS 2349 (2019) ...................................... 5

*Lynch v. Merrell-National Laboratories*, 830 F.2d 1190 (1st Cir. 1987)....................................... 4

*McCain v. Fla. Power Corp.*, 593 So2d 500 (Fla. 1992)........................................................ 2

*Morsch v. JP Morgan Chase Bank*, 2018 U.S. Dist. LEXIS 190523 (M.D. Fla. Nov. 7, 2018).. 12

*National Tel. Coop. Ass'n v. Exxon Corp.*, 38 F.Supp. 2d 1 (D.C. Cir. 1998) ............................ 3

*Nebula Glass Int'l v. Reichhold, Inc.*, 454 F.3d 1203 (11th Cir. 2006)........................................ 15

*Neff v. Kehoe*, 708 F.2d 639 (11th Cir. 1983)............................................................... 10

*Norris v. Baxter Healthcare Corp.,* 397 F.3d 878 (10th Cir. 2005) ................................................ 4

*O'Connor v. Boeing N. Am.*, 2005 U.S. Dist. LEXIS 46226 (C.D. Cal. August 18, 2005) ........... 3

*Proudfoot Consulting v. Gordon*, 576 F.3d 1223 (11th Cir. 2009) ................................ 15

*Ready v. United/Goedecke Servs.*, 939 N.E.2d 417 (Ill. 2010)...................................... 6

*South Grande View Dev. Co. v. City of Alabaster*, 2017 U.S. Dist. LEXIS 193666 (N.D. Ala. Nov. 22, 2017) .................................................................................... 12

*Thermo v. BesTop, Inc.*, 2019 U.S. Dist. LEXIS 115848 (E.D. Mich. July 12, 2019) ................. 3

*United States ex rel. TVA v. An Easement & Right-Of-Way over 6.09 Acres of Land*, 140 F.Supp.3d 1218 (2015) ............................................................................... 13

*Vieira v. County of Sacramento*, 2019 U.S. Dist. LEXIS 195426 (N.D. Cal. Nov. 8, 2019) ......... 6

*Webb v. Carnival Corp.*, 2017 U.S. Dist. LEXIS 103856 (S.D. Fla. July 6, 2017)...................... 3

*Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1250 (11th Cir. 2018) ......................... 10, 11

*Zaki Kulaibee Establishment v. McFlicker*, 788 F.Supp.2d 1363 (S.D. Fla. 2011)..................... 15

**Statutes**

Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601, et seq. ................................................................. 18

Federally Required Commencement Date (FRCD), 42 USC § 9658 ...................................... 1, 17

Fla. Stat. § 376.301(21)................................................................................ 5

Fla. Stat. § 376.301(7).................................................................................. 5

Fla. Stat. § 376.308 ............................................................................... 19, 20

Fla. Stat. § 376.313(3)............................................................................. 2, 4, 5, 20

Florida Water Quality Assurance Act (WQAA), Fla. Stat. §§ 376.30–376.317. ........................... 4

O.C.G.A. § 24-7-701(b) ............................................................................ 11, 12

Price Anderson Act (PAA), 42 U.S.C. § 2210........................................................ 16, 17

**Regulations**

10 C.F.R. § 20.1002 .................................................................................. 15

10 C.F.R. § 20.1301 .................................................................................. 15

**Rules**

Federal Rule of Evidence 701 ...................................................................... 10, 11

Federal Rule of Evidence 702......................................................................... 10

# INTRODUCTION

Plaintiffs Cotromano, DeCarlo, Dunsford, and Featherston (hereinafter "Plaintiffs") request summary judgment in Plaintiffs' favor on liability on all their claims (Counts III, V, and VII of the Consolidated Complaint) and against all affirmative defenses directed to those claims and an order directing trial as to amount of damages and entitlement to punitive damages only.

The present record—following closure of expert disclosures and fact-based discovery in July and October 2019—demonstrates Plaintiffs are entitled to summary judgment on liability. UTC has failed to rebut the facts adduced by Plaintiffs and expert testimony showing that UTC's remediation practices both breached the applicable standard of care and produced a "discharge or other condition of pollution" triggering strict liability, which caused the pediatric brain cancer cluster in the Acreage; that knowledge of that cluster deterred potential buyers and induced owners to sell at lower prices, resulting in diminution of the value of Acreage properties; and that Plaintiffs have offered a reasonable yardstick to measure that decreased value.

Regarding UTC's various affirmative defenses, first, those invoking the Price Anderson Act (PAA) do not apply here. UTC has not rebutted the opinion that it failed to comply with the applicable federal regulations for its use of nuclear materials and has failed to demonstrate that the use was indemnified. In addition, the PAA is inapplicable because the property value loss alleged here does not constitute a "nuclear incident."

Nor is this action time barred. Its August 16, 2013, filing was within four years of August 28, 2009, the date the cluster was designated. Any of the plaintiffs' claims accruing earlier than that designation would still be timely under a predecessor putative action claiming the damages alleged by these plaintiffs. Further, because this is not a Price Anderson action, a discovery rule—the Federally Required Commencement Date (FRCD)—applies. Finally, any delay in ascertaining UTC's liability for the cluster was caused by UTC's affirmative concealment.

UTC's affirmative defenses directed to the strict liability claim under Florida Statutes chapter 376 are not supported, and UTC's other affirmative defenses are either not directed to these Cotromano Plaintiffs' claims or are otherwise inapplicable or defeated by undisputed facts.

Accordingly, because UTC's duty to the plaintiffs is established as a matter of law and injury to the plaintiffs proximately caused by breach of that duty, as well as by contamination for which UTC is strictly liable, is established by unrebutted or undisputed evidence, Plaintiffs are entitled to summary judgment on liability and an order directing trial on amount of damages.

**ARGUMENT**

Plaintiffs are entitled to summary judgment on liability on all claims, leaving only amount of damages and entitlement to punitive damages for trial.

Summary judgment should be granted where the moving party demonstrates that there is no genuine issue of material fact for trial. Fed. R. Civ. P. 56; *In re Chiquita Brands Int'l Inc*., 2019 U.S. Dist. LEXIS 153856, at *157 (S.D. Fla. Sept. 5, 2019). If the movant carries that initial burden, the non-moving party but must produce "relevant and admissible evidence beyond the pleadings" that establish a triable issue of fact, *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1315 (11th Cir. 2011), and "[a] court need not permit a case [or defense] to go to a jury when the inferences drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Chiquita*, 2019 U.S. Dist. LEXIS at *157.

Counts V and VII allege negligence, which, under Florida law, a plaintiff proves by demonstrating (1) "that the defendant owed a duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks," (2) "that the defendant failed to conform to that duty," (3) a "reasonably close causal connection between the nonconforming conduct and the resulting injury to the claimant," and (4) "some actual harm." *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007) (cited in *Adinolfe v. UTC*, 768 F.3d 1161, 1171 (11th Cir. 2014)).

Since a nearby residential community falls within the "foreseeable zone of risk" within which the operator of a facility such as UTC's owes a duty of reasonable care as a matter of law, *see McCain v. Fla. Power Corp*., 593 So2d 500, 503 (Fla. 1992), negligence liability here depends on showing the standard of care applicable in these circumstances, its breach, and a "reasonably close connection" between that breach and "some actual harm" to the plaintiffs.

Count III alternatively alleges a violation under Florida Statutes § 376.313(3), which imposes strict liability for a "discharge or other condition of pollution" within the meaning of that section. *Aramark Uniform and Career Apparel v. Easton*, 894 So. 2d 20, 21 (Fla. 2004).

Plaintiffs' claims meet the summary judgment standard for the applicable substantive elements of liability as follows: (I) Unrebutted expert testimony may ground summary judgment on matters calling for expertise, such as the standard of care for environmental remediation and epidemiological inference. Here, unrebutted expert testimony and undisputed facts establish that (II) UTC breached the standard of care applicable to its remediation practices, (III) UTC is

2

responsible for a "discharge or condition of pollution" triggering strict liability, and (IV) there is a more than "reasonably close causal connection" between the breach of the standard of care, the contamination of the Acreage with radioactive carcinogens, and, in turn, the pediatric brain cancer cluster. Moreover, (V) UTC has not disputed Plaintiffs' evidence that the cancer cluster caused "some actual harm"—that is, some diminution of the value of their homes in the Acreage, the particular amounts of which (VI) Plaintiffs may establish at trial by a "reasonable yardstick," and (VII) UTC's affirmative defenses to liability are inapplicable or unsupported.

## I. Unrebutted Expert Testimony May Ground Summary Judgement on Matters Calling for Expertise, Such as the Standard of Care for Environmental Remediation and Epidemiological Inference

Unrebutted expert testimony on an issue that requires expert evidence will permit summary judgment on that issue:

> [T]he trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness, where . . . the testimony bears on technical questions . . . beyond the competence of lay determination.

*Calde v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1127 (11th Cir. 2016) (quoting *Webster v. Offshore Food Service, Inc*., 434 F.2d 1191, 1193 (5th Cir. 1970).[1]

Here, the first issue requiring expert evidence is the standard of care for remediation of hazardous waste and whether UTC's actions conformed to it. "Expert testimony is required to define the standard of care when the subject matter is beyond the understanding of the average juror." *Ins. Co. of the West v. Island Dream Homes*, 679 F.3d 1295, 1298 (11th Cir. 2012).[2] In particular, "expert testimony is required to establish the standard of care . . . in negligence cases involving alleged environmental contamination." *O'Connor v. Boeing N. Am*., 2005 U.S. Dist. LEXIS 46226, at *56 (C.D. Cal. Aug.18, 2005) (chemical, radiological contamination of environment by rocket engine manufacturing and testing facility).[3] And such an expert's role includes "opin[ing] as to whether the defendant's conduct *violated* the standard of care" where

---

[1] *See also Thermo v. BesTop, Inc.*, 2019 U.S. Dist. LEXIS 115848 (E.D. Mich. July 12, 2019) (summary judgment on patent infringement where defendant failed to provide expert rebuttal).

[2] *See also Webb v. Carnival Corp*., 2017 U.S. Dist. LEXIS 103856, at *14 (S.D. Fla. July 6, 2017) ("beyond the common knowledge of the average lay person").

[3] *See also National Tel. Coop. Ass'n v. Exxon Corp*., 38 F.Supp. 2d 1, 21–28  (D.C. Cir. 1998) (expert testimony essential on standard of care for claims of negligent storage and operation of underground gasoline storage takes and negligent remediation).

3

"specialized knowledge is necessary to understand the defendant's obligations." *In re Trasylol Prods. Liab. Litig. – MDL-1928*, 709 F.Supp.2d 1321, 1333 (S.D. Fla. 2010) (emphasis added).

Epidemiological inference regarding whether such environmental contamination has, in turn, caused a disease cluster also depends on expertise. *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005) ("Epidemiology is the best evidence of general causation in a toxic tort case. . . . [W]here epidemiology is available, it cannot be ignored."); *Lynch v. Merrell-National Laboratories*, 830 F.2d 1190, 1193-97 (1st Cir. 1987) (affirming summary judgment where plaintiff offered only criticism of defendant's epidemiological evidence with no epidemiological evidence of its own).

## II.      Unrebutted Expert Testimony Establishes that UTC Breached the Standard of Care Applicable to Its Remediation Practices

Licensed Site Professional Brain Moore concluded that UTC's soil remediation practices were "woefully beneath the standard of care for the remediation of soils at a site including a history of radioactive materials burial and a host of hazardous materials violations." SOF ¶ 51. His opinion is based on a chain of uncontroverted facts demonstrating UTC's soil was transported as fill material to the Acreage. SOF ¶¶ 11-38, 45-50. Moreover, the Cotromano Plaintiffs' individual merits expert disclosure included the opinion of Michael Gossman that UTC failed to educate its staff regarding the disposal of nuclear materials, failed to keep an inventory of materials, and basically failed to maintain ALARA standards. SOF ¶ 53. His opinion is based on undisputed evidence regarding UTC's attempts to dispose unlicensed materials. SOF ¶¶ 39-48. UTC has not submitted any rebuttal to those opinions in this action.

## III.      Unrebutted Expert Testimony Also Establishes a "Discharge or Other Condition of Pollution" for which UTC Is Strictly Liable under Florida Statutes § 376.313(3)

Florida imposes strict liability for a "discharge or other condition of pollution" covered by Florida's Water Quality Assurance Act (WQAA)[4] and not authorized by Chapter 403[5]:

> [I]n any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. . . . The only defenses to such cause of action shall be those specified in s. 376.308.

Fla. Stat. § 376.313(3); *see also Aramark*, 894 So.2d at 21.

---

[4] Florida Statutes §§ 376.30–376.317.
[5] With exceptions, for petroleum storage facilities and dry-cleaning facilities. Fla. Stat. § 376.313.

A "discharge" within the scope of section 376.313(3) includes "any spilling, leaking, . . . emitting, . . . releasing, or dumping of any pollutant or *hazardous substance* which occurs and which affects lands and the surface and ground waters of the state" that is not otherwise regulated by the Pollutant Discharge Prevention and Control Act, which governs pollution of coastal waters and lands.[6] And "hazardous substance[s]" are those defined by CERCLA.[7]

Holding an injury from battery acid spilled on a highway fell under 376.313(3), the Florida Supreme Court recently emphasized the mandate to liberally construe the WQAA:

> the Legislature found and declared that spills, discharges, and escapes of pollutants "as a result of procedures taken by private and governmental entities involving the storage, transportation, and disposal of such products pose threats of great danger and damage to the environment of the state, to citizens of the state, and to other interests deriving livelihood from the state.

*Lieupo v. Simon's Trucking, Inc*., 2019 Fla. LEXIS 2349, at *6–7 (2019).

Here, unrebutted expert testimony establishes that UTC discharged a hazardous substance as defined by CERCLA, namely that Th-230, Th-232, Sr-90, and Cs-137 were all found on the UTC site at levels above U.S. EPA Preliminary Remediation Levels, alongside benzopyrene and metals detected at levels magnitudes above FDEP Soil Clean Up Target Levels (SCTLS). Soils at these sites were transported by Acreage-based fill providers. These contaminants were then found at UTC homes. DEP had found levels above its own standards for benzopyrene and arsenic at these homes. SOF ¶¶ 50. And UTC has offered no evidence that that discharge was authorized under Chapter 403 nor, as detailed in Part VII below, to support a defense to liability under § 376.308. Moreover, the transport occurred when UTC was concealing its use of a local soil thermal treatment facility, not only violating the standard set forth in Fla. Admin. Code. 62-773 at the time but submitting false reports in violation of §307.308.

## IV.  The No Reasonable Jury Could Fail to Find a "Reasonably Close Causal Connection" Between UTC's Breach of the Standard Care, or Its § 376.313(3)-Covered Pollution, and the Pediatric Brain Cancer Cluster in the Acreage

Summary judgment on causation is proper when a reasonable jury would find it more likely than not that the defendant's breach caused the alleged harm. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–250 (1986); *Vieira v. County of Sacramento*, 2019 U.S. Dist.

---

[6] Fla. Stat. § 376.301(7) (emphasis added).
[7] Fla. Stat. § 376.301(21).

LEXIS 195426, at *5 (N.D. Cal. Nov. 8, 2019) ("any reasonable juror would be compelled to conclude that the harm to [the plaintiff] was proximately caused by his own criminal conduct"); *Ready v. United/Goedecke Servs.*, 939 N.E.2d 417, 424 (Ill. 2010) ("No reasonable jury would have concluded that [the defendant] was not a proximate cause of the accident.").

On causation here, Plaintiffs have disclosed the opinions of Dr. Francesca Dominici, Dr. Marco Kaltofen, Dr. William Sawyer, Dr. Ari Perry, Dr. Richard Smith, dosimetrist Bernd Franke, and licensed site professional Brian Moore. UTC, by contrast, has not disclosed any experts relevant to the cancer cluster's causation. (Rather, its only disclosed expert is Richard Roddewig, on the issue of home value loss.) SOF ¶ 9, 10, 49, 51, 53, 59.

That UTC's breach of the standard of care more than likely caused the cancer cluster is both the conclusion of Dr. Dominici (IV.A) and the combined implication of the unrebutted expert opinion and facts showing UTC's radioactive contamination of the Acreage (IV.B) and the unrebutted expert opinion, in turn, linking that contamination to the cancer cluster (IV.C).

No reasonable jury could fail to concur given such undisputed facts and unrebutted expert testimony, testimony that it "would not be at liberty to disregard," *Calde*, 838 F.3d at 1127.

### A. Dr. Dominici's unrebutted opinion identifies UTC as the cause of the Acreage cancer cluster by inference from undisputed cancer-incidence data coupled with unrebutted expert opinion on contamination, exposure, and disease process

Dr. Francesca Dominici, bio-statistician and data scientist, reviewed the incidence data and statistics alongside the unrebutted opinions of Plaintiffs' experts in nuclear physics, nuclear site remediation, neuropathology, toxicology, and dosimetry and concluded that those "reports . . . by experts across a wide range of fields . . . all point[] to UTC's contaminating activities as the cause of elevated female pediatric brain cancer risk in the Acreage." DE 550-95, at 22. Based on her expertise in biostatistics and the development of statistical methods for analysis of large complex data sets and for combining information across heterogeneous data sources, Dr. Dominici explained that assessment of causation in a case such as this requires consideration of biological, toxicological, epidemiological, and statistical evidence. *Id.*

### B. Unrebutted expert testimony and facts ground Dr. Dominici's inference, first, that UTC caused the Acreage to be contaminated with radioactive carcinogens

The record shows UTC's contamination of the Acreage as follows: unrebutted expert opinion establishes that the massive deposit of thorium 230 (Th-230) found in Cynthia

Santiago's tissue after her death matched deposits of that radionuclide discovered at UTC's site (subsection 1); no evidence shows that that matching Th-230 traveled from the Acreage to UTC or independently contaminated both places from some other common source (subsection 2); but the inference that UTC was the source of the Acreage contamination aligns with undisputed facts demonstrating the pathways for Th-230 and other radioactive carcinogens from UTC to have reached the Acreage (subsection 3).

1. ***Unrebutted expert testimony establishes that thorium 230 found in the Acreage matches that found at UTC's site***

Dr. Marco Kaltofen's opinions updated through March 2018—disclosed and unrebutted in the present proceeding, SOF ¶ 49—include findings that there is thorium present in the tissue preserved in Cynthia Santiago's 2009 pathology slide, specifically a particle is "strikingly similar" to "an almost identical particle" in the thorium contamination found at UTC, SOF ¶ 55, leading him to conclude that

> [t]he UTC particle ***matches*** both the Corbett particles and the thorium particle found in the C. Santiago tumor.[8]

He found such matches in dusts at case homes and the UTC site containing rare particles, DE 550-70, 48. There is a marked presence of radioactive materials in other tissues (teeth) in the children of other Plaintiffs including Newfield and Dunsford; there is a marked presence of thorium 230 in spinal cord tissue removed from Cynthia's diseased remains; and the thorium 230 present in the Acreage is coupled with the same combinations of radionuclides and non-radioactive contaminants in the Acreage and contamination at UTC. There appears to be no other such local source. SOF ¶¶ 49-50.

2. ***Nothing supports an inference that the Th-230 found in the Acreage that matches the Th-230 found at UTC's site came from anywhere but UTC***

There is zero evidence that the match determined by Dr. Kaltofen—between thorium and other radionuclides found in the Acreage and similar material found at UTC's site—was caused by contamination first existing at the Acreage being subsequently transported to UTC's site. Likewise, no evidence has been adduced of a common industrial source independently contaminating the Acreage and UTC. And Dr. Kaltofen's unrebutted opinion concludes that the

---

[8] Kaltofen's 12/22/17 Report (DE 339-12), at 4–5 (emphasis added).

thorium and other radioactive contamination he found in the Acreage that matched that found at UTC was not a result a result of radioactive fallout or natural background sources. SOF ¶55.

### 3. Undisputed facts establish how UTC enabled its radioactively-contaminated soil to reach the Acreage, which an unrebutted expert confirms occurred

Plaintiffs' statement of facts details a well-connected chain of undisputed evidence establishing the ground transport mechanism for contaminants from UTC's site to reach the Acreage: (1) from 1999 to 2001, UTC used local transporters and recyclers; (2) when it submitted a falsehood-laden Final Interim Measures report to the Florida DEP in 2001, UTC knew that its selected local recycler, Magnum, had been experiencing troubles in 2000 and that it had already closed due to bankruptcy; at that time, UTC (3) was concluding a remediation in which it did not supervise transporters that were known to sell fill in the Acreage and (4) knew its manifesting procedures were a sham and that the facility was not treating all of the soil (which renders the Magnum manifests unreliable as evidence that the soil was actually transported there); (5) UTC could not, reasonably, have been unaware that its soil was being sold for fill because public classifieds advertised fill being sold by the tonnage from UTC's contractor gate, a concern previously reported to UTC (when the number used in the ad was a UTC phone number); and (6) the areas remediated in 2000 included the site where UTC was known to dispose of radioactive materials, a site that still includes thorium 230. SOF ¶¶ 11-50.

In light of all that, licensed site professional Brian Moore concluded "having reviewed the testing data, been to both the UTC site and the Acreage for the sampling, and . . . reviewed the fill needs history of the Acreage and the records supporting the facts above, UTC's practices resulted in the transport of contaminated soil, including thorium, to The Acreage." SOF ¶ 51.

### C. Unrebutted expert testimony contributes to Dr. Dominici's inference that UTC's contamination of the Acreage, in turn, caused the cancer cluster

Dr. Dominici based her epidemiological inference that UTC-sourced contamination, in turn, caused the cancer cluster on both cancer incidence statisticss and expertise on exposure and disease process provided in the reports of Dr. Perry, Dr. Sawyer, and Bernd Franke.

Dr. Dominici draws data and other information for the statistical component of her assessment primarily from the Florida Department of Health (FDOH) and the portions of Dr. Richard Smith's reports that compile data and provide statistical calculations related to pediatric brain cancer. DE 550-95, at 1–4. Regarding female pediatric brain cancer—the demographic–

disease profile of the declared cluster—the FDOH provided non-public data on incidence in the Acreage and, indirectly through the expected rates for certain time intervals, for the state of Florida. The FDOH materials also provide a statistical assessment that incidence was so elevated as to warrant public designation of the Acreage as a site of statistically elevated pediatric brain cancer and the epidemiological determination that "ionizing radiation is the primary environmental risk factor for increasing pediatric brain cancer incidence." SOF ¶ 10.

Plaintiffs' biostatistician, Dr. Richard Smith, followed the FDOH's process to confirm not only the SIR regarding female pediatric brain cancer from 2004-2007 (which according to the FDOH was over 6 times background), but also for the total diagnoses of malignant brain cancer in girls between 2004-2009, yielding a cluster of 7.88 times background, or a p-value (chance of occurring randomly) of 0.00004. That is, the probability that so many cases could have occurred by chance is 1 in 25,000. SOF ¶ 8. Not only is Smith unrebutted in the present proceeding, SOF ¶ 9, but UTC has never disputed the actual p-value assigned to the 2004-2009 diagnoses and nor offered any proof to dispute Plaintiffs evidence, including the work of Dr. Watkins, that there were in fact 7 diagnoses in that time frame. SOF ¶ ___.

Alongside that statistical analysis, Dr. Dominici considered the opinions of experts on, neuropathology, toxicology, and radiation dosimetry. In particular, neuropathologist Dr. Perry's unrebutted report establishes the general causal connection between low-dose radiation and pediatric glioma cancer clusters—an opinion, never disputed by UTC, originally published in epidemiological literature in the New England Journal of Medicine in 2002 and relied on by neuropathologists and epidemiologists to present day. SOF ¶ 10.

Dr. Sawyer's unrebutted report concludes that the ependymoma brain cancer of Cynthia Santiago, part of the female pediatric brain cancer cluster in the Acreage, was far more likely to have been caused by Th-230 than by any other cause, including random mutation. SOF ¶ 57.

And Bernd Franke's unrebutted report concludes that, taking into account (i) the quantity of Th-230 found in Cynthia Santiago's tumor-ridden spinal cord post-mortem and (ii) the likely interval of time between her exposure to the external source of thorium and her death, she had received an estimated alpha radiation of 4.7 rem—more than double the expected background dosage. SOF ¶ 56-57. That dose determined for Th-230 is similar to the 1.5-2.5 gray dose found in radiation-caused cancer clusters as described in the literature in his field and as cited by Perry. SOF ¶10.

9

V.   **UTC Has Not Disputed Plaintiffs' Evidence that the Cancer Cluster Caused "Some Actual Harm"—a Diminution of the Value of Their Homes in the Acreage**

In Florida, plaintiffs need not show physical contamination of their own property for an environmental-stigma tort claim, *Adinolfe*, 768 F.3d at 1179, and may recover for diminution of that property's value caused by public perception of health risk, alone. *Florida Power & Light v. Jennings*, 518 So.2d 895, 898 (Fla. 1987) ("the impact of public fear on the market value of property is admissible without independent proof of the reasonableness of the fear").[9]

Moreover, a plaintiff may provide evidence regarding the value of his or her own home, as detailed in subsection V.A., below.

Here, Plaintiffs have established the fact of diminution of their property values by two independent, unrebutted means. First, the plaintiffs themselves have attested that that the stigma associated with the cancer cluster diminished the value of their homes—based on personal knowledge gleaned from various sources (V.B). Second, Dr. Kilpatrick has opined that the cancer cluster stigma affected the entire Acreage market in a way that makes each home within it suffer some diminution in value. While UTC's expert, Mr. Roddewig, contested Kilpatrick's methodology for arriving at specific dollar amounts for each plaintiff's value loss, he did not opine on the fact of diminution of value due to stigma (V.C).

A.   **Testimony by the owner may establish the fact of loss of home value**

In general, "an owner of property is competent to testify regarding its value," *Neff v. Kehoe*, 708 F.2d 639, 644 (11th Cir. 1983)—referred to herein as the owner-competence principle. "The general rule (is) that homeowners may testify as to the value" unless the testimony is not "based on personal knowledge"; and sufficient personal knowledge may include even prior attempts to sell or mere discussions with an appraiser or real estate agent. *See Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1250 (11th Cir. 2018).

---

[9] Plaintiffs' claims here differ from those of the Adinolfe plaintiffs regarding UTC's negligent conduct, contaminants, transport, exposure, and nature and scope of the resulting stigma. Plaintiffs allege that UTC's negligent remediation allowed soil containing carcinogenic radionuclides to contaminate the Acreage, which caused a pediatric brain cancer cluster that the FDOH and CDC publicly linked to the Acreage as a whole, which stigmatized and diminished the value of homes within the Acreage, without regard to an individual property's physical contamination or specific proximity to any suspected contamination source.

UTC's argument against the owner-competence principle (DE 514, at 7) conflates individuals' valuations of their own stigmatized homes—within the scope of lay assessment—with the evaluation of the aggregate impact of stigma on an entire community—which does require expertise but is not what Plaintiffs attest. In briefing its own motion for summary judgment, UTC argues that "[r]egardless whether the Plaintiffs might have the requisite foundation to testify as to the value of their properties . . ., fact witnesses cannot offer opinion testimony on the cause, fact or amount of alleged property value diminution due to environmental stigma." DE 514, at 7. But that authorities UTC cites for that proposition—*Mosaic* and *Anderson v. Am. Family Ins. Co.*, 350 F.Supp.3d 1295 (M.D. Ga. 2018)—do not support it.

In *Mosaic*, the Eleventh Circuit reaffirmed *Neff*'s owner-competence principle while holding that the district court did not abuse its discretion in excluding a homeowner's opinion on value that was "pure speculation," "not . . . based on personal knowledge," and self-contradictory. 889 F.3d at 1250–51. Ms. Williams's testimony was not excluded because it addressed environmental stigma.

Moreover, UTC's misstatement of the *Anderson* holding would conflict with Eleventh Circuit precedent. *Anderson* indeed excluded a plaintiff's testimony that "stigma caused the value of his home to decrease," but not because lay testimony on that topic necessarily conflicts with Federal Rule of Evidence 701, as UTC asserts (DE 514, at 7). Rather, the court held, first, that the plaintiff's testimony there—consisting entirely of a one-word "yes" response to a deposition question—lacked foundation because "[t]here is nothing to suggest that he had an opportunity to form a reasoned opinion," he was not "shown to have adequate relevant knowledge," and he had not "given reasons for his . . . opinion." 350 F.Supp.3d at 1302–03. Second, the plaintiff offered no authority for extending a specific Georgia evidence code provision allowing testimony on "market value" to testimony on stigma diminution. *Id.* at 1303. A footnote also notes a conflict between that Georgia provision and Rule 701. *Id.* at 1303 n.5. Georgia's rule, O.C.G.A. § 24-7-701(b), allows any non-expert—not just the owner—who "has had an opportunity to form a reasoned opinion" to testify as to "market value" of "an article or property." And since that provision does not exclude non-expert testimony based on "scientific, technical, or other specialized knowledge within the scope of" Georgia's version of Federal Rule of Evidence 702, it conflicts with Rule 701, which contains that type of limit. Thus, *Anderson*

11

holds only that a Georgia rule conflicts with Rule 701, not that homeowner testimony regarding loss of value does.[10]

Though *Neff* itself was decided before Rule 701 was amended in 2000 to explicitly preclude lay testimony on expert matters,[11] the continuing validity of the owner-competence principle is confirmed by the notes of the Advisory Committee on Rules regarding the intent of the amendment and by post-2000 case law. The Advisory Committee noted,

> The amendment is not intended to affect the prototypical examples of the type of evidence contemplated by the adoption of Rule 701 [including] . . . . an endless number of items that cannot be described factually in words apart from inferences. For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis. . . . .

Fed. R. Evid. 701, Notes of Advisory Committee on 2000 amendments (internal cites omitted).

Post-amendment case law includes not only *Mosaic*'s 2018 invocation of the principle but district court decisions allowing testimony under it. Owners' testimony on the value of their property was permitted, for instance, in *Morsch v. JP Morgan Chase Bank*, 2018 U.S. Dist. LEXIS 190523, at *14–15 (M.D. Fla. Nov. 7, 2018) (value of lost safe-deposit-box contents, primarily diamond jewelry); *South Grande View Dev. Co. v. City of Alabaster*, 2017 U.S. Dist. LEXIS 193666, at *4–5 (N.D. Ala. Nov. 22, 2017) (diminution of market value of land caused by regulatory taking); *Gadsden Indus. Park, LLC v. U.S.*, 111 F. Supp. 3d 1218, 1235 (N.D. Ala. 2015) (market value of rail spur lines); and *Chmura v. Monaco Coach Corp.*, 2006 U.S. Dist. LEXIS 11217, at *13 (M.D. Fla. Mar. 20, 2006) (diminution of value of recreational vehicle).

---

[10] The court agreed with the argument of the defendant, *id.* at 1303 n.5, whose briefing on the conflict between § 24-7-710(b) and Rule 701 (in its reply on summary judgment) had cited only *Armstead v. Allstate Prop. & Cas. Ins. Co*, 2016 U.S. Dist. LEXIS 31272 (Mar. 11, 2016). (*Anderson*, 5:15-cv-00475-MTT Doc. 74, at 7.) *Armstead* excluded testimony against the insurer's fire-damage adjustment—not from the owner but from a building contractor and a public adjuster, who had not been disclosed as experts—holding that the Georgia rule allowing such undisclosed expert testimony as lay opinion conflicts with Rule 701. *Id* at *16. Neither *Armstead* nor *Anderson* discusses the Eleventh Circuit's owner-competence-principle cases.

[11] The 2000 amendment to Rule 701 added the requirement that lay testimony cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Indeed, UTC's argument that the owner-competence principle conflicts with Rule 701, as amended, has been explicitly rejected. *See United States ex rel. TVA v. An Easement & Right-Of-Way over 6.09 Acres of Land*, 140 F.Supp.3d 1218, 1240 (2015) ("[C]ontrary to the Government's assertion, Rule 702 does not always apply to opinion testimony by a witness as it relates to the value of his own land or property.").

**B. Plaintiffs' testimony that their home values were diminished by the cancer-cluster stigma is uncontradicted and supported by unrebutted local-real-estate-professional opinion**

The Cotromanos, DeCarlos, Dunsfords, and Joyce Featherson have all attested that the stigma associated with the cancer cluster diminished the value of their homes—based on personal knowledge gleaned from their various experiences with sale or valuation of their homes, the Acreage real estate market, and the publicity with the Acreage of the cancer cluster and its investigation, as detailed in the Statement of Facts. SOF ¶¶ 3, 61-62.

Realtors such as Robert Barwald, who has been selling properties in The Acreage since 2012, when he retired as a 33-year Pratt Whitney employee. Barwald's final position was as Purchasing Manager for the Palm Beach campus at which time he was already a local realtor. This professional described a demand for Acreage properties that is still reduced upon notice of the cancer cluster issues, testifying that from 2009 until the present, realtors have a fiduciary duty to inform their clients of the cluster's existence and that even recently, clients who had been interested in the Acreage have decided against the market due to that information. SOF ¶¶ 3, 60.

**C. Alternatively, Dr. Kilpatrick's particular conclusion that the cancer cluster diminished the value of Acreage homes is not rebutted**

In his May 2019 declaration, in addition to providing specific diminution estimates for each of the plaintiffs' homes (damages amount, not at issue here), Dr. Kilpatrick opines on the general fact of some diminution of value caused by the stigma:

> My market trend analysis clearly shows that the average sale prices in Cotromano were lower during the height of the revealed effect of the stigma . . . and were less than what would be expected if there were no stigma attached to the class area, as in the case of Jupiter Farms.

Dr. Kilpatrick's May 10, 2019 Declaration, DE 496-1, at 3–4.

The rebuttal report of UTC's expert, Mr. Roddewig, disputes Dr. Kilpatrick's methodology but not his conclusion of the fact of some value diminution due to stigma. First, Roddewig acknowledges that he is not offering an opinion on diminution of value:

Q. In your . . . present report did you offer an opinion yourself as to diminution of value?

A. No.[12]

Rather, Roddewig critiques Dr. Kilpatrick's specific methodology for determining specific amounts and duration of the stigma effect for individual properties.[13]

Moreover, Roddewig testifies that (i) a percentage diminution over the whole stigmatized area can be used to assess the impact on individual properties and (ii) that such an area-wide diminution percentage may properly be determined by comparing average price per square foot in the affected area to that of a control area.[14]

That is exactly what Dr. Kilpatrick has done here. Indeed, Roddewig does not contradict the conclusion that there was some loss of value due to stigma:

> Q. Do you agree that there was a time where the Acreage was stigmatized?
>
> A. I don't have an opinion on that. All that I have done in my work is review Dr. Kilpatrick's report and his analysis, and correct it for what I consider to be errors, and see what results when he -- when his report is corrected for those errors.

Roddewig Deposition, DE 550-25, at 230: 5–13 (emphasis added).

## VI. To Prove Amount of Damages, Plaintiffs Need to Provide Only a Reasonable Yardstick

Applying Florida law, the Eleventh Circuit has held that proof of the amount of damages does not require certainty but only a "reasonable yardstick":

> In lost profit cases, Florida's courts have clearly held that once causation is proven with reasonable certainty, uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages. As the Florida Supreme Court

---

[12] Deposition of Richard Roddewig, August 28, 2019, DE 550-25, at 111: 16–19. (UTC counsel's objection to the form of each cited questions omitted from the quotations here.)

[13] "I've corrected his analysis for what I have concluded is an error in his methodology. And, after correcting for that one error without correcting for other problems in his methodology, like his failure to consider individual property characteristics, I've indicated here's what happens to the result of his analysis if you correct for this error related to the time factor that he looked at to derive his percentage difference between Jupiter Farms and the Acreage." Roddewig Deposition, DE 550-25, at 111: 22–24; 112: 1–9.

[14] Roddewig Deposition, DE 550-25, at 208: 17–209: 2.

in *W.W. Gay* explained, "the 'uncertainty which defeats recovery in such cases' is the cause of the damage rather than the amount.

*Nebula Glass Int'l v. Reichhold, Inc.*, 454 F.3d 1203, 1217 (11th Cir. 2006) (quoting *W.W. Gay Mechanical Contractor v. Wharfside Two, Ltd.*, 545 So.2d 1348, 1350 (Fla. 1989)); *see also Proudfoot Consulting v. Gordon*, 576 F.3d 1223, 1243 (11th Cir. 2009) (following *Nebula Glass*).

Although *Nebula Glass* dealt with lost profits, a "reasonable yardstick" suffices to quantify economic damages more generally. Recent examples in this Court include the estimated percentage above fair market value that breach of an appraisal contract caused the plaintiff to pay, *Henderson v. Demars*, 2013 LEXIS Dist. 38574, at *37–38 (S.D. Fla. Mar. 20, 2013) (damages need only be "causally connected" to breach and measured by "some reasonable yardstick"), and the "fair value" of converted property, *Zaki Kulaibee Establishment v. McFlicker*, 788 F.Supp.2d 1363, 1380 (S.D. Fla. 2011) (evidence needs not be exact and "damage rules must be flexibly applied so as to provide fair compensation").

The plaintiffs' two independent, unrebutted sources establishing that fact of some diminution of value due to stigma—the testimony of the plaintiffs themselves, backed up by real estate professionals, and Dr. Kilpatrick's opinion—also could provide "reasonable yardsticks" by which to establish amount of damages at trial.

## VII.  UTC's Affirmative Defenses to Liability Are Inapplicable or Unsupported

UTC's affirmative defenses based on (A) compliance with federal regulations, (B) the Price Anderson Act, (C) the statute of limitations, (D) putative defenses to strict liability or (E) various other theories are inapplicable to UTC's negligence liability here or fail on the undisputed facts.

### A.  Affirmative Defense 1 fails because the referenced dose limit, 10 C.F.R. § 20.1301, applies only to a "licensed operation" while UTC had neither an operative license for thorium in 2000 nor licenses for Th-230, Sr-90, or Cs-137 in the forms found on its property and in the Acreage

UTC's First Affirmative Defense asserts that "Plaintiffs fail to state a cause of action because Plaintiffs have failed to demonstrate Pratt and Whitney breached federally-imposed dose limits." The dose limits to which UTC refers are the radiation dose limits the Nuclear Regulatory Commission (NRC) has established for protection of members of the public in certain circumstances, codified in Part 20 of CFR Title 10 ("NRC Regulations"), specifically at 10 C.F.R. § 20.1301. But those limits apply only to "licensees," defined as

15

persons licensed by the Commission to receive, possess, use, transfer, or dispose of byproduct, source, or special nuclear material or to operate a production or utilization facility under parts 30 through 36, 39, 40, 50, 52, 60, 61, 63, 70, or 72 of this chapter, and in accordance with 10 CFR 76.60 to persons required to obtain a certificate of compliance or an approved compliance plan under part 76 of this chapter. . . . .

10 C.F.R. § 20.1002. UTC had neither an operative license for thorium in 2000 nor licenses for Th-230, Sr-90, or Cs-137 in the forms found on its property and in the Acreage. SOF ¶¶ 39,42, 44.

**B. UTC's affirmative defenses based on the Price Anderson Act (PAA) are not applicable**

As the Price Anderson Act (PAA), 42 U.S.C. § 2210, does not apply to or preempt Plaintiffs' negligence claim here, UTC's various assertions that Plaintiffs' claims fail to meet the requirements of the PAA, or UTC's liability is precluded by it, fail, including UTC's assertion that the PAA would preclude punitive damages.

*1. Defenses 3, 28, 29, 30, and 44 do not apply because property value loss is not a "nuclear incident" and the PAA does not preempt state-law tort claims regarding radioactive materials that it does not govern*

For the PAA to apply, there must be a "nuclear incident," which "requires a showing of actual physical injury to the properties themselves, rather than a mere decline in the properties' value." *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1141 n.12 (10th Cir. 2010) (hereinafter "*Cook I*"). Moreover, the PAA does not preempt state law tort claims that do not constitute a nuclear incident. *See Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1099 (10th Cir. 2015) (Gosuch, J.) (hereinafter "*Cook II*") (the court is "[u]npersuaded that the Act preempts and precludes a state law nuisance claim when a 'nuclear incident' is asserted but unproven . . . ."). (In an opinion in the related individual-injury cases, this Court noted the *Cook II* holding: "In analyzing the history and text of the PAA, the Tenth Circuit found that Congress anticipated the existence of 'lesser nuclear occurrences' that would not constitute a 'nuclear incident.' In those cases, the Tenth Circuit held that a plaintiff can still recover under state law for a lesser nuclear occurrence." *Pinares v. United Techs. Corp.*, No. 10-80883-CIV, 2018 U.S. Dist. LEXIS 195073, at *13 (S.D. Fla. Nov. 14, 2018) (internal citations omitted).)

As the Plaintiffs' negligence claim alleges the cancer cluster stigma caused a diminution in the value of their homes—not an actual physical injury to their property—there is no "nuclear

incident," and hence, the PAA does not apply. *Cook I*, 618 F.3d at 1141 n. 12. Nor is the claim preempted. *Cook II*, 790 F.3d at 1099.

Thus, UTC's affirmative defenses 3, 28, 29, 30, and 44 do not apply here.[15]

> **2. Defense 25 regarding the inapplicability of punitive damages for claim indemnified by the federal government fails because UTC is not indemnified under the PAA**

The PAA precludes punitive damages "in any action with respect to a nuclear incident . . . against a person on behalf of whom the United States in obligated to make payments under an agreement of indemnification covering such an incident," 42 U.S.C. § 2210(s). That punitive damages limitation cannot apply here, not only because there is no requisite "nuclear incident" (subsection 1, above) but also because UTC has no evidence to claim its uses or disposals were ever indemnified. SOF ¶¶ 39,42, 44.

### C. The statute of limitations defense fails as this action was filed within four years of the cancer cluster designation and for several independent reasons

Plaintiffs claims are timely, as their filing on August 16, 2013, was within four years of the cancer cluster's designation on August 28, 2009, and no law or set of facts would require a claim for the stigma arising from a cancer cluster designation be filed earlier than four years from its designation. Moreover, the claims cannot be time-barred as (1) the limitations period for their claims was tolled by the filing of the Adinolfe putative class action in 2011 and (2) for independent reasons without regard to the Adinolfe filing, including operation of the Federally Required Commencement Date (FRCD), 42 USC § 9658, as knowledge of UTC's causal connection to the cluster was frustrated by a misinformed FDOH; application of equitable principles, as UTC proactively concealed information that would have identified it as the source of any environmental injury in the Acreage; regarding the strict liability claim, statutory

---

[15] UTC's PAA-dependent defenses assert that (3) "Plaintiffs' state law claims are preempted by the [PAA] to the extent those claims are based on injury resulting from radioactive materials," (28) "there is no currently existing actual physical injury to Plaintiffs properties, which is necessary to establish 'damage to property' under the [PAA]," (29) "Plaintiffs fail to state a cause of action for a [PAA] claim because there has been no damage to or loss of use of Plaintiffs' properties," (30) "Plaintiffs fail to state a cause of action for a [PAA] claim because there was no nuclear incident," and (44) "Plaintiffs' claims . . . are barred, in whole or in part, by the privileges and defenses set forth in the [PAA]." DE-324 at 95–99.

exclusion of limitation defenses; and Florida's continuing-injury tolling doctrine, operational until the rights of the victim are restored. Thus, Affirmative Defense 46 fails.

> **1.    *The pendency of the predecessor putative action claiming the damages alleged by these plaintiffs, filed within any arguably-applicable limitations period, also rendered these claims timely***

"Under the rationale of *American Pipe*, the filing of a class action tolls the statute of limitations for a putative class member to file a separate lawsuit whether the putative class member files before or after the trial court's certification decision." *Aguilar v. Ocwen Loan Servicing, LLC*, 2018 U.S. LEXIS 26288, at \*13 (N.D. Tex. Feb. 20, 2018) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)); *see also Crown v. Parker*, 462 U.S. 345 (1983).

Though Plaintiffs maintain that their claims accrued, earliest, at the cancer cluster designation on August 28, 2009, the filing of the Adinolfe putative class action's initial complaint on June 3, 2010, and an amended complaint on April 18, 2011, would have timely tolled the limitations period for claims accruing earlier in 2009 or in 2008.

> **2.    *Plaintiffs' claims are further rendered timely by operation of the FRCD, by the equitable implications of UTC's concealment, by chapter 376, and by the continuing nature of the injury***

The 1986 CERCLA amendments preempted state limitations law such that for any state-law action for property damage, "caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant released into the environment," if the applicable state limitations statute "provides a commencement date earlier than the [FRCD], such period shall commence at the [FRCD] in lieu of the date specified in such State statute." 42 USC §9658(a)(1). And the FRCD is generally defined as "the date the plaintiff knew (or reasonably should have known) that the . . . property damages . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." §9658(b)(4)(A). Hence, since the contaminants at issue here are "hazardous substances" under CERCLA, SOF ¶¶ 50, a discovery rule applies regardless whether available under other Florida law.

Thus, the limitations period for Plaintiffs' claims did not begin to run until they knew or reasonably should have known that the diminution in value of their homes due to the stigma of the cancer cluster designation was caused by UTC's contamination of the Acreage and resulting elevated cancer incidence that then predicated the FDOH's designation of the

cluster. The Plaintiffs could not have known that until after the FDOH designated the cluster on August 28, 2009.

Regardless of the FRCD, equitable principles under Florida law delay the accrual date for Plaintiffs' claims during the period in which UTC's concealment delayed Plaintiffs' discovery of the cancer cluster's cause.  "[E]quitable tolling may be available when there is no misconduct on behalf of the defendants and may delay the running of the limitations period based on the plaintiff's blameless ignorance  and the lack of prejudice to the defendant[,] . . . [and] may also be used when a plaintiff has been misled or lulled into inaction and has in some extraordinary way been prevented from asserting his rights." *Aruanno v. Martin County Sheriff*, 343 Fed. Appx. 535, 537 n.2 (11th Cir. 2009) (internal citations and quotation marks omitted). UTC's concealments as described in the statement of facts, SOF ¶¶ 15-16, 28, 64-66, warrant a delay in the accrual of Plaintiffs' claims.

Regarding the strict liability claim, the statutory section governing it provides that "[t]he only defenses to such cause of action shall be those specified in section 376.308"[16]— and Florida Statutes section 376.308 does not provide a limitations defense.

Finally, in Florida, "the statute of limitations in environmental contexts where there is a continuing invasion of rights does not begin to run until the wrongful invasion of rights that constitutes the violation ceases." *California Financial, LLC v. Perdido Land Dev. Co*., 303 F. Supp. 3d 1306, 1310–11 (M.D. Fla. 2017); *see also Fla. Dep't of Envtl. Prot. v. Fleet Credit Corp.*, 691 So. 2d 512, 514 (Fla.4th DCA 1997) (citing *United States v Reaves*, 923 F. Supp. 1530 (M.D. Fla. 1996)). To hold otherwise would frustrate "the Legislature's stated intention to abate pollution that threatens human, animal, aquatic, and plant life as well as property interests." In *California Financial*, the claim at issue was a diminution of the property California Financial had acquired from Perdido Land Development, who failed to fully remediate decades of contamination that preexisted the purchase.

> D.  **UTC's asserted defenses to liability under Florida Statutes § 376.313(3) are not supported**.

UTC Affirmative Defenses 13, 14, and 14 invoke the exclusive defenses to the strict liability claim specified under § 376.308—in particular, those of § 376.308(2)(d). However,

---

[16] Fla. Stat. § 376.313(3).

UTC has offered no evidence that—as claimed in defenses 13 and 14—the acts Plaintiffs allege caused the contamination of the Acreage were those of a third party that is not an employee or agent of UTC and were not in connection with any contractual relationship existing directly or indirectly with UTC, as required by that subsection (with one exception). While Defense 15 invokes the one contractual relationship under 376.308(2)(d) that might underlie a defense—a "sole contractual arrangement [that] that arises from a published tariff and acceptance for carriage by a common carrier or rail"—that defense also requires that the "defendant exercised due care with respect to the pollutant concerned." And unrebutted expert testimony, elaborated in Part II, concludes that UTC did not exercise due care with regard to the remediation, transport, and disposition of the pollutants at issue.

The reference in Defense 45 to "the privileges and defenses set forth in Florida Statutes Chapter 376," can mean only the exclusive enumeration of defenses to the strict liability claim set forth in 376.308, addressed above.

And Defense 21's assertion that "Plaintiffs fail to state a cause of action because Plaintiffs have failed to demonstrate Pratt and Whitney breached any regulatory safe drinking water standards," is facially inapplicable to the Cotromano Plaintiffs' negligence claims and incoherent as applied to their strict liability claim, as breach of a "regulatory safe drinking water standard" is not a prerequisite to a claim under Florida Statutes § 376.313(3).

### E.  UTC's other affirmative defenses lack evidentiary support or do not articulate a defense to the Cotromano Plaintiffs' claims

UTC Affirmative Defenses 16, 17, 18, 19, and 38. asserting the potential superseding liability of third parties, are not supported by evidence nor are Defenses 4, 20, 22, 31, 36, 42 and 47, asserting Plaintiff negligence, laches, spoliation, estoppel, and unclean hands; and the remaining asserted defenses go to issues related to the putative class, claims other than the Cotromano Plaintiffs' claims, or the damages phase or merely deny allegations of the complaint or elements of claims.

### CONCLUSION

For the foregoing reasons, Plaintiffs request summary judgment in Plaintiffs' favor on liability as to all their claims (Counts III, V, and VII of the Consolidated Complaint) and against all affirmative defenses directed to those claims and an order directing trial as to amount of damages and entitlement to punitive damages only.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of January 2020, I electronically filed the foregoing Cotromano Plaintiffs' Statement of Facts in Support of Motion for Summary Judgment as to UTC's Liability for Cancer Cluster Stigma.


<u>s/ Mara R. P. Hatfield</u>      **Searcy Denney Scarola Barnhart & Shipley, P.A.**
MARA R. P. HATFIELD      2139 Palm Beach Lakes Boulevard
Florida Bar No.: 37053      West Palm Beach, Florida 33409
Attorney E-Mails: mrh@searcylaw.com  Phone: (561) 686-6300
And dbotero@searcylaw.com      Fax:   (561) 383-9539
Primary E-Mail:
_hatfieldteam@searcylaw.com    *Attorneys for Cotromano and subsequent Plaintiffs*

21