**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 13-80928-CIV-MARRA
(Consolidated Action: Lead Case)

| | |
|---|---|
| RICHARD COTROMANO, et al., all on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br>vs.<br><br>RAYTHEON TECHNOLOGIES CORPORATION, Pratt & Whitney Group, A Connecticut Corporation, and PALM BEACH AGGREGATES, LLC, a Florida Corporation,<br><br>    Defendants.<br>_____/ | **9:13-cv-80928 Marra/Reinhart** |
| JOSEPH ADINOLFE, etc., et al.,<br><br>    Plaintiffs,<br>vs.<br><br>RAYTHEON TECHNOLOGIES CORPORATION, Pratt & Whitney Group, A Connecticut Corporation,<br><br>    Defendant.<br>_____/ | **9:10-cv-80840 Marra/Reinhart** |

**PRATT & WHITNEY'S *DAUBERT* MOTION**
**TO EXCLUDE THE TESTIMONY OF BERND FRANKE**
**AND INCORPORATED MEMORANDUM OF LAW**

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

I. THERE IS NO "FIT" BETWEEN FRANKE'S OPINIONS AND ANY MATTER IN DISPUTE. ............................................................................................................... 5

II. FRANKE'S ANALYSIS OF RADIATION EXPOSURE TO SANTIAGO RESTS ON IMPROPER ASSUMPTIONS. ................................................................................ 7

    A. Franke Improperly Assumes Spinal Cord Tissue Results Are The Same As Brain Tissue Results ........................................................................................ 7

    B. Franke Assumes Ingestion Of Unrealistic Quantities Of Soil. ....................... 8

III. FRANKE'S OPINION CONCERNING RADIATION EXPOSURE TO MS. SANTIAGO IS UNRELIABLE. ................................................................................... 9

    A. The Spinal Cord Tissue Sample On Which Franke Relies Is Not A Reliable Basis For His Calculations. ............................................................................ 9

    B. Franke's Use Of The ICRP Model To Calculate Effective Dose Is Unreliable ...................................................................................................... 10

CONCLUSION ..................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Cases**

*Cotromano v. United Techs. Corp.*,
  Case No. 13-80928-CIV-MARRA,
  2018 WL 2047468 (S.D. Fla. May 2, 2018) ............................................................................... 9

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ............................................................................................................... 4, 5

*Finestone v. Fla. Power & Light Co.*,
  03-14040-CIV, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006)
  (*aff'd*, 272 F. App'x 761 (11th Cir. 2008) ................................................................................ 7

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................................... 4, 9

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) .............................................................................................. 5, 9

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000) ...................................................................................................... 9

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ................................................................................................. 5

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) .............................................................................................. 5, 7

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ......................................................................................... 4, 5, 9

**Rules**

Fed. R. Evid. 702 ............................................................................................................... 4, 5, 7, 9

## INTRODUCTION

Plaintiffs rely on expert testimony from Bernd Franke, a radiological researcher, in support of their claim for property damages arising from an alleged "informational stigma" caused by the Florida Department of Health's ("FDOH") cancer cluster designation in the Acreage. Franke purports to be an expert at calculating dose from exposure to radioactive materials. But Franke has not disclosed any opinions in support of Plaintiffs' property claims. Instead, Plaintiffs rely on Franke's previously disclosed specific cause opinions from the *Santiago v. UTC* personal injury case. *See* DE 487 (*Cotromano* Expert Disclosure). Given that Ms. Santiago's tumor was not part of the FDOH's cancer cluster designation, Franke's opinions about her alleged exposure do not bear on the "informational stigma" at issue here. The Court should therefore exclude Franke under *Daubert* on the basis of fit. Even if Franke's opinions about Ms. Santiago's exposure were relevant to the property Plaintiffs' claims (they are not), the Court should also exclude Franke's opinions because they are the product of improper assumptions and are otherwise unreliable.

## BACKGROUND

***The Cancer Cluster Investigation***. In 2009, federal and state authorities investigated a potential cancer cluster in an area of Palm Beach County sometimes loosely called "the Acreage." Ex. 1 (Aug. 2009 FDOH Rpt.) at 1, 24. On February 1, 2010, the FDOH confirmed a statistically elevated rate of ***pediatric female*** brain cancers in the area from 2005 to 2007. Ex. 2 (FDOH Release). This finding was based on identifying "three cases among females" age 0 to 19 in the Acreage that were diagnosed from 2005-2007. *Id*. The FDOH has never publicly identified a cancer cluster in the Acreage beyond that described in its February 1, 2010 notice.

***Santiago Cancer and Tissue Samples***. In 2009, at age 13, Cynthia Santiago was diagnosed with an ependymoma, which is a type of brain cancer. Ex. 3 (4/16/18 Franke Tr.) at

1

40:21-41:2. Between 2009 and 2013, she was treated with multiple surgeries and radiotherapy to address her original tumor, a recurrence, and a metastasis to the spine. In 2015, Ms. Santiago was diagnosed with a second metastatic spinal cord tumor; she died in 2016. *Id.* at 41:3-12.

Eberline Analytical analyzed various samples taken from Ms. Santiago's body after her death in order to measure the presence of different radionuclides in different organs. The only radionuclide at issue here is Thorium-230. For most tissues, Eberline did not find Thorium-230 above the minimum detectable amount (MDA). Ex. 3 (Franke) at 105:14-19. Eberline found Thorium-230 above the MDA (though below the MDA plus the lab's measure of "uncertainty" for the test) in only two samples: bone tissue and spinal cord tissue. *Id.* The reported "result" for the Thorium-230 in each was: 0.045 pCi/g (Picocouries per gram) in the bone and 0.131 pCi/g in the spinal cord. Ex. 4 (Eberline Rpt.) at 2 (00027). There was no Eberline analysis of brain tissue. Ex. 3 (Franke) at 44:5-7.

***Franke Reports***. Plaintiffs seek to rely on reports issued by Franke in February 2017, December 2017, and March 2018. DE 487. Each of these reports addresses Franke's calculation of the radiation dose allegedly received by Ms. Santiago. Ex. 5 (Feb. 2017 Rpt.); Ex. 6 (Dec. 2017 Rpt.); Ex. 7 (Mar. 2018 Rpt.). Franke does not offer a dose assessment for any other individual in the Acreage. *Id*.

***Franke's Initial Expert Report.*** Despite having no radiological test results from Ms. Santiago's brain, Franke used the *spinal cord tissue* result as the basis to project a potential annual dose of Thorium-230 to which Ms. Santiago's brain was exposed, or what Franke called the "brain dose." In particular, Franke inputted the 0.131 pCi/g result from the spinal cord tissue into a model from the ICRP (International Commission on Radiological Protection) Database of Dose Coefficients and calculated that the annual brain dose to Ms. Santiago from Thorium-230

2

was 0.23 rem at age 20. Ex. 5 (Feb. 2017 Rpt.) at 2. Using this number, Franke then calculated the total radiation to her brain assuming different ages of first intake (varying from 3 months old to 10 years old) and different methods of intake (either ingestion or inhalation). Franke's calculation is that the "cumulative doses from ingestion until the end of the year 2009 are in a range of 1.7 rem (intake at age 10 years) to 9.6 rem (intake at age 3 month)." *Id.* For inhalation, he calculates that the "cumulative doses from inhalation until the end of the year 2009 are in a range of 0.75 rem (intake at age 10 years) to 5.6 rem (intake at age 3 month)." *Id.*

All of these calculated doses are a fraction of the 140 rem (or 1.4 gray) that is the lowest amount of radiation shown to be associated with brain cancer in children. Ex. 3 (Franke) at 72:8-13; Ex. 8 (Ron Study); Ex. 9 (4/23/18 Sawyer Tr.) at 60:24-61:16 (could not identify a study linking a lower amount of radiation linked to brain cancer in children).

***Franke's Supplemental Report.*** Franke opined that the dosage to Ms. Santiago was higher than the federal limit of 0.1 rem (which equates to 1 milliSievert or mSv) per year under the Price-Anderson Act. Franke took his hypothetical brain dose of 0.23 rem (which he said equates to 230 mSv) and applied a weighting factor of 0.01 to come up with an "effective dose" of 2.3 mSv, higher than the 1 mSv federal annual limit. Ex. 6 (Dec. 2017 Rpt.).

***Franke's Rebuttal Report.*** Pratt & Whitney health physics expert John Frazier pointed out a math error in Franke's calculations—namely that 0.23 rem is equivalent to 2.3 mSv, not 230 mSv. In his rebuttal report, Franke acknowledged the math error. Ex. 7 (Mar. 2018 Rpt.) at 1. Correcting for this error in Franke's calculations (but keeping his other assumptions the same) yields an effective dose of 0.023 mSv, well-below the 1 mSv limit. *Id.* at 1-2. Franke therefore conceded that "on the basis of the brain dose alone, one cannot claim exceedance of the 10 CFR 20 dose limit of 1 mSv effective dose." *Id.* at 2.

3

Franke then took a new tack and attempted to calculate the "effective dose" by taking the total of all organ doses multiplied by the appropriate weighting factor and then summing that up to derive a total effective dose. Ex. 7 (Mar. 2018 Rpt.) at 2; Ex. 3 (Franke) at 76:10-14. Though Eberline tested a variety of tissues from Santiago, Franke could only rely on the results for the spinal cord and bone tissue because the other results did not exceed the MDA. Ex. 3 (Franke) at 104:13-105:19. And the ICRP model does not have a weighting factor for spinal cord tissue. *Id.* at 53:15-17. So Franke took the spinal cord tissue data, assumed that it was the same as brain tissue data (where there was a weighting factor) and then ran the model to generate a ratio of the "effective dose" to brain dose for various ages of first intake and years of intake—both for ingestion of Thorium-230 and inhalation of Thorium-230. Ex. 7 (Mar. 2018 Rpt.) at 2. Franke claimed that "[i]n all cases, the effective dose exceeds the brain dose by a factor of 10. Because the brain dose is 2.3 mSv, the effective dose will be greater than 23 mSv." *Id.* Based on that calculation, Franke opined that the "radiation exposure that Ms. Cynthia Santiago received in the last year of her life clearly exceeded the applicable federal dose limit for individual members of the public of 1 mSv effective dose." *Id.*

## ARGUMENT

The Court must act as a "gatekeeper" to ensure that the admission of expert testimony is consistent with the requirements of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7 (1993); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The court's gatekeeping function requires an exacting analysis of the reliability, relevancy, and "intellectual rigor" required by Fed. R. Evid. 702. *Frazier*, 387 F.3d at 1260 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," the significance of

4

the court's role under *Daubert* "cannot be overstated." *Id.* at 1260, 1263. Plaintiffs bear the burden of establishing the admissibility of Franke's testimony under Rule 702. *Id.* at 1260.

The Eleventh Circuit has distilled this exacting analysis into a "rigorous three-part inquiry." *Id.* at 1260. *First*, the proffered expert must be qualified to offer his opinions. *Id.* *Second*, the expert's opinions must be based on a sufficiently reliable and discernible methodology. *Id.*; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003). *Third*, the proffered expert's testimony must "fit" the facts of the case such that the testimony is helpful to the trier of fact. *Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260. Importantly, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (citation omitted).

The Court should exclude Franke's testimony because (1) there is no "fit" between his analyses and any issue to be resolved at trial, (2) he relied on improper and unjustified assumptions, and (3) his methodology is not reliable.

## I. THERE IS NO "FIT" BETWEEN FRANKE'S OPINIONS AND ANY MATTER IN DISPUTE.

Plaintiffs' claim is predicated on the assertion that an "informational stigma" resulting from the FDOH's designation of the Acreage as a cancer cluster negatively impacted the value of their properties. Franke does not offer an opinion on the cause of the cancers that comprise the so-called "cancer cluster" or on any other subject relevant to Plaintiffs' claims here. As such, his opinions are not helpful to the jury in resolving any matter that remains in dispute on the Plaintiffs' claims and, therefore, fail the baseline requirement of "fit" under Rule 702. *See Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260. The Court should exclude Franke's testimony on this basis alone.

5

Franke only addresses issues related to *specific* causation for one individual, Ms. Santiago, who was not part of the cancer cluster identified by the FDOH. Indeed, the FDOH's cancer cluster designation was based exclusively on pediatric female brain cancers diagnosed between 2005 and 2007. Ms. Santiago was diagnosed in 2009. Ex. 5 (Feb. 2017 Rpt.) at 1. Moreover, Plaintiffs do not allege that Ms. Santiago ever resided at any of the four subject properties (owned by the four individual property plaintiffs) at issue in this case. Nor is Franke's dose calculation for Ms. Santiago based on an environmental Thorium-230 reading in the Acreage. Instead his calculation is based on alleged readings from *Ms. Santiago's* tissues (which, as discussed below, could not have conceivably come from her exposure to soil in the Acreage). As such, whether Pratt & Whitney allegedly contributed to the cause of Ms. Santiago's cancer is irrelevant to Plaintiffs' claims here—because Plaintiffs' claims are expressly based on the diminution in value of four specific properties allegedly caused by the FDOH's cancer cluster announcement.

Allowing testimony from Franke would only serve to confuse the jury and prejudice Pratt & Whitney. As set forth in Pratt & Whitney's motion for summary judgment, Plaintiffs have a complete failure of proof when it comes to their allegation that Pratt & Whitney caused the cancer cluster in the Acreage. DE 498 at 5-7. Permitting testimony from Franke about an individual's cancer that was not part of the cluster the FDOH designated will confuse the jury about Plaintiffs' failure of proof and mislead the jury about whether Plaintiffs have presented an evidentiary basis to link the cancer cluster to Pratt & Whitney. Pratt & Whitney would be forced to engage in a mini-trial to demonstrate the substantial errors in Franke's opinions, despite the fact that those opinions pertain to a cancer diagnosis that is irrelevant to Plaintiffs' claims here. Such an exercise would be prejudicial, wasteful, and confusing. Franke should be excluded.

## II. FRANKE'S ANALYSIS OF RADIATION EXPOSURE TO SANTIAGO RESTS ON IMPROPER ASSUMPTIONS.

Franke's opinions should be excluded on the additional ground that they are unreliable. Expert testimony that is untethered to the facts of the case and depends on demonstrably false assumptions is inadmissible under the exacting standard set by Rule 702. *Rink*, 400 F.3d at 1292 (affirming exclusion of expert testimony that is based on demonstrably unreliable data and a "scientifically unsupported 'leap of faith'"); *Finestone v. Fla. Power & Light Co.*, 03-14040-CIV, 2006 WL 267330, at *13 (S.D. Fla. Jan. 6, 2006) (*aff'd*, 272 F. App'x 761, 768 (11th Cir. 2008)) (excluding expert testimony that is based on unsupported and "false assumptions").

In his calculation of Santiago's "effective dose" of radiation in the last year of her life as over the federal limit, Franke makes two fundamental assumptions that are without basis and contrary to the facts.

### A. Franke Improperly Assumes Spinal Cord Tissue Results Are The Same As Brain Tissue Results.

Franke's calculations are based on the notion that the spinal cord tissue results are the same as what the results would have been from brain tissue because both are in the central nervous system. Ex. 3 (Franke) at 53:18-25. That assumption is incorrect. Franke admitted that he did not have any data or studies or medical support to back up his assumption. *Id.* at 54:9-17. He "searched for information of this type" and "didn't find it." *Id.* at 54:13-17. Pratt & Whitney expert, health physicist John Frazier, explained that ICRP describes the brain and spinal cord as "separate and distinct" and notes a number of differences between the two, including that they "receive blood via separate vascular systems—the brain from common carotid arteries and the spinal cord from vertebral arteries arising from subclavian arteries." Ex. 10 (4/27/18 Frazier Rpt.) at 4-5. Pratt & Whitney expert neuro-oncologist Dr. Duane Mitchell testified that animal experiments demonstrate thorium distributes unevenly within the brain (much less across the

7

central nervous system) such that you could not estimate the dose to the brain by looking at tissues from the spine. Ex. 11 (5/9/18 Mitchell Tr.) at 92:25-94:17.

Franke testified that if there were data on the comparison between Thorium-230 in the spinal cord tissue and brain tissue, it would be relevant to his analysis. Ex. 3 (Franke) at 54:18-25. In fact, tissue results from another plaintiff in these cases, Christian Wenderoth, included both spinal cord tissue and brain tissue. It shows Thorium-230 of 0.368 pCi/g in his spine and 0.077 pCi/g in his brain. Ex. 9 (Sawyer) at 200:16-23. As plaintiffs' own toxicologist William Sawyer testified, "the Wenderoth tissue sample shows thorium-230 levels in the spinal cord that are approximately 4.7 times higher than the tissue in the brain." *Id*. at 200:24-201:3. A fact Franke fails to address.

By assuming that the spinal cord tissue is the same as the brain tissue model for calculating effective dose of radiation, Franke vastly overstates the amount of radiation to which Ms. Santiago was exposed. Franke agreed that if the concentration of Thorium-230 in Ms. Santiago's brain were different than what he used from the spinal cord tissue, then his "calculation would be inaccurate." Ex. 3 (Franke) at 45:17-46:3. In the face of data showing just this difference, his calculation is demonstrably unreliable and should be excluded.

      **B.**      **Franke Assumes Ingestion Of Unrealistic Quantities Of Soil.**

Franke's calculations are based on the impossible assumption that Ms. Santiago ingested or inhaled thousands of pounds of Thorium-230. Franke was not aware of any samples or analysis of Thorium-230 in the air at the Santiago residence, which would be relevant to inhalation. Ex. 3 (Franke) at 58:20-25, 60:9-11. That leaves soil ingestion as the sole medium through which Plaintiffs have evidence that Ms. Santiago was even hypothetically exposed to Thorium-230. As to ingestion, Franke admitted that his calculation would require the ingestion of

approximately 20,000 pounds of soil, which he called "hard to believe." *Id.* at 56:12-58:10.[1] A calculation based on an assumed route of exposure that Franke himself admits is not realistic does not pass the *Daubert* standard.

### III. FRANKE'S OPINION CONCERNING RADIATION EXPOSURE TO MS. SANTIAGO IS UNRELIABLE.

Expert testimony is reliable only when it is grounded in a "rigorous methodology," *Frazier*, 387 F.3d at 1262 (citation omitted), and is "based upon sufficient facts or data," *McClain*, 401 F.3d at 1237 (quoting Fed. R. Evid. 702). As this Court recently noted in its denial of a related motion for class certification:

> To determine whether an expert's proposed testimony is reliable, a trial judge may consider (1) whether it can be tested or whether it is purely subjective; (2) whether it has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of controls, and (5) whether the method has been generally accepted in the scientific community. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S 137, 149-50, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). Under these factors, experts are not allowed to engage in haphazard, intuitive inquiry, and they must explain the research and methodology they employed in sufficient detail in order to allow the other party's expert to test that hypothesis. *Oddi v. Ford Motor Co.,* 234 F.3d 136 (3d Cir. 2000).

*Cotromano v. United Techs. Corp.*, Case No. 13-80928-CIV-MARRA, 2018 WL 2047468, at *14 (S.D. Fla. May 2, 2018).

Franke's methodology fails to meet this standard for at least two reasons.

#### A. The Spinal Cord Tissue Sample On Which Franke Relies Is Not A Reliable Basis For His Calculations.

The starting point in Franke's calculation is the 0.131 pCi/g spinal cord tissue result from Ms. Santiago (which as noted above he improperly assumes to be the same as a brain tissue

---

[1] In his deposition, Franke agreed that the highest reading of Thorium-230 at the Santiago property was 1.12 pCi/g. Ex. 3 (Franke) at 56:12-16. Franke next agreed that his estimate of the intake of 10 million to 190 million pCi of radiation required an ingestion of at least 8.9 million grams, based on dividing the 10 million pCi by 1.12 pCi/g. *Id.* at 56:17-57:18. That equates to almost 20,000 pounds of soil. *Id.* at 57:19-58:3.

9

result). This tissue result is too fraught with uncertainty to be a reliable basis for Franke's calculation. A "J value" or "J result" refers to a "result" that is less than the total of the MDA (Minimum Detectable Activity) and the CSU (Combined Standard Uncertainty). Ex. 9 (Sawyer) at 179:19-180:1. The Santiago spinal cord tissue sample yielded a J result. Ex. 3 (Franke) at 48:14-18; Ex. 9 (Sawyer) at 180:2-4. As such, Franke admits that in this case the result he relies on is "subject to interpretation." Ex. 3 (Franke) at 47:17-19.

Plaintiffs' other experts have agreed with the uncertainties of relying on J results. Toxicology expert William Sawyer testified that the J result from the Santiago spinal cord tissue sample was not at the 95% level of confidence and "only serves as an estimated value." Ex. 9 (Sawyer) at 181:2-7. That is why he deliberately relied on the lower MDA value for the spinal cord tissue and not the "result" of 0.131 pCi/g. *Id.* at 181:8-21. Franke did not perform any radiation dose calculation using the MDA instead of the "result" for the spinal cord tissue. Ex. 3 (Franke) at 50:5-8. Plaintiffs' radiological testing expert Marco Kaltofen admitted that "[t]he fact of detection is reliable, but it's below the limit of quantitation." Ex. 12 (4/5/18 Kaltofen Tr.) at 55:23-56:2. Franke agreed that Kaltofen specializes in "radiological testing" and has more expertise in the "measurement of radiological data." Ex. 3 (Franke) at 19:7-9, 20:3-7. Simply put, a single 0.131 pCi/g tissue result that is known to be a "J value" or an "estimate" is not sufficiently reliable to use as the basis for Franke's calculations of effective dose of radiation.

**B.     Franke's Use Of The ICRP Model To Calculate Effective Dose Is Unreliable.**

The ICRP model is a model that predicts the distribution of radiation to different organs throughout the body, given a certain intake. Ex. 3 (Franke) at 88:19-89:5. It allows one to predict the "effective dose" a person might receive from the intake of a particular type and amount of radiation. The "effective dose" is a number that attempts to take into account the radiation absorbed by all organs, recognizing that the proportionate risk of radiation absorption differs

10

between different organs.[2] Ex. 10 (Frazier) at 3. In simpler terms, the "effective dose" is a whole-body dose. *Id*. at 3-4.

Franke's effective dose calculation is flawed for several reasons. **First**, his calculation for Ms. Santiago is unreliable because he lacks any evidence of an actual dose to the brain. Franke used the ICRP model to obtain a ratio of total effective dose (from all organs) to brain dose. *See* Ex. 3 (Franke) at 100:20-24. In other words, he attempted to determine how much greater the total effective dose would be than a brain-specific dose for any given intake of Thorium-230. He then picked the spinal cord tissue result from Ms. Santiago, assumed it was the same as the brain result (an entirely unsupported assumption, discussed above), and used the ratio of brain dose to effective dose to estimate the effective dose from his assumed brain dose. *See id.* In effect, he created an effective dose using a ratio that compared the brain to the whole body, even though he did not have proof of any dose to Ms. Santiago's brain.

**Second**, Franke's effective dose calculation assumes that certain organs received radiation doses that are not supported—and are in fact refuted—by the record evidence. The premise of an effective dose calculation is that you determine the whole-body dose by adding together the doses experienced by various organs throughout the body. When Franke uses the alleged dose of radiation to Ms. Santiago's brain to calculate the effective dose, his calculation assumes that other organs (*i.e.* the liver, kidneys, bone tissue) received corresponding doses. However, Plaintiffs' testing of Ms. Santiago's tissue samples refutes that critical assumption in two ways—(1) based on Franke's assumption, Ms. Santiago's kidney *should* have shown Thorium-230 at a level 14 times her brain *but in fact* had no measurable result, Ex. 4 (Eberline

---

[2] Franke agrees that the "[e]ffective dose" using the ICRP model is a "derived quantity" or "mathematical construct, and not a physical, measurable quantity." Ex. 3 (Franke) at 94:4-11.

Rpt.); Ex. 3 (Franke) at 106:4-16; Ex. 10 (Frazier) at 6-7, and (2) Plaintiffs failed to test the liver or the lungs, which are the areas you would most expect to observe concentrated levels of Thorium, Ex. 9 (Sawyer) at 71:4-9. The record evidence therefore fails to substantiate and, in fact, undermines Franke's effective dose calculation.

*Third*, the "effective dose" results that Franke obtained are the result of his arbitrary decision to cherry-pick the highest measurement from Ms. Santiago's tissue samples—from the spinal cord—and plug that into the model. *See* Ex. 3 (Franke) at 100:20-24. Franke did not even attempt to calculate the effective dose (the total body number) using the ICRP model with results from other tissue as the starting point even though he could do the calculation "pretty quickly." *Id.* at 100:25-101:15, 109:7-13. For example, Franke could have used the kidney as his starting point; he could determine the ratio of kidney dose to effective dose and then calculate the effective dose based on the observed level of Thorium-230 in the kidney. But there *was no* Thorium-230 reliably detected in Ms. Santiago's kidney, so the "effective dose" determined from that calculation would be zero. *Id.* at 106:17-21. He also could have used the bone as the starting point, as the bone sample did have a detectable amount of Thorium-230 (though it was not reliably quantified). Even assuming the amount of Thorium-230 reported for Ms. Santiago's bone sample was reliable, Frazier explains that the effective dose Franke would have calculated using his same methodology would have been below the 1 mSv federal limit of 0.1 rem.[3] Ex. 10 (Frazier) at 7. It is only by cherry-picking the result Plaintiffs obtained from Ms. Santiago's spine

---

[3] There are actually two types of bone samples considered in the ICRP model—bone surface and bone marrow. Plaintiffs' testing data did not specify what type of bone sample from Ms. Santiago was tested, so Frazier ran his calculations assuming it was both types. If bone surface is used, the effective dose would be 0.80 mSv; and if bone marrow is used, the effective dose would be 0.171 mSv. Ex. 10 (Frazier) at 7 n.11.

that Franke is able to arrive at a dose that he can even allege (misguidedly) clears the Price-Anderson Act threshold.

In sum, Franke's theoretical effective dose calculation is at odds with the actual data he had at his disposal, and he admits that taking a different but equally valid approach would have led him to conclude that Ms. Santiago simply did not receive a dose from Thorium-230. Franke's dose opinion is nothing more than a litigation-driven analysis produced by cherry-picking unreliable data points to use in a fundamentally flawed dose calculation. His dose opinions should be excluded.

## CONCLUSION

For the foregoing reasons, Franke's opinions should be excluded.

## REQUEST FOR HEARING

Pratt & Whitney respectfully requests a hearing on this motion. This motion concerns expert testimony regarding complex medical and radiological issues, and is therefore more complex than a typical motion. Pratt & Whitney believes that oral argument will aid this Court in understanding the facts and issues presented in the parties' briefing. Pratt & Whitney estimates that this motion requires 30 minutes of oral argument.

Pratt & Whitney's *Daubert* Motion to Exclude the Testimony of Bernd Franke
And Incorporated Memorandum of Law

Index to Exhibits

| Exhibit 1 | Acreage Cancer Review, Palm Beach County, August 2009 FDOH Report |
|---|---|
| Exhibit 2 | February 2010 FDOH Press Release |
| Exhibit 3 | Deposition of Bernd Franke, April 16, 2018 |
| Exhibit 4 | Eberline Report 16-11010 (excerpts) |
| Exhibit 5 | Expert Report of Bernd Franke, February 2, 2017 |
| Exhibit 6 | Addendum to Expert Report of Bernd Franke, December 20, 2017 |
| Exhibit 7 | Rebuttal Report of Bernd Franke, March 23, 2018 |
| Exhibit 8 | Elaine Ron, et al., Tumors of the Brain and Nervous System after Radiotherapy in Childhood, NEJM, Vol. 319, No. 16, 1033-1039 (1988) |
| Exhibit 9 | Deposition of William Sawyer, April 23, 2018 |
| Exhibit 10 | Rebuttal Report of John Frazier, April 27, 2018 |
| Exhibit 11 | Deposition of Duane Mitchell Deposition, May 9, 2018 |
| Exhibit 12 | Deposition of Marco Kaltofen, April 5, 2018 |

Dated:  May 20, 2020

Respectfully submitted,

By: /s/ Gregor J. Schwinghammer
GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL  33401
Telephone:  (561) 650-0595
Facsimile:  (561) 655-5677
GREGOR J. SCHWINGHAMMER, JR.
Florida Bar No. 090158
gschwinghammer@gunster.com
BARBARA BOLTON LITTEN
Florida Bar No. 0091642
blitten@gunster.com

BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL  60654
Telephone:  (312) 494-4400
Facsimile:  (312) 494-4440
SEAN W. GALLAGHER
*Pro Hac Vice*
sean.gallagher@bartlitbeck.com
ANDREW C. MacNALLY
*Pro Hac Vice*
andrew.macnally@bartlitbeck.com
DANIEL R. McELROY
*Pro Hac Vice*
daniel.mcelroy@bartlitbeck.com
ALEX L. GRODEN
*Pro Hac Vice*
alex.groden@bartlitbeck.com

***Attorneys for Defendant Raytheon Technologies Corporation (Pratt & Whitney)***