# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80928-CIV-MARRA
(Consolidated Action: Lead Case)

RICHARD COTROMANO, et al., all on behalf of        **9:13-cv-80928 Marra/Reinhart**
themselves and all others similarly situated,

        Plaintiffs,

vs.

RAYTHEON TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, A Connecticut Corporation,
and PALM BEACH AGGREGATES, LLC, a
Florida Corporation,

        Defendants.

_____/

JOSEPH ADINOLFE, etc., et al.,        **9:10-cv-80840 Marra/Reinhart**

        Plaintiffs,

 vs.

RAYTHEON TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, A Connecticut Corporation,

        Defendant.

_____/

## PRATT & WHITNEY'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF BRIAN D. MOORE AND INCORPORATED MEMORANDUM OF LAW

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ..................................................................................................................... 4

I.  MOORE'S OPINIONS REGARDING "TEMPORAL" AND "SPATIAL"
    CORRELATIONS SHOULD BE EXCLUDED. ............................................................. 5

    A.  Moore's Alleged "Temporal Correlation" Is Unreliable. ....................................... 5

    B.  Moore's Alleged "Spatial Correlation" Is Neither Relevant Nor
        Reliable. ........................................................................................................... 6

        1.  Moore's "spatial correlation" theory does not fit the facts of
            this case. ........................................................................................ 7

        2.  Moore did not employ any reliable methodology to form his
            "spatial correlation" opinion. ............................................................ 8

II.  MOORE'S OPINIONS REGARDING THE SUPPOSED
     ENVIRONMENTAL TRANSPORT OF CONTAMINANTS SHOULD BE
     EXCLUDED. ............................................................................................................. 9

    A.  Moore Did Not Conduct Any Expert Analysis To Support His Theory
        That Contaminants Could Travel By Air From Pratt & Whitney To The
        Acreage. ........................................................................................................... 9

    B.  Moore's Opinions Related To Groundwater Transport Solely Consist
        Of Improper Bolstering. .................................................................................... 9

    C.  There Is No "Fit" Between Moore's Groundwater Opinions And This
        Case. .............................................................................................................. 10

III.  MOORE'S OPINIONS REGARDING MOVEMENT OF CONTAMINANTS
      WITHIN THE ACREAGE SHOULD BE EXCLUDED. .............................................. 11

    A.  Moore's Opinion As To Alleged Wind Transport Of Contaminants Is
        Unsupported And Unreliable. ........................................................................... 12

    B.  Moore's Theory Of Groundwater Transport Within The Acreage Is Not
        Supported By A Reliable Methodology. ........................................................... 13

    C.  Moore's Opinions Regarding Alleged Movement Of Contaminants
        Within The Acreage Do Not "Fit" This Case. ................................................... 14

IV.    MOORE'S REMAINING OPINIONS REGARDING THE ALLEGED
TRANSPORT OF SOIL SHOULD BE EXCLUDED. .................................................. 15

    A.    Moore's Factual Commentary Is Not An Appropriate Subject Matter
For Expert Testimony. ........................................................................................ 15

    B.    Moore's "Opinions" Regarding Supposed Soil Transport Are Not
Premised Upon Any Reliable Methodology. ...................................................... 17

    C.    Moore's Speculative Interpretations Of Documents Are Irrelevant. ................... 19

CONCLUSION ........................................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) ............................................................................. 20

*Chapman v. Procter & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) ............................................................................. 20

*Cotromano v. United Techs. Corp.*,
    2018 WL 2047468 (S.D. Fla. May 2, 2018) ................................................. 5, 13, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................... passim

*Eberli v. Cirrus Design Corp.*,
    615 F. Supp. 2d 1357 (S.D. Fla. 2009) .................................................................. 10

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ........................................................................................... 19

*Hibiscus Assoc. Ltd. v. Bd. of Trustees of Policemen & Firemen*
    *Ret. Sys. of City of Detroit*,
    50 F.3d 908 (11th Cir. 1995) ................................................................................ 15

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) .............................................................. 16, 17

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. Mar. 15, 2004) ...................................................... 16

*In re TMI Litig.*,
    193 F.3d 613 (3rd Cir. 1999) ................................................................................. 9

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ............................................................. 16, 17

*Kumho Tire Co. v. Carmichael*,
    526 U.S 137 (1999) .......................................................................................... 5, 14

*LinkCo, Inc. v. Fujitsu Ltd.*,
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) .................................................. 16, 17, 19

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ....................................................................... 4, 6, 13

*Oddi v. Ford Motor Co.*,
 234 F.3d 136 (3d Cir. 2000) ............................................................................. 5

*Rink v. Cheminova, Inc.*,
 400 F.3d 1286 (11th Cir. 2005) ........................................................................ 4

*Tampa Bay Water v. HDR Eng'g*,
 2011 WL 7429399 (M.D. Fla. Sept. 8, 2011) ................................................. 17

*United States v. Frazier*,
 387 F.3d 1244 (11th Cir. 2004) ................................................................. passim

**Rules**

Fed. R. Evid. 403 ................................................................................................... 19

Fed. R. Evid. 702 ................................................................................... 4, 6, 13, 15

Fed. R. Evid. 703 ................................................................................................... 16

# INTRODUCTION

Plaintiffs claim that their properties diminished in value as the result of the publicity surrounding the declaration of a "cancer cluster" in the Acreage neighborhood in which their homes are located. Plaintiff expert Brian Moore purports to support this theory with a smattering of opinions based on his supposed expertise in "geology, hydrogeology, hydrology, chemistry, physics," and "most of the major scientific fields." Ex. 1 (1/11/18 Moore Test.) 46:25-47:7. But those opinions are not the result of actual expert analysis, nor would they be relevant even if they were reliable.

Moore purports to find a "temporal" and "spatial" relationship between Plaintiffs' relatives' cancer diagnoses, the location of Plaintiffs' homes, and the delivery of "fill" to a random assortment of properties in the Acreage by a company called Tru Trucking. He also sponsors other aspects of Plaintiffs' theory of the case, for example by offering his interpretation of evidence concerning the remediation of fuel-contaminated soil at the Magnum facility and summarizing other experts' opinions about the flow of groundwater into and around the Acreage. These and other opinions have nothing to do with geology or any other supposed area of expertise, nor are they based on any discernible methodology. Instead, Moore's opinions are merely a regurgitation of other experts' opinions, a recitation of slanted facts he claims to have "discerned" from a document review, or conclusions he summarily drew after putting data provided by Plaintiffs' lawyers into charts.

This Court recognized the limited utility of Moore's testimony at the class certification hearing in this case. When addressing Pratt & Whitney's Motion to Strike Moore's untimely and inadmissible direct testimony, the Court captured the thrust of Pratt & Whitney's objection to Moore simply providing Plaintiffs' spin on the circumstantial evidence they offer to support their soil transport theory of liability:

> On the issue of Mr. Moore's testimony, I read his affidavit last evening. Frankly, I had some issues with it. Didn't quite understand why I needed a geologist to explain to me all the history about the movement of the soil, and I don't know what -- why I need an expert geologist to explain all of that. I don't know why that's within his area of expertise. Anybody can listen to the evidence about the soil transports and everything that I've heard about the wrong routes and the wrong exits on the turnpike that didn't exist and everything. I don't know what that has to do with a geologist. A trier of fact can listen to all that evidence and draw whatever conclusions the trier of fact wants to draw from that circumstantial evidence. Again, I don't see how that has anything to do with an expert opinion.

1

Ex. 2 (1/10/18 Moore Test.) 5:13-6:1.

Even setting aside Moore's lack of an analytical or logical basis for his opinions, they would not help a trier of fact decide any material issue in this case. For instance, Moore issues a number of opinions regarding the environmental transport of contaminants, but Plaintiffs have made clear that they intend to prove that contaminants traveled to the Acreage via a supposed soil trucking conspiracy, rendering Moore's summary of other experts' opinions on the potential for groundwater transport irrelevant. *See, e.g.*, DE 552 at 4-5. Moore's opinions on Plaintiffs' "trucking" theory and supposed "spatial" and "temporal" correlations related to fill dirt are also irrelevant. As explained in summary judgment briefing, Plaintiffs intend to prove that their diminution in property value was caused by the declaration of a cancer cluster. DE 559 at 4-10. That means they must prove that Pratt & Whitney caused the cancer cluster, and therefore the cancers that comprise the cluster. *Id*. Yet Moore admitted that he cannot say that any soil removed from Pratt & Whitney was contaminated with radioactive material, that any home in the Acreage received contaminated soil from Pratt & Whitney, or indeed the source from which *any* home in the Acreage received its soil. He thus cannot say that the members of the cancer cluster and/or the Plaintiffs in this case received soil from Pratt & Whitney, or that they were exposed to contaminated soil, rendering his opinions about soil transport irrelevant as well. In short, Moore does not advance any of Plaintiffs' claims, meaning his opinions do not "fit" this case.

For these reasons, as set forth below, Moore's opinions should be excluded.

## BACKGROUND

Plaintiffs rely on five reports from Brian Moore: 1) a May 23, 2016 Declaration, Ex. 3; 2) an August 8, 2016 Supplemental Declaration, Ex. 4; 3) a December 1, 2017 Direct Testimony Affidavit, Ex. 5; 4) a December 22, 2017 Report, Ex. 6; and 5) a March 23, 2018 "Reply to the Responses to the Opinion of Brian D. Moore as Contained in UTC Expert Submissions," Ex. 7.

***2016 Declaration.*** Moore's stated aim in his 2016 Declaration was "to perform a peer review of readily available scientific literature and other furnished professional reports and declarations, and compose a declaration using my own experience and professional judgement on transport and/or migration of oil and/or hazardous material (OHM), including radioactive materials, to the unincorporated portion of Palm Beach County known as the Acreage." Ex. 3 (5/23/16 Moore Decl.) at 2. In reality, he merely summarized the hydrogeology opinions of other experts who are not themselves being called to testify in this case. *Id.* at 2-4.

*2016 Supplemental Declaration.* Moore's 2016 Supplement described his review of documents concerning Pratt & Whitney soil manifests from environmental remediation projects, as well as his summary of the testing analysis conducted by another plaintiff expert, Marco Kaltofen. Ex. 4 (8/8/16 Moore Decl.). Based on his review of those documents and Kaltofen's report, Moore opined that "oil and/or hazardous material (OHM)" allegedly exists in the Acreage above background levels and that there purportedly is a temporal correlation between soil being transported off the Pratt & Whitney campus for remediation, fill being used in the Acreage for house pad development, and the dates of diagnoses of cancer in the Acreage. *Id.* at 2, 4-5, Ex. A. He did not conduct any independent study or analysis in reaching that conclusion. Rather, his opinions were premised upon his admitted "data presentation" of points plotted on a graph to reflect the construction of homes in the Acreage alongside some Plaintiffs' diagnoses. *See id.* at Ex. A; Ex. 1 (Moore) 6:8-24 (Q. "What you did here was not based on geology, for example. It was, as you explained in your deposition, data presentation?" A. "Correct.").

*2017 Direct Testimony Affidavit.* Moore next offered previously undisclosed factual commentary, under the guise of "expert" opinions, in his 2017 Affidavit for the class certification hearing. Ex. 5 (12/1/17 Moore Aff.). Though the direct testimony affidavits were intended to streamline the hearing, Moore proffered entirely new and wide-ranging factual assertions, chronicling his interpretation of documents and testimony.

*2017 Report.* Moore's December 2017 Report summarized and incorporated his prior three submittals. Ex. 6 (12/22/17 Moore Rpt.) ¶ 5. Moore reiterated his opinions on: 1) alleged contamination in the Acreage; 2) alleged transport of contamination by way of groundwater and air; 3) purported correlations between the use of fill in the Acreage, removal of soil from Pratt & Whitney, and cancer cases in the Acreage; 4) soil remediation activity at Pratt & Whitney; and  5) the purported trucking of soil from Pratt & Whitney to the Acreage. *Id.* This report does not contain any citations to specific documents to support any of his claims and relies upon the facts Moore claims to have "discerned" as listed in Attachment C (which includes a recitation of the "facts" he claims to have discerned in his 2017 Affidavit). Ex. 8 (4/20/18 Moore Tr.) 191:21-192:12; *compare* Ex. 5, *with* Ex. 6 at Attachment C. Moore also includes eight maps he created that depict plaintiff properties alongside Acreage parcels that allegedly received fill in connection with construction activities in the 2000-2001 time period. Ex. 6 at Attachment B. Overlain on these maps are purported "interpolated" wind contribution, canal flow direction, and "near-surface

3

groundwater flow direction," which he claims illustrate a spatial correlation "along prevailing average wind vectors and interpolated groundwater flow directions." Ex. 6 at 5, Attachment B.

***2018 Reply Report.*** Moore's 2018 Reply attempts to respond to critiques of his opinions offered by Pratt & Whitney's experts Thomas Missimer, Ph.D., Thomas Borch, Ph.D., and John Frazier, Ph.D. But the extent of Moore's response to these experts is a series of bare claims that "nothing" in those expert submittals alters his opinions. He also offers his interpretation of the January 2018 deposition of a fact witness, Frank Trujillo of Tru Trucking, and the February 2018 amended interrogatory response of former Plaintiff Tracy Newfield, which itself conveys the hearsay of a previously deposed fact witness. Ex. 7 (3/23/18 Moore Reply).

## ARGUMENT

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. District courts act as "gatekeepers" to the admission of expert testimony, ensuring that any and all expert testimony or evidence admitted is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Expert testimony must meet the test of admissibility found in Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Eleventh Circuit has distilled this analysis into a "rigorous three-part inquiry." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). *First*, the proffered expert's testimony must "concern[] matters that are beyond the understanding of the average lay person," and be helpful to the trier of fact. *Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1262. *Second*, the expert's opinions must be based on a sufficiently reliable and discernible methodology. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). *Third*, the proffered expert must be qualified to offer his opinions. *Frazier*, 387 F.3d at 1260. Importantly, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (internal citations and quotation omitted) (emphasis in original). Plaintiffs bear the burden of establishing the helpfulness, reliability, and qualification of Brian Moore and his testimony. *Id.* at 1238; *see also Daubert*, 509

4

U.S. at 592 n.10 (proponent of expert testimony must prove admissibility by a preponderance of the evidence).

None of Moore's purported expert opinions are based on scientific, technical, or specialized expertise, nor are they grounded in any discernible or reliable methodology. Moore has not engaged in any independent studies or analysis. Instead, he created charts and maps premised upon information given to him by Plaintiffs' counsel and purportedly "discerned" facts based upon his slanted review of select documents and testimony. All of his opinions should be excluded as they are not the result of expert analysis.

## I. MOORE'S OPINIONS REGARDING "TEMPORAL" AND "SPATIAL" CORRELATIONS SHOULD BE EXCLUDED.

In his 2016 Supplement and then his 2017 Report, Moore opines that there is a temporal correlation and a spatial correlation between events in the Acreage and at Pratt & Whitney. He relies upon a graph and maps he created from information supplied to him by Plaintiffs' counsel, without any explanation as to the methodology he employed or the basis for his conclusions.

When assessing whether an expert's proposed testimony is reliable, the Court may consider (1) whether the opinion can be tested or whether it is purely subjective; (2) whether it has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of controls, and (5) whether the method has been generally accepted in the scientific community. *See Kumho Tire Co. v. Carmichael*, 526 U.S 137, 149-50 (1999). "Under these factors, experts are not allowed to engage in haphazard, intuitive inquiry, and they must explain the research and methodology they employed in sufficient detail in order to allow the other party's expert to test that hypothesis." *Cotromano v. United Techs. Corp.*, 2018 WL 2047468, at *14 (S.D. Fla. May 2, 2018) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000)). Moore's opinions are entirely speculative and lack any rigorous, reliable, or identifiable methodology. For that reason, they should be excluded.

### A. Moore's Alleged "Temporal Correlation" Is Unreliable.

Moore offers his opinion that there is a "temporal correlation" between soil leaving Pratt & Whitney and fill being used in the Acreage based on a graph he created. He constructed a timeline and plotted on it the dates of select cancer diagnoses in the Acreage, the completion of 30 selected house pads, and the dates that Pratt & Whitney sent soil to a thermal treatment facility. Ex. 4 (Moore) at Ex. A. Moore's conclusory assertion that there is a "temporal correlation"

between these data points is not supported by a shred of expert analysis. He merely presented data supplied by Plaintiffs' counsel and cast it as an opinion.

Moore did not conduct any type of statistical analysis or assessment of the data he received from Plaintiffs' counsel. There was no methodology other than plotting the dates on the timeline. Moore himself admitted that there was "no geology" or science involved in those opinions; the chart was simply "data presentation." Ex. 9 (9/16/16 Moore Tr.) 134:6-135:19; Ex. 1 (Moore) 6:8-24. Moore himself did not sponsor or choose the underlying data, and the only step Moore took after plotting the data was to look at the points on the graph. Ex. 8 (Moore) 460:24-461:8. This is not the province of experts. *Frazier,* 387 F.3d at 1262-63 (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen") (citation omitted).

Further, even if Moore had conducted some statistical inquiry, he did not consider anywhere close to enough data to draw a conclusion about a "correlation" between the diagnosis dates of cancers in the Acreage and Pratt & Whitney's remediation activities. He only considered these and related Plaintiffs' diagnoses, rather than considering all of the diagnoses in the Acreage. Ex. 8 (Moore) 458:6-22; 460:16-23. He also focused solely on the time period with which he was concerned and did not compare that data to diagnoses from before or after that time period to determine if there was any type of increase or decrease that correlated to a particular time period or event. *Id.* at 457:13-458:3; 458:23-459:11; 460:10-15.

Expert testimony is only reliable when it is grounded in a "rigorous methodology," *Frazier*, 387 F.3d at 1262, and is "based upon sufficient facts or data," *McClain*, 401 F.3d at 1237 (quoting Fed. R. Evid. 702). Moore's biased presentation of data that was cherry-picked by Plaintiffs' counsel does not constitute a sound methodology. Moore simply does not conduct any expert analysis to support his baseless, conclusory assertion, and his "temporal correlation" opinion should be excluded.

### B.    Moore's Alleged "Spatial Correlation" Is Neither Relevant Nor Reliable.

Moore's opinion about an alleged "spatial correlation" between parcels in the Acreage that received fill dirt in 2000-2001 and Plaintiffs' homes should also be excluded, for two reasons. ***First***, his "spatial correlation" opinion does not fit the case, given that Moore does not know where the fill in the Acreage came from. ***Second***, the opinion is unreliable, as it is not based on any discernible methodology (much less a reliable one), nor is it based on sufficient facts or data. Ex. 6 (Moore) at 5.

### 1.   Moore's "spatial correlation" theory does not fit the facts of this case.

Moore reached his conclusion about a "spatial correlation" by highlighting particular homes on a map and deducing that they are close to one another. Specifically, he highlighted in blue or purple select homes of Plaintiffs in this and related cases and highlighted in red some homes he believes received fill in 2000-2001, which is the primary period during which he says soil was being removed from Pratt & Whitney.[1] Ex. 6 (Moore) at Attachment B; Ex. 8 (Moore) 277:9-12; 278:6-24.

Critically, Moore does not know and therefore cannot say where any of the fill purportedly used at the "red" properties came from. Ex. 8 (Moore) 283:8-25; 326:7-17. Indeed, he does not have any information as to where *any* homeowners in the Acreage got their fill (though he acknowledges that there are "multiple sources of fill.") Ex. 9 (Moore) 92:23-93:2; Ex. 1 (Moore) 123:3-6. Thus, Moore is incapable of saying anything meaningful about Plaintiffs' and/or the members of the cancer cluster's soil, much less connecting it to Pratt & Whitney in some way.

Moore also opined that there is a correlation between some homes that received fill from Tru Trucking[2] and some Plaintiffs' homes. But he could not identify which, if any, homes in his maps in Attachment B were Tru Trucking homes and did not identify the location of any of those homes on any map or figure. Ex. 8 (Moore) 327:25-331:9.

Because Moore does not know from where any home in the Acreage received its fill, his conclusion about a supposed "spatial correlation" is irrelevant to this case.

---

[1]The identification of the red supposed "fill" homes was based upon a spreadsheet of data—created by Plaintiffs' counsel—that purported to summarize final plumbing inspection dates from Palm Beach County Planning, Zoning, and Building records. Ex. 8 (Moore) 280:15-282:3. Moore simply assumes the final plumbing inspection dates should reflect the latest date by which fill would have been deposited at the red homes, but he did not verify the actual dates on which fill was deposited or whether his assumption is reasonable. Ex. 8 (Moore) 279:7-283:4.

[2]Moreover, by speculating that Tru Trucking obtained fill from Pratt & Whitney, Moore ignores the actual evidence presented in this case in the form of testimony by the owner of Tru Trucking, Frank Trujillo, who testified that Tru Trucking did not use soil from Pratt & Whitney as fill and that much of the residential fill they sold came from Palm Beach Aggregates. Ex. 10 (1/3/18 Trujillo Tr.) 21:20-22:9; 23:3-11; 24:7-21. Related plaintiffs' own interrogatory responses reflect that they obtained fill for their Acreage properties from Palm Beach Aggregates, as well as from soil obtained by digging a pond on their own property or from nearby canals. Composite Ex. 11 (Interrog. Responses).

### 2. Moore did not employ any reliable methodology to form his "spatial correlation" opinion.

Even setting aside its irrelevance, Moore did not employ any reliable methodology to arrive at his conclusion of a "spatial correlation." He did not conduct any type of statistical analysis—he simply looked at the maps he created and offered his opinion that he thought the houses seemed to be "in the vicinity of" one another. Ex. 8 (Moore) 332:2-15; 339:5-24; 339:25-340:5 (Q. "So you didn't conduct any analysis in trying to determine this correlation, as you say, beyond just looking at these pictures and – and noting that you see red homes in the vicinity of purple homes; correct?" A. "That's about right."). This does not constitute a rigorous methodology—or any "expert" analysis at all—nor would it assist the trier of fact. *Frazier*, 387 F.3d at 1262.

Further, as with "temporal correlation," Moore had nowhere near sufficient data to support this assertion regarding a "spatial correlation." Moore looked only at the areas immediately surrounding Plaintiffs' homes. It is hardly surprising that there are homes in the vicinity that received fill during the time period on which Moore focuses, as practically all properties in the area required fill to facilitate building and houses in the area were built over the course of many years. But Moore did not look at a "control area" to see if red homes (whatever they actually represent) were more common near plaintiff homes than in other areas. Ex. 8 (Moore) 330:2-331:9; 335:1-24; 339:5-24. There is also no pattern in the distance from the "red fill homes" to the plaintiff homes—some plaintiff homes were within a couple lots of a red home; others were 6 or 7 lots away from the nearest one. *Id.* at 332:16-333:15. Moore also admitted there were hundreds upon hundreds of non-plaintiff homes that were also "nearby" the red homes, without offering any explanation as to how that does not undermine the relevance of his alleged correlation. *Id.* at 340:9-14; 341:7-343:1. Moore's conclusion that somehow there is a spatial correlation based upon his identifying *some* red homes being "within the vicinity" of *some* plaintiff homes is not based upon any methodology, let alone a reliable one.

In sum, Moore's opinion as to a "spatial correlation" should be excluded because it does not show anything relevant, it does not reflect the application of any discernible expertise or expert methodology, and the core observation that some houses are "in the vicinity" of others that allegedly received fill from an unknown source cannot reliably be attributed to anything beyond the coincidence of numerous houses in the area periodically receiving fill for construction over time.

## II.   MOORE'S OPINIONS REGARDING THE SUPPOSED ENVIRONMENTAL TRANSPORT OF CONTAMINANTS SHOULD BE EXCLUDED.

Moore claims that contaminants could have traveled in environmental media between Pratt & Whitney and the Acreage. Ex. 3 at 3-5; Ex. 4 at 3; Ex. 5 ¶¶ 50-51; Ex. 6 ¶¶ 9(a)-(i), 10(c), 12, Attachment B. He suggests this could have happened one of two ways: through air transport or through groundwater. *Id.* Moore admits that he did not conduct even a scintilla of expert analysis regarding whether and how contaminants could travel by wind from Pratt & Whitney to the Acreage. He did not conduct expert analysis regarding the possibility of groundwater transport either, but he did review the analysis of other hydrogeologists, and regurgitated their conclusions in his reports.

An expert that "simply adopt[s]" another expert's analysis and conclusions has undertaken "a methodology [that] surely does not satisfy the *Daubert* standards." *In re TMI Litig.*, 193 F.3d 613, 716 (3rd Cir. 1999) (finding that an expert's "unblinking reliance" on other experts' opinions "demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results"). Because Moore merely parroted other experts' hydrogeological opinions, his opinions regarding groundwater transport should be excluded. Further, Plaintiffs are not pursuing a theory of environmental transport and, in any event, the opinions Moore seeks to co-opt have nothing to do with the travel of radioactive material in groundwater. Moore's groundwater opinions should therefore be excluded for the additional reason that they do not "fit" Plaintiffs' case.

### A.   Moore Did Not Conduct Any Expert Analysis To Support His Theory That Contaminants Could Travel By Air From Pratt & Whitney To The Acreage.

Moore admits that he did not conduct any air-transport modeling, or any other type of air-transport analysis, to support his air-transport theory. Ex. 8 (Moore) 275:17-25; 322:2-323:2. He also admits that he did not review any air-transport analysis from any other experts. *Id*. at 276:1-18. Because Moore's speculation about the possibility of contaminant air transport from Pratt & Whitney to the Acreage is wholly unsupported, that "opinion" does not come close to clearing the bar set by *Daubert*.

### B.   Moore's Opinions Related To Groundwater Transport Solely Consist Of Improper Bolstering.

Moore testified that he knew the proper steps one should take to determine if a contaminant could or did travel from one place to another. *Id.* at 221:1-234:10. He cited various methods

through which one could estimate the rate of groundwater flow, such as Darcy's formula. *Id.* at 222:25-225:5. And he is aware of various methods by which one can estimate the direction of groundwater flow, such as the creation of a potentiometric surface map through the measurement of the water table in wells. *Id.* at 225:22-228:14. Indeed, Moore said that he engages in these types of methodologies in his normal work. *Id*. at 219:23-222:12.

But Moore did not perform any "independent studies or tests" of this nature. Ex. 9 (Moore) 31:7-23; Ex. 8 (Moore) 234:11-239:18; 270:2-16. Instead, he simply summarized the work done by other expert witnesses on hydrogeology retained by other parties—Dr. Stephens and Dr. Bedient—whom the Plaintiffs in this case have declared they are *not* calling in support of their claims.[3] Ex. 9 (Moore) 30:19-33:1; 35:4-36:17 ("I believe I was reviewing the reports, as a peer in the industry, to render an evaluation as to the validity of the opinions that were rendered by that expert, or in that report."). He did claim to separately review a few articles from the United States Geological Survey to confirm some of the assertions made by Dr. Stephens and Dr. Bedient, but he admits that this limited article review is nowhere near enough to independently support an opinion about the ability of contaminants to travel from Pratt & Whitney to the Acreage. Ex. 8 (Moore) 248:5-23. Put simply, Moore's "peer review" does not constitute a reliable methodology or an admissible expert opinion under *Daubert*.

"While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, such expert must make some findings and not merely regurgitate another expert's opinion." *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) (internal citations and quotations omitted). Because Moore did nothing more than put his stamp of approval on other experts' hydrogeological opinions—opinions that are *not* being offered independently in this cases—his groundwater opinions are not based upon any reliable methodology and should be excluded.

**C.     There Is No "Fit" Between Moore's Groundwater Opinions And This Case.**

Even if Moore were permitted to adopt wholesale other experts' analyses, his opinions would still be inappropriate, as they do not "fit" the theories upon which Plaintiffs base their case, for two reasons.

---

[3] In response to a specific inquiry about the scope of expert testimony at issue for purposes of these *Daubert* motions, counsel for Plaintiffs confirmed that they are not relying on Bedient or Stephens as experts in this case.  DE 571-1 at 1.

*First*, Plaintiffs have made clear that they are pursuing a theory of contaminant transport via a supposed soil trucking conspiracy, not the environmental transport of contaminants. *See, e.g.*, DE 552 at 4-5. To that end, Plaintiffs have disavowed any reliance on Dr. Stephens and Dr. Bedient. Any opinion regarding environmental transport between Pratt & Whitney and the Acreage is therefore irrelevant to Plaintiffs' theory of liability and should be excluded from this case.

*Second*, even if Plaintiffs were pursuing an environmental transport theory, Moore's groundwater opinions would remain irrelevant. Plaintiffs allege that the cancer cluster was caused by radioactive contamination. The experts Moore copied—Dr. Stephens and Dr. Bedient—opined on the ability of *non-radioactive* contaminants like 1,4-Dioxane to travel through groundwater between Pratt & Whitney and the Acreage. Ex. 12 (4/7/16 Bedient Decl.), Ex. 13 (4/4/16 Stephens Rpt.); Ex. 8 (Moore) 265:9-15; 265:23-266:3 (Q. "Sir, we just established, and you just agreed, that Stevens [sic] and Bedient don't say anything about whether radioactive materials could travel from Pratt & Whitney to the groundwater. Do you recall that testimony?" A. "I do."). They did not assess whether and to what extent radioactive materials could travel through groundwater. Ex. 12 (Bedient) at 39-47; Ex. 13 (Stephens) at 45. Moore admits that different contaminants have differing abilities to travel through groundwater. Ex. 8 (Moore) 229:9-12. He also admits that he has done nothing to determine whether, how, and how much any particular radioactive material could travel in the groundwater near the Acreage. *Id.* at 273:2-10 (Q. "So you are not offering an opinion that radioactive material could travel through groundwater from Pratt & Whitney to the Acreage; is that correct?" A. "It's a hypothetical. I'm not offering an opinion on that right now." Q. "Right. You don't have an opinion that radioactive material could travel from Pratt & Whitney to The Acreage, correct?" A. "I haven't written that opinion out, no."). Moore therefore has no basis to claim that radioactive materials could travel the great distance between Pratt & Whitney and the Acreage through groundwater, rendering his groundwater opinions irrelevant to Plaintiffs' theory of liability.

Moore's groundwater opinions do not "fit" the facts behind Plaintiffs' claims, and should be excluded.

## III.   MOORE'S OPINIONS REGARDING MOVEMENT OF CONTAMINANTS WITHIN THE ACREAGE SHOULD BE EXCLUDED.

Moore likewise did not employ any reliable or discernible methodology to arrive at his opinions regarding the movement of contaminants within the Acreage. Such opinions should therefore be excluded.

In the maps comprising Attachment B to his 2017 Report, Moore includes a series of yellow lines and blue and red arrows that purport to represent overlays of "direction and prevalence of wind contribution," "[i]nterpolated canal flow direction," and "[i]nterpolated near-surface groundwater flow direction." His intent apparently is to suggest that alleged contaminants at parcels that received fill in 2000-2001 (highlighted in red) *could have* traveled by air or water to select properties in the Acreage of persons diagnosed with cancer. Ex. 6 (Moore) at Attachment B. Moore does not actually explain in his 2017 Report what the graphics are meant to represent or the significance of the lines and arrows. Ex. 8 (Moore) 315:8-316:20. Nor does he provide an explanation in his Report of the source of this information, or the methodology he relied upon to create the maps. When deposed, Moore revealed that this was because Attachment B is not premised upon *any* methodology, let alone a reliable one.

### A. Moore's Opinion As To Alleged Wind Transport Of Contaminants Is Unsupported And Unreliable.

According to Moore, his maps depicting the homes of plaintiffs in this and related cases and certain parcels that received fill purportedly indicate the "direction and prevalence of wind contribution towards" those homes. Ex. 6 (Moore) ¶ 10(g); Attachment B. The implication is that contaminants from "red" homes could have traveled by wind to Plaintiffs' "purple" homes. However, this is not based upon any reliable methodology, nor does Moore have the expertise to proffer such opinions.

As explained above, Moore did not create any airborne transport models.[4] Ex. 8 (Moore) 275:17-25. Indeed, he admitted that he did not conduct any analysis whatsoever "regarding the possibility of airborne travel of contaminants in this case." *Id.* at 275:17-276:23. Moore did not conduct any wind testing or determine typical wind forces or average wind velocity. *Id.* at 320:12-321:14. He did not conduct any analysis regarding what type of contaminants could travel by wind and how, much less whether, there is evidence that any contaminant *actually did* travel by wind. *Id.* at 322:2-323:2. And he did not test *any* air in the Acreage for the presence of contaminants. *Id.* at 321:15-17. Moore admitted that he just copied and pasted wind patterns from an airport miles

---

[4]To the extent Moore intends to testify that his depictions on his maps allegedly support a theory that contaminants traveled by air from Pratt & Whitney to the Acreage, his opinions should be excluded. Moore expressly admitted that he has "no opinion regarding whether it's possible for airborne particles to travel from Pratt & Whitney to The Acreage." Ex. 8 (Moore) 276:19-23.

away from the Acreage. *Id.* at 319:5-320:11. This is patently insufficient and unreliable, as he admitted local patterns differ from regional patterns. *Id.* at 321:18-21.

Further, Moore admitted that he has no experience in assessing airborne transport of contaminants—he has never created an airborne model for transport of particles and has never been asked professionally to determine whether it is possible for particulates to travel by wind from one location to another. *Id.* at 274:9-275:16. Moore did not employ a reliable, rigorous methodology "based upon sufficient facts or data," he has no expertise to offer opinions on airborne transport, and his opinions regarding the airborne transport of contaminants within the Acreage—to the extent they even exist—should be excluded. *McClain*, 401 F.3d at 1237 (quoting Fed. R. Evid. 702).

## B.  Moore's Theory Of Groundwater Transport Within The Acreage Is Not Supported By A Reliable Methodology.

Similarly, Moore did not employ any reliable methodology in representing "[i]nterpolated canal flow direction" and "[i]nterpolated near-surface groundwater flow direction" on his maps of certain Acreage properties. Ex. 6 (Moore) at Attachment B. Moore did not conduct any analysis regarding the type of contaminants that could travel by groundwater in the Acreage and how, much less whether, there is evidence that any contaminant *did* travel by groundwater within the Acreage.

Despite recognizing myriad factors that influence flow, Moore based his opinion regarding directional flow solely on the location of some, but not all, canals. Ex. 8 (Moore) 287:8-288:12. Moore did not conduct *any* field analysis to determine if his assumptions were accurate. Moore did not test, for instance, water-table height to determine if his guesses were correct. *Id.* at 289:1-5. Nor did he take into account where different wells were placed, or matters like the potentiometric surface of groundwater in the area. *Id.* at 288:16-25.[5]

Further, even if Moore's methodology was reliable, it wasn't disclosed. He opines as to purported groundwater directions in Attachment B but does not explain how he determined those directions. *Id.* at 284:1-286:2. *See Cotromano*, 2018 WL 2047468, at *14 (experts "must explain the research and methodology they employed in sufficient detail in order to allow the other party's expert to test that hypothesis"). Instead, he claimed to have based his work on his experience. Ex. 8 (Moore) 286:1-2. Moore simply placed arrows on a map, with no explanation of how they were,

---

[5]For context, only one of Pratt & Whitney's hydrogeologist's several opinions required the collection of water-table heights at over 200 wells.

as he says, "interpolated." *See* Ex. 6 (Moore) at Attachment B. His conclusion is thus "connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co.*, 526 U.S. at 157. Having failed to employ a reliable, rigorous, or even identifiable methodology, Moore's opinions should be excluded.

### C.   Moore's Opinions Regarding Alleged Movement Of Contaminants Within The Acreage Do Not "Fit" This Case.

Moore's opinions regarding alleged movement of contaminants within the Acreage would not be helpful to the trier of fact in this case. There is no "fit" because he offers no opinions as to any actual contamination or transport of contamination to any Plaintiff's home, nor to the home of any member of the declared cancer cluster.

Moore admits he does not know if there is contamination at any particular home in the Acreage, including Plaintiffs' homes, the homes of the individuals who comprise the declared cluster, and the homes that purportedly received fill in 2000-2001. Ex. 8 (Moore) 306:4-313:19; 350:2-5 (claiming that he was assessing the Acreage "on a macro level" and has no opinion whether there is contamination at Plaintiffs' homes, including Featherston's home). He did not independently review any testing data apart from data that was either included in or attached to another expert's report or included in or attached to a factual document that he reviewed. *Id.* at 201:19-24; 217:2-16.[6] Moore reviewed the report of Plaintiffs' proffered expert witness Marco Kaltofen, but did not do any related, independent analysis, instead simply deferring to Kaltofen regarding whether, where, and to what extent radiological contamination existed. Ex. 9 (Moore) 50:25-51:24; Ex. 8 (Moore) 208:7-19. Moore admitted that he supposedly "discerned . . . from reading the Kaltofen report" that the "relative abundance" of radionuclides is "evidence that the radioactive materials in The Acreage are derived from an anthropogenic source." Ex. 8 (Moore) 209:24-210:15; 211:21-212:1.

Moore further admits that he has no opinion regarding whether contamination could travel from any one particular house to any other particular house. *Id.* at 304:4-305:11; 313:20-314:19. For example, he does not know if contamination could have traveled to the Featherston's home—

---

[6]Nor does Moore have any experience testing samples to determine whether they contain radioactive material, let alone determine whether radiological data is reflective of normal radioactive material levels or of some type of radioactive contamination. He also has no experience examining radiological data from two different places and attempting to determine whether they are the same or related. Ex. 8 (Moore) 201:25-205:3.

by water or by air—from any other home in the Acreage. *Id.* at 349:22-350:1. He additionally admitted different contaminants travel differently through groundwater, and he did not assess the extent to which radionuclides could travel through groundwater. *Id.* at 229:9-12; 271:3-25.

Moore's opinions and the figures he created are irrelevant and would not assist the trier of fact. His opinions essentially boil down to the uncontroversial claim that some contamination can sometimes travel through water or by wind. Because he does not have an opinion whether contamination did or even could have traveled from some source to any particular home, much less that contamination did travel to the home of a cancer-cluster member, his opinions do not help Plaintiffs show that Pratt & Whitney caused the cluster. They therefore lack the fit that is required by Rule 702 and *Daubert* and should be excluded. *Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260.

## IV.   MOORE'S REMAINING OPINIONS REGARDING THE ALLEGED TRANSPORT OF SOIL SHOULD BE EXCLUDED.

The remainder of Moore's opinions consist of his lay observations of a small set of documents and the larger, unsupported factual inferences he draws from them. It is little more than Plaintiffs' counsel's narrative of their trucking theory dressed up as expert opinion testimony. This is document review and advocacy meant for lawyers, not geology or expert analysis. Moore supplants the role of the trier of fact by offering a "factual" narrative describing his view of select documents and testimony. Moreover, his factual narrative is not grounded upon any reliable methodology and does not fit the facts of this case.

### A.   Moore's Factual Commentary Is Not An Appropriate Subject Matter For Expert Testimony.

Moore does not conduct any type of expert analysis to "discern facts" purportedly showing that soil from Pratt & Whitney likely went to the Acreage. Rule 702 requires that expert testimony be helpful to the trier of fact. It is axiomatic that "[e]xpert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assoc. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995).

Everything in Moore's reports is well within the understanding of the average lay person. Moore merely reads some (but not all) of the documents and provides a slanted interpretation of selected portions of those documents. He discusses soil excavation projects, including the shipment and manifest records for soil; he critiques Magnum, the thermal treatment facility where

petroleum-laden soil from Pratt & Whitney was sent for treatment; he interprets what he sees as purported "discrepancies" in manifests for the shipment of soil; and he argumentatively and misleadingly characterizes the testimony of witnesses, such as individuals from a trucking company. Ex. 6 (Moore) at Attachment C, ¶¶ 1-46. Moore essentially offers a summary of Plaintiffs' trucking theory.[7] For example, Moore's statements regarding Pratt & Whitney's manifests for the disposal of soil were limited to contending, based upon what Plaintiffs' counsel told him, that there allegedly were insufficient records and "data gaps" regarding the removal of soil from Pratt & Whitney. Moore had not even initially reviewed the soil manifests in reaching his conclusions, relying instead upon a summary prepared by Plaintiffs' counsel. Ex. 9 (Moore) 62:11-16. Moore also provides details about a group of entities that have no known relation to Pratt & Whitney, and then parrots the purported connection advocated by Plaintiffs' counsel—describing a 2000 advertisement for fill dirt being sold within the vicinity of Pratt & Whitney. Ex. 6 (Moore) at Attachment C, ¶¶ 35-43.

Expert testimony is unnecessary and improper where the witness simply reviews documents, deposition transcripts, and exhibits, and then provides "a narrative of selected [] events and a summary of" documents. *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337 (S.D. Fla. 2010); *cf. In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. Mar. 15, 2004) (explaining that because a jury "is equally capable of constructing" the facts of the case from evidence introduced through "percipient witnesses and documentary evidence," the expert's testimony on the subject is not only unnecessary, it is improper). "While an expert must of course rely on facts or data in formulating an expert opinion, *see* Fed. R. Evid. 703, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (ruling factual narrative in expert witness report inadmissible). "[T]estimony by fact witnesses familiar with those documents would be far more appropriate . . . and renders [the expert witness'] secondhand knowledge unnecessary for the edification of the jury." *LinkCo, Inc. v. Fujitsu Ltd.*,

---

[7]The Court noted in its Order denying class certification that Plaintiffs' trucking theory is premised upon "a chain of circumstantial evidence," upon which they "adduce that contaminated soil from UTC found its way directly to the Acreage for use as residential landfill." *Cotromano*, 2018 WL 2047468, at *4 n.6.

2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (citation and internal quotation marks omitted) (alterations in original).

Expert testimony also must consist of more than speculation and inferences drawn from evidence or "what lawyers for the parties can argue in closing arguments." *Tampa Bay Water v. HDR Eng'g*, 2011 WL 7429399, at *2 (M.D. Fla. Sept. 8, 2011) (quoting *Frazier*, 387 F.3d at 1262–63); *see also Highland Capital*, 379 F. Supp. 2d at 469 ("no expert may supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence.") (alteration in original; internal citations and quotations omitted). Moore's opinions do not contain any scientific testimony supporting the opinions he offers. Rather, his opinions seek to usurp the factfinder's role by offering conclusory statements as to the meaning of documents—it "offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63. "Plainly stated, [the proffered expert] is an advocate, presented with the trappings of an expert but with no expectation or intention of abiding by the opinion constraints of Rule 702." *In re Trasylol*, 709 F. Supp. 2d at 1351. Indeed, Moore betrayed his true role as a conduit for Plaintiffs' counsel's speculations when questioned about his "opinions." Ex. 8 (Moore) 435:2-8 ("**I believe** it is **our claim** that these are the daily logs. . . .") (emphases added).

Moore's opinions should be excluded, and he should be prohibited from testifying because his characterization of the facts does not assist the trier of fact through the application of specialized expertise.

## B. Moore's "Opinions" Regarding Supposed Soil Transport Are Not Premised Upon Any Reliable Methodology.

As a further sign that Moore's speculations and biased commentary is not proper expert testimony, Moore's factual narrative, including his opinions regarding Pratt & Whitney's records of soil disposal, is not premised upon any discernible methodology employed to reach this conclusion. Moore simply read documents and then stated what he believes he can discern from them. Again, Moore's opinions read more like the argument of counsel than testimony from an expert witness applying "scientific" or other real expertise.

For example, Moore offers opinions regarding Pratt & Whitney's records of soil disposal, without offering any explanation for the methodology he employed to reach this conclusion. *See* Ex. 6 (Moore) at Attachment C, ¶¶ 12-17. He discusses what he perceives are "numerous inconsistencies and irregularities that appear within [soil shipping] manifests" that Pratt & Whitney produced in this case. *Id.* ¶ 17; *see also id.* ¶¶ 12-16. Yet Moore does not apply any expert

standard or analysis in determining whether these alleged inconsistencies are meaningful or important. Instead, he provides his lay observations of a small set of documents and draws larger, unsupported factual inferences from them. When asked how his expertise allowed him to draw the conclusion that soil went from Pratt & Whitney to the Acreage, Moore's response was: "I guess my expertise includes reading, reviewing, and understanding other people's sworn testimony or depositions [and] making note of those statements that were made in the record and reiterating them and relying upon those in rendering my opinions." Ex. 8 (Moore) 355:11-24. That is the job of the jury, not an expert.

As another example, Moore opined that there was an elevated demand for fill in the Acreage in 2000-2001 but did not perform any calculations; his opinion was based on just "general observation." *Id.* at 343:3-344:13. Moreover, he fails even at that simplistic, non-expert task. He highlights unreliable evidence (like hearsay provided by a Plaintiff), while ignoring the sworn testimony of people who were present at the events about which he "opines."[8] Moore also ignores facts that contradict his interpretations. For example, he does not include in his "discerned facts" that Frank Trujillo testified that he never took soil from Pratt & Whitney and dumped it in the Acreage. *Id.* at 397:1-5; 397:16-398:14 (admitting that Trujillo's testimony contradicts his opinion). In addition, Moore makes logical leaps about what documents purportedly mean while ignoring sworn testimony that directly contradicts his interpretations. As but one example, Moore claims that an audit of the Magnum soil treatment facility stated that Magnum could only receive 60,000 tons of soil in a year, which, he claims, shows that Magnum never could have handled the 10,000 tons of soil Pratt & Whitney sent in October and November of 2000. Ex. 6 (Moore) at Attachment C, ¶¶ 8-9. In reality, the audit says no such thing. The audit merely estimates the "Annual Quantity of Waste Managed at The Facility." Ex. 17 (1999 ERM Audit) at 7, 11. And the former manager of the Magnum facility testified that Magnum could receive 10,000 tons of soil in *a week*. Ex. 15 (Miskimens) 82:1-4.

---

[8] A former Magnum employee testified that Magnum did not sell fill dirt for use in residential areas, Ex. 14 (9/20/17 Johnson Dep.) 19:15-17, and another said that 90% - 99% of Magnum's remediated soil was sold to a single asphalt company. Ex. 15 (9/27/17 Miskimens Dep.) 32:21-33:1. Moore ignores that testimony. He instead relies on a hearsay statement made by former Plaintiff Tracy Newfield. Ex. 16 (2/22/18 Newfield Interrog. Answers). Ms. Newfield claims that Perry Williams, an independent contractor who did work at Pratt & Whitney, told her that he bought soil from Magnum for use as residential fill. *Id.*

Plaintiffs cannot rescue Moore's inadmissible opinions by reference to his experience as a "Licensed Site Professional" and "Professional Geologist," Ex. 6 (Moore) ¶ 3, because he "neglects to explain how his experience supports his conclusion." *LinkCo*, 2002 WL 1585551, at \*4. Moore also admitted that his prior soil disposal consulting work ***did not*** include providing input on record maintenance related to the project, which is a primary focus of his criticisms here. Ex. 9 (Moore) 159:17-23. "While it is permissible for [an expert] to base his opinion on his own experience, he must do more than aver conclusorily that his experience led to his opinion." *LinkCo*, 2002 WL 1585551, at \*4. "Without good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience." *Id.* "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Moore offers his opinions without explanation as to how he reached his conclusion nor how his factual summary relates to the conclusions.[9]

### C.    Moore's Speculative Interpretations Of Documents Are Irrelevant.

Moore's opinions are based upon mere speculation, are not grounded in any methodology, and require no expertise. They also are not relevant and would not assist the trier of fact—there is no fit to the facts of this case. Again, Moore cannot point to a single property that purportedly received fill from Pratt & Whitney, and has not even tried to claim that a Plaintiff or member of the declared cancer cluster received such fill. Ex. 8 (Moore) 344:25-345:15. Moore also cannot say that any fill that left Pratt & Whitney had radioactive material in it, much less material that purportedly caused anyone's cancer. *Id.* at 208:20-25; 367:21-368:14; 393:24-394:3. Moore further does not know where any of the fill purportedly used at those properties came from. *Id.* at 283:8-25; 326:7-17. He claims that the red houses on his figures in Attachment B are relevant because they received fill in 2000-2001. However, he does not have any information as to where any homeowners in the Acreage got their fill. Ex. 9 (Moore) 92:23-93:2. He further admitted that he did not look at "whether any other place could have been a source for particulate matter in the

---

[9]As with all other experts, UTC reserves objections to Moore's testimony at trial based on a lack of probative value. *See* Fed. R. Evid. 403. When (as here) a party dresses factual testimony in a veneer of expert testimony, there is a palpable risk of prejudice, given that experts "may be assigned talismanic significance in the eyes of lay jurors." *Frazier*, 387 F.3d at 1263. The risk of prejudice heightens the importance of the Court's role as a gatekeeper.

Acreage" and admitted that there is no "direct documentation of relocation of the soils" from Pratt & Whitney to the Acreage. *Id.* at 96:14-97:9.

Moore's "opinions" suffer from an even more foundational and dispositive shortcoming as well. Moore claims soil from Pratt & Whitney could have been used as fill dirt in the Acreage between 1993 and 2001. Ex. 4 (Moore) at 2, 4, 6. To determine if homes received fill dirt during this period (and thus potentially received fill from Pratt & Whitney, according to him), Moore established a "speculated window for fill" based on the date of these and related Plaintiffs' homes' construction permits and plumbing inspections. Ex. 8 (Moore) 279:7-283:4; Ex. 18 (Moore's "speculated window[s] for fill"). Yet Moore did not even identify the individuals who comprised the FDOH's announced cancer cluster, much less show that their homes were built during the window when Moore claims that fill could have come from Pratt & Whitney. And what is more, the only home Moore assessed that is actually associated with a member of the cancer cluster— that of former Plaintiff Newfield—was built in 2002, *after* the period when Moore himself says homes could have received soil from Pratt & Whitney. Ex. 1 (1/11/18 Perry Test.) 74:1-75:10 (Newfield is the only Plaintiff who was a member of the FDOH's declared cancer cluster); Ex. 18 (Newfield's "speculated window for fill" occurred in 2002). Thus, even Moore's unsupported speculation does not establish that any member of the cancer cluster received fill from Pratt & Whitney, and in fact affirmatively suggests to the contrary. Moore's analysis therefore does not help Plaintiffs show any causal link between Pratt & Whitney and the cancer cluster and is thus irrelevant.

In sum, even if Moore's opinions were based on some reliable methodology, they do not make it any more likely that Pratt & Whitney caused the cancer cluster on which Plaintiffs base their case. Moore's "unscientific speculation" is not proper expert testimony and should be excluded. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316–17 (11th Cir. 1999)).

## CONCLUSION

For the foregoing reasons, Moore's opinions should be excluded in their entirety.

**REQUEST FOR HEARING**

Pratt & Whitney respectfully requests a hearing on this motion. This motion concerns expert testimony regarding geological, hydrogeological, and radiological issues, and is therefore more complex than a typical motion. Pratt & Whitney believes that oral argument will aid this Court in understanding the facts and issues presented in the parties' briefing. Pratt & Whitney estimates that this motion requires 30 minutes of oral argument.

Pratt & Whitney's *Daubert* Motion to Exclude the Testimony of Brian D. Moore
And Incorporated Memorandum of Law

Index to Exhibits

| | |
|---|---|
| Exhibit 1 | Transcript of Hearing on Motion for Class Certification, January 11, 2018 |
| Exhibit 2 | Transcript of Hearing on Motion for Class Certification, January 10, 2018 |
| Exhibit 3 | Declaration of Brian Moore, May 23, 2016 |
| Exhibit 4 | Supplemental Declaration of Brian Moore, August 8, 2016 |
| Exhibit 5 | Class Certification Direct Testimony Affidavit of Brian Moore, December 1, 2017 |
| Exhibit 6 | Report of Brian Moore, December 22, 2017 |
| Exhibit 7 | Reply to the Responses to the Opinion of Brian D. Moore as Contained in UTC Expert Submissions, March 23, 2018 |
| Exhibit 8 | Deposition of Brian Moore, April 20, 2018 |
| Exhibit 9 | Deposition of Brian Moore, September 16, 2016 |
| Exhibit 10 | Deposition of Frank Trujillo, January 3, 2018 |
| Exhibit 11 (Composite) | Notice of Serving Answers to Defendant's Second Set of Interrogatories – Gayahpersad, July 7, 2016<br>Notice of Serving Answers to Defendant's Second Set of Interrogatories – Wise, July 7, 2016 |
| Exhibit 12 | Report of Phillip Bedient, Ph.D., April 7, 2016 |
| Exhibit 13 | Declaration of Daniel B. Stephens, Ph.D., April 4, 2016 |
| Exhibit 14 | Deposition of Donna Johnson, September 20, 2017 |
| Exhibit 15 | Deposition of Rebecca Miskimens (nee Piche), September 27, 2017 |
| Exhibit 16 | Notice of Serving Verified Revised Updated Answers to Defendant's Second Set of Interrogatories to Newfield, February 22, 2018 |
| Exhibit 17 | ERM Audit of Magnum Environmental Services, Inc., March 5, 1999 |
| Exhibit 18 | Exhibit 16 to Deposition of Brian Moore |

Dated:  May 20, 2020

Respectfully submitted,

By: /s/ Gregor J. Schwinghammer

GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL  33401
Telephone:  (561) 650-0595
Facsimile:  (561) 655-5677
GREGOR J. SCHWINGHAMMER, JR.
Florida     Bar     No.     090158
gschwinghammer@gunster.com
BARBARA BOLTON LITTEN
Florida Bar No. 0091642
blitten@gunster.com

BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Telephone:  (312) 494-4400
Facsimile:  (312) 494-4440
SEAN W. GALLAGHER
*Pro Hac Vice*
sean.gallagher@bartlitbeck.com
ANDREW C. MacNALLY
*Pro Hac Vice*
andrew.macnally@bartlitbeck.com
DANIEL R. McELROY
*Pro Hac Vice*
daniel.mcelroy@bartlitbeck.com
ALEX L. GRODEN
*Pro Hac Vice*
alex.groden@bartlitbeck.com

***Attorneys for Defendant Raytheon Technologies***
***Corporation (Pratt & Whitney)***