**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 13-80928-CIV-MARRA
(Consolidated Action: Lead Case)

RICHARD COTROMANO, et al., all on behalf of       **9:13-cv-80928 Marra/Reinhart**
themselves and all others similarly situated,
       Plaintiffs,
vs.

RAYTHEON TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, A Connecticut Corporation,
and PALM BEACH AGGREGATES, LLC, a
Florida Corporation,

     Defendants.
_____/

JOSEPH ADINOLFE, etc., et al.,       **9:10-cv-80840 Marra/Reinhart**

     Plaintiffs,
vs.

RAYTHEON TECHNOLOGIES CORPORATION,
Pratt & Whitney Group, A Connecticut Corporation,

     Defendant.
_____/

**PRATT & WHITNEY'S *DAUBERT* MOTION TO**
**EXCLUDE THE TESTIMONY OF WILLIAM SAWYER**
**AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ....................................................................................................................... 5

I.      SAWYER'S OPINIONS DO NOT "FIT" ANY MATTER IN DISPUTE. ...................... 6

      A.     Sawyer's Opinions Do Not "Fit" Because He Does Not Opine
            On The Cause Of Any Cancer In The Cluster. ....................................................... 6

      B.     Sawyer's Baratta Analysis Is Irrelevant Because He Has No
            Specific Cause Opinion For Baratta. ..................................................................... 7

II.     SAWYER'S DOSE OPINIONS ARE NOT RELIABLE. ................................................. 8

      A.     Sawyer Does Not Offer A Reliable—Or Any—Dose Opinion
            For Baratta. ............................................................................................................. 9

      B.     Sawyer Does Not Have A Reliable Dose Opinion For
            Santiago .................................................................................................................. 10

           1.     Sawyer Cannot Establish A Causative Dose Through
                 Evidence Of Exposure. ............................................................................ 10

           2.     Sawyer Cannot Establish A Causative Dose From
                 Santiago's Spinal Cord Sample. ............................................................. 11

           3.     The Particle From Santiago's Brain Tumor Does Not
                 Allow Sawyer To Establish A Causative Dose Of
                 Thorium-230. .......................................................................................... 13

           4.     Sawyer Did Not Establish A Causative Dose. ........................................ 16

      C.     Sawyer Does Not Have A Reliable Dose Opinion For
            Wenderoth. ............................................................................................................. 17

III.    SAWYER FAILED TO CONSIDER BOTH THE BACKGROUND RISK
      OF IDIOPATHY AND ALTERNATIVE CAUSES. ........................................................ 18

      A.     Sawyer Ignored Background Risk For Brain Cancer In His
            Analyses. ................................................................................................................ 18

      B.     Sawyer Does Not Rule Out, Or Even Consider, Other
            Potential Causes Of Baratta's Tumor. .................................................................. 19

CONCLUSION ................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ................................................................................... 6

*Cano v. Everest Minerals Corp.*,
   362 F. Supp. 2d 814 (W.D. Tex. 2005) ................................................................ 8, 16

*Chapman v. Procter & Gamble Distrib., LLC*,
   766 F.3d 1296 (11th Cir. 2014) ......................................................... 8, 16, 18, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).................................................................................... 5, 6

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)........................................................................................ 5

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ..................................................... 6, 8, 16, 18

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) .................................................................... 6

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) .................................................................... 6

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ............................................................... 5, 6

*Williams v. Mosaic Fertilizer, LLC*,
   2016 WL 7175657 (M.D. Fla., June 24, 2016)
   (*aff'd*, 889 F.3d 1239 (11th Cir. 2018) ........................................... passim

**Other Authorities**

Restatement (Third) of Torts:
   Phys. & Emot. Harm § 28 (2010) ............................................................... 19

**Rules**

Fed. R. Evid. 702 ...................................................................................... 5, 6

## INTRODUCTION

Plaintiffs rely on expert testimony from Dr. William R. Sawyer, a toxicologist, in support of their claim for property damages related to an alleged "informational stigma" caused by the Florida Department of Health's ("FDOH") cancer cluster designation in the Acreage. Sawyer's opinions should be excluded as lacking in fit and because they are fundamentally unreliable.

Sawyer has not issued an expert report in support of Plaintiffs' property claims. Instead, Plaintiffs rely on Sawyer's previously-disclosed specific cause opinions from three personal injury cases—*Santiago v. UTC, Featherston v. UTC,* and *Wenderoth v. UTC. See* DE 487 (*Cotromano* Expert Disclosure). Given that none of those three personal injury plaintiffs were included as part of the FDOH's cancer cluster designation, Sawyer's opinions about those individuals do not bear on the "informational stigma" at issue here. The Court should therefore exclude his opinions under *Daubert* on the basis of fit.

In addition to Sawyer's lack of "fit," the Court should also exclude him because his purported toxicology opinions are fundamentally unreliable. ***First***, the "hallmark of basic toxicology" is to establish a relationship between the alleged dose a plaintiff was exposed to and the purported effect the plaintiff claims. For Baratta and Wenderoth, Sawyer has no calculation of the alleged dose of Thorium-230 to which they were supposedly exposed, much less does Sawyer establish that such a dose was delivered to their brains in an amount sufficient to cause cancer. For Santiago, Sawyer relies on a flawed dose calculation from Dr. Bernd Franke that was based on samples taken from Santiago's spine (not her brain) years *after* she was diagnosed with brain cancer. Sawyer not only fails to tie Santiago's alleged Thorium-230 exposure to her environment, he also fails to establish that Santiago's claimed exposure was sufficient to cause her brain cancer. ***Second***, a toxicologist must consider a plaintiff's background risk of a disease in evaluating disease causation. Sawyer's analyses fail to account for the individual plaintiff's risk factors for brain cancer, including the fact that 90-95% of all brain cancers are idiopathic (meaning they are caused by natural mutations in our body).

The Court should exclude Sawyer as fundamentally unreliable based on Sawyer's inability to establish a reliable dose for these individuals, failure to establish that any purported dose to these individuals was sufficient to cause brain cancer, and his failure to take into account the individual's risk factors for brain cancer including the background risk of developing cancer.

## BACKGROUND

*The Cancer Cluster Investigation*. In 2009, federal and state authorities investigated a potential cancer cluster in an area of Palm Beach County that is sometimes loosely called "the Acreage." Ex. 1 (Aug. 2009 FDOH Report) at 1, 24. On February 1, 2010, the FDOH confirmed a statistically elevated rate of *pediatric female* brain cancers in the area from 2005 to 2007. Ex. 2 (2010 FDOH Press Release). This finding was based on identifying "three cases among females" age 0 to 19 in the Acreage that were diagnosed from 2005 to 2007. *Id*. The FDOH has never publicly identified a cancer cluster in the Acreage beyond that described in its February 1, 2010 notice.

*Sawyer Reports*. Sawyer issued reports in three personal injury cases in December 2017 along with rebuttal reports in March 2018 that Plaintiffs have incorporated in this case. *See* DE 487. Sawyer's reports address (1) Cynthia Santiago, a pediatric female diagnosed with an ependymoma in November 2009, Ex 3 (Dec. 2017 *Santiago* Rpt.) at 2; (2) Joseph Baratta, a pediatric male diagnosed with a pilocytic astrocytoma in February 2005, Ex. 4 (Dec. 2017 *Baratta* Rpt.) at 2-3; and (3) Christian Wenderoth, a pediatric male diagnosed with a glioblastoma multiforme in August 2016, Ex. 5 (Dec. 2017 *Wenderoth* Rpt.) at 2-3.

*Santiago Cancer and Sawyer Report.* In 2009, at age 13, Cynthia Santiago was diagnosed with an ependymoma, which is a type of brain cancer. Ex. 6 (4/23/18 Sawyer Tr.) at 167:21-23. Following her original diagnoses, Santiago underwent multiple tumor resections and rounds of radiation over the next several years. Ex. 3 (*Santiago* Rpt.) at 2-3. In 2013, Santiago's tumor metastasized to her spine requiring a tumor resection and radiation therapy. *Id*. at 3. The tumor recurred in 2015 on her spine and she died in 2016. *Id*. at 3-4.

After her death, tissue samples were taken from Santiago's body. Eberline Analytical conducted an analysis of various tissue samples in order to measure the amount of different radionuclides in her tissue. With respect to most tissues, Eberline did not find Thorium-230 above the minimum detectable activity (MDA). Ex. 7 (4/16/18 Franke Tr.) at 105:14-19. The only two tissues in which Eberline found Thorium-230 above the MDA were bone tissue and spinal cord tissue. *Id*. The "result" for the Thorium-230 in each was: 0.045 pCi/g (Picocuries per gram) in the bone and 0.131 pCi/g in the spinal cord. Ex. 8 (Eberline Rpt.) at 2 (00027). There was no Eberline analysis of brain tissue. Ex. 6 (Sawyer Tr.) at 44:5-7.

Sawyer's report alleges that Santiago's brain tumor was caused by Thorium-230 exposure. Ex. 3 (*Santiago* Rpt.) at 30-32. While he "assessed non-radiological" contaminants alleged by Plaintiffs, Sawyer admits that he did not find any of them were associated with Santiago's cancer. Ex. 6 (Sawyer Tr.) at 16:25-17:14. In claimed support of his Thorium-230 theory, Sawyer cites a number of studies researching the connection between doses of radiation and many different types of cancers. Ex. 3 (*Santiago* Rpt.) at 5-7, 26-30. Notably, Sawyer does not identify any studies that conclusively show a connection between brain cancer and a dose below 1.4 Gy of x-ray radiation (or, 140 rem). Ex. 6 (Sawyer Tr.) at 60:24-61:16; *see also* Ex. 9 (1/11/18 Perry Test.) at 86:24-87:1; Ex. 10 (2018 Frazier Rpt.) at 58.

Sawyer cites two pieces of data specific to Santiago that he claims led to his conclusion that Thorium-230 caused her brain tumor. The first is the Thorium-230 analysis of Santiago's spinal cord tissue. Ex. 3 (*Santiago* Rpt.) at 20-21, 31. Sawyer admits the spinal cord tissue test came back as a "J" result—*i.e.* a result greater than the MDA, but less than the MDA plus the uncertainty. Ex. 6 (Sawyer Tr.) at 179:24-180:4. "J" results are not reliably quantified. *See infra* at 6-7.

Despite the fact that the amount of Thorium-230 in Santiago's spinal cord could not be reliably measured, Sawyer compares that result to expected levels of Thorium-230 in the spine to reach the conclusion that Santiago has elevated levels of Thorium-230 in her body. Ex. 3 at 22. He then assumes—with no supporting literature or testing data—that the concentration of Thorium-230 in Santiago's spinal cord is an accurate proxy of the Thorium-230 allegedly in her brain. *Id.* at 23. Finally, Sawyer summarily concludes that "the contaminant (Th-230) has been measured at a 'high enough dose'" to cause Santiago's brain tumor. *Id.* at 31.

Second, Sawyer relies on an SEM/EDS analysis of a particle taken from a biopsy slide from Santiago's brain. SEM/EDS—or Scanning Electron Microscopy and Energy Dispersive X-ray Spectroscopy—allows one to assess the elemental composition of particle-sized portions of a sample. Ex. 11 (Feb. 2018 Borch Rpt.) at 5-8, 30. Sawyer claims that the SEM/EDS data for the brain tumor particle in question shows a small amount of Thorium present—about 1.3%. Ex. 3 at 30. Sawyer does not attempt to calculate the amount of radioactivity from that particle or the potential resultant dose. But he does claim that this particle could have transgressed Santiago's blood brain barrier and caused her brain tumor.

*Baratta Cancer and Sawyer Report.* Baratta moved with his family to the Acreage on December 15, 2004. Ex. 12 (7/25/13 Interrog. Resp.) at 17. Roughly six weeks later, in January 2005, a tumor was discovered in Baratta's brain, which his doctors eventually diagnosed as a pilocytic astrocytoma—one of the more common types of brain tumors for children. Ex. 13 (8/26/15 Morrison Tr.) at 11:20-15:23; Ex. 14 (Dec. 2017 Corrected *Baratta* Rpt.) at 3-4; Ex. 35 (*Featherston* Compl.) ¶ 18; Ex. 15 (Feb. 2018 Mitchell Rpt.) at 9. The doctors described this tumor as "huge." Ex. 16 (2/25/05 Record) at 2. They further observed that it had "low proliferative activity . . . confirmed by the very low MIB-1 labeling," meaning it was slow-growing. Ex. 17 (3/3/05 Record); Ex. 13 (Morrison Tr.) at 32:19-34:25.

Baratta's 2005 tumor was partially resected, then treated with medical radiation therapy. Ex. 4 (*Baratta* Rpt.) at 3-4; Ex. 18 (7/14/15 Wen Tr.) at 44:3-45:10. Between April and May 2005, 50.4 gray (5,040 cGy, or 5,040 rem) of radiation was directed to the site of Baratta's tumor. Ex. 4 (*Baratta* Rpt.) at 4; Ex. 18 (Wen Tr.) at 44:3-45:10, 54:19-24, 62:13-63:13. Baratta's doctors warned him and his family that such high, concentrated doses of radiation carried a risk of "malignant transformation" and a "secondary tumor." Ex. 18 (Wen Tr.) at 19:3-23:25. After this treatment, Baratta's original tumor was stable for several years. Ex. 3 at 4.

In December 2008, Baratta's doctors found a new, more aggressive tumor—a glioblastoma multiforme—in his brain. Ex. 4 (*Baratta* Rpt.) at 4-5. The tumor was in the field of irradiation from the radiation treatment of Baratta's first tumor. Ex. 4 (*Baratta* Rpt.) at 5; Ex. 18 (Wen Tr.) at 57:14-58:25; Ex. 19 (1/23/09 Record). In other words, the new tumor was in the same location as Baratta's original tumor. Ex. 18 (Wen Tr.) at 58:22-25. Baratta's 2008 tumor caused his death on September 12, 2009. Ex. 4 (*Baratta* Rpt.) at 6.

Sawyer produced his Baratta report on December 22, 2017. Ex. 4. In that report, Sawyer based his opinions in part on radiological data purportedly related to tissue samples from Baratta. *Id.* at 27, 29, 36-37. Plaintiffs, however, never conducted any radiological testing on tissue samples from Baratta; they only produced radiological data from testing done on Baratta's cremated remains. *Id.* at 27-28. Plaintiffs' counsel later admitted that Sawyer was mistaken about the source of the tissue-based data on which Sawyer relied, and produced a new version of Sawyer's report with "cross-outs" that eliminated the portions of his report purportedly related to the misidentified data. Ex. 20 (2/9/18 Email); Ex. 14 (Corrected *Baratta* Rpt.).

4

The only substance that Sawyer's report even alludes to as potentially related to Baratta's brain tumors is Thorium-230. Ex. 4 (*Baratta* Rpt.) at 35-38. Indeed, Sawyer's report contains a section entitled "Specific Causation Analysis of Mr. Baratta's Thorium-230 Exposures." *Id*. Despite that misleading heading, however, Sawyer's report does not contain any statement regarding what Sawyer believes caused either of Baratta's tumors. *Id*. Sawyer did not identify what he believes to be the cause of either of Baratta's tumors at his deposition, either. In fact, Sawyer testified that he does not have any specific causation opinion regarding Baratta. Ex. 6 at 215:16-18. Sawyer did, however, affirmatively rule out the possibility that Baratta's first tumor was caused by exposure to anything in the environment in the Acreage, including radionuclides. *Id.* at 213:13-214:8.

**Wenderoth Cancer and Sawyer Report.** Plaintiffs prematurely produced a report from Sawyer for Christian Wenderoth in December 2017 despite the fact that his case was not set for expert discovery and Pratt & Whitney has not yet had the chance to conduct fact discovery on his specific claim. Ex. 5 (*Wenderoth* Rpt.). The Court should not allow Sawyer to testify about Wenderoth on that basis alone. Wenderoth was diagnosed with a glioblastoma multiforme in 2016 at the age of 19. *Id.* at 2. Sawyer's specific cause analysis of Wenderoth's case follows the same flawed methodology Sawyer applied to Santiago and Baratta.

**Sawyer's Rebuttal**. Pratt & Whitney submitted a number of expert reports in response to Sawyer's opinions, and Sawyer replied with two rebuttal reports. The reports essentially rehash Sawyer's claims from his original report. But he did claim in one rebuttal report, for the first time, that the brain tumor particle discussed above could have crossed Santiago's blood brain barrier during a short period in her childhood when she had viral meningitis. Ex. 21 (Mar. 2018 Rebuttal Rpt.) at 5.

### ARGUMENT

The Court must act as a "gatekeeper" to ensure that the admission of expert testimony is consistent with the requirements of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7 (1993); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The court's gatekeeping function requires an exacting analysis of the reliability, relevancy, and "intellectual rigor" required by Fed. R. Evid. 702 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Because "expert testimony may be assigned talismanic significance in the eyes of lay jurors," the significance of the court's role under

*Daubert* "cannot be overstated." *Id.* at 1260, 1263. Plaintiffs bear the burden of establishing the admissibility of Dr. Sawyer's testimony under Rule 702. *Id.* at 1260.

The Eleventh Circuit has distilled this exacting analysis into a "rigorous three-part inquiry." *Id.* at 1260. *First*, the proffered expert must be qualified to offer his opinions. *Id.* *Second*, the expert's opinions must be based on a sufficiently reliable and discernible methodology. *Id.*; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003). *Third*, the proffered expert's testimony must "fit" the facts of the case such that the testimony is helpful to the trier of fact. *Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260. Importantly, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (citation omitted).

Further, toxicologists like Sawyer require heightened scrutiny. "The uncertainty of the evidence in toxic tort cases, dependent as it is upon speculative scientific hypotheses and epidemiological studies, creates a special need for robust screening of experts and gatekeeping under Rules 403 and 703 by the court." *Williams v. Mosaic Fertilizer, LLC*, 2016 WL 7175657, at *4 (M.D. Fla., June 24, 2016) (*aff'd*, 889 F.3d 1239 (11th Cir. 2018)). The Court should exclude Sawyer's opinions because there is no "fit" between his analyses and any issue to be resolved at trial and because his analyses are fundamentally unreliable.

## I.   SAWYER'S OPINIONS DO NOT "FIT" ANY MATTER IN DISPUTE.

The "fit" or "relevance" prong of *Daubert* requires that the proffered expert's analysis be "relevant to the task at hand" and that it "logically advances a material aspect" of the case. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted). "[T]he evidence must have a valid scientific connection to the disputed facts in the case." *Id.*

### A.   Sawyer's Opinions Do Not "Fit" Because He Does Not Opine On The Cause Of Any Cancer In The Cluster.

Plaintiffs' claim is predicated on the assertion that an "informational stigma" resulting from the FDOH's designation of the Acreage as a cancer cluster negatively impacted the value of their properties. But Sawyer does not offer an opinion on the cause of the cancers that comprise the so-called "cancer cluster" or on any other subject relevant to Plaintiffs' claims here. As such, his opinions are not helpful to the jury in resolving any matter that remains in dispute on the Plaintiffs' claims and, therefore, fail the baseline requirement of "fit" under Rule 702. *See Daubert*, 509 U.S. at 591; *Frazier*, 387 F.3d at 1260. The Court should exclude his testimony.

6

Sawyer only addresses issues related to specific causation for three individuals—Santiago, Baratta, and Wenderoth. None of those individuals were part of the cancer cluster identified by the FDOH, which was based exclusively on pediatric female brain cancers diagnosed between 2005 and 2007. Santiago was diagnosed in 2009. Ex. 3. Baratta was male and Wenderoth was not only male, he was diagnosed almost a decade *after* the alleged cancer cluster. Exs. 4 & 5. Moreover, Plaintiffs do not allege that Santiago, Baratta, or Wenderoth ever resided at any of the four subject properties (owned by the four individual property plaintiffs) at issue in this case. Nor are Sawyer's opinions regarding the presence of Thorium-230 in these individuals based on environmental Thorium-230 readings in the Acreage. Instead his opinions are based on alleged readings from *human* tissues such as Santiago's—which, as discussed below, could not have conceivably come from her exposure to soil in the Acreage. As such, whether Pratt & Whitney allegedly caused the cancers of these three individuals is irrelevant to Plaintiffs' claims here, which are expressly based on the diminution in value of four specific properties allegedly caused by the FDOH's cancer cluster announcement.

Allowing testimony from Sawyer would only serve to confuse the jury and prejudice Pratt & Whitney. As set forth in Pratt & Whitney's motion for summary judgment, Plaintiffs have a complete failure of proof when it comes to their allegation that Pratt & Whitney caused the cancer cluster in the Acreage. DE 498 at 5-7. Permitting testimony from Sawyer about individual cancers that were not part of the cancer cluster that allegedly caused a "stigma" will confuse the jury about Plaintiffs' failure of proof and mislead the jury about whether Plaintiffs have presented an evidentiary basis to link the cancer cluster to Pratt & Whitney. Pratt & Whitney would be forced to engage in a mini-trial to demonstrate the substantial errors in Sawyer's opinions, despite the fact that those opinions pertain to cancer diagnoses that are irrelevant to Plaintiffs' claims. Such an exercise would be prejudicial, wasteful, and confusing. The Court should exclude Sawyer on this basis alone.

**B.    Sawyer's Baratta Analysis Is Irrelevant Because He Has No Specific Cause Opinion For Baratta.**

Even if the alleged cause of Baratta's tumors is relevant (it is not), Sawyer should be excluded because he does not offer a specific causation opinion for Baratta. Sawyer's report contains a section entitled "Specific Causation Analysis of Mr. Baratta's Thorium-230 Exposures." Ex. 4 (*Baratta* Rpt.) at 35. But Sawyer discloses no specific causation opinion at

all—that is, it has no statement identifying the purported cause of Baratta's tumor. *See generally* Ex. 4. In fact, Sawyer admitted he has no specific causation opinion regarding Baratta:

> 215:16   Q.   Do you have any specific causation opinion with
> 215:17        respect to Mr. Baratta?
> 215:18   A.   No.

Ex. 6 at 215:16-18.

Plaintiffs' counsel has tried to suggest that Sawyer walked back that admission with an erratum to his deposition, but he did no such thing. Sawyer's deposition erratum merely says that his "[o]verall opinions in pgs. 35-38 of report have not changed." Ex. 22 (4/23/18 Sawyer Errata) at 4. But that is meaningless because Sawyer's report also does not include any specific causation opinion; it does not say anywhere that Sawyer believes Thorium-230 caused Baratta's tumor. *See* Ex. 4 (*Baratta* Rpt.) at 35-38; *cf.* Ex. 3 at 39 (*Santiago* Rpt. stating that Santiago's tumor was "causally induced from her childhood exposures to ionizing alpha radiation from Thorium."). Sawyer's Baratta analysis is therefore irrelevant and should be excluded.

## II.   SAWYER'S DOSE OPINIONS ARE NOT RELIABLE.

"[T]he relationship between dose and effect (dose-response relationship) is the hallmark of basic toxicology, and is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1307 (11th Cir. 2014) (citation omitted). *See also McClain*, 401 F.3d at 1242. As Plaintiff expert Bernd Franke explained regarding radioactive dose specifically, "the further down you go with dose, the greater the uncertainty becomes with respect to the effect." Ex. 7 (Franke Tr.) at 31:12-32:4.

That is why "the court should pay careful attention to the expert's testimony about the dose-response relationship" "[w]hen analyzing an expert's methodology in toxic tort cases." *Williams*, 889 F.3d at 1246 (quoting *McClain*, 401 F.3d at 1241-42). A toxicologist must establish "not simply proof of exposure to the substance," but a "dose or level of exposure at which [the substance at issue] causes harm." *McClain*, 401 F.3d at 1241-42. *See also Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 853 (W.D. Tex. 2005) ("[H]is failure to link the Plaintiffs to the study subjects on any basis, including dose and dose rate, which are significant in determining biological effects of radiation and which he acknowledges affect risk, renders his specific causation opinion unreliable.").

8

Failure to perform a dose assessment is grounds for exclusion. In *Williams*, for instance, the Eleventh Circuit deemed a toxicologist's specific causation opinion excludable because he did not "conduct[] an independent dose calculation specific to [the plaintiff]," but rather provided a mere estimate based on the levels of a contaminant found in the plaintiff's general environment. 889 F.3d at 1246. The Eleventh Circuit further held that the expert's specific causation opinion was excludable because the toxicologist failed to "demonstrate a scientific basis for concluding that [the plaintiff's] exposure levels would likely produce, contribute to, or exacerbate [the plaintiff's] conditions." *Id*. In other words, the excluded expert neither established a reliable dose nor demonstrated that such a dose was high enough to cause the plaintiff's injury. *Id*.

### A.    Sawyer Does Not Offer A Reliable—Or Any—Dose Opinion For Baratta.

Sawyer's Baratta opinions lack any analysis whatsoever regarding the "hallmark" of toxicology: the dose-response relationship; and should be excluded on that ground. Indeed, Sawyer's analysis is even more lacking than the expert in *Williams*. He did not merely fail to put forth a *reliable* dose estimate for Baratta; he did not put forth *any* estimate of a purported dose of Thorium-230 radiation to Baratta's brain. Ex. 4 (*Baratta* Rpt.) at 35-38. Nor do any of Plaintiffs' other experts put forth a purported dose of radiation for Baratta's brain on which Sawyer could rely. This means Sawyer necessarily failed to complete the second dose-response step discussed in *Williams* as well: he did not compare any purported dose to the level of radiation necessary to cause brain cancer. *Id*. Sawyer further did not attempt to establish the "exposure level" for Thorium-230 that would "likely produce, contribute to, or exacerbate" either of Baratta's tumors. *Williams*, 889 F.3d at 1246.

That Sawyer did not conduct a dose-response assessment for Baratta is unsurprising, as Plaintiffs lack any evidence that Baratta's brain absorbed *any* radiation from Thorium-230. Ex. 4 (*Barrata* Rpt.) at 35-38. Sawyer certainly could not extrapolate a meaningful dose from Baratta's environment, as it is undisputed that there is no Thorium-230 contamination at the Featherston property.[1] Sawyer also has no tissue data suggesting that Baratta's brain received a dose of

---

[1] Pratt & Whitney's expert established as much, explaining that the Thorium-230 levels at the Featherston home were in line with what one would expect to find naturally. Ex. 10 (Frazier Rpt.) at 33-34. In fact, only a single sample had a Thorium-230 concentration above the expected *mean* concentration of Thorium-230 (1 pCi/g), and just barely so at 1.245 pCi/g. *Id*. at 14; Ex. 23 (Dec. 2017 Kaltofen Rpt.) at 34; Ex. 24 (Featherston Data) at 2. Plaintiff expert Kaltofen did not

radiation from Thorium-230. The only radiological data Sawyer has related to Baratta's body is from testing on Baratta's cremated remains. Ex. 4 (*Baratta* Rpt.) at 27-28. Even putting aside the obvious problems with that type of sample, Sawyer admits that he cannot determine from testing on Baratta's ashes whether Baratta had an unusually high amount of Thorium-230 in his body. *Id.* at 29 ("[T]he actual emission rates in pCi/g ash cannot be quantitatively compared to the general population due to a lack of published data.").

Sawyer did not even try to establish a dose of Thorium-230 radiation to Baratta's brain, much less reliably establish a dose high enough to cause a tumor. And even if he had tried, he could not have done so, as Plaintiffs have no evidence that Baratta's brain ever received a dose of Thorium-230. Sawyer's Baratta analysis should be excluded as irrelevant and unreliable.

**B.    Sawyer Does Not Have A Reliable Dose Opinion For Santiago.**

   **1.    Sawyer Cannot Establish A Causative Dose Through Evidence Of Exposure.**

If one knows the type, level, and route of radiation exposure for a recipient, it is possible to use radiological models to estimate the resultant dose to particular organs of that recipient. But Sawyer has not considered any radiological dose to Santiago's brain based on the quantity of radioactivity to which she was exposed. That is because neither he nor any of Plaintiffs' other experts have opined on the level of Thorium-230 to which Santiago was purportedly exposed in her environment—either at her home or anywhere else.

Indeed, it is uncontested that Plaintiffs' testing data *does not* show the presence of any Thorium-230 contamination at the Santiagos' property. *See* Ex. 10 (Frazier Rpt.) at 32-33. The highest Thorium-230 result at the Santiago property was 1.12 pCi/g, just barely above the *mean* expected detection of 1 pCi/g. Ex. 23 (Dec. 2017 Kaltofen Rpt.) at 34; Ex. 25 (Kaltofen Tr.) at 240:4-8. And the only Plaintiff expert who looked for the presence of environmental contamination—Marco Kaltofen—admitted he has no opinion regarding whether there is contamination at the Santiago home. Ex. 25 at 226:21-227:13, 228:22-229:3.

Sawyer speculated at his deposition that perhaps Santiago was exposed to Thorium-230 on a dirt road somewhere. Ex. 6 at 240:12-241:3. But neither he, any other Plaintiff expert, nor any fact witness establish that Santiago spent considerable time at some other location

---

even examine whether the Featherstons had radiological contamination on their property. Ex. 25 (4/5/18 Kaltofen Tr.) at 244:6-245:24.

contaminated with Thorium-230. Much less is there evidence of how much time, when, and at what level Santiago could have been exposed at this unidentified location. Such an analytical leap without supporting evidence cannot serve as the basis of a dose assessment.

> **2.    Sawyer Cannot Establish A Causative Dose From Santiago's Spinal Cord Sample.**

The Thorium-230 analysis of Santiago's spinal cord sample on which Sawyer relies does not reliably show any radiological dose to Santiago's brain. And even if it did, Sawyer cannot establish when such a dose was received by Santiago, and therefore cannot substantiate any claim that a radiological dose caused Santiago's brain tumor.

Plaintiffs do not have any measurement of radioactivity from Santiago's brain. Ex. 7 (Franke Tr.) at 53:18-54:3. Sawyer's assumed dose is instead based on a measurement of Thorium-230 in tissue from Santiago's metastasized spinal cord tumor. *Id.* at 41:19-42:5; Ex. 3 (*Santiago* Rpt.) at 23. Sawyer assumes that the Thorium-230 concentration in Santiago's spinal cord is the same as in her brain, based on the simplistic assumption that they are both part of the central nervous system. *Id.* Sawyer cites no medical literature to support this assumption. Another of Plaintiffs' experts, Bernd Franke, said he looked for such literature and could not find any. Ex. 7 at 54:9-17.

Pratt & Whitney's health physicist Frazier and its neuro-oncologist Dr. Duane Mitchell, on the other hand, opined that there is no physical mechanism that would cause the spinal cord and the brain to have the same concentration of Thorium-230. Ex. 26 (Apr. 2018 Frazier Rpt.) at 4-5; Ex. 27 (5/9/18 Mitchell Tr.) at 92:25-94:14. Mitchell explained that the literature relied on by Sawyer demonstrates that the dispersion of thorium even within the brain itself (much less between the brain and spinal cord) is not uniform, making it impossible to render an estimate of the brain based on spinal tissue. Ex. 27 at 92:25-94:17.

In fact, Frazier and Mitchell were proven right by the testing data from tissue samples from Christian Wenderoth—the other plaintiff for whom Sawyer issued a report. Tissue samples from Wenderoth's brain and spinal cord were collected and tested for Thorium-230. Ex. 6 (Sawyer Tr.) at 199:24-201:17. The spinal cord tissue sample had between 4 and 8 times the Thorium-230 activity as the brain tissue sample. *Id.* (Ultimately, the level of Thorium-230 in Wenderoth's brain was so low, Sawyer apparently determined that he could not conclude the Thorium-230 in Wenderoth's brain was anything more than the result of contamination in the

11

laboratory materials. *See* Ex. 5 (*Wenderoth* Rpt.) at Table 3.) Simply put, Plaintiffs have no evidence of *any* Thorium-230 radioactivity in Santiago's brain.

Further, even if the spinal cord and brain did have equal concentrations of Thorium-230, the quantity of Thorium-230 on which Sawyer bases his dose calculations is not reliable. The spinal cord result is a "J" result, meaning a result that is greater than the MDA but less than the MDA plus the "uncertainty" (the plus-or-minus). Ex. 6 (Sawyer Tr.) at 179:24-180:4; Ex. 7 (Franke Tr.) at 46:4-47:25. "J" results are not reliably quantified. Ex. 10 (Frazier Rpt.) at 13; Ex. 25 (Kaltofen Tr.) at 54:16-55:22 ("J" results are "below the limit of quantitation"). Sawyer claims that even though "J" result quantities are not at the "95% confidence" level, one can confidently use the MDA as an estimated quantity for "J" results. Ex. 6 (Sawyer Tr.) at 179:19-181:15, 225:14-21. But Dr. Frazier, who has worked exclusively with radioactive material and radiological data for nearly 50 years, has never heard of such a rule. Ex. 28 (5/7/18 Frazier Tr.) at 217:17-22. And the literature Sawyer cites in support of his approach actually contradicts it, stating "[t]he minimum detectable value should not be used for projects where the issue is quantification of the analyte and not detection." Ex. 29 (Marlap Rpt.) at 12.

The unreliability of the data Sawyer relies on is not merely an "academic" concern, as Plaintiffs have previously suggested. A dose opinion from Plaintiffs' own expert Bernd Franke, discussed *supra* at 11, illustrates the absurdity of the level of radioactivity Sawyer assumes existed in Santiago's brain. Franke opined that for Santiago to receive the theoretical dose from Thorium-230 that he calculates based on the spinal cord result, she would have had to be exposed to between 5 million and 190 million pCi of radioactivity. Ex. 30 (Feb. 2017 Franke Rpt.) at 2. The highest amount of Thorium-230 activity detected at the Santiago property, however, was a mere 1.12 pCi/g. Ex. 25 (Kaltofen Tr.) at 240:4-8. Thus, if all of the soil to which Santiago was exposed had the same concentration as the very highest Thorium-230 concentration detected on the Santiago property, she would have had to ingest or inhale roughly 892,000 grams of soil (1,900 pounds) to consume 1 million pCi/g of Thorium-230, and 8.9 million grams (19,000 pounds) to reach ten million pCi/g. *Id.* at 240:4-242:10; Ex. 7 (Franke Tr.) at 55:4-58:10. That, in Franke's words, is "hard to believe." Ex. 7 at 58:7-10. This serves as further evidence that the many logical leaps Sawyer and Franke make to arrive at a dose of Thorium-230 in Santiago's brain are not just unsupported; they are wrong.

In addition to the unreliability of both the presence and quantity of Thorium-230 in Santiago's brain, Sawyer's reliance on the spinal cord result has a more foundational problem. That sample was collected after Santiago's death, in 2016. Ex. 7 (Franke Tr.) at 41:19-22; 63:25-64:3. That was seven years after Santiago was first diagnosed with cancer in 2009. *Id*. Sawyer has not put forth any reason to believe that Santiago's spinal cord—much less her brain—had the same level of Thorium-230 in it, or even any Thorium-230 in it, whenever her tumor first formed 7-plus years before her death.

As is clear, Santiago's spinal cord sample does not provide a basis for the presence of any Thorium-230 in Santiago's brain, much less enough to cause cancer. Without that basis, Sawyer's specific causation opinion contains an "analytical gap" too great for his opinion to pass muster under *Daubert*.

### 3. The Particle From Santiago's Brain Tumor Does Not Allow Sawyer To Establish A Causative Dose Of Thorium-230.

Sawyer also relies on data related to a particle found in Santiago's brain tumor that he claims contains trace amounts of Thorium. As with Franke's dose calculation, this particle does not provide a reliable basis from which Sawyer can conclude that Santiago received a radiological dose that caused her brain tumor.

As Pratt & Whitney expert Dr. Borch explained, the particle in question likely does not even contain any Thorium. Plaintiffs' lab, Microvision, analyzed the particle using Scanning Electron Microscopy and Energy Dispersive X-ray Spectroscopy (SEM/EDS), which allows one to assess the elemental composition of particle-sized portions of a sample. Microvision reported that a scant 1.26% of the brain tumor particle was made of Thorium. Ex. 31 (TAP260B, Part. 11 Data). But that detection, Borch explains, was below the sample's limit of detection, meaning the detection is not reliable. Ex. 32 (4/12/18 Borch Tr.) at 118:6-16. None of Plaintiffs' experts offer an opinion to the contrary. Sawyer said he does not know what the limit of detection is for SEM/EDS. Ex. 6 at 173:7-8. Kaltofen notes in one of his reports that the SEM/EDS methodology's *general* limit of detection is 0.1 wt. %, Ex. 33 (Mar. 2018 Kaltofen Rpt.) at 2; Ex. 25 (Kaltofen Tr.) at 256:4-20. But he also admitted that sample-specific limits of detection can be calculated, that Thorium typically has a higher limit of detection, that he uses limits of detection in his normal work, and that he did not report such limits of detection in the *Santiago* case. Ex. 25 at 259:9-11, 260:3-15.

13

Microvision's raw data is even more conclusive on the issue. An EDS spectrum is created for every sample analyzed with EDS technology. Ex. 11 (Feb. 2018 Borch Rpt.) at 5-8, 28-30. The spectrum shows a "peak" at the element-specific energy levels for every element present in the sample. *Id*. Borch explained that it is critical to confirm that a peak actually exists for all elements one claims to have detected, especially if a detection is very low (like the 1.26% Thorium reported for the brain tumor particle). *Id*. The EDS spectrum for the brain tumor particle at issue shows no peak whatsoever for Thorium, proving that the reported detection is the result of one of the several well-known causes of false positives. *Id*.; Figure 1 (below).[2]



**Figure 1**. EDS spectrum for TAP260B, Part. 11, and closeup of one of the portions of the spectrum where a Thorium "peak" ought to be present.

Neither Sawyer nor Kaltofen has explained the lack of a Thorium peak in this spectrum. The evidence strongly indicates that there is no Thorium in the particle from Santiago's brain tumor biopsy slide.

Further, even if the brain tumor particle did have a trace amount of Thorium in it, Sawyer has no evidence regarding when this particle purportedly entered Santiago's brain. The particle was taken from a sample that was collected around the time of Santiago's diagnosis, in 2009. Ex. 32 (Borch Tr.) at 113:23-114:6. There is therefore no evidence that it was present prior to the

---

[2] It is not surprising that Plaintiffs' data includes a false positive for Thorium. Kaltofen specifically asked Plaintiffs' lab to look for Thorium, and Plaintiffs tested 50 different particles from Santiago's brain tumor. Ex. 25 (Kaltofen Tr.) at 250:6-251:10; 286:24-287:20.

formation of Santiago's brain tumor. In fact, it very likely was not. Particles the size of the one at issue typically cannot cross the blood brain barrier.[3] Ex. 15 (Feb. 2018 Mitchell Rpt.) at 4-5. It is agreed by the parties, however, that brain tumors cause angiogenesis and enhanced permeability and retention effect. *Id.* at 25-26; Ex. 6 (Sawyer Tr.) at 142:21-144:3. That means brain tumors allow foreign material to pass the blood brain barrier that usually cannot do so, and that tumors preferentially attract and retain such materials. *Id*. Thus, the particle was likely an effect, not a cause, of the tumor.

Sawyer's claim that the particle could have entered Santiago's brain when she had viral meningitis as a child is not a legitimate alternative explanation. For one, it is speculative, as Sawyer only says that the particle *could have* crossed Santiago's blood brain barrier when she had meningitis. Ex. 21 at 5. He has no evidence that it actually did. But more importantly, Mitchell explained at his deposition that Santiago's medical records prove her blood brain barrier was substantially intact during her bout with viral meningitis. Ex. 27 (Mitchell Tr.) at 107:5-109:13. The literature on which Sawyer relies demonstrates that only about half of meningitis cases cause the blood brain barrier to become severely permeable. *Id*. For Santiago, her blood work demonstrated that the protein levels in her spinal fluid were normal. *Id*. These proteins are a small fraction of the size of the particle Sawyer claims traversed her blood brain barrier. *Id*. at 107:5-109:13, 111:17-113:4. The fact that these proteins were unable to cross into Santiago's spinal fluid is conclusive proof that her blood brain barrier was sufficiently intact such that the so-called Thorium particle could not have crossed over either. *Id*.

Even assuming without proof both that the particle contained Thorium and that it was present in Santiago's brain prior to the formation of her tumor, SEM/EDS does not allow one to determine the isotope of Thorium present in the particle. Ex. 25 (Kaltofen Tr.) at 248:25-249:16. The particle could therefore just as easily contain Thorium-232 as Thorium-230, which has important consequences.[4] For example, a particle containing 1.26 % Thorium-232 would have "a

---

[3] Sawyer says that ultrafine Thorium particles can pass the blood brain barrier. Ex. 34 (Feb. 2017 Sawyer Rpt.) at 10. He defines ultrafine as 0.1 micron. *Id*. The particle from Santiago's brain that Sawyer claims contained Thorium was, according to Sawyer, 0.5 X 0.9 micron—much larger than 0.1 micron. Ex. 2 at 16.

[4] In fact, it is much more likely that the particle contains Thorium-232, if it contains Thorium at all. Naturally present Thorium-232 has far greater mass (though not necessarily radioactivity) than Thorium-230, and would therefore be more likely to show up in SEM/EDS data, which measures by weight. Ex. 11 (Feb. 2018 Borch Rpt.) at 44.

tiny fraction of the radioactivity" that a particle containing 1.26% Thorium-230 would have. *Id.* at 284:25-285:5. And, just as importantly, Sawyer simply does not have a specific causation opinion related to Thorium-232. *See generally*, Ex. 3 (*Santiago* Rpt.).

Finally, even if *all* of Sawyer's unsupported assumptions are right, neither he nor anyone else has calculated the amount of radioactivity that would be produced by a less than 1-micron particle consisting of a mere 1.26% Thorium-230. Sawyer therefore has no dose from this particle on which he can rely.

The Microvision data reporting a trace amount of Thorium in a particle from Santiago's brain tumor does not support the conclusion that Santiago received a dose of Thorium-230 to her brain. And even if it did, Sawyer has not determined what that dose might be. He therefore lacks evidence of "the single most important factor" for toxic tort specific causation opinions, and he cannot rely on the presence of this particle to support his opinion blaming Thorium-230 for Santiago's brain tumor.

### 4.    Sawyer Did Not Establish A Causative Dose.

Sawyer's failure to compare any dose to the literature is also grounds for his exclusion.

As noted above, dose is "the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Chapman*, 766 F.3d at 1307 (citation omitted). A specific causation expert must offer "not simply proof of exposure to the substance, but proof of enough exposure to cause the plaintiff's specific illness." *McClain*, 401 F.3d at 1242. Accordingly, an expert's failure to connect the dose of a contaminant he claims a plaintiff received to literature showing that such a dose could cause that plaintiff's injury is grounds for the exclusion of that expert's specific causation opinion. *Cano*, 362 F. Supp. 2d at 853 ("[H]is failure to link the Plaintiffs to the study subjects on any basis, including dose and dose rate, which are significant in determining biological effects of radiation and which he acknowledges affect risk, renders his specific causation opinion unreliable.").

Sawyer did not even attempt to compare a theoretical dose for Santiago to the literature. He could have done so, as Franke calculated a number of doses of radiation—albeit unreliable doses—that he claims Santiago could have received during her lifetime. Ex. 30 (Franke Rpt.) at 4. Sawyer did not even consider the doses calculated by Franke, much less compare them to the

literature.[5] Instead, he summarily concluded that "the contaminant (Th-230) has been measured at a 'high enough dose'" to cause Santiago's brain tumor. Ex. 3 (*Santiago* Rpt.) at 31.

Even Plaintiffs' experts agree that the dose of radioactivity impacts the chances that such radioactivity could have caused a tumor. Ex. 7 (Franke Tr.) at 31:12-32:4 ("[T]he further down you go with dose, the greater the uncertainty becomes with respect to the effect."). Sawyer's failure to compare Santiago's purported dose of Thorium-230 radiation to the scientific literature, or even to consider what that dose might have been, renders his specific causation opinion unreliable and excludable.

**C.      Sawyer Does Not Have A Reliable Dose Opinion For Wenderoth.**

The Court should not entertain Sawyer's specific cause analysis for Wenderoth because it was issued prematurely, and Pratt & Whitney has not had an opportunity to conduct specific cause discovery in that case. Nonetheless, it is apparent that Sawyer's dose analysis for Wenderoth fails for many of the same reasons his analysis of Santiago fails. *First*, Sawyer never identifies an actual *dose* of Thorium-230 he alleges that Wenderoth received in his brain. Instead, Sawyer looks at *post-mortem* radiological analyses that register Thorium-230 readings in other tissues. *See* Ex. 5 (*Wenderoth* Rpt.) at Table 3. *Second*, consistent with his failure to identify a dose to Wenderoth's brain, Sawyer does not compare any alleged dose of Thorium-230 that Wenderoth received to establish whether such a dose could cause cancer (much less brain cancer). *Third*, Sawyer's analysis of Wenderoth's Thorium-230 exposure is based on "J" results that are unreliable for the reasons discussed above. *Id*. at Table 2. And *fourth*, Sawyer provides no analysis, calculation or assessment to explain when, how, or where Wenderoth was allegedly exposed to Thorium-230. Sawyer's dose opinions regarding Wenderoth should be excluded as fundamentally unreliable.

---

[5] The only comparison between Santiago and the literature that Sawyer drew was to note that a single patient in a study from 1963 had "Th-232 emissions of 0.180 pCi" in a portion of his tumor. Ex. 3 (*Santiago* Rpt.) at 31. This metric cannot be compared to the presumed concentration of Thorium-230 in Santiago's brain, as picocuries is not the same as picocuries per gram. But in any event, the study in question only reported the level of radioactivity in a resected tumor, *not* the dose of radioactivity that purportedly caused that tumor. Sawyer relies on the same, flawed comparison in his Wenderoth report. Ex. 5 (*Wenderoth* Rpt.) at 30-31.

III.   **SAWYER FAILED TO CONSIDER BOTH THE BACKGROUND RISK OF IDIOPATHY AND ALTERNATIVE CAUSES.**

A.   **Sawyer Ignored Background Risk For Brain Cancer In His Analyses.**

The Eleventh Circuit has recognized that "[a] reliable methodology should take into account the background risk" of a specific disease, meaning "the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the . . . chemical in question." *McClain*, 401 F.3d at 1243 (emphasis in original). Indeed, knowledge of background risks is one of the methodologies the Eleventh Circuit "has recognized as indispensable to proving the effect of [a toxic] substance." *Williams*, 2016 WL 7175657, at 11 (quoting *Chapman*, 766 F.3d at 1308).

"The background risks include all those causes of a disease, whether known *or unknown*, excluding the drug or chemical in question." *McClain*, 401 F.3d at 1243 (emphasis added). An expert must therefore consider the possibility that a disease is idiopathic. *Chapman*, 766 F.3d at 1308. *Williams*, again, provides an example of the Eleventh Circuit upholding the exclusion of a specific causation expert for failing to take into account the background risk of a particular disease. *Williams*, 889 F.3d at 1249-50 (expert failed to "meaningfully account[] for background risk," as evidenced by the fact that he "failed to address background risk in his report or elsewhere").

Sawyer did not take the background risk of brain cancer into account in reaching his opinions. Plaintiffs' own expert, Arie Perry, testified that "the overwhelming majority of brain tumors"—indeed, "90 to 95 percent"—are idiopathic, meaning they have no known cause. Ex. 9 at 80:18-22. Yet for his Santiago analysis, Sawyer did nothing to determine that the flimsy evidence of Thorium-230 causation discussed in Section I above makes it more likely than not that Santiago's brain tumor was not idiopathic, as most brain tumors are. *See generally*, Ex. 3 (*Santiago* Rpt.). Sawyer's failure to assess the background of idiopathy for brain tumors is all the more problematic given the very low (and unreliable) dose Plaintiffs have put forth. Franke estimates that Santiago received a dose of 0.23 rem to her brain in the final year of her life. Ex. 30 (Franke Rpt.) at 2. He further speculates, based on assumptions about time of exposure for which he has no evidence, that she received, at most, a 9.6 rem dose throughout her life. *Id*. at 4; Ex. 7 (Franke Tr.) at 40:9-11. This maximum dose is a mere 7% of the dose at which a reliable connection between radiation and brain cancer has been found in the literature cited by Plaintiffs: 1.4 Gy of x-ray radiation (or 140 rem). Ex. 15 (Mitchell Rpt.) at 14-15; Ex. 10 (Frazier Rpt.) at

58; Ex. 3 (*Santiago* Rpt.) at 5-6. Sawyer has not identified any literature showing such a reliable connection with a dose lower than 1.4 Gy of x-ray radiation. Ex. 6 at 60:24-61:16.

As noted above, Franke testified that "the further down you go with dose, the greater the uncertainty becomes with respect to the effect." Ex. 7 (Franke Tr.) at 31:12-32:4. Yet Sawyer assumes that merely showing the possibility that Thorium could have caused Santiago's tumor is enough to show that it likely *did* cause her tumor. This approach fails to take into account the fact that the vast majority of brain tumors are idiopathic.

The same problem persists in Sawyer's analysis for Baratta and Wenderoth. Despite the extremely high rate of idiopathic brain tumors, Sawyer did not even consider the possibility that Baratta's or Wenderoth's tumors were idiopathic.[6] Ex. 4 (*Baratta* Rpt.) at 35-36; Ex. 5 (*Wenderoth* Rpt.) at 32-34. Sawyer's failure to account for background risk renders his analyses unreliable and inadmissible, especially in light of the high rate of idiopathic brain tumors.

### B. Sawyer Does Not Rule Out, Or Even Consider, Other Potential Causes Of Baratta's Tumor.

In addition to Sawyer's unfulfilled duty of establishing Thorium-230 as a possible cause of Baratta's tumor, Sawyer, as a "specific causation expert," was obligated to "meaningfully rule out other potential causes" of Baratta's tumor. *Williams*, 889 F.3d at 1248. *See also Chapman*, 766 F.3d at 1311 (affirming exclusion of toxicologist based in part on his failure "to consider obvious alternative causes for" plaintiff's alleged injury). In *Williams*, for instance, the same specific causation expert discussed above was excluded for the separate reason that he merely "made passing references to the purported 'low' probability of . . . other causes," but "never provided the District Court with any scientific basis upon which he relied in concluding that the likelihood that various other potential factors caused [plaintiff's] conditions was low enough to reasonably rule them out." 889 F.3d at 1249.

Unlike the excluded expert in *Williams*, Sawyer does not even pay lip service to other potential causes of Baratta's second tumor. *See* Ex. 4 (*Baratta* Rpt.) at 35-36. This failure to even consider alternative causes, much less rule them out, is particularly problematic here, as there is

---

[6] Any claim by Plaintiffs that Sawyer conducted a differential diagnosis vis-à-vis Baratta, Santiago, or Wenderoth would not help them avoid this problem with Sawyer's analysis. As the Restatement of Torts explains, "[w]hen the causes of a disease are largely unknown"—that is, when there is a high rate of idiopathy for a disease—"differential etiology is of little assistance." Restatement (Third) of Torts: Phys. & Emot. Harm § 28 (2010). Notably, Sawyer does not use the phrase "differential etiology" in any of his reports, much less perform one.

an obvious alternative cause: the high dose of medical radiation administered directly to the area where Baratta's second tumor developed. *Id.* at 4-5. Sawyer is aware that Baratta's radiation therapy had the potential to cause a secondary tumor because he noted that possibility in his summary of the deposition testimony of Baratta's radiologist. *Id.* at 11-12. Yet Sawyer does not address Baratta's radiation therapy as a potential cause of his second tumor anywhere in the "specific cause" section of his report. *Id*. at 35-36.

In fact, Sawyer's testimony makes clear that if he *had* considered medical radiation as a potential alternative cause of Baratta's second tumor, he inevitably would have concluded that medical radiation was, in fact, the likely cause of that tumor. Sawyer admits that the medical radiation Baratta received was high enough to cause Baratta's second tumor. Ex. 6 at 215:25-218:4, 220:18-21. Sawyer also admits that the tumor meets the "Cahan criteria" that medical doctors—like Plaintiff expert Ari Perry—use to establish that a tumor was induced by medical radiation treatment. Ex. 18 (Wen Tr.) at 28:16-29:18; Ex. 9 (Perry Tr.) at 92:25-93:19. As Sawyer acknowledges, a tumor was likely caused by medical radiation therapy if it "differ[s] histologically from the original lesion that was treated" and "[arose] within the irradiation field over a sufficient latency period, typically years." Ex. 6 at 218:18-219:13; Ex. 4 (*Baratta* Rpt.) at 12. Sawyer agreed Baratta's second tumor was histologically different from the first, and that it appeared in Baratta's field of irradiation. Ex. 6 at 219:17-220:12. And Baratta's second tumor was diagnosed nearly four years after his radiation treatment—far more than the 12-month minimum latency period Sawyer claims for radiation-induced tumors. Ex. 4 (*Baratta* Rpt.) at 3-5, 16. Thus, Sawyer's own testimony shows that Baratta's second tumor meets the Cahan criteria, and thus was likely caused by medical radiation, not his environment.

Sawyer ignored the possibility that Baratta's second tumor was caused by the beams of high-dose radiation directed at the precise spot where that tumor arose, instead investigating the possibility that some unknown source of Thorium-230 in Baratta's environment, for which there is no evidence, caused the tumor. As in *Williams*, this failure to consider an obvious alternative explanation would render any specific causation opinion unreliable if Sawyer had, in fact, issued such an opinion.

## CONCLUSION

Sawyer's opinions should be excluded because there is no "fit" between his analyses and any issue to be resolved at trial and because his analyses are fundamentally unreliable.

**REQUEST FOR HEARING**

Pratt & Whitney respectfully requests a hearing on this motion. This motion concerns expert testimony regarding complex medical, physiological, and radiological issues, and is therefore more complex than a typical motion. Pratt & Whitney believes that oral argument will aid this Court in understanding the facts and issues presented in the parties' briefing. Pratt & Whitney estimates that this motion requires 30 minutes of oral argument.

Pratt & Whitney's *Daubert* Motion to Exclude the Testimony of William Sawyer
And Incorporated Memorandum of Law

Index to Exhibits

| | |
|---|---|
| Exhibit 1 | Acreage Cancer Review, Palm Beach County, August 2009 FDOH Report |
| Exhibit 2 | February 2010 FDOH Press Release |
| Exhibit 3 | Expert Report of William Sawyer, December 22, 2017 (*Santiago*) |
| Exhibit 4 | Expert Report of William Sawyer, December 22, 2017 (*Featherston/Baratta*) |
| Exhibit 5 | Expert Report of William Sawyer, December 22, 2017 (*Wenderoth*) |
| Exhibit 6 | Deposition of William Sawyer, April 23, 2018 |
| Exhibit 7 | Deposition of Bernd Franke, April 16, 2018 |
| Exhibit 8 | Eberline Report 16-11010 (excerpts) |
| Exhibit 9 | Transcript of Hearing on Class Certification, January 11, 2018 |
| Exhibit 10 | Expert Report of John Frazier, March 2, 2018 |
| Exhibit 11 | Expert Report of Thomas Borch, February 13, 2018 |
| Exhibit 12 | Plaintiff's Amended Third Revised Answers to Interrogatories re Complaint Nos. 1-11, July 25, 2013 (Featherston) |
| Exhibit 13 | Deposition of Glenn Morrison, August 26, 2015 |
| Exhibit 14 | Corrected Expert Report of William Sawyer, December 22, 2017 (*Featherston/Baratta*) |
| Exhibit 15 | Expert Report of Duane Mitchell, February 20, 2018 |
| Exhibit 16 | Medical Record, February 25, 2005 |
| Exhibit 17 | Medical Report, March 3, 2005 |
| Exhibit 18 | Deposition of B-Chen Wen, July 14, 2015 |
| Exhibit 19 | Medical Record, January 23, 2009 |
| Exhibit 20 | Mara Hatfield Email to Counsel re Sawyer Report, February 9, 2018 |
| Exhibit 21 | Rebuttal Expert Report of William Sawyer, March 23, 2018 |
| Exhibit 22 | Errata to Deposition of William Sawyer, April 23, 2018 |

| Exhibit 23 | Expert Report of Marco Kaltofen, December 22, 2017 |
| Exhibit 24 | Featherston Non-Tissue Samples |
| Exhibit 25 | Deposition of Marco Kaltofen, April 5, 2018 |
| Exhibit 26 | Rebuttal Expert Report of John Frazier, April 27, 2018 |
| Exhibit 27 | Deposition of Duane Mitchell, May 9, 2018 |
| Exhibit 28 | Deposition of John Frazier, May 7, 2018 |
| Exhibit 29 | MARLAP Report, Ch. 20, July 2004 |
| Exhibit 30 | Expert Report of Bernd Franke, February 2, 2017 |
| Exhibit 31 | TAP260B, Part. 11 Data (Borch Deposition Exhibit 14) |
| Exhibit 32 | Deposition of Thomas Borch, April 12, 2018 |
| Exhibit 33 | Rebuttal Expert Report of Marco Kaltofen, March 23, 2018 |
| Exhibit 34 | Expert Report of William Sawyer, February 1, 2017 |
| Exhibit 35 | Complaint for Wrongful Death in Southern District, *Featherston v. UTC*, May 1, 2017 |

Dated:  May 20, 2020

Respectfully submitted,

By: /s/ Gregor J. Schwinghammer
GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL  33401
Telephone:  (561) 650-0595
Facsimile:  (561) 655-5677
GREGOR J. SCHWINGHAMMER, JR.
Florida Bar No. 090158
gschwinghammer@gunster.com
BARBARA BOLTON LITTEN
Florida Bar No. 0091642
blitten@gunster.com

BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL  60654
Telephone:  (312) 494-4400
Facsimile:  (312) 494-4440
SEAN W. GALLAGHER
*Pro Hac Vice*
sean.gallagher@bartlitbeck.com
ANDREW C. MacNALLY
*Pro Hac Vice*
andrew.macnally@bartlitbeck.com
DANIEL R. McELROY
*Pro Hac Vice*
daniel.mcelroy@bartlitbeck.com
ALEX L. GRODEN
*Pro Hac Vice*
alex.groden@bartlitbeck.com

***Attorneys for Defendant Raytheon***
***Technologies Corporation (Pratt & Whitney)***