# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80928-CIV-MARRA
(Consolidated Action: Lead Case)

RICHARD COTROMANO, et al., all on behalf of themselves and all others similarly situated,

    Plaintiffs,

vs.

RAYTHEON TECHNOLOGIES CORP., d/b/a Pratt & Whitney,

    Defendant.

_____/

9:13-cv-80928 Marra/Reinhart

## DEFENDANT RAYTHEON TECHNOLOGIES CORP.'S
## OMNIBUS MOTION IN LIMINE

Throughout the eight-year history of this case, Plaintiffs have searched for and cycled through a great many theories regarding the type of contamination they allege, how it supposedly traveled from Pratt & Whitney to the Acreage, and how it purportedly harmed them. Most of these theories have been irrelevant, unsupported by evidence, abandoned by Plaintiffs, or some combination of the three. Evidence or argument about such theories is therefore bound to confuse or mislead the jury, waste the parties' and the Court's time, and prejudice Pratt & Whitney. Pratt & Whitney therefore moves *in limine* to exclude evidence or argument regarding these theories.

## LEGAL STANDARD

This Court's authority to manage trials includes the power to exclude evidence pursuant to motions *in limine*. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). The purpose of a motion *in limine* is to exclude irrelevant and immaterial matters, or to exclude relevant evidence when its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 402 & 403; *see also Chrysler Int'l Corp. v. Chemaly*, 280 F.3d 1358, 1364 (11th Cir. 2002).

Only relevant evidence is admissible. *See* Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Even if evidence is relevant, a court may exclude it if its probative value is "outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## ARGUMENT

I. **The Court Should Exclude Evidence and Argument Concerning Plaintiffs' Irrelevant and Unsupported Theories Regarding the Supposed Presence, Source, or Burial of Radioactive Material at Pratt & Whitney's Facility**

Over the course of this litigation, Plaintiffs have introduced, pursued, and often abandoned various theories about Pratt & Whitney's supposed use of nuclear materials—ranging from fanciful claims that Pratt & Whitney tested a nuclear aircraft in Palm Beach County, to questions about operations over 1,000 miles away from Pratt & Whitney's Palm Beach facility. Each of these irrelevant, unsupported, and / or now-abandoned theories should be excluded because they are (1) not relevant to Plaintiffs' claim that Thorium-230 caused a cancer cluster in the Acreage, and (2) will require the parties to engage in a wasteful side show that can only serve to confuse the jury and distract from the issues actually in dispute.

A. **Nuclear Airplane and "Poison Fuel"**

Despite a complete absence of evidence, Plaintiffs have attempted to gin-up a story during discovery to suggest that Pratt & Whitney tested a nuclear aircraft, or nuclear fuels, in Florida. Plaintiffs' focus on nuclear aircraft or fuel sources is designed to leave the impression with the jury that there was secret nuclear work at the Florida facility that could conceivably provide a source for alleged radioactive contamination. The evidentiary record, however, is absolutely clear that no nuclear-powered aircraft was ever produced and that Pratt & Whitney's work on the project was done in Connecticut (not Florida), was conceptual design work (*i.e.*, on paper only), and that no nuclear fuel was ever used in Florida. As such the Court should exclude under Federal Rules of Evidence 402 and 403 any evidence or argument about nuclear aircraft or fuel sources because it is irrelevant and would prejudice Pratt & Whitney by forcing it to engage in a trial-within-a-trial.

There Was No Nuclear Aircraft. The record shows that the US government investigated developing a nuclear aircraft in the 1950's and 1960's, but no such aircraft was ever flown and no

prototype was ever built. **[DE 668-1]** Comptroller General Report, Review of Manned Aircraft Nuclear Propulsion Program, Report to Congress, February 1963, at 2. While Pratt & Whitney was one of many companies involved in that program, the work was primarily performed in Connecticut, not Florida. There were plans to conduct engine tests in Florida in September 1961 related to the program, but those plans called for Pratt & Whitney to test convential JP aviation fuel. *See* [**DE 668-2**] Revised CNLM-3143 Development Plan for NJ-18A Power Package Ground Test Program 1961-1965, issued January 24, 1961 at 11, 63 ("Development Plan"). The contemplated nuclear reactor and propulsion testing was to take place in Idaho and Connecticut, starting in December 1962. *Id.* at 11. Ultimately, the Florida tests on convential fuel never occurred because the program was cancelled in March 1961, six months before the tests were scheduled.[1] **[DE 668-1]** Comptroller Report, at 2, 19 ("the ANP [Aircraft Nuclear Propulsion program] was terminated in March 1961.").

The testimony of Pratt & Whitney's engineers confirms these basic facts. *First*, no one has ever actually built a nuclear aircraft or flown—whether in Florida or anywhere else. *See* **[DE 668-3]** C. Joyner Depo., July 10, 2013 at 84:5-8 ("To the best of my knowledge, there has never been a nuclear aircraft to fly."). *Second*, the work Pratt & Whitney performed on the nuclear aircraft project was conceptual in nature and performed in Connecticut rather than Florida. *Id*. at 118:12-21; **[DE 668-4]** R. Parsley Depo., Oct. 19, 2015, at 66:10-16, 38:9-16 ("aircraft nuclear propulsion project . . . was not going on at Pratt & Whitney in Florida"; any work was in Connecticut).

<u>There Was No Nuclear Fuel.</u> There is no evidence that there has ever been nuclear fuel at Pratt &Whitney's Florida facility. A Pratt & Whitney engineer who spent years working on theoretical nuclear propulsion, Claude Joyner, testified, "To the best of my knowledge, our company has never handled uranium, especially in Florida." **[DE 668-3]** *Id.* at 49:6-17. Asked whether Pratt & Whitney tested a nuclear ceramic/metallic ("CERMET") fuel that was proposed for the space propulsion system, Joyner testified "Pratt & Whitney would not have been able to test this fuel. . . . Because we do not handle uranium dioxide." *Id.* at 58:2-14. Asked to review a specific report on CERMET fuel, he testified, "I can tell you, to the best of my knowledge, Pratt

---

[1] In fact, Pratt & Whitney memoranda at the time show that, as late as March 24, 1961, there was a tour of the Florida test facilities to determine whether they met requirements to support future planned tests. Memo In Re "Visit to FRDC" dated March 24, 1961 [DE 367-80] One week later, the entire program was cancelled.

Whitney has never tested CERMET fuel forms historically. What this document is referring to is the work done by Argonne National Lab, a government facility. And they did not test a fuel form, a fuel element. They tested small, little material coupons." *Id.* at 60:3-20; 77:7-21. He further testified that Pratt & Whitney did not have the facilities, or security, in Florida to handle nuclear fuel sources. *Id.* at 120:24-121:5. Others who worked on nuclear space propulsion testified that Pratt & Whitney did not have nuclear fuel at the Palm Beach facility. **[DE 668-5]** S. Peery Depo., Nov. 9, 2015, at 52:11-18; **[DE 668-4]** R. Parsley Depo., Oct, 19, 2015, 32:7-19, 52:5-22.[2]

Plaintiffs have implied some connection between the closing of the Connecticut Advanced Nuclear Engineering Laboratory ("CANEL") in 1965, and Pratt & Whitney's disposal of some mildly radioactive materials in Florida in 1965. **[DE 668-6]** M. Kaltofen Direct Testimony, Ex. C (originally filed as DE 363-4), at 2. The insinuation was that Pratt & Whitney closed CANEL and transported radioactive material 1,300 miles to dispose of it in Florida. There is no evidentiary support for this suggestion. On the contrary, when asked whether any of the radioactive material at CANEL in Middletown CT was moved to Florida, witnesses unequivocally testified that "none of this material left the Middletown facility" until it was properly disposed of when Middletown was "remediated and cleaned up appropriately." **[DE 668-7]** D. Alberghini Depo., Aug. 15, 2013, at 30:24-31:10, 31:11-24.

<u>There Were No So-called "Poison Fuels."</u> On a related topic, Plaintiffs may seek to introduce a statement from a speech given by Robert Abernethy, a former Pratt & Whitney engineer that worked on the engine for the SR-71 Blackbird aircraft. Long after his retirement from Pratt & Whitney, when the SR-71 Blackbird program was declassified, Dr. Abernethy gave a speech to a reunion of people involved with the SR-71 project. In his preamble, he told a story about coming to Florida:

> In late 1957 PW had two top secret, black, engine projects that were to use poison fuels! Not a good idea in the middle of Connecticut . . . how about the middle of the Everglades?? So I was invited to move to Florida. I was assigned to the 158, a Mach 3 Navy engine. To scrub the poison out of the 158 exhaust we built a huge swimming pool with a tall tower to centrifuge the poison out of the exhaust . . . If it didn't work, we might wipe out the Palm Beaches so we were a little nervous. The Navy canceled the poison fuel just before we ran the first test .... thank heavens!

---

[2] Parsley was asked about a document he authored regarding CERMET fuel, which referred to Pratt & Whitney "internal studies." He testified the "internal studies" were not of actual fuel, but reviews of historical databases, Dept. of Energy reports, and other external studies. **[DE 668-4]** R. Parsley Depo., Oct. 19, 2015 at 36:9-37:15.

**[DE 668-8]** R. Abernethy Depo., Sept. 27, 2012, 7:19-22 & **[DE 668-9]** Depo. Ex. 1, at 2. Plaintiffs have used the phrase "poison fuels" often during this litigation, but there is no probative value to this testimony. As to the comment that the test might "wipe out the Palm Beaches" Abernethy testified this was "a joke." *Id.* 65:8-9, 100:2-7. More importantly, Dr. Abernethy testified that the Navy test he was speaking about never took place. He testified "poison fuels" referred to "the Navy test program. And the Navy test program was cancelled. We never ran the engines under the Navy test program." *Id.* at 50:13-51:9; 59:4-9. He also testified that he did not believe the fuel for the Navy project was transported to Florida. *Id.* at 34:10-35:11 ("Q. [D]id it go so far as to transport the fuel to the Pratt campus for testing before the tests were cancelled? A. As far as I know, that's not true, the fuel, but I don't know . . . I highly doubt it was transported but I don't know.") Another witness corroborates Dr. Abernethy and testified that the Navy cancelled because the Navy's own lab test determined that the fuel would not work. **[DE 668-10]** R. Jacobs Depo., May 27, 2015, at 54:3-20.

  **B.** **Pratt & Whitney's Unrelated Facility in Connecticut.**

During discovery, Plaintiffs pursued information related to the CANEL, Pratt & Whitney's nuclear facility in Middletown, Connecticut. Plaintiffs previously advanced several allegations regarding the Connecticut Facility, including facts regarding the radioactive materials that the facility was permitted to possess, the alleged unlicensed disposal of thorium, and alleged health issues of Pratt & Whitney employees at the Connecticut Facility. *See, e.g.,* **[DE 668-6]** M. Kaltofen Direct Testimony, Ex. C.

Generally speaking, these allegations were untrue, unsupported, or misleading. But regardless of their truth, the allegations regarding the Connecticut Facility are irrelevant to Plaintiffs' claims. The CANEL is located more than 1,000 miles from Plaintiffs' properties in the Acreage. Plaintiffs have made no suggestion, much less provided admissible evidence, for how any materials in Connecticut would have traveled to the Acreage, or how any activities at the Connecticut facility have any bearing on what occurred in Palm Beach County. Plaintiffs should therefore be prohibited from arguing or introducing evidence about Pratt & Whitney's facilities outside of Palm Beach County.

  **C.** **Abandoned Cadmium 109 and Iridium 192 Theories**

Early in this case, Plaintiffs and their radiological expert suggested that there was Cadmium-109 and Iridium-192 contamination at Pratt & Whitney and in the Acreage. **[DE 668-**

5

11] M. Kaltofen Depo., Sept. 12, 2016 at 20:22-21:5. But they have since abandoned that theory. In fact, Plaintiffs' expert witness, Marco Kaltofen, eventually admitted that readings for Cadmium-109 and Iridium-192 in the Acreage soil samples are likely "ghost readings" and conceded that it was "unlikely" that Cadmium-109 or Iridium-192 were present in the Acreage and he "didn't have evidence to show that they were present" in the Acreage. *Id.* at 21:2-14, 22:16-23; Santiago Complaint, Case 14-cv-81385, at 24, ¶121 (alleging lead 214 can cause a "ghost reading" of Iridium-192) What is more, these materials are not relevant to Plaintiffs' *current* theory—that Thorium-230 is the cause of the alleged "cancer cluster." *See* [DE 563-1] at 2 ("Sawyer's work proves not only that Cynthia's tissue shows Thorium-230 caused her brain cancer, but that it is the result of exposure."). Plaintiffs should therefore be prohibited from arguing or putting on evidence about supposed Cadmium-109 or Iridium-192 contamination.

### D. James Seelinger Testimony Regarding the Landfill

Plaintiffs took the deposition of former Pratt & Whitney employee James Seelinger. At that deposition, Plaintiffs raised at least two issues that are not relevant to this litigation, and should therefore be excluded from it.

First, Seelinger testified that a foreman named Franklin Wildes "said that he had put TD Nickel"—a metal with a small amount of radioactive material in it—"in either the pits that preceded the landfill or the landfill." **[DE 668-12]** J. Seelinger Depo., April 7, 2016 at 149:5-21. This secondhand information was contradicted by Wildes himself. He testified that he had disposed of TD Nickel in drums in a marked location near the scrapyard, and when asked whether he buried any TD Nickel in the landfill, he said "Absolutely not." **[DE 668-13]** F. Wildes Depo., May 20, 2016 at 125:20-25; 48:8-15. But in any event, this testimony from Sellinger is irrelevant, for two primary reasons. First, TD Nickel contains Thorium-232, and thus cannot support Plaintiffs' theory centered on the completely different isotope of Thorium-230. **[DE 668-14]** at 2 ("Radioactive Materials License")

Second, Plaintiffs allege that soil was transported to the Acreage by truck, but no soil from the landfill was removed from Pratt & Whitney. Seelinger himself testified that nothing was ever removed from the landfill, but rather that it was capped and covered. "I feel like we took responsible action, in that, we covered the landfill . . . . We capped the landfill and covered the landfill and had monitoring wells associated with the landfill." **[DE 668-12]** J. Seelinger Depo., April 7, 2016 at 265:14-23. Remediation manager Don Bilder confirms that the landfill was

capped. **[DE 668-15]** D. Bilder Depo., Sept. 30, 2015 at 67:19-22. Accordingly, material in the landfill has no relevance to the claims in this case.[3]

Plaintiffs also questioned Seelinger about his time working at Three Mile Island, and his knowledge about the partial nuclear meltdown that occurred at that facility. Three Mile Island has nothing to do with this case. Any attempt by Plaintiffs to raise it at trial would contribute nothing to the resolution of the actual issues of this case, yet would potentially mislead the jury into drawing some unsupported connection between what happened there and Pratt & Whitney's Palm Beach County facility.

In sum, Plaintiffs should be prohibited from eliciting testimony from Mr. Seelinger related to the supposed disposal of radioactive material in the landfill, or to his work at Three Mile Island.

## II. The Court Should Exclude Any Evidence Regarding Alleged Water Transport or Contamination.

The primary issue in dispute is whether contamination from Pratt & Whitney caused a cancer cluster in the Acreage community that impacted property values. Plaintiffs only theory for how Pratt & Whitney allegedly contaminated the Acreage is centered on a baseless soil trucking theory. Plaintiffs have not provided (and cannot provide) any evidence that contaminants were transported to the Acreage by water, leached into the water supply in the Acreage from fill soil, or caused anyone to develop brain cancer through water exposure.

Any evidence or argument about water transportation, contamination, or exposure is therefore irrelevant to Plaintiffs' theory of the case and should be exclude. Excluding such evidence is particularly important because the complexity that surrounds water transport, the interaction of contaminated soil and groundwater, or water exposure will require a confusing mini-trial implicating otherwise irrelevant expert testimony and evidence. This can only serve to prejudice Pratt & Whitney and distract the jury.

### A. Evidence or Argument Regarding Water Transportation Should Be Excluded

Plaintiffs have disclaimed any reliance on water transport, and have made clear they are not offering an expert witness to address water transport. *See* Plaintiff's Response to *Daubert* Motion to Exclude Moore [DE 611] at p. 10 ("Moore Is Not Proposing That Contaminants

---

[3] Further, as Seelinger testified, Pratt & Whitney installed groundwater monitoring wells around the landfill, so groundwater contamination is not an issue. Moreover, as set out in this Motion, Plaintiffs do not allege any migration of materials to the Acreage through groundwater and have no fact or expert witness suggesting any transport of contaminants through groundwater.

7

Travelled By Air Or Water From UTC To The Acreage"); *see also* **[DE 668-16]** Jan. 11, 2018 Class Certification Hearing Tr., Volume 4, 115:17-117:7 (Plaintiffs' expert Marco Kaltofen admits he does not offer any opinion of water or air transport of contaminant sources from Pratt & Whitney to proposed class area because surface water transport and air transport models "don't necessarily reflect the facts on the ground."). Pratt & Whitney, on the other hand, has proffered the unrebutted expert testimony of Dr. Thomas M. Missimer that the contaminants cited by Plaintiffs "could not travel long distances in groundwater." [DE 372-1] at p. 26; *see also id*. at pp. 2-3, 25-28. As a result, this Court should exclude any evidence or argument (1) about the fact that Pratt & Whitney and the Acreage share an aquifer, and (2) insinuating that contaminants could travel via groundwater (including an aquifer) or surface water from Pratt & Whitney to the Acreage.

      **B.**     **Evidence or Argument Regarding Contamination of Groundwater Via Soil.**

Plaintiffs have speculated at various times during this litigation that their water may have had radioactive contamination in it. This, of course, is at odds with their theory that alleged radioactive contamination from Pratt & Whitney was transported by *soil*, not water. Plaintiffs may try to bridge this gap by suggested that radioactive contamination from soil could leach into their groundwater, as their radiological expert casually did without analysis.

Plaintiffs should not be permitted to do so. They have provided no expert testimony from a hydrogeologist, or hydrogeological analysis, regarding the ability of radioactive materials to leach from the soil into groundwater. Pratt & Whitney, however, did put forth an opinion from a hydrogeologist on the subject. Dr. Missimer explained that even if Plaintiffs had radioactive contamination in their soil, it would be unlikely to leach into their groundwater. **[DE 668-17]** (Jan. 30, 2017 T. Missimer Rpt. at 15). Thus, any suggestion from Plaintiffs that radionuclides could leach into their groundwater would be based on speculation, not hydrogeologic evidence, and would therefore risk misleading the jury.

      **C.**     **Test Results of Well Water (or Well Water Residue) Should Be Excluded.**

Plaintiffs obtained test results from samples of well water and supposed well water residue from things like pipe and toilet scale. These results are irrelevant for several reasons. First, they are disconnected from Plaintiffs' actual theory: that contaminated soil caused the cancer cluster that decreased their property values. Again, Plaintiffs have failed to offer competent expert testimony suggesting that test results from well water or well water residue could be the result of

8

soil contamination. Second, no expert, including Dr. Kaltofen, has suggested that actual water samples, as opposed to water residue samples, reflect contamination. Third, even according to Plaintiffs own expert, only a single water residue sample showed a barely elevated level of the actual radioisotope at issue in this case—Thorium-230. [DE 328, Case 10-cv-80883] at 14. And even setting aside the fact that that one result is unreliable and in no way reflective of actual contamination,[4] it is certainly not reflective of widespread contamination that could cause a cancer cluster.

The only purpose of Plaintiffs raising test results from well water or well water residue is to distract the jury from their fundamental lack of proof of any method by which residents of the Acreage could have actually been exposed to the contamination they allege existed in soil. Allowing such evidence will waste valuable judicial resources, increase the complexity of the case, and could only serve to prejudice Pratt & Whitney by confusing the jury with an irrelevant theory. *See* Fed. R. Evid. 403.

### III.   Evidence or argument regarding soil and soil transport

Plaintiffs allege that contaminated soil was trucked from Pratt & Whitney to the Acreage. But all the evidence suggests that, to the contrary, the soil that left Pratt & Whitney all went to its intended destinations, such as the Magnum facility that treated and cleaned contaminated soil. To try to bridge this gap, Plaintiffs have introduced and pursued numerous conspiratorial theories. They are without foundation, and should therefore be kept from the jury.

#### A.   William Brow Testimony about Asbestos and Padula Trucking

During discovery, Plaintiffs deposed a "secret witness" that was supposed to support their trucking theory—William Brow. But at his deposition, it became clear that he had no knowledge relevant to this case. Mr. Brow testified that around 1986-1988 he worked as a truck driver and hauled materials from Pratt &Whitney on a total of three occasions. **[DE 668-18]** W. Brow Depo., March 8, 2018 at 9:11-23, 18:5-7. He claims that on one of those three occasions, he was told by a Pratt & Whitney employee that he was hauling away "asbestos" material that had been used as insulation. *Id.* at 27:18-28:3. Critically, Brow testified that he never hauled anything from Pratt & Whitney to the Acreage, and that on all three occasions he took the material to the "Dyer dump"

---

[4] As but one example of the indicia of unreliability for this one sample, it was tested two additional times, and both tests showed normal, expected levels of Thorium-230. *Pinares v. United Tech. Corp.*, Case No.: 10-80883-CIV-MARRA [DE 322-12] at 164:8-21.

(the former landfill that is now Dyer Park on 45th Street in West Palm Beach). *Id.* at 29:23-30:4, 33:8-14, 54:2-11.

This testimony is irrelevant. It has nothing to do with soil—or *anything*—being dumped in the Acreage. Plaintiffs may point to Mr. Brow's speculation that the materials he dumped *outside* the Acreage could have somehow had an effect on the Acreage. But Mr. Brow admits that he has no personal knowledge to support his speculation, has no knowledge of the protections in place at the Dyer landfill, and has no training regarding the transportation of contaminants through water. *Id.* at 54:17-55:10. As importantly, the supposed contaminant in the materials he disposed of for Pratt & Whitney—asbestos—is not related to this case.

Plaintiffs may also raise Mr. Brow's speculation that he "think[s]" other truck drivers dumped material in the Acreage. *Id.* at 46:1-10. But Brow admitted "I can't prove it. I wasn't there." *Id*. The sole basis for his speculation is that Fred Padula "did a lot of crazy, sneaky stuff back then." *Id.* 46:11-13; *see also* 56:8-13 ("Q. Not just speculation of what might have happened. But have you – do you have any information that's ever been given to you that Fred Padula took anything from Pratt & Whitney and took it to the Acreage? A. No."). Brow admitted his speculation about others' actions lacks the requisite personal knowledge by stating under oath "I have no knowledge of it." *Id.* at 59:18-23.

Allowing the jury to hear Brow's testimony regarding dumping three loads of insulation allegedly containing asbestos into the Dyer landfill in 1986-1988 would result in a "mini-trial" about the irrelevance of asbestos, water contamination, and various non-parties. Brow's testimony is not relevant to Plaintiffs' sole theory that soil contaminated by Thorium-230 was transported from Pratt & Whitney to the Acreage. Accordingly, all evidence or argument regarding William Brow should be excluded.

**B.     Testimony about the "Powerline Road" Should Be Excluded.**

The Court should also exclude any argument or speculative testimony suggesting that contaminated soil was trucked out of a secret exit out the back of Pratt & Whitney, through the Corbett, along a trail under the powerlines, and to the Acreage. Plaintiffs have made such a suggestion during this litigation, implying that there was some secret exfiltration of soil through the woods. But there is no evidentiary basis for the assertion. And in fact, there is ample evidence refuting it.

10

Several witnesses have testified that soil was not trucked through the Corbett on a "powerline road." Former Pratt & Whitney employee William Richards testified that all trucks, including those carrying contaminated soil, went out Pratt & Whitney's main gate and were sent to the appropriate treatment facility. **[DE 668-19]** W. Richards Depo., Feb. 23, 2016 at 159:14-18, 160:5-12. Perry Williams—a Pratt & Whitney contractor—also testified that trucks carrying soil out of Pratt & Whitney used the hard top cement roads through the gates leading to Beeline Highway. (**[DE 668-20]** P. Williams Depo., July 12, 2016 at 114:21-115:7.) Mr. Richards further testified that there is no road linking Pratt & Whitney's property to the Corbett Wildlife Area and that no trucks carrying contaminated soil were ever sent through the roads within the Corbett Wildlife Area. (**[DE 668-19]** W. Richards Depo., Feb. 23, 2016 at 160:13-161:1.) Similarly, Gary Halker, the previous manager of the Facilities Design group, testified that soil was "Never" trucked through the Corbett Wildlife Area. (**[DE 668-21]** G. Halker Depo., March 4, 2016 at 96:7-16, 105:16-19.) Pratt & Whitney sub-contractor Frank Trujillo also confirmed that soil was not trucked through the Corbett. (**[DE 668-22]** F. Trujillo Sept. 7, 2016 Depo., at 124:20-24.) *See also* **[DE 668-23]** F. Trujillo Depo., Jan. 3, 2018 at 16:20-17:7, 17:23-18:1.

Witnesses have further testified that it would be impossible to truck soil through the Corbett. Mr. Halker explained that the dirt trail near the southern border of Pratt & Whitney's property underneath the power lines are "under water most of the time" and it would extremely difficult, if not impossible, to drive a dump truck through that area. (*Id.* at 96:20-97:5.) Perry Williams accordingly testified that a "buggy barely fits down it. And there's swamp on each side of it. So if you're asking me, do I think a truck loaded with fill dirt or any amount of weight would make it down that road?· No, sir." (**[DE 668-20]** P. Williams Depo., July 12, 2016 at 113:22-114:18.)

There is no evidence soil left Pratt & Whitney's facility other than through the front gates. There is no evidence that roads through the Corbett Wildlife Area were ever used by Pratt & Whitney, let alone that they were used to carry contaminated soil in sufficient quantities to contaminate the Acreage neighborhood miles away. Accordingly, any speculative evidence or argument relating to this baseless conspiracy should be excluded.

### C. Testimony of Former Deputy Schultetus

The Court should also exclude any evidence or argument from or about Palm Beach County Sheriff's Deputy Layne Schultetus. Years ago, Plaintiffs obtained an affidavit from Schultetus that said the following:

> a former (now deceased) employee of Pratt & Whitney who informed me that soil and barrels of waste were leaving Pratt & Whitney facility located on Beeline road at night, ostensibly to be treated at this [remediation] facility. . . . Based upon some information that had been provided to me by the confidential informant mentioned above, I became aware that some of the waste removed from the Pratt &Whitney [sic] location was mixed with soil at the Indian Lakes cite [sic] [an undeveloped area in Jupiter] and then transported to the Acreage as fill.

**([DE 668-24]** L. Schultetus Depo., Feb. 3, 2017, Ex. 2.) Mr. Schutletus's subsequent testimony, however, confirmed two key problems with this affidavit: (1) it was drafted by Plaintiffs' counsel and (2) it included multiple errors. (*Id.* at 126:11-13, 127:13-128:10.) Mr. Schultetus' "knowledge" is both unreliable and irrelevant, and therefore should be excluded from this case.

Mr. Schultetus' testimony is unreliable because it is based not on his own personal knowledge, but on inadmissible hearsay from an undisclosed "confidential informant." Plaintiffs may claim that such hearsay is admissible as an admission of a party opponent, since Mr. Schultetus claims that the "informant" was a Pratt & Whitney employee. But Plaintiffs bear the burden of showing that that is actually true, and they have not done so. *United States v. Kennard*, 472 F.3d 851, 856 (11th Cir. 2006). Even if the so-called informant really did tell Mr. Schultetus that he or she was a former Pratt & Whitney employee, that does not mean he or she *actually was*. Plaintiffs also have not shown, or even alleged, that this supposed informant was a Pratt & Whitney employee at the time he or she made these alleged statements to Mr. Schultetus, as he or she must have been in order for this to be an admission of a party opponent. Finally, Mr. Schultetus refused to provide the name of the alleged confidential informant, and thus his or her status as a Pratt & Whitney employee cannot be evaluated. (*Id.* at 58:4-12.)

Even setting to one side the unreliability of Mr. Schultetus' testimony, it is irrelevant, for at least two reasons. First, his claims about supposed dumping in the Indian Lakes Estates is not related to Pratt & Whitney, except by his raw speculation. Schultetus testified in deposition that the purported confidential informant was speculating that the trucks he saw leaving Pratt & Whitney were the same trucks dumping soil in the neighborhood known as Indian Lakes Estates. **([DE 668-25]** L. Schutletus Depo., Feb. 3, 2017 at 72:1-10.) Schultetus admitted that he "never

found out" if Pratt & Whitney actually dumped soil in the Indian Lakes Estates neighborhood and described his belief that material went from Pratt & Whiney to Indian Lakes Estates neighborhood as "my speculation." (*Id.* at 74:21-75:5, 81:1-9, 85:8-13, 150:10-17.) Second, Mr. Schultetus' testimony has no evidentiary connection to the Acreage. His testimony made clear that he had the mistaken belief that Indian Lakes Estates, an area several miles north of the Acreage along Indiantown Road, was "within" the Acreage. (*Id.* at 129:5-11, 131:25-132:17.) Thus, even if his unsupported story were true, it had nothing to do with anything being dumped *in the Acreage*.[5]

Plaintiffs have failed to present any information, let alone admissible evidence, to establish that soil from Pratt & Whitney was trucked to the Indian Lakes Estates development, or that soil from that development was ever transported to the Acreage. Whether illegal dumping occurred in the Indian Lakes Estate development by individuals unaffiliated with Pratt & Whitney is irrelevant to Plaintiffs' claims. Accordingly, testimony from or about Mr. Schultetus should be excluded.

### D. Ads Selling Fill Dirt.

Plaintiffs have attempted to develop evidence suggesting that classified ads purporting to sell fill dirt *near* Pratt & Whitney are somehow reflective of dirt *from* Pratt & Whitney being trucked to the Acreage. The evidence they have developed shows no such thing, and should be excluded as irrelevant.

The first ads on which Plaintiffs focus purports to sell fill dirt "next to Pratt & Whitney" or at the "intersection of Pratt & Whitney Road and Beeline Highway." [**DE 668-26**] D. Jarrell Depo., Oct. 16, 2017, Ex. 6; [**DE 668-27**] D. Behringer Depo., April 18, 2018, Ex. 7. On their face, these ads do not suggest that the fill dirt at issue came from Pratt & Whitney, was contaminated, or was trucked to the Acreage. Testimony from those with first-hand knowledge confirms that none of these things are true. Plaintiffs deposed Debra Jarrell, the former owner of Earthworks Recycling, because the phone number on the ad belonged to Earthworks Recycling and one of the ads said "Call […] Larry" (the name of Jarrell's husband). Ms. Jarrell testified that Earthworks Recycling did not do any business with Pratt & Whitney, and said "I have no idea" what the phrase "next to Pratt & Whitney" meant in the ad. **[DE 668-28]** D. Jarrell Depo., Oct. 16, 2017 at 13:19-21; 46:18-23. Moreover, Ms. Jarrell testified that she had no indication that her husband was involved in the sale of contaminated soil. *Id.* at 93:10-21. Moreover, Pratt & Whitney employees

---

[5] Mr. Schultetus did testify that material from a variety of locations other than Pratt & Whitney, including the Acreage, was dumped in the Indian Lakes Estates neighborhood. (*Id.* at 76:19-22, 77:21-78:2.)

have testified that they did not send clean fill offsite because they needed clean fill dirt for projects: "And it was always a matter of, where in hell we going to get the dirt from? Why would we send it somewhere else?" **[DE 668-13]** F. Wildes Depo., May 20, 2016 at 114:20-115:5.

Plaintiffs second ad-based theory comes from hearsay-within-hearsay statements originating from an interrogatory answer of former Plaintiff Tracy Newfield. Ms. Newfield claimed she heard another individual—Pratt & Whitney contractor Perry Williams, who was actually deposed in this case—describe "an ad with UTC's Beeline address on it as a location where fill was being sold. He recalled that when P and L discovered the ad, his father got upset that another contractor on site was selling dirt from the facility at the facility's address on Beeline. The other contractor's name was David, Dave Behringer, and Houston Construction." **[DE 668-29]** D. Behringer Depo., April 18, 2018, Ex. 2.

This theory is problematic, for two main reasons. First, the story is unreliable. It is supported only by Ms. Newfield's out-of-court statements regarding Mr. Williams' out-of-court statements regarding a supposed ad, and his father's out-of-court reaction to that ad. In other words, this is inadmissible hearsay within hearsay within hearsay. Fed. R. Evid. 805 (Hearsay within hearsay statements are only admissible "if each part of the combined statements conforms with an exception to the rule."). These hearsay within hearsay statements are rendered even more unreliable and untrustworthy by the fact that David Behringer testified that his company never placed ads to sell dirt at Pratt & Whitney because it "[n]ever had any dirt." **[DE 668-30]** D. Behringer Depo., April 18, 2018 at 36:17-24; see also *id*. at 39:2-4 ("We were not -- you've asked me a couple times, did I take dirt in and out of Pratt Whitney. And I believe my answers have all been no."); 40:5-6 ("And I'm going to guarantee you one thing, Pratt and Whitney wasn't giving you any passes for dirt.").) Second, this hearsay within hearsay is not relevant to the case, as it is unconnected from Plaintiffs' theory of the case. Mr. Williams' supposed statements about this ad, which may not have even existed, do not in any way suggest that the alleged fill was contaminated, or that it went to the Acreage.

Because these ad-based theories are both unsupported by admissible evidence and irrelevant, they should be excluded from this case.

  **E.**  **Insinuations Regarding Section 1031 Exchange**.

In the Complaint in a related Acreage case (Case No. 17-cv-81288), Plaintiffs' counsel made further allegations about Larry Jarrell, and insinuated that there was some secretive land

14

swap between Larry Jarrell and Pratt & Whitney. **[DE 668-31]** J. Owen Depo., Dec. 22, 2017, Ex. 14, at ¶¶89-92. They allege "in what appears to be a simultaneous transaction" that an entity owned by DiVosta Builders simultaneously sold property (which happened to be *near* Jarrell's business property) to a company called "Blackbird Exchange," and simultaneously purchased property from Pratt & Whitney. Ex. 14, ¶ 92. They further allege "though the land deals appear to have occurred simultaneously, the deeds were filed a day apart and avoided any connectivity in public filings." *Id.*

Plaintiffs present this deal as something nefarious, but it is simply a routine land transaction that Plaintiffs' counsel did not understand. Jack Owen, counsel for DiVosta, testified the deal was a routine "like-kind" exchange in which DiVosta sold one property and replaced it with another property purchased from Pratt & Whitney, as provided for by Section 1031 of the Internal Revenue Code. **[DE 668-32]** J. Owen Depo., Dec. 22, 2017, at 44:12-46:17.  Jarrell had nothing to do with the transaction. *Id*. The DiVosta entity made the exchange because of "investment potential." *Id.* 61:14-18. There was no secret deal between Pratt & Whitney and the DiVosta entity, nor was there anything untoward or conspiratorial in the deal. *Id.* 65:18-24. Most importantly, the deal has nothing to do with soil being trucked to the Acreage.

Argument or evidence related to this transaction is irrelevant, and should therefore be excluded from this trial.

### F. Conjecture Regarding Larry Kusch Should Be Excluded.

The Court should also exclude evidence or argument regarding Plaintiffs' unsupported theory that Larry Kusch, a homebuilder, used soil from Pratt & Whitney as fill for homes in the Acreage. This conjecture is based upon the fact that a trucking company, Tru Trucking, filed liens related to the delivery of fill and other materials to homes in the Acreage on days that it also transported soil from Pratt & Whitney to an environmental treatment facility, called Magnum. Notably, most of the liens relate to delivery of specialty materials, such as shell rock and septic sand, and not just dirt fill. **[DE 668-23]** F. Trujillo Depo., Jan. 3, 2018 at 19:17-26:24. Tru Trucking obtains those materials—including the fill dirt—from specific, particular sources, and none came from Pratt & Whitney. *Id*.

More importantly, the fact that Tru Trucking delivered such materials around the same time that it transported soil out of Pratt & Whitney is irrelevant. Tru Trucking had "about 15" trucks at that time (and access to more contract trucks if needed) that regularly operated different routes to

different destinations on the same day. *Id.* at 18:2-19:1. Accordingly, there is no competent evidence to show, or even support, that the liens on homes in the Acreage are in any way related to the operations of Tru Trucking removing soil from Pratt & Whitney. To the contrary, Frank Trujillo testified that Tru Trucking did not bring soil from Pratt & Whitney intended for Magnum anywhere else; he also pointed out that he was hired by Magnum and would only get paid if the soil was actually delivered to Magnum. *Id.* at 12:8-13:6. Moreover, Mr. Trujillo (who was responsible for dispatching the trucks to their designations) testified that Tru Trucking never took soil from Pratt & Whitney to the Acreage. *Id.* at 14:21-23, 28:3-21. Mr. Trujillo provided the following unrebutted testimony:

> Q  It is true that Tru Trucking recorded charging liens against certain properties for deliveries that were not paid for, right?
> **A  Correct.**
> Q  Did any of the material for any of those charging liens come from Pratt & Whitney? […][6]
> **A  No, sir.**
> Q  And when Tru Trucking was bringing the material from Pratt & Whitney that was destined for Magnum did it bring all that material to Magnum?
> **A  Yes, sir.**

**[DE 668-23]** F. Trujillo Depo., Jan. 3, 2018 at 31:8-20. Plaintiffs' unsupported speculation regarding Larry Kusch and Tru Trucking should be excluded as it is dependent upon the improper stacking of inferences that are not just unsupported, but are contradicted by the actual evidence. *Cooper v. Magic Burgers, LLC*, 6:20-CV-625-PGB-EJK, 2021 WL 2792449, at *2 (M.D. Fla. Apr. 8, 2021) ("Florida courts prohibit the 'stacking' of inferences derived from such circumstantial evidence in civil cases.").

IV.  **Evidence Regarding the Acreage Community Focus Group is Irrelevant**

In this litigation, Plaintiffs have asserted that Pratt & Whitney somehow influenced a local group, the "Acreage Community Focus Group," because a member of the Focus Group had, ten years earlier, been a junior engineer at Pratt & Whitney. The Focus Group is irrelevant to this case, and Plaintiffs' accusations of deception are baseless.

---

[6] The ellipsis denotes an objection for lack of predicate. However, Trujillo had personal knowledge of these issues because he personally dispatched the drivers for Tru Trucking; he never sent a driver to pick up material from Pratt & Whitney for delivery in the Acreage. **[DE 668-23]** F. Trujillo Depo., Jan. 3, 2018 at 28:3-21.

16

The Focus Group was initiated by a local official, Michelle Damone, for the Acreage community to share information and as an information forum when the concerns about an alleged cancer cluster first arose. **[DE 668-33]** M. Damone Depo., Aug. 16, 2012 at 14:18-22. The Focus Group could send suggestions and concerns to the investigating agencies, the Dept. of Health and Dept. of Environmental Protection, but the Focus Group did not direct any part of the investigation. **[DE 668-34]** R. Siedlecki Depo., Dec. 17, 2015 at 102:9-103:1. Plaintiffs' counsel asked a DOH official at the time whether the Focus Group could have influenced DOH regarding whether to do more or less testing, and the answer was "No," that the DOH would conduct the study according to proper protocols. *Id.* at 132:8-19.[7] The Focus Group had no effect on any investigation, did not have subpoena power, and did not influence the government investigations.

Despite that, Plaintiffs assert there was something underhanded in having Andrew Narcus as a member of the Focus Group, because his first job out of college was at Pratt & Whitney. The charge is baseless. Narcus did not conceal his employment; he disclosed it to Michele Damone at the outset as the group was being formed. **[DE 668-33]** M. Damone Depo., Aug. 16, 2012 at 148:13-149:7 & **[DE 668-35]** Depo. Ex. 20. Narcus had left employment with Pratt & Whitney ten years before the cancer cluster story broke. *Id.* Damone asked Narcus to join the Focus Group because he was an engineer and because he had tested his own well, which she saw as a responsible activity. *Id.* at 21:22-22:5. She considered his previous employment at Pratt & Whitney to be an asset, "because I figured people in the focus group would point to Pratt and Whitney . . . I saw it as an asset maybe being able to answer a question . . . ." *Id.* at 36:9-38:25. Narcus did not try to skew the Focus Group either for or against Pratt & Whitney. **[DE 668-36]** A. Narcus Depo., May 21, 2012 at 193:23-194:12.

The inner workings of the Focus Group simply do not matter—it was not an investigating or adjudicating body, so the assertions have no relevance to trial. The Court should exclude Plaintiffs assertions about the Focus Group, Narcus, Damone, and Siedlecki. None is relevant.

## VI. Testimony of Drums in the Corbett Area Should Be Excluded.

Plaintiffs have pointed to local news stories regarding certain metal drums, marked as hazardous waste, laying on the ground adjacent to Pratt & Whitney in the J.W. Corbett Wildlife

---

[7] The former DOH chief of staff is an attorney named Robert Siedlecki. He was an associate at Gunster for a brief time—from May 1999 to 2000—nearly ten years before the Focus Group was formed. *Id.* at 27:8-16. This fact, too, is irrelevant to the case at bar, and should be excluded from argument or testimony.

Management Area (the "Corbett"), and have suggested they evidence contamination. The Court should exclude evidence of the drums in the Corbett, for two primary reasons.

First, and as a threshold matter, even if Plaintiffs' assumptions were true (which they are not), Plaintiffs have no evidence that (1) any soil was actually impacted by whatever material was in those purported drums, (2) that any such assumed (but unproven) contamination had any relation to the type of contamination alleged in this case, and (3) that any supposedly contaminated soil related to these drums was then transported to the Acreage.

Second, and more importantly, the record evidence establishes that the drums were empty drums placed to hold water samples drawn from monitoring wells near the property line between Pratt & Whitney and the Corbett. **[DE 668-19]** W. Richards Depo., Feb. 23, 2016 at 161:2-23. Moreover, these empty drums were only labeled as hazardous waste as a precaution because of Pratt & Whitney's policy to label material as hazardous until it was proven the material was not hazardous. *Id.* at 161:22-23, 163:5.

Thus, any evidence or argument regarding these drums have no connection to Plaintiffs' theory of soil contamination due to Thorium-230 and no connection to Plaintiff's speculation that soil from Pratt & Whitney was trucked and dumped in the Acreage. This evidence should be excluded because it is not relevant and because any probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 402; Fed. R. Evid. 403.

### Conclusion.

In sum, Plaintiffs have, throughout the history of this litigation, put forth theories that are based on nothing more than conjecture. What's worse, these speculative theories are often contradicted by actual, admissible evidence. Allowing Plaintiffs to argue about these theories, or to attempt to develop testimony about them, will serve no legitimate purpose, yet will confuse the jury and prejudice Pratt & Whitney by implying, without support, that there were illegal or illicit activities taking place at its facility or in the Acreage. This Court should therefore prohibit argument or evidence regarding the baseless theories catalogued above.

Dated:  October 22, 2021

Respectfully submitted,

By: /s/ *Gregor J. Schwinghammer*
GUNSTER, YOAKLEY & STEWART, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL  33401
Telephone: (561) 650-0595
Facsimile: (561) 655-5677
GREGOR J. SCHWINGHAMMER, JR.
Florida Bar No. 090158
gschwinghammer@gunster.com
BARBARA BOLTON LITTEN
Florida Bar No. 0091642
blitten@gunster.com

BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL  60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
SEAN W. GALLAGHER
*Pro Hac Vice*
sean.gallagher@bartlitbeck.com
ANDREW C. MacNALLY
*Pro Hac Vice*
andrew.macnally@bartlitbeck.com
DANIEL R. McELROY
*Pro Hac Vice*
daniel.mcelroy@bartlitbeck.com
ALEX L. GRODEN
*Pro Hac Vice*
alex.groden@bartlitbeck.com

***Attorneys for Defendant Raytheon Technologies Corporation (Pratt & Whitney)***