UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO.: 9:13-cv-80928 MARRA**
**(Consolidated Action: Lead Case)**

RICHARD COTROMANO, et al., all on behalf of
themselves and all others similarly situated,

    Plaintiffs,
vs.

RAYTHEON TECHNOLOGIES CORPORATION,
et al,

    Defendants.                          **CASE NO.: 9:13-cv-80928 MARRA**
_____/

**RESPONSE IN OPPOSITION TO DE 671, RAYTHEON'S[1] MOTION IN LIMINE NO. 2
TO PROHIBIT EVIDENCE OR ARGUMENT REGARDING THE SUPPOSED
HEALTH EFFECTS OF ALLEGED CONTAMINATION**

    P&W has it backwards. It is the epidemiological evidence that (i) anchors Plaintiffs' proof that P&W caused the elevated brain cancer incidence that inevitably caused the stigma and (ii) frames the relevance of other causation evidence. As such, the plaintiffs' expert evidence, mischaracterized by P&W, squarely establishes the plausible pathway between the nature of radioisotope environmental contamination alleged and type of brain tumors suffered that here, along with other evidence, grounds the epidemiological causation inference. As its supposed counterevidence, P&W offers the purportedly "unrebutted" opinion of an expert who, in fact, thoroughly self-rebutted on examination at deposition and an entirely fabricated, false conclusion it claims was reached by a scientific study on Thorium-dust inhalation.

    In this property-value-diminution case, Plaintiffs do not need to prove P&W caused any individual case.[2] Rather, Plaintiffs must prove that P&W caused a stigma that reduced their home values. Plaintiffs allege that stigma was caused by the FDOH's public disclosure of a pediatric brain cancer cluster, which followed from the FDOH's discovery of a highly-statistically-significant elevation of female pediatric brain cancers, caused by P&W's contamination of the

---

[1] Defendant Raytheon and its predecessor and related entities are hereinafter referred to as P&W.
[2] As elaborated in Plaintiffs Response in Opposition to DE 670, filed contemporaneously with this response, at 5–8.

1

Acreage. And Plaintiffs' central evidence that P&W's contamination caused that elevation of tumor incidence is epidemiological.

The *Reference Guide on Epidemiology* in the Federal Judicial Center's Reference Manual on Scientific Evidence, relied upon by the Eleventh Circuit, cautions against "confusing the role of epidemiology in proving causation with the issue of the plaintiffs' exposure to the alleged carcinogen and [failing to address] *the evidentiary value of the plaintiffs' evidence of a disease cluster*."[3]

Thus, the epidemiologic proof begins with the plaintiffs' experts' determination that that the incidence numbers are so high compared to background expectations, that a systematic, non-random cause is highly likely;[4] and the "evidentiary value" of that strong "evidence of a disease cluster" then informs the next question: whether it is more likely than not that P&W's contamination of the Acreage is that systematic cause. The *Reference Guide on Epidemiology*,[5] case law,[6] and even P&W's statistical expert Dr. Marais,[7] all recognize the validity of considering a range of criteria, such as the Bradford Hill criteria,[8] in making such a causation inference.

One of those criteria is often expressed as "biological plausibility" in the context of the causal connection between an individual exposure and disease response.[9] In the broader context of the connection between a putative contamination source and disease cluster, that criterion extends to assessment of the plausibility of links in the causal chain beyond the strictly biological. In an article on causality she cites in both her reports, Dr. Dominici notes the Bradford Hill criteria are part of a common approach by scientists using epidemiological

---

[3] Michael D. Green et al., *Reference Guide on Epidemiology*, in Reference Manual on Scientific Evidence 561 n.34 (Federal Judicial Center, 3d ed.2011) (emphasis added) (relied upon by Eleventh Circuit in *McClain v. Metabolife Intern., Inc*., 401 F.3d 1233, 1239 (11th Cir. 2005) (citing second edition)).

[4] Initial Report of Francesca Dominici, Ph.D., December 22, 2017, DE 550-95, at 2; Reply of Francesca Dominici, Ph.D., in Rebuttal to Marais Report of February 12, 2018, DE 550-95, at 1, 3, and 12.

[5] *Reference Guide on Epidemiology*, at 600.

[6] *See, e.g., Jones v. Novartis Pharmaceuticals Corp*., 235 F.Supp.3d 1244, 1268 (N.D. Ala. 2017) ("While the Eleventh Circuit has not yet directly commented on the Bradford Hill criteria, the reliability of the methodology is strengthened by the number of other circuit courts and district courts within this Circuit who have approved of an expert's use of the criteria. Furthermore, the Third Restatement of Torts states that if an association is found between a substance and a disease, 'epidemiologists use a number of factors (commonly known as the 'Hill guidelines') for evaluating whether that association is causal or spurious.' Restatement, § 28 cmt. c(3).").

[7] Deposition of M. Laurentius Marais, Ph.D., May 1, 2018, DE 607-7, at 39:2–20 and 45:19 to 46:23.

[8] Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc.Royal Soc'y Med. 295 (1965) (identifying nine factors for consideration in causal inference).

[9] *Reference Guide to Epidemiology*, at 600.

evidence but identifies more-recent advances in methodology categorized as "causal inference methods" or "causal analysis techniques,"[10] which she employs in her analysis here.[11] But her method still also includes plausibility assessment, referenced in her reports. For example, "an incidence of tumors being particularly elevated in brain tissue compared to other sites *plausibly* may be caused by environmental contamination, based on" published data or reports establishing pediatric brain cancer latency periods, and frequency of brain tumors compared to other cancer types and ionizing radiation as the "primary scientifically-verified environmental cause of brain tumors."[12] And "the plaintiff and other experts have provided evidence regarding biologically *plausible* exposure pathways and mechanisms of exposure . . . ."[13]

In sum, once overwhelming evidence indicates a systematic, not-random cause, further causal inference may recognize an overwhelmingly most-plausible systematic source, as Dr. Dominici has done, finding that factual information supplied by reports "across a wide range of fields points to UTC's contaminating activities as the cause of elevated female brain cancer risk in the Acreage."[14]

Moreover, because it is alleged and evidence supports that (i) exposure may have occurred years after the initial Acreage contamination event and in multiple possible locations through multiple means, (ii) tumor onset may have occurred years after exposure, with a further delay to diagnosis, and (iii) soil and water testing occurs even more years later in very limited quantities and narrow locations,[15] there is neither an epidemiological requirement that such tests identify the exact source of contamination, nor an assumption that any discovered contaminant levels reflect the levels that were present many years earlier, undiminished.

---

[10] Dominici, F., & Zigler, C. (2017), *Best practices for gauging evidence of causality in air pollution epidemiology. American Journal of Epidemiology*, 186(12), 1303-1309.
[11] Dominici initial report, DE 550-95, at 2–3; Dominici Reply to Marais, DE 550-95, at 1–2.
[12] Dominici initial report, DE 550-95, at 6 (emphasis added).
[13] Dominici reply to Marais, DE 550-95, at 2 (emphasis added).
[14] *Id.* at 12.
[15] See Dominici initial report, DE 550-95, at 4–6.

**I.  P&W ignores the exposure-pathway evidence presented by Plaintiffs and falsely claims Plaintiffs lack expert testimony that ionizing radiation "poses any risk of harm"**

In the second sentence, P&W claims Plaintiffs lack evidence that "*any level* of radioactive contamination when *merely present* in one's soil or water is capable of causing brain cancer." Motion at 1 (emphasis added). But Plaintiffs have not alleged that the contamination was "merely present" in their environment; rather the Acreage children came into the contact with it. P&W cannot be claiming, for instance, that a load of radioisotope-contaminated dirt dumped in residential area is not capable of ultimately causing brain cancer in children who shortly thereafter play in and ingest some of that dirt—no matter how high the concentration and radioactivity of the contaminants. Implicitly conceding the overbreadth of its initial assertion, P&W softens its claims in the ensuing argument, now asserting "[t]he presence of chemicals in one's environment—or even the actual ingestion of chemicals—does not *necessarily* pose a health risk" and "mere exposure to low levels of radioactivity in our environment does not *necessarily* pose a health risk . . . ." Motion at 1–2 (emphasis added), citing *McClain v. Metabolife Int'l, Inc.*,[16] which dealt with chemical, not radioactive, toxins and allegations of personal injury requiring individual case proof. Thus, P&W admits that the chemicals in one's environment and low levels of radioactivity may pose a health risk.

Moreover, P&W falsely asserts that "Plaintiffs have no admissible expert testimony suggesting that the *type or* amount of supposed contamination they claim to have detected in the Acreage poses any risk of brain cancer." Motion at 3 (emphasis added). The reports of Drs. Perry and Kaltofen demonstrate that claim to be false as to types of contamination. Dr. Kaltofen has identified contamination in the form of radioisotopes that emit ionizing radiation,[17] and Dr. Perry has confirmed ionizing radiation—even low-level ionizing radiation to be a potential cause of brain cancer.[18] And the specific amounts detected in limited-locus, years-hence tests should not be presumed to cap the assessment of amounts plausibly present earlier or elsewhere.

---

[16] 401 F.3d 1233 (11th Cir. 2005).
[17] See section II, below.
[18] *Id.*

**II.     Plaintiffs' experts Perry and Kaltofen establish the nature of contaminants present and risk for the type of brain cancers that support the epidemiological inference that P&W caused the female pediatric brain cancer cluster**.

P&W's assertion that Dr. Perry cannot "offer an opinion linking radiological contamination in the Acreage to brain cancer," Motion at 2, again, has things backwards. P&W ignores the causal framework determined by the initial epidemiological conclusion that the highly-statistically-significant SIR for the 2004–09 female pediatric brain cluster very likely has a systematic, nonrandom cause. And Perry's opinions indeed provide causal *links* that support the further epidemiological inference that, more likely than not, P&W is that systematic cause. Dr. Sharon Watkins, Ph.D., noted in the 2009 Acreage Cancer Review that "ionizing radiation is the primary environmental risk factor for increasing pediatric brain cancer" referencing studies regarding external irradiation.[19] Dr. Perry confirmed that each tumor in this litigation is a glioma, associated with this general link.[20]

Further, while Dr. Kaltofen indeed has indicated he cannot opine on the "medical cause" of the tumors here, Motion at 2, he has identified types and levels of radioactive contamination at the P&W site and the Acreage sufficient to make highly-plausible the conclusion that P&W is the systematic, nonrandom cause of the cluster. Kaltofen discovered Th-230 in the scrapyard above levels expected in Florida, as high as 3.22 pCi/g, while .87 pCi/g might be expected.[21] He found corresponding contamination at UTC and Acreage case homes and Tru Trucking homes. Kaltofen's opinions are unrebutted.[22] For example, Kaltofen opines on a sample of fill from the DeCarlo home which contained large pieces of scrap metal and high amounts of Sr90 and other radionuclides that are similar to the results at UTC.[23]  This sample has never been rebutted.

**III.    P&W falsely claims a scientific study found that exposure to high levels of inhaled radioactive thorium dust particles did not induce increased incidence of brain tumors.**

As its purported example that the literature "contradicts [the] . . . causal connection Plaintiffs allege," P&W says its expert, Dr. Mitchell, has cited "a study of miners who experienced

---

[19] DE 550-19, p. 17, highlighting added; DE 550- 21:137:08-23.
[20] DE 550-26, pp. 5-6, par. 16-20.
[21] DE 550-70, as to radionuclides: p 20, 32, 99-100, as to Benzo(a)pyrene:16,34,56,71,72,73,74  regarding UTC's own testing: 71, regarding FDEP testing 73.  FDEP summary of results in letter filed by UTC as 544-23, p. 34.
[22] DE 550-70 pp. 20,32,34,99-100 re Th230; 33,35,40,70,76,91 re DeCarlo, 43,44, re Dunsford; 40 re Cotromano (Sarette).
[23] DE 550-70, pp. 34-35 and DE 550-76.

'continual exposure to high levels of inhaled radioactive thorium dust particles' and *yet did not have increased incidences of brain tumors*." Motion at 3 (emphasis added). False.

P&W is completely misrepresenting what its own expert said about the study, and the context in which it was raised. Mitchell's report included both a response to Ari Perry's opinion regarding general causation and a criticism response to William Sawyer's opinions as to specific causation and some of the cancers within that cluster. Mitchell's "example" is as follows

> *Several of the references cited within the Sawyer report also substantiate the improbability of such a mechanism.* In the study by Chen et al., titled "Health effects following long-term exposure to thorium dusts: a twenty year follow up study in China" a large cohort of miners with documented continual exposure to high levels of inhaled radioactive thorium dust particles was examined for increased incidence of cancer. *Sawyer notes* "The study further revealed significant lung cancer mortality rates at nearly four times higher in the miners as compared to the control population." It is notable that in this cohort of patients with documented chronic inhalation exposure to elevated environmental radioactive thorium (Th232), only an increase in lung cancers (the organ in direct contact with an inhalation exposure) *has been reported*. No increased incidences of brain tumors or other cancers *has been reported* in this cohort of high environmental radiation exposure subjects after more than 20 years of follow-up data that has been reported in the literature.[24]

To begin with, and as discussed in greater detail below, Mitchell never cited the study at all, he simply responded to the citation as it was raised within the dose-response relationship assessment performed by Plaintiff's dose toxicologist William Sawyer—an assessment this Court eliminated upon P&W's motion. Critically, Mitchell never provided his own opinion as to the relationship between the amount of thorium in the cancer victim's tissue, he simply criticized the assessment that Sawyer did. As discussed later below, raising this citation as part of Mitchell's allegedly "unrebutted opinion" is problematic: It is utterly without predicate and is incomplete; or, it opens the door for the Plaintiff to admit Sawyer's dose-response relationship in rebuttal.

But moreover, the study ("Chen study")[25] never addresses brain tumors anywhere, at all. And there is nothing, zero, from which to infer anything about brain tumor incidence in the study population. It simply was not anything that the study was looking at because it specifically

---

[24] DE 671-06 at 7 (emphasis added).
[25] X.A. Chen, et al., *Health effects following long-term exposure to thorium dusts: a twenty-year follow-up study in China*, 39:4 Radioprotection 525–33 ((Oct.–Dec. 2004), available at https://www.radioprotection.org/articles/radiopro/abs/2004/04/rad200312/rad200312.html (last visited 11/19/21).

addressed lung-burned data. As such, Mitchell does not say that brain tumor incidence is not increased, only that such an increase is not reported. Though, unlike P&W, Mitchell has not made a completely-false statement, his implication—that brain tumor increase is not reported because it does not exist—is highly misleading. Moreover, such an inference is completely unwarranted given both the article's actual description of the study and its findings and its epidemiological context.

As the article's opening abstract explains, the study's purpose was to "investigate possible health effects in [thorium-containing dust]-exposed miners" by using a certain "measurement system to estimate the miner's thorium *lung burden*" and an epidemiological study of "the *lung cancer* mortality of the dust-exposed miners."[26] The article relates that a new technique for estimating the amount of thorium in lungs—the "negative high voltage exhaled thoron progeny measurement system"—had been developed at the Argonne National Laboratory in the U.S. in 1982.[27] The following year, 1983, scientists at the study site, the Bayun Obo Rare-earth Mine[28] in China, began collecting Thorium lung-burden data from the dust-exposed miners and non-exposed workers, as a control.[29] It is not surprising that researchers would focus on comparing lung-burden data with lung-cancer data, to which the article states the epidemiological study was limited.

Reading his characterization of the study most charitably, Mitchell may intend to imply that any substantial increase in brain-tumor incidence of the study population surely would be noticed and reported. But, even if focused scientific-research articles did typically fulfill such a catch-all reporting function, the inference is not warranted.

The epidemiological context completely undercuts Mitchell's apparent inference about brain cancer incidence. The researchers' epidemiology study did not examine all lung cancer incidence but only the smaller subset of lung cancer mortality.[30] And the studied population was not large in epidemiological terms—3,091 dust-exposed miners, whose lung-cancer mortality data was collected for a period of approximately 24 years.[31] Thus, though incidence exceeded the

---

[26] Chen study, at 525.
[27] *Id*. at 526.
[28] The Chinese name of the inner Mongolian mining town for which the mine is named is sometimes also spelled "Baiyun-Obo," "Baiyun'ebo," or "Haiyun Obo," using the English alphabet.
[29] Chen study, at 526.
[30] *Id*. at 528–29.
[31] *Id*. at 526, 529.

expected total by more than six-fold, the total number of observed deaths was just 27.[32] Moreover, lung cancer mortality is much higher than brain cancer mortality. In China presently, mortality from lung cancer mortality is reported to be around 17.5 times higher than from brain cancer.[33] If a similar ratio were applicable to the 1977–March 2001 study period, then, even if brain cancer mortality was just as elevated above expected rates as was lung cancer mortality, there would only be around 1 to 2 brain cancer deaths for that 24-year period.[34] Not an unavoidable alarm bell that would compel brain cancer mortality to be added to any article addressing another type of cancer at Bayun Obo.

Thus, not only did the Chen study say nothing about brain cancer incidence (or mortality)—contrary to P&W's false assertion—but there is no rational reason to infer anything about brain cancer from the study, or from the absence of other published articles or reports on the Bayun Obo miner population addressing brain cancer.

Finally, it is improper for P&W to have even introduced this portion of Mitchell's report in its present argument. Mitchell's discussion of the Chen study is entirely in response to Dr. Sawyer's use of its findings in his earlier report. And Plaintiffs have now been precluded from using Dr. Sawyer as an expert.

As noted in the Plaintiff's Response regarding P&W's Motion to Preclude Certain Opinions regarding Radiation Safety Office Michael Gossman (which is a late Daubert motion as discussed therein), P&W's argument regarding which regulations were at issue in 2000 tacitly acknowledges that by 2013, the NRC changed its regulations of general license holders, restricting the amount that could be held because of concerns that the industry was exposing workers to small amounts of dispersible amounts of thorium and uranium dusts without regard to the cancer-causing dangers of relatively low-dose dust exposures. This fact directly supported the dose-response relationship assessment that Sawyer performed, and that Mitchell merely responded to.

---

[32] *Id.* at 529.

[33] Lung cancer mortality in China was estimated to be 28.02 per 100,000 in 2015. Shugeng Gao, M.D.*, et al*, Lung *Cancer in People's Republic of China*, 15:10 J. Thoracic Oncology, 1566–76 (Oct. I, 2020), available at https://www.jto.org/article/S1556-0864(20)30375-0/fulltext (last visited 11/19/21). And the mortality rate for brain cancer was estimated to be 1.6 per 100,000 in 2013. Bin Jiang, *et al*., Mortality due to primary brain tumours in *China and detection rate in people with suspected symptoms: a nationally representative cross-sectional survey*, 19:71 World J. Surgical Oncology 6 (2021), available at https://wjso.biomedcentral.com/articles/10.1186/s12957-021-02179-5 (last visited 11/19/21). That yields a lung-cancer-mortality/brain-cancer-mortality ratio of 17.5.

[34] Dividing the observed lung cancer mortality for the dust-exposed miners, 27 cases, by the lung/brain cancer mortality ratio of 17.5 gives an estimate of 1.54 brain cancer cases.

As noted in the response regarding Gossman, the Court eliminated the radiological dose opinions of Bernd Franke, and then eliminated Sawyer because the Court noted that at the hearing Plaintiffs had conceded that Sawyer relied on Franke's dose. In a subsequent motion for rehearing, before the transcript of the hearing was available, Plaintiffs noted that any such admission was made in error. Sawyer did not rely on Franke's radiological dose, but instead performed a dose-response assessment by using the amount of thorium in an Acreage cluster victim's Cerebral Spinal column as a dose and assessing that in the manner of a toxicologist, performing each of the steps required for such an assessment. Since then, the Plaintiffs have obtained the transcript and despite P&W's argument otherwise, Plaintiffs did not admit that Sawyer relied on Franke. Sawyer simply can neither calculate nor utilize a radiation dose. He used a toxicological dose assessment. When asked if Sawyer relied on Franke, the answer was no, Sawyer did not even have the radiation dose when he provided the toxicological dose-response assessment. See Exhibit 1, Transcript of the Daubert hearing: 116:21-25 and 121:16-129: 06.

Sawyer did, however, respond to the criticism note from Mitchell's Responsive Report, the one that P&W is not attempting to claim was Mitchell's original and unrebutted opinion, noting that Mitchell's implication regarding the study, attempting to present a study that was not reporting about brain cancer as one which could intimate that brain cancer was not occurring, was a "dangerous" misrepresentation. By raising Mitchell's response now, when Plaintiffs cannot rebut it, P&W has arguably opened the door.

### IV. P&W's claim it has "unrebutted evidence that the low levels of radioactive materials detected in Plaintiffs' soil samples could not cause brain cancer," is both irrelevant and false.

Again, Plaintiffs do not need to have found the specific site of the strongest concentration of contaminants that existed years, at the time of individual exposures, in the Acreage, and it should not be assumed that any recently-detected contaminant levels mirror levels from years earlier, undispersed and undiminished.[35]

Moreover, the claim that Dr. Mitchell's assertions are unrebutted completely ignores his concessions in his deposition testimony, as comprehensively outlined in Plaintiffs' *Daubert*

---

[35] See note 15, above, and accompanying text.

challenge,[36] and unsupported assertions demonstrated above. For instance, Mitchell asserts that his conclusion from the Bayun Obo miners study combined "with the improbability of the particle described in the Santiago report of being capable of crossing the BBB" to yield his finding of "no credible evidence of a link of causation in this case of malignant brain tumor to thorium particles."[37] But, as demonstrated above, the conclusion Mitchell draws from the Chen study is simply wrong, and in his deposition testimony, he receded from the claim that particles of the size at issue could not possibly cross the blood-brain barrier (BBB).[38]

Finally, Mitchell's reports had inaccurately depicted the cancers in what Mitchell acknowledges to be the FDOH pediatric brain cancer cluster to be too various to share any common cause. But his deposition and recent research yielded his recognition of what is commonly accepted in his field: that these are all glioma and that there is a causal association between all glioma and radiation exposure such as discussed in the Ron study and in studies on CT scan exposure.[39]

## CONCLUSION

For the foregoing reasons, the motion should be denied.

---

[36] Plaintiffs' Mitchell *Daubert* motion, DE 605; Plaintiffs Mitchell *Daubert* reply, DE-622.
[37] 2/20/18 Mitchell *Santiago* Report, DE 671-6, at 5.
[38] As detailed in the *Daubert* motion:

> In his testimony, Mitchell admitted that cerebral spinal fluid is in direct contact with ependymal cells and which, in this case, transformed to malignant cells. He stated that "CSF does circulate with brain tissue. And so it is feasible for substances that are put into the CSF to make it to other parts of brain tissue. But the distribution and the penetration can often times be very limited. With regard to whether the intrusion could have occurred, Mitchell testified in deposition "if a particle were to get across the blood CSF barrier, could it make it to blood -- I'm sorry, brain tissues, the answer would be yes."

DE 605, at 15 (citing Deposition of Duane A. Mitchell, M.D., May 9, 2018, DE 605-4, at 23:2–5 and 24:14–20).
[39] Testimony of Duane Mitchel, May 9, 2018, DE 605-1, at 26:19-27:09, 29:20-3; 36:12-37:02, 40:24-41:15, 80:13-81:18.

WHEREFORE, UTC's motion should be DENIED.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of November 2021, I electronically filed the foregoing Cotromano Plaintiffs' Statement of Facts in Opposition to UTC's Incorporated Statement of Facts in DE 498 Motion for Summary Judgment with the Clerk of the Court using CM/ECF.

s/ Mara R. P. Hatfield
MARA R. P. HATFIELD
Florida Bar No.: 37053
Attorney E-Mails: mrh@searcylaw.com
And dbotero@searcylaw.com
Primary E-Mail:
_hatfieldteam@searcylaw.com

**Searcy Denney Scarola Barnhart & Shipley, P.A.**
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 383-9539

*Attorneys for Cotromano and subsequent Plaintiffs*